## Declaration of Bradley D. Grinage, M.D.
## Pursuant to 28 U.S.C. Section 1746

I, Bradley D. Grinage, M.D., hereby verify and declare and follows:

1.      I am a medical doctor with a specialty in psychiatry. I was a chemistry major at the University of Kansas and after that went to the University of Kansas Medical School. I was at that time active duty in the United States Air Force and completed a four year residency program in San Antonio, Texas, in adult psychiatry. After that, I completed a year long fellowship in forensic psychiatry at the University of Missouri. I was involved with the development of the forensic program at the University of Kansas and taught the complement of residents in psychiatry at the University hospital. Following, I worked as a psychiatrist with the Veteran's Administration. At the same time, I have developed and maintained a clinical and forensic practice in which I consult and perform evaluations for courts and for specific forensic purposes. It was in that capacity I was retained by trial counsel for Edward Fields in 2005.

2.      I was in my early development as a testifying witness at that time, as my private clinical practice was rather new. The Fields case was my first capital case in either the state or federal courts. Although I felt completely competent regarding the psychiatric aspects of my participation in this, I believe that I needed extra preparation by counsel because of my relative forensic experience in this forum.

3.      I have been contacted by Mr. Fields' current counsel and asked to review my

1

(MON)MAR 29 2010  8:10/ST.  8:08/No. 7500000743  P  2

FROM LAWRENCE C800

report from 2005 and my trial testimony. Current counsel have also provided me with documents that were not given to me by trial counsel, including the transcript of Mr. Fields' "change of plea," Dr. Gelbort's report, Dr. Price's report, medical records for "Baby Boy Fields," Preliminary Psychosocial Assessment and a declaration by Mr. Fields' sister. They have also provided me with the Halstead-Reitan report of Mr. Fields' mother (which did not exist at the time of trial). Trial counsel only provided me Dr. Gelbort's raw neuropsychological and psychological data, the interpretation of which I am not expert.

4.    I have now reviewed all of the materials noted in the previous paragraph. I can confirm my diagnosis of Mr. Fields as a man with Bipolar I Disorder with Psychotic Features. I also confirm that a disease presentation such as Mr. Fields could be negatively affected by treatment with the wrong medication, in this instance, venlafaxine (Effexor). I also remain firm in my opinion that Mr. Fields is not a malingerer – he was not lying about his symptoms for any secondary gain before the offense or after the offense. It should be noted, however, that the additional record information as to his brain damage would be important to any further assessment of his mental status. It is highly likely that he has frontal lobe impairment that would affect his bipolar behavior and treatment.

5.    What was very problematic in my review of the records is the aura of confusion that clouded my testimony. The only lawyer with whom I had any contact from Mr. Fields' defense team was Julia O'Connell. I met also with Isaiah Gant only for an initial

2

consultation. I was contacted rather close in time to the trial, which has not been the norm even in my relatively brief forensic experience. Our preparation time for the testimony was short, as I recall, and only right before I testified. Counsel appeared to be overextended.

6.      Lamentably, I was not made aware of two important sources of information prior to my testimony. The first was the "change of plea" colloquy and the other is the report by the government's expert witness, Dr. Price.

7.      The particulars of the change of plea colloquy were not made known to me at the time I was called to the witness stand and asked to testify as to my assessment and evaluation; I have now been provided the actual transcript. With the terms and conditions of that legal proceeding not available to me, my testimony suffered. This is especially true as the question posed was not one of legal "insanity" but rather a question of Mr. Fields' impairments at the time of the killings. Without prior assessment of the medico-legal terms of art in the change of plea proceeding, particularly the concept of premeditation and deliberation, I was not prompted by counsel in a way to clearly discuss the terms and to draw the distinction between legal responsibility (insanity) and impairment that constitutes mental health mitigation for sentencing purposes. This should have been made clear for the jury. Thus, I stated to the jury " [m]y testimony is that the time he had a psychotic disorder that influenced his behavior, not his thought process. And deliberation really is a thought process issue. You know, what I can say to you is that's not part of my

3

(MON)MAR 29 2010  9:11/ST.  9:08/No. 7500000743 P  4          FROM LAWRENCE CBOC

evaluation. I did not evaluate him cognitively. What I evaluated was – what I was asked to evaluate was emotional condition that might have affected his ability to control his behavior." Not having the "change of plea" colloquy from counsel grossly affected my overall assessment and how I could have presented my opinions on Mr. Fields' diagnosis and overall mental health status to the jury. With the appropriate materials from counsel I could have been more proactive in clarifying the nature and the impact of Mr. Fields' condition as it relates to the penalty phase trial that was taking place. At a minimum, the missing plea transcript left my testimony highly vulnerable to cross examination and this did not have to occur. If I had the transcript of the change of plea, I would have been able to respond to the questions presented on cross examination.

8.    Not having the report from Dr. Price also left my testimony highly vulnerable to cross examination. Knowing what the prosecution had with regards to MH assessment would have helped me prepare. I don't believe I had any document (or idea) that anyone was thinking of a personality disorder (or malingering). The records I had were historical and in overwhelming fashion, consistent. When I evaluated him he was on Lithium and an antipsychotic medication. There had been a diagnosis of schizoaffective disorder by a doctor who had him under relatively long term observation since he had been in custody. Mr. Fields symptoms were markedly overlapping and seemingly progressive over time. Had I been aware of Dr. Price's findings and opinions I could have assisted counsel in developing

4

FROM LAWRENCE CBOC

a presentation that effectively differentiated the personality diagnoses with the diagnoses of schizoaffective disorder and Bipolar I Disorder with Psychotic Features. Like the Anti-Social Personality Disorder or Narcissism, analogously, Mr. Fields met all the criteria for a primary sleep disorder,

eating disorder, sexual disorder, attention deficit disorder etc. However, none of these are appropriate diagnoses because they all are accounted for and are excluded based on his bipolar (schizoaffective) state.

9.    Also, the Dr. Price report calls his auditory hallucinations malingering (although he did not put that on Axis I it is in his report).   Malingering is ultimately a diagnosis of exclusion (where you exclude all other possible diagnoses.) Had I had notice of the Dr. Price findings and opinion, I could have been better prepared for cross examination on this important point. Based on my review of his report, Dr. Price did not exclude other diagnoses but came to his conclusion in a simple conclusory way. Likewise, a finding that Mr. Fields mood problems were "dysthymia" is problematic and unique when: 1. his primary care provider documented "voices" prior to any

potential secondary gain; 2. he had prior documentation of a major depression; 3. the jail had been treating him for a psychotic schizoaffective disorder; 4. and he was noted to markedly improve on Lithium.

10.    From looking at my report, I note that as part of the request for consultation,

5

I was asked to make "detailed findings including factors in the defendant's background, record or character or other circumstance of the offense that may mitigate against imposition of the death penalty." I understand that this question encompasses my assessment of life history and social history and presentation of extant mitigation facts to the jury consistent with my expertise and experience as a psychiatrist. At the time of trial, I reviewed a document called the "Preliminary Psychosocial Assessment" which was prepared by an investigator working with defense counsel. From my review of that document, reviewing my report and in reviewing the declaration of Mr. Fields' sister, it is clear that there were many aspects of Mr. Fields' family history which are pertinent to mitigation in a capital case. However, counsel did not ask me about any of these facts and factors while I was testifying. Nor did we prepare my testimony to cover these facts in any sort of comprehensive manner. Whether it was through me or another witness who was capable of providing a thorough family and social history-compelling testimony about the mitigation present in Mr. Fields' social history could have been presented. It is axiomatic that collateral history is critical in assessing and presenting a complete picture of the patient/defendant as I seek to explain his mental state at the time of the incident, and it should have been presented in Mr. Fields' case.

11.    At the time of trial, I was provided only with the raw data from Dr. Gelbort's neuropsychological testing. I have since been able to review his report and the report from

6

Dr. Price. I also have been made aware that recent additional follow-up testing has been conducted by Dr. Daniel Martell. As noted above, I am not expert in the interpretation of psychological test data, and, as most psychiatrists, I rely on reports written by psychologists to provide such interpretation. These reports then become part of my overall psychiatric opinion. From what I now understand Mr. Fields is impaired in the frontal lobes of his brain. Based on what I understand that was found by Dr. Martell, Mr. Fields was moderately impaired at the time of trial and now is severely impaired with some kind of degenerative or progressive neurological disease. If I had been presented with the information that I now have about Mr. Fields' organic dysfunction and had I been asked to consider his "cognition" – which, as the excerpt from my testimony above shows I was not asked to consider – I would have testified that his organic brain damage, focused in his frontal lobes, is a mitigating factor.

12.    The frontal lobes of the brain are central for humans to "be human." In other words, it is with the frontal lobes – which are by far the largest parts of the human brain- that humans plan, control impulses, weigh options, deliberate and consider consequence. At the time of trial, all which was given to me was Dr. Gelbort's raw data, and that was not critical to my final opinion. However, his expert interpretive findings are very important and would have been important for my testimony. This is so for a number of reasons. The presence of such organic deficits could have explained some of his behaviors that the

7

prosecution portrayed as the product of his psychopathy. Additionally, there were several times when I was asked on the witness stand about the process of diagnosing a person who presents with multiple symptoms. The answer remains that one has to weigh each symptom with all the other symptoms in order to reach conclusions to a degree of psychiatric certainty. In this case, based on a number of treatment plans over his life which had failed, the manner of Mr. Fields' response to the psychopharmacology regimen he began to receive while in prison prior to the trial, his mother's history of brain damage, his own birth trauma the evidence of organic brain damage could have been offered as a factor that exacerbated the bipolar disease from which Mr. Fields suffers.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Bradley D. Grinage, M.D.

Dated:    Lawrence, Kansas
          March 29, 2010

8