## DECLARATION OF R. ROBERT TRESSEL
## PURSUANT TO 28 U.S.C. § 1746

I, R. Robert Tressel, do hereby declare and affirm as follows:

1.    My name is R. Robert Tressel. I am a forensic investigation specialist with extensive training and experience in homicide investigation, crime scene reconstruction and death scene processing. I worked for the Medical Examiner's Office for Cobb County, Georgia for thirteen years and the Cobb County Police Department for twelve years. I have studied crime scene investigation at the Georgia Police Academy and other training programs around the country, and also have served as an instructor in many crime scene investigation training programs. I have been retained as an expert by both the defense and the prosecution. I have been qualified numerous times in federal and state courts as an expert in homicide investigation, crime scene reconstruction and death processing, and have testified on a wide range of issues, including lividity patterns, blood staining and blood spatter patterns.

2.    I have been retained on behalf of Edward Fields, Jr. by the Capital Habeas Unit of the Federal Community Defender Office for the Eastern District of Pennsylvania. I have been asked by Mr. Fields' counsel to review and analyze certain crime scene and forensic matters relating to the homicides of Charles and Shirley Chick at the Winding Stair Campground in the Ouachita National Forest or about July 10, 2003. In particular, I have been asked to evaluate (1) when the driver's side window of the Chicks' van was broken relative to when Mrs. Chick was shot; (2) whether Mr. Chick's body was moved after he was shot and, if so, when his body was moved relative to when he was shot; and (3) whether Mr. Chick's wounds were the source of high velocity blood spatter observed on Mrs. Chick's face and hands.

1

3.    In performing my evaluation, I reviewed a large number of documents provided to me by Mr. Fields' counsel, including but not limited to autopsy and toxicology reports; trial testimony; law enforcement investigative and criminalistics examination reports; crime scene photographs; morgue and autopsy photographs; and stained clothing photographs.

4.    With regard to the driver's side window of the Chicks' van, after reviewing the materials provided to me, it is my conclusion that this window was broken a short time – probably an hour or less – after Mrs. Chick was shot.   My conclusion is based on the following facts.

5.    Agent Iris Dalley, who helped process the crime scene, testified that, when she arrived at the campsite, the driver's side window of the Chicks' van was broken and fragments of glass consistent with that broken window were scattered about the front compartment of the van. According to Agent Dalley, Government's Exhibit 43 depicts the area around the front passenger door of the Chicks' van.  A number of glass fragments in the well of the passenger side door are visible in Government's Exhibit 43.  Several of these fragments appear to be resting on what Agent Dalley describes as a pool of dried blood.

6.    Agent Dalley's report of her processing of the crime scene indicates that the glass fragments in question were not collected as evidence.  Her report also does not describe the condition of the glass fragments she observed in the van.  Based on my knowledge of police procedures, had Agent Dalley observed anything significant about the glass fragments, she would have recorded that information in her report.  This leads me to believe that either Agent Dalley did not conduct a physical examination of the fragments or she examined them and did not observe anything significant.

2

7. Because Agent Dalley did not collect the glass fragments in question and preserve them as evidence, I was not able to physically examine them.

8. Although I was not able to conduct a physical examination of the glass fragments in question, the materials I reviewed included a crime scene photograph that was not admitted into evidence depicting a close-up view of the well of the passenger side door. In this photograph, a red stripe consistent with blood is clearly visible on one of the glass fragments resting on the dried blood pool.

9. The presence of blood on this particular glass fragment indicates that it landed on the blood pooled in the well of the passenger side door when that blood was still viscous. While it is not possible to determine precisely how long this pool of blood was viscous, given the cool mountain temperatures on the evening of the offense (indicated by the fact that the Chicks were wearing sweatshirts and long pants when they were shot), the blood likely was dry at least an hour after Mrs. Chick was shot.

10. I am aware that Agent Dalley testified that the glass fragments on top of the dried pool depicted in Government's Exhibit 43 were not stained with blood, although she did not explain how she determined that they were in that condition. I am also aware that Agent Dalley testified that, because these fragments lacked any blood stains, they must have landed on the blood after it had dried, which she estimates would have been at least an hour after Mrs. Chick was shot. I am further aware that, based on these facts, the government argued that the driver's window of the van was broken at least an hour after Mrs. Chick was shot.

11. Agent Dalley's testimony and the government's argument were inconsistent with the fact that at least one of the glass fragments had a red stripe consistent with blood. The fact

3

that at least one fragment of glass had blood on it indicates that the driver's window was broken before the pooled blood dried.

12.    Even if some glass fragments resting on top of the dried blood lacked any blood staining, this does not indicate that the driver's window was broken after the blood dried. Agent Dalley testified that the front passenger door was closed when she arrived at the scene and that she opened the door to view the van's interior. It was not until after Agent Dalley opened this door that she discovered the glass fragments on the pool of dried blood. It is likely that some of these glass fragments fell onto the dried blood as a result of movement caused when Agent Dalley opened the front passenger door. This is corroborated by the fact that, in Government's Exhibit 43, a small whitish square object consistent with a glass fragment is visible lying on the pavement directly below the open passenger door. The presence of a glass fragment outside of the van confirms the fact that some glass fragments were disturbed and moved when Agent Dalley opened the front passenger door.

13.    With regard to the position of Mr. Chick's body, after reviewing the materials provided to me, it is my conclusion that Mr. Chick was moved from the picnic table to the ground after he was shot. My conclusion is based on the following facts.

14.    According to the testimony of Agent Dalley and crime scene photographs: (1) Mr. Chick's body was found lying in a prone position beside a picnic table; (2) his sweatshirt was partly pulled up over his back and his right foot was bare; (3) his bare foot had abrasions or cuts around the tops of some toes; and (4) blood was found pooled on the top surface of a picnic table. Based on these and other facts, it appears that Mr. Chick was shot while seated at the picnic table and his body was subsequently moved to the location where it was found.

4

15. With regard to when Mr. Chick's body was moved, after reviewing the materials provided to me, it is my conclusion that his body was moved within a relatively short time – as soon as one hour or less – after he was shot. My conclusion is based on the following facts.

16. First, when Mr. Chick's body was found, much of his right hand was covered with dried blood. Pine needles and other debris from the ground appear to be embedded in this dried blood. If Mr. Chick had been moved from the picnic table to the ground much more than an hour after he was shot, the blood on his hand would have been dry and would not have picked up this quantity of debris from the ground. Mr. Chick's body must have been moved while the blood on his hand was viscous or tacky in order to pick up this debris.

17. Second, crime scene photographs indicate that a significant volume of blood pooled on the ground around Mr. Chick's head. Post-mortem blood flow to this extent likely would not have occurred if Mr. Chick's body had been moved many hours after he was shot, particularly since his blood would have congealed more quickly in the relatively cool evening air.

18. Third, some lividity patterns on Mr. Chick's body are consistent with the position in which he was found.

19. Lividity is a discoloration of the skin caused by the settling of blood in the capillaries due to gravity. It does not occur in areas of the body that are in contact with the ground or another object. Lividity becomes "fixed," or unchangeable, within four to six hours after death, although lividity can be fixed is less time in colder temperatures.

20. Autopsy photographs of Mr. Chick's torso and thighs indicate that lividity became fixed while he was lying on the ground and not while sitting on the picnic table bench. Mr. Chick was discovered lying face down with his left arm under his chest, which had the effect of

5

slightly elevating his right side. The autopsy photographs indicate that lividity was present on Mr. Chick's left side, right abdomen, and right top thigh. These lividity patterns are consistent with the position in which Mr. Chick was found.

21. Crime scene and autopsy photographs of Mr. Chick's feet also indicate that lividity became fixed while he was lying on the ground and not while sitting on the picnic table bench. These photographs do not indicate any significant pooling of blood in Mr. Chick's feet and ankles, as would be expected if lividity had become fixed while he was sitting on the picnic table bench. Moreover, crime scene photographs indicate that, when Mr. Chick's body was found, the tops of his toes were pressed onto the ground. In these photographs, the bottom of his toes and the ball of his foot – which were not in contact with the ground or any object – show lividity. Autopsy photographs indicate no lividity on the tops of his toes, which were pressed onto the ground. This lividity pattern is consistent with the position in which Mr. Chick's foot was found.

22. My conclusion is consistent with rigor mortis present in Mr. Chick's body. Rigor mortis, or stiffening of the muscles, fully develops in six to twelve hours after death. Although rigor can be broken under some circumstances, it generally does not reestablish itself. An investigator from the medical examiner's office noted that Mr. Chick's body showed full rigor at 8:25 p.m. the day after the homicides. At that time, Mr. Chick's body was in a prone position inconsistent with being seated at the picnic table. It is likely, then, that rigor established itself in Mr. Chick's body while he was lying prone on the ground and not while seated at the picnic table.

6

23.    I am aware that Dr. DiStephano and Agent Dalley testified that, based on livor patterns, Mr. Chick was moved more than six hours after he was shot. It does appear that the livor observed on the back of Mr. Chick's thighs is not consistent with lividity becoming fixed while Mr. Chick was lying on the ground. However, the livor on the back of Mr. Chick's thighs also is inconsistent with the conclusions of Dr. DiStephano and Agent Dalley because that livor appears to extend circumferentially around much of Mr. Chick's thighs, which is not the pattern that settling blood would be expected to make. At best, then, lividity patterns on Mr. Chick's body are inconclusive in establishing when Mr. Chick's body was moved.

24.    Moreover, the conclusions of Dr. DiStephano and Agent Dalley are inconsistent with the fact that (1) ground debris attached itself to the blood on Mr. Chick's right hand; (2) a significant volume of blood flowed out of Mr. Chick's head and onto the ground after he was moved; and (3) Mr. Chick's body shows fixed lividity consistent with the position in which his body was found. While it is not possible to determine precisely when Mr. Chick was moved, it had to be before the blood on his right hand dried, the blood in his body congealed, and lividity became fully fixed. The debris on Mr. Chick's hand alone indicates that he was moved less than an hour after he was shot.

25.    With regard to the high velocity blood spatter observed on Mrs. Chick's face and hands, after reviewing the materials provided to me, it is my opinion that, while it cannot be determined conclusively whether that the source of that spatter was Mr. Chick's wound, there is a likelihood that Mrs. Chick's own wounds were the source of the spatter.

26.    Dr. DiStephano testified that high velocity blood spatter was observed on Mrs. Chick's face – particularly her left cheek – and hands. High velocity blood spatter can be caused

7

by either an entrance or exit wound. The materials I reviewed indicate that this high velocity blood spatter was not tested to determine whether the blood was Mr. Chick's blood.

27.     Mrs. Chick was shot twice in the head. One shot was to the back of her head, with no associated exit wound. Another shot was to the left frontal region of her head, with an associated partial exit wound. The autopsy report indicates that this exit wound was caused by either a bone or bullet fragment. Either of the wounds caused by the shot to the left frontal region of her head could have caused high velocity blood spatter that landed on her face and, depending on their position at the time of the shot, her hands.

28.     I am aware that Dr. DiStephano and Agent Dalley testified that high velocity blood spatter can be recognized on an object after traveling up to around about two feet from its source. I also am aware that the government argued that this meant Mrs. Chick was within two feet of Mr. Chick when he was shot and that she was spattered with his blood. While this may have been the case, it is equally plausible that the source of the high velocity blood spatter observed on Mrs. Chick's face – specifically the spatter on her left cheek – and hands was the wound to the left frontal region of her own head.

29.     I was not retained by trial counsel for Mr. Fields, but the conclusions that I offer in this affidavit could have been offered by me or any competent forensic crime scene expert at the time of Mr. Field's trial. All of the opinions expressed in this affidavit are to a reasonable degree of scientific and forensic certainty.

8

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury pursuant to 28 U.S.C.A. 1746.

R. Robert Tressel

Dated: March 31, 2010
Hiram, Georgia

9