UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

_____

UNITED STATES OF AMERICA,

       Respondent,

    -v-

EDWARD LEON FIELDS, JR.,

       Petitioner.

_____

:
:
:
:
:
:
:
:
:
:
:
:
:

CIV-10-115-RAW

CAPITAL 2255 PROCEEDINGS

HONORABLE RONALD A. WHITE

**PETITIONER'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR RELIEF
PURSUANT TO 28 U.S.C. SECTION 2255 OR IN THE
ALTERNATIVE PURSUANT TO 28 U.S.C. SECTION 2241**

Michael Wiseman
Chief, Capital Habeas Corpus Unit
Cristi Charpentier
Assistant Federal Defender
Federal Community Defender
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, Pennsylvania 19106
215-928-0520
Michael_Wiseman@fd.org
Cristi_Charpentier@fd.org

Counsel for Petitioner
Edward Leon Fields

Dated:  July 30, 2010
       Philadelphia, PA

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STANDARD OF REVIEW OF CLAIMS OF
INEFFECTIVE ASSISTANCE OF COUNSEL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

GROUND ONE

      THE SIXTH AMENDMENT WAS VIOLATED WHEN TRIAL COUNSEL INEFFECTIVELY
      INVESTIGATED, PRESENTED AND ARGUED MITIGATING MENTAL HEALTH EVIDENCE.
      THE EIGHTH AMENDMENT WAS VIOLATED WHEN THE JURY SENTENCED MR. FIELDS
      TO DEATH WITHOUT HAVING FOUND AND GIVEN MITIGATING EFFECT TO
      UNCONTESTED MENTAL HEALTH-RELATED MITIGATING EVIDENCE. . . . . . . . . . . . . . . . . 4

      A.      Trial Counsel Ineffectively Failed to Argue that Mr. Fields' Uncontested Mental
            Illness Was Mitigating and Failed to Request Instructions to That Effect . . . . . . . 6

            1.      The Evidence the Defense Presented to the Jury Regarding Mr. Fields'
                  Mental Health Impairments and Trial Counsel's Limited Argument on the
                  Mitigating Effect of Only a Portion of That Evidence. . . . . . . . . . . . . . . . . 7

            2.      Trial Counsel's Ineffective Assistance. . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                  a.      Deficient performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                  b.      Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

            3.      The Jury's Death Verdict Violated the Eighth Amendment Because the Jury
                  did not Find Uncontested and Important Mitigating Evidence. . . . . . . . . . 15

      B.      Trial Counsel Were Ineffective for Failing to Investigate and Present Evidence of
            Mr. Fields' Organic Brain Damage. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

            1.      The Defense's Inadequate Efforts to Develop and Present
                  Neuropsychological Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

            2.      The Organic Brain Damage Evidence That Trial Counsel Never Presented
                  and the Misleading Testimony of Dr. Randall Price. . . . . . . . . . . . . . . . . 18

            3.      Trial Counsel's Ineffective Assistance. . . . . . . . . . . . . . . . . . . . . . . . . . . 19

i

a. Deficient performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

b. Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

C. Trial Counsel Ineffectively Failed to Investigate and Present Local Medical Professionals Who Would Have Supported the Manic Flip Defense and Testified that Mr. Fields' Mental Illness was Genuine, Not Malingered.. . . . . . . 24

1. The Government's Claims of Malingering and the Treating Medical Professionals Who Would Have Rebutted Those Charges. . . . . . . . . . . 25

2. Trial Counsel's Ineffective Assistance.. . . . . . . . . . . . . . . . . . . . . . . . . 26

a. Deficient performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

b. Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

D. Trial Counsel Were Ineffective for Eliciting Damaging Testimony During the Cross-Examination of Dr. Price. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

1. The Direct and Cross-Examination Testimony of Dr. Price. . . . . . . . . . . 29

2. Trial Counsel's Ineffective Assistance.. . . . . . . . . . . . . . . . . . . . . . . . . 30

a. Deficient performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

b. Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

E. Trial Counsel Were Ineffective for Failing to Investigate and Present Evidence of Compulsive Aggression in Effexor Patients. . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

1. Mr. Fields' Effexor Defense and Uninvestigated Evidence of Effexor-Related Compulsive Aggression.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

2. Trial Counsel's Ineffective Assistance.. . . . . . . . . . . . . . . . . . . . . . . . . 37

a. Deficient performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

b. Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

ii

G.     Trial Counsel Ineffectively Failed to Adequately Prepare the Two Mental Health Experts Who Testified for the Defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

       1.     Deficient Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

       2.     Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

GROUND TWO

THE EIGHTH AMENDMENT AND INTERNATIONAL LAW BAR MR. FIELDS' EXECUTION BECAUSE HE IS NOT COMPETENT TO BE EXECUTED AND BECAUSE THE DEATH PENALTY IS PRECLUDED BY HIS DETERIORATING MENTAL HEALTH . . . . . . . . . . . . . . . . 42

A.     Mr. Fields Will not be Competent to be Executed.. . . . . . . . . . . . . . . . . . . . . . 42

B.     Mr. Fields' Execution is Precluded by his Mental Illness. . . . . . . . . . . . . . . . . . 42

C.     Ripeness. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

GROUND THREE

THE SIXTH AMENDMENT WAS VIOLATED BECAUSE TRIAL COUNSEL INEFFECTIVELY FAILED TO INVESTIGATE, PRESENT AND ARGUE EVIDENCE THAT WOULD HAVE REBUTTED THE SUBSTANTIAL PLANNING AND MENTAL ANGUISH AGGRAVATING FACTORS, AND THE FIFTH AMENDMENT WAS VIOLATED BECAUSE THE GOVERNMENT PRESENTED FALSE AND MISLEADING TESTIMONY AND ARGUMENT TO SUPPORT THE SUBSTANTIAL PLANNING AGGRAVATING FACTOR . . . . . . . . . . . . . . . . . . . . . . . . . . 46

A.     The Substantial Planning Aggravating Factor. . . . . . . . . . . . . . . . . . . . . . . . . 48

       1.     The Government's Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

       2.     The Rebuttal Evidence That the Defense Never Presented. . . . . . . . . . . 49

             a.     Evidence that Mr. Fields did not shoot the Chicks after substantial planning. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

             b.     Evidence that Mr. Fields did not stage a robbery many hours after the shootings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

B.      The Mental Anguish Aggravating Factor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

     1.      The Government's Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

     2.      The Rebuttal Evidence That the Defense Never Presented. . . . . . . . . . . 53

C.      Trial Counsel's Ineffective Assistance.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

     1.      Deficient Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

     2.      Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

D.      The Government's Due Process Violations.. . . . . . . . . . . . . . . . . . . . . . . . . . . 56

     1.      False and Misleading Testimony and Argument About a Purportedly Staged Robbery. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

     2.      Misleading Testimony and False and Misleading Argument About Mr. Fields' Purported "Alibi". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

     3.      The False and Misleading Testimony and Argument Could Have Affected the Judgment of the Jury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

GROUND FOUR

THE SIXTH AMENDMENT WAS VIOLATED BECAUSE TRIAL COUNSEL INEFFECTIVELY FAILED TO PRESENT MR. FIELDS' SOCIAL HISTORY THROUGH THE TESTIMONY OF A MITIGATION SPECIALIST OR MENTAL HEALTH EXPERT AND TO ARGUE THAT SOCIAL HISTORY AS A MITIGATING FACTOR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

A.      The Incomplete and Misleading Evidence of Mr. Fields' Family Background that the Jury Heard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

B.      Mr. Fields' full – But Unpresented – Social History Shows Significant and Mitigating Family Dysfunction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

C.      Trial Counsel's Ineffective Assistance.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

     1.      Deficient Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

     2.      Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

GROUND FIVE

MR. FIELDS WAS DENIED HIS RIGHT TO INDIVIDUALIZED SENTENCING, DUE PROCESS, A FAIR TRIAL AND THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL BECAUSE THE GOVERNMENT'S CLOSING WAS RIFE WITH IMPROPER ARGUMENT, MOST OF WHICH WAS NOT OBJECTED TO BY TRIAL COUNSEL, AND APPELLATE COUNSEL FAILED TO RAISE THIS ISSUE ON DIRECT APPEAL. . . . . . . . . . . . . . . . . . . . . . . 71

A. The Government's Closing Arguments Were Rife with Improper Conduct, Denying Mr. Fields' Rights Under the Fifth and Eighth Amendments. . . . . . . . . . . . . . . . 74

    1. Improper Arguments Regarding the Weighing of Aggravating Factors and Mitigating Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

    2. Improper Arguments Regarding Mr. Fields' Mental Health. . . . . . . . . . . 78

    3. Improper Arguments Designed to Inflame the Passions and Prejudices of the Jury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

    4. Improper Invocation of Biblical Authority in Support of a Sentence of Death . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

B. Individually and Cumulatively, These Errors Rendered Mr. Fields' Trial Fundamentally Unfair and Substantially Prejudiced his Eighth Amendment Rights to Individualized Sentencing and a Death Sentence That is not Arbitrary and Capricious. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

C. Trial Counsel Were Ineffective for Failure to Object and Preserve These Issues at Trial, and Appellate Counsel Were Ineffective for Failure to Raise These Instances of Prosecutorial Misconduct on Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

    1. Deficient Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

    2. Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

GROUND SIX

TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO INSTRUCTIONS AND A VERDICT FORM THAT ALLOWED THE JURY TO APPROVE A GENERAL VERDICT OF DEATH BASED ON THE COMBINED WEIGHING OF AGGRAVATING FACTORS APPLICABLE TO TWO SEPARATE MURDER COUNTS................................ 90

    A.    The Unified Weighing Process and General Death Verdict. ................. 91

    B.    Trial Counsel's Ineffective Assistance................................... 95

GROUND SEVEN

THE GOVERNMENT WITHHELD EXCULPATORY, MATERIAL EVIDENCE FROM THE DEFENSE IN VIOLATION OF DUE PROCESS, AND TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT EXCULPATORY EVIDENCE.............. 100

    A.    Effexor Pill Bottle. ............................................... 100

    B.    Emails and Documents from Mr. Fields' Computers. ..................... 106

GROUND EIGHT

THE CUMULATIVE IMPACT OF ALL THESE ERRORS DENIED MR. FIELDS DUE PROCESS, EFFECTIVE ASSISTANCE OF COUNSEL AND A RELIABLE SENTENCING HEARING........................................................... 106

GROUND NINE

THE MANNER OF MR. FIELDS' EXECUTION, IF CARRIED OUT, WOULD VIOLATE THE EIGHTH AMENDMENT.............................................. 109

CONCLUSION. ............................................. 110

# TABLE OF AUTHORITIES

## FEDERAL CASES

Abdul-Kabir v. Quarterman, 550 U.S. 233 (2007) ................................................................ 102

Anderson v. Sirmons, 476 F.3d 1131 (10th Cir. 2007) ........................................................ 4, 73

Antwine v. Delo, 54 F.3d 1357 (8th Cir. 1995) ........................................................ 10, 21, 41

Armstrong v. Dugger, 833 F.2d 1420 (11th Cir. 1987) ........................................................ 20

Atkins v. Virginia, 536 U.S. 304 (2002) ........................................................ 44, 45

Banks v. Dretke, 540 U.S. 668 (2004) ........................................................ 103

Battenfield v. Gibson, 236 F.3d 1215 (10th Cir. 2001) ........................................................ 57

Baxter v. Thomas, 45 F.3d 1501 (11th Cir. 1995) ........................................................ 21

Bean v. Calderon, 163 F.3d 1073 (9th Cir. 1998) ........................................................ 20, 21, 73

Bell v. Cone, 129 S. Ct. 1769 (2009) ........................................................ 105, 107, 108

Ben-Sholom v. Ayers, 566 F. Supp. 2d 1053 (E.D. Ca. 2008) ........................................................ 10, 13

Berger v. United States, 295 U.S. 78 (1935) ........................................................ 74, 85

Berryman v. Morton, 100 F.3d 1089 (1996) ........................................................ 31, 110

Blanco v. Singletary, 943 F.2d 1477 (11th Cir. 1991) ........................................................ 10, 20

Bland v. Sirmons, 459 F.3d 999 (10th Cir. 2006) ........................................................ 80, 90

Bloom v. Calderon, 132 F.3d 1267 (9th Cir. 1997) ........................................................ 41

Bobby v. Van Hook, 130 S. Ct. 13 (2009) ........................................................ 2

Boyde v. California, 494 U.S. 370 (1990) ........................................................ 9, 15, 102

Brady v. Maryland, 373 U.S. 83 (1963) ........................................................ 103

Brewer v. Aiken, 935 F.2d 850 (7th Cir. 1991) ........................................................ 21

Brewer v. Quarterman, 550 U.S. 286 (2007) ........................................................ 10, 11

Caldwell v. Mississippi, 472 U.S. 320 (1985) ........................................................ 75

Callins v. Collins, 510 U.S. 1141 (1994) ..................................................... 80

Cargle v. Mullin, 317 F.3d 1196 (10th Cir. 2003) ................................. 29, 74, passim

Chambers v. Mississippi, 410 U.S. 284 (1973) ..................................... 23, 28

City of Greenwood v. Peacock, 384 U.S. 808 (1966) ............................. 83

Claudio v. Scully, 982 F.2d 798 (2d Cir. 1992) ..................................... 92

Coble v. Quarterman, 496 F.3d 430 (5th Cir. 2007) ............................. 10

Cone v. Bell, 89 F. Supp. 2d 922 (M.D. Tenn. 2000) ............................. 19

Crane v. Kentucky, 476 U.S. 683 (1986) ............................................... 24, 28

Cunningham v. Zant, 928 F.2d 1006 (11th Cir. 1991) ........................... 87

Delap v. Dugger, 890 F.2d 285 (11th Cir. 1989) ................................. 10

Deutscher v. Whitley, 884 F.2d 1152 (9th Cir. 1989) ........................... 81

Donnelly v. DeChristoforo, 416 U.S. 637 (1974) ................................. 75

Douglas v. Workman, 560 F.3d 1156 (10th Cir. 2009) ....................... 75, 82, 83

Draughon v. Dretke, 427 F.3d 286 (5th Cir. 2005) ............................... 56

Eddings v. Oklahoma, 455 U.S. 104 (1982) ......................................... 4, 9, passim

Eze v. Senkowski, 321 F.3d 110 (2d Cir. 2003) ................................... 14, 22, 29

Ford v. Wainwright, 477 U.S. 399 (1986) ............................................. 43

Freeman v. Class, 95 F.3d 639 (8th Cir. 1996) ..................................... 31

Gersten v. Senkowski, 426 F.3d 588 (2d Cir. 2005) ............................. 56

Giglio v. United States, 405 U.S. 150 (1972) ....................................... 62, 103, 104

Glenn v. Tate, 71 F.3d 1204 (6th Cir. 1995) ......................................... 21, 24, passim

Godfrey v. Georgia, 446 U.S. 420 (1980) ............................................. 78, 81, passim

Green v. Johnson, 2006 WL 3746138, at 21 (E.D. Va. Dec. 15, 2006) .... 34

Gregg v. Georgia, 428 U.S. 153 (1976) ............................................... 16, 43, passim

Harries v. Bell, 417 F.3d 631 (6th Cir. 2005) ............................................................. 57

Harris by and Through Ramseyer v. Blodgett, 853 F. Supp. 1239
(W.D. Wash. 1994) ....................................................................................................... 10

Harris v. Wood, 64 F.3d 1432 (9th Cir. 1995) ........................................................... 110

Hertz Corp. v. Friend, 130 S. Ct. 1181 (2010) ........................................................... 83

Hitchcock v. Dugger, 481 U.S. 393 (1987) ....................................................... 4, 10, 78

Hooks v. Workman, 606 F.3d 715 (10th Cir. 2010) .................................................... 75

Hooper v. Mullin, 314 F.3d 1162 (10th Cir. 2002) ......................................... 31, 32, 35

Jackson v. Brown, 513 F.3d 1057 (9th Cir. 2006) ..................................................... 108

Jackson v. Herring, 42 F.3d 1350 (11th Cir. 1995) .................................................... 69

Jacobs v. Horn, 395 F.3d 92 (3d Cir. 2005) ............................................................... 21

Jurek v. Texas, 428 U.S. 262 (1976) .......................................................................... 12

Kenley v. Armontrout, 937 F.2d 1298 (8th Cir. 1991) ............................................... 21

Kimmelman v. Morrison, 477 U.S. 365 (1986) .......................................................... 92

Kubat v. Thieret, 867 F.2d 351 (7th Cir. 1989) ................................................. 23, 110

Kyles v. Whitley, 514 U.S. 419 (1995) .......................................... 64, 103, passim

Le v. Mullin, 311 F.3d 1002 (10th Cir. 2002) ................................... 75, 80, passim

Lesko v. Lehman, 925 F.2d 1527 (3d Cir. 1991) ............................................. 75, 110

Lewis v. Jeffers, 497 U.S. 764 (1990) ........................................................................ 15

Lockett v. Anderson, 230 F.3d 695 (5th Cir. 2000) .................................................... 20

Lockett v. Ohio, 438 U.S. 586 (1978) ........................................................ 4, 16, passim

Lockhart v. Warden, Maine State Prison, Slip Copy, 2010 WL 610708, 7
(D. Me. Feb. 19, 2010) ............................................................................................... 38

Lowenfield v. Phelps, 484 U.S. 231 (1988)   47

Mahorney v. Wallman, 917 F.2d 469 (10th Cir. 1990) ................................... 76, 79, 90

Mak v. Blodgett, 970 F.2d 614 (9th Cir. 1992) ........................................... 110, 111

Mann v. Dugger, 844 F.2d 1446 (11th Cir. 1988) ........................................... 90

Mason v. Hanks, 97 F.3d 887 (7th Cir. 1996) ........................................... 92

Matire v. Wainwright, 811 F.2d 1430 (11th Cir. 1987) ........................................... 92

Maynard v. Cartwright, 486 U.S. 356 (1988) ........................................... 78

Mayo v. Henderson, 13 F.3d 528 (2d Cir. 1994) ........................................... 92

McCleskey v. Kemp, 481 U.S. 279 (1987) ........................................... 78

McNeill v. Branker, 601 F. Supp. 2d 694 (E.D. N.C. 2009) ........................................... 10

Middleton v. Dugger, 849 F.2d 491 (11th Cir. 1988) ........................................... 20

Middleton v. Evatt, 855 F. Supp. 837 (D. S.C. 1994) ........................................... 33

Mills v. Maryland, 486 U.S. 367 (1988) ........................................... 96

Mooney v. Holohan, 294 U.S. 103 (1935) ........................................... 58

Murphy v. Puckett, 893 F.2d 94 (5th Cir. 1990) ........................................... 92

Napue v. Illinois, 360 U.S. 264 (1959) ........................................... 58, 60, passim

Nelson v. Nagle, 995 F.2d 1549 (11th Cir. 1993) ........................................... 81

Nero v. Blackburn, 597 F.2d 991 (5th Cir. 1979) ........................................... 92

Outten v. Kearney, 464 F.3d 401 (3d Cir. 2006) ........................................... 21

Padilla v. Kentucky, 130 S. Ct. 1473 (2010) ........................................... 2

Parle v. Runnels, 505 F.3d 922 (9th Cir. 2007) ........................................... 112

Paxton v. Ward, 199 F.3d 1197 (10th Cir. 1999) ........................................... 76, 78

Peek v. Kemp, 784 F.2d 1479 (11th Cir. 1986) ........................................... 12

Penry v. Johnson, 532 U.S. 782 (2001) ........................................... 100, 101

Penry v. Lynaugh, 492 U.S. 302 (1989) ........................................... 7, 81

Poindexter v. Booker, 301 Fed. App'x 522, 530-31 (6th Cir. 2008) ........................................... 24

Porter v. McCollum, 130 S. Ct. 447 (2009) ............................................ 4, 16, 20

Presnell v. Georgia, 439 U.S. 14 (1978) ............................................ 102

Richards v. Quarterman, 566 F.3d 553 (2009) ............................................ 39

Richter v. Hickman, 578 F.3d 944 (9th Cir. 2009) ............................................ 56, 58

Ring v. Arizona, 536 U.S. 584 (2002) ............................................ 47

Romano v. Gibson, 239 F.3d 1156 (10th Cir. 2002) ............................................ 72

Rompilla v. Beard, 545 U.S. 374 (2005) ............................................ 4, 16, passim

Roper v. Simmons, 543 U.S. 304 (2005) ............................................ 44

Sallahdin v. Gibson, 275 F.3d 1211 (10th Cir. 2002) ............................................ 40

Sandoval v. Calderon, 241 F.3d 765 (9th Cir. 2001) ............................................ 87, 88, 90

Sears v. Upton, 130 S. Ct. 3259 (2010) ............................................ 25

Strickland, Sears, 130 S. Ct. at 3266 ............................................ 72

Sechrest v. Ignacio, 549 F.3d 789 (9th Cir. 2008) ............................................ 40

Simmons v. South Carolina, 114 S. Ct. 2187 (1994) ............................................ 96

Skaggs v. Parker, 235 F.3d 261 (6th Cir. 2000) ............................................ 20

Skipper v. South Carolina, 476 U.S. 1 (1986) ............................................ 78

Smith v. Mullin, 379 F.3d 919 (10th Cir. 2004) ............................................ 4, 15, 38

Stewart v. Martinez-Villareal, 523 U.S. 637 (1998) ............................................ 47

Strickland v. Washington, 466 U.S. 688 (1984) ............................................ 2, 9, passim

Strickler v. Greene, 527 U.S. 263 (1999) ............................................ 62, 103

Stromberg v. California, 283 U.S. 359 (1931) ............................................ 102

Taylor v. Kentucky, 436 U.S. 478 (1978) ............................................ 110

Tosh v. Lockhart, 879 F.2d 412 (8th Cir. 1989) ............................................ 24

Trest v. Cain, 522 U.S. 87 (1997) ............................................ 3

Tuilaepa v. California, 512 U.S. 967 (1994) ............................................................... 99

United States v. Agurs, 427 U.S. 97 (1976) ......................................... 58, 62, passim

United States v. Alferahin, 433 F.3d 1148 (9th Cir. 2006) .................................... 98

United States v. Alzate, 47 F.3d 1103 (11th Cir. 1995) ........................................ 63

United States v. Bagley, 473 U.S. 667 (1985) ................................................ 62, 103

United States v. Barham, 595 F.2d 231 (5th Cir. 1979) ....................................... 62

United States v. Biberfeld, 957 F.2d 98 (3d Cir. 1992) ........................................ 60

United States v. Bowie, 892 F.2d 1494 (10th Cir. 1990) ...................................... 82

United States v. Dunn, 564 F.2d 348 (9th Cir. 1977) ........................................... 95

United States v. Fields, 516 F.3d 923 (10th Cir. 2009) ........................ 48, 94, passim

United States v. Gallegos, 2009 WL 1028273 (W.D. Mo. April 16, 2009) ............ 18

United States v. Garza, 608 F.2d 659 (5th Cir. 1979) .......................................... 77

United States v. Hammer, 404 F. Supp. 2d 676 (M.D. Pa. 2005) ....................... 18

United States v. Hinson, 585 F.3d 1328 (10th Cir. 2009) .................................... 74

United States v. Kelly, 35 F.3d 929 (4th Cir. 1994) ............................................ 108

United States v. Massaro, 538 U.S. 500 (2003) .................................................... 3

United States v. McCullah, 76 F.3d 1087 (10th Cir. 1996) ................................. 100

United States v. McGrady, 508 F.2d 13 (8th Cir. 1974) ....................................... 96

United States v. Udechukwu, 11 F.3d 1101 (1st Cir. 1993) ................................. 64

United States v. Young, 470 U.S. 1 (1985) .................................................... 82, 87

Wade v. White, 368 F. Supp. 2d 695 (E.D. Mich. 2005) ..................................... 92

Walbey v. Quarterman, 309 Fed. App'x 795, 804, 806 (5th Cir. 2009) ................ 85

Wallace v. Stewart, 184 F.3d 1112 (9th Cir. 1999) ............................................. 40

White v. Thaler, - F.3d -, 2010 WL 2595272 (5th Cir. June 30, 2010) ................ 98

Wicks v. Lockhart, 569 F. Supp. 549 (E.D. Ark. 1983) ....................................................... 95, 96

Wiggins v. Smith, 539 U.S. 510 (2003) ................................................................. 2, 3, passim

Williams v. Taylor, 529 U.S. 362 (2000) ............................................................. 4, 16, passim

Williamson v. Ward, 110 F.3d 1508 (10th Cir. 1997) ................................................... 20

Wilson v. Kemp, 777 F.2d 621 (11th Cir. 1985) .......................................................... 81

Woodard v. Sargent, 806 F.2d 153 (8th Cir. 1986) ...................................................... 13

Woodson v. North Carolina, 428 U.S. 280 (1976) ............................................... 69, 71, 75

Worthington v. Roper, 619 F. Supp. 2d 661 (E.D. Mo. 2009) ................................... 10, 42

Zant v. Stephens, 462 U.S. 862 (1983) ....................................................................... 100

## STATE CASES

Hall v. Lance, 687 S.E.2d 809 (Ga. 2010) ................................................................. 19

People v. Harris, 779 N.E.2d 705 (N.Y. 2002) ........................................................... 19

State v. Holton, 126 S.W.3d 845 (Tenn. 2004) ........................................................... 19

State v. Reid, 213 S.W.3d 792 (Tenn. 2006) .............................................................. 19

## FEDERAL STATUTES

18 U.S.C.A. § 3591 et seq., ...................................................................................... 96

28 U.S.C. Section 2241 ................................................................................................ 1

28 U.S.C. Section 2255 ................................................................................................ 1

18 U.S.C. § 3591, et seq .............................................................................................. 5

18 U.S.C. § 3592 (a)(1) .............................................................................................. 37

18 U.S.C. §3592 (a)(6) .............................................................................................. 37

18 U.S.C. § 3592 (a)(8) .......................................................................................... 8, 37

18 U.S.C. § 3592(a)(1) .............................................................................................. 41

18 U.S.C. § 3592(a)(1) ................................................................................................ 8

18 U.S.C. § 3592(a)(6) ........................................................................................ 8

18 U.S.C. §3592(c)(9) ........................................................................................ 49

18 U.S.C. § 3593(c) ...................................................................................... 47, 58

18 U.S.C. § 3593(c), (d) .................................................................................... 87

18 U.S.C. § 3593(e) ........................................................................................... 79

18 U.S.C. § 3953(a) ........................................................................................... 54

28 U.S.C. § 2255(a) ............................................................................................. 1

**PRELIMINARY STATEMENT**

On April 6, 2010, Petitioner Edward Leon Fields, Jr. filed a *Motion for Relief Pursuant to 28 U.S.C. Section 2255 or in the Alternative Pursuant to 28 U.S.C. 2241* (*"Motion"*) challenging his convictions and sentences of death for two homicides in the Ouachita National Forest in 2003.

On June 29, 2010 the Court granted Mr. Fields' request for an opportunity to submit a memorandum of law in support of the *Motion* (the "*Memorandum*") and ordered him to file the *Memorandum* on or before July 30, 2010 (Dkt. # 11).

As in the *Motion*, in this *Memorandum* the transcript of the trial proceedings are cited as "*TR*" followed by a page citation. Other proceedings are cited as *TR* followed by the date of the proceeding and page number. Mr. Fields also cites a number of documents that are not currently of record. These documents are included in the *Appendix* that accompanied the *Motion*, and, as in the *Motion*, are cited as "*A*" followed by an exhibit number. Documents that are of record are not included in the *Appendix* but are cited. Mr. Fields is filing with this Memorandum a brief *Supplemental Appendix*. Entries from it are cited as "*SA*" followed by the document number.

Petitioner is referred to as Mr. Fields, and the United States of America is referred to as the Government. Parallel citations are omitted. All other citations are either self-explanatory or are explained in the *Memorandum*. All emphasis is supplied unless otherwise indicated.

**STANDARD OF REVIEW OF CLAIMS OF**
**CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL**

Under 28 U.S.C. § 2255(a), a federal conviction and sentence must be vacated if obtained in violation of the Constitution or laws of the United States.

The majority of Mr. Fields' grounds for relief allege violations of his right to the effective assistance of counsel as guaranteed by the Sixth Amendment. These claims are governed by

Strickland v. Washington, 466 U.S. 688 (1984), which provides that counsel is ineffective where: (1) his or her performance fell below objective standards of reasonableness and therefore was deficient, and (2) as a result of that deficiency, the petitioner suffered prejudice. Id. at 694.

In determining whether counsel's performance was deficient, the Supreme Court has repeatedly cited the American Bar Association's *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (rev. ed. Feb. 2003) ("ABA Guidelines"), as guides for determining the reasonableness of counsel's conduct.[1] "Although they are 'only guides,' ... and not 'inexorable commands,' ... these standards may be valuable measures of the prevailing professional norms of effective representation ...." Padilla v. Kentucky, 130 S.Ct. 1473, 1482 (2010) (quoting Strickland, 466 U.S. at 688; Bobby v. Van Hook, 130 S.Ct. 13, 17 (2009)). The Guidelines relied upon herein were promulgated in 2003, before the offenses. Accordingly, "they describe the professional norms prevailing when the representation took place." Van Hook, 130 S.Ct. at 16; see also Wiggins v. Smith, 539 U.S. 510, 523 (2003) (applying 1989 Guidelines in existence at time of trial where "[c]ounsel's conduct similarly fell short of the standards for capital defense work articulated by the [ABA Guidelines] – standards to which we long have referred as 'guides to determining what is reasonable'") (quoting Strickland at 688).

Prejudice is established when a petitioner shows that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Wiggins, 539 U.S. at 534. Such a probability can be shown by less than a preponderance of the evidence:

The result of a proceeding can be rendered unreliable, and hence the proceeding

---

[1] The ABA Guidelines are published in 31 Hofstra L.Rev. 913 (2003) and are available online at www.ABAnet.org.

itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

Strickland, 466 U.S. at 694.    With regard to sentencing phase ineffectiveness, prejudice is established if there is a reasonable probability that even one juror would have voted for life imprisonment instead of death.  Wiggins, 539 U.S. at 537.

Claims of ineffective assistance of counsel properly are pursued in a section 2255 proceeding and are not waived even though they were not presented on direct appeal.  United States v. Massaro, 538 U.S. 500, 509 (2003) ("failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255").[2]

---

[2] Mr. Fields does not address in this Memorandum any procedural defenses, such as procedural bar or waiver, that may be asserted by the Government.  Mr. Fields does not believe that the Government has available to it any such procedural defenses.  In any event, the Government is obliged to raise any such defenses, if they exist, and the failure to do so may constitute a waiver of such defenses.  Trest v. Cain, 522 U.S. 87, 89 (1997) (quoting Gray v. Netherland, 518 U.S. 152, 166 (1996) ("procedural default is normally a 'defense' that the [Government] is 'obligated to raise' and 'preserv[e]' if it is not to 'lose the right to assert the defense thereafter.'")).  Accordingly, should the Government raise procedural defenses to any of Mr. Fields' grounds for relief, he will address them in a Reply Memorandum, which is permitted by Rule 5(d) of the Rules Governing Section 2255 Proceedings for the United States District Courts.

**ARGUMENT**

**GROUND ONE**

**THE SIXTH AMENDMENT WAS VIOLATED WHEN TRIAL COUNSEL INEFFECTIVELY INVESTIGATED, PRESENTED AND ARGUED MITIGATING MENTAL HEALTH EVIDENCE. THE EIGHTH AMENDMENT WAS VIOLATED WHEN THE JURY SENTENCED MR. FIELDS TO DEATH WITHOUT HAVING FOUND AND GIVEN MITIGATING EFFECT TO UNCONTESTED MENTAL HEALTH-RELATED MITIGATING EVIDENCE.**

The Eighth Amendment guarantees a capital defendant the right to individualized sentencing. Lockett v. Ohio, 438 U.S. 586 (1978); Eddings v. Oklahoma, 455 U.S. 104 (1982); Hitchcock v. Dugger, 481 U.S. 393 (1987). This includes the constitutionally secured right to the presentation of all available mitigating evidence. Wiggins, 539 U.S. at 524-25.

Such mitigating evidence includes the defendant's mental health deficits (e.g., emotional disturbance, presence of organic brain damage), as well as evidence of a difficult upbringing. See, e.g., Porter v. McCollum, 130 S.Ct. 447 (2009); Rompilla v. Beard, 545 U.S. 374 (2005) ("It goes without saying that the undiscovered "mitigating evidence [including evidence of organic brain damage, emotional disturbance and difficult upbringing], taken as a whole, 'might well have influenced the jury's appraisal' of [Rompilla's] culpability") (internal citations omitted); Williams v. Taylor, 529 U.S. 362 (2000), Eddings, 455 U.S. at 115 ("Nor do we doubt that the evidence Eddings offered was relevant mitigating evidence. ... Evidence of a difficult family history and of emotional disturbance is typically introduced by defendants in mitigation. See McGautha v. California, 402 U.S. 183, 187-188 . . . (1971)."); see also Anderson v. Sirmons, 476 F.3d 1131 (10th Cir. 2007); Smith v. Mullin, 379 F.3d 919 (10th Cir. 2004).

At the time of his sentencing hearing, Mr. Fields had suffered a lifetime of mental illness and

emotional disturbance. He suffered from the effects of a difficult and dysfunctional upbringing.[3] All of this evidence was available to counsel, and it should have been presented and argued to the jury as mitigating facts pursuant to <u>Lockett</u> and its progeny, as well as the Federal Death Penalty Act (FDPA) (18 U.S.C. § 3591, et seq.). Yet trial counsel were ineffective with regard to nearly every aspect of Mr. Fields' mental health mitigation defense:

- Trial counsel ineffectively failed to argue to the jury that the largely uncontested evidence of Mr. Fields' pre-offense history of depression and auditory hallucinations – as well a post-offense diagnosis of bipolar disorder – possessed mitigating value independent of the "manic flip" diagnosis testified to by the defense's mental health experts. Even with this uncontested evidence, the jury found no mental health mitigation.

- Trial counsel ineffectively failed to discover and present evidence that Mr. Fields suffered from a progressive neurological disease which at the time of his sentencing hearing had already caused him organic brain damage localized in his frontal lobes. Trial counsel failed to do so even though they had an expert ready to testify to the existence of neurological damage and cited this neurological damage in arguing to the Department of Justice that it should not seek the death penalty against Mr. Fields.

- Trial counsel ineffectively failed to present the testimony of local medical professionals who treated Mr. Fields both before the offenses and at the Muskogee and Tulsa County Jails after his arrest. These medical professionals would have rebutted the Government's claim that Mr. Fields was malingering his illness and supported his manic flip defense.

- Trial counsel ineffectively opened the door to a Government expert's damaging – and erroneous – testimony that Mr. Fields did not have significant neurological impairments.

- Trial counsel ineffectively failed to investigate, present and argue readily available evidence that Effexor – an antidepressant Mr. Fields had been prescribed in the weeks before the offenses – was

---

[3] Trial counsel's failures to present Mr. Fields' dysfunctional upbringing are discussed in Ground Four, below.

associated with aggressive and violent behavior.

- Trial counsel ineffectively prepared the defense's mental health experts for their testimony, damaging their credibility with the jury even though Mr. Fields' defense largely depended on the jury believing this expert testimony.

Trial counsel's failure to effectively investigate, present and argue mitigating mental health evidence violated Mr. Fields' right to the effective assistance of counsel guaranteed by the Sixth Amendment,[4] while the jury's verdict, that was rendered without finding and giving mitigating effect to uncontested mental health evidence, violated his right to reliable sentencing guaranteed by the Eighth Amendment.

### A.     Trial Counsel Ineffectively Failed to Argue that Mr. Fields' Uncontested Mental Illness Was Mitigating and Failed to Request Instructions to That Effect

Mr. Fields' lawyers presented to the jury significant mental health-related mitigating evidence, including his pre-offense history of chronic depression and auditory hallucinations and a post-offense diagnosis of bipolar disorder.  The Government agreed that much of it existed. Despite asking for jury instructions on twenty-two mitigating factors, including, for instance, that Mr. Fields was a good cook, and then arguing the existence of each of these twenty-two factors, trial

---

[4] Trial counsel's ineffectiveness with regard to this, and other claims alleging ineffective assistance of counsel, stems in large part from the overall dysfunction of the defense team.  Federal Public Defender Julia O'Connell effectively was Mr. Fields' only trial lawyer.  She assumed the lion's share of pre-trial preparation and she alone examined the thirty-two witnesses who testified at Mr. Fields' complex sentencing hearing and delivered the opening statement and closing argument.  Her assigned "Learned Counsel," Isaiah Gant of the National Capital Resource Counsel Project, performed little, if any, actual work, inside or outside of the courtroom, and what work he did was often more harmful than helpful.  This breakdown of the defense team violated both the letter and the spirit of the ABA Guidelines, which emphasize that "the provision of high quality legal representation in capital cases requires a team approach that combines the different skills, experience, and perspectives of several disciplines."  ABA Guideline 10.4 (The Defense Team), cmt. at 65.  See also ABA Guideline 10.4(D) ("Counsel should demand on behalf of the client all resources necessary to provide high quality legal representation.  If such resources are denied, counsel should make an adequate record to preserve the issue for post-conviction review.").

counsel neither argued nor requested jury instructions on the uncontested mental health evidence they presented. *Motion*, ¶ 14. This was ineffective:

> Eddings [v. Oklahoma] makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The **sentencer must also be able to consider and give effect to that evidence in imposing sentence**. ... Only then can we be sure that the sentencer has treated the defendant as a "uniquely individual human bein[g]" and has made a reliable determination that death is the appropriate sentence.

Penry v. Lynaugh, 492 U.S. 302, 319 (1989) (citation omitted).

### 1. The Evidence the Defense Presented to the Jury Regarding Mr. Fields' Mental Health Impairments and Trial Counsel's Limited Argument on the Mitigating Effect of Only a Portion of That Evidence

The defense presented two psychiatrists, Dr. Bradley Grinage and Dr. George Woods, to establish that Mr. Fields suffered from bipolar disorder and that he was improperly treated with the antidepressant Effexor, which caused him to experience a manic flip at the time of the offenses. *TR*, 2775, 2812, 2973, 2989. Dr. Grinage and Dr. Woods also testified that Mr. Fields had a history of depression as early as age sixteen; that for many years prior to the offenses he had been treated with a number of antidepressants, including Paxil, Wellbutrin, Celexa, Lexapro and Effexor; and that in the months before the offenses he suffered from sleeplessness, command auditory hallucinations and dramatic weight loss. *TR*, 2778, 2800, 2974, 2981, 2745, 2804, 2974, 2987.

The Government conceded much of the defense's mental health evidence. Government rebuttal experts Dr. Jeffrey Mitchell, a psychiatrist, and Dr. Randall Price, a psychologist, agreed that Mr. Fields suffered from severe depression. See, e.g., *TR*, 3263-64, 3220. Dr. Mitchell also agreed that Mr. Fields' history of hearing voices was "credible," *TR*, 3284, see also *TR*, 3315, while Dr. Price admitted he could not rule out that Mr. Fields' hallucinations were genuine. *Tr.*, 3221, 3228. In closing argument, the Government acknowledged that Mr. Fields suffered from severe and

chronic depression.  *TR*, 3425, 3428.

The Court instructed the jury on each of the twenty-two separate mitigating factors that were requested by the defense.  Trial counsel argued these factors more or less as the Court charged them.  Yet, of these twenty-two mitigating factors, the **only** mental health mitigation trial counsel argued was that, at the time of the offenses, Mr. Fields experienced a manic flip that "significantly impaired" his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law pursuant to 18 U.S.C. § 3592(a)(1).[5]  At no time was the jury told by either the Court or trial counsel that it could:

- find and give mitigating effect to a diagnosis of manic flip under the severe mental or emotional disturbance mitigating factor pursuant to 18 U.S.C. § 3592(a)(6)[6] or the "catch-all" mitigating factor pursuant to 18 U.S.C. § 3592(a)(8);[7]

- find and give mitigating effect to a diagnosis of bipolar disorder under the (a)(1), (a)(6) or (a)(8) mitigating factors;

- find and give mitigating effect to Mr. Fields' uncontested depression under the (a)(1), (a)(6) or (a)(8) mitigating factors; or

- find or give mitigating effect to Mr. Fields' largely uncontested history of auditory hallucinations under the (a)(1), (a)(6) or (a)(8) mitigating factors.

---

[5] Section 3592(a)(1) provides that it is mitigating if "[t]he defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge."

[6] Section 3592(a)(6) provides that it is mitigating if "[t]he defendant committed the offense under severe mental or emotional disturbance."  While trial counsel did argue this mitigating factor, it was based, not on any mental health issues, but on the circumstances of Mr. Fields' life, including his rocky relationships, his separation from his family, his father's recent death and his homelessness.  *TR*, 3440.

[7] Section 3592(a)(8) provides that a defendant may argue "[o]ther factors in the defendant's background, record, or character or any other circumstances of the offense that mitigate against imposition of the death sentence."

Thus, the jury was left without an option by which to give mitigating effect to any mental health evidence except the manic flip diagnosis under the (a)(1) mitigating factor.

### 2. Trial Counsel's Ineffective Assistance

Trial counsel were ineffective for failing to argue or to request jury instructions that would allow the jury to give mitigating effect to Mr. Fields' mental health impairments, independent of the manic flip theory under the (a)(1) mitigating factor. Trial counsel's performance was deficient and Mr. Fields was prejudiced by that deficient performance. See Strickland, 466 U.S. at 687.

### a. Deficient performance

Trial counsel were deficit for failing to argue, and request jury instructions on, Mr. Fields' mental health impairments. These were mitigating factors independent of manic flip under the (a)(1) mitigating factor. Thus, the jury was denied an opportunity to give full mitigating effect to that evidence. Trial counsel presented evidence of bipolar disorder, severe depression, and auditory hallucinations. Much of this evidence was uncontested. As the Supreme Court has observed, there is a "belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." Boyde v. California, 494 U.S. 370, 382 (1990) (internal quotations and emphasis omitted); Eddings, 455 U.S. at 115. Thus, mental illnesses, emotional disturbances and childhood dysfunction, such as the ones Mr. Fields suffered, are plainly mitigating, **even if they do not explain the offenses or rise to the level of significantly impaired capacity**. Hitchcock v. Dugger, 481 U.S. 393, 398 (1987) (in finding the Florida death penalty statute unconstitutional – which permitted consideration only of statutory mitigating factors such as impaired capacity, but not non-statutory factors such as those presented here – the Court stated, "We think it could not be clearer that the advisory jury was instructed not to consider, and the sentencing

9

judge refused to consider, evidence of nonstatutory mitigating circumstances, and that the proceedings therefore did not comport with the requirements of <u>Skipper v. South Carolina</u>, 476 U.S. 1, (1986), <u>Eddings</u> [] and Lockett ....”); <u>see</u> <u>also</u> <u>Coble v. Quarterman</u>, 496 F3d 430, 446-47 (5th Cir. 2007) (holding that evidence of bipolar disorder constituted “relevant mitigating information” that required special instruction); <u>Antwine v. Delo</u>, 54 F.3d 1357, 1368 (8th Cir. 1995) (discussing bipolar disorder as a mitigating factor that should have been presented to jury); <u>Worthington v. Roper</u>, 619 F. Supp. 2d 661 (E.D. Mo. 2009) (same); <u>Brewer v. Quarterman</u>, 550 U.S. 286, 292-93 (2007) (holding that special issues under Texas law impermissibly prevented jury from considering mitigating evidence of defendant’s depression); <u>Blanco v. Singletary</u>, 943 F.2d 1477, 1504 (11th Cir. 1991) (finding counsel ineffective for failing to present evidence of defendant’s depression as mitigation); <u>McNeill v. Branker</u>, 601 F. Supp. 2d 694 (E.D. N.C. 2009) (discussing depression as a mitigating factor that should have been presented to sentencing jury); <u>Ben-Sholom v. Ayers</u>, 566 F. Supp. 2d 1053 (E.D. Ca. 2008) (same); <u>Harris by and Through Ramseyer v. Blodgett</u>, 853 F. Supp. 1239 (W.D. Wash. 1994) (same); <u>Delap v. Dugger</u>, 890 F.2d 285, 306 (11th Cir. 1989) (“there was substantial non-statutory mitigating evidence presented which could have led to a recommendation of a lesser sentence by the jury,” including “ expert psychological testimony as to Delap’s mental and emotional problems caused in part by his organic brain syndrome”). Indeed, such illnesses are mitigating **even if they do not rise to the level of significantly impaired capacity or are otherwise related to the offenses**. See, e.g., <u>Brewer</u>, 550 U.S. at 289, 292-93 (jury should have been permitted to consider as mitigation evidence that defendant suffered from bout of depression three months before murder).

Even though all of Mr. Fields’ mental health impairments were broadly mitigating, trial counsel inexplicably argued **only** the mitigating value of manic flip under the (a)(1) mitigating

factor. Section 3592(a)(1) arguably is more difficult to prove than (a)(8) or even (a)(6) because it requires proof – generally presented through expert testimony – that the defendant was "significantly impaired" at the time of the offense. There were other ways that Mr. Fields' mental health impairments should have been argued to the jury.

First, trial counsel should have asked the Court to instruct the jury that, if it believed Mr. Fields experienced a manic flip but that flip did not "significantly impair" him, it could still find the manic flip diagnosis mitigating under either the (a)(6) severe mental disturbance mitigating factor or the (a)(8) "catch-all" mitigating factor.

Second, trial counsel should have asked the Court to instruct the jury that, if it believed Mr. Fields suffered from bipolar disorder but did not experience a manic flip, it could still find that disorder mitigating under the (a)(1) significantly impaired mitigating factor, the (a)(6) severe mental disturbance mitigating factor or the (a)(8) "catch-all" mitigating factor.

Third, trial counsel should have asked the Court to instruct the jury that the uncontested evidence of severe depression was mitigating under the (a)(1) significantly impaired mitigating factor, the (a)(6) severe mental disturbance mitigating factor or the (a)(8) "catch-all" mitigating factor, regardless of whether the jury believed Mr. Fields experienced a manic flip or suffered from bipolar disorder.

Finally, trial counsel should have asked the Court to instruct the jury that the largely uncontested evidence of auditory hallucinations was mitigating under the (a)(1) significantly impaired mitigating factor, the (a)(6) severe mental disturbance mitigating factor or the (a)(8) "catch-all" mitigating factor, regardless of whether the jury believed Mr. Fields experienced a manic flip or suffered from bipolar disorder.

Trial counsel neither asked the Court for any such instructions nor argued the mitigating

11

nature of Mr. Fields' mental health impairments independent of the defense's manic flip theory under (a)(1). Because trial counsel failed to argue these alternative means of considering Mr. Fields' mental health impairments, the jury was left with no other way to give expression to the mitigating value of that evidence.

The fact that trial counsel adduced evidence of Mr. Fields' mental health impairments did not relieve them of their duty to explain the mitigating value of that evidence to the jury. "A jury which does not understand that the evidence and argument presented to it can be considered in mitigation of punishment cannot give a capital defendant the individualized sentencing hearing which the Constitution requires." Peek v. Kemp, 784 F.2d 1479, 1488 (11th Cir. 1986). Thus, the jury must receive clear instructions which not only do not impede its consideration of mitigating factors, Lockett, but also "guid[e] and focu[s] the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender ...." Jurek v. Texas, 428 U.S. 262, 274 (1976). That did not happen in Mr. Fields' case.

Trial counsel's failure to request alternative mental health mitigation instructions, and to argue that Mr. Fields' demonstrated mental health impairments and history of childhood dysfunction met those mitigating circumstances, violated their constitutional obligation to ensure that their client received individualized sentencing consideration. Trial counsel perform deficiently when they fail to request that a capital jury be instructed on applicable mitigating factors. See, e.g., Woodard v. Sargent, 806 F.2d 153, 157 (8th Cir. 1986) (counsel rendered deficient performance by failing to request instruction on lack of prior criminal history mitigating circumstance that was applicable to defendant); Ben-Sholom, 566 F. Supp. 2d at 1129 (counsel rendered deficient performance by failing to request instructions on statutory mitigating circumstances of extreme mental or emotional disturbance, substantial domination, and impairment due to mental disease or defect). All of the

12

instructions discussed above were applicable to Mr. Fields, but trial counsel never asked the Court to give those instructions to the jury.

Trial counsel's failure to request and argue alternative instructions to manic flip under (a)(1) also violated the standards of professional conduct for capital counsel as set out in the ABA Guidelines. As previously noted, the ABA Guidelines are "guides to determining" the adequacy of capital counsel's investigation. Wiggins, 539 U.S. at 522-25 (quoting Strickland and Williams). Guideline 10.11(K) – which were in effect at the time of Mr. Fields' sentencing hearing – provides, "Trial counsel should request jury instructions and verdict forms that ensure that jurors will be able to consider and give effect to **all** relevant mitigating evidence. Trial counsel should object to instructions or verdict forms that are constitutionally flawed, or are inaccurate, or confusing and should offer alternative instructions." In Mr. Fields' case, this standard of professional conduct went unmet. Trial counsel failed to request instructions and a verdict form that ensured the jury gave full mitigating effect to evidence of bipolar disorder, severe depression and auditory hallucinations.

There was no tactical or strategic reason for trial counsel's failure to request all applicable mental health mitigation instructions and to argue the mitigating nature of Mr. Fields' bipolar disorder, depression, auditory hallucinations and dysfunctional childhood. By arguing only manic flip under the (a)(1) mitigating factor, trial counsel made it far less likely that the jury would find any mitigating mental health evidence, which is the opposite of what reasonable counsel seeking to avoid a death sentence for her client would have intended. Thus, Mr. Fields' interests were not advanced by trial counsel's failure to request alternative mental health mitigation instructions and to argue those instructions to the jury. See Eze v. Senkowski, 321 F.3d 110, 129 (2d Cir. 2003) (strategy must "advance the client's interest"). Moreover, trial counsel concede that they had no tactical or strategic reason for proceeding in this way. Ms. O'Connell acknowledges, "I should have

13

told the jury that they could find these facts as mitigating and ask the Court to charge them on those facts as separate mitigating factors." Declaration of Julia O'Connell, Esq. ("O'Connell Dec."), *A – 1*, ¶ 18.

### b.      Prejudice

Mr. Fields was prejudiced by trial counsel's deficient performance.  In the context of a capital sentencing proceeding, a petitioner shows a reasonable probability of a different outcome by demonstrating that, but for counsel's errors, at least one juror would have recommended a life sentence.  <u>Wiggins</u>, 539 U.S. at 537.  Trial counsel presented significant evidence of Mr. Fields' history of mental illness and current diagnoses.  Some of this evidence was accepted by the Government's own rebuttal mental health experts.  Both Government experts conceded that Mr. Fields suffered from depression, and one agreed that he experienced command auditory hallucinations.  <u>See</u>, <u>e.g.</u>, *TR*, 3263-64, 3220, 3284, 3315.  It is likely that at least one juror would have found this evidence to be mitigating had he or she been given a way to express such a finding. Evidence of such mental illness "is exactly the sort of evidence that garners the most sympathy from jurors."  <u>Smith v. Mullin</u>, 379 F.3d 919, 942 (10th Cir. 2004).[8]  Had trial counsel argued to the jury that it could find Mr. Fields' mental health impairments mitigating independent of the (a)(1) mitigating factor, then, there is a reasonable likelihood that the verdict would have been different.

This is especially true because there is evidence that, although the jury rejected the manic flip-based impaired capacity mitigating factor, it found credible at least some evidence that Mr.

---

[8]  The Tenth Circuit credited the conclusions of death penalty litigation expert Dr. Craig Haney, who testified at the evidentiary hearing in district court that "[j]uries respond to and find mitigating [this type of evidence,] and [they] are more likely to vote for life rather than death sentences in cases where there is ... clear and clearly presented evidence that the defendant has suffered from some form of mental illness...."  379 F.3d at 942.

Fields suffered from mental illness. One of the seventeen mitigating factors the jury found was that Mr. Fields "sought treatment for his mental illness." *TR*, 3482. This finding assumes that Mr. Fields in fact suffered from mental illness, since there would be nothing to treat if the illness did not exist. Clearly, then, the jury was persuaded that Mr. Fields suffered from mental illness. Due to trial counsel's deficient performance, however, the jury did not understand that this mental illness itself was mitigating, and it was given neither argument nor instruction as and thus could not give effect to this evidence.

### 3. The Jury's Death Verdict Violated the Eighth Amendment Because the Jury did not Find Uncontested and Important Mitigating Evidence

The Eighth Amendment "requires that the jury be able to consider and <u>give effect to</u> all relevant mitigating circumstances offered by petitioner." <u>Boyde v. California</u>, 494 U.S. 370, 377-78 (1989) (citing <u>Lockett v. Ohio</u>, 438 U.S. 586 (1978); <u>Eddings v. Oklahoma</u>, 455 U.S. at 111-12; <u>Penry v. Lynaugh</u>, 492 U.S. 302 (1989)). A sentence imposed in violation of this requirement results in the arbitrary and capricious imposition of the death penalty. <u>E.g.</u>, <u>Lewis v. Jeffers</u>, 497 U.S. 764, 782 (1990) (discussing "the Eighth Amendment's bedrock guarantee against the arbitrary or capricious imposition of the death penalty"); <u>Lockett</u>, 438 U.S. at 601, <u>Gregg v. Georgia</u>, 428 U.S. 153, 188 (1976).

The sentencing jury's death verdict in this case was arbitrary and capricious. This is because the jury did not find uncontested evidence that Mr. Fields suffered from severe depression, <u>see</u>, <u>e.g.</u>, *TR*, 3263-64; *TR*, 3220, as well as largely uncontested evidence that he suffered auditory hallucinations. <u>See</u> *TR*, 3284, *TR*, 3315. Having not found uncontested mitigating evidence, the jury could not have given mitigating effect to this evidence, thus rendering the verdict arbitrary and capricious.

**B.** **Trial Counsel Were Ineffective for Failing to Investigate and Present Evidence of Mr. Fields' Organic Brain Damage**

The presence of organic brain damage is mitigating in a capital case. <u>Porter</u>, 130 S.Ct. at 453; <u>Rompilla</u>, 545 U.S. at 392-93; <u>Williams</u>, 529 U.S. 362, 370 (even evidence that a defendant "might have mental impairments organic in origin" is mitigating).

At the time of the offenses, Mr. Fields suffered from organic brain damage. The jury never learned this fact because trial counsel failed to discover the extent of his impairments after ignoring a defense neuropsychologist's recommendation to conduct further testing. The jury also never learned about the brain impairments trial counsel **did** discover: that Mr. Fields' frontal lobes were damaged, affecting his executive functioning in areas such as judgment and impulse control. Although this evidence would have been highly mitigating in its own right and also would have bolstered the defense theory that Mr. Fields experienced a manic flip at the time of the offenses, trial counsel neglected to present this evidence and argue it to the jury. Trial counsel's performance was ineffective.

**1.** **The Defense's Inadequate Efforts to Develop and Present Neuropsychological Evidence**

Trial counsel knew or should have known of red flags that Mr. Fields suffered from brain damage. When Mr. Fields was born, he was diagnosed as suffering from hyaline membrane of the lung (now known as neonatal respiratory distress syndrome). This condition can cut off oxygen to the brain for periods of time, creating a serious risk of brain damage. Trial counsel learned about this fact anecdotally, but failed to obtain legible medical records that would have confirmed the diagnosis as well as the seriousness of Mr. Fields' condition in the days after his birth. Declaration of Glori J. Shettles ("Shettles Dec."), *A – 4*, ¶ 4.

Because of Mr. Fields' oxygen deprivation at birth, as well as his repeated head injuries and

losses of consciousness before the age of twenty, <u>see</u> Neurological Evaluation conducted by Michael M. Gelbort on August 11, 2004 ("Gelbort Report"), *A – 6*, at 2, a full neurological evaluation was warranted to determine whether he had suffered from any brain damage. Trial counsel took a step in this direction by having Mr. Fields evaluated by Dr. Michael Gelbort, a neuropsychologist. Dr. Gelbort's testing found organic brain impairments in areas such as working verbal and visual memory, short-term memory, verbally mediated tasks, higher-level reasoning tasks and impulsivity control. Gelbort Report at 3-4.

Although Dr. Gelbort conducted limited testing, he suspected that Mr. Fields suffered from frontal lobe damage and reported to trial counsel that "further evaluation [is] warranted." Gelbort Report at 3. Trial counsel did not follow up on this recommendation and failed to arrange for further neuropsychological examinations of Mr. Fields – even though they filed a number of court pleadings acknowledging that further neuropsychological testing was necessary. <u>See</u> *Defendant's Ex Parte Supplement to Motion for Extension of Time* at 1; *Defendant's Supplemental Ex Parte Application For Extension of Time to File Rule 12.2 Notice* at 6; <u>see</u> <u>also</u> *Defendant's Notice of Intent to Present Expert Testimony* (Rule 12.2 Notice) (indicating that experts at trial would include a neuropsychiatrist, a neuropsychologist and a pharmacologist). Trial counsel also argued to the Department of Justice that Mr. Fields' brain damage was a reason not to seek the death penalty in this case. Letter from Sheldon Sperling to Julie O'Connell, dated December 2, 2004, *A – 7*, at 1, 2, 4.

On the eve of trial, the Government arranged for its own testing of Mr. Fields and produced its expert report to trial counsel. The Government's expert, Dr. Price, discovered that Mr. Fields was impaired on a number of significant neuropsychological tests and noted no malingering. Report of Neuropsychological Evaluation dated July 1, 2005 ("Price Report"), *A – 8*, at 21-25. After

receiving this report, Ms. O'Connell turned it over to Dr. Gelbort, who told her that Dr. Price's data was consistent with his own, but that Dr. Price's conclusions understated Mr. Fields' impairments. O'Connell Dec., ¶ 16.

Mr. Fields never received further neuropsychological testing as recommended by Dr. Gelbort, O'Connell Dec., ¶¶ 10, 17, nor did Dr. Gelbort testify at Mr. Fields' sentencing hearing.

### 2. The Organic Brain Damage Evidence That Trial Counsel Never Presented and the Misleading Testimony of Dr. Randall Price

In the course of these post-conviction proceedings, Mr. Fields was evaluated by Dr. Daniel A. Martell, a neuropsychologist who routinely works for the prosecution.[9] Dr. Martell has determined that Dr. Price's data unequivocally demonstrates organic impairment in the frontal lobes and that more current testing shows Mr. Fields has experienced a "catastrophic decline in functioning over the five years since he was seen by Dr. Price." Report of Daniel A. Martell, Ph.D., ("Martell Report"), *A – 9*, at 10. Dr. Martell notes that "some of his test performances were among the worst I have seen."[10] Id. In particular, Mr. Fields scored in the severely impaired range on the

---

[9] See e.g., United States v. Gallegos, 2009 WL 1028273 (W.D. Mo. April 16, 2009) (finding that the defendant malingered his illness); United States v. Hammer, 404 F. Supp. 2d 676 (M.D. Pa. 2005); Cone v. Bell, 89 F. Supp. 2d 922 (M.D. Tenn. 2000) (noting his "impressive curriculum vitae" and that Dr. Martell testifies for both prosecution and defense but mostly for the Government); Hall v. Lance, 687 S.E.2d 809 (Ga. 2010); State v. Reid, 213 S.W.3d 792 (Tenn. 2006); State v. Holton, 126 S.W.3d 845 (Tenn. 2004); People v. Harris, 779 N.E.2d 705 (N.Y. 2002).

[10] As stated in the *Motion*, Dr. Martell has not yet determined the cause of Mr. Fields' progressive decline, although he believes it may be related to a tumor or stroke and recommends brain imaging. Martell Report at 17. After filing the *Motion*, current counsel moved for an order to have Mr. Fields transported to an appropriate imaging facility for further testing. *Petitioner's Motion for Non-Dispositive Omnibus Relief* (Dkt. # 4). The Court denied this motion, stating that "[a]fter all briefing has been conducted in this matter and this Court has an opportunity to determine if any of the issues raised merit an evidentiary hearing, the Court will then decide what, if any, discovery should be allowed herein." Order dated 6/29/10 at 4 (Dkt. # 11).

gold-standard of neuropsychological tests, the Halstead-Reitan battery, and his executive functioning was "among the most profoundly impaired area tests." Id. at 10. Based on his review of the reports of Dr. Gelbort and Dr. Price, Dr. Martell concludes that Mr. Fields' disease existed prior to the offenses. Id. at 16.

### 3. Trial Counsel's Ineffective Assistance

Trial counsel were ineffective for failing to fully and properly develop and present evidence of Mr. Fields' organic brain damage, as well as for failing to rebut testimony presented by the Government claiming that Mr. Fields did not have any significant neuropsychological impairments. Trial counsel's performance was deficient and Mr. Fields was prejudiced by that deficient performance. See Strickland, 466 U.S. at 687.

### a. Deficient performance

Trial counsel rendered deficient performance because evidence that Mr. Fields' frontal lobes were damaged would have been valuable mitigating information for the jury to consider. Dr. Woods states that, had he known about Mr. Fields' brain impairments, he could have explained to the jury that persons with frontal lobe impairments suffer a loss of control over impulsivity and therefore such an impairment is "highly mitigating." Declaration of George W. Woods, M.D. ("Woods Dec."), $A - 2$, ¶ 7; see also Declaration of Bradley D. Grinage, M.D. ("Grinage Dec."), $A - 3$, ¶ 12 (stating that he could have told jury that damage to frontal lobes is a mitigating factor). Counsel are routinely found to have performed deficiently for failing to discover and present evidence of neurological damage that impedes impulse control or causes other frontal lobe dysfunction. See, e.g., Porter, 130 S.Ct. at 453 (counsel rendered deficient performance by failing to uncover and present neuropsychological evidence that defendant suffered from brain damage that could manifest

in impulsive and violent behavior).[11]

Furthermore, evidence of organic brain damage would have bolstered Mr. Fields' core defense that he experienced a manic flip at the time of the offenses. As Dr. Woods explains, "If this [organic brain] impairment is added to my belief that Mr. Fields underwent a manic flip, then we see a situation where Mr. Fields' already impaired ability to control himself made him even less able to negotiate the flip that I believe occurred." Woods Dec., ¶ 7. Dr. Grinage agrees that evidence of organic brain damage could have been offered as a factor that "exacerbated" Mr. Fields' bipolar disorder, an assessment that he believes is strengthened by the previously undiscovered legible records of Mr. Fields' birth. Grinage Dec., ¶ 12.

Counsel's performance in failing to discover the extent of Mr. Fields' organic brain damage was particularly deficient because they knew that additional testing was required but failed to follow up. Counsel perform deficiently when they ignore the need to conduct further expert evaluation.

---

[11] See also Rompilla, 545 U.S. 374 (counsel rendered deficient performance by failing to review court records that contained reference to broad range of mitigating evidence that counsel had failed to develop through other investigative efforts, including red flags of brain damage); Williamson v. Ward, 110 F.3d 1508, 1517 (10th Cir. 1997) (counsel rendered deficient performance by failing to present history of mental illness, alcohol and drug abuse, and brain damage or neurological disorder); Skaggs v. Parker, 235 F.3d 261 (6th Cir. 2000) (counsel rendered deficient performance by failing to present mental retardation and abnormal neuropsychological tests indicating brain damage); Lockett v. Anderson, 230 F.3d 695 (5th Cir. 2000) (counsel rendered deficient performance by failing to present temporal lobe brain damage, head injuries, and possible schizophrenia); Middleton v. Dugger, 849 F.2d 491, 495 (11th Cir. 1988) (counsel rendered deficient performance by failing to investigate, develop and present evidence of brain damage); Bean v. Calderon, 163 F.3d 1073, 1079-80 (9th Cir. 1998) (counsel rendered deficient performance by failing to present brain damage and dysfunction from drug use); Armstrong v. Dugger, 833 F.2d 1420, 1433-34 (11th Cir. 1987) (counsel rendered deficient performance by failing to investigate, develop and present evidence of brain damage); Blanco v. Singletary, 943 F.2d 1477, 1505 (11th Cir. 1991) (same); Baxter v. Thomas, 45 F.3d 1501, 1512-15 (11th Cir. 1995) (counsel rendered deficient performance by failing to present low IQ, potential brain injury); Brewer v. Aiken, 935 F.2d 850, 857-60 (7th Cir. 1991) (counsel was deficient for failing to present brain damage and "blows to the head as a young boy"); Outten v. Kearney, 464 F.3d 401, 410-12, 422-23 (3d Cir. 2006) (same); Jacobs v. Horn, 395 F.3d 92 (3d Cir. 2005) (same).

See Bean v. Calderon, 163 F.3d 1073, 1079 (9th Cir. 1998) (counsel ineffective where they knew that experts needed additional information and testing but failed to obtain it).[12]  Here, almost a year before Mr. Fields' sentencing trial, Dr. Gelbort informed counsel that he suspected frontal lobe dysfunction and recommended further testing.  Gelbort Report at 3.  Counsel indicated to the Court that they intended to conduct such testing, implying this could include CT, PET and MRI scans and an EEG.  Yet they failed to do so, even though Ms. O'Connell "stayed in contact with Dr. Gelbort about conducting further testing" and Dr. Gelbort expressed his willingness to perform such testing.  O'Connell Dec., ¶ 15.

Counsel had no tactical or strategic reason for failing to fully develop and present this evidence, as trial counsel acknowledges.  O'Connell Dec., ¶ 17.  She never considered organic brain damage to be inconsistent with a manic flip defense and agrees that "[p]resentation of brain impairments would have been an important part of our mitigation presentation."  O'Connell Dec., ¶¶ 15, 17.  Given the highly mitigating nature of organic brain damage, Mr. Fields' interests were not advanced by denying the jury information about his frontal lobe impairments.  See Eze, 321 F.3d at 129 (strategy must "advance the client's interest").

Trial counsel also were deficient for not presenting Dr. Gelbort's findings of significant neuropsychological impairments indicating frontal lobe dysfunction.  Even without full testing and

---

[12]  See also Glenn v. Tate, 71 F.3d 1204, 1208-11 (6th Cir. 1995) (counsel  deficient for failing to obtain neuropsychological testing that would have confirmed that defendant suffers from organic brain damage, instead relying on incomplete evaluations that were less helpful and did not include such testing); Antwine, 54 F.3d at 1365-66 (counsel deficient for failing to obtain additional mental health evaluations after initial evaluation found no mental disease or defect but counsel was aware of numerous witness reports concerning defendant's odd behavior; psychological testing revealed that defendant suffers from bipolar disorder); Kenley v. Armontrout, 937 F.2d 1298, 1308 (8th Cir. 1991) (counsel deficient for failing to investigate further after receiving negative, but incomplete and inconclusive report from one mental health expert).

evaluation, Dr. Gelbort's testimony would have been highly mitigating by itself, and also would have bolstered the opinions of Dr. Woods and Dr. Grinage that Mr. Fields experienced a manic flip. Woods Dec., ¶ 7; Grinage Dec, ¶ 12. Counsel should present to the sentencer "all reasonably available evidence in mitigation unless there are strong strategic reasons to forego some portion of such evidence." ABA Guideline 11.8.6 (1989). Here, there was no reason whatsoever to forgo this important mitigating evidence.

Dr. Gelbort's testimony also was essential to rebut the testimony of Dr. Price, the Government rebuttal witness who falsely testified that Mr. Fields did not suffer from brain dysfunction, even though his own testing showed significant impairment. See *TR*, 3154; Price Report at 21-25. "Counsel should ... object to and be prepared to rebut arguments that improperly minimize the significance of mitigating evidence." ABA Guideline 10.11, cmt. at 115. After reviewing Dr. Price's report, Dr. Gelbort informed trial counsel that the Government's test results were consistent with his own data and that Dr. Price understated the importance of that data in his conclusions. O'Connell Dec., ¶ 16; see also Martell Report at 12-13 (opining that Dr. Price's testimony was misleading and could have been rebutted by any competent neuropsychologist). Thus, in light of the considerable contribution Dr. Gelbort could have made to the defense's mitigation presentation, trial counsel's failure to call him as a witness was deficient. See Kubat v. Thieret, 867 F.2d 351, 368 (7th Cir. 1989) (finding counsel ineffective where counsel knew of mitigation witnesses but failed to present them).

Counsel had no strategic or tactical reason for not presenting Dr. Gelbort's testimony. Trial counsel acknowledges that she "stayed in contact with Dr. Gelbort about ... his ability to testify" and that he indicated his willingness to do so. O'Connell Dec., ¶ 15. As late as the start of jury selection, it was still trial counsel's intention to call Dr. Gelbort as a witness. Id., ¶ 15. According

to trial counsel, at the last minute Dr. Gelbort informed her that he had travel plans which prevented him from testifying, but she acknowledges that she did not seek a continuance or otherwise attempt to remedy the problem. Id., ¶ 17. Moreover, trial counsel concedes that she had no strategic or tactical reason for not presenting Dr. Gelbort's testimony. Id.

Counsel's failure to take steps to ensure the attendance of their witness violated a core defense function – to present their client's case. See Chambers v. Mississippi, 410 U.S. 284, 302 (1973) ("Few rights are more fundamental than that of the accused to present witnesses in his own defense."); Crane v. Kentucky, 476 U.S. 683, 690 (1986) (discussing defendant's right to present a defense); see also Tosh v. Lockhart, 879 F.2d 412, 414 (8th Cir. 1989) (counsel rendered deficient performance by failing to call alibi witness or to ask for continuance after assuring defendant and his family that the witness would be called); cf. Poindexter v. Booker, 301 Fed. App'x 522, 530-31 (6th Cir. 2008) (counsel rendered deficient performance by failing to ask court to reopen proofs for last-minute witness). Trial counsel made no such efforts to procure Dr. Gelbort's testimony.

### b. Prejudice

Mr. Fields was prejudiced by trial counsel's failure to investigate and present evidence of organic brain damage. Organic brain damage is a highly mitigating condition. Jurors are "likely to react sympathetically when their attention is drawn to organic brain problems." Glenn, 71 F.3d at 1211. Had counsel presented this evidence, although some jurors may have been disinclined to employ mercy, it is equally as likely that at least one juror would have empathized with Mr. Fields, given the additional insight into his mental state.

Mr. Fields was further prejudiced by trial counsel's failure to rebut Dr. Price's testimony. That testimony was devastating, but trial counsel failed to challenge his conclusions in any

meaningful way, and actually elicited more harmful testimony on cross-examination.[13] Not only did the jury never learn that Mr. Fields was brain-damaged, but Dr. Price affirmatively misled it to believe he was **not** brain-damaged. The prejudice to Mr. Fields is particularly compelling when evidence of his organic brain damage is considered in combination with his other diagnosed mental illnesses and his use of the antidepressant Effexor. When assessing prejudice a reviewing court must consider **all** of the mitigating evidence that could have been presented to the sentencing jury – including both the evidence that was presented at the trial and the evidence that was adduced in post-conviction proceedings. Sears v. Upton, 130 S.Ct. 3259, 3267 (2010) (citing Porter, 130 S.Ct. at 453-54). Both Dr. Woods and Dr. Grinage agree that Mr. Fields' frontal lobe impairment exacerbated his bipolar disorder and further inhibited his ability to control himself during his manic flip. See Woods Dec., ¶ 7; Grinage Dec., ¶ 12. Thus, when evidence of Mr. Fields' organic brain damage is added to the mix of mitigating factors that were presented, there is an even greater likelihood that at least one juror would have voted for life.

C. **Trial Counsel Ineffectively Failed to Investigate and Present Local Medical Professionals Who Would Have Supported the Manic Flip Defense and Testified that Mr. Fields' Mental Illness was Genuine, Not Malingered**

The Government gave no quarter to Mr. Fields' core defense that he committed the offenses while experiencing a manic flip. Prosecutors attacked the manic flip diagnosis as the opinion of "left coast ... hired guns" and argued that Mr. Fields was malingering when he reported experiencing auditory hallucinations. Trial counsel readily could have rebutted the Government's claims by calling the local medical professionals who treated Mr. Fields before and immediately after the

---

[13] Mr. Fields' claim that trial counsel were ineffective for eliciting damaging testimony during the cross-examination of Dr. Price is discussed in Part E, below.

offenses. These professionals would have eviscerated the Government's malingering charge and bolstered the defense's manic flip theory. Instead, trial counsel ineffectively failed to call them as witnesses, allowing the Government's "left coast ... hired guns" charge to stand unchallenged. As a result, the jury rejected the only mental health mitigation argued by the defense. Trial counsel's performance was ineffective.

1. **The Government's Claims of Malingering and the Treating Medical Professionals Who Would Have Rebutted Those Claims**

Dr. Price, the Government's expert rebuttal psychologist, testified that Mr. Fields was malingering when he reported hearing voices. *TR*, 3221-22. In closing, the Government argued that Mr. Fields' was malingering with regard to his reports of auditory hallucinations, *TR*, 3450-51, and that his suicide attempt after his arrest was simply a means of gaining attention and sympathy. *TR*, 3464. The Government told the jury, "We didn't have to go out to the left coast to find somebody who testified for the defense every time. **We got people in our own back yard who were credible**, who would give an honest opinion who were not hired guns." *TR*, 3429.

Trial counsel, too, did not have to "go out to the left coast" to find someone to support Mr. Fields' defense. Trial counsel could have called credible treating medical professionals "in [their] own back yard" to rebut the Government's claim that Mr. Fields was a malingerer and to endorse the manic flip defense.

First, the defense could have called Dr. Louise Bumgardner, a psychiatrist and life-time resident of Oklahoma who treated Mr. Fields at the Muskogee County Detention Center after the offenses. Dr. Bumgardner believes that Mr. Fields "was genuinely mentally ill," Declaration of Dr. Joyce Louise Bumgardner, *A* – 10, ¶ 4, and agrees with the opinions of Dr. Grinage and Dr. Woods that Mr. Fields experienced a manic flip at the time of the offenses. Id. at ¶ 5.

Second, the defense could have called Dr. Larry Trombka, a psychiatrist employed by the Oklahoma Department of Corrections who treated Mr. Fields when he was transferred to the Tulsa County Jail. Dr. Trombka, like Dr. Bumgardner, believes that Mr. Fields heard voices, was schizoaffective, and gave no indication "that he was faking his illness, or that his complaints were not genuine ...." Declaration of Larry Trombka, M.D., *A* – 11, ¶ 2.

Third, the defense could have called Dr. R.L. Winters, a physician at the Sparks Medical Foundation who treated Mr. Fields for chronic depression at various times in 2000 and saw no reason to believe he "was malingering his illness. To the contrary, I believe that Mr. Fields suffered from chronic depression." Declaration of R.L. Winters, M.D., *A* – 12, ¶ 4.

Finally, the defense could have called Dean Anderson, a physician's assistant at the Heavener Clinic who treated Mr. Fields for depression in 1999. Mr. Anderson is "confident" that Mr. Fields' symptoms "were genuine" and does not believe "he was in any way malingering these conditions or complaints." Declaration of Dean Anderson, *A* – 13, ¶ 11.

Although Dr. Bumgardner, Dr. Trombka, Dr. Winters and Mr. Anderson all were ready and willing to testify, the defense failed to call any of these four local medical practitioners to support Mr. Fields' defense.

### 2. Trial Counsel's Ineffective Assistance

Trial counsel were ineffective for failing to present the testimony of Mr. Fields' treating medical professionals to rebut the government's allegations of malingering and to bolster the defense's manic flip theory. Trial counsel's performance was deficient and Mr. Fields was prejudiced by that deficient performance. See Strickland, 466 U.S. at 687.

### a. Deficient performance

Trial counsel's performance was deficient because Mr. Fields' reports of auditory hallucinations were important to the defense's claim of manic flip, as well as to establishing other mental health mitigating factors. After the Government called Dr. Price to rebut this evidence, the defense needed to counter this charge of malingering. The views of medical professionals who worked in local jails and personally treated Mr. Fields would have been viewed by the jury as highly credible. Yet trial counsel failed to call them, relying instead on nothing more than a few speculative inferences that Dr. Woods was able to draw from Mr. Fields' medical records. See *TR*, 2979-80. Trial counsel also failed to call Dr. Bumgardner to bolster the manic flip opinions of Dr. Grinage and Dr. Woods, even though those opinions went to the heart of Mr. Fields' mitigation defense.

Trial counsel had a duty to rebut the Government's claims and to bolster Mr. Fields' core mitigation defense. See Chambers, 410 U.S. at 302 ("Few rights are more fundamental than that of the accused to present witnesses in his own defense."); Crane, 476 U.S. at 690 (discussing defendant's right to present a defense). The ABA Guidelines also provide that "counsel at every stage of the case have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation." ABA Guideline 10.11. According to the commentary to this guideline, "Counsel should ... object to and be prepared to rebut arguments that improperly minimize the significance of mitigating evidence." ABA Guideline 10.11, cmt. at 115. That did not happen here. Instead, trial counsel failed to adequately respond with available witnesses to the Government's allegations of malingering and left the manic flip theory vulnerable to the Government's claim that it was nothing more than an excuse

27

cooked up by "left coast ... hired guns." <u>See</u> *TR*, 3429.

As trial counsel admits, she had no tactic or strategy for not investigating or presenting these witnesses. O'Connell Dec., ¶¶ 13-14. By not presenting local medical professionals who could rebut the Government's claims of malingering and bolster the manic flip theory, trial counsel made it less likely – not more – that the jury would accept Mr. Fields' core defense. Thus, Mr. Fields' interests were not advanced by neglecting to present the testimony of Dr. Bumgardner, Dr. Trombka, Dr. Winters and Mr. Anderson. <u>See</u> <u>Eze</u>, 321 F.3d at 129 (strategy must "advance the client's interest").

### b. Prejudice

Mr. Fields was prejudiced by trial counsel's failure to call the medical professionals who treated him to rebut the Government's allegations that he was malingering. In closing, the Government argued these allegations at length. This argument not only undermined the defense's claim that Mr. Fields suffered from impaired capacity at the time of the offenses, but it also suggested that he was fabricating an excuse for his behavior, and thus showed consciousness of guilt. *TR*, 3451 ("The voices like the robbery and burglary were a convenient afterthought."). In short, by failing to call important witnesses "counsel effectively acquiesced in the case being tried as a neat three-act play" directed by the prosecution. <u>Cargle v. Mullin</u>, 317 F.3d 1196, 1214 (10th Cir. 2003) (finding that counsel's failure to call witnesses who could have contradicted prosecution's evidence made a "persuasive case for <u>Strickland</u> prejudice"). Moreover, prejudice is established because the jury's acceptance of the Government's argument that Mr. Fields fabricated a defense unquestionably effected its weighing of those mitigating factors that it did find.

Thus, there is a reasonable likelihood that, had trial counsel called these witnesses at least

one juror would have voted for life.

**D.** **Trial Counsel Were Ineffective for Eliciting Damaging Testimony During the Cross-Examination of Dr. Price**

Not only did trial counsel fail to present readily available evidence that Mr. Fields was brain-damaged, but they actually elicited from the Government's rebuttal expert his opinion that Mr. Fields was **not** brain-damaged. Trial counsel exacerbated the harm by failing to either object to this expert's improper testimony on direct examination or to meaningfully challenge that testimony on cross-examination. Trial counsel's performance was ineffective.

**1.** **The Direct and Cross-Examination Testimony of Dr. Price**

Trial counsel neglected to present any evidence demonstrating that Mr. Fields suffered from organic brain damage. For this reason, prior to Dr. Price's rebuttal testimony, trial counsel argued that, since the defense offered no evidence of brain injury, Dr. Price should not be permitted to opine on that subject. *TR,* 3080. Declining to rule in a vacuum, the Court stated it wanted to hear Dr. Price's testimony before ruling on the defense motion. *TR*, 3083-84.

When the Government then elicited harmful but limited testimony regarding brain damage, the defense failed to object. See, e.g., *TR*, 3106 (Dr. Price observed that Mr. Fields' "cognitive processes ... were intact"); *TR*, 3116 (recounting health history of Mr. Fields, including respiratory distress syndrome at birth, and concussion at age 16); *TR*, 3154 (stating, "But I thought there was probably going to be some brain dysfunction, something there to have people evaluating him for this."). Trial counsel also failed to object when, on direct examination, Dr. Price – a psychologist with no expertise in pharmacological matters – testified that overdosing on Effexor would not "have an effect on behavior immediately." *TR*, 3129.

More astonishing, however, on cross-examination trial counsel directly elicited from Dr.

29

Price his opinion he "did not see much neuropsychological impairment, not significant neuropsychological impairment ...." *TR*, 3204-5. Thus, through the actions of Mr. Fields' **own counsel**, the jury heard unchallenged expert testimony that Mr. Fields did not have any real organic brain damage when in fact he suffered from significant frontal lobe impairments.

### 2. Trial Counsel's Ineffective Assistance

Trial counsel were ineffective for eliciting harmful testimony from Dr. Price that Mr. Fields did not suffer from any organic brain damage and for failing to use readily available information to impeach his testimony. Trial counsel's performance was deficient and Mr. Fields was prejudiced by that deficient performance. See Strickland, 466 U.S. at 687.

### a. Deficient performance

It was unquestionably counter to Mr. Fields' interests to disprove that he suffered from highly mitigating organic brain damage – particularly since the data proves the contrary. When trial counsel asked Dr. Price whether he saw much impairment in Mr. Fields, she **knew** that his answer would be damaging. Prior to the sentencing hearing, counsel received a copy of Dr. Price's report, which stated, "Performance on neuropsychological testing is inconsistent with either an acute or chronic neurological condition including a brain injury and/or a frontal lobe disorder." Price Report at 27; see also O'Connell Dec., ¶ 16. Counsel's elicitation of harmful testimony is deficient. See Freeman v. Class, 95 F.3d 639, 642-42 (8th Cir. 1996) (counsel rendered deficient performance by presenting evidence that his own client stole a police car); Berryman v. Morton, 100 F.3d 1089, 1100 (1996) (counsel deficient in rape trial when eliciting that co-defendant was a suspect in a robbery/homicide investigation).

Trial counsel's opening the door to evidence that his client was not brain-damaged was

similarly found deficient in <u>Hooper v. Mullin</u>, 314 F.3d 1162 (10th Cir. 2002). There counsel showed the defense's psychologist a neuropsychological report about the defendant that had been prepared as part of pre-offense anger management counseling. <u>Id.</u> at 1167-68. The psychologist then wrote a one-page report opining that the data from the neuropsychological report suggested mild brain damage. <u>Id.</u> at 1168. At trial, counsel called the psychologist as a mitigation witness, who told the jury that, since he did not personally evaluate the defendant, the author of the original neuropsychological report was the best source of information on this subject. <u>Id.</u> In rebuttal, the prosecution called the author of the neuropsychological report, who testified that the defendant had no brain damage. <u>Id.</u> The Tenth Circuit called the testimony that the defendant was not brain-damaged "disastrous." <u>Id.</u> at 1171.

Mr. Fields' counsel's errors were even more egregious. <u>Hooper</u> noted, "[A]lthough the defense did not intend to call [the author of the neuropsychological report] as a mitigation witness, defense counsel should have foreseen that the State might use him in rebuttal after the defense specifically relied on his report as mitigating evidence." 314 F.3d at 1171. Here, trial counsel did not merely fail to foresee that Dr. Price might give damaging testimony, but affirmatively elicited that testimony from him.

Moreover, trial counsel should have presented Dr. Gelbort in anticipation of or rebuttal to Dr. Price's testimony. Trial counsel were aware that evidence of Mr. Fields' organic brain damage had mitigating significance. O'Connell Dec., ¶ 17. Trial counsel also were aware that Dr. Price's opinion regarding Mr. Fields' lack of organic brain damage was vulnerable to impeachment because Dr. Gelbort had told Ms. O'Connell before trial that Dr. Price's data was consistent with neurological impairment. O'Connell Dec., ¶ 16.

Nevertheless, trial counsel failed to demonstrate to the jury that Dr. Price minimized Mr. Fields' actual neuropsychological impairments and overreported Mr. Fields' actual level of functioning. See Martell Report at 12-13. While trial counsel did question Dr. Price about individual tests on which Mr. Fields scored poorly, see *TR*, 3195-96, they failed to show that these scores amounted to "a pattern of impairments suggestive of brain damage." Martell Report at 12-13. This could have been accomplished either through more probing cross-examination or by presenting the testimony of Dr. Gelbort, or another competent expert, who concluded that Mr. Fields "displays a pattern often found in individuals with frontal lobe or non-dominant hemisphere neurocognitive dysfunction and brain damage with further evaluated warranted." Gelbort Report at 4. See ABA Guideline 10.11, cmt. at 115 ("Counsel should ... object to and be prepared to rebut arguments that improperly minimize the significance of mitigating evidence.").

Furthermore, trial counsel failed to attack Dr. Price's overestimation of Mr. Fields' level of functioning by questioning him about the "practice effect" in neuropsychological testing. Martell Report at 13. The "practice effect" occurs when individuals are administered the same testing instruments in a relatively short period of time and, as a result, show artificially inflated scores on the second administration due to the effects of prior experience with the test and practice with the test stimuli. Id.; see also id. at n.3 (listing neuropsychological texts describing the "practice effect"). Dr. Price's opinion was vulnerable to impeachment on this front because he repeated many of the tests that Dr. Gelbort administered ten months earlier. Id. Cf. Middleton v. Evatt, 855 F. Supp. 837, 846-47 (D. S.C. 1994) (failure to cross-examine prosecution's expert on "practice effect" deficient – however, no prejudice because that information was elicited during cross-examination of defense's expert).

Trial counsel also failed to object to Dr. Price's testimony regarding the effects that Effexor had on Mr. Fields. *TR*, 3129-30. As Dr. Martell points out, Dr. Price is a psychologist and is not an expert on the effects of such medications. Indeed, Dr. Price acknowledged as much when he refused to answer a question on cross-examination about the effects of the medication because of his lack of expertise in this area. *TR*, 3206. Thus, trial counsel ineffectively let the prosecution have it both ways. Dr. Price gave a harmful opinion on direct examination that Effexor could not "have an effect on behavior." This improper opinion was not objected to, even though Dr. Price later admitted that he was not expert in this area.

Trial counsel had no reasonable basis for eliciting harmful testimony from Dr. Price and failing to meaningfully challenge his flawed opinion that Mr. Fields did not suffer from organic brain damage. Prior to the sentencing hearing, trial counsel sought to limit the scope of Dr. Price's testing of Mr. Fields. See generally *Defendant's Response to Government's March 24th, 2005, Motion Regarding Mental Health Evidence* (filed March 31, 2005). Then, just before the Government called Dr. Price as a rebuttal witness, trial counsel specifically attempted to preclude Dr. Price from testifying about organic brain damage, arguing that this subject was beyond the scope of the evidence presented by the defense. *TR*, 3080. There can be no strategic reason for undercutting these efforts by bringing to the jury's attention – without meaningful response – the very evidence trial counsel sought to exclude. Cf. Green v. Johnson, 2006 WL 3746138, at \*21 (E.D. Va. Dec. 15, 2006) (concluding that counsel's failure to file motion for mitigation specialist after remand was "not strategic" where counsel notified prosecution that defense intended to refile all previously filed motions and later claimed on appeal that court's denial of motion was error).

### b. Prejudice

Mr. Fields was prejudiced by trial counsel's elicitation of harmful testimony that he did not

suffer from organic brain damage and failure to impeach or otherwise counter the questionable testimony of Dr. Price. It was bad enough that the defense failed to present highly mitigating evidence that Mr. Fields suffered from significant frontal lobe damage. Trial counsel made the situation far worse by eliciting Dr. Price's opinion that he did not have any significant neuropsychological impairment. See Hooper, 314 F.3d at 1171(characterizing counsel's opening the door to testimony that client was not brain-damage "disastrous"). Had trial counsel not elicited this harmful testimony, or if trial counsel had properly attacked his opinion with readily available evidence of its flaws, there is a reasonable likelihood that the verdict would have been different.

### E. Trial Counsel Were Ineffective for Failing to Investigate and Present Evidence of Compulsive Aggression in Effexor Patients

Mr. Fields' core defense was that his capacity to conform his actions to the requirements of the law and to appreciate the wrongfulness of his actions was significantly impaired after he experienced a manic flip as a result of taking an increased dosage of the antidepressant Effexor, while suffering from then-undiagnosed bipolar disorder. The Government countered that his behavior before and after the offenses indicated volition, contradicting the defense's claim of mania. However, trial counsel never investigated the fact that Effexor could have triggered another adverse effect: compulsive aggression. This evidence would have further and better explained to the jury how Mr. Fields' violent behavior could have been induced by medication, even though his actions appeared on the surface to be volitional.

### 1. Mr. Fields' Effexor Defense and Uninvestigated Evidence of Effexor-Related Compulsive Aggression

The antidepressant Effexor was at the center of Mr. Fields' defense. Both Dr. Grinage and Dr. Woods testified that Mr. Fields committed the offenses while experiencing a manic flip caused by the improper administration of the antidepressant Effexor. *TR*, 2812, 2990. In closing, trial counsel argued that Mr. Fields was impaired because his Effexor "built up like it's supposed to" and "was like a wave and he got to the tipping point." *TR*, 3438.

The Government challenged the defense's theory by arguing that the circumstances surrounding the offenses demonstrated that Mr. Fields' judgment and concentration were not impaired. According to the Government, he took deliberate steps to plan and carry out the homicides by donning the ghillie suit, waiting in the woods for his opportunity, taking a precise shot and concealing his homicidal objective by staging a robbery many hours later. *TR*, 3413-22. As the prosecutor told the jury, "The Defendant had no delusions. It's impossible, virtually impossible, for Effexor to trigger a single manic episode. The facts here clearly compel the conclusion the Defendant was entirely responsible and not impaired by his volitionally, his purposefully, acquired sadness." Id. at 3451-52.

The jury apparently was persuaded by the Government's argument because it rejected the impaired capacity mitigating factor. *TR*, 3480-81. Since impaired capacity was the only mental health mitigator argued by trial counsel, the jury found no other mental health mitigation.

Had trial counsel conducted a reasonable investigation into the heart of their defense – how Effexor affected Mr. Fields' behavior – they would have learned that patients treated with this drug experience increased rates of compulsive aggression. Compulsive aggression, unlike impaired judgment or concentration, would have been more consistent with the Government's view that Mr.

Fields was able to deliberate before and after the offenses. Mr. Fields could have been compelled by an irrational need to commit a violent act that impaired his capacity to conform his conduct to the requirements of the law, while still being able to take the steps necessary to carry out that violent act, such as donning the ghillie suit and waiting in the woods to shoot the Chicks. Such an Effexor-induced compulsion would thus have been mitigating as significant impairment pursuant to 18 U.S.C. § 3592 (a)(1), as a severe mental or emotional disturbance pursuant to under 18 U.S.C. § 3592 (a)(6), or as catch-all mitigation under 18 U.S.C. § 3592 (a)(8).

Evidence of an association between increased rates of compulsive aggression among Effexor users was readily available to trial counsel. See, e.g., Peter Breggin, *Suicidality, Violence and Mania Caused by Selective Serotonin Reuptake Inhibitors (SSRIs): A Review and Analysis*, 16 International Journal of Risk & Safety in Medicine (2003/2004) ("Breggin Article"), *A* – 14, at 36 (discussing "relatively sudden onset and rapid escalation of the compulsive aggression against self and/or others," an "extremely violent and/or bizarre quality to the thoughts and actions," and an "obsessive, compelling, unrelenting quality to the thoughts and actions."); FDA Public Health Advisory dated Mar. 22, 2004 ("PHA"), *A* – 15 (recommending "close observation" of patients being treated with Effexor and other drugs for increased depression or suicidality and noting that "[a]nxiety, agitation, panic attacks, insomnia, irritability, **hostility**, impulsivity, akathisia, hypomania, and mania have been reported in adult and pediatric patients being treated with antidepressants for major depressive disorder as well as other indications, both psychiatric and nonpsychiatric.").

The PHA in particular was widely reported in the general media, and Wyeth Pharmaceuticals, Inc., the manufacturer of Effexor, responded to it by changing the drug's

Medication Guide to include the warnings requested by the FDA. Wyeth advised patients, their families and caregivers to be alert to "hostility" and "aggressiveness," among other behaviors, "especially during early antidepressant treatment and **when the dose is adjusted up or down**." Effexor Medication Guide (2004), *A – 19*, at 12.

### 2. Trial Counsel's Ineffective Assistance

Trial counsel were ineffective for failing to present evidence that patients treated with SSRI-type medications, such as Effexor, can experience increased rates of compulsive aggressiveness. Trial counsel's performance was deficient and Mr. Fields was prejudiced by that deficient performance. See Strickland, 466 U.S. at 687.

### a. Deficient performance

Trial counsel's performance was deficient because the defense's theory that Mr. Fields experienced a manic flip which impaired his capacity to conform his actions to the requirements of the law or to appreciate the wrongfulness of his actions was vulnerable to the Government's argument that his actions before and after the homicides appeared to be deliberate. The Tenth Circuit has noted the importance of mitigation evidence that explains to the jury why a defendant acted as he did in committing the offense. Smith, 379 F.3d at 943. Evidence that Effexor caused or added to Mr. Fields' sudden compulsive aggressiveness would have been highly mitigating because it would have helped the jury understand how he could have committed the offenses even though he had no criminal record. Cf. Lockhart v. Warden, Maine State Prison, Slip Copy, 2010 WL 610708, *7 (D. Me. Feb. 19, 2010) (had the sentencer "credited that Lockhart was in fact experiencing aggression and hostility as a side effect of Effexor, this would have been a mitigating factor to some degree at sentencing").

It was particularly deficient for trial counsel not to pursue this investigation because Mr. Fields' behavior around the time of the offenses closely matched the kinds of obsessive aggression observed in SSRI patients. This included a "relatively sudden onset and rapid escalation of the compulsive aggression against self and/or others," an "extremely violent and/or bizarre quality to the thoughts and actions," and an "obsessive, compelling, unrelenting quality to the thoughts and actions." Breggin Article at 36. In addition, on July 7, 2005 – three days before the homicides – his Effexor dosage was increased from 75 mg to 150 mg. *TR*, 2809-10; *TR*, 3127. There was evidence that Mr. Fields filled this prescription the day before the homicides.[14] This evidence is consistent with Wyeth's warning that adverse effects were more likely to occur after an upward adjustment to the Effexor dosage. Effexor Medication Guide (2004) at 12.

Counsel could not have possessed a tactical or strategic reason for not investigating this avenue as it was entirely consistent with the defense that counsel did investigate and present. See Richards v. Quarterman, 566 F.3d 553, 564-66 (2009) (affirming district court's finding of ineffective assistance where counsel failed to present evidence of alternative theory of circumstances of the offense that was consistent with counsel's chosen strategy of self-defense).

### b. Prejudice

Mr. Fields was prejudiced by trial counsel's deficient performance. Compulsive aggression would have explained the factual circumstances of this case and supported the statutory impaired capacity mitigator. Had the jury known that patients treated with Effexor experience increased rates of compulsive aggression, there is a reasonable likelihood that at least one would have voted for life.

---

[14] Mr. Fields' claim that the Government withheld exculpatory and material evidence regarding the amount of Effexor that Mr. Fields consumed is discussed in Ground Seven, below.

In a similar case involving counsel's failure to present expert evidence about the side-effects of prescription medication, the Tenth Circuit found Strickland prejudice. In Sallahdin v. Gibson, 275 F.3d 1211, 1238 (10th Cir. 2002), the petitioner claimed that counsel ineffectively failed to present expert testimony that "a substantial and consistent scientific literature had already accumulated, showing that anabolic steroids could cause severe psychiatric effects ... in some individuals." The Court noted that this evidence "could have explained how Sallahdin could have been transformed from an allegedly mild-mannered, law-abiding individual into a person capable of committing the brutal murder with which he was found guilty." Thus, it "conclude[d] there is a reasonable probability that the presentation of [this expert] testimony could have altered the outcome of the sentencing phase ...." However, the Court was unable to determine whether counsel had a strategic reason for not presenting this evidence and remanded for an evidentiary hearing.

### G. Trial Counsel Ineffectively Failed to Adequately Prepare the Two Mental Health Experts Who Testified for the Defense

Capital counsel have an obligation, not merely to present necessary expert testimony, but to adequately prepare their experts to give such testimony. Counsel may not simply hire an expert and then abandon all further responsibility. "[A]n attorney ha[s] a responsibility to investigate and bring to the attention of mental health experts who are examining his client, facts that the experts do not request." Wallace v. Stewart, 184 F.3d 1112, 1116 (9th Cir. 1999); see also Sechrest v. Ignacio, 549 F.3d 789, 816-17 (9th Cir. 2008).

Trial counsel were ineffective for inadequately preparing Dr. Grinage and Dr. Woods for their testimony, which enabled the Government to damage their credibility on cross-examination and undercut the heart of Mr. Fields' defense. Trial counsel's performance was deficient and Mr. Fields was prejudiced by that deficient performance. See Strickland, 466 U.S. at 687.

39

### 1. Deficient Performance

Both Dr. Grinage and Dr. Woods acknowledge they were not properly and adequately prepared. Grinage Dec., ¶¶ 5-12, Woods Dec., ¶¶ 4, 8. Ms. Shettles and Ms. O'Connell concur with this assessment. Shettles Dec., ¶ 14; O'Connell Dec., ¶¶ 11-12. For instance, trial counsel failed to provide Dr. Grinage with a copy of the transcript of Mr. Fields' change of plea hearing. O'Connell Dec., ¶ 11; Grinage Dec., ¶¶ 6-7. Trial counsel also failed to educate Dr. Woods that the statutory impaired capacity mitigator required only that Mr. Fields' ability to appreciate the wrongfulness of his conduct or to conform to the requirements of the law be "significantly impaired." O'Connell Dec., ¶ 12; see also 18 U.S.C. § 3592(a)(1). This was deficient. See Antwine, 54 F.3d at 1366-68 (finding counsel ineffective for failing to investigate mental issues and adequately prepare mental health expert); Glenn, 71 F.3d at 1210 n.5 ("defense counsel should obviously have worked closely with anyone retained as a defense expert to insure that the expert was fully aware of all facts that might be helpful to the defendant"); Bloom v. Calderon, 132 F.3d 1267, 1277 (9th Cir. 1997) ("counsel's failure to adequately prepare his expert and then present him as a trial witness, was constitutionally deficient performance").

### 2. Prejudice

Mr. Fields was prejudiced by trial counsel's deficient performance. Because Dr. Woods and Dr. Grinage were not adequately prepared to testify, their credibility with the jury was damaged. For instance, because trial counsel failed to provide Dr. Grinage with a copy of the transcript of Mr. Fields' change of plea hearing, on cross-examination he contradicted some of the answers he gave on direct examination. *TR*, 2816-18; see also O'Connell Dec., ¶ 11; Grinage Dec, ¶ 7. Because trial counsel failed to educate Dr. Woods that the statutory impaired capacity mitigator required only that

Mr. Fields' ability to appreciate the wrongfulness of his conduct or to conform to the requirements of the law be "significantly impaired," Dr. Woods testified incorrectly that Mr. Fields was "unable" to conform his behavior to the requirements of the law, *TR*, 2999, exposing him to impeachment by the Government on cross-examination. *TR*, 3048; <u>see</u> <u>also</u> O'Connell Dec., ¶ 12.

In this case, the credibility of the parties' experts was paramount. These errors singularly, or when viewed in combination with the other ways in which counsel compromised the credibility of their witnesses and theory, were highly prejudicial to the defense case. Trial counsel placed Mr. Fields' life almost entirely in the hands of the defense's mental health experts and their diagnosis that he suffered a manic flip at the time of the offenses. The jury plainly did not credit the testimony of Dr. Woods and Dr. Grinage, since it rejected the manic flip diagnosis that formed the core of Mr. Fields' defense. Had Dr. Woods and Dr. Grinage been properly prepared, they likely would not have been impeached on issues that caused the jury to doubt their credibility. There is a reasonable likelihood that the jury's verdict would have been different, undermining confidence in the result. <u>See</u> <u>Worthington</u>, 619 F. Supp. 2d at 688 ("Based on a review of the totality of the evidence that was presented at the penalty hearing, the Court finds that had the trial judge heard testimony from properly prepared defense experts, there is a reasonable probability that petitioner would have received a different sentence.").

**GROUND TWO**

**THE EIGHTH AMENDMENT AND INTERNATIONAL LAW BAR MR. FIELDS' EXECUTION BECAUSE HE IS NOT COMPETENT TO BE EXECUTED AND BECAUSE THE DEATH PENALTY IS PRECLUDED BY HIS DETERIORATING MENTAL HEALTH.**

A sentencing process that offends "the evolving standards of decency that mark the progress of a maturing society" violates the Eighth Amendment's bar against excessive and cruel and unusual punishment. Gregg, 428 U.S. at 173 (quoting Trop v. Dulles, 356 U.S. 86, 101 (1958)). Mr. Fields' execution would violate this standard and thus is prohibited by the Eighth Amendment as well as by international law.

**A.     Mr. Fields Will not be Competent to be Executed**

If Mr. Fields' execution becomes imminent, he will not be competent to be executed at that time. As set forth in Ground One above, Dr. Daniel Martell has identified a progressive neurological process causing Mr. Fields to experience a "catastrophic" decline in function. Martell Report at 10. Although the cause of the process is not yet clear, and the precise rate of Mr. Fields' decline has yet to be determined, it is likely that he will be incompetent at the time of his execution. "The Eighth Amendment prohibits the State from inflicting the penalty of death upon a prisoner who is insane." Ford v. Wainwright, 477 U.S. 399, 407 (1986). Thus, Mr. Fields' execution will be barred.

**B.     Mr. Fields' Execution is Precluded by his Mental Illness**

Regardless of whether Mr. Fields is incompetent by the time of his scheduled execution, he is ineligible for the death penalty because of his mental illness. Although the Supreme Court has not yet held that the Eighth Amendment precludes the execution of the mentally ill, two recent cases interpreting the Eighth Amendment command such a conclusion.

42

In <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002), the Supreme Court held that the Eighth Amendment's ban on excessive and cruel and unusual punishment prohibits the execution of individuals with mental retardation.  A person with mental retardation is both less culpable and less able to be deterred because of his "diminished capacity to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others."  <u>Id.</u> at 318.

In <u>Roper v. Simmons</u>, 543 U.S. 304 (2005), the Court held that the execution of juveniles who commit crimes while under age eighteen also violates the Eighth Amendment.  As in <u>Atkins,</u> the Court reasoned, "[r]etribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity.... [T]he likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent."  <u>Id.</u> at 571-72 (internal quotations omitted).

The <u>Atkins</u> and <u>Roper</u> bars on the death penalty for mentally retarded and underage offenders are grounded in the same concerns that ought to prevent the execution of the severely mentally ill.  Such individuals, like Mr. Fields, share those characteristics that make the execution of mentally retarded and underage individuals inconsistent with the retributive and deterrence functions of the death penalty, such as a diminished capacity for understanding, impulse control, and ability to engage in meaningful cost-benefit analysis.  <u>See</u> ABA, *Special Feature:  Recommendation and Report on the Death Penalty and Persons with Mental Disabilities*, MENTAL & PHYSICAL DISABILITY LAW RPT'R 668, 670 (2006).

In addition, the execution of the mentally ill offends the "evolving standards of decency"

protected by the Eighth Amendment. Eighth Amendment analysis is "informed by objective factors" such as the views of professional "organizations with germane expertise." <u>Atkins</u>, 536 U.S. at 312, 316 n.21. The leading legal professional organization in the country, the American Bar Association, unequivocally expresses the view that "[d]efendants should not be executed or sentenced to death if, at the time of the offense, they had a severe mental disorder or disability that significantly impaired their capacity (a) to appreciate the nature, consequences, or wrongfulness of their conduct, (b) to exercise rational judgment in relation to conduct, or (c) to conform their conduct to the requirements of the law." American Bar Resolution 122A, unanimously passed on Aug. 8, 2006; ABA, 30 MENTAL & PHYSICAL DISBILITY LAW RPT'R at 668.

Similarly, nearly every major mental health association in the United States has published a policy statement addressing the issue of the execution of mentally ill offenders, and all of those organizations advocate either an outright ban on executing **all** mentally ill offenders, or a moratorium until a more comprehensive evaluation system can be implemented.[15]

---

[15] <u>See</u> American Psychiatric Association, *Moratorium on Capital Punishment in the United States* (approved October 2000), APA Document Reference No. 200006; American Psychological Association, *Resolution on the Death Penalty in the United States*, National Alliance for the Mentally Ill, *The Criminalization of People with Mental Illness*; National Mental Health Association, *Death Penalty and People with Mental Illness* (approved March 10, 2001). Specifically, the National Mental Health Association (NMHA) found that the fact-finding portion of capital trials "fails to identify who among those convicted and sentenced to death actually has a mental illness." NMHA, *Death Penalty and People with Mental Illness.* Similarly, the American Psychological Association (APA) argued that too many "[p]rocedural problems, such as assessing competency," render capital punishment unfair to the mentally ill. APA, *Resolution on the Death Penalty in the United States*. Such procedural inadequacies fall far short of the "basic requirements of due process," according to the American Psychiatric Association (AMPA). AMPA, *Moratorium on Capital Punishment in the United States*. Thus, the NMHA, APA, and AMPA believe that the criminal justice system routinely executes many mentally ill individuals without realizing that any illness existed and, therefore, without considering that illness as a mitigating factor. The National Alliance for the Mentally Ill (NAMI) advocates an outright ban on death sentences for individuals with any type of brain disorder. NAMI, *The Criminalization of People with Mental Illness*.

In addition, just as in <u>Atkins</u> and <u>Roper</u>, where international law and opinion weighed against the execution of persons with mental retardation, international law and opinion also weigh against the execution of the mentally ill. The execution of the severely mentally ill is forbidden by Article 6, § 1 of the International Covenant on Civil and Political Rights ("ICCPR"), 999 U.N.T.S. 171 (1966). In the case of <u>Francis v. Jamaica</u>, Communication No. 606/1994 U.N.H.R.C., on August 12, 1994, the United Nations Human Rights Committee held that the execution of an individual who was mentally disturbed, but examined and found not to be "insane," amounted in that case to cruel, inhuman or degrading treatment in violation of Article 7 of the ICCPR.

Finally, Mr. Fields' execution would violate principles of international law that this Court is constitutionally bound to enforce. The exemption of the severely mentally ill and brain-damaged from capital punishment is a long-recognized and entrenched norm of international humanitarian law, which applies to this Court through treaty and convention. As a customary norm of international humanitarian law, the prohibition on the execution of the severely mentally ill has acquired the character of jus cogens, a peremptory norm of general international law accepted and recognized by the international community of states as a binding obligation from which no derogation is permitted, regardless of the circumstance. The United States has ratified the ICCPR, thereby recognizing the binding nature of its provisions. These international rules prohibiting cruel, inhuman or arbitrary punishments are a part of United States law, as set forth in United States treaty obligations. As such, they are directly enforceable in United States courts and are available as an alternate basis for granting the relief requested in the *Motion*. Treaties create binding obligations on the United States, and the courts must give full effect to these rules.

## C.    Ripeness

By their very nature, Eighth Amendment and international law analyses are constantly evolving to reflect the evolving standards of decency on both a national and international level. Thus, portions of this claim may not be ripe for litigation at this time. See Stewart v. Martinez-Villareal, 523 U.S. 637 (1998) (recognizing that death-sentenced prisoner properly raises a Ford claim after a warrant for his execution has been issued). Nevertheless, Mr. Fields raises these issues here in order to preserve the claim for future review and avoid any assertion by the Government that the claim has been waived. He is prepared to litigate this claim and present his proofs at an evidentiary hearing should this Court conclude that it is appropriate to do so at this time.

## GROUND THREE

**THE SIXTH AMENDMENT WAS VIOLATED BECAUSE TRIAL COUNSEL INEFFECTIVELY FAILED TO INVESTIGATE, PRESENT AND ARGUE EVIDENCE THAT WOULD HAVE REBUTTED THE SUBSTANTIAL PLANNING AND MENTAL ANGUISH AGGRAVATING FACTORS, AND THE FIFTH AMENDMENT WAS VIOLATED BECAUSE THE GOVERNMENT PRESENTED FALSE AND MISLEADING TESTIMONY AND ARGUMENT TO SUPPORT THE SUBSTANTIAL PLANNING AGGRAVATING FACTOR.**

"The use of 'aggravating circumstances' is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion." Lowenfield v. Phelps, 484 U.S. 231, 244 (1988) (citing Jurek, 428 U.S. 262). In the federal capital sentencing regime, aggravating circumstances must be proven beyond a reasonable doubt.[16] 18 U.S.C. § 3593(c).

In Mr. Fields' case, the Government sought to prove, among other aggravating

---

[16] In addition, where enumerated aggravating factors operate as "the functional equivalent of an element of a greater offense," the Sixth Amendment requires their proof beyond a reasonable doubt. Ring v. Arizona, 536 U.S. 584, 609 (2002).

circumstances, the statutory aggravating factor that Mr. Fields shot Mr. and Mrs. Chick after substantial planning and premeditation, and the non-statutory aggravator that he inflicted mental anguish on Mrs. Chick. The jury found both of these aggravating circumstances. See United States v. Fields, 516 F.3d 923, 927 (10th Cir. 2009).

Trial counsel neglected their constitutional duty to challenge the aggravating factors that made Mr. Fields eligible for the death penalty. The Government's evidence of substantial planning and mental anguish was deeply flawed, yet trial counsel failed to attack the Government's witnesses on cross-examination and failed to present their own rebuttal experts who could have helped them expose the vulnerabilities of this evidence. Even more remarkably, in closing argument trial counsel failed to utter a single word about why the Government had failed to prove the aggravating factors beyond a reasonable doubt.

Moreover, with regard to the substantial planning aggravating factor, the Government presented testimony and argument that was at best misleading testimony and at worst false. The Government presented the false and misleading testimony of a law enforcement official to establish that Mr. Fields purportedly staged a robbery many hours after shooting the Chicks and endorsed that false and misleading testimony in its closing argument; selectively and misleadingly elicited facts from a witness to bolster its claim in closing argument that Mr. Fields attempted to set up a false alibi for his whereabouts on the evening of the homicides; and twisted Mr. Fields' long-time interest in hunting squirrels into a methodical plan to kill human beings.

Trial counsel's failure to challenge the substantial planning and mental anguish aggravating factors violated Mr. Fields' right to the effective assistance of counsel guaranteed by the Sixth Amendment, and the Government's knowing presentation of false and/or misleading evidence in

support of the substantial planning aggravating factor violated his right to due process guaranteed by the Fifth Amendment.

### A. The Substantial Planning Aggravating Factor

### 1. The Government's Evidence

To prove the substantial planning aggravating factor,[17] the Government alleged that, a year or more prior to the homicides, Mr. Fields conceived a plan to become "a predator, a sniper" and shoot human beings. TR, 3406-07. As evidence of this purported scheme, the Government elicited from Daniel Presley, a friend of Mr. Fields, that Mr. Fields went squirrel–hunting in a ghillie suit, that he attached a powerful scope to his .22 rifle (which he also ghillied), and that he was a "[g]reat shot." *TR*, 2378-79, 2384-85.

The Government further alleged that, a few days before July 10, 2003, Mr. Fields met the Chicks and decided to put his plan into action. As evidence of this "plan," the Government first called Mr. Presley to testify that on the evening of July 10, 2003, he had plans "to go to the casino in Pocola, Oklahoma with my sister who was in town." *TR*, 2382. The Government then called Dawn Michelle (Tipton) Bond, Mr. Fields' former girlfriend, to testified that Mr. Fields called her on the morning of July 10, 2003, and told her he had plans to go fishing with his friend Mr. Presley

---

[17] The statutory aggravating factor of substantial planning and premeditation (18 U.S.C. § 3592(c)(9)) provides as follows:

(c) Aggravating factors for homicide – In determining whether a sentence of death is justified for an offense described in section 3591(a)(2), the jury, or if there is no jury, the court, shall consider each of the following aggravating factors for which notice has been given and determine which, if any, exist:

(9) Substantial planning and premeditation – The defendant committed the offense after substantial planning and premeditation to cause the death of a person or commit an act of terrorism.

that evening so "he wouldn't be right home." *TR,* 2558-59.  From these facts, the Government argued that Mr. Fields did not really have a plan to go fishing with Mr. Presley and instead was attempting to create an "alibi" for his whereabouts.  *TR*, 3412-13.

The Government also presented evidence that Mr. Fields returned to the campsite hours after shooting the Chicks and "staged robbery" to make it appear that Mr. Fields' motive was to steal, not to kill.  *Tr.*, 3421, 3422; see also *Tr*, 2019.

To support this "staged robbery" theory, the Government relied on the testimony of Agent Iris Dalley, an Oklahoma State Bureau of Investigation ("OSBI") crime scene agent, and Dr. Ronald DiStephano, a medical examiner for the state of Oklahoma.  First, Agent Dalley testified that the driver's side window of the Chicks' van had been broken and that several glass fragments from this window rested upon a pool of dried blood in the well of the front passenger door.  *TR*, 2099. According to Agent Dalley, because these glass fragments had no blood on them, they must have landed on the blood in the well after it had dried.  *TR*, 2098-99.  Second, Agent Dalley and Dr. DeStephano both testified that lividity patterns on Mr. Chick's body indicated that his body was moved from the picnic table to the ground at least six hours after he was shot.  *TR*, 2026-32, 2111-15.

### 2. The Rebuttal Evidence That the Defense Never Presented

#### a. Evidence that Mr. Fields did not shoot the Chicks after Substantial Planning

Had trial counsel conducted a reasonable investigation, they would have discovered evidence refuting the Government's allegations that Mr. Fields shot the Chicks after substantial planning.  If asked, Mr. Presley – a cooperative witness who made himself available to the defense – would have told trial counsel that the evidence the Government relied on in arguing that Mr. Fields had a long-

standing plan to hunt human beings were in fact entirely innocuous.  According to Mr. Presley:

- Ghillie suits and ghillied weapons were common among hunters in the area, Declaration of Daniel Presley ("Presley Dec."), *A* – 20, ¶¶ 4, 5;

- It was not unusual for hunters like Mr. Fields who ate the squirrels they shot to attach large scopes to their .22 rifles because it prevented the meat from being ruined by shot; and

- Mr. Fields attached the scope to his rifle at least a year before the homicides.  Presley Dec., ¶ 5.

Mr. Presley also could have provided the defense with crucial information destroying the Government's claim that Mr. Fields tried to set up an alibi for the night of the homicides.  Had he been asked by trial counsel, Mr. Presley would have told them that Mr. Fields came over to his house after work on the day of the shootings and **asked him to go snake-hunting that night**.  Presley Dec., ¶ 3.  Mr. Presley and Mr. Fields frequently went snake hunting at night.  Id.  On this particular occasion Mr. Presley declined to go because he had plans to go to the casino with his sister that evening.  Id.  Thus, had trial counsel been properly prepared, on cross-examination they could have elicited from Mr. Presley that Mr. Fields **did** hope to do something with Mr. Presley on the evening of the homicides, as he told Ms. Tipton, and was not trying to fabricate an "alibi."  This information also would have demonstrated that, just a short time before the shootings took place, Mr. Fields still had no plan to go to the Winding Stairs Campground to kill the Chicks.[18]

### b.      Evidence that Mr. Fields did not stage a robbery many hours after the shootings

Had trial counsel conducted a reasonable investigation – including consulting with an

---

[18]  Although Mr. Presley initially believed Mr. Fields came to his house sometime after 4:00 p.m, see FD-302 Interview of Daniel Presley dated August 7, 2003 ("Presley Interview"), *A* – 21, at 3, his wife Marilyn testified that Mr. Fields stopped by "around 6:30, quarter to seven," *TR,* 2462, a fact that Mr. Presley acknowledged in his testimony.  *TR*, 2382.

independent crime scene investigator – they would have discovered evidence refuting the Government's allegations that Mr. Fields returned to the crime scene many hours after the shootings and staged a robbery .

Agent Dalley's testimony that the glass fragments found resting on a dried pool of Mrs. Chick's blood were not stained with blood was contradicted by both Agent Dalley's own investigative report and photographs taken at the crime scene. In her report, Agent Dalley recorded no observations about these glass fragments, nor did she note whether she examined the fragments at the scene or collected them for later examination. OSBI Crime Scene Investigation Report dated August 1, 2003, *A* – 22, at 3. Trial counsel never cross-examined her about why, if the glass fragments were such important evidence, she failed to note in her report that they were free of blood, as she told the jury two years later.

Moreover, one of the crime scene photographs taken by Agent Dalley shows that at least one glass fragment resting on the dried pool of Mrs. Chick's blood has a red stripe consistent with blood. Declaration of R. Robert Tressel ("Tressel Dec."), *A* – 23, ¶ 8. Thus, contrary to Agent Dalley's testimony that the glass fragments landed on Mrs. Chick's blood after it had dried, at least one fragment must have landed on the blood while it was still viscous. Id., ¶ 9.

Even if other glass fragments had no blood on them, this could have been accounted for by the fact that Agent Dalley had to open the passenger door of the van to view the interior, TR, 2098, at which time she likely disturbed a number of glass fragments and caused them to fall onto the dried blood. Tressel Dec., ¶ 12. This conclusion is supported by another photograph taken by Agent Dalley which shows that at least one glass fragment appears to have fallen from the van door to the pavement below. Id.

51

Evidence related to Mr. Chick's body also suggests that he was not moved many hours after he was shot, as the Government alleges. As Tressel, or another competent crime scene investigator, could have told the defense:

- Government's Exhibit 51, a photograph depicting Mr. Chick's right hand, shows pine needles and other ground debris attached to a thin layer of blood coating his fingers and the top half of his hand, but no debris attached to the blood-free portion of his hand and wrist. This indicates that Mr. Chick was moved from the picnic table to the ground before the blood on his hand dried. Tressel Dec., ¶ 16.

- Another crime scene photograph shows a considerable pool of blood around Mr. Chick's head. Given the cool evening temperature and the heavy volume of blood that flowed from his head, his body must have been moved relatively soon after he was shot. Tressel Dec., ¶ 17.

- Although the Government's theory that Mr. Chick's body was moved more than six hours after he was shot was based on livor patterns on the body, see, e.g., *TR*, 2031-32, 2177, trial counsel failed to cross-examine Dr. DiStephano and Agent Dalley on the fact that a number of livor patterns on Mr. Chick's body also were **consistent** with lividity having become fixed while Mr. Chick was lying where he was found and **inconsistent** with lividity having become fixed while Mr. Chick was slumped at the picnic table. Tressel Dec., ¶ 18. Trial counsel could have impeached the lividity testimony of Dr. DiStephano and Agent Dalley by demonstrating that at least some livor was inconsistent with the Government's theory, thereby creating reasonable doubt that Mr. Chick's body was moved long after he was shot.

### B.     The Mental Anguish Aggravating Factor

#### 1.     The Government's Evidence

To prove the nonstatutory mental anguish aggravating factor,[19] the Government argued that Mrs. Chick was close enough to her husband when he was shot that she was "splattered" with his blood "all over h[er] face." *TR*, 3415-16. As evidence to support this argument, the Government presented the testimony of Agent Dalley. Agent Dalley testified that she observed high velocity blood spatter on Mrs. Chick's face, particularly on her left check, and that high velocity spatter can

---

[19] Non-statutory aggravating factors are permitted under 18 U.S.C. § 3953(a).

travel up to two feet and still remain visible. *TR*, 2088-91. According to Agent Dalley, Mr. Chick had to be the source of the high velocity spatter on Mrs. Chick's face, *TR*, 2090, although the spatter was never tested to confirm that claim. *TR*, 2213.

### 2. The Rebuttal Evidence That the Defense Never Presented

Had trial counsel conducted a reasonable investigation by consulting with a blood spatter expert, they could have rebutted the Government's claim that Mrs. Chick was sitting just two feet from her husband and was spattered with his blood when he was shot. Mrs. Chick was shot in the left frontal region of her head, resulting in two wounds: an entrance wound and a nearby exit wound. Tressel Dec., ¶ 26. Either of these wounds could have created high velocity blood spatter, and this spatter could have landed on Mrs. Chick's face. Id. Significantly, most of the spatter observed by Agent Dalley was on Mrs. Chick's left cheek, the same side as her frontal bullet wound. Id., ¶ 25.

### C. Trial Counsel's Ineffective Assistance

Trial counsel were ineffective for failing to fully investigate the Government's claims that Mr. Fields carried out these crimes with substantial planning and premeditation and inflicted mental anguish on Mrs. Chick and to adequately challenge those claims at the sentencing hearing. Trial counsel's performance was deficient and Mr. Fields was prejudiced by that deficient performance. See Strickland, 466 U.S. at 687.

### 1. Deficient Performance

Trial counsel were deficient because they had an obligation to rebut the aggravating factors presented by the Government. "[C]ounsel at every stage of the case have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation." ABA Guideline 10.11(A); see also ABA Guideline

$10.11(I)^{20}$ ("Counsel at all stages of the case should carefully consider whether all or part of the aggravating evidence may appropriately be challenged as improper, inaccurate, misleading or not legally admissible."). Notwithstanding these duties, the Government's evidence of substantial planning and mental anguish went unrebutted.

Had trial counsel mounted a reasonable investigation, they could have discovered ample evidence with which to rebut the Government's aggravating circumstances. For instance, Mr. Presley could have testified that ghillie suits and scoped rifles were commonly used for hunting, placing the Government's evidence on those matters in its proper context. He also could have demolished the Government's "alibi" claim by informing the jury that Mr. Fields asked him to go snake hunting on the night of the offenses. Trial counsel should have discovered this information in particular because, in Mr. Presley's statement to the FBI, he mentioned that, just hours before the offenses, Mr. Fields asked him if he "wanted to do something." Presley Interview at 3. That statement, which was produced to the defense in discovery, should have prompted trial counsel to inquire what exactly Mr. Fields wanted to do with Mr. Presley. Yet trial counsel never followed up on the matter with Mr. Presley. Presley Dec., ¶ 3.

A crime scene investigator or other appropriate expert also should have been called to cast reasonable doubt on the Government's claim that Mr. Fields staged a robbery hours after the shootings and inflicted mental anguish on Mrs. Chick by causing her husband's blood to be spattered on her face. At the very least, trial counsel should have consulted with such an expert to assist in

---

[20] See also ABA Guideline 10.11(I), cmt. at 111 ("Counsel should prepare for the prosecutor's case at the sentencing phase in much the same way as for the prosecutor's case at the guilt/innocence phase. Counsel should use available discovery mechanisms to ascertain the aggravating and rebuttal evidence the prosecution intends to introduce, and then thoroughly investigate to determine whether this evidence can be excluded, rebutted or undercut.").

cross-examining the Government's witnesses.  See Richter v. Hickman, 578 F.3d 944, 955-961 (9th Cir. 2009) (counsel deficient for failing to consult with blood spatter experts before settling on trial strategy and to present expert testimony at trial).[21]  Yet trial counsel acknowledges that she did not even consider retaining a crime scene investigator or pathologist and concedes that "I could have presented such an expert on my case or, at a minimum, to advise me about how to prepare and conduct my cross-examination of the Government's witnesses."  O'Connell Dec., ¶ 22.

Not only did trial counsel fail to attack the Government's evidence supporting the substantial planning and mental anguish aggravating factors with readily available affirmative evidence of their own, but in closing argument failed to utter a single word about these aggravating factors.  It was, in short, a nearly complete capitulation by the defense.  Under these circumstances, trial counsel's performance was deficient.  See Battenfield v. Gibson, 236 F.3d 1215, 1228 (10th Cir. 2001) (counsel's performance was "constitutionally deficient" because he was "wholly unprepared to rebut the aggravating factors argued by the prosecution"); Harries v. Bell, 417 F.3d 631, 638 (6th Cir. 2005) (counsel rendered deficient performance by failing to rebut aggravating evidence).

Trial counsel admits that she had no strategic or tactical reason for not consulting or presenting a crime scene investigator or other appropriate expert to rebut the Government's claims.  O'Connell Dec., ¶ 22.  Nor could there could be any reasonable basis for failing to investigate and attack the Government's theory that Mr. Fields committed these crimes with substantial planning

---

[21]  See also Draughon v. Dretke, 427 F.3d 286, 296 (5th Cir. 2005) (counsel deficient where "the failure to investigate the forensics of the fatal bullet deprived [the defendant] of a substantial argument, and set up an unchallenged factual predicate for the State's main argument .... [The defendant] became the sole source of evidence available to counter the prosecution's theory."); Gersten v. Senkowski, 426 F.3d 588, 607-08 (2d Cir. 2005) (counsel deficient when he "failed to call as a witness, or even to consult in preparation for trial and cross-examination of the prosecution's witnesses, any medical expert on child sexual abuse").

and premeditation and inflicted mental anguish on Mrs. Chick. These aggravating factors were factors that made Mr. Fields eligible for the death penalty, and trial counsel had every reason to rebut them or argue that they did not sufficiently outweigh the mitigating factors.

### 2. Prejudice

Mr. Fields was prejudiced by trial counsel's deficient performance. The Government presented expert testimony and vigorously argued that this testimony supported both the substantial planning and mental anguish aggravating factors. See, e.g., *TR*, 3406-13, 3415-16, 3420-22, 3454, 3456. That testimony and argument went unchallenged by the defense. Yet trial counsel could have injected reasonable doubt into the jury's deliberations by effectively cross-examining the Government's witnesses, presenting their own expert testimony in rebuttal, and arguing why the Government had not proven these aggravating factors beyond a reasonable doubt. See Richter, 578 F.3d at 962 ("Because expert testimony that contradicted that offered by the prosecution was in fact available, and strongly persuasive, the harm caused by counsel's failure to make any effort to obtain it is readily apparent, and devastating."). Given that the Government had the burden of proof beyond a reasonable doubt, 18 U.S.C. § 3593(c), there is a reasonable likelihood that, had trial counsel attacked the Government's evidence in these ways, the verdict would have been different.

### D. The Government's Due Process Violations

"[C]ontrivance by a state to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation." Mooney v. Holohan, 294 U.S. 103, 112 (1935). For this reason, the Supreme Court has long recognized that a conviction obtained through the use of false evidence violates due process. Napue v. Illinois, 360 U.S. 264, 269 (1959) (citing Holohan, Pyle v. Kansas, 317 U.S. 213

56

(1942) and <u>Curran v. Delaware</u>, 259 F.2d 707 (3d Cir. 1958)).  Such a conviction violates due process regardless of the prosecution's good faith or bad faith.  <u>Napue</u>, 360 U.S. at 269 (due process violated where prosecution knew or should have known of false testimony); <u>United States v. Agurs</u>, 427 U.S. 97, 103 (1976) (same).

Here, the Government violated <u>Napue</u> and its progeny by presenting false and misleading testimony and argument to persuade the jury that Mr. Fields killed Mr. and Mrs. Chick after substantial planning and deliberation.

### 1. False and Misleading Testimony and Argument About a Purportedly Staged Robbery

As noted, the Government argued that, after Mr. Fields shot the Chicks, he left the campground and returned more than six hours later to stage a robbery to make it appear that his objective had been to steal, not to kill.  *TR*, 3421, 3422.  This theory supported the Government's claim that the shootings were the result of substantial planning and deliberation, a statutory aggravating circumstance that made Mr. Fields eligible for the death penalty and was weighed by the jury.  <u>See</u>, <u>e.g.</u>, *TR*, 2019 (explaining relevance of "staged robbery" theory to statutory aggravating factor).  Establishing these facts also tended to contradict Mr. Fields' mental health-related evidence.

The Government's "staged robbery" theory relied in significant part on Agent Dalley testimony that the driver's side window of the Chicks' van had been broken and that several glass fragments from this window rested upon a pool of dried blood in the well of the front passenger door.  *TR*, 2099.  According to Agent Dalley, she found these glass fragments "significant" because they had no blood on them, and therefore must have landed on the blood in the well after it had dried.  <u>Id.</u> at 2098-99.  The Government argued in closing that this testimony supported the

substantial planning aggravating circumstance.  *TR*, 3456.

Agent Dalley's testimony was false and misleading.  Her claim that she "noted was there are some of these fragments on top of the blood, and those glass fragments are not stained" is contradicted by (1) her own crime scene investigation report, and (2) photographs she took at the crime scene.  She made no mention of any lack of blood staining in the report she prepared approximately two weeks after the homicides, nor did she collect the glass fragments for later examination.  OSBI Crime Scene Investigation Report dated August 1, 2003, 3, 7-9.  Thus, she had no basis upon which to testify two years later that the glass fragments were free of blood.

Moreover, Agent Dalley's claim that the glass fragments lacked any blood staining is refuted by the photographs she herself took at the crime scene.  In one photograph, at least one glass fragment resting on the dried pool of Ms. Chick's blood shows a red stripe consistent with blood.  See OSBI Photograph (CR03527CD40085.jpg), $A-24$.  This photograph directly contradicts Agent Dalley's testimony.  Significantly, during Agent Dalley's direct examination, the Government never showed her this particular photograph even though it reveals more detail than Government's Exhibit 43, the photograph prosecutors did show her.

The prosecutors knew or should have known that Agent Dalley's testimony was false and misleading.  The Government had both Agent Dalley's crime scene report and the photographs she took at the scene, and thus the false and misleading nature of Agent Dalley's testimony should have been readily apparent to the prosecutors.  Even if the prosecutors did not elicit Agent Dalley's false and misleading testimony, they unquestionably had a duty to correct it.  Napue, 360 U.S. at 269 ("[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."); US v. Biberfeld, 957 F.2d 98, 102 (3d Cir. 1992) ("If a prosecutor

uses testimony it knows or should know is perjury, it is fundamentally unfair to an accused .... The same is true when the government, although not soliciting false evidence, allows it to go uncorrected when it appears at trial.").

**2.      Misleading Testimony and False and Misleading Argument About Mr. Fields' Purported "Alibi"**

As also noted, the Government argued that Mr. Fields attempted to construct an alibi for his whereabouts on the night of the offenses.  This argument was based on the testimony of two witnesses, Mr. Presley and Ms. Tipton.  The Government first called Mr. Presley to testify that on the evening of the homicides he had a plan to go to the casino in Pocola, Oklahoma with his sister. *TR*, 2382.  The Government then called Ms. Tipton to testify that Mr. Fields called her on the morning of July 10, 2003 and told her that he had "plans" with Mr. Presley for that evening and that "[t]hose plans – those plans were for him and Danny [Presley] to go fishing and him not – he made it very clear to me he would not be home right after work." *TR,* 2558-59.

Based on this testimony, the Government argued in closing that Mr. Fields had attempted to set up an alibi for the night he planned to shoot the Chicks:

> He knew this was the day.  **He had already set up us [sic] alibi**.  If you remember, Michelle Tipton told you, yeah, he called me on that day.  He said he was going fishing with Dan Presley, not to expect him over at her house later that evening, that he'd be late.  Well, we know that's not true because Dan Presley was at his house and sleeping for a period of time with the Defendant there, certainly not fishing with him.  **He's already set up the alibi because he knows on this night that would be the last night that the Chicks have on this earth**.

TR, 3412-13.

The Government knew or had reason to know that Mr. Fields never tried to "set up [an] alibi," as it falsely and misleadingly argued to the jury.  In August 2003, Mr. Presley told the FBI that, on the day of the offenses, Mr. Fields came to his house sometime after 4:00 p.m. and asked

59

him if he "wanted to do something." Presley Interview at 3. Mr. Presley replied that he had "plans to play the casino in Fort Smith." Id. This statement was memorialized in a FBI 302 Report and provided to the prosecutors. Id. During Mr. Presley's direct examination, the Government selectively asked him about only **part** of this statement – that he planned to go to the casino – to create the misimpression that, contrary to what Mr. Fields told Ms. Tipton, he had no plans with Mr. Presley for that evening. The Government failed to ask Mr. Presley about the exculpatory fact that Mr. Fields suggested they "do something" together, which is why Mr. Presley mentioned his casino plans to the FBI in the first place and thus was necessary to place this information in proper context.

It was clear from Mr. Presley's complete statement to the FBI that Mr. Fields **did** intend – or at least hoped – to do something with Mr. Presley on the evening of the homicides, just as he had told Michelle Tipton. What Mr. Fields said to Ms. Tipton was not an alibi, but an intention. This evidence would have shown that he had no plan to shoot the Chicks at the time he made this statement to Ms. Tipton, nor did he have such a plan when he suggested to Mr. Presley that they go snake hunting – which likely occurred right before he went to the Winding Stair Campground. The Government argued to the jury that Mr. Fields tried to set up an alibi knowing that this claim simply was not true.

### 3. The False and Misleading Testimony and Argument Could Have Affected the Judgment of the Jury

Where false and misleading testimony and argument are used to obtain a conviction, such testimony and argument are material if "if there is any reasonable likelihood that the false testimony **could** have affected the judgment of the jury." Agurs, 427 U.S. at 103. Accord Giglio v. United States, 405 U.S. 150, 154 (1972); Napue, 360 U.S. at 271. See also Strickler Greene, 527 U.S. 263, 299 (1999); United States v. Bagley, 473 U.S. 667, 678-80 & n.9 (1985); United States v. Barham,

595 F.2d 231, 242-43 (5th Cir. 1979).

There is a reasonable likelihood that the judgment of the jury **could** have been affected by the Government's presentation of false and misleading testimony and argument. This testimony and argument were important to the Government's efforts to prove the substantial planning aggravating factor, which was one of the aggravating factors that made Mr. Fields eligible for the death penalty. The Government's presentation of Agent Dalley's false and misleading testimony, and its closing argument endorsing that testimony, could have persuaded the jury that the homicides were the product of substantial planning and premeditation because Mr. Fields staged a robbery hours after killing the Chicks to conceal his intent to kill. The Government's selective and misleading presentation of Mr. Presley's testimony, and its closing argument that the evidence proved Mr. Fields set up an alibi many hours before killing the Chicks, also could have persuaded the jury to find the substantial planning aggravating circumstance. Had the jury not been presented with this false and misleading testimony and argument, it could have rejected the substantial planning aggravating circumstance and concluded that the proven aggravating circumstances did not outweigh the proven mitigating factors.

The impact of the false and misleading evidence used in this case was exacerbated by the fact that it not only helped prove an aggravating circumstance, but also undercut the defense's argument that Mr. Fields was not capable of planning out the crimes because he suffered a manic flip at the time of the offenses. Courts readily find that there is a reasonable likelihood that the jury's judgment could have been affected when the prosecution's misrepresentations undermine the defense position. See, e.g., United States v. Alzate, 47 F.3d 1103, 1110 (11th Cir. 1995) (finding Napue/Giglio error where government witness' "testimony about the statement [defendant] made

while being interviewed did serious damage to the duress defense .... [The defendant's] attempt to repair that damage and salvage his only defense by explaining the statement was seriously undermined by the representations [the prosecutor] made to the court and the jury – representations which [the prosecutor] later learned were false."); United States v. Udechukwu, 11 F.3d 1101, 1106 (1st Cir. 1993) (finding Napue/Giglio error because prosecution's argument and evidence "weakened immeasurably" the defense case).

Moreover, in determining whether suppressed exculpatory evidence or false and misleading evidence is material for purposes of Brady and Napue, the cumulative effect of that evidence must be considered. See Kyles, 514 U.S. at 436 (suppressed evidence to be considered "collectively, not item-by-item"). Thus, even if a single violation does not rise to a deprivation of the right to a fair trial, the effect of all violations considered together may undermine confidence in the outcome of the trial and deprive a defendant of a fair trial. See id. at 434. Here, the combined effect of all these due process violations, as well as the due process violations discussed in Ground Seven, below, denied Mr. Fields his right to due process, even if each due process violation considered individually was not material.

## GROUND FOUR

**THE SIXTH AMENDMENT WAS VIOLATED BECAUSE TRIAL COUNSEL INEFFECTIVELY FAILED TO PRESENT MR. FIELDS' SOCIAL HISTORY THROUGH THE TESTIMONY OF A MITIGATION SPECIALIST OR MENTAL HEALTH EXPERT AND TO ARGUE THAT SOCIAL HISTORY AS A MITIGATING FACTOR.**

Capital counsel has an "obligation to conduct a thorough investigation" for mitigating evidence. Williams, 529 U.S. at 396 (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed. 1980)). A constitutionally adequate investigation must include "efforts to discover all reasonably available mitigating evidence," including information about "family and

social history." <u>Wiggins</u>, 539 U.S. at 524 (quoting ABA Guidelines, §§ 11.4.1(C), 11.8.6 (1989) (emphasis omitted)); <u>accord</u> <u>Rompilla</u>, 545 U.S. 380-81.

Although the defense's mitigation specialist thoroughly investigated Mr. Fields' social history, the information she gathered was never told to the jury. What passed for a social history was a disjointed presentation of random events in Mr. Fields' life that misled the jury into believing he had been raised in a typical family. The truth was far different.

Contrary to the impression created with the jury, Mr. Fields was raised in a highly dysfunctional family, and that dysfunction had a profound impact on his life, his mental health and his adult functioning. While this information would have been mitigating in its own right, it also would have helped a mental health expert explain his mental state at the time of the offenses. Trial counsel should have presented this evidence through a mitigation specialist or mental health expert, who would have testified about information gleaned from many sources, including relatives, friends and institutional records. Such a witness could then have explained that information to the jury as part of a coherent, compelling mitigation theme. Trial counsel also should have argued to the jury that Mr. Fields' social history mitigated the offenses. Instead, the jury deliberated over Mr. Fields' fate knowing little about the events and forces that shaped his life.

Trial counsel's failure to present a comprehensive social history and to argue that social history as a mitigating factor violated Mr. Fields' right to the effective assistance of counsel guaranteed by the Sixth Amendment.

### A. The Incomplete and Misleading Evidence of Mr. Fields' Family Background That the Jury Heard

Nearly all of the truncated evidence the jury heard about Mr. Fields' childhood and family background came from his sister, Cherie Fields. On direct examination, trial counsel asked her

about relatively benign topics. Trial counsel elicited the places her family lived, *TR*, 2674-76; her fighting with Mr. Fields, which she described as "normal teenage type stuff," *TR*, 2676; her father's long hours at work and the fact that he did not spend much time with his children, *TR*, 2677-78; the impact of her grandfather's death on the family, *TR*, 2679-80, her mother's physical ailments, *TR*, 2680-82; life with her mother in the months before the offenses, *TR*, 2682; the impact of her father's death on her mother, *TR*, 2682-85; the work Mr. Fields did for his father when he was sick, *TR*, 2685-86; and her relationship with Mr. Fields' children. *TR*, 2687. Trial counsel never asked her any questions that would have revealed the extent of family dysfunction, abuse, and emotional neglect that characterized Mr. Fields' upbringing.

Trial counsel also never asked the defense's mental health experts, Dr. Grinage and Dr. Woods, about Mr. Fields' history of family dysfunction. Indeed, very little social history information made its way to Dr. Grinage and Dr. Woods. See Grinage Dec., ¶ 10; see also Dr. Grinage's Forensic Mental Health Evaluation, dated June 24, 2005, *A* – 28, at 2; Shettles Memo Preliminary Assessment, dated September 11, 2003 ("Shettles Memo"), *A* – 25, at 2; Letter from Dr. George Woods to Julia O'Connell dated June 25, 2005, *A* – 28, at 1. Thus, their opinions were not informed by the wealth of family and social history uncovered by the defense's mitigation specialist, Glori Shettles.

Because trial counsel did not present evidence of Mr. Fields' family dysfunction, they never argued this evidence as a mitigating factor. Of the twenty-two mitigating factors raised by the defense, not a single one addressed his childhood, family background or family dysfunction. *TR*, 3400-01.

**B. Mr. Fields' Full – But Unpresented – Social History Shows Significant and Mitigating Family Dysfunction**

In reality Mr. Fields was raised in a severely dysfunctional family – a fact that never emerged from Cherie Fields' limited testimony. His parents were themselves raised in physically and sexually violent households. Shettles Dec., ¶ 5; Shettles Memo at 4-5, 7. His mother suffered from depression her entire life and failed to give her children the emotional support they needed. Shettles Dec., ¶ 5. The problem was compounded by the fact that, when Mr. Fields' largely absentee father was around, he and Mr. Fields' mother spent most of their time together to the exclusion of the children. Id., ¶ 6; see also Declaration of Cherie Fields ("Fields Dec."), *A – 26*, ¶ 3. Mr. Fields' mother played him and his sister against each other, Fields Dec., ¶ 5, creating a triangle of coldness between Mr. Fields, his sister and their parents. Shettles Dec., ¶ 6. At the command of their mother, Mr. Fields' father whipped Mr. Fields and his sister with belts. Id., ¶ 6.

Mr. Fields' family had lived in four different states by the time he reached high school. Although Cherie Fields testified about her family's various moves, *TR*, 2674-76, the jury never learned that the family's nomadic lifestyle made it difficult for Mr. Fields to make and keep friends and increased his sense of isolation. As he approached his teenage years, he began exhibiting signs of chronic depression, causing others to dismiss him as lazy. Shettles Dec., ¶¶ 8, 10. His sister recalls that he was "getting weirder and weirder," Fields Dec., ¶ 9, and that by the time they moved to Virginia he "was sick and as strange and depressed and unpredictable as he had ever been." Id., ¶ 7.

It is more likely than not that Mr. Fields' mental health problems have a genetic component. Intergenerational mental health and neurological issues have plagued Mr. Fields' family, particularly on his mother's side. Shettles Dec., ¶ 8. His mother and his daughter have been diagnosed as

65

suffering from bipolar disorder, his grandmother, Pat Ginnaman, received electroshock treatments, and two sisters of Ms. Ginnaman were known to have been mentally ill. Fields Dec., ¶ 8. Mr. Fields' mother reported having brain lesions. Shettles Memo at 2. On his father's side, Mr. Fields has a cousin who is bipolar, hears voices and has received in-patient treatment for significant periods of time, and his father's mother died of a brain tumor. Id. at 3-4.

### C. Trial Counsel's Ineffective Assistance

Trial counsel were ineffective for failing to present a complete and comprehensive social history of their client – including family dysfunction and other mitigating evidence – through the testimony of a mitigation specialist such as Ms. Shettles, or a mental health expert such as Dr. Woods or Dr. Grinage. Trial counsel also were ineffective for failing to argue that Mr. Fields' social history was a mitigating factor and to provide this evidence to the defense's mental health experts to help evaluate his mental state at the time of the offenses. As these are among the more core duties expected of capital counsel, trial counsel's failures in this regard were ineffective. See Strickland, 466 U.S. at 687.

### 1. Deficient Performance

Trial counsel performed deficiently by failing to present a complete social history and to argue that social history as a mitigating factor. It is axiomatic that the development of social history evidence is crucial to an effective mitigation defense at capital sentencing. See, e.g., Wiggins, 539 U.S. at 524 (counsel ineffective for failing to generate and present capital defendant's "social history"); Glenn, 71 F.3d at 1208 (capital counsel must fully investigate and develop "their client's social history" and are ineffective if they fail to do so); Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir. 1995) ("In cases where sentencing counsel did not conduct enough investigation to formulate

an accurate profile of a defendant," counsel's representation has consistently been held "beneath professionally competent standards."). A necessary corollary is that the evidence developed must be presented at sentencing as part of a compelling narrative that helps the jury understand the "diverse frailties of humankind" that make the defendant a unique human being. <u>Woodson v. North Carolina</u>, 428 U.S. 280, 304 (1976). Moreover, "it is critically important to construct a persuasive narrative, rather than to simply present a catalog of seemingly unrelated mitigating factors." ABA Guidelines 10.11, cmt., p. 108. None of this happened in Mr. Fields' case.

The defense's social history presentation was woefully inadequate and distorted the real picture of Mr. Fields' family. Part of the problem stemmed from trial counsel's inadequate preparation of Cherie Fields, who now acknowledges that at the time of her testimony she did not understand why it was important for the jury to hear about family dysfunction. Fields Dec., ¶ 12. According to Cherie Fields, "It is very hard to admit that there was so much strange behavior and strange violence in our house and I wish that the lawyers for Eddie before had been more specific and clear about why it was important to tell the gory details." <u>Id.</u>

The problem was far greater than just trial counsel's poor preparation of Cherie Fields, however. As Ms. Shettles, who attended the entire sentencing hearing, describes:

> [W]hile some isolated social history facts were provided to the jury, there was never a comprehensive social history that would really "humanize" Mr. Fields or place into proper context the inter-related factors about his life. Counsel never considered these problems, nor did they consider for development and presentation, the significant mitigation that I had collected. There was simply no effort given to contextualizing those isolated life and social history facts that were incidentally provided to the jury.

Shettles Dec., ¶ 14.

To properly contextualize Mr. Fields' life, trial counsel should have called, not just Cherie

Fields, but a mitigation expert such as Ms. Shettles or a mental health expert such as Dr. Woods or Dr. Grinage to relate this information to the jury. Ms. Shettles, Dr. Woods or Dr. Grinage could have developed this information into compelling mitigation themes of parental abandonment, emotional and physical abuse, family dysfunction, and mental illness. Had trial counsel asked any of these witnesses to present Mr. Fields' social history, the jury would have learned information that came from many relatives and family acquaintances, not just Cherie Fields. The jury also would have learned information that came from documentary sources such as school, hospital and other institutional records. All of these facts could then have been woven into coherent mitigation themes: that Mr. Fields was raised without parental attachment; that his parents placed their own relationship ahead of their relationship with their children, that he was emotionally and physically abused; that his family's transience made it difficult for him to form friendships; that his family was dysfunctional, that his mother was chronically depressed; and that he suffered significant losses in his life. See, e.g., Shettles Dec., ¶ 11.

Moreover, Dr. Woods and Dr. Grinage should have been given this information and asked about how it affected their opinions of Mr. Fields' state of mind at the time of the offenses. The commentary to the ABA Guidelines discusses the importance of having the meaning of a defendant's social history explained to the jury by an appropriate expert:

> Since an understanding of the client's extended, multigenerational history is often needed for an understanding of his functioning, construction of the narrative normally requires evidence that sets forth and explains the client's complete social history from before conception to the present. Expert witnesses may be useful for this purpose and, in any event, are almost always crucial to explain the significance of the observations. **For example, expert testimony may explain the permanent neurological damage caused by fetal alcohol syndrome or childhood abuse, or the hereditary nature of mental illness, and the effects of these impairments on the client's judgment and impulse control**. Counsel should choose experts who are tailored specifically to the needs of the case, rather than relying on an "all-purpose"

expert who may have insufficient knowledge or experience to testify persuasively. ABA Guidelines 10.11, cmt., p. 108-109.

Had trial counsel asked Dr. Woods and Dr. Grinage to have provided the jury with this kind of understanding, they would have done so. According to Dr. Grinage, "It is axiomatic that collateral history is critical in assessing and presenting a complete picture of the patient/defendant as I seek to explain his mental state at the time of the incident." Grinage Dec., ¶ 10. Yet Dr. Woods and Dr. Grinage were not even supplied all of the social history evidence uncovered by Ms. Shettles, much less asked to explain the significance of that evidence to the jury. Id., ¶ 10; Forensic Mental Health Evaluation, dated June 24, 2005, *A* – 28, at 2; Letter from Dr. George Woods to Julia O'Connell dated June 25, 2005, *A* – 28, at 1.

Trial counsel acknowledges that she had no tactical or strategic reason for failing to present a complete social history through Ms. Shettles or one of the defense's expert psychiatrists. O'Connell Dec., ¶ 19. Nor could there be any reasonable basis for failing to do so. Trial counsel clearly understood the value of social history evidence – particularly evidence of Mr. Fields' childhood and family background – because they retained Ms. Shettles to investigate his social history and then called Cherie Fields to testified about that background. Having chosen to present this kind of evidence to the jury, trial counsel had a duty to do so in a manner reasonably calculated to effectuate Mr. Fields' interests. Trial counsel's scattered and incomplete social history presentation failed to accomplish that result.

### 2. Prejudice

Mr. Fields was prejudiced by trial counsel's deficient performance, "As a practical matter, the defendant probably has little or no chance of avoiding the death sentence unless the defense

counsel gives the jury something to counter both the horror of the crime and the limited information

the prosecution has introduced about the defendant." Romano v. Gibson, 239 F.3d 1156, 1180 (10th

Cir. 2002). Mr. Fields' jury learned relatively little about Mr. Fields beyond what the prosecution

wanted it to know, making it more likely to vote for death.

Although trial counsel presented a few random biographical facts, *TR*, 3400-01, some of the

most compelling aspects of Mr. Fields' life – his upbringing in a home filled with abuse, emotional

deprivation and dysfunction – were never coherently presented to the jury.[22] Moreover, because

Cherie Fields was not properly prepared to give testimony (i.e., by being informed about the purpose

of social history evidence), she "pulled her punches" and downplayed the dysfunction in her family.

The complete story – had it been told by an objective narrator with the ability to weave a compelling

narrative – would have powerfully mitigated the offenses. Had trial counsel presented that

information, there is a reasonable likelihood that the jury would have returned a verdict of life rather

than death. See Wiggins, 539 U.S. at 537 ("Had the jury been able to place petitioner's excruciating

life history on the mitigating side of the scale, there is a reasonable probability that at least one juror

would have struck a different balance."); see also Bean v. Calderon, 163 F.3d 1073, 1080-81 (9th

Cir. 1998) (finding Strickland prejudice where counsel presented a family portrait in mitigation that

was an "unfocused snapshot" that failed to show abuse experienced by defendant as a child).

The prejudice Mr. Fields suffered from trial counsel's deficient performance was

compounded because the defense's meager social history presentation left the jury to conclude that

---

[22] The fact that trial counsel presented some mitigating evidence does not end the prejudice analysis under Strickland. Sears, 130 S.Ct. at 3266 ("We certainly have never held that counsel's effort to present **some** mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant."); see also Williams, 529 U.S. at 398.

there was nothing particularly mitigating about his childhood and that he was, as the Government claimed, simply a "sociopath" who manipulated and mistreated his family. For instance, the Government argued that Mr. Fields "abandoned" his family until he needed their help after being arrested, that he "envied his hard working, high achieving sister's success" and that he "wouldn't help his o[w]n widowed mother move halfway across this country." *TR*, 3458-59. Because there was no defense evidence putting Mr. Fields' family relationships into accurate context, the Government's argument had credibility with the jury. See Anderson v. Sirmons, 476 F.3d 1131, 1146-47 (10th Cir. 2007) (finding prejudice resultant from counsel's inadequate mitigation presentation because "the case in mitigation presented by trial counsel played into the prosecution's theory that the only explanation for the murders was that Anderson was simply an 'evil' man. The prosecution seized on Anderson's case in mitigation to assert during closing arguments that there was no excuse for Anderson's conduct because he grew up in a 'good family' and was never abused as a child.").

## GROUND FIVE

**MR. FIELDS WAS DENIED HIS RIGHT TO INDIVIDUALIZED SENTENCING, DUE PROCESS, A FAIR TRIAL AND THE EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE THE GOVERNMENT'S CLOSING WAS RIFE WITH IMPROPER ARGUMENT, MOST OF WHICH WAS NOT OBJECTED TO BY TRIAL COUNSEL, AND APPELLATE COUNSEL INEFFECTIVELY FAILED TO RAISE THIS ISSUE ON DIRECT APPEAL.**

A prosecutor's proper concern in a criminal prosecution "is not that it shall win a case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88 (1935); United States v. Hinson, 585 F.3d 1328, 1338 & n.4 (10th Cir. 2009) (expressing the Court's concern that "the important message contained in Berger is being forgotten" and "remind[ing] all U.S. Attorney's Offices that ... [their] interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice

shall be done."). Thus, while a prosecutor "may strike hard blows, he is not at liberty to strike foul ones." Berger, 295 U.S. at 88.

As part of the duty to see that justice is done, the prosecutor has a special duty to avoid improper argument to the jury:

> It is fair to say that the average jury, in a greater or lesser degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

Id.; see also Cargle, 317 F.3d at 1218 ("As the State's official representative prosecuting the case on the public's behalf, the prosecuting attorney 'carries a special aura of legitimacy about him.' Thus, 'the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own.' Further, the prosecutor's personal 'experience in criminal trials may induce the jury to accord unwarranted weight to [his opinions regarding the defendant's guilt]. Finally, the jury might think that the prosecutor's opinion is based on evidence beyond that presented at trial.") (citations omitted); Le v. Mullin, 311 F.3d 1002, 1018 (10th Cir. 2002) ("Like the Court in Berger, we are especially aware of the imprimatur of legitimacy that a prosecutor's comments may have in the eyes of the jury.").

The United States Supreme Court has subjected closing arguments in capital cases to a greater degree of scrutiny. Caldwell v. Mississippi, 472 U.S. 320 (1985); see also Hooks v. Workman, 606 F.3d 715, 746 n.29 (10th Cir. 2010); Douglas v. Workman, 560 F.3d 1156, 1194 (10th Cir. 2009) (stating that in death penalty cases court will "apply a heightened concern for fairness ... where the state is prepared to take a man's life"); Lesko v. Lehman 925 F.2d 1527, 1541 (3d Cir. 1991) ("Because of the surpassing importance of the jury's penalty determination, a

prosecutor has a heightened duty to refrain from conduct designed to inflame the sentencing jury's passions and prejudices."). These principles are particularly important in the penalty phase of a capital case, where the Eighth Amendment's requirements of heightened "reliability in the determination that death is the appropriate punishment," Woodson, 428 U.S. at 305, and that the sentencing process "minimize the risk of wholly arbitrary and capricious action" by the sentencing jury, Gregg, 428 U.S. at 189, together with the "highly subjective" nature of the sentencing decision, Caldwell, 472 U.S. at 340-41 n.7, require that special scrutiny be given to prosecutorial argument.

"When specific guarantees of the Bill of Rights are involved, [the Supreme Court] has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). Thus, a petitioner may receive relief by demonstrating that the prosecutor's improper argument "had a substantial prejudicial effect" on a specific constitutional right, without having to prove that the entire proceeding was unfair. Paxton v. Ward, 199 F.3d 1197, 1217-18 (10th Cir. 1999) (affirming grant of habeas relief where prosecutor's penalty phase argument "had a substantial prejudicial effect" on petitioner's right to present mitigating evidence); see also Cargle, 317 F.3d at 1207 ("claims of prosecutorial misconduct ... require a showing of fundamental unfairness in order to provide habeas relief, unless they involve violation of specific constitutional rights, in which case the principles governing such rights control"); Mahorney v. Wallman, 917 F.2d 469, 472 (10th Cir. 1990) ("While, ordinarily, claims of prosecutorial misconduct and other trial errors are reviewed on habeas [under the DeChristoforo fundamental fairness standard], when the impropriety complained of effectively deprived the defendant of a specific constitutional right, a habeas claim may be established without requiring proof that the entire trial was thereby rendered fundamentally unfair").

When "specific constitutional guarantees are [not] implicated, 'a prosecutor's misconduct will require reversal of ... a conviction only where the remark sufficiently infected the trial so as to make it fundamentally unfair, and, therefore, a denial of due process.'" <u>Cargle</u>, 317 F.3d at 1220; <u>see also</u> <u>Paxton</u>, 199 F.3d at 1217 (holding that <u>DeChristoforo</u> fundamentally unfair standard applies to improper prosecutorial arguments that do not effectively deprive defendant of specific constitutional right); <u>Mahorney</u>, 917 F.2d at 472 (same).

Where individual remarks by themselves do not justify relief, their cumulative effect may do so. <u>Cargle</u>, 317 F.3d at 1206-07; <u>see also id.</u> at 1224-25 (granting penalty phase relief where "the death sentences imposed in this case were substantially influenced by cumulative error"). "'A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.'" <u>Id.</u> at 1206 (quoting <u>United States v. Toles</u>, 297 F.3d 959, 972 (10th Cir. 2002)); <u>see also United States v. Garza</u>, 608 F.2d 659, 665 (5th Cir. 1979) ("While any single statement among those we have isolated might not be enough to require reversal of the conviction and, indeed, some clearly would not, we think it beyond question that the prosecutor's improper comments, taken as a whole, affected the substantial rights of the defendant").

### A. The Government's Closing Arguments Were Rife with Improper Conduct, Denying Mr. Fields' Rights Under the Fifth and Eighth Amendments

During Mr. Fields' capital trial, the United States Attorney repeatedly struck "foul blows," crossing the line of acceptable trial advocacy into inflammatory argument and prosecutorial misconduct. The Government's improper arguments included: (a) misstating the law regarding the weighing of mitigating and aggravating circumstances so as to increase Mr. Fields' burden of persuasion and decrease that of its own, denigrating the jury's discretion to show mercy, and inviting

the jury to sentence Mr. Fields to death based upon irrelevant and inflammatory societal concerns; (b) vouching for its own expert witnesses while denigrating the expert witnesses presented by Mr. Fields; (c) launching *ad hominem* attacks on Mr. Fields that were irrelevant to any of the issues at trial; (d) misrepresenting the record and the testimony of witnesses; (e) making arguments without factual basis in the record; and (f) reciting Biblical scripture at length. See *Motion*, Ground 5, ¶¶ 175, 177-79, 182-93. The cumulative effect of the Government's improper closing arguments was to render Mr. Fields' trial fundamentally unfair and to substantially prejudice his constitutional right to jury consideration of all relevant mitigating evidence and to the imposition of a death sentence only under a statutory process that "channel[s] the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death .'" Godfrey v. Georgia, 446 U.S. 420, 428 (1980) (citations omitted).

### 1. Improper Arguments Regarding the Weighing of Aggravating Factors and Mitigating Evidence

The Government's closing arguments "had a substantial prejudicial effect," Paxton, 199 F.3d at 1217, on Mr. Fields' specific constitutional right to jury consideration of all relevant mitigating information and to a sentence based only upon the objective, specific and reviewable standards set forth by the federal capital sentencing statute. Id. at 1218 (affirming grant of penalty phase relief where improper prosecutorial closing argument deprived petitioner of right to present mitigating evidence). One of the bedrock requirements of the Eighth Amendment is that a capital sentencing jury must be permitted to consider and give effect to all relevant mitigating evidence. E.g., Hitchcock, 481 U.S. at 394; Skipper v. South Carolina, 476 U.S. 1, 4 (1986); Eddings, 455 U.S. at 110; Lockett, 438 U.S. at 605. Another is that the sentence must be based upon a clear, reviewable

process set out by law that channels the discretion of the sentencer so that the imposition of death is not arbitrary and capricious. <u>Godfrey</u>, 446 U.S. at 427-28; <u>Maynard v. Cartwright</u>, 486 U.S. 356; <u>Gregg</u>, 428 U.S. at 196.[23] Here, the Government diminished and denigrated the jury's ability to weigh the significant mitigating evidence presented by Mr. Fields, and injected irrelevant and inflammatory societal concerns into the weighing process.

The Government misstated the law regarding one of the central aspects of the federal death penalty statutory scheme, the weighing of aggravating and mitigating factors, twice placing its burden of persuasion on Mr. Fields and incorrectly telling the jury that the mitigating factors must outweigh the aggravating factors in order to justify a sentence of life without parole. <u>Compare</u> *TR*, 3463-64 ("The mitigating factors ... cannot outweigh the premeditated murder of Charlie. ... The mitigating factors ... do not begin to outweigh just one of the steps that Shirley took in a terrorized flight from the Defendant.') <u>with</u> 18 U.S.C. § 3593(e). This misstatement of law was improper. <u>Mahorney</u>, 917 F.2d at 473 ("A misstatement of law that affirmatively negates a constitutional right or principle is often, in our view, a more serious infringement that the mere omission of a requested instruction.").

The Government also repeatedly and improperly contrasted Mr. Fields' life with the deaths of Mr. and Mrs. Chick, in order to denigrate the jury's discretion to show mercy and suggest that,

---

[23] <u>McCleskey v. Kemp</u>, 481 U.S. 279, 305-6 (1987) ("[O]ur decisions since <u>Furman</u> have identified a constitutionally permissible range of discretion in imposing the death penalty. First, there is a required threshold below which the death penalty cannot be imposed. In this context, the State must establish rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold. ... Second, States cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the penalty. In this respect, the State cannot channel the sentencer's discretion, but must allow it to consider any relevant information offered by the defendant.").

by seeking a punishment of life without parole, Mr. Fields was acting injustly. See *TR*, 3430 ("[J]ust remember the victims in this case, Charles and Shirley and their family and what they went through. The defense is going to talk to you and they're going to ask you to show mercy for this Defendant. What I want you to do is think back on July 10th of 2003. How much mercy was shown then? The Defendant wants you to look at this Defendant and oh, there's a life that can be had."); *TR*, 3457 ("The Defendant wants to choose a sentence. He wants to live. Now, how unjust is that? Just what choice did he give Charles Chick? Just what choice did he give Shirley Chick?"); *TR*, 3459 ("Remember this, here in court the Defendant continues to victimize his own family by reducing them to props in an effort to escape justice. Remember also that Charlie didn't get an opportunity to plead for his life.") Such tactics are improper, and "[r]epeated attempts by the prosecution to contrast the living defendant with the dead victim might encourage the jury not to consider mitigating evidence, in violation of the Eighth Amendment." Le, 311 F.3d at 1002 (citing Tuilaepa v. California, 512 U.S. 967, 972 (1994)).

Additionally, the Government infringed Mr. Fields' Eighth Amendment right to a sentence of death imposed in a manner that is not arbitrary and capricious, by invoking improper societal concerns and making light of the punishment of life imprisonment without parole. See *TR*, 3431 ("I can't believe they gave probation to a child molester"); *TR*, 3457 ("Well, can justice be served by life in prison? The Defendant wants to be sent to his room as punishment. If he's allowed to live, he will have their percs [sic], like workouts and visitors and phone calls and mail and tv and recreation. Don't let this Defendant be a hero to his incarcerated criminal inmates."). Such comments were improper. See Bland v. Sirmons, 459 F.3d 999, 1027 (10th Cir. 2006) ("We regret to observe that in death-penalty case after death-penalty case, Oklahoma prosecutors have made

77

speeches to the jury making light of the penalty of life in prison to demonstrate that the only proper punishment for a defendant's crime was death.").

These instances of prosecutorial misconduct had a substantially prejudicial effect on Mr. Fields' right to full jury consideration of mitigating evidence, including the sentencer's unlimited "discretion ... to extend mercy" based upon the evidence presented, <u>Callins v. Collins</u>, 510 U.S. 1141 (1994) (Scalia, J., concurring in the denial of certiorari),[24] and to a sentence of death that is not arbitrary and capricious because it is based upon clear, objective, reviewable standards, <u>Godfrey</u>, 446 U.S. at 427-28.

### 2. Improper Arguments Regarding Mr. Fields' Mental Health

One of the central issues of Mr. Fields' capital trial was whether his mental state at the time of the offenses was mitigating – did Mr. Fields suffer from an Effexor-induced manic flip at the time of the offenses, thus substantially impairing his capacity to appreciate the wrongfulness of his conduct or conform his conduct to the law? The Government's closing arguments included a barrage of comments designed to distort the evidence on this central issue and inflammatorily invoke the fear, emotions and passions of the jury, rendering his trial fundamentally unfair.

The Government's strategy at trial was to contest Mr. Fields' evidence of his mental illness

---

[24] <u>See</u> <u>also</u> <u>Penry v. Lynaugh</u>, 492 U.S. 302, 326-27 (1989) (a capital sentencing jury must be able to give effect to feelings of mercy to the defendant arising out of the evidence in the case); <u>Deutscher v. Whitley</u>, 884 F.2d 1152, 1161 (9th Cir. 1989) ("The Constitution prohibits the imposition of the death penalty without adequate consideration of factors which might evoke mercy."), <u>adopted in pertinent part by</u> <u>Deutscher v. Angelone</u>, 16 F.3d 981 (9th Cir. 1994); <u>Wilson v. Kemp</u>, 777 F.2d 621, 624 (11th Cir. 1985) ("the validity of mercy as a sentencing consideration is an implicit underpinning of many United States Supreme Court decisions in capital cases") (citing <u>Woodson v. North Carolina</u>, 428 U.S. 280 (1976); <u>Lockett v. Ohio</u>, 438 U.S. 586 (1978)); <u>cf.</u> <u>Nelson v. Nagle</u>, 995 F.2d 1549 (11th Cir. 1993) ("mercy is an implicit sentencing consideration in many United States Supreme Court decisions in capital cases").

and Effexor-induced manic flip, and to portray him as a "manipulative," *TR*, 3450, "parasitic," <u>id.</u>, "narcissistic," *TR*, 3459, 3460, "sociopath," *TR*, 3428, 3449, who was "unalterably and fundamentally different from most human beings," *TR,* 3455, and had planned all along to hunt and kill people. While in its closing arguments the Government could have emphasized appropriate methods for presenting this strategy, such as its presentation of any counter-evidence or its cross-examination of Mr. Fields' witnesses, it instead chose to improperly vouch for its own expert witnesses while denigrating those presented by Mr. Fields, launch irrelevant *ad hominem* attacks on Mr. Fields, misrepresent testimony, and make arguments without factual basis in the record.

A large and crucial portion of the evidence regarding Mr. Fields' mental state, including the existence and likelihood of an Effexor-induced manic flip, was presented through the testimony of expert witnesses, and thus the credibility of these experts was a critical part of the jury's consideration of the evidence. The Government engaged in a series of attempts to enhance the appearance of its own experts' credibility, improperly vouching for their credibility and expressing the prosecutor's personal belief in their honesty, which rendered Mr. Fields' trial fundamentally unfair. <u>See</u> *Motion*, Ground 5, ¶¶ 182-83; <u>see also</u> <u>United States v. Young</u>, 470 U.S. 1, 7-8 (1985) (citing the ABA Standards for the proposition that a prosecutor may not "express his or her personal belief or opinion as to the truth or falsity of any testimony"); <u>Douglas v. Workman</u>, 560 F.3d 1156, 1179 (10th Cir. 2009) ("Under <u>Young</u>, vouching for the credibility of witnesses is equally as improper as other methods of 'offering unsolicited personal views on the evidence'"; finding that prosecutor's comments in closing argument expressing personal opinion of truthfulness of witness were error but AEDPA deference prevented grant of relief); <u>Cargle</u>, 317 F.3d at 1219.

The jury could reasonably infer from these comments that the prosecutors were expressing

their personal beliefs in the credibility of Dr. Price and Dr. Mitchell, from the repeated use of "we" to the suggestion that the Government easily found experts to support its position, a suggestion not based upon evidence of record. Such vouching for the witnesses is improper. United States v. Bowie, 892 F.2d 1494, 1498 (10th Cir. 1990) (stating that it is "impermissible vouching" if the prosecution "implicitly indicat[es] that information not presented to the jury supports the witness' testimony"); Douglas, 560 F.3d at 1179-80; Cargle, 317 F.3d at 1219.

The impropriety of the Government's witness vouching is emphasized by its corresponding denigration of Mr. Fields' expert witnesses. Dr. Woods and Dr. Grinage were disparaged as "high dollar shrinks," TR, 3452, and "hired guns," TR, 3429, from the "left coast," id., who had an "axe to grind," TR, 3430, and did not give "an honest opinion," TR, 3429. The Government's "left coast" – "hired gun" attack is especially improper given its falsity – Dr. Grinage was from Kansas, and like the Government's witness Dr. Mitchell, had never before testified in a capital case. Moreover, the Government's suggestion that the jury should trust expert witnesses from "our own back yard" over those from the "left coast" is a naked attempt to inflame the jury's passions and prejudice, and is antithetical to the traditional view of the federal courts as a safe harbor from "local prejudice." Cf. Hertz Corp. v. Friend, 130 S.Ct. 1181, 1188 (2010) (noting that basic rationale for diversity jurisdiction was to "open[] the federal courts' doors to those who might otherwise suffer from local prejudice against out-of-state parties"); City of Greenwood v. Peacock, 384 U.S. 808, 836-40 (1966) (Douglas, J., dissenting) (discussing history of provision of federal forum to protect against "local passions and prejudices").

In addition to this improper vouching and unprofessional name-calling, the Government grossly misrepresented the testimony of Dr. Woods, Dr. Grinage and other witnesses on several

factual issues critical to the assessment of Mr. Fields' mental state. First, the Government contended that Mr. Fields had previously used the ghillie suit to sneak up on other people in practice for eventually killing the Chicks, and that this undermined Mr. Fields' contention that he killed the Chicks in an Effexor-induced manic state. Instead of relying on any evidence in the record of this contention, the Government chose to twist the testimony to falsely support its position. The Government argued that Dr. Woods and Dr. Grinage testified that they were unaware that Mr. Fields had used the ghillie suit to sneak up on other people, an argument that is false and flatly contradicted by the record.[25] Additionally, the prosecution misrepresented the testimony of lay witness Daniel Love, see *Motion*, Ground 5, ¶ 190, painting Mr. Fields in a far worse light than the evidence indicated.[26] Such misrepresentations were error, and are of special concern "given the weight with which jurors generally view a prosecutor's remarks." Le, 311 F.3d at 1020 ("Since jurors usually have no access to the testimonial record during deliberation, the risk that the prosecutor's characterization would be remembered in lieu of the correct statement ... is increased.").

Second, the Government repeatedly and falsely claimed that Mr. Fields was diagnosed as a sociopath by doctors hired by the defense, in order to elicit fear of Mr. Fields and to undermine the true diagnosis of bipolar disorder that was made by defense expert witnesses. See *Motion*,

---

[25] Dr. Woods testified that he "was aware" that Mr. Fields had admitted to doing so, *TR*, 3024, and Dr. Grinage was never questioned about the issue, by the Government or otherwise.

[26] Mr. Love's actually testimony suggests that Mr. Fields was upset by what Mr. Love said, explaining Mr. Fields' later refusals to tell people why he had a ghillie suit, contrary to the Government's argument that Mr. Fields did not want to tell anyone he planned to use the ghillie suit to kill people. *TR*, 3409. The Government also elicited from Carol Lamb that Mr. Fields said, "You don't want to know" when she asked him why he was ghillieing his rifle. *Tr.* 2340. Neither the Government nor trial counsel elicited from Ms. Lamb that, according to her statement to the OSBI, Mr. Fields often refused to tell her things. See OSBI Transcript of Interview of Carol Lamb dated 7/18/03 at 18.

Ground 5, ¶ 186. The prosecution's attempts to elicit any testimony to support this statement were met with failure, and the record contradicts the Government's assertions. See id. Dr. Grinage denied that Mr. Fields exhibited any such traits, *TR*, 2841-46, and Dr. Woods was never cross-examined on the subject. The Government also sought to elicit an alleged diagnosis through a lay witness, see *Motion*, Ground 5, ¶ 186 n. 29, but was unable to do so. *TR,* 3086. The allegation that Mr. Fields was a sociopath was particularly harmful by itself, see, e.g., Walbey v. Quarterman, 309 Fed. App'x 795, 804, 806 (5th Cir. 2009) (observing that antisocial personality disorder was "an aggravating diagnosis"; concluding that if trial counsel's investigation and preparation had not been deficient, "he could have offered a rebuttal to [the prosecution]'s argument that [petitioner] is a sociopath"; and granting relief on that basis), but coupled with the assertion that his own doctors believed him to be a sociopath, it was devastating. Given that the jury views a prosecutor as "'carr[ying] a special aura of legitimacy about him,'" Cargle, 317 F.3d at 1218, these misstatements of fact were "apt to carry much weight against [Mr. Fields] when they should properly carry none." Berger, 295 U.S. at 88.

### 3. Improper Arguments Designed to Inflame the Passions and Prejudices of the Jury

The Government's closing arguments also sought to invoke the fear and inflame the passions of the jury, by concocting prejudicial theories without factual basis in the record and engaging in a series of *ad hominem* attacks on Mr. Fields.

The Government contended that the killing of the Chicks was not caused by an Effexor-induced manic flip but rather was the act of a sniper after a year's worth of practice and preparation, starting with Mr. Fields' construction of the ghillie suit and his hunting of squirrels, and culminating with his using the Winding Stair Campgrounds to scout potential victims. See *Motion*, Ground 5,

82

¶¶ 187, 191. The Government's story that Mr. Fields "had mastered his craft, he had practiced with squirrels, and now he was moving to humans," *TR*, 3414, was a flight of fancy worthy of a horror film and completely without factual support in the record. The undisputed testimony at trial was that Mr. Fields' purpose in making the ghillie suit was to use it for hunting squirrels, and nothing more.[27] See *Motion*, Ground 5, ¶ 188. Indeed, the testimony reflected that Mr. Fields was prepared to abandon the ghillie suit weeks before the offenses. *TR*, 2656-57. Moreover, there was absolutely no evidence to support the argument that Mr. Fields "[k]ept track of when people are [at the campground], who's staying there, when they're staying there, what the habits are." *TR*, 3410. The Government further engaged in abject speculation, coupling this theory of calculating and escalating violence with an equally unfounded description of the death of Mrs. Chick, claiming that "she was begging and pleading for her life" and that "this was not ... a silent murder," *TR*, 3417, 3462, although there was no evidence of record from which this could have even been a reasonable inference. The Government's highly speculative and misleading storytelling was calculated to scare and inflame the passions of the jury.

To complement the scary story the Government sought to tell in its closing arguments, the prosecutors launched a series of irrelevant, *ad hominem* attacks on Mr. Fields, inviting the jury to sentence Mr. Fields to death, not because any of the noticed aggravating factors were proven, but because he was a fundamentally bad person. See, e.g., *TR*, 3450 ("He lied. He was trying – manipulative, a con artist."); *TR*, 3450 ("And was financially irresponsible, parasitic and

---

[27] The Government suggested that Mr. Fields' best friend and hunting partner, Daniel Presley, said that Mr. Fields' ghillie suit and rifle were unnecessary for squirrel hunting. Mr. Presley provided no such testimony, and he disavows any suggestion that the Government's arguments correctly interpreted his testimony. See *Motion*, Ground 5, ¶ 189.

promiscuous.”); *TR*, 3455 (“The Defendant is unalterably and fundamentally different from most human beings.’); *TR*, 3459 (“Selfish. Selfish. Narcissistic.”); *TR*, 3465 (“That tells you who the Defendant will chose to be near. A child abuser.’); *Motion*, Ground 5, ¶ 185. The prosecutors’ statements were not relevant to any of the aggravating factors properly noticed,[28] nor were they proper rebuttal of any of mitigating evidence presented.[29]

Just as a prosecutor may not use closing argument to inflame the passions and prejudices of the jury, see Young, 470 U.S. at 8 n.5, here, the Government used scary stories and personal attacks to do just so.

### 4. Improper Invocation of Biblical Authority in Support of a Sentence of Death

The Government concluded its closing arguments by relating the well-known “writing on the wall” sermon from the Book of Daniel, and then argued that Mr. Fields similarly should be weighed and found wanting. *TR*, 3466-67 (“[T]he prophet said the writing said you have been weighed in the balance and found wanting. Sure enough, that night the King was killed.”). This appeal to religious authority was improper. Sandoval v. Calderon, 241 F.3d 765, 777 (9th Cir. 2001) (observing that “religious arguments have been condemned by virtually every federal and state court to consider their challenge” and citing cases); Cunningham v. Zant, 928 F.2d 1006, 1020 (11th Cir.

---

[28]  The noticed aggravating factors were substantial planning and premeditation to cause the death of both Mr. and Mrs. Chick, multiple intentional killings in a single episode, future dangerousness, permanent loss to the family, friends and community of Mr. and Mrs. Chick, and the infliction of mental anguish upon Mrs. Chick before her death.

[29]  Even if these comments were considered to be proper rebuttal – which they should not – no cautionary instruction was given to limit their consideration as rebuttal only. Without such limitation, it would swallow whole the statutory provision that a death sentence be based only upon the aggravating factors noticed and proven at trial. See 18 U.S.C. § 3593(c), (d).

1991) (finding prosecutor's appeals to religious beliefs, including comparison of defendant and Judas Iscariot, to be improper).

Not only was the Government's extended recitation of scripture intended to inflame the passions of the jury, it also substantially prejudiced Mr. Fields' right to a sentence of death imposed only under the dictates of the Eighth Amendment. "In a capital case like this one, the prosecution's invocation of higher law or extra-judicial authority violates the Eighth Amendment principle that the death penalty may be constitutionally imposed only when the jury makes findings under a sentencing scheme that carefully focuses the jury on the specific factors it is to consider in reaching a verdict." Sandoval, 241 F.3d at 776 (citing Godfrey, 446 U.S. at 428).

> **B. Individually and Cumulatively, These Errors Rendered Mr. Fields' Trial Fundamentally Unfair and Substantially Prejudiced his Eighth Amendment Rights to Individualized Sentencing and a Death Sentence That is not Arbitrary and Capricious**

Although many of the prosecutors' comments were sufficiently egregious on their own to warrant relief, the cumulative effect of the prosecutorial misconduct throughout the Government's closing argument was to deny Mr. Fields a fair trial in violation of his right to due process of law, and to substantially prejudice his right to a fair and reliable sentencing proceedings in comport with the specific dictates of the Eighth Amendment.

Unlike the instances in which courts have found prosecutors' comments to be improper but did not render the trial fundamentally unfair, see, e.g., Le, 311 F.3d at 1020 (finding prosecutor's misrepresentation of testimony to be error, but denying relief because of overwhelming evidence of guilt and in support of aggravating factors), the Government's case here for death was not overwhelming. Mr. Fields presented a significant case for life, including the hotly contested testimony of a forensic psychiatrist and a neuropsychiatrist, as well as seven lay witnesses, and

elicited mitigating information from a number of witnesses presented by the Government. See, e.g., *TR*, 2361-65 (cross-examination of Carol Lamb); *TR*, 2398-2406 (cross-examination of Daniel Presley); *TR*, 2471-73, 2474-76 (cross-examination of Marilyn Presley); *TR*, 2492-94 (cross-examination of Daniel Love); *TR*, 2597-61 (cross-examination of Michelle Bond). The jury found seventeen mitigating factors to be present, although these factors were based largely upon uncontested fact, e.g., his cooperation with authorities, confession and guilty plea; his prior service in the Navy; his lack of criminal history.

The mitigating factors not found by the jury – indeed, the core of Mr. Fields' defense – were the factors most likely to have been affected by the Government's misconduct in its closing arguments. The rejected mitigating factors focused on Mr. Fields' mental state at the time of the offenses, and his mental health in general: (1) his capacity to appreciate the wrongfulness of his conduct and conform his conduct to the law was significantly impaired; (2) he committed the offenses under severe mental or emotional disturbance; (3) he expressed remorse for the crimes; and (4) he will not present a future danger to society by being imprisoned for life without possibility of relief. The issues raised by these factors were precisely the subject of the Government's improper conduct – its argument that Mr. Fields was a "sociopath" and did not experience an Effexor-induced manic flip; its vouching for the credibility of Government expert witnesses who minimized Mr. Fields' mental health problems and disparagement of those defense experts who supported the mitigating circumstances; its personal attacks presenting Mr. Fields as an unrepentant "con artist" who engaged in "ploys," and "selfish[ly]" and "narcissistic[ally]" "put all of us here"; its bolstering of its claim that Mr. Fields did not commit these offenses under a mental disturbance, but instead planned them for over a year, with misstatements of the record and speculation.

Moreover, the Government's closing arguments skewed the jury's sentencing determination

by encouraging the jury to underweigh and ignore the mitigation it did find. Its improper comments increased Mr. Fields' burden with respect to the mitigating factors, telling the jury that the evidence in mitigation must outweigh the aggravating factors. Furthermore, it employed tactics that courts have condemned as attempts to convince the jury to ignore mitigation altogether. See Le, 311 F.3d at 1002 (criticizing prosecutor's repeated contrast of living defendant and dead victim); Bland, 459 F.3d at 1027 (criticizing prosecutorial "speeches to the jury making light of the penalty of life in prison to demonstrate that the only proper punishment for a defendant's crime was death."); Sandoval, 241 F.3d at 777 (noting widespread condemnation of religious arguments).

Mr. Fields' claim is not based upon a few isolated comments, but rather a pattern of argument designed to impede his rights, and to improperly influence and inflame the jury with misstatements of law and of the record, factually unsupported arguments, name-calling and personal attacks. Moreover, these instances of misconduct were committed by both attorneys who delivered closing arguments for the Government, with the improper themes repeated in both the opening and rebuttal arguments.

Trial counsel objected to two comments – the Government's misstatement of law that the mitigating factors must outweigh the aggravating factors to justify a life sentence, and the comment that Mr. Fields' "own doctors are saying, yeah, he has the traits of a sociopath" – and this Court overruled both objections, despite the impropriety of the comments.[30] "The official imprimatur thereby placed upon the prosecution's misstatements of law obviously amplified their potential prejudicial effect on the jury." Mahorney, 917 F.2d at 473; see also Mann v. Dugger, 844 F.2d

---

[30] The Court overruled the objection to the comment about Mr. Fields' doctors, despite previously sustaining an objection to the Government's question to Mrs. Presley on that very subject. *TR*, 3086.

1446, 1457 (11th Cir. 1988) ("When a trial court does not correct misleading [prosecutorial] comments ... the state has violated the defendant's ... rights because the court has given the state imprimatur to those comments; the effect is the same as if the trial court had actually instructed the jury that the prosecutor's comments represented a correct statement of the law."). No curative instructions were given, despite the request of defense counsel to have the Court reread its initial instruction on the weighing of aggravating and mitigating factors. *TR*, 3473.

Given that this was a close case, in which Mr. Fields presented a significant case for life and the jury found mitigation to exist, it is more likely that these errors had an effect. See Strickland, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.") Individually and cumulatively, the Government's improper arguments in closing rendered the trial fundamentally unfair, and denied Mr. Fields his rights to due process, to jury consideration of mitigating evidence, and to a death sentence that is not arbitrary and capricious.

**C.     Trial Counsel Were Ineffective for Failure to Object and Preserve These Issues at Trial, and Appellate Counsel Were Ineffective for Failure to Raise These Instances of Prosecutorial Misconduct on Appeal**

Other than in the two instances noted above, trial counsel's failure to object to these unconstitutional instances of prosecutorial misconduct or to request a limiting instruction, and appellate counsel's failure to raise these issues on appeal, denied Petitioner his right to effective assistance of counsel.[31] Strickland, 466 U.S. 668. As discussed, the Government made a wide range of impermissible comments throughout its closing, and properly made objections would have been

---

[31] Appellate counsel denied Mr. Fields his right to effective assistance of counsel by failing to raise on direct appeal the two issues preserved by trial counsel, and by failing to raise the other instances of improper prosecutorial argument under the plain error standard.

meritorious.

### 1. Deficient Performance

Effective counsel do not fail to make meritorious objections. <u>See, e.g.</u>, <u>Kimmelman v. Morrison</u>, 477 U.S. 365 (1986) (counsel's failure to file timely motion to suppress evidence was deficient performance); <u>Claudio v. Scully</u>, 982 F.2d 798, 805-06 (2d Cir. 1992) (appellate counsel ineffective for failing to challenge admission of statement on potentially meritorious state constitutional grounds); <u>Nero v. Blackburn</u>, 597 F.2d 991, 994 (5th Cir. 1979) (failure to raise objection and move for a mistrial on the basis of state law error constituted ineffective assistance of counsel); <u>Wade v. White</u>, 368 F. Supp. 2d 695 (E.D. Mich. 2005) (ineffective assistance of counsel for failure to object to inadmissible irrelevant testimony that was detrimental to the defense); <u>see</u> <u>also</u> ABA Guideline 10.11, cmt. at 1156 "counsel should . . . object to argument that improperly minimizes the significance of mitigating evidence.").

### 2. Prejudice

When a petitioner shows that counsel ineffectively failed to object to reversible error, he has shown prejudice. <u>Murphy v. Puckett</u>, 893 F.2d 94 (5th Cir. 1990) (petitioner prejudiced by counsel's failure to raise valid double jeopardy defense); <u>Mason v. Hanks</u>, 97 F.3d 887, 892 (7th Cir. 1996) (petitioner prejudiced by counsel's failure to raise meritorious appealable issue); <u>Mayo v. Henderson</u>, 13 F.3d 528, 533 (2d Cir. 1994) (same); <u>Matire v. Wainwright</u>, 811 F.2d 1430, 1435 (11th Cir. 1987) (same).

Had trial counsel objected to the Government's numerous instances of misconduct in closing and requested cautionary instructions, the jurors would not have deliberated with the Government's misstatements of law and fact, appeals to passion and prejudice, and denigration of the constitutionally-required sentencing proceeding in their minds, but rather would have assessed

punishment based upon a clear-headed consideration of the significant mitigating evidence presented, as well as the evidence in aggravation. Had the Government's improper and inflammatory arguments been corrected, Mr. Fields' trial would not have been rendered fundamentally unfair, his rights under the Eighth Amendment would not have been substantially infringed, and there is a reasonable likelihood that at least one juror would have found that the case for life presented by Mr. Fields justified a sentence less than death. <u>Wiggins</u>, 539 U.S. at 537.

**GROUND SIX**

**TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO INSTRUCTIONS AND A VERDICT FORM THAT ALLOWED THE JURY TO APPROVE A GENERAL VERDICT OF DEATH BASED ON THE COMBINED WEIGHING OF AGGRAVATING FACTORS APPLICABLE TO TWO SEPARATE MURDER COUNTS.**

Although Mr. Fields pled guilty to two counts of first degree murder, the jury sentenced him to a general verdict of death, not separate sentences on each count. In doing so, the jury was allowed to consider all seven of the aggravating factors argued by the Government – including five factors that properly applied to only one of the two counts. This unified weighing process skewed the balancing of aggravating and mitigating factors in favor of death, rendered the resulting death sentence arbitrary and capricious, and denied Mr. Fields his right to a sentencing process in which the jury was able to give effect to his evidence in mitigation. Trial counsel not only failed to object to this unconstitutional general verdict, but in fact invited it – they requested instructions and a verdict form that were, in the words of the Court of Appeals, "functionally the same" as the improper instructions and verdict form used by the Court. <u>United States v. Fields</u>, 516 F.3d 923, 939 (10th Cir. 2009). Accordingly, trial counsel rendered ineffective assistance in violation of the Sixth Amendment.

**A.      Trial Counsel Were Deficient By Requesting An Unified Weighing Process**

Trial counsel were deficient by requesting – instead of objecting to – jury instructions and a verdict form that allowed the jury to engage in an unified weighing process and render a general verdict of death.

On direct appeal, the Court of Appeals explained:

Although Fields was indicted, convicted and sentenced to death on two murder counts, the verdict form and instructions did not direct the jury to weigh the aggravating and mitigating factors relevant to each count and determine whether a death sentence was warranted for either murder. Rather, the jury was directed to weigh all of the aggravators and mitigators in the case at once and reach a single sentencing verdict.

Specifically, the verdict form and associated instructions properly directed the jury to find those aggravators applicable to the murder of Charles Chick (substantial planning and premeditation; intentional killing of more than one person; future dangerousness; and victim impact relating to Charles) and those applicable to the murder of Shirley Chick (substantial planning and premeditation; intentional killing of more than one person; future dangerousness; victim impact relating to Shirley; and mental anguish of victim). The mitigators, which related to the defendant and thus did not vary with the victims, were properly found generally, without reference to each murder.

At that point, instead of being told to weigh the aggravators and mitigators on each count and record the resultant sentences on separate forms, the jury was given a general form with these directions regard the "Weighing Process" and "Imposition of Sentence," respectively:

> The question you must answer at this stage of your deliberations is whether the proven aggravating factor(s) sufficiently outweigh the proven mitigating factors and information to justify a sentence of death ... If you unanimously find that the weight of the aggravating factor(s) is sufficient to justify a sentence of death, answer _yes below [and] record your verdict on [the general verdict form for death] ... If you do not unanimously find that a death sentence is justified, answer  no_ below, stop your deliberations [and] sign [the general verdict form for life imprisonment].
>
> * * *
>
> This is the last step in your deliberations. If you have made all of the findings necessary to make the defendant eligible for a death sentence

and have unanimously concluded that such a sentence is justified and that a sentence of death is therefore appropriate in this case, record your decision by collectively signing the verdict [form for death] ... and notify the court that you have reached a decision. If you do not unanimously conclude that sentence of death is justified and therefore must be imposed, sign the verdict for life imprisonment ... and notify the court that you have reached a decision.

The form specifying "that a sentence of death shall be imposed on the defendant"- without reference to any particular count-was signed by all of the jurors. The court's subsequent poll of the jurors, all of whom affirmed the verdict, was likewise unitary. **Pointing up the potential problem here, however, the Judgment and Commitment Order entered by the court reflected imposition of two separate sentences: "The defendant is hereby sentenced to Death on each of the Counts One and Three of the Indictment."**

516 F.3d at 938-39 (citations omitted). The verdict form and instructions given to the jury were "functionally the same" as those requested by trial counsel. Id. at 939.

Trial counsel should have objected to the unified process and instead requested that the jury consider separately and render separate verdicts for each of Count One and Count Three. See Wicks v. Lockhart, 569 F. Supp. 549 (E.D. Ark. 1983) (concluding that reasonably competent attorney would have known that separate verdict on each count "was required in order to protect the petitioner's basic constitutional rights").[32] ABA Guideline 10.11(k) – which was in effect at the

---

[32] In the context of a jury's determination of guilt or innocence on a multi-count indictment or information, the law is clear that the jury must consider each count separately and render separate verdicts on each count. See, e.g., United States v. Dunn, 564 F.2d 348, 360 (9th Cir. 1977) ("the law is uniform that ... as to multiple counts against a single defendant, each count is to be considered separately"); United States v. McGrady, 508 F.2d 13, 21 (8th Cir. 1974) ("where there are separate counts in an indictment, there must be separate verdicts by the jury as to the guilt or innocence of each defendant on each count"); Wicks v. Lockhart, 569 F. Supp. 549, 561-62 (E.D. Ark. 1983) (listing cases). This rule is no less applicable in the context of a jury's determination of whether a defendant will be sentenced to death, where the Eighth Amendment requires heightened "reliability in the determination that death is the appropriate punishment in a specific case." Simmons v. South Carolina, 114 S.Ct. 2187, 2198 (1994) (Souter, J., concurring) (quoting Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (plurality op. of Stevens, J.)); Godfrey v. Georgia, 446 U.S. 420, 427- 28 (1980); Mills v. Maryland, 486 U.S. 367, 383-84 (1988)).

time of Mr. Fields' sentencing hearing – provides that "trial counsel should request jury instructions and verdict forms that ensure that jurors will be able to consider and give effect to all relevant mitigating evidence. Trial counsel should object to instructions or verdict forms that are constitutionally flawed, or are inaccurate, or confusing and should offer alternative instructions."

The federal death penalty statute, 18 U.S.C.A. § 3591 et seq., clearly anticipates that a defendant will receive a sentence of death or life without possibility of release for each death-eligible offense, that is, each murder. The statute repeatedly uses singular references such as "the victim," "the offense," and "the charge" that indicate an intent that a defendant be sentenced for each individual charge of murder. See, e.g., § 3591(a)(2)(A) ("intentionally killed the victim"); § 3591(a)(2)(B) ("the death of the victim"); § 3591(a)(2)(C) ("the victim died"); § 3592(a)(1) ("the charge"); § 3592(a)(2) ("the charge"); § 3592(a)(3) ("the charge"); § 3592(a)(6) ("the offense"); § 3592(c) ("an offense"); § 3592(c)(1) ("the death"); § 3592(c)(6) ("the offense" and "the victim"); § 3592(c)(9) ("the offense" and "the death of a person"); § 3592(c)(11) ("the victim"); § 3592(c)(14) ("the defendant committed the offense against ... a chief of state ... a foreign official ... a Federal public servant"); § 3593(e)(1) ("an offense"); § 3593(e)(2) ("an offense"); § 3593(e)(3) ("an offense"). Additionally, the statute makes a specific provision for when a defendant kills multiple victims – the aggravating factor for "multiple killings or attempted killings" found in § 3592(c)(16). The inclusion of this specific provision indicates that Congress, in drafting the federal death penalty statute, intended that defendants receive separate sentences for each charge of murder. Based upon these statutory provisions, as well as the constitutional principles discussed below, trial counsel should have requested an instruction requiring separate consideration of and separate verdict forms for each of Counts One and Three.

Had the jury been properly instructed and given the appropriate verdict form requiring it to

return separate sentences for each count, it would have weighed five aggravating factors (two general, and three specific to Mrs. Chick) against the seventeen mitigating factors found by the jury in determining whether to sentence Mr. Fields to death for the murder of Mrs. Chick, and four aggravating factors (two general, and two specific to Mr. Chick) against the seventeen mitigating factors in determining a sentence for Mr. Chick.[33] Instead, the unified weighing process permitted the jury to consider all seven aggravating factors (two general, two specific to Mr. Chick, and three specific to Mrs. Chick) together in deciding whether to sentence Mr. Fields to death or life without parole.[34]

The erroneous unified weighing process was raised as court error on direct appeal. The Court of Appeals declined to review the issue, finding that trial counsel invited the error. Fields, 516 F.3d at 939; see also id. at 940 (declining to review claim that "the two instances of the [substantial planning] aggravator were improperly aggregated" in the unitary weighing process on basis of invited error). While the invited error doctrine may be an appropriate appellate basis for denying relief on a claim of court error, it leaves open the question of whether trial counsel were

---

[33] The three factors applying exclusively to Count 1 were the murder of Mrs. Chick after substantial planning, victim impact related to the death of Mrs. Chick, and the infliction of mental anguish on Mrs. Chick. The two factors applying exclusively to Count 3 were the murder of Mr. Chick after substantial planning and victim impact related to the death of Mr. Chick. The other aggravating factors were killing more than one person in a single episode and future dangerousness.

[34] The Court instructed the jury to find the substantial planning and victim impact aggravating factors separately for each of the Chicks. TR, 3396, 3398-99, see also id. at 3478-80 (Special Findings Form). These instructions would have been proper if the jury was also instructed to determine, and given a mechanism to impose, separate sentences as to each count. Because of the jurors were asked to impose one sentence in a general verdict, however, the Court's instructions permitted the jury to consider two separate plans to kill the Chicks, even though the Government argued only that Mr. Fields had one plan to kill both in a single criminal episode, and allowed the jury to consider victim impact evidence related to the death of Mr. Chick in determining the sentence for killing Mrs. Chick, and vice versa.

ineffective for requesting and failing to object to the unitary weighing process, verdict form and instructions. See White v. Thaler, – F.3d –, 2010 WL 2595272, at *10, *14 (5th Cir. June 30, 2010) (granting habeas relief based upon counsel's "invited error"; counsel rendered ineffective assistance by opening door for impeachment of defendant with post-arrest silence); United States v. Alferahin, 433 F.3d 1148, 1162 (9th Cir. 2006) (finding counsel ineffective where court failed to instruct jury on element of crime and counsel "declined an offer by the judge to instruct the jury on the element").

**B.     As a Result of Trial Counsel's Deficient Request of an Unified Weighing Process, Mr. Fields' Sixth and Eighth Amendment Rights Were Violated, Rendering the Death Sentence Unconstitutional**

Mr. Fields suffered prejudice from trial counsel's deficient performance. As a result of trial counsel's error in requesting an unitary sentencing process, the jury returned a general verdict of death which could have been based upon any one of three scenarios. Two of those three scenarios are invalid and unconstitutional, and thus his sentence cannot stand.

The jury's verdict can be interpreted in three ways. *First*, the jury could have, as instructed, weighed all seven aggravating factors against the evidence in mitigation, and returned a sentence of death because it determined that all seven aggravating factors substantially outweighed the mitigating factors. *Second*, it could have weighed the aggravating factors for Count One only against the mitigating factors, and separately weighed the aggravating factors for Count Three only against the mitigating factors, and returned a sentence of death based on the determination that the aggravating factors substantially outweighed the mitigating evidence for one of the two counts. *Third*, the jury could have weighed the aggravating factors for Count One only against the mitigating factors, and separately weighed the aggravating factors for Count Three only against the mitigating factors, and determined that death was appropriate because the aggravating factors substantially

outweighed the mitigating evidence for both counts. Only the third scenario is a constitutionally valid basis for the jury's general verdict of death.

The first scenario – in which the jury returned a general verdict of death because it believed the seven aggravating factors together substantially outweighed the evidence of mitigation – is invalid because the resulting death sentence is arbitrary. The jury was permitted to weigh aggravating factors that were unrelated to the particular count (i.e. weighing the victim impact related to Mr. Chick in determining the sentence for the death of Mrs. Chick, or the mental anguish inflicted upon Mrs. Chick prior to her death in determining the sentence for the death of Mr. Chick), and thus the process had no "inherent restraint on the arbitrary and capricious infliction of the death sentence." Godfrey, 446 U.S. at 428-29; see also Tuilaepa, 512 U.S. at 973 ("Eligibility factors almost of necessity require an answer to a question with a *factual nexus to the crime* or to the defendant so as to 'make rationally reviewable the process for imposing a sentence of death.'") (quoting Arave v. Creech, 507 U.S. 463, 471 (1993)). Because the jury did not distinguish between the crimes charged in Count One (the murder of Mrs. Chick) and Count Three (the murder of Mr. Chick) in considering all seven aggravating factors, the jury did not make an "individualized determination on the basis of the character of the individual and *the circumstances of the crime*." Zant v. Stephens, 462 U.S. 862, 879 (1983); see also Eddings, 455 U.S. at 110-12; Lockett, 438 U.S. at 601-5). This scenario is the most likely of the three, as it reflects the Court's instructions, and jurors are presumed to follow those instructions. Penry v. Johnson, 532 U.S. 782, 799 (2001) ("Penry II").

Furthermore, this scenario allowed the jury to give undue weight to the case for death, while giving short shrift to the evidence in mitigation. The jury could have concluded that the seven aggravating factors, considered together, substantially outweighed the evidence in mitigation. Thus,

the case for death was given greater weight by the unitary weighing process, while the mitigating factors were effectively undercounted, skewing the jury's determination in favor of death. Additionally, because all the aggravating factors for both counts were considered together, the jury was allowed to double count the substantial planning aggravating factor, even though it is not victim-specific.[35]  United States v. McCullah, 76 F.3d 1087 (10th Cir. 1996) (holding that the identically-worded former 21 U.S.C.A. § 848 (n)(8) was not victim-specific).  Such double counting skewed the weighing process and rendered the resulting death sentence arbitrary and unconstitutional.  Id. at 1111; see also id. at 1112 ("When the sentencing body is asked to weigh a factor twice in its decision, a reviewing court cannot 'assume it would have made no difference if the thumb had been removed from death's side of the scale.'") (quoting Stringer v. Black, 503 U.S. 222, 232 (1992)).  In light of the significant case for life presented by Mr. Fields, it is possible that if the jury separated the two counts, and weighed only the aggravating factors applicable to each count with the mitigating evidence, at least one juror would have concluded that on neither count did the aggravating factors substantially outweigh the mitigating factors.

The second scenario – in which the jury determines that death is appropriate for only one of the two counts – is invalid because it violates Mr. Fields' Eighth Amendment right to a "vehicle for [the jury to] express[] its 'reasoned moral response' to [mitigating] evidence in rendering its sentencing decision.'"  Penry II, 532 U.S. at 797 (quoting Penry v. Lynaugh, 492 U.S. 302, 328 (1989) ("Penry I")).  The jury did not and could not make a determination of Mr. Fields' moral culpability for each murder count because the jury had no mechanism for separating the two counts. The verdict form did not allow the jury to make a finding of death as to one count and life without

---

[35]  The jury separately found the substantial planning aggravating factor to be proven for both Count One and Count Three.  However, this does not save the verdict because the jury did not separately weigh the aggravating and mitigating factors for each count.

possibility of release as to the other. Such a verdict was not merely a theoretical possibility – the mental anguish aggravating factor applied only to Mrs. Chick, arguably making her death more egregious in the eyes of the jury, and thus the jury could have returned a sentence of death for the murder of Mrs. Chick only, concluding that the aggravating factors applicable to the death of Mr. Chick did not substantially outweigh the evidence in mitigation. Thus, if the jury concluded that death was an appropriate sentence for the murder of Mrs. Chick, the jury was not "able to 'consider and *give effect to* [Mr. Fields' mitigating] evidence in imposing [a] sentence'" of life without possibility of release for the death of Mr. Chick. Penry II, 532 U.S. at 797 (quoting Penry I, 492 U.S. at 319) (emphasis in original) (concluding that jury instructions violated Eighth Amendment because jury had no logical and ethical mechanism for giving effect to mitigation by voting for life sentence). Because trial counsel's actions left Mr. Fields without a vehicle for the jury to give effect to mitigating evidence, we cannot "be sure that the jury 'has treated [Mr. Fields] as a uniquely individual human bein[g] and has made a reliable determination that death is the appropriate sentence'" for either Count One or Count Three. Penry II, 532 U.S. at 797 (quoting Penry I, 492 U.S. at 319 (quoting Woodson v. North Carolina, 428 U.S. 280, 304 (1976))); Abdul-Kabir v. Quarterman, 550 U.S. 233, 252 (2007) ("Indeed, the right to have the sentencer consider and weigh relevant mitigating evidence would be meaningless unless the sentencer was also permitted to give effect to its consideration.") (quoting Franklin v. Lynaugh, 487 U.S. 164, 184-85 (1988) (O'Connor, J., concurring)).

These two scenarios are unconstitutional. Although there is one possible interpretation of the jury's general verdict of death that avoids constitutional error, this is insufficient to save the sentence. As an initial matter, the most plausible interpretation of the jury's verdict is that the jury followed the instructions given by the Court and requested by trial counsel – that the jury should

weigh all seven aggravating factors against the mitigating evidence in an unitary weighing process – and this scenario is unconstitutional. Moreover, where a verdict "may have had a proper basis," but "'it is equally likely that the verdict … rested on an unconstitutional ground,'" a court may not choose between the proper and improper bases, and the verdict cannot stand. Boyde v. California, 494 U.S. 370, 380 (1990) (quoting Bachellar v. Maryland, 397 U.S. 564, 571 (1970)); see also Stromberg v. California, 283 U.S. 359, 368 (1931) ("It follows that instead of it being permissible to hold, with the state court, that the verdict could be sustained if any one of the clauses of the statute were found to be valid, the necessary conclusion from the manner in which the case was sent to the jury is that, if any of the clauses in question is invalid under the Federal Constitution, the conviction cannot be upheld."); cf. Presnell v. Georgia, 439 U.S. 14 (1978) (death sentence vacated where defendant was convicted of uncharged offense, noting that due process principle of Cole v. Arkansas, 333 U.S. 196 (1948), require that appellate court review verdict based upon case actually tried before and the jury "appl[ied] with no less force at the penalty phase of a trial in a capital case").

Trial counsel's request of – and failure to object to – improper jury instructions and verdict form placed Mr. Fields in an untenable situation in which his sentence is most likely based upon an unconstitutional unitary weighing process. On that basis alone, his sentence cannot stand. Additionally, given the not-inconsequential case for life presented by Mr. Fields, there is a reasonable likelihood that the jury would have returned a sentence of life on both counts if it had been properly instructed to engage in an individualized sentencing determination for each count that enabled it to give effect to the evidence in mitigation.

**THE GOVERNMENT VIOLATED DUE PROCESS WHEN IT WITHHELD EXCULPATORY, MATERIAL EVIDENCE FROM THE DEFENSE IN VIOLATION OF DUE PROCESS, AND TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT EXCULPATORY EVIDENCE.**

Mr. Fields' right to due process was violated because the Government withheld information that was material to his punishment. Brady v. Maryland, 373 U.S. 83, 87 (1963); see also Banks v. Dretke, 540 U.S. 668 (2004); Strickler v. Greene, 527 U.S. 263 (1999); Kyles v. Whitley, 514 U.S. 419, 437 (1995); United States v. Bagley, 473 U.S. 667, 676 (1985); Giglio v. United States, 405 U.S. 150, 153-56 (1972).

### A. Effexor Pill Bottle

In the *Motion*, Mr. Fields pled alternatively that the Government failed to disclose exculpatory evidence relating to the quantity of 150 mg Effexor pills Mr. Fields ingested prior to the offense, and trial counsel were ineffective for failing to investigate, discover and present this evidence. This alternative pleading was necessary because, based upon information provided to trial counsel, it was unclear what had happened to the bottle of 150 mg Effexor pills that were initially observed in Mr. Fields' truck by Oklahoma State Bureau of Investigation Agent Iris Dalley. See *A*-29.

Documents in the possession of trial counsel indicate that, during her search of Mr. Fields' truck on July 18, 2003, Agent Dalley discovered a pill bottle in Mr. Fields' truck with the label indicating it contained a prescription for thirty (30) 150 mg Effexor pills to be taken once daily, and a "pharmacy sack label" dated July 9, 2003, for the same prescription. Id. at 3. However, subsequent inventories of the contents of the truck by the United States Forest Service and a defense investigator made no mention of the pill bottle. See *A*-30, *A*-31. Documents also in the possession

of trial counsel indicated that Mr. Fields was administered 150 mg Effexor pills while in custody at the Muskogee County Detention Center. Med Sheet July 3, *SA-1*; Med Sheet Aug 3, *SA-2*.

In its response to Mr. Fields' *Motion for Non-Dispositive Omnibus Relief*, the Government informed Mr. Fields **for the first time** that the Effexor he was administered at the Muskogee County Detention Center **was from the bottle of Effexor pills found in his truck**. Docket #6, at 7. According to the Government's response, "the FBI has represented to the government's counsel that it delivered the bottle to the jail where Fields was held before trial, so that he could continue to take the medicine." Id.

The Government's admission is significant in two respects. First, it establishes that the FBI was in possession of the pill bottle.[36] Second, this admission, combined with information on the "Med Sheet" from the Muskogee County Detention Center, demonstrates that when the FBI turned the pill bottle over to the jail, it was half empty. The "Med Sheet" for July, 2003 indicates that Mr. Fields received his first 150 mg dosage of Effexor at the jail on July 19, 2003, the day after he was arrested. *SA-1*. All tolled, Mr. Fields was administered fourteen 150 mg pills while at the jail before his prescription ran out. The "Med Sheet" for August, 2003 indicates that Mr. Fields was administered his last 150 mg Effexor pill on August 5, 2003, and that the prescription was not refilled. *SA-2*. The "Med Sheet" also indicates that the prescription was discontinued on August 12, 2003, a date on which Mr. Fields saw a doctor. Email from Kim Shamblin of the Muskogee County Sheriff's Office to Aimee Karnes of the United States Marshal Service dated June 11, 2010,

---

[36] To the extent this information was in the knowledge and possession of the FBI, the Government is charged with this knowledge. A prosecutor is responsible for disclosing "any favorable evidence known to the others acting on the government's behalf, including the police." Kyles v. Whitley, 514 U.S. 419, 437, 438 (1995); see also Giglio v. United States, 405 U.S. 150, 154 (1972).

*SA-3*. Fourteen pills were administered at the jail out of a prescription for thirty,[37] and thus it would have been a highly reasonable inference for the jury to have drawn that he consumed sixteen pills between July 9, when the prescription was filled, and July 18, when he was arrested and the pill bottle was seen in his truck.

The Government's recent admission regarding the disposition of the bottle of 150 mg Effexor pills is material because it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 435; see also Bell v. Cone, 129 S. Ct. 1769, 1783 (2009) (same). At trial, counsel pursued the theory that the increased 150 mg Effexor dosage prescribed to Mr. Fields on July 7, 2003 caused Mr. Fields to suffer a manic flip that substantially impaired his capacity to conform his conduct to the law and. The Government countered this theory by eliciting from Mr. Fields' expert witnesses that there was no evidence that Mr. Fields took the increased dosage prior to the killings of Mr. and Mrs. Chick.[38] The Government

---

[37] The fourteen pills had to have come from Mr. Fields' pill bottle, because he did not see a doctor at the prison regarding his mental health until July 24, 2003, five days after the jail began administering 150 mg Effexor pills to Mr. Fields. SA-3.

[38] Dr. Grinage was questioned as follows:

Q  How do we know if he took any of those 150 milligram pills?
A  He may not have.
Q  He may then have been operating on July 10 under the same dosage that he had been carrying and taking for a period of time prior to that, correct?
A  Well, yeah, clinically speaking. …
Q  But, he was taking the same dosage on July 10, assuming he was taking it, as he was on July 9, wasn't he?
A  If he filled it on July 9th he may have been taking it on July 10th. I can't answer that with any degree of accuracy.
                              * * *
Q  And you don't know exactly when the Defendant took Effexor on July 8, 9 or 10 or in what dosages or amounts, do you?
A  My understanding is that he was on 75 milligrams as documented by the records up until the 7th of July when he was prescribed 150 milligrams.
Q  My question to you, Doctor, is you don't know how much and when he took

also questioned Dr. Woods regarding the absence of any evidence that Mr. Fields took the increased dosage of Effexor.[39]

The Government's admission demonstrates the FBI delivered a half-empty bottle of 150 mg Effexor pills to the jail. This undisclosed fact would have impeached the Government's suggestion in its cross-examination of Drs. Grinage and Woods that there was no indication that Mr. Fields had taken any of the increased dosage. This fact leads to the highly likely inference that Mr. Fields took the increased dosage, and in fact, took much more of the increased dosage than prescribed in the ten

---

Effexor, do you?
A    I can only testify to the records that I have read.
Q    That's nowhere in the record. Or is there any record that reflects how much Effexor he took on July 8th, 9 or 10?
A    I think it is generally perceived that if you are prescribed the medication, then you take it. In this case that may have not been. I can only go by what I read in the records.

*TR*, 2837-38, 2868-69.

[39] Dr. Woods was questioned as follows:

Q    Are you aware that there's no evidence in this record apart from representations that the Defendant may have made to treating or to examining doctors that he even took any of the increased dosage?
A    Yes.
Q    Are you aware that in his truck there were still blister packs of the old dosage?
A    Yes.

\* \* \*

Q    How do you know other than what the Defendant said when he took what medication in July 2003?
A    I have no indication to say that he was not taking the medication, nor do I have an indication to say that he was taking it. …
Q    If there were blister packs yet in his truck that were unused, it would indicate, certainly, that he had not used the medication that had previously been dispensed, wouldn't it?
A    Not used all of the medication.
Q    Yes, sir. …

*TR*, 3029-30, 3060-61.

days from when he filled the prescription until he was arrested.[40]  This is at a minimum circumstantial evidence that Mr. Fields took the prescribed 150 mg dosage, and possibly more, on July 9 and July 10.  Furthermore, the fact that Mr. Fields took more pills than he was prescribed (sixteen in ten days) indicates that at the time of the crimes and in the days immediately after he may have taken additional pills because his mental state was deteriorating.  Thus, the undisclosed information regarding the FBI's possession and disposition of the pill bottle "strengthens the inference that [Mr. Fields] was impaired by [his mental illness] around the time his crimes were committed."  Cone, 129 S. Ct. at 1783 (concluding that prosecution's suppression of information regarding defendant's drug addiction violated Brady because the information was material as to mitigating factor that defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to requirements of law was impaired).   The best evidence to rebut the Government's claims – that the OSBI found and the FBI possessed Mr. Fields' **half-empty** bottle of 150 mg Effexor pills – was withheld by the Government.

Had the jury been aware that Mr. Fields' pill bottle was found half-empty on July 18, it could have reasonably inferred that Mr. Fields took the increased dosage of Effexor prior to killing Mr. and Mrs. Chick, and that his mental state was deteriorating at and around the time of the crimes. With these inferences in hand, there is a reasonable likelihood that at least one juror would have found the substantially impaired capacity mitigating factor to be present and concluded that the aggravating factors did not substantially outweigh this evidence in mitigation.  Thus, there is a reasonable probability that, had the Government disclosed the suppressed information regarding the half-empty pill bottle, "the result of [Mr. Fields' sentencing] proceeding would have been different."

---

[40] The prescription called for Mr. Fields to take one pill daily for thirty days.  In the ten days spanning July 9 through July 18, Mr. Fields consumed sixteen pills.

<u>Cone</u>, 129 S. Ct. at 1783 (citing <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985)).

Additionally, the Government's line of questioning in the cross-examinations of Drs. Grinage and Woods violated Mr. Fields' right to due process as set forth in <u>Napue v. Illinois</u>, U.S. 264 (1959). "[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." <u>Id.</u> at 269. Reversal is required whether the prosecution **knew or should have known** that the testimony was false. <u>United States v. Agurs</u>, 427 U.S. 97, 103 (1976) (defendant entitled to new trial where prosecution "knew or should have known" that its witness testified falsely); <u>Jackson v. Brown</u>, 513 F.3d 1057, 1075 (9th Cir. 2006) ("<u>Napue</u> applies whenever a prosecution 'knew or should have known that the testimony was false'"); <u>United States v. Kelly</u>, 35 F.3d 929, 933 (4th Cir. 1994) (use of false testimony violates due process 'regardless of whether the Government solicited testimony it knew or should have known to be false or simply allowed such testimony to pass uncorrected"). Here, the Government elicited testimony from Drs. Grinage and Woods that it knew or should have known was false, because it possessed information regarding the pill bottle that the defense witnesses did not.

Under <u>Napue</u>, Mr. Fields must demonstrate only that "there is **any reasonable likelihood** that the false testimony **could have affected** the judgment of the jury." <u>Agurs</u>, 427 U.S. at 103; <u>Napue</u>, 360 U.S. at 271. Again, for the reasons that this information was material under <u>Brady</u>, Mr. Fields meets this comparatively more lenient standard.

To the extent that trial counsel should have deduced that the pill bottle was half-empty from the Muskogee County Detention Center records in their possession and without the Government's admission, trial counsel was ineffective for failing to do so. <u>See</u> O'Connell Dec., *A*-1, ¶ 20. For the

same reasons that this evidence is material, trial counsel's failure to present to the jury that the pill bottle was found half-empty was prejudicial.

**B.     Emails and Documents from Mr. Fields' Computers**

In response to the *Motion for Non-Dispositive Omnibus Relief*, the Government provided counsel with copies of the images of the hard drives of two computers used by Mr. Fields.  Counsel has submitted these imaged hard drives to a forensic computer expert for data extraction and analysis.  Given the volume of the data on the two imaged hard drives, Mr. Fields' expert was not able to complete her work in time for the filing of this memorandum, and thus counsel has been unable to review any material from the imaged hard drives.  Counsel will file a supplementary memorandum on this aspect of Ground Seven promptly should the analysis reveal evidence helpful to his cause.

**GROUND EIGHT**

**THE CUMULATIVE IMPACT OF ALL THESE ERRORS DENIED MR. FIELDS  DUE PROCESS, EFFECTIVE ASSISTANCE OF COUNSEL AND A RELIABLE SENTENCING HEARING.**

Each of the claims presented herein individually entitles Mr. Fields to relief from his sentence of death.  However, even if this Court finds that Mr. Fields is not entitled to relief on any particular claim, he is nevertheless entitled to relief because the cumulative effect of these errors was to deny him a fair capital sentencing proceeding and the heightened procedural safeguards constitutionally required in capital cases.

Courts have long recognized that all kinds of claims of constitutional error are to be considered both individually and cumulatively, and that cumulative error or prejudice may provide a basis for relief whether or not the effect of the individual errors warrants relief.  See, e.g., Kyles, 514 U.S. at 437-38 (cumulative prejudice from state's failure to reveal multiple pieces of

106

exculpatory evidence undermined fairness of trial and entitled defendant to relief); <u>Taylor v. Kentucky</u>, 436 U.S. 478, 488 (1978) (cumulative prejudicial effect of prosecutor's misstatements and improper jury instructions undermined fairness of trial, necessitating relief); <u>Cargle</u>, 317 F.3d at 1224-25 (habeas relief warranted based upon cumulative errors during guilt and penalty phases; at penalty phase prosecutor engaged in improper argument and improper victim impact evidence was presented).[41]

If the court finds cumulative error or prejudice, it eliminates the need to analyze the individual prejudicial effect of each deficiency. <u>See</u> <u>Cargle</u>, 317 F.3d at 1223 (declining to decide issue of whether prosecutor's improper argument was so prejudicial as to render penalty-phase proceedings fundamentally unfair because "when considered with the other errors at the sentencing stage, we have no difficulty finding cumulative error"); <u>Mak</u>, 970 F.2d at 622 ("We do not need to decide whether these deficiencies alone meet the prejudice standard because other significant errors occurred that, considered cumulatively, compel [relief]"). Moreover, if the court finds itself in equipoise as to the effect of these cumulative errors, such that it "merely ha[s] 'grave doubt' as to the existence of prejudice," relief must be granted. <u>Glenn</u>, 71 F.3d at 1211 (quoting <u>O'Neal v. McAninch</u>, 115 S. Ct. 992, 994 (1995)).

---

[41] <u>See also</u> <u>Lesko v. Lehman</u>, 925 F.2d 1527, 1541 (3d Cir. 1991) (cumulative prejudicial effect of prosecutor's penalty phase remarks entitled petitioner to new sentencing hearing, even if individually the remarks may not have been sufficiently prejudicial to warrant relief); <u>Berryman v. Morton</u>, 100 F.3d 1089 (3d Cir. 1996) (cumulative effect of each instance of counsel's deficient performance was sufficiently prejudicial to require relief); <u>Harris v. Wood</u>, 64 F.3d 1432, 1438-39 (9th Cir. 1995) (granting relief for cumulative prejudicial effect of counsel's deficient performance); <u>Mak v. Blodgett</u>, 970 F.2d 614, 622 (9th Cir. 1992) (granting relief for cumulative effect of errors including counsel's failure to present mitigating evidence, court's refusal to admit exculpatory evidence and improper sentencing-stage instructions); <u>Kubat v. Thieret</u>, 867 F.2d 351, 371 (7th Cir. 1989) (district court "appropriately considered the combined effect of counsel's errors"; <u>Strickland</u> "clearly allows the court to consider the cumulative effect of counsel's errors in determining whether a defendant was prejudiced").

The circumstances of this case demonstrate that the cumulative effect of counsel's deficient penalty phase representation, and the constitutional errors committed by the Court and the Government, so undermined the fairness of the sentencing proceedings that Mr. Fields's sentence of death should be vacated. Mr. Fields was denied his opportunity to present significant mitigation to the jury and to rebut the Government's evidence of the aggravating factors, while at the same time the jury was allowed to consider unfettered false and misleading testimony presented in support of the aggravating factors, and the Government's improper and prejudicial comments in its closing arguments. The verdict slip and instructions – which permitted the jury to enter a general verdict of death, rather than separately sentencing him on each count of murder – resulted in the jury double-counting the aggravating factors while depriving Mr. Fields of his right to have the jury give effect to the mitigating evidence he presented. These errors significantly weakened Mr. Fields's case in favor of life while bolstering the Government's position in favor of death. Where the combined effort of individual errors renders a defense "'far less persuasive that it might [otherwise] have been,' the resulting conviction violates due process." Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007) (quoting Chambers, 410 U.S. at 294, 302-3 (granting habeas relief based upon cumulative prejudice from wrongful admission of testimony of prosecution witness and wrongful exclusion of portion of defense witness testimony because errors "left the jury with only half the picture").

Collectively and cumulatively, these errors denied Mr. Fields his rights to due process of law and his rights under the Fifth, Sixth and Eighth Amendments to the United States Constitution and require that he be afforded a new sentencing hearing.

**GROUND NINE**

**THE MANNER IN WHICH THE GOVERNMENT WOULD CARRY OUT MR. FIELDS'
EXECUTION WOULD VIOLATE THE EIGHTH AMENDMENT.**

In the *Motion*, Mr. Fields alleged that the manner in which the Government would carry out his execution by lethal injection would violate the Eighth Amendment. He also pled that the litigation of this claim was not appropriate in at this time, and that he raised the claim in the *Motion* in order to avoid a later allegation that the claim was waived.

Mr. Fields stands by those suggestions as to why the so-called lethal injection claim ought not be litigated in this context at this time. Should the Court or the Government have a different view of this Ground, Mr. Fields will pursue it as directed.

**CONCLUSION**

For all of the above reasons, those set forth in the *Motion*, and based upon the entire record of these proceedings, Mr. Fields respectfully requests that the Court grant the relief sought in the *Motion*.

Respectfully Submitted,

/s/Michael Wiseman

Michael Wiseman
Chief, Capital Habeas Corpus Unit
Cristi Charpentier
Assistant Federal Defender
Federal Community Defender
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Michael_Wiseman@fd.org
Cristi_Charpentier@fd.org

Dated:  July 30, 2010
        Philadelphia, PA

## CERTIFICATE OF SERVICE

I, Michael Wiseman, Esq., hereby certify that on this 30th day of July, 2010, the foregoing document was electronically filed and is available for viewing and downloading through the ECF system.

/s/ Michael Wiseman

Michael Wiseman