# fIN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

EDWARD LEON FIELDS, JR.      §
     §
      Movant,      §
     §      Case No. CV-10-00115-RAW
v.      §      Criminal Case No. CR-03-73-RAW
     §
UNITED STATES OF AMERICA      §
     §
      Respondent.      §

## GOVERNMENT'S ANSWER IN OPPOSITION TO MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT A SENTENCE BY A PERSON IN FEDERAL CUSTODY

## (Answer Under 28 U.S.C. § 2255)

SHELDON J. SPERLING
United States Attorney
Eastern District of Oklahoma

CHRISTOPHER J. WILSON
Assistant United States Attorney
Eastern District of Oklahoma
1200 West Okmulgee
Muskogee, OK 74401-6848
Tel: (918) 684-5100

JEFFREY B. KAHAN, PA Bar No. 93199
Trial Attorney
U.S. Department of Justice
1331 F Street, N.W.; Rm. 337
Washington, D.C. 20530
Tel: (202) 305-8910

# TABLE OF CONTENTS

PROCEDURAL HISTORY.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

FIELDS'S CONTENTIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

FEDERAL COLLATERAL REVIEW OF PRESUMPTIVELY FINAL CRIMINAL
      JUDGMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.  Cognizable Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      B.  Time Barred Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      C.  Procedurally Defaulted Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      D.  Claims Previously Adjudicated on Direct Appeal. . . . . . . . . . . . . . . . . . . 8

      E.  New Rule of Criminal Procedure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      F.  Harmless Error. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

THE GOVERNMENT'S ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    I.  COUNSEL PROVIDED COMPETENT REPRESENTATION IN PRESENTING
        AND ARGUING MENTAL HEALTH EVIDENCE. . . . . . . . . . . . . . . . . . . . . 9
      A.  Counsel's Mental Health Advocacy and the Jury's Verdict. . . . . . . . . . . . 11
          1.  Trial Counsel Adequately Argued the Case in Mitigation. . . . . . . . . 12
          2.  The Jury Rejection of Mental Health Mitigators. . . . . . . . . . . . . . . . 16
             a.  Procedural Default.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
             b.  Neither the Law nor the Record Required the Jury to find
                Mental Health Mitigators. . . . . . . . . . . . . . . . . . . . . . . . . . 17
      B.  Trial Counsel Reasonably Omitted Brain Damage Evidence. . . . . . . . . . . 23
      C.  Trial Counsel Reasonably Opted to Forgo the Testimony of Fields's Treating
        Mental Health Professionals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
      D.  Trial Counsel Reasonably Responded to Dr. Price's Testimony . . . . . . . . . 32
      E.  Counsel's Reliance on the Opinions of Retained Experts. . . . . . . . . . . . . . 36
      F.  Trial Counsel's Preparation of the Expert Witnesses. . . . . . . . . . . . . . . . . 39

    II.  FIELDS HAS FAILED TO STATE A JUSTICIABLE CLAIM THAT HE IS
        INCOMPETENT TO BE EXECUTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

III. TRIAL COUNSEL REASONABLY RESPONDED TO THE GOVERNMENT'S
VALID EVIDENCE AND ARGUMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
    A. Counsel Reasonably Responded to Evidence in Support of Aggravating
       Factors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
       1. Substantial Planning and Premeditation. . . . . . . . . . . . . . . . . . . . . 46
          a. The Testimony of Fields's Associates.. . . . . . . . . . . . . . . . . 46
          b. Glass Fragment Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . 50
          c. Blood Flow Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
       2. Mental Anguish.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
    B. The Government Properly Presented Evidence and Argued Reasonable
       Inferences from the Record. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
       1. Allegedly False Glass Fragment Evidence. . . . . . . . . . . . . . . . . . . 58
       2. Allegedly Baseless Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

IV. TRIAL COUNSEL PRESENTED APPROPRIATE SOCIAL HISTORY EVIDENCE
WITHOUT UNDERMINING THE DEFENSE STRATEGY. . . . . . . . . . . . . . . 62

V. COUNSEL PROPERLY OMITTED FUTILE OBJECTIONS TO APPROPRIATE
PROSECUTION ARGUMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
    A. Fields Defaulted any Claim of Prosecutorial Misconduct. . . . . . . . . . . . 67
    B. Ineffective Assistance of Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
       1. Appellate Counsel Reasonably Omitted an Argument that the
         Prosecutor had Misstated the Law. . . . . . . . . . . . . . . . . . . . . . . . . 69
       2. Counsel Reasonably Omitted Challenges to Comments about the
         Defendant's Crimes, and the Propriety of Mercy or Other
         Mitigation.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
       3. Counsel Reasonably Omitted Challenges to an Argument that Prison
         Was Insufficient Punishment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
       4. Counsel Reasonably Omitted Challenges to Comments on the
         Credibility of Expert Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . 76
       5. Counsel Reasonably Omitted Challenges to Appropriate Inferences
         from the Record. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
         a. The Prosecution Fairly Characterized the Mental Health
           Evidence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
         b. The Prosecution Fairly Characterized the Evidence of Planning
           and Premeditation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84
         c. The Prosecution Fairly Characterized the Evidence of Shirley
           Chick's Death.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90
       6. Counsel Reasonably Omitted Challenges to the Prosecution's
         Appropriate References to the Bible. . . . . . . . . . . . . . . . . . . . . . . . 91

VI. TRIAL COUNSEL PROPERLY REQUESTED A JURY CHARGE AND

VERDICT FORM THAT PERMITTED A SINGLE WEIGHING OF
AGGRAVATING AND MITIGATING FACTORS.. . . . . . . . . . . . . . . . . . . . . . . 94

VII.  THE PROSECUTION HONORED ITS OBLIGATIONS TO DISCLOSE
EXCULPATORY MATERIAL TO THE DEFENSE AND TO AFFORD FIELDS
A FAIR TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101
    A.  Alleged Suppression of Effexor Bottle. . . . . . . . . . . . . . . . . . . . . . . . . 102
    B.  Alleged Suppression of Computers. . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

VIII.  THERE ARE NO ERRORS TO ACCUMULATE. . . . . . . . . . . . . . . . . . . . . . . 107

IX.  THIS COURT LACKS JURISDICTION TO DETERMINE WHETHER FIELDS'S
EXECUTION WILL CONSTITUTE CRUEL AND UNUSUAL PUNISHMENT
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

iii

# TABLE OF AUTHORITIES

**A. Constitution**

U.S. Const. art. III, § 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 107


**B. Federal Statutes**

1 U.S.C. § 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

18 U.S.C. § 3591. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

18 U.S.C. § 3592. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 43

18 U.S.C. § 3593. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 31, 34, 38

18 U.S.C. § 3595. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

21 U.S.C. § 848. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

28 U.S.C. § 2255. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 22


**C. Federal Cases**

*Alcala v. Woodford*, 334 F.3d 862 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . 47, 48, 51, 53, 55

*Allen v. Mullin*, 368 F.3d 1220 (10th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Ballard v. United States*, 152 F.2d 941 (9th Cir. 1945). . . . . . . . . . . . . . . . . . . . . . 77

*Battle v. United States*, 419 F.3d 1292 (11th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . 7

*Bean v. Calderon*, 163 F.3d 1073 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Beard v. Banks*, 542 U.S. 406 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 22

*Bell v. Cone*, 535 U.S. 685 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Berger v. United States*, 295 U.S. 78 (1935). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Blinder, Robinson & Co., Inc. v. S.E.C.*, 837 F.2d 1099 (D.C. Cir. 1988). . . . . . . . . . . . . . . . . 94

*Bousley v. United States*, 523 U.S. 614 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Boyd v. Ward*, 179 F.3d 904 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Boyde v. California*, 494 U.S. 370 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*Boyle v. McKune*, 544 F.3d 1132 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 28

*Brady v. Maryland*, 373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

*Brecht v. Abrahamson*, 507 U.S. 619 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Bryan v. Mullen*, 335 F.3d 1207 (10th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 63

*Buchanan v. Angelone*, 522 U.S. 269 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Burnett v. Kerr*, 835 F.2d 1319 (10th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Butler v. McKellar*, 494 U.S. 407 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Caldwell v. Mississippi*, 472 U.S. 320 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Caldwell v. Russell*, 181 F.3d 731 (6th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Cannon v. Gibson*, 259 F.3d 1253 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 63

*Capps v. Sullivan*, 921 F.2d 260 (10th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*Card v. Dugger*, 911 F.2d 1494 (11th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 67

*Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102, 103

*Coe v. Bell*, 209 F.3d 815 (6th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Coleman v. Brown*, 802 F.2d 1227 (10th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Crosetto v. State Bar of Wisconsin*, 12 F.3d 1396 (7th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . 45

*Cummings v. Sirmons*, 506 F.3d 1211 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 55

*Daniels v. United States*, 254 F.3d 1180 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Darden v. Wainwright*, 477 U.S. 168 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

v

*Dever v. Kan. State Penitentiary*, 36 F.3d 1531 (10th Cir. 1994)..........................10

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)...................................69

*Drake v. Portuondo*, 553 F.3d 230 (2d Cir. 2009)..................................59

*Eddings v. Oklahoma*, 455 U.S. 104 (1982)..................................18, 21

*Elledge v. Dugger*, 823 F.2d 1439 (11th Cir. 1987)...........................36, 37

*Fields v. Brown*, 431 F.3d 1186 (9th Cir. 2005)..................................74

*Flast v. Cohen*, 392 U.S. 83 (1968)...........................................45, 107

*Fox v. Ward*, 200 F.3d 1286 (10th Cir. 2000)..........................12, 29, 47, 63

*Giglio v. United States*, 405 U.S. 150 (1972)....................................101

*Graham v. Collins*, 506 U.S. 461 (1993).........................................18

*Green v. United States*, 262 F.3d 715 (8th Cir. 2001)..............................9

*Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991)............................106, 108

*Hallford v. Culliver*, 459 F.3d 1193 (11th Cir. 2006)..............................24

*Harris v. Dugger*, 874 F.2d 756 (11th Cir. 1989)..................................10

*Harris v. Pulley*, 692 F.2d 1189 (9th Cir. 1982)..................................100

*Harris v. Vasquez*, 949 F.2d 1497 (9th Cir. 1990)..............................36, 43

*Hawkins v. Hannigan*, 185 F.3d 1146 (10th Cir. 1999)...........................33, 68

*Jones v. Barnes*, 463 U.S. 745 (1983) ..........................................12

*Jones v. United States*, 527 U.S. 373 (1999).....................................98

*Juan H. v. Allen*, 408 F.3d 1262 (9th Cir. 2005).................................33

*Kansas v. Marsh*, 548 U.S. 163 (2006) ..........................................18

*Kimmelman v. Morrison*, 477 U.S. 365 (1986)..................................10, 12

*Knighton v. Mullin*, 293 F.3d 1165 (10th Cir. 2002)...................................28

*Knowles v. Mirzayance*, 129 S. Ct. 1411 (2009)...................................10, 95

*Lankford v. Arave*, 468 F.3d 578 (9th Cir. 2006)...................................95, 98

*Le v. Mullin*, 311 F.3d 1002 (10th Cir. 2002)...........................70, 72, 74, 86

*McCoy v. North Carolina*, 494 U.S. 433 (1990)...................................18

*Middleton v. McNeil*, 541 U.S. 433 (2004)...................................70

*Murray v. Carrier*, 477 U.S. 478 (1986)...................................7

*Neder v. United States*, 527 U.S. 1 (1999)...................................9

*New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495 (10th Cir. 1995)............45

*Nooner v. Norris*, 499 F.3d 831 (8th Cir. 2007)...................................45

*Oregon v. Guzek*, 546 U.S. 517 (2006)...................................18

*O'Dell v. Netherland*, 521 U.S. 151 (1997)...................................9

*Parker v. Scott*, 394 F.3d 1302 (10th Cir. 2005)...................................39

*Patel v. United States*, 19 F.3d 1231 (7th Cir. 1994)...........................54, 56, 57

*Patterson v. Dahm*, 769 F.Supp. 1103 (D. Neb. 1991)...................................95

*Penry v. Johnson*, 532 U.S. 782 (2001)...................................44

*Penry v. Lynaugh*, 492 U.S. 302 (1989)...................................18

*Pierce v. Blaine*, 467 F.3d 362 (3d Cir. 2006)...................................45

*Randle v. Jackson*, 544 F. Supp. 2d 619 (E.D. Mich. 2008)...................................15

*Renne v. Geary*, 501 U.S. 312 (1991)...................................45

*Rompilla v. Beard*, 545 U.S. 374 (2005)...................................24

*Saffle v. Parks*, 494 U.S. 484 (1990)...................................22, 100

*Sandoval v. Calderon*, 241 F.3d 765 (9th Cir. 2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92, 93

*Schlup v. Armontrout*, 941 F.2d 631 (8th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Schriro v. Summerlin*, 542 U.S. 348 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 22, 59, 62, 100

*Short v. Sirmons*, 472 F.3d 1177 (10th Cir. 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69, 72

*Smith v. Gibson*, 197 F.3d 454 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Smith v. Murray*, 477 U.S. 527 (1986).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Smith v. Sec'y of New Mexico Dep't of Corrections*, 50 F.3d 801 (10th Cir. 1995). . . . . . . . . . 59

*Smith v. Workman*, 550 F.3d 1258 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Smith v. Zachary*, 255 F.3d 446 (7th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*Snow v. Sirmons*, 474 F.3d 693 (10th Cir. 2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 31, 33, 37

*Spirko v. Mitchell*, 368 F.3d 603 (6th Cir. 2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

*St. Aubin v. Quarterman*, 470 F.3d 1096 (5th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Steffel v. Thompson*, 415 U.S. 452 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Strickland v. Washington*, 466 U.S. 668 (1984).. . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12, 16, 98

*Teague v. Lane,* 489 U.S. 288 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8, 9, 22

*Thornburg v. Mullin*, 422 F.3d 1113 (10th Cir. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77, 91

*Tuilaepa v. California*, 512 U.S. 967 (1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*United States v.  Horey*, 333 F.3d 1185 (10th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*United States v. Agurs*, 427 U.S. 97 (1976).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 61

*United States v. Allen*, 16 F.3d 377 (10th Cir. 1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 17, 68

*United States v. Barajas-Diaz*, 313 F.3d 1242 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Basham*, 561 F.3d 302 (8th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Beers*, 189 F.3d 1297 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

*United States v. Bender*, 304 F.3d 161 (1st Cir. 2002). . . . . . . . . . . . . . . . . . . . . . 101, 103, 105

*United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*United States v. Blackwell*, 127 F.3d 947 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Blandin*, 784 F.2d 1048 (10th Cir. 1986).. . . . . . . . . . . . . . . . . . . . . . . . . . 59, 105

*United States v. Challoner*,  583 F.3d 745 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . 68, 69

*United States v. Clingman*, 288 F.3d 1183 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . 105

*United States v. Cook*, 45 F.3d 388 (10th Cir. 1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*United States v. Cousins*, 455 F.3d 1116 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Cronic*, 466 U.S. 648 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Dago*, 441 F.3d 1238 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Dazey*, 403 F.3d 1147 (10th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*United States v. Erickson*, 561 F.3d 1150 (10th Cir. 2009).. . . . . . . . . . . . . . . . . . . . . . 101-103

*United States v. Espinoza-Saenz*, 235 F.3d 501 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . 7, 106

*United States v. Fields*, 483 F.3d 313 (5th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79, 80

*United States v. Fields*, 516 F.3d 923 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . 3, 4, 21, 70, 97, 98

*United States v. Fisher*, 38 F.3d 1144 (10th Cir. 1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Frady*, 456 U.S. 152 (1982).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 17, 68

*United States v. Franklin-El*, 555 F.3d 1115 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . 77, 80

*United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*United States v. Gabaldon*, 522 F.3d 1121 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Galloway*, 56 F.3d 1239 (10th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Guerrero*, 488 F.3d 1313 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Haddock*, 12 F.3d 950 (10th Cir. 1993). . . . . . . . . . . . . . . . . . . . . 11, 52, 54, 58

*United States v. Hall*, 152 F.3d 381 (5th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*United States v. Hanley*, 974 F.2d 14 (4th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*United States v. Harden*, 846 F.2d 1229 (9th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Henry*, 545 F.3d 367 (6th Cir. 1008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*United States v. Higgs,* 353 F.3d 281 (4th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*United States v. Ivy*, 83 F.3d 1266 (10th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . 72, 76, 80, 85

*United States v. Jackson*, 84 F.3d 1154 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*United States v. Johnson*, 403 F. Supp. 2d 721 (N.D. Iowa 2005). . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Johnson*, 495 F.3d 951 (8th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 72

*United States v. Jones*, 34 F.3d 596 (8th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

*United States v. Jones*, 468 F.3d 704 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*United States v. Kelly*, 35 F.3d 929 (4th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

*United States v. Kennedy*, 225 F.3d 1187 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Khan*, 835 F.2d 749 (10th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Kluger,* 794 F.2d 1579 (10th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

*United States v. Lee*, 274 F.3d 485 (8th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Lopez-Medina*, 596 F.3d 716 (10th Cir. 2010). . . . . . . . . . . . . . . . . 61, 74, 84

*United States v. Lowden*, 900 F.2d 213 (10th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . 69, 72

*United States v. Malatesta*, 583 F.2d 748 (5th Cir. 1978)...............................80

*United States v. Marashi*, 913 F.2d 724 (9th Cir. 1990)...............................101

*United States v. McCullah*, 76 F.3d 1087 (10th Cir. 1996)...............................20

*United States v. McVeigh*, 153 F.3d 1166 (10th Cir. 1998)...............................34

*United States v. Molina*, 934 F.2d 1440 (9th Cir. 1991)...............................39

*United States v. Nguyen*, 413 F.3d 1170 (10th Cir. 2005)......................15, 29, 95, 98

*United States v. Nolan*, 571 F.2d 528 (10th Cir. 1978)...............................8

*United States v. Olano*, 507 U.S. 725 (1993) ...............................44, 98

*United States v. Ortiz Oliveras*, 717 F.2d 1 (1st Cir. 1983)...............................29

*United States v. Paul*, 217 F.3d 989 (8th Cir. 2000)...............................20, 21

*United States v. Prichard*, 875 F.2d 789 (10th Cir. 1989)...............................8

*United States v. Quezada-Enriquez*, 567 F.3d 1228 (10th Cir. 2009)..............45, 107

*United States v. Rivera*, 347 F.3d 850 (10th Cir. 2003)...............................9

*United States v. Rodriguez-Ramirez*, 777 F.2d 454 (9th Cir. 1985)...............................33

*United States v. Rogers*, 556 F.3d 1130 (10th Cir. 2009)...............................107

*United States v. Salazar*, 323 F.3d 852 (10th Cir. 2003)...............................10

*United States v. Sanders*, 372 F.3d 1183 (10th Cir. 2004)...............................12

*United States v. Sherrill*, 388 F.3d 535 (6th Cir. 2004)...............................69, 75

*United States v. Shoff*, 151 F.3d 889 (8th Cir. 1998)...............................80

*United States v. Sullivan*, 919 F.2d 1403 (10th Cir. 1991)...............................80

*United States v. Torres*, 569 F.3d 1277 (10th Cir. 2009)...............................101, 104

*United States v. Visinaiz*, 428 F.3d 1300 (10th Cir. 2005)...............................71

*United States v. Walker*, 155 F.3d 180 (3d Cir. 1998)...................................77

*United States v. Warner*, 23 F.3d 287 (10th Cir. 1994)..................................8

*United States v. Willis*, 202 F.3d 1279 (10th Cir. 2000). ...........................6, 106

*United States v. Wiseman*, 297 F.3d 975 (10th Cir. 2002)...........................7, 8

*United States v. Younger*, 398 F.3d 1179 (9th Cir. 2005). ..........................77

*United States v. Younger*, 398 F.3d 1179 (9th Cir. 2005). ..........................77

*Van Poyck v. Florida Dep't of Corrections*, 290 F.3d 1318 (11th Cir. 2002). ...............37

*Vanderwerf v. SmithKline Beecham Corp.*, 603 F.3d 842 (10th Cir. 2010). ................38

*Wackerly v. Workman*, 580 F.3d 1171 (10th Cir. 2009). ...........................63, 66

*Walls v. Bowersox*, 151 F.3d 827 (8th Cir. 1998). ..................................10

*Walton v. Arizona*, 497 U.S. 649 (1990). .........................................18

*Waters v. Thomas*, 46 F.3d 1506 (11th Cir. 1995)................................12, 47

*Welch v. Workman*, 607 F.3d 674 (10th Cir. 2010)..................................98

*Wicks v. Lockhart*, 569 F. Supp. 549 (E.D. Ark. 1983)...............................96

*Williams v. Bowersox*, 340 F.3d 667 (8th Cir. 2003)................................29

*Williams v. Groose*, 77 F.3d 259 (8th Cir. 1996)...................................70

*Williams v. Woodford*, 384 F.3d 567 (9th Cir. 2004)................................63

*Willis v. United States*, 87 F.3d 1004 (8th Cir. 1996). ..............................34

*Wright v. Hopper*, 169 F.3d 695 (11th Cir. 1999)...................................16

*Yarborough v. Gentry*, 540 U.S. 1 (2003). ......................12, 16, 24, 50, 63

**D. State Cases**

*Bryant v. Bryant*, 545 S.W.2d 938 (Ky. 1977).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*People v. Crittenden*, 885 P.2d 887 (Cal. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*People v. Sandoval*, 841 P.2d 862 (Cal.1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95, 97

*State v. Hancock*, 840 N.E.2d 1032 (Ohio 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

**E. Federal Rules**

Fed. R. Evid. 609.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

Rule 2(b)(2), Rules Gov'g § 2255 Proceedings.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

**F. Unpublished Case Material**

*Estate of Lam v. Upjohn Co.*, No. Civ. A. 94-003-H,1995 WL 478844 (W.D. Va. April 21, 1995)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Estate of Moffett v. SmithKline Beecham Corp.*, No. 1:03 CV 532 WJG JMR, 2005 WL 1595664
(S.D. Miss. June 9, 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Scott v. Romero*, No. 04-2262, 2005 WL 2865173 (10th Cir. Nov. 2, 2005). . . . . . . . . . . . . . . 33

*United States v. McVeigh*, No. 96-CR-68-M, 1997 WL 330507 (D. Colo. 1997).. . . . . . . . . . . 96

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| EDWARD LEON FIELDS, JR. | § | |
| | § | |
| Movant, | § | |
| | § | Case No. CV-10-00115-RAW |
| v. | § | Criminal Case No. CR-03-73-RAW |
| | § | |
| UNITED STATES OF AMERICA | § | |
| | § | |
| Respondent. | § | |

**GOVERNMENT'S ANSWER IN OPPOSITION TO MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT A SENTENCE BY A PERSON IN FEDERAL CUSTODY**

**(Answer Under 28 U.S.C. § 2255)**

## PROCEDURAL HISTORY

On August 1, 2003, a federal grand jury for the Eastern District of Oklahoma returned an indictment that charged Edward Leon Fields with four non-capital offenses and two death-eligible counts of first degree murder, all stemming from the homicides of Charles Glenn Chick, Jr. and Shirley Elliot Chick. (Trl. Doc. 16.)[1] On March 15, 2004, the government filed a notice of intent to seek the death penalty as to both murder charges. (Trl. Doc. 38.)

On June 30, 2005, Fields pleaded guilty to all six counts of the indictment. On July 13, 2005, a jury trial commenced regarding penalty. On July 22, 2005, at the conclusion of the trial, the jury found that Fields was at least 18 years old at the time of the offenses and that he intentionally killed the victims. (Trl. Doc. 228 at 33-34.) The jury found three statutory

---

[1]Throughout its Answer, the government refers to the documents in case no. 03-cr-73-WH by docket number or date of entry and prefaces the citations with "Trl." Citations to documents filed on the instant docket, case no. 10-cv-00115-RAW, have no preface.

aggravating factors: a substantial planning and premeditation aggravator applicable to each murder and a multiple-murder aggravator applicable to both. (*Id*. at 35.) Additionally, the jury found four non-statutory aggravating factors: that Fields posed a future danger to others, that Fields inflicted mental anguish upon Shirley Chick, and – as to each victim – that Fields caused permanent injury, loss and harm to surviving family, friends and co-workers. (*Id*. at 36-37.) Seventeen mitigating factors were found true by at least one juror. (*Id*. at 38-41.) After weighing the aggravating and mitigating factors, the jury recommended a sentence of death. (*Id*. at 42-43.) On November 8, 2005, this Court imposed the recommended sentence.

Fields appealed his conviction and sentence to the United States Court of Appeals for the Tenth Circuit, raising the following claims of error:

1. The government and this Court lacked jurisdiction over these offenses.

2. This Court improperly struck a venire member whose scruples did not substantially impair his ability to serve.

3. This Court improperly allowed the jury to consider two separate substantial planning and premeditation statutory aggravators.

4. This Court improperly permitted the jury to return a single penalty verdict as to two murders.

5. Insufficient evidence supported the findings of substantial planning and premeditation.

6. The future dangerousness aggravator was vague and overbroad, and was premised on improper evidence.

7. This Court did not require the jury to unanimously agree on the factual predicates of the future dangerousness aggravator.

8. The mental anguish aggravator was vauge, overbroad and statutorily preempted.

9. This Court improperly admitted evidence concerning the impact of the murders on people unrelated to the victims.

10. The unanimous rejection of the mental disturbance mitigator was prejudicial error.

11. The jury should have weighed the aggravators and mitigators under the reasonable doubt standard.

12. This Court improperly permitted Fields's ghillie suit into the jury deliberation room.

13. Cumulative error prejudiced Fields.

In a published opinion, the Tenth Circuit affirmed the conviction and sentence in full. *United States v. Fields*, 516 F.3d 923 (10th Cir. 2008).

On April 6, 2010 (365 days after the Supreme Court denied a petition for writ of certiorari from the Tenth Circuit's judgment), Fields filed a Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody. (Doc. 1.) The Motion does not include any of Fields's claims, which are all contained – albeit without citation to authority – in a companion brief, entitled Grounds in Support of Motion Pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody. (Doc. 2 (hereinafter "Pet.").) On July 30, 2010, Fields set forth his legal theories in a second companion brief, entitled Petitioner's Memorandum of Law in Support of Motion for Relief Pursuant to 28 U.S.C. Section 2255 or in the Alternative Pursuant to 28 U.S.C. Section 2241. (Doc. 14 (hereinafter "Mem.").) Pursuant to this Court's Orders (Docs. 3 & 11), the Government now files this Answer.

Edward Leon Fields killed Charles and Shirley Chick at the Winding Stair Campground in the Ouachita National Forest on July 10, 2003. He had seen the couple there days earlier and drove there the evening of July 10 with a homemade ghillie suit (a covering for head and body made to resemble underbrush that Fields referred to as his sniper suit) and a camouflaged and powerfully scoped rifle in his truck. He found the Chicks on a vista some distance from their campsite. He retrieved the rifle, put on the ghillie suit, and hid near their campsite as it grew dark. In time, the Chicks came back to the campsite and sat at a table. Fields waited and watched them for about twenty minutes. When Charles told Shirley he was going to the tent, Fields shot him in the face. As Charles slumped to the table, Shirley got up and began running toward the couple's van. Fields shot at her and a bullet tore through her foot. She reached the passenger door of the van, but was shot again, on the side of her head. Fields caught up and shot her once more, in the back of the head, in the doorway of the van. Shirley died as a result of both head wounds. Fields returned to the table and shot Charles a second time in the head. Charles also died as a result of both of his wounds.

Physical evidence indicated that Fields then left the campsite and only returned hours later, when he broke the driver's window of the van and stole some items. He rummaged through only the driver's area of the van; the rest of the van and the Chicks' tent were untouched. A tip eventually led police to Fields' truck, where they found the rifle, the ghillie suit, and some of the items stolen from the Chicks' van. In the meantime, Fields had been taken in for

---

[2]The Statement of Facts is drawn from the Tenth Circuit's opinion in this case, *Fields*, 516 F.3d at 927.

questioning.  He initially denied any connection to the crime, but confessed when confronted with the evidence taken from his truck.

**FIELDS'S CONTENTIONS**

1.  The jury improperly rejected an alleged mental health mitigator, and trial counsel ineffectively investigated, presented and argued mental health evidence.

2.  Fields's mental health precludes his execution.

3.  Trial counsel ineffectively investigated and presented evidence to rebut the substantial-planning and mental-anguish aggravators, which were based on false and misleading evidence and argument.

4.  Trial counsel failed to present Fields's social history through the testimony of an appropriate expert and omitted an argument that such evidence was mitigating.

5.  Trial counsel failed to interpose appropriate objections to the prosecution's arguments.

6.  Trial counsel failed to object to the verdict form and jury charge, which allowed a unitary sentence.

7.  The government withheld exculpatory evidence, which trial counsel ineffectively failed to investigate and present.

8.  Cumulative prejudice requires relief.

9.  The means of Fields's execution would violate the Constitution.

**FEDERAL COLLATERAL REVIEW OF PRESUMPTIVELY FINAL CRIMINAL JUDGMENTS**

Collateral relief under 28 U.S.C. § 2255 is strictly circumscribed.  The grounds for relief under § 2255 are narrower than those for relief on direct appeal.  With very limited exceptions,

5

relief may not be based on (1) an error that is not of jurisdictional or constitutional dimension, (2) a procedurally defaulted ground, (3) a claim previously raised and rejected on direct appeal, (4) a "new rule" as defined by *Teague v. Lane,* 489 U.S. 288 (1989), or (5) an error that did not have a substantial and injurious effect or influence in determining the jury's verdict.

A.  Cognizable Claims

While § 2255 provides a "comprehensive remedy, 'it does not encompass all claimed errors in conviction and sentencing.'"  *United States v. Khan*, 835 F.2d 749, 753 (10th Cir. 1987).  Once a defendant has appealed his conviction, the court is "entitled to presume he stands fairly and finally convicted. . . . Our trial and appellate procedures are not so unreliable that we may not afford their completed operation any binding effect beyond the next in a series of endless postconviction collateral attacks."  *Khan*, 835 F.2d at 753 (emphasis omitted).  Errors of law or fact do not provide a basis for § 2255 relief unless they involve "a fundamental defect which inherently results in a complete miscarriage of justice."  *United States v. Blackwell*, 127 F.3d 947, 954 (10th Cir. 1997) (internal quotes omitted).

B.  Time Barred Claims

Statutory law imposes a one-year period of limitations in which federal prisoners may file motions to vacate, set aside or correct his sentence.  28 U.S.C. § 2255(f); *United States v. Willis*, 202 F.3d 1279, 1280 (10th Cir. 2000).  The limitation period begins on the date the Supreme Court denies a defendant's petition for writ of certiorari from direct appeal, regardless of whether the defendant seeks rehearing.  *Willis*, 202 F.3d at 1280-81.  The period of limitations bars untimely amendments that add new claims to a defendant's initial § 2255 motion.  *United States v. Guerrero*, 488 F.3d 1313, 1316 (10th Cir. 2007).  While § 2255 movants may file untimely

6

amendments that clarify, amplify or expand the facts in their timely-filed motions, they may not use such pleadings to add new claims. *United States v. Espinoza-Saenz*, 235 F.3d 501, 504-05 (10th Cir. 2000). Section 2255 movants may, though, justify untimely pleadings by showing a need for equitable tolling, which is reserved for extraordinary circumstances beyond the defendant's control. *United States v. Gabaldon*, 522 F.3d 1121, 1124 (10th Cir. 2008).

C. Procedurally Defaulted Claims

A collateral attack is more limited than an appeal, and the doctrine of procedural default generally bars consideration of any claim that the movant omitted to appropriately raise on appeal. *United States v. Frady*, 456 U.S. 152, 165 (1982); *United States v. Allen*, 16 F.3d 377, 378 (10th Cir. 1994). This doctrine applies equally in death penalty cases. *See Battle v. United States*, 419 F.3d 1292, 1298 (11th Cir. 2005). An exception lies for claims of ineffective assistance of counsel, which should be raised in a collateral attack rather than a direct appeal. *See United States v. Galloway*, 56 F.3d 1239, 1240 (10th Cir. 1995).

Apart from claims of ineffective assistance, courts may consider otherwise procedurally-defaulted claims in two instances. First, they may consider defaulted claims when a movant demonstrates "that the constitutional error 'has probably resulted in the conviction of one who is actually innocent.'" *United States v. Wiseman*, 297 F.3d 975, 979 (10th Cir. 2002) (quoting *Bousley v. United States*, 523 U.S. 614, 623-24 (1998)). Second, courts may consider defaulted claims if the petitioner establishes cause and prejudice. *United States v. Allen*, 16 F.3d at 378. "Cause" exists only in those cases in which a factor external to the defense prevented counsel from raising a claim at the appropriate juncture. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). A movant can show cause by demonstrating that a claim was "so novel that its legal basis [was]

7

not reasonably available to counsel." *United States v. Barajas-Diaz*, 313 F.3d 1242, 1248 (10th Cir. 2002). A movant can also establish cause by showing that defense counsel provided constitutionally ineffective assistance. *Wiseman*, 297 F.3d at 979. To establish prejudice, a petitioner must show that the claimed errors "worked to his *actual* and substantial disadvantage, infecting his entire trial with errors of constitutional dimension." *Daniels v. United States*, 254 F.3d 1180, 1191 (10th Cir. 2001) (emphasis original, internal quotations omitted).

D. Claims Previously Adjudicated on Direct Appeal

Generally, a claim raised and rejected on direct appeal cannot be relitigated in a § 2255 motion. *United States v. Warner*, 23 F.3d 287, 291 (10th Cir. 1994). Relitigation of an appellate issue during § 2255 proceedings "may be proper when there has been an intervening change in the law of a circuit." *United States v. Prichard*, 875 F.2d 789, 790-91 (10th Cir. 1989); *United States v. Nolan*, 571 F.2d 528, 530 (10th Cir. 1978).

E. New Rule of Criminal Procedure

Collateral relief is further limited to claims based on established law. *Teague v. Lane*, 489 U.S. at 310. When the Supreme Court announces a new rule of law, it "applies to all criminal cases still pending on direct review. As to convictions that are already final, however, the rule applies only in limited circumstances." *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004) (citation omitted). Generally, new procedural rules do not apply retroactively, while new substantive doctrines – those that alter the range of punishable conduct or the class of punishable people – do. *Id.* at 351-52. A court employs a three-step analysis to ascertain whether a rule of criminal procedure applies. *Beard v. Banks*, 542 U.S. 406, 411 (2004). First, it determines when the judgment became final. *Id.* Second, it decides whether the pertinent rule of law was "new"

at the time of finality by deciding whether a "court considering the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution." *O'Dell v. Netherland*, 521 U.S. 151, 156 (1997) (internal quotations omitted). Third, the court considers if a new rule is of "watershed" magnitude, and therefore applicable under an exception to *Teague*. *United States v. Cousins*, 455 F.3d 1116, 1126 n.6 (10th Cir. 2006).

F.  Harmless Error

Even assuming a § 2255 motion demonstrates legal error, "[i]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis." *United States v. Dago*, 441 F.3d 1238, 1245-46 (10th Cir. 2006). Thus, absent a showing that the case involves one of a rare group of structural errors that affect the framework of the trial and require reversal without a showing of prejudice, a § 2255 movant cannot obtain relief without establishing that an identified legal error "had substantial and injurious effect or influence in determining the jury's verdict." *United States v. Rivera*, 347 F.3d 850, 852 (10th Cir. 2003) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)); *see Green v. United States*, 262 F.3d 715, 717-18 (8th Cir. 2001) (applying structural error analysis in a § 2255 case); *see also Neder v. United States*, 527 U.S. 1, 8 (1999) (collecting structural error cases).

**THE GOVERNMENT'S ARGUMENT**

I.  COUNSEL PROVIDED COMPETENT REPRESENTATION IN PRESENTING AND
ARGUING MENTAL HEALTH EVIDENCE

Fields raises six enumerated claims about the supposed failings of his attorneys in their

9

investigation, presentation and summation of mental health evidence.  Additionally, Fields makes an abortive and procedurally-defaulted claim that the jury violated the Eighth Amendment when it rejected his mental health mitigator.  (Pet. 1-54; Mem. 4-41.)

"The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect."  *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986).  To demonstrate ineffective assistance of counsel, Fields must therefore show that his attorneys' performance was deficient and that the deficient performance was prejudicial.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

As to the first, prong, Fields bears the burden of demonstrating that counsel's performance fell below prevailing professional norms.  *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009); *United States v. Salazar*, 323 F.3d 852, 857 (10th Cir. 2003).  In so doing, he must overcome a strong presumption that counsel did provide effective assistance.  *United States v. Kennedy*, 225 F.3d 1187, 1197 (10th Cir. 2000) (citation omitted).  "Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Dever v. Kan. State Penitentiary*, 36 F.3d 1531, 1537 (10th Cir. 1994).  Any conclusory assertions of ineffectiveness will be insufficient.  *United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994).  Indeed, counsel's own admissions of ineffectiveness are not decisive, because the reasonableness of performance is a question for the court.  *Walls v. Bowersox*, 151 F.3d 827, 836 (8th Cir. 1998); *Harris v. Dugger*, 874 F.2d 756, 761 n.4 (11th Cir. 1989); *see also Allen v. Mullin*, 368 F.3d 1220, 1240 (10th Cir. 2004) (trial counsel's "about-face on the competency issue strongly suggests a willingness to 'fall on the

10

sword' in order to derail a death sentence. The motive is transparent, if not misguided.").

The prejudice prong imposes a heavier burden on the petitioner than the harmless error test applied on direct appeal. *United States v. Haddock*, 12 F.3d 950, 958 (10th Cir. 1993). Under the prejudice standard, Fields must show that, absent his attorney's error, a reasonable probability exists that he would have received a more favorable verdict. *See id.*

None of Fields's attacks on his trial attorneys have merit under the prevailing standards for constitutional competency of counsel. And, as fully detailed below, his contention that the jury erred is procedurally defective and devoid of any legal basis.

A. Counsel's Mental Health Advocacy and the Jury's Verdict

Fields claims that his attorneys ineffectively argued the case in mitigation. He concedes that counsel presented substantial evidence of mental illness and argued that his various conditions established specific mitigators. He, however, faults his lawyers for failing to argue or seek supporting instructions for a theory that his asserted mental conditions, including depression and "bipolar flip," satisfied multiple mitigating factors. He also contends that counsel failed to argue that his history of depression and auditory hallucinations was mitigating. Apart from his complaints about counsel's performance, Fields claims that the jury violated the Eighth Amendment when it found he had not refused to find his mental health issues were a mitigating factor. (Pet. 7-16; Mem. 6-15.) Fields argument is factually flawed, as it relies on claims that counsel omitted arguments that were, in fact, made on his behalf. Indeed, counsel specifically relied in mitigation on Fields's asserted history of depression and auditory hallucinations. To the extent counsel did not argue that Fields's alleged mental issues would satisfy multiple mitigators, he does not establish that counsel failed to provide constitutionally acceptable representation.

11

Fields's related complaint, about the jury's rejection of his defense theory, is defective and baseless.

The Constitution does not require trial counsel to present, much less argue, every nonfrivolous defense. *See Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc). Counsel are strongly presumed to have acted for tactical reasons when they focus their arguments on particular issues to the exclusion of others. *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003). Even inadvertent omission do not require automatic relief, because the Constitution guarantees "reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Id.* (citing *Bell v. Cone*, 535 U.S. 685, 702 (2002); *Kimmelman v. Morrison*, 477 U.S. at 382; *Strickland*, 466 U.S. at 689; *United States v. Cronic*, 466 U.S. 648, 656 (1984)). For counsel's actions to offend the Constitution, "his strategic decisions must have been completely unreasonable, not merely wrong, so that [they] bear no relationship to a possible defense strategy." *Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000). Given that counsel enjoys broad discretion to determine how best to employ argument as a means of sharpening and clarifying issues, trial attorneys have no obligation to advance weaker arguments that dilute their overall presentation to the jury. *See Yarborough*, 540 U.S. at 5-6; *see also Jones v. Barnes*, 463 U.S. 745, 752 (1983) (holding no duty to dilute appellate briefing with weak arguments); *United States v. Sanders*, 372 F.3d 1183, 1186 (10th Cir. 2004) (finding no duty to argue inconsistent theories).

1. Trial Counsel Adequately Argued the Case in Mitigation

Contrary to Fields's assertions, the record demonstrates that counsel presented a strong case in mitigation, premised on several theories of mental illness. None of the attorneys' supposed omissions offended the Sixth Amendment's guarantee of effective representation.

Fields's counsel presented the testimony of two mental health experts, George Woods and Brad Grinage. Woods, a neuropsychiatrist who specialized in examining the relationship between his patients' brains and their behavior, testified that Fields had, since childhood, suffered from a from a mood disorder. (Tr. 12: 2946.) Specifically, Woods diagnosed Fields with either schizoaffective disorder or bipolar disorder with psychotic features (Tr. 12: 2973), which the expert claimed had caused the defendant to exhibit poor judgment and erratic thinking (Tr. 12: 2976-77.) Woods asserted that the drug Effexor, which Fields was taking at the time of the murders was known to "flip" people with bipolar disorder from depression to mania, further impairing the patient's judgment. (Tr. 12: 2989-90.)

The defense's other expert, forensic psychiatrist Brad Grinage diagnosed Fields with bipolar disorder with psychotic features, including auditory hallucinations. (Tr. 11: 2768-2771, 2775-77.) Grinage explained that treating bipolar patients with antidepressant drugs, especially Effexor, carried with it the "danger" of putting them in a manic state and enhancing any existing psychosis. (Tr. 11: 2780-81, 2811-13.) Ultimately, Grinage concluded that Fields had bipolar disorder and that Effexor had caused the defendant to enter an irritable manic state that amounted to a severe emotional disturbance. (Tr. 11: 2815-16.)

During argument, counsel addressed all aspects of Barrett's alleged mental health issues. Counsel urged the jury to empathize with the defendant, in view of his supposed psychological issues, including depression and auditory hallucinations:

> Imagine being so depressed in a way that you can't control that you are in such despair that you don't want to live. That you don't want to see your beautiful children, that you don't want to be around the people who love you. That's an illness and it's serious. Imagine this thing that has been described as a rush of thoughts coming on without warning, can't control what's going through your

13

mind continually.  What could that be like?  And imagine if you possibly can having to live with something that you know is not real.  Hearing something that's not there.  Someone talking to you who's not there.  What does that do to you? How do you think of yourself?  How broken do you feel you are when that is in your life?  And then imagine them all together.  [¶]  That's what this mitigation is. Number one, the capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law was significantly impaired.

(Tr. 14: 3435-36.)  Counsel later addressed the theory of bipolar flip with specificity: "Effexor affects two of those neuroreceptors, and that over a period of time that medication built up like it's supposed to.  It built up and it was like a wave and he got to the tipping point."  (Tr. 14: 3438.)  As she finished her summation regarding the impaired capacity mitigator, counsel returned to the evidence of auditory hallucinations: "[E]veryone of those physicians endorses the idea that voices are credible.  That sounds fantastic.  You've read about it in newspapers.  But it's real, and it has to be painful for whoever is experiencing it."  (Tr. 14: 3439.)

In view of this record, Fields cannot establish a factual basis for his complaint that counsel failed to rely in mitigation on his alleged history of depression and auditory hallucinations.  Quite simply, counsel began the argument about the impaired capacity mitigator with a discussion of Fields's depression and ended it with a discussion of his hallucinations. Fields's claim to the contrary is baseless and cannot support relief.

Fields does correctly note that counsel argued that his alleged depression, hallucinations and bipolar flip supported the impaired capacity statutory mitigator (18 U.S.C. § 3592(a)(1)), rather than the emotional disturbance allegation (§ 3592(a)(6)) or any undefined factor left to the jury's discretion ((§3592(a)(8)).  Counsel argued that traumatic events, including the death of the defendant's father and the illness of the defendant's mother, supported the emotional disturbance factor.  (Tr. 14: 3440.)  Counsel did not re-urge any of the facts alleged to have supported the

14

statutory mitigators as the basis of a jury-defined non-statutory mitigator.  Counsel recently

declared that her failure to urge every legally permissible theory of mitigation was an oversight

amounting to ineffectiveness.  (*See* Pet. Ex. 1.)  But counsel provided a cogent and intuitive

explanation of how the jury should apply the defense evidence to the alleged mitigating factors –

relying on mental illness diagnoses as the basis of alleged impaired capacity and emotional

trauma as the basis of supposed emotional disturbance.

Counsel could have quite reasonably concluded that arguing the same sets of facts under

multiple theories was potentially confusing and counterproductive.  Such an tactic would have

suggested that the alleged mitigating factors were vague and duplicative.  *Cf. Randle v. Jackson*,

544 F. Supp. 2d 619, 633-34 (E.D. Mich. 2008) (denying habeas relief where state court had

reasonably found that trial counsel had no obligation to make a confusing closing argument).

Furthermore, the jury was instructed that the weighing of factors was "not a mechanical process.

You should not simply count the number of factors, but consider the particular character of

each." (Trl. Doc. 227 at 28.)  As such, the defense did not stand to benefit from arguing or

seeking instructions to support a theory that multiple mitigators were satisfied by the same

evidence, as Fields now claims his attorneys should have done.  Such a needlessly confusing

position could have, at best, led the jury to discount the weight it accorded to individual factors

that the defense urged it to base on a single body of evidence.  *See United States v. Nguyen*, 413

F.3d 1170, 1181-82 (10th Cir. 2005) (finding no ineffectiveness where counsel declined

instruction with potentially detrimental effect on defense); *see also Burnett v. Kerr*,835 F.2d

1319, 1323 (10th Cir. 1988) (finding no ineffectiveness for failure to request supplement to

correct instructions).  At its worst, the forgone argument that the jury should have accorded

alternative legal significance to a single set of facts might have caused the jury to discredit the defense generally by suggesting that its theory of the case was so plastic as to be meaningless.

Given the reasonableness of counsel's actions, Fields cannot demonstrate ineffectiveness based on the omission of arguments urging the jury to apply every legally viable defense theory, especially when such a strategy was likely to undercut the strength of the defense case as a whole. *See Yarborough*, 540 U.S. at 5-6, 8. The fact that trial counsel submitted a declaration attesting to her own supposed error does not alter the analysis, as the determination of constitutional ineffectiveness is a legal matter for the Court's determination.[3] *See Wright v. Hopper*, 169 F.3d 695, 707 (11th Cir. 1999).

Even if Fields could show that counsel's argument was ineffective, he could not demonstrate prejudice. The jury, as Fields complains, rejected both of his asserted theories of mitigation. (Trl. Doc. 228 at 38.) Fields fails to explain why his allegations of mental illness and personal trauma would have appeared any more credible and appealing to the jury had counsel argued that they were susceptible to consideration under multiple legal theories. In short, Fields has failed to establish a reasonable likelihood that the jury would have found the factors true in the first instance, much less that he would have received a more favorable verdict, had his attorneys argued that multiple mitigators could be satisfied by the same facts. *Strickland*, 466 U.S. at 691.

2. The Jury Rejection of Mental Health Mitigators

Fields summarily argues that the Eighth Amendment required the jury to find the

---

[3]Trial counsel's declaration asserts multiple instances of ineffectiveness. Rather than repeatedly address counsel's declaration, the government simply notes that the reasonableness of counsel's conduct is a legal question for the Court alone. *Wright*, 169 F.3d at707.

impaired capacity and emotional disturbance aggravators because the government did not dispute some evidence of mental illness. (Pet. 16; Mem. 15.) Fields defaulted this claim by failing to raise it on appeal. Apart from that flaw, his argument is premised on an erroneous view of the law and a misinterpretation of the record. Even if Fields could overcome those errors, he still could not obtain relief on this contention because the argument requires a application of a novel principle of constitutional law on collateral review.

a. Procedural Default

In his contention that the jury violated the Eighth Amendment by rejecting his mental health mitigators, Barrett relies on facts within the four corners of the record. On appeal, Barrett raised a related contention that the Fifth, rather than the Eighth, Amendment guaranteed him a right to a jury finding of mental health mitigation. Indeed, Fields's reply brief on appeal specifically disavowed the Eighth Amendment as a basis of the argument that the jury erroneously rejected his proposed mitigators. (*See* RB 53-54.) Having failed to raise the Eighth Amendment claim on appeal, Fields has defaulted it for purposes of collateral review. *See United States v. Frady*, 456 U.S. at 165. Fields makes no attempt to explain his default or to demonstrate cause and prejudice to excuse it. *United States v. Allen*, 16 F.3d at 378. Furthermore, he makes no attempt to excuse his default through a showing of factual innocence. As such, he cannot obtain collateral relief on his claim that the jury unconstitutionally rejected his alleged mental health mitigating factors.

b. Neither the Law nor the Record Required the Jury to find Mental Health Mitigators

Assuming, arguendo, that Fields had not defaulted this claim, he still could not

demonstrate that it has any legal support.

Notwithstanding Fields's argument to the contrary, the Eighth Amendment does not require juries to find mitigators that are based on uncontested defense evidence. In fact, the Supreme Court has held that the government may properly place a burden upon the defendant to prove mitigating circumstances. *Kansas v. Marsh*, 548 U.S. 163, 170-71 (2006) (quoting *Walton v. Arizona*, 497 U.S. 649, 650 (1990)). "So long as the sentencer is not precluded from considering relevant mitigating evidence, a capital sentencing statute cannot be said to impermissibly, much less automatically, impose death." *Id.* at 171. The Supreme Court has stated that "a sentencer may not be precluded from considering, and may not refuse to consider, any relevant mitigating evidence offered by the defendant as the basis for a sentence less than death." *Graham v. Collins*, 506 U.S. 461, 508 (1993) (citing *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982)).

Drawing on this principle, the Court in *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989), held that a capital sentencer must also be able to give effect to any mitigating evidence that is relevant to a defendant's background and character or the circumstances of his offense. *Accord*, *Oregon v. Guzek*, 546 U.S. 517, 526 (2006). In *Mills v. Maryland*, 486 U.S. 367 (1988), and *McCoy v. North Carolina*, 494 U.S. 433 (1990), the Court held that the Eighth Amendment requires that individual jurors be able to determine for themselves the existence and weight to be accorded any mitigating factor. These requirements did not, however, impede the ability of the federal government "to structure and shape consideration of mitigating evidence." *Guzek*, 546 U.S. at 526. As the Supreme Court noted at length in *Buchanan v. Angelone*, 522 U.S. 269, 276-77 (1998) (some internal citations omitted):

In the selection phase, our cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence . . . . However, the State may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence . . . . Our consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence. Thus, in *Boyde v. California*, 494 U.S. 370 (1990), we held that the standard for determining whether jury instructions satisfied these principles was "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id*. at 380.

But we have never gone further and held that the State must affirmatively structure in a particular way the manner in which juries consider mitigating evidence. And, indeed, our decisions suggest that complete jury discretion is constitutionally permissible. *See Tuilaepa*, [512 U.S.] at 978-79 (noting that at the selection phase, the State is not confined to submitting specific propositional questions to the jury and may indeed allow unbridled discretion); [*Zant v.*] *Stephens*, [462 U.S. 862, 875 (1983)] (rejecting the argument that a scheme permitting the jury to exercise "unbridled discretion" in determining whether to impose the death penalty after it has found the defendant eligible is unconstitutional, and noting that acceptance of that argument would require the Court to overrule *Gregg* [*v. Georgia*, 428 U.S. 153 (1976)]).

The Federal Death Penalty Act is consistent with these principles. In particular, the

FDPA does not require the jury to return "special findings" regarding the mitigating factors or the

number of jurors who concurred in their existence. Rather, § 3593(d) provides for different

verdicts for aggravating and mitigating factors:

Return of Findings – The jury, or if there is no jury, the court, shall consider all the information received during the hearing. It shall return special findings identifying any aggravating factor or factors set forth in section 3592 found to exist and any other aggravating factor for which notice has been provided under subsection (a) found to exist. A finding with respect to a mitigating factor may be made by 1 or more members of the jury, and any member who finds the existence of a mitigating factor may consider such factor established for purposes of this section regardless of the number of jurors who concur that the factor has been established.

This dichotomy between aggravating and mitigating factors carries forward in the FDPA's

appellate review provisions.  The FDPA provides that a death sentence is subject to reversal if

"the admissible evidence and information adduced does not support the special finding of the

existence of the required aggravating factor."  18 U.S.C. § 3595(c)(2)(B).[4]  No comparable

provision requires appellate review of mitigating factor findings.

In light of the language of the FDPA, courts have consistently doubted their authority to

review the rejection of asserted mitigating factors.  *See United States v. Bernard*, 299 F.3d 467,

485-86 (5th Cir. 2002) (questioning authority to review jury findings regarding mitigating

evidence, as "the FDPA does not require the jury to make specific findings of the existence of, or

degree of jury unanimity upon, mitigating factors"); *United States v. Paul*, 217 F.3d 989, 999-

1000 & n.6 (8th Cir. 2000) ("We question whether we are able to review the jury's findings

regarding the number of jurors who found a particular mitigator because the FDPA does not

require the jury to return special findings showing which mitigating factors that jury found to

exist or the number of jurors who found a particular mitigator"); *United States v. Hall*, 152 F.3d

381, 413 (5th Cir. 1998) (because FDPA does not require "special findings" to be made

regarding mitigating factors, court "question[s] whether the juror's failure to find a particular

mitigating factor constitutes a proper subject for appellate review").[5]

_____

[4]Vacation of a death sentence is also required if it "was imposed under the influence of passion, prejudice, or any other arbitrary factor" or because "the proceedings involved any other legal error requiring reversal of the sentence that was properly preserved for appeal under the rules of criminal procedure."  18 U.S.C. § 3595(c)(2)(A), (C).

[5]In a case decided under the now-repealed Title 21 capital sentencing procedures (21 U.S.C. § 848(g), *et seq*.) the court in *United States v. McCullah*, 76 F.3d 1087, 1112-13 (10th Cir. 1996), reviewed a jury's non-unanimous finding regarding an asserted mitigator.  Unlike the FDPA, theTitle 21 review provision expressly required appellate courts to determine that "the information supports the special finding of the existence of every aggravating factor upon which the [death] sentence was based, . . . or the failure find[] any mitigating factors as set forth or

20

Thus, the prevailing law does not require capital juries to give mitigating weight to any particular evidence. *United States v. Johnson*, 495 F.3d 951, 966 (8th Cir. 2007). Even when the factual predicate for a mitigator was uncontroverted, the Fifth and the Eighth Circuits held that jurors were constitutionally and statutorily free to find whether a particular set of facts has mitigating force in a particular case. *See Bernard*, 299 F.3d at 485-86 (as long as jurors were free to give mitigating effect to defendants' ages, jurors were not required to find that defendants' youthfulness was mitigating); *Paul*, 217 F.3d at 999-1000 (although defendant was 18 years old and his codefendant received a life sentence, jury not required to give mitigating effect to either factor); *Hall*, 152 F.3d at 413 ("jury was free to believe or disbelieve" testimony of family members that defendant experienced a difficult upbringing that mitigated against imposition of a death sentence).

Simply stated, the Supreme Court has clearly stated that juries cannot be directed to reject mitigation evidence as a matter of law, but it has never implied that the rejection of alleged mitigators is subject to review for correctness. *Eddings*, 455 U.S. at 114 ("neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence"). "*Eddings* simply does *not say* that the sentencer must give some weight to every mitigating factor asserted by the defendant." *United States v. Johnson*, 403 F. Supp. 2d 721, 876 (N.D. Iowa 2005); *see also Fields*, 516 F.3d at 948-49 (holding that the FDPA does not authorize appellate courts to

---

allowed in this section." 21 U.S.C. § 848(q)(3)(B). Comparable language regarding the review of mitigators was tellingly and purposely omitted from the later-enacted FDPA. The bill containing Title 21's capital procedures was drafted before the Supreme Court's *Mills* opinion. It initially required jury unanimity as to the existence of any mitigating factor and appellate review of the failure to make such a finding. After *Mills* was decided, the bill was modified to allow a single juror to find any mitigating factor, but the logical parallel change was not made in the bill's review provisions. The FDPA was not afflicted with this problem.

review the rejection of an alleged mitigator). Viewed against this backdrop, the jury's refusal to find the existence of any proffered mitigating factor is not subject to judicial review. Thus, Fields cannot show that he has any right under § 2255 to re-consideration of the jury's factual findings.

Because Fields's claim lacks a basis in existing law, any relief would necessarily require the legally impossible – a retroactive application of a new rule of law. *Schriro v. Summerlin*, 542 U.S. 348. The Supreme Court has never held that capital defendants have an Eighth Amendment right to findings in mitigation whenever the government chooses not to contest some allegedly underlying facts. Even if Fields could show that such a rule fell within the "logical compass" of Supreme Court authority or that Supreme Court decisions "inform, or even control or govern, the analysis" of his contention, his claim would still rely on a new rule because the result he seeks is not dictated by existing precedent. *See Saffle v. Parks*, 494 U.S. 484, 491 (1990); *Butler v. McKellar*, 494 U.S. 407, 415 (1990); *see also Beard v. Banks*, 542 U.S. at 416 (holding that prior precedent may support a particular result, but if it does not mandate the outcome it is not an existing rule for *Teague* purposes). Because Fields calls upon this Court to apply a new rule of constitutional import, it should reject the matter out of hand. *Schriro*, 542 U.S. 348.

Assuming, arguendo, that Fields had such a right, he could not show that the evidence he adduced in supported of the mental health mitigators went unchallenged by the prosecution, and was therefore necessarily deserving of some weight. Fields argues that the defense offered uncontested evidence of depression and largely uncontested evidence of auditory hallucinations. (Pet. 13.) In truth, the defense presented evidence that Fields was not depressed, but that he instead suffered from bipolar or schizoaffective disorder. (Tr. 11: 2775-76, 2815, 12: 2973.)

Indeed, the defense took pains to distinguish bipolarity from depression. (Tr. 12: 2961-63.) Responding to this evidence, the government presented a an expert who diagnosed Fields with dysthymic disorder – a mild but chronic depression. (Tr. 12: 3145) The expert also found that Fields had a personality disorder with anti-social, psychopathic, narcissistic and dependent traits and features. (Tr. 12: 3148.) The expert found that Fields's claims of auditory hallucinations "sound[ed] suspiciously not genuine." (Tr. 12: 3161.)

Crediting the prosecution witness, rather than the defense witnesses, the jury could have easily concluded on this record that Fields had a mild depressive condition and a non-mitigating personality disorder. Such a plausible finding would have merited rejection of the allegations that Fields's capacity to appreciate the wrongfulness of his conduct was significantly impaired and that he committed the offense under a severe mental or emotional disturbance. (*See* Trl. Doc. 227 at 25.) Furthermore, a finding that Fields had psychopathic traits and a mild depression would understandably have failed to the convince the jury to find this crime was mitigated under any theory.

Accordingly, to the extent that this Court finds that Fields has not defaulted this claim and that it has a cognizable legal basis, it should reject the contention for lacking any factual support.

B. Trial Counsel Reasonably Omitted Brain Damage Evidence

Fields claims his attorneys were ineffective for failing to investigate and present evidence of his supposed organic brain damage, as it was reported to them by their retained neuropsychologist, Dr. Gelbort. Building on Gelbort's findings, Fields now presents the opinion of a new expert, Dr. Martell, that indicates he is severely affected by brain damage. (Pet. 16-31; Mem. 16-24.) Counsel's decision not to develop or present organic brain damage testimony was

23

objectively reasonable, based on the information available to them at the time.  Moreover, Fields

has not demonstrated that the alleged omission caused him any prejudice.

An attorney is not required to investigate all leads or present all available mitigating

evidence as long as the decision not to pursue a particular lead or present particular evidence is

reasonable under the circumstances.  *See Smith v. Workman*, 550 F.3d 1258, 1270 (10th Cir.

2008).  "[R]easonably diligent counsel may draw a line when they have good reason to think

further investigation would be a waste."  *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).  Counsel

have, however, no obligation to advance weaker arguments that dilute their overall presentation

to the jury.  *See Yarborough*, 540 U.S. at 5-6.  Thus, a decision not to call an expert is reasonable

when the value of his testimony could be outweighed by damaging admissions elicited on cross-

examination or rebuttal.  *See Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008); *see also*

*Hallford v. Culliver*, 459 F.3d 1193, 1205 (11th Cir. 2006) ("It is reasonable – and not ineffective

– for trial counsel to eliminate certain lines of presentation if he has misgivings about hurtful

cross-examination and rebuttal witnesses") (internal quotations omitted).  Whatever mitigating

value a jury might ascribe to organic brain damage evidence, it remains a "double-edged sword"

that supports a future dangerousness aggravator.  *See Bryan v. Mullen*, 335 F.3d 1207, 1222-23

(10th Cir. 2003); *Cannon v. Gibson*, 259 F.3d 1253, 1277-78 (10th Cir. 2001).

In this case, counsel reasonably omitted to pursue Dr. Gelbort's findings as an avenue of

investigation or potential mitigation, as his report suggested the existence of only marginally

mitigating evidence.  Dr. Gelbort found only "mild impairment" of higher cognitive abilities and

processing speed for verbal tasks and "impulsivity of mild proportions."  (Pet. Ex. 6 at 4).

Gelbort noted that Fields incongruously tended to perform better on more difficult tests, a

phenomenon he explained as the result "deficits or impairments in functional attention and concentration abilities appear to be the most likely cause of these suppressions in performance." (*Id*.) While Gelbort concluded that Fields displayed a "pattern often found in individuals with frontal lobe or non-dominant hemisphere neurocognitive dysfunction and brain damage," his report of "mild" symptoms did not suggest this was a potentially rich vein of untapped mitigation evidence.

Furthermore, trial counsel clearly hoped that by avoiding marginal evidence of brain damage evidence they might preclude the presentation of what they viewed as damaging rebuttal. After resting their case-in-chief, counsel noted an intention to interpose specific objections to Dr. Price's testimony. (Tr. 12: 3075.) Pressed for detail, counsel asserted that the defense case had not "open[ed] the door" to damaging rebuttal testimony about Fields's childhood. (Tr. 12: 3078.) The Court, referring to itself as a "skeptic" about evidence of the defendant's early life, noted that experts for both parties had considered evidence of Fields's infantile hypoxia, though it did not appear to have had a significant effect on his development. (Tr. 12: 3078-79.) Counsel responded with a specific concern that Price's anticipated testimony concerning brain damage would constitute improper rebuttal, because the defense had "presented no information, no evidence, no testimony of brain injury." (Tr. 12: 3080.) While counsel's theory of exclusion relied on inapplicable legal principals (*see, infra*, Arg. I, D), the decision to forgo marginal brain damage evidence deprived the government of an opportunity to attack the reliability of an entire body of defense evidence. Furthermore, counsel did successfully obtain evidentiary exclusion of specific, and aggravating, facts upon which Price relied. (Tr. 12: 3081-82.)

In short, counsel made a reasonable strategic decision not to present evidence of brain

damage, which held little promise of mitigation but threatened to open the door to damaging rebuttal. The "mild" symptoms described by Gelbort did not suggest a need for further investigation, and counsel was aware that the prosecution had obtained an exhaustive report from Dr. Price, refuting the theory of organic brain damage. (*See.* Tr. 12: 3080; Pet. Ex. 8.) Counsel appear to have reasonably concluded that Price's report was authoritative and premised on, among other things, a litany of incidents from the defendant's life that could damage the defense case. (Pet. Ex. 8 at 2-6; Tr. 13: 3202-03 (questioning Price about records he relied on).) On this record, the decision to avoid brain damage evidence was entirely reasonable.

Even if trial counsel had erred in forgoing evidence of brain damage, Fields has not shown that he was prejudiced by the omission. Fields presents no basis for concluding that the brain damage evidence available at the time of trial was especially mitigating. In reality, it is quite the opposite. His newly-retained expert, Dr. Martell, reports that Fields has experienced a "catastrophic decline in functioning in the five years *since he was seen by Dr. Price*." (Pet. Ex. 9 at 10 (emphasis added).) Martell states that Fields's "overall level of cognitive functioning was significantly higher at the time [of trial]," and that he has experienced deterioration as a result of some unidentified organic process. (*Id*. at 16-17). Thus, Martell's report only serves to confirm Gelbort's finding that Fields showed mild indicia of brain damage at the time of trial. Because Martell ascribes the alleged brain damage to a process of deterioration, his report suggests that Fields was healthier at the time of the murders – further undermining the mitigation value of any forgone brain damage evidence. And, as noted, the contemporaneous findings were of mild impairment.

Indeed, Fields's other experts – Grinage and Woods – were aware of Gelbort's testing but

ascribed little value to them. Dr. Grinage testified that he considered Fields's alleged brain damage a "piece of evidence to be weighed," but nothing "cataclysmic." (Tr. 11: 2830.) Grinage also conceded that evidence of a frontal lobe impairment would "reveal itself in a number of ways concerning cognitive performance," though "you might be able to stretch to say that it would have some contribution to a bipolar type disorder." (Tr. 11: 2830-31). He also agreed that "if the defendant had suffered brain damage at birth, age thirty-six is a little late to blame an alleged hypoxia." (Tr. 11: 2868). Dr. Woods, a neuropsychiatrist who "specialize[d] in looking at the relationship between the brain and behavior (Tr. 12: 2939), read Dr. Gelbort's report (Pet. Ex. 2 at 2; Tr. 12: 3002) but made no mention of it in his findings. (*see* Pet. Ex. 28; 12: 2938-3069.)

While the brain damage evidence available at trial does not appear to have had much mitigating value, the defense presented the bipolar flip theory as a cogent explanation for Fields's commission of the murders. (Tr. 11: 2811-15 (asserting Fields committed the murders as part of an "irritable manic mania" prompted by Effexor); 12: 2989-90 (asserting that Effexor caused Fields to "flip," impairing his judgment).) Not only did that theory potentially support alleged mental health mitigators, it explained the homicides as a behavioral anomaly, potentially undermining two alleged aggravators – future dangerousness and substantial planning and premeditation. Conversely, arguing a theory of brain damage resulting in progressively-deteriorating impulse control would likely have suggested that Fields had premeditated the murders and would be apt to commit violent crimes in the future. Furthermore, the testimony obviated the defense's evident concern that presentation of brain damage evidence would permit even more damaging testimony from Dr. Price, who had prepared a chronology of the

defendant's behavior that counsel clearly believed would damage the case in mitigation. (See Tr. 12: 3080-83.)

Given that the counsel presented cogent evidence of mental impairment – evidence that did not lend itself to advantageous reinterpretation by the government – Fields has not shown a reasonable likelihood that the addition of any available brain damage evidence (a double-edged sword) would have altered the outcome of this case. *See Knighton v. Mullin*, 293 F.3d 1165, 1179 (10th Cir. 2002); *cf. Smith v. Mullin*, 379 F.3d 919, 943 n. 11 (10th Cir. 2004) (finding that mitigating evidence of mental health problems was not double-edged because the aggravating "edge" had previously been presented to the jury in the guilt phase of trial).

C. Trial Counsel Reasonably Opted to Forgo the Testimony of Fields's Treating Mental Health Professionals

Fields claims that trial counsel ineffectively failed to call mental health professionals who had treated him, before and after the murders, to support the theory of bipolar flip and to rebut the testimony of a government expert that the defendant had not genuinely experienced auditory hallucinations. Specifically, Fields argues that his attorneys should have adduced the testimony of Joyce Bumgardner and Larry Trombka – psychiatrists who treated the defendant in custody – as well as Dean Anderson and R.L.Winters – a physician and physician's assistant who treated the defendant prior to the murders. (Pet. 31-39; Mem. 24-29.) Trial counsel reasonably elected to forgo the putative testimony of these potential witnesses, which would have been cumulative to the evidence presented.

"[T]he decision of which witnesses to call is quintessentially a matter of strategy." *Boyle v. McKune*, 544 F.3d at 1139. As such, counsel's choices are accorded a strong presumption of

reasonableness. *Williams v. Bowersox*, 340 F.3d 667, 669-71 (8th Cir. 2003); *see also United States v. Nguyen*, 413 F.3d at 1181 (holding that adequately informed strategic choices are "virtually unchallengeable"). To establish that a strategic decision was ineffective, the defendant must show that it was completely unreasonable, such that it bore no relationship to any possible defense strategy. *See Fox v. Ward*, 200 F.3d 1296 (quoting *United States v. Ortiz Oliveras*, 717 F.2d 1, 4 (1st Cir. 1983)). Counsel have no obligation to present cumulative evidence. *See Snow v. Sirmons*, 474 F.3d 693, 729 (10th Cir. 2007).

In this case, trial counsel adduced substantial testimony from the retained experts regarding the diagnoses of Fields's treating mental health professionals. Much of this testimony was intended to preempt the conclusion of Dr. Price, a prosecution expert, that Fields was malingering. For instance, Dr. Grinage explained that his confidence in his diagnosis was based in part on the consistency with which Fields had described his symptoms over time:

> A  I believe that he was not malingering based on pretty consistent on my interview and when I would come back with symptoms he didn't change his story. Many times people who malinger will do that. Pretty consistent story across physicians, Dr. Woods, Dr. Mitchells and Dr. Kemp. Very consistent symptoms and the way he described his symptoms. Most people with malingering don't have the criteria of bipolar in front of them to be able to say what's going on with them. So, you know, describing racing thoughts in the manner that he did was very credible and consistent with patients that I treat with bipolar disorder.

> Q The fact that he sought out a doctor's treatment for hearing voices some months prior to this happening, that's one the things you thought was important?

> . . .

> A Yes.

> Q (By Ms. O'Connell) When did Ed Fields start to see Dr. Kemp for his mental condition?

. . .

Q When he went to see Dr. Kemp in April of 2003 what 3 were his complaints?

A In April of 2003 he was complaining at that time of depressive symptoms and he described -- bear with me here one second. He was describing the voices at that time. And these voices that he described to Dr. Kemp in my reading of that were what we call command in nature in that they would tell him to do things. Everyone who has a command hallucination doesn't automatically act on those, but, many times there's an anxiety component associated with command hallucination that at times compels you to act on that or imposes itself upon you, I guess, to act on that. So, he was talking at that time in April about his repetitive voices.

(Tr. 11: 2798-2800.) Dr. Grinage returned to this theme on cross-examination when he stated that he believed Fields's reports of auditory hallucinations because they were previously reported: "I am assuming that based on the records that I've read and the testimony and the information I got from patient, other providers, previous providers of which he discussed voices with." (Tr. 11: 2821.) And on redirect examination, Dr. Grinage specifically cited his reliance on the observations of Dr. Kemp as a basis for his decision to credit Fields's reports of voices. (Tr. 11: 2893-94.)

Dr. Woods was even more inclusive of Fields's treating mental health professionals when he explained why he believed the defendant was not malingering: "If you look at the doctors' records from 1999, 2000, 2003, 2004, 2005, all the way through the relatively current treatment that he's getting in the jail, there is not one doctor that ever thought that Mr. Fields was malingering. Not one treating doctor that thought Mr. Fields was malingering." (Tr. 12: 2978; *see also id.* at 2980, l. 23.) Dr. Woods further explained, "In 2003 obviously Dr. Kemp believed, number one, that Mr. Fields was hearing voices, number two, that Mr. Fields was depressed."

30

(Tr. 12: 2979.)  Dr. Woods also pointed out that Fields's contemporaneous treatment records indicated that his condition had improved on anti-psychotic medications, suggesting that he had validly reported his symptoms.  (Tr. 12: 2993-95.)  Obviously cognizant of the forgone witnesses, defense counsel challenged the prosecution's expert, Dr. Price, to explain his diagnosis of malingered hallucinations in view of the findings of "Dr. Tromka " [*sic*], Dr. Kemp, and "Dr. Baumgartner" [*sic*].  (Tr. 13: 3209-10.)  Even during argument, counsel noted that Fields had reported auditory hallucinations prior to the murders.  (Tr. 14: 3442.)

Because counsel adduced substantial evidence that Fields had reported auditory hallucinations to treating professionals, they bore no obligation to present cumulative testimony from the medical personnel who recorded the defendant's complaints.  *See Snow*, 474 F.3d at 729.  Certainly, Fields cannot show that counsel bore any obligation to present percipient testimony from the treating professionals to supplement the hearsay explanations of the experts, as the relaxed evidentiary standards applicable to the penalty phase trial did not require such a tactic.  *See* 18 U.S.C. § 3593(c); *United States v. Basham*, 561 F.3d 302, 334 (8th Cir. 2009).  Given the cumulative nature of the supposedly omitted evidence, Fields cannot show that his attorneys acted ineffectively or prejudiced him.

Beyond the cumulative nature of the forgone evidence, counsel could have reasonably concluded that presenting testimony from treating mental health professionals, rather than the retained experts, was an area fraught with potential drawbacks.  Calling the treating physicians to the stand would have opened their credentials and files to scrutiny by the government.  Further, none of the treating professionals would have any obligation to prepare his or her testimony, unlike the retained experts.

31

Moreover, Fields fails to show that his attorneys would have necessarily been aware that the treating professionals would support the bipolar flip defense theory. Indeed, Dr. Winters claims to have only a vague recollection of the defendant and does not represent that he would have testified on Fields's behalf (*see* Pet. Ex. 12). *Cf. United States v. Harden*, 846 F.2d 1229, 1231-32 (9th Cir. 1988) (holding a defendant cannot establish ineffectiveness without showing the willingness of a forgone witness to have offered helpful testimony). Dr. Bumgardner, who now appears to endorse the defense's bipolar flip theory (*see* Pet. Ex. 10 at 2), was known at the time of trial to have made a major depression diagnosis (*see* Tr. 13: 3272), an opinion that would have undermined the defense's bipolar flip theory. Likewise, Dr. Trombka's diagnosis is freighted with ambiguity that would have detracted from the defense presentation. (*See* Pet. Exs. 11 at 1-2 ("reasonable mental health professionals could disagree with regard to the most appropriate diagnoses for Mr. Fields' [*sic*]").) Finally, physician's assistant Anderson – whose testimony could have been reasonably rejected based on the relative weakness of his credentials and his admitted social relationship with the defendant – observed anxiety and depression, not bipolarity or schizoaffective disorder like the experts. (Pet. Ex. 13.) The fact that these putative witnesses could have distracted from the defense undercuts any attempt to show that the omission of their testimony was unreasonable or prejudicial to Fields.

D.  Trial Counsel Reasonably Responded to Dr. Price's Testimony

Fields alleges that trial counsel ineffectively failed to object when Dr. Price testified that the defendant appeared to have intact and average cognitive function and when the prosecution expert later implied that he had not detected any organic brain damage. Fields also contends that counsel ineffectively cross-examined Dr. Price concerning neuropsychological evidence,

inadvertently adducing testimony that Fields was not brain damaged. (Pet. 39-46; Mem. 29-34.) Fields fails to show that counsel's actions were unreasonable, much less that they prejudiced the outcome of this case.

As noted, trial counsel indicated before Dr. Price's testimony that the defense would object if the government elicited evidence regarding organic brain damage. (Tr. 12: 3080 ("[A] great deal of what Dr. Price did was testing in relation to brain injury. And during the course of our case we presented no information, no evidence, no testimony of brain injury.").) However, the defense interposed no objection when Price touched on the subject of brain damage during direct examination. (Tr. 12: 3106 (stating that Fields's cognitive processes, "for just the observer, were average. They were intact"), 3154 (implying that he found no brain dysfunction despite expecting to do so).) And during cross-examination, trial counsel elected to elicit some limited testimony regarding Price's observations of the defendant's apparently-normal cognitive function. (Tr. 13: 3204-05 ("I did not see much neuropsychological impairment, not significant neuropsychological impairment").)

The omission of an objection does not constitute ineffectiveness when it is part of a valid trial strategy. *Snow*, 474 F.3d at 721. By extension, attorneys have no obligation to raise futile objections. *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005); *Hawkins v. Hannigan*, 185 F.3d 1146, 1152 (10th Cir. 1999); *see Scott v. Romero*, No. 04-2262, 2005 WL 2865173, at **2 (10th Cir. Nov. 2, 2005) ("Counsel is not ineffective for failing to advance a futile argument.").[6] Likewise, cross-examination is a matter of trial strategy, subject to a presumption of reasonableness. *See, e.g. Boyd v. Ward*, 179 F.3d 904, 915 (10th Cir. 1999); *United States v.*

---

[6]The government has attached to this Answer copies of all cited unpublished opinions.

33

*Rodriguez-Ramirez*, 777 F.2d 454, 458 (9th Cir. 1985). In hindsight, "few, if any, cross-examinations" could not be improved, but that showing does not establish constitutional ineffectiveness. *Willis v. United States*, 87 F.3d 1004, 1006 (8th Cir. 1996).

In this case, while counsel indicated a belief that evidence regarding Fields's cognitive function might not constitute proper rebuttal, the attorney gave no legal basis for such an objection. Any attempt to have done so would have failed. During this penalty phase hearing, the Court could have excluded evidence only "if its probative value [was] outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." *United States v. Lee*, 274 F.3d 485, 494 (8th Cir. 2001) (citing 18 U.S.C. § 3593(c) and *United States v. McVeigh*, 153 F.3d 1166 (10th Cir. 1998)). During penalty phase trials, attorneys may elicit testimony that would normally fall outside the scope of that which preceded it, absent a showing that the evidence is unfairly prejudicial. *Lee*, 274 F.3d at 494.

Fields makes no effort to demonstrate that he was in any way unfairly prejudiced by Dr. Price's brief direct testimony regarding the apparent normalcy of his cognitive functioning. (Tr. 12: 3106, 3154.) Likewise, Fields fails to identify any basis for an objection to testimony in which Price summarily recounted the defendant's self-report that he had no permanent impact from a decades-old concussion. (*See* Tr. 12: 3116.) Fields's defense did not hinge on any claim of organic brain damage. Even if he could show he was unfairly surprised by any of the direct testimony, he was never foreclosed from introducing surrebuttal testimony from Dr. Gelbort in an attempt to contradict Dr. Price's findings. But, as discussed above, Gelbort's testimony was unlikely to be of much mitigating value. (*See, supra*, Arg. I, B.) Thus, Fields has not shown that his attorneys omitted any valid objection, and there is no reasonable probability that the failure to

interpose futile ones had a prejudicial impact on the verdict.

By the same token, Fields has not shown that his counsel acted unreasonably in eliciting Price's brief testimony regarding cognitive function. Counsel began cross-examination by eliciting Price's explanation that as a psychologist, he was involved in the "diagnosis and treatment of mental disorders, emotional dysfunction, personality problems," while as a neuropsychologist he diagnosed and sometimes treated "mental disorders that have an organic basis that are due to brain impairment." (Tr. 13: 3182.) When counsel briefly adduced his testimony that he had not observed "significant neuropsychological impairment" in Fields (Tr. 13: 3204), the defense effectively implied that half of the witness's expertise was not even implicated by Fields's condition. Counsel followed that questioning with a lengthy set of inquiries into the anti-psychotic medicines prescribed to Fields, punctuating the examination by eliciting Price's concessions that he was not a medical doctor and had no expertise about psychotropic medications. (Tr. 13: 3205-11.) In so doing, counsel implied that Price simply lacked the requisite expertise to provide a valid opinion in this case.

The decision to elicit Price's rather innocuous observation about Fields's cognitive functioning was utterly reasonable under these circumstances. As shown, the testimony assisted counsel in attempting to negate the significance of Price's opinion. Given that counsel had been informed by a defense expert that Fields had only a mild impairment (Pet. Ex. 6 at 4), the decision to elicit a slightly less sympathetic portrait from a prosecution expert was utterly reasonable in view of potential that the testimony might negate the significance of his opinion, altogether. Furthermore, given that the defense proceeded on a theory of bipolar flip and had no evidence of significant organic brain damage (*see, supra*, Arg. I, B.), Fields cannot establish any

reasonable likelihood that he would have received a more favorable verdict if counsel had not elicited Dr. Prices neuropsychological opinion.

E.  Counsel's Reliance on the Opinions of Retained Experts

Fields claims that his trial counsel provided ineffective assistance because they failed to present evidence that ingestion of the anti-depressant Effexor has been shown to correlate with higher rates of compulsive aggressive behavior.  (Pet. 46-53; Mem. 34-39.)  Fields is wrong.  Counsel reasonably and effectively presented two experts who explained the defendant's violence in terms of his use of Effexor.  Fields cannot show that counsel were ineffective for relying on the experts' opinions or in omitting testimony that was different only by degree from that presented but subject to attack for admissibility.

"It is certainly within the 'wide range of professionally competent assistance' for an attorney to rely on properly selected experts." *Harris v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990).  Thus, an attorney need not "'shop' for a psychiatrist who will testify in a particular way." *Elledge v. Dugger*, 823 F.2d 1439, 1447 n.17 (11th Cir. 1987).  A retrospective assessment of an expert's methods and conclusions, even one that demonstrates the expert's inadequacy, does not establish that counsel was ineffective for relying on that expert.  *Card v. Dugger*, 911 F.2d 1494, 1513-14 (11th Cir. 1990).

As previously discussed, defense counsel presented two mental health experts who attributed Fields's commission of this crime to his use of the drug Effexor.  Dr. Grinage opined that Effexor likely caused Fields to experience "both depression and mania, but, he tended to have more of a diagnosable irritable mania."  (Tr. 11: 2814-15.)  Dr. Grinage concluded, "In my opinion he had such mental disorder that it caused significant impairment in his ability to behave

in a particular way that he might otherwise or what he might be thinking about doing." (Tr. 11: 2815.)  Building on those themes, Dr. Woods agreed that testified that "when you looked at the actual . . . pharmacological literature, you see that Effexor has a significant incidence of flipping people into mania, of making that switch.  When a person switches into mania, they often become – their judgment becomes increasingly impaired." (Tr. 12: 2990.)  As to mania, Woods explained that it " really shows up in irritability, in *spontaneous anger*, in kind of this *inability to control your anger*." (Tr. 12: 2953 (emphasis added)).)  He further attributed to mania behaviors that a person would not exhibit but for his condition: "They often are very responsive, not impulsive but responsive.  And you see real problems with judgment." (Tr. 12: 2954.)

The retained experts therefore provided a plausible basis upon which the jury could have found a nexus between Fields's aggressiveness and his use of Effexor, which Woods explained could result in spontaneous anger and an inability to control that anger.  Counsel's reliance on these experts, whose methods and conclusions Fields does not attack, was wholly within the ambit of professionally competent assistance, and the attorneys had no obligation to seek out different opinions. *Elledge v. Dugger*, 823 F.2d at 1447 n. 17.  Furthermore, given that counsel presented testimony that attributed the murders to the use of Effexor, any forgone evidence that statistically linked compulsively violent behavior to the use of anti-depressants would have been merely cumulative.  Such an omission does not constitute ineffective assistance. *See Snow*, 474 F.3d at 729; *see also Van Poyck v. Florida Dep't of Corrections*, 290 F.3d 1318, 1324 n.7 (11th Cir. 2002) ("A petitioner cannot establish ineffective assistance by identifying additional evidence that could have been presented when that evidence is merely cumulative").

Fields may argue that the omitted evidence was not cumulative because it would have

37

drawn a direct link between violent behavior and the use of anti-depressants, while the testifying witnesses more cautiously testified that the drugs created the emotional prerequisites for violence – mania, irritability and poor judgment. To the extent that the testimony adduced at trial had a shade of slightly different meaning than the information Fields now presents – in the form of an article by Peter Breggin (Pet. Ex. 14) – counsel would have still reasonably forgone the information. Breggin's opinions, linking anti-depressants and other drugs to violent behavior have been subject to exclusion from court proceedings. *Vanderwerf v. SmithKline Beecham Corp.*, 603 F.3d 842, 844 (10th Cir. 2010) (noting that Breggin did not demonstrate an accepted methodology from determining that the anti-depressant Paxil can cause suicide); *Estate of Moffett v. SmithKline Beecham Corp.*, No. 1:03 CV 532 WJG JMR, 2005 WL 1595664 (S.D. Miss. June 9, 2005) (excluding Breggin's testimony regarding Paxil); *Estate of Lam v. Upjohn Co.*, No. Civ. A. 94-003-H, 1995 WL 478844 (W.D. Va. April 21, 1995) (excluding Breggin's testimony regarding Halcion: "Simply put, the court believes that Dr. Breggin's opinions do not rise to the level of an opinion based on 'good science.'").

Given that Breggin's methods have been subject to successful attack, Fields has not established the admissibility of his putative testimony, even under the liberal standards applicable in a penalty phase hearing. In short, Fields has not demonstrated that Breggin's scientifically baseless opinions would not have been found more prejudicial than probative. 18 U.S.C. § 3593(c). Even if Breggin had testified, his methods and specific conclusions would have been subject to obvious attack, potentially undermining Woods and Grinage's opinions about the

effect of Effexor on Fields.[7]  Accordingly, trial counsel did not unreasonably or prejudicially

omit to call Breggin or someone espousing his particular conclusions about anti-depressants.  *See*

*Parker v. Scott*, 394 F.3d 1302, 1326 (10th Cir. 2005) (observing that defense counsel are not

ineffective in failing to elicit presumably inadmissible evidence); *Schlup v. Armontrout*, 941 F.2d

631, 639 (8th Cir. 1991) ("Counsel was not ineffective in failing to interview and call witnesses

whose testimony would be repetitive or potentially damaging").

F.  Trial Counsel's Preparation of the Expert Witnesses

Fields claims his attorneys were ineffective for failing to adequately prepare Drs. Grinage

and Woods for their testimony.  Fields contends that the experts had a "general sense" that they

were inadequately prepared.  He further argues that counsel's failure to provide Grinage with a

transcript of his guilty plea or to inform Woods of the elements of a pertinent statutory mitigator

exposed both witnesses to damaging cross-examination.  (Pet. 53-54; Mem. 39-41.)  Fields is

wrong.  Both experts testified consistently with written opinions they rendered before Fields

pleaded guilty and defended their conclusions in the face of questioning by the prosecution.

At least one court has found a duty for trial counsel to provide adequate information to

expert witnesses before calling them to the stand.  *Bean v. Calderon*, 163 F.3d 1073, 1079 (9th

Cir. 1998).  However, counsel do not act ineffectively when allegedly forgone preparation would

not have affected the outcome of the case.  *United States v. Molina*, 934 F.2d 1440, 1448 (9th

---

[7]Fields also notes that the FDA published Public Health Advisory that warned that anti-depressants could cause hostility.  (Pet. Ex. 15.)  The Advisory does not endorse or rely on Breggin's methods or conclusions.  In particular, it does not attribute to anti-depressants a tendency to cause violence toward others.  (*Cf.* Pet. Ex. 14 at 34-35.)  It goes no further than to warn of the potential for "hostility," virtually the same side-effect noted by Dr. Woods: "irritability, . . . spontaneous anger, [and] inability to control your anger."  (Tr. 12: 2953.)

Cir. 1991); *see also Smith v. Gibson*, 197 F.3d 454, 462 (10th Cir. 1999) ("Petitioner fails to allege how further preparation would have enhanced his testimony").

Given Fields's obligation to show specifically that any asserted error in witness preparation actually redounded to the detriment of the defense, his allegation of a "general sense that . . . testimony was ill-prepared and presented" should fail as a matter of law. Simply put, a "general sense" of inadequate preparation does not demonstrate how further preparation would have enhanced the experts's testimony or led to a reasonable likelihood of a more favorable verdict. *See Smith*, 197 F.3d at 462.

Fields's more specific allegations of error also fail to show that Drs. Grinage or Woods would have testified more effectively had they received more preparation.

Dr. Grinage testified in pertinent part that Fields committed the murders while suffering from a "severe emotional mental disturbance, mainly bipolar disorder with [auditory hallucinations]," which significantly impaired his ability to conform his behavior to the law. (Tr. 11: 2814-15.) Grinage's testimony was nearly identical to the conclusions he had offered in a written report, which he submitted to defense counsel on June 24, 2005, a few weeks before Fields pled guilty. (Pet. Ex. 27 at 8-9.)

During cross-examination, the prosecution observed that Grinage's opinion predated the guilty plea, and asked whether the expert's conclusions were inconsistent with the defendant's admissions:

> Q In your report – by the way, do I have a copy of it there, sir?
>
> A Yes.
>
> . . .

40

Q  And in fairness to you, this report is dated June 24, 2005.

A  Correct. And I have had some other collateral history gathering since this report as well.

Q  I'm not trying to be unfair with you with regard to this. This report was drafted before that plea of guilty was entered?

A  Yes, sir.

. . .

Q  All right, sir. You're also aware, sir – by the way have you reviewed a transcript of his plea hearing?

A  No, sir, I have not.

. . .

Q  All right.  And are you aware that at the plea hearing the Defendant acknowledged specific – specifically to the Court that he admitted the murders with premeditation?

A  Would I be surprised by that?

Q  Yes, sir.

A  I would find that important information.

Q  In fact, that would be pretty basically inconsistent with the opinion that you just rendered to this jury, right?

A  Not necessarily.  It depends on what you say by premeditation.  I think with regards to some of the crimes that occurred I obtain premeditative – thoughts of premeditation in my evaluation.  But, with regards specifically to the shooting, I did not obtain that information.  But, I think that would be information important the look at and weigh at in regards to my opinion.

(Tr. 11: 2817-19.)  Rather than backing away from his earlier opinion, Grinage reiterated his understanding of the crime – that Fields did not recall pulling the trigger of his gun but did recall hearing a voice.  (Tr. 11: 2820.)

In fact, Fields is mistaken in asserting that Grinage conceded on cross-examination that any aspect of the guilty plea contradicted his medical conclusions. While Grinage stated that Fields's admission of premeditation could have significance, he eventually explained that it did not affect his conclusion: "I think I misunderstood your premeditation comment before. . . . [Fields's] intention at that particular time was not of what happened. And all I can say in my testimony is that he had a mental illness that was influencing. I'm not saying it caused it. I'm not saying it created this situation. I'm just saying that he was influenced by mental illness at that time." (Tr. 11: 2875.) Similarly, while Grinage allowed for the possibility that Fields's admission of deliberateness could influence his opinion (Tr. 11: 2823-24), he never conceded that it changed his conclusion: "My testimony is that the time he had a psychotic disorder that influenced his behavior, not his thought process. And deliberation really is a thought process issue. . . . that's not part of my evaluation. I did not evaluate him cognitively." (Tr. 11: 2825.)

In short, Grinage stated that he had not read Fields's plea transcript, and appeared unaware of the precise elements to which the defendant had admitted, but the witness never indicated that he would have offered a different opinion had he reviewed the plea as part of his analysis. Given that the analysis predated Fields's plea, trial counsel could not have provided him with the information in any event, precluding any finding that the attorneys acted unreasonably. Whether or not defense counsel informed Grinage of Fields's specific admissions prior to trial, the expert explained how his opinion remained intact in the face of the defendant's plea. As such, Fields has not shown that any alleged failure to prepare the expert for testimony had any detrimental impact on the outcome of the trial.

Likewise, Fields fails to show that counsel prejudicially omitted to prepare Dr. Woods for

his testimony. Fields claims that Woods erroneously testified that the defendant was unable to conform his conduct to the dictates of the law, when the pertinent statutory mitigator required proof that the defendant was "substantially impaired" in his ability to behave lawfully. Woods's testimony was consistent with the opinion he had rendered in writing, prior to trial. (*See* Pet. Ex. 28 at 10 ("His ability to resist the voices, always tenuous, became impossible at the time of offense.").) While Woods's opinion went beyond the statutory requirements for application of the application of the impaired-capacity mitigator (*cf.* 18 U.S.C. § 3592(a)(1)), it nonetheless encompassed the requisite showing of substantial impairment.

It appears, moreover, that Woods offered his diagnosis despite the fact that counsel likely asked whether Fields met the strict criteria of the statutory mitigator. Indeed, Dr. Grinage specifically recounted trial counsel's request: "An opinion as to whether there was significant impairment in the defendant's capacity . . . to conform his conduct to the requirements of the law. (Pet. Ex. 27 at 1.) Fields provides no reason to believe that counsel would have asked Grinage to opine about the applicability of the elements of the statutory mitigator, while requesting that Woods determine the applicability of some inapplicable, and more rigorous, standard. Once Woods had offered, in writing, an opinion that went beyond the applicable standard (Pet. Ex. 28), counsel had no reason to instruct him to testify inconsistently with his earlier conclusion. Presumably, doing so would have merely opened Woods to cross-examination about a prior inconsistent statement, and it was appropriate for the attorneys to rely on the expert's conclusions. *See Harris v. Vasquez*, 949 F.2d at 1525.

The prosecution's cross-examination in no way dislodged Woods from his conclusion:

> A  Yes. I'm absolutely aware of that. He pled guilty.

43

Q  (By Mr. Sperling) Yet you contend the Defendant was unable to conform his behavior to the law?

A  Those are two different statutory requirements.  The first one has to do – insanity has to do with whether he is guilty or not.  He pled guilty to the crime.  The second one has to do with whether there are mitigating factors to separate out the death penalty from life without the possibility of parole. They're different factors.

. . .

A  It's not irresistible impulse.  You know what I mean.  It's a mitigation factor of being able to conform your behavior to the law.

(Tr. 12: 3048-49.)  Fields fails to show how this interchange may have prejudiced the defense.

Indeed, he does not identify any argument by the prosecutors in which they attempted to exploit

Woods's possible overstatement of the requisite standard.

At most, Woods might have created the false impression that application of the mitigator

required a showing that Fields could not conform his conduct to the law rather than that he was

significantly impaired from doing so.  But the court properly instructed on the requisite standard

(Trl. Doc. 227 at 25), and the jury rejected the mitigator on a verdict form that quoted the

"significantly impaired" language (Trl. Doc. 228 at 38).  The jury presumably heeded this

Court's instructions.  *See United States v. Olano*, 507 U.S. 725, 740 (1993) ("'[It is] the almost

invariable assumption of the law that jurors follow their instructions.'"); *see also Penry v.*

*Johnson*, 532 U.S. 782, 799-800 (2001) (noting general presumption that juries follow

instructions applies in habeas proceedings).

Given that Fields has failed to show that his attorneys' alleged failure to prepare the

expert witnesses for their testimony fell below prevailing professional norms or prejudiced the

defense, his claim of ineffectiveness should fail.

## II. FIELDS HAS FAILED TO STATE A JUSTICIABLE CLAIM THAT HE IS INCOMPETENT TO BE EXECUTED

Fields claims that his alleged mental illnesses render him incompetent to be executed. (Pet. 54-55; . Mem. 42-46.)  The argument, as Fields concedes, is not ripe for adjudication.

Fields cannot challenge his prospective execution because the issue is not yet ripe. Article III of the Constitution extends the judicial power of the United States only to real cases or controversies.  U.S. Const. art. III, § 1; *see United States v. Quezada-Enriquez*, 567 F.3d 1228, 1231 (10th Cir. 2009).  Thus, federal courts cannot give advisory opinions in hypothetical cases. *Flast v. Cohen*, 392 U.S. 83, 96-97 (1968).  Among other issues, the question of ripeness bears on a federal court's subject matter jurisdiction under Article III.  *See New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1498-99 (10th Cir. 1995).  Before a plaintiff may obtain an injunction against future enforcement of a law he must show some substantial hardship-the enforcement must be certain and the only impediment to the case's ripeness is delay before eventual prosecution.  *Steffel v. Thompson*, 415 U.S. 452, 462 (1974) (allowing an injunction against police when the plaintiff or his friends had twice before been arrested for distributing the same handbills at the same shopping center); *Crosetto v. State Bar of Wisconsin*, 12 F.3d 1396, 1403 (7th Cir. 1993).  The plaintiff bears the burden to allege facts sufficient to demonstrate the appropriateness of a judicial resolution. *See Renne v. Geary*, 501 U.S. 312, 316 (1991).

In this case, Fields has made no effort to demonstrate ripeness of his complaints about his mental health, nor could he.  Courts have universally found that claims of incompetence to be executed are not ripe until the execution is imminent.  *See, e.g.*, *Nooner v. Norris*, 499 F.3d 831, 834 (8th Cir. 2007); *Pierce v. Blaine*, 467 F.3d 362, 367 n.2 (3d Cir. 2006); *Coe v. Bell*, 209 F.3d

45

815, 823 (6th Cir. 2000); *see also Stewart v. Martinez-Villareal*, 523 U.S. 637, 643 (1998) (recognizing that a defendant's claim of incompetence to be executed was "unquestionably ripe" after the state issued a warrant for the execution).

Fields's execution is not imminent, and his claim is therefore not ripe. This Court should therefore decline to consider the contention.

## III.  TRIAL COUNSEL REASONABLY RESPONDED TO THE GOVERNMENT'S VALID EVIDENCE AND ARGUMENTS

Fields claims that trial counsel ineffectively failed to investigate and identify evidence that might have rebutted the government's showing and arguments in favor of two aggravating factors – mental anguish and substantial planning and premeditation. In related arguments, Fields complains that the government presented false and misleading evidence to support the aggravators. (Pet. 56-83; Mem. 46-62.) Fields is wrong. His attorneys reasonably responded to the government's presentation, which was, itself, entirely appropriate. The government addresses Fields's claims, in turn, below.

A.  Counsel Reasonably Responded to Evidence in Support of Aggravating Factors

Fields claims that trial counsel inadequately investigated and presented evidence to rebut evidence that he substantially planned and premeditated the crime and that he caused mental anguish. Neither of these arguments has any validity.

1.  Substantial Planning and Premeditation

a.  The Testimony of Fields's Associates

Fields contends that his attorneys failed to adduce testimony from Daniel Presley that the defendant's ghillie suit was a ubiquitous item among squirrel hunters. Likewise, he argues that

counsel should have adduced Presley's testimony that Fields attached a large scope to his .22 rifle to allow him to take long range shots at squirrels.  According to Fields, Presley's putative testimony would have rebutted government evidence and argument that the ghillie suit and rifle scope were evidence that the defendant had long intended to murder people.  Further, Fields claims that counsel should have presented Presley's testimony that the defendant invited him to go snake hunting a few hours before the murders.  According to Fields, such testimony would have rebutted evidence that the defendant manufactured an alibi by telling his girlfriend, several hours before the murders, that he would not be home that evening because he had plans to go fishing with Presley.  (Pet. 59-64 & 74-75; Mem. 48-49.)  Fields cannot show that the omission of the supposedly forgone testimony was unreasonable or prejudicial.

For counsel's actions to offend the Constitution, "his strategic decisions must have been completely unreasonable, not merely wrong, so that [they] bear no relationship to a possible defense strategy."  *Fox v. Ward*, 200 F.3d at 1296.  As noted, a showing that additional evidence could have been adduced "usually proves at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel."  *Waters v. Thomas*, 46 F.3d at 1514.  But if trial counsel did not know of facts that would alert him or her to the need to conduct a particular investigation, a failure to investigate does not amount to deficient performance.  *Alcala v. Woodford*, 334 F.3d 862, 893 (9th Cir. 2003).

In this case, Fields claims that his attorneys should have investigated Presley's knowledge of ghillie suits and rifle scopes to show that both were items common to squirrel hunters and,

thus, not evidence of planning and premeditation on the defendant's part. But Presley's own statement to the FBI precluded any reason for defense counsel to inquire about his knowledge of ghillie suits. He told the FBI that he was "not certain if it's common for an individual to wear a gilli [sic] suit while squirrel hunting." (Pet. Ex. 21 at 4.) Presley also told the FBI that he believed Fields wrapped his rifle shortly before the crime. (Pet. Ex. 21 at 3.) Presley said that Fields had previously used the rifle to hunt without camouflage and did not explain why he had covered it. (*Id*.) As a result, counsel was aware of no fact that might have alerted the to the possibility that Presley might provide testimony,[8] as he now claims, that a ghillie suit is a "common tool" among area hunters. *See Alcala*, 334 F.3d at 893.

Had counsel adduced such testimony from Presley, the witness would have been susceptible to impeachment with his prior inconsistent statements to investigators. (*See* Pet Ex. 21.) Even if Presley had explained that other hunters commonly use camouflage like that used by Fields during the murders, such testimony would have had little impact, given that the defendant referred to his ghillie outfit as "sniper suit" or suspiciously refused to explain its purpose. (Tr. 9: 2331, 2338; 10: 2486.) Because Fields indicated, by assertion or omission, that the ghillie suit was intended for a nefarious purpose, no reasonable probability exists that any forgone testimony from Presley intended to neutralize the significance of the outfit would have altered the outcome of the trial.

Presley also told investigators that Fields's .22 caliber rifle had a "very powerful" scope.

---

[8]Presley recently declared that he did not ask Fields why he had covered the rifle because he believed he understood the motive. (Pet. Ex. 20 at 5.) Presley's understanding is, however, irrelevant, as his state of mind does not demonstrate whether trial counsel knew of facts that could form evidence helpful to the defense.

(Pet. Ex. 21 at 3.) Consistent with that statement, he testified that the scope was "[v]ery powerful. It was something you would see on a high powered hunting rifle." (Tr. 9: 2379.) Presley now claims that he could have testified that squirrel hunters commonly use "a scope on a .22 rifle." However, there is no indication that trial counsel knew Presley might be able to explain the reason that Fields chose to outfit his rifle with a scope meant for a longer-range weapon. Regardless of the fact that Fields has not shown his attorneys were aware of this line of inquiry, he has not shown that it would have been fruitful. In fact, Presley recently declared that Fields used the scope to "challenge himself," making especially long range kills. (Pet. Ex. 20 at 4-5.) Ironically, Presley's assertion supports, rather than defeats, the very point the prosecutor was attempting to make when he argued about the significance of squirrel hunting:

> It's the actions of a man who is methodically thinking out what he wants to do. His plan down the road is to become a predator, a sniper. This was the first step in that action. His own friends tell you about how he tried to carry out those plans, how he'd go squirrel hunting, however he had the Ghilley suit, Dan Presley told you, they went squirrel hunting. . . . Plan was not to kill Charles and Shirley Chick, per se, but he had become a hunter. This was what he wanted to do. He had built the Ghilley suit and now he had built the gun. He had become proficient in his stalking activities without, as the squirrels, being able to sneak up on people.

(Tr. 14: 3407-08.) Because Presley's explanation of the scope does not appreciably alter the fact that Fields could transfer his squirrel hunting skills to the stalking and killing of human beings, no reasonable probability exists that the defendant would have received a more favorable verdict had trial counsel adduced the witness's putative testimony.

Finally, Fields cannot show that his attorneys acted ineffectively in failing to adduce testimony from Presley that Fields invited him to go snake hunting on the evening of the murders. Fields is simply wrong that such evidence would have forestalled the government from

49

arguing that the defendant attempted to manufacture an alibi by telling his girlfriend, Michelle Tipton, that he was going fishing with Presley that night. (*Cf.* Tr. 10: 2558.) Indeed, such evidence would have underscored the fact that Fields falsely told Tipton that he had a standing social engagement with Presley. (*See id.*) At most, Fields's invitation to Presley indicated that he was willing to defer the murder until after a snake hunt. And Fields may have hoped that, if he committed the murders soon after such a hunt, the convergence of time lines might suggest to investigators that he was unlikely to have killed the Chicks. However, there is no reason to believe that Fields's last minute invitation to Presley would have detracted in any way from the government's evidence that Fields had lied to Tipton when he told her that he had existing plans to fish with Presley. Accordingly, counsel did not act unreasonably or prejudicially in omitting to adduce evidence that would have largely served to advance the government's position. *See Yarborough*, 540 U.S. at 5-6.

> b. Glass Fragment Evidence

Fields claims that his attorneys ineffectively failed to retain an expert witness who could have contradicted crime scene analyst Iris Dalley or suggested fruitful cross-examination to challenge her explanation of glass fragments found at the scene. Dalley testified that she found unstained fragments lying inside the Chicks' van, atop a pool of dried blood. Because she observed no blood on the fragments, Dalley concluded that they came from a window that Fields shattered several hours after the murder – enough time to permit the blood to dry so that it was not transferred to the glass on contact. Fields now presents the declaration of a retained expert who asserts that one glass fragment was stained and that the fragments could have fallen from the van door during the crime scene investigation. (Pet. 65-69 (citing Pet. Ex. 23).) Fields has not

shown that his attorneys acted unreasonably or that their asserted omission prejudiced him.

While Fields has identified an expert who disagrees with Ms. Dalley, he does not indicate why trial counsel might have sought out a criminalist. As previously noted, if counsel did not know of facts that would alert him to the need to conduct a particular investigation, a failure to investigate does not amount to deficient performance. *Alcala v. Woodford*, 334 F.3d at 893. In this case, Fields pleaded guilty to all counts, specifically conceding that he had premeditated the Chicks' murders. (Tr. June 30, 2005: 28-31.) Fields had earlier confessed that he left the victims' campsite after the murders, returning with his truck to complete the robbery. (Trl. Ex. 131 at 2.) The confession is silent as to the period of time he was absent. (*Id.*) Fields provides no indication that he ever informed his attorneys that Ms. Dalley's conclusions were erroneous. Certainly, counsel was not expected to make the observations that Fields now attributes to his current expert. Accordingly, Fields has failed to show that counsel was alerted to circumstances that would have reasonably required them to retain a criminalist as a consultant or witness.

Regardless of the reasonableness of counsel's actions, Fields cannot show that the decision prejudiced him, because the conclusions of his present expert, Robert Tressel, are erroneous. Tressel asserts that a photograph of the crime scene depicts a "red stripe" of blood transfer on a glass fragment, indicating that the piece of glass fell on still-viscous blood. Tressel is wrong. Had a glass fragment fallen into viscous blood, the stain on it would have mirrored the shape of the blood with which it came in contact, and the red stripe is a different shape than the blood beneath the fragment. (Ex. 1 at ¶¶ 6-13.) Furthermore, the apparent red stripe is visible from only one angle: it does not appear in other photographs of the fragment, even under magnification. (*Id.*) Tressel has managed only to identify the image of blood underneath the

51

fragment, refracted through the glass. (Ex. 1 at ¶ 12.) His identification of an illusory stain in a two dimensional photograph would have done nothing to undermine Dalley's eyewitness observation that the fragments were unstained.

Likewise, the defense would not have benefitted from presentation of Tressel's theory that the glass fragments may have fallen onto the dried blood when Dalley opened the van's door. Dalley could have testified that she carefully opened the door to avoid shifting any evidence. More significantly, Dalley could rely on photographs of the inside of the passenger-side door, taken prior to opening, to show that there were no glass fragments in a position to fall on the dried blood. (Ex. 1 at ¶¶ 16-20.) Indeed, the photographs show that there were no surfaces above the dried blood capable of holding glass fragments that could shift and fall when moved. While it appears that one fragment likely fell to the ground below when the door was opened, it does not demonstrate that any fragments were in line with the dried blood pool when the door opened.

Given that the government could have easily refuted Tressel's assertions regarding the glass fragments, no reasonable probability exists that the failure to retain a defense expert – to testify or merely consult – prejudiced the outcome of this case. *See Haddock*, 12 F.3d at 958.

c. Blood Flow Evidence

Fields claims that his attorneys ineffectively failed to retain an expert witness who could have reinterpreted certain crime scene photos as evidence that Charles Chick's body was moved less than six hours after the murder. Specifically, Fields relies on Tressel's declaration to argue that plant material that adhered to Chick's hand indicates that the victim was moved while blood on his hand was still wet. Fields also observes that, in Tressel's opinion, the blood found around

52

Mr. Chick's body would not have been there had the corpse been moved several hours after the murder for the simple reason that it would have congealed. (Pet. 69-70; Mem. 52.) Fields cannot show that trial counsel acted unreasonably because he cannot offer reliable, much less correct, evidence in support of his theory regarding the flow of blood from Charles Chick's head.

As with the glass fragment evidence, Fields fails to demonstrate that his attorneys were alerted to any fact that would have reasonably required them to obtain expert assistance in this matter. *See Alcala*, 334 F.3d at 893. Certainly, he has not averred that he informed counsel that the government's experts were wrong. In any event, Fields cannot show, on the basis of Tressel's declaration, that counsel could have presented competent testimony with which to refute the government's evidence.

Fields's putative expert, Tressel, appears to have offered opinions based on facts beyond his ken. In essence, his opinions about blood flow hinge on the rate at which blood would congeal in a dead body and therefore be available to drain several hours after death. In no way does he indicate that he has training and knowledge about such medical matters. This is not the first time Tressel has proffered an opinion about medical matters, despite a lack of knowledge. *See United States v. Frazier*, 387 F.3d 1244, 1252-54 (11th Cir. 2004). Having failed to identify any reliable evidence that defense counsel could have presented, Fields has not shown that his attorneys acted unreasonably in omitting to seek expert forensic assistance. *See Cummings v. Sirmons*, 506 F.3d 1211, 1233 (10th Cir. 2007) *cert. denied*, 128 S.Ct. 2943 (2008) (rejecting ineffective assistance claim because the petitioner never identified precisely what purported experts would have testified to).

Indeed, Tressel's conclusions are not merely unfounded, they are incorrect. Tressel

opines that Mr. Chick's blood would have congealed within six hours and therefore could not have drained when Fields was believed to have moved the body. Tressel asserts that the process of coagulation was accelerated by low temperatures on the night of the murders. (*See* Pet. Ex. 23 at 5, 7.) Tressel's assumption does not survive the barest of scrutiny. Dr. Distefano, the medical examiner who testified at Fields's trial, has explained that the coagulation of blood is slowed by lower temperatures and one could expect Mr. Chick's wounds to have drained freely for up to 24 hours after death. (Ex. 2 at ¶ 4.) As Dr. Distefano states "it is completely incorrect to conclude that blood in Mr. Chick's body would have congealed in six hours in relatively cool evening air." (*Id*.) As such, no reasonable probability exists that the omission of Tressel's involvement in this case prejudiced its outcome. *See Patel v. United States*, 19 F.3d 1231, 1237 (7th Cir. 1994) (holding no prejudice to petitioner who failed to make specific, affirmative showing that absent witness's testimony would have affected outcome of trial).

Similarly, the defense could not have effectively refuted the evidence that Mr. Chick's body was moved several hours after death by noting that a limited amount of plant material had adhered to the blood on the back of his right hand. Any moisture such as dew could have rehydrated the blood on the back of Mr. Chick's hand sufficiently to adhere a small amount of plant material. Furthermore, the pattern of debris distribution suggests that it was transferred there by some passing animal or by Fields's hand or foot. (Ex. 1 at ¶¶ 21-24.) Once again, no reasonable probability exists that the omission of a defense forensics expert prejudiced altered the jury's findings. *See Haddock*, 12 F.3d at 958.

d. <u>Lividity Evidence</u>

Fields claims that his attorneys ineffectively failed to retain an expert witness who could

have testified that the photos of Mr. Chick's body refuted the medical examiner's testimony that the victim sat in an upright position for several hours after death.  Fields relies on Tressel's declaration to argue that the medical examiner simply misinterpreted the lividity patterns on the body.  (Pet. 69-70; Mem. 52.)  Fields does not show that counsel were alerted to the need for such opinions.  But like Tressel's other medical opinions, his views on lividity are neither competent nor correct.  As such, they fail to support any claim that trial counsel erred.

As before, Fields has not revealed that he informed counsel that the government's experts were wrong or that his attorney could have discovered competent evidence with which they could refute the government's case.  *See Alcala*, 334 F.3d at 893.  Furthermore, Tressel has once again offered a medical opinion without showing that he has the requisite training and experience to support it.  His baseless assertions should not form the basis of a finding that counsel acted unreasonably.  *See Cummings v. Sirmons*, 506 F.3d at 1233.

Tressel's conclusions are not merely beyond his expertise, but simply incorrect.  Dr. Distefano has explained that lividity becomes fixed in a matter of hours – generally eight to twelve.  (*See* Ex. 2; *see also* Tr. 8: 2031.)  Even after lividity has set in one position, secondary patterns can develop if the body is moved to another position.[9]  (Ex. 2 at ¶¶ 5-6; *see also* Ex. 1 at ¶¶ 28-29.)  That fact undermines Tressels's supposition that the lividity patterns observed on Mr.

_____

[9]Fields does not assert that his attorneys failed to present evidence about rigor mortis, but Tressel's Declaration asserts that rigor could have precluded the movement of Mr. Chick's body. (Pet. Ex. 23 at 7.)  Tressel, however, concedes that Mr. Chick was found in full rigor 24 hours after his killing.  Because the process of rigor would have therefore been previously incomplete, there is no basis for asserting that Tressel's estimation of rigor would have undermined the argument that Fields moved the body about six hours after death.  In fact, Dr. Distefano testified to essentially the same estimate as Tressel, but noted the potential for variability in the process. (*See* Tr. 8: 2057-59; *see also* Ex. 2 at ¶¶ 12-13 (noting an absence of facts to suggest that rigor would have precluded movement of the body).)

Chick's body were in any way inconsistent with the trial testimony that livor initially fixed while the body was seated. (*Cf.* Tr. 8: 2029-32.) Indeed, Dr. Distefano explains that the pattern visible on the rear of Mr. Chick's lower body is consistent with lividity having fixed while he was in a seated position and the pattern visible on his anterior thighs is consistent with secondary lividity having fixing in a prone position. (Ex. 2 at ¶¶ 7-8.) Dr. Distefano also notes that the lividity patterns visible on Mr. Chick's feet are not inconsistent with either position, as the victim was thought to have had his feet pointed downward while seated, as well as prone. (Ex. 2 at ¶ 9.) Given the evident flaws in Fields's putative lividity evidence, no reasonable probability exists that its omission at trial prejudiced the defense. *See Patel v. United States*, 19 F.3d at 1237.

2. <u>Mental Anguish</u>

Fields claims that his attorneys erred when they omitted to present evidence that the high velocity blood spatter found on Shirley Chick could have come from her own wounds, though the government attributed the source of the blood to Charles Chick's wounds. According to Fields, such evidence would have blunted the government's argument that he began inflicting mental anguish upon Shirley when he shot her husband as she sat close enough to him to be misted by his blood. (Pet. 72-74; Mem. 52-53.)

Fields provides no basis for concluding the counsel might have believed such a strategy might prove fruitful. He does not indicate that counsel was aware of any information that would have indicated Mrs. Chick was an appreciable distance from her husband when the first bullet hit him. In fact, Fields told investigators, "The Chicks . . .. were sitting at the picnic table at their campsight [*sic*]. I remained concealed in the woods for about 15 minutes after their return to the campsight [*sic*]. At one point, Charles Chick said he was going to the tent. I shot Charles Chick

with one shot to the head." (Gov't Trl. Ex. 131.) Corroborating Fields's statement, investigators found two partially empty beverage containers at the picnic table. (Tr. 8: 2119; Gov't Trl. Ex. 63.) Furthermore, there could be no real controversy that Mrs. Chick was close enough to be hit by spatter from her husband's wound, given that high-speed droplets, consistent with ejection from a gunshot, were found on the far side of the picnic table. (Tr. 8: 2123; Gov't Trl. Exs. 63-66.) In view of the defendant's confession and other evidence establishing that Ms. Chick was at the table when Fields shot her husband, trial counsel had every reason to believe that suggesting, or even establishing, an alternate source of blood spatter on her face could amount to nothing more than a pyrrhic victory. But because Fields's current expert incorrectly predicts the direction in which back spatter from Mrs. Chick's wounds would have traveled (*see* Ex. 1 at ¶¶ 25-26), he cannot show that the absence of such evidence would have affected the outcome of his case. *See Patel v. United States*, 19 F.3d at 1237.

Not only could counsel have validly concluded that the defense was unlikely to profit from a rebuttal of the blood spatter evidence, but Fields has failed to show that it was central to the government's argument in support of the mental anguish aggravator. Fields quotes, without appropriate context, the government's argument regarding the blood spatter evidence. (*See* Pet. 72.) But a more complete rendition of the prosecutor's argument makes clear that the government premised the mental anguish factor, not on a mere misting of blood, but on Shirley's Chick's presumed shock at seeing Charles gunned down and her own unsuccessful flight from Fields:

> What happens at the time of the shot? She gets splattered with her husband's blood allover her face. That's what happens to her. And picture the scene, ladies and gentlemen. They're out in the middle of nowhere and all of a sudden a sound

> of a gunshot and her husband collapses and she has his blood allover his face. What was the horror, the shock, the sheer, oh, my God, the terror that went through her mind at that instant? Because she doesn't know where it's coming from at this period of time, ladies and gentlemen. She has no idea. Her defensive mechanisms take over and she gets up and she begins to run. She tries to escape. She tries to seek cover. But there is no escape for Shirley. She can't run. She's got a bad leg. There is nowhere for her to hide. This man has thought this out. He is executing his plan to precision. He takes out the biggest threat and Shirley was going to be easy one.

(Tr. 14: 3416.) The prosecutor continued in this vein, noting the metal rod in Ms. Chick's leg, her attempt to seek cover, and her likely view of Fields in his ghillie suit as he approached her and shot her at close range. (*Id*. at 3416-17.) While the prosecutor mentioned the spatter of blood in arguing the mental anguish factor, he focused his argument elsewhere – on the perceptions of Ms. Chick in the waning moments of her life. Given the relative unimportance of the blood-spatter evidence to support the showing of mental anguish, no reasonable probability exists that Fields would have received a more favorable verdict had his attorneys attempted to rebut it with the fatally flawed opinions of his current expert. *See Haddock*, 12 F.3d at 958.

B.  The Government Properly Presented Evidence and Argued Reasonable Inferences from the Record

As a corollary to his ineffective assistance claims, Fields also argues in the alternative that the prosecutors improperly adduced false evidence and made improper arguments. As shown below, neither argument has any validity.

1.  Allegedly False Glass Fragment Evidence

Fields argues that the government erroneously presented false and misleading testimony. Specifically, he argues that the prosecutors knew or should have known that the crime scene reconstruction testimony of Iris Dalley was false because, as averred by his present expert, a

fragment of glass depicted in a photograph appears to have a "red stripe" on it. (Pet. 77-80; Mem. 57-59.)

The Supreme Court has stated that the *Brady* doctrine applies if the prosecution "knew or should have known" that its case contained perjured testimony and "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Blandin*, 784 F.2d 1048, 1051 (10th Cir. 1986) (citing *United States v. Agurs*, 427 U.S. 97, 103 (1976)). However, the Tenth Circuit has refused to impute even the knowing falsity of a law enforcement officer to the prosecution. *See Smith v. Sec'y of New Mexico Dep't of Corrections*, 50 F.3d 801, 831 (10th Cir. 1995) (concluding that a *Napue* violation was avoided because the prosecution did not have actual knowledge of false testimony). Indeed, the notion that the prosecution violates the Constitution when it presents evidence it "should have known" was false is premised on dicta. *Drake v. Portuondo*, 553 F.3d 230, 240 (2d Cir. 2009).

Here, Fields's entire argument hinges on the strained notion that prosecutors should have known Iris Dalley's testimony was false because they should have recognized what she supposedly failed to observe. This not only imputes Dalley's knowledge to the prosecution, but also her expertise. In essence, Fields's argument hinges on a finding that the prosecution has an obligation to better practice crime scene reconstruction than a crime scene reconstruction expert. Fields fails to identify any authority for such a proposition. Because the claim lacks a basis in existing law, any relief would necessarily require the legally impossible – a retroactive application of a new rule of law. *Schriro v. Summerlin*, 542 U.S. 348. Fields calls upon this Court to apply a new rule of constitutional import, and it therefore should reject the matter out of hand. *Id.* Even if he could identify existing authority to support his position, his factual premise

– that Dalley erred – is without merit.  As discussed above, Ms. Dalley stands by her conclusions and has refuted the validity of Fields's theory that there is any visible blood transfer on any glass fragment that might suggest the defendant burglarized the victims' van shortly after the murder. (*See, supra*, Arg. III, A, 1, b.)

Because Fields cannot show that his present theory has any basis in fact, he cannot demonstrate that Dalley's testimony was false, much less materially so.  Indeed, the government could have relied on the medical examiner's lividity findings to demonstrate that Fields committed the burglary many hours after the murders.  (*See* Tr. 8: 2031-32.)  Thus, Fields cannot show a reasonable likelihood that he would have received a more favorable verdict, even in the absence of the supposedly false evidence regarding blood transfer to the glass fragments.

2.  Allegedly Baseless Argument

Fields also claims that the trial prosecutors falsely argued that he tried to create an alibi when he told Michelle Tipton that he had plans to spend the evening of the murders with Daniel Presley.  Fields also argues that the prosecution improperly implied that he did not attempt to spend the evening with Presley, because Presley was only asked if he had an existing engagement on the night of the murders that precluded spending time with the defendant.  According to Fields, the prosecutor should have also asked if the defendant invited Presley to go hunting just hours before he murdered the Chicks.  (Pet. 80-82; Mem. 59-60.)  Fields's argument should fail because the omitted evidence that Fields did not invite Presley out until after he claimed to have made plans would have only enhanced the government's position.

As previously discussed, Fields attempted to set up a false alibi when he told Michelle Tipton something that was not true – that he had pre-existing plans with Presley.  (*See, supra*,

Arg. III, A, 1, a.)  The fact that Presley actually intended to go to a casino that night would not have assisted Fields.  The prosecutor could have elicited Presley's recollection that Fields came to his house on the day of the murders – following the false statement to Tipton – and invited Presely to spend the evening with him.  Such evidence would have only served to further underscore the falsity of Fields's initial statement to Tipton.  In essence, prosecution only missed an opportunity to adduce evidence that would have further supported its view of the case.  This may have been an oversight on the part of the prosecutor, but it certainly was not misconduct, nor was the argument that Fields attempted to set up a false alibi anything but a fair inference from the evidence.  *See United States v. Lopez-Medina*, 596 F.3d 716, 740 (10th Cir. 2010) ("[T]he cardinal rule of closing argument [is] that counsel must confine comments to evidence in the record and to reasonable inferences from that evidence.").

To the extent that Fields now asserts that his statement to Tipton was a signal of his intent to spend the evening with Presley, that is merely one other interpretation of Fields's actions. (Pet. 81-82.)  However, the inference is at odds with Tipton's observation that Fields was highly routinized and would note exceptions to his schedule.  (Tr. 10: 2558-59.)  A person like Fields, who was slavishly dedicated to his schedule, would seem unlikely to inform an intimate associate of an exception to it when had not yet confirmed plans to deviate from his usual routine.  More likely, it appears that Fields would have willingly deferred the murders until after a snake hunt. And Fields may have hoped that, if he committed the murders soon after such a hunt, the convergence of time lines might suggest to investigators that he was unlikely to have killed the Chicks.

While, admittedly, *Agurs* prohibited the government from knowingly eliciting false

testimony, Fields has not established that the government suborned perjury, nor has he identified any authority that required the government to adduce evidence that might have benefitted the defense. Because the claim lacks a basis in existing law, any relief would necessarily require the legally impossible – a retroactive application of a new rule of law. *Schriro v. Summerlin*, 542 U.S. 348. This Court should therefore reject the matter out of hand. *Id.*

## IV. TRIAL COUNSEL PRESENTED APPROPRIATE SOCIAL HISTORY EVIDENCE WITHOUT UNDERMINING THE DEFENSE STRATEGY

Fields claims that trial counsel ineffectively failed to present and rely upon social-history evidence as a basis for mitigation. While conceding that counsel did present some such evidence through his sister, Cherie Fields, Fields argues that his attorneys should have adduced additional testimony to demonstrate the atmosphere of familial dysfunction in which he allegedly was raised. Furthermore, Fields faults his lawyers for presenting social history evidence through his sibling instead of through a paid witness – mental health experts Woods and Grinage or mitigation investigator Glori Shettles. Fields also contends that his attorneys should have argued that his personal history supported an independent mitigating factor. (Pet. 83-94; Mem. 62-71.) Fields is wrong. His defense strategy centered on an explanation of his crimes as a behavioral aberration driven by a misprescribed psychotropic drug. Any forgone evidence concerning Fields's supposed family history would have undermined the defense by suggesting Fields was a dangerous person whose homicidal conduct was a product of his character. In fact, evidence intended to explain the crime in terms of Fields's upbringing would have been inconsistent with the fact – one recognized by the jury in mitigation – that he had no record of criminal conduct until he committed this crime at age 36.

As noted, the law strongly presumes that counsel acted for tactical reasons when they focus arguments on particular issues to the exclusion of others. *Yarborough v. Gentry*, 540 U.S. at 8. Even incorrect decisions do not offend the guarantee of competent counsel, so long as they are not "completely unreasonable." *Fox v. Ward*, 200 F.3d at 1296. Counsel does not err in omitting evidence that would have undermined, rather than supplemented, a viable mitigation strategy. *See Wackerly v. Workman*, 580 F.3d 1171, 1177-79 (10th Cir. 2009). In particular, testimony about a troubled upbringing and mental issues can be mitigating, but is double-edged – a fact that can support a reasonable strategic choice not to present such evidence. *See Williams v. Woodford*, 384 F.3d 567, 619-20 (9th Cir. 2004)); *St. Aubin v. Quarterman*, 470 F.3d 1096, 1103 (5th Cir. 2006). In fact, the Tenth Circuit has frequently observed that counsel may reasonably omit "double-edged" evidence. *See Wackerly v. Workman*, 580 F.3d at 1177-78 (collecting cases); *Bryan v. Mullen*, 335 F.3d at 1222-23; *Cannon v. Gibson*, 259 F.3d at 1277-78.

In this case, defense counsel attempted to portray Fields as an essentially normal, law-abiding person who committed a horrifying and – for him – anomalous crime, while under the influence of emotional trauma and wrongly-prescribed psychotropic medicine. In argument, counsel conceded the defendant's eccentricities, but specifically attempted to dissuade the jury from accepting the government's theory that Fields acted in conformity with his bad character: "This man has never quite been able to live his life the right way, yet he has a ton of people who love him. How can that be if he is such a sociopath?" (Tr. 14: 3435.) After defining the impaired capacity statutory mitigator (Tr. 14: 3436), counsel asserted that "Effexor . . . over a period of time that medication built up like it's supposed to. . . . it was like a wave and he got to the tipping point." (Tr. 14: 3438.) Counsel observed that Fields had no history of convictions, a

63

basis for her further argument that his commission of these murders meant that, "Something was wrong" and that the death penalty was inappropriate punishment for someone who did not "need[] to be put down." (Tr. 14: 3439-40.) Further attempting to explain the crime as the product of external forces, counsel argued that Fields committed the murders under the severe emotional distress occasioned by his father's recent death and his mother's illness. (Tr. 14: 3440.) Counsel returned once again to the theme that Fields was an essentially decent person when she argued that he was a beloved relative and friend who expressed remorse and did not present a future danger. (Tr. 14: 3441-42.)

In support of the defense tactic of portraying the murders as atypical of Fields's character, the defense presented the testimony of his sister, who described her brother's upbringing. Cherie Fields said that she loved her brother. (Tr. 11: 2676, 2689.) She recounted how Fields demonstrated his love for his father by planting a garden for him and fishing with him toward the end of his life. (Tr. 11: 2685-86.) Cherie also testified, on direct and cross-examination, to troubling aspects of her family life and her brother's conduct. (*See, e.g.*, Tr. 11: 2674-76 (stating that she and her brother fought as teenagers), 2677-78 (stating that her father worked long hours and was largely absent from his children's lives), 2679-80 (discussing her mother's long-time illnesses), 2703-05 (recounting Fields's irresponsibility and laziness), 2711 (noting that Cherie believed Fields was an inadequate father).) But the thrust of her testimony was that her brother, while flawed and "sick," was not "vicious"; he was, in fact, someone she loved and supported, despite his own admonition that she not testify on his behalf. (*See* Tr. 11: 2719-20.)

Fields committed these murders as an adult, nearly 20 years after his emancipation from his parents' home. As the defense successfully observed in mitigation, he had no criminal

record.  (*See* Trl. Doc. 228 at 38.)  If the murders were, however, somehow a by-product of loveless parenting, Fields has not explained the psychological mechanism at work, much less the reason why two decades passed before the emotional trauma at issue manifested itself as an unprovoked double murder of two strangers unrelated to his parents in any way.  Rather than rely on such a tenuous hypothesis, the defense presented concrete theory premised on the defendant's ingestion of a psychoactive substance.  But the notion that these murders were, in any way, a product of some long-standing lack of socialization or empathy, caused by a bad family life, would have diluted the theory that the crime was Effexor driven, rather than a product of the defendant's sociopathic tendencies.  Further, evidence that Fields was emotionally estranged from his family would have contradicted the defense arguments that the death of the defendant's father and the illness of his mother represented a severe emotional disturbance.  (*Cf.* Tr. 14: 3440.)  Likewise, evidence that Fields had difficulty forming relationships would have contradicted the notion that he was remorseful and that he was a loved relative and friend.  (*See* Trl. Doc. 228 at 39-40.)

Thus, Fields's attorneys reasonably omitted evidence that the defendant's home life was dysfunctional – that his parents were abusive and emotionally distant, that the family's frequent moves stunted Fields's ability to form relationships, and that his upbringing created the perception that he was "moody," "lazy," and "weird."  Such evidence would have severely undermined the defense's portrayal of the murders as aberrant, and would have tended to support the government's positions that Fields was a future danger to others and had substantially planned and premeditated the murders.  (*See* Trl. Doc. 228 at 35-36.)  In particular, presentation of evidence that Fields could not form meaningful relationships would have done nothing to

explain why he chose to commit these murders, which were certainly not shown to have been motivated by any frustration Fields might have had in befriending the victims or anyone else. In sum, the presentation of additional evidence that Fields had a dysfunctional upbringing, or was cruel and violent toward his relatives, would have weakened, rather than strengthened, the defense's attempt to mitigate this crime.

Given that any forgone evidence of the defendant's family life was a double-edged sword, counsel reasonably chose not to rely on it to the detriment of their existing strategies. In fact, the Tenth Circuit has observed that the omission of "double-edged" evidence does not constitute unreasonable or prejudicial performance. *Wackerly v. Workman*, 580 F.3d at 1178 & n.1. Because any forgone evidence would have necessarily detracted from the defense's chosen strategy, Fields cannot show a reasonably likelihood that he would have received a more favorable verdict in the absence of his attorneys' alleged error. *Id.*

Because Fields cannot demonstrate prejudicial ineffectiveness based on the omission of social history evidence, he cannot show that the decision to present evidence of the defendant's childhood through a percipient sibling, rather than through a retained expert, was error. Moreover, the notion that counsel should have elicited this information through the mental health professionals is at odds with an abortive complaint that the complete data was not shared with those witnesses. Certainly, Dr. Grinage acknowledged receipt of investigator Shettles's extensive "Preliminary Assessment" of Fields's social history. (*See* Pet. Ex. 27 at 2 (citing Pet. Ex. 25).) While Dr. Woods was less specific that Grinage in describing the documents he reviewed, he certainly provides no indication that he lacked social history information necessary for his diagnosis. (*See* Pet. Ex. 28 at 1.) Assuming, arguendo, that the experts provided opinions

in the absence of necessary information, their flawed process should not be imputed to defense counsel. *See Card v. Dugger*, 911 F.2d at 1513-14.

In short, Fields has failed to show that trial counsel acted ineffectively in their handling and presentation of evidence of his upbringing and social history.

## V. COUNSEL PROPERLY OMITTED FUTILE OBJECTIONS TO APPROPRIATE PROSECUTION ARGUMENTS

Fields claims his trial counsel provided ineffective assistance when they failed to object to several instances of alleged prosecutorial misconduct. He contends his attorneys should have objected to arguments denigrating prison as insufficient punishment, vouching for Dr. Price, attacking the defendant personally, misrepresenting the record, speculating about facts, and reciting scripture. Additionally, Fields complains that in instances in which trial counsel objected to supposed misconduct, appellate counsel ineffectively failed to raise the issue on appeal. (Pet. 95-112; Mem. 71-90.) To the extent Fields now attempts to raise claims of prosecutorial misconduct, those contentions are procedurally barred. Because, in any event, Fields fails to identify any instance of prejudicial misconduct, he cannot show that his attorneys unreasonably omitted any meritorious objections or appellate claims.

## A. Fields Defaulted any Claim of Prosecutorial Misconduct

Under the guise of a supposed Sixth Amendment claim of ineffective assistance of counsel, Fields attempts to smuggle a multi-part complaint that alleged prosecutorial misconduct undermined his Fifth and Eighth Amendment rights to a fair trial and against cruel and unusual punishment. Indeed, in his Memorandum of Law, Fields relies almost entirely on the Fifth and Eighth amendment jurisprudence. (Mem. 71-75.)

Because any claim of prosecutorial misconduct at trial relies on facts wholly within the ambit of the record, Fields was required to raise the issue on direct appeal, and his failure to do so resulted in a procedural default of those arguments. *See United States v. Frady*, 456 U.S. at 167-68. To the extent Fields attempts to explain his default by claiming appellate counsel were ineffective for failing to raise these issues, the attorneys had no obligation to raise the meritless claims identified here. (*See, infra*, Arg. V, B.) Because these claims would have been futile if raised on appeal, Fields cannot establish constitutionally-cognizable ineffectiveness or, by extension, cause and prejudice to excuse the default. *See United States v. Allen*, 16 F.3d at 378; *cf. United States v. Horey*, 333 F.3d 1185, 1187-88 (10th Cir. 2003). Apart from the fact that he has not shown cause and prejudice, Fields makes no attempt to demonstrate actual innocence to excuse his default. Accordingly, Fields cannot obtain collateral relief based on the alleged prosecutorial misconduct at trial.

B.  Ineffective Assistance of Counsel

While it remains true that Fields defaulted any claim of misconduct, he can properly address a claim of ineffective assistance to this Court's § 2255 jurisdiction. However, he cannot succeed in demonstrating his trial attorneys unreasonably omitted objections if his underlying claims of misconduct have no merit, because defense counsel had no obligation to raise futile objections arguments on his behalf. *Hawkins v. Hannigan*, 185 F.3d at 1152. As to appellate counsel, the omission of a merely "viable" appellate issue does not amount to ineffective assistance of counsel. *United States v. Challoner*, 583 F.3d 745, 749 (10th Cir. 2009). "[The] process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate

advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986). Only the omission of a "dead-bang winner" by counsel is deficient performance that prejudices the defendant. *Challoner*, at 749 (citing *United States v. Cook*, 45 F.3d 388, 395 (10th Cir. 1995)). A "dead-bang winner" is "an issue which was obvious from the trial record and one which would have resulted in a reversal on appeal." *Id.*

To establish misconduct, Fields is required to have shown that the alleged malfeasance violated due process. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). In other words, he must show, in view of the entire proceeding, that the prosecutor's remarks so infected the trial with unfairness as to make the resulting judgment a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *see United States v. Sherrill*, 388 F.3d 535, 538 (6th Cir. 2004) (emphasizing the need to view controverted remarks in context). To establish that a prosecutor's remarks merit relief, a defendant must show either persistent and pronounced misconduct or that the evidence was so insubstantial that absent the remarks, the jury would not have imposed the death penalty. *Short v. Sirmons*, 472 F.3d 1177, 1195 (10th Cir. 2006); *see United States v. Lowden*, 900 F.2d 213, 217 (10th Cir. 1990).

Because none of the prosecutorial remarks identified by Fields in any way impinged on his right to a fair trial, he cannot show that his attorneys ineffectively failed to challenge them.

1. Appellate Counsel Reasonably Omitted an Argument that the Prosecutor had Misstated the Law

Fields contends that the prosecutor misstated the law regarding the weighing of mitigating and aggravating factors, which should have prompted a claim on appeal. (Pet. 96-97; Mem. 76.) Specifically, Fields complains about the following passage from the prosecution's

rebuttal argument:

> Let's remember and honor the two people who are unable to be here. The aggravating factors have been proved beyond a reasonable doubt. The mitigating factors, even if accepted as proved, cannot outweigh the premeditated murder of Charlie. The mitigating factors – (Interrupted)
> Mr. Derryberry: Objection to that based on the law.
> The Court: Overruled.
> Mr. Sperling: The mitigating factors – and I submit all of this to you based on the evidence that has been admitted – do not begin to outweigh just one of the steps that Shirley took in a terrorized flight from the Defendant.

(Tr. 14: 3463-64.)

While misconduct may be assigned from misstatements of law, a defendant's right to a fair trial is not violated if the jury is properly instructed. *Williams v. Groose*, 77 F.3d 259, 262 (8th Cir. 1996); *see also United States v. Hanley*, 974 F.2d 14, 19 (4th Cir. 1992) (finding no plain error in misstatement of law regarding unanimity where jury was properly instructed and returned a unanimous verdict). Indeed, instructions carry substantially more weight than the argument of counsel, when the two are in opposition to each other. *Middleton v. McNeil*, 541 U.S. 433, 438 (2004); *Boyde v. California*, 494 U.S. 370, 384-85 (1990). And even defense counsel's argument may minimize the prejudice from inappropriate prosecution argument. *See Le v. Mullin*, 311 F.3d 1002, 1017-19 (10th Cir. 2002).

In this case, the Court repeatedly instructed the jury on the appropriate standard for weighing of aggravating and mitigating factors. (Tr. 14: 3384, 3394-95, 3402-04; *see also Fields*, 516 F.3d at 950 (noting the jury instruction reflected the applicable statutorily-defined standard).) Defense counsel further explained the process as follows:

> The way mitigating factors work in the weighing process, in the decision-making process, is that as individuals you look and decide which ones you feel have been proved by a preponderance of the evidence. That's not beyond

70

> a reasonable doubt.  By a preponderance of the evidence. . . . You take what
> you've decided has been proved and you weigh it.  And never, ever, ever do you
> have to impose a sentence of death. The sentence of death is not foreordained.
> That's what those instructions told you.

(Tr. 14: 3443.)  The prosecution did not contradict the instructions or the defense.  Rather, the

prosecutor fully endorsed the application of the court-defined standard by arguing, "This

Defendant's capital crimes are way over the capital limits as defined by law that the Court has

given you."  (Tr. 14: 3447.)  On a similar note, the prosecutor asserted, "even if you give all of

[the mitigators] to the defense, as we emotionally were just urged.  What the Defendant chose to

do is way over the balancing line under the Court's instructions."  (Tr. 14: 3448; *see also* Tr. 14:

3463 ("I respectfully submit that you will find consistent with the Court's instructions that the

law allows [imposition of the death penalty]."), 3467 ("Under the Court's instructions and the law

given by the Court, the Defendant should be, as it were, weighed in the balance and found

wanting.").)

The statement to which Fields now objects did not purport to state the law.  Rather, it set

forth the prosecution's unobjectionable position that the defense case was weaker than its own.

To the extent the remark make use of the verb "weigh, " thereby permitting an attenuated

inference that a death sentence was appropriate if the mitigators did not outweigh the

aggravators, that impression was amply corrected by the jury charge and the arguments of

counsel for both parties.  *Cf. United States v. Visinaiz*, 428 F.3d 1300, 1312 (10th Cir. 2005)

(upholding government argument about which the court expressed doubt that the prosecutor had

"been 'stating the law' at all").  Moreover, counsel for both parties urged the jury to adhere to the

instructions.  Fields has therefore fallen far short of identifying some persistent or pronounced

error that improperly led the jury to impose death.  *See Short v. Sirmons*, 472 F.3d at 1195;

*United States v. Lowden*, 900 F.2d at 217.

By extension, Fields has failed to show that his appellate attorneys unreasonably omitted

a claim regarding his strained interpretation of the prosecutor's fleeting comment.  *See United

States v. Ivy*, 83 F.3d 1266, 1288 (10th Cir. 1996) (noting that courts do not ordinarily reverse for

"singular and isolated" misconduct)).  Certainly, he has not shown that such a claim would have

been a "dead bang winner," wholly undermining his effort to demonstrate ineffective assistance

of appellate counsel.

2.  Counsel Reasonably Omitted Challenges to Comments about the Defendant's Crimes, and the Propriety of Mercy or Other Mitigation

Fields claims that his attorneys failed to challenge an argument in which the prosecutor

improperly contrasted the living defendant with his dead victims.   (Pet. 97-98; Mem. 76-77.)  As

the legal premise for his position (*see* Mem. 77), Fields relies on a Tenth Circuit opinion that

articulated a concern that a jury might disregard mitigating factors if the prosecutor over-

emphasized the permanency of a victim's death in comparison to the defendant's continued life.

*See Le v. Mullin*, 311 F.3d at 1016; *see United States v. Johnson*, 495 F.3d at 979-80.  Fields,

however, has not identified any prosecution argument that emphasized such an inappropriate

concern.  Rather, he unsuccessfully attempts to apply the rule in *Le* to three remarks that

emphasized the defendant's lack of mercy.

In concluding the opening argument, the prosecutor reasoned that mercy was

inappropriate for a defendant who had committed two cold-blooded murders:

> [I]n closing, just remember the victims in this case, Charles and Shirley and their
> family and what they went through.  The defense is going to talk to you and

they're going to ask you to show mercy for this Defendant. What I want you to do is think back on July 10th of 2003. How much mercy was shown then? The Defendant wants you to look at this Defendant and what he's done for the last two and a half years and say, oh, there's a life that can be had. This case is about what happened on July 10th of 2003, not what happened since then.

(Tr. 14: 3430.) During rebuttal, the prosecution reiterated the theme that a merciful sentence was inappropriate for such a cold-blooded crime:

All with a civilized core must recoil with revulsion of what the Defendant did to act as the executioner of the innocent. Don't give this Defendant what he wants. In the name of justice, give him what he deserves. [¶] The Defendant wants to choose a sentence. He wants to live. Now, how unjust is that? Just what choice did he give Charles Chick? Just what choice did he give Shirley Chick?

(Tr. 14: 3457.) The prosecution highlighted this theme a third time when it encouraged the jury not to give mitigating weight to the defendant's family ties:

Sympathy. It's hard not to feel sympathy for the Defendant's family members. He abandoned them though. . . . Only resurrecting contact with them conveniently now that he's in jail. . . . What ultimately did his former wife say about him? Do you remember that one word? Selfish. Selfish. Narcissistic.. . . Remember this, here in court the Defendant continues to victimize his own family by reducing them to props in an effort to escape justice. Remember also that Charlie didn't get an opportunity to plead for his life. We can only imagine what Shirley must have said in the waning moments of her life. . . . Whatever he does for other people is far outweighed by what he has done. He has paid for membership in the club of the most hardened, the worst group of criminals. Remorseless, wanton, senseless, without any empathy or feeling, no emotion for a wonderful man and woman whose lives he extinguished that with six semi-automatic gun shots.

(Tr. 14: 3458-59.)

None of these arguments improperly compared the defendant's continued existence with his victims' perpetual state of death. Instead, they properly advanced the position that the defendant did not deserve mercy or a sentence less than death in view of his actions. An argument that a penalty phase jury should consider the mercy extended by the defendant to his

victims is not misconduct when based on evidence properly before the jury. *Fields v. Brown*, 431 F.3d 1186, 1206 (9th Cir. 2005). This jury was specifically instructed that it could consider mercy in weighing the appropriate penalty. (Trl. Doc. 227 at 6.) The jury was also instructed that it could consider Fields's lack of remorse (*id*. at 23), the mental anguish he inflicted on Shirley Chick (*id*.), his value as a friend (*id*. at 26), his value as a family member (*id*. at 25-26), and the impact his death would have on relatives and friends (*id*. at 26). Because all of these subjects were properly before the jury, they were fairly the subject of argument by the prosecution. *Fields*, 431 F.3d at 1206; *see United States v. Lopez-Medina*, 596 F.3d at 740.

Even if Fields could successfully demonstrate that the prosecution had commented on some forbidden subject, he has not show that the statements had any impact on the outcome of this trial. Specifically, he has not established in view of the Court's instructions, that the prosecution's sporadic comments infected the trial with unfairness. *See Le v. Mullin*, 311 F.3d at 1016 ("[A] review of the record indicated that the jury was appropriately informed by the jury instructions and by closing arguments that it had to consider mitigating evidence before deciding to impose a death sentence").

Accordingly, Fields cannot show that trial counsel unreasonably omitted an objection to the arguments identified here or that appellate counsel erroneously omitted to raise any "dead-bang winner" on appeal.

### 3. Counsel Reasonably Omitted Challenges to an Argument that Prison Was Insufficient Punishment

Fields claims that the prosecutors improperly remarked on inappropriate societal concerns and argued that a prison sentence was insubstantial punishment for his crime. (Pet. 98; Mem. 77-

78.) The prosecutors, however, committed no impropriety.

At the conclusion of the opening argument, the prosecutor urged the jury to mete out justice, noting that it alone would bear the responsibility for the defendant's sentence:

> Ladies and gentlemen, when you look around this courtroom you see a lot of people. They haven't here to see me or Mr. Sperling or defense counselor not even the judge. They've come here to see justice. They've come here to see what you are going to do today. Because today you are justice. You decide what is right. You decide what is wrong. You can't ever walk out of here again and say, boy, I can't believe they gave such a light sentence or I can't believe they gave such a heavy sentence. I can't believe they gave probation to a child molester. You know longer have that luxury. We ask you to do what's right, ladies and gentlemen.

(Tr. 14: 3431.) This argument was entirely appropriate. Indeed, the converse of the prosecutor's argument – diluting or diminishing the jury's responsibility for the verdict – constitutes error. *Caldwell v. Mississippi*, 472 U.S. 320, 323 (1985); *Coleman v. Brown*, 802 F.2d 1227, 1240-41 (10th Cir. 1986). To create the appearance of error, Fields seizes on a single sentence – the reference to a hypothetically-sentenced child molester. (*See* Mem. 77.) Fields improperly quotes this language in isolation. *Cf. United States v. Sherrill*, 388 F.3d at 538. Properly read in context, Fields cannot show that the jury misunderstand the remark as a reference to him or a diminution of his potential life sentence, rather than as an analogy to its own responsibilities.

In a related vein, Fields fails to show that the prosecutor erred in commenting on the inappropriate leniency of a prison sentence. During rebuttal, the prosecutor argued that this crime merited greater punishment than lifetime incarceration:

> Well, can justice be served by life in prison? The Defendant wants to be sent to his room as punishment. If he's allowed to live, he will have their percs, like workouts and visitors and phone calls and mail and tv and recreation. Don't let this Defendant be a hero to his incarcerated criminal inmates. All with a civilized core must recoil with revulsion of what the Defendant did to act as the

executioner of the innocent. Don't give this Defendant what he wants. In the name of justice, give him what he deserves.

(Tr. 14: 3457.) Prosecutors do not commit misconduct in arguing that incarceration is an inadequate, and arguably indulgent, form of punishment for the crime charged in a capital case. *See United States v. Higgs,* 353 F.3d 281, 332 (4th Cir. 2003) (summarily rejecting a claim that the government improperly argued that imprisonment would be "soft" in view of the privileges available to the defendant as an inmate). As in *Higgs*, in which the defense had argued that the defendant would face high security imprisonment, the prosecutor's argument in this case was an especially apt rebuttal to the defense contention that Fields was already the subject of close confinement.[10] *See id*.; *see also* Tr. 14: 3442.

Fields has not shown that trial counsel unreasonably omitted an objection to the arguments or that appellate counsel erroneously failed to raise a winning issue on appeal.

4. Counsel Reasonably Omitted Challenges to Comments on the Credibility of Expert Witnesses

Fields complains that the prosecution improperly vouched for its mental health experts and denigrated the defense's witnesses. (Pet. 99-100; Mem. 79-80.) Once again, Fields identifies isolated words and phrases in an effort to create the appearance of prosecutorial error. Properly viewed in its totality, the prosecutor's arguments were unobjectionable, supporting and attacking credibility on the basis of the evidence rather than personal opinion.

The hallmarks of improper vouching involve credibility arguments based on personal

---

[10]Fields also asserts in passing that this argument was not supported by evidence because the record did not include any testimony about conditions on federal death row. (Pet. 98 n.27.) Had Fields received a life sentence, he would not have been incarcerated on death row. The prosecutor's comments were a fair inference from Daniel Presley's testimony about prison life (Tr. 9: 2408-09). *See United States v. Ivy*, 83 F.3d at 1288.

76

belief, the prestige of the government or information outside the record. *See United States v. Franklin-El*, 555 F.3d 1115, 1124-25 (10th Cir. 2009); *United States v. Jackson*, 84 F.3d 1154, 1158 (9th Cir. 1996). But no vouching occurs when a prosecutor argues, based on an inference from the record, that a witness lacked a motive to lie. *See Thornburg v. Mullin*, 422 F.3d 1113, 1132 (10th Cir. 2005); *United States v. Walker*, 155 F.3d 180, 188 (3d Cir. 1998); *see also United States v. Jones*, 468 F.3d 704, 707 (10th Cir. 2006) (holding that no vouching occurs when government elicits evidence of witnesses' plea agreements that include truthfulness provisions). Even comments like "I believe the evidence or testimony shows . . ." do not amount to misconduct or vouching because they are facially based on the record. *Caldwell v. Russell*, 181 F.3d 731, 737-38 (6th Cir. 1999), *superseded by statute on other grounds*, *State v. Hancock*, 840 N.E.2d 1032, 1043 (Ohio 2006) . Thus, the use of the phrase "we know," while generally inappropriate, does not constitute vouching when used as part of a summary of evidence. *United States v. Younger*, 398 F.3d 1179, 1191 (9th Cir. 2005).

Prosecutors "may strike hard blows, [but] he is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935); *see also Ballard v. United States*, 152 F.2d 941, 943 (9th Cir. 1945) (noting that prosecutors are not limited to Chesterfieldian politeness), *reversed on other grounds*, 329 U.S. 187 (1946). They may fairly rely on the record to attack the credibility of defense witnesses. *United States v. Henry*, 545 F.3d 367, 382 (6th Cir. 1008); *see United States v. Franklin-El*, 555 F.3d at 1125-26. Accordingly, a prosecutor commits no misconduct when arguing that "[t]he defendants had to go all the way to Missouri to find some blow hard expert who talked a lot but said very little of significance in this case." *Franklin-El*, 555 F.3d at 1127. Such a comment does not constitute prosecutorial misconduct because it serves to "remind

the jury of its duty to scrutinize and weigh all witness testimony, including that of experts." *Id.*

In this case, the prosecutor properly argued that the jury should base its determination of expert credibility on facts in the record:

> Our doctors came in, ladies and gentlemen, and told you a number of different things also and I'll just run through those quickly because obviously they had a different opinion. They thought most of the Defendant's problems were based upon his depression. Kind of look at – who do I believe? Which is the one for me? Who am I going to believe out of this? What does Dr. Price tell you? He tells you he's done hundreds of these things. And over half the time, 60 percent of the time, he testifies for the defendant. He told you he fully expected to find some type of mental illness here but didn't. He has a lot of credibility. He's not somebody who every time comes in and testifies for the defendant. We didn't have to go out to the left coast to find somebody who testified for the defense every time. We got people in our own back yard who were credible, who would give an honest opinion who were not hired guns. Dr. Mitchell – and he may be the best one of all, one because he's never been a witness before in a criminal case. He's in charge of a well-recognized psychiatric care center. He comes in and he says I've never testified before. I'm just doing the best I can. But I did this evaluation and, yeah, I did give some credence to the voices. I thought the voices may be part of his problem. Whether or not he actually heard them I can't tell you, but they may be part of it. He even tells you with that knowing with the voices, he had the ability to conform his conduct to the requirements of law. These were volitional choices on this Defendant's part. Dr. Mitchell who has no axe to grind here, ladies and gentlemen.

(Tr. 14: 3429-30.) The prosecution returned to the subject of Fields's mental health and the experts who testified about it, noting all were retained:

> The facts here clearly compel the conclusion the Defendant was entirely responsible and not impaired by his volitionally, his purposefully, acquired sadness. He was just emotionally variable. . . . High dollar shrinks were hired by the defense and we paid ours as well. I respectfully submit, thought [*sic*], that Randy Price and Jeff Mitchell were straight shooters. Not hired guns. The defense got to substantially determine the parameters, we were told, of Dr. Price's exam. They both came into this case with an open mind, open to the prospect that the defense might be right. They found them wrong. . . . The defense experts, one from far away, with a 60 to zero record, he has never testified for the Government. Every single time he testifies, sixty to zip, is for Defendant. There's no evidence of mania here. The spending spree was a rational criminal effort to impress

Michelle.

(Tr. 14: 3452.)

While the prosecution struck "hard blows" in arguing about the credibility of the various expert witnesses in this case, it struck fair ones. All of its comments were based on evidence in the record, rather than the unvarnished opinion of the attorneys or their attempt to rely on the prestige of the government. The prosecutor premised supported Price's credibility with evidence: his experience as a forensic mental health expert (Tr. 12: 3097), his mixed record of retention by the defense and prosecution bars (*id*.), his expectation that he would diagnose some brain dysfunction (Tr. 12: 3154), and the fact that he was easily found in the surrounding region (Tr. 12: 3094). The prosecutor also advocated for Mitchell's credibility on the basis of evidence: his local availability (Tr. 13: 3248-49), his experience as the head of mental health center (Tr. 13: 3249-50), his lack of reliance on paid testimony (Tr. 13: 3352), and his openness to the possibility that Fields experienced auditory hallucinations (Tr. 13: 3283-84.). In contrast, defense expert George Woods, was located over 1,000 miles away (Tr. 12: 3000) and had a record of consistent testimony for the defense bar (Tr. 12: 3001-02). These facts permitted a fair inference that Woods had an "axe to grind" and that the defense had to go far afield to find him.

To the extent that the prosecutors may have occasionally used the word "we," they did so as part of a recitation of evidence and thereby did not place a personal or governmental imprimatur upon their credibility arguments. Likewise, the prosecution properly used mildly disparaging reference to – "high dollar shrinks" – was used in reference to witnesses for both parties: "we paid ours as well" (*see* Tr. 14: 3452). *See United States v. Fields*, 483 F.3d 313, 360 (5th Cir. 2007) (permitting "colorful pejoratives" supported by the record); *see also Franklin-El*,

555 F.3d at 1125-26 (upholding use of "indelicate" term "whoppers" to describe aspects of defendant's testimony). As such, it was not used to unfairly characterize the defense witnesses.

Accordingly, Fields has not shown that trial counsel unreasonably omitted any valid objection or appellate claim.

5. Counsel Reasonably Omitted Challenges to Appropriate Inferences from the Record

Fields complains that the prosecution improperly denigrated him and misstated facts in the record. (Pet. 100-08; Mem. 78-82.) Here again, Fields seizes on isolated remarks in an effort to create the appearance of error. Properly viewed in its totality, the prosecutor's arguments were unobjectionable because they were properly premised on inferences from the record.

A prosecutor's summation must rely on facts adduced in the record. *See United States v. Ivy*, 83 F.3d at 1288; *United States v. Sullivan*, 919 F.2d 1403, 1425-26 (10th Cir. 1991). Prosecutors may, however, argue that the jury should draw reasonable inferences from the evidence in support the government's theory of the case. *United States v. Dazey*, 403 F.3d 1147, 1170 (10th Cir. 2005). Furthermore, as previously noted, prosecutors may make use of "colorful pejoratives" when supported by the record. *United States v. Fields*, 483 F.3d at 360 (citing inter alia *United States v. Shoff*, 151 F.3d 889, 893 (8th Cir. 1998); *United States v. Malatesta*, 583 F.2d 748, 759 (5th Cir. 1978)).

a. The Prosecution Fairly Characterized the Mental Health Evidence

Fields complains that the prosecutors referred to his many negative character traits, arguing that he was manipulative, parasitic, narcissistic, sociopathic, and unalterably and fundamentally different from most human beings. On a related note, he contends that the

80

prosecution baselessly argued that he was a sociopath. (Pet. 101-03; Mem. 78-79.) In truth, the

government based its arguments on evidence, highlighting Fields's many negative personality

traits in an effort to blunt the case in mitigation.

The testimony of Dr. Price provided the foundation for the arguments that Fields had the

traits of a sociopath. Price specifically diagnosed Fields as suffering from a personality disorder,

not otherwise specified, with antisocial and psychopathic narcissistic and dependent traits and

features. (Tr. 12: 3148.) When asked to expound upon traits at issue, Dr. Price provided a

lengthy explanation that wholly undergirded the prosecutor's comments during argument:

> [T]his constellation of traits is a person that can be very charming, people like
> them especially at first. They get bored easily. They like excitement. They lie a
> lot. . . . They are manipulative. They get things out of people for themselves,
> sometimes to the extent that they con people. They don't feel bad about these
> things. They don't feel guilty. If they do something bad to somebody else, they
> don't feel any significant remorse. . . . There's a lack of empathy for others, other
> living things. They don't have a wide range of feelings. . . .They have often a
> parasitic lifestyle. . . . they manage to get other people to take care of them,
> financially, et cetera. Often probably because of this excitement orientation, they
> have a lot of partners in their life. A lot of partners that are like there's some level
> of commitment. They live together. They're promising things and a lot of casual
> promiscuous sexual activity.

(Tr. 12: 3148-49.) To the extent that the prosecutor characterized these traits as immutable, Dr.

Price testified that there existed no "effective treatment" for such a disorder – explaining that the

traits were only controlled to the extent that such people were denied the ability to manipulate

others. (Tr. 12: 3150-51.)

Specific evidence of Fields's conduct supported the expert's conclusion that the

defendant was remorseless, manipulative, narcissistic and parasitic. For instance, Fields's former

girlfriend, Carol Lamb, described him as withdrawn and cold. (Tr. 9: 2362.) Immediately after

the murders, Fields did not evince any palpable remorse, but instead went on a spending spree with another girlfriend, whom he asked to marry him. (Tr. 10: 2544, 2554, 2556-59, 2562-74.) When subsequently describing the murders, Fields was "cool as cool could be as we went through this whole thing, and he was pretty much emotionless. He didn't express – there was no tears." (Tr. 9: 2277.) Fields's sister described the defendant's lack of work ethic (Tr. 10: 2705-07) and an incident in which he manipulated their father into paying an auto loan he had taken (Tr. 10: 2709). Likewise, she described Fields's habit of contacting her as transparent overtures to requests for money. (Tr. 10: 2711-12.) She also said she counseled him that he did not take his role as a spouse and parent seriously enough. (Tr. 10: 2710-11.) In fact, Fields's former wife noted that he was moody (Tr. 11: 2743), did not hold jobs (Tr. 11: 2729-32, 2739-41), was verbally abusive (Tr. 11: 2751), once pushed her on the bed and choked her (Tr. 11: 2752-53), did not do his fair share of domestic chores (Tr. 11: 2743 ("I just wanted a partner. And I just got miserable.")), and did not pay child support (Tr. 11: 2756). Thus, an overwhelming body of evidence fairly supported the prosecutor's description of Fields, however unpleasant it may have been.

Fields likewise fails to demonstrate any misconduct when he observes that the prosecutor argued, "One of the things that Marilyn Presley told you was after the Defendant's doctors had tested and long before the Government's doctors tested, he calls her and says, hey, they say I have the characteristics of a sociopath. . . . His own doctors are saying, yeah, he has a traits [sic] of a sociopath." (Tr. 14: 3428.) The prosecutor's argument was a fair inference from the record. Marilyn Presley testified that Fields told her sometime after Christmas 2004 that some unidentified "they" had said "he had some sociopathic tendencies," a fact that concerned him

82

enough that he asked the witness to research the condition. (Tr. 12: 3086, 3088.) Additionally, the evidence showed that Fields was under psychiatric care at the end of 2004 (*see* Tr. 12: 2991) and was evaluated by a defense expert in late 2004, but not by a prosecution expert until June 2005. (Tr. 12: 2945-46; 21: 3177, 3274.) In fact, defense expert Grinage was questioned at length about antisocial personality disorder, and agreed that Fields met many of the diagnostic criteria, but asserted the diagnosis was still inappropriate in this case. (Tr. 11: 2865-66.) On this record, the prosecutor could rationally conclude that one of Fields's treating psychiatrists or retained witnesses had noted his sociopathic tendencies, as no other known mental health expert was in a position to do so.

At one point, the prosecutor asserted that Fields was a "sociopath." (Tr. 14: 3449.) The assertion was a fair prosecutorial inference from the ample evidence of Fields's sociopathic traits, as discussed above. In no way did the prosecutor suggest, as Fields now claims, that the diagnosis emanated from the defense experts. (*Compare* Pet. 103; *with* Tr. 14: 3449.) Furthermore, the jury was well aware that sociopathy was not a diagnosable condition, though it was a widely-used term of art among mental health professionals. (Tr. 13: 3215-17.) Fields has failed to show that the prosecutor misused the term in any way.

Because the evidence amply demonstrated that Fields was sociopathic, the prosecutor's comments were not, as Fields asserts, ad hominem attacks on his character. They were rejoinders to the defense experts' mental health diagnoses. But just as significantly, they were meant to diminish the weight the jury might accord to several supposed mitigators, including the allegations that Fields was remorseful (Trl. Doc. 227 at 41), that he was a loved parent and relative (*id.* at 39), and that he was genuinely upset by his father's death and the departure of his

relatives in the weeks prior to the crime (*id*. at 40). Fields made his character and emotional life an issue in this case and cannot complain that the prosecution pointed out ample reasons why it was not deserving of mitigating weight. *See United States v. Lopez-Medina*, 596 F.3d at 740.

Similarly, Fields alleged that he was a valued friend (Doc. 227 at 39) and someone whose death would impact his friends (*id*. at 40). The weight accorded those allegations was informed by the quality of those friends and friendships. As such, the prosecutor did not act inappropriately when pointing out that one of Fields's friends, Terry Hanna, was a convicted child molester (Tr. 14: 3465), a fact wholly within the ambit of the record. (Tr. 12: 2925-26.) In addition to its relevance to the weighing of the friendship mitigator, Hanna's criminal history was probative of his credibility as a witness. *See generally* Fed. R. Evid. 609.

Once more, Fields has not shown that his attorneys unreasonably omitted any argument, at trial or on appeal, concerning supposed misconduct.

b. The Prosecution Fairly Characterized the Evidence of Planning and Premeditation

Fields claims that the prosecution improperly characterized the record in arguing about evidence that he substantially planned and premeditated the murders. (Pet. 100-01, 104-07; Mem. 81.) Fields is wrong. The government based its arguments on evidence in the record and highlighted Fields's many negative personality traits in an effort to blunt the case in mitigation.

Fields initially argues that a prosecutor wrongly asserted that "[o]n cross examination, the doctors were asked about the Ghilley suit. Well, I didn't know he had the Ghilley suit and had snuck up on people beforehand. I didn't know that at all. That came as news to them." (Tr. 14: 3427.) Consistent with the prosecutor's summation, Dr. Woods indicated that he had only

sketchy knowledge of these significant events:

> Q (By Mr. Sperling) Dr. Woods, were you aware that the Defendant reported to a number of people that he had put on his Ghilley suit and sneaked up to a couple on Talimena Drive and watched them in an intimate moment?

> A No. I was aware that he had said to one person, perhaps two, that he had put on his Ghilley suit and observed someone, but not -- that's all I recall.

> . . .

> Q All right. If the Defendant were to have confided that factor, that he had put on his Ghilley suit, that he had sneaked up close to a vehicle in which two people were having sex, and had confided that information in four close friends, would you find that significant?

> A Yes.

> . . .

> Q If he had told another friend, some eight months, before, around the turn of the year, 2002 to 2003, that he had [contemporaneously] put on his Ghilley suit and sneaked up on some other people . . . would you find that matter to be of significance?

> A It could be, yes.

(Tr. 12: 3024-25.) In view of this colloquy, the prosecutor accurately described Woods's ignorance of the incidents in which Fields had stalked people other than the Chicks, especially given the expert's implied concession that he did not take these facts into account in his findings.

The prosecutor's argument was, however, ambiguous as to the number of experts who expressed ignorance of the surveillance incidents – twice referring to a singular witness ("I didn't . . . I didn't.) and twice referring to plural witnesses ("the doctors . . . . them"). While the plural references allowed an inference that Dr. Grinage had also admitted ignorance of Fields's stalking behavior, such brief and isolated misstatements should not form the basis of relief. *See Ivy*, 83

F.3d at 1288. The prosecutor's minor, isolated and ambiguous references to the two experts should be analyzed in the context of the jury's extensive instructions on its independent duty to weigh testimony and to reject the statements of counsel as evidence. (*See* Trl. Doc. 227 at 7-8, 12-14.) A finding of prejudicial misconduct would be particularly inappropriate here because the significance of the ghillie suit sneaking incidents went largely to the experts' knowledge of premeditation. Grinage, however, conceded he was unaware of the defendant's judicial admission of premeditation. (Tr. 11: 2818, 2824-25.) Grinage was also unaware that Fields had falsely told Michelle Tipton that he had plans to go fishing with Daniel Presley on the evening of the murder in an apparent attempt to preemptively allay her concerns about his absence that evening. (Tr. 11: 2859.) The record, thus, showed that Grinage was unfamiliar with rudimentary evidence of Fields's premeditation, even if that evidence did not concern his stalking activities. Viewed in light of the record as a whole, Fields cannot show that the prosecutor's two plural references infected the entire trial with unfairness. *See Le v. Mullin*, 311 F.3d at 1016.

Fields also fails in his complaints that the prosecutors improperly argued that he constructed a ghillie suit and hunted squirrels as part of a "prelude" to murder. In fact, the prosecutor quite reasonably inferred from the record that Fields's squirrel hunting skills assisted him in committing murder and that his ghillie suit was constructed with more than one purpose in mind. (*See* Tr. 14: 3406-09.) The defendant referred to his ghillie suit as a "sniper suit." (Tr. 9: 2331, 10: 2486.) He manifested his apparent preoccupation with killing people, rather than squirrels, in other statements: he bragged that he could shoot anyone at 100 yards (Tr. 9: 2329) and expressed interest in constructing a silencer (Tr. 10: 2488). Likewise, when asked why he applied ghillie camouflage to his rifle, Fields ominously stated, "You don't want to know," a

response that hardly suggested plans to hunt small rodents. (Tr. 9: 2338.) Fields persisted in

keeping the ghillie suit despite advice that it was unnecessary camouflage for squirrel hunting.

(Tr. 10: 2487.) And while he wore it to lull squirrels into approaching him for short range kills

(Tr. 12: 3121), he incongruously used a scope more appropriate to a high-powered rifle,

permitting him to take long-range shots (Tr. 9: 2379). In any event, Fields did not restrict his use

of the suit to squirrel hunting: he also used it to surreptitiously approach friends and strangers.

(*See* Tr. 9: 2346-48, 2376-77, 2379; 12: 3122.)

Thus, Fields cannot sustain his argument that the prosecutor unfairly suggested he had

constructed his ghillie suit with murder in mind. His reference to it as "sniper suit" indicates that

he contemplated its use in killing people. Similarly, the fact that he used it to surreptitiously

surveil strangers indicates that he saw it as far more nefarious than a squirrel hunting tool. His

desire for a silencer, his use of scope inappropriate to his short-range hunting technique, and his

boastful statement about shooting people at long range all indicate a contemplation of murder.

Accordingly, the prosecutor fairly inferred that Fields's hunting activities formed an obvious

personal backdrop to the murders.

The prosecutor also appropriately characterized the record when arguing that Fields did

not shoot the Chicks during a manic episode. Specifically, the prosecutor argued as follows:

> But he waits by a tree, crouched, motionless in this Ghilley suit. . . . Is this the sign of somebody who's going through a manic episode and lie and wait motionless for long periods of time? . . . He had mastered his craft. He had practiced with squirrels and now he was moving to humans.

(Tr. 14: 3414.) The prosecutor did not assert, as Fields suggests, that the defendant engaged in

squirrel hunting with a specific intent to improve his ability to murder people. Rather, he

asserted that Fields's well developed and practiced skills as a stalker were put to use on the day of the murder and undercut the evidence that he was acting under the influence of a drug-induced manic episode. But had the prosecutor taken such a tack, the evidence that demonstrated Fields's preoccupation with shooting people – a desire for a silencer, references to his "sniper suit," and boasts of human-shooting prowess – would have allowed a fair inference that squirrel hunting served a dual purpose of recreation and murder rehearsal.

The prosecutor also properly interpreted Daniel Presley's testimony regarding the murder weapon, when arguing, "Dan Presley told you there's no need to have a scope like this on this kind of a gun, a .22. He said this was a scope for a high powered rifle. A sniper's rifle." (Tr. 14: 3408.) In fact, Presley described the murder weapon as follows:

Q What did he hunt with?

A A .22 rifle.

Q Was the -- just a natural scope or amplified?

A Oh, it was amplified.

. . .

Q How I mean just roughly how would you, in lay terms, explain its power?

A Very powerful. It was something you would see on a high powered hunting rifle.

. . .

Q How far could he knock a squirrel off a branch?

A I want to say in the area of -- let's see. I'll say fifty to seventy yards. I know he can make long shots with it. But with that scope, anybody could.

(Tr. 9: 2379.)

The prosecutor did not, as Fields argues, state that Presley had called the defendant's rifle a "sniper's rifle." Rather, the prosecutor properly relied on Presley's testimony to assert that the scope Fields chose to mount on his rimfire rifle was more appropriate to a weapon useable by snipers. Given that Fields viewed his ghillie suit as sniper's camouflage, expressed an interest in silencing his rifle and bragged of his ability to shoot people at long range (*see* Tr. 9: 2329, 2331; 10: 2486-88), the prosecutor certainly made a fair inferential leap in suggesting that the defendant viewed his gun as a sniper's rifle. Indeed, Fields used the gun as a sniper's rifle to kill Charles Chick, undermining any effort to show that the prosecutor's characterization was improper.

The prosecutor also properly argued that Fields had "kind of laughed' at Daniel Love when the witness warned him to desist from stalking people in his ghillie suit. (Tr. 14: 3408.) Love had testified that he admonished Fields to dispose of the ghillie suit, which he believed was unnecessary for squirrel hunting and would lead to violent retaliation if the defendant were found using it to stalk people. (Tr. 10: 2487.) Love said that Fields appeared "aggravated a little bit" by this opinion and took the suit back to his truck, rather than destroying or disposing of it. (*Id.*) If Fields did not literally laugh at Love's concern, the effect was the same: when he placed the suit in his truck, he expressed an insouciant unwillingness to heed Love's sound advice that the dangers of the ghillie suit far outweighed its benefits.

The prosecutor also fairly inferred that Fields used his regular visits to the Winding Stair Campground to keep track of potential victims. (See Tr. 14: 3410.) The record, as previously noted, showed the Fields stalked people at the campground and ultimately murdered two of them. After the killings, he confessed that he was aware of the Chicks and intended to rob them.

(Gov't Trl. Ex. 131; Tr. 9: 2259-70).  He specifically admitted that he had observed the Chicks

two days before the murders.  (Gov't Trl. Ex. 131.)  Of course, he had also begun stalking people

in his ghillie suit, as a form of recreation, sometime beforehand.  (*See* Tr. 10: 2380-81, 2486-87.)

He had demonstrated his incipient homicidal intent well before the murders– inquiring about a

silencer, referring to his "sniper suit," and stating he could shoot people at a long distance.  (Tr.

9: 2329, 2331.)  Given Fields's obvious preoccupation with murder, the prosecutor could

properly infer that Fields used his access to the campground to consider other random victims.

As with his other claims of prosecutorial misconduct, Fields has not shown that his

attorneys unreasonably omitted any argument, at trial or on appeal.

### c.  The Prosecution Fairly Characterized the Evidence of Shirley Chick's Death

Fields claims that the prosecutor improperly argued that Shirley Chick did not die

silently, but rather begged for her life.  (Pet. 108; Mem. 83.)  Fields is wrong.

Charles Chick was across the table from Shirley, when he was hit by the initial shot; the

pair were known to have an exceptionally close relationship.  (Tr. 8: 1973, 2090-92, 2177.)  The

record indicates that Shirley Chick was spattered with her husband's blood when Fields shot him

in the head.  (Tr. 8: 2177.)  As Shirley ran from her mortally-wounded husband toward the van,

presumably in the hope of escaping, Fields shot her in the left foot.  (Tr. 8: 2178).  The physical

evidence suggested that Shirley Chick had assumed a defensive posture just before Fields, clad in

a ghillie suit, shot her in the head.  (Tr. 8: 2181.)  From this evidence, the prosecutor could

reasonably infer that Ms. Chick made noise before her death, and likely begged for her life: she

had seen a beloved spouse gunned down, she had been wounded while seeking safety, and was

then confronted by an armed and camouflaged intruder who aimed a gun at her head.  She had

ample reasons – physical pain, emotional trauma, and outright terror – to have begged for her life in the last moments Fields allowed her.   The prosecutor properly inferred as much from the evidence.[11]

Given the obvious propriety of the prosecutor's argument, Fields has not shown that his attorneys unreasonably omitted any argument, at trial or on appeal.

6. Counsel Reasonably Omitted Challenges to the Prosecution's Appropriate References to the Bible

Fields claims the prosecutor improperly paraphrased the Bible during argument.  (Pet. 108-10; Mem. 84-85.)  Fields overstates the content of the prosecutor's argument as well as the applicability of his major source of legal authority.  The case law does not prohibit the instant argument because the prosecutor made no attempt to justify a death sentence in terms of biblical authority or "higher law."  Rather, he merely made a secularized, if somewhat elongated, allusion to an oft-quoted idiom.

At the conclusion of the rebuttal argument, the prosecutor argued that Fields should be found –  under the court's instructions – to be weighed in the balance and found wanting.  As a preamble to that assertion, the prosecutor recounted, by way of analogy, a story from the Old Testament, but one devoid of specific reference to the Bible or religious law:

> Thousands of years ago the king of the world's greatest then existent civilization and most powerful empire held a great feast for thousands of his ruling friends.  They ate, they drank from golden and silver goblets that they had stolen from the temple of a subdued and now enslaved nation.  They drank wine and they worshiped pagan idols.  All of a sudden the fingers of a hand began to write on the palace wall.  The king saw the hand and was so frightened, he was so

---

[11]Because the prosecution properly premised these arguments on the record, Fields cannot sustain his suggestion that one such comment amounted to vouching.  *See Thornburg v. Mullin*, 422 F.3d at 1132; *cf.* Pet. 108.

scared, that his clothing literally came loose.  He became white.  He shook.  His knees banged together.  He cried out:  Bring the astrologers, bring the wise men of the nation.  Whoever interprets this saying on the wall will become the third most powerful member of my government.  He will have great riches.  The wise men came in.  They studied, they deliberated, they conversed, they conferred and they thought.  But they couldn't read much less interpret the writing on the wall.  The king's face turned ashen. The queen, though, remembered a forgotten man.  She called for him after talking to the king.  And the king made the man the same offer.  The man, though, he turned down all of the riches, all the honor and all of the prestige.  The man bravely interpreted the writing on the wall.  And the writing on the wall said in three words, your kingdom has come to an end, your kingdom will be divided and given to your neighboring enemies, and then the prophet said the writing said you have been weighed in the balance and found wanting.  Sure enough, that night the king was killed.  His kingdom was separated among his neighboring enemies.

> The Defendant weighed his options on July 10, 2003.  Under the Court's instructions and the law given by the Court, the Defendant should be, as it were, weighed in the balance and found wanting.

(Tr. 14: 3466-67.)

Despite the distinctly non-religious content of the prosecutor's remarks, Fields unsuccessfully attempts to analogize it to an argument that gave rise to relief in *Sandoval v. Calderon*.  (*See* Mem. 84-88 (citing *Sandoval v. Calderon*, 241 F.3d 765, 777 (9th Cir. 2001).)  In that wholly distinguishable case, the prosecutor urged jurors, among other things, that in imposing a death sentence they would be "doing what God says."  *Sandoval*, 241 F.3d at 775 n.1.  In granting relief in *Sandoval*, the Ninth Circuit declined to find religious references automatically reversible.  *Id.* at 776.  Instead, the court found that the prosecutor had violated Sandoval's Eighth Amendment right to sentencing under a rational scheme of specific factors by advocating the jury's reliance on "higher law or extra-judicial authority."  *Id.*  The ruling was premised on a summation the court described as "eloquent, powerful, and unmistakably Biblical in style," which jurors would easily understand "as referring to Scripture."  *Id.* at 778.

92

The Ninth Circuit highlighted two portions of the summation that it found especially

offensive to the Eighth Amendment:

> [Defense counsel] says don't play God.  Let every person be in subjection
> to the governing authorities for there is no authority except from God and those
> which are established by God. Therefore, he who resists authority has opposed the
> ordinance of God, and they who have opposed will receive condemnations upon
> themselves for rulers are not a cause of fear for good behavior, but for evil. Do
> you want to have no fear of authority?  Do what is good and you will have praise
> for the same for it is a minister of God to you for good. But if you do what is evil,
> be afraid for it does not bear the sword for nothing for it is a minister of God an
> avenger who brings wrath upon one who practices evil.  You are not playing God.
> You are doing what God says. This might be the only opportunity to wake him up.
> God will destroy the body to save the soul. Make him get himself right. . . . Don't
> be fooled by what's to come [in defense's rebuttal]. Let him have the opportunity
> to get his soul right. That's the only way to get his attention. You are not playing
> God.  God ordains authority.

*Sandoval*, 241 F.3d at 775, n.1.  The court characterized as the "core" of the erroneous

comments, the following remarks:

> Let every person be in subjection to the governing authorities for there is no
> authority except from God and those which are established by God.  Therefore, he
> who resists authority has opposed the ordinance of God, and they who have
> opposed will receive condemnations upon themselves for rulers are not a cause of
> fear for good behavior, but for evil.  Do you want to have no fear of authority?
> Do what is good and you will have praise for the same for it is a minister of God
> to you for good.  But if you do what is evil, be afraid for it does not bear the sword
> for nothing for it is a minister of God an avenger who brings wrath upon one who
> practices evil.

*Id.* at 778.

The summation at issue here bears no resemblance to the one that gave rise to relief in

*Sandoval*.  While eloquent, the argument was not delivered in a biblical style and made no

reference to God or any spiritually-ordained authority.  Most significantly, the prosecutor did not

argue that religious authority justified the death penalty, generally, or its imposition in this case,

specifically. Instead, the prosecutor made mention of a story that appears in the Bible as the

backdrop to his assertion that the defendant, like the unnamed king in the story, should be

"weighed in the balance and found wanting." The king was just one of several anonymous

characters who appeared in the story that featured an unidentified civilization. Thus, the

prosecutor denuded his narrative of details and religious overtones that would have identified its

origins. The story was merely used to drive home the point that the jury should impose a death

sentence under the law provided by the Court.

Because the prosecutor cleansed his argument of any religiosity, and used a familiar

aphorism[12] to drive home the point that the jury should apply its instructions, Fields has not

shown that his attorneys unreasonably omitted any argument, at trial or on appeal.

## VI. TRIAL COUNSEL PROPERLY REQUESTED A JURY CHARGE AND VERDICT FORM THAT PERMITTED A SINGLE WEIGHING OF AGGRAVATING AND MITIGATING FACTORS

Fields claims that his trial counsel acted ineffectively when they requested a single

penalty verdict for the two murders to which he had pleaded guilty. Fields asserts that no

reasonable strategy explains the decision and contends that it prejudiced him by permitting the

jury to double count the substantial planning and premeditation aggravators. He also complains

that the unitary verdict permitted the jury to improperly aggregate aggravating factors in its

weighing analysis. (Pet. 112-119; Mem. 90-99.) Fields is wrong. His attorneys validly sought

and received a unitary verdict that supported their strategy – explaining the murders as the

product of a single behavioral and pharmacological anomaly. Not only was the employment of a

---

[12]This turn of phrase even appears occasionally in published opinions without connoting any particular religious overtone. *E.g.*, *Blinder, Robinson & Co., Inc. v. S.E.C.*, 837 F.2d 1099, 1112 (D.C. Cir. 1988); *Bryant v. Bryant*, 545 S.W.2d 938, 940 (Ky. 1977).

unitary verdict consistent with the defense's theory of the case, it avoided the likelihood that the outcome of the case might be influenced by multiple penalty verdicts, which would have required repeated jury consideration of the aggravated facts of these crimes.

As previously noted, Fields bears the burden of demonstrating that counsel's decision to seek a instructions on a unitary verdict was constitutionally unreasonable in light of prevailing professional norms. *See Knowles v. Mirzayance*, 129 S. Ct. at 1420. An adequately-informed strategic choice of legally-permissible instructions is virtually unchallengeable. *See United States v. Nguyen*, 413 F.3d at 1181-82; *cf. Capps v. Sullivan*, 921 F.2d 260, 262 (10th Cir. 1990) (finding ineffective assistance where counsel refused to submit legally supportable instructions and instead argued for jury nullification). A request for specific instructions is unreasonable only if they contain an affirmative misstatement of established law or reflect an abdication of counsel's role as an advocate. *See Lankford v. Arave*, 468 F.3d 578, 584-85 (9th Cir. 2006) (misstatement of law); *Patterson v. Dahm*, 769 F.Supp. 1103, 1111 (D. Neb. 1991) (abdication of role as advocate).

A request for a unitary verdict is not only permissible but, in appropriate circumstances, a sound strategic choice. *See People v. Crittenden*, 885 P.2d 887, 932-33 (Cal. 1994) (observing that no authority compels separate penalty verdicts in capital sentencing). Indeed, a unitary verdict provides two substantial benefits to defendants exposed to multiple death verdicts: it allows the jury to give individualized consideration to a defendant without over-emphasizing the individual characteristics of the victims or underscoring their number (*Crittenden*, 885 P.2d at 932-33) and it avoids the danger of compromise verdicts in which a jury imposes a death sentence for one murder and a life sentence for others (*cf. People v. Sandoval*, 841 P.2d 862,

885-86 (Cal.1992) (rejecting an argument that multiple verdicts prejudiced the defendant)). Indeed, at least one other court in this circuit has relied upon a unitary penalty verdict in a multi-victim case. *See* Special Findings Form A, *United States v. McVeigh*, No. 96-CR-68-M, 1997 WL 330507 (D. Colo. 1997).

Fields premises an alleged right to separate penalty verdicts on a distinguishable case that recognized a right to separate convictions for separate charges. (Mem. at 92 (citing *Wicks v. Lockhart*, 569 F. Supp. 549 (E.D. Ark. 1983).) Fields also erroneously relies on Congress's repeated use of singular nouns in the Federal Death Penalty Act. (Mem. 93 (quoting 18 U.S.C. § 3591, *et seq*.) Fields's statutory construction argument ignores Congress's own rule of statutory interpretation: "words importing the singular include and apply to several persons, parties, or things." 1 U.S.C. § 1; *see also Smith v. Zachary*, 255 F.3d 446, 449 (7th Cir. 2001) ("the distinction between plural and singular words is not scrupulously observed in legislative language"). Fields does not merely advance unpersuasive authority; he also fails to come to grips with the fact that once a jury has found a defendant death eligible, the Constitution permits it to freely "consider a myriad of factors to determine whether death is the appropriate punishment . . . . Indeed, the sentencer may be given 'unbridled discretion.'" *Tuilaepa v. California*, 512 U.S. 967, 979-80 (1994). Thus, his failure to find supporting case law is unsurprising.

Lacking any specific legal bar to a unitary verdict, trial counsel reasonably elected to seek one, as it embodied the defense's view of the case and discouraged repeated consideration of damaging facts. As discussed above, the defense theorized that the murders were a single aberrant event, precipitated by Fields's reaction to a misprescribed psychotropic drug. (*See* Tr. 8: 1982-83; 13: 3438-40.) Counsel's strategy promoted a view that Fields was impaired when he

committed the murders, but no longer unstable or dangerous.[13]  That strategy would have been

ill-served by the need for multiple penalty verdicts, which would have emphasized the number of

homicides and required the jury to repeatedly weigh future dangerousness and multiple murder

aggravators.  (*See* Trl. Doc. 228 at 35-36.)  Repeated weighing of future dangerousness would

have underscored the jury's findings that Fields lacked remorse and committed the murders as

part of a pattern of violence.  (Doc. 228 at 36.)  Counsel's successful effort to minimize these

considerations, through a unitary verdict, was consistent with their prior attempts to bar

presentation of future dangerousness evidence.  (*See* Trl. Docs. 54, 60,175, 221.)  The unitary

verdict also avoided repeated weighing of the victim-impact testimony.  (*See* Tr. 10: 2434-51,

2495-2513, 2606-23.)  Thus, the single verdict reduced the jury's reliance on evidence that the

defense had attempted to exclude.  (*See* Docs. 55, 64 & 159.)

The unitary verdict did not merely embody the defense's conception of the case, and

minimize consideration of damaging facts, it also precluded the possibility of a compromise

verdict.  As Fields recognizes, the jury could have rationally viewed the murder of Shirley Chick

as more aggravated than the murder of Charles Chick, because she experienced the terror of

seeing her husband shot to death without warning and of being stalked by an armed and

camouflaged predator.  (Pet. 115,  202; Mem. 98.)  Thus, counsel could have reasonably foreseen

that a jury considering the murders separately and the aggravators repeatedly and distinctly might

have returned one death verdict and one life verdict despite crediting the mitigation theory– an

outcome of no practical benefit to Fields.  *Cf. People v. Sandoval*, 841 P.2d at 885-86.  In these

---

[13]The Tenth Circuit resolved a challenge to the unitary verdict under the invited-error
doctrine, suggesting that counsel acted consciously and strategically in requesting it.  *See Fields*,
516 F.3d at 939.

circumstances, counsel's strategic decision was a "reasonable response to a difficult situation." *See Nguyen*, 413 F.3d at 1181-82.

The verdict form and supporting instructions did not misapply the law, much less ease the government's burden, and counsel's request for them was wholly reasonable under the circumstances. *See Lankford*, 468 F.3d at 585. The instructions properly explained the weighing process and the government's burden of proof, informing the jury "what is called for in weighing the various factors is not arithmetic" but "careful . . . considered . . . mature judgment." (*See* Tr. 14: 3395-96; Trl. Doc. 133 at 28.) Presumably, the jury heeded those instructions and weighed the aggravators qualitatively, rather than quantitatively, avoiding any possible "double counting" of factors. *United States v. Olano*, 507 U.S. at 740 (noting presumption that jurors follow their instructions); *see also Jones v. United States*, 527 U.S. 373, 399-400 (1999) (finding instructions virtually identical to the ones used in this case cured the danger of double counting). The submission of the unitary verdict was, therefore, a presumptively informed strategic decision that is "virtually unchallengeable." *Strickland*, 466 U.S. at 690.

Assuming, arguendo, that Fields could show his counsel erred in seeking a unitary verdict, he cannot show that he was prejudiced by the decision. In an attempt to demonstrate prejudice, Fields explores two hypothetical scenarios under which the jury's could have returned a procedurally-defective verdict. (*See* Mem. 96-98.) Fields's argument misses the point: the fact that a unitary verdict may have created a procedural defect was waived as invited error. *Fields*, 516 F.3d at 939. At this juncture, Fields must demonstrate a reasonable probability that, absent the unitary verdict, the jury "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Welch v. Workman*, 607 F.3d 674, 702 (10th

Cir. 2010). Fields makes no attempt at such a showing and could not succeed in doing so. Indeed, he posits that he might well have received a death verdict for Shirley Chick's murder and a life verdict for the Charles Chick murder (*see* Mem. at 97-98), without explaining how such a state of affairs satisfies the relevant standard or would have provided him with any practical advantage over the current judgment.

Ultimately, Fields cannot carry his burden with regard to either murder. The two capital counts arose from the same set of facts, as the murders were committed in a single continuous episode. Unsurprisingly, the jury's findings of aggravation and mitigation as to both counts were identical. The jury found that the defendant killed each of the victims after substantial planning and premeditation, and that he caused harm to the family, friends and community of each victim. (Trl. Doc. 228 at 35-37.) The jury's remaining findings applied to both counts: that Fields killed and attempted to kill more than one person, that Fields inflicted mental anguish on Shirley Elliot Chick, and that Fields poses a future danger to the lives and safety of other persons. (*Id*. at 35-36.) Fields repeatedly, but baselessly, asserts that the mental-anguish factor applied only to Shirley Chick's murder. The government's Notice of Intent to Seek the Death Penalty provides no support for that position, neutrally alleging the aggravator without reference to any particular count. (Trl. Doc. 38 at 3.) Because Charles Chick's murder formed the initial basis of Shirley's mental anguish, there exists no rational argument why the aggravator would not apply to both crimes.

Fields cannot escape the fact that a jury analysis identical to the one that occurred here, but cabined by count, would have resulted in two death judgments instead of one. The circumstances of the two murders are obviously intertwined, and Fields has not identified any

reason that the jury would have weighed the factors differently had it been required to view them one crime at a time. To analyze the question otherwise, as Fields posits may have occurred (*see, e.g.*, Mem. at 96 ("[t]he jury could have concluded that <u>seven</u> aggravating factors, considered together, substantially outweighed the mitigating evidence").), requires resort to a mechanical counting of factors, rather than the subjective evaluation employed by the jury (Trl. Doc. 227 at 28 ("You should not simply count the number of factors, but consider the particular character of each")). *See Harris v. Pulley*, 692 F.2d 1189, 1203 (9th Cir. 1982) (refusing to presume prejudice based on the assertion that a multiple-murder unitary verdict, which included the same three narrowing special circumstances for each of three murders, led the jury to simply count up factors), *rev'd on other grounds*, 465 U.S. 37 (1984).

On this record, no reasonable probability exists that Fields would have received a more favorable verdict had his attorneys omitted to request a unitary sentencing verdict.

Indeed, Fields's claim lacks a basis in existing law, as he cannot demonstrate any requirement that counsel request, or the courts provide, separate penalty verdicts for separate counts. As such, relief on this issue would necessitate a forbidden retroactive application of a new rule of law. *Schriro v. Summerlin*, 542 U.S. 348. Even if Fields could show that such a rule fell within the "logical compass" of Supreme Court authority or that Supreme Court decisions "inform, or even control or govern, the analysis" of his contention, his claim would still rely on a new rule because the result he seeks is not dictated by existing precedent. *See Saffle v. Parks*, 494 U.S. at 491.

VII. THE PROSECUTION HONORED ITS OBLIGATIONS TO DISCLOSE EXCULPATORY MATERIAL TO THE DEFENSE AND TO AFFORD FIELDS A FAIR TRIAL

Fields makes a two-pronged attack on the government, claiming that it suppressed exculpatory evidence concerning a bottle of Effexor and that it failed to provide evidence concerning two seized computers. (Pet. 119-24; Mem. 100-06.) As detailed below, Fields fails to demonstrate that any aspect of the prosecution's actions amounted to prejudicial misconduct.

Prosecutors must disclose all substantial material evidence favorable to the defense, whether it relates to guilt, punishment, or the credibility of witnesses. *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Brady v. Maryland*, 373 U.S. 83, 87 (1963). To establish a *Brady* violation, a defendant must show that "the prosecution suppressed evidence, the evidence was favorable to the defense, and the evidence was material." *United States v. Erickson*, 561 F.3d 1150, 1163 (10th Cir. 2009). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Torres*, 569 F.3d 1277, 1282 (10th Cir. 2009).

Prosecutors, however, bear no obligation to volunteer information they do not possess. *United States v. Erickson*, 561 F.3d at 1163. Likewise, prosecutors need not compile or seek evidence favorable to the defense. *United States v. Bender*, 304 F.3d 161, 164 (1st Cir. 2002); *United States v. Jones*, 34 F.3d 596, 599 (8th Cir. 1994); *United States v. Marashi*, 913 F.2d 724, 734 (9th Cir. 1990). Thus, a successful *Brady* claim requires a showing that any allegedly suppressed evidence actually existed. *Erickson*, 561 F.3d at 1163. *Brady* does not compel disclosure if the defendant knew or should have known the essential facts permitting him to take

101

advantage of the exculpatory evidence. *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998); *United States v. Kelly*, 35 F.3d 929, 937 (4th Cir. 1994); *see also Erickson*, 561 F.3d at 1163 (citing with approval *Coe*, 161 F.3d at 344).

Despite his burdens in demonstrating error under *Brady*, Fields presents claims that are a conglomeration of speculation and flawed logic. Ultimately, he fails to show that the government suppressed any material evidence.

A. <u>Alleged Suppression of Effexor Bottle</u>

In his initial Petition, Fields argued that the government failed to disgorge to him a bottle of Effexor that was found in his truck at the time of his arrest. The lynchpin of Fields's claim was an assertion that the government had "sole possession" of the bottle. (*See* Pet. 121.) Subsequent to filing his Petition, Fields asked counsel for the government to investigate the fate of the bottle. Counsel for the government agreed to do so and determined that the FBI had taken possession of the Effexor bottle long enough to deliver it to the jail (*see* Doc. 6), where Fields apparently ingested some or all of its contents. Relying on jailhouse medical records, Fields infers that he took more than the prescribed dosage of Effexor prior to his arrest and may therefore have done so prior to murdering the Chicks. Fields claims that the government had constructive knowledge of the bottle that it failed to disclose and further contends that the prosecutors asked improper questions of witnesses in view of that information. (Mem. 100-06.) In actuality, the Fields had access to all the information he relies upon here and has not shown that the government deprived him of any material fact.

Fields premises the exculpatory value of the bottle on the number of tablets inside of it, but he fails to show that the government was aware of that fact. The government did not

inventory the contents of the Effexor bottle and had no obligation to provide Fields with information it did not have. *Erickson*, 561 F.3d at 1163.

Fields also observes that the Effexor he took in jail must have come from the seized bottle because he did not see a medical professional until July 24, 2003, five days after he began receiving the pills in custody. This observation appears to undermine the entire premise of his claim that the government suppressed information about the container of pills. Because Fields personally knew he was taking Effexor in jail, and the defense could have obtained records demonstrating the essential facts about the container (*see, e.g.*, Pet. Ex. 27 at 2 (noting defense expert's review of Fields's custodial medical records)), the government bore no obligation to provide him with information about the bottle. *See Coe v. Bell*, 161 F.3d at 344. Indeed, Fields, unlike the government, had access to his own medical records. If, as he posits, those records demonstrate that he received Effexor that could have only come from his truck, he cannot show that the government had a burden to inform him of that fact. Likewise, he cannot show that the government had a duty to compile his medical records in order to glean information about the container. *See United States v. Bender*, 304 F.3d at 164.

In order to create the appearance of impropriety on the part of the government, Fields selectively assembles facts and speculation. He presents medical records that, he claims, show that he ingested 14 Effexor tablets between his July 18 arrest and August 5. (Mem. SA-1 & 2.) As noted, he argues that the pills must have come from the seized bottle because he did not see a doctor in custody until July 24, 2003. (Mem. 101-02 & n.37.) He then speculates that he ceased taking the drug because he exhausted the remaining supply in the previously-seized bottle. (*Id.*) Likewise, he presumes that if he exhausted a supply of 14 pills in jail, he had taken the other 16

prescribed pills (from a bottle of 30 tablets) during the 10 days prior to his arrest. (*Id*.) From this, he guesses that at the time of the crimes . . . "he may have taken additional pills," beyond those prescribed. (*Id*. at 104.) But the records upon which Fields attempts to rely are hardly a model of clarity. They allow an inference that jailers administered 14 Effexor tablets to Fields between July 19 and August 5, 2003, as they contain 14 initials on lines denominated "Effexor 150 mg." (Mem. SA 1 & 2.) Interspersed among those initials are eight hash marks, which Fields appears to have concluded reflect the denial of the tablets to him. Fields provides no basis for this interpretation of the record and gives no hint as to why the hash marks do not reflect the fact that he refused to take his dosage when provided.

Ultimately, none of that matters, because even if the records indicated Fields had ingested 14 Effexor tablets in jail, it does not demonstrate that he took the other 16 pills in the bottle, rather than losing, selling or giving away some or all of them. Even if the jury could have inferred that Fields ingested the 16 pills prior to his arrest, it still would have no information to show that Fields took so much as the prescribed dosage before committing the murders. Accordingly, the records concerning the fate of the Effexor bottle did not provide any relevant exculpatory information about Fields's mental state at the time of the crime. Certainly, the simple fact that a bottle of Effexor was transmitted to the jail for Fields's personal consumption – the only relevant evidence imputable to the government – could have created no reasonable likelihood of a different outcome in this case. *Cf. United States v. Torres*, 569 F.3d at 1282.

In a related – but equally unavailing – claim, Fields argues that the prosecution improperly questioned defense witnesses about the lack of evidence, apart from the defendant's self-reports, as to the amount of Effexor he had ingested prior the murders. Fields argues the

prosecution's presumptive knowledge of the Effexor bottle should have barred them from such examination. Fields, however, cannot show that the government had access to records that would have allowed it, or the experts, to determine the number of pills in the Effexor bottle at the time of his arrest or its disposal. Accordingly, he cannot show that the prosecutors knowingly asked a question based on a false premise. *Cf. United States v. Blandin*, 784 F.2d at 1051. Because Fields cannot show that the prosecution or its investigators knew the number of pills in the bottle at the time it was recovered, he cannot even show that the government asked a question it *should have* known was based on a false premise. *Cf. Bender*, 304 F.3d at 164 (prosecutors need not seek evidence favorable to the defense); *United States v. Beers*, 189 F.3d 1297, 1304 (10th Cir. 1999) (holding that *Brady* requires the disclosure of only that evidence within the actual or constructive possession of the prosecution and its investigative team). In any event, the fact remains that Fields's experts, though they presumably could have requested medical records from him, apparently failed to seek any documentary evidence to substantiate the defendant's self-reported ingestion of Effexor.

Accordingly, the prosecution did not improperly ask any questions intended to adduce false testimony.

B. Alleged Suppression of Computers

Fields summarily claims that the government improperly suppressed evidence from his personal computers. (Mem. 106.) His claim is inadequately pled and, therefore, not amenable to consideration.

In a collateral attack on a criminal judgment, the defendant must allege some factual basis for relief sought. Rule 2(b)(2), Rules Gov'g § 2255 Proceedings; *see United States v. Clingman*,

288 F.3d 1183, 1187 (10th Cir. 2002); *see also Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) ("conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based" (citations omitted)).  Fields makes no attempt to show that the government suppressed any material evidence, and his Court should therefore disregard his claim.

Any attempt to demonstrate error would fail.  The computers in question were returned to Fields's associates prior to trial and images of the hard drives were made available to the Petitioner upon request.  (*See* Doc. 6.)  The government had no obligation to disclose information that was available to Fields from other sources.  *United States v. Kluger*, 794 F.2d 1579, 1583 (10th Cir. 1986); *see Spirko v. Mitchell*, 368 F.3d 603, 611 (6th Cir. 2004) (no *Brady* violation because evidence was available to defense from other sources), *cert. denied*, 544 U.S. 948 (2005)

Though he makes no effort at this juncture to show the suppression of any evidence, much less exculpatory evidence, Fields reserves the right to supplement his pleadings with allegations about the computers, should he develop information in the future.  (Mem. 106.)  Fields does not have an unlimited right to amend his § 2255 Petition.  *See United States v. Willis*, 202 F.3d at 1280.  He may introduce an untimely amendment that "clarifies or amplifies a claim or theory in [the original motion]."  *United States v. Espinoza-Saenz*, 235 F.3d at 505.  If the proposed amendment does not seek to add a new claim or theory this Court may permit an untimely amendment.  *Id.*  However, Fields filed his present memorandum more than three months after time expired for him to file a § 2255 Motion and he has yet to articulate any reasonable basis for a *Brady* claim concerning his computers.  He should not be permitted to cede himself an unlimited right to supplement his briefing, given that he has not articulated any

colorable claim that an amendment might clarify or amplify.

## VIII.  THERE ARE NO ERRORS TO ACCUMULATE

Barrett argues that even if no single alleged error requires relief, the cumulative effect of the supposed errors does require the Court to grant his Motion.  (Pet. 124; Mem. 106-08)  As the Government has demonstrated, none of Barrett's contentions have merit, and many are procedurally defective.  Moreover, Barrett has failed to establish prejudice as to any of the claims he raises.  Accordingly, his contention of cumulative error should be rejected.  *See United States v. Rogers*, 556 F.3d 1130, 1144 (10th Cir. 2009).

## IX.  THIS COURT LACKS JURISDICTION TO DETERMINE WHETHER FIELDS'S EXECUTION WILL CONSTITUTE CRUEL AND UNUSUAL PUNISHMENT

Fields, without asserting any supporting facts, claims that his execution would constitute cruel and unusual punishment under the Eighth Amendment.  (Pet. 125; Mem. 109.)  As Fields concedes, this claim is not ripe for adjudication.  This Court should therefore disregard it.  Even if the claim were ripe, Fields's failure to plead any facts in support of it would still render it subject to dismissal.

Fields cannot challenge his prospective execution because the issue is not yet ripe.  As previously noted, the Constitution extends the judicial power of the United States only to real cases or controversies.  U.S. Const. art. III, § 1; *see United States v. Quezada-Enriquez*, 567 F.3d at 1231.  Thus, this Courts cannot give advisory opinions in hypothetical cases  *Flast v. Cohen*, 392 U.S. at 96-97.  In this case, Fields concedes a lack of ripeness.  He has not and cannot argue that the manner of execution about which he attempts to preemptively complain is not subject to change to his actual execution.  Because Fields has not and cannot demonstrate the justiciability

of the instant claim, this Court should disregard it.  Even if the claim were ripe, Fields has not

identified any fact that might give rise to relief on an Eighth Amendment theory.  Accordingly,

even if the Court finds this claim constitutionally justiciable, it should nonetheless disregard it.

*See Hall v. Bellmon*, 935 F.2d at 1110.

**CONCLUSION**

Based on the foregoing reasoning and authority, the government respectfully urges this

Court to deny the Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a

Person in Federal Custody.

Respectfully submitted,

Dated: September 28, 2010

SHELDON J. SPERLING
United States Attorney
Eastern District of Oklahoma


s/     Christopher J. Wilson
       CHRISTOPHER J. WILSON, OBA #13801
       Assistant United States Attorney
       Eastern District of Oklahoma
       1200 West Okmulgee
       Muskogee, OK 74401-6848
       Tel: (918) 684-5100


s/     Jeffrey B. Kahan
       JEFFREY B. KAHAN, PA Bar No. 93199
       Trial Attorney
       U.S. Department of Justice
       1331 F Street, N.W.; Rm. 345
       Washington, D.C. 20530
       Tel: (202) 305-8910

## CERTIFICATE OF SERVICE

I, hereby certify that on 28th day of September, 2010, I electronically transmitted the attached ANSWER IN OPPOSITION TO MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT A SENTENCE BY A PERSON IN FEDERAL CUSTODY and Attachments to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Michael Wiseman - Michael_Wiseman@fd.org
Cristi Charpentier - Cristi_Charpentier@fd.org Attorney for Petitioner


s/      Christopher  J. Wilson
        Assistant United States Attorney