DECLARATION OF IRIS DALLEY

I, IRIS DALLEY, hereby declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.   I am a forensic analyst and partner in Bevel, Gardner & Associates, a forensic consulting and education group.   I was an agent with the Oklahoma State Bureau of Investigation ("OSBI") assigned as a crime scene agent for the Eastern Regional Office.

2.   On July 11, 2003, in my capacity as an OSBI agent, I responded to a crime scene at the Winding Stair Campground, where the bodies of Charles Chick and Shirley Chick had been discovered.

3.   I was present throughout the initial crime scene investigation and took the official crime scene photographs.   I was also present during the autopsies of the Chicks and observed photographs taken of the bodies as part of that process.   The photographs attached to this Declaration as Exhibits A to L are true and accurate depictions of conditions as I observed them at the crime scene and during the autopsy, though I have modified some of the photos with circles and arrows, as noted below, to highlight certain portions of the images.

4.   I testified at the federal trial of Edward Leon Fields regarding my observations and conclusions, and I have reviewed a declaration prepared by Robert Tressel regarding my testimony.

5.   Mr. Tressel declares that an unidentified crime scene photograph depicts a "red stripe" on a fragment of glass in the front passenger door well of the Chick's van.   According to Mr. Tressel, his observation demonstrates that at least one glass fragment from the van's broken driver's window landed in viscous blood, contradicting my testimony that the glass fragments landed on dried blood.   Mr. Tressel also declares that the reliability of my testimony is

1

EXHIBIT 1

diminished by my decision not to preserve the glass fragments found in the door well to demonstrate that they were unstained by blood.   Mr. Tressel further hypothesizes that the unstained fragments could have fallen into the door well, onto previously dried blood, when I opened the van's front passenger door during my crime scene investigation.

6.   I personally observed the fragments of glass in the door well and they were unstained by blood.

7.   I photographed the fragments from a variety of angles to memorialize my observations.

8.   Though Mr. Tressel does not identify any particular photograph, I have reviewed the crime scene photos and have concluded that the only image containing a glass fragment that could be characterized as having a "red stripe" appears on crime scene photo CR03527CD40085.   A true and correct copy of photo CR03527CD40085 is attached to this Declaration as Exhibit A. Additionally, a true and correct copy of photo CR03527CD40085, modified with a yellow circle around the apparently striped fragment, is attached to this Declaration as Exhibit B, and a magnification of the pertinent portion of photo CR03527CD40085, with the apparently striped fragment circled in yellow, is attached to this Declaration as Exhibit C.

9.   The appearance of a seeming "red stripe" in Exhibits A, B and C does not undermine my observation that none of the glass fragments in the door well were stained by blood.   Had a glass fragment fallen into viscous blood, the stain on it would have mirrored the shape of the blood underneath it.   In other words, like any fluid, the blood would have coated the underside of the glass to the extent that the two were in contact.   The red stripe visible in Photo Exhibit A does not mirror the contact between the glass and the blood.

10.   Furthermore, if a glass fragment had contacted viscous blood, the resulting stain would have been visible from all angles.   However, crime scene photo CR03527CD40092 depicts the

2

glass fragment from above, and no red stripe is visible.    A true and correct copy of photo CR03527CD40092 is attached to this Declaration as Exhibit D.    Additionally, a magnification of the pertinent portion of photo CR03527CD40092, with the significant fragment circled in yellow, is attached to this Declaration as Exhibit E.    Again, no red stripe is visible.

11.    Likewise, the glass fragment on which Mr. Tressel identifies a stripe was captured in crime scene photo CR03527CD40095.    A true and correct copy of photo CR03527CD40095 is attached to this Declaration as Exhibit F.    Also, a magnification of the pertinent portion of photo CR03527CD40095, with the significant fragment circled in yellow, is attached to this Declaration as Exhibit G.    Once again, no red stripe is visible on the fragment.

12.    Because the "red stripe" is not visible from all angles, I conclude that it is not a stain, but an illusion created by light refracted through the glass, which is transparent to light, in a two-dimensional photograph.

13.    I have reviewed the crime scene photographs at extreme magnification, and while red pixels are occasionally visible in the images of the glass fragments, they do not mirror the shape of the blood underneath the fragments and are not consistently visible from image to image.    In short, any apparent staining on the fragments in the crime scene photographs is an illusion, created by photographing small pieces of a transparent substance above a red background.

14.    I elected not to collect the glass fragments in the door well because no further forensic testing was necessary to determine the observed condition of the fragments at the scene, and no further forensic testing was necessary to determine the origin of the glass fragments or the mechanism that produced the fragmentation.

15.    Consistent with my observation that the fragments were not blood stained, when I removed them from the door well, I did not observe any liquid blood under them.    Viscous material or

wet blood under the fragments would have indicated that the fragments had fallen into blood that had dried around them.   It is not uncommon to expose wet blood even days after the surface has dried.

16.   Mr. Tressel's theory that the glass fragments could have fallen into the door well during the crime scene investigation is inconsistent with the evidence.

17.   I opened the passenger-side door carefully to avoid shifting any evidence, before photographing the interior of the van.

18.   I photographed the inside of van, including the interior side of the front passenger door, before I opened that door.   The interior side of that door is depicted in crime scene photo CR03527CD30052.   A true and correct copy of photo CR03527CD30052 is attached to this Declaration as Exhibit H.   Likewise, the lower portion of the door is depicted in crime scene photo CR03527CD30056.   A true and correct copy of photo CR03527CD30056   is attached to this Declaration as Exhibit I.   I have studied Exhibits H and I under magnification and did not see any glass fragments that could have fallen into the dried pool of blood when the door was opened.

19.   As most clearly shown in Exhibit E, the pertinent glass fragments were found in line with, or forward of, the front edge of the passenger seat.   However, Exhibits H and I, which show the interior side of the front passenger door, do not depict any surfaces above that area capable of holding glass fragments.   The window sill and door handle, depicted in Exhibit H sloped toward the floor.   The papers visible in Exhibit I might have trapped glass fragments, but were behind the plane defined by the front edge of the seat and therefore not above the area where the fragments were found atop the dried blood.

20.   It appears that one glass fragment fell from the van to the ground below when I opened the

4

door.    That fragment may have been in a precarious position and fallen when the door was opened, but it does not explain the deposition of fragments atop the blood pool in the door well.

21.    Mr. Tressel notes that Mr. Chick's right hand was covered in blood and debris.    He declares that if Mr. Chick had been moved from the picnic table to the ground more than an hour after the shooting, the blood on his hand would have dried to the point that it would not have adhered to the debris.

22.    I took photographs of both sides of Mr. Chick's right hand.    The palm side of the hand is depicted in crime scene photo CR03527CD40044.    A true and correct copy of photo CR03527CD40044 is attached to this Declaration as Exhibit J.    Likewise, the back of his hand is depicted in crime scene photo CR03527CD30069 . A true and correct copy of photo CR03527CD30069 is attached to this Declaration as Exhibit K.

23.    Any moisture such as dew could have rehydrated blood on the hand sufficiently for the limited amount of debris on the back of Mr. Chick's hand, as depicted in Exhibit K.    The pattern of debris in that photograph is limited to the knuckles of the index to ring fingers and may have been transferred there after the body was moved to the ground (perhaps by a person or animal stepping on the hand) or may have resulted from a person grasping the back of the hand when moving the body.    Indeed, the debris appears to be a transfer pattern on top of the bloodstain.    If the debris had been picked up by wet blood, rather than superimposed upon blood, I would expect some blood to be visible on the exposed surfaces of that debris.

24.    At least two sources of wet blood were available for the palm side of the right hand, as depicted in Exhibit J.    The surface of the blood pool on the table could have sealed wet blood that was exposed when the body was moved from the table.    As noted, the removal of an object from an apparently dried blood pool commonly exposes wet blood underneath.    Additionally,

repositioning the body allowed liquids in the body to drain from the two bullet wounds in Mr. Chick's head.    Blood draining to the ground around the right hand could have added to the moisture, sufficient to adhere the debris found there.

25.    Mr. Tressel declares that blood spatter found on the lower portion of Mrs. Chick's face was as likely to have come from her own head wounds as from Mr. Chick's initial bullet wound.

26.    The misted spatter on Mrs. Chick's lower face is best explained by her proximity to her husband, when he was shot. Based on Mrs. Chick's position, as demonstrated by the surrounding bloodstains, back spatter from either entry wound to her head can be excluded as a source of the spatter on her face.    Back spatter travels away from the victim, toward the shooter, in a cone shaped area.    Spatter from the wound on the left top of Mrs. Chick's head would have traveled away from her face.    Forward spatter from the partial exit wound traveled toward Mrs. Chick's rear.    In fact, I found a bone fragment from the exit wound on the door well frame of the van. Backspatter from the shot to the back of Mrs. Chick's head would have been behind her.

27.    Mr. Tressel declares that some of the livor mortis or lividity patterns evident on Mr. Chick's body were consistent with the prone position in which he was found.    He further declares that lividity becomes fixed and unchangeable within four to six hours after death and that cooler temperatures speed the process of fixation.

28.    Even after lividity has developed in one position, secondary patterns can develop if the body is moved to another position before the lividity becomes fixed.

29.    The time frame in which lividity becomes fixed is variable, depending on conditions, but generally occurs six or more hours after death.    The process of fixation is known to be slowed, not accelerated, by lower temperatures.

30.    A true and correct copy of autopsy photo MVC005F is attached to this Declaration as

Exhibit L, and depicts fixed lividty on the rear of Mr. Chick's thighs.    The blanching (or

lightened areas of skin) evident at the tops of the thighs and across the buttocks is consistent with

Mr. Chick having been seated on the picnic table bench while lividity fixed, creating the obvious

lines of demarcation.    Blanching is caused by the pressure of the skin against an object.


Executed at Tulsa, Oklahoma this 24th day of September 2010:


_____
Iris Dalley

# EXHIBIT A



# EXHIBIT B



# EXHIBIT C





# EXHIBIT D



# EXHIBIT E







# EXHIBIT F



# EXHIBIT G





# EXHIBIT H



# EXHIBIT I



# EXHIBIT J



# EXHIBIT K



# EXHIBIT L

