UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CIV-10-115-RAW |
|  | : |  |
| Respondent, | : | CAPITAL 2255 PROCEEDINGS |
|  | : |  |
| -v- | : | HONORABLE RONALD A. WHITE |
|  | : |  |
| EDWARD LEON FIELDS, JR., | : |  |
|  | : |  |
| Petitioner. | : |  |
|  | : |  |

_____ :

### PETITIONER'S MEMORANDUM IN REPLY TO THE GOVERNMENT'S *ANSWER IN OPPOSITION TO MOTION UNDER 28 U.S.C. § 2255*

Michael Wiseman
Chief, Capital Habeas Corpus Unit
Cristi Charpentier
Assistant Federal Defender
Federal Community Defender
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, Pennsylvania 19106
215-928-0520
Michael_Wiseman@fd.org
Cristi_Charpentier@fd.org

Counsel for Petitioner
Edward Leon Fields

Dated:  November 15, 2010
Philadelphia, PA

**TABLE OF CONTENTS**

TABLE OF CONTENTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

PRELIMINARY STATEMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Reply to the Government's Abstract Recitation of Potential Procedural Defenses.. . . . . . . . . . . 1

Statement Regarding Need for an Evidentiary Hearing.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      Ground One.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      The Sixth Amendment Was Violated When Trial Counsel Ineffectively
      Investigated, Presented and Argued Mitigating Mental Health Evidence.
      The Eighth Amendment Was Violated When the Jury Sentenced Mr. Fields
      to Death Without Having Found and Given Mitigating Effect to Uncontested
      Mental Health-Related Mitigating Evidence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

          A.    Counsel's Failure to Argue the Full Mitigating Value
               of Mr. Fields' Bipolar Disorder, Depression and
               Auditory Hallucinations.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

          B.    Counsel's Failure to Investigate and Present Evidence
               of Organic Brain Damage. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

          C.    Counsel's Failure to Present Treating Medical
               Professionals to Rebut Allegations of Malingering and
               Support Manic Flip Diagnosis.. . . . . . . . . . . . . . . . . . . . . . . . . . . 17

          D.    Counsel's Failures Regarding the Admission of
               Damaging Testimony by Dr. Price.. . . . . . . . . . . . . . . . . . . . . . . . 19

          E.    Counsel's Failure to Present Evidence of Effexor's
               Association With Compulsive Aggression. . . . . . . . . . . . . . . . . . . 21

Ground Two. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    The Eighth Amendment and International Law Bar Mr. Fields'
    Execution Because He is Not Competent to be Executed and Because
    the Death Penalty is Precluded by His Deteriorating Mental Health. . . . . . . . . 22

Ground Three. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    The Sixth Amendment Was Violated Because Trial Counsel
    Ineffectively Failed to Investigate, Present and Argue Evidence
    That Would Have Rebutted the Substantial Planning and Mental Anguish
    Aggravating Factors, and the Fifth Amendment Was Violated Because
    the Government Presented False and Misleading Testimony and Argument
    to Support the Substantial Planning Aggravating Factor. . . . . . . . . . . . . . . . . . . 22

    A.    The Rebuttal Testimony That Could Have Been
        Elicited From Mr. Presley Was Consistent With Mr.
        Presley's Statement to the FBI, and Trial Counsel
        Knew That Mr. Presley Was an Important Witness to
        Interview. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    B.    Rebuttal Testimony That Could Have Been Elicited
        From a Criminalist. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        1.    The Government's counter-explanations For
            Criminalist Tressel's conclusions are meritless. . . . . . . . . . . . . . 27

            a.    Blood-stained glass fragment. . . . . . . . . . . . . . . . . . . . . . . 28

            b.    Debris on the back of Mr. Chick's hand. . . . . . . . . . . . . . 29

            c.    Blood flow from Mr. Chick's head. . . . . . . . . . . . . . . . . 30

            d.    Blood spatter on Mrs. Chick's face. . . . . . . . . . . . . . . . . 32

            e.    Lividity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

        3.    At a minimum, the Government's counter-explanations
            create disputed issues of fact that demonstrate the need for
            an evidentiary hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

            A.    Trial counsel concede they had no strategic or
                tactical reason for failing to present this evidence. . . . . . . 38

B.      The Prosecutors Violated <u>Napue</u> by Presenting
False and Misleading Testimony and Argument. . . . . . . . 40

Ground Four. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

The Sixth Amendment Was Violated Because Trial Counsel
Ineffectively Failed to Present Mr. Fields' Social History Through
the Testimony of a Mitigation Specialist or Mental Health Expert and
to Argue That Social History as a Mitigating Factor. . . . . . . . . . . . . . . . . . . . . 42

Ground Five. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Mr. Fields Was Denied His Right to Individualized Sentencing, Due
Process, a Fair Trial and the Effective Assistance of Trial Counsel
Because the Government's Closing Was Rife with Improper Argument,
Most of Which Was Not Objected to by Trial Counsel, and Appellate
Counsel Failed to Raise this Issue on Direct Appeal. . . . . . . . . . . . . . . . . . . . . 44

Ground Six. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Trial Counsel Were Ineffective for Failing to Object to Instructions and
a Verdict Form That Allowed the Jury to Approve a General Verdict of
Death Based on the Combined Weighing of Aggravating Factors Applicable
to Two Separate Murder Counts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Ground VII. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

The Government Withheld Exculpatory, Material Evidence from the
Defense in Violation of Due Process, and Trial Counsel Were
Ineffective for Failing to Investigate and Present Exculpatory Evidence. . . . . . . 59

Ground VIII. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

The Cumulative Impact of All These Errors Denied Mr. Fields  Due
Process, Effective Assistance of Counsel and a Reliable Sentencing
Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Ground IX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

The Manner of Mr. Fields' Execution, If Carried Out, Would
Violate the Eighth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

Alcala v. Woodford, 334 F.3d 862 (9th Cir. 2003) ...................................... 7, 9, passim

Arave v. Creech, 507 U.S. 463 (1993) ...................................................... 47

Bell v. Cone, 129 S.Ct. 1769 (2009) ......................................................... 62

Benson v. United States, 332 F.2d 288 (5th Cir. 1964) ............................... 53

Berryman v. Morton, 100 F.3d 1089 (3d Cir. 1996) .................................. 20, 58

Bland v. Sirmons, 459 F.3d 1999 (10th Cir. 2006) .................................. 8, 9, 47

Brady v. Maryland, 373 U.S. 83 (1963) .................................................. 56, 59

Brecht v. Abrahamson, 507 U.S. 619 (1993) ............................................. 2

Draughon v. Dretke, 427 F.3d 286 (5th Cir. 2005) ..................................... 39

Eddings v. Oklahoma, 455 U.S. 104 (1982) ........................................... 43, 44

Freeman v. Class, 95 F.3d 639 (8th Cir. 1996) .......................................... 20

Godfrey v. Georgia, 446 U.S. 420 (1980) .................................................. 47

Green v. United States, 262 F.3d 715 (8th Cir. 2001) .................................. 2

Harris v. Wood, 64 F.3d 1432 (9th Cir. 1995) ........................................... 58

Hitchcock v. Dugger, 481 U.S. 393 (1987) ............................................... 10

Hooper v. Mullin, 314 F.3d 1162 (10th Cir. 2002) ..................................... 20

Kubat v. Thieret, 867 F.2d 351 (7th Cir. 1989) ......................................... 58

Kyles v. Whitley, 514 U.S. 419 (1995) ............................................... 40, 56, 60

Le v. Mullin, 311 F.3d 1002 (10th Cir. 2002) ............................................ 47

Lockett v. Ohio, 438 U.S. 586 (1978) ............................................... 10, 44, 47

Mahorney v. Wallman, 917 F.2d 469 (10th Cir. 1990) ............................. 44, 49

Massaro v. United States, 538 U.S. 500 (2003) ...................................... 11, 53

Maynard v. Cartwright, 486 U.S. 356 (1988) ................................................ 47

Miller-El v. Cockrell, 537 U.S. 322 (2003) ................................................ 1

Miller-El v. Dretke, 545 U.S. 231 (2005) ................................................ 1

Murray v. Carrier, 477 U.S. 478 (1986) ................................................ 52

Napue v. Illinois, 360 U.S. 264 (1959) ................................................ 40

Neder v. United States, 527 U.S. 1 (1999) ................................................ 2

Newlon v. Armontrout, 885 F.2d 1328 (8th Cir. 1989) ................................................ 49

Panetti v. Quarterman, 127 S.Ct. 2842 (2007) ................................................ 1

Paxton v. Ward, 199 F.3d 1997 (10th Cir. 1999) ................................................ 44

Porter v. McCollum, 130 S.Ct. 447 (2009) ................................................ 1, 14

Richter v. Hickman, 578 F.3d 944 (9th Cir. 2009) ................................................ 39

Rompilla v. Beard, 545 U.S. 374 (2005) ................................................ 1, 14, passim

Sears v. Upton, 130 S.Ct. 3259 (2010) ................................................ 1, 2

Smith v. Mullin, 379 F.3d 919 (10th Cir. 2004) ................................................ 14

Strickland v. Washington, 466 U.S. 668 (1984) ................................................ 2, passim

Stringer v. Black, 503 U.S. 222 (1992) ................................................ 56

Sumner v. Shuman, 483 U.S. 66 (1987) ................................................ 44

Sunward Corp. v. Dun & Bradstreet, Inc., 811 F.2d 511 (10th Cir. 1987) ................................................ 51

Teague v. Lane, 489 U.S. 288 (1989) ................................................ 58

Tennard v. Dretke, 542 U.S. 274 (2004) ................................................ 44

Thomas v. Varner, 428 F.3d 491 (3d Cir. 2005) ................................................ 7

Towery v. Schriro, 2010 WL 3665202 (9th Cir. Sept. 22, 2010) ................................................ 40

United States v. Agurs, 427 U.S. 97 (1976) ................................................ 40, 41

United States v. Barrett, 496 F.3d 1079 (10th Cir. 2007) ................................................ 45

United States v. Benally, 146 F.3d 1232 (10th Cir. 1998) ........................................................ 11

United States v. Dago, 441 F.3d 1238 (10th Cir. 2006). ........................................................ 2

United States v. Edwards, 526 F.3d 747 (11th Cir. 2008) ........................................................ 54

United States v. Fields, 516 F.3d 923 (10th Cir. 2009) . ........................................................ 57

United States v. Frazier, 387 F.3d 1244 (11th Cir. 2004) ........................................................ 31, 32

United States v. Gallegos, 108 F.3d 1272 (10th Cir. 1997) ........................................................ 11

United States v. Henry, 709 F.2d 298 (5th Cir. 1983) . ........................................................ 54

United States v. Hill, 48 F.3d 228 (7th Cir. 1995) ........................................................ 53

United States v. Jones, 49 F.3d 628 (10th Cir. 1995) . ........................................................ 51

United States v. Kelly, 35 F.3d 929 (4th Cir. 1994) . ........................................................ 40

United States v. McCoy, 410 F.3d 124 (3d Cir. 2005) . ........................................................ 8

United States v. Price, 566 F.3d 900 (9th Cir. 2009) ........................................................ 60

United States v. Rivera, 347 F.3d 850 (10th Cir. 2003),. ........................................................ 2

United States v. Saget, 991 F.2d 702 (11th Cir. 1993) . ........................................................ 23

United States v. Shannahan, 605 F.2d 539 (10th Cir. 1979) . ........................................................ 23

United States v. Waldron, 2007 WL 2080520 (D.S.D. Jul. 17, 2007) ........................................................ 18

United States v. Wood, 207 F.3d 1222 (10th Cir. 2000) . ........................................................ 11

United States v. Woodward, 938 F.2d 1255 (11th Cir. 1991) . ........................................................ 53, 54

United States v. Zuno-Arce, 339 F.3d 886 (9th Cir. 2003) ........................................................ 40

Wiggins v. Smith, 539 U.S. 510 (2003) ........................................................ 1, 7, passim

Williams v. Taylor, 529 U.S. 362 (2000) ........................................................ 1, 14, passim

Williamson v. Ward, 110 F.3d 1508 (10th Cir. 1997) ........................................................ 25

Wood v. Allen, 130 S.Ct. 841 (2010) . ........................................................ 9, 55

Woodson v. North Carolina, 428 U.S. 280 (1976) . ........................................................ 46

## STATE CASES

People v. Crittenden, 885 P.2d 887 (Cal. 1994) . ........................................................ 54

People v. Sandoval, 841 P.2d 862 (Cal. 1992) . .......................................................... 52

## DOCKETED CASES

Barrett v. United States, No. 6:09-cv-105-JHP (E.D. Okla) ....................................... 46

## FEDERAL STATUTES

18 U.S.C. § 3592(a). ....................................................................................... 6, passim

## FEDERAL RULES

Fed. R. Evid. 402. ..................................................................................................... 20

**PRELIMINARY STATEMENT**

On April 6, 2010, Petitioner Edward Leon Fields, Jr. filed a *Motion for Relief Pursuant to 28 U.S.C. Section 2255 or in the Alternative Pursuant to 28 U.S.C. 2241* (cited herein as "*Motion*") challenging his convictions and sentences of death for two homicides in the Ouachita National Forest in 2003 (Doc. 1).

With permission of the Court, on July 30, 2010 Mr. Fields filed a *Memorandum of Law in Support of the Motion* (cited herein as "*Memo*") (Doc. 14).

The Government filed its *Answer in Opposition to Motion Under 28 U.S.C. § 2255* (cited herein as "*Answer*") on September 28, 2010 (Doc. 16).

Pursuant to this Court's order of October 1, 2010 (Doc. 19), Mr. Fields submits this *Memorandum in Reply* to the Government's *Answer*.

As in the *Motion* and *Memo*, the transcript of the trial proceedings are cited as "*TR*" followed by a page citation. Other proceedings are cited as *"TR"* followed by a description of the proceeding and page number.

Mr. Fields also cites a number of documents that are not currently of record. These documents are included in the *Appendix* that accompanied the *Motion* or the *Supplemental Appendix* that was filed with the *Memo,* or are attached to the *Answer*. These documents are cited as "Pet. Ex." or Gov. Ex." followed by an exhibit number.

Documents that are of record are not included in the *Appendix* or *Supplemental Appendix*, but are cited.

Petitioner is referred to as Mr. Fields, and the United States of America is referred to as the Government. Parallel citations are omitted. All other citations are either self-explanatory or are explained. All emphasis is supplied unless otherwise indicated.

**ARGUMENT**

REPLY TO THE GOVERNMENT'S ABSTRACT RECITATION
OF POTENTIAL PROCEDURAL DEFENSES

The Government provides a recitation of a number of procedural defenses that in the abstract are available to the Government in response to any section 2255 motion. *Answer*, 5-9. It discusses, in the abstract, that: post-conviction review is limited; only particular categories of claims are cognizable; a one year time bar applies to grounds presented for relief; the doctrine of procedural default precludes review of some types of claims; the doctrine of previous litigation precludes review of other types of claims; and new rules of criminal procedural may not be reviewed in post-conviction litigation.

None of these procedural defenses are applicable to Mr. Fields and all of his grounds for relief are reviewable on their merits. Indeed, the Government does not even attempt to apply most of them to the actual grounds asserted by Mr. Fields. In those few instances where the Government does attempt to apply them, Mr. Fields responds to these attempts in the body of each Ground.

The Government's abstract recitation is largely uncontroversial, with two exceptions. First, contrary to the Government's assertions that post-conviction review is "strictly circumscribed" *Answer*, 5, post-conviction review remains robust. See Sears v. Upton, 130 S.Ct. 3259 (2010); Porter v. McCollum, 130 S. Ct. 447 (2009); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003); Panetti v. Quarterman, 127 S.Ct. 2842 (2007); Miller-El v. Dretke, 545 U.S. 231 (2005); Rompilla v. Beard, 545 U.S. 374 (2005); Wiggins v. Smith, 539 U.S. 510 (2003); Williams v. Taylor, 529 U.S. 362 (2000) (each granting post-conviction relief on a variety of grounds including ineffective assistance of counsel during the penalty phase of a capital trial).

Second, the Government suggests that relief may only be awarded if there is a demonstration of "structural error" that had a "substantial and injurious" effect on the trial. *Answer*, 9. Here the Government confuses harmless error analysis applicable to a post-conviction review of a constitutional error under Brecht v. Abrahamson, 507 U.S. 619 (1993), with the standard of Strickland v. Washington, 466 U.S. 668 (1984), which unquestionably governs all post-conviction claims of ineffective assistance of counsel. See *Memo*, 1-3. The United States Supreme Court has clearly and repeatedly applied Strickland to post-conviction relief of claims of ineffective assistance of counsel, doing so as recently as this past June. Sears v. Upton, 130 S.Ct. 3259 (June 29, 2010) (applying Strickland and its progeny to finding of capital counsel ineffectiveness).[1]

The Government's attempt to muddy the waters over the applicable standard is disturbing. It demonstrates a pattern of either carelessness or intentional obfuscation that is seen elsewhere in the Government's *Answer*. See infra at 4-5 (citing the Government's discussion of "Mr. Barrett"

---

[1]In support of its erroneous reference to "structural error" that is only actionable if it had a "serious and injurious" impact on the trial, the Government cites a portion of United States v. Dago, 441 F.3d 1238, 1245-46 (10th Cir. 2006) *Answer*, 9. This is a significantly misleading citation. The portion of Dago cited by the Government relates to the trial court's failure to provide a so-called Richardson jury instruction – one that did not exist at the time of trial. 441 F.3d at 1241 ("We conclude that the district court's failure to instruct the jury in Dago's 1992 trial in accordance with the subsequent holding of Richardson v. United States . . . is subject to harmless-error analysis under the standard set out in Brecht v. Abrahamson, 507 U.S. 619, 622-23 . . . (1993)"). Thus, it is quite clear that this portion of the opinion did not address a claim of ineffective assistance of counsel. The Government's other "structural error" citation, United States v. Rivera, 347 F.3d 850, 852 (10th Cir. 2003), *Answer*, 9, is also a case evaluating a lack of a Richardson instruction which does not address a post-conviction claim of ineffectiveness. The Government's citation to Green v. United States, 262 F.3d 715, 717-18 (8th Cir. 2001), is inapposite. Green rejected a harmless error approach when an indigent section 2255 petitioner was improperly denied counsel at an evidentiary hearing. That case has nothing to do with the standards governing post-conviction claims of ineffective assistance of counsel. Finally, the Government's citation to Neder v. United States, 527 U.S. 1 (1999) is also inapposite. *Answer*, 9. Neder was a direct appeal and has nothing to do at all with the proper standard for review of post-conviction ineffectiveness of counsel claims.

likely resulting from a sloppy cut and paste job); infra at 4-5 (discussing hypothetical reasons for a variety of counsel's errors, without even acknowledging counsel's actual reasons provided in a sworn declaration). This is a serious and complex matter. The parties and Court will benefit from an honest and earnest discussion of the issues. There is no place in this case for obfuscation, misdirection or carelessness.

### STATEMENT REGARDING NEED FOR AN EVIDENTIARY HEARING

Mr. Fields has previously moved for an evidentiary hearing. See *Petitioner's Motion for Non-Dispositive Omnibus Relief and Consolidated Brief in Support* ("*Omnibus Motion*") (Doc. 4) at 13-16. The Court denied that request pending review of the Government's *Answer*. As the Court will see, the Government's *Answer* heightens the need for evidentiary resolution of virtually every asserted Ground. In virtually every instance, the Government contests **facts** underlying Mr. Fields' entitlement to relief. As set forth in the *Omnibus* motion, when a district court cannot resolve the issues presented in section 2255 motion, an evidentiary hearing is required. In this *Reply*, Mr. Fields points out the various instances where the Government – at most – disputes facts, and where, therefore, evidentiary resolution is required. Mr. Fields will formally renew his request for a hearing in the near future.

3

**THE SIXTH AMENDMENT WAS VIOLATED WHEN TRIAL COUNSEL INEFFECTIVELY INVESTIGATED, PRESENTED AND ARGUED MITIGATING MENTAL HEALTH EVIDENCE. THE EIGHTH AMENDMENT WAS VIOLATED WHEN THE JURY SENTENCED MR. FIELDS TO DEATH WITHOUT HAVING FOUND AND GIVEN MITIGATING EFFECT TO UNCONTESTED MENTAL HEALTH-RELATED MITIGATING EVIDENCE.**

Faced with compelling evidence that Mr. Fields' trial counsel ineffectively investigated, presented and argued mental health mitigation on his behalf, the Government leaps to trial counsel's defense, arguing that they "presented a strong case in mitigation ...." *Answer*, 12. But that was not the Government's tune at trial. There, standing before Mr. Fields' sentencing jury, the Government condemned his manic flip defense as "unbelievable," *TR*, 3424, and "not credible." *TR*, 3451. It mocked his expert witnesses as "left coast ... hired guns" who "every time come[] in and testif[]y for the defendant ...." *TR*, 3429. It declared that he "has no excuse and his mitigation pales in relation to the aggravating factors." *TR*, 3453.

The Government cannot have it both ways. If trial counsel's mental health mitigation presentation was "unbelievable" in 2005, it cannot be characterized as "strong" in 2010. The Government's newfound admiration for Mr. Fields' mitigation defense simply is not credible. As alleged in the *Motion*, trial counsel's mental health investigation, presentation and argument were deficient, and Mr. Fields was prejudiced as a result.

**A.      Counsel's Failure to Argue the Full Mitigating Value of Mr. Fields' Bipolar Disorder, Depression and Auditory Hallucinations.**

Mr. Fields has alleged that trial counsel were ineffective for failing to argue the full mitigating value of his bipolar disorder as well as his uncontested depression and largely uncontested

auditory hallucinations.  The Government responds that "counsel addressed all aspects of **Barrett's** [sic] alleged mental health issues."[2]   *Answer*, 13.  Perhaps it is the case that all of "**Barrett's**" "alleged mental health issues" were addressed, but all of **Mr. Fields'** mental health issues absolutely were not.

 In support of its argument, the Government quotes snippets of trial counsel's summation, a portion of which makes a passing reference to Mr. Fields' depression and auditory hallucinations. *Answer*, 13-14.  In that same paragraph, trial counsel also argues, "Imagine this thing that has been described as a rush of thoughts coming on without warning, can't control what's going through your mind continually.  What could that be like?" *TR*, 3436.  This plainly is a reference to a manic flip, not depression or auditory hallucinations.  She then concludes, "[I]magine them all together."  Thus, when trial counsel's closing argument is read in context and in its entirety, it is obvious she was referring to depression and auditory hallucinations as symptoms of Mr. Fields' bipolar disorder and associated manic flip, not as separate and independent mental health conditions that were deserving of consideration of mitigating factors, independent of manic flip.   Mentioning depression and auditory hallucinations – particularly in this context – is just not the same as arguing how those conditions are independently mitigating.

Moreover, in a subsequent passage **not** quoted by the Government, trial counsel made it clear that she was talking about a singular disease – not the constellation of uncontested symptoms and other illnesses, i.e., depression and hallucinations – as the cause of Mr. Fields' impaired capacity to

---

[2]The Government's responsive pleading in this case is replete with references to "Barrett" where the Government presumably intended to write "Fields."  See *Answer*, 13, 17, 107.  "Barrett" apparently is Kenneth Eugene Barrett, another capital prisoner convicted in this district before the Honorable James H. Payne in November of 2005.  Mr. Barrett has petitioned for section 2255 relief in Barrett v. United States, 6:09-CV-00105-JHP (E.D. Okla.).

appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law:

> That's what this mitigation is. Number one, the capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law was significantly impaired. Not for one minute did the defense try to say that Mr. Fields was not capable of appreciating, that he was not capable of understanding. That would have been an insanity defense. And when these doctors come in here and say he appreciated the nature and quality of his conduct and the fact that he could tell the difference between right and wrong, that's probably right. Because he wasn't insane, he's not asking to be excused. **What I'm telling is that that disease impaired his abilities.** That's what we call a statutory mitigator. A mitigator that Congress has specifically identified.

*TR*, 3436. In other words, trial counsel argued that one particular "disease" formed the basis for the mitigating circumstance under 18 U.S.C. § 3592(a)(1). Dr. George Woods and Dr. Bradley Grinage, the defense's mental health experts at trial, both had testified about Mr. Fields' "disease" of bipolar disorder accompanied by a manic flip, see, e.g., *TR*, 2785, and thus the jurors were led to understand that either they had to find that Mr. Fields' vigorously-disputed bipolar disorder and associated manic flip severely impaired his abilities or they had to completely reject the (a)(1) mitigating factor. Trial counsel never argued that, separate and apart from "that disease," Mr. Fields' depression and auditory hallucinations also met the requirements of the (a)(1) mitigating factor.

Trial counsel not only failed to argue that depression and auditory hallucinations were independently mitigating under section 3592(a)(1), but also that his bipolar disorder, depression and auditory hallucinations all were independently mitigating under sections 3592(a)(6) (emotional disturbance) and 3592(a)(8) (other factors). The Government concedes that trial counsel failed to do so, *Answer*, 14-15, but offers a hypothetical and entirely speculative explanation for trial counsel's failure: "Counsel could have quite reasonably concluded that arguing the same sets of facts under multiple theories was potentially confusing and counterproductive." Id. at 15.

The problem with the Government's argument is that it rests on a speculative and incorrect explanation of counsel's reasons for arguing as she did. In reality, the Government's explanation starkly contrasts with Ms. O'Connell's actual explanation as contained in her post-conviction declaration:

> Although we offered the theory of a drug induced manic flip, we never offered to the jury or argued to the jury, that they should find that Mr. Fields' lifetime of depression and hearing voices as distinct mitigating factors. As I recall, one of the Government's doctors (Mitchell) agreed that his history of depression and voices was true, and the Government conceded that in argument. I should have told the jury that they could find these facts as mitigating and ask the Court to charge them on those facts as separate mitigating factors. **I did not have any tactical or strategic reason for having not done so.**

Pet. Ex. 1, ¶ 18.

The Government is not permitted to make up its own a strategic reason for trial counsel's failure to take a specific action, particularly when trial counsel has already confirmed under oath that the Government's hypothetical strategy was not **her** strategy. To allow the Government to substitute a possible strategic or tactical basis for counsel's actual reasons would defy well-established Supreme Court and circuit precedent requiring an inquiry into the reasonableness of trial counsel's **actual** decision-making. See Wiggins v. Smith, 539 U.S. 510, 526-27 (2003) ("[T]he 'strategic decision' the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing."); see also Alcala v. Woodford, 334 F.3d 862, 871 (9th Cir. 2003) ("We will not assume facts not in the record in order to manufacture a reasonable strategic decision for Alcala's trial counsel."); Thomas v. Varner, 428 F.3d 491, 499 n.7 (3d Cir. 2005) ("We believe that an inquiry into whether counsel actually had some strategy is permissible ... Otherwise,

7

incompetency of defense counsel could be rewarded by ingenuity on the part of a State's attorneys in supplying hypothetical strategies to explain defense counsel's uninformed prejudicial oversights."); <u>United States v. McCoy</u>, 410 F.3d 124, 135 (3d Cir. 2005) (in section 2255 case, "[w]ithout the opportunity to evaluate the rationale given by trial counsel, the issue of possible ineffectiveness cannot be conclusively determined.").

The Government acknowledges that Ms. O'Connell has sworn that she had no strategic reason for not arguing depression and auditory hallucinations as mitigating factors under (a)(1), (a)(6) and (a)(8). *Answer*, 16. The Government is correct in stating that the ultimate question of whether any lawyer performed ineffectively is a mixed question of law and fact and ultimately "the determination of constitutional ineffectiveness is a **legal matter** for the Court's determination." <u>Id.</u> See <u>Bland v. Sirmons</u>, 459 F.3d 999, 1030 (10th Cir. 2006) ("Claims of ineffective assistance of counsel present mixed questions of law and fact."). However, the Government's argument that Ms. O'Connell's declaration should be ignored because it contains such legal conclusions is incorrect. This error is repeated throughout its *Answer*. <u>See</u>, <u>e.g.</u>, *Answer*, 16 n.3 (Ms. O'Connell's declaration "asserts multiple instances of ineffectiveness."). Ms. O'Connell's declaration asserts **facts** regarding her reasons for taking or not taking specific actions. It simply does not contain any legal conclusions. Nowhere in Ms. O'Connell's declaration does she opine that she was "ineffective." Her declaration merely sets out the facts upon which this Court can – and should – base its legal judgment that counsel were ineffective.

Ms. O'Connell's assertion that she did not have a strategic or tactical reason for failing to ask the Court to instruct the jury or for arguing that depression and auditory hallucinations are mitigating circumstances is a factual representation about her decision-making, which she

indisputably would be permitted to testify to at an evidentiary hearing.  See, e.g., Wood v. Allen, 130

S.Ct. 841, 843 (2010) (noting that after evidentiary hearing post-conviction court "made a **factual**

**finding** that counsel had made a strategic decision not to pursue evidence of Wood's alleged

retardation").  Indeed, the Court **must** determine the actual reason for trial counsel's acts and

omissions in order to decide Mr. Fields' ineffectiveness claim.[3]  See Wiggins, 539 U.S. at 526-27

(discussing need to determine counsel's actual strategy); Alcala, 334 F.3d at 871 (same).[4]

The Government makes scant mention of Mr. Fields' allegation that he was prejudiced by

trial counsel's deficient performance, arguing merely that "Fields fails to explain why his allegations

of mental illness and personal trauma would have appeared any more credible and appealing to the

jury had counsel argued that they were susceptible to consideration under multiple legal theories."

*Answer*,  16.  The Government's attempt to reframe Mr. Fields' prejudice argument entirely misses

the point.  The issue is not whether Mr. Fields' mental health impairments would have "appeared

more credible and appealing" had trial counsel offered other legal theories for how the jury could

find them mitigating.  Rather, the issue is whether trial counsel sufficiently informed the jury – by

---

[3]Mr. Fields has already moved for an evidentiary hearing.  See *Petitioner's Motion for Non-Dispositive Omnibus Relief and Consolidated Brief in Support* ("*Omnibus Motion*"), 13-16 (Doc. 4).  The Court denied this  request.  See *Order*, 4 (Doc. 11).  However, the Court ruled that it would revisit the question of a hearing following the submission of the Government's *Answer*.  Id.  Mr. Fields will renew his motion for an evidentiary hearing shortly.  At this point he will only note that, given the Government's repeated assertions that Ms. O'Connell possessed reasons for particular actions that are disputed by her sworn declaration, this Court cannot resolve the ineffectiveness claims without an evidentiary hearing.

[4]The fact that the Court must determine trial counsel's actual strategy does not mean that the issue is a question of law.  As previously noted, claims of ineffectiveness are mixed questions of law and fact.  See Bland, 459 F.3d at 1030.  That portion of an ineffectiveness claim that involves trial counsel's strategy is a question of fact.  See Wood, 130 U.S. at 852 ("whether counsel's decision was the product of strategy is a question of fact") (Stevens, J., dissenting) (citing Carr v. Schofield, 364 F.3d 1246, 1264 (11th Cir. 2004); Berryman v. Morton, 100 F.3d 1089, 1095 (3d Cir. 1996)).

9

seeking appropriate instructions and making argument – that it could find that Mr. Fields' uncontested mental health impairments were mitigating. Proper instructions and argument would not have made the facts more credible to the jury, but they would have helped the jury understand why those facts supported a sentence of life over death. Moreover, such instructions and argument would have obviously provided the jury with the tools needed to "consider and give effect to" the uncontested mitigating evidence. See, e.g., Lockett v. Ohio, 438 U.S. 586 (1978); Hitchcock v. Dugger, 481 U.S. 393 (1987) (each condemning as violative of the Eighth Amendment any factor that precludes a capital jury from considering and giving effect to mitigating evidence).

Obviously, the jury did not believe that the disputed evidence of bipolar disorder and associated manic flip rose to the level of significant impairment, since it rejected trial counsel's argument that this disorder met the requirements of the (a)(1) mitigating factor. However, given that the evidence of depression and auditory hallucinations was largely uncontested, the jury was far more likely to conclude that these particular manifestations of mental illness met the requirements of (a)(1) or the alternative mitigating factors under (a)(6) or (a)(8). There is also a reasonable probability that the jury would have concluded that, although the disputed evidence of bipolar disorder did not rise to the level of significant impairment, that evidence did satisfy the emotional disturbance or catch-all mitigating factor. The latter two mitigating factors could be found by the jury even if the jury rejected the opinions of the defense's experts that Mr. Fields was significantly impaired by his bipolar disorder and associated manic flip. Thus, the mitigating evidence that was **not** argued had far greater mitigating value than simply "counting the number of factors," as the Government

10

cynically asserts.[5]

The Government also contends that Mr. Fields has procedurally defaulted his claim that the death verdict violated the Eighth Amendment because the jury was not able to consider and give effect to undisputed mental health mitigation. The Government has misconstrued the nature of Mr. Fields' allegation. He does not assert an independent Eighth Amendment violation. Rather, he offers this Eighth Amendment analysis to demonstrate the prejudice arising from counsel's deficient performance. See *Motion*, ¶ 21. As an element of an ineffective assistance of counsel claim, this error did not have to be raised on direct appeal. See Massaro v. United States, 538 U.S. 500, 504 (2003); United States v. Gallegos, 108 F.3d 1272, 1279 (10th Cir. 1997) ("Generally, ineffective assistance of counsel claims should be brought in collateral proceedings, not on direct appeal.").

**B.      Counsel's Failure to Investigate and Present Evidence of Organic Brain Damage.**

Mr. Fields claims that trial counsel were ineffective for failing to fully investigate and present evidence that he suffered from organic brain impairment at the time of the offense. Significantly,

---

[5]The Government's cynicism is well-captured by its unpersuasive assertion that "the forgone argument that the jury should have accorded alternative legal significance to a single set of facts might have caused the jury to discredit the defense generally by suggesting that its theory of the case was so plastic as to be meaningless." *Answer,* 15-16. The Government's professed concern against proceeding on alternative legal theories based on the same set of facts logically should apply with equal force to the practice of charging defendants with lesser-included offenses. Yet courts routinely charge juries – often at the request of defense counsel – that they may find the defendant guilty of first-degree, second-degree murder, or involuntary manslaughter, depending on what elements they decide the Government proved. See, e.g., United States v. Wood, 207 F.3d 1222, 1227 (10th Cir. 2000) (noting that "[t]he district court instructed the jury on first-degree murder as well as the lesser included offenses of second-degree murder and involuntary manslaughter"); United States v. Benally, 146 F.3d 1232, 1235 (10th Cir. 1998) (same). Had Mr. Fields not pled guilty, his jury almost certainly would have been presented with these same alternative theories of liability without any objection by the Government that the jury would be led to believe the Government's "theory of the case was so plastic as to be meaningless."

the Government does not challenge the conclusions of Dr. Daniel Martell, a forensic neuropsychologist who recently evaluated Mr. Fields and confirms the severe and progressive nature of his brain damage. See generally *Answer*, 23-28.[6] Instead, the Government contends that trial counsel reasonably did not further investigate or present evidence of brain damage because Dr. Michael Gelbort – a forensic neuropsychologist retained by the defense prior to trial – found only "mild impairment" and because "trial counsel clearly hoped that by avoiding marginal evidence of brain damage evidence [sic] they might preclude the presentation of what they viewed as damaging rebuttal." *Answer*, 24-25.

Once again, the Government attempts to substitute its made-up reasons for counsel's actions – those that it prefers, but do not actually exist. Ms. O'Connell's declaration confirms that, contrary to the Government's musings, it was trial counsel's intention all along to call Dr. Gelbort as a witness and to present evidence of Mr. Fields' brain damage. Pet. Ex. 1, ¶ 15. She admits that she had no tactical or strategic reason for abandoning the presentation of brain damage evidence at trial. Id. She also concedes that she was informed by Dr. Gelbort that Mr. Fields should undergo

---

[6]Mr. Fields moved for permission to be transferred to a facility where he can undergo brain imaging. *Omnibus Motion*, 2-4. The Court denied this request, stating that, while "counsel state that petitioner has suffered a "cataclysmic decline" in his cognitive functioning ..., exhibits provided with his motion to vacate continue to indicate he is "generally well oriented to person, place, and situation." *Order*, 3 (Doc. 11). But see Pet. Ex. 9, 7 (report of Dr. Martell indicating that Mr. Fields thought the year was 2001 in 2009). In any event, it is not merely counsel's personal opinion that Mr. Fields has suffered a "cataclysmic decline," but Dr. Martell's professional assessment as well. See Pet. Ex. 9, 16 (Dr. Martell concludes,"It is apparent from the current testing that Mr. Fields has experienced a catastrophic loss of brain function over the past five years."). At a hearing, counsel will prove that one can be severely brain impaired while still being oriented as to person, place and situation. The requested imaging will likely assist in demonstrating the **cause and full extent** of Mr. Field's decline. Accordingly, Mr. Fields also intends to renew his request to undergo brain imaging to determine the origins and course of his cognitive impairments.

additional neuropsychological testing and that she had no tactical or strategic reason for not having this testing performed. Id., ¶¶ 15, 17. Significantly, she also confirms that, contrary to the Government's made-up facts, that "[p]resentation of such brain impairments would have been an important part of our mitigation presentation." Id., ¶ 17. The only reason she did not fully investigate and present evidence of brain damage was that she "was overwhelmed with the trial progress." Id. Being "overwhelmed" is not a reasonable strategic or tactical basis for failing to present evidence of brain damage. Moreover, Ms. O'Connell also admits that Dr. Gelbort was "unavailable" during trial, and that she failed to address this problem with the Court. Id. (Ms. O'Connell states she was informed by Dr. Gelbort that he was traveling during dates of trial).

Notwithstanding Ms. O'Connell's representations, the Government speculates that trial counsel shrewdly decided not to present evidence of brain damage because they wanted to preclude "damaging rebuttal," evidenced by the fact that trial counsel moved *in limine* to exclude any testimony by the Government's neuropsychologist, Dr. Randall Price, about brain damage. *Answer*, 25. This speculation squarely conflicts with counsel's sworn declaration. The reason Ms. O'Connell moved to exclude evidence of brain damage during Dr. Price's testimony was because, having failed to call Dr. Gelbort during her case-in-chief, she did not have a defense expert prepared to rebut Dr. Price's testimony. There is no basis for the Government's claim that trial counsel wanted to exclude Dr. Price's testimony because she considered evidence of brain damage – properly presented by an appropriate defense expert – to be damaging to Mr. Fields. On the contrary, Ms. O'Connell considered evidence of brain damage to be "an important part of our mitigation presentation." Id. The Government's argument again demonstrates the need for evidentiary resolution of this claim.

The Government falls back on the argument that Mr. Fields was not prejudiced by trial

counsel's deficient performance in failing to present evidence of his brain damage. The Government contends that, according to Dr. Martell, Mr. Fields has suffered a "catastrophic decline" since his trial, and thus "his report suggests that Mr. Fields was healthier at the time of the murders ...." *Answer*, 26.

The Government's argument is simplistic. The fact that Mr. Fields is severely brain-damaged in 2010 does not change the opinion – which the Government does not dispute – that Mr. Fields was also organically impaired in 2004. These impairments were touched upon by Dr. Gelbort in 2004; corroborated by Dr. Price's testing data in 2005; and confirmed by Dr. Martell in 2010. That Mr. Fields' brain damage might be even more severe now does not diminish the mitigating impact of the fact that he was organically impaired at the time of the offense and trial. See, e.g., Rompilla v. Beard, 545 U.S. 374, 8, 392-93 (2005); Porter v. McCollum, 130 S.Ct. 447-455, 451 (2009); Williams v. Taylor, 529 U.S. 362 (2000) (observing that evidence that defendant "**might** have mental impairments organic in origin" is mitigating); Smith v. Mullin, 379 F.3d 919, 942 (10th Cir. 2004) (finding it "patently unreasonable" for trial counsel to fail to present evidence of appellant's brain damage because such evidence "is exactly the sort of evidence that garners the most sympathy from jurors").

Moreover, if the jury had learned that Mr. Fields' organic brain damage was a progressive condition – a fact trial counsel failed to discover because she did not follow through with Dr. Gelbort's recommendation for further testing, such as that done by Dr. Martell at undersigned counsel's request – it likely would have considered that information to be highly mitigating, particularly since it would have undermined the Government's argument that Mr. Fields posed a risk of future dangerousness.

In attacking the prejudice to Mr. Fields that resulted from trial counsel's deficient performance, the Government mischaracterizes the testimony of Dr. Grinage and Dr. Woods. Dr. Grinage did not testify, as the Government alleges, "that he considered Fields' alleged brain damage a 'piece of evidence to be weighed,' but nothing 'cataclysmic.'" *Answer*, 27. The trial transcript reveals that the Government has grossly misrepresented Dr. Grinage's testimony:

> Q        All right, sir. You indicate in your report that the Defendant was born with a circumstance called hypoxia, that is respiratory distress, right?
>
> A.       Yes, sir.
>
> Q        That's really not a very significant feature with regard to this Defendant, is it?
>
> A        I think it's another piece of evidence to be weighed, but, it's not cataclysmic.

*TR*, 2830. This exchange makes clear that Dr. Grinage was speaking about **hypoxia**, not Dr. Gelbort's findings of brain damage.

Dr. Grinage's post-conviction declaration confirms that the Government has mischaracterized his view of the mitigating value of Mr. Fields' brain impairment:

> If I had been presented with the information that I now have about Mr. Fields' organic dysfunction and had I been asked to consider his "cognition" – which, as the excerpt from my testimony above shows I was not asked to consider – I would have testified that his organic brain damage, focused in his frontal lobes, is a mitigating factor.
>
> The frontal lobes of the brain are central for humans to "be human." In other words, it is with the frontal lobes – which are by far the largest parts of the human brain – that humans plan, control impulses, weigh options, deliberate and consider consequence. At the time of trial, all which was given to me was Dr. Gelbort's raw data, and that was not critical to my final opinion. However, his expert interpretive findings are very important and would have been important for my testimony. This is so for a number of reasons. The presence of such organic deficits could have explained some of his behaviors that the prosecution portrayed as the product of his psychopathy. Additionally, there were several times when I was asked on the witness

15

stand about the process of diagnosing a person who presents with multiple symptoms. The answer remains that one has to weigh each symptom with all the other symptoms in order to reach conclusions to a degree of psychiatric certainty. In this case, based on a number of treatment plans over his life which had failed, the manner of Mr. Fields' response to the psychopharmacology regimen he began to receive while in prison prior to the trial, his mother's history of brain damage, his own birth trauma the evidence of organic brain damage could have been offered as a factor that exacerbated the bipolar disease from which Mr. Fields suffers.

Pet. Ex. 3, ¶¶ 11-12.

The Government also distorts the record with regard to Dr. Woods. The Government claims that, according to Dr. Woods' declaration, he "read Dr. Gelbort's report ... but made no mention of it in his findings." *Answer*, 27. His declaration, however, does not state whether he received Dr. Gelbort's report before or after he prepared his own report – only that he reviewed it prior to testifying at trial. Pet. Ex. 2, ¶ 8. Although listing all of the materials he reviewed, Dr. Woods' report makes no mention of Dr. Gelbort's report (Pet. Ex. 28), thus strongly suggesting that he did not receive Dr. Gelbort's report until after he submitted his own report.

Moreover, Dr. Woods, like Dr. Grinage, agrees that evidence of Mr. Fields' frontal lobe impairments would have been mitigating:

> Regardless of whether one accepts my opinion about a manic switch, the presence of frontal lobe impairments is highly significant. People with frontal lobe impairments as severe as those present in Mr. Fields experience disinhibition – that is, an impaired ability to control one's impulses. They also experience impairments in social judgment. Such people act out without making the types of judgments that persons with intact frontal lobe functioning can make. By itself, this type of impairment is a highly mitigating factor. If this impairment is added to my clinical opinion that Mr. Fields underwent a manic switch, then we see a situation where Mr. Fields' already impaired ability to control himself made him even less able to negotiate the flight into mania that I believe occurred.

Pet. Ex. 2, ¶ 7.

Thus, the Government's argument that Dr. Grinage and Dr. Woods "ascribed little value" to

Dr. Gelbort's testing, *Answer*, 26-27, is refuted by their own declarations in this proceeding. On the contrary, Dr. Grinage and Dr. Woods both believe Mr. Fields' brain impairments were mitigating and would have testified to that effect had trial counsel inquired into this subject. Indeed, even the Government's expert, Dr. Randall Price has written extensively on the mitigating value in capital sentencing of brain dysfunction. See Reynolds, Price and Niland, *Applications of Neuropsychology in Capital Felony (Death Penalty) Defense*, Journal of Forensic Neuropsychology,, Vol. 3 (2004) at 101 ("The mitigation evidence presented during the punishment phase of a capital trial should serve to humanize the client and attempt to put his actions in context of the entire life of the defendant and any relevant history that may have contributed to the development of the actionable behavior . . . The neuropsychologist can help the trial team and the jury understand the issue of moral culpability. . .").

> **C. Counsel's Failure to Present Treating Medical Professionals to Rebut Allegations of Malingering and Support Manic Flip Diagnosis.**

Mr. Fields alleges that trial counsel were ineffective for failing to call local medical professionals who treated him before and just after the offense and could corroborate that he did not malinger his mental health-related symptoms and illness. The Government does not dispute that these professionals could have provided relevant and important testimony at trial. Instead, the Government argues that trial counsel were under no obligation to call these witnesses because their testimony purportedly would have been cumulative. According to the Government, it was enough that Dr. Grinage and Dr. Woods summarized the opinions of these witnesses during their own testimony during the defense case. *Answer*, 29-31.

Given the Government's fierce attacks on these same experts as "left coast ... hired guns," it verges on hypocrisy for the Government to argue that the defense's expert witnesses were sufficiently

credible to present the opinions of the local treating medical professionals when it spent much of the trial disparaging these same experts as hired guns who would tell the jury whatever they were paid to say. Given these attacks, it was wholly inadequate for trial counsel to present the opinions of local treating professionals through those impeached experts. The live testimony of these potential witnesses would have been far more persuasive than, for instance, Dr. Woods' conclusory testimony that treating doctors did not believe Mr. Fields was malingering. See, e.g., United States v. Waldron, 2007 WL 2080520, at *6 (D.S.D. Jul. 17, 2007) ("[T]he court recognizes that live testimony is vastly preferable than accepting the transcripts offered in this case.").

As with Mr. Fields' other claims, the Government again offers its own made-up reasons for counsel's actions, instead of considering the actual reasons sworn to by counsel. The Government speculates that "counsel could have reasonably concluded that presenting testimony from treating medical professionals, rather than the retained experts, was an area fraught with potential drawbacks." *Answer*, 31. In fact, Ms. O'Connell plainly states that she had no such strategic or tactical reason. See Pet. Ex. 1, ¶13 (" I did not have a tactic or strategy for not presenting these doctors as witnesses in my case in chief or on rebuttal."); id., ¶ 14 ("I had no tactical or strategic reason for not investigating Dr. Bumgardner and presenting her opinion."). Indeed, according to Ms. O'Connell, "Had I a congruent opinion from a local psychiatrist, who actually treated Mr. Fields, I would have presented it as a supplement to Dr. Woods' testimony." Id.

Finally, the Government suggests that counsel were not necessarily aware that these treating professionals would be helpful to the defense. *Answer*, 32. This is puzzling in view of the Government's earlier argument that their helpful opinions were introduced through the defense's hired experts. Moreover, in a case where a defendant's mental health is likely to be the central issue, counsel

18

has an obligation to investigate and obtain all records that may be relevant to that issue.  See <u>Williams</u>, 529 U.S. at 396 (capital counsel have an "obligation to conduct a thorough investigation of the defendant's background" for mitigating evidence).  Here, there is no dispute that trial counsel obtained Mr. Fields' medical records in advance of trial.  See *TR*, 2774 (Dr. Grinage testifies that "included in my record review were medical records from other facilities and from other physicians."); *TR*, 2944 (Dr. Woods testifies that he reviewed "Mr. Fields' medical records at the – both historically that were available, records from 1996 through about 2000 and then other records that were – medical records from 2003 " as well as "the medical records of the jails when Mr. Fields had been incarcerated both here in Muskogee and also in Tulsa.").  Thus, counsel knew that Dr. Baumgardner, Dr. Winters, Dr. Trombka and Mr. Anderson had each treated Mr. Fields and were therefore potential witnesses.  Had trial counsel investigated further – as they were obligated to do – they would have discovered the information contained in the declarations of Dr. Baumgardner, Dr. Winters, Dr. Trombka and Mr. Anderson.

> **D.  Counsel's Failures Regarding the Admission of Damaging Testimony by Dr. Price.**

Mr. Fields alleges that trial counsel were ineffective for failing to object to Dr. Price's testimony about Mr. Fields' brain impairments and for eliciting damaging testimony from Dr. Price on cross-examination.  To be clear, defense counsel **should have** introduced evidence of Mr. Fields' organic dysfunction.  However, having ineffectively failed to do so, they ineffectively failed to preclude or object to Dr. Price's opinions about brain damage. The Government argues that any objection to Dr. Price's direct examination would have been futile, that trial counsel's objections and cross-examinations are "a matter of trial strategy, subject to the presumption of reasonableness," and

that Mr. Fields was not prejudiced by trial counsel's deficient performance. *Answer*, 33-36. Each of these arguments fail.

First, the Government contends that the Court could have "excluded evidence only 'if its probative value [was] outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.'" *Answer*, 34. That remarkable legal proposition ignores the fundamental rule that only **relevant** evidence is admissible. See Fed. R. Evid. 402 ("Evidence which is not relevant is not admissible."). Given that the defense never introduced evidence about Mr. Fields' organic brain functioning in its case-in-chief, any testimony by Dr. Price on this subject was plainly not relevant to any issue that had to be decided by the jury and thus was inadmissible.

Trial counsel's failure to raise a relevancy or other appropriate objection to Dr. Price's direct testimony, as well as their elicitation of damaging testimony on cross-examination, was not based on a reasonable strategic decision. Permitting or eliciting damaging testimony is **never** a reasonable strategy. See, e.g., Freeman v. Class, 95 F.3d 639, 642-42 (8th Cir. 1996); Berryman v. Morton, 100 F.3d 1089, 1100 (3d Cir. 1996); Hooper v. Mullin, 314 F.3d 1162 (10th Cir. 2002).

The Government's attempt to defend trial counsel's actions in the face of this obvious proposition is opaque. According to the Government, trial counsel elicited Dr. Price's testimony that he had not observed any "significant neuropsychological impairment" in order to "impl[y] that Price simply lacked the requisite expertise to provide a valid opinion in this case" because he "had no expertise about psychotropic medications," which would thereby "negate the significance of Price's opinion." *Answer*, 35. As best as Mr. Fields can tell, the Government appears to argue that trial counsel elicited damaging testimony from Dr. Price so the defense could show the jury he was not qualified to give that damaging opinion, even though, as a neuropsychologist, Dr. Price indisputably

**was** qualified to give that damaging opinion. If the Government is correct that such a convoluted and nonsensical "strategy" did in fact guide trial counsel's actions, the Court would have no choice but to find such a "strategy" unreasonable.

Mr. Fields was prejudiced by trial counsel's deficient performance in this regard. The Government argues that "[e]ven if he could show that he was unfairly surprised by any of the direct testimony, he was never foreclosed from introducing sur-rebuttal testimony from Dr. Gelbort in an attempt to contradict Dr. Price's findings." *Answer*, 34. The Government's assertion ignores the fact that trial counsel failed to ensure that Dr. Gelbort would be available to testify at trial, which was the reason trial counsel failed to introduce evidence of brain damage in the first place. The Government's oversight in this regard therefore is based on its made-up assertion that counsel really did not want to introduce evidence of organic brain damage – she did, because it is mitigating.

### E. Counsel's Failure to Present Evidence of Effexor's Association With Compulsive Aggression.

Mr. Fields has alleged that trial counsel were ineffective for failing to present evidence of the link between Effexor and increased compulsive aggression. The Government objects to this claim on the ground that these conclusions may not have been admissible at trial and at the very least would have been subject to "obvious attack." *Answer*, 38. This argument relies upon disputed facts that can only be resolved at an evidentiary hearing.

GROUND TWO

**THE EIGHTH AMENDMENT AND INTERNATIONAL LAW BAR MR. FIELDS' EXECUTION BECAUSE HE IS NOT COMPETENT TO BE EXECUTED AND BECAUSE THE DEATH PENALTY IS PRECLUDED BY HIS DETERIORATING MENTAL HEALTH.**

As Mr. Fields asserts in both his *Motion* and *Memo*, this claim is not ripe for review, and thus he concurs with the Government's *Answer* to this claim.

GROUND THREE

**THE SIXTH AMENDMENT WAS VIOLATED BECAUSE TRIAL COUNSEL INEFFECTIVELY FAILED TO INVESTIGATE, PRESENT AND ARGUE EVIDENCE THAT WOULD HAVE REBUTTED THE SUBSTANTIAL PLANNING AND MENTAL ANGUISH AGGRAVATING FACTORS, AND THE FIFTH AMENDMENT WAS VIOLATED BECAUSE THE GOVERNMENT PRESENTED FALSE AND MISLEADING TESTIMONY AND ARGUMENT TO SUPPORT THE SUBSTANTIAL PLANNING AGGRAVATING FACTOR.**

Mr. Fields claims that trial counsel failed to present readily-available evidence that would have rebutted the Government's substantial planning and mental anguish aggravating factors and that the Government presented false and misleading testimony and argument in support of the substantial planning aggravating factor. The Government's chief response is to dispute the conclusions of Robert Tressel, Mr. Fields' expert criminalist, by offering alternative and highly speculative explanations for many of the troubling inconsistencies pointed out by Criminalist Tressel. This response supports Mr. Fields' contention that an evidentiary hearing is needed in order for the Court to assess the validity of this claim. As noted above, Mr. Fields will shortly renew his motion for an evidentiary hearing.

**A.      The Rebuttal Testimony That Could Have Been Elicited From Mr. Presley Was Consistent With Mr. Presley's Statement to the FBI, and Trial Counsel Knew That Mr. Presley Was an Important Witness to Interview.**

Mr. Fields claims that trial counsel failed to discover valuable rebuttal evidence that could have been presented through Daniel Presley. The Government responds that, had Mr. Presley testified at

trial consistent with his declaration, he would have been "susceptible to impeachment" with his prior statements. *Answer*, 48.

Contrary to the Government's assertion, there is absolutely nothing contradictory between Mr. Presley's prior statements to law enforcement agents and his declaration in this proceeding. In his interview with the FBI, Mr. Presley purportedly said he was not "certain if it's common for an individual to wear a gilli [sic] suit **while squirrel hunting**." Pet. Ex. 21 at 4.[7] In his declaration, Mr. Presley states:

> Though ghillie suits are most often used for turkey hunting, the fact that Ed made his own ghillie suit and used it for squirrel hunting did not at all strike me as unusual. You can go into any hunting supply store in Eastern Oklahoma and buy a ghillie suit. **It is a common tool of hunters and lots of guys around here use them**.

Pet. Ex. 20, ¶ 4. In other words, although Mr. Presley did not know whether it was common to use a ghillie suit to hunt squirrels specifically, he knew it was common to use a ghillie suit for other types of hunting. There is nothing contradictory between his statement to the FBI and his declaration in this proceeding.

Nor is there anything contradictory between Mr. Presley's declaration and his statement to the FBI about Mr. Fields' rifle. He purportedly told the FBI**:**

---

[7]It bears noting that the "statement" in question was not a sworn statement by Mr. Presley, but an FD-302 in which SA Gary Graff paraphrased what he purportedly had been told by Mr. Presley. Mr. Presley did not sign or otherwise adopt this statement. Thus, the FD-302 could not have been used to impeach Mr. Presley. See, e.g., United States v. Shannahan, 605 F.2d 539, 542 (10th Cir. 1979) (FBI agent's reports of witness' prior statements made during interviews, which were not signed or otherwise adopted or approved by witness, did not come within rule authorizing use of prior statements); United States v. Saget, 991 F.2d 702, 710 (11th Cir. 1993) ("[W]e conclude that a witness may not be impeached with a third party's characterization or interpretation of a prior oral statement unless the witness has subscribed to or otherwise adopted the statement as his own."). Rather, the Government would have been required to call SA Graff as a rebuttal witness. The Government has failed to provide a declaration by SA Graff that Mr. Presley's declaration in this proceeding contradicts anything he told SA Graff.

Approximately three or four weeks ago, FIELDS showed PRESSLEY the rifle wrapped in burlap stripping. FIELDS was staying with CAROLE LAMB in Wister at the time and FIELDS showed PRESSLEY the rifle at LAMB'S residence. FIELDS did not explain to PRESSLEY why he had wrapped the rifle in burlap. PRESSLEY has seen the weapon on several occasions over the years and FIELDS had never had it wrapped before. It was PRESSLEY's impression that when FIELDS showed him the rifle at LAMB's residence, that FIELDS had wrapped the rifle recently.

Pet. Ex. 21 at 3. Mr. Presley said nothing in this statement about when Mr. Fields mounted the scope on his rifle. In his declaration, Mr. Presley confirms his statement about when the gun was ghillied but adds important information about when Mr. Fields mounted the scope:

Although, **Ed had mounted the scope on his gun more than a year before the tragedy happened**, **he ghillied the gun around three or four weeks before the tragedy**. When I saw the gun at Carol Lambs house, like I testified, Ed didn't tell me why he ghillied the gun, but there really was no need for him to tell me why. Lots of hunters who use ghillie suits also ghillie their guns as well. Ghillieing the gun just completes the whole outfit. Had I thought there was something out of the ordinary about him ghillieing the gun I certainly would have asked him why he did that, but of course I didn't ask because it wasn't unusual.

Pet. Ex. 20, ¶ 5. Thus, these two statements are not inconsistent – there would have been no impeachment on this basis.

The Government also argues that other testimony Mr. Presley could have provided that would have been exculpatory as to punishment – that Mr. Fields had an innocent reason for attaching a high-powered scope to his rifle and that Mr. Fields asked him to go snake-hunting with him shortly before the shootings – are in fact inculpatory. They are not.

The Government attempts to excuse trial counsel's failures by claiming that "trial counsel did not know of facts that would alert him or her to the need to conduct a particular investigation." *Answer*, 47. This is an excuse, and as one, it is a non-starter. The Government's argument boils down to an assertion that counsel can only be ineffective for failing to present evidence about which she is

24

aware. The Government's argument eschews the body of well-established Supreme Court precedent that requires counsel to vigorously search for evidence that can lessen a death sentence. See Rompilla v. Beard, 545 U.S. 374, 385-88 (2005) (trial counsel ineffective for failing to investigate aggravating factors, which would have led to the discovery of mitigating evidence); Wiggins v. Smith, 539 U.S. 510, 524 (2003) ("investigations into mitigating evidence 'should comprise efforts to discover **all reasonably available** mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'"); Strickland, 466 U.S. at 690-91 ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"). The Tenth Circuit has "strictly observed" this fundamental principle. Williamson v. Ward, 110 F.3d 1508, 1514 (10th Cir. 1997) (noting that Tenth Circuit is "mindful of the Supreme Court's observation that our duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case," in which "counsel's duty to investigate all reasonable lines of defense is strictly observed").

The Government cites Alcala v. Woodford, 334 F.3d 862 (9th Cir. 2003) to suggest that Mr. Fields' counsel were not deficient for failing to interview or call Mr. Presley. *Answer*, 47-48. That case is distinguishable. There trial counsel was found to have not acted deficiently when he failed to call a gemologist to establish that earrings found in the defendant's storage locker were more expensive than a cheap pair the government argued had been worn by the victim because the owner of the earrings, the defendant, could have be expected to tell trial counsel to investigate their value.[8]

_____

[8]The Alcala Court also noted, "We will not assume facts not in the record in order to manufacture a reasonable strategic decision for Alcala's trial counsel." 334 F.3d at 871. Thus, Alcala actually undermines a critical theme of the Government's answer by demonstrating that the Government cannot substitute its own speculative strategic decisions for trial counsel's actual decisions.

Id. at 893. Here, in contrast, Mr. Presley's knowledge was not something about which Mr. Fields necessarily and uniquely was capable of alerting trial counsel. Moreover, in the context of a capital penalty hearing, the onus is on counsel to conduct a thorough investigation into any facts that could result in a sentence of life imprisonment. Wiggins, 539 U.S. at 524.

Moreover, trial counsel indisputably **did** know of the importance of Mr. Presley as a witness and the need to thoroughly interview him. The Government produced to the defense a copy of the FBI's interview of Mr. Presley, which gave trial counsel notice of how the Government would use him at trial. In addition, the Government disclosed that it would present Mr. Presley's testimony on these subjects in a pretrial court filing. See Notice of the Nature of Evidence and Listing of Potential Witnesses in Support of Aggravating Factors and Death Penalty Eligibility at 7-9 (Doc. 147). Reasonably effective counsel, anticipating the Government's line of questions for Mr. Presley, would have interviewed him to probe how to respond to those questions. Having done so, counsel would have been in a position to learn the facts contained in his post-conviction declaration.

B.      **Rebuttal Testimony That Could Have Been Elicited From a Criminalist.**

The Government focuses its response on the proffered conclusions of Criminalist Tressel, who refutes much of the evidence supporting the Government's theory that Mr. Fields returned to the crime scene hours after the shootings to stage a robbery and that Mrs. Chick suffered from mental anguish after watching at close range the shooting of her husband.[9]

---

[9]As explained in the *Motion* and *Memo*, this evidence was important to the Government's efforts to secure a death sentence. Evidence that Mr. Fields returned to the crime scene to stage a robbery hours after the shootings was offered to support the substantial planning aggravating factor, while evidence that Mrs. Chick saw her husband shot from a couple of feet away was offered to support the mental anguish aggravating factor.

### 1. The Government's counter-explanations for Criminalist Tressel's conclusions are meritless.

In response to Mr. Fields' claim that trial counsel were ineffective for failing to hire a criminalist to attack the Government's theory that he returned to the crime scene to stage a robbery many hours after killing the Chicks, the Government admits many of Mr. Fields' factual assertions: that a red stripe appears on at least one glass fragment even though Agent Dalley testified at trial that she observed no blood; that Agent Dalley disturbed at least one glass fragment when she opened the door to the van, causing it to fall to the ground; that ground debris was adhered to the blood on Mr. Chick's hand; and that Mr. Chick's body showed lividity patterns inconsistent with livor becoming fully fixed while he was sitting at the picnic table. *Answer*, 51, 52, 55-56.

To counter the conclusions that follow from these undisputed facts, the Government throws out a slew of inventive explanations: that the red stripe on the glass fragment was "an illusion created by light refracted through the glass;" that dew rehydrated the dried blood on Mr. Chick's hand; that the debris on Mr. Chick's hand was deposited by a passing animal; that the lividity that developed while Mr. Chick was seated had only partially fixed. At bottom, however, it is obvious that had the defense hired a criminalist to challenge the weak evidence supporting the staged robbery theory, the Government would have been forced to present these speculative and unlikely explanations to the jury in order to make the facts fit the theory. The very fact that the Government would have had to go through such contortions to defend its theory demonstrates how effective a testifying criminalist such as Tressel could have been on Mr. Fields' behalf. By forcing the prosecution to defend its speculative theories, the defense could have eroded the jury's confidence in the Government's case, making the jury less likely to find the substantial planning aggravator beyond a reasonable doubt, thus resulting

in a verdict of life instead of death.

Instead, the Government's theory went all but unchallenged, allowing the jury to accept it as a gospel truth when in fact it was deeply flawed. The Government's attempts to explain away these flaws are unavailing.

### a. Blood-stained glass fragment.

Criminalist Tressel notes that, contrary to the testimony of OSBI Agent Iris Dalley, blood is visible on at least one fragment of window glass lying in a pool of blood in the passenger door well of the Chicks' van. This contradicts the Government's theory that Mr. Fields returned to the campsite long after the blood in the door well had dried and smashed the driver's side window to make it appear that a robbery had taken place.

The Government **admits** that a red stripe appears on a fragment of glass in one of the photographs she took of the Chicks' van. *Answer*, 51. Agent Dalley dismisses this red stripe, however, as "an illusion created by light refracted through the glass, which is transparent to light, in a two-dimensional picture." Gov. Ex. 1, ¶ 12. As support for her claim, Agent Dalley points to two other photographs of that same fragment, taken from a different angle, which – she contends – do not appear to have the same red stripe. Id., ¶¶ 10, 11.

Agent Dalley's attempt to explain away the red stripe visible in CR03527CD40095 is factually flawed. This photograph was taken at a **lower angle** than CD0357CD30052 and CD0357CD30056, the other two photographs depicting the glass fragment with the red stripe. The latter two photographs appear to show only the top surface of the fragment, while first photograph shows one of the side surfaces as well as the top. As depicted in CR03527CD40095, the red stripe appears on the side of

the glass fragment, not the top.[10]  This explains why the red stripe is not visible in the two photographs which depict only the fragment's top surface.

Moreover, the Government does not challenge Mr. Fields' allegation that Agent Dalley failed to make any contemporaneous notation in her report about this purportedly important evidence, nor did she collect the glass fragments so they could be examined to corroborate her testimony at trial.[11]  Rather, the Government attempts to excuse this failure by proffering Agent Dalley's claim she did not collect any purportedly unstained glass fragments "because no further forensic testing was necessary to determine the observed condition of the fragments at the scene ...."  Gov. Ex., ¶ 14.  Yet Agent Dalley **did** collect glass from the driver's side window even though "no further forensic testing" was needed or performed on that evidence.  See Pet. Ex. 22, 6, 9.  Moreover, evidence collection is not just about gathering items that require forensic testing.  It also is about **preserving** evidence.  And nothing excuses the fact that Agent Dalley failed to make any record of her purported observations, but relied on her memory two years later to conjure up explanations with respect to this important evidence.

### b.  Debris on the back of Mr. Chick's hand.

Criminalist Tressel observes that ground debris attached to dried blood on the back of Mr. Chick's hand indicates that his body was moved before the blood on his hand dried.  Recognizing the significant problem this fact poses for the Government's staged-robbery theory, Agent Dalley offers

---

[10]The blood on the side of the glass fragment likely resulted from the fragment striking the blood at an angle and then tumbling into its final position.

[11]Not only did Agent Dalley fail to mention this observation in her report, but there was no mention of it in the Government's summary of her testimony that was filed with the Court on May 26, 2005, just weeks before from Mr. Fields' trial.  See Notice of the Nature of Evidence and Listing of Potential Witnesses in Support of Aggravating Factors and Death Penalty Eligibility, 3, 7 (Doc. 147).

two highly speculative theories. First, she posits that moisture such as dew could have rehydrated the blood on the back of his hand. Gov. Ex. 1, ¶ 23. Second, she opines, "The pattern of debris in [the photograph at Exhibit K of her declaration] is limited to the knuckles of the index to ring fingers and may have been transferred there after the body was moved to the ground (perhaps by a person or animal stepping on the hand) ..." Id.

Agent Dalley's description of this photograph is completely inaccurate. Pine needles can be seen adhering to all the blood-stained areas of the back of Mr. Chick's hand, and are not just "limited to the knuckles of the index to ring fingers," as Agent Dalley claims. This undermines her speculation that the pine needles were deposited by a person or animal stepping on Mr. Chick's hand.[12] Moreover, it is unlikely that dew could have so thoroughly and uniformly rehydrated the blood on the back of Mr. Chick's hand. Thus, Agent Dalley's explanations for how Mr. Chick's hand came to be covered in pine needles if he was moved long after the blood on his hand had dried remain nothing more than remote speculation – speculation that a jury could have rejected if offered an alternative explanation through an independent criminalist such as Criminalist Tressel.

### c. Blood flow from Mr. Chick's head.

Criminalist Tressel observes that the volume of blood pooled around Mr. Chick's head is inconsistent with the Government's theory that Mr. Chick's body was moved many hours after he died. The Government refutes this observation with the declaration of Dr. Ronald Stephano. Dr. Stephano opines that blood clotting is retarded by cool temperatures and that he "would expect bodily fluids to drain freely from any open defect on the body as much as twenty-four hours after death." Gov. Ex.

---

[12]This theory is further undermined by the fact that there are no animal tracks or footprints in the blood on and around Mr. Chick's hand.

2, ¶ 4.

Dr. DeStephano's opinion does not conflict with Criminalist Tressel's observations. Although the Government distorts Tressel's declaration by suggesting that he claimed the blood in Mr. Chick's body would have fully congealed in six hours, or that blood clotting would have accelerated in cool mountain air, neither is true. Tressel actually stated:

> Second, crime scene photographs indicate that a significant volume of blood pooled on the ground around Mr. Chick's head. Post-mortem blood flow to this extent likely would not have occurred if Mr. Chick's body had been moved many hours after he was shot, particularly since his blood would have congealed more quickly in the relatively cool evening air.

Pet. Ex. 23, 17. There is nothing inconsistent in the opinions of Criminalist Tressel and Dr. DeStephano. Dr. DeStephano concluded that fluids would drain from "any **open** defect on the body" and that blood clotting in the body is retarded by cooler temperatures. Tressel disagrees with neither statement. In this case, however, as the blood in and around Mr. Chick's wounds dried over six or more hours during exposure to cool mountain temperatures, there likely was "no open defect on the body" from which blood could freely drain, particularly since, after Mr. Chick expired, blood would have flowed from his body only by the force of gravity.[13]

---

[13]The Government also challenges Criminalist Tressel's competence to opine on this subject, attempting to frame this issue as a "medical matter." *Answer*, 53. As stated in his declaration, Mr. Tressel worked for the Medical Examiner's Office for Cobb County, Georgia for thirteen years and has studied crime scene investigation at the Georgia Police Academy and other training programs around the country. Pet. Ex. 23, ¶ 1. He has been qualified numerous times in federal and state courts as an expert in homicide investigation, crime scene reconstruction and death processing, and has testified on a wide range of related issues, including lividity patterns, blood staining and blood spatter patterns. Id. There is no question that he is qualified to opine about blood patterns observed around homicide victims. At a minimum, the Court would need to hear from him before making any determination that he lacks qualifications.

The Government cites United States v. Frazier, 387 F.3d 1244, 1252-54 (11th Cir. 2004), as an instance when Mr. Tressel opined about a medical matter outside his field of expertise. In Frazier,

### d.      Blood spatter on Mrs. Chick's face.

Criminalist Tressel concludes that blood spatter on Mrs. Chick's face could have emanated from her own head wounds and that Mr. Chick was not the only possible source of that spatter.  In response, Agent Dalley opines that the "misted spatter on Mrs. Chick's lower face is best explained by her proximity to her husband, when he was shot." Gov. Ex. 1, ¶ 26.  Thus, she apparently concedes that other explanations are possible.  She asserts that "[b]ack spatter travels away from the victim, toward the shooter, in a cone shaped area" and thus would have "traveled away from her face." Id.  However, at trial she testified that spatter does not travel far – perhaps two feet – and described it as a "[m]isting pattern." *TR*, 2091; see also Gov. Ex. 1, ¶ 26 (Agent Dalley states that Mrs. Chick's face showed "misted spatter").  Given the small field of travel and misted character of spatter, Agent Dalley cannot reasonably eliminate the likelihood that some spatter from Mrs. Chick's own head wounds settled upon her face, particularly since the wounds and the spatter are on the same side of her head.  In any event, the Court cannot resolve the opposing views of Criminalist Tressel and Agent Dalley without conducting an evidentiary hearing.

The Government also argues that the spatter on Mrs. Chick's face was not the only basis for the jury to find the mental anguish aggravating factor, and thus Mr. Fields was not prejudiced by trial counsel's deficient performance.  It quotes at length the prosecutor's closing argument regarding this factor.  In doing so, the Government demonstrates the importance of the spatter evidence, because much of the rest of the prosecutor's closing argument on this aggravating factor was sheer speculation

---

however, the district court qualified Mr. Tressel as an expert on a number of forensic matters but precluded him from testifying about whether the evidence in a rape kit substantiated whether a rape had taken place.  The district court noted that Mr. Tressel was "obviously a very good crime scene investigator," id. at 1255 n.11, albeit, one who was not qualified to testify about the medical analysis of a rape kit.

designed to inflame the passions of the jury:

> What was the horror, the shock, the sheer, oh, my God, the terror that went through her mind at that instant?  Because she doesn't know where it's coming from at this period of time, ladies and gentlemen.  She has no idea.  He defensive mechanisms take over and she gets up and begins to run.

*Answer*, 57-58.[14]  Needless to say, there was absolutely no evidence presented about what Mrs. Chick's thoughts may have been in the seconds before she was shot.  In fact, this type of argument clearly overstepped the bounds of proper advocacy and has been challenged by Mr. Fields.  See *Motion*, Ground Five, ¶ 192, infra at 51.

In addition, Agent Dalley's credibility is challenged by her claim that she "found a bone fragment from the exit wound on the door well frame of the van."  Gov. Ex. 1, ¶ 26.  This alleged fact – like the unstained glass fragments – appears to be something she conjured up years after the fact.  Her contemporaneous report of the crime scene make no mention of recovering a bone fragment from the back of Mrs. Chick's skull.  In relevant part, Agent Dalley wrote:

> Bloodstains were on the passenger doorstep, in front of the woman's head.  Those stains were a flowing pattern, from the inside the van.  No other bloodstains were on the passenger side of the van.

---

[14]In the same vein, the Government later argued:

He likely heard whatever cries or moans or expressions of fear from at least one of his human prey.  He killed from a short distance....

And by the way, may I suggest one area in which the evidence establishes really our witness's credibility?  Special Agent Gary Graff didn't pump things up.  He didn't say the Defendant laughed as he ignored Shirley's cries or her shrieks in anguish and beg for her life saying please in the name of God don't kill me.  But, Shirley, we may reasonably infer from all of this evidence that this was not, was not, a silent murder.

*TR*, 3462; see also *TR*, 3417 ("But I submit to you what she was doing, she was begging and pleading for her life.").

> A pair of eyeglasses was under the woman's head. Keys were in the right front pocket of her jeans. DALLEY collected the eyeglasses and the keys.
>
> Medical Examiner's Investigator SHERRY BEDFORD examined the woman's body in the campsite. Dowden Funeral Home removed the body for transport to the Office of the Chief Medical Examiner in Tulsa for autopsy.
>
> DALLEY opened the front passenger door. Three sandals were inside the front passenger doorstep, between the front passenger seat and the front passenger door. Bloodstains were on those sandals and in the runners of the doorstep. Blood spatter was on the front passenger doorpost, below the dash, and on the hinge and frame of the opened passenger door. **A tissue-like fragment was on the vertical portion of the doorstep**. Fragments of broken glass were on top of the sandals and blood in the doorstep. DALLEY collected the three sandals and the tissue-like fragment.

Pet. Ex. 22, 3. There is no indication anywhere in any document generated at the time of her investigation that the Government ever tested the "tissue-like fragment" referred to in Agent Dalley's report and determined that it was "a bone fragment from the exit wound" of Mrs. Chick's skull.

### e. Lividity.

There is no disagreement that lividity patterns indicate that Mr. Chick's body was moved at some point after he was shot. The critical issue is **when** that event occurred. Agent Dalley and Dr. DeStephano testified at trial that, based on lividity patterns, Mr. Chick's body was moved at least six hours after he was shot. In Criminalist Tressel's judgment, the lividity patterns present on Mr. Chick's body are inconclusive on this point. Pet. Ex. 23, ¶ 23. In challenging Criminalist Tressel's opinion, the Government proffers the declarations of Dr. DeStephano and Agent Dalley. These declarations actually corroborate some of Tressel's key observations, however, and help demonstrate how valuable a criminalist or pathologist could have been to the defense.

In his declaration, Tressel notes that Mr. Chick's body shows lividity patterns consistent with **both** being seated at the picnic table and lying prone on the ground. Pet. Ex. 23, ¶¶ 20-21. This dual

lividity suggests that livor was not fully fixed when Mr. Chick's body was moved, but rather was in a state that allowed it to shift. This fact is important because it disrupts the neat timeline the Government attempted to create for the jury. Lividity fixes over time, as Criminalist Tressel, Dr. DeStephano and Agent Dalley all agree. See Pet. Ex. 23, ¶ 19; Gov. Ex. 1, ¶ 29; Gov. Ex. 2, ¶ 6. Thus, if lividity was fully fixed – meaning unchangeable – at the time Mr. Chick's body was moved, it increases the length of time that Mr. Chick was seated at the picnic table. If lividity was not fully fixed at the time Mr. Chick's body was moved, it decreases the length of time.

In their declarations, Dr. DeStephano and Agent Dalley both acknowledge the fact that secondary patterns of lividity may develop if a body is moved before lividity becomes fixed. See, e.g., Gov. Ex. 2, ¶ 6 (Dr. DeStephano states, "[E]ven after lividity has **partially fixed** in one position, if the body is then moved to another position, additional secondary patterns can develop."); Gov. Ex. 1, ¶ 28 (Agent Dalley states, "Even after lividity has developed in one position, secondary patterns can develop if the body is moved to another position **before the lividity becomes fixed**.").

This is important because Dr. DeStephano now agrees with Criminalist Tressel that Mr. Chick's body shows secondary lividity patterns. For instance, Dr. Stephano states, "The pattern of lividity and blanching visible on the anterior portion of Mr. Chick's upper thighs, as depicted in Exhibit B[15] to this Declaration, is consistent with subsequent lividity becoming fixed after he was in a prone position." Gov. Ex. 2, ¶ 8. He also does not challenge Tressel's observation that the livor in Mr. Chick's feet is consistent with having developed while his body was lying on the ground.[16] Id.,

---

[15]Although Dr. DeStephano refers to an "Exhibit B" to his declaration, the Government failed file any such exhibit with the *Answer*.

[16]Dr. Stephano attempts to explain away the livor in Mr. Chick's feet by speculating, "The lividity patterns on Mr. Chick's feet are not inconsistent with the position in which he was **thought**

¶ 10.

In order to account for the dual or secondary lividity patterns observed by Criminalist Tressel, Dr. DeStephano now opines that the lividity that developed while Mr. Chick was in a seated position was only **partially fixed**. Gov. Ex. 2, ¶ 7. In concluding that Mr. Chick's body was in a seated position for more than six hours, Dr. DeStephano had relied largely on the lividity on Mr. Chick's upper legs and buttocks. See, e.g., *TR*, 2029-30. As Dr. DeStephano now states in his declaration, "The pattern visible on the upper legs and buttocks of Mr. Chick, as depicted in Exhibit A[17] to this Declaration, is consistent with lividity having **partially fixed** while he was in a seated position."

**This was not Dr. DeStephano's testimony at trial**. In that proceeding, Dr. DeStephano repeatedly testified that lividity in Mr. Chick's body had become **fully fixed** by the time it was moved. See, e.g., *TR*, 2056 (Dr. DeStephano testifies, "The livor that we talked about earlier and saw in the photos was all fixed."); *TR*, 2031-32 (Dr. DeStephano testifies, "Well, I would say from this that he – that once he died, his body was in the position of seated at the table for a period of time long enough that the livor not only collected there, but also fixed."); *TR*, 2032 (Dr. DeStephano testifies that finding Mr. Chick's body lying on the ground "would indicate that the body was in a different position than

---

**to be seated** at the time of his death – with his feet pointed behind him." Gov. Ex. 2, ¶ 10. Needless to say, nobody knows the actual position of Mr. Chick's feet while he was seated at the picnic table because, as everyone agrees, his body was moved before it was discovered. Although Mr. Chick's feet theoretically **could** have been in a position that would have caused livor to develop while he was seated, this is pure conjecture. Moreover, Dr. DeStephano apparently concurs with Criminalist Tressel that this livor is consistent with Mr. Chick's body lying prone on the ground, since, according to Dr. DeStephano's speculative explanation, "his feet would have been in the same position while prone or seated." Id. Thus, Dr. DeStephano would have to agree that Criminalist Tressel or another criminalist could have pointed out to the jury that some livor on Mr. Chick's body was consistent with having developed while it was lying on the ground.

[17]As with the purported "Exhibit B," there is no "Exhibit A" attached to Dr. DeStephano's declaration.

36

it was during the time that the livor accumulated and fixed"); *TR*, 2059-60 (Dr. DeStephano testifies, "It's my belief that [face-down on the picnic table] was the position the body was in following the death and for a period of time long enough that the livor fixed."); *TR*, 2643 (Dr. DeStephano testifies, "The top part of his body slumped forward onto the surface of the chair and he was in that position for a question of some hours until the livor fixed. That is, until the coloration became essentially permanently patterned in the way that it was."). It was on this basis that he estimated that Mr. Chick's body was moved at least six hours after he was shot.[18]

Neither Dr. DeStephano nor Agent Dalley was ever questioned about the phenomenon of dual or secondary lividity, nor did any defense witness testify that dual or secondary lividity developed in Mr. Chick's body. As a result, the jury never learned that the lividity that developed while Mr. Chick was seated at the picnic table had only **partially fixed** by the time his body was moved, which would have moved back the timeline for when that event occurred. Had trial counsel consulted with a criminalist or pathologist, Dr. DeStephano and Ageny Dalley could have been cross-examined on this matter, and the defense could have introduced its own expert witnesses. Instead, because trial counsel's preparations were deficient, Dr. DeStephano and Agent Dalley were able to testify that lividity had become fixed at the picnic table, without challenge by the defense.

---

[18]Agent Dalley was not specifically asked if the lividity had become fixed in Mr. Chick's body when it was moved, but she implied that such was the case when she testified that Mr. Chick's body must have been moved more than six hours after he was shot "[b]ased on the lividity **having been set** in that seated position ...." *TR*, 2185.

### 2. At a minimum, the Government's counter-explanations create disputed issues of fact that demonstrate the need for an evidentiary hearing.

The Government's arguments highlight the need for an evidentiary hearing to resolve disputed issues of fact. Because the Government has challenged Criminalist Tressel's conclusions with declarations by Agent Dalley and Dr. DeStephano, this Court cannot determine whether this claim has merit without taking testimony from Tressel, Dalley and DeStephano, at a minimum.

### A. Trial counsel concede they had no strategic or tactical reason for failing to present this evidence.

Alternatively, the Government suggests that trial counsel's failure to attack the staged robbery theory was reasonable because trial counsel was "not alerted to circumstances that would have reasonably required them to retain a criminalist as a consultant or witness." *Answer*, 51. This ignores the fact that trial counsel has **conceded** that she did not have a strategic or tactical basis for failing to take this action. See Pet. Ex. 1, ¶ 2 ("[Mr. Tressel] presents alternative explanations for what happened. I could have presented such an expert in my case or, at a minimum, retained such an expert to advise me about how to prepare and conduct my cross-examination of the Government's witnesses. I had no strategic or tactical reason for not consulting an expert crime scene investigator or pathologist.").

Moreover, the suggestion that trial counsel did not have to **investigate** weaknesses in the Government's case unless they knew what those weaknesses were is ludicrous. The purpose of investigation is to discover previously unknown facts. Trial counsel indisputably knew that the Government would seek to prove that Mr. Fields returned to the campsite hours later to stage a robbery because the Government stated as much in its trial brief filed on April 25, 2005, over two months

before the start of trial. <u>See</u> Government's Trial Brief, 6, 15 (Doc. 131); <u>see</u> <u>also</u> Notice of the Nature of Evidence and Listing of Potential Witnesses in Support of Aggravating Factors and Death Penalty Eligibility, 2-10 (Doc. 147). Trial counsel also knew that the Government would seek to prove the mental anguish aggravating factor by establishing Mrs. Chick's proximity to Mr. Chick when he was shot. <u>See</u> Brief Addressing Admissibility of Evidence in Support of Future Dangerousness and Mental Anguish Non-Statutory Aggravating Factors, 12 (Doc. 153). Thus, trial counsel knew or should have known that they needed expert advice to assess the validity of the Government's staged robbery scenario and the purported location of Mrs. Chick when Mr. Chick was shot – theories which themselves depended largely on the opinions of Government experts.

Capital counsel have a clear obligation to investigate the factual basis for aggravating factors. <u>See</u> <u>e.g.</u>, <u>Rompilla v. Beard</u> 545 U.S. 374 (2005) (counsel ineffective for failing to review court file containing facts about aggravating factor; had counsel investigated, they would have found other mitigating factors); <u>see</u> <u>also</u> <u>Richter v. Hickman</u>, 578 F.3d 944, 960 (9th Cir. 2009) ("In the end, counsel again failed to consult a single expert in the field of blood evidence, this time to help him prepare for his cross-examination of the State's two expert witnesses once he knew that they would testify. He, further, made no effort to consult forensic experts so as to present testimony in rebuttal. When the need for expert advice was abundantly clear, counsel still failed to take reasonable steps mid-trial to remedy his deficient pretrial investigation and preparation. That failure was itself deficient ...."); <u>Draughon v. Dretke</u>, 427 F.3d 286, 296 (5th Cir. 2005) (counsel deficient for failing to investigate ballistics evidence or consult expert where the "centrality [of the ballistics evidence] is plan").

**B.** **The Prosecutors Violated <u>Napue</u> by Presenting False and Misleading Testimony and Argument.**

Mr. Fields alleges that the prosecutors knew or should have known that Agent Dalley's testimony about the purportedly unstained glass fragment was false and misleading, that they elicited misleading and incomplete testimony from Mr. Presley about Mr. Fields' purported "alibi," and that they argued this false and misleading testimony to the jury. The Government responds that due process is not violated unless the prosecutors knew of the false testimony, and that in any event the testimony was not material. *Answer*, 59.

The Government's assertion that the Due Process Clause is violated only by the knowing presentation of false and misleading evidence has not been the law for a half century. See, e.g., <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959) (due process violated where prosecution knew or should have known of false testimony); <u>United States v. Agurs</u>, 427 U.S. 97, 103 (1976) (same); <u>Kyles v. Whitley</u>, 514 U.S. 419, 453 (1995) (same); <u>Towery v. Schriro</u>, 2010 WL 3665202, at \*6 (9th Cir. Sept. 22, 2010) ("To establish a <u>Napue</u> claim, a petitioner must show that '(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) ... the false testimony was material.'") (quoting <u>United States v. Zuno-Arce</u>, 339 F.3d 886, 889 (9th Cir. 2003)); <u>United States v. Kelly</u>, 35 F.3d 929, 933 (4th Cir. 1994) (presentation of false testimony violates due process "regardless of whether the Government solicited the testimony, knew or should have known it to be false or simply allowed such testimony to pass uncorrected.")

Moreover, Mr. Fields can establish that the prosecutors knew that the testimony in question was both false and misleading and material. With regard to Agent Dalley's testimony about the purportedly unstained glass fragments, the prosecutors should not have presented this to the jury in

40

view of the fact that (1) a red stripe is visible on a glass fragment in at least one photograph of the Chicks' van; (2) she made no contemporaneous report of her observations; and (3) she failed to collect and preserve the glass fragments that would have corroborated her claim. For all the reasons discussed in Section B, *supra*, there is a reasonable likelihood that this false and misleading testimony **could** have affected the decision of the jury. See Agurs, 427 U.S. at 103.

With regard to misleading testimony about Mr. Fields' so-called "alibi," the prosecutors cannot excuse their selective misuse of Mr. Presley's statement to the FBI. Consistent with that statement, the prosecutors elicited from Mr. Presley testimony that he had plans to play the casino in Fort Smith the night of the offense and then argued this testimony in closing. By doing so, the prosecutors made it appear that Mr. Presley contradicted Mr. Fields' purported statement to Michelle Tipton that he planned to go fishing with Mr. Presley the night of the offense. The prosecutors knew, however, that Mr. Presley **also** told the FBI that on the afternoon of the offense Mr. Fields came to his house and asked him if he "wanted to do something." Pet. Ex. 21, 3. That "something," a few more questions would have revealed, was to go snake-hunting that evening, which likely would not have ended until 10 or 11 p.m. Pet. Ex. 22, ¶ 3. The Government's claim that Mr. Fields tried to set up an "alibi" would have evaporated – which is precisely why the prosecutors withheld from the jury the whole story.

The Government even concedes that this innocent explanation for Mr. Fields' behavior is "one other interpretation of Fields' actions." *Answer*, 61. Having agreed that the defense could have argued to the jury a viable innocent interpretation of Mr. Fields' actions, it rings hollow for the Government to now insist that Mr. Fields was not prejudiced by the prosecutors' selective misuse of evidence. The Constitution does not tolerate such prosecutorial misconduct.

41

**THE SIXTH AMENDMENT WAS VIOLATED BECAUSE TRIAL COUNSEL INEFFECTIVELY FAILED TO PRESENT MR. FIELDS' SOCIAL HISTORY THROUGH THE TESTIMONY OF A MITIGATION SPECIALIST OR MENTAL HEALTH EXPERT AND TO ARGUE THAT SOCIAL HISTORY AS A MITIGATING FACTOR.**

Mr. Fields alleges that trial counsel were ineffective for failing to present his social history through a mitigation specialist or mental health expert and to argue that social history as a mitigating factor. The Government responds that trial counsel were not obligated to do so because Mr. Fields' "defense strategy centered on an explanation of his crimes as a behavioral aberration driven by a misprescribed psychotropic drug" and"[a]ny forgone evidence concerning Fields's supposed family history would have undermined the defense by suggesting that Fields was a dangerous person whose homicidal conduct was a product of his character." *Answer*, 62. Thus, trial counsel reasonably decided not to present social history evidence to the jury because "[s]uch evidence would have severely undermined the defense's portrayal of the murders as aberrant, and would have tended to support the government's positions that Fields was a future danger to others and had substantially planned and premeditated the murders." Id. at 65.

Once again, the Government erroneously supplies a hypothetical strategic or tactical reason for trial counsel's failures that contradicts trial counsel's own sworn and actual reasons. Ms. O'Connell unambiguously rejects the Government's speculation about why she did not present more detailed social history through an expert witness:

> I have also been provided with a copy of the declaration of Glori Shettles. In it she indicates that she was available to testify as to Mr. Fields' social history which was not well-covered by the doctors or family who testified. I do not disagree with her assessment of the social history. **I had no tactical or strategic reason for not presenting that history either through one of the doctors or through Ms. Shettles**.

Pet. Ex. 1, ¶ 19.

Moreover, Mr. Fields' unpresented social history was not the "double-edged sword" claimed by the Government. *Answer*, 66. None of this evidence would have even remotely suggested that Mr. Fields was a "dangerous person whose homicidal conduct was a product of his character." *Answer*, 62. This is an odd assertion in view of the Government's contention that Mr. Fields was a sociopathic homicidal stalker – no small character flaw in its own right. In any event, the social history evidence would have humanized Mr. Fields to the jury by bringing to light the abuse and neglect he experienced as a child and the dysfunctional family environment in which he was raised. The evidence trial counsel should have presented included: the physically and sexually violent nature of the households in which his parents grew up; his mother's chronic depression and inability to give her children emotional support; his father's prolonged absences from the family; his mother's efforts to manipulate her children; his mother's orchestration of physical abuse against the children; the teenage onset of his battles with chronic depression; and the intergenerational aspect of the mental illness and neurological impairments that existed on both sides of his family. See *Motion*, ¶¶ 153-59. The Government fails to explain how any of this evidence – devoid as it is of any hint of physical violence by Mr. Fields – even remotely could have suggested to the jury that Mr. Fields posed a future danger to the community or methodically planned the murder of two campers. Such evidence of family dysfunction, abuse and emotional disturbances, has been deemed relevant and powerful as mitigating evidence since before the dawn of the modern era of capital punishment. See Eddings v. Oklahoma, 455 U.S. 104, 115 (1982) ("Evidence of a difficult family history and of emotional disturbance is typically introduced by defendants in mitigation.") (citing McGautha v. California, 402 U.S. 183, 187-88 (1971)).

In defending trial counsel's failure to present important social history evidence, the

Government erroneously argues that evidence is not mitigating unless it explains the crime. *Answer*, 65. But, evidence need not explain the offense to be mitigating. The Eighth Amendment mandates individualized capital sentencing based upon a reasoned moral response to the personal culpability of the defendant. E.g., Lockett v. Ohio, 438 U.S. 586 (1978); Eddings, 455 U.S. 104; Sumner v. Shuman, 483 U.S. 66 (1987). For this reason, the Supreme Court has rejected the proposition that a defendant must establish a nexus between his proffered mitigation and the crime with which he is charged. Tennard v. Dretke, 542 U.S. 274, 287 (2004).

### GROUND FIVE

**MR. FIELDS WAS DENIED HIS RIGHT TO INDIVIDUALIZED SENTENCING, DUE PROCESS, A FAIR TRIAL AND THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL BECAUSE THE GOVERNMENT'S CLOSING WAS RIFE WITH IMPROPER ARGUMENT, MOST OF WHICH WAS NOT OBJECTED TO BY TRIAL COUNSEL, AND APPELLATE COUNSEL FAILED TO RAISE THIS ISSUE ON DIRECT APPEAL.**

Mr. Fields' *Motion* and *Memo* set forth in detail the number and range of improper arguments made by the Government, and he will largely rely on them. Moreover, because Mr. Fields must demonstrate that trial and appellate counsel failed to raise meritorious issues in order to satisfy the dictates of Strickland, he relies upon cases interpreting the Fifth and Eighth Amendments because those amendments provide the legal basis for the meritorious objections counsel failed to make.[19]

The Government attempts to defend its many improper comments by contending that they are fair comments on, or inferences from, the record. This contention lacks all credibility, as the

---

[19]The Government fails to acknowledge the Eighth Amendment implications of its improper comments in closing. Its *Answer* ignores the relevant standard for claims that a prosecutor's argument infringed specific guarantees of the Bill of Rights – in such instances a petitioner may obtain relief by demonstrating that the improper argument had a substantial prejudicial effect on a specific right, without having to prove the entire proceeding was unfair. Paxton v. Ward, 199 F.3d 1997, 1217-18 (10th Cir. 1999); Mahorney v. Wallman, 917 F.2d 469, 472 (10th Cir. 1990).

Government apparently will make such comments in any penalty trial, regardless of the particular facts. Mr. Fields has become aware that the United States Attorney gave substantially the same rebuttal closing argument in the penalty trial of Kenneth Eugene Barrett, a capital case tried before the Honorable James H. Payne in November of 2005.[20] As evidenced by the opinion of the Court of Appeals affirming the conviction and sentence on direct appeal, the facts of United States v. Barrett, 496 F.3d 1079 (10th Cir. 2007), are dramatically different than the circumstances of the instant matter. Most significantly, no mental health testimony was presented in Barrett, while the penalty trial here focused primarily on such evidence. The lack of similarity did not stop the Government from trotting out its pat arguments in both cases, and, more to the point, it shatters any defense of its comments here based on the unique inferences or circumstances arising from Mr. Fields' record.

Despite the significant factual differences between Barrett and Mr. Fields' case, the United States Attorney made numerous similar – and in some instances identical – arguments in support of the death penalty.[21] These similar and identical arguments are catalogued in a chart prepared by

---

[20]Due to the Government's numerous references to Barrett in the *Answer*, undersigned counsel reviewed the Government's pleadings in the section 2255 litigation in United States v. Kenneth Eugene Barrett. They discovered that many of the challenged comments that are the subject of the instant claim were also made during the rebuttal closing argument in Barrett. As a result, undersigned counsel obtained a copy of the transcript of the closing arguments in Barrett and uncovered the full extent of the similarities between the rebuttal closings in Barrett and the instant matter.

[21]The use of similar or identical arguments cannot be ascribed to the fact that the Government is obligated to prove beyond reasonable doubt a number of statutory factors in order for the jury to consider whether a sentence of death is appropriate. The arguments made here are irrelevant to those statutory factors. See, e.g., *TR*, 3452 ("The Defendant, though, by his conduct has abandoned the community of human beings who have empathy for others."); *TR* (Barrett), 5411 ("You know, he lacked an essentially [sic] ingredient of the community of people. He doesn't have empathy for other people."); *TR*, 3457 ("Don't let this Defendant be a hero to his incarcerated criminal inmates. All with a civilized core must recoil with revulsion of what the Defendant did to act as the executioner of the innocent."); *TR* (Barrett), 5412 ("Don't let this Defendant – the evidence may reasonably infer

45

undersigned counsel and attached hereto as Exhibit A. The transcript of the full closing arguments in

Barrett is attached hereto as Exhibit B. Many of the improper arguments that Mr. Fields has

challenged in the *Motion* were also given during the rebuttal closing in Barrett. At a minimum, this

undermines the plausibility and credibility of the Government's contention that any of the challenged

arguments were properly based upon the individual trial record. Moreover, if the Court examines the

United States Attorney's response to the section 2255 petition filed on behalf of Mr. Barrett, in which

a number of the common arguments were challenged, the Court will discover that the United States

Attorney has attempted to justify those arguments on the unique facts of the Barrett case. Barrett v.

United States, No. 6:09-cv-105-JHP, Doc. No. 174 (E.D. Okla).

Additionally, the fact that the United States Attorney employs the same arguments and rhetoric

to exhort juries in cases presenting significantly different facts to impose the death penalty is evidence

of the Eighth Amendment violation in Mr. Fields' case. "[I]n capital cases the fundamental respect

for humanity underlying the Eighth Amendment requires consideration of the individual offender and

the circumstances of the particular offense as a constitutionally indispensable part of the process of

inflicting the penalty of death." Woodson v. North Carolina, 428 U.S. 280, 304 (1976) (citation

---

and you may reasonably conclude – be a hero to his fellow inmates, to his fellow incarcerated criminals. All with a civilized core must have revulsion at what the Defendant did to have acted as the executioner of the innocent."); *TR*, 3459 ("Remember this, here in court the Defendant continues to victimize his own family by reducing them to props in an effort to escape justice. Remember also that Charlie didn't get an opportunity to plead for his life."); *TR* (Barrett), 5420 ("And remember this, hear [sic] in court, the Defendant victimizes his own family by making them serve as props, as witnesses on his behalf. Remember, Rocky didn't get this similar chance to plead for his life."); *TR*, 3460 ("He's the one who put us all here. What a sense of power he may feel. The narcissistic kind of selfish collection of reality that he has become. We must not refuse to do our duty because we cannot make the victims whole."); *TR* (Barrett), 5422 ("He is the one who put us all here. What a sense of power he must feel, the narcissistic, selfish collection of reality that he is. He's the one that put us all here. But we must not refuse to do our duty just because we can't make the victim's family or friends or community whole.).

omitted). The United States Attorney's arguments reflect no such concern for the circumstances of the particular offense and the particular offender, but instead encourage the imposition of a sentence of death on every murder regardless of the facts.

Just as a prosecutor cannot argue that the jury should refuse to consider evidence presented in mitigation, see, e.g., Lockett, 438 U.S. at 605, *Motion*, ¶¶ 174-180; *Memo*, 75-78, the United States Attorney cannot encourage a death sentence for reasons that apply to "every unjustified, intentional taking of human life." Maynard v. Cartwright, 486 U.S. 356, 364 (1988) (invalidating aggravating circumstance that "an ordinary person could honestly believe" described every murder); see also Arave v. Creech, 507 U.S. 463, 474 (1993) ("If the sentencer fairly could conclude that an aggravating circumstance applies to *every* defendant eligible for the death penalty, the circumstance is constitutionally infirm.") (emphasis in original); Godfrey v. Georgia, 446 U.S. 420, 428-9 (1980) (invalidating death sentence based upon finding that offense was "outrageously or wantonly vile, horrible and inhuman," where "[a] person of ordinary sensibility could fairly characterize almost every murder as" such); Le v. Mullin, 311 F.3d 1002, 1018 (10th Cir. 2002); Bland v. Sirmons, 459 F.3d 1999, 1027 (10th Cir. 2006). The actions of the United States Attorney in Mr. Fields' case and in Barrett flout this principle.

This credibility gap is evident throughout the Government's response to Mr. Fields' claim. On critical aspects of the case – specifically, the mental health evidence and the evidence supporting the substantial planning aggravating circumstances – the *Answer* either sidesteps the improper arguments made in closing or ignores them altogether. The Government's position appears to be that just because it made some proper comments on a particular subject in closing argument, or because some conceivably proper spin can be given to a comment, it erases the unconstitutional taint of its clearly

47

improper comments. This position is entirely erroneous and merely an attempt to misdirect this Court's attention from the prosecution's numerous improper comments which rendered Mr. Fields' trial fundamentally unfair and denied him his right to jury consideration of all mitigating evidence, and to the imposition of a death sentence by a process that adequately narrows the class of defendants eligible for the death penalty, provides guidance and clear standards to channel the jury's discretion and is rationally reviewable.

The error of the Government's position is especially evident in its response to the claims that it misrepresented and made false statements about the mental health evidence presented by Mr. Fields. The *Answer* overlooks the demonstrably false statements made by the United States Attorney regarding the qualifications and testimony of Dr. Grinage, and the testimony of Dr. Woods, choosing instead to highlight other statements it made regarding the credibility of the Government's experts. See *Answer*, 78-9. While the Government attempts to justify its "left coast – hired gun" attack with respect to Dr. Woods, it cannot – and in fact does not even attempt to – escape the fact that its supposed factual predicate for such an argument is totally inapplicable to Dr. Grinage, who was from Kansas and had never before testified in a capital case. Compare *Answer*, 79 with *Motion*, ¶ 182 n.28.

More significant is its gross misrepresentation of the testimony of Drs. Woods and Grinage. Contrary to the Government's argument in closing, neither doctor testified that they were unaware that Mr. Fields owned a ghillie suit or observed people while wearing such a suit. See *TR*, 3427 ("On cross examination, the doctors were asked about the Ghilley suit. Well, I didn't know he had the Ghilley suit and had snuck up on people beforehand. I didn't know that at all. That came as news to them."). The Government now attempts to backtrack from this assertion, characterizing Dr. Woods' testimony he was aware of that fact as "sketchy" and chalking up its complete fabrication of such testimony with

regard to Dr. Grinage as a mistaken use of the plural. See *Answer*, 84-6. The Government further attempts to misdirect this Court by pointing to other, unrelated points on which Dr. Grinage actually testified. Id. at 86.

The Government also responds that the United States Attorney's statement that Mr. Fields' doctors said he had sociopathic characteristics is a fair inference from the record.[22] This argument blinks reality. The Government relies on Marilyn Presley's vague testimony that "they" told Mr. Fields he had sociopathic tendencies as supporting an inference that his doctors diagnosed him as such, but this inference is flatly contradicted by the record. Dr. Grinage denied that Mr. Fields exhibited any such traits, and Dr. Woods was never asked. Moreover, this Court properly sustained an objection to the Government's attempt to ask Mrs. Presley if Mr. Fields identified the doctors who allegedly told him that he had such tendencies. If the question was improper, the inference can hardly be considered appropriate.[23]

With regard to its arguments in support of the substantial planning aggravating circumstance,

---

[22]Trial counsel properly objected to this comment, as well as the Government's misstatement of law regarding the weighing of aggravating and mitigating factors. *Motion*, ¶¶ 175-76, 186 n.30; *Memo*, 87-88. The Government contends that the jury was properly instructed, and thus these incidences of misconduct are irrelevant. This answer fails to recognize that no curative instructions were provided, and in fact, these improper comments were made in the **rebuttal** closing argument, after the Court's instructions and the defense closing were given, and thus the Government had the last word. "The official imprimatur thereby placed upon the prosecution's misstatements of law obviously amplified their potential prejudicial effect on the jury." Mahorney v. Wallman, 917 F.2d 469, 473 (10th Cir. 1990). Furthermore, if this Court's initial general instructions were sufficient to cure any subsequent misstatements, this would permit any closing argument by the Government, no matter how egregious. See Newlon v. Armontrout, 885 F.2d 1328, 1337 (8th Cir. 1989).

[23]The Government also contends that "[i]n no way did the prosecutor suggest, as Fields now claims, that the diagnosis emanated from the defense experts." *Answer*, 83. This argument rings hollow given that, in the prior paragraph, the Government strenuously argues that Mr. Fields' doctors did in fact diagnose him with "sociopathic tendencies." *Answer*, 82.

the Government denies that it contended that Mr. Fields engaged in squirrel hunting with a specific intent to improve his ability to murder people, but suggests that such an argument was a reasonable inference nonetheless. This is incorrect on both fronts. As an initial matter, the Government argued that squirrel hunting was just one step in Mr. Fields' alleged plan to become a sniper and predator. See *TR*, 3407-9, 3421. The Government argued that building the ghillie suit was the "first step" in that plan, *TR*, 3407, and then immediately discussed how Mr. Fields would squirrel hunt with a scope on his rifle unnecessary for such prey. *TR*, 3407-8. Next, the Government argued that he had become proficient in his stalking and sniping skills by hunting squirrels, as part of his plan to become a hunter of people. *TR*, 3408 ("He had become proficient in his stalking activities without, as the squirrels, being able to sneak up on people."); *TR*, 3409 ("Just another step in this long process, ladies and gentlemen. Dan Presley told you that he'd become very proficient with that particular firearm, that he could hit a squirrel from 60 to 70 yards away. In fact, I think he told you he could knock a squirrel off a branch. At this time Defendant has all parts of his plans coming together. He's become a proficient stalker and he's become a proficient sniper."). At a minimum, the Government's contention that it merely argued that Mr. Fields put his "skills as a stalker...to use on the day of the murder" lacks credibility. *Answer*, 88.

Furthermore, there is no evidence in the record to support the inferential leap the Government exhorted the jury to take – that Mr. Fields engaged in squirrel hunting as part of a plan to become a predator of people. The record is clear that Mr. Fields engaged in squirrel hunting with his rifle and while wearing a ghillie suit, and it is clear that he killed Mr. and Mrs. Chick with the same rifle and while wearing the same suit, but anything more is mere speculation. The Government's argument asked the jury to engage in a version of the logical fallacy known as *post hoc ergo propter hoc* –

assuming a connection between the two events based upon their order in time.

The Government similarly conflates guesswork with reasonable inferences when it argues that Mrs. Chick begged for her life. The leap between evidence in the record suggesting that Mrs. Chick assumed a defensive posture prior to being shot and the notion that she begged for her life is too great to be anything other than mere speculation. At a minimum, the jury would have to make assumptions about the timing and distance of the shots, for which there is little to no evidence in the record, in order to guess whether Mrs. Chick even had the opportunity to speak, and still would be left to speculate as to whether she in fact said anything. Based upon the evidence of record, it is no more than a mere possibility that Mrs. Chick said anything before her death.

The *Answer* illustrates that not all inferences from the record are reasonable. While a prosecutor is certainly allowed to make inferences from the record, "reasonable inferences themselves must be more than speculation and conjecture." Sunward Corp. v. Dun & Bradstreet, Inc., 811 F.2d 511, 521 (10th Cir. 1987) (citing Galloway v. United States, 319 U.S. 372, 395 (1943) ("the essential requirement is that mere speculation be not allowed to do duty for probative facts"); see also United States v. Jones, 49 F.3d 628, 632 (10th Cir. 1995). "A jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility. Such a finding is infirm because it is not based on the evidence." Sunward, 811 F.2d at 521; Jones, 49 F.3d at 632 (same). Here, the Government's arguments invited the jury to make mere guesses based upon evidence in the record, and can hardly be called reasonable inferences.

The United States Attorney concluded the rebuttal closing arguments in both Mr. Fields' case and Barrett with an extended recitation of the "Writing on the Wall" story from the Book of Daniel. The United States Attorney's invocation of the story here was clearly identifiable as a story from the

51

Bible. "[T]he passage was unmistakably biblical in style and readily recognizable by persons schooled in the Christian religion." <u>People v. Sandoval</u>, 841 P.2d 862, 883 (Cal. 1992). Not only did the United States Attorney choose a popular and familiar story from the Bible and recount its most-recognized lessons, but included its references to a temple, a prophet and a mystical hand, and its disdain for the worship of pagan idols. The origin of the story was unmistakable, even if the United States Attorney did not say the words "God" or "Bible." Moreover, if the Government simply wanted to invoke the secularized idiom, it could have done that. Instead, it chose to recite the entire story, evidencing its intent to invoke what was immediately recognizable as a passage from the Bible.

The Government's *post hoc* explanations of the prosecutors' improper closing arguments cannot be credited. As the *Motion* and *Memo* describe, these comments were not isolated, but rather part of a strategy to bolster the Government's case in support of death while denigrating Mr. Fields' case for mercy. The additional issues raised in this memorandum with regard to <u>Barrett</u> illustrate the lack of credibility of the Government's *Answer*. The record establishes that the closing arguments contain a series of false, misleading or inappropriate comments, and that trial and appellate counsel failed to raise these meritorious issues, indeed, these "dead bang winners" of objections.

Finally, the Government argues that these claims are defaulted. *Answer*, 67-68. This is not so. The Supreme Court has long recognized that a claim of ineffective assistance of counsel overcomes any procedural default in raising other constitutional grounds for relief. <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986) ("[I]f the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State, which may not 'conduc[t] trials at which persons who face incarceration must defend themselves without adequate legal assistance."). A section 2255 proceeding is the proper forum for a claim of ineffective assistance

of counsel. <u>Massaro</u>, 538 U.S. at 504. Thus, contrary to the Government's suggestion, this proceeding is an entirely appropriate venue for Mr. Fields' claim that trial and appellate counsel rendered ineffective assistance of counsel in failing to object to and raise on direct appeal the numerous instances of improper, unconstitutional and unfair argument by the United States Attorney during closing arguments in Mr. Fields' penalty trial.

**GROUND SIX**

**TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO INSTRUCTIONS AND A VERDICT FORM THAT ALLOWED THE JURY TO APPROVE A GENERAL VERDICT OF DEATH BASED ON THE COMBINED WEIGHING OF AGGRAVATING FACTORS APPLICABLE TO TWO SEPARATE MURDER COUNTS.**

Underlying the federal sentencing system is "a principle unmistakable though implicit, and so obviously sound that it would take extraordinary circumstances to justify a departure from it. It is that every separate violation of law deserves a separate sanction, so that no violation shall go unsanctioned." <u>United States v. Hill</u>, 48 F.3d 228, 232 (7th Cir. 1995); <u>see also</u> <u>United States v. Woodward</u>, 938 F.2d 1255, 1257 (11th Cir. 1991) (reaffirming rule that general sentences are illegal after adoption of Sentencing Guidelines, citing Guidelines § 5G1.2). Here, trial counsel ineffectively failed to object to jury instructions and a verdict slip that allowed the jury to impose a unitary sentence of death, in contravention of this principle.

The unitary sentence was improper, and trial counsel rendered deficient performance in requesting instructions and a verdict slip that called for one. Contrary to the Government's position, a unitary sentence is neither permissible nor did counsel act reasonably in seeking one. Federal courts have long recognized that general sentences are impermissible. <u>See</u>, <u>e.g.</u>, <u>Benson v. United States</u>, 332 F.2d 288, 291 (5th Cir. 1964) (finding general sentence on three counts to be illegal, and observing

53

that a "sentence is passed not because the defendant is a social outcast or needs chastisement generally. It is the law's punishment for specific transgressions of its formalized standards."); United States v. Henry, 709 F.2d 298 (5th Cir. 1983) ("Whether in the Speedy Trial Act or in any other context, a federal 'sentence' is not general or transactional. It is the specific consequence of a specific violation of a specific federal statute."); Woodward, 938 F.2d at 1257-58; United States v. Edwards, 526 F.3d 747, 761-62 (11th Cir. 2008) (*sua sponte* remand for resentencing when the district court imposed a single sentence for multiple counts, with instructions that the district court impose a sentence for each count). Here, there were two victims, and two crimes, which the instructions and verdict slip should have reflected by asking the jury to determine a sentence for each count.[24]

In response to this rather obvious flaw in Mr. Fields' sentencing proceeding, the Government points only to two California **state** cases, one *upholding* separate penalty verdicts in a capital case with multiple victims. See *Answer*, 95-96 (citing People v. Sandoval, 841 P.2d 862, 885-86 (Cal. 1992) ("We are not persuaded that there is any impropriety in requiring the jury to return a separate penalty verdict for each capital murder count.")). The other case, People v. Crittenden, 885 P.2d 887 (Cal. 1994), contains no discussion of anything but California law, and suggests that jurors need not find aggravating factors unanimously, rendering it unpersuasive here. *Answer*, 95. The Government also relies on the fact that a similarly improper verdict slip was used in United States v. McVeigh. That fact is neither here nor there, as there is no indication that defense counsel in McVeigh ever objected

---

[24]The Government conceded on direct appeal that there were two crimes. See, e.g. *Gov't Br. on Appeal*, 37 (acknowledging that "the government alleged 'substantial planning and premeditation' as to each crime").

to a unitary sentence, and thus no court was presented with the opportunity to rule its propriety.[25]

This unitary weighing process and resulting sentence of death were improper, and trial counsel had no reasonable strategy in requesting them. Here again, the Government offers a hypothetical theory as to why counsel might have requested a unitary weighing process and sentence in this case. *Answer*, 96-98. Even if one accepts that such a hypothetical strategy was reasonable, the Government's explanation is contrary to Ms. O'Connell's actual explanation in her post-conviction declaration, in which she describes how the defense team's dysfunction negatively affected the preparation of proposed jury instructions, and also states that she had no tactical or strategic reason for failing to make meritorious objections. Pet. Ex. 1, ¶¶ 8, 23. This Court cannot adopt the Government's hypothetical strategy in light of these contrary statements from trial counsel, and at a minimum, must hold a hearing to determine trial counsel's actual reason – or lack thereof – for seeking a general sentence here. See Wiggins, 539 U.S. at 526-27 (2003) ("[T]he 'strategic decision' the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing."); Alcala, 334 F.3d at 871 ("We will not assume facts not in the record in order to manufacture a reasonable strategic decision for Alcala's trial counsel."); see also Wood v. Allen, 130 S.Ct. 841, 852 (2010) ("whether counsel's decision was the product of strategy is a question of fact") (Stevens, J., dissenting) (citing Carr v. Schofield, 364 F.3d 1246, 1264 (11th Cir. 2004); Berryman v. Morton, 100 F.3d 1089, 1095 (3d Cir. 1996)).

Furthermore, the Government misunderstands the nature of the prejudice suffered by Mr. Fields

---

[25]The Government does not address the fact that the text of the FDPA itself supports Mr. Fields' claim, in that Congress provided a mechanism in the multiple murder aggravating factor for taking into consideration that a defendant killed more than one person.

from his counsel's ineffective failure to object to a unitary sentence.  Mr. Fields must show only a reasonable probability of a different result, and "the adjective is important." Kyles v. Whitley, 514 U.S. 419, 434 (1995).[26] Here, assuming as we must that the jury followed the Court's instructions and imposed a general sentence for both counts, the jurors were allowed to give weight to aggravating factors where no weight at all was due.  If the jury had been instructed to make separate sentencing determinations for Count One and Count Three, surely it would not have been instructed to consider aggravating factors specific to Count Three in determining the sentence for Count One, and vice versa – but the instructions and verdict slip given here in effect allowed the jury to do so.  This is not merely a matter of counting the number of aggravating factors, but assessing the weight that the additional improper factors added to death's side of the scale.  See Stringer v. Black, 503 U.S. 222, 232 (1992) ("when the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale"). Given that Mr. Fields presented a significant case for life at the penalty trial – albeit, one with many flaws – and the jury found mitigating factors to be present, had the jurors not been instructed to give weight to additional, inapplicable aggravating factors in determining the sentences for the deaths of Mr. and Mrs. Chick, there is a reasonable probability of a different result – two sentences of life without possibility of release.

Additionally, had the jury been given an opportunity to give effect to the mitigating evidence by instructions and a verdict slip that allowed it to impose a life sentence on each count irrespective of the sentence imposed on the other count, there is a reasonable likelihood of a different result.  Based

---

[26]Although Kyles addressed the materiality of the prosecution's non-disclosure of exculpatory evidence, so-called Brady v. Maryland, 373 U.S. 83 (1963), materiality is co-extensive with Strickland prejudice.  Kyles, 514 U.S. at 436.

upon the evidence presented at trial and the aggravating factors alleged by the Government, there is

a possibility that the jury could have returned a death sentence on one count and a life sentence on the

other. The Government contends that Mr. Fields "baselessly" asserts that the mental anguish factor

applied only to Mrs. Chick, and in fact the factor could apply to both Mr. and Mrs. Chick, *Answer*, 99,

but it is the Government's argument that is baseless, and misleading. On direct appeal, the

Government acknowledged that the jury found the mental anguish aggravating factor to apply only to

Mrs. Chick.[27] <u>See</u> *Gov't Br. on Appeal*, 45-46 ("The jury's findings arising from the two counts

differed in only one respect: the jury found that the defendant inflicted mental anguish on Shirley Elliot

Chick."). The Tenth Circuit found that the mental anguish factor applied only to Mrs. Chick. <u>United

States v. Fields</u>, 516 F.3d 923, 938-39 (10th Cir. 2009). Given that the Government presented

evidence that Mr. Chick was killed first, and in front of his wife, and that Mrs. Chick was shot three

times while trying to escape from Mr. Fields, a jury could have found that the additional weight of the

mental anguish factor sufficient to render death the appropriate sentence for the killing of Mrs. Chick,

while concluding that the aggravating factors did not substantially outweigh the mitigating factors for

the killing of Mr. Chick.

Contrary to the Government's assertion, a verdict of death on Count One and life imprisonment

on Count Three is beneficial to Mr. Fields, because a death sentence for the killing of Mrs. Chick

based upon the mental anguish aggravating factor should be deemed invalid. The Government does

not take into account the relationship between the flaws in the verdict form and Mr. Fields' contention

(set forth in Ground Three) that trial counsel ineffectively failed to present evidence to rebut the mental

---

[27]The Government has never before suggested that the mental anguish aggravating factor might apply to Mr. Chick, at trial or on direct appeal. This attempt in the *Answer* is not more than a *post hoc* creation to avoid the consequences of the constitutional error identified in this Ground.

anguish aggravating factor. This Court must assess prejudice cumulatively – if trial counsel had ensured that the jury would determine a separate sentence for each count, and presented evidence to rebut the mental anguish aggravating factor, there is a reasonable likelihood that the jury would have returned two life sentences. See, e.g. Berryman v. Morton, 100 F.3d 1089 (3d Cir. 1996) (cumulative effect of each instance of counsel's deficient performance was sufficiently prejudicial to require relief); Harris v. Wood, 64 F.3d 1432, 1438-39 (9th Cir. 1995) (granting relief for cumulative prejudicial effect of counsel's deficient performance); Kubat v. Thieret, 867 F.2d 351, 371 (7th Cir. 1989) (district court "appropriately considered the combined effect of counsel's errors"; Strickland "clearly allows the court to consider the cumulative effect of counsel's errors in determining whether a defendant was prejudiced").

The Government also suggests that this claim invites the Court to make a new rule of criminal procedure in contravention of Teague v. Lane, 489 U.S. 288 (1989). This is not the case. Mr. Fields' claim is based upon Strickland, which the Supreme Court has acknowledged is a "framework" decision. A post-conviction petitioner is entitled to relief if his lawyer was ineffective. There is no Teague bar permitting relief only for particular types of ineffectiveness that have been the subject of a particular Supreme Court holding. Williams v. Taylor, 529 U.S. 362, 382 (2000) (That the Strickland test "of necessity requires a case-by-case examination of the evidence" obviates neither the clarity of the rule nor the extent to which the rule must be seen as "established" by this Court.")

**THE GOVERNMENT WITHHELD EXCULPATORY, MATERIAL EVIDENCE FROM THE DEFENSE IN VIOLATION OF DUE PROCESS, AND TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT EXCULPATORY EVIDENCE.**

Mr. Fields contends that the Government's suppression of the fact that the Effexor bottle and its contents was delivered to the Muskogee County Detention Center by the FBI is exculpatory.[28]  One of the critical factual issues at the penalty trial was whether Mr. Fields had taken any, or enough, of the increased 150 mg dosage of Effexor prior to the killings of Mr. and Mrs. Chick to induce a manic flip.  As the Government repeatedly emphasized, there was no evidence on this issue other than Mr. Fields' self-reporting, and the Government effectively argued that Mr. Fields' had not suffered from a manic flip induced by his consumption of the increased dosage of Effexor.  The Government's belated revelation that the bottle and its contents were delivered to the jail by the FBI, where Mr. Fields was administered the contents of the bottle, is exculpatory because it provides the missing evidentiary link to determining how much Effexor Mr. Fields actually took around the time of the killings of Mr. and Mrs. Chick.

In response to Mr. Fields' contention that the Government suppressed information regarding the disposition of the Effexor bottle and its contents found in his truck, in violation of Brady v. Maryland, 373 U.S. 83 (1963), the Government raises a series of issues of fact that may only be resolved following a hearing.

The Government first contends that it had no knowledge of the contents of the Effexor bottle.

---

[28]Mr. Fields has taken the United States Attorney at his word with regard to the disposition of the bottle, but notes that nothing in the records of the Muskogee County Detention Center provides any confirmation, nor do any of the records previously provided to Mr. Fields.  The Government also has not offered any declarations from the FBI agent or agents who delivered the bottle to the jail, or other any other documentation of the FBI's role with regard to the bottle.

This is a factual issue that must be resolved after an evidentiary hearing. Agent Dalley's inventory of the contents of the truck mentions the bottle and corresponding pharmacy sack, but does not include an inventory of the bottle's contents. See Pet. Ex. 29. Based upon the Declaration of Iris Dalley submitted by the Government in conjunction with the *Answer*, Gov. Ex. 1, we now know that Agent Dalley's reports do not contain a full summary of her observations. And as shown by her Declaration's silence on this issue, it appears that the Government either never asked her about the contents of the bottle, or asked and did not like the answer it received. What is clear is that Agent Dalley had the bottle in her possession, as did one or more unnamed FBI agents. Mr. Fields does not contend that the Government should have conducted any scientific or other testing on the contents of the bottle – he argues only that the Government should have disclosed information regarding the disposition of the bottle, information that the Government admits was in the possession of the FBI.

Contrary to the Government's position in the *Answer*, it does have an affirmative duty to seek out any information favorable to the defense that was known to those acting on the Government's behalf. *Answer*, 103-05. Kyles v. Whitley, 514 U.S. 419, 437-38 (1995) (rule of Brady encompasses evidence "known only to police investigators and not to the prosecutor"and thus "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police"); United States v. Price, 566 F.3d 900 (9th Cir. 2009) (once petitioner produces evidence to support inference government possessed or knew about material favorable to defense and failed to disclose it, "the burden shifts to the government to demonstrate that the prosecutor satisfied his duty to disclose all favorable evidence known to him or that he could have learned from 'others acting on the government's behalf'") (quoting Kyles, 514 U.S. at 437).

60

Mr. Fields had no way of knowing where the Effexor he was administered in jail came from – only the Government could shed light on that fact. The records from the Muskogee County Detention Center contain no indication of where the bottle came from – the bottle does not appear on any property receipt, nor is there a medication acceptance form among the records. See July 15, 2010 Letter from Sheldon Sperling to Michael Wiseman regarding Muskogee County Detention Center records, with Enclosures, attached hereto as Exhibit C. At a minimum, this is a factual issue that can only be resolved following an evidentiary hearing.

Counsel for Mr. Fields have investigated the medication administration sheets to determine the significance of the various markings on the sheet. Shirley Shores-Todd, who was employed at the prison as a nurse in 2003, informed counsel that an initial in a box on the sheet indicates that a dosage of the medication was administered on that date by a nurse with that initial. A hash mark indicates that no medication was administered. If an inmate refused to take medication, there would be an "R" in a circle in the appropriate box on the form. A solid vertical line with the notation "no refill" next to it indicates that the prescription ran out and no refill was authorized or ordered. The information provided by Mrs. Shores-Todd confirms Mr. Fields' reading of the medication administration sheets, and demonstrates that Mr. Fields was administered fourteen Effexor pills while at the Muskogee County Detention Center, and that the reason he received only fourteen pills was that the prescription ran out and was not refilled.

What Mr. Fields now knows, as a result of the Government's belated disclosure, is that the fourteen Effexor pills he consumed while at the Muskogee County Detention Center came from the bottle in his truck. That bottle originally contained 30 pills when it was filled on July 9, 2003. Between July 9 and July 18, when Mr. Fields was arrested, Mr. Fields consumed sixteen pills, well

more than the dosage of one pill a day. The Government contends that Mr. Fields may have lost or otherwise disposed of the pills – although this contention is no more than pure speculation, it raises another factual issue to be resolved following an evidentiary hearing.

The fact that Mr. Fields took more than the recommended dosage between July 9 and July 18, 2003, supports his contention that he was suffering from an Effexor-induced manic flip on July 10 because the jury could reasonably infer that he consumed at least some of the increased 150 mg dosage prior to the killings. Furthermore, from the fact that he took more than the recommended dosage, the jury could reasonably infer that his reports of symptoms such as hearing voices at and around the time of the killings was more credible, because people commonly take additional medication when the recommended dosage is not addressing their symptoms or their symptoms become more severe. Evidence that Mr. Fields had taken the 150 mg dosage of Effexor would have lent credibility to the testimony of Drs. Wood and Grinage that Mr. Fields was suffering from a manic flip brought on by the increased dosage of Effexor.

The undisclosed information regarding the FBI's possession and disposition of the pill bottle "strengthens the inference that [Mr. Fields] was impaired by [his mental illness] around the time his crimes were committed." Bell v. Cone, 129 S. Ct. 1769, 1783 (2009) (concluding that prosecution's suppression of information regarding defendant's drug addiction violated Brady because the information was material as to mitigating factor that defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to requirements of law was impaired). Thus, had the Government disclosed prior to trial that the bottle of 150 mg Effexor pills was delivered to the Muskogee County Detention Center, there is a reasonable probability of a different result.

## GROUND VIII

**THE CUMULATIVE IMPACT OF ALL THESE ERRORS DENIED MR. FIELDS DUE PROCESS, EFFECTIVE ASSISTANCE OF COUNSEL AND A RELIABLE SENTENCING HEARING.**

Because all of the preceding claims are meritorious for the reasons set forth above, this claim, too, is meritorious. Even if the Court concludes that Mr. Fields was not prejudiced by any individual error, the cumulative impact of all these errors considered together establishes prejudice.

## GROUND IX

**THE MANNER OF MR. FIELDS' EXECUTION, IF CARRIED OUT, WOULD VIOLATE THE EIGHTH AMENDMENT.**

As Mr. Fields has asserted in both the *Motion* and the *Memo*, this claim is not ripe for review, and thus he concurs with the Government's answer to this claim.

**CONCLUSION**

For all of the foregoing reasons, and for all of the reasons set forth in the *Motion*, *Memo*, *Appendix* and *Supplemental Appendix*, the Court should (1) grant Mr. Fields such discovery as is necessary to prove his claims; (2) conduct an evidentiary hearing on all of his claims; and (3) grant him the relief requested in the *Motion*.

Respectfully Submitted,

/s/Michael Wiseman

_____
Michael Wiseman
Chief, Capital Habeas Corpus Unit
Cristi Charpentier
Assistant Federal Defender
Federal Community Defender for the
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West, The Curtis Center
Philadelphia, PA 19106
215-928-0520
Michael_Wiseman@fd.org
Cristi_Charpentier@fd.org

Counsel for Petitioner
Edward Leon Fields, Jr.

Dated:  November 15, 2010
        Philadelphia, Pennsylvania

**CERTIFICATE OF SERVICE**

I, Michael Wiseman, Esq., hereby certify that on this 15th day of November, 2010, the foregoing document was electronically filed and is available for viewing and downloading through the ECF system.

/s/ Michael Wiseman

_____

Michael Wiseman