# Exhibit B-1

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

FILED
MAY 22 2006
WILLIAM B. GUTHRIE
Clerk, U.S. District Court
By_____
Deputy Clerk

UNITED STATES OF AMERICA, )
                          )
            Plaintiff,    )
                          )
-vs-                      )    No. CR-04-115-P
                          )
KENNETH EUGENE BARRETT,   )
                          )
            Defendant.    )

VOLUME 27 OF 27

TRANSCRIPT OF PROCEEDINGS,

held before the Honorable James H. Payne, Judge in the

United States District Court for the Eastern District

of Oklahoma on November 17, 2005.

A P P E A R A N C E S

For the Plaintiff:        Mr. Sheldon J. Sperling
                          United States Attorney
                          and
                          Mr. D. Michael Littlefield
                          Assistant U.S. Attorney

For the Defendant:        Mr. Roger Hilfiger and
                          Mr. Bret A. Smith
                          Attorneys at Law

## EUSTICE REPORTING SERVICE

CERTIFIED SHORTHAND REPORTER
POST OFFICE BOX 700488
TULSA, OKLAHOMA 74170
(918) 445-2965

KEB104150

5285

P R O C E E D I N G S

THE COURT:  Let the record reflect counsel for the Government is present, Defendant is present with counsel.  For the record, counsel for the Government and Defendant have been provided with the Court's proposed instructions and special penalty phase verdict forms and special interrogatories for Counts One, Two and Three; is that correct from the Government's perspective?

MR. SPERLING:  That's correct, Your Honor.

THE COURT:  From the Defendant?

MR. HILFIGER:  Yes, Your Honor, that's correct.

THE COURT:  It's my understanding from the Government and the Defendant there are for objection to these Instructions, however, I want to go over them individually for the record.

First, the jury instructions, the introduction, any objection from the Government?

MR. SPERLING:  No, Your Honor.  May we remain standing while you go through these?

THE COURT:  You may.  Or you can remain seated, whichever is most comfortable for you.

MR. SPERLING:  How about the second?  Thank you.

MR. HILFIGER:  No objection.

THE COURT:  Instruction Number One, death

KEB104151

5286

penalty generally.

MR. SPERLING:  No objection.

MR. HILFIGER:  No objection.

THE COURT:  Instruction Number Two, burden of proof.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Instruction Number Three, reasonable doubt defined.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Instruction Number Four, unanimity required for death sentence.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number Five, age at the time of the offense.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number Six, threshold eligibility factors.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number Seven, summary of deliberative process.

KEB104152

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number Eight, aggravating and mitigating factors generally.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number Nine, statutory aggravating factors.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number Ten, grave risk of death to additional persons.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection, Your Honor.

THE COURT:  Number Eleven, multiple killings or attempted killings.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection, Your Honor.

THE COURT:  Instruction Number 12, substantial planning and premeditation.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection, Your Honor.

THE COURT:  Number 13, non-statutory aggravating factors.

MR. SPERLING:  No objection, Your Honor.

KEB104153

5288

MR. HILFIGER:  No objection.

THE COURT:  Number 14, mitigating factor, burden of proof.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number 15, mitigating factors.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number 16, unanimity not required as to mitigating factors.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number 17, failure of Defendant to testify.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.  Judge, I think on that particular, we have requested that step up instruction as part of the defense.

THE COURT:  That was my about to be inquiry. Court notes the Defendant requested Instruction Number 17.  Number 18, dual prosecutions.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number 19, mitigating circumstances do not include residual doubt.

KEB104154

MR. SPERLING: No objection, Your Honor.

MR. HILFIGER: No objection.

THE COURT: Number 20, weighing the various factors.

MR. SPERLING: No objection, Your Honor.

MR. HILFIGER: No objection.

THE COURT: Instruction 21, consequences of deliberation.

MR. SPERLING: No objection, Your Honor.

MR. HILFIGER: No objection.

THE COURT: Number 22 is duty to deliberate.

MR. SPERLING: No objection, Your Honor.

THE COURT: Number 23, judging the evidence.

MR. SPERLING: No objection, Your Honor.

MR. HILFIGER: No objection. And on 22, I think I --

THE COURT: I skipped --

MR. HILFIGER: I didn't say -- I have no objection.

THE COURT: I'm going too fast. 22.

MR. HILFIGER: I believe that was the one I missed.

THE COURT: Duty to deliberate, number 22, no objection from the defense; is that correct?

MR. HILFIGER: Correct.

KEB104155

THE COURT:  Number 23, judging the evidence.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Twenty Four is penalty phase special verdict form.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Twenty Five is special interrogatories.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  Number 26, right to justice without discrimination.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  And Number 27 is the concluding instruction that I'll read after you finished your closing arguments.

MR. SPERLING:  No objection, Your Honor.

MR. HILFIGER:  No objection.

THE COURT:  I think there is a penalty phase verdict form that is 41 pages long.  I understand there's no objection to the penalty phase and the special verdict form.

MR. SPERLING:  That's correct, Your Honor.

KEB104156

5291

MR. HILFIGER:  That's correct.

THE COURT:  And then there are three special interrogatories.  One as to Count One, Two and Three. Government have any objections?

MR. SPERLING:  No, Your Honor.

MR. HILFIGER:  We have no objection.

THE COURT:  I'll advise that I have prepared copies of the instructions for each member of the jury that I plan to give to them after the Court's instruction -- read the instructions, and that the decision from the Court is based on the first phase of the trial the jury requested the instructions and then also because of the length of these instructions and the -- I've made arrangements so they could each have a copy during their deliberations.  The Government have any objection to that?

MR. SPERLING:  No, Your Honor.

MR. HILFIGER:  Defense does not have any.

THE COURT:  Now, has the Government determined how much time for closing?

MR. SPERLING:  We have, Your Honor.  Ninety.

THE COURT:  And I'll then -- the defense, you desire to split your arguments between counsel?

MR. HILFIGER:  We do, Your Honor.  I think I'll do the first and Mr. Smith will do the next.

KEB104157

5292

THE COURT: You can live with the 90?

MR. HILFIGER: Yes, sir, we can.

THE COURT: It's 10:00 o'clock. If I get the jury, I'm not sure how long it will take for me to read these instructions. They're a little bit longer, I think, than the first phase. So perhaps we should take a break so that counsel for the Government will know -- plan for me to take a break after your first argument, so the defense will know also. So that will be the plan. Government ready for the jury to be brought in?

MR. LITTLEFIELD: May we take five? Not ten, five.

THE COURT: Okay. We'll take a five minute recess. Except for the five minutes, is the defense ready?

MR. HILFIGER: Yes.

(Whereupon, a short recess as held after which the following record was made in the presence the jury.)

THE COURT: Let the record reflect the jury is in the box, counsel for the Government is present, Defendant is present with counsel.

Members of the jury, as I informed you yesterday, both the Government and the Defendant have rested during this penalty phase of the trial and it's now appropriate that the Court give you instructions and

KEB104158

that you hear closing arguments from first the Government then the Defendant and then the Government closes as they did in the first phase, and that's because the Government has the burden of proof. That's the rules that we developed in our criminal jury trial process.

Now the instructions. Now that you heard all of the evidence in this case and the arguments of each side, it is my duty to give you instructions as to the law applicable to the very serious question of whether the Defendant, Kenneth Eugene Barrett, should be sentenced for his convictions on Count One and Two to death, to imprisonment for life without the possibility of release, or some other lesser sentence. You must also determine whether the Defendant, Kenneth Eugene Barrett, should be sentenced for his conviction on Count Three to any term of imprisonment which shall not be less than 20 years and which may be up to life imprisonment, or to death. Your unanimous decision that the Defendant should be sentenced to death or life imprisonment without possibility of release will be binding upon the Court, and I will impose such sentence on the Defendant according to your verdict.

If you cannot unanimously agree on the appropriate punishment, I will sentence the Defendant in accordance with the law. Regardless of any opinion you

KEB104159

5294

may have as to what the law may be or should be, it would be a violation of your oaths as jurors to base your verdict upon any other view of the law than that given to you in these instructions.

Some of the legal principles that you must apply to this sentencing decision duplicate those you followed in reaching your verdict in the first stage of this trial. Others are different. You are to consider all the evidence received during the first stage of the trial as well as evidence received at this second stage of the trial with respect to the Defendant, Kenneth Eugene Barrett.

In resolving the issues regarding the appropriate punishment of the Defendant, you must not be persuaded by bias, prejudice or sympathy for or against any of the parties or victims or by any public opinion. I have prepared a full set of instructions on the applicable law in order to ensure that you are clear in your duty at this stage of the case. I have also prepared a Penalty Phase Special Verdict Form which contains not only Verdict Forms for each count, but also space for you to record findings which are required in this case.

Instruction Number One, Death Penalty Generally. In Count One, you found the Defendant,

KEB104160

5295

Kenneth Eugene Barrett, guilty of committing murder through the use of a firearm during or in relation to a drug trafficking crime, or possessing a firearm in furtherance of such crime. By law, Congress has expressly provided that any person who commits murder through the use of a firearm during or in relation to a drug trafficking crime shall "be punished by death or by imprisonment for a term -- for any term of years or for life." In Count Two, you found the Defendant, Kenneth Eugene Barrett, guilty of committing a murder through the use of a firearm during or in relation to any crime of violence, or possessing a firearm in furtherance of such crime. Congress has also expressly provided that any person who commits murder through the use of a firearm during or in relation to a crime of violence shall "be punished by death or by imprisonment for any term of years or for life." In Count Three, you found the Defendant, Kenneth Eugene Barrett, guilty of intentionally killing, during the commission of a drug trafficking crime, a state law enforcement officer, engaged in the performance of his official duties. Congress has expressly provided that any person, during the commission of, in furtherance of, or while attempting to avoid apprehension, prosecution or service of a prison sentence for, a felony drug violation, who intentionally

KEB104161

kills or counsels, commands, induces, procures, or causes the intentional killing of any federal, state, or local law enforcement officer engaged in, or on account of, the performance of such officer's official duties "shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death."

Because you have found the Defendant, Kenneth Eugene Barrett, guilty beyond a reasonable doubt of these three capital crimes, you must now decide whether the appropriate sentence for each count individually is (1) death; (2) life in prison without the possibility of release; or (3) in the case of Counts One and Two, some lesser sentence to be decided by the Court; and (4) in the case of Count Three, some other sentence not less than 20 years to be decided by the Court. Your recommendation that the Defendant be sentenced either to death or to life in prison without possibility of release will be binding on the Court and I will sentence the Defendant according to your recommendation. In the event you choose the third option for Count One or Two, or the fourth option for Count Three, and recommend that the Defendant receive some lesser sentence, I will impose a sentence other than death as authorized by law. I again stress the importance of your giving careful and thorough

KEB104162

consideration to all evidence before you.  I also remind you of your obligation to follow strictly the applicable law.

Instruction Number Two, Burden of Proof.  The burden of proving that Kenneth Eugene Barrett should be sentenced to death rests at all times with the Government.  If, after fair and impartial consideration of all the evidence in this case, all twelve of you are not persuaded that a sentence of death is justified, then you must return a decision against capital punishment.

In that event, the jury must next consider whether the Defendant should be sentenced to life in prison without the possibility of release.  Again, should all twelve members of the jury so determine, I will impose a sentence of life imprisonment without the possibility of release.

As I have previously stated, for Counts One and Two, Congress has provided additional sentencing options: Life imprisonment without the possibility of release, or some lesser sentence to be determined by the Court; and, for Count Three, Congress has provided additional sentencing options:

Life imprisonment without the possibility of release, or any term of imprisonment which shall not be less than 20 years.  Your verdict on each of these

KEB104163

5298

options, like a death verdict, must be rendered by unanimous vote.

Instruction Number Three, Reasonable Doubt. A reasonable doubt is a doubt based upon reason and common sense, the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his or her own affairs. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt.

The Government must prove aggravating factors beyond a reasonable doubt. It is not necessary that the Government prove an aggravating factor beyond all possible doubt; it is only required that the Government's proof exclude any reasonable doubt.

If, based on your consideration of all the evidence, you are convinced that an aggravating factor has been proved beyond a reasonable doubt, you must find that aggravating factor to exist. If, on the other hand, you are not convinced that an aggravating factor has been proved beyond a reasonable doubt, you must give the Defendant the benefit of the doubt and find that the

KEB104164

aggravating factor has not been proved beyond a reasonable doubt.

Unanimity Required For Death Sentence, Instruction Number Four. Again, I want to emphasize that unanimity is required for you to sentence the Defendant, Kenneth Eugene Barrett, to death. That is, the death penalty may not be imposed under our law unless all twelve jurors agree. If after due deliberation any of you -- even a single juror -- is not persuaded that the death penalty should be imposed in this case, then the jury may not sentence the Defendant, Kenneth Eugene Barrett, to death.

As I have previously explained, each count also allows for a sentence of life in prison without the possibility of release and for an alternative sentence of a term of years to be imposed by the Court as authorized by the law. Again, your verdict regarding punishment on each of these options, like a death verdict, must be rendered by unanimous vote.

Instruction Number Five, Age At The Time Of Offense. Before you may consider whether the death penalty is an appropriate sentence in this case, you must unanimously find beyond a reasonable doubt that the Government has proved the Defendant was at least eighteen years old at the time of the offense. If you do so find,

KEB104165

answer yes on the appropriate page of the Special Verdict Form and continue your deliberations. If you do not find, answer no on the Form, and your deliberations as to the death penalty are complete. However, you will then need to consider whether to impose a sentence of life imprisonment without the possibility of release or some lesser sentence.

Instruction Number Six, Threshold Eligibility Factors. Before you begin your deliberation of aggravating and mitigating factors and the sentence to be imposed in this case, you must first consider whether you are unanimously persuaded, beyond a reasonable doubt, that the Government has proven at least one threshold eligibility factor for each of the counts. For Counts One and Two, there are four possible threshold eligibility factors which deal with the Defendant's intent and role in committing the offenses. In relation to Count Three, there is only one possible threshold eligibility factor.

You will be required to make independent findings for each of the counts. If you find none of the possible threshold eligibility factors present as to a particular count, your deliberations as to the death penalty on that count are over. You should then go to the appropriate count in Section Six of the Special

KEB104166

5301

Verdict Form and indicate that you have not found a threshold eligibility factor. You will then need to consider whether to impose a sentence of life imprisonment without the possibility of release or some lesser sentence.

As to Counts One and Two the Government alleges four possible threshold eligibility factors. Before you may consider whether the death penalty is an appropriate sentence on either of these two counts, you must unanimously find beyond a reasonable doubt that the Government proved the Defendant committed at least one of the following acts:

One, intentionally killed the victim;

Two, intentionally inflicted serious bodily injury that resulted in the death of the victim;

Three, intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or

Four, intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in

KEB104167

5302

the act constituted a reckless disregard for human life and the victim died as a direct result of the act.

These alternatives are set out in the Special Verdict Form, and you must consider and resolve them separately. For each one, you must decide whether you unanimously agree that it has been proved beyond a reasonable doubt, and indicate your answer on the Form, and then continue with the next until you have finished. If you answer no to all four alternatives, your deliberations regarding the death penalty are over and you should proceed to consider whether to impose life in prison without the possibility of release or imprisonment for any term of years authorized by the law. Your verdict on either of these options, like a death penalty, must be rendered by unanimous vote. Sign the appropriate verdict form, and certify your decision as described in Section Seven of the Form. If you answer yes to one or more of these threshold eligibility factors, proceed to the next step in your deliberations.

As to Count Three, before you may consider whether the death penalty is an appropriate sentence on this count, you must unanimously find beyond a reasonable doubt that the Government has proved the following threshold eligibility factors, to-wit: The Defendant intentionally killed the victim, David Eales.

KEB104168

As previously indicated, the threshold eligibility factor or factors for each of these counts are to guide you in assessing the Defendant's intent and role in committing each of these offenses. You must unanimously find beyond a reasonable doubt, as to Counts One and Two, that at least one of these factors is proven by the Government in order to further consider imposition of the death penalty with respect to those counts. In relation to Count Three, you must find that the Government has proven beyond a reasonable doubt the threshold eligibility factor to further consider imposition of the death penalty with respect to that count.

Instruction Number Seven, Summary Of The Deliberative Process. Let me now discuss with you the deliberative process you should follow in considering the very serious issue before you.

First, before you consider aggravating or mitigating factors, you must make a determination concerning the age of the Defendant and the threshold eligibility factors in regard to each of the three counts for which the Defendant has been convicted. If you unanimously resolve the preliminary factors of the Defendant's age and the threshold eligibility factor inquiry in favor of the Government, you must then take up

KEB104169

5304

the question of the Defendant's sentence. As I told you earlier, if you have not resolved these preliminary matters in favor of the Government, you may not consider imposition of the death penalty, but you will be required to consider life in prison without the possibility of release or the alternative lesser sentence. You are reminded that you will be required to make independent findings for each of Counts One, Two, and Three.

Second, you must consider whether the Government has proven beyond a reasonable doubt and to your unanimous satisfaction at least one statutory aggravating factor established by Congress. (If you do not unanimously find beyond a reasonable doubt that the Government has proven a statutory aggravating factor, your consideration of the death penalty as to that count or counts is complete.)

Third, you must consider whether any non-statutory aggravating factor or factors alleged by the Government are proven to your unanimous satisfaction beyond a reasonable doubt.

Fourth, you must consider whether any of you think that mitigating factors have been established by a preponderance of the evidence.

Fifth, as to Counts One and Two, you must each decide whether the statutory and non-statutory

KEB104170

5305

aggravating factors found to exist sufficiently outweigh the mitigating factors found to exist to justify a sentence of death.

Whereas, in relation to Count Three, you must decide whether the threshold eligibility factor and the statutory and non-statutory aggravating factor or factors found to exist sufficiently outweigh the mitigating factors found to exist to justify a sentence of death.

Even if you determine that no mitigating factors have been proven to exist, you must consider whether, in the case of Counts One and Two, the aggravating factors that have been proven are themselves sufficient to impose the death penalty. In the case of Count Three, even if you determine that no mitigating factors have been proven to exist, you must consider whether the threshold eligibility factor plus the aggravating factor or factors that have been proven are themselves sufficient to impose the death penalty. Whether any given amount of aggravation, once proven, is sufficient to warrant actually sentencing this Defendant to death is a question that the law leaves entirely to you.

Sixth, you must individually decide for yourselves whether you choose not to impose the death penalty in this case as to each of the three

EUSTICE REPORTING SERVICE
BOX 700488   TULSA, OK 74170   (918)445-2965

KEB104171

5306

Counts.  Remember that absent unanimous findings as to certain aggravating factors for Count One and Two or absent unanimous findings as to the threshold eligibility factor plus at least one aggravating factor for Count Three, you cannot vote to impose the death penalty.  However, even if you make all of the above findings relating to these matters adverse to the Defendant, as I have previously instructed, you are never required to impose a sentence of death upon the Defendant.

Instruction Number Eight, Aggravating And Mitigating Factors Generally.  Although it is left solely to you to decide whether the death penalty should be imposed, Congress has narrowed and channeled your discretion in specific ways, particularly by directing you to consider and weigh aggravating and mitigating factors presented by this case.  These factors guide your deliberations by focusing on certain circumstances surrounding the crime and on the personal traits, character and background of the Defendant.

Aggravating factors are facts or circumstances which would tend to support imposition of the death penalty.  The Government is required to specify the factors it relies on, and your deliberations are constrained by its choice.  Even if you believe that the evidence reveals other aggravating factors, you may not

KEB104172

consider them.

Mitigating factors are considerations that suggest that a sentence of death should not be imposed. They do not justify or excuse the Defendant's conduct, but they do suggest that a punishment less than death may be sufficient to do justice in the case. Any aspect of Defendant's character or background, any circumstance of the offense, or any other relevant consideration may be a mitigating factor. You are not limited to those factors identified by the Defendant.

Aside from the condition that the Government prove at least one statutory aggravating factor, your task is not simply to decide whether, which, or how many aggravating and mitigating factors are present in the case. You also must evaluate and weigh such factors as previously instructed and, ultimately, make a unique individualized judgment about the justification for the appropriateness of the death penalty as a punishment for the Defendant.

Instruction Number Nine, Statutory Aggravating Factors. Before you may consider whether the death penalty is an appropriate sentence for the Defendant, you must unanimously find beyond a reasonable doubt that the Government has proved at least one of the following aggravating factors prescribed by Congress and alleged by

KEB104173

5308

the Government in this case. The statutory aggravating factors for which the Government has offered proof are the same for Counts One and Two. Keep in mind, however, that you must make a separate finding for each count independently. Those statutory aggravating factors are:

One, the Defendant in the commission of the offense charged in Counts One and Two of the Superseding Indictment, or in escaping apprehension for the violation of these offenses, knowingly created a grave risk of death to one or more persons, to-wit: The other law enforcement officers involved in the tactical entry, except for John Mark Hamilton, Jr., in addition to the victim of the offenses, David Eales. 18 U.S.C. Section 3592(c)(5).

Two, the Defendant killed or attempted to kill more than one person, to-wit: John Mark Hamilton, Jr., and David Eales, in a single criminal episode. 18 U.S.C. Section 3592(c)(16).

Three, the Defendant committed the offenses as charged in Counts One and Two of the Superseding Indictment after substantial planning and premeditation to cause the death of a person. 18 U.S.C. Section 3592(c)(9).

If after considering all of the evidence you are left with a reasonable doubt as to whether any of

KEB104174

these statutory aggravating factors have been proven for each count with respect to the murder and the Defendant's role in it, you must resolve that doubt in Defendant's favor, and you may not find the statutory aggravating factor to have been established.  If you do not find beyond a reasonable doubt that any of these statutory aggravating factors have been established for a particular count, report such to the Court in Section Six of the Special Verdict Form.

The statutory aggravating factors for which the Government has offered proof under Count Three of the Superseding Indictment are:

One, the Defendant, Kenneth Eugene Barrett, in the commission of the offense alleged in Count Three, or in escaping apprehension for a violation of said offense, knowingly created a grave risk of death to one or more persons in addition to the victim of the offense, David Eales.  21 U.S.C. Section 848(n)(5).

Two, the Defendant, Kenneth Eugene Barrett, committed the offense as alleged in Count Three of the Superseding Indictment after substantial planning and premeditation.  21 U.S.C. Section 848(n)(8).

If after considering all of the evidence you are left with a reasonable doubt as to whether at least one of these statutory aggravating factors have been

KEB104175

5310

proven for Count Three, you must resolve that doubt in the Defendant's favor, and you may not find a statutory aggravating factor to have been established. If you do not find that the threshold eligibility factor plus the aggravating factor or factors are sufficient to impose the death penalty, report such to the Court in Section Six of the Special Verdict Form.

Instruction Number Ten, Grave Risk Of Death To Additional Persons. To find this factor, you must be convinced beyond a reasonable doubt that the Defendant in committing the offense, or in escaping apprehension -- in escaping apprehension for committing the offense, knowingly created a grave risk of death to one or more persons, other than John Mark Hamilton, Jr. and David Eales. This aggravating factor requires you to find that the Defendant's conduct not only resulted in death, but also posed a significant risk of death to other persons who were in close proximity to those who died, in terms of time and location. The Defendant must have knowingly in creating this grave risk of death to other persons, which means that he must have been conscious and aware of the grave risk of death to other persons, must have realized what he was doing, and must not have acted because of ignorance, mistake, or accident.

Instruction Number Eleven, Multiple Killings Or

KEB104176

5311

Attempted Killings. This statutory aggravating factor requires proof beyond a reasonable doubt that the Defendant intentionally killed or attempted to kill more than one person in a single criminal episode, to-wit: John Mark Hamilton, Jr. and David Eales.

Instruction Number Twelve, Substantial Planning And Premeditation. This statutory aggravating factor requires proof beyond a reasonable doubt that the murder/killing of David Eales was committed after substantial planning and premeditation by the Defendant, Kenneth Eugene Barrett. A premeditated murder/killing is one committed upon deliberation and prior design. In short, the Government must prove that the Defendant committed the murder/killing offense only after thinking the matter over and deliberating whether to act.

There is no requirement that the Government prove that the Defendant deliberated for any particular period of time in order to show premeditation. It must, however, show that the Defendant had some period of time to become fully aware, fully aware, of what he intended to do and to think it over before he acted.

The Government must also prove beyond a reasonable doubt that the killing was committed after substantial planning by the Defendant for you to find this factor proved. In this regard, planning refers to

KEB104177

the creation or development of a method of doing something or achieving some end. Substantial planning means planning that is ample or considerable for the commission of the crime at issue.

Instruction Number Thirteen, Non-statutory Aggravating Factors. If you find at least one of the statutory aggravating factors alleged to Counts One, Two and Three has been proven beyond a reasonable doubt and to your unanimous satisfaction, you must next consider whether any other non-statutory aggravating factor alleged by the Government have been proven to your unanimous satisfaction beyond a reasonable doubt. These factors tend to support imposition of the death penalty, though they have not been specifically listed by Congress.

You are instructed that the law permits you to consider and discuss only those non-statutory aggravating factors specifically alleged by the Government, and no others. The jury is not free to consider any other factors in aggravation which the Government may have argued in closing or which you conceive on your own. You may consider only the following non-statutory aggravating factors alleged by the Government, if proven as to the Defendant to your unanimous satisfaction and beyond a reasonable doubt. Because the Government seeks to prove

KEB104178

5313

the same two non-statutory aggravating factors for each of Counts One, Two, and Three, the Court will not repeat the explanation of the alleged non-statutory aggravating factors for each count.  Keep in mind, however, that you must make a separate finding for each count independently.  The non-statutory aggravating factors alleged by the Government are:

One, future dangerousness.  The Defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to the lives or safety of other persons, including, but not limited to, inmates and correctional officers in an institutional correctional setting as evidenced by the offenses charged in the Superseding Indictment and the statutory and non-statutory aggravating factors.  The circumstances that demonstrate the Defendant's future dangerousness include but are not limited to the capital offense charged in the Superseding Indictment and the statutory and non-statutory aggravating factors alleged by the Government.

In addition, the Defendant's future dangerousness is demonstrated by his making non-specific and specific threats of violence; his non-verbal threats of violence directed toward others; his plans to commit acts of violence against others and his encouragement and

KEB104179

5314

solicitation of the commission of acts of violence against others. These include, but are not limited to:

A, Barrett advised others that he intended to kill law enforcement officers if they came upon his property.

B, Barrett posted a sign upon his property which stated "Keep out. I don't give a shit who you are. If you cross my gate or come on my property I'll shoot."

C, Barrett would obtain and carry a firearm when a vehicle which he did not recognize came onto his property.

D, Barrett in, on or about January, 2000, communicated with certain individuals that the identity of the confidential informant should be learned and that the confidential informant should be taken care of.

E, Barrett in about January, 1998, did intentionally accelerate through a vehicle check point in Sequoyah County, Oklahoma, endangering multiple law enforcement officers.

F, Barrett committed other acts of violence or potential violence and threatened violence to others.

Because of the available sentencing options in this case, any consideration of the Defendant's future dangerousness must be confined solely to the prison setting. In other words, you may only consider whether

KEB104180

5315

the Defendant is likely to pose a threat to the safety of other inmates or the prison staff.  If the Defendant is sentenced to life in prison without the possibility of release, he will spend the remainder of his natural life in prison.  If you sentence the Defendant to a term of years to be determined by the Court, he will more probably than not also spend the remainder of his natural life in prison.

Two, victim impact evidence.  The Defendant caused injury, harm, and loss to the victim, the victim's family, and the victim's friends as demonstrated by the victim's personal characteristics as an individual human being and the impact of the death on the victim's family and friends.

Section Four of the Special Verdict Form asks whether you are unanimously persuaded that the Government has proven either or both of these non-statutory aggravating factors beyond a reasonable doubt.  Even if you are not so persuaded, remember that a unanimous jury finding that the Government has proven, beyond a reasonable doubt, at least one statutory aggravating factor relating to Counts One and Two, or as it relates to Count Three, a unanimous jury finding that the Government has proven, beyond a reasonable doubt, the threshold eligibility factor plus at least one statutory

KEB104181

5316

aggravating factor, permits you to consider the death penalty, as well as the options of life imprisonment without any possibility of release or imprisonment for a term of years.

In short, in relation to Counts One and Two, you may consider the death penalty if at least one statutory aggravating factor has been unanimously proven beyond a reasonable doubt. You may still consider the death penalty, as well as life imprisonment without any possibility of release or imprisonment for a term of years, even in the absence of any finding of a non-statutory aggravating factor. Likewise, as it relates to Count Three, you may consider the death penalty, as well as life imprisonment without any possibility of release or any term of imprisonment for not less than 20 years, if the threshold eligibility factor plus at least one statutory aggravating factor has been proven beyond a reasonable doubt, even in the absence of any finding of a non-statutory aggravating factor.

Instruction Number Fourteen, Mitigating Factors, Burden Of Proof. Next, consider any mitigating factors that may be present in this case. The law never assumes or presumes that a defendant should be sentenced to death. As previously indicated, a mitigating factor

KEB104182

5317

is not offered to justify or excuse a defendant's conduct. A mitigating factor is intended to present extenuating facts about the Defendant's life or character, or the circumstances surrounding the murder/killing for which he has been convicted, that would suggest that a sentence of death is not appropriate.

It is the Defendant's burden to establish any mitigating factors by a preponderance of the evidence. This is a lesser standard of proof under the law than beyond a reasonable doubt. A factor is established by a preponderance of the evidence if its existence is shown to be more likely so than not. In other words, a preponderance of the evidence means such evidence as, when considered and compared with that opposed to it, produced in your minds the belief that what is sought to be established is, more likely than not, true. If the Defendant fails to meet his burden, he has not proven a mitigating factor.

Note, however, that the Defendant at this hearing does not have to present any evidence. He does not have to prove to you that he should be permitted to live. He was, however, entitled to present any mitigating evidence to you, that is, evidence that favor a lesser punishment than death. You should evaluate that

KEB104183

5318

evidence in the manner just described.

Instruction Number Fifteen, Mitigating Factors. The mitigating factors relied upon by the Defendant in this case are:

One, the Defendant has accepted responsibility for the death of David Eales from his previous conviction.

The Defendant has been convicted and punished for the death of David Eales.

Three, the Defendant, at the time of this incident, had no prior felony convictions.

Four, the Defendant is a father.

Five, the Defendant is a loved son and stepson.

Six, The Defendant is a good neighbor and friend.

Seven, the Defendant's death will impact his child, family and friends.

Eight, the Defendant has expressed remorse for the crimes.

Nine, the Defendant will not present a future danger to society by being imprisoned for life without the possibility of release as demonstrated by his incarceration since September 24, 1999.

In addition to these specific mitigating factors relied upon by the Defendant, the law also

KEB104184

5319

permits you to consider whether other factors in the Defendant's background, record, or character or any other circumstance of the offense mitigates against the imposition of a death sentence. Indeed, you may consider any other factor, whether specifically argued by defense counsel or not, that you believe to be mitigating, if such factor has been established by a preponderance of the evidence. In short, your discretion in considering mitigating factors is much broader than your discretion in considering aggravating factors.

Section Five of the Special Verdict Form relates to mitigating factors.

Instruction Number Sixteen, Unanimity Not Required As To Mitigating Factors. Any evidence relating to mitigating factors should be fully discussed by all of you to ensure that each of you considers the matter carefully. It is important to note, however, that unlike aggravating factors, which you must unanimously find proven beyond a reasonable doubt in order for you to consider them in your deliberations, the law does not require unanimity with regard to mitigating factors. If any one of you is persuaded of the existence of a mitigating factor by a preponderance of the evidence, even if the rest of you disagree, that juror may still consider it in reaching his or her individual decision in

KEB104185

this case.

Instruction Number Seventeen, Failure Of Defendant To Testify. As I have previously instructed you, the law does not compel a defendant to take the witness stand and testify, and no presumption of guilt may be raised, and no inference of any kind may be drawn from the failure of a defendant to testify.

The law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

Instruction Number Eighteen, Dual Prosecutions. You are instructed that it is not a violation of the Double Jeopardy Clause of the United States Constitution for a state government and a federal government to prosecute a criminal defendant for the same or similar acts made illegal by both governments. Rather, the Double Jeopardy Clause only prohibits the same sovereign from prosecuting a second time for the same offense. While the Defendant was previously tried by the District Court of Sequoyah County, State of Oklahoma, this case involves both different charges than those brought within the state court system and a different sovereign, the United States of America.

Instruction Number Nineteen, Mitigating Circumstances Do Not Include Residual Doubt. You have

KEB104186

5321

found the Defendant guilty of three capital crimes. Your consideration of guilt or innocence has, therefore, been completed. You must now determine an appropriate punishment. In considering the appropriate punishment to impose, you are not to revisit the issue of guilt or innocence. All twelve jurors are bound by your verdict in the first portion of this case.

Additionally, you are instructed that you must not speculate about the reasons for the jury's verdict or sentences in the Sequoyah County District Court case. Only the charges and the evidence presented in this Court are relevant to the task now before you. The sentences in the Sequoyah County District Court may, therefore, only be considered with regard to their mitigating effect, if any, on the Defendant's sentence for the charges at issue in this federal court case.

You must consider any mitigating circumstances you find to exist. Mitigating circumstances are facts about the Defendant's character, background, or record, or the circumstances of the particular offenses, or other similar relevant factors, that may call for a penalty less than death. However, any lingering doubt that you may have about the Defendant's guilt is not a mitigating circumstance and cannot be considered by you in determining the appropriate punishment.

KEB104187

5322

Instruction Number Twenty, Weighing The Various Factors. Once you have decided upon the aggravating and mitigating factors present in this case in relation to Counts One and Two, the law requires you to evaluate these factors and decide whether you are unanimously persuaded that the aggravating factors sufficiently outweigh any mitigating factors to justify a sentence of death. Even if you determine that no mitigating factors have been proven to exist, you must consider whether the aggravating factors that you have proven -- you must consider whether the aggravating factors that have proven are themselves sufficient to justify a sentence of death.

Further, once you have decided upon the threshold eligibility, aggravating and mitigating factors present in this case in relation to Count Three, the law requires you to evaluate these factors and decide whether you are unanimously persuaded that the threshold eligibility factor plus the aggravating factor or factors sufficiently outweigh any mitigating factors to justify a sentence of death. Even if you determine that no mitigating factors have been proven to exist, you must consider whether the threshold eligibility factor and the aggravating factor or factors that have been proven are themselves sufficient to justify a sentence of death.

KEB104188

5323

Passion, prejudice, sympathy and any arbitrary consideration have no role to play in your effort to reach a just result in this case. In carefully weighing the various factors at issue in this case, you are called upon to make a unique, individualized judgment about the appropriateness of sentencing the Defendant to death. This is not a mechanical process. Neither is it determined by raw numbers. You do not simply count factors. Instead, you must consider the quality and value of the factors.

Any one aggravating factor proven by the Government, if sufficiently serious in your mind, may outweigh several mitigating factors. Thus, on Counts One and Two, even if you were to find only one statutory aggravating factor proven as to the Defendant, and no statutory aggravating -- and no non-statutory aggravating factor -- let me read that again because I maybe left out a word. Start over.

Thus, on Counts One and Two, even if you were to find only one statutory aggravating factor proven as to the Defendant, and no non-statutory aggravating factor, you would still have to consider it carefully against the mitigating factors. On the other hand, you must recognize that a single mitigating factor may outweigh several aggravating factors. Similarly, on

KEB104189

Count Three, if you were to find the threshold eligibility factor and only one statutory aggravating factor and no non-statutory aggravating factor, you would still have to consider those factors against the mitigating factors.  Again, a single mitigating factor may outweigh the threshold eligibility and several aggravating factors.

In short, what is called for in weighing the various factors is not mathematical skills, but your careful, considered and mature judgment.  As to this stage in the process, you are not called upon simply to find relevant factors.  You are called upon to decide whether the Defendant shall live or die.

If you are unanimously persuaded that, in the case of Counts One and Two, the aggravating factors outweigh the mitigating factors sufficiently that a sentence of death is justified; or in the case of Count Three, the threshold eligibility factor plus the aggravating factors outweigh the mitigating factors sufficiently that a sentence of death is justified, only then may you return a decision in favor of the death penalty.  Each individual juror must decide whether the law requires that the Defendant be put to death.  If even one juror finds a mitigating factor present which, in that juror's mind, is not outweighed by the various

KEB104190

5325

factors that you have agreed were proven, then the jury may not sentence the Defendant to death. If even one juror finds that a sentence of death is not justified, the jury cannot return a decision in favor of the death penalty.

You are also reminded again that, whatever the findings you make with respect to these various factors, you are never required to impose a death sentence. For example, there may be something about this case or about the Defendant that one or more of you are not able to identify as a specific mitigating factor, but that nevertheless causes you to believe that the death penalty is not justified. In such a case, the jury must render a decision against the death penalty.

Instruction Number Twenty One, Consequences Of Deliberation. If, after weighing the various factors, you unanimously find that a sentence of death shall be imposed, then the Court is required to sentence the Defendant to death. If you unanimously find that a sentence of life imprisonment without the possibility of release shall be imposed, then the Court is required to sentence the Defendant to life imprisonment without the possibility of release. If you unanimously find that a lesser sentence for the Defendant is appropriate, the Court is required to impose a sentence as authorized by

KEB104191

5326

law.  In reaching your verdicts, you are not to speculate about the particular sentence the Defendant might receive in the event you do not recommend a sentence of death or life imprisonment without the possibility of release. That is a matter for the Court to decide.

Instruction Number Twenty Two, Duty To Deliberate.  It is your duty as jurors to discuss the issue of punishment with one another in an effort to reach an agreement.  Each of you must decide this remaining question for yourselves, but only after full consideration of the evidence with the other members of the jury.  While you are discussing this matter, do not hesitate to re-examine your own opinion, and to change your mind if you become convinced that you are wrong. But do not give up your honest beliefs as to the weight or the effect of the evidence solely because others think differently or simply to get the case over with.

Instruction Number Twenty Three, Judging Evidence.  As in the guilt phase of the trial, you the jury are the sole judges of the facts in this part of the case.  You may decide issues of the credibility of witnesses and whether or not to accept any piece of evidence as true or what amount of weight to give it, if any.  At this phase of the trial, the evidence consists of all the evidence received at the guilt phase of this

KEB104192

trial to the extent it is relevant to your inquiry regarding the existence of any threshold eligibility, aggravating or mitigating factors.

You may also consider any evidence received at the penalty phase of the trial, including testimony, documents and stipulations between the parties. You may only consider evidence received in this courtroom in making your determination. As in the guilt phase, the arguments of the attorneys and the comments and rulings of the Court are not evidence. You may consider both direct and circumstantial evidence at this phase of the trial and you may use your common sense in determining whether aggravating or mitigating factors are established.

The weighing process you are called upon to undertake in this portion of the trial is different from the fact finding process. Once you have found the threshold eligibility, aggravating and mitigating factors, if any, you must use your own experience, judgment, and sense of judgment in weighing the aggravating and mitigating factors to arrive at your ultimate verdicts in this case.

Instruction Number Twenty Four, Penalty Phase Special Verdict Form. As you retire to begin your deliberations, you will be provided with a form entitled

KEB104193

5328

Penalty Phase Special Verdict Form to record your determinations. You should consider each count separately. You are required to record your determinations as to the existence or non-existence -- I'll start this instruction again.

This is Penalty Phase Special Verdict Form. As you retire to begin your deliberations, you will be provided with a form entitled Penalty Phase Special Verdict Form to record your determinations. You should consider each count separately. You are required to record your determinations as to the existence or non-existence of each threshold eligibility factor and aggravating factor. Section One of the Special Verdict Form requires you to record your findings with respect to the Defendant's age. Section Two of the Special Verdict Form contains space to record your written findings on threshold eligibility factors. Section Three of the Special Verdict Form will be where you will record your written findings on statutory aggravating factors. On Section Four of the Special Verdict Form you will record your written findings on non-statutory aggravating factors. Remember that you must be unanimous as to the existence of any aggravating factor that you determine to have been established beyond a reasonable doubt.

In addition, you have the option to return

KEB104194

5329

written findings as to the existence or non-existence of each mitigating factor, if you choose -- if you so choose, but you are not required to return such findings. Section Five of the Special Verdict Form contains a space to record written findings on mitigating factors if you choose to do so. Because any one juror may find the existence of any mitigating factor, space is provided for you to note how many jurors find any particular mitigating factor. If you choose not to record written findings, cross out each page of Section Five with a large X. Section Six is where you should record your ultimate verdicts as to what penalty should be imposed as to each of the counts and each juror should sign and date the form.

Instruction Number Twenty Five, Special Interrogatories. If after consideration of all of the evidence in this case you do not unanimously find, beyond a reasonable doubt, that the Government has proven that the Defendant committed the offenses as charged in Counts One, Two or Three of the Superseding Indictment after substantial planning and premeditation, you must then answer the question posed in the Special Interrogatory which relates to those specific counts.

Instruction Number Twenty Six, Right To Justice Without Discrimination. Finally, in your consideration

KEB104195

5330

of whether the sentence of death is justified as to the Defendant, you shall not consider the race, color, religious beliefs, national origin, or sex of the Defendant or the victim.  These facts are completely irrelevant to the important issues you must consider at this phase of the proceedings.

You are not to impose a sentence of death unless you have concluded that you would have rendered a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of either the Defendant or the victim might have been.

Whatever decision you return, each of you is required by law to sign a certification attesting to the fact that you have followed this instruction.  Section Seven of the Special Verdict Form contains a certificate that must be signed by each juror.

Before I give my Concluding Instruction, you will hear closing arguments.  First you will hear from the Government.

MR. LITTLEFIELD:  May it please the Court. Ladies and gentlemen of the jury:  Before I begin the specifics of the closing argument, I want to -- and they may sound like empty words, but I want to tell you I thank you.  Nearly been here two months.  It has been a

KEB104196

lengthy and extended process and you all have given a great deal of service, a great deal of care, attention and concern throughout this trial. And again, thank you.

You are about to begin a process of deciding what is the appropriate sentence for Kenneth Eugene Barrett. Should his sentence be death, life imprisonment without parole or a term of years to be decided by the Court. And to reach that, to make that determination for his sentence, you are required to go through a process, a series of steps.

The first step will be determining his age at the time of the commission of the offense. Once that's out of the way you have a five step process through which you will proceed. The first step in that process is determination of whether there are threshold factors, threshold eligibility factors. Step two will be statutory aggravating factors. Step three will be nonstatutory aggravating factors. After you make those determinations you go to step four which is the existence or determination of the existence of mitigating factors. And then step five will be the weighing or deliberative process.

As you move from step one to step two to step three to step four, if you answer -- and I'm telling you the -- the forms are thick and look to be confusing. But

KEB104197

5332

actually they're fairly simple. As you go from threshold to statutory to nonstatutory aggravating factors, if you answer the question yes, yes, the threshold's been met, yes, statutory aggravating factors are met, yes, the nonstatutory aggravating factors are met -- as long as the Government has proven those steps and you move through answering affirmatively, you keep on going. And that's really all there is to it.

I'm going to talk about those four steps. The first four are facts finding. Just like you've done to this point. You will act as a factfinding jury. Does the Government prove those steps, those factors, beyond a reasonable doubt? The fifth takes a different approach. In that final stage, the weighing stage, you will be acting not as factfinders but as judges. As judges weighing the aggravating factors you've found beyond a reasonable doubt versus the mitigating factors, if any you find, beyond a preponderance of the evidence and you will make the determination as to whether or not the statutory and nonstatutory aggravating factors sufficiently outweigh the -- any found mitigating factors to warrant a death penalty. And you will pronounce a sentence.

If you consider the process, consider the steps which you will follow in your deliberations, then I

KEB104198

5333

believe that the evidence establishes beyond a reasonable doubt the existence of all of those steps to reach the determination then of the mitigating factors and the weighing stage.

The first -- first thing you got to do is what was Kenneth Barrett's age at the time of the commission of the offense?  This happened in September -- September 24, 1999.  His mother testified he was born in 1961.  He was 38 years old.  The first question you have to answer:  Yes, he was 18.

Second step -- or actually step one as I've identified it are the threshold factors.  On Counts One and Two you are given four threshold factors.  On Count Three you are given one threshold factor.  And it is only necessary to find yes to one of those threshold factors before you proceed to the second step, the statutory aggravating factors.

The first threshold factor given in each one of those three counts, the first one is did the Defendant intentionally kill the victim?  And I submit you have already made that finding beyond a reasonable doubt. Your verdict was that Kenneth Eugene Barrett murdered Rocky Eales on Counts One and Two.  Your verdict on Count Three was that the Defendant intentionally killed, intentionally killed, the victim knowing he was a police

KEB104199

5334

officer. You have already answered that first step beyond a reasonable doubt as guilty. The answer to that question is yes on all three counts.

As to the three other factors in Count One, they are consumed by that first aggravating factor or that first threshold question. He is -- beyond a reasonable doubt, yes, he did intend to kill the victim in this offense. That takes you then with an affirmative answer on step one to step two. The statutory aggravating factors. And there are two statutory -- two different statutory processes or schemes in these counts. Counts One and Two fall under Title 18, murder. Count Three falls under Title 21, which is an intentional killing. And so, there is some variation between the statutory aggravating factors which can be alleged for Counts One and Two as opposed to Count Three. But there is commonality. There are three statutory aggravating factors alleged for Counts One and Two. There are two for Count Three. And both of those in Count Three are listed for Counts One and Two. Those are, one, was there a grave risk of death to more than one person. A grave risk of death to more than one person or additional persons other than -- and this refers to persons other than Rocky, and other than Buddy Hamilton. The Judge read you in your instructions, Instruction Ten, what a

KEB104200

5335

grave risk of death is. And it refers to a significant risk of death to other persons who were in close proximity to those who died in terms of time and location. A grave risk of death other than those who died, that being Rocky and in this case Buddy, in terms of time and location. And if you examine the evidence beyond a reasonable doubt there was a grave risk of death -- enough for the instruction.

Consider first the firearm itself, the .223 Sporter. And consider how it was set up and utilized. Three magazines taped together, fully loaded, 91 rounds. It was a powerful weapon fully prepared, a lethal range -- and you heard this evidence in the first stage -- of 500 meters, five and a half football fields in length. You saw the power of those rounds that were fired in this particular case. They were powerful enough to pass through glass. They were powerful enough to pass through metal, through the door of that automobile. They were powerful enough to pass through the body armor worn through troopers on that night. And you saw what the impact of those rounds could do to a human body. Exhibit Number 85. Under the armpit, that is not a wound caused by the shot. That was the explosion of that shot back out of the body as Dr. Distefano testified. Those rounds were powerful. Those rounds were deadly. The firearm

KEB104201

5336

shows the danger. This firearm was no deer rifle for hunting season. This firearm was for one thing and that was to kill human beings. A substantial danger was imposed when you consider the power of that firearm which was used to multiple individuals.

Consider first the officers on the scene. You recall the approximate location of where the first shots were fired. And you also recall, as to Government Exhibit Number 1, the location of the other two vehicles. Behind Rocky and Buddy's vehicle was Raymond Greninger and Rick Manion, the second automobile. Behind that was Steve Hash and Danny Oliver. They were in the line of fire. Greninger, Manion, Hash and Oliver were in the line of fire. They were in proximity and time close to a grave and deadly danger. Passed through the glass, they could have been hit. Slightly off in aim, they could have been hit. They could have been killed and they were in danger.

But even after the initial shots were fired, consider the location at the porch and where Kenneth Eugene Barrett would have fired from. As he shot into that Bronco, Rick Manion testified he went to the rear to provide assistance to Rocky. Gene Hise went to the rear to provide assistance to Rocky. And even after the flash bang was thrown, firing still continued. They were

KEB104202

exposed. Billy Poe was right in that line of fire at the gate. Robert Darst and Gene Hise were crossing across by that gate when the shots were going. A shot goes through that window, a shot misses and they are in proximity both in time and location to that lethal fire. Those officers were in danger.

And consider also that when Mr. Barrett was taken into custody he didn't stop with the -- this firearm, he reached for this firearm which was in his waistband of his pants. He still continued to pose a grave risk to Robert -- or Trooper Manion, to Trooper Hise who was at that location, Steve Hash, to Billy Poe to Raymond Greninger, to Buddy Hamilton, by his continued assaultive behavior.

But it wasn't just the troopers. It wasn't just the troopers who were exposed and placed in grave danger for their lives. Government Exhibit 184, Mr. Barrett's residence. He fired across this line at the vehicle. Cousin Gwen lived in that trailer and you've heard the testimony that round could have passed through that trailer and injured an individual inside that trailer. As the Bronco moved through here Tommy Sanders and Janice Sanders lived -- his aunt and uncle -- lived within that five hundred meter lethal range. A round from that weapon could have passed through the window.

KEB104203

5338

Had they been awakened and looked out they would have been exposed to a line of fire. In that trailer, his cousin Alvin Hahn, just like Gwen, a round could have passed if fired from this porch in this direction into that trailer. And cousin Alvin Hahn was placed in grave danger. And as he is shooting out this way, in this house his aunt Ada Blount lived, within that five hundred meter lethal range. Had she looked out a window, had she stepped outdoors to see what was happening, a round from that weapon could have passed through the glass, could have passed over the Bronco had he missed, and exposed her to danger. Not only were the troopers exposed to a grave risk, civilians, his relatives in the area were exposed to a grave risk of danger.

As to all three counts, because this statutory aggravating factor is listed as to all three counts. Beyond a reasonable doubt the evidence you have heard in this trial establishes that it exists and you should answer yes for the statutory aggravating factor.

The second statutory aggravating factor that exists as to all three counts is substantial planning and premeditation. And those two items, substantial planning and premeditation, while similar, are different. And the Court tells you what they are in the instructions. Substantial planning lasts for an extended period or a

KEB104204

5339

longer period than premeditation.  The Court tells you in Instruction Number 12 that premeditation is one committed upon deliberation or prior design.  The Government must prove that it committed it only after thinking over the matter or deliberating whether to act.

In the special verdict form, the special interrogatory, the Court tells you how long one must think -- go ahead and put the special interrogatory up.  At the bottom it says it must be long enough for the Defendant to have formed the -- go to the second page -- specific intent to kill, to be fully conscious of that intent and to have considered the killing.  It can be formed in an instant before the killing or it can be planned or deliberated for days, months or years.

Premeditation can you formed in an instant and I submit you already have found that this was a premeditated killing because you have found beyond a reasonable doubt that he intended to kill Trooper Eales and he intended to do so knowing, with full knowledge that, he was a law enforcement officer.  There was premeditation without question.

What about substantial planning?  Go back to Instruction 12 and the Court tell you that -- tells you that at the bottom of Instruction 12, on the first page -- it can be -- planning refers to the creation -- go to

KEB104205

5340

next page -- or development of a method of doing something or achieving some end. Substantial planning means that -- means planning that is ample or considerable for the commission of the crime at issue. And if you look at what was done, considering the nature of this crime, the evidence is beyond a reasonable doubt that also there was substantial planning.

Look to the steps. He planned for the incident. And I'm not going to just beat it to death because we talked about it early on in this trial in the other closing arguments. But he intended this. He planned it, he announced it. He told his friends they're going to come and when they do here's what I'm going to do. He had been planning for this offense for weeks and months and even years.

Look at what he did. He locked the front gate consistently, forcing entry from the east side of that property. And he prepares for the entry from the east side of the property. Remember in the loft, the spotting scope? Vicki Lyons testified -- and we showed the photograph, I'm not going to do it again. But Vicki Lyons testified I looked through that scope and it was trained right on that entry. He forced entry there and he prepared for entry there. But he didn't just do that. He prepared the firearm. 91 rounds, ready to be used. 9

KEB104206

millimeter in his waistband ready to be used. He left the Colt Sporter at all times in an accessible location. You remember the testimony of Karen Real, Charles Sanders, Brandie Price, Randy Turman. This firearm was leaning again the door or the desk. If he went out to that storage building he took this with him. He took this 9 millimeter, which was chambered and ten rounds in it, he kept it in his waistband at all times. And I submit to you it wasn't to keep his pants up, it was to be prepared for what he knew was coming and knew what was inevitable.

And he also prepared himself mentally. I submit to you that when he talked to his friends and associates and when he exerted is bravado about what he was going to do -- I'm going to take those bastards out, as many of them as I can. I'm going to kill the first one through the door. He was hyping himself up, building himself up mentally to be prepared for what he wanted to do. That was substantial planning.

When he was -- when the incident went down he immediately had access to that rifle and shortly after they got onto the property he began firing. He continued to and backed into the room and when he went into that east room, not only did he have that firearm with still 72 rounds and this pistol with ten rounds in it, in that

KEB104207

5342

same room into which he retreated he had his Browning .22 also fully loaded in a drawer. He went to the room where he had his firearms loaded and ready. And I submit to you that wasn't an accident. That was planning.

He knew that night they were coming. He saw the Bronco drive by and he told his cousin, Travis Crawford, it's a Bronco, I think it's a cop car. There's a warrant, they're coming back and when they do all hell will break loose. That was planning. He was ready. He was prepared physically and mentally and he acted upon his plans.

Folks, for what was necessary to commit this crime he had it fully planned out. And I submit to you beyond a reasonable doubt he premeditated and he substantially planned this crime. And you should find that factor as to all three counts again, yes, beyond a reasonable doubt and be ready to move on.

The third factor is listed only into counts -- as to Counts One and Two. And that is that he intended to kill more than one person. You have already found he intended to kill Rocky beyond a reasonable doubt. The question here is isolated and unique only as to John Mark Buddy Hamilton. Did he intend to kill Buddy Hamilton beyond a reasonable doubt? And if you look to Government Exhibit Number 67, the shots are aimed primarily at the

KEB104208

driver.  Iris Dalley testified that both of the shots were directed at the driver.  There were the four shots through the door at the passenger.  He primarily intended to kill -- to take out the driver of that vehicle.  When it stopped and parked at the porch, his attention shifted to Rocky.  And once Rocky was injured, when Buddy threw out the flash bang to exit the vehicle, he again returned his focus and intent to Buddy.

Buddy had an injury in the eye, in the cheek and in the front of the left shoulder.  And as he was exiting, he was shot in the back of the left shoulder.  The distance was the same for the shooting at Buddy at the front porch as it was for the shooting at Rocky.  Remember the testimony of Loyd Cobb.  Less than 15 feet.  With that rifle I just dropped and I'm not going to pick up, from a distance of less than from me to you.  He aimed and he shot Rocky and he aimed and he shot Buddy.  With that rifle, with that impact and with that power.  And I submit to you he intended to kill not only Rocky, he intended to kill Buddy as well.  And beyond a reasonable doubt, that third statutory aggravating factor which applies only as to Counts One and Two is proven beyond a reasonable doubt.  He was not successful in his intent to both, but it was still his intent.

Once the three statutory aggravating factors as

EUSTICE REPORTING SERVICE
BOX 700488  TULSA, OK 74170  (918)445-2965

KEB104209

5344

to Counts One and Two and the two as to Count Three are answered yes affirmatively -- if any one is answered yes, you go to the next step. But I submit all three should be answered yes.

The next step is the non-statutory aggravating factors -- the non-statutory aggravating factors. And they're different in a way from the statutory aggravating factors. Because the Court tells you for you to reach -- for you to have to go to the mitigating factors and determine their existence and weigh, it is only necessary that you find one statutory aggravating factor. Only have to find a statutory aggravating factor and only have to find one.

If you find one or two or all three, as I submit you should, then you may find the non-statutory aggravating factors as well. And if you do find them as well, beyond a reasonable doubt, then you may utilize these in conjunction or combination with the statutory -- step two, the statutory aggravating factors in your weighing process.

And I submit to you when you examine the non-statutory aggravating factors you will find that they exist as well beyond a reasonable doubt. There are two identified by the Government in this case. And they are common to all three counts. They are the same as to all

KEB104210

5345

three counts. And so, I'm going to only talk about them one time, each one of them one time. But remember that they exist in all three counts. There are two, future dangerousness and the victim impact. What about future dangerousness? It's been said that he who fails to learn from history is deemed to repeat or make the mistakes of the past. In Cherokee County we say fool me once, shame on you, fool me twice shame on me. The best predictor of human behavior is past human conduct. And I submit to you that when you examine past human behavior as it relates to that man he is a future danger.

Consider first, 17 years old and Johnny Philpot arrests him and he's ordered by a judge to take him to jail. A judge orders him to take the juvenile to jail. And as they do, this man is fighting and struggling as they're going up a narrow stairway with a wooden banister and Johnny Philpot pops him in the nose. Hard enough to break his hand. Is it an overreaction? Don't know. I do know that Mr. Philpot testified the FBI examined it and cleared him of it. He cleared him of it. We hear from the defense well Mr. Philpot held a grudge. Wait a minute, folks. Who held the grudge? Who -- 18 -- no, 21 years -- pardon my math -- who, 21 years later wanted to kill Johnny Philpot? Who said to two different people Randy Turman and Charles Sanders I hope the first one

KEB104211

through the door is Johnny Philpot so I can kill him? And who bore the grudge? Kenneth Eugene Barrett. He is a danger in the future based upon his past history.

His marriage to Abby Stites, then Abby Barrett, was a marriage filled with violence. Seventeen years ago, Stanley -- or Shannon Smith observed this man in the front yard of the residence holding her by the arm, slapping her around with an open hand. Seven different cases of domestic abuse or violation of domestic abuse in the court of Sequoyah County as to this man against his former wife.

He broke into her trailer and destroyed -- broke her aquarium, flooded the trailer, killed her exotic fish and slashed up her furniture. He abducted her, took her to Webbers Falls. He broke her nose. And what was their response? On redirect they got Abby to admit that, yeah, after he hit me I hit him back. After he struck me, I returned blows. This man's history establishes violence is how he responds to someone who does not do as he wishes.

Look to Shannon Smith himself and we hear, well, those are just threats, those are empty words, they're just talk, it's easy to talk. But remember Shannon Smith, I stopped in the yard and told him, hey, quit slapping her around. And Kenneth Barrett said I'm

KEB104212

5347

getting my gun, you better not be here when I get back and went into the house. Were those empty words? Abby Barrett, then, didn't think so, because she knew him better than anybody. And what did she tell Shannon Smith? You better get out of here. Kenneth Barrett may threaten and not follow through, but he also threatens and follows through. And Abby Barrett was concerned enough for Shannon Smith that she told him get out of here when he said I'm getting a gun.

Consider his recent behavior. The road block incident. He slows down and then floors it, just missing Cindy Smith and Michael Readner, who have to jump over a ditch to avoid being hit. And then goes through the county at speeds in excess of 100 miles an hour for a couple of miles until he ditches the car in a ditch to escape. Stanley Philpot -- he -- boy, the Philpots have a grudge. Rather than towing his car and costing Kenneth Barrett money, Stanley, to get him, said, yeah, I'll follow you home and save you the money. And what was the response from this man? What was the appreciation he showed Stanley Philpot? He dusted him and when he got home, he met him at the front door with a long barrel pistol. .44 magnum shells empty in the living room and a .44 magnum tray in the house. Stanley Philpot backed off because he didn't want to be involved in a shootout. He

KEB104213

5348

called backup. Is this man just idle threats? Certainly law enforcement didn't think so. Johnny Philpot told his deputies don't go out there by yourself because I fear a shootout, a gunfight and he proved him right.

Consider Karen Real. When unknown persons came up he would retrieve his gun until he knew who they were. Cindy Crawford testified that when she refused his sexual advances -- when she wouldn't put out and started to leave with his brother Richie, he grabbed the shotgun, stuck it to her leg and said never come back here, I'll blow your leg off.

Consider his conduct towards the police on September 24th. He told everybody what he was going to do and he did it. Idle threats or one who has shown danger in his past? He'll do it again. He endangered Rocky, Buddy, the officers, had no concern for the civilians, his relatives. He endangered them. He will remain a danger. He will remain a danger to others who prevent him from getting his way as long as he lives. There has been no evidence of any sudden conversion in Kenneth Barrett's life.

What we hear, that this be in a jail setting, it will be non-threatening. He cannot threaten anyone from there. He told Charles Sanders -- or he called when Charles Sanders heard him, we need to find

KEB104214

5349

the CI -- and that was from jail. We need to find the CI and kill the son of a bitch.

He thumped a prisoner, Donald Fair, and Donald Fair -- or Fear, I guess -- is characterized as a cold blooded killer. And, yeah, he was. But Kenneth Barrett thumped him, popped his head against the wall hard enough that a jailer on the other side heard it. And why? Because he was a cold blooded -- because Donald Fear was a cold blooded killer? Was it because of Kenneth Barrett's repulsion at his acts? No. He cut his toenails one too many times. We got to beat him up.

Even in a jail setting he is a threat. George Borman heard Kenneth Barrett threaten Brad Boyd. I'll get out of here and I'll get you. Michael Hendricks, if I'm not -- if I wasn't in here I'd kick your ass. And he told him on a second occasion that he tried to grab him through the bars. These two are guards. Remember Mr. Hendricks was asked? Well, that's not the only prisoner who threatened you, was it? And his response. Yeah. Kenny Barrett is the only prisoner in the time I was in the jail who threatened to kick my ass. He was the only prisoner who threatened me.

Kenny Barrett assaulted a guard while in the Muskogee County Jail, Mr. Satterfield. Threw the tray of food at him. And Rick Fargo. He hit him in the

KEB104215

5350

testicles with a potato.  Doesn't sound like a big deal, not a deadly weapon, not a dangerous weapon, but it's what he had access to and it shows his willingness to commit assaultive behavior upon authorities in a correctional setting.

Don't be naive.  Do not think that the only weapons available in a prison setting are baked potatoes.  Mr. Borman told you that the day that there was the confrontation between Brad Boyd and Kenny Barrett they were looking for razor blades and pens, weapons.  Didn't say they were Mr. Barrett's.  But they were found in that cell.

Do not think that throughout his time in an institution, if that's where he ends up, Mr. Barrett will not have access to shanks, shives, razors and other items that can be made into weapons.  And guards and prisoners will be endangered as demonstrated by his response.

You heard his witness, Brad Gude, say that he was bold and arrogant.  You heard the guard say Kenny thought he ought to run it.  He wanted it to be his way.  And the evidence demonstrates what he will do when he does not get his way.  Kenneth Barrett is a danger in the future wherever he is.  He is a future danger.  And the first non-statutory aggravating factor is established beyond a reasonable doubt.  Answer it yes and move on.

KEB104216

5351

The second statutory -- non-statutory, pardon me -- aggravating factor is victim impact. And you heard the testimony of his family and friends. You heard Bill DeWeese, the minority leader of the Pennsylvania house of representatives. He met Rocky -- pardon me, it's DeWeese. He met Rocky in the Marines. And Rocky soon became his best friend. He described Rocky as an epitome of American manhood. He -- Rocky helped Mr. DeWeese through physical training. Rocky achieved what he wanted. His desire was to return to Oklahoma and become a Highway Patrol trooper and that's what he did.

And Mr. DeWeese told you about the phone call a month before Rocky's death. Rocky had achieved more than what he wanted. More than just being a trooper. Because Rocky was truly living his dream. And he told Bill DeWeese that in his own way. He told Mr. DeWeese -- he was still a bachelor -- you need to get you a family and settle down. Because Rocky had done that and Rocky knew the true value of living the life he was living.

You heard the testimony of Nancy Stalcup, his sister. Rocky was honest, bright, brave, her confidant. People flocked to him. They gravitated to him. His eyes twinkled. He had a robust laugh. She never got to say goodbye. She will miss him. Every day she dies. The hardest thing she's ever done in her life was having to

KEB104217

5352

tell her children what happened to Rocky.  She spoke with him about the religious faith.  She rests with that comfort.  The pain in her has not diminished and it never will.

You heard the testimony of Bobbie Eales, his mother.  She can no longer go to church because the hymns cause her to break down.  She goes to his grave daily.  She told you of the love she felt at seeing him for the last time as he drove off, not knowing it was the last time.  And she told you of what a parent feels when their child dies too early.  No parent should live longer than their child.  You heard Gene Hise, a brother Marine and trooper who said I lost part of myself.  He was my friend, my best friend.  Six years later Trooper Hise still can't talk about it without crying.  And this man says he ought to grow up.  The hardest thing Mr. Hise ever did -- Trooper Hise ever did was tell Rocky -- or tell Kelli about his efforts to save Rocky's life.  He told about the team falling apart.  A large percentage of that team -- marriage is breaking up.  How he almost, because of his own personal PTSD -- Post Traumatic Stress Disorder from this incident -- how he almost lost his wife and child.

And Kelli.  A brave woman.  She had to be.  She fell in love with a trooper who gave her a traffic

KEB104218

5353

citation. She fell in love with a trooper and found a life partner and a lover and a friend who was violently torn from her. She told of the two troopers coming to the porch and her opening the door and seeing the tears. And her remembering what Rocky had said. If you ever have two troopers on the porch and I'm not one of them I'm not coming back.

She told about their love, their life, the birth of their children. She described Allison -- trying to tell Allison, at six and a half, that Daddy's in heaven. He's not -- he got killed. And Allison's question, when's he coming back. You heard Allison's award winning essay written last year, this time. I'm thankful for the six and a half years of love I had with my daddy. It was enough to fill a lifetime. And I wouldn't ever want anyone else. Two year old Mackey -- telling him. When he was four he said, Mommy, I want to die. I want to go to heaven and be angel with Daddy because he's lonesome. You'll have Allie. I want to be with my Daddy.

You got a brief glimpse of a life that's beyond measure. A life too full and cut down too soon. A life that was shamelessly -- shamefully ended. Senselessly ended by this man over $25. Look at Government Exhibit 203. 203 is the affidavit of the charges. Get the

KEB104219

middle -- right -- the type line. It tells you, that area right there. Bought a quarter gram of meth for $25. That's the price this man put on the head of Rocky Eales. Because he was unwilling to go to court and face the charges. $25 is the value this man put on that life that you heard about. The victim impact is established beyond a reasonable doubt.

Once these factors are established -- and I submit they all are beyond a reasonable doubt -- consider the mitigating factors. One, accepted responsibility. How? The only evidence that he accepted responsibility is he didn't appeal his conviction. Twenty years for manslaughter. And you heard the evidence. Manslaughter carries up to life. If he'd have appealed, he could have been retried and faced a life sentence. He made a calculated choice. I'd rather take the 20 than risk life again. Ain't no mitigating factor there. Two, convicted and punished. He got 20 years for this act, for killing Rocky Eales. And you heard Jimmy Wilson from OSP, 20 years is not 20 years. He gets 52 days for every month he's down there. Basically, two for one. He's already served six years. He's only got 14 left. He doesn't have another seven years for Rocky. He is up for parole next May for killing Rocky. Put them all together. Give the extra ten years for killing Rocky and for wounding

KEB104220

Buddy Hamilton. Is that 30 years, which is going to be a whole lot less than that in the Oklahoma prison system, an appropriate punishment? And does that show he accepted responsibility? I submit not. No felony convictions. Why not? Because he jumped bond. He didn't show up for trial. There was a bench warrant.

He is -- number four. He is a father. And do you know what's missing? There's no adjective. He's not described as a loving father, a carrying father, a nurturing father, a good father. He is a father. That, folks, describes nothing more than a biological process. He is also breeds. But there's more to being a father than just making a baby. And that's the only thing that's offered. And I submit that's not a mitigating factor.

A loved son and stepson. That is their feelings for Kenneth Barrett. Notice what's missing? Any feelings they receive back. His father says I hadn't spoken to him for two years prior to this incident. His step mom said I didn't even know him before this. But I started going to jail. If he gets a life sentence he's going to be some place off who knows where. And how strong do you think that relationship is?

His mother? She fights with him and threat -- and they have threats. And she cared about him so much

KEB104221

5356

that she thought he was hyper as opposed to being hyped up. Living right next door she didn't even know of the drug activity. How close can that be? Good neighbor, good friend? The only testimony there is he fixed cars cheap. Death would impact his child, his friends and his family. And there was no testimony of impact upon his child. No testimony of what impact his death would have upon his friends. And the only impact coming from his family was his stepmother who said that I could no longer have my relationship with him in jail. I'm sorry. I submit that that mitigating factor does not exist. Or to the extent it does, it comes nowhere near the aggravating factors in this case.

He expressed remorse. How? When? Well, he told his mom he wished it could have been different. Yeah, like not get caught. Yeah, like kill more of the bastards like I intended to. Where's the remorse? He told his dad that, well, I'm sorry that two children had lost their daddy. What are you going to say to your dad? Damn, Dad, I wanted to kill more than that. I didn't do a good enough job. Come on.

Nine, no danger because he's in prison. And we've already dealt with that. Ten, other factors in his background which mitigate against the death penalty. What factors? What factors? One, he didn't get his

KEB104222

haircut so he dropped out of school? Two, he voluntarily chose to use and sell and make methamphetamine? Three, he beat his wife. Four, on the night in question he left his son at the residence knowing the cops were going to come back and he was going to have a shootout? What factors weigh against the death penalty that are not mentioned? And I submit when you look at all of them there are no mitigating factors which exist or to the extent they do, they pale in significance to the aggravating factors the Government has established beyond a reasonable doubt in this case. When you reach that last step, whatever mitigating factors you have to compare to the aggravating factors that the Government has proven all of them beyond a reasonable doubt, when you make that comparison, compare the lives involved. You are going to sit in judgment to see if the aggravating factors substantially outweigh the mitigating factors. And I submit they do. You will sit as judges.

And when you compare the lives -- and that should be in evidence. Compare the life and the loss of Rocky Eales with the life of Kenneth Barrett. But I think there's another comparison. Actually, the word is contrast because comparison is how there are alike. Contrast is how they are different. And I submit there is another contrast that is stark in this case. That is

KEB104223

5358

Kenneth Barrett with his brother, the defense witness Steven Barrett. Kenneth Barrett dropped out of school because he didn't want to get a haircut. Steven Barrett chose to remain in school and graduated and go to college and get a masters. Kenneth Barrett chose drugs. Steven Barrett chose football and an education. Kenneth Barrett's life revolved around cooking, making and using dope. Steven Barrett's life revolved around educating and nurturing our children. Same house, same circumstances, same parents, same conditions. The difference is choices made. Choices made by Steven Barrett versus choices made by Kenneth Eugene Barrett. And you saw where Steve Barrett's choices have taken him. And you have seen in this trial the choices Kenneth Barrett continually made through his lifetime and where it has taken him.

When you look at the mitigating factors they either fail -- they fail totally as far as the weighing process against the aggravating factors. The death penalty is an appropriate, correct and just punishment for this crime and it should be your verdict. Two months of trial is a long, long time. But it's nothing in comparison to the six years for which Rocky Eales has been awaiting justice. Today is the day and the wait should end. Thank you.

KEB104224

5359

THE COURT:  For the defense.

MR. HILFIGER:  Your Honor, should we take a break at this time?

THE COURT:  Approach.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

THE COURT:  I was thinking about going to 12:30.  I guess we got about another hour -- got a good hour and a half.  We've been going about two hours.  I don't know.  If you're not ready.

MR. HILFIGER:  No.  I'm ready.  I just -- I thought you said that we were going to take -- (Interrupted)

THE COURT:  You're going to take about 30 minutes or an hour?

MR. HILFIGER:  No.  I was going to go longer than that though.

THE COURT:  Well, how much time do you plan now?

MR. HILFIGER:  About 45-50 minutes, something like that.

THE COURT:  Then we better take a break.

(Whereupon, the following record was made in open court within the hearing of the jury.)

THE COURT:  Members of the jury, we'll take --

EUSTICE REPORTING SERVICE
BOX 700488   TULSA, OK 74170   (918)445-2965

KEB104225

5360

try to hold this to a 15 minute recess.  Remember my admonition not to discuss this matter among yourselves. It's not yet been submitted to you.  Remember all my previous admonitions about discussing the matter.  I'll ask that everyone in the courtroom please remain seated as the jury leaves the courtroom.

(Whereupon, a brief recess was held after which the following record was made.)

THE COURT:  Let the record reflect the jury is in the box, counsel for the government is present, Defendant is present with counsel.  Counsel for the Defendant may now address the jury.

MR. HILFIGER:  Thank you, Your Honor.

May it please the Court.  Ladies and gentlemen of the jury, you know, as Mr. Littlefield said, I think everybody here agrees this has been an extremely long trial.  I have been in practice for about 33 years now and this is longest continuous trial that I've ever been involved with.  It's -- been in some others that go a little bit and stop, go a little bit and stop.  But this is the longest continuous trial and I sure appreciate the attention that you've given, the diligence that you've -- just coming here every day, which is a big deal.  So I do appreciate that.  Along with the prosecution and defense, we think you've done a very good job on being here and

KEB104226

5361

paying attention.

Without going into a lot of detail on the first stage evidence, there are some things I'd like to point out because there's some interpretations that -- of evidence that the prosecution and that we have a real strong disagreement on. And I'm not going to go back through all of them. But I'm just doing this for you to consider in your sentencing deliberations rather than accepting what the prosecution's version is just right off the top.

Both the prosecutors in this case have stated in either openings or closings or, you know, some point in time that Kenny Barrett stood out on the porch looking east and firing easterly into the line of cars. And they've contended that. And yet, there's no evidence that any one person saw anybody on that porch firing in an easterly direction. But they've contended this all the way down and they've said it all the way down to support Buddy Hamilton when he says that he was out there at the top of the yellow flowers when he first got hit.

You'll recall that not one of the troopers in the entry vehicles saw anybody on the porch or even saw anybody at all until after Hamilton's vehicle was up against the porch. And then Hamilton saw somebody, Ricky Manion saw somebody. But until that time nobody saw

KEB104227

5362

anybody on the porch. The troopers in the yard that were around Toby Barrett, they didn't see anybody on the porch at all either. The only testimony that came close to seeing a person on the porch was from the two troopers in Gelene Dotson's yard. And I went back and looked and reviewed my notes for that testimony. You know, I'm not telling you what they said. I'm telling you what my notes reveal. And I want you to think about it too. Because it's your memories that count.

Mr. Pettingill says he saw a muzzle flash from the door, that fire was coming out, that brass was being ejected and smoke and silhouette of a person and the silhouette was partially in or out, and the silhouette was facing out shooting towards the south. And this was only recalled, if you'll remember, three years after the incident. And I'll remind you it was after the second trial and after McBride, the other person, had already made a statement two years before about seeing a silhouette.

And then we have McBride who says he saw firing as he was looking at the house that was left to right as he was looking at this house, and that would be in a southerly direction. He saw a full silhouette on the porch the first time and the second time he saw more muzzle but no full silhouette, just head and arms. All

KEB104228

the weapon was outside and firing in a southerly direction. And yet, the prosecution contends that there was a person out there shooting on the -- out there in an easterly direction towards that line. But there's no evidence to that. Pettingill even went further and described seeing the brass ejecting in an arc because I had him -- I had him come up and go around and say now how was this -- where did you see the brass coming out and where was it going and he stood out there and he said it was going this way, going in a westerly direction. In order to go in a westerly direction the gun has to be facing south. There was no evidence found of any brass -- brass found immediately south of the house which would indicate a person firing easterly. And you -- I want you to consider this evidence when considering the statutory aggravating factor of creating a brave risk -- a grave risk of death to persons other than Hamilton and Eales. The shots that were fired were directed at and hit the Bronco which Hamilton and Eales were in. And no other shots were fired or endangered other people because Hamilton's vehicle was out southerly -- to the southeast corner of that house when the shots were fired.

Now, another -- of course, the prosecution uses whatever evidence they want and takes it for that particular purpose. At one point they're saying he's got

KEB104229

5364

to be out there firing easterly and because he is, he's firing down that line. And because he's firing down that line he creates a grave risk of death to other people other than Hamilton and Eales. That's one purpose they want to use it. But then for another aggravator they say he attempted to kill more than one person and virtually all the shots were shot at the car and shot at Hamilton and at Eales when it was up against the porch. But you can't have both ways. Because virtually everybody that testified as to hearing shots said that they were -- once they started it was just bam bam bam bam bam bam and you can't have the shots starting out to the yellow flowers and going bam bam bam bam bam all the way up to the porch. There's not enough time. There's too much -- too much space there. Nobody said they shot a couple times and then waited till they come to the porch. But the prosecution says, well, for this purpose all the shots were right here at the front of the porch. But for this purpose the guy was facing east down the porch. You can't have it both ways, ladies and gentlemen.

One of the things -- another thing that the evidence and I'm going to move on is, you know, they say all the shots at Rocky and Eales were within 15 feet. One of the contentions that I have in this is that the shots were -- occurred at a different time than what they

KEB104230

say.  John Hamilton said he pulls the pin out of the flash bang and drops the pin in the car.  Now, if you'll recall from the evidence of the picture that was drawn by Vicki Jones, that pin was found, but which would be on the right side -- outside of the car.  And the only way that pin could be out there, if John Hamilton is telling the truth and says he dropped it in the car, is if he dropped it on Rocky Eales and as Rocky Eales exited that pin came out.  Which means that not only do you have Rocky Eales exiting, but you have John Hamilton throwing a flash bang at the same time.  There's no doubt that al those shots occurred within that 15 feet.  But those were reactionary shots.  They were not premeditated shots. They were shots reacting to somebody unknown getting out of the car, somebody throwing something out of the car while it was at the porch.

Now, you've also found by your verdicts and your special interrogatories that this was done -- this action was done with malice aforethought.  We disagree that there was premeditation.  However, under the law we agree that there was -- that there is malice aforethought -- there could be malice aforethought based on your verdict and everything.  But not only was there not premeditation under the law, but there was also much less substantial planning and premeditation as alleged in the

KEB104231

5366

statutory aggravators saying special -- substantial premeditation.

The shooting started as a reaction to an unidentified Bronco coming onto the property without warning and the continuation of the shots did not amount to any conscious thought or premeditation or action, but those actions could be seen as done with callous and wanton disregard. We can see that. Callous and wanton disregard for human life, but not premeditation. Your finding on substantial planning and premeditation should be no, with a similar finding on the special interrogatories for no premeditation.

I will back up and use a little bit of the analogy that has been used a number of times in this case by the Government, because I think it really is applicable here. The Government -- prosecution has given you an analogy of a parent punishing his child, his or her child. First you determine what the child did, and then you fit the punishment to what happened. Well, let's take the analogy a step further. Let's say one parent has already punished that child for a certain incident. And then another parent comes along and says, hey, I don't agree with that punishment. Is it then fair for the second parent to re-punish that child for the very same incident or should that parent lessen the

KEB104232

5367

punishment?  Even if he doesn't agree with the punishment that was given, should he lessen it because punishment has already been inflicted and received for the very same act?

We contend that a second punishment is basically unfair unless that punishment takes into consideration the first punishment and tempers the second punishment to fit with the first punishment.  And how is that done?  Kenneth Barrett has been punished for causing the death of Rocky Eales by receiving a sentence of 20 years in prison for manslaughter, first degree.  Would you show Defendant's Exhibit Number 235, please?  235. It' one of the long ones.  This is the judgment and sentence.  And you can see for manslaughter in the first degree he's been sentenced to a term of 20 years imprisonment.  That's punishment for the killing of Rocky David Eales.

Now, the federal government's coming to you and they're saying we want additional punishment for violation of our law, of our federal laws.  Well, one of the things that their asking for is as to Count Three is they're saying we want punishment for the killing of a law enforcement officer.  Well, Kenny Barrett's already being punished for the killing of David Eales because of manslaughter in first degree.  But now -- would you put

KEB104233

5368

on Defendant's 241? I'm sorry. I got the wrong -- 243. But now you see -- and as part of that punishment, the DOC is punishing Kenneth Barrett because they're making a special case of him because they're putting him in administrative special management inmate notice saying that certain things can't happen to him unless the top people in DOC make notice of it or are notified of it. And why are they doing it? Because of the highly publicized death of an Oklahoma Highway Patrol officer.

Look at -- this is 244. Okay. Look at 244. 244 again is showing -- look at the top of it, please. This is a cell assessment form and based on this cell assessment form, again, he is being given administrative -- considered as an administrative separatee based on the killing of a Highway Patrol officer. So DOC is already punishing him for that. And look at 246. Because he is in prison they come in and they figure out an assessment of where he should go. And the assessment on manslaughter for a person who does not have a previous conviction, that assessment would come up and show that he would have a -- six points. In six points he will be -- because of his age, he would be at five points and that would put him in a minimum security prison. But that's overridden. And why is it overridden? Because -- go to the second. See, he's got six points right there.

KEB104234

Go to the second page. Is there another -- one more page to it? It's at the bottom of that page. It's overridden because -- here it is right here. The custody level -- not the minimum that he would be entitled to, if -- on a regular manslaughter, this is being overridden because the killing involved a highway patrolman. And so, he goes to the maximum security prison. So punishment for Count Three has already been inflicted on him because of the killing of a law enforcement officer.

Based on his criminal history, his jail record, his escape risk and his state conviction, he would normally be assessed to a minimum security prison, but because of this case, high profile and the fact that it is Rocky David Eales, a Highway Patrol trooper that was killed, all that is overridden and he's serving his time in a maximum prison facility at McAlester. Not only that, but he's serving it as an administrative separatee in the Oklahoma State Penitentiary. In a 23-hour a day lock down with no contact with others. He's being punished for the fact that the person that was killed was a highway patrolman.

Now, let's look at Count One. Kenneth Barrett has already been punished for the death, because you've seen the judgment and sentence. He's received 20 years for the death -- of killing Rocky David Eales. Should it

KEB104235

5370

be fair that you should add additional punishment, saying okay, let's punish you one more time for the same death? Or should your punishment deal with what this case is dealing with, that was not dealt with in the state court. And that's drugs, that's the federal charge on Count One. Count One, if you'll look, it's use of a firearm during a drug felony, a drug offense, which caused the death. They've already determined the cause of death in Sallisaw. So you should focus on use of a firearm during the drug offense for Count One.

As to Count Two, Kenny Barrett has already been punished for causing the death during a crime of violence. And why is that? Look at 235 again. That's the long one. He's already been sentenced, found guilty of assault and battery with a dangerous weapon. And he's received a sentence of ten years and that sentence is ten years consecutive. So as far as Count Two, the crime of violence, he's already been assessed a ten year sentence for the assault and battery to Buddy Hamilton. That's the crime of violence and that's the sentence that that sentence is consecutive to the death of Rocky Eales. So that sentence hadn't even started yet and it will not start until the completion of Count One.

So in considering your punishment for Counts One and Two, do not assess additional punishment for the

KEB104236

5371

death of Rocky Eales. That punishment has been invoked and Kenneth Barrett has accepted that. He hasn't appealed. He's accepted that sentence. The essence of those crimes, along with the portion -- unpunished portion of those crimes is the use of a firearm during either the crime of violence or the drug offense. And we acknowledge that that punishment, the use of a firearm during a drug offense or during the crime of violence, has not been inflicted for the violation of those crimes. And as was stated and sung in an opera Machado, my object all sublime, I shall achieve in time, to make the punishment fit the crime. Therefore, to make this second punishment for the same incident and the acts that Kenneth Barrett has previously been convicted of and punished and sentenced, you should sentence Kenneth Barrett to a lesser term of years.

Now, let's talk about fairness. In fairness both to the Government and in fairness to Kenneth Barrett, is it fair for you as a second jury to sentence again, and more harshly like they're asking you to, than another jury has done for virtually the same act? The death of Kenneth Eales. Just because another government has come up with a violation of its laws, most people would say that's double jeopardy. But as Instruction 18 will show you, that's not double jeopardy. It's not.

KEB104237

But the real question that comes to you, ladies and gentlemen, is, is it fair? You know, the Government has the authority to do whatever it wants to do, even to kill people. You have seen that the Government can come on another person's property, without even showing authority to come on that property, and arrest and search its citizens.

Now the prosecution has stated many times in this trial that, oh, yeah, the Highway Patrol had court authority to be there, and they didn't have to announce their authority because they had a warrant issued by the court to allow them to do a no knock at any time they wanted to.

But you've also heard even from the troopers and from other law enforcement people is, yeah, while we do have that authority and we don't have the obligation to announce law enforcement when entering the property, be it a house or someone else's land, they should do it and announce their authority and announce they're a Highway Patrol to let the subject that they're looking for know that they are law enforcement. The Government has the authority to do what it wants to do, whatever it wants. But you need to make sure that what they do is fair. And let's go back to that analogy. You wouldn't tolerate a second parent punishing his child for the same

KEB104238

5373

act that the first parent has already punished that child for, without considering that punishment has already be meted out. And that's what we would want you to do. Consider that punishment and what it was for.

So why should you allow a second government to do the same thing just because it's not satisfied with the punishment previously received? And that's the only reason we're here. Or because an aggrieved person or an organization such as Oklahoma Highway Patrol continues to want more punishment, or what that victim or that organization considers as the only just punishment. And they consider the death penalty in this case is the only just punishment. It just isn't fair.

But the federal government may -- can say or contend that shouldn't we be allowed to enforce our own laws and seek our own punishments independently of the state government? Is that fair to the federal government to be locked into punishments based on what the state government has already done? Well, let's use the same analogy as the two parents. Is it fair for the child or for the citizens of those governments to be punished twice and more harshly for the same act? We contend that it is not. But the federal government wants to enforce its laws and it should be allowed to. But is it fair for the federal government to lay and wait for five years, in

KEB104239

excess of five years, after September 24th, 1999 to November of 2004 before it decides to enforce its laws? And then it only comes to this decision to enforce its own laws after the state government has received a conviction and invoked punishment, but that punishment doesn't satisfy the victims, doesn't satisfy the Highway Patrol or it doesn't satisfy the federal prosecutors.

It is lawful, I'll grant you that. The question is, is it fair? The federal government has been on this case since the very beginning. You heard the testimony, the federal -- the Drug Enforcement Agency -- Administration, which is the arm of the federal government were out -- they were out there on September 24th, 1999 doing their investigation. They were there. They knew what was going on. They could have filed their charges, but they didn't. They waited. They laid in wait. They did their drug analysis shortly thereafter. The federal government, they waited. They waited for more than five years for the state government to complete its case before they even brought its charges. And now it's going for its pound of flesh because they're not happy with the state's request, with the state's results.

Now, you know, again I get back to is it legal? Yeah. But the question is, is it fair? The federal

KEB104240

5375

government cannot say in good faith that this is an independent federal prosecution, that, oh, we're doing this -- all -- this is all by ourselves. We don't care what the state did. Because who is here? Who is here at the Government's table this whole time? Ben Rosser. And who does Ben Rosser represent? The Oklahoma State Bureau of Investigation. The state agency. He's the case agent from the state government and he's here. The same person, Ben Rosser, that sat at the government's table in Sequoyah County during the trials there in state court.

Virtually all of the people that were dealing with the death of Rocky Eales -- not the drug stuff I'm talking about, I'm talking about the death of Rocky Eales -- were state investigators. Vicki Lyons, April Marcangeli -- I never can pronounce her name. But all these people were state investigators and they were here. The Highway Patrol itself, they were here. This is not an independent federal prosecution. This is a concerted effort by Sequoyah County government, by state government and by the federal government to join in and to continue to prosecute Kenneth Barrett for the sole reason that the state, the victim or more likely the Highway Patrol didn't get the result they wanted in state court. As a citizen, do you think that's fair? How many times?

You were reminded by the prosecution about

KEB104241

certain inscriptions up here. And I sort of want to look at one right over here. It is impossible to be just if one is not generous. As a juror, in order to be just in this case we're asking that you be generous. You have given the federal government the convictions they want. Now be generous and give Kenneth Barrett the proper sentence to a term of years on each count. Not life imprisonment, not the death penalty, but a term of years. The previous conviction and punishment is a mitigator and that one mitigator can outweigh all the statutory aggravators, and this one does.

Now, let me talk a little bit about future dangerousness and scare tactics. This area deals with a little bit of the evidence and the testimony from the past and into the future. As to the past, the Government contends that there are previous acts of violence that show that Kenneth Barrett will be a danger even in a prison setting. This is not so, but look at the evidence of it. The earliest evidence is really biased. And we look -- for that we look to Kenneth Barrett's nemesis, Johnny Philpot. He arrested a 17 year old. How many times have you ever heard of a 17 year old being arrested for a traffic violation? He was taking him back to his cell and there was a scuffle that occurred. Now, there's nothing been shown in that whole scuffle that showed that

KEB104242

Kenneth Barrett did any violent act toward Philpot. But the implication sure was there when the prosecution asked Philpot if he received any injuries after the arrest of Kenneth Barrett as a juvenile, while he was taking him back to his cell. Sheriff Philpot said, yeah, I received broken bones in my hands -- in my hand, and he left it at that. What's that implication to you? Somehow Kenneth Barrett did something to Sheriff Philpot. But it was -- it was left up to us to come up and say how did you get those broken bones? And the Policeman Philpot, he was a police officer at the time, had to admit, well, I received those broken bones in my hand when I hit Kenneth Barrett in the face. Now, probably in the context that the Government wants to make this, that that was a violent act on the part of Kenneth Barrett because he stuck his face in front of the fist of the policeman. But ladies and gentlemen, who did commit that violent act? That sure wasn't Kenneth Barrett.

Now let's talk about the domestic violence and the marital relation with Abby. We acknowledge, just like Abby did, that both of them fought. And Kenneth probably more than her. She admits she's mouthy. She admits Kenneth's mouthy. I'll admit Kenneth's mouthy. They both hit each other. He probably hit her more and there were domestic abuse actions filed. But I've heard

KEB104243

5378

the characterization of lengthy history. That's a label they put onto -- a lengthy history of domestic abuse. But let's look at that lengthy history. What it was -- there are instances of actions filed in 1984 and 1986 when they were -- marriage -- young marriage, four to five years old, young couple, he was 23 or 24 and she was 20 to 21. And the marriage was rocky and divorce was considered and finally it ended up in his commitment to Eastern State for drug abuse and other treatment. And then they got back together. And there wasn't -- there wasn't another act of violence, you know, another charge or anything like that from that time until 1995.

In one action, when again she was ready to and later did file for divorce. And after the divorce there was no more. Now, ladies and gentlemen, I agree, that, you know, that there were problems in that marriage. That marriage was rocky. It happens all the time. That doesn't mean that a person has this tremendous dangerousness.

You know, I've dealt in marital relationships as a private attorney. I've seen it turn too many times to problems in the marriage when it gets rocky. That doesn't mean a person's a bad person. That doesn't mean that they have this tremendous dangerousness toward violence or anything like that. You've got to look at it

KEB104244

5379

in the context of the marital relationship. That's a special relationship where there is so much tension, there is so much -- there's so much intenseness in the relationship, especially when it's breaking up. Don't rely just on that relationship and those instances to determine if there's future dangerousness.

Practically all of the other accusations of so called violence deal with threats, and I'll agree with that. Admittedly, Kenneth Barrett is mouthy. He's made statements that many consider as threats. But what violence other than the September 24th, 1999 incident have you seen from those threats? And you really haven't seen anything. Now he does put on a bold face and he threatens, but he doesn't carry out those threats.

And I'll guarantee you this: As much money, time, effort and investigation that the federal government has put into this thing, if there were actions of actual violence you would see them here today. Anybody that's going to go back and pick up domestic abuse 20 years ago, if they can find something else they would have brought it here and there's not any. If there was true violence that -- the Government would have found it and you'd be aware of it. But it doesn't exist. And they want to scare you with -- you know, with this idea that, well, because of this domestic violence that he's

KEB104245

6:10-cv-00115-RAW    Document 20-2    Filed in ED/OK on 11/15/10    Page 98 of 100

5380

going to be violent in prison and yet there's no evidence for that.

Let's discuss the future. As Instruction Number 13 says, consideration of future dangerousness must be confined solely to a prison setting. You can only consider whether he will pose -- Kenneth Barrett will pose a threat to the safety of other inmates or other prison staff while in prison. Any sentence he receives here doesn't -- and it's Instruction 13 says this: Any sentence -- any sentence he receives here, death, life imprisonment or even a term of years, in addition to the sentences he has already received means that he will probably, more probably than not, spend the remainder of his natural life in prison. That's instruction -- you look at Instruction 13. More probably than not -- no matter what you do here, he's going to spend the rest of his life in prison.

There's not the real probabilities, so don't listen to the scare tactics, but there's not the real probability that Kenneth Barrett will be released, at least not until he's an old, old man, if at all. We can only live day by day. We can plan for the future. We can't guaranty what the future will bring. But questions about what can happen on credits, jail time, administrative separatee status or parole eligibility are

EUSTICE REPORTING SERVICE
BOX 700488  TULSA, OK 74170  (918)445-2965

KEB104246

5381

merely scare tactics to make you think that Kenneth Barrett will be released any time. And that's not true. Not only that, but you've heard scare tactics as to what can happen, what can possibly happen with Kenneth Barrett in the future, because he's made threats in jail. Yet the jailers for the most part really say he's mouthy, but he's not physical and that's true. There's not sufficient evidence to show that the statutory aggravator of future dangerousness is proven. And because it is not true, you should so find for each count.

In conversations I had the other day with Ernie Barrett, the father of Kenneth Barrett, he expressed to me his concern that the death of Rocky Eales devastated one family and that's true. Devastated his friends and devastated his co-workers. But he also said to me -- Ernie Barrett said, you know, imprisonment is punishment for Kenneth Barrett. The death penalty is punishment for the entire family.

You know, at the end, the prosecutor said that the Eales family has waited six years for this and I go back to what I said right at the first. Whose fault is that? If they felt justice -- justice according to the federal prosecutors, which they translate as being the death penalty could only occur here, then why did they wait to prosecute this case for five years? This was a

KEB104247

calculated premeditated concerted effort and decision on the part of the federal government to let the state government do this and then follow up, to go again if the state government didn't get what they wanted. The state government didn't get that death penalty and so the federal government took it over and said we're going to do it now.

It is impossible to be just if one is not generous. Be just and generous, ladies and gentlemen. Sentence Kenneth Barrett to a term of imprisonment for the federal portion of the crimes that he has not already been punished for. Thank you. Bret Smith will now give you some further remarks.

MR. SMITH: May it please the Court, Mr. Barrett, Mr. Hilfiger, I think you all know and I've expressed it before but I'm going to here again briefly, how much we do appreciate your attention and devotion that you've had to this case. And I can tell by the expressions that you've been making that this is weighing on your mind heavily now, like it should. And that is what it should be doing.

I have to start a little bit with what Mr. Hilfiger reiterated and that is about this fundamental fairness idea because, ladies and gentlemen, this does strike me as being fundamentally unfair as to what has

KEB104248