# Exhibit B-2

gone on in this courtroom.

Now, I will assure you Judge Payne would not allow anything to happen in here that was illegal. But what has happened in here over the past two months has not been fair, it has not been proper and I will assure you that it offends also sense of justice that you carried with you ever since you were in a civics class. You've always learned that there will not be twice you'll be subject to jeopardy for the same offense. And that's exactly what the Government is asking you to do here today. They're asking you to be an instrument of death for the Government. That, ladies and gentlemen, is fundamentally unfair. And the way that they're -- or trying to achieve that goal is to bring in what they've call the friends and associates of Kenny Barrett. And they bring them in all under the similar idea that, yeah, we're out there doing dope. Kenny knew he had a warrant and he was going to kill the cops whenever they come out to get me.

Every one of those people have something to gain from the federal government. Everyone of those people didn't appear until six years after this event. We brought that up in the first stage and I want you to revisit again in your mind why did they come up here? Were they friends of Kenny Barrett? Now I will tell you

KEB104249

5384

something that you can gather from some of those and you think about Karen Real, the gal who was cooking dope on the other side of Lake Tenkiller. Whenever she would get put out of her house, who would she turn to that would put her up and give her a place to lay her head? Kenny Barrett.

Whenever Randy Weaver came over to Kenny Barrett's to talk about some vehicles, to talk about car parts and somebody's at Kenny Barrett's house that was going to jump on him and do something to him and Kenny Barrett ran that fellow off. That's the type of person that Kenny Barrett is.

Now, you had Cindy Crawford come in here. She admitted she lied to you the first time around and then she wanted to come in and bring up that incident about the shotgun up against the leg because she wouldn't perform sex. Now, didn't she say there was five or six people inside of Kenny's house? A 20 by 20 cabin, but yet he's pressuring her to have sex inside of there? She didn't lie to you once, ladies and gentlemen, she lied to you twice.

But yet, they want to scare you with his threats, with his acts of violence. If Kenny Barrett would have spit on the sidewalk you would have heard about it. Everything that he has ever done in his life,

KEB104250

5385

this government was out there trying to uncover and what is the most that they could come up with? He engaged in domestic violence as a young married couple. It's not right. A man should never put his hands on a woman. A woman should never put her hands on a man. But we always expect the man to have a little more restraint. It's not right that he ever struck Abby Barrett. She's a nice woman, a pretty woman. And I'm sure she stuck by him in times when a lot of us would have said, you know, it's probably not worth it, but she did. They had a child together and they tried to make the work. But that is the instance of violence that they want to bring in to you and say this is a dangerous guy over here. That's a bunch of hog wash.

Protective order violations. You all aren't expected nor required to check in your common sense at the door. You know people that have been in divorces. You know people that have brought protective orders. You know people who have been accused of protective order violations. Put that evidence in the context in which it should be.

Now, they want to talk about the road block. He comes speeding through a road block. Well, that's really not what happened. The evidence was Kenny approaches this area where there is a road block at night

KEB104251

6:10-cv-00115-RAW    Document 20-3    Filed in ED/OK on 11/15/10    Page 5 of 76

5386

with the officers' vehicles off the road with no lights on, they have flashlights. And that he slows down and he's moving about five miles an hour. And as he's -- the officer is walking to his door, that he accelerates and goes on. Now, they said, well, two deputies had to jump out of the way. I don't doubt that there were deputies out there. But, ladies and gentlemen, why was there not any felonies charged if somebody was in fear that Kenny Barrett was going to injure them with his vehicle? Why was there not? Because the prosecutor has discretion and they look at that stuff and if they think it has merit they file it. But yet, you hear about it because that is some sort of violence, a violent act that Kenny Barrett committed.

Or this sign -- this is some sort of premeditation and substantial planning that Kenny Barrett has engaged in, so alleges the Government, because he put this sign on his gate. And they want you to believe that by locking his gate that he is trying to direct traffic through the east edge of his drive. The only person you have heard, other than the troopers that has testified that they came through that drive was a woman that says she was in a Mazda or a Mitsubishi. The other fellow's with her, he described the vehicle as different and said that never happened. A little vehicle going through a

EUSTICE REPORTING SERVICE
BOX 700488  TULSA, OK 74170  (918)445-2965

KEB104252

two and a half foot ditch, one that disabled a trooper's vehicle as they came through the ditch, that's the only person that you heard during this trial that says they came through the ditch.  But yet, he's directing traffic through there.

This sign wasn't over there.  This sign was at his front gate.  That's a stupid sign.  And the reason that's a stupid sign is because whenever something like this happens and they want to prosecute him, that just gives the Government something to argue about.  But you know what?  That is a trumped up no trespassing sign, stay off my property, you're not welcome.  There's nothing improper about that.  It's not very smart, but there's nothing improper about it.  We don't appreciate the wording that's written on there.  It's just not very smart.  There's nothing illegal about it.

Substantial planning and design.  Because we've got some clips taped together.  He says this gun can only be used for one thing.  They're only bought for one thing, killing a person.  They didn't bring the individual in here to tell you that the reason I'm buying this gun is because I want to kill somebody.  That's not what was brought before you.  But they want to talk about these clips because we got them taped together.  What over purpose is there for killing?  You heard about the

KEB104253

5388

bottoms down there to the east of the Barrett property. People walk up and down creeks shooting. Troopers had mechanical clips for their magazines to attach two of them together, so that you can carry more rounds with you. But yet, Kenny Barrett is sinister because he has his duct taped together. That's the sort of stuff that when you look at it, there's a whole lot of fluff here, not a whole lot of substance. And that's what Mr. Hilfiger was talking to you about. Don't you think that if there were fights, if there was guns that were being shot at people, that if this guy was so bad, that you would have heard a little bit more than him and his wife got into some slapping incidents? And that is all that's before you. But yet, because of that they want you all to take this case and sentence this man to death. They want you to be their instrument of death.

Now, I want to talk about the jailers a little bit. Rick Fargo, and you know it's hard to not make light of a baked potato incident. But ladies and gentlemen, throwing a baked potato from a fellow that's locked up in a cell with five or six people that is a dump, when you are facing prosecution for the death penalty, and you don't let those people out, you don't give them any programs, there's nothing for them to do but to sit in there and go stir crazy? Would you expect

KEB104254

5389

that you might have heard a little bit more than he threw a baked potato? I mean, is that not somewhat insignificant whenever we're talking about I want you to be an instrument of death? And what I want to talk about whenever I say this person is violent, he threw a baked potato?

Michael Hendricks, he almost grabbed me. Well, my gosh, almost grabbed you. Does that show violence? He didn't think it was significant enough to write a report. Or if he did, the sheriff's office hadn't found it yet. Almost grabbed me. Then they want to talk about Daniel Fears. Nobody saw Kenny Barrett (banging noise) but when Kenny Barrett -- whenever the jailer came around there Kenny Barrett said I did it. You don't know if he just took up for somebody. There was no -- nothing said that Daniel Fears received any medical attention. Nothing said he's even hurt. They want you to believe that. In this PC where everybody in there was accused of murder. (Two banging noises) Death penalty, that's what they want you to do.

Ladies and gentlemen, this case is death penalty eligible. And whenever I sit here and I try to weigh what is an appropriate punishment, what punishment fits the crime, what punishment -- if I'm on that side of the rail would I be thinking is significant, what conduct

KEB104255

5390

is significant enough to warrant the ultimate sanction? One that if I'm a juror and I were called on by the Government to be their instrument of death, that I can live with myself for the rest of my life knowing that I made the right decision, what sort of cases require that sanction? I don't know. Blowing up a building and killing 160 people, maybe. A terrorist act? I mean, that seems like something that seems pretty outrageous, seems like that might fit the crime if you have in your mind that you can impose the death penalty under some circumstances. How about like those guys that blew up the trains in London? Terrorists, bombers. You know, think about those. Those were terrible nasty people. Those were people that there is no purpose for them in this life.

You think about somebody like Daniel Fears, multiple, indiscriminate killings. Now, you all don't know about the facts of that case and I'm not going to tell you about them. We talked about it with the jailer a little bit, but you know that he killed two women that had no relation to anything, just shot Jimmy Nung in the parking lot of the dealership as he's showing a woman a car that gets killed. Is that a death penalty case? I don't know. I guess you'd have to be on that jury to know.

KEB104256

5391

How about crimes committed against children? Well, that seems like most of the jurors, whenever they were questioned early on, those type of crimes are those that strike that passion. You know, that fellow down in Florida that abducts a child and kills her. Those are horrible type crimes. What about two guys that are sitting around carrying on and pretty soon it gets into a heated argument. One of them says, well, I'm going to kill you. They get in a fight and one of them is dead. Is that a death penalty crime? I don't know. What about two inmates who get into a disturbance and one of them dies? Is that inmate that dies, is his life worth less than somebody else's? And we say, well, it's two inmates and they got -- one got what he deserved? How about a love quarrel? Woman comes home, finds her husband in bed with a neighbor, shoots him. Is that a death penalty case?

Those are the sort the things that you're called upon to weigh in this case. That's whenever we say fundamental fairness. Is this the type of case that should cause you to wrestle your conscience for the rest of your life because somebody is not happy with what another jury did? Because they didn't get what they thought was due and just punishment? And so, let's do it again. Let's do it harder. Let's do it more. Let's

KEB104257

invoke a little more passion. That's what you're being asked to do. So don't ignore what you are being asked to do in a circumstance that it's my perception fundamentally unfair.

In your instructions, the Judge has told you that the status of the victim is not to be considered. Now, I'm going to be the first to tell you Rocky Eales was a quality guy and I never knew him. But I can tell from the things that the family has said about him this was a good guy. There's no doubt about that. But you know that doesn't have anything to do with what you're called upon to decide here now. You're not to be persuaded by sympathy. You're not to be persuade by public opinion. Your role is to decide this case as to the appropriate punishment Mr. Barrett should get, the appropriate additional punishment Mr. Barrett should get.

Now, ladies and gentlemen, like we said before, lawyers are trained somewhat in picking up what we call nonverbal clues. Whenever you make an expression, if we see it, then we're trying to interpret it. And we see those things and we're not always right when we read them. But you know whenever you all came back from your first stage deliberation, there were some of you that were visibly upset. So here we are again. You're fixing to go into a second stage of deliberation. Whenever you

KEB104258

5393

spend ten hours in deliberation on a first stage murder case and you come back in visibly upset, tells me somebody compromised.  Somebody wavered.  Somebody backed off of their position and you rendered a conviction.  And I don't criticize that conviction.  I respect the jury's work.

But, ladies and gentlemen, as the Judge has told you, now is not the time to compromise and it just takes one.  It just takes one person to stand on their own two feet and to tell the Government I will not be your instrument of death.  That's what we're asking several of you to do.  Because I know several of you feel that something just isn't quite right about this prosecution.

Now, ladies and gentlemen.  I want to show you how to get to that process.  But I know when you're making a decision about the extreme, ultimate punishment you want to be deliberate, but you also want to have peace and you want to be calm in your heart and in your mind.  Because regardless of the decision that you render here today, it's not over yet.  You're going to live it. You're going to think about this case for the rest of your life.  You know, you all have made friends amongst yourselves.  I know that just from being around juries. This is the longest, like Mr. Hilfiger, that I've ever

EUSTICE REPORTING SERVICE
BOX 700488  TULSA, OK 74170  (918)445-2965

KEB104259

5394

been in trial. But I've seen you out and about several times. And you all get together and you've exchanged a lot of stories. I'm going to bet there's been recipes exchanged. How many times have you shown pictures of your kids and grand kids to one another? That's what you do when you're together in a group like this for as long as you all have been. This is going to have a profound impact upon you. And we trust that you're going to make the right decision.

Ladies and gentlemen, the decision that you make here today will be final. If there's any golfers in the jury, there aren't any mulligans. We don't get any do-overs. This is it. It's not for somebody else to decide, well, let's do it again. This is it as it relates to Mr. Barrett. And we trust that you all are going to get it right.

I don't want you to misinterpret what I'm fixing to tell you, because there's a message here. But I'm not saying it to be smart, I'm not staying it to be coy and I'm not saying it to be disrespectful. But there's a fellow that owns a boat. The boat is called the Senile. That Senile is docked south of Houston and its owned by Captain Bob Burns. Bob Burns likes to fish and he likes to go offshore and sometimes he'll go more than a hundred miles offshore. And Bob Burns will tell

KEB104260

you that life is cheap.  He will tell you if you step off at the back of that boat at night and if there's a rough sea and you go overboard and there's not somebody there with you, we're not going to find you.  His point is if you go to the back of the boat, you better have somebody with you that can alert, because when you're out there on the high sea you're taking risks.

Well, ladies and gentlemen, when you get on a motorcycle and start riding, you're taking a risk.  When you hop in the cockpit of an airplane you're taking a risk.  When you jump out of an airplane with a parachute you're taking risk.  And whenever you approach somebody's house in the middle of the night with no lights on, no warning equipment, approach unannounced, you are taking risks.  Whenever you fill out an application for life insurance, they ask you about qualifications.  Are you a pilot?  Do you scuba dive?  Do you sky dive?  And why do they do that?  Because they understand that that involves an increased risk of death.

Now, ladies and gentlemen, the flip side of that coin is life is precious.  Life is special.  Now, we all hope that we can maintain a quality of life such that we can enjoy to its fullest.  And you have heard that Mr. Eales was enjoying his life to his fullest.  He did a lot of activities, had a wonderful family and seemed to enjoy

KEB104261

5396

them. Oftentimes we don't realize, we tend to take things for granted. And sometimes we don't realize just how precious life is. When there's a birth in your family, then you tend the realize how precious life is. When there's a death in your family, then you tend to realize how precious life is.

Ladies and gentlemen, not a thing we can do to bring back Mr. Eales. That was a tragic event that happened out there. And it was a tragic event for several reasons. One is cause he can't be with his family. Another because Mr. Hamilton carries scars from that incident with him and will for the rest of his life. And Mr. Hise, the impact that its had on him and the other members of that tact team. I don't doubt that that's real. That's their buddy. That was their friend. That was their comrade. Sure, it's impacted, but you know what, you become an instrument of death, take away that life that is precious. And just like Mr. Hilfiger said, penitentiary is punishment. The death penalty is punishment for the Defendant, the death penalty is punishment for the family. Do we want to extend this case any farther? Do we want to continue this fundamental unfairness any father? Do we want to keep on this road and continue to hurt more and more people because somebody else can't accept 12 jurors' verdict in

EUSTICE REPORTING SERVICE
BOX 700488  TULSA, OK 74170  (918)445-2965

KEB104262

5397

Sequoyah County? That's what were being asked to do. That's what you're being asked to do.

Ladies and gentlemen, what it takes is at least one of you and maybe more to turn to those other jurors and say I've listened to this, I've deliberated but I am not going to do it. Because this isn't right. It just takes one of you.

The Judge told you, regardless of what happens here, he's never getting out of prison. He's going to spend the rest of his natural life in the penitentiary. Now, was he going to if the federal government did not bring their prosecution? Probably not. That 30-year sentence, if Mr. Littlefield -- he says he's getting 58 days. Say if he did it in 15 years, he was 38 when the incident happened. What's that, 53? So they bring their prosecution. At a minimum, without you doing nothing, because of the federal prosecution and we're now in the sentencing phase, he will never get out of the penitentiary. Question is, is that enough? Well, I guess not, because again, you're being asked to be an instrument of death. And is that what you want to be a participant in?

The mitigating factors -- and there's several of them and it was pointed out that reasons why you shouldn't give them heed. Well, I want to go back

KEB104263

through a couple of them and one is the very first one about acceptance of responsibility from the previous conviction. They say, well, if he appealed it and its overturned and he come back for trial and he might get life for manslaughter. Yeah, he could get death. Yeah, he could get acquitted. There's all sorts of things that could happen. You weren't told whether or not there were any appealable issues in that case. You don't know. But what you do know is that Mr. Barrett accepted that verdict and was doing his time. And because of him doing his time, it's time that the Government decided wasn't enough, they bring this action.

The Defendant has been convicted and punished for David Eales. Ladies and Gentlemen, that's a mitigating factor that have proved. And let me explain this to you. The mitigating factors are beyond -- with a preponderance of the evidence, which is it more believable than not. You know, 51-49 type situation. It's not the burden of proof that the Government's held to beyond a reasonable doubt. The mitigating factors are just right there. If you believe it's more probably true than not, then it's found established. It just takes one of you to find mitigating factors. All of you can, but it just takes one for you to consider that in your deliberation.

KEB104264

5399

How about the no prior felony convictions? They say, well, he ran from that case. He didn't stand prosecution. Oh, he stood prosecution. He had a lawyer. The lawyer withdrew. The bondsman knew that there was a bench warrant, but he never came out to get him, never notified him of it. That was Marty Daggs that told you that.

The bottom line is whatever the circumstances of that '97 case is, that the question is not did he run from prosecution. The question is had he ever been convicted of a felony. Well, ladies and gentlemen, that's a slam dunk. Because you know if he had, you'd have heard about it. The Defendant is a father. There's no question about that, a loved son and a stepson. All these mitigating factors you can find. And I suggest that you will find.

Ladies and gentlemen, regardless of the heart strings that they've pulled, regardless of the acts of violence that they want you believe in that's a bunch of smoke and mirrors, you never have to impose a sentence of death. Just takes one person to say I'm not going to do it. It's a lot easier when there's more than one of you.

Now, I've got to ask you to not give up your honest beliefs, those that you hold. You got to deliberate, that's the nature of this process. And we

KEB104265

5400

want you to do that. We don't want you to check in your common sense at the door. We don't want you to give up your deeply held beliefs whether it's to reach a decision or whether it's just to get this case over with. You carried conviction with you all your life before you came in here and we want you to carry that conviction with you as you go into that jury room. And when you come out of that jury room, we want you all to be able to live with this decision that you've made.

And, ladies and gentlemen, the answer to your solution, to not be an instrument of death for the Government is found in three places on your verdict form. It's found on page 31, verdict of lesser sentence. Verdict lesser sentence says he's never going to get out of the penitentiary. Even if you can't agree -- if you can't agree, you come in and say, Judge, we're locked, he's going to sentence this man according to the law. And he's told you he will never get out of the penitentiary. Page 31 accomplishes that, if you all are able to reach it by agreement. It's for Count One. Page 35 accomplishes that result for Count Two, same thing. Count Three, because it's a little different -- the statute is worded a little different, says a term of years not less than 20 years. But the judge has told you that he will never hit the street.

KEB104266

5401

So, ladies and gentlemen, we rely upon your life experience, we rely upon your common sense, we rely upon your memory to render a verdict in this case. I feel confident on behalf of Mr. Barrett that you're going to do the right thing. And just because the Government has brought this case six years later, spent no told how many thousands of dollars and uncovered every stone that was ever existed in Sequoyah County, that they have not shown this to be the type of case that is deserving of you being an instrument of death. Thank you for your time and attention.

THE COURT: Final remarks from the Government.

MR. SPERLING: May it please the Court. You've been thanked repeatedly. I must admit that I had a different take when I saw you return your first verdict than did Mr. Smith. I didn't see anger. I saw people who took their oaths very seriously, who rendered their verdict very carefully, who obviously examined each piece of evidence, who consulted with each other and who reached a just verdict.

What you've heard for the last 70-80 minutes or so is an emotional plea to ignore the primary evidence in this case. I'm going to ask you to be the agents of justice in this case. There has been a prior prosecution. We're going to examine it in this closing

KEB104267

5402

argument. But I ask you in the final analysis, each one of you, to be the agents of justice and fairness in this case. Last evening I sat down at my computer and I began to write and early this morning I reached this conclusion and that's that words cannot do justice to this extraordinary case.

I want to ask you two preliminary questions. The first is this: What kept the Defendant from being a multiple murderer in this case? Some may say the hand of God, Providence, fate, dumb luck. The Defendant in this case intended to be a multiple murderer. We'll examine the facts. But the second question I want to ask you is this: If 19 rounds -- and I'm going to be careful not to point this at anyone. If 19 rounds from this firearm -- and I admit it, it could be used to shoot skunks. We heard that from his mom. I'll tell you that tells you one thing, he know something about shooting black and whites. But if this gun and 19 shots at highway patrolman, at officers of the law, at soldiers of the law, if 19 shots from this gun at point blank range, but extending farther out to begin, if that's not over the capital line, what is? Must it have been 30 or 60 or the 91 that he had at the ready?

Ladies and gentlemen, I submit to you that when you carefully and you honestly and you dispassionately

KEB104268

look at this evidence in this case -- this may be a very difficult case and a very difficult decision. Mr. Smith tugs at your heart strings. This is a decision that you will live with, yes. It is a difficult decision to sentence someone to death. But, ladies and gentlemen, under this evidence this is not a close call. This is not a close call. Months ago we looked each other in the eye and considered the prospect that this day would come, didn't we? And you looked me, each of you, directly in the eye and asked each of you this question: If the law permits it and the evidence justifies it, are you capable of signing your name to the bottom line of a jury verdict form knowing that the result will be the death by execution of another human being, the Defendant in this case? Each of you reverently and respectfully answered that question in the affirmative. That day has come. The law permits it and the evidence resoundingly justifies a capital sentence in this case based on what you heard as to this Defendant. And I am confident that you will take this decision very seriously. You each fully understand the gravity of the verdict that you're asked to enter. This isn't an easy decision, but it's not a close call. Nineteen shots are way over the capital verdict line. And the Defendant's crimes deserve the death penalty not because we want to impose it, not

KEB104269

5404

because it's easy.

You know, they are really kind of like those sirens in mythology when you hear this defense argument, they're tugging at one or two of you saying bolt from the rest. You know, it's kind of an enticing entreaty, isn't it? But ladies and gentlemen, we are not asking that you do this because you want to or because it will make you feel really good. It won't. But because it's the right thing to do.

The evidence, the testimony and the information in this case warrant and dramatically outweigh the aggravating factors, dramatically outweigh the mitigating factors in this case. What the Defendant chose to do is way over the balancing line under the Court's instructions. As I listened to the defense lawyers the thought occurred to me that I wonder if it sometimes takes longer to attack individual facts of the case rather than to look at the entire case, all of the case and all of the facts together. They'd isolate one piece. They'd talk about Abby. They'd talk about a potato. But did you ever say -- hear them say look at all of this together, put it all together? Now what do we have? Oh, they looked at the sign. This is just a no trespassing sign? Not like any that I've seen. This is a threatening prediction of what he was willing to do. But

KEB104270

5405

I'm not saying base this decision on this. I wouldn't ask you for a moment to base your decision in this case based on what Abby Barrett said or suffered. What I do ask you to do is to consider it as one piece of the puzzle. Put it all together. This conduct is way over the capital line. The 19 rounds fired by the Defendant with precise targeting is way over the capital verdict line.

This Defendant substantially planned, he premeditated, he calculated a murderous rampage that only ended not because he voluntarily decided to stop it. It only ended because of Rick Manion's -- and we're going to look at his PowerPoint now -- because of Rick Manion's accuracy. He couldn't be with us. He was killed in a motorcycle wreck some time ago. But Rick Manion -- he testified, he was under oath and he shared his version of what happened. You know, what we have here is the Defendant who fired at a vehicle that was some distance. And the evidence according to the troopers was that they were as far away as from the reach of this courtroom from one end to another. Ladies and gentlemen, that's way too far away to be firing with impunity at someone who is merely an agent of the law, ordered to serve a no-knock warrant at that time.

But here what we have is the Defendant who even

KEB104271

after he had fired many of those shots -- let's go to this now. Remember Manion said that he -- he activated red and blue visor strobe just before he turned in off the drive. He said that Hash's -- Steve Hash's marked unit's emergency light bar was fully activated. He said that we were directly behind the lead vehicle, less than a car length behind when we turned off. He said that he didn't know whether the troopers in the lead Bronco even had time to activate emergency lights before they took gunfire.

He continue by saying the second Bronco was offset to the right of the lead motor vehicle upon our approach and could see past the lead motor vehicle to the home. He continued. Gunfire at the Bronco occurred when the Bronco was far away. The gunfire intensified upon approach. The gunfire came from the front door area. The gunfire was from the house occupant's rifle. Rocky was mortally wounded and then said I'm hit bad. Gunfire continued as Rocky and Manion were at the rear of the Bronco. Rocky then went to his knees and went down. A commotion attended Toby's detention. And then a flash bang went off, then Buddy came to the rear of the Bronco. Buddy had already been shot. Gunfire from the house continued. Grave risk, yeah. Gunfire from the house continued. The Defendant, holding his -- well,

KEB104272

5407

essentially an AR-15 stepped sideways into the east room on the east side of the house. That's the testimony that you heard in transcribed form from Rick Manion. But the Defendant had slipped into the southeast room. Seventy two rounds remained in his chosen weapon of choice, ready for further murder. He continued to grip his murder weapon, he had peppered the lead Bronco with eight lethal rounds through the windshield at the driver, continued to fire at the unarmored vehicle. He observed the Bronco approach his front porch, he saw Rocky get out of the passenger door, he took aim at Rocky and he fired. The blast pierced Rocky's flank. He continued his aim. Another blast penetrated Rocky's side, broke ribs, punctured a lung and perforated Rocky's life -- lifeline, aorta. And then complaining about fairness?

The Defendant maintained his aim at the man the Defendant had already shot twice. He staggered away from the Defendant in desperate, halting steps, in a futile search for safety. The Defendant took aim again at the man who retreated. The Defendant fired again at Rocky while Rocky's back was fully exposed. The bullet struck Rocky's un-holstered pistol, damaged the butt plate as you recall, and relieved the unused weapon of its contents.

The Defendant who committed these crimes isn't

KEB104273

5408

a child.  He was a fully conscious adult who substantially planned, who premeditated in a number of ways in the weeks and months prior to this murder.  He expected, he watched, he surveilled and he slaughtered an absolutely innocent man who had done nothing to him.  And they ask for increased leniency or fairness?

This was game day for the murderer.  He clearly tried to murder at least two human beings, shots at the Bronco, the intentional killing of the passenger.  But he wasn't finished.  He saw the driver, Buddy Hamilton, getting out of the vehicle, didn't he?  Buddy was wounded.  He fired at him, too.  Buddy was wounded in the front, the face, in the front and back, and back, and back, of his shoulder.  And they claim unfairness.

The Defendant still wasn't finished.  He was waiting, rifle at the ready, chamber loaded pistol in his waistband, for law enforcement officers to walk onto his porch.  Fortunately, two bursts from Rick Manion's MP-5 put a halt to his killing field.  Still, the Defendant's substantial plan and premeditation continued.  He reaches for a weapon as he's being subdued.  Let's not get distracted from the real issues in this case.  My judgment is that you have this Defendant figured out.  He talked for a long time about what he was going to do, about what he wanted to do.  He talked about it long

KEB104274

5409

before he stepped over the death penalty line. He hoped that Johnny Philpot or Frank Loyd would be the first ones through the door. Please keep that in mind as we consider what the Defendant planned for approaching law enforcement officers, had Rick Manion's fire not been accurate. Defendant new the law was going to come for him. He could have easily turned himself in. Rather he did what he wanted to do. Were his crimes out of character? No. They were consistent with the character he had become. The Defendant tragically tried to murder two human beings. He succeeded tragically with regard to Rocky Eales. And it's not as if he didn't know that a murdered victim would have a mother and a father, sister, a wife or a husband and children and friends and coworkers. This Defendant did not care. He gave no thought to the suffering of others. We have a mother and father who lost their only son. A sister who lost her only brother and nephew and niece, twins, who lost their favorite uncle. A wife, Kelli, who lost the love of her life and must reckon with a situation that even she can't fully comprehend. A daughter, Allie, who when told by her mom dad wouldn't be coming home asked tearfully, well, when will he be coming home? A young son who longed to be with his father in heaven. A good friend from the Marines who will never be able to share those

KEB104275

5410

memories again. Coworkers like Buddy Hamilton, who survived the murderous hail of gunfire and Ray Greninger and Rick Manion who rushed to Rocky's aid. Steve Hash, who would have been the ram trooper, Danny Oliver who heard perhaps Rocky's last audible sound, a scream in pain as Danny tried to render him aid. Billy Poe who moved forward to suppress gunfire from the Defendant who had come too soon. Doc Darst who moved into the yard to eliminate the danger to or from the Defendant's son. Tactical team supervisors Pettingill and McFry, and last but not least protégé Gene Hise whose CPR, in a desperate race to buy Rocky a few more moments of life, produced mouthfuls of frothy last breath blood.

The suffering of each of these wonderful people who graced our courtroom in this presence, this chamber of justice, was foreseeable to this Defendant. But he cared not about the consequences. He scoffed at the emotional scarring and the psychological suffering of others, at the agonizing pain he so carefully had planned and premeditated to inflict. And what did you hear from Deputy United States Marshal Lloyd Valleck? The Defendant remorsefully reflects after hearing Gene Hise's compelling testimony about how Gene frantically tried to save his mentor's life and raced Rocky to the emergency room. Without a tinge of regret, the Defendant

KEB104276

5411

heartlessly responded:  He acted the same way six years ago.  He needs to grow up and be a man.  He needs to stop whining.  This from the Defendant whose lawyers now plead for fairness?

The Defendant elected to suppress his conscience.  He chose a criminal path in this case.  His murderous actions were conscious, knowing, intentional, deliberate and a premeditative result of thoughtful choice.  You know, he lacked an essentially ingredient of the community of people.  He doesn't have empathy for other people.

You know, for others -- over six years the Defendant has been preparing for the prospect of parole.  Might he have been pretty well behaved in jail, generally speaking, given the prospect that he may be paroled one of these days?  Might he be so motivated?  Might that motivation now be gone?  And jail rewards good behavior, commissary and reading and visitors and television association.  Okay, he hasn't killed anyone in jail.  But he showed us the tip of the iceberg.  He hurls solid food at a jailer, he threatens other jailers, even tries to grab one through the bars.  He thumps a cellmate, himself a murderer.  Why?  Not because he murdered innocent people but because he clipped his toenails.  The Defendant's sense of justice, utter, utter selfish.

KEB104277

5412

That's a telling forecast of what is to come if the Defendant is just sent back to his room.

You know, in the days, weeks and months before this killing, the Defendant had the idea of murder germinating in his mind. The Defendant was on a trajectory, a chosen path. This evidence is unmistakable. Instead of surrendering to arrest, the Defendant took everything Rocky had. And they now complain about unfairness? He took Rocky's hopes and his dreams and his time and his life. This was cold blooded murder. And the question that we asked you originally, why wasn't this a double murder or a triple or quadruple murder? Only because the Defendant was stopped. Before that night and after, the Defendant behaved the way he wanted to. He did what he wanted.

You've heard the defense attorneys ask you to do something other than to render a capital sentence. The Defendant wants to be sentenced to his room as punishment. Justice cannot be served in the case by allowing the Defendant to live in prison. If he's allowed to live in prison, he will have perks like workouts and visitors and phone calls and mail, TV and recreation. Don't let this Defendant -- the evidence may reasonably infer and you may reasonably conclude -- be a hero to his fellow inmates, to his fellow incarcerated

KEB104278

5413

criminals.  All with a civilized core must have revulsion at what the Defendant did to have acted as the executioner of the innocent.  Don't give this Defendant what he wants.  In the name of justice give this Defendant what he deserves.  Don't just send him to his room.

The Defendant wants to choose his sentence.  He now wants to live.  And how unjust is that?  What opportunity did he give Rocky Eales to live?  How unjust is that?  The Defendant made Rocky Eales do something he would never ever do in life, but for the desperation of his moment.  Rocky would never have done what the Defendant made him do, but for the fact that he believed there was absolutely nothing he could further do to defend himself or others.  His life was ebbing away, he could do nothing for others because he was mortally wounded, bleeding and dying, he retreated for what was left of his life.

This disturbing criminal conduct is way over the capital line.  The Defendant didn't need to commit this murder.  He wanted the thrill of the kill.  And now his lawyer complains because he has been brought to the federal bar of justice, to our doorstep.  He has not been placed in double jeopardy.  The Court's instructions tell you there is no legal bar to this trial.  But let's just

KEB104279

5414

go farther and practically. Let's say I get in trouble at school and that doesn't mean that there wasn't going to be a more serious reckoning when I got home and dad found out about what I had done. If the punishment was insufficient at school, I can assure you that dad had punishment waiting later. That's not unfair, that's just. Let's say, for example, that I had misbehaved and my mother had caught me and she furrowed her brow and she'd scolded me and may have swatted me a couple of times and told me not to leave the house. And then she told dad. And because of disrespect or some other reason, Dad said that original punishment is not enough, it's not just. You know, I could have complained about fairness, say, oh, whoa. Whoa, whoa, mom swatted me, the school tried to punishment me. I can guarantee you that my pleas would have been drowned out by the whack of the belt on the place God made for that appropriate punishment. That's their claim. They're asking you, ladies and gentlemen, not for fairness but for leniency for a man who offered Rocky no leniency, who offered Buddy no leniency, who was ready to kill at will. Ladies and gentlemen, don't let a cop killer get leniency.

So much for analogies, though. Let's talk about the difference in the cases. You heard witnesses testify here that in the state proceeding they didn't --

KEB104280

they were really grossly under-evidenced. Randy Turman didn't testify, nor did Travis Crawford, nor Charles Sanders nor Karen Real nor Brandie Price, Cindy Crawford, Randall Weaver. No small effort was involved in getting them brave enough to hit the stand. They didn't want to testify. We required their testimony.

His friends and associates didn't want to testify against him. But then there was Juan Beal, Kevin -- remember Kevin, no small potatoes, Wilson? Craig Nixon and an array of drug evidence, lab equipment, chemical and proof of the Defendant's serial drug manufacturing, distribution and use. Chemist David Love, Lyndell Griffin and Gerald Skowronski. All of these witnesses were presented to you never set foot in that prosecution down there.

Ladies and gentlemen, this is the time for justice. This is not the time for the leniency that the defense asks. All of those witnesses were presented to you not at the abridged state proceedings. The state jury just got a small glimpse at the wide screen feature length film that you have very patiently experienced in this case. And you heard from Kelli Eales and Bobbie Eales and Nancy Stalcup and Bill DeWeese and Gene Hise. They didn't testify in state court. We need not belabor their testimony, but you also heard from Stanley Philpot.

KEB104281

Here's a man on donated law enforcement officer time and equipment who put his life on the line after giving the Defendant a gracious opportunity. They have already been generous. Oh, go ahead and drive your car home, we -- or truck home, we won't impound it. And what does he do? He takes advantage of the generosity. But now he asks for more? Here's the Defendant with a cloud of dust who then confronts them with an arm, with a gun, with a big pistol. And what did Stanley do? Rather than to be involved in a gunfight, he first called for a bullet proof vest and then he repaired and basically retreated.

Johnny Philpot drove a white SUV, he said. What was he shooting at? The Defendant was shooting at a white SUV. No wonder he shot so many times at the lead white Bronco. He tried to locate, Johnny did, the Defendant to bring him in. Did he thump him, did he do anything to him in the adult experience? No, he just merely tried to bring him in. Didn't arrest him, didn't harass him other than to check a gun and let him go early. That's not the man who has a vendetta out for this Defendant.

And, yes, you heard from Cindy Crawford. No, not that Cindy Crawford, the one who had the Defendant put a shotgun to her leg and threaten to shoot her. Well, actually he said he'd F-ing kill her if she came

KEB104282

5417

back.  Charles Sanders -- the Defendant said we need to find that SOB to have him -- that came in and had me arrested and we need to kill him.  Larry Lane, the Defendant slows down, grins, then runs through a traffic checkpoint, ignored lights and sirens and led a hundred mile chase.  Shannon Smith, Micah Reasoner and Cindy Smith had to jump out of the way to keep from getting run over by this man.  Past behavior indicative of what he will do in the future.

And years ago the Defendant was slapping his wife around in broad daylight and Shannon sought to intervene and what's the Defendant's response?  To threaten Shannon that he was going to go inside, get a gun and shoot him.  A crying Abby asked Shannon to leave, obviously for Shannon's safety.  And the defense mitigation in this case?  Let's see.  Maudeen Vann, seven -- count them, seven filed cases of domestic abuse in this case, seven of them.  An affidavit says, quote, he was going to blow my head off.  Oh, mere talk?  Ultimately this Defendant lived out his fantasy.  The Defendant stalked, going to a restaurant, like the abused -- I mean, she was pathetic, like the abused wife she is.  Yeah, it was mutual combat.  Yeah, right.  And Kathy Trotter, a real ear to the ground, who knows all the goings on in the Sallisaw area, never been in the

KEB104283

5418

Defendant's house, never seen him armed, unaware of the seven cooperating witnesses testified about the threats that he had made, unaware of any domestic violence, she didn't know anything of consequence. And Jimmy Wilson, from the prison, the Defendant's parole hearing is next May. An administrative assignment can be changed with a stroke of a pen.

Clyde and Craig Edgmon, okay, the Defendant occasionally fixed their cars for little, if any money. But they didn't know the other Kenneth Eugene Barrett. Jailer Robert Gude. The Defendant was arrogant, bold and showed no signs of remorse. Courtney Burke, when called not to tongue meds, he throws his medication and spit a pill at a 70-year old lady. Adam Satterfield, Defendant throws a large tray at him. Brother Steven, the Defendant came up to Abby from the back, grabbed her and took her to the ground. Oh, that's the Defendant's style, attacking from behind. The Defendant is fairly anti-social, huh uh. Steven pretty much stayed away from family in Sallisaw. Steven took -- selected an entirely different direction. Roger Crawford, well, he really didn't know the Defendant that well. Asked about redeeming qualities -- remember how he stalled. He was asked, well, what about his redeeming qualities? Do you remember that pause, that pregnant pause? And then he

KEB104284

limped. He said, well, a good person, helps people, son and ex-wife need him. Ex-wife, I asked. Maybe not. Gelene Dotson. Doesn't remember when the Defendant got married or divorced. They fought a lot. Doesn't remember any domestic abuse allegations? And she wasn't going to run his messenger service and didn't want a salvage yard next door. She says Defendant knows he made a wrong decision as to how to react that night. If he could do it different, he would. Now, that's big of him. That's about as weak as his reason for leaving school.

Ernie Barrett gave the Defendant several time -- chances to succeed at work. The Defendant basically blew them. Mother-in-law, Doris, I got to respect her loyalty. She's been in court when he's been in court. But the state trial, as she admitted, was nothing like you heard here. The jailers -- he chunks a potato at one, curses others, he's in a cell with dangerous contraband weapons, he threatens yet another one, he reaches out from a cell and tries to grab another, he thumps a younger cellmate, a cowardly killer himself, I might add, not out of injustice but because of the way he cuts his toenails?

Sympathy. If we're tempted to feel sorry for the Defendant or his relatives, we should remember this. He abandoned them through his conduct. How he must envy

KEB104285

5420

his hard-working, highly achieving bother's success. Abby, every pore of her body oozed that she had been abused, physically and emotionally. The Defendant had sporadic contact, pretty much unwanted, particularly with his mother, until he committed murder and got arrested. They didn't visit him at his house. They hadn't seen the inside of his house by and large. And remember this, hear in court, the Defendant victimizes his own family by making them serve as props, as witnesses on his behalf. Remember, Rocky didn't get this similar chance to plead for his life.

Defendant's parents visit him. Well, whatever he does for them or anyone else is largely undefined and far outweighed by the crimes he committed. The Defendant has paid for his membership into the worst of the worst groups of criminals. He's a murderer. He killed remorselessly, wantonly, senselessly and had no empathy, no sympathy, no thought, no feeling and no emotion for a wonderful man whose life he extinguished like that with semi-automatic gunshots.

There is no proof that this Defendant lost one wink of sleep over what he did. It's almost as if he had done nothing, like nothing happened. And now he says give me leniency. His mother quoted him as saying he made a wrong decision and would do it differently. You

KEB104286

5421

know, it's almost an oops. It's kind of like, well, Derek Jeter may have bobbled a ball in a preseason spring training game that's meaningless. His dad says, well, he's sorry it happened. Sorry two kids are without a father. Boy, that's pathetically understated, even if it's accurately relayed.

MR. BARRETT: Get off my family, Sperling. This is about murder, not my family. You didn't mention the fact that I made two statements to OSBI Internal Affairs that you wouldn't let this jury hear, would you? I've heard enough of him talking about my family. Take me out of the courtroom. Take me out.

THE MARSHAL: We'll take you -- do you want him removed, Your Honor?

THE COURT: Yes.

(Whereupon, Mr. Barrett was escorted out of the courtroom after which the following record was made.)

MR. SPERLING: And he never intentionally shot anybody? Every bullet he fired was in the direction of the man and men he shot. The final shots were deadly accurate. All he saw was headlights. He saw lots of emergency lights, too. Remember the real victims. It is not our job here to forgive. We are not the victims of the Defendant's brutality. It's not our job to feel guilty. The murderer who mercilessly killed in this case

KEB104287

5422

as a matter of conscious, premeditation and planning ought to feel guilt and remorse, but he doesn't. He is the one who put us all here. What a sense of power he must feel, the narcissistic, selfish collection of reality that he is. He's the one that put us all here.

But we must not refuse to do our duty just because we can't make the victim's family or friends or community whole. Remember that the Defendant employed the machinery of death as Rocky sought only to enable a court ordered search of the Defendant's house and then to go home to his family. This tactical team had never fired their weapons or been fired upon. There was only one difference here, the Defendant. The Defendant chose when Rocky would breathe his last breath. This Defendant substantially planned and premeditated and deliberated. His aggravating factor laden murder was unprovoked, it was predatory, it was deliberate and it was premeditated. He had taken steps to get where he was heavily armed that night. He selected the means, the instrument, the place, the victim's pathway. He struck without warning. He killed from a distance and then killed close-up as he cowered in the cover of his house.

They say that the Defendant accepted responsibility by declining to appeal his state conviction for mere manslaughter. Hardly. He made a

KEB104288

5423

strategic choice. If retried, he could have been sentenced up to life in prison. The defense lawyer says the Defendant has people who care for him. But he's manipulative, he's a taker, a narcissistic personality. To him it's all about him. If only they had done things differently. This Defendant chose to be the person that he was before and on September 24th, 1999. Remorse? The evidence indicates that this Defendant has not only not seen the light, he hasn't even felt the heat. The defense lawyer says that the Defendant is not a future danger. Ask yourselves, would any of us want to be in a prison cell next to a man who is capable of coldly attacking law enforcement officers? So he's a good prisoner, to those he can't manipulate or selectively attack.

You did hear an emotional appeal from his lawyers. We predicted -- they asked for fairness. We ask, ladies and gentlemen in this venue, for justice. If we merely send this Defendant back to his room, you may reasonably infer that this cop killer will be a hero to many in the prison population he enters. He will have committed cold blooded murder, yet will have escaped the capital noose. This Defendant will have slaughtered an innocent soldier of the law and merely be given more time. Don't make him a hero.

EUSTICE REPORTING SERVICE
BOX 700488   TULSA, OK 74170   (918)445-2965

KEB104289

5424

The aggravating factors in this case have been proved beyond a reasonable doubt. Mike Littlefield -- and I'm very thankful for his work in this case -- did a wonderful job of setting forth the evidence and testimony in support of each of the aggravating factors. The mitigating factors, even if accepted as fully proved, cannot outweigh the substantially planned and premeditated murder of 49 year old Rocky Eales. The mitigating factors cannot begin to outweigh one of the tortured steps Rocky took as he stumbled into darkness. This Defendant has earned and deserves the death penalty.

Thousands of years ago, the king of the world's most powerful empire held a great feast for thousands of the rulers of his nation. They ate and they drank from golden and silver cups which had been stolen from the temple of a subdued and now enslaved nation. They drank wine and they worshipped idols. All of a sudden, the fingers of a hand appeared and began to write on the palace wall. The king saw the hand and the writing and he was frightened. He was so scared that his clothes actually loosened and his knees knocked together. He cried out bring the astrologers, bring the wise men of the nation. Whoever interprets this writing will have great wealth and be named the third highest ruler in the country. The wise men came in and they studied and they

KEB104290

thought and they consulted, they conferred, they thought. But they couldn't read, much less interpret the writing. The king's face turned ashen. The queen remembered a forgotten foreigner. The king made the man the same offer. The man declined all of the riches and all of the honor and then he bravely read and interpreted the writing on the wall. His interpretation was that you're kingdom is at an end. Your kingdom will be divided -- and divided and given to your neighboring enemies and then the prophet said you have been weighed in the balance and found wanting. That night the king was killed and his kingdom was divided.

Ladies and gentlemen, under this evidence, under this testimony, the Defendant has been weighed in the balance and found wanting. We've heard a lot about re-punishment. We've heard a lot about the prosecution in closing argument. But you know that there was very modest punishment handed out in his prior prosecution. You know that Counts One and Two were essentially never brought in the state prosecution. There was virtually -- there was no drug evidence in the trial -- the one that last occurred. That trial did not do justice to the Defendant's criminality or to the Defendant's lethality. You know, he was found guilty of assault and battery with a dangerous weapon. You know, at least it should have

KEB104291

5426

been shooting with intent to kill. That's dramatically inadequate. But there's no evidence that the loss of Kelli and Hook and Bobbie and Nancy and Ally and Mackey and the troopers and Bill DeWeese has ever been considered by a jury.

Ladies and gentlemen, the punishment should fit the crime. The punishment should fit the crime. You know they asked for generosity. They point to this quotation as we did earlier, as you've been generous with your time. How generous was the Defendant to Rocky Eales?

I'm thankful for the opportunity and I ask you to do this. Under the standards of the law and the instructions by the Court, the Defendant should be as it were, weighed in the balance and found wanting. This is a difficult decision. But I submit to you it's not a close call. Justice demands a capital sentence. We respectfully and reverently ask you to return a death penalty against the Defendant. Thank you.

THE COURT: Let me see counsel at the bench.

(Whereupon, the following record was made at the bench outside the hearing of the jury.)

THE COURT: Any requested instructions from the defense in regard to the incident that just took place?

MR. HILFIGER: No, I really haven't, you know,

KEB104292

thought of anything. Do you have anything?

THE COURT: My thought was, I can't -- I could ask them to disregard what they saw. I think the verbiage, verbal statement, to the extent they heard anything should be disregarded.

MR. HILFIGER: They were unsworn. I mean, that doesn't --

THE COURT: I'm listening, Government.

MR. SPERLING: I'm still shaking.

MR. LITTLEFIELD: I don't think he -- consciously chose to do what he did in the presence of the jury.

THE COURT: I could. The other thing -- instruction you should.

MR. LITTLEFIELD: No, I think it should be - (Interrupted)

THE COURT: Well, there's nothing on the record. That's why I'm making this record.

MR. SPERLING: Are you going to take a break for a minute to allow us to consult?

MR. LITTLEFIELD: Judge, I think one of your jurors was squirming real hard -- to get somebody's. Just -- that you should know.

THE COURT: Obviously, I've got two minutes of instructions to finish. Any requested instruction from

KEB104293

5428

the defense?

MR. HILFIGER:  I don't have anything.

THE COURT:  Any requested instruction from the Government?

MR. SPERLING:  I'm very hesitant to suggest that they ignore what was in front of them.  On the other hand -- I don't have a requested instruction at this time, Your Honor.

THE COURT:  Do you think we should recess and consider drafting an instruction?

MR. LITTLEFIELD:  Probably have an answer -- problems that arise -- (Interrupted)

MR. HILFIGER:  That may be an idea.  Then you would have -- (Interrupted)

MR. SPERLING:  I'd like just to have just a little time first.

THE COURT:  Let's recess.  I still have the concluding instruction.

MR. HILFIGER:  Well, I mean, he's -- he needs to go to the bathroom, is that right?

MR. LITTLEFIELD:  I don't know if I could get the --

THE COURT:  I'm going to recess.  What my plan is to give that some consideration, that issue some consideration.  Then come back and give this concluding

KEB104294

5429

instruction or whatever instruction, if any, we come up with. The instructions as given by the Court to this point, any objection from the Government?

MR. SPERLING: No, Your Honor.

MR. HILFIGER: No, Your Honor.

(Whereupon, the following record was made in open court within the hearing of the jury.)

THE COURT: Members of the jury, we'll be in recess. You should not discuss this matter among yourselves. It's not yet been submitted to you. Remember my previous admonitions that are all still in effect. I'll ask that everyone in the courtroom please remain seated until the jury leaves the courtroom.

(Whereupon, the jury exited the courtroom after which the following record was made.)

THE COURT: The clerk provided me -- go ahead and proceed with lunch if it's in there.

We'll be in recess. Let the record reflect the jury has left the courtroom. At this point I understand the Government had no proposed instruction to deal with the occurrence in the courtroom. At this time the defense had nothing to offer. And part of the purpose for this recess at this point is to give both parties an opportunity contemplate that issue before we proceed with the concluding instruction.

KEB104295

5430

(Whereupon, a short recess was held after which the following record was made outside the hearing of the jury.)

THE COURT: Let the record reflect the jury is not present. Counsel for the Government is present, counsel for the Defendant is present. The Defendant is not present. For the record, I would recite the Court's observations. Before the recess and during the closing moments of U.S. Attorney Sperling's closing remarks, the Court first heard the Defendant say words to the effect: Sperling, leave my family out of this. He said something other than that that I could not detect. And then I saw the Defendant come out of his chair and make what appeared to the Court to be an effort to get up. I can't say that he was attempting to come out across the table, but he did attempt to get up and take a step. As a result of that, it was necessary for the U.S. Marshals to restrain him and take him from the courtroom. I will say that once the marshals made contact with the Defendant, he ceased -- there ceased to be any struggle and he was removed from the courtroom without further activity in front of the jury. I've instructed counsel for the Government and the Defendant to advise the Court as to what if any instructions they would request or suggest I give the jury as a result of the incident that I've just

KEB104296

described.  First from the Government.

MR. SPERLING:  I know this isn't football and this is not a coin toss, Your Honor, but I think it might be appropriate for us to defer.  The reason I say that is because I understand that there have been discussions and that the defense may not wish a cautionary instruction so as to avoid highlighting the incident.  If that is their position, we would agree.

MR. HILFIGER:  Yes, Your Honor.  If I may take a couple of steps with what your observations were?

THE COURT:  Well, I would say the Government -- let me before you speak -- well, I want to be sure that you've had an opportunity to illustrate for the record what you saw versus what the Court saw and I'll give the Government -- I don't know.  I started to speak for the U.S. Attorney.  I think he could hear, but his back was to the Defendant.  Between him and Mr. Littlefield, perhaps they can come up with their factual version of what they observed.  You may.

MR. HILFIGER:  After he said leave my family out of this, there was -- the additional comment was something about statements that he had made.  Why didn't you allow statements that had been made to agents into evidence.  That wasn't word-for-word, but it was something like that, something referring to that.  But

KEB104297

the main thing I wanted to comment on was when he came out of chair, at that point he was not making an aggressive move toward anybody. What he was saying is I want to get out of courtroom. Take me out of the courtroom. I don't want to be here. And then the marshals, you know, asked you if they could take him out. Before that they were trying to put him back down in the chair. His move as I saw at that point was he was saying, you know, take me out of the courtroom. I want to get out of here. It wasn't an aggressive move towards anybody, just he wanted to get out.

I didn't answer your the question. Yes, we have talked to Mr. Barrett after this incident and he said he just -- he didn't want anything further. We talked about having instructions and he said he did not desire -- didn't want to have any instructions and he didn't want to participate in the court proceeding now. How much longer that will be I don't know, but I mean, his indication was he didn't want to be in the courtroom.

THE COURT: So, you're advising the Court on his behalf at least at this point he does not -- of course, what I have left to do is give the closing instruction and then the case will be submitted to the jury. Is it was my understanding what you said is he does not desire to be present for that?

KEB104298

MR. HILFIGER:  That's right.  That he made that -- I don't know if we got as far as the verdict. Mr. Smith said he did.  But, I mean, I can tell you right now from -- (Interrupted)

THE COURT:  If he changes his mind, please advise the Court.  I want to have a hearing with counsel to determine what if any initial measures to take.

MR. SPERLING:  My notes reflect that during the closing argument the Defendant rose and spoke.  I didn't interrupt him.  In fact, Judge, I only turned slightly so I could see him peripherally.  He said get off the backs of my family, Sperling.  This isn't about my family, it's about me.  I made two statements to the OSBI.  I don't remember the words to the effect.  He said you did -- I don't know exactly what words he used.  There was then an exchange between the Marshal's Service deputies, the Court and the Defendant.  And as I recall, the deputy U.S. Marshal -- I don't know which one because I didn't turn -- indicated or asked the Court do you want us to take him out and you said yes.  And at about that same time, the Defendant indicated he also wanted to leave. One thing -- (Interrupted)

THE COURT:  Let me just inject.  I think that's an accurate description of what happened and Danny David did speak to me and asked me if I wanted him to take the

KEB104299

Defendant out of the courtroom and my response was yes, and he did. And then he was removed from the courtroom by two or three deputy marshals.

MR. SPERLING: I'd like to compliment the restraint of the deputy U.S. Marshals. And even though I did not turn around to watch them, at least there was not a lot of sound so they took apparently appropriate and very quick action. I concur with the Court's sentiment that if the Defendant is not to be here, I believe the Court should make specific inquiry of the Defendant. It's not that we should not -- I think it appropriate for the Court to make specific inquiry with regard to the Defendant. I'm kind of thinking analogous to -- those kinds of issues but --

THE COURT: Let me think about that for a moment. Does the Defendant request any instructions to the jury?

MR. HILFIGER: No, Your Honor, no instruction.

THE COURT: No instruction. My clerks have done some research and I'm looking at the case law that they've submitted. I note no glaring Tenth Circuit -- the cases I've look at speak in terms of the court did not err by not giving the instruction. And as you lawyers know, that can be interpreted two ways. The court did not err, but perhaps they should have given

KEB104300

instruction. That's the way I tend to lean. I've proposed instructions something like this, or not something like this, exactly like this. Members of the jury: You are instructed that neither the Defendant's conduct nor his statements during closing argument are evidence in this case and you should not consider them when rendering your verdict herein.

MR. HILFIGER: I think I share the same opinion. Mr. Smith is sort of ambivalent to the instruction. It highlights it to an extent, but then it also, you know, cautions the jury. I don't really care one way or the other. I don't object, I don't approve. I just --

MR. SPERLING: We don't object if the defense acquiesces. I think we -- (Interrupted)

THE COURT: I'm inclined to give the instruction, so let me hear what you have to say. Defense, anything further to add to what you said?

MR. HILFIGER: No, Your Honor.

MR. SPERLING: Again, I think my sense is that if the defense does not object and the defense does not believe having seen the incident, having engaged in this inquiry, that it draws undue attention to this incident and they're satisfied with the instruction, I think the record is -- should operate in favor of giving the

KEB104301

5436

instruction. We don't object to the instruction.

THE COURT: Now, the issue of whether the Defendant should be brought to the courtroom for the Court to inquire as to whether or not he wants to be here, Mr. Hilfiger do you wish to speak to that issue?

MR. HILFIGER: Well, the only problem, I'd say, on that is he has specifically told us he doesn't want to be in court. Now, whether he's saying I don't want to be in court when the jury is there or whether he's saying I don't want to be in court at all, I'm just telling you what he told us. He did not want to be in court. He wanted to go back to jail.

THE COURT: Mr. Smith, just for the sake of verification, is that your understanding also?

MR. SMITH: That is, Judge. And it's my understanding he didn't wish to participate in the verdict either. Like I say, some time may go by and he might have a change of heart. I think we ought to re-address that, Mr. Hilfiger and I ought to re-address that, with him at the appropriate time.

THE COURT: At the time of the verdict?

MR. HILFIGER: Just to give the Court a little bit of idea, he does get hot. Just like we were telling all along, he does get hot and calms down. And you know, I would -- it may be a little time that we -- before we

KEB104302

5437

went down and talked to him after this incident, he had sort of calmed down then. He just said I couldn't take it anymore.

THE COURT: That was how long ago?

MR. HILFIGER: It was within ten or 15 minutes after the incident. Well, it was after -- before that because whatever amount of time Mr. Sperling had to finish closing and then the jury went and then we went five or ten minutes after the jury left we went down.

THE COURT: It's been less than an hour ago?

MR. HILFIGER: Yes.

THE COURT: Do you feel any necessity to go talk to him again about that subject?

MR. HILFIGER: Not at this point. I do agree with Mr. Smith, maybe with the verdict -- you know, when we get close on the verdict or something, talk to him again and see if he still has that same --

THE COURT: Was anyone -- in your discussions, any representative of the marshal's office present during those discussions?

MR. HILFIGER: Yes. There was somebody there. I don't know. I can't -- that may have been. I'm not positive. Somebody from the marshal's office was there.

THE COURT: I have some concerns to the extent that I think he should be brought here and tell me that

KEB104303

5438

in open court.  The next issue is, because of the outburst, I have some concerns about whether he should be in restraints.  I'm going to ask the marshal to put him in minimum restraints, of course, not in front of the jury.  And let him come up and address.  And the marshal has also brought to my attention that the Defendant has said if you force me to come to the court, I can give you some problems.  So, I'll have to wait and see when he comes.

MR. HILFIGER:  Well, if that's the case, maybe we should go down there and tell him.

THE COURT:  Yes, I think that -- (Interrupted)

MR. HILFIGER -- that may help out to do that.  He's not dressed out.  Back in his orange.  Is that going to make any difference?

THE COURT:  There's no jury here.

MR. HILFIGER:  They'll stay in there?

THE COURT:  Yes.

MR. HILFIGER:  Well, let us go down.

THE COURT:  I'll send the marshal with you and you can explain what's going on.

(Whereupon, a short recess was held after which the following record was made outside the hearing of the jury.

THE COURT:  Let the record reflect counsel for

KEB104304

the Government is present and the Defendant is present with counsel. Mr. Barrett, I asked the marshal to bring you up because you have a right to be present in court during all proceedings. I've been advised by both of your attorneys that you advised them you did not desire to be here in any further proceedings; is that correct?

MR. BARRETT: Yes, Your Honor.

THE COURT: Do you have any questions of the Court about that?

MR. BARRETT: No, sir.

THE COURT: Any questions of your attorneys?

MR. BARRETT: No, sir.

THE COURT: I'll ask the marshal to return -- (Interrupted)

MR. HILFIGER: One more. Does that include the verdict?

MR. BARRETT: Yes, Your Honor.

THE COURT: Since I anticipate there will be some time between now and the verdict, if you have some change of mind, if you'll relay that to your counsel.

MR. BARRETT: Yes, sir.

THE COURT: We'll be in recess.

(Whereupon, a short recess was held after which the following record was made in open court in the presence of the jury.)

KEB104305

THE COURT: Let the record reflect the jury is in the box, counsel for the Government is present, counsel for the Defendant is present. The Defendant is not present.

Members of the jury, you are instructed that neither the Defendant's conduct nor his statements during closing argument are evidence in this case and you should not consider them in rendering your verdict herein. I'll ask the clerk to mark that instruction as Court Exhibit 24 for the record.

You have now heard the closing arguments from both counsel for the Government and counsel for the Defendant, and it's appropriate that you hear this concluding instruction.

I have outlined for you the rules of law applicable to your consideration of the death penalty and the processes by which you should determine the facts and weigh the evidence. You should consider the instructions as a whole, and not single out some instruction and ignore the others. In a few minutes you will retire to the jury room for your deliberations. Once again, Juror Number 10 should act as foreperson to ensure that your deliberations proceed in an orderly manner. Of course, his or her vote is not entitled to any greater weight than that of any other juror.

KEB104306

5441

The importance of your deliberations should be obvious. If after due deliberation even one juror is not persuaded that the appropriate sentence in this case is death, then you must return a verdict against the death penalty.

When you are in the jury room, please discuss all aspects of the sentencing issues among yourselves with candor, frankness, and a due regard for the opinions of one another. Each of you must decide this question for yourself and not merely acquiesce in the conclusion of your fellow jurors. In the course of your deliberations, no juror should surrender conscientious beliefs of what the truth is and what the weight or effect of the evidence is. Remember that the parties and the Court are relying upon you to give full consideration to this sentencing issue. By so doing, you carry out to the fullest your oaths as jurors, well and truly to try the issues of this case, and to render a just result.

If it becomes necessary during your deliberations to communicate with me for any reason, simply send me a note signed by your foreperson. Do not attempt to communicate with the Court or any other court personnel by any means other than a signed writing. I will not communicate with any member of the jury on any subject touching on your sentencing decision other than

KEB104307

in writing or orally here in open court.

When you have reached a decision as to what sentence to impose, send me a note signed by your foreperson that you have reached a decision. Do not indicate in the note what the decision is. In no communication with the Court should you ever give a numerical count of where the jury stands in its deliberations.

You must be prepared to report to the Court both your findings as to the aggravating and mitigating factors listed on your Special Verdict Form and then one of the decisions provided in the Special Verdict Form as to each of the three counts.

Let me remind you that nothing that I have said in these instructions and nothing that I have said or done during the trial has been said or done to suggest to you what I think your decision should be. The decision is your exclusive responsibility.

Now, that concludes what I call the formal instructions. I have had the clerk prepare copies of these instructions so you'll each have one in addition to the ones that I've signed that will be the Court's instructions. In the front part of the instruction booklet you'll find the verdict forms and special interrogatory forms for your use.

KEB104308

5443

I would also remind you of the smoking instruction I gave you during the first phase. Now that the case is being submitted to you, it's important to remember that there are to be no deliberations unless all of the jurors are present, so that brings to the smoking procedure. If there are those who desire to take a smoking break during deliberations, then you must give to the foreperson the name of those persons who desire to take a smoke break, knock on the door, give it to the bailiff and I've instructed the bailiff to tell you -- you know that drill by now -- take you to the smoking place. Those of you who break for a smoke break are not to talk among yourselves about anything. Those left in the deliberation room should cease your discussions about the case, that is, cease your deliberations. You can talk about other things, but not about this case until those who have taken the break return. Once they return, you can continue your deliberation.

I know that our schedule has not been -- we're not on a normal schedule for lunch and breakfast and those things, and that's the Court's fault. But it's now 4:00 o'clock. If you decide as we go forward this evening that you would desire dinner at sometime, you'll have to let me know about it in writing. That's simply done with a note. The foreperson will send that note and

KEB104309

5444

say we'd like to have dinner and sign it and then I'll see orders are taken. I don't know. It may not take you long enough that you want to eat another meal. It may take only some minutes to make your decision, it may take an hour, it may take several hours, it may take longer than that. Of course, the parties, including the Court, has no idea how long it may take. But however long it takes, we'll obviously be here waiting for you.

If for some reason you should deliberate into the evening hours and determine at some point that you want to recess until tomorrow and come back and complete your deliberations at that time, all you have to do is tell me that's what you want to do, again with a note in writing. These are just a few things I try to anticipate in advance that may be helpful to you as we go forward. I'll ask now that the bailiff come forward. I think the alternates know who they are. You should remain seated. You'll be taken to the alternate waiting area.

(Whereupon, the bailiff was administered the oath.)

THE COURT: I'll instruct the jury to further notify the bailiff when you have reached your verdict so that you may return it in open court. The jury is now placed in charge of the bailiff and will be taken to the jury room.

KEB104310

(Whereupon, the jury left the courtroom to deliberate after which the following record was made.)

THE COURT: I'll ask the alternates to go with my clerk. She'll show you to the deliberation room. If you'll leave those in your seats, I'll have the clerk pick them up.

(Whereupon, the alternate jurors exited the courtroom after which the following record was made.)

THE COURT: Let the record reflect the jury, including the alternates, have departed the courtroom. Now, is there anything further from the Government at this time?

MR. SPERLING: No, Your Honor.

THE COURT: Defense?

MR. HILFIGER: No, Your Honor.

THE COURT: With the parties' attorneys' permission, I'm going to allow the clerk to take the exhibits into the jury room. If you desire to come forward, examine the exhibits to be sure she has everything that you want for the jury room, please feel free to do so. Otherwise, I'm going to instruct her once we close to take those exhibits into the jury room. Any objection from the Government?

MR. SPERLING: No, Your Honor.

MR. HILFIGER: No, Your Honor.

KEB104311

.5446

THE COURT: If you will leave your cell phones with the clerk so that we can contact you, you can be here ten or 15 minutes, that's satisfactory.

MR. LITTLEFIELD: Only thing, Judge, I have a concern. I don't think it will happen at this stage, but I think they should be advised that if they want to look at Government's Exhibit 1, it would be available for them to use in the courtroom.

THE COURT: Mr. Littlefield, you come with these ideas after I send the jury in. Okay. How do you propose that we communicate that to the jury?

MR. LITTLEFIELD: I have no problem with whoever takes the exhibits in advising them of that fact.

THE COURT: The issue, of course, is the jury is in the jury deliberation room. For them to come over here and have to be escorted by a bailiff.

MR. LITTLEFIELD: The courtroom would need to be cleared.

THE COURT: And we'll lock the courtroom down for that purpose. And I'll have the clerk advise them if they do desire, to send a note to let the bailiff know and if they do, then they can come over.

MR. HILFIGER: Judge, I would request it be -- that all of them do it instead of just one or two. If one or two want to see it, they should all be able to

KEB104312

come over and see it.

THE COURT: You mean if one wants to come they all have to come, is that the -- (Interrupted)

MR. HILFIGER: Yes.

THE COURT: Are you giving me permission to leave that instruction to the clerk?

MR. LITTLEFIELD: Yes.

THE COURT: That's Government's Exhibit 1, if they desire to observe Government's Exhibit 1, they're permitted to do so. If one wants to come, they all have to come and they'll be with the bailiff when they come.

MR. HILFIGER: Right.

THE COURT: They'll stay and observe it until they all are prepared to return.

Anything further from the Government?

MR. SPERLING: No, Your Honor.

THE COURT: Defense?

MR. HILFIGER: No, Your Honor.

THE COURT: The marshal, for the record, inquired of the Court as to whether to take the Defendant back to the city/federal lock up or leave him here. I've instructed him to leave him here in case you want to communicate with him or he wants to communicate with you.

(Whereupon, the Court was in recess while the jury deliberated after which the following record was

KEB104313

5448

made outside the hearing of the jury.)

THE COURT: Let the record reflect counsel for the Government is present, counsel for the Defendant is present. I'd inquire first of -- well, let me advise that I've received a note from the foreperson indicating the jury has reached a verdict. It reads: We have reached a verdict. I'll ask the clerk to mark this as Court Exhibit 28. Then, I'd inquire counsel for the Defendant when the Defendant was here earlier he announced in open court that he did not desire to be present for the verdict. And I instructed him if he had a change of heart to advise defense counsel. Does counsel for the defense have anything to report in that regard?

MR. SMITH: Judge, I visited with him through the hour and he didn't wish to come up here anymore.

THE COURT: I'll then ask the clerk to bring the jury in.

(Whereupon, the jury entered the courtroom and was seated in the box after which the following record was made.)

THE COURT: Let the record reflect the jury is in the box, counsel for the Government is present, counsel for the defense is present. Mr. Foreman, I've received a note indicating that the jury has reached a

KEB104314

verdict; is that correct?

JUROR: Yes, we have.

THE COURT: If you would please hand the verdict to the bailiff and I'll ask the bailiff to hand it to the clerk.

The record should reflect that the Court has reviewed the verdict and I find it to be in order. I'm now going to ask the clerk to publish the verdict. Now, again, before we heard testimony in some there have been several potential emotional -- there's none more emotional than reading the verdict. I speak to all involved. And the same rule. I'm interested in this jury being protected because of the very difficult work they've had to do the past three months and they're emotionally involved. So, if you cannot control your emotions, then I'd ask you to leave the courtroom now. If you cannot control your emotions, I don't want you to be embarrassed by one of the court security officers or the marshals taking you out of the courtroom because that just will not happen in my courtroom. So with that admonition, I'll ask the clerk to publish the verdict.

COURT CLERK: In the United States District Court for the Eastern District of Oklahoma, United States of America, Plaintiff versus Kenneth Eugene Barrett, Defendant, Case Number CR-04-115-P. Verdict. Count one,

KEB104315

5450

committing a murder through the use of a firearm during or in relation to a drug trafficking crime or possession of a firearm in furtherance of such crime. Based upon our consideration of the evidence and in accordance with the Court's instructions, we find by unanimous vote that a sentence of life imprisonment without possibility of release shall be imposed upon the Defendant for the murder of David Eales as described in Count One of The Superseding Indictment. Dated 11-17-05 signed by all 12 jurors.

Verdict. Count Two, committing a murder through the use of a firearm during or in relation to a crime of violence or possessing a firearm in furtherance of such crime. Verdict. Based upon our consideration of the evidence and in accordance with the Court's instructions we find by unanimous vote that a sentence of life imprisonment without possibility of release shall be imposed upon the Defendant for the murder of David Eales as described in Count Two of the Superseding Indictment. Dated 11-17-05. Signed by all 12 jurors.

Count Three, intentionally killing during the commission of a drug trafficking crime a state law enforcement officer engaged in the performance of his official duties. Verdict. Based upon our consideration of the evidence and in accordance with the Court's

KEB104316

5451

instructions, we find by unanimous vote that a sentence of death shall be imposed upon the Defendant for the murder of David Eales as described in Count Three of the Superseding Indictment. Dated 11-17-05. Signed by all 12 jurors.

Certification. By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin or gender of the Defendant or the victim was not involved in reaching his or her individual decision and that the individual juror would have made the same decision regarding the appropriate sentence for the offense in question regardless of the race, color, religious beliefs, national origin or gender of the Defendant or the victim. Dated 11-17-05. Signed by all 12 jurors.

THE COURT: Members of the jury, you heard the clerk publish your verdict in regard to the penalty phase of this trial. If this is, in fact, your verdict, would you please signify by raising your right hand? The record should reflect that all 12 jurors have raised their right hand. Any further polling of the jury requested by the Government?

MR. SPERLING: No, Your Honor.

THE COURT: Any further polling of the jury?

MR. HILFIGER: I think we need to, Your Honor.

KEB104317

5452

THE COURT:  I'll start on the top row.  Juror number 84, you heard the verdict read by the clerk.  Is this in fact your verdict?

JUROR 84:  Yes, sir.

THE COURT:  Juror number 213, you heard the clerk read the verdict of the jury.  Is this in fact your verdict?

JUROR 213:  Yes, sir.

THE COURT:  Juror number 30, you heard the clerk publish the verdict.  Is this in fact your verdict?

JUROR 30:  Yes, sir.

THE COURT:  Juror number 10, you heard the clerk publish the verdict of the jury.  Is this in fact your verdict?

JUROR 10:  Yes, sir.

THE COURT:  Juror number 239, you heard the clerk publish the verdict in open court.  Is this in fact your verdict?

JUROR 239:  Yes, sir.

THE COURT:  Juror number 44, you heard the clerk read, publish, your verdict in open court.  Is this in fact your verdict?

JUROR 44:  Yes, sir.

THE COURT:  Juror number 157, you heard the clerk read and publish the verdict of the jury in open

KEB104318

5453

court.  Is this in fact your verdict?

JUROR 157:  Yes, sir.

THE COURT:  Juror number 57, you heard the clerk read the verdict.  Is this in fact your verdict?

JUROR 57:  Yes, sir.

THE COURT:  Jury number 49, you heard the clerk read the verdict.  Is this in fact your verdict?

JUROR 49:  Yes, it is.

THE COURT:  Juror number 73, in open court the clerk has read the verdict of the jury.  Is this in fact your verdict?

JUROR 73:  Yes, sir.

THE COURT:  Juror number 169, you've been present and heard the reading of the verdict by the clerk.  Is this in fact your verdict?

JUROR 169:  Yes, Your Honor.

THE COURT:  Juror number 55, you've been present in the court and heard the reading of the verdict.  Is this in fact your verdict?

JUROR 55:  Yes, sir.

THE COURT:  Any further polling of the jury?

MR. HILFIGER:  No, Your Honor.

THE COURT:  Do you find that the polling -- now, while the jury is still present and before I excuse them, I'm going to present the verdict form first and ask

KEB104319

5454

the special interrogatories and give counsel for the Government and the Defendant the opportunity to review them and then make any record you choose to make while the jury is still here.

Counsel for the Government, having reviewed the verdict form, do you have any record to make while the jury is still here?

MR. SPERLING:  No, Your Honor.

THE COURT:  For the Defendant?

MR. HILFIGER:  No, Your Honor.

THE COURT:  If there's nothing further, then I'll ask the clerk to file the verdict.

Members of the jury, before I excuse you, I have for the last three months that we've been together told you you could not discuss this matter with anyone. You couldn't discuss it among yourselves even before the case was submitted to you.  Now you're relieved of that admonition.  You may discuss this with anyone you choose to.  That's up to you.  You can discuss it with no one. You can discuss it with anyone you choose to with one exception that I'll alert you to is the parties, that is, counsel for the Government or any of their representatives, counsel for the Defendant or any of their representatives cannot talk with you about it unless they have an order of the Court allowing them to

KEB104320

5455

do so.  And those orders are not frequently given.  But the press, friends, family, anyone else you desire to discuss this matter with, you may.

What you have done for our system of justice these past three months is impossible for me to explain to you how important you've been in the process.  You've been instrumental in the preservation of individual rights while at the same time asserting the interest of society in general.  Your service as a jury during the three months has been a remarkable demonstration of your willingness to accept and use the responsibility to treat it greatly to your country and your community.  I know how much time you've devoted to your jury service and how much of a sacrifice it's been for you and your family.  And on behalf of the Government, on behalf of counsel, the Defendant and all of us involved, we thank you.  I feel confident that you've learned perhaps more than you wanted to learn about the court system and our system of justice in this three months that you've been here.  But I want to take this opportunity to publicly acknowledge your dedicated service to this Court and personally thank you for your service to this Court.

I'll now tell you that you're dismissed from any further service in this matter and I'll one last time ask everyone in the courtroom please remain seated as

KEB104321

5456

this jury leaves the courtroom. If you'll leave your badges with the clerk.

(Whereupon, the jury exited the courtroom after which the following record was made.)

THE COURT: Let me enter this minute order. It's directed -- each party is to withdraw their respective trial exhibits. The same should be kept and maintained for any possible appeal. If you'll recall at the beginning of this trial, I allowed these jurors to take notes. Those notes have been accumulated and I've instructed the clerk to shred those notes.

Now that the jury has been excused, any record to be made outside the hearing of the jury from the Government?

MR. SPERLING: May we pick up the exhibits tomorrow, Your Honor, or should we take them --
(Interrupted)

THE COURT: No, you may.

MR. SPERLING: Thank you, Your Honor.

THE COURT: We'll lock the courtroom.

MR. SPERLING: Thank you.

THE COURT: Any record to be made on behalf of the Defendant outside the hearing of the jury?

MR. HILFIGER: No, Your Honor.

THE COURT: It will be the order of the Court

KEB104322

the Defendant to remain in the custody of the U.S. Marshal.  I'll set the sentencing date December the 7th at 10:00 a.m.  The Court will be in recess.

(END OF PROCEEDING)

KEB104323