# Exhibit F

# Some Final Thoughts
# and Comments Regarding the Issues
# of Third Party Observers

Robert J. McCaffrey

*University at Albany, State University of New York*
*Albany Psychological Associates, P.C.*

**ABSTRACT.** Clinical neuropsychologists need to be aware of the issues associated with requests for third party observers to be present during an evaluation and be prepared to address these issues before they arise. While the literature to date has focused upon the impact of the third party observer on the examinee's test performance, the issue of examiner reactivity to the presence of an observer remains largely unstudied. The data from an evaluation conducted with a third party observer present cannot be deemed to be either a reliable or valid indication of the examinee's current neuropsychological status. As such, any data obtained in the presence of a third party observer may be considered as unreliable and any opinion testimony based upon those data inadmissible. *[Article copies available for a fee from The Haworth Document Delivery Service: 1-800-HAWORTH. E-mail address: <docdelivery@haworthpress.com> Website: <http://www.HaworthPress.com> © 2005 by The Haworth Press, Inc. All rights reserved.]*

**KEYWORDS.** Third party observer, forensic neuropsychology, examiner reactivity, clinical training

---

Robert J. McCaffrey is affiliated with the University at Albany, State University of New York, and Albany Psychological Associates, P.C.

Address correspondence to: Robert J. McCaffrey, PhD, University at Albany, State University of New York, Department of Psychology, Social Sciences 369, 1400 Washington Avenue, Albany, NY 12222 (E-mail: rm188@albany.edu).

Journal of Forensic Neuropsychology, Vol. 4(2) 2005
Available online at http://www.haworthpress.com/web/JFN
© 2005 by The Haworth Press, Inc. All rights reserved.
Digital Object Identifier: 10.1300/J151v04n02_07

*83*

*84*        *JOURNAL OF FORENSIC NEUROPSYCHOLOGY*

Clinical neuropsychologists are called upon to assist physicians, attorneys, school districts, parents, and the courts in a number of very important ways–for example, in differential diagnosis for appropriate early interventions, providing input to Committees on Special Education and parents regarding the best program of instruction for a student with a disability, determination of the presence and extent of a brain-related disability for either a governmental agency or private insurance carrier, assisting in sorting out secondary gain-related issues from brain dysfunction in personal injury litigation referrals, and in the mitigation phases of death penalty cases, to name but a few. The work that we do is very important and serves as a significant factor in the overall decision making processes by our referents. The quality of our work should benefit the referent in the decision making process; however, data from an evaluation with a third party observer present can lead to an unintended result. The empirical studies contained in this special issue of the *Journal of Forensic Neuropsychology* focus on different types of third party observers and their influence upon examinees' performance on neuropsychological tests. The presence of a quiet, unobtrusive third party observer present in the testing room was shown to have a negative impact on test results in a sample of CHI survivors. A second study showed that the third party observer effect occurs when the examinees were tested in the presence of a video recording device. Finally, the third party observer effect was found in a simulated clinical training situation where the supervisor was present in the room to observe the examiner's test administration. Regardless of the format of third party observation, each of these studies demonstrated that the examinees' performance on memory testing was negatively impacted. This issue also contained an article that demonstrates that the third party observer effect has both a statistically significant and clinically meaningful influence on the examinees' performance. These findings add to the previous work in this area and argue against the presence of third party observers in any format during neuropsychological testing.

There is also a small but growing body of literature that demonstrates that the presence of a third party observer actually has a negative impact on the results of at least two symptom validity measures: the Portland Digit Recognition Test (Binder & Johnson-Greene, 1995) and the Test of Malingering Memory (Constantinou & McCaffrey, 2003). The impact of third party observers on other symptom validity measures remains to be examined; however, for any individual, performance on symptom validity measures may be skewed in the direction of suspect effort. This could result in an opinion of suspect effort or dissimulation when in reality the data may represent a false positive finding due to the

presence of the third party observer. The implications of this scenario in any neuropsychological evaluation are obvious, especially in neuropsychological evaluations involving capital murder cases.

In addition to the negative impact on neuropsychological test performance, third party observers challenge test security. Preventing the dissemination of neuropsychological and psychological testing materials to the general public is essential to maintaining the integrity and utility of all tests. Test developers strive to maintain the integrity of their copyrighted and intellectually protected property by having clinical neuropsychological practitioners sign copyright, licensing and maintenance of test security agreements as a pre-condition to the sale and purchase of their products. The litigation policy of Harcourt Assessment, Inc., reads as follows:

> Harcourt does not wish to impede the progress of legal proceedings; however, we are equally unwilling to jeopardize the security and integrity of our test instruments by consenting to the release of copyrighted and confidential material to those not professionally qualified to obtain them. Should litigation in which a psychologist is involved reach the stage where a court considers ordering the release of proprietary test materials to non-professionals such as counsel, we request that the court issue a protective order prohibiting parties from making copies of the materials; requiring that the materials be returned to the professional at the conclusion of the proceedings; and requiring that the materials not be publicly available as part of the record of the case, whether this is done by sealing part of the record or by not including the materials in the record at all.
>
> In addition, testimony regarding the items, particularly that which makes clear the content of items, should be sealed and again not be included in the record. Pleadings and other documents filed by the parties should not, unless absolutely necessary, make specific reference to the content of or responses to any item, and any portion of any document that does so should be sealed. Finally, we ask that the judge's opinion, including both findings of fact and conclusions of law, not include descriptions or quotations of the items or responses. We think this is the minimum requirement to protect our copyright and other proprietary rights in the test, as well as the security and integrity of the test.[1]

While this litigation policy from Harcourt Assessment does not specifically mention third party observers, the concerns addressed within

the policy regarding release of test content are relevant to third party observation.

## *CLINICAL VS. FORENSIC SETTINGS*

The issues associated with a third party observer are applicable to neuropsychological evaluation in both the forensic and clinical settings. In the clinical setting, the practitioner, using his/her best clinical judgment, makes the decision to allow another person to be present for part or all of the formal testing. This is particularly likely to occur in the evaluation of children where having a parent present for the early portions of the examination may facilitate the cooperation of the child. Nonetheless, the literature on third party observers and the potential impact on the outcome of an evaluation of a child must be factored into the clinical decision making process. It is common for practitioners to permit a parent to be present during the initial testing in order to engage the child and then to proceed to conduct the remainder of the examination with the parent absent. The policy statements from both the NAN and AACN indicate that there may be circumstances where the presence of a third party may be permissible in order to conduct evaluations of children. AACN further indicates that a third party may be present to assist with adults who have extreme behavioral difficulties. The role of the third party in these situations is to assist with managing the behavior of the examinee and not to observe the test procedures *per se*. Nonetheless, the clinical literature on third party observers indicates that the presence of a third party in such clinical situations does impact test performance. Binder and Johnson-Greene (1995) found that inclusion of a patient's mother during administration of the Portland Digit Recognition Test resulted in a significant decline in the patient's accuracy. Kehrer, Sanchez, Habif, Rosenbaum, and Townes (2000) found that the presence of a significant other during testing resulted in a significant decline in performance on several neuropsychological measures. There is an additional study from the social psychology literature that demonstrated that the presence of a supportive person during performance of difficult tasks (i.e., backward counting by 13s and a videogame) was associated with a worse performance in the presence of a supportive observer than in the presence of a stranger or adversarial observer (Butler & Baumeister, 1998). These researchers described the individuals within the supportive-observer condition as more cautious in their approach to the tasks in that they decreased speed; however, the cautious approach did not result

in a higher accuracy rate. Subjectively, the individuals observed by supportive persons described a sense of decreased stress and a generally positive feeling about the presence of a supportive individual. They did not recognize the detrimental impact that the supportive presence had on their performance. In light of the research, the clinician who makes the decision to permit a family member to be present during some or all of the testing must factor into the final interpretation of the test findings the impact that the family member had on test performance.

Unlike a clinical setting where clinical necessity dictates the presence of a third party observer, the neuropsychologist conducting an evaluation in a forensic setting may not be making the decision as to whether or not a third party will be permitted during testing. There are likely to be competing and conflicting legal issues as to the presence or absence of third party observers that have nothing to do with clinical necessity.

## *IMPLICATIONS FOR CLINICAL TRAINING*

The findings from the Yantz and McCaffrey study (2005) highlight the concern that the mode of training our students and postdoctoral fellows in assessment techniques and methods needs to be reconsidered, as their presence may not be as benign as we have thought it to be for the past 60 years. While additional research is warranted, it would be prudent nonetheless for clinical neuropsychological practitioners not to utilize for clinical training purposes cases that involve serious matters such as personal injury litigation, competency evaluations, and death penalty-related matters. It would also seem that the recommendation by McSweeny et al. (1998) that audio recording and/or video recording of a clinical neuropsychological evaluation as a compromise to the physical presence of a third party observer not be adopted in light of current literature. Moreover, these "compromises" also involve the unknown impact of reactivity in the examining clinical neuropsychologist's efforts to perform a standardized administration.

## *EXAMINER REACTIVITY:*
## *UNCHARTED TERRITORY*

To date, the research associated with the presence of a third party observer has focused on the *examinee*. An issue that has been overlooked is the cognitive, physiological and emotional reactivity of the *examiner*

*88*        *JOURNAL OF FORENSIC NEUROPSYCHOLOGY*

while conducting an examination in the presence of a third party observer. Specifically, there is no guarantee that either the reliability or the validity of the assessment process is not impacted by the examiner's obvious knowledge that his/her actions, comments, questions and so forth are being scrutinized by a third party observer or memorialized in living color. Imagine how you might react if Ralph M. Reitan, PhD, were sitting in the room taking notes about your administration of the Halstead-Reitan Neuropsychological Test Battery for Adults. What impact would the presence of a video recorder have on your ability to conduct an evaluation?

### *AN OUNCE OF PREVENTION IS WORTH A TON OF CURE*

Practitioners are not likely to know which forensic evaluations will involve requests for a third party observer. As such, it would be prudent to be prepared to address this issue for every forensic neuropsychological evaluation, particularly given the complexity of professional, ethical and legal issues that accompany requests for third party observers. Waiting until the examinee and his/her attorney are in your waiting room is probably too late. The practitioner should be up-to-date on the current research and policy statements from national organizations regarding third party observers, applicable ethical standards, and the applicable statutes in the state(s) where he/she practices. All of these relevant materials should be maintained in a readily accessible file that can be shared with counsel should the issue arise. Many times, the request may be withdrawn once both sides understand fully the implications of having a third party observer present during testing and the impact on the validity and reliable of the data.

If this initial attempt to dissuade the request for a third party observer is unsuccessful, then you need to be prepared to assist counsel in the preparation of an affidavit to be submitted to the court. The intent of an affidavit is to educate the court. Towards this end, counsel should be educated about and provided copies of all relevant literature and documents pertaining to third party observers. You should be aware, however, that the courts will look to the law regarding this issue as well as expert affidavits. Other potentially useful materials to provide counsel in preparing the affidavit are the formal policy statements from the legal departments of test publishers regarding the release of copyrighted and confidential material that deal with the measures to be utilized during

your evaluation. Affidavits from other clinical neuropsychologists, especially those who have developed neuropsychological tests, may also assist the trier of fact in understanding the salient issues.

If the court rules that a third party observer may be present during your evaluation, you must decide whether or not to conduct the evaluation. If you decide to conduct the evaluation, then the major issue becomes one of maintaining the security and integrity of the assessment instrument. At this point, counsel should petition the court for a protective order to safeguard the confidentiality of the test publisher's intellectual and copyrighted property. The potential need for a protective order to safeguard the test materials is an issue that counsel should be made aware of at the time that your services are retained. A statement regarding the circumstance under which counsel agrees to seek a protective order could be included in your standard letter of agreement, such as:

> Counsel understands that neuropsychological testing and/or psychological testing services involve raw test data, test manuals, and testing apparatus, and other copyrighted materials. These materials are made available to the neuropsychologist pursuant to "Copyrights, Permissions, Licensing and Maintenance of Test Security" agreements. Counsel agrees to promptly apply for a protective order to safeguard the confidentiality of test materials. The cost of applying for such protective order shall not be the responsibility of the neuropsychologist.

Counsel requesting the presence of a third party observer should be informed that the written report will contain a section outlining the myriad of problems in the interpretation of their client's test performance caused by the presence of the third party observer. Furthermore, the written report should contain a behavioral observation section that focuses exclusively on the behavior of the third party observers and/or any disruptions/distraction of the examinee or the examiner caused by the third party observer. For example, did the examinee turn around to look at the observer during testing, did the examinee or the third party observer initiate conversation between them, or did the observer leave and then re-enter the room without permission during the testing?

The neuropsychologist always has the option to refuse to conduct a forensic evaluation with a third party observer present. It is important to be cognizant of the possibility that opposing counsel's underlying agenda may have been to not have you conduct the evaluation. If a sub-

set of the legal community can control who does and who does not perform forensic neuropsychological evaluations, then the entire legal process may not be well-served.

## *ONE FINAL POINT*

Clinical neuropsychologists undergo years of rigorous training in the appropriate administration of assessment instruments in order to ensure that the test results are a reliable and valid indication of the examinee's cognitive, neuropsychological, academic achievement, and behavioral/ emotional functioning. In order to assure that the testing findings are reliable and valid, the clinical neuropsychologist must adhere to each assessment instrument's standardized test administration guidelines. This is essential, since the normative data for each battery or individual test was produced by following the standardized administration guidelines. Failure to follow a test's standardized administration guidelines negates the clinical neuropsychologist's ability to utilize the norms for the tests, since they were developed under the standardized administration guidelines. Any deviation from a standardized administration may render the testing findings unreliable and invalid, since the norms may no longer be applicable, and the error rates and terms may also be affected. Deviation from the standardized administration outlined in a test manual has been found to have profound effects on examinees' performance on cognitive/neuropsychological testing, achievement/educational testing, and personality/emotion testing. Included among the deviations from standardized administration are the test setting, presentation of test stimuli, examinee's response mode, and alteration in test instructions (Lee, Reynolds, & Willson, 2003). The presence of a third party observer is also a deviation from standardized administration.

Deviation from standardized administration in forensic neuropsychological evaluations may have profound negative consequences for everyone involved. As Lee et al. (2003) point out, three United States Supreme Court cases have addressed the issue of error rates and reliability of data upon which an expert's opinion is formulated. The conclusions reached by the Court are that, if the data used by an expert to form an opinion are unreliable, then any opinion derived from those data, even in part, is considered unreliable and not admissible as testimony. Given that the presence of a third party observer during testing is both a deviation from a standardized test administration and has been demonstrated to skew the results of the testing, it would appear that the data ob-

*Robert J. McCaffrey*                                91

tained from an evaluation with a third party observer present would be deemed to be unreliable, and any opinion based upon those data inadmissible. Perhaps, this would be the ultimate unintended consequence of a third party observer.

## NOTE

1. (*http://harcourtassessment.com/hai/Templates/GeneralPurposeTemplate.aspx? NRMODE=Published&NRORIGINALURL=%2fhaiweb%2fCultures%2fen-US%2fFooter% 2fLegal%2bPolicies%2ehtm&NRNODEGUID=%7bB506C9EF-0DA3-42C3-A3AF-12CEAC9B0792%7d&NRCACHEHINT=NoModifyGuest#release* Harcourt Legal Affairs may be reached at 800-228-0752).

## REFERENCES

Binder, L. M., & Johnson-Greene, D. (1995). Observer effects on neuropsychological performance: A case report. *The Clinical Neuropsychologist*, *9*, 74-78.

Butler, J., & Baumeister, R. F. (1998). The trouble with friendly faces: Skilled performance with a supportive audience. *Journal of Personality and Social Psychology*, *75*, 1213-1230.

Constantinou, M., & McCaffrey, R. J. (2003). Using the TOMM for evaluating children's effort to perform optimally on neuropsychological measures. *Child Neuropsychology*, *9*, 81-90.

Kehrer, C. A., Sanchez, P. N., Habif, U., Rosenbaum, J. G., & Townes, B. D. (2000). Effects of a significant-other observer on neuropsychological test performance. *The Clinical Neuropsychologist*, *14*, 67-71.

Lee, D., Reynolds, C. R., & Willson, V. L. (2003). Standardized test administration: Why bother? *Journal of Forensic Neuropsychology*, *3(3)*, 55-81.

McSweeney, A. J., Becker, B. C., Naugle, R. I., Snow, W. G., Binder, L. M., & Thompson, L. L. (1998). Ethical issues related to third party observers in clinical neuropsychological evaluations. *The Clinical Neuropsychologist*, *12*, 552-559.

Yantz, C. L., & McCaffrey, R. J. (2005). Effects of a supervisor's observation on memory performance of the examinee: Third party observer effect confirmed. *Journal of Forensic Neuropsychology*, *4(2)*, 27-38.

Copyright of Journal of Forensic Neuropsychology is the property of Haworth Press and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.