# Exhibit H

The Clinical Neuropsychologist
2001, Vol. 15, No. 4, pp. 433–439

1385-4046/01/1504-433$16.00
© Swets & Zeitlinger

# SPECIAL PRESENTATION

# Policy Statement on the Presence of Third Party Observers in Neuropsychological Assessments*

### American Academy of Clinical Neuropsychology

## Purpose

The purpose of this policy is to clarify what is the appropriate response of a clinical neuropsychologist when a request is received for the presence of a third party during a medicolegal consultation and patient examination.

## Definitions

For the purposes of this policy, two classes of third party observers are recognized, viz., involved and uninvolved parties.

Involved third parties are those who, directly or indirectly, have some stake in the outcome of an examination of a particular plaintiff in civil litigation. This stake may derive from a legal, financial, family, social, or other relationship or benefit. Involved parties may or may not be known or familiar to the plaintiff patient. For example, an unfamiliar agent of the plaintiff's attorney would be deemed an involved party for the purposes of this policy.

Uninvolved third parties have no stake in the outcome of a plaintiff patient's examination, directly or indirectly. Instead, uninvolved third parties do have an interest in the behavior of the examiner or in the examination process or in the behavior of the patient during the assessment as an exemplar of such relevant entities as a disease (e.g., cerebrovascular disease, closed-head injury), a condition (e.g., dementia, aphasia), or a phenomenon (e.g., visual neglect, right hemi-paresis), or others (e.g., malingering, manifestations of personality disorders). An uninvolved third party does not have an interest in the particular individual who serves as the exemplar. The purpose of the presence of uninvolved parties generally is to learn about or practice the administration of neuropsychological tests, procedures, interviews, and so forth, and to observe how patients respond to the administration of such tests or to receive critical feedback concerning their performance in the role of an examiner. Uninvolved parties include health-care professionals and student professionals, for example, student neuropsychologists, other student psychologists, student psychometrists, and cognate professionals or technical personnel.

## Medicolegal Consultations

### Scope of Application

The context for this policy pertains to medicolegal consultations in which the consulting clinical neuropsychologist is being asked to formulate professional opinions about a patient's condition within their area of expertise in the specialty of clinical neuropsychology in relation to tort litigation, or related insurance benefits involving third parties. This policy is not intended for application to clinical (medical) consultations in which the clinical neuropsychologist has direct responsibility for the assessment, diagnosis, or treatment of

*Members of the Task Force were: Kerry Hamsher, Ph.D. (Chair), Gregory P. Lee, Ph.D., and Ida Sue Baron, Ph.D. Address correspondence to: American Academy of Clinical Neuropsychology, Department of Psychiatry (B2954, CFOB), University of Michigan Health Systems, 1500 East Medical Center Drive, Ann Arbor, MI 48109-0704, USA. Accepted for publication: August 2, 2001.

the patient. Likewise, this policy is not intended for application to criminal forensic consultations that involve issues of criminal liability or culpability because the right to legal representation and a third party observer is absolute in criminal matters.

*Policy*

It is not permissible for involved third parties to be physically or electronically present during the course of an evaluation assessment of a plaintiff patient with the exception of those situations specified below.

*Exceptions*

In the case of toddlers and young children, when their physical separation from the parental or caretaker figure results in, or is known to result in, a behavioral reaction (e.g., disruptive behavior, dysphoric state, social withdrawal) such as to invalidate the outcome of a neuropsychological or neurobehavioral assessment, it may be permissible to allow the caretaker (e.g., parent) to be physically present, at least initially until rapport is established, if this exception results in the cessation or mollification of the behavioral reaction or otherwise allows more useful assessment data to be obtained. For example, it might be facilitative to allow a family member, who may otherwise have a distorting influence, to be present in the testing room when a child simply will not stay in the examination room without that family member.

Likewise, so long as the latter principle obtains, viz., it would allow more useful assessment data to be obtained in the professional opinion of the clinical neuropsychologist, this exception may be extended to certain cases involving older children and adult patients with extreme behavioral disturbances, for example, severe mental illness, delirium.

When the circumstances are such that the presence of an involved third party may have both a potentially distorting and a potentially facilitating influence on the collection of assessment data, it shall be the sole responsibility of the clinical neuropsychologist employing their best clinical judgment to determine whether or not to proceed with the assessment of the plaintiff patient on the particular occasion. As always, it remains incumbent upon the clinical neuropsychologist to make known any limitation regarding the reliability and validity of their conclusions and other professional opinions.

**Fundamental Issue**

The fundamental issue with which this policy is concerned is the validity of the results obtained from a clinical neuropsychological assessment process. As a general principle, it is important that the clinical neuropsychologist not deviate from their ordinary clinical practices when called upon to do the same in the execution of an evaluation or in their treatment of a plaintiff patient. The greatest degree of validity is understood to be obtained when the patient is motivated to cooperate with the examiner by performing in an optimal fashion in compliance with instructions, and in a candid or unbiased fashion, and that this occurs in the context of a controlled environment simulating or comporting with psychological laboratory conditions.

The presence of an involved third party observer potentially introduces a distortion of the patient's motivation, behavioral self-selection, and rapport with the examiner(s). For example, the patient's rapport may be more attached to, and their behavior at least somewhat directed toward, the involved third party. This introduces threats to the validity of the neuropsychological evaluation in ways potentially unknown to, and perhaps not perceptible by, the examiner.

Because the surreptitious eavesdropping on a patient during an examination or treatment is ethically proscribed, the mere displacement of the involved third party from the examination room to a remote site does neither necessarily eliminate nor lessen the above described threats to the validity of the obtained psychometric or other evaluation data upon which the clinical neuropsychologist will rely in formulating their professional opinions. That is, a stealthy presence via such mechanisms as a one-way mirror, audio monitoring, video monitoring, or audiovisual monitoring, does not constitute a tolerable exception to the above-stated policy.

DOCUMENTARY SUPPORT

**Observer Adverse Effects**

The presence of an involved third party observer during the neuropsychological examination may distract the examinee or distort patient motivation which could adversely affect test performance.

The distraction effect can come in different forms, that is, as an external distraction or an internal distraction, or some combination thereof. External distractions refer to stimuli that arise external to the patient and are potentially observable. These include, for example, sights and sounds. Under sights, the distracting stimuli could be simple physical movements, such as the involved third party observer turning their head in anticipation of a cough or sneeze. Also, the distracting visual stimuli could be more complex, such as postures ('body language') or facial expressions. Although it would be a wholly unsatisfactory solution, as discussed below, removal of the involved third party from the examination room may greatly reduce the source of external distractions. Internal distractions, on the other hand, generally are not directly observable as they arise from within the patient. These involve such stimuli as perceptions, attitudes, and social expectations on the part of the patient. For example, given that it appears that the financial rewards of a lawsuit may increase in some proportion to the severity of subjective complaints or claimed disabilities on the part of the patient, and knowing they are being observed by a representative of their own attorney, a patient may behave during the period of involved third party observation (by whatever means, including remotely) in such a way as they perceive would please this involved observer. Or the patient may suffer internal distraction from simply wondering how the involved third party observer is evaluating their behavior and test performance rather than being fully focused on the task at hand, (e.g., if an involved third party observer were to insist on access to such observation, it would be reasonable for the patient to assume that how they behaved during observation was particularly important to the involved third party). In regard to internal distractions, the use of remote observation by audio or visual monitoring or videotaping does not greatly reduce the source of this type of distraction.

Psychologists are obligated to create a testing environment relatively free of distractions. Standard 15.2 of the *Standards for Educational and Psychological Testing* (American Educational Research Association, 1985) states, ''The testing environment should be one of reasonable comfort and with minimal distractions'' (p. 83).

The *Standards for Educational and Psychological Testing* also direct psychologists to follow the procedures for administration specified by the publisher in the test manual: ''In typical situations, test administrators should follow carefully the standardized procedures for administration and scoring specified by the test publisher'' (Standard 15.1, p. 83). The *Wechsler Adult Intelligence Scale – III, Administration and Scoring Manual* (Wechsler, 1997) specifically states that involved third parties should be excluded from the testing area:

> As a rule, no one other than you and the examinee should be in the room during the testing. Attorneys who represent plaintiffs sometimes ask to observe but typically withdraw this request when informed of the potential effect of the presence of a third person. (p. 29)

An almost identical statement against the presence of an involved third person is presented on page 30 of the *Wechsler Memory Scale – III, Administration and Scoring Manual* (Wechsler, 1997).

In her authoritative work, *Neuropsychological Assessment, Third Edition*, (1995) Lezak notes that distractions in the testing environment adversely affect performance, and thus, jeopardize the validity of a neuropsychological assessment. She states:

> It is not difficult to get a patient to do poorly on a psychological examination. This is especially true of brain damaged patients, for the quality of their performance can be exceedingly vulnerable to external influences or changes in their internal states. All an examiner need do is make these patients

tired or anxious, or subject them to any one of a number of distractions most people ordinarily do not even notice, and their test scores will plummet...

Eliciting the patient's maximum output is necessary for a valid behavioral assessment. Interpretation of test scores and of test behavior is predicated on the assumption that the demonstrated behavior is a representative sample of the patient's true capacity in that area. (pp. 139–140)

Binder and Johnson-Greene (1995) demonstrated the negative effect that an involved observer had on test performance in a single case study. McSweeny, Becker, Naugle, Snow, Binder, and Thompson (in press) have detailed many of the ethical implications of the use of third party observers. Some of the adverse effects of observers on test performance have been systematically investigated in a body of literature that has come to be known as social facilitation research. McCaffrey, Fisher, Gold, and Lynch (1996) summarized the recent literature on social facilitation in their article on the presence of third party observers during neuropsychological evaluations. The social facilitation literature provides empirical evidence that the presence of a third party observer can alter cognitive and motor test performance whether or not the patient has a brain injury or disease.

The social facilitation effect causes examinees to perform better than usual on tests of simple or overlearned skills and poorer on tasks that are more difficult for them (McCaffrey et al., 1996). These adverse effects have been shown to occur even when the observer is behind a one-way mirror. Although there are no studies at present that demonstrate a social facilitation effect during video or audio taping, these alternatives to the physical presence of an observer in the room raise other important ethical and professional concerns (such as, problems involving test security, allowing testing materials to become part of the public domain, or potential misuse of assessment results by third parties for purposes unrelated to the current case).

**Test Administration and Interpretation**

Psychological and neuropsychological tests have not been standardized in the presence of involved third party observers, and thus, it is inappropriate to compare the examinee's results to the normative results from the standardization sample. Departure from a standardized testing procedures may diminish the utility of the normative data. Thus, any factor that compromises the standard administration of a neuropsychological test may jeopardize the validity and reliability of the test's fingings.

In a highly regarded book on the nature and use of psychological and neuropsychological tests, Anastasi (1988) stresses the importance of test standardization, ''Standardization implies uniformity of procedure in administering and scoring the test. If the scores obtained by different persons are to be comparable, testing conditions must obviously be the same for all. Such a requirement is only a special application of the need for controlled conditions in all scientific observations. In a test situation, the single independent variable is often the individual being tested.'' (p. X).

The *Standards for Educational and Psychological Testing* (American Educational Research Association, 1985) stress the importance of following standardized procedures in Standard 15.1,

In typical applications, test administrators should follow carefully the standardized procedures for administration and scoring specified by the test publisher. Specifications regarding instructions to test takers, time limits, the form of item presentation or response, and test materials or equipment should be strictly observed. Exceptions should be made only on the basis of carefully considered professional judgment, primarily in clinical applications. (p. 83)

In the American Psychological Association's ethical principles of psychologists (American Psychological Association, 1992), ethical standard 2.04(c) *Use of Assessment in General with Special Populations* states in part, ''Psychologists attempt to identify situations in which particular interpretations or assessment techniques or norms may not be applicable or may require adjustment

in administration or interpretation because of factors such as. . ." Because no norms exist for testing in the presence of involved third parties, misinterpretation of test results may be common, and psychologists should be aware of the potential ethical difficulties involved in interpretation of test results under these circumstances.

If an involved third party were present during a neuropsychological examination, neuropsychologists should include in their report any concerns regarding limitations that this places on interpretation. This is made clear in ethical standard 2.05, *Interpreting Assessment Results*:

> When interpreting assessment results, including automated interpretations, psychologists take into account the various test factors and characteristics of the person being assessed that might affect psychologists' judgements or reduce the accuracy of their interpretations. They indicate any significant reservations they have about the accuracy or limitations of their interpretations.

Ethical principle 2.02 (a), *Competence and Appropriate Use of Assessments and Interventions*, states, "Psychologists who develop, administer, score, interpret, or use psychological assessment techniques, interviews, tests, or instruments do so in a manner and for purposes that are appropriate in light of the research on or evidence of the usefulness and proper application of the techniques." Thus, psychologists should be aware that the presence of an involved third party may alter the validity of test results and either refuse to administer tests under these circumstances or alter their interpretations if an observer has been present. The presence of an involved third party may especially impact on determinations made about the integrity of brain function, change over time intervals, and effects of treatment in individuals prone to easy disruption of function such as those with neurological conditions.

## Test Security
Involved third party observers may undermine the neuropsychologist's ethical responsibility to maintain test security. This ethical principle is most clearly presented in Ethical Standard 2.10, *Maintaining Test Security* (American Psychological Association, 1992):

> Psychologists make reasonable efforts to maintain the integrity and security of tests and other assessment techniques consistent with law, contractual obligations, and in a manner that permits compliance with the requirements of this code.

The same principle is also delineated in the *Standards for Educational and Psychological Testing* (1985). Standard 15.7 states that, "Test users should protect the security of test materials." These standards would be applicable whether the observation occurred in the testing room, behind a one-way mirror, or through audio or video monitoring or recording.

## Test Misuse
The neuropsychologist has little or no control over how an involved third party observer will use the content of testing in the present or future cases. This lack of control over the data generated during a neuropsychological assessment may be incompatible with our ethical responsibilities. The American Psychological Association's (1992), Ethical Standard, 1.16, *Misuse of Psychologists' Work* states, "Psychologists do not participate in activities in which it appears likely that their skills or data will be misused by others, unless corrective mechanisms are available."

Involved third party observers could take notes and record specific test questions and answers to be used in preparing or coaching future litigants with neuropsychological claims. Moreover, poor performances could be misinterpreted by the third party resulting in incorrect conclusions. All these difficulties which could arise from the presence of an involved observer could result in a potential conflict with Ethical Standard, 2.02 (b), *Competence and Appropriate Use of Assessments and Interventions*:

> Psychologists refrain from misuse of assessment techniques, interventions, results, and interpretations and take reasonable steps to

prevent others from misusing the information these techniques provide. This includes refraining from releasing raw test results or raw data to persons, other than to patients or clients as appropriate, who are not qualified to use such information.

As with the problem of test security, potential test misuse may occur regardless of the method of observation (i.e., actual presence in the same room, behind a one-way mirror, or audio or video monitoring/recording).

**Responsibility in Forensic Situations**

Because the presence of an involved third party observer is most commonly requested within a medicolegal context, several ethical principles may help to guide neuropsychologist's decisions regarding this issue. Ethical standard, 7.06, *Compliance with Law and Rules*, appears to indicate that it is the responsibility of the neuropsychologist to inform lawyers, judges, and others that the presence of an involved third party observer represents a potential ethical conflict. Ethical standard, 7.06, *Compliance with Law and Rules*, states:

> In performing forensic roles, psychologists are reasonably familiar with the rules governing their roles. Psychologists are aware of the occasionally competing demands placed upon them by these principles and the requirements of the court system, and attempt to resolve these conflicts by making known their commitment to this Ethics Code and taking steps to resolve the conflict in a responsible manner.

In a similar vein, Ethical Standard, 1.02, *Relationship of Ethics and Law*, explicitly explains that, "If psychologists' ethical responsibilities conflict with law, psychologists make known their commitment to the Ethics Code and take steps to resolve the conflict in a responsible manner."

Confidentiality may also encompass the issue of involved third party observers. Ethical standard, 5.02, *Maintaining Confidentiality*, states that "psychologists have a primary obligation and take reasonable precautions to respect the con-fidentiality rights of those with whom they work or consult..." Neuropsychologists need to communicate the potential limitations to confidentiality with all parties involved but especially with the patient.

Ethical standard, 7.01, *Professionalism*, informs the psychologist that the APA Ethics Code applies to the atypical professional activities that take place within the forensic context. Standard 7.01 states in part, "Psychologists who perform forensic functions, such as assessments, interviews, consultations, reports, or expert testimony, must comply with all other provisions of this Ethics Code to the extent that they apply to such work activities." This ethical standard makes clear that all ethical issues raised by the presence of an involved third party are applicable whether or not the neuropsychological assessment occurs in a forensic setting.

Ethical standard, 7.04, *Truthfulness and Candor*, emphases the need to communicate the bases for conclusions as well as any threats to the validity of an examination when an involved third party has been an observer.

> 7.04 (a) "In forensic testimony and reports, psychologists testify truthfully, honestly, and candidly and, consistent with applicable legal procedures, describe fairly the bases for their testimony and conclusions."

> 7.04 (b) "Whenever necessary to avoid misleading, psychologists acknowledge the limits of their data or conclusions."

REFERENCES

American Educational Research Association, American Psychological Association, and National Council on Measurement in Education. (1985). *Standards for educational and psychological testing*. Washington, DC: American Psychological Association.

American Psychological Association. (1992). Ethical principles of psychologists and code of conduct. *American Psychologist, 47,* 1597–1611.

Anastasi, A. (1988). *Psychological testing*, (6th ed.). New York: MacMillian.

Binder, L., & Johnson-Greene, D. (1995). Observer effects on neuropsychological performance: A case report. *The Clinical Neuropsychologist, 9,* 74–78.

Lezak, M.D. (1995). *Neuropsychological assessment* (3rd ed.). New York: Oxford University Press.

McCaffrey, R.J., Fisher, J.M., Gold, B.A., & Lynch, J.K. (1996). Presence of third parties during neuropsychological evaluations: Who is evaluating whom? *The Clinical Neuropsychologist*, *10*, 435–449.

McSweeny, A.J., Becker, B.C., Naugle, R.I., Snow, W.G., Binder, L. M., & Thompson, L.L. (in press).

Ethical issues related to the presence of third-party observers in clinical neuropsychological evaluations. *The Clinical Neuropsychologist*.

Wechsler, D. (1997). *Wechsler Memory Scale – third edition, administration and scoring manual*. San Antonio, TX: The Psychological Corporation, Harcourt Brace & Company.