# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. CIV-10-115-RAW |
| Respondent, | : | **CAPITAL 2255 PROCEEDINGS** |
| v. | : | HON. RONALD A. WHITE |
| EDWARD LEON FIELDS, JR., | : | |
| Petitioner. | : | |

# GROUNDS IN SUPPORT OF AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT A SENTENCE BY A PERSON IN FEDERAL CUSTODY

Cristi Charpentier
Katherine Ensler
Hunter Labovitz
Capital Habeas Corpus Unit
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 545 West, The Curtis Center
601 Walnut Street
Philadelphia, PA 19106
Telephone: (215) 928-0520
FAX: (215) 928-0826

Counsel for Petitioner Edward Fields, Jr.

Dated: October 13, 2015
Philadelphia, PA

# INDEX TO GROUNDS

## GROUND ONE

THE EIGHTH AMENDMENT WAS VIOLATED WHEN THE JURY FAILED TO FIND AS MITIGATING FACTORS ANY OF THE UNCONTESTED MENTAL HEALTH-RELATED MITIGATING FACTS PRESENTED TO IT. THE SIXTH AMENDMENT WAS VIOLATED WHEN TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN INVESTIGATING, PRESENTING AND ARGUING MITIGATING MENTAL HEALTH EVIDENCE, INCLUDING FAILING TO ARGUE THAT THE UNCONTESTED MITIGATING FACTS CONSTITUTED MITIGATING FACTORS. ........................................ 1

A.     Introduction. ........................................ 1

B.     Trial Counsel Ineffectively Failed to Argue that Mr. Fields' Uncontested Mental Illness Was Mitigating. The Jury's Failure to Find any of this Uncontested Mitigating Evidence Violated the Eighth Amendment. ........................................ 7

     1.     Trial Counsel's Ineffective Assistance. ................ 14

C.     Trial Counsel Were Ineffective for Failing to Investigate and Present Evidence of Mr. Fields' Organic Brain Damage. ......... 16

     1.     The Defense's Inadequate Efforts to Develop and Present Neuropsychological Evidence. ...................... 17

     2.     The Organic Brain Damage Trial Counsel Never Presented and the Misleading Testimony of Dr. Randall Price. ....... 24

     3.     Trial Counsel's Ineffective Assistance. ................ 26

D.    Counsel Ineffectively Failed to Investigate and Present Available Medical and Mental Health Providers Who Could Have Supported the Manic Flip Defense and Who Would Have Testified that Mr. Fields' Mental Illness was Genuine, Not Malingered. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        1.    The Government's Contentions of Malingering and the Treating Medical Professionals Who Could Have Rebutted Those Charges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        2.    Trial Counsel's Ineffective Assistance.. . . . . . . . . . . . . . . . . . 37

E.    Trial Counsel Were Ineffective for Eliciting Damaging Testimony During the Cross-Examination of Dr. Price. . . . . . . . . . . 39

        1.    The Direct and Cross-Examination Testimony of Dr. Price. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

        2.    Trial Counsel's Ineffective Assistance.. . . . . . . . . . . . . . . . . . 42

F.    Trial Counsel Were Ineffective for Failing to Investigate and Present Evidence of Compulsive Aggression in Effexor Patients.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

        1.    Mr. Fields' Effexor Defense and Uninvestigated Evidence of Effexor-Related Compulsive Aggression. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

        2.    Trial Counsel's Ineffective Assistance.. . . . . . . . . . . . . . . . . . 52

G.    Counsel Ineffectively Failed to Thoroughly and Properly Prepare the Two Mental Health Experts Who Testified. . . . . . . . . . 53

**GROUND TWO**

THE EIGHTH AMENDMENT AND INTERNATIONAL LAW PRECLUDE MR. FIELDS' EXECUTION BECAUSE OF HIS DETERIORATING MENTAL HEALTH. ADDITIONALLY, HE IS NOT COMPETENT FOR EXECUTION. . . . . . . . . . . . . 54

**GROUND THREE**

TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE, PRESENT AND ARGUE EVIDENCE THAT WOULD HAVE REBUTTED THE SUBSTANTIAL PLANNING AND MENTAL ANGUISH AGGRAVATING FACTORS, AND THE GOVERNMENT PRESENTED FALSE AND MISLEADING TESTIMONY AND ARGUMENT ABOUT THE SUBSTANTIAL PLANNING AGGRAVATING FACTOR IN VIOLATION OF DUE PROCESS.............. 56

A.   Evidence Rebutting the Substantial Planning Aggravating Factor. ................................................ 59

   1.   Evidence that Mr. Fields Did Not Shoot the Chicks After Substantial Planning..................... 59
   2.   Evidence that Mr. Fields Did Not Stage a Robbery Many Hours After the Shootings.. .............. 64

B.   Evidence Rebutting the Mental Anguish Aggravating Factor. ................................................ 72

C.   Trial Counsel's Ineffective Assistance........................ 74

D.   The Government's Due Process Violations.................... 76

   1.   False and Misleading Testimony and Argument About a Purportedly Staged Robbery.. ..................................... 77
   2.   Misleading Testimony and False and Misleading Argument About Mr. Fields' Purported "Alibi"............................... 80
   3.   The False and Misleading Testimony and Argument Could Have Affected the Judgment of the Jury........................... 82

**GROUND FOUR**

TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT MR. FIELDS' SOCIAL HISTORY THROUGH THE TESTIMONY OF A MITIGATION SPECIALIST OR MENTAL HEALTH EXPERT AND ARGUING THAT SOCIAL HISTORY AS A MITIGATING FACTOR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

A.  Evidence of Family Dysfunction that the Jury Never Heard. . . . . . . 84

B.  Trial Counsel's Ineffective Assistance. . . . . . . . . . . . . . . . . . . . . . 91

**GROUND FIVE**

MR. FIELDS WAS DENIED HIS RIGHT TO INDIVIDUALIZED SENTENCING, DUE PROCESS, A FAIR TRIAL AND THE EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE THE GOVERNMENT'S CLOSING WAS RIFE WITH IMPROPER ARGUMENT, MOST OF WHICH WAS NOT OBJECTED TO BY TRIAL COUNSEL, AND APPELLATE COUNSEL FAILED TO RAISE THIS ISSUE ON DIRECT APPEAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

A.  Improper Arguments Denying the Right to Jury Consideration of All Relevant Mitigating Evidence. . . . . . . . . . . . . 95

B.  Improper Arguments Denying the Right to a Fair Trial. . . . . . . . . . 99

C.  Trial Counsel's Ineffectiveness. . . . . . . . . . . . . . . . . . . . . . . . . . . 110

**GROUND SIX**

TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO INSTRUCTIONS AND A VERDICT FORM THAT ALLOWED THE JURY TO APPROVE A GENERAL VERDICT OF DEATH BASED ON THE COMBINED WEIGHING OF AGGRAVATING FACTORS APPLICABLE TO TWO SEPARATE MURDER COUNTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

A.  The Unified Weighing Process and General Death Verdict. . . . . . 113
B.  Trial Counsel's Ineffective Assistance. . . . . . . . . . . . . . . . . . . . . 117

**GROUND SEVEN**

THE GOVERNMENT WITHHELD EXCULPATORY, MATERIAL EVIDENCE FROM THE DEFENSE IN VIOLATION OF DUE PROCESS, AND TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT EXCULPATORY EVIDENCE. ........................... 119

A.    The Undisclosed Exculpatory Evidence.. ..................... 119

    1.    Bottle of 150 mg Effexor Capsules. ................... 120
    2.    Emails and Documents from Mr. Fields' Computers.. ...................................... 122
    3.    FBI Forms 302 and Reports of the OSBI.. ............... 123

B.    The Undisclosed Exculpatory Evidence Was Material. ......... 123

C.    Trial Counsel's Ineffective Assistance.. ..................... 123

**GROUND EIGHT**

THE CUMULATIVE IMPACT OF ALL THESE ERRORS DENIED MR. FIELDS DUE PROCESS AND A RELIABLE SENTENCING HEARING.. .............. 124

**GROUND NINE**

THE MANNER OF MR. FIELDS' EXECUTION, IF CARRIED OUT, WOULD VIOLATE THE EIGHTH AMENDMENT. ........................... 125

**STATEMENT REGARDING CITATIONS AND APPENDIX**

The transcript of the trial proceedings are sequentially numbered and will be cited as "*TR*" followed by a page citation. Other proceedings will be cited as *TR* followed by the date of the proceeding and page number. Mr. Fields cites a number of documents that are not currently of record. Those documents are included in the accompanying *Appendix*, which will be cited as "*A*" followed by an exhibit number. Documents that are of record are not included in the *Appendix*, but will be cited. Defendant, Edward Leon Fields, the movant herein, will be referred to as Mr. Fields. The United States of America will be referred to as the Government. All other citations are either self-explanatory or will be explained.

All emphasis is supplied unless otherwise indicated.

# GROUND ONE

## THE EIGHTH AMENDMENT WAS VIOLATED WHEN THE JURY FAILED TO FIND AS MITIGATING FACTORS ANY OF THE UNCONTESTED MENTAL HEALTH-RELATED MITIGATING FACTS PRESENTED TO IT. THE SIXTH AMENDMENT WAS VIOLATED WHEN TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN INVESTIGATING, PRESENTING AND ARGUING MITIGATING MENTAL HEALTH EVIDENCE, INCLUDING FAILING TO ARGUE THAT THE UNCONTESTED MITIGATING FACTS CONSTITUTED MITIGATING FACTORS.

### A.    Introduction.

1.    While there was significant debate at trial regarding whether the offenses to which Mr. Fields pled guilty could be mitigated by the occurrence of what the defense termed a "manic flip," there was no serious controversy that Edward Leon Fields has had a lifetime of mental illness. There was no dispute between the parties that he suffered from chronic depression, nor was there any serious dispute that he experienced auditory hallucinations before and after the offenses. Yet, counsel never presented these significant mitigating facts to the jury as possessing mitigating value independent of the "manic flip." Although the presence of these facts were largely conceded by the Government, the jury did not find depression or auditory hallucinations to be mitigating factors. The failure of counsel to present them as such violated the Sixth Amendment, and the jury's failure to find and give effect to these uncontested mitigating factors violated the Eighth Amendment.

1

2.    Counsel's closing argument was confusing, but to the extent it can be read as asking the jury to find some of the uncontested mental health-related mitigating facts, it was deficient in suggesting to the jury that they could be given mitigating effect only through one of three available statutory mitigating factors.

3.    Mr. Fields suffers from a progressive neurological disease (discussed in detail below), and at the time of trial this disease had already caused him organic brain damage localized in his frontal lobes. However, this extant mitigating factor was not presented at all to the jury, and accordingly the jury never found his organic brain damage as a mitigating factor. This evidence was not presented despite the fact that counsel had an expert ready to testify to the presence of this damage, and relied upon this factor in arguing to the Department of Justice not to authorize this case as a capital prosecution.

4.    These were not counsel's only failures. They failed to call available witnesses who would have testified – contrary to the Government's position – that Mr. Fields was not malingering his illness. These witnesses include those who treated Mr. Fields in the community before the offenses and during his pre-trial incarceration at the Muskogee and Tulsa County Jails. Counsel also ineffectively opened the door to damaging testimony by a Government expert. Counsel ineffectively failed to investigate, marshal and present available evidence showing

2

that one of the drugs that Mr. Fields had been prescribed in the weeks before the offenses was associated with causing aggressive and violent behavior. And, counsel ineffectively prepared the mental health experts that she did call to testify.

5.     Trial counsel rendered ineffective assistance in investigating, presenting and arguing nearly every aspect of Mr. Fields' mental health mitigation defense. These failures – and all of the failures set forth elsewhere in this *Motion* – were due to the dysfunction of the defense team. Federal Public Defender Julia O'Connell effectively was Mr. Fields' only trial lawyer. In this capital case, Ms. O'Connell alone examined the thirty-two witnesses who testified at Mr. Fields' complex sentencing hearing and delivered the opening statement and closing argument. Her assigned "Learned Counsel," Isaiah Gant of the National Capital Resource Counsel Project, performed little, if any, actual work, inside or outside of the courtroom, and what work he did was often more harmful than helpful. See App. 32; App. 33.

6.     Ms. O'Connell initially anticipated that Mr. Gant would share the work of preparing and trying this case. Declaration of Julia O'Connell, Esq. ("O'Connell Dec."), *A* – 1, ¶¶ 2-3. To Ms. O'Connell's dismay and Mr. Fields' significant detriment, however, Mr. Gant made no meaningful contribution to the defense effort. He punted the critical Department of Justice authorization meeting to Ms. O'Connell at the last minute, ignored pleas for assistance in drafting jury instructions, gave

contradictory and unfocused advice about whether Mr. Fields should plead guilty, and, other than fumbling through a portion of the voir dire,[1] played no role at the sentencing hearing. <u>Id.</u>, ¶¶ 4, 6-10. By the time trial began, Mr. Gant had ceased to play any meaningful role in assisting the defense. <u>See</u> App. 32; App. 33.

7.     Because Ms. O'Connell shouldered nearly all the burdens of preparing and trying this complex case, she became overwhelmed. The defense team repeatedly made important decisions without giving them appropriate consideration. Witness preparation was either poorly done or in some cases, non-existent – some witnesses the defense intended to call were not called at all. Ms. O'Connell acknowledges, "There is no question in my mind that the bulk of the ... errors [in this case] were a result of my being overburdened by essentially functioning without co-counsel in this complex and difficult case." O'Connell Dec., ¶ 24.

8.     The defense team's dysfunction not only adversely affected the performance of Mr. Fields' lead lawyer, but also the performance of the mental health experts who were the anchors of his mitigation defense. Dr. George Woods, a

---

[1] <u>See e.g.</u> *TR*, 340 (The Court: "Now, we've got to work on the opening and closing argument way of questioning jurors, because I don't like it. Mr. Gant, are you listening. Okay, I really don't. And I may just cut off questioning completely by counsel if we don't restrain ourselves.); *TR*, 373 (The Court: "We've hoed this road [sic] before. We've hoed this road before. I'm going to start putting a limit on counsel of five minutes each. You're [Mr. Gant] done, okay.").

psychiatrist who testified for the defense, recalls:

> Even though Ms. O'Connell was the engaged member of the team, I never believed that she gave the presentation I ultimately made the proper time and attention that it required. I had the definite sense that Ms. O'Connell was in over her head. To be clear, I do not mean that she was not capable of handling a complex set of issues, such as those presented by Mr. Fields' case. Instead, I believed that she was being required to handle too much work to be able to responsibly and competently make the required presentation. From my perspective, it was rather obvious that her inability to pay the required attention to the preparation and presentation of my testimony was traceable to Mr. Gant's failure to carry his share of the work.

Declaration of George W. Woods, M.D. ("Woods Dec."), $A-2$, ¶ 4. Another defense psychiatrist, Dr. Bradley Grinage, states that he was contacted "rather close in time to the trial," his preparation time was "short ... and only right before [he] testified" and trial counsel "appeared to be overextended." Declaration of Bradley D. Grinage, M.D. ("Grinage Dec."), $A-3$, ¶ 5.

9. The mitigation specialist retained by the defense, Glori J. Shettles, also recounts that Ms. O'Connell was effectively alone in her work:

> Initially, Ms. O'Connell expected to rely heavily on Mr. Gant because he was Learned Counsel. However, it became apparent that this reliance was misplaced. . . . It was quite clear that Ms. O'Connell was effectively on her own in both pre-trial preparations and during the trial.

> I was in close contact with Ms. O'Connell during the pre-trial period and was actually present during the entire trial. I stayed in the same lodging as the lawyers during the trial - a bed and breakfast. This allowed me to observe the interactions between counsel, and the level of preparation

5

that was on-going. It was clear to me that Mr. Gant did very little useful work during the immediate pre-trial and trial stages. Consequently, Ms. O'Connell was left to shoulder almost the entire burden of the case. Aside from the small part of the voir dire questioning done by Mr. Gant (until it became quite clear that the Court was losing patience with him and it had to be taken over by Ms. O'Connell), Ms. O'Connell was the in-court voice of the defense. Ms. O'Connell examined every witness in the case. This caused significant tension between the two lawyers and, to my eye, had an adverse impact on the defense preparations and presentation. During evenings after court, Mr. Gant seemed far more energetic about making sure dinner was served (he brought his wife with him and she cooked for the team just about every night) than in preparing for the next day. Evenings seemed to him to be more in the nature of a social event than a serious endeavor. I distinctly recall assisting her in witness preparation during short breaks during the trial or else staying up with her until the early morning before heading off to court. Ms. O'Connell voiced her concerns to me about work overload resulting from Mr. Gant's failure to carry his share of the burden. I recall her finally giving up on trying to get him to perform a meaningful role.

Declaration of Glori J. Shettles ("Shettles Dec."), $A - 4$, ¶¶ 12-13. She observed the damage caused by the dysfunctional team:

In my view, based on over twenty years working in the criminal justice system and with significant expertise in capital sentencing, I am shocked that the jury failed to find a single mental health-related mitigating factor in this case when Mr. Fields is so clearly ill and had a demonstrable history of difficulties. I believe that this failure was attributable to the lapses in the defense presentation caused by the impact of Ms. O'Connell being effectively on her own.

Id., at ¶ 15.

10. While the defense team's dysfunction caused problems that permeated the entire sentencing hearing, it had an especially acute impact on Mr. Fields' mental

health mitigation case for the reasons discussed below.[2]  Accordingly, trial counsel's

performances were ineffective in violation of the Sixth Amendment to the United

States Constitution.

**B.    Trial Counsel Ineffectively Failed to Argue that Mr. Fields' Uncontested Mental Illness Was Mitigating. The Jury's Failure to Find any of this Uncontested Mitigating Evidence Violated the Eighth Amendment.**

11.    Although the defense presented mitigating facts related to Mr. Fields'

mental health – including his pre-offense history of chronic depression and auditory

hallucinations – trial counsel ineffectively failed to argue that this evidence had

---

[2]As Ms. O'Connell notes, this dysfunction did not effect just her performance with regard to the mental health evidence discussed in this Ground. It had an impact on virtually ever significant decision and action that she took. After recounting many of her trial shortcomings, her Declaration concludes that they are all traceable to her status as sole counsel:

> I am an experienced, dedicated and conscientious criminal defense attorney. I am disturbed by many of the events that I have discussed In this statement. As the Federal Public Defender for the Northern and Eastern Districts of Oklahoma, I accept full responsibility for my acts or omissions described above. Although Mr. Gant failed to perform his role, I should have either forced the issue with him, or brought it to the attention of the Court. **There is no question in my mind that the bulk of the above-described errors were a result of my being overburdened by essentially functioning without cocounsel in this complex and difficult case.**

O'Connell Dec., ¶ 24. Accordingly, rather than repeat the allegations regarding the team dysfunction in each succeeding ground for relief, counsel will refer back to this section outlining the relevant events.

mitigating weight independent of the "manic flip" opinion presented by Dr. Woods and Dr. Grinage. This evidence could have been presented as free-standing mitigating evidence under 18 U.S.C. § 3592(a)(1) (significantly impaired capacity), (a)(6) (severe mental or emotional disturbance), or (a)(8) (other factors).[3] Even when counsel mentioned depression and hallucinations separately from the theory of manic flip, counsel never told the jury it could give these facts mitigating effect through anything but the (a)(1) circumstance. This, too, was ineffective.

12. The defense presented two psychiatrists, Dr. Bradley Grinage and Dr.

---

[3]These three mitigating factors state in full:

(a) Mitigating factors – In determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider any mitigating factor, including the following:

(1)    Impaired capacity – The defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge.

(6)    Disturbance – The defendant committed the offense under severe mental or emotional disturbance.

(8)    Other factors – Other factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence.

18 U.S.C. § 3592 (a).

8

George Woods, to establish that Mr. Fields suffered from bipolar disorder at the time of the offenses. *TR*, 2775 (Dr. Grinage); *TR*, 2973 (Dr. Woods). Both doctors also testified that the administration of Effexor to Mr. Fields caused him to endure a manic flip. *TR*, 2812 (Dr. Grinage: "[S]pecific to patients with bipolar disorder is you may treat the depressions with an antidepressant, but, there's a risk when treating someone with bipolar disorder that you might actually not only go past treating depression, but, put them into a manic episode or give them symptoms of mania.... the term that is described in the literature is called switching."); *TR*, 2989 ("[I]t's the medication and the blood level. In the same way that some people have unusual responses to penicillin or unusual responses to other types of medicine, there are people who have unusual responses to antidepressants as well. And one of the unusual responses for someone that is bipolar is to switch into mania."). Dr. Grinage and Dr. Woods also testified that Mr. Fields had a history of depression as early as age sixteen and, in the months before the offenses, suffered from sleeplessness, command auditory hallucinations and dramatic weight loss. *TR*, 2778, 2800 (Dr. Grinage); *TR*, 2974, 2981 (Dr. Woods). Dr. Grinage and Dr. Woods also testified that for many years prior to the offenses Mr. Fields had been treated with a number of antidepressants, including Paxil, Wellbutrin, Celexa, Lexapro and Effexor. *TR*, 2745, 2804 (Dr. Grinage); *TR*, 2974, 2987 (Dr. Woods).

9

13. While contesting the core of each expert's opinion, the Government conceded much of the mental health evidence presented by the defense. Dr. Jeffrey Mitchell, a psychiatrist who testified for the Government on rebuttal, agreed that Mr. Fields suffered from severe depression. See, e.g., *TR*, 3263-64 (Dr. Mitchell testifies, "I think Dr. Kemp gave – diagnosed depression which I think was a correct diagnosis."). Dr. Randall Price, the Government's rebuttal psychologist, also noted that Mr. Fields suffered from depression which improved with treatment. *TR*, 3220. In closing argument, the Government did not dispute depression. *TR*, 3425 (Government telling the jury: "Was the Defendant depressed during this time period? **Absolutely.**"); *TR*, 3428 (Government arguing that Mr. Fields was depressed and not bipolar). In addition, Dr. Mitchell testified that Mr. Fields' history of hearing voices was "credible," *TR*, 3284, and that he did not "doubt that [Mr. Fields] heard voices ...."[4] *TR*, 3315.

14. Trial counsel requested that the Court instruct the jury on twenty-two

---

[4]Dr. Price did not endorse auditory hallucinations and believed Mr. Fields was malingering in this respect. But he was the only doctor at trial who did not believe that the hallucinations were genuine. As indicated in other portions of this *Motion*, every doctor who has ever treated Mr. Fields for a mental health-related symptom or illness, or administered mental health-related testing, has found his reports of symptoms and his testing credible. **None have found him to be a malingerer – Dr. Price stands alone in this regard.** And, in any event, Dr. Price agreed he could not rule out that the hallucinations were genuine. *TR*, 3221, 3228.

mitigating factors that they contended were present in the case. The Court charged

the jury in accordance with trial counsel's request, i.e., the Court did not refuse to

charge on any mitigating facts or factors requested by the defense.[5] In closing, trial

counsel argued these factors more or less as the Court charged them. Despite the

exquisitely detailed list of mitigating factors given by the Court and argued by

counsel (e.g. Mr. Fields was a good cook), nowhere was the jury told by the Court or

---

[5]The Court charged the jury that the defense had offered as mitigating factors the following factors: (1) the Defendant's capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge; (2) the Defendant did not have a significant prior history of other criminal conduct; (3) the Defendant committed the offenses under severe mental or emotional disturbance; (4) the Defendant served in the Navy and was honorably discharged; (5) the Defendant worked as a prison guard for the Oklahoma Department of Corrections; (6) the Defendant has special talents in cooking, art, and computers; (7) the Defendant excelled in his manufacturing job at Kenco Plastics; (8) the Defendant is a loved father; (9) the Defendant is a loved brother; (10) the Defendant is a loved son; (11) the Defendant is a valued friend; (12) the Defendant endured the death of his father months before the offenses; (13) the Defendant's mother moved away weeks before the offenses; (14) the Defendant's ex-wife and children moved away months before the offenses; (15) the mother of the Defendant's children, Teresa Fields, has recently had cancer which may or may not be in remission; (16) the Defendant's death will impact his children, family and friends; (17) the Defendant cooperated with authorities after his arrest; (18) the Defendant confessed to the crimes; (19) the Defendant pled guilty to the crimes; (20) the Defendant has expressed remorse for the crimes; (21) the Defendant sought treatment for his mental illness; (22) the Defendant will not present a future danger to society by being imprisoned for life without possibility of release. *TR*, 3400-01. The Court also instructed the jury that "any other relevant mitigating information presented in this proceeding" could be considered as a mitigating factor. *TR*, 3402.

11

by counsel that it could:

- consider whether manic flip was a mitigating factor under (a)(6)[6] or (8); the (a)(1) mitigating factor was the sole basis offered to the jury for finding and giving effect to manic flip;

- find or give mitigating effect to Mr. Fields' uncontested depression under (a)(1), (6) or (8);

- find or give mitigating effect to Mr. Fields' largely uncontested history of auditory hallucinations under (a)(1), (6) or (8);

- find mental health mitigation (depression and hallucinations) under (a)(1), (6) or (8), even if it did not accept the manic flip theory.

Thus, caught up in presenting and arguing Dr. Woods' and Dr. Grinage's opinions regarding manic flip, counsel made these critical errors which unconstitutionally cramped the jury's ability to find and give mitigating effect to mitigating facts, including those that were uncontested. Simply put, the jury was left without an option by which to give mitigating effect to any of the mental health evidence except under (a)(1), and was given no means of finding and giving effect to depression and hallucinations at all.

15. The jury rejected trial counsel's presentation of manic flip under the

---

[6]While trial counsel did offer the (a)(6) severe disturbance mitigating factor, they argued that it was proven, not by mental health evidence, but by the facts that Mr. Fields was in rocky relationships, he was apart from his family, his father had recently died, his mother was ill and he was living out of his truck. *TR*, 3440.

12

(a)(1) mitigating factor. *TR*, 3480-81. Yet, there are two other ways that the jury could have found and given effect to manic flip. If the jury believed that Mr. Fields experienced a manic flip, and that it impaired him but did not "significantly" impair him – in the words of the statute – the jury could have found it under the (a)(8) catch-all factor. Counsel never argued that, nor did they ask the Court to so instruct. Similarly, the jury may have accepted that Mr. Fields underwent a manic flip, and that this constituted a "severe mental disturbance" – to quote the statute – even if it did not "significantly impair" his capacity. Had the jury believed this, it could have found manic flip under the (a)(6) factor. Again, counsel never argued that and did not ask the Court to so instruct. And, the jury may have believed he was bipolar, but did not experience a manic flip. In that case, it may have wanted to give effect to this finding under any of the three discussed mitigating factors. But, again, counsel failed to ask for such an instruction, or provide the jury with this choice. Because of counsel's failure to provide the jury with these alternative means of finding and giving effect to the manic flip, the jury was left with no other way to give expression to the mitigating value of that evidence.

16. In similar fashion, counsel's single-minded focus on the manic flip prevented the jury from finding and giving effect to the uncontested evidence of depression and the largely uncontested evidence of hallucinations.

13

17. The jury found no mental health related mitigation, and voted for death. *TR*, 3484-85. Although the jury rejected the manic flip-based impaired capacity mitigating factor, this did not mean it must have rejected evidence that Mr. Fields suffered from mental illness. One of the seventeen mitigating factors the jury did find was that Mr. Fields "sought treatment for his mental illness." *TR*, 3482. Concluding that seeking treatment for mental illness is mitigating assumes the existence of mental illness. It is likely, then, that the jury was persuaded that Mr. Fields suffered from mental illness. The jury, however, lacked a means for giving effect to these uncontested mitigating facts. When a capital jury is not given the means by which to give effect to existing mitigating facts, the Eighth Amendment is violated.

### 1. Trial Counsel's Ineffective Assistance.

18. Trial counsel rendered deficient performance by failing to argue that Mr. Fields' mental health impairments were mitigating independent of the manic flip theory and the (a)(1) mitigating factor. Trial counsel presented evidence of bipolar disorder, severe depression, and auditory hallucinations. Mental illnesses such as these are plainly mitigating even if they do not rise to the level of significantly impaired capacity, yet trial counsel argued the mitigating value of this evidence only through the impaired capacity mitigating factor. Trial counsel acknowledges, "I should have told the jury that they could find these facts as mitigating and ask the

14

Court to charge them on those facts as separate mitigating factors." O'Connell Dec., ¶ 18.

19. Trial counsel concedes that she had no tactical or strategic reason for proceeding in this way. O'Connell Dec., ¶ 18. Nor could there be any reasonable tactic or strategy for doing so. By proceeding in this manner, counsel made it far less likely that the jury would find the defense's mental health evidence to be mitigating, which is the opposite of what reasonable counsel would have intended.

20. Mr. Fields was prejudiced by trial counsel's deficient performance. Trial counsel presented significant evidence of his history of mental illness and current diagnoses. Some of this evidence was accepted by the Government's own rebuttal mental health experts. Both Government experts conceded that Mr. Fields suffered from depression, and one even agreed that he experienced command auditory hallucinations. See, e.g., TR, 3263-64, 3220, 3284, 3315. Given that Mr. Fields' history of depression was undisputed, and that the jurors apparently believed at least some evidence of mental illness was credible, the jury likely would have found this evidence to be mitigating had it been given a way to express such a finding. As a result, there is a reasonable likelihood that, had trial counsel argued to the jury that it could find Mr. Fields' mental health impairments mitigating independent of the statutory impaired capacity mitigator, the verdict would have been different.

15

21. Mr. Fields submits that, when a jury fails to find uncontested mitigation, the Eighth Amendment is violated. In addition, when counsel fails to take advantage of a prosecutor's concession that mitigating facts exist, and the jury does not find those mitigating facts, Sixth Amendment prejudice is established.

**C. Trial Counsel Were Ineffective for Failing to Investigate and Present Evidence of Mr. Fields' Organic Brain Damage.**

22. At the time of the offenses, Mr. Fields suffered from organic brain damage.[7] Trial counsel failed to discover the full extent of his brain damage because they arranged for Mr. Fields to receive only limited neuropsychological testing and then, after that testing indicated frontal lobe dysfunction, they ignored their neuropsychologist's recommendation to conduct further testing.

23. Nonetheless, the testing done by the defense neuropsychologist showed that Mr. Fields' frontal lobes were impaired. These impairments affected his executive functioning in areas such as judgment and impulse control. Evidence of this damage would have been mitigating in its own right and also would have bolstered the defense that Mr. Fields experienced a manic flip at the time of the offenses. Because trial counsel did not fully investigate and discover this brain

---

[7]As discussed in more detail below, Mr. Fields' brain damage is progressive and he is now even more severely impaired than he was at the time of the offenses.

16

damage, the jury never heard this crucial mitigating mental health evidence.

**1. The Defense's Inadequate Efforts to Develop and Present Neuropsychological Evidence.**

24. Trial counsel knew or should have known of red flags that Mr. Fields suffered from brain damage, should have sought appropriate evaluation and should have presented such evidence to the jury. See App. 32.

25. When Mr. Fields was born, he was diagnosed as suffering from hyaline membrane of the lung (now known as neonatal respiratory distress syndrome). Because this condition can cut off oxygen to the brain for periods of time, it creates a serious risk of brain damage. Trial counsel anecdotally learned that Mr. Fields suffered from something described to them as "hollow membrane" – a non-existent medical condition – but they failed to obtain legible medical records that would have identified hyaline membrane as the actual diagnosis and documented the resulting respiratory distress. Shettles Dec., ¶ 4. Mr. Fields' current counsel obtained a legible copy of these records which clearly describe his actual condition. They demonstrate that Baby Boy Fields was in dire condition, unable to breathe and near death. Counsel's failure to obtain a legible set of these crucial records was ineffective.

26. The legible records recount that Baby Boy Fields had Hyaline Membrane Disease – an illness in newborns which is associated with twenty to thirty percent of

all neonatal deaths. The records show that the "baby sox" (which measured the level of oxygen saturation) was thirty percent when he was taken away from his mother to a specialized hospital. The records also note Baby Boy Fields had "mucous in the lung [that] was so thick" the medical staff was unable to siphon it out. The records show that Baby Boy Fields had "very labored breathing," and "appear[ed] in distress." Radiographs showed "diffuse pulmonary infiltrates, " and that "prognosis [was] guarded." At the time he was removed from his mother, he was administered emergency baptismal rites and transferred in "isolette by ambulance." Subsequent tests showed that "in comparison to earlier films [there was] persistent increase in the markings of the right lung. Persistent inadequate pneumonization of the right lung [was] indicated." See Records of Hillcrest Osteopathic Hospital, A–5, at pp. 1, 3, 4, 7, 10, 14, and 16.

27. In addition, Mr. Fields experienced a number of head injuries and losses of consciousness before the age of twenty. When he was thirteen he had a sleigh-riding accident in which he crashed and lost consciousness for several minutes. Neurological Evaluation conducted by Michael M. Gelbort on August 11, 2004 ("Gelbort Report"), A – 6, at 2. At the age of sixteen he rolled a truck down a hill, flipping it over four times. Id. Two days later he became unconscious while riding a dirt bike and required four days of hospitalization. Id. He also experienced an

18

episode of syncope at boot camp after he enrolled in the U.S. Navy. Id.

28. Thus, for good reason, trial counsel arranged for Mr. Fields to receive neuropsychological testing. On August 11, 2004, Dr. Michael Gelbort, a neuropsychologist, conducted an evaluation of Mr. Fields on behalf of the defense. Dr. Gelbort's testing battery included the Wechsler Adult Intelligence Scale-III, portions of Weschsler Memory Scale-III, Wide Range Achievement Test-III, Category Test, Trail Making Test, Lateral Dominance Test, Strength of Grip Test, a partial Sensory Perceptual Examination, Aphasia Screening, and items from the Luria Nebraska. Gelbort Report at 3.

29. This testing showed, among other things: "mild suppressions in working verbal and visual memory"; short-term memory for meaningful information "vacillat[ing] with the overall level of functioning in the borderline defective range of functioning"; verbally mediated tasks "mildly slowed to mildly impaired"; higher-level reasoning tasks demonstrating "mild impairment"; and "[i]mpulsivity of mild proportions." Gelbort Report at 3-4. Dr. Gelbort noted that "deficits or impairments in functional attention and concentration abilities appear to be the most likely cause of these suppressions in performance." Id. at 4. In short, he found that Mr. Fields suffered from organic brain impairments. See also App. 34.

30. Most significantly, based on his testing, Dr. Gelbort concluded that Mr.

19

Fields likely suffered from frontal lobe damage that required further evaluation:

> Overall, Mr. Fields is an individual who demonstrated overall measures of intellectual functioning toward the lower portion of the average range with specific tests of freedom from distractibility and processing speed being lower. Tests of learning and memory found a similar pattern with new learning/memory adversely affected as a result. The patient has a history of emotional upset, turmoil, and treatment which has been less than optimally effective. **He displays a pattern often found in individuals with frontal lobe or non-dominant hemisphere neurocognitive dysfunction and brain damage with further evaluation warranted**. The nature and pattern of his deficits is long-standing and affects his every-day life, thought processes, and behavior.

Gelbort Report at 3; <u>see also</u> App. 34.

31. Although Dr. Gelbort recommended further testing, his August 2004 evaluation was the only neuropsychological examination ever conducted for the defense. Nonetheless, there is no question that, based on Mr. Fields' birth history, the other red flags in his background and on Dr. Gelbort's testing, defense counsel knew that Mr. Fields suffered from neuropsychological impairments.

32. That the defense knew Mr. Fields' suffered from impairments is shown by several facts. In the late summer and fall of 2004, the defense filed a number of pleadings with the Court indicating that it intended to conduct further neuropsychological testing and present neuropsychological testimony at trial. Shortly after Dr. Gelbort's testing showed the presence of neuropsychological deficits with frontal lobe involvement, on August 27, 2004, the defense notified the Court "that

20

defendant's neuropsychological test results indicate the presents [sic] of frontal lobe impairment in his brain functioning." Defendant's Ex Parte Supplement to Motion for Extension of Time at 1. On September 17, 2004, the defense notified the Court that they had:

> [C]onferred with the neuropsychologist, and was informed that testing indicated the presence of frontal lobe impairment. This information was then shared with the neuropsychiatrist, who determined that additional medical testing is mandated to confirm the existence, nature and extent of Fields' brain damage. The doctor arranged to return to Tulsa at the end of September to conduct a neurological examination. Thereafter, additional time is necessary for the doctors to analyze testing results, determine if any further testing is indicated, formulate opinions and confer with counsel.

Defendant's Supplemental Ex Parte Application For Extension of Time to File Rule 12.2 Notice at 6. This filing included an affidavit from an attorney stating that "[a] neurologist is often necessary as well when any brain damage, disease, or dysfunction is suspected" and that "[n]eurologists are usually best equipped to interpret the array of data gathered from the client's history, neuropsychological tests, measures of brain structure and functioning (CT and MRI scans, EEG's, PET scans), and additional tests ...." Id., Exh. B at 7. On November 1, 2004, the defense gave notice that its experts at trial would include a neuropsychiatrist, a neuropsychologist and a pharmacologist. Defendant's Notice of Intent to Present Expert Testimony (Rule 12.2 Notice).

33. On December 1, 2004, the defense met with the Government to discuss the results of their mental health investigation in hope of settling the case for a sentence of life imprisonment without parole. United States Attorney Sheldon Sperling memorialized this meeting in a letter sent the next day. He wrote, among other things:

> Your experts found the frontal lobe injury through psychological testing. While no PET scan or MRI had been conducted, you assured us that any type of brain damage testing would yield similar results. . . . no PET scan was conducted because you had been told that such a test would cost $35,000 and the cost seemed too high at this stage in the case. You indicated that the prosecution team might want to conduct such a test and thereby absorb this cost.

Letter from Sheldon Sperling to Julie O'Connell, dated December 2, 2004, *A – 7*, at pp. 1, 2, 4.

34. Whatever doubts may have remained regarding Mr. Fields' organic impairments after Dr. Gelbort's testing were resolved in June 2005, when Dr. Jack Randall Price conducted a neuropsychological evaluation of Mr. Fields on behalf of the Government. On July 1, 2005, Dr. Price reported impaired performance on a number of significant neuropsychological tests, including the Trail Making Test, Part A (27th percentile), Trail Making Test, Part B (7th percentile), Digit Vigilance Time (9th percentile), Selective visual attention (variable), COWA (7th percentile) and RFFT (1st percentile). Report of Neuropsychological Evaluation dated July 1, 2005 ("Price

22

Report"), *A* – 8, at 21-25. On the Frontal Systems Behavior Scale Subscales of Apathy, Disinhibition, and Executive Dysfunction, Dr. Price found that Mr. Fields ranged from 83rd percentile to above 99th percentile. Id. at 25. He noted no evidence of malingering on the neuropsychological testing portion of the evaluation. Id. at 21.[8]

35.    Ms. O'Connell provided Dr. Price's report to Dr. Gelbort, who told her that Dr. Price's data was consistent with his, even though Dr. Price's conclusions understated the significance of the data and Mr. Fields' impairments. O'Connell Dec., ¶ 16 ("I provided this report to Dr. Gelbort, who told me that Dr. Price's data was consistent with his own – that Mr. Fields was brain damaged and neurologically impaired."). Ms. O'Connell confirmed that Dr. Gelbort would testify. Id.

36.    On July 3, 2005 – just before the start of jury selection – trial counsel sent Dr. Gelbort a contract to cover his anticipated testimony at the sentencing hearing. Trial counsel informed him that he would be needed to testify around July 18, 2003, and also would be needed to consult about the cross-examination of Dr. Price. O'Connell Dec., ¶¶ 10, 15 ("Through the months leading up to the trial, I stayed in contact with Dr. Gelbort about conducting further testing and his ability to

_____

[8]Despite these impairments, Dr. Price concluded, "Performance on neuropsychological testing is inconsistent with either an acute or chronic neurological condition including a brain injury and/or a frontal lobe disorder." Price Report at 27. However, as noted by Dr. Daniel Martell and discussed below, Dr. Price misrepresented the significance of his findings.

testify.... Even up until the time of jury selection, the plan was to call Dr. Gelbort at the penalty phase trial to testify about organic brain damage."); see also App. 34.

37.    Mr. Fields never received further neuropsychological testing as recommended by Dr. Gelbort, nor did Dr. Gelbort ever testify at Mr. Fields' sentencing hearing. O'Connell Dec., ¶¶ 10, 17 ("I never had him perform the additional testing.... I had no strategy or tactic for abandoning the specific factor of organic brain damage."); see App. 32; App. 34.

### 2.    The Organic Brain Damage Trial Counsel Never Presented and the Misleading Testimony of Dr. Randall Price.

38.    At the request of current counsel, Mr. Fields has been evaluated by neuropsychologist Dr. Daniel A. Martell.[9] Dr. Martell was asked to assess Mr. Fields' current neuropsychological state and functioning, and to assess the accuracy of Dr. Price's opinions and testimony. His conclusions are stunning and compelling.

---

[9] Dr. Martell is a member of *Park Dietz and Associates*. He is routinely retained by and testifies on behalf of the Government and state prosecutors in both capital and non-capital cases. See e.g., United States v. Gallegos, 2009 WL 1028273 (W.D. Mo. April 16, 2009) (finding that the defendant malingered his illness); United States v. Hammer, 404 F. Supp. 2d 676 (M.D. Pa. 2005); Coe v. Bell, 89 F. Supp. 2d 922 (M.D. Tenn. 2000) (noting his "impressive curriculum vitae" and that Dr. Martell testifies for both prosecution and defense but mostly for the Government); Hall v. Lance, 687 S.E.2d 809 (Ga. 2010); State v. Reid, 213 S.W.3d 792 (Tenn. 2006); State v. Holton, 126 S.W.3d 845 (Tenn. 2004); People v. Harris, 779 N.E.2d 705 (N.Y. 2002).

Dr. Price's data unequivocally demonstrates organic impairment in the frontal lobes. Dr. Martell finds that Dr. Price's testimony did not accurately reflect the significance of his data. Dr. Martell's current testing shows that Mr. Fields has experienced a "catastrophic decline in functioning over the five years since he was seen by Dr. Price" and that "some of his test performances were among the worst I have seen") Report of Daniel A. Martell, Ph.D., ("Martell Report"), *A – 9*, at p. 10.[10]

39. On Dr. Martell's testing, Mr. Fields scored in the severely impaired range on the gold-standard of neuropsychological tests, the Halstead-Reitan battery. Martell Report at 10. Mr. Fields' executive functioning – a function controlled by the frontal lobes – was "among the most profoundly impaired area tests." Id. Based on his review of the data provided by Dr. Gelbort and Dr. Price, Dr. Martell is easily able to opine that the progressive disease process observed on his testing had its origins prior to the time of the offenses. Id. at 16.

40. Dr. Martell finds that Dr. Price inaccurately portrayed his neuropsychological data. Dr. Price also gave a false impression that Mr. Fields malingered, when his own testing – and the testing of every doctor who has ever

---

[10]Dr. Martell cannot yet be certain of the causes of this progressive decline. He believes it may be related to a tumor or another process involving stroke. He recommends further imaging to determine the cause. Martell Report at 17. Counsel will shortly move for an order to have Mr. Fields transported to an appropriate imaging facility.

evaluated Mr. Fields – shows that he has never malingered. Dr. Martell himself administered multiple, objective, and scientifically sound and accepted tests for malingering, which show conclusively that Mr. Fields did not malinger on his most recent testing. Martell Report at 9.

41. Dr. Martell also finds that Dr. Price employed a "faulty basis" for concluding that Mr. Fields' reports of auditory hallucinations were false, i.e. that they were malingered. Martell Report at 13-14. Dr. Price's faulty conclusions were not challenged by the defense as they could have been.

42. Dr. Martell finds that Dr. Price testified outside of his area of expertise when he opined on the impact of several of the psychotropic medications administered to Mr. Fields. Martell Report at 14. This testimony violated the standards articulated by the American Psychological Association's *Ethical Principles of Psychologists and Code of Conduct* and that group's *Specialty Guidelines for Forensic Psychologists*. Id. at 14-15.

### 3. Trial Counsel's Ineffective Assistance.

43. Trial counsel were ineffective for failing to fully develop and present evidence of Mr. Fields' organic brain damage and to present this evidence to the jury. Trial counsel also were ineffective for failing to rebut testimony presented by the Government claiming that Mr. Fields did not have any significant neuropsychological

26

impairments.

44. Almost a year before Mr. Fields' sentencing hearing, Dr. Gelbort informed trial counsel that he suspected frontal lobe dysfunction and recommended further testing. Gelbort Report at 3. Trial counsel indicated to the Court that they intended to conduct such testing, implying this could include CT, PET and MRI scans and an EEG. Yet they failed to do so, even though Ms. O'Connell "stayed in contact with Dr. Gelbort about conducting further testing" and Dr. Gelbort expressed his willingness to perform such testing. O'Connell Dec., ¶ 15.

45. Presentation of evidence that Mr. Fields' frontal lobes were damaged would have been highly mitigating. Woods Dec., ¶ 7 ("People with frontal lobe impairments as severe as those present in Mr. Fields experience disinhibition – that is, an impaired ability to control one's impulses. Such people act out without making the types of judgments that intact people can make. By itself, this type of impairment is a highly mitigating factor."); Grinage Dec., ¶ 12 ("If I had been presented with the information that I now have about Mr. Fields' organic dysfunction and had I been asked to consider his 'cognition' ... I would have testified that his organic brain damage, focused in his frontal lobes, is a mitigating factor.").

46. Furthermore, organic brain damage would have bolstered Mr. Fields' core defense that he experienced a manic flip at the time of the offense. As Dr.

27

Woods explains, "If this [organic brain] impairment is added to my belief that Mr. Fields underwent a manic flip, then we see a situation where Mr. Fields' already impaired ability to control himself made him even less able to negotiate the flip that I believe occurred." Woods Dec., ¶ 7. Dr. Grinage agrees that "the evidence of organic brain damage could have been offered as a factor that exacerbated the bipolar disease from which Mr. Fields suffers."[11] Grinage Dec., ¶ 12. Trial counsel never considered organic brain damage to be inconsistent with a manic flip defense and agreed that "[p]resentation of brain impairments would have been an important part of our mitigation presentation." O'Connell Dec., ¶¶ 15, 17.

47.    There was no reasonable basis for trial counsel's failure to fully develop and present this evidence. Trial counsel concedes she had no strategic or tactical reason for failing to arrange for additional testing to be done. O'Connell Dec., ¶ 17.

48.    Trial counsel were deficient for not presenting Dr. Gelbort's findings of significant neuropsychological impairments which showed frontal lobe dysfunction. Trial counsel acknowledges that she "stayed in contact with Dr. Gelbort about ... his ability to testify" and that he indicated his willingness to do so. O'Connell Dec., ¶ 15. As late as the start of jury selection, it was still trial counsel's intention to call Dr.

---

[11]Dr. Grinage notes that the previously undiscovered legible records of Mr. Fields' birth also strengthens this opinion. Grinage Dec., ¶ 12.

28

Gelbort as a witness. O'Connell Dec., ¶ 15. Dr. Gelbort's testimony would have been highly mitigating by itself and also would have bolstered the opinions of Dr. Woods and Dr. Grinage that Mr. Fields experienced a manic flip. Woods Dec., ¶ 7; Grinage Dec, ¶ 12; see App. 32; App. 34.

49.    In addition, Dr. Gelbort's testimony was essential to rebut the testimony of Dr. Price, the Government rebuttal witness who told the jury that Mr. Fields did not suffer from brain dysfunction even though his own testing showed significant impairment. See *TR*, 3154; Price Report, at 21-25; see also Martell Report, pp. 12-13. (opining that Dr. Price's testimony was misleading and could have been rebutted by any competent neuropsychologist); App. 34.

50.    Trial counsel fell below a reasonable objective professional standard when they failed to present this known and available mitigating evidence and failed to rebut Dr. Price's conclusions. According to trial counsel, at the last minute Dr. Gelbort informed her that he had travel plans which prevented him from testifying, but she acknowledges that she did not seek a continuance or otherwise attempt to remedy the problem. O'Connell Dec., ¶ 17. Trial counsel concedes she had no strategic or tactical reason for not presenting Dr. Gelbort's testimony. Id. Nor could she have had a sound strategy. One of counsel's most fundamental duties is to present her client's case. It is therefore incumbent upon trial counsel to invoke the

29

court's processes, if needed, to insure the attendance of a witness, or else to seek a continuance until the witness is available. See App. 34.

51.    Mr. Fields was prejudiced by trial counsel's deficient performance in failing to investigate and present evidence of organic brain damage. Evidence of frontal lobe damage would have been highly mitigating, especially when considered in combination with Mr. Fields' other diagnosed mental illnesses and his use of the antidepressant Effexor. Woods Dec., ¶ 7; Grinage Dec., ¶ 12. Had the jury known that Mr. Fields suffered from organic brain damage, there is a reasonable likelihood that the jury's verdict would have been different.

52.    Mr. Fields also was prejudiced by trial counsel's failure to rebut Dr. Price's testimony. That testimony was devastating, but trial counsel failed to challenge his conclusions in any meaningful way, and actually elicited more harmful testimony on cross-examination.[12] Not only did the jury never learn that Mr. Fields was brain-damaged, but it was affirmatively led to believe he was **not** brain-damaged by Dr. Price's misleading testimony. Had the jury known that Mr. Fields suffered from significant neuropsychological impairments consistent with frontal lobe dysfunction, there is a reasonable likelihood that the jury's verdict of death would

---

[12]    Mr. Fields also alleges that trial counsel were ineffective for eliciting damaging testimony during the cross-examination of Dr. Price. See Part E, below.

have been different.

**D.  Counsel Ineffectively Failed to Investigate and Present Available Medical and Mental Health Providers Who Could Have Supported the Manic Flip Defense and Who Would Have Testified that Mr. Fields' Mental Illness was Genuine, Not Malingered.**

53.  The Government contended that Mr. Fields was malingering when he reported experiencing auditory hallucinations, and also attacked the diagnosis of manic flip presented by Dr. Woods and Dr. Grinage as the opinions of "left coast ... hired guns." *TR*, 3429. Trial counsel could have rebutted these contentions by calling the medical professionals who treated him before and immediately after the offenses. The testimony of local medical professionals, who treated Mr. Fields would have silenced the Government's "left coast ... hired guns" argument. Moreover, as treating providers, these witnesses had a unique opportunity to see and evaluate Mr. Fields' condition, and to offer persuasive testimony about it. Trial counsel neither investigated these medical professionals nor called them to testify. Their unpresented opinions would have carried great weight.

31

### 1. The Government's Contentions of Malingering and the Treating Medical Professionals Who Could Have Rebutted Those Charges

54.     Dr. Randall Price, a psychologist called as a rebuttal witness for the Government, testified that Mr. Fields was malingering when he reported hearing voices:

Q:     In your report what did you say you concluded about auditory hallucinations?

A:     That the way he described them to me was consistent with exaggerated or malingered auditory hallucinations that were inconsistent with genuine auditory hallucinations experienced by psychotic individuals.

Q:     What about the description is inconsistent with the voices described by other psychotic individuals?

A:     Having identified the – a single voice and referring to that voice as a little friend that tells you what to do and that being the only kind of content to the voice, to a single voice. Not having any strategies to be able to deal with those voices except to obey them and those voices being talked about without an associated delusional system. Those things are inconsistent with psychotic individuals.

Q:     All right. The fact that he said it was just a lone voice, you say that's not consistent with – that's not credible?

A:     That's correct.

*TR*, 3221-22.

55. The Government also suggested in closing argument that Mr. Fields' suicide attempt was not a real one, but simply a means of gaining attention and sympathy. *TR*, 3464 (Government arguing that suicide attempt was a "transparent ploy" to gain sympathy and imploring the jury not to be "fooled" by it).

56. Ostensibly to address the charge that Mr. Fields was malingering his auditory hallucinations, trial counsel questioned Dr. Woods about whether Mr. Fields' treating doctors believed he heard voices. All Dr. Woods could say was that Mr. Fields' treating doctors (i.e., those who treated him before and after the offenses) did not make any notes in their files indicating a belief he was malingering and that they continued to prescribe medication. *TR*, 2979-80. But trial counsel never presented the available source evidence – evidence that would not have been vulnerable to the Government's "left coast – hired guns" argument. Nor did counsel present any evidence showing that Mr. Fields' suicide attempt while incarcerated at the Muskogee jail was an earnest and serious attempt to take his life.

57. In closing argument, the Government repeated its claim that Mr. Fields was a malingerer. His report of auditory hallucinations was vigorously attacked:

> Not at the confession, not in that conversation [with Michelle Tipton]. Voices, she says, are real and influential? Not his. The voices like the robbery and burglary were a convenient afterthought. Remember the voice made him falsely claim that cannot be measured. This alleged voice that the Defendant claims in this case at about the time he chose

to activate his long though out plan to become a double murderer is just not real. When had the Defendant had any of these voices or had previously heard voices beside the issue here? ... These voices are suspiciously fabricated consistent with exaggeration or malingering, inconsistent with genuine auditory hallucinations described by psychotics. A little friend that tells him what to do? Heard by a person with no strategies to deal with the voice but obey? Unaccompanied by a delusional system, the doctors say, Dr. Price, not credible.

*TR*, 3450-51.

58. The Government also hammered its "left coast – hired guns" mantra in attacking the credibility of the defense experts:

We didn't have to go out to the left coast to find somebody who testified for the defense every time. **We got people in our own back yard who were credible,** who would give an honest opinion who were not hired guns.

*TR*, 3429.

59. **The Government was correct.** There were credible local providers "in our own back yard" – to quote the Government – who could have provided extremely helpful testimony. Such testimony would have rebutted the claim that Mr. Fields was a malingerer, supported the manic flip defense, showed that his suicide attempt was genuine, and demonstrated that, on the whole, Mr. Fields was a truly sick individual. Counsel did not call any of these medical professionals at trial, each of whom examined Mr. Fields before or immediately after the offense. They are each local practitioners, which would have given them far greater credibility with the jury than

34

the defense's out-of-state mental health experts who were vulnerable to the Government's charge of being "left coast ... hired guns." *TR*, 3429.

60.     Dr. Louise Bumgardner is a life-time resident of Oklahoma. She is a psychiatrist who treated Mr. Fields at the Muskogee Jail after the homicides. Dr. Bumgardner states that Mr. Fields reported "that he was suffering from auditory hallucinations (hearing voices) and was feeling 'very suicidal.' He reported to me that he was depressed throughout his life." Declaration of Dr. Joyce Louise Bumgardner ("Bumgardner Dec."), *A* – 10, ¶ 3. She further states:

> Based upon my review of my records and my recollection of this patient, I believe that his suicide attempt was a genuine effort to take his life. I also believed that he was suffering from actual psychiatric symptoms and was not malingering them. I have treated many prisoners presenting with psychiatric complaints, many of whom were malingering for secondary gain. When I believed that prisoners were malingering I would not hesitate to place that conclusion in my notes. The absence of that notation, my actual notes and my recollection of Mr. Fields, show that I believed he was genuinely mentally ill.

Id., ¶ 4.

61.     In addition, Dr. Bumgardner agreed with the opinions of Dr. Grinage and Dr. Woods that Mr. Fields experienced a manic flip at the time of the offense:

> Based on his history, the materials I have reviewed, and my own impressions at the time I treated him, I believe that Mr. Fields presented a classic case of the adverse impact that can occur when anti-depressive medications are given to a person with bi-polar disorder. Providing anti-depressive medications alone (that is, without appropriate additional

medications), to a person in Mr. Fields' condition can cause an explosion of extant smoldering manic symptoms, with devastating effects. I have seen such a reaction in other patients I have treated, and I have read about this phenomena in the literature. I also believed that he was a mentally ill individual and was not malingering.

Bumgardner Dec., ¶ 5.

62. When Mr. Fields was transferred to the Tulsa County Jail, he was treated by Dr. Larry Trombka, a psychiatrist employed by the Oklahoma Department of Corrections. Like Dr. Bumgardner, Dr. Trombka believed that Mr. Fields was hearing voices:

> I diagnosed schizoaffective because of Mr. Fields' complaints of auditory hallucinations which were reported concurrent with his mood symptoms. Although reasonable mental health professionals could disagree with regard to the most appropriate diagnosis for Mr. Fields' (whether depression with psychotic features or bi-polar illness with psychotic feature), it was clear to me that he was ill. There was no indication in the jail records upon which to conclude that he was faking his illness, or that his complaints were not genuine .... My notes of February 2, 2004 indicates that he told me that he was feeling better than he had in years. I also noted observations by correctional personnel, which caused me to believe that Mr. Fields was genuinely ill.

Declaration of Larry Trombka, M.D., *A* − 11, ¶ 2.

63. Other medical professionals who treated Mr. Fields in the years before the homicides confirm that he presented no signs of malingering in describing his symptoms. Dr. R.L. Winters, a physician at the Sparks Medical Foundation who treated Mr. Fields for chronic depression at various times in 2000, states that "he

presented with chronic depression which I treated in a standard manner. There is no indication in either my records or my memory that I believed Mr. Fields was malingering his illness. To the contrary, I believe that Mr. Fields suffered from chronic depression." Declaration of R.L. Winters, M.D., $A - 12$, ¶ 4.

64. In 1999, Dean Anderson, a physician's assistant at the Heavener Clinic, also treated Mr. Fields for depression. Mr. Anderson states that "I am confident that his reports of mood disturbances and related symptoms (e.g. depression, anxiety, sleep disturbances and weight loss) were genuine. I did not believe that he was in any way malingering these conditions or complaints. I perceived him at the time to be a disturbed individual (one whom I described as "different")." Declaration of Dean Anderson, $A - 13$, ¶ 11.

65. Although they were each available and willing to testify at trial, none were called. Bumgardner Dec., ¶ 6; Trombka Dec., ¶ 4; Anderson Dec., ¶ 12.

### 2. Trial Counsel's Ineffective Assistance.

66. Trial counsel were ineffective for failing to call the medical professionals who treated Mr. Fields to testify that they did not believe he malingered his complaints of auditory hallucinations or suicide attempt, and to bolster the opinions of Dr. Grinage and Dr. Woods that Mr. Fields experienced a manic flip.

67. Trial counsel admits that she had no tactic or strategy for not

investigating or presenting these witnesses. O'Connell Dec., ¶¶ 13-14. Mr. Fields' reports of auditory hallucinations were important to the defense's claim of manic flip, as well as to establishing other mental health mitigating factors. After the Government called Dr. Price to rebut this evidence, the defense needed to counter this charge of malingering. The views of local medical professionals who worked in local jails and treated Mr. Fields, would have assumed far greater weight and would have been greeted as more credible by the jury. Yet trial counsel failed to call them, relying instead on nothing more than the speculative inferences that Dr. Woods was able to draw from Mr. Fields' medical records. Trial counsel also failed to call Dr. Bumgardner to bolster the manic flip opinions of Dr. Grinage and Dr. Woods, even though those opinions went to the heart of Mr. Fields' mitigation defense. There was no reasonable basis for trial counsel's failure to present this evidence when it was readily available and vital to Mr. Fields' defense.

68. Mr. Fields was prejudiced by trial counsel's failure to call the medical professionals who treated him to rebut the Government's allegations that he was malingering. In closing, the Government argued these allegations at length. This argument not only undermined the defense's claim that Mr. Fields suffered from impaired capacity at the time he shot the Chicks, but it also suggested that he was fabricating an excuse for his behavior, and thus was a powerful indication of

38

consciousness of guilt. *TR*, 3451 ("The voices like the robbery and burglary were a convenient afterthought."). There is a reasonable likelihood that, had trial counsel called these witnesses to rebut allegations of malingering, the verdict would have been different.

### E.    Trial Counsel Were Ineffective for Eliciting Damaging Testimony During the Cross-Examination of Dr. Price.

69.    The defense team's dysfunction and ineffective handling of the neuropsychological evidence was reflected in trial counsel's cross-examination of Dr. Price. Although trial counsel previously sought to limit the testimony of Dr. Price to exclude discussion of organic brain damage, trial counsel elicited the very conclusions they argued were outside the scope of Dr. Price's rebuttal testimony. Furthermore, these conclusions were elicited without meaningful challenge by the defense team, even though the defense team possessed significant information to impeach the testimony of Dr. Price. See App. 35; App. 36.

### 1. The Direct and Cross-Examination Testimony of Dr. Price.

70.    As set forth above, trial counsel ineffectively failed to present evidence of Mr. Fields' organic brain damage during the course of trial. This error was compounded by trial counsel's elicitation from rebuttal witness Dr. Price of testimony that Mr. Fields had no significant brain impairment. Counsel's combined failures left

Mr. Fields with the worst of both worlds.

71. Trial counsel initially sought to limit the scope of Dr. Price's direct testimony regarding organic brain damage:

> MS. O'CONNELL: What I was getting ready to tell the Court is that that brings to mind for me the fact that a great deal of what Dr. Price did was testing in relation to brain injury. And during the course of our case we presented no information, no evidence, no testimony of brain injury.
>
> THE COURT: Meaning that would not be proper rebuttal?
>
> MS. O'CONNELL: Yes.

*TR*, 3080. The Court declined to rule in a vacuum and stated that it would address the matter through any specific objections raised during the course of testimony. *TR*, 3083-84.

72. Despite bringing the issue to the attention of the Court, trial counsel failed to object when the Government brought out harmful, but limited, testimony from Dr. Price regarding brain damage. See, e.g., *TR*, 3106 (observing that Mr. Fields' "cognitive processes ... were intact"); *TR*, 3116 (recounting health history of Mr. Fields, including respiratory distress syndrome at birth, and concussion at age 16). Notably, trial counsel did not object when Dr. Price suggested that his evaluation did not detect any organic brain damage. *TR*, 3154 ("But I thought there was probably going to be some brain dysfunction, something there to have people

evaluating him for this.").

73.    Although the bulk of Dr. Price's neuropsychological opinions were not presented in his direct examination, counsel elicited them on cross-examination. She inexplicably elicited from Dr. Price the opinion that he hinted at in his direct testimony, and the opinion trial counsel initially sought to exclude:

Q:    Yesterday you said that you didn't see at least much impairment in Mr. Fields, is that right, when you testified at the jail? When you saw him at the jail you did not see much impairment?

A:    I did not see much neuropsychological impairment, not significant neuropsychological impairment, that's correct.

Q:    Not much neuropsychological impairment?

A:    Right.

Q:    The kind of impairment that comes from damage to the cells in the brain?

A:    Primarily, yes.

*TR*, 3204-5.[13] After eliciting this testimony, trial counsel moved on to another subject and did not return to the issue of organic brain damage, leaving Dr. Price's opinion as the final – and as it is now known, inaccurate – word on the issue of organic brain

---

[13] Trial counsel could not have been surprised by this testimony, as Dr. Price's report states, "Performance on neuropsychological testing is inconsistent with either an acute or chronic neurological condition including a brain injury and/or a frontal lobe disorder." Price Report at 27; see also O'Connell Dec., ¶ 16.

damage.

## 2. Trial Counsel's Ineffective Assistance.

74. Trial counsel were ineffective for eliciting harmful testimony from Dr. Price that Mr. Fields did not suffer from any organic brain damage and for failing to use readily available information to impeach his testimony.

75. Trial counsel could have presented Dr. Gelbort in anticipation of or in rebuttal of Dr. Price's testimony. Trial counsel were aware of the mitigating significance of the evidence of Mr. Fields' organic brain damage. O'Connell Dec., ¶ 17. Trial counsel also were aware that Dr. Price's opinion regarding organic brain damage was vulnerable to impeachment:

> About one month before jury selection commenced I received the reports of the Government's experts, Dr. Randall Price and Dr. Jeff Mitchell. I saw that Dr. Price opined that Mr. Fields did not have significant brain impairments, although Mr. Fields scored in the impaired range on a number of the tests he administered. I provided this report to Dr. Gelbort, who told me that Dr. Price's data was consistent with his own — that Mr. Fields was brain damaged and neurologically impaired. Dr. Gelbort again confirmed that he was available to testify.

O'Connell Dec., ¶ 16. In fact, trial counsel cross-examined Dr. Price regarding the testing areas where Mr. Fields demonstrated impairment. See TR, 3195-96 (e.g., testimony that Mr. Fields performed at 7th percentile on Trail Making Test and Verbal Fluency, 17th percentile on Stroop Test); see also Apps. 34-36.

42

76. Despite this, trial counsel failed to demonstrate to the jury that Dr. Price minimized Mr. Fields' actual neurobehavioral impairments and over-reported Mr. Fields' actual level of functioning. See Martell Report, pp. 12-13. While trial counsel questioned Dr. Price regarding individual tests on which Mr. Fields scored poorly, they failed to demonstrate to the jury the combined significance of those results. Trial counsel failed to pull together the isolated testing results to show that "there was a pattern of impairments suggestive of brain damage." Martell Report at 12-13. This could have been accomplished through cross-examination or by presenting the testimony of Dr. Gelbort, who concluded that Mr. Fields "displays a pattern often found in individuals with frontal lobe or non-dominant hemisphere neurocognitive dysfunction and brain damage with further evaluated warranted." Gelbort Report at 4; see Apps. 34-36.

77. Furthermore, trial counsel failed to attack Dr. Price's overestimation of Mr. Fields' level of functioning by questioning him about the practice effect in neuropsychological testing. Martell Report at 13. The practice effect occurs when individuals are administered the same testing instruments in a relatively short period of time and, as a result, show artificially inflated scores on the second administration due to the effects of prior experience with the test and practice with the test stimuli. Id.; see also id. at n.3 (listing neuropsychological texts describing the practice effect).

43

Dr. Price's opinion was vulnerable to impeachment on this front, as he repeated

many of the tests that Dr. Gelbort administered ten months earlier. Id.; see Apps.

35-36.

78. Trial counsel failed to object to Dr. Price's testimony regarding the

effects on Mr. Fields of the administration of Effexor. *TR*, 3129-30.[14] As Dr. Martell

points out, Dr. Price is a psychologist and is not expert in the effects of such

medications. Indeed, Dr. Price acknowledged as much when he refused to answer a

question on cross-examination about the effects of the medication, because of his lack

---

[14] On direct examination, Dr. Price gave the following testimony:

Q:   By the way, Doctor, do you know what happens if you
     were–let's say you were prescribed 150 milligrams of
     Effexor and instead of taking one, you took four. You
     took 600 milligrams. What would happen?

A:   Well, I think you would– that you would feel bad. That
     you would get– I mean, that you might get sick. It might
     cause you to be sick to your stomach.

Q:   Would it screw up behavior?

A:   **No.** I know on Effexor that if you stopped taking it
     abruptly that you could get dizzy. But taking extra. **I
     don't think immediately, antidepressants don't have
     an effect on behavior immediately.**

*TR*, 3129.

of expertise in this area. *TR*, 3206.[15] Counsel ineffectively let the prosecution have it both ways. Dr. Price gave a harmful opinion on direct that Effexor could not "have an effect on behavior." This improper opinion was not objected to, even though Dr. Price later admitted that he was not expert in this area.

79. Trial counsel had no strategic reason for eliciting harmful testimony from Dr. Price and failing to meaningfully challenge his flawed opinion that Mr. Fields did not suffer from organic brain damage. Trial counsel originally sought to limit the scope of Dr. Price's testing of Mr. Fields. See generally Defendant's Response to Government's March 24th, 2005, Motion Regarding Mental Health Evidence (filed March 31, 2005). Furthermore, just before Dr. Price's direct testimony was presented, trial counsel sought to **prevent** Dr. Price from testifying about organic brain damage, on the basis that it was improper rebuttal because it was outside the scope of the mitigation evidence presented by the defense team. *TR*,

---

[15]On cross-examination, he admitted he was not an expert:

Q: How familiar are you with those medications?

A: I'd say I have a nodding familiarity. I'm not – I don't prescribe. I'm not an M.D. It's not my – I wouldn't say by any stretch of the imagination I'm an expert in those medications.

*TR*, 3206.

3080. There can be no strategic reason for undercutting these efforts by bringing to the jury's attention – without meaningful response – the very evidence trial counsel sought to exclude.

80. Mr. Fields was prejudiced by trial counsel's elicitation of harmful testimony that he did not suffer from organic brain damage and failure to impeach or otherwise counter the vulnerable testimony of Dr. Price. Instead of hearing the wealth of evidence of Mr. Fields' organic brain damage, or at a minimum, hearing nothing at all regarding Mr. Fields' brain functioning, the jury heard only that Mr. Fields tested poorly in isolated areas but on the whole did not have any significant neuropsychological impairment. Had trial counsel not elicited Dr. Price's harmful testimony, or if trial counsel properly attacked his opinion with readily available evidence of its flaws, there is a reasonable likelihood that the verdict would have been different. See Apps. 34-36.

### F. Trial Counsel Were Ineffective for Failing to Investigate and Present Evidence of Compulsive Aggression in Effexor Patients.

81. Mr. Fields' core defense was that his capacity to conform his actions to the requirements of the law and to appreciate the wrongfulness of his actions was significantly impaired after he experienced a manic flip as a result of taking an increased dosage of the antidepressant Effexor, while suffering from then-

undiagnosed bipolar disorder. The Government countered that his behavior before and after the offense indicated volition, contradicting the defense's claim of mania. However, trial counsel never investigated the fact that Effexor could have triggered another adverse effect: compulsive aggression. This evidence would have further and better explained to the jury how Mr. Fields' violent behavior could have been induced by medication, even though his actions appeared on the surface to be volitional.

    **1.    Mr. Fields' Effexor Defense and Uninvestigated Evidence of Effexor-Related Compulsive Aggression.**

82.    Trial counsel called Dr. Grinage and Dr. Woods to testify that Mr. Fields committed the offense while experiencing a manic flip caused by the ill-advised administration of the antidepressant Effexor. Dr. Grinage testified that a manic flip caused by Effexor would sometimes put a person into a "really high, flighty, euphoric state, but many times I have seen with patients very irritable and unable to concentrate." *TR*, 2812. Dr. Woods, too, testified that Effexor could have caused a manic flip and that mania leads to "impaired judgment." *TR*, 2990. In closing, trial counsel argued that Mr. Fields was impaired because his Effexor "built up like it's supposed to" and "was like a wave and he got to the tipping point." *TR*, 3438.

83.    The Government challenged the defense's theory by arguing that the circumstances surrounding the offense demonstrated that Mr. Fields' judgment and

47

concentration were not impaired. According to the Government, he took deliberate steps to plan and carry out the homicides by donning the ghillie suit, waiting in the woods for his opportunity, taking a precise shot and concealing his homicidal objective by staging a robbery many hours later. *TR*, 3413-22. As the prosecutor told the jury, "The Defendant had no delusions. It's impossible, virtually impossible, for Effexor to trigger a single manic episode. The facts here clearly compel the conclusion the Defendant was entirely responsible and not impaired by his volitionally, his purposefully, acquired sadness." Id. at 3451-52.

84. The jury apparently was persuaded by the Government's argument, rejecting the impaired capacity mitigating factor. *TR*, 3480-81. Because impaired capacity was the only mental health mitigator argued by trial counsel, the jury found no mental health mitigation.

85. Had trial counsel conducted a reasonable investigation into the heart of their defense – how Effexor affected Mr. Fields' behavior – they would have learned that patients treated with this drug experience increased rates of compulsive aggression. Compulsive aggression, unlike impaired judgment or concentration, would have been consistent with the Government's view that Mr. Fields was able to deliberate before and after the offense. Mr. Fields could have been compelled by an irrational need to commit a violent act that impaired his capacity to conform his

48

conduct to the requirements of the law, while still being able to take the steps necessary to carry out that violent act, such as donning the ghillie suit and waiting in the woods to shoot the Chicks. Such an Effexor-induced compulsion could thus have been mitigating under the (a)(1) significant impairment factor, as a severe mental or emotional disturbance or as catch-all mitigation (18 U.S.C. § 3592 (a)(6) & (8)).

86. Evidence of an association between increased rates of compulsive aggression among Effexor users was readily available to trial counsel. In a peer-reviewed article published in 2003, Dr. Peter Breggin described various case reports, epidemiological studies and clinical trials showing an increased rate in obsessive aggression and violence in patients who were being treated with selective serotonin reuptake inhibitors ("SSRIs"). Peter Breggin, *Suicidality, Violence and Mania Caused by Selective Serotonin Reuptake Inhibitors (SSRIs): A Review and Analysis*, 16 International Journal of Risk & Safety in Medicine (2003/2004) ("Breggin Article"), *A* − 14. Effexor, or venlafaxine, is a non-selective serotonin reuptake inhibitor that is in the category of SSRIs. Id. at 32. Obsessive aggression observed in SSRI patients includes a "relatively sudden onset and rapid escalation of the compulsive aggression against self and/or others," an "extremely violent and/or bizarre quality to the thoughts and actions," and an "obsessive, compelling, unrelenting quality to the thoughts and actions." Id. at 36.

87.    After Dr. Breggin's article was published, the United States Food and Drug Administration ("FDA") issued a related public health advisory. On March 22, 2004 – over a year **before** Mr. Fields' sentencing hearing – the FDA asked the manufacturers of ten anti-depressant drugs, including venlafaxine (Effexor), to alter their labeling to include a warning statement recommending "close observation" of patients being treated with these drugs for increased depression or suicidality and noting that "[a]nxiety, agitation, panic attacks, insomnia, irritability, **hostility**, impulsivity, akathisia, hypomania, and mania have been reported in adult and pediatric patients being treated with antidepressants for major depressive disorder as well as other indications, both psychiatric and nonpsychiatric." FDA Public Health Advisory dated Mar. 22, 2004 ("PHA"), *A* – 15. The FDA also recommended that "therapy should be evaluated, and medications may need to be discontinued, when symptoms are severe, abrupt in onset, or were not part of the patient's presenting symptoms." Id.

88.    The PHA was widely reported in the general media. See, e.g., Elizabeth Kaledin, *People Taking Antidepressants Need to be Monitored for Turbulent Emotions, Including Possible Risk of Suicide, CBS Evening News Transcript*, March 22, 2004, *A* – 16; Gardner Harris, *Labels on Antidepressants Sought to Warn of Suicide Risk*, N.Y. Times, March 22, 2004, *A* – 17; *Antidepressants May Have*

*Opposite Effect, FDA Warns*, USA Today, March 22, 2004, *A* – 18.

89.     Wyeth Pharmaceuticals, Inc., the manufacturer of Effexor, responded to the PHA by changing the drug's Medication Guide to include the warnings requested by the FDA.  Wyeth advised patients, their families and caregivers to be alert to "hostility" and "aggressiveness," among other behaviors, "especially during early antidepressant treatment and **when the dose is adjusted up or down**."  Effexor Medication Guide (2004), *A* – 19, at 12.  The Medication Guide also advised that these changes "**may be abrupt**." Id.

90.     Trial counsel failed to investigate and present this evidence even though it would have been highly mitigating and was consistent with the facts of his case. Mr. Fields' behavior around the time of the offense closely matched the kinds of obsessive aggression observed in SSRI patients, including a "relatively sudden onset and rapid escalation of the compulsive aggression against self and/or others," an "extremely violent and/or bizarre quality to the thoughts and actions," and an "obsessive, compelling, unrelenting quality to the thoughts and actions."  Breggin Article at 36.  In addition, on July 7, 2005 – three days before the homicides – his Effexor dosage was increased from 75 mg to 150 mg. *TR*, 2809-10; *TR*, 3127.  There

51

was evidence that Mr. Fields filled this prescription the day before the homicides.[16]

This evidence is consistent with Wyeth's warning that adverse effects were more likely to occur after an upward adjustment to the Effexor dosage. Effexor Medication Guide (2004) at 12.

### 2. Trial Counsel's Ineffective Assistance.

91. Trial counsel were ineffective for failing to present evidence that patients treated with SSRI-type medications, such as Effexor, can experience increased rates of compulsive aggressiveness.

92. The defense's theory that Mr. Fields experienced a manic flip which impaired his capacity to conform his actions to the requirements of the law or to appreciate the wrongfulness of his actions was vulnerable to the Government's argument that his actions before and after the homicides appeared to be deliberate. Evidence that Effexor caused or added to Mr. Fields' sudden compulsive aggressiveness would have been highly mitigating and entirely consistent with the facts of this case. There was no reasonable basis for failing to investigate and present this evidence.

93. Mr. Fields was prejudiced by trial counsel's deficient performance.

---

[16]The Government withheld exculpatory and material evidence regarding the amount of Effexor that Mr. Fields consumed. This is discussed in Ground Seven, below.

Compulsive aggression would have explained the factual circumstances of this case and supported the statutory impaired capacity mitigator. Had the jury known that patients treated with Effexor experience increased rates of compulsive aggression, there is a reasonable likelihood that the verdict would have been different.

**G. Counsel Ineffectively Failed to Thoroughly and Properly Prepare the Two Mental Health Experts Who Testified.**

94. Because trial counsel poorly prepared Dr. Grinage and Dr. Woods for their testimony, the Government was able to damage their credibility on cross-examination. Each expert believes that they were not properly and adequately prepared. Grinage Dec., ¶¶ 5-12, Woods Dec., ¶¶ 4, 8; Glori Shettles agrees (Shettles Dec., ¶ 14) and Ms. O'Connell acknowledges this as well. O'Connell Dec., ¶¶ 11-12.

95. Aside from a general sense that the testimony was ill-prepared and presented, some specific examples demonstrate the problems each expert encountered. For instance, trial counsel failed to provide Dr. Grinage with a copy of the transcript of Mr. Fields' change of plea hearing, O'Connell Dec., ¶ 11; Grinage Dec., ¶¶ 6-7, causing him on cross-examination to contradict some of the answers he gave on direct examination. *TR*, 2816-18; <u>see also</u> O'Connell Dec., ¶ 11; Grinage Dec, ¶ 7. Trial counsel also failed to educate Dr. Woods that the statutory impaired capacity mitigator required only that Mr. Fields' ability to appreciate the

wrongfulness of his conduct or to conform to the requirements of the law be "significantly impaired." O'Connell Dec., ¶ 12; see also 18 U.S.C. § 3592(a)(1). As a result, Dr. Woods testified incorrectly that Mr. Fields was "unable" to conform his behavior to the requirements of the law, *TR*, 2999, exposing him to impeachment by the Government on cross-examination. *TR*, 3048; see also O'Connell Dec., ¶ 12.

## GROUND TWO

### THE EIGHTH AMENDMENT AND INTERNATIONAL LAW PRECLUDE MR. FIELDS' EXECUTION BECAUSE OF HIS DETERIORATING MENTAL HEALTH. ADDITIONALLY, HE IS NOT COMPETENT FOR EXECUTION.

96. As set forth in connection with Ground One, above, Dr. Daniel Martell has identified a progressive neurological process causing Mr. Fields to experience a "catastrophic" decline in function. Although the cause of the process is not yet clear, and the precise rate of decline has yet to be determined, Mr. Fields' mental health will not permit his execution.

97. First, the evolving standards of decency – by which cruel and unusual punishments are adjudged under the Eighth Amendment – no longer permit the execution of profoundly mentally ill people. The evolution of these standards is seen in the prohibition of the execution of people with mental retardation, people who were under eighteen at the time of their offense, and those who are not mentally competent to be executed. Although there is no current holding of the United States

54

Supreme Court precluding the execution of those with profound mental illness, counsel submits that this date is not far off. Given the apparent pace of Mr. Fields' mental decline, it is likely that, by the time his execution, his mental health status would preclude his execution.

98. Second, the Supreme Court has ruled that the Eighth Amendment precludes the execution of people who are not competent for execution. Such people are not aware of the reason for their execution or that they are to be executed. Again, by the time of Mr. Fields' execution, it is likely that he will be incompetent for execution.

99. Mr. Fields' execution would violate principles of international law that this Court is constitutionally bound to enforce. The exemption of the severely mentally ill and brain damaged from capital punishment is a long-recognized and entrenched norm of international humanitarian law, which applies to the Court through treaty and convention.

100. Although neither of these Eighth Amendment bases for precluding Mr. Fields' execution are now ripe for adjudication, he raises them in this *Motion* to ensure that they are not waived.

## GROUND THREE

**TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE, PRESENT AND ARGUE EVIDENCE THAT WOULD HAVE REBUTTED THE SUBSTANTIAL PLANNING AND MENTAL ANGUISH AGGRAVATING FACTORS, AND THE GOVERNMENT PRESENTED FALSE AND MISLEADING TESTIMONY AND ARGUMENT ABOUT THE SUBSTANTIAL PLANNING AGGRAVATING FACTOR IN VIOLATION OF DUE PROCESS.**

101. The jury found, among others, the statutory aggravating factor against Mr. Fields that he shot Mr. and Mrs. Chick after substantial planning and premeditation, and it found the non-statutory aggravating factor, among others, that he inflicted mental anguish on Mrs. Chick. See United States v. Fields, 516 F.3d 923, 927 (10th Cir. 2009).[17]

102. The Government presented false and at best misleading testimony and

---

[17]The statutory aggravating factor of substantial planning and premeditation is found at 18 U.S.C. § 3592(c)(9) and states:

(c)  Aggravating factors for homicide -- In determining whether a sentence of death is justified for an offense described in section 3591(a)(2), the jury, or if there is no jury, the court, shall consider each of the following aggravating factors for which notice has been given and determine which, if any, exist:

(9)  Substantial planning and premeditation -- The defendant committed the offense after substantial planning and premeditation to cause the death of a person or commit an act of terrorism.

Non-statutory aggravating factors are permitted under 18 U.S.C. § 3953(a).

argument to support the substantial planning aggravating factor. First, the Government presented the false and misleading testimony of a law enforcement official to establish that Mr. Fields purportedly staged a robbery many hours after shooting the Chicks and endorsed that false and misleading testimony in its closing argument. Second, the Government selectively and misleadingly elicited facts from a witness to bolster its claim in closing argument that Mr. Fields attempted to set up a false alibi for his whereabouts on the evening of the homicides. The Government also twisted Mr. Fields' long-time interest in hunting squirrels into a methodical plan to kill human beings, and made it appear that he tried to concoct an alibi for his whereabouts on the night of the offense. It presented flawed expert opinions that ignored basic facts about the crime scene to support its theory that Mr. Fields returned to the scene hours later to stage a robbery.

103. Yet at every step, trial counsel failed to attack the aggravating factors in any meaningful way. Before the sentencing hearing, trial counsel failed to consult with experts who could have helped them expose the vulnerabilities of the Government's experts on cross-examination. During cross-examination, trial counsel failed to correct distorted testimony elicited by the Government. During the defense's case-in-chief, trial counsel neglected to call their own experts to rebut the flawed testimony of the Government's experts. At closing, trial counsel never argued why

the Government had failed to prove the aggravating factors beyond a reasonable doubt.

104.    Thus, through knowing presentation of false and/or misleading evidence and counsel's ineffectiveness for failing to put this aspect of the Government's case through adversarial testing, the jury was permitted to find two aggravating factors it either should not have found, or, if found, should not have weighted as heavily as it did.

105.    Had trial counsel conducted a reasonable investigation – by adequately interviewing friendly Government (i.e., civilian) witnesses and consulting with a crime scene investigator or pathologist – they could have discovered and presented evidence rebutting the Government's claim that Mr. Fields shot the Chicks after substantial planning and inflicted mental anguish on Mrs. Chick. Had the defense done so, it is likely that the jury would have rejected these aggravating factors. Had these aggravating factors been rejected, in whole or part, there is a reasonable probability that the jury's weighing of the remaining aggravating and mitigating circumstances would have been different, and Mr. Fields' life would have been spared. Counsel's ineffective failure to properly challenge these circumstances allowed the jury to consider facts that they would not otherwise have had before it. Thus, counsel's failure caused Mr. Fields significant prejudice.

**A.  Evidence Rebutting the Substantial Planning Aggravating Factor.**

106.  To prove the substantial planning aggravating factor, the Government introduced evidence purporting to show that Mr. Fields had been laying the groundwork to shoot a human being for a year or more before the offense, and that he devised a specific plan to shoot the Chicks after setting up an alibi for his whereabouts.  The Government also introduced evidence purporting to show that, at least six hours after shooting the Chicks, Mr. Fields returned to the campsite and staged a robbery to make it appear that his objective had been to steal, not to kill.  All of this evidence could have been rebutted by proper defense investigation.

**1.  Evidence that Mr. Fields Did Not Shoot the Chicks After Substantial Planning.**

107.  The Government alleged that, a year or more prior to the homicides, Mr. Fields conceived a plan to become a sniper and shoot human beings.  The prosecutor argued in closing:

> Didn't start on July 10th, 2003, started long before that.  It started about a year before that when, as you heard the testimony, the Defendant was with Penney to help to create a Ghilley suit, a black Ghilley suit – a black shirt and a Ghilley suit, I believe the testimony was, and they made that Ghilley suit and it continued.
>
> \*   \*   \*
>
> His plan down the road is to become a predator, a sniper.  This was the first step in that action.

TR, 3406-07.

108. According to the Government, Mr. Fields finally decided to put his plan "to become a predator, a sniper" into action on the evening of July 10, 2003 after meeting the Chicks at the Winding Stair Campground a few days earlier. As evidence of this plan, the Government argued that Mr. Fields attempted to create an "alibi" for the evening of July 10, 2003 – when he purportedly intended to shoot the Chicks – by telling his former girlfriend that he planned to go fishing with a friend that night and would be home late. TR, 3412-13.

109. If trial counsel had conducted a reasonable investigation by adequately interviewing a friendly Government witnesses – Daniel Presley – they would have discovered evidence refuting the Government's allegations. Mr. Presley could have explained to the jury that certain remarks and actions by Mr. Fields that the Government made seem ominous were in fact innocuous.

110. Had he been asked by trial counsel on cross-examination, Mr. Presley could have given testimony contradicting the Government's argument that, because Mr. Fields used a ghillie suit and scoped rifle, he must have been planning a sniper attack. Under questioning by the Government, Mr. Presley told the jury that Mr. Fields went squirrel–hunting in his ghillie suit, that he attached a powerful scope to his .22 rifle, and that he was a "[g]reat shot." *TR*, 2378-79. He also told the jury that

Mr. Fields had ghillied his rifle. Id. at 2384-85. However, he has now explained that it was common for hunters in the area to use ghillie suits and to ghillie their weapons – questions he was never asked by trial defense counsel:

> Though ghillie suits are most often used for turkey hunting, the fact that Ed made his own ghillie suit and used it for squirrel hunting did not at all strike me as unusual. You can go to any hunting supply store in Eastern Oklahoma and buy a ghillie suit. It is a common tool of hunters and lots of guys around here use them. Rather than spending a hundred dollars or so on a ghillie suit, Ed is the kind of person who is good with his hands and likes to make things for himself.
>
> * * *
>
> Lots of hunters who use ghillie suits also ghillie their guns as well. Ghillieing the gun just completes the whole outfit. Had I thought there was something out of the ordinary about him ghillieing the gun I certainly would have asked him why he did that, but of course I didn't because it wasn't unusual.

Declaration of Daniel Presley ("Presley Dec."), *A* – 20, ¶¶ 4, 5.

111. Mr. Presley also would have explained, if asked, that it was not unusual for hunters who ate what they shot (such as Mr. Fields) to attach large scopes to their .22 rifles. He states, "You an either hunt small game with a shot gun or a .22. Using a shot gun, its easier to hit the target, though you have to be closer to it, but it often ruins the meat because it leaves too much shot in it. Using a .22 with a scope allows you to make a longer shot and it doesn't ruin the meat with a bunch of bee-bee's." Presley Dec., ¶ 5. Moreover, Mr. Presley would have testified that Mr. Fields

61

attached the scope to his rifle at least a year before the homicides.  Id.

112.  Mr. Presley also could have rebutted the Government's claim that Mr. Fields tried to set up an alibi for the night of the homicides, if only trial counsel had inquired into the matter.  The Government first called Mr. Presley to testify that on the evening of July 10, 2003 he had plans "to go to the casino in Pocola, Oklahoma with my sister who was in town." *TR*, 2382.  The Government then called Dawn Michelle (Tipton) Bond, Mr. Fields' former girlfriend, to testified that Mr. Fields called her on the morning of July 10, 2005 and told her he had plans with his Mr. Presley for that evening.  Ms. Tipton testified:

> Those plans – those plans were for him and Danny [Presley] to go fishing and him not – he made it very clear to me he would not be home right after work. He was a very timed person and he got home at exactly the same time every night and he knew – at this time I was not working, so, he knew that I would worry. So, he wanted me to know that him and Danny would be out fishing and that he wouldn't be right home.

*TR*, 2558-59.

113.  From these facts, the Government argued that Mr. Fields did not really have a plan to go fishing with Mr. Presley and instead was attempting to create an "alibi" for his whereabouts. *TR*, 3412-13.

114.  However, Mr. Presley would have testified on cross-examination that Mr. Fields came over to his house after work that day and **asked him to go snake-**

**hunting that night.** Presley Dec., ¶ 3. Mr. Presley declined to go hunting because

he had plans to go to the casino with sister, id., but the fact that Mr. Fields suggested

that the two of them go snake-hunting that evening shows that, as he indicated to Ms.

Tipton, he **did** hope to do something with Mr. Presley that evening. As Mr. Presley

observes:

> When Ed and I would go snake hunting, it would always be at night. We'd use headlights to see the snakes. We wouldn't get back from snake hunting till ten or eleven p.m. – or even later. Snake hunting is one of the activities we would do all the time. Now that I have seen the prosecutor's closing argument, where he said that Ed had planned to kill those people, I wonder how he could have planned it, when he asked me to go snake hunting?

Id.

115. Although trial counsel did not question Mr. Presley about this

information on cross-examination, they had been alerted to its existence. In Mr.

Presley's statement to the FBI, he mentioned that, just hours before the offense,[18]

Mr. Fields asked him if he "wanted to do something." FD-302 Interview of Daniel

Presley dated August 7, 2003 ("Presley Interview") *A* – 21, at 3. Mr. Presley's

statement was produced to the defense in discovery. Yet trial counsel never followed

---

[18]Mr. Presley told the FBI that Mr. Fields came over to his house sometime after 4:00 p.m. Presley Interview at 3. In his testimony at the sentencing hearing he said he "thought it was around 4:00" that he last saw Mr. Fields that day, but he had "heard since that it was later than that." *TR*, 2382. His wife Marilyn testified that Mr. Fields stopped by "around 6:30, quarter to seven, I believe." *TR*, 2462.

up with Mr. Presley – either through investigation or cross-examination – to find what it was that Mr. Fields "wanted to do." Had trial counsel followed up on this remark during their investigation, they would have learned that Mr. Fields wanted to go snake hunting the night of the offense, not shoot the Chicks, and could have presented that information to the jury to contradict and challenge the substantial planning and premeditation aggravating factor.

116. Trial counsel never asked Mr. Presley these matters. <u>See</u> Presley Dec., ¶ 3.

### 2. Evidence that Mr. Fields Did Not Stage a Robbery Many Hours After the Shootings.

117. As further proof that Mr. Fields had a premeditated plan to shoot the Chicks, the Government argued that, after Mr. Fields shot the Chicks, he left the campground and returned several hours later to stage a robbery. This claim was critical to the Government's case that the shootings were the result of substantial planning because it purportedly showed that Mr. Fields' true objective had been to kill, not steal. The Government argued:

> To [Agent Dalley] this was not a true burglary or robbery. This was staged.
>
> So you have to ask yourself why would he do this. Why would he come back some hours later to commit this crime. Don't know. But one thing I throw out to you is this. The evidence suggests that he knew he may

have been caught by those people coming in. These people may have recognized his truck and when he had completed his plan, when he had killed the Chicks, when he had finally murdered his prey, when he had graduated from squirrels to humans, he left the area.

\* \* \*

So I submit to you he goes back with the idea that, well, I'll just make it look like a burglary and a robbery and if anyone says anything I can say, well, I was – they were – I was there using the bathroom. They were already dead.

*TR*, 3421, 3422; see also *TR*, 2019 (Government explains relevance of staged robbery theory to statutory aggravating factor).

118. To support this "staged robbery" theory, the Government relied on the testimony of Agent Iris Dalley, an Oklahoma State Bureau of Investigation ("OSBI") crime scene agent, and Dr. Ronald DiStephano, a medical examiner for the state of Oklahoma. Agent Dalley testified that the driver's side window of the Chicks' van had been broken and that several glass fragments from this window rested upon a pool of dried blood in the well of the front passenger door. *TR*, 2099. According to Agent Dalley, these glass fragments had no blood on them, and therefore must have landed on the blood in the well after it had dried:

A:  In addition to the blood that is in the runners of the foot well and on top of the sandals, I also note that there are these small, shiny fragments here which are pieces of broken glass.

Q:  And did you find those pieces of broken glass significant?

A:  Yes, sir.

Q:  And how did you find them significant?

A:  In two ways.  One, they were consistent with being from the driver's window, which I found had been broken, such that there was an impact to the window from the driver's side towards the passenger's side.
The other thing that I noted was there are some of these fragments on top of the blood, and those glass fragments are not stained, indicating the blood was dry at the time that those glass fragments came to be on top of that blood.

*TR*, 2098-99.

119.  In addition, Agent Dalley and Dr. DeStephano both testified that lividity patterns on Mr. Chick's body indicated that his body was moved from the picnic table to the ground at least six hours after he was shot. *TR*, 2026-32, 2111-15.

120.  If trial counsel had conducted a reasonable investigation of the facts surrounding the purportedly staged robbery – including consultation with an independent crime scene investigator – they would have learned that the evidence supporting the Government's "staged robbery" theory could have been soundly impeached.

121. Agent Dalley's testimony that no blood stained the glass fragments found resting on a dried pool of Mrs. Chick's blood was contradicted by both Agent Dalley's own investigative report and photographs taken at the crime scene. Referring to a photograph marked Government's Exhibit 43, Agent Dalley testified "there are some of these fragments on top of the blood, and those glass fragments are not stained, indicating the blood was dry at the time that those glass fragments came to be on top of that blood." *TR*, 2099. Agent Dalley did not explain on direct examination how she arrived at this conclusion, nor did trial counsel ask this question on cross-examination.

122. In the report Agent Dalley prepared almost two weeks after the homicides, however, she recorded no observations about these glass fragments and failed to mention whether she examined the fragments at the scene or collected them for later examination.[19] Trial counsel never cross-examined her about the fact that

---

[19] Agent Dalley reported about these objects as follows:

DALLEY opened the front passenger door. Three sandals were inside the front passenger doorstep, between the front passenger seat and the front passenger door. Bloodstains were on those sandals and in the runners of the doorstep. Blood spatter was on the front passenger doorpost, below the dash, and on the hinge and frame of the opened passenger door. A tissue-like fragment was on the vertical portion of the doorstep. *Fragments of broken glass were on top of the sandals and blood in the doorstep.* DALLEY collected the three sandals and the tissue-like fragment.

67

her report is utterly silent as to whether the glass fragments had any blood on them. If these fragments were such important pieces of evidence, as the Government argued, Agent Dalley's failure to note their significance in a report written two weeks after the crime raises serious questions about whether she did in fact examine them to determine whether they were free of blood – particularly since she neglected to collect and preserve the fragments as evidence. Her testimony could have been severely impeached on this fact alone.

123. Moreover, while Government's Exhibit 43 does not show any blood visible on the glass fragments, another crime scene photograph taken by Agent Dalley – a close-up of the area depicted in Government's Exhibit 43 – reveals that at least one glass fragment resting on the dried pool of Mrs. Chick's blood has a red stripe consistent with blood. Declaration of R. Robert Tressel ("Tressel Dec."), *A* – 23, ¶ 8. This fact contradicts Agent Dalley's testimony that none of the glass fragments had any blood staining and demonstrates that this particular fragment landed on Mrs. Chick's blood while the blood was still viscous. Id., ¶ 9. If even one glass fragment landed on Mrs. Chick's blood while it was still viscous, the driver's side window must have been broken before the blood had time to dry. Thus, the Government's theory is deeply flawed and was eminently impeachable.

---

OSBI Crime Scene Investigation Report dated August 1, 2003, *A* – 22, at 3.

124. Even if other glass fragments had no blood on them, trial counsel could have offered a reasonable explanation for this fact during Agent Dalley's cross-examination. Agent Dalley testified that the front passenger door was closed when she arrived on the scene and that she had to open it in order to view the interior of the van. TR, 2098. It is likely that Agent Dalley disturbed a number of glass fragments when she opened the door, causing them to fall onto the dried blood at that time. This explanation is corroborated by the fact that Government's Exhibit 43 shows an object consistent with a glass fragment resting on top of the dried blood on the pavement just below the front passenger door. Tressel Dec., ¶ 12. Since, as Agent Dalley testified, the front passenger door was closed when the driver's window was broken, this glass fragment could only have landed on the pavement after Agent Dalley opened the front passenger door, demonstrating that at least some glass fragments were disturbed when she did so. Id.

125. Trial counsel also could have attacked the Government's claim that Mr. Chick's body must have been moved from the picnic table to the ground six hours or more after he was shot. Government's Exhibit 51 is a photograph depicting Mr. Chick's right hand. It shows pine needles and other ground debris attached to a thin layer of blood coating his fingers and the top half of his hand, but no debris attached to the blood-free portion of his hand and wrist. Mr. Chick's right hand must have

69

been exposed to this debris while he was being moved from the picnic table to the ground. Tressel Dec., ¶ 16. If Mr. Chick had been moved many hours after he was shot, the blood on his right hand would have been dry when it came into contact with the ground, and pine needles and other ground debris would not have become attached to the dried blood. Id. Thus, Mr. Chick's body likely was moved within an hour after he was shot,[20] not more than six hours later, as the Government argued. Id.

126. In addition, crime scene photographs show a considerable pool of blood around Mr. Chick's head. Blood in the body congeals after death, and that process speeds up in cooler temperatures. Tressel Dec., ¶ 17. The air temperature on the evening of July 10, 2003 was cool, as demonstrated by the fact that the Chicks were wearing sweatshirts and long pants when they were shot. Id., ¶ 9. In order for the volume of blood depicted in crime scene photographs to have flowed out of Mr. Chick's head, his body must have been moved relatively soon after he was shot, not more than six hours later as the Government argued.

127. The Government's theory that Mr. Chick's body was moved more than six hours after he was shot was based on livor patterns on the body. Lividity is a

---

[20]Agent Dalley estimated that the pool of blood found in the well of the front passenger door of the van would have taken an hour or more to dry. *TR*, 2099-2100. The blood on Mr. Chick's right hand appears to be considerable less thick than the blood found in the van, and thus would have dried in less time.

discoloration of the skin caused by the settling of blood in the capillaries due to gravity. Tressel Dec., ¶ 18. It does not occur in areas of the body that are in contact with the ground or another object. Id. Although lividity can become become "fixed," or unchangeable in less than four to six hours after death, although lividity can be fixed is less time in colder temperatures. Id. Dr. DiStephano and Agent Dalley testified that livor patterns on Mr. Chick's body were consistent with lividity having become fixed while Mr. Chick was seated at the picnic table. See, e.g., *TR*, 2031-32 (testimony of Dr. DiStephano), 2177 (testimony of Agent Dalley).

128. Trial counsel failed to cross-examine Dr. DiStephano and Agent Dalley on the fact that a number of livor patterns on Mr. Chick's body **also** were consistent with lividity having become fixed while Mr. Chick was lying where he was found. Mr. Chick was discovered face down beside the picnic table with his left arm extended across his chest, his right foot bare, and the top of his right foot pressed against the ground. Tressel Dec., ¶¶ 19-20. Mr. Chick's body shows lividity on his left side, right abdomen, top thigh and right bottom toes, which is consistent with the position in which he was found and inconsistent with being seated at the picnic table. Id. These livor patterns could not have occurred if lividity had been fixed before Mr. Chick's body was moved. Id.

129. Some livor patterns on Mr. Chick's body are inconsistent with the

position in which he was found. These patterns include areas of discoloration on the backs of Mr. Chick's thighs. Trial counsel nevertheless could have impeached the lividity testimony of Dr. DiStephano and Agent Dalley by demonstrating that at least some livor was inconsistent with the Government's theory, thereby creating reasonable doubt that Mr. Chick's body was moved long after he was shot.

### B. Evidence Rebutting the Mental Anguish Aggravating Factor.

130. In closing argument, the Government argued that Mrs. Chick was close enough to her husband when he was shot that she was "splattered" with his blood "all over her face" and that this alleged fact supported the mental anguish aggravating factor:

> [Mr. Chick's] wife Shirley sitting right in front of him face to face in the darkness sharing moments of the beautiful scenery and the vista. What happens at the time of the shot? She gets splattered with her husband's blood all over her face. That's what happens to her. And picture the scene, ladies and gentlemen. They're out in the middle of nowhere and all of a sudden a sound of a gunshot and her husband collapses and she has his blood all over his [sic] face. What was the horror, the shock, the sheer oh, my God, the terror that went through her mind at that instant?

*TR*, 3415-16.

131. As evidence to support this argument, the Government presented the testimony of Agent Dalley. Agent Dalley testified that she observed high velocity blood spatter on Mrs. Chick's face, particularly on her left check. *TR*, 2088-91. She

72

also testified that high velocity spatter can travel up to two feet and still remain visible on an object. *TR*, 2091. Finally, she testified that Mr. Chick had to be the source of the high velocity spatter on Mrs. Chick's face:

> Well, if I can explain just a bit. Since it appears to be from a gunshot wound, then I look for any other gunshot wound in the scene that would be in a position that could cause that staining on her face. And subsequent to the autopsy and getting that information, I could exclude the wounds to her head as producing these stains down on her — especially down on her cheek. I could exclude the wound to her foot. That leaves Mr. Chick having two wounds. And one of those wounds then would be consistent with the staining on her face.

*TR*, 2090. Agent Dalley never explained why she could exclude the wounds to Mrs. Chick's head as the source of the high velocity spatter observed on Mrs. Chick's face, nor was she cross-examined on this point, although trial counsel did establish that the blood spatter on Mrs. Chick's face was never tested to determine the source.[21] *TR*, 2213.

132. Had trial counsel consulted a blood spatter expert, they could have rebutted the Government's claim that Mrs. Chick was sitting just two feet from her husband and was spattered with his blood when he was shot. Mrs. Chick was shot in the left frontal region of her head, resulting in two wounds: an entrance wound and

---

[21]Agent Dalley also did not test high velocity blood spatter that she observed on Mrs. Chick's hands. *TR*, 2213. She attributed this spatter to Mrs. Chick's head wound, claiming it could be accounted for if her hands had been in a defensive position. *TR*, 2180-81.

a nearby exit wound. Tressel Dec., ¶ 26. According to Mr. Tressel, either of these wounds could have created high velocity blood spatter[22] and this spatter could have landed on Mrs. Chick's face. Id. Significantly, most of the spatter observed by Agent Dalley was on Mrs. Chick's left cheek, the same side as her frontal bullet wound. Id., ¶ 25.

### C. Trial Counsel's Ineffective Assistance.

133. Trial counsel were ineffective for failing to fully investigate the Government's claims that Mr. Fields carried out this crime with substantial planning and premeditation and inflicted mental anguish on Mrs. Chick and to adequately challenge those claims at the sentencing hearing.

134. Trial counsel were deficient for failing to adequately challenge the aggravating factors. The Government's evidence of substantial planning and mental anguish effectively went unrebutted even though trial counsel had readily available information that could have undermined that evidence or placed it in its proper context. Mr. Presley could have testified that ghillie suits and scoped rifles were commonly used for hunting and that Mr. Fields wanted to go snake hunting with him on the night of the offense. Presley Dec., ¶¶ 3-5. A crime scene investigator or other

---

[22]Indeed, Agent Dalley conceded this fact when she attributed the high velocity blood spatter on Mrs. Chick's hands to her head wound.

appropriate expert could have been called to cast reasonable doubt on the Government's claim that Mr. Fields staged a robbery hours after the shootings and inflicted mental anguish on Mrs. Chick by causing her husband's blood to be spattered on her face. Tressel Dec., ¶¶ 8, 9, 12, 16-17, 19-20, 26. At the very least, trial counsel could have consulted with such an expert to assist in cross-examining the Government's witnesses. Trial counsel concedes that she did not even consider retaining a crime scene investigator or pathologist and that "I could have presented such an expert on my case or, at a minimum, to advise me about how to prepare and conduct my cross-examination of the Government's witnesses." O'Connell Dec., ¶ 22. Trial counsel not only failed to consult with appropriate experts and attack the Government's evidence supporting the substantial planning and mental anguish aggravating factors, but in closing argument she failed to utter a single word about these aggravating factors.

135. Trial counsel admits that she had no strategic or tactical reason for not consulting or presenting a crime scene investigator or other appropriate expert to rebut the Government's claims. O'Connell Dec., ¶ 22. Nor could there could be any reasonable basis for failing to investigate and attack the Government's theory that Mr. Fields committed this crime with substantial planning and premeditation and inflicted mental anguish on Mrs. Chick. These aggravating factors were factors that made Mr.

75

Fields eligible for the death penalty, and trial counsel had every reason to rebut the aggravating factors to convince the jury that mitigating factors outweighed aggravating factors.

136. Mr. Fields was prejudiced by trial counsel's deficient performance. The Government vigorously argued that its evidence supported both the substantial planning and mental anguish aggravating factors. See, e.g., *TR*, 3406-13, 3415-16, 3420-22, 3454, 3456. That evidence went unchallenged. Trial counsel could have injected reasonable doubt into the jury's deliberations by cross-examining the Government's witnesses, presenting their own expert testimony in rebuttal, and arguing why the Government had not proven these aggravating factors beyond a reasonable doubt. There is a reasonable likelihood that, had trial counsel vigorously attacked the Government's evidence in these ways, the verdict would have been different.

**D.     The Government's Due Process Violations.**

137. The Government presented false and misleading testimony and argument to persuade the jury that Mr. Fields killed Mr. and Mrs. Chick after substantial planning and deliberation.

### 1. False and Misleading Testimony and Argument About a Purportedly Staged Robbery.

138. As discussed above, the Government argued that, after Mr. Fields shot the Chicks, he left the campground and returned more than six hours later to stage a robbery to make it appear that his objective had been to steal, not to kill. *TR*, 3421, 3422. This theory supported the Government's claim that the shootings were the result of substantial planning and deliberation, a statutory aggravating circumstance that made Mr. Field eligible for the death penalty and was weighed by the jury. See, e.g., *TR*, 2019 (explaining relevance of staged robbery theory to statutory aggravating factor).

139. The Government's "staged robbery" theory relied in significant part on Agent Dalley testimony that the driver's side window of the Chicks' van had been broken and that several glass fragments from this window rested upon a pool of dried blood in the well of the front passenger door. *TR*, 2099. According to Agent Dalley, she found these glass fragments "significant" because they had no blood on them, and therefore must have landed on the blood in the well after it had dried. Id. at 2098-99.

140. Agent Dalley's testimony was false and misleading. Her claim that she "noted was there are some of these fragments on top of the blood, and those glass fragments are not stained" is contradicted by (1) her own crime scene investigation

77

report, and (2) photographs she took at the crime scene.

141. In a report she prepared approximately two weeks after the homicides, the only observation Agent Dalley made about the glass fragments was that "[f]ragments of broken glass were on top of the sandals and blood in the doorstep." OSBI Crime Scene Investigation Report dated August 1, 2003, 3. Agent Dalley mentioned nothing more about the glass fragments, nor did she include those fragments in the list of evidence she collected at the scene. Id. at 7-9.

142. Although Agent Dalley testified that the glass fragments were "significant" because they were not stained by blood, *TR*, 2098-99, her report fails to mention any characteristic that made them significant, indicating that either she did not physically inspect the fragments at the scene or she inspected them but did not observe anything significant about them. Because the glass fragments were not collected as evidence, she could not have examined them at a later time. Thus, her testimony that the fragments were "significant" because they were not stained with blood could not have been based upon her physical examination of those fragments.

143. Nor could Agent Dalley's claim that the glass fragments were "significant" have been based on her examination of photographs. The bottom surface of these glass fragments is not visible in any photograph. More importantly, one of the photographs taken by Agent Dalley shows that at least one glass fragment

resting on the dried pool of Ms. Chick's blood *does* have a red stripe consistent with blood. See OSBI Photograph (CR03527CD40085.jpg), *A* − 24.[23] This photograph − which the Government never asked Agent Dalley about − contradicts her testimony that none of the glass fragments had any blood staining and demonstrates that this particular fragment landed on Ms. Chick's blood while the blood was still viscous. If even one glass fragment landed on Ms. Chick's blood while the blood was still viscous, the driver's side window must have been broken before the blood had time to dry.

144. The prosecutors knew or should have known that Agent Dalley's testimony was false and misleading. The Government had both Agent Dalley's crime scene report and the photographs she took at the scene, and thus the false and misleading nature of Agent Dalley's testimony should have been readily apparent to the prosecutors. Even if the prosecutors did not solicit Agent Dalley's false and misleading testimony, they had a duty to correct it.

145. Despite the fact that the prosecutors knew or should have known that Agent Dalley's testimony was false and misleading, they nevertheless argued in closing that her testimony supported the substantial planning aggravating

---

[23]The photograph included in the Appendix is not a clear copy and is included for identification purposes only.

circumstance.  *TR*, 3456 (prosecutor argues that glass fragments proved that Mr. Fields staged a robbery).

### 2. Misleading Testimony and False and Misleading Argument About Mr. Fields' Purported "Alibi."

146.  As discussed above, the Government argued that Mr. Fields attempted to construct an alibi for his whereabouts on the night of the offense.  This argument was based on the testimony of two witnesses, Mr. Presley and Ms. Tipton.  The Government first called Mr. Presley to testify that on the evening of the homicides he had a plan to go to the casino in Pocola, Oklahoma with his sister.  *TR*, 2382.  The Government then called Ms. Tipton to testify that Mr. Fields called her on the morning of July 10, 2003 and told her that he had "plans" with Mr. Presley for that evening and that "[t]hose plans – those plans were for him and Danny [Presley] to go fishing and him not – he made it very clear to me he would not be home right after work." *TR*, 2558-59.

147.  Based on this testimony, the Government argued in closing that Mr. Fields had attempted to set up an alibi for the night he planned to shoot the Chicks:

> He knew this was the day. **He had already set up us [sic] alibi.** If you remember, Michelle Tipton told you, yeah, he called me on that day. He said he was going fishing with Dan Presley, not to expect him over at her house later that evening, that he'd be late. Well, we know that's not true because Dan Presley was at his house and sleeping for a period of time with the Defendant there, certainly not fishing with him. **He's**

**already set up the alibi because he knows on this night that would
be the last night that the Chicks have on this earth.**

TR, 3412-13.

148.   The Government knew or had reason to know that Mr. Fields never tried

to "set up [an] alibi," as it falsely and misleadingly argued to the jury.  In August

2003, Mr. Presley told the FBI that, on the day of the offense, Mr. Fields came to his

house sometime after 4:00 p.m.[24] and asked him if he "wanted to do something."

Presley Interview at 3.  Mr. Presley replied that he had "plans to play the casino in

Fort Smith."  Id.  This statement was memorialized in a FBI 302 Report and provided

to the prosecutors.  Id.  During Mr. Presley's direct examination, the Government

selectively asked him about only **part** of this statement – that he planned to go to the

casino – to create the misimpression that, contrary to what Mr. Fields told Ms. Tipton,

he had no plans with Mr. Presley for that evening.  The Government failed to ask Mr.

Presley about the exculpatory fact that Mr. Fields suggested they "do something"

together, which is why Mr. Presley mentioned his casino plans to the FBI in the first

place and thus was necessary to place this information in proper context.

149.   It was clear from Mr. Presley's complete statement to the FBI that Mr.

---

[24]At the sentencing hearing, Mr. Presley testified that it may have been later
than 4:00.  *TR*, 2382.  His wife Marilyn testified that it was between 6:30 and 6:45
p.m.  *TR*, 2462.

Fields **did** intend – or at least wanted – to do something with Mr. Presley on the evening of the homicides, just as he had told Michelle Tipton. What Mr. Fields said to Ms. Tipton was not an alibi, but an intention. This evidence shows that he had no plan to shoot the Chicks at the time at the time he made this statement to Ms. Tipton. It also shows that he had no intention of shooting the Chicks when he suggested to Mr. Presley that they go snake hunting, which likely occurred right before he went to the Winding Stair Campground. The Government argued to the jury that Mr. Fields tried to set up an alibi knowing that this claim simply was not true.

### 3. The False and Misleading Testimony and Argument Could Have Affected the Judgment of the Jury.

150. There is a reasonable likelihood that the judgment of the jury could have been affected by the Government's presentation of false and misleading testimony and argument. This testimony and argument were important to the Government's efforts to prove the substantial planning aggravating factor, which was one of the aggravating factors that made Mr. Fields eligible for the death penalty. The Government's presentation of Agent Dalley's false and misleading testimony, and its closing argument endorsing that testimony, could have persuaded the jury that the homicides were the product of substantial planning and premeditation because Mr. Fields staged a robbery hours after killing the Chicks to conceal his intent to kill. The

Government's selective and misleading presentation of Mr. Presley's testimony, and its closing argument that the evidence proved Mr. Fields set up an alibi many hours before killing the Chicks, also could have persuaded the jury to find the substantial planning aggravating circumstance. Had the jury not been presented with this false and misleading testimony and argument, it could have rejected the substantial planning aggravating circumstance and concluded that the proven aggravating circumstances did not outweigh the proven mitigators. Moreover, the combined effect of all these due process violations, as well as the due process violations discussed in Ground Seven, below, denied Mr. Fields his right to due process, even if each due process violation considered individually was not material.

## GROUND FOUR

**TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT MR. FIELDS' SOCIAL HISTORY THROUGH THE TESTIMONY OF A MITIGATION SPECIALIST OR MENTAL HEALTH EXPERT AND ARGUING THAT SOCIAL HISTORY AS A MITIGATING FACTOR.**

151. The defense's presentation of Mr. Fields' social history evidence was disjointed, incomplete and unpersuasive. A handful of witnesses told bits and pieces of his life history, and none of this testimony even remotely suggested that he was raised in anything but a typical family. Yet, as trial counsel were well aware, the defense's mitigation specialist had collected compelling evidence that, contrary to the

impression created with the jury, Mr. Fields was raised in a highly dysfunctional family, and that dysfunction had a profound impact on his life, his mental health and his adult functioning. This information would have been mitigating in its own right, and also would have helped a mental health expert explain his mental state at the time of the offense. Trial counsel should have presented this evidence through a mitigation specialist or mental health expert, who would have testified about information gleaned from many sources, including relatives, friends and institutional records. Such a witness could then have explained that information to the jury as part of a coherent, compelling mitigation theme. Trial counsel also should have argued to the jury that Mr. Fields' social history mitigated the offenses. Instead, the jury deliberated over Mr. Fields' fate knowing little about the events and forces that shaped his life. Accordingly, trial counsel rendered ineffective assistance in violation of the Sixth Amendment to the United States Constitution.

### A. Evidence of Family Dysfunction that the Jury Never Heard.

152. Mr. Fields was raised in a severely dysfunctional family, as the defense's investigator and mitigation specialist, Glori Shettles, discovered and conveyed to trial counsel. Ms. Shettles was retained by trial counsel in August 2003. Shettles Dec., ¶¶

2-3.[25]  She spent the next several months interviewing persons who knew about Mr. Fields' family and background and collecting relevant documents, including his medical, mental health and school records. Id., ¶ 3.  She provided trial counsel with the results of her investigation and advised them about mitigation themes. Id., ¶ 3-5.

153.  According to Ms. Shettles, Mr. Fields' family history "was marked by notable dysfunction."  Shettles Dec., ¶ 5.  Both of his parents came from family backgrounds where sexual abuse and violence were prevalent. Id. His father spent part of his youth in a foster home. Preliminary Assessment, dated September 11, 2003 ("Shettles Memo") A – 25, at 4.  Three of his father's sisters experienced sexual abuse and rape, one was disabled from polio, and another was disfigured in an automobile accident. Id. at 4-5.  In his mother's family, sexual abuse, gambling and drinking took place. Id. at 7.

154.  Mr. Fields' mother, Margaret Fields, suffered from depression her entire life and "placed her own emotional needs above those of her family ...." Shettles Dec., ¶ 5.  His father was largely absent from his upbringing, and his mother "jealously

---

[25]As is typical in such cases, Glori J. Shettles is a well-credentialed (masters level educated) and vastly experienced mitigation specialist.  As her declaration reveals, she has law enforcement experience, and for approximately the last 17 years she has been involved as a mitigation specialist in over 70 capital cases.  Shettles Dec., ¶ 2.  Counsel hired the right person, but failed to effectively use the mitigating evidence she unearthed.

guarded her relationship with her husband" by keeping him from their children. Id., ¶ 6. As Cherie Fields, Mr. Fields' sister, explains, "Literally, as soon as Dad came home, Mom would not allow Eddie and I to be in the same room with them. It was very hurtful to Eddie and to me as kids to feel as though we did not matter at all to our mother and father." Declaration of Cherie Fields ("Fields Dec."), ¶ 3, *A − 26*. She recalls that her parents never hugged her or Mr. Fields or told them they were loved. Id., ¶ 5.

155. Cherie Fields also recalls that her mother "took pleasure in making sure Eddie and I stayed at each other's throats. She was very good at dividing us and separating us from emotional comfort or security." Fields Dec., ¶ 5. As a result, Mr. Fields received love from no one in the family. According to Ms. Shettles, "the relationship between the parents and Mr. Fields and his sister ... was distant, cold and unemotional." Shettles Dec., ¶ 6. Mr. Fields' apparent inability to express emotions may have its roots in the lack of appropriate parenting he received as a child. Id., ¶ 9.

156. The problem was compounded by the family's transient lifestyle. Mr. Fields' family had lived in four different states by the time he reached high school. Although Cherie Fields testified about her family's various moves, *TR*, 2674-76, the jury never learned the significance of the family's nomadic life: that Mr. Fields had a difficult time forming and keeping friendships, which increased his sense of

isolation at a time when he already felt emotionally cut off from his parents.

157. Mr. Fields and his sister were the recipients of "bizarre discipline inflicted by either parent, but always at the command or insistence of the mother." Shettles Dec., ¶ 6. Cherie Fields describes this discipline:

> I recall my father being provoked by our mother to have us whip each other with belts – our Dad would be the one to say if we were doing it hard enough. If we weren't, then he would take a lick.
>
> *   *   *
>
> When we got a whipping, we'd have to take our pants off and lie on the bed. Dad would whip us with a belt until we'd cry and scream. It didn't matter what time of day or night it was. If Mom ordered him to give us a whipping he'd do it. It was all very bizarre and Eddie really got the worse of it.

Fields Dec., ¶ 6.

158. For most of his life, Mr. Fields suffered from chronic depression. Shettles Dec., ¶ 8. He appeared "unhappy," "moody" and "strange," lacked motivation and moved from one activity or relationship to the next without any obvious reason. Id., ¶ 8. As a result, he was frequently and inaccurately dismissed by those who knew him as "lazy." Id., ¶ 10. To Cherie Fields, her brother's depression made him act "weird." She states that, when she was growing up with her brother, "there is no denying that at that time Eddie was getting weirder and weirder and I did not want to hang around him because he was too weird." Fields Dec., ¶ 9.

By the time the family was preparing to move to Virginia, she recalls, "my brother was sick and as strange and depressed and unpredictable as he had ever been." Id., ¶ 7.

159. In addition, intergenerational mental health and neurological issues plagued Mr. Fields' family, particularly on his mother's side. Shettles Dec., ¶ 8. Cherie Fields explains that Mr. Fields' mother and his daughter have been diagnosed as suffering from bipolar disorder, and his grandmother, Pat Ginnaman, received electroshock treatments, and two sisters of Ms. Ginnaman were known to have been mentally ill. Fields Dec., ¶ 8. Mr. Fields' mother reported having brain lesions. Shettles Memo at 2. On his father's side, Mr. Fields has a cousin who is bipolar, hears voices and has received in-patient treatment for significant periods of time, and his father's mother died of a brain tumor. Id. at 3-4.

160. The jury never learned about Mr. Fields' severely dysfunctional family. Most of the evidence about his childhood and family background was presented through his sister Cherie Fields. During her direct examination, trial counsel focused on a handful of non-controversial subjects – the impact of the deaths of her father and grandfather and her mother's physical ailments, for instance[26] – which gave the

---

[26]On direct examination, Cherie Fields testified about: the places her family lived, *TR*, 2674-76; fighting with Mr. Fields, which she described as "normal teenage type stuff," *TR*, 2676; her father's long hours at work and the fact that he did not

misleading impression that the Fields were a more or less typical family. Trial counsel never inquired into subjects that would have revealed Ms. Fields' own tortured upbringing, significant family dysfunction, including the kind of parenting she and Mr. Fields received, how they were disciplined, the struggles of Mr. Fields and his mother with depression and other mental health issues, or inter-generational mental illness.

161. One of the reasons Cherie Fields' testimony failed to reveal the degree of family dysfunction was that trial counsel never explained to her why it was important for the jury to learn about such matters. Fields Dec, ¶ 12. She states, "It is very hard to admit that there was so much strange behavior and strange violence in our house and I wish that the lawyers for Eddie before had been more specific and clear about why it was important to tell the gory details." Id.

162. As a result, the defense's social history presentation was woefully inadequate and distorted the real picture of Mr. Fields' family. As Ms. Shettles, who attended the entire sentencing hearing, describes it:

[W]hile some isolated social history facts were provided to the jury,

---

spend much time with his children, *TR*, 2677-78; the impact of her grandfather's death on the family, *TR*, 2679-80, her mother's physical ailments, *TR*, 2680-82; life with her mother in the months before the offense, *TR*, 2682; the impact of her father's death on her mother, *TR*, 2682-85; the work Mr. Fields did for his father when he was sick, *TR*, 2685-86; and her relationship with Mr. Fields' children. *TR*, 2687.

there was never a comprehensive social history that would really "humanize" Mr. Fields or place into proper context the inter-related factors about his life. Counsel never considered these problems, nor did they consider for development and presentation, the significant mitigation that I had collected. There was simply no effort given to contextualizing those isolated life and social history facts that were incidentally provided to the jury.

Shettles Dec., ¶ 14.

163. Trial counsel also never asked the defense's testifying mental health experts, Dr. Grinage and Dr. Woods, about Mr. Fields' history of family dysfunction.

164. Because trial counsel did not present evidence of Mr. Fields' family dysfunction, they never argued this evidence as a mitigating factor. Of the twenty-two mitigating factors raised by the defense, not a single one addressed his childhood, family background or family dysfunction. *TR*, 3400-01.

165. Not only was this social history information never presented to the jury, but much of it was not even presented to Dr. Grinage and Dr. Woods to use in evaluating Mr. Fields. Trial counsel provided Dr. Grinage only with the Shettles Memo, a "preliminary" document that Ms. Shettles had prepared in the very early stages of her investigation. Grinage Dec., ¶ 10; see also Dr. Grinage's Forensic Mental Health Evaluation, dated June 24, 2005 at *A* – 28 at 2; Shettles Memo at 2. Similarly, the only information about family dysfunction that trial counsel provided Dr. Woods, the other defense psychiatrist, was "family historical records" which

90

included the medical records of his parents and maternal grandmother. Letter from Dr. George Woods to Julia O'Connell dated June 25, 2005 *A – 28* at 1.

**B.     Trial Counsel's Ineffective Assistance.**

166.    Trial counsel were ineffective for failing to present Mr. Fields' complete social history – including family dysfunction and other mitigating evidence – through the testimony of a mitigation specialist such as Ms. Shettles, or a mental health expert such as Dr. Woods or Dr. Grinage. Trial counsel also were ineffective for failing to argue that Mr. Fields' social history was a mitigating factor and to provide this evidence to the defense's mental health experts to help evaluate his mental state at the time of the offense.

167.    Trial counsel performed deficiently when they failed to present a complete social history and argue that social history as a mitigating factor. Ms. Shettles had collected valuable information about Mr. Fields' background that the jury never heard. Either she or a mental health expert such as Dr. Woods or Dr. Grinage could have developed this information into compelling mitigation themes of parental abandonment, emotional and physical abuse, family dysfunction, and mental illness. All three individuals were available to testify on this subject. Dr. Woods and Dr. Grinage actually did testify at the sentencing hearing (although they were not asked about Mr. Fields' social history), and Ms. Shettles, while not called as a

witness, attended the entire sentencing hearing and could have testified anytime. Shettles Dec., ¶ 13.

168. Had trial counsel asked Ms. Shettles, Dr. Woods or Dr. Grinage to present Mr. Fields' social history, the jury would have learned information that came from many relatives and family acquaintances, not just Cherie Fields. The jury also would have learned information that came from documentary sources such as school, hospital and other institutional records. All of these facts could then have been woven into coherent mitigation themes: that Mr. Fields was raised without parental attachment; that his parents placed their own relationship ahead of their relationship with their children, that he was emotionally and physically abused; that his family's transience made it difficult for him to form friendships; that his family was dysfunctional, that his mother was chronically depressed; and that he suffered significant losses in his life. See, e.g., Shettles Dec., ¶ 11.

169. From a mitigation and mental health standpoint, this information would have been compelling evidence for the jury to consider. Dr. Grinage explains:

> I reviewed a document called the "Preliminary Psychosocial Assessment" which was prepared by an investigator working with defense counsel. From my review of that document, reviewing my report and in reviewing the declaration of Mr. Fields' sister, it is clear that there were many aspects of Mr. Fields' family history which are pertinent to mitigation in a capital case. However, counsel did not ask me about any of these facts and factors while I was testifying. Nor did

we prepare my testimony to cover these facts in any sort of comprehensive manner. Whether it was through me or another witness who was capable of providing a thorough family and social history-compelling testimony about the mitigation present in Mr. Fields' social history could have been presented.

Grinage Dec., ¶ 10.

170. Moreover, Dr. Woods and Dr. Grinage should have been asked about how this information affected their opinions of Mr. Fields' state of mind at the time of the offense. Dr. Grinage notes, "It is axiomatic that collateral history is critical in assessing and presenting a complete picture of the patient/defendant as I seek to explain his mental state at the time of the incident." Grinage Dec., ¶ 10.

171. Trial counsel acknowledges that she had no tactical or strategic reason for failing to present a complete social history through Ms. Shettles or one of the defense's expert psychiatrists. O'Connell Dec., ¶ 19. Nor could there be any reasonable basis for failing to do so. Trial counsel clearly understood the value of social history evidence – particularly evidence of Mr. Fields' childhood and family background – because they retained Ms. Shettles to investigate his social history and ultimately presented a smidgen of this evidence, e.g., through the testimony of Cherie Fields. Having chosen to present this kind of evidence to the jury, trial counsel had a duty to do so in a manner reasonably calculated to effectuate Mr. Fields' interests. Trial counsel's scattered and incomplete social history presentation failed to

93

accomplish that result.

172.   Mr. Fields was prejudiced by trial counsel's deficient performance. Trial counsel presented and argued a number of relatively minor biographical facts as mitigators – for instance, that he served in the Navy, worked as a prison guard and performed well at his job at Kenco Plastics.  *TR*, 3400-01.  However, trial counsel never presented or argued the far more powerful mitigation that was at their fingertips:  family dysfunction and the long-term effects of that dysfunction on Mr. Fields' personality and behavior.  As Ms. Shettles observes, "counsel were not seeing the forest for the trees as a result of their [own] dysfunctional relationship."  Shettles Dec., ¶ 16.  Prejudice is well-established:

> In my view, based on over twenty years working in the criminal justice system and with significant experience in capital sentencing, **I am shocked that the jury failed to find a single mental health-related mitigating factor in this case,** when Mr. Fields is so clearly ill and had a demonstrable history of difficulties.

Shettles Dec, ¶ 15.  Had the jury heard evidence of Mr. Fields' dysfunctional family background, there is a reasonable likelihood that the jury would have returned a verdict of life rather than death.

94

**MR. FIELDS WAS DENIED HIS RIGHT TO INDIVIDUALIZED SENTENCING, DUE PROCESS, A FAIR TRIAL AND THE EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE THE GOVERNMENT'S CLOSING WAS RIFE WITH IMPROPER ARGUMENT, MOST OF WHICH WAS NOT OBJECTED TO BY TRIAL COUNSEL, AND APPELLATE COUNSEL FAILED TO RAISE THIS ISSUE ON DIRECT APPEAL.**

173. The Government's closing arguments were rife with misrepresentations of law and fact, impermissible witness bolstering, *ad hominem* attacks, and speculation intended to inflame the passions of the jury. As a result, Mr. Fields was deprived of his right under the Eighth Amendment to have a jury consider and give effect to all relevant mitigating evidence. These comments violated his due process right to a fundamentally fair trial. Trial counsel was ineffective for failing to object to most of the Government's improper arguments, and where trial counsel did object, appellate counsel were ineffective for failing to raise these issues on direct appeal.

### A. Improper Arguments Denying the Right to Jury Consideration of All Relevant Mitigating Evidence.

174. The Government misstated the law regarding the weighing of mitigating and aggravating circumstances so as to improperly increase Mr. Fields' burden of persuasion and decrease its own burden; it denigrated the jury's discretion to show mercy; and it invited the jury to sentence Mr. Fields to death based upon irrelevant and inflammatory societal concerns. These instances of prosecutorial misconduct had

a substantially prejudicial effect on Mr. Fields' right to full jury consideration of mitigating evidence, including the sentencer's unlimited discretion to extend mercy based on the evidence presented.

175. The Government twice told the jury that the mitigating factors had to outweigh aggravating factors in order to justify a sentence less than death:

> The mitigating factors, even if accepted as proved, cannot outweigh the premeditated murder of Charlie. The mitigating factors – (Interrupted)
>
> MR. DERRYBERRY: Objection to that based on the law.
>
> THE COURT: Overruled.
>
> MR. SPERLING: The mitigating factors – and I submit all of this to you based on the evidence that has been admitted – do not begin to outweigh just one of the steps that Shirley took in a terrorized flight from the Defendant.

*TR*, 3463-64. This argument incorrectly stated the law, which requires that the aggravating factors must "sufficiently outweigh" the mitigating factors in order for the jury to impose a sentence of death. 18 U.S.C.A. § 3593(e). Trial counsel appropriately objected to this argument. This Court erred in overruling the objection. Appellate counsel was ineffective for failing to raise this issue on direct appeal.

176. The improper comments were made worse when this Court overruled the objection in front of the jury, thus suggesting that the Government's incorrect statements were in fact correct. The official imprimatur thereby placed upon the

prosecution's misstatements of law obviously amplified their potential prejudicial effect on the jury.

177. The Government also urged to the jury to reject mercy based on the evidence as a basis for a sentence less than death:

> Ladies and gentlemen, in closing, just remember the victims in this case, Charles and Shirley and their family and what they went through. The defense is going to talk to you and they're going to ask you to show mercy for this Defendant. What I want you to do is think back on July 10th of 2003. How much mercy was shown then? The Defendant wants you to look at this Defendant and oh, there's a life that can be had. This case is about what happened on July 10th of 2003, not what happened since then.

*TR*, 3430. To the contrary, mercy is one of the most central and important factors to guide the jury's sentencing discretion.

178. Despite Mr. Fields' unquestioned statutory and constitutional right to have a penalty hearing before the jury, the Government told the jurors that the entire proceeding was unjust:

> **The Defendant wants to choose a sentence.** He wants to live. Now, how unjust is that? Just what choice did he give Charles Chick? Just what choice did he give Shirley Chick?

*TR*, 3457.

> Remember this, here in court the Defendant continues to victimize his own family by reducing them to props in an effort to escape justice. Remember also that Charlie didn't get an opportunity to plead for his life.

97

*TR*, 3459. The Government's comments invited the jurors to sentence Mr. Fields to death merely for exercising his Eighth Amendment right to individualized sentencing. This also violated Mr. Fields' Sixth Amendment right to a trial on these sentencing facts the jury was required to consider.

179. The Government improperly invoked societal concerns about lenient sentences and recidivism as a basis for rejecting a sentence less than death:

> You can't ever walk out of here again and say, boy, I can't believe they gave such a light sentence or I can't believe they gave such a heavy sentence. I can't believe they gave probation to a child molester. You know [sic] longer have that luxury.

*TR*, 3431. These sentiments were echoed in later comments, invoking popular opinion that prison was too easy on criminals:

> Well, can justice be served by life in prison? The Defendant wants to be sent to his room as punishment. If he's allowed to live, he will have their percs [sic], like workouts and visitors and phone calls and mail and tv and recreation. Don't let this Defendant be a hero to his incarcerated criminal inmates.

*TR*, 3457.[27] The Government's comments were an invitation to reject the individualized sentencing determination required by the Eighth Amendment, and a

---

[27] The Government's argument was based upon facts not in evidence. The only testimony about so-called jailhouse perks was elicited from Daniel Presley, who testified about the policies at the minimum security Oklahoma state prison where he was employed. *TR*, 2408-09. Mr. Presley had no knowledge of the conditions of confinement on the Special Confinement Unit of the Federal Death Row at the United States Penitentiary at Terre Haute, Indiana.

naked appeal to vengeance designed to inflame the passions of the jury.

180. Individually and collectively, these improper arguments denied Mr. Fields his right to a jury that would consider and give effect to the mitigating evidence presented and to an individualized determination of the appropriate sentence in his case.

**B.     Improper Arguments Denying the Right to a Fair Trial.**

181. The Government's closing argument contained numerous statements misrepresenting the record and contained comments designed to inflame the passions of the jury, thus inviting the jury to decide Mr. Fields' punishment on factors other than the evidence properly presented at trial. The Government also improperly embellished and bolstered the testimony of its witnesses throughout its closing.

182. Given the nature of the mitigating evidence of Effexor-induced "manic flip" presented by trial counsel, the credibility of the mental health experts presented by both Mr. Fields and the Government was a critical aspect of the trial. The Government engaged in a series of attempts to improperly bolster and vouch for the credibility of its experts. Referring to Dr. Price, the Government stated:

> He has a lot of credibility. He's not somebody who every time comes in and testifies for the defendant. We didn't have to go out to the left coast to find somebody who testified for the defense every time. We got people in our own back yard who were credible, who would give an honest opinion who were not hired guns.

*TR*, 3429. The Government continued: "Dr. Mitchell – and he may be the best one of all ... Dr. Mitchell who has no axe to grind here, ladies and gentlemen." TR, 3429-30.[28]

183. The Government echoed the earlier bolstering of Drs. Price and Mitchell, personally vouching for their credibility by stating, "I respectfully submit, thought [sic], that Randy Price and Jeff Mitchell were straight shooters. Not hired guns." *TR*, 3452. At the same time, both attorneys for the Government denigrated Mr. Fields' expert witnesses as "high dollar shrinks," id.; "hired guns," *TR*, 3429, from the "left coast," id., who had an "axe to grind," *TR*, 3430, and did not give "an honest opinion." *TR*, 3429.

184. This improper bolstering of the Government's experts was paired with the Government's gross misrepresentation of the testimony of Drs. Grinage and Woods about a significant factual issue raised by the Government in support of the aggravating factors – whether Mr. Fields' prior use of the ghillie suit to sneak up on other people undermined Mr. Fields' contention that he killed the Chicks in an

---

[28]Contrary to the Government's "left coast – hired gun" attack, Dr. Grinage is from Topeka, Kansas. *TR*, 2768. Like the Government's expert Dr. Mitchell, Dr. Grinage had never before testified in a capital case. Grinage Dec., ¶ 2; see also *TR*, 3429-30 ("Dr. Mitchell – and he may be the best one of all, one because he's never been a witness before in a criminal case."). Thus, Dr. Grinage was neither a hired gun, nor from the "left coast."

Effexor-induced manic state. The Government argued:

> On cross examination, the doctors we asked about the Ghilley suit. Well, I didn't know he had the Ghilley suit and had snuck up on people beforehand. I didn't know that at all.

*TR*, 3427. The Government's statements are false. Dr. Woods testified, "I was aware that he had said to one person, perhaps two, that he had put on his Ghilley [sic] suit and observed someone...." *TR*, 3024. Dr. Grinage was **never asked** if he was aware that Mr. Fields put on the ghillie suit and observed people.

185. In addition to improperly bolstering its own expert witnesses and denigrating those of Mr. Fields, the Government launched a series of *ad hominem* attacks on Mr. Fields:

- "But it was he who chose to turn his back on his family five years ago. It was he who chose to be abusive. It was he who chose to ignore his kids and not even pay child support. ... he's already turned his back on his family..." *TR*, 3431.

- "He abandoned them though. He abandoned them." *TR*, 3458.

- "The Defendant used and discarded people." *TR*, 3449.

- "He lied. He was trying – manipulative, a con artist." *TR*, 3450.

- "And was financially irresponsible, parasitic and promiscuous." *TR*, 3450.

- "The Defendant is unalterably and fundamentally different from most human beings." *TR*, 3455.

- "Selfish. Selfish. Narcissistic. It's all about him. That's an understatement. He would have left them all perhaps by the easy way out. Typical for him. The Defendant wouldn't help his widowed mother move halfway across the country." *TR*, 3459.

- "He's the one who put all of us here. What a sense of power he may feel. The narcissistic kind of selfish collections of reality that he has become." *TR*, 3460.

- "He had talked often enough about committing suicide in a transparent ploy to gain sympathy and money from his marks." *TR*, 3464.

- "The fight and Terry Hanna. That was illustrative, wasn't it? That tells you who the Defendant will choose to be near. A child abuser." *TR*, 3465.

These arguments were designed to inflame the passions of the jury, inviting the jurors to sentence Mr. Fields to death, not because any of the aggravating factors that were offered or proven, but because Mr. Fields was a fundamentally bad person, the kind of man who pals around with child abusers and who did not support his family.

186. Without factual basis in the record, the Government attempted to elicit fear of Mr. Fields – and bolster its claim that Mr. Fields posed a future danger – by arguing that he had been diagnosed as a sociopath.[29] The Government told the jury:

---

[29] The Government repeatedly sought without success to have some witness tar Mr. Fields with the label of sociopath. Neither of the Government's mental health experts diagnosed Mr. Fields as a sociopath. At most, Mr. Sperling was able to elicit from Dr. Price a diagnosis of personality disorder not other specified with antisocial, psychopathic and narcissistic features and traits. *TR*, 3148. Dr. Price did not diagnose Mr. Fields as antisocial, psychopathic, sociopathic or narcissistic. *TR*, 3215-

"His own doctors are saying, yeah, he has the traits of a sociopath...." *TR*, 3428; "He's a sociopath." *TR*, 3449. To the contrary, neither Dr. Grinage nor Dr. Woods testified that Mr. Fields was a "sociopath" or even had sociopathic traits. Mr. Sperling had attempted to elicit such evidence from Dr. Grinage, whom he questioned extensively about whether Mr. Fields exhibited any of the traits of a sociopath. See TR, 2841-46. Dr. Grinage, however, denied that Mr. Fields exhibited any such traits, as this Court itself noted. TR, 2849 ("I think Mr. Sperling is simply asking the doctor if he noticed these characteristics or traits in the Defendant. I don't think he's asking to give that. And, of course, I know the doctor didn't and I think he said he didn't.). Dr. Woods was never questioned regarding a diagnosis of sociopathy.[30]

---

17. The Government then tried to adduce evidence that Mr. Fields' experts had diagnosed him as having sociopathic "tendencies" by calling a lay witness, Marilyn Presley, to testify that Mr. Fields "stated that they were – had said that he had some sociopathic tendencies, I believe, and wanted me to look it up on the computer for him." *TR*, 3086. Although the Government's theory was that the "they" who purportedly told Mr. Fields he had "sociopathic tendencies" referred to mental health experts retained by the defense, see *TR*, 3428, Mrs. Presley testified that Mr. Fields never told her who "they" were and in fact conceded it was a "good possibility" that the comment had been communicated to Mr. Fields by trial counsel who were merely reporting what other attorneys had said about him. *TR*, 3086, 3090. Thus, there was no evidence that Mr. Fields' experts had diagnosed him as having "the traits of a sociopath," contrary to Mr. Fries' assertion during closing argument. The reports of the defense trial experts confirm that neither diagnosed Mr. Fields as a sociopath nor observed in him any psychopathic traits.

[30] Trial counsel appropriately objected to the Government's statement that Mr. Fields' "own doctors are saying, yeah, he has a traits [sic] of a sociopath." *TR*, 3428-

103

187. In addition to arguing that Mr. Fields was a sociopath, the Government made a number of other improper arguments without factual basis in the record in order to bolster its case in support of the aggravating factor of substantial planning and deliberation. The Government argued that Mr. Fields planned for many months to commit this crime, contending that his hobby of squirrel hunting – and his construction of the ghillie suit for that hobby – was really a prelude to murder:

> Didn't start on July 10, 2003, started long before that. It started about a year before that when, as you heard, the Defendant was with Penny to help create a Ghilley suit, a black Ghilley suit – a black shirt and a Ghilley suit, I believe the testimony was, and they made that Ghilley suit and it continued.

*  *  *

> Look at the painstaking manner that must have been done in order to complete this Ghilley suit. This is not the act of a man who's frenzied or has flights of thoughts. It's the actions of a man who is methodically thinking out what he wants to do. His plan down the road is to become a predator, a sniper. This is the first step in that action.

*  *  *

This is when the plan really began to take form. Plan was not to kill

---

39. However, this Court overruled the objection. *TR*, 3429. The Court did so despite previously sustaining an objection to the question asked to Marilyn Presley: "Did he explicitly identify the doctors who had made that finding?" *TR*, 3086. The Court erred in overruling the objection to the statement made in the Government's closing argument, as there was no factual basis in the record for the Government's assertion that Mr. Fields' doctors said that he had the traits of a sociopath. Appellate counsel was ineffective for failing to raise this issue on direct appeal.

Charles and Shirley Chick, per se, but he had become a hunter. This was what he wanted to do. He had built the Ghilley suit and now he had built the gun. He had become proficient in his stalking activities without, as the squirrels, being able to sneak up on people.

* * *

At this time the Defendant has all parts of his plans coming together. He's become a proficient stalker and he's become a proficient sniper.

*TR*, 3406, 3408-9. The Government continued: "He had mastered his craft. He had practiced with squirrels and now he was moving to humans." *TR*, 3414; "in the days, weeks and months before the killing ... the killing germ began to take root in his mind ...." *TR*, 3454.

188. However, there was nothing in the record to support the inference that Mr. Fields constructed the Ghillie suit with the idea of shooting a human being, or that he hunted squirrels for reasons other than to enjoy a hobby with his friend. Indeed, the evidence adduced at trial actually contradicted such an inference. The undisputed evidence at trial established that Mr. Fields' purpose in making the Ghillie suit was to use it for hunting squirrels, and nothing more. See *TR*, 2378-79 (Mr. Presley testified that he went hunting several times with Mr. Fields, who wore the Ghillie suit to shoot squirrels); *TR*, 2458 (Mrs. Presley testified, "It's just a Ghilley suit that people go hunting in."); *TR*, 3121 (Dr. Price testified, "And [Mr. Fields] preferred to use this Ghilley suit that he had constructed and hide and let the squirrels

105

come close to him."); *TR*, 2487 (David Love testified, "He told me that he had basically made it to hunt squirrels with."). Additionally, Jovanna Fields testified Mr. Fields was prepared to abandon the ghillie suit weeks before the Chicks were killed. *TR*, 2656-57.

189. The Government further misrepresented and twisted the testimony of Daniel Presley in order to bolster its argument that Mr. Fields' hobby of squirrel hunting – and use of the ghillie suit for that hobby – was part of a greater plan to murder the Chicks. The Government told the jury that Mr. Presley – Mr. Fields' hunting partner – testified that Mr. Fields "[d]idn't need to have a ghilley suit to go squirrel hunting" and that "there's no need to have a scope like this on this kind of gun, a .22," and contended that Mr. Presley called it a "sniper's rifle." *TR*, 3407-8. Mr. Presley provided no such testimony, and disavows any suggestion that the Government's arguments correctly interpreted his testimony.[31] See *TR*, 2370-2410; Presley Dec., ¶¶ 4-5.

190. Additionally, the Government misrepresented the testimony of Daniel Love. Mr. Love testified that during the spring of 2003 Mr. Fields said he had snuck

---

[31] The Government also contended that Mr. Presley testified about an incident when Mr. Fields scared Mr. Presley while the two were hunting and Mr. Fields was wearing the Ghillie suit. *TR*, 3408-9. Mr. Presley never testified about this incident – the story was recounted in the testimony of Dr. Price. *TR*, 3122. The Government never attempted to elicit this story from Mr. Presley. See *TR*, 2370-97; 2408-10.

up on a couple on Talimena Drive while dressed in the Ghillie suit. *TR*, 2487. Mr. Love further testified that he told Mr. Fields to stop doing that or he would "get his ass shot off." Id. The Government contended that "the Defendant just kind of laughed at [Mr. Love]," *TR*, 3408, which was untrue. Mr. Love testified was that Mr. Fields was "[k]ind of aggravated a little bit. He took [the Ghillie suit] back out to the truck." *TR*, 2487. Mr. Love's actual testimony suggests that Mr. Fields was upset by Mr. Love's comments, explaining Mr. Fields' later refusals to tell people why he had a ghillie suit, contrary to the Government's argument that Mr. Fields did not want to tell anyone he planned to use the ghillie suit to kill people. TR, 3409.

191. The Government also contended that Mr. Fields used the campground to scout out potential victims:

> So he begins to look for victims. What is the testimony? He's hanging out at the Winding Stair Campgrounds. He's up in the Talimena Drive. He's going snake hunting. He's doing all these things, but he's also searching for a victim. Not a particular individual, but an individual or individuals who unfortunately have put themselves in a position of danger. He's at the Winding Stair Campgrounds and he's there several times a week. He's taking a shower, he's going to the bathroom. He's using it because his girlfriend won't let him live in their house anymore, but he's also using it as a place to search for a victim. He keeps track of when people are there, who's staying there, when they're staying there, what the habits are.

*TR*, 3410. Contrary to the Government's assertion, there was absolutely no testimony that Mr. Fields used to campground to identify a victim, much less any evidence that

107

he "ke[pt] track of when people are there, who's staying there, when they're staying there, what the habits are." Id. At most, the evidence indicated that Mr. Fields was aware the Chicks were staying at the campground. The Government's argument impermissibly exaggerated the trial evidence in a manner designed to mislead and inflame the jury.

192. In support of the mental anguish aggravating factor, the Government argued that the jury could reasonably infer that Shirley Chick's death was not silent:

> He likely heard whatever cries or moans or expressions of fear from at least one of his human prey. He killed from a short distance....
>
> And by the way, may I suggest one area in which the evidence establishes really our witness's credibility? Special Agent Gary Graff didn't pump things up. He didn't say the Defendant laughed as he ignored Shirley's cries or her shrieks in anguish and beg for her life saying please in the name of God don't kill me. But, Shirley, we may reasonably infer from all of this evidence that this was not, was not, a silent murder.

*TR*, 3462; see also *TR*, 3417 ("But I submit to you what she was doing, she was begging and pleading for her life."). There was no evidence that Mrs. Chick cried out when she was shot. This argument was pure speculation and was calculated to elicit an emotional reaction from the jury. It is also another example of the Government's improper witness bolstering.

193. The Government concluded its closing argument with an extended and

108

wholly improper recitation of scripture to support its position that Mr. Fields was worthy of death. The Government related to the jury the well-known "writing on the wall" sermon from the Book of Daniel, in which God finds King Belshazzar wanting and condemns him to death:

> Thousands of years ago the king of the world's greatest then existent civilization and most powerful empire held a great feast for thousands of his ruling friends. They ate, they drank from golden and silver goblets that they had stolen from the temple of a subdued and now enslaved nation. They drank wine and they worshipped pagan idols. All of a sudden the fingers of a hand began to write on the palace wall. The king saw the hand and was so frightened, he was so scared, that his clothing literally came loose. He became white. He shook. His knees banged together. He cried out: Bring the astrologers, bring the wise men of the nation. Whoever interprets this saying on the wall will become the third most powerful member of my Government. He will have great riches. The wise men came in. They studied, they deliberated, they conversed, they conferred and they thought. But they couldn't read much less interpret the writing on the wall. The king's face turned ashen. The queen, though, remembered a forgotten man. She called for him after talking to the king. And the king made the man the same offer. The man, though, he turned down all of the riches, all the honor and all of the prestige.
>
> The man bravely interpreted the writing on the wall. And the writing on the wall said in three words, your kingdom has come to an end, your kingdom will be divided and given to your neighboring enemies, and then the prophet said the writing said you have been weighed in the balance and found wanting. Sure enough, that night the King was killed. His kingdom was separated among his neighboring enemies.

*TR*, 3466-67; <u>compare</u> Daniel 5:1-31. The Government then argued that Mr. Fields should be weighed in the balance and found wanting. TR, 3467. The Government's

invocation of biblical support for its position invited the jurors to decide the question of Mr. Fields' punishment on matters other than the evidence properly presented in court, and was designed to inflame the passions of the jurors and incite feelings of vengeance. Bible references as a basis for a death sentence are anathema to the Eighth Amendment.

194. Individually and in combination, the improper statements by the Government had a substantially prejudicial effect on Mr. Fields' rights under the Sixth and Eighth Amendment, and rendered his trial fundamentally unfair. These comments exaggerated and improperly bolstered the evidence in support of the Government's position while denigrating the mitigating evidence presented by Mr. Fields, and invited the jury to decide the question of Mr. Fields' punishment in a manner other than set out by statute and the Constitution. It is the prosecutor's job to seek justice, not victory. Here, the Government crossed that line, using a pattern of attacks, misrepresentations and improper appeals to passion, vengeance and fear to seek victory in the form of a death sentence.

**C.     Trial Counsel's Ineffectiveness.**

195. Other than in the two instances noted above, trial counsel failed to object to any of the Government's improper statements throughout its closing arguments. Trial counsel's failure to object to these blatantly improper comments was deficient

110

performance, and trial counsel could have had no strategic reason for their failure to do so. O'Connell Dec., ¶ 23 ("Because this was a capital case, I knew it was important to make all meritorious objections and to raise and preserve all meritorious issues for appellate and post-conviction purposes. That was my goal. I had no tactical or strategic reason for not making all meritorious objections and raising and preserving all meritorious issue for appellate review.").

196. Mr. Fields suffered prejudice from trial counsel's failure to make meritorious objections to the Government's improper closing arguments. As a result, the jury was encouraged to ignore the substantial mental health evidence presented by Mr. Fields, which it did in refusing to find that Mr. Fields committed the offenses under severe mental or emotional disturbance. *TR*, 3481. Based upon the Government's improper embellishment of its evidence, the jury also found that Mr. Fields committed the offenses after substantial planning and premeditation, and that Mr. Fields inflicted mental anguish upon Mrs. Chick. *TR*, 3479-80. If trial counsel had objected to the Government's misrepresentations of the law and the evidence, its *ad hominem* attacks on Mr. Fields, and its appeals to passion and vengeance, there is a reasonable likelihood that the verdict would have been different.

197. Appellate counsel rendered deficient performance by failing to raise these repeated instances of prosecutorial misconduct on direct appeal. Had appellate

counsel raised these, there is a reasonable likelihood that Mr. Fields' sentence would have been vacated and the matter remanded for resentencing. Appellate counsel can have no reason for failing to raise meritorious claims on direct appeal, particularly in a capital case.

## GROUND SIX

**TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO INSTRUCTIONS AND A VERDICT FORM THAT ALLOWED THE JURY TO APPROVE A GENERAL VERDICT OF DEATH BASED ON THE COMBINED WEIGHING OF AGGRAVATING FACTORS APPLICABLE TO TWO SEPARATE MURDER COUNTS.**

198. Although Mr. Fields pled guilty to two counts of first degree murder, the jury sentenced him to a general verdict of death, not separate sentences on each count. In doing so, the jury was allowed to consider all seven of the aggravating factors argued by the Government – including five factors that applied to only one of the two counts. This unified weighing process skewed the balancing of aggravating and mitigating factors in favor of death. Trial counsel not only failed to object to this unconstitutional weighing process and general verdict, but they requested instructions and a jury verdict form that were, in the words of the Court of Appeals, "functionally the same" as the improper instructions and verdict form approved by the Court. United States v. Fields, 516 F.3d 923, 939 (10th Cir. 2009). Accordingly, trial counsel rendered ineffective assistance in violation of the Sixth Amendment to the United

States Constitution.

### A.     The Unified Weighing Process and General Death Verdict.

199.   Mr. Fields pled guilty to two counts of first degree murder: Count 1 (the murder of Mrs. Chick) and Count 3 (the murder of Mr. Chick). The Government sought the death penalty for Counts 1 and 3 based on seven aggravating factors, including three factors that exclusively applied to Count 1 (murdering Mrs. Chick after substantial planning, victim impact related to the death of Mrs. Chick, and inflicting mental anguish on Mrs. Chick) and two factors that exclusively applied to Count 3 (murdering Mr. Chick after substantial planning and victim impact related to the death of Mr. Chick).[32] *TR,* 3396-99.

200.   Although Mr. Fields pled guilty to two separate murder counts, the Court never instructed the jury that it had to determine the penalty for **each** murder count individually and that it could consider only those aggravating factors applicable to a particular count in determining the sentence for that count. See generally *TR,* 3393-3304; see also *TR,* 3478-83 (Special Findings Form). Instead, the Court's instructions and the Special Findings Form required the jury to vote on a single verdict of life or death. *TR,* 3404 (instructions), 3484 (Special Findings Form). Moreover, although

---

[32]The other aggravators argued by the Government were: (1) killing more than one person in a single episode; and (2) future dangerousness. *TR,* 3396-99.

the Court instructed the jury to decide each aggravating factor separately, *TR*, 3403-04; see also *TR*, 3396, 3399 (Special Findings Form), **the jury was permitted to consider all seven aggravators in deciding whether Mr. Fields should live or die.**[33] *TR*, 3403-04; see also *TR*, 3483-84 (Special Findings Form).

201. Consistent with the Court's instructions, the jury "f[ou]nd by unanimous vote that *a* sentence of death shall be imposed on the Defendant." *TR*, 3484-85 (Special Findings Form). The jury rendered no verdict distinguishing between each murder count,[34] nor did the jury apply specific aggravating factors to particular murder counts. See id.

202. The jury's general verdict of death denied Mr. Fields his right under the

---

[33] The Special Findings Form instructed:

The question you must answer at this stage of your deliberations is whether the proven aggravating factor(s) sufficiently outweigh the proven mitigating factors and information to justify a sentence of death .... If you unanimously find that the weight of the aggravating factor(s) is sufficient to justify a sentence of death, answer "yes" below [and] record your verdict on [the general verdict form for death] .... If you do not unanimously find that a death sentence is justified, answer "no" below, stop your deliberations [and] sign [the general verdict form for life imprisonment].

*TR*, 3483-84.

[34] The Court's poll of the jury after the verdict also failed to distinguish between each count. *TR*, 3485-87.

114

Sixth and Eighth Amendments to have the jury make a determination of his moral culpability for each murder count. In imposing the sentence, the jury had no mechanism for separating out the two counts. The Special Findings Form did not allow the jury to make a finding of death on one count and life without the possibility of release on the other count. Such a verdict was not merely a theoretical possibility. The mental anguish aggravating factor applied only to Mrs. Chick, *TR*, 3399, arguably making her death more egregious in the eyes of the jury. The unitary weighing process used here, however, did not give the jury the option of returning a verdict of death for the murder of Mrs. Chick but life without the possibility of release for the murder of Mr. Chick. Instead, the jury faced an "all or nothing" proposition as its sole sentencing option.

203. More importantly, the unitary weighing process approved by the Court skewed the weighing of aggravating and mitigating factors, denying Mr. Fields his right to reliable sentencing guaranteed by the Eighth Amendment. The Court instructed the jury to consider the substantial planning aggravating factor separately for each of the Chicks. *TR*, 3396; see also id. at 3478 (Special Findings Form). Had the Court also told the jury to render individual verdicts on each murder count and to consider only the aggravating factors that related to each count in rendering those verdicts, such an instruction would have been proper. The jury would not have been

able to consider two plans to kill the Chicks when deliberating about the verdict for each murder count. Under a unitary weighing process, however, the substantial planning aggravating circumstance or instruction skewed the weighing of aggravating and mitigating factors because it allowed the jury to double-count the substantial planning circumstance. The instruction had the effect of allowing the jury to consider two separate plans to kill each of the Chicks even though the Government argued only that Mr. Fields had one plan to kill both of the Chicks in a single criminal episode.

204. The Court also instructed the jury to consider the victim impact aggravating factor separately with regard to each of the Chicks. *TR*, 3398-99; <u>see</u> <u>also</u> *TR*, 3479-80 (Special Findings Form). Had the Court also told the jury to render individual verdicts on each murder count and to consider only the aggravating factors that related to each count in rendering those verdicts, such an instruction would have been proper. The jury would not have been able to consider any victim impact related to the death of Mr. Chick when deliberating about the verdict for killing Mrs. Chick, nor would it have been permitted to consider any victim impact related to the death of Mrs. Chick when deliberating about the verdict for killing Mr. Chick. Under a unitary weighing process, however, the Court's instruction on applying the victim impact aggravating factor skewed the weighing of aggravating and mitigating factors

because it added an aggravating factor that would not have been present had the jury separately considered each murder count. The jury was permitted to weigh victim impact related to the deaths of **both** of the Chicks in deciding whether the aggravators outweighed the mitigators.

### B.  Trial Counsel's Ineffective Assistance.

205. This ground was raised as court error on direct appeal. The Court of Appeals for the Tenth Circuit stated:

> Fields argues that it was error to allow the jury to consider a general death sentence in a multi-count case, based on a weighing process incorporating a set of aggravators that combined, and consequently exceeded, those it found applicable to the individual counts for which the death penalty was sought. Fields, however, did not object to the collective weighing process and general verdict below. Indeed, as the government emphasizes, the instructions and verdict form tendered by the defense were functionally the same as those ultimately used by the court. Therefore, because Fields invited any error of which he now complains, we decline to review it.

Fields, 516 F.3d at 939.

206. While the invited-error doctrine relied upon by the Court of Appeals in denying relief may be an appropriate analysis for a direct appeal (where claims of ineffectiveness of counsel may not be raised or decided), it leaves open the question of whether trial counsel were ineffective for failing to object and in requesting the objectionable unified weighing process. The answer to that question is rather

117

obvious.

207. Trial counsel were ineffective for failing to object to the unified weighing process and general death verdict that denied Mr. Fields his rights under the Sixth and Eighth Amendments. For the reasons discussed above, the instructions and verdict form deprived Mr. Fields of his right to reliable sentencing and a unanimous sentencing verdict on each count to which he pled guilty. Not only did trial counsel fail to object to these unconstitutional instructions and verdict form, but, as the Court of Appeals noted, they proffered their own instructions and verdict form that were "functionally the same as those ultimately used by the court." Fields, 516 F.3d at 939; see also Defendant's Tendered Penalty Phase Instructions. Counsel could have had no reasonable tactic or strategy to fail to object to this clearly disadvantageous weighing scheme. O'Connell Dec., ¶ 23.

208. Mr. Fields was prejudiced by trial counsel's deficient performance. Because the jury was allowed to consider all of the aggravating factors in the aggregate in rendering a general verdict, its weighing of aggravating and mitigating factors was skewed in favor of death. The jury was allowed to double-count the substantial planning aggravating factor and to consider an additional victim impact aggravating factor, neither of which would have been possible if the jury had been required to render a verdict separately on each murder count. Accordingly, there is

118

a reasonable likelihood that, had the jury been required to deliberate individually on each murder count, the verdict of the jury would have been different.

## GROUND SEVEN

### THE GOVERNMENT WITHHELD EXCULPATORY, MATERIAL EVIDENCE FROM THE DEFENSE IN VIOLATION OF DUE PROCESS, AND TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT EXCULPATORY EVIDENCE.

209. The Government withheld exculpatory, material evidence that it had an obligation to disclose to the defense, including but not limited to evidence that would have corroborated the defense's argument that Mr. Fields had taken an increased dose of Effexor before the offense, emails and other documents on Mr. Fields' computers supporting the fact that he was mentally ill, and witness statements containing favorable information. To the extent the Government did not have an obligation to disclose this evidence, or the information was equally available to the defense, trial counsel were ineffective for failing to investigate, discover and present the evidence. Accordingly, Mr. Fields was denied his rights to due process and the effective assistance of counsel in violation of the Fifth and Sixth Amendments to the United States Constitution.

### A. The Undisclosed Exculpatory Evidence.

210. The Government had a duty to disclose exculpatory evidence to the

defense that included but was not limited to the following.

## 1. Bottle of 150 mg Effexor Capsules.

211. In a report dated July 18, 2003, Agent Iris Dalley of the Oklahoma State Bureau of Investigation ("OSBI") stated that, during a search of Mr. Fields' truck, she observed two prescription pill bottles. *A – 29*. OSBI Report of Iris Dalley dated July 18, 2003 at 1. Later in her report she noted that she observed a "pharmacy sack label" dated July 9, 2003 for "30 Effexor 150 mg capsules for EDWARD FIELDS" and a bottle of pills with the same label. Id. at 3.

212. Five days later, Special Agent James Alford of the United States Forest Service prepared an inventory of items found in Mr. Fields' truck, including an item described as "'Effexor XR 3.75mg/75mg' blister pack containing three pills" but **not** the pharmacy sack label or the bottle of Effexor 150 mg capsules observed by Agent Dalley during her search of the truck. Inventory of Items in 1989 Chevrolet Truck dated July 23, 2003, *A – 30*, at 2.

213. The FBI subsequently turned over to Mr. Fields' mother the items found in his truck. The defense's investigator prepared an inventory of these, including "July 9, 2003 - Empty pharmacy bag from Youngs Pharmacy, Poteau, OK, for 30 Effexor XR 150 mg" and "14-day sample packet of Effexor XR. Three (3) capsules remain in the package." Memorandum from Glori J. Shettles dated January 1, 2004,

120

*A* – 31 at 1, 4. The bottle of 150 mg Effexor that Agent Dalley observed in July 2003 was not returned. See id.

214. Law enforcement officials seized the bottle of 150 mg Effexor and are charged with the knowledge of what was in the bottle. The Government elicited agreement from defense expert Dr. Woods that "there's no evidence in this record apart from representations that the Defendant may have made to treating or to examining doctors that he even took any of the increased dosage? [i.e., the 150 mg dosage of Effexor]" *TR*, 3029-30. The Government also implied that Mr. Fields took a 37.5 mg dose of Effexor from the fourteen-day blister pack, not the 150 mg dose from the thirty day prescription bottle. *TR*, 3030.

215. The Government elicited this testimony from Dr. Woods while being in sole possession of the 150 mg bottle and knowing or being able to determine the contents of it. Thus, the 150 mg Effexor bottle contains exculpatory evidence relating to the quantity of Effexor capsules Mr. Fields ingested prior to the offense. The Government failed to disclose this exculpatory evidence to the defense. See O'Connell Dec., ¶ 20.

## 2. Emails and Documents from Mr. Fields' Computers.

216. On August 28, 2003, Patrick Kennedy of the OSBI imaged the hard drive of a computer used by Mr. Fields. OSBI Report of Patrick Kennedy dated November 20, 2003 at 3. This hard drive contained 7,904 documents and 544 email messages. Id. at 4. On September 4, 2003, Mr. Kennedy imaged the hard drive of a second computer used by Mr. Fields. Id. at 3. This hard drive contained 8,095 documents and 6,418 email messages. Id. at 4. According to Mr. Kennedy's report, these drives were "searched for images, documents and web pages relevant to camouflage clothing and particularly Ghillie Suits; snipers; and homicide; in a variety of manners." Id. at 4-5.

217. The hard drives of these two computers contain exculpatory mental health and other evidence that should have been disclosed to the defense, including information in the almost 16,000 documents and 7,000 emails. The Government failed to produce this exculpatory evidence to the defense.[35]

---

[35]In response to written requests from undersigned counsel, the Government permitted inspection of the computers seized from Mr. Fields. Counsel appeared at the FBI office to inspect the computers and following that inspection the Government shipped three such computers to the defense for forensic analysis. Upon such analysis, counsel were told that the computers they were permitted to inspect, and which ultimately were shipped to them, are **not** the computers or hard drives references by Agent Kennedy. Those have not been provided by the Government, and counsel will soon include a request for those in a to-be-filed discovery request.

### 3. FBI Forms 302 and Reports of the OSBI.

218. On information and belief, FBI Form 302's and reports of the OSBI exist that contain exculpatory evidence, including but not limited to witness interviews reporting favorable information. The Government failed to produce this exculpatory evidence to the defense.[36]

### B. The Undisclosed Exculpatory Evidence Was Material.

219. The exculpatory evidence withheld by the Government was material, both considered separately and because of their cumulative impact. See, e.g., O'Connell Dec., ¶ 20 (discussing importance of Effexor pills). There is a reasonable likelihood that, had this evidence been disclosed to the defense, the result of Mr. Fields' sentencing hearing would have been different. Also, when considered along with the due process violations set forth in Ground Three, above, materiality is established.

### C. Trial Counsel's Ineffective Assistance.

220. To the extent the Government did not have an obligation to disclose this evidence or it was equally available to the defense, trial counsel were ineffective for failing to investigate, discover and present the evidence. Trial counsel rendered

---

[36]Counsel will soon file a discovery motion seeking all of these materials as well as others.

deficient performance by failing to discover exculpatory evidence that could have been used to prove the defense's case-in-chief and to impeach the Government's witnesses. There was no reasonable basis for failing to investigate, discover and present this evidence. See, e.g., O'Connell Dec., ¶ 20 (discussing lack of strategy or tactics regarding discovery of Effexor pills). Mr. Fields was prejudiced by trial counsel's deficient performance because, had the jury learned of this exculpatory evidence, there is a reasonable likelihood that the verdict would have been different.

## GROUND EIGHT

### THE CUMULATIVE IMPACT OF ALL THESE ERRORS DENIED MR. FIELDS DUE PROCESS AND A RELIABLE SENTENCING HEARING.

221. Each of the grounds presented in this *Motion* individually entitles Mr. Fields to relief from his death sentence. However, even if this Court finds that Mr. Fields is not entitled to relief based on any particular ground, the cumulative effect of these errors described herein, have denied him due process and a reliable sentencing hearing as guaranteed by the Fifth and Eighth Amendments to the United States Constitution. Moreover, counsel's cumulative errors and omissions individually and cumulatively entitle Mr. Fields to relief for violations of the Fifth, Sixth and Eighth Amendments to the United States Constitution,

## GROUND NINE

### THE MANNER OF MR. FIELDS' EXECUTION, IF CARRIED OUT, WOULD VIOLATE THE EIGHTH AMENDMENT.

222.   The manner of Mr. Fields' execution, if carried out under current Bureau of Prison lethal injection protocols, would violate the Eighth Amendment to the United States Constitution.  The protocols governing his execution, including the combination of drugs that would be used to accomplish his death, the use of untrained non-medical and unqualified personnel to carry out his execution, the physical space in which his execution would take place, and other factors which are currently not within counsel's knowledge, would result in the infliction of unnecessary pain and suffering.

223.   While the manner of Mr. Fields' execution would be unconstitutional, this claim is not ripe for review at this time.  Mr. Fields is not at imminent risk of execution, and this claim may be moot if this Court grants him the relief he seeks pursuant to other claims in the Petition. Mr. Fields asserts this claim only to preserve it against a later challenge by the Government based on waiver or other defenses. Mr. Fields will amend this claim if the Court deems it appropriate to address it in connection with these proceedings.

Respectfully Submitted,

/s/Hunter Labovitz
Hunter Labovitz
Katherine Ensler
Cristi Charpentier
Capital Habeas Corpus Unit
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 545 West, The Curtis Center
601 Walnut Street
Philadelphia, PA 19106
Telephone: (215) 928-0520
FAX: (215) 928-0826

Counsel for Petitioner Edward Fields, Jr.

Dated: October 13, 2015
Philadelphia, PA

# CERTIFICATE OF SERVICE

I, Hunter Labovitz, hereby certify that on this 13th day of October, 2015, I electronically transmitted the foregoing document to the Clerk of Court using the Court's electronic case filing system. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Christopher J. Wilson, Attorney for Respondent
Jeffrey B. Kahan, Attorney for Respondent


/s/ Hunter Labovitz
Hunter Labovitz