**1**

Declaration of Julia O'Connell, Esq.
Pursuant to 28 U.S.C. § 1746

I, Julia O'Connell, Esq., hereby verify and declare and follows:

1.    I am the Federal Public Defender for the Northern and Eastern Districts of Oklahoma. I was co-counsel in the capital case of <u>United States v. Edward Leon Fields</u>, which was tried in 2005 in the Muskogee Division of our Court. I am making this Declaration at the request of Mr. Fields' section 2255 counsel to discuss certain aspects of my representation of Mr. Fields.

2.    At the time of Mr. Fields' arraignment, I was an Assistant Federal Defender in the Northern and Eastern Districts. Soon after the case came into the ED, I was appointed to the case. I had litigated two capital cases for state public defender office, but this was my first federal capital case. I was aware of the Federal National Resource Counsel Project that made "Learned Counsel" available in capital cases. I contacted the Project and after a short time, Isaiah "Skip" Gant was designated to seek appointment as Learned Counsel in this

1

case.

3.    I was gratified for Mr. Gant to join the team. He had a sterling reputation.  I checked him out and he appeared to be a highly respected, skilled and knowledgeable federal capital trial attorney.  My research corroborated my initial belief that since he was a national resource counsel, he must be highly qualified. My initial beliefs were proven incorrect.

4.    Very early on, we began to prepare for our authorization meeting with the Department of Justice. This is a critical stage of federal capital pre-trial preparation as it allows defense counsel to make a formal presentation to the Department of Justice in Washington to convince them not to seek the death penalty.  I treated it as such, and prepared diligently for the DOJ presentation.  It quickly became apparent to me in the preparation stage, however, that Mr. Gant was not carrying his share of the work.  I was still willing to chalk this up to him having a busy national practice. All through our preparations, the plan was for Mr. Gant to make the presentation in Washington.  I had never even

2

been present at a meeting like this where there would be a determination as to whether or not the government would seek the death penalty, as this was my first federal capital case – I was led to believe that this was precisely his area of learnedness. Thus, I was flabbergasted when, just two hours before the presentation, he backed out and insisted that I make the presentation. His reason was that he had made so many that the DOJ lawyers would never listen to him. If he really felt that way, he could have told me that weeks earlier, or maybe even a day earlier. Instead, at the last minute he abandoned his duty to the client and to me. I had the distinct impression that he backed out because he was not adequately prepared.

5. As our pre-trial preparations continued, and especially after our meeting with the DOJ, Mr. Gant's role grew smaller still. I carried the vast bulk of the caseload with respect to supervising the mitigation specialist's work, vetting potential expert witnesses and in overall preparation for both phases of trial.

6. The next significant incident with Mr. Gant

3

occurred when Mr. Fields reached the decision to enter a guilty plea. My immediate, strong and visceral reaction was to counsel him against pleading guilty. A guilty plea in this capital case just seemed ill-advised. Of course, I immediately contacted Mr. Gant to seek his advice. Mr. Gant said "go ahead and plead." I continued to counsel Mr. Fields against the guilty plea, and did all that I could to prevent it. If at any point he had told me that it was a disadvantage to entertain a plea and then proceed with a jury for the penalty phase trial, I would have made an extremely concerted effort to dissuade Mr. Fields from a change of plea. Nothing proved more disastrous to his penalty phase trial.

7. Mr. Fields remained insistent, and ultimately he pled guilty. Even though Mr. Gant knew the date of the change of plea hearing, four days after the change of plea proceeding, Mr. Gant told me that he "asked around" and he thought it would be a bad idea for Mr. Fields to plead guilty. He presented this "advice" as if the guilty plea had not already taken place. Needless to say I was very upset. Had Mr. Gant weighed in with this

4

"advice," and joined me in counseling against the plea, together we may have convinced Mr. Fields not to plead guilty. Instead, as with so many other aspects of this case, I was left to work alone, and the results were disappointing.

8. I next recall being shocked when Mr. Gant failed to perform his work on proposed jury instructions, an area for which he was nationally regarded as an "expert." Drafting of jury instructions are critical for both favorable instructions at the time of the trial and a record for any appeal – an important consideration in any case, and especially in a capital case. Despite Mr. Gant's assurances that he would take on much of the work involved with jury instructions, he did not do any of the drafting: Barry Derryberry and I worked toward completion of the instructions under strict deadline. Given his expertise, it was agreed that he would do voir dire. We requested that, because of his status as resource counsel, he at least review what we were drafting and to provide us with any model instructions that were endorsed by the Resource Counsel Project. After many attempts to

5

get his attention, he ultimately sent us a set of instructions for a Title 21 drug case. I was in disbelief and shock at his lack of effort and apparent lack of concern for our client and me.

9. At the time of jury selection, after very few jurors were questioned, Mr. Gant was having a great deal of difficulty conducting an effective voir dire and so I had to assume that responsibility as well. My planned trial preparation was severely affected by this change.

10. Because the trial was in Muskogee, we required accommodations near the Courthouse for the trial. We rented a small place for us to stay nearby. I stayed there with Mr. Gant (who brought his wife with him), and Glori Shettles, the mitigation specialist that I had retained. Mr. Derryberry commuted from Tulsa. The primary reason we had a place nearby was to prepare for witnesses and the witnesses themselves for the following day of trial. But, Mr. Gant's lack of attention to the trial was on display again. Each evening, Mr. Gant's focus was a meal, relaxation and baseball. He expected there to be a full evening meal with wine. Ms. Shettles,

6

Mr. Derryberry and I, on the other hand, wanted to grab a quick bite and get to work preparing for the next day. Mr. Gant provided no help whatsoever in the evenings. The consequences to our presentations, particularly the expert witnesses, was dramatic and harmful to our client's interest.

11. Dr. Bradley Grinage was called to the stand on July 19, 2005. Prior to his taking the witness stand, I neglected to give him three important documents: Dr. Gelbort's report, Dr. Price's report and the change of plea transcript. I recall that Dr. Grinage was effectively cross examined because he was unaware that when Mr. Fields pled guilty to the charges he admitted to acting in a premeditated manner. Because he did not have all the appropriate materials from counsel, Dr. Grinage appeared to be contradicting the opinions he gave on direct examination when he was cross examined by the United State Attorney. Dr. Grinage could have provided convincing and accurate answers to the questions of premeditation and deliberation and planning; malingering; and personality disorders had he had the appropriate

7

materials.  I did not possess any tactical or strategic reason for not preparing Dr. Grinage to provide those answers or for not providing him with a copy of the change of plea transcript and the other documents.

12.  It has been pointed out to me that Dr. Woods provided an opinion that Mr. Fields was "unable" to conform his behavior to the requirements of law.  This is not the correct statutory standard.  The statutory mitigating factor says requires only that a person's ability to appreciate the wrongfulness of his conduct or to be able to conform his conduct to the requirements of law be "significantly impaired."  I have also seen where the prosecutor used this higher standard against Dr. Woods in cross-examination.  I had no tactic or strategy for failing to prepare Dr. Woods on this point.

13.  After I received Dr. Price's report, the question of whether Mr. Fields was malingering his mental health problems was now front and center.  Current counsel have presented me with declarations of Dr. Winter and PA Anderson who provided physical and mental health treatment in the years prior to Mr. Fields' arrest; and

8

the declarations of psychiatrists of Drs. Trombka and Bumgardner, who provided mental health treatment in the months after Mr. Fields' arrest. Each of them indicates that they believed that Mr. Fields had serious mental health problems and did not believe that Mr. Fields was malingering. I did not have a tactic or strategy for not presenting these doctors as witnesses in my case in chief or on rebuttal.

14. In the case of Dr. Bumgardner, I also note that she has endorsed the manic-flip opinion that was presented by Dr. Woods in his testimony. I recall that Dr. Woods was cross examined on, among other topics, that he was a "hired-gun" from California. Had I a congruent opinion from a local psychiatrist, who actually treated Mr. Fields, I would have presented it as a supplement to Dr. Woods' testimony. Again, I had no tactical or strategic reason for not investigating Dr. Bumgardner and presenting her opinion.

15. Dr. George Woods was also retained to act as an expert in the field of neuropsychiatry. He studied the case and opined on the witness stand on July 20, 2005,

9

that Mr. Fields underwent a "manic-flip" at the time of the killings. We had also retained Michael Gelbort, Ph.D. to conduct neuropsychological testing. Dr. Gelbort's report of his testing showed that Mr. Fields was damaged in the frontal lobes of his brain, which, according to the doctor was a significant finding. Dr. Gelbort indicated that further testing was needed. Early on in the development of our mental health evidence we considered the presentation of both manic-flip and organic brain damage. In other words, we never considered those to be mutually exclusive. Through the months leading up to the trial, I stayed in contact with Dr. Gelbort about conducting further testing and his ability to testify. He always indicated his willingness to do both. Even up until the time of jury selection, the plan was to call Dr. Gelbort at the penalty phase trial to testify about organic brain damage.

16. About one month before jury selection commenced I received the reports of the Government's experts, Dr. Randall Price and Dr. Jeff Mitchell. I saw that Dr. Price opined that Mr. Fields did not have significant

10

brain impairments, although Mr. Fields scored in the impaired range on a number of the tests he administered. I provided this report to Dr. Gelbort, who told me that Dr. Price's data was consistent with his own- that Mr. Fields was brain damaged and neurologically impaired. Dr. Gelbort again confirmed that he was available to testify.

17. I never had him perform the additional testing that I mentioned above. I can offer no tactical or strategic reason for not having the additional testing performed. The evening before trial testimony was to begin, Dr. Gelbort notified me that he was going to be traveling and would not be available on the dates of trial that had been set. I made no motion to continue the trial to the Court. Again, I had no strategy or tactic for abandoning the specific factor of organic brain damage, but I was overwhelmed with the trial in progress. Presentation of such brain impairments would have been an important part of our mitigation presentation. However, this trial was an ordeal like none other that I have ever experienced.

18. We offered and argued to the jury the existence

11

of twenty-two mitigating factors. In the realm of mental health mitigation, we offered the two mental health statutory mitigating factors: that he suffered a severe mental or emotional disturbance and that his capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law, was significantly impaired. Although we offered the theory of a drug induced manic flip, we never offered to the jury or argued to the jury, that they should find that Mr. Fields' lifetime of depression and hearing voices as distinct mitigating factors. As I recall, one of the Government's doctors (Mitchell) agreed that his history of depression and voices was true, and the Government conceded that in argument. I should have told the jury that they could find these facts as mitigating and ask the Court to charge them on those facts as separate mitigating factors. I did not have any tactical or strategic reason for having not done so.

19. I have also been provided with a copy of the declaration of Glori Shettles. In it she indicates that she was available to testify as to Mr. Fields' social

history which was not well-covered by the doctors or family who testified. I do not disagree with her assessment of the social history. I had no tactical or strategic reason for not presenting that history either through one of the doctors or through Ms. Shettles.

20. Current counsel have brought to my attention that the pill bottle containing the Effexor that Mr. Fields had acquired days before the offenses, was never produced for me in discovery. I recall that the prosecution cross-examined Drs. Woods and Grinage on the fact that they could not be sure how many of the pills that had been prescribed for Mr. Fields had actually been taken. It did not occur to me at the time that I should have insisted on inspecting the bottle pre-trial and possibly putting it in evidence at trial, if the number of pills left in the bottle supported our position that Mr. Fields had taken the prescribed amount or possibly more. I had no tactical or strategic reason for not demanding production of the pill bottle for inspection.

21. I recall it was the Government's theory that Mr. Fields planned to kill the Chicks, not to rob them. The

13

Government also posited that he came back to the crime scene many hours later and staged a fake robbery to disguise his true homicidal purpose. To prove this theory, the Government called OSBI Agent Iris Dalley, who examined and photographed the crime scene. Agent Dalley testified that the driver's window of the victims' van was broken and that some glass fragments lying on a pool of dried blood in passenger compartment of the van were not stained with blood. She said this proved that the driver's window was not broken until after the blood in the van had dried, which would have taken at least an hour and possibly longer. The Government also called a pathologist, Dr. DiStefano, as well as Agent Dalley to testify that lividity patterns on Mr. Chick's body established that he was moved to the position in which he was found at least six hours after he was shot. The government argued that these facts proved its theory that Mr. Fields returned to the crime scene many hours later and staged a fake robbery.

22. This testimony was damaging because it supported the substantial planning aggravating circumstance or by

14

suggesting that Mr. Fields had a plan to kill the victims and that plan did not involve a robbery. This testimony was damaging. Although I had the government's forensic reports pre-trial, I did not retain a pathologist or criminalist of my own to test the Government's theories. I have been provided with a declaration by current counsels' expert, Robert Tressel. He presents alternative explanations for what happened. I could have presented such an expert in my case or, at a minimum, retained such an expert to advise me about how to prepare and conduct my cross-examination of the Government's witnesses. I had no strategic or tactical reason for not consulting an expert crime scene investigator or pathologist.

23. Because this was a capital case, I knew it was important to make all meritorious objections and to raise and preserve all meritorious issues for appellate and post-conviction purposes. That was my goal. I had no tactical or strategic reason for not making all meritorious objections and raising and preserving all meritorious issues for appellate review. To the

15

contrary, my strategy was to waive no meritorious issue.

24. I am an experienced, dedicated and conscientious criminal defense attorney. I am disturbed by many of the events that I have discussed in this statement. As the Federal Public Defender for the Northern and Eastern Districts of Oklahoma, I accept full responsibility for my acts or omissions described above. Although Mr. Gant failed to perform his role, I should have either forced the issue with him, or brought it to the attention of the Court. There is no question in my mind that the bulk of the above-described errors were a result of my being overburdened by essentially functioning without co-counsel in this complex and difficult case.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_Julia L. O'Connell_ 3/30/2010
Julia O'Connell, Esq.
Federal Public Defender,
Eastern and Northern
Districts of Oklahoma

16