**4**

Declaration of Glori J. Shettles
Pursuant to 28 U.S.C. § 1746

I, Glori J. Shettles, hereby verify and declare and follows:

1.      My employer, Inquisitor, Inc., was retained by the Federal Public Defender for the Eastern District of Oklahoma to provide capital mitigation services for the defense in the criminal case of USA v. Edward Leon Fields, 03-cr-73. I was assigned to this case by my superior at Inquisitor, Inc. I am providing this declaration at the request of Mr. Fields' current counsel to explain my role in the litigation and provide information about several aspects of the case. I understand that Inquisitor, Inc., and myself in particular, was retained at the suggestion of Learned Counsel, Isaiah "Skip" Gant.

2.      I received a B.A. degree in sociology from Memphis State University in 1974. I obtained a masters degree in guidance and counseling also from Memphis State in 1978. From 1985 to 1990 I was a Regional Director for the Tennessee Board of Paroles. I served for a time as Acting State Director for the Board. I was an investigator for the District Attorney General's Office in Memphis from 1990 to 1991. I then became a Program Manager for Community Corrections until 1993. Since January 1993, I have been continuously employed by Inquisitor, Inc., as an investigator and mitigation specialist. Inquisitor provides a wide-range of forensic

1

services with respect to sentencing and parole. During my approximately seventeen years at Inquisitor, Inc., I have provided capital mitigation services in over seventy cases in state and federal courts. I am thoroughly familiar with the standard of care for the provision of capital case mitigation services and I abide by those standards in my work.

3.  I began working on the Fields case as soon as I was appointed by my superior in August, 2003. As is customary, I set out to identify, locate and interview as many individuals as possible who knew about Mr. Fields' background. I also ordered and eventually obtained as many documents as possible about Mr. Fields' life, including medical, mental health and school records. I used the records and background interviews to form impressions about Mr. Fields, to guide my on-going investigation, and to advise counsel of potential mitigation themes.

4.  The lawyers on the case were Julia O'Connell, Esq. and Isaiah "Skip" Gant. Although Mr. Gant was appointed as Learned Counsel, it was clear to me that Ms. O'Connell was assuming a grossly disproportionate amount of the pre-trial preparation. Accordingly, I took direction from her. While I was afforded some flexibility, for the most part, I interviewed only those people to whom I was directed by Ms. O'Connell. There was a third lawyer involved in the case, Barry Derryberry, who was employed in Ms. O'Connell's office. However, my sense is that he was in

2

a largely research and support role with regard to the issues in the case.

5.   During the ensuing months, I gathered a significant amount of information and prepared several memos for counsel. I learned, and told counsel, that Mr. Fields had a family history that was marked by notable dysfunction. Each parent came from highly dysfunctional backgrounds with prevalent sexual abuse and violence. Mr. Fields' mother (Margaret Fields) has been depressed for her entire life. She presents as a person who is emotionally cold, uncaring of others and highly self-centered. For instance, I learned that she insisted that her family stop celebrating Christmas after her father died because Christmas was his favorite holiday. This simple example illustrates how she placed her own emotional needs above those of her family and other loved ones.

6.   Mr. Fields' childhood was notable for several other reasons. His family moved often because of his father's jobs. His father was largely absent from Mr. Fields' day-to-day life due to the long work hours his jobs required. His mother was emotionally turbulent and self-centered. She jealously guarded her relationship with her husband to the extent that she literally kept the father from the children so as to maximize her private time with him. As a result, the relationship between the parents and Mr. Fields and his sister (Cherie), was distant, cold and unemotional. Also notable were the descriptions I heard from the children of bizarre discipline inflicted

3

by either parent, but always at the command or insistence of the mother. These factors are important in considering Mr. Fields' history of depression, discussed later in this statement.

7.     Another significant finding that I made had to do with Mr. Fields' near-death experience at the time of his birth. His mother related to me that he had a "hollow membrane disorder." We obtained his birth records (which current counsel have provided to me), however, they were largely illegible. We were unable to secure a legible copy. As I understood the story related by his mother, as a result of this condition, Mr. Fields could not breath at birth, almost died and ultimately was sent to another specialized hospital where he spent about one week. This finding is important to my mitigation investigation because it raised the possibility of organic brain damage at the time of the birth, secondary to oxygen deprivation.

8.     My investigation also revealed a documentary and anecdotal history showing that Mr. Fields suffered from life-long depression. He was predominantly described by those who knew him as "unhappy," "moody" and "strange." He did not maintain interest in any particular activities and changed jobs frequently without apparent reasons. He seemed to move from one activity or relationship to another, without any obvious motivation for doing so. Medical records document that he was variously diagnosed as "depressed," "anxious" and as having mood problems. He

4

reported sleep disturbances, weight loss and lack of energy as a result of his mood problems. At times, he reported hearing voices, which he also described to me in interview. I also discovered inter-generational mental health and apparent neurological problems, particularly on his mother's side of the family.

9. Mr. Fields has rarely been able to express emotions or been encouraged to express emotions during his life. There are a number of possible reasons for this flat emotional presentation: he could have been modeling his mother's own cold demeanor, it could be a result of his own depression, or, as I know from my years of experience, such lability in mood is a common sign of organic brain dysfunction. Whatever the cause, Mr. Fields has been almost universally perceived as an emotionally flat or cold individual. With an emotionally flat and depressed mother, Mr. Fields' own depression was neither adequately recognized nor addressed at important times in Mr. Fields' life. Then, when he exhibited behavioral problems as a teenager, which could no longer be ignored, his mother took him to the same psychiatrist who was seeing her for "therapy." However, this was short-lived as he was soon pushed by his family into joining the Navy as a way of addressing the "problem."

10. While he was able to complete his commitment in the service, it was far from a therapeutic environment for his problems and may have contributed to future

5

difficulties. For the remainder of his adult life, his inability to stay at one job for long, his moods, and inattention to the people around him were chalked up to his being "lazy" or "moody." The family appeared to ignore or tolerate his "moods" and erratic behavior. People around him simply did not perceive that he was chronically depressed, with, potentially, other pathology.

11. As a result of my investigation, I brought to the attention of Ms. O'Connell a variety of potential mitigating factors and themes that could be developed and presented to the jury. Such factors included that Mr. Fields was raised with a lack of parental attachment, his parents placed their own relationship ahead of their relationship with their children, he was emotionally abused, the family had a transient existence, the family was dysfunctional, his mother was chronically depressed and he suffered significant loses in his life, particularly around the time of the offenses. It is fairly standard practice in modern capital mitigation to present the defendant's "social history" to the jury through either a mental health professional or a mitigation specialist, like myself. However, I was never called to testify and much of the mitigating factors that I found were either not presented at all to the jury or were presented in isolated fashion and without providing an overall mitigating context. I was present throughout the trial. I recall that I believed that the jury was never provided with a comprehensive and contextualized presentation or explanation

6

of the relevant aspects of Mr. Fields' social history. I believe that I gathered the facts and provided the analysis needed to make this presentation.

12. Initially, Ms. O'Connell expected to rely heavily on Mr. Gant because he was Learned Counsel. However, it became apparent that this reliance was misplaced. At the very beginning, Mr. Gant offered some "big" suggestions. He suggested hiring Dr. George Woods as the defense mental health expert. As noted, he also suggested retaining my firm. However, it soon became clear to me that after making these "big" suggestions, he did little actual work to advance the defense's preparations. It was quite clear that Mr. O'Connell was effectively on her own in both pre-trial preparations and during the trial.

13. I was in close contact with Mr. O'Connell during the pre-trial period and was actually present during the entire trial. I stayed in the same lodging as the lawyers during the trial – a bed and breakfast. This allowed me to observe the interactions between counsel, and the level of preparation that was on-going. It was clear to me that Mr. Gant did very little useful work during the immediate pre-trial and trial stages. Consequently, Ms. O'Connell was left to shoulder almost the entire burden of the case. Aside from the small part of the voir dire questioning done by Mr. Gant (until it became quite clear that the Court was losing patience with him and it had to be taken over by Ms. O'Connell), Ms. O'Connell was the in-court voice of

7

the defense. Ms. O'Connell examined every witness in the case. This caused significant tension between the two lawyers and, to my eye, had an adverse impact on the defense preparations and presentation. During evenings after court, Mr. Gant seemed far more energetic about making sure dinner was served (he brought his wife with him and she cooked for the team just about every night) than in preparing for the next day. Evenings seemed to him to be more in the nature of a social event than a serious endeavor. I distinctly recall assisting her in witness preparation during short breaks during the trial or else staying up with her until the early morning before heading off to court. Ms. O'Connell voiced her concerns to me about work overload resulting from Mr. Gant's failure to carry his share of the burden. I recall her finally giving up on trying to get him to perform a meaningful role.

14.    Because of the lack of a coordinated team effort, and because Mr. Gant was largely not contributing to the defense, significant decisions were made without proper consideration of their impact on the defense. The most prominent of these issues relates to the adoption of the defense of "manic-flip." The decision to go with this explanation for Mr. Fields' action was made without any discussion or consideration of the other mental health conditions that were extant in his life. The Government was largely not contesting that Mr. Fields had a lifetime of depression and heard voices. Nonetheless, there was no emphasis in the penalty phase to

8

demonstrate that these significant facts were mitigating in their own right. By the same token, defense counsel completely missed the obvious social history factors about which I could have testified. Thus, while some isolated social history facts were provided to the jury, there was never a comprehensive social history that would really "humanize" Mr. Fields or place into proper context the inter-related factors about his life. Counsel never considered these problems, nor did they consider for development and presentation, the significant mitigation that I had collected. There was simply no effort given to contextualizing those isolated life and social history facts that were incidently provided to the jury.

15. In my view, based on over twenty years working in the criminal justice system and with significant expertise in capital sentencing, I am shocked that the jury failed to find a single mental health-related mitigating factor in this case when Mr. Fields is so clearly ill and had a demonstrable history of difficulties. I believe that this failure was attributable to the lapses in the defense presentation caused by the impact of Mr. O'Connell being effectively on her own.

16. In short, from my perspective, counsel were not seeing the forest for the trees as a result of their dysfunctional relationship. This poor relationship and Mr. Gant's unwillingness or inability to contribute to the defense, placed a significant burden on Ms. O'Connell. This burden, in turn, caused the team to fail to fully and

9

properly pursue and present to the jury obvious mitigating themes.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_Glori J. Shettles_
Glori J. Shettles

Dated:      Memphis, Tennessee
            March 22, 2010

10