**6**

# NEUROPSYCHOLOGICAL EVALUATION

Name:                 Edward Fields
Age:                  37
Date of Birth:        ████████
Date of Evaluation:   8-11-04
Referred by:          Julia O'Connell
Evaluated by:         Michael M. Gelbort, Ph.D.


Edward Fields is a thirty-seven year old right-handed twice divorced (from the same woman) white male who was referred for neuropsychological evaluation by his attorney, Julia O'Connell, in the course of preparation for trial on capital murder charges. He explained during the full contact interview and evaluation that he is charged with two counts of first degree murder. Mr. Fields explained that he has been in the Tulsa County Jail for about a year after being transferred from the Muscogee County Jail. While in the first facility Mr. Fields had a "shaving accident" in which he attempted to commit suicide by slashing his right wrist once, his left wrist six times, and once to the inside of his left elbow. He was taken to the hospital where many staples and sutures were utilized to close his wounds. Asked about any accompanying alteration of consciousness with the incident the patient explained that he "got woozy." He acknowledged having thoughts of suicide on a daily basis since that event. Before the incarceration and attempt he explained that he had been having anxiety attacks "one right after the other." He had been prescribed Effexor before the incarceration and, reportedly, other neuroleptics had been considered. The dosage he was given had been doubled about three days before the event for which he has been charged. Mr. Fields has also been treated with Risperdal but complained that he had trouble breathing through his nose while on that medication. This was followed by Stelazine which resulted in involuntary muscle contractions. The patient did not believe that he was given Artane or Cogentin in conjunction with the Stelazine. Medications being given at the time of evaluation include Prozac, Lithium, Loxatane, and Artane. He has been on this regimen for approximately six months.

Health history related by the patient found that he was born "at some Catholic hospital in Oklahoma City." He did not know his birth weight but stated "when I was born I couldn't breathe" resulting in a transfer to another hospital. He did not know if there was a problem with the pregnancy or delivery. He did state that he had presented breach, that

he arrived via a vaginal delivery, but that he did not know the length of the labor or if there was distress. It was Mr. Field's understanding that developmental milestones were met at normal ages.

Asked about emergency room visits, the patient reported that he had fallen off a bicycle at age eight or nine resulting in a fracture of his left wrist, and that he had a visit as a result of "a dose of the clap" while in Ohio. Inpatient stays arose from dehydration at age fourteen with the flu resulting in a week-long stay. He was also hospitalized as a result of having "wrecked a truck" at the age of sixteen when he "rolled" a pick-up down a hill with the vehicle turning over four times. He was taken to the ER, checked over, and released. Two days later he was riding a dirt bike and "slapped it down" referring to his helmet with resulting loss of consciousness and four day hospitalization. He has also had outpatient hospitalization for vasectomy.

In addition to the motor vehicle accident induced loss/alteration of consciousness, the patient described a "sleigh-riding" incident at the age of thirteen or fourteen where he was coming off of a hill and the runner sled and he did not make a turn resulting in a crash and a presumed several minute loss of consciousness. He also had an episode of syncope reported while at boot camp "walking down the injection line, needles bother me." Otherwise he stated that, to the best of his knowledge, his heart is fine, his blood pressure is a little high, thyroid in normal, and that he has had notable febrile episodes with the flu giving rise to 104 plus degree fevers. He was also exposed to toxins while in the Navy when he performed spray painting without a respirator: as a result he said "I was pretty stoned every night." This went on for about nine months. He noted a pattern of headaches following the painting, as well as headaches once or twice a day in the evenings which improve with analgesic medications. He also had recurring headaches as a child. Mr. Fields denied any history of seizure disorder, hypoxia or anoxia, hypoglycemia or diabetes, and his kidneys are fine. He does not believe that he has ever seen a neurologist. He does acknowledge having seen a mental health professional while in Richlands at the behest of his mother when he was sixteen or seventeen. He was in treatment once per week but does not know the duration of the intervention. Medication intervention began around the time he turned thirty years old by "Mr. Anderson, a P.A. (physician's assistant) who was a fishing buddy who treated my girlfriend." At that time he believes he was given Paxil, the Prozac, then Serzone. Mr. Fields explained that he went off the medications when he lost his job and insurance as "a little bird (auditory hallucinations in the form of voices) told me to quit my job, and I did." He reported that "each medication helped me a little bit." Mr. Fields explained that he had Effexor with him at the time of his arrest, and that he also had Elavil his mother had given him. He had not attempted suicide at that time as he had a list of "things to do, including my three children in Virginia" before he was planning to end his life. He was arrested prior to executing his plan.

Asked about sleep disturbance, the patient said that he now sleeps "like the dead" with the medications on board. On the "street" he experienced poor sleep hygiene unless he took medications such as Tylenol PM. Appetite was good at the time of testing with a forty pound weight gain since incarceration. Prior to being jailed he had had a fifty pound weight loss in four months associated with problems with his girlfriend: "I just quit eating."

Educational history found that the patient completed the eleventh grade at Richlands High School with "fair" overall performance highly affected by whether or not he liked the individual class. He was never retained and may have failed an English class. He believed he was in remedial English and math in third and fourth grades. He also stated that he was never in significant trouble in school and that he had a few friends.

Work history was somewhat limited and he worked at odd jobs but "never kept a job." He was in the Navy and served about three years on active duty, including working as a recruiter for two years. He was never "busted" in rank or pay and received an Honorable Discharge. He then drove a truck for a year, was a fill-in cleaner for six months, and worked as a security guard for several years, as well as in a chicken processing plant. From July 1995 through September 1999 he worked as a Correctional Officer with the Oklahoma Department of Corrections. He also worked as a warehouseman for several years and then was unemployed for a year as "I just could not make myself go get it…" He explained "the voices would start and I would go home." He had a few other jobs and Mr. Fields noted that his mother said she "could tell when I had a job because I was happy, down when not working." Asked about the voices in this context, Mr. Fields explained that one of the voices was clear and understandable while the others mumbled." He was told to hurt himself occasionally and give homicidal instructions only "one spring night."

The patient was reared by his mother, Mary Margaret Fields, now fifty-six or fifty-seven. She is disabled with rheumatoid arthritis and Lupus. The patient's father is deceased in late 2003 of cancer and had been a coal miner. Mr. Fields has an older sister in Virginia who completed some college and who owns several Wendy's restaurants.

Mr. Fields was administered a comprehensive neuropsychological evaluation including the Wechsler Adult Intelligence Scale - III, portions of the Wechsler Memory Scale - III, Wide Range Achievement Test - III, Category Test, Trail Making Test, Lateral Dominance Exam, Strength of Grip, partial Sensory Perceptual Examination, Aphasia Screening, items from the Luria Nebraska, and diagnostic interview with mental status testing. The obtained data was judged to be an accurate reflection of the patient's functioning in the areas assessed at the time of testing.

Intellectual assessment found Verbal, Performance (non-verbal,) and Full Scale IQ scores of 92, 94, and 93, respectively. As compared with his same-aged peers, subtest scaled scores tapping vocabulary skills and fund of old, overlearned factual information were in the center of the average range. These scores are most highly correlated with premorbid levels of functioning and academic abilities. In general, they can be seen as a benchmark against which other scores can be compared to determine how the patient likely has functioned in the past and whether there has been a decline in functioning. Measures of verbal attention and concentration assessed in a structured setting were average to low average, while freedom from distractibility measures were low average. Verbal concrete reasoning abilities were average with abstract verbal reasoning capacities in the average to low average range. Non-verbal scores showed a greater range or degree of variability with a measure of pure verbal reasoning tested in an untimed paradigm reaching high average levels of performance while visual scanning to recognize what detail is missing

from familiar objects or scenes was in the lower portion of the average range. A task tapping constructional praxis was at the same level, while visual sequencing and problem solving was average to low average. Visual processing speed with an embedded visual memory task was found to be low average.

Academic achievement testing found sight-reading and spelling at the high school level with percentile scores of 30 and 34, respectively. Math tested in a written and timed format was at the seventh grade level and had a percentile score of 18. Tests of receptive and expressive language abilities were grossly within normal limits, although comprehension was mildly suppressed.

Tests of learning and memory showed mild suppressions in working verbal and visual memory with performance fluctuating and sometimes in the average range but sometimes mildly impaired. Verbal rote memorization occurred at a slower than normal rate and never reached criterion levels of performance. Short term verbal memory for meaningful, paragraph length material was also variable and sporadic with the average performance just below the center of the average range. Short term visual memory for meaningful information was also found to vacillate with the overall level of functioning in the borderline defective range of functioning. Memory was able to be utilized much of the time, but could not be counted upon, most likely due to fluctuating attention and concentration functions.

Measures of higher cognitive abilities found mildly slowed to mildly impaired processing speed for verbally mediated tasks. Impulsivity of mild proportions was also found. Higher level reasoning tasks demonstrated mild impairment (performance in the bottom three percent of the population) with better performance noted on some of the more difficult tasks and worse performance on some that were easier. Again, deficits or impairments in functional attention and concentration abilities appear to be the most likely cause of these suppressions in performance.

Overall, Mr. Fields is an individual who demonstrated overall measures of intellectual functioning toward the lower portion of the average range with specific tests of freedom from distractibility and processing speed being lower. Tests of learning and memory found a similar pattern with new learning/memory adversely affected as a result. The patient has a history of emotional upset, turmoil, and treatment which has been less than optimally effective. He displays a pattern often found in individuals with frontal lobe or non-dominant hemisphere neurocognitive dysfunction and brain damage with further evaluation warranted. The nature and pattern of his deficits is long-standing and affects his every-day life, thought processes, and behavior. Please call on me if I can clarify these results.

Michael M. Gelbort, Ph.D.
Clinical Neuropsychologist