7

**U.S. Depart.    )f Justice**

*United States Attorney*
*Eastern District of Oklahoma*

---

*1200 West Okmulgee*                                    *(918) 684-5100*
*Muskogee, Oklahoma 74401*                    *Main Fax (918) 684-5130*
                                                    *Criminal Fax (918) 684-5150*

February 1, 2005

Julie O'Connell
Assistant Federal Public Defender
Office of the Federal Public Defender
Williams Tower I, Suite 1225
One W. Third Street
Tulsa, OK 74103-3532

     Re:    *United States v. Edward Leon Fields, Jr.*
            Case No. CR-03-73-S

Dear Ms. O'Connell:

The prosecution team has grown concerned about the absence of a written record detailing the information you disclosed to Sheldon Sperling and me during our meeting on December 2, 2004. In order to avoid any later claims that members of our trial team gained information in violation of the firewall agreement, this letter will serve to document those matters which you disclosed during the December meeting.

We met in your office in Tulsa on December 2, 2004, at the conclusion of a Federal Public Defender training session. The meeting lasted for approximately two hours. You explained that you had consulted with other members of your defense team and, believing that settlement was a possibility, had decided to withdraw your guilt phase Rule 12.2 notice and disclose the mental health aspects of your mitigation case. These disclosures addressed a medication-induced manic "flip or switch", a pre-existing frontal lobe impairment, a pharmacological explanation of Effexor and its interaction with other medications, and an in-depth discussion of bipolar disorder which included information about your client's family background, his behavior and his current medications.

You prefaced your remarks by informing us that your client is much better now and that all the people in his life have noticed a remarkable difference in him since he has been receiving treatment at the Tulsa County Jail. You commented that most people would not be able to function on the amount of medication he is currently taking, but that it has improved his life and his relations with his family members. (You also gave us an update on how his ex-wife and children are adjusting to his incarceration and showed me a videotape of his ex-wife describing the changes she has seen in him and how her children are suffering.)

**ATTACHMENT**
**1**

O'Connell Letter
February 1, 2005
Page 2

## *Medication-induced manic "flip" or "switch"*

You told us that, while psychiatric experts may differ on the phraseology, what likely happened to your client, serving as a trigger for this crime, was a manic "flip" or manic "switch." Your expert believes that your client suffered from bipolar disorder when he began to seek treatment in the Spring of 2004. Like other individuals with bipolar disorder, he presented to the local doctor with depression because that was the state he was in at that time. The local doctor, not being a mental health expert, diagnosed the depression that he saw and missed the manic aspect of a proper bipolar diagnosis.

Your expert said that such a misdiagnosis in not uncommon when a bipolar patient sees a general practitioner who fails to obtain a full medical, social and family history. When the patient does not respond to medication as predicted, the doctor will adjust the dosage or change the medication, still not realizing that they are treating the wrong diagnosis. When medication works properly to alleviate depression, it does so by either stimulating or suppressing electrical impulses from the synapses in the brain. If a patient is truly bipolar and not simply depressed, too much of the wrong medication will not only lift the depression, but also can increase these electrical impulses to such a degree that the brain will trigger a mania or hypomania state. This reaction is what your expert refers to as a manic "flip" or manic "switch."

## *Frontal lobe impairment*

You said that the medication error was compounded by a pre-existing frontal lobe impairment. Your experts found the frontal lobe injury through psychological testing. While no PET scan or MRI had been conducted, you assured us that any type of brain damage testing would yield similar results. Injury to the frontal lobe, which regulates impulse control and judgement, would have undoubtedly complicated any mania suffered by the defendant.

Your neuropsychiatrist asserts that it is very hard for a defendant to malinger by presenting behavior and testing which would show only a frontal lobe injury and not an injury to other parts of the brain. He told you that "there is no such thing as a minor case of brain damage" just like there is no "minor" case of cancer. You informed us that the frontal lobe is "required for the brain's operating system" and that the brain "can't just patch itself." Such an injury cannot be "cured" and cannot be overcome if the defendant were to just "suck it up and be a man."

Your experts theorize that your client's brain was injured twice. The first trauma occurred at birth due to oxygen deprivation. Your expert informed you that most babies born in the 1960's who suffered similar oxygen deprivation died or were severely impaired. The defendant's survival is something of an exception, but the injury would still have caused his frontal lobe "not to grow right". The second injury happened when he wrecked a truck during his high school years in West Virginia. He was in the hospital for three days with a head injury and probably lost consciousness. You said that the hospital basically "just kept him until they saw he was alive and then they up and let him go."

O'Connell Letter
February 1, 2005
Page 3

*Pharmacological properties of Effexor*
After emphasizing that you were not claiming that the medicine "made him do it," you explained that the defendant's acts shocked everyone who knew him. You asserted that he was "sick" when he committed the crime, beyond his own ability to control his behavior, due to a combination of diminished impulse control resulting from his frontal lobe impairment and the effects of taking the wrong medication. You stressed that, from a pharmacological standpoint, the risk of such an outcome with Effexor is greater than with other antidepressants.

You told us that Effexor was engineered to provide a controlled release of medication over a certain time period. The medication is designed to attach to protein molecules and release over time. Because your client was having trouble sleeping, he was also taking Tylenol PM - a medication that should not be taken with Effexor. You instructed us that the Tylenol attaches to the same protein molecules and effectively bars the Effexor from attaching as designed. This would increase the immediate dosage to the body, rather than allowing a gradual and controlled release of the medication. Dumping all the Effexor into the defendant's system at once would created an even more concentrated reaction to the medication.

Your experts also reported that adverse reactions are not rare and were the subject of recent FDA warnings for physicians to closely monitor any changes in antidepressant medication or dosage.

*Bipolar diagnosis*
You related that your client's family history fits with a bipolar diagnosis. His grandmother was hospitalized and subjected to electroshock therapy during the 1930's or 1940's. His mother is likely bipolar or at least mentally ill. (She has long claimed to suffer from MS - the family just learned that she does not, in fact, have MS. She suffers from cotton-mouth due to medication and was recently hospitalized after attempting to overdose on Lortabs). His sister is now being treated for bipolar disorder. His children, as of now, show no signs of mental illness, but are worried that they will also develop a mental disorder.

Since getting treatment in the Tulsa jail, the defendant reports that "my head is not racing." You indicated that this statement is characteristic of persons emerging from a manic phase. The defendant now takes Haldol, Prozac, Cogentin, and Loxipene. At the jail, doctors have combined his antidepressants with some type of antipsychotic medication. His medical professionals have actually increased the antipsychotic dosages in recent weeks.

Before the crime, the defendant often bragged that he had an I.Q. of 178. Defense tests showed that he actually has an I.Q. of 138. You reminded us that the defendant tried to commit suicide at the Muskogee jail just before his initial appearance. You told us that people suffering from bipolar disorder can experience psychotic features such as auditory and visual hallucinations. You said that there is no evidence that your client experienced visual hallucinations, but that he has reported being plagued by voices for some time. He told the doctor he saw in the Spring of 2004 that he was hearing voices. He told the doctor that he had recently heard voices telling him to "sharpen knives." When his girlfriend complained that she didn't like him repeatedly sharpening her knives, he agreed to seek medical treatment.

O'Connell Letter
February 1, 2005
Page 4

You said that indicators of his bipolar disorder can be seen in his impulsive and irrational conduct. He impulsively stopped productive behavior that he had liked or that was good for him - like quitting jobs, etc. He robbed the victims and then used their credit cards which any former prison guard should have known would get him caught.

*Defense Experts*

You stressed that you had endeavored to find experts who were not merely "hired guns" for the defense bar. You then revealed the identity of the two experts then retained by the defense team.

Dr. George Wood, M.D., is a neurologist and psychiatrist from California who volunteers one month each year with the Doctors Without Borders program. He spent approximately three days with the defendant during two trips to Oklahoma. He spent the night here during his first visit and returned for the second trip after receiving the psychological testing which showed frontal lobe impairment.

Michael Gelbort is a psychologist from Chicago. He traveled to Oklahoma and conducted several neuropsychological tests on the defendant in the Tulsa County jail. You told us that no PET scan was conducted because you had been told that such a test would cost $35,000 and the cost seemed too high at this stage in the case. You indicated that the prosecution team might want to conduct such a test and thereby absorb this cost.

You informed us that you had not yet retained a pharmacologist.

I am aware that these are only the major points covered during our meeting, but I have tried to create as comprehensive a record of what you disclosed to us as possible. If anything repeated above does not comport with your recollection of your disclosures, please respond and correct my version. If we do not hear from you, we will assume that the matters reported above were disclosed to us during the December 2004 meeting and we will also assume that we may share these matters with prospective government experts.

Thank you for you attention to this matter.

Sincerely yours,

SHELDON J. SPERLING
United States Attorney

LINDA A. EPPERLEY
Assistant United States Attorney

LAE:le