**8**

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **SEALED** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.    CR-03-73-WH |
| | ) | |
| EDWARD L. FIELDS, | ) | FILED UNDER SEAL PURSUANT |
| | ) | TO COURT ORDER DATED 12/20/04 |
| Defendant. | ) | |

## REPORT OF NEUROPSYCHOLOGICAL EVALUATION
## OF J. RANDALL PRICE, Ph.D, DATED JULY 1, 2005

**FILED**

**JUL 0 1 2005**

WILLIAM B. GUTHRIE
Clerk, U.S. District Court

By: _____
Deputy Clerk

DAVID E. O'MEILIA
United States Attorney

_____
DOUGLAS A. HORN, OBA No.  13508
Assistant United States Attorney
110 West 7th Street, Suite 300
Tulsa, Oklahoma 74119-1029
(918) 382-2700

# J. RANDALL PRICE, Ph.D., ABPP, ABPN
### Board Certified in Forensic Psychology, American Board of Professional Psychology
### Board Certified in Neuropsychology, American Board of Professional Neuropsychology

**FORENSIC PSYCHOLOGY ASSOCIATES OF TEXAS**
**1221 ABRAMS RD., SUITE 109**
**RICHARDSON, TEXAS 75081-5579**
**TELEPHONE:  972-644-8686**
**FACSIMILE:  972-644-8688**

## Report of Neuropsychological Evaluation

### Identifying Information:

**Name:**                        Edward Leon Fields, Jr.
**Date of Birth:**               ███████
**Chronological Age:**           38
**Dates of Evaluation:**         06/13/05 and 06/28/05

**Date of Final Report:**        07/01/05

**Style of Case:**               United States of America vs. Edward L. Fields
**Case No.:**                    CR-03-73-S
**Court:**                       United States District Court for the Eastern District of Oklahoma

**Attorney for the U.S.:**       Sheldon J. Sperling
                                 United States Attorney
**Address:**                     1200 West Okmulgee
                                 Muskogee, Oklahoma 74401
**Telephone;**                   (918) 684-5100
**Facsimile:**                   (918) 684-5150

**Attorney for the Defense:**    Julia L. O'Connell OBA#13882
                                 Assistant Federal Public Defender
**Address:**                     One West Third Street, Ste. 1225
                                 Tulsa, Oklahoma 74103
**Telephone:**                   (918) 581-6916
**Facsimile:**                   (918) 581-7630

**Referral:**                    Sheldon J. Sperling
                                 United States Attorney

**Firewall Counsel:**            Scott Woodward, FAUSA/NDOK
**Address:**                     110 West 7th, Suite 300
                                 Tulsa, OK  74119
**Telephone:**                   Office: (918) 382-2700
                                 Cell:    (918) 605-2832
**Facsimile:**                   (918)-560-7943

Neuropsychological Report: Edward L. Fields, Jr.

## EVALUATION METHODS:

- Review of Records
- Behavior Observations and Mental Status
- Clinical Interview and History
- Mini-Mental Status Examination (MMSE)
- 21 Item Test
- Rey 15 Item Test
- Digit Symbol Modality Test (DSMT)
- Wechsler Adult Intelligence Scale-III (WAIS-III)
- Wechsler Test of Adult Reading (WYAR)
- Wechsler Memory Scale-III (WMS-III)
- Trail Making Test, Parts A & B (TMT-A, TMT-B)
- Stroop Neuropsychological Screening Test
- Wisconsin Card Sorting Test (WCST)
- Booklet Category Test
- Controlled Oral Word Association Test (COWA)
- Sentence Repetition Test
- Boston Naming Test (BNT)
- Clock, Cross, Key Bicycle Drawings
- Hooper Visual Organization Test (VOT)
- Digit Vigilance Test (DVT)
- Ruff 2 & 7
- Ruff Figural Fluency
- Finger Tapping Test
- Grip Strength Test
- Grooved Pegboard Test
- Frontal Systems Behavior Scale

## RECORDS REVIEWED:

Notebook 1

Court Records and Communications from Attorneys

    A. Indictment

    B. Order Regarding Mental Health Evidence and Examination 12/20/04

    C. Government's Motion and Incorporated Memorandum Regarding Mental Health Evidence 03/24/05

       Order Responding to Government's Motion of 03/24/05

    D. Joint Motion for 30 Day Extension of Filing Deadline

    E. Notice of the Nature of Evidence and Listing of Potential Witnesses in Support of Aggravating Factors and Death Penalty Eligibility

    F. Prosecution's Categorized Witness List

    G. Summary of Deceptive Information Provided by Edward Fields During Interview on 07/18/03

    H. Letter Dated 02/01/05 to Julie O'Connell from Sheldon J. Sperling and Linda A. Epperley Regarding Information Disclosed to Mr. Sperling and Ms. Epperley by Ms. O'Connell on 12/02/04.

    I. Time Line Designed by Prosecution

2

Neuropsychological Report: Edward L. Fields, Jr.

    J.  Communications with Attorneys (Letters and emails)

Notebook 2
    Crime and Crime Scene Investigation and Results
        A.  Supplemental Incident Report
        B.  Oklahoma SBI Crime Scene Investigation
        C.  Crime Scene Photo Log
        D.  Log of Who Entered the Crime Scene and Why
        E.  Crime Scene Measurements
        F.  Oklahoma SBI Second Search of Chick's Van
        G.  Oklahoma SBI Search of Chick's Apartment in Hurst, Texas.
        H.  FBI receipt for Property Received/Returned/Released/Seized
        I.  Report of Medical Analysis of Shirley Chick
        J.  Photographs of Mr. and Ms. Chick Before They Were Murdered
        K.  Report of Investigation By Medical Examiner for Charles Chick
        L.  Report of Investigation By Medical Examiner for Shirley Chick
        M.  Recreation Fee Permits for Camping
        N.  Automobile Records for the Chick's Car

Notebook 3
    Arrest, Confession, Suicide, Investigation Procedures and Results
        1.  Oklahoma SBI Interview with Carol Lamb When She Went to Police 07/18/03
        2.  Arrest Warrant for Edward Leon Fields & Search Warrant for Mr. Field's Truck
        3.  FBI Arrest, Interview and Confession of Edward Fields
        4.  Edward Fields' Written Confession of the Murders of Mr. and Ms. Chick
        5.  Edward Field's Phone Call to Michelle Tipton Following His Confession
        6.  FBI Transportation Record When Mr. Fields was Taken from the Poteau Police Department to the Muskogee County Detention Center
        7.  Jail, Medical Records, and Photos Related to Attempted Suicide by Mr. Fields on 07/23/03
        8.  Investigation Records Related to the Murders of Mr. and Mrs. Chick that Substantiate the Confession on Edward Fields' Confession
            j.  A series of U.S. Department of Justice FBI Homicide Reports Dated 07/26/03, 09/02/03, 01/30/04
            k.  Inventory of Items from Mr. Fields' Truck
            l.  Information Related to Carl Wise
            m.  Pre Trial Health Section: Progress Notes from Dr. Kemp
            n.  FBI Collection of Clothes of Mr. Fields from the Muskogee County Jail
            o.  FBI Analysis and Return of Shoe Wear Impression and Field' Shoes
            p.  Oklahoma SBI Search and Recovery of Back Pack in Wister Lake
            q.  Oklahoma SBI Latent Evidence Analysis Report
            r.  Oklahoma SBI DNA Analysis Report Finding Mr. Fields DNA Matched that Found in Van
            s.  Analysis of Firearms Evidence Report Finding All Bullet Casings Found at Crime Scene Matched the Gun Found in Mr. Fields' Truck

            t.  Oklahoma SBI Report of Distance From Kenco Plastics To Winding Stairs Campground Area
            u.  FBI Analysis and Return of Ghillie Suit and Fibers

Neuropsychological Report: Edward L. Fields, Jr.

      v.  FBI Items Recovered Related to Crime and Results of the Item's Analysis

      w.  Information from Ray Crow, the Manager for the Firearms Information Center for Wal-Mart Stores, Inc. Verifying a Marlin .22 caliber rifle to Edwads Fields on 11/25/94.

      x.  Receipts and the Chick's Credit Card Statements Records Showing Money Spent by Mr. Fields the Weekend Following the Murders

      y.  Title and Registration for Mr. Fields' Truck

      z.  Information Related to the Purchase of Guns by Mr. Fields in 10/00 & 09/01

      z.  Discovery Log

## Notebook 4

Telephone Transcripts Between Fields and Others While in Jail

## Notebook 5

Telephone Transcripts Between Fields and Others While in Jail

## Notebook 6

Fields' Employment Files from Oklahoma Department of Corrections 04/96 – 01/99

## Notebook 7:

Interviews

A.    Deborah Bailey, Fields' Cousin, 09/09/03

B.    Helen Walker, Fields' Aunt, 09/09/03

C.    Mary Margaret Fields, Fields' Mother, 09/05/03

D.    James Richard White, Fields'Cousin, 09/05/03

E.    Teresa Fields, Fields' Ex-Wife. 09/09/03

       Rhiannon Nycole Meadows, Fields' Daughter 11/21/03

F.    Elaeanor Elizabeth White, Fields' Aunt, 09/08/03

G.    Angela Wade, 3rd Cousin, 09/11/03

H.    Rufus Allan Skeens, Brother-in-Law, 10/24/03

I.    Ethel Gist, Family Friend, 09/10/03

J.    Paule D. Fields, Acquaintance, 09/10/03

K.    Gayla Schlosser, Acquaintance, 09/04/03

L.    Carlena Michele Sparks, Ex-Girlfriend, 09/09/03

M.    Jerry Alan Carter, Friend, 10/30/03

N.    Margaret Elliott , Mother of Shirley Chick, 10/03/03

O.    Andrea White, Worked in Video Store Where Fields Rented 02/04/04

P.    OK SBI Interview of Carol Sakura Lamb, Girlfriend 07/18/03

Q.    OK SBI Interview of Roland Richard Robinson, Jr., Girlfriend 07/12/03

    R.  FBI Interview with Denise Chitwood, a family friend who knew Mr. Fields 10/29/04

    S.  FBI Interview with Daniel Pressley, Fields' Friend 008/07/03

    T.  FBI Interview with Carol Sakura Lamb, Fields' Friend 008/07/03

    U.  FBI Interview with Deborah Kay Bailey, Fields' Cousin & CO in FL. 08/07/03

    V.  FBI Home Searches of Michelle Tipton 07/23/03 & 07/30/03

    W.  FBI Interview of Dawn Michelle Tipton

    X.  FBI Interview of Marilyn K. Pressley, Wife of Dan Pressley and Fields' Friend 08/08/03

    Y.  OK State Bureau of Investigation Interview of Mr. Fields' Co-Workers

      •  OK SBI Interview of Robert Ray Shankle, Employee of Kenco Plastics 07/22/03

      •  OK SBI Interview of Curtis Lee Elmore, Employee of Kenco Plastics 07/22/03

4

Neuropsychological Report: Edward L. Fields, Jr.

- • OK SBI Interview of Marshall Henry Lamar, Employee of Kenco Plastics 07/22/03
- • OK SBI Interview of Warren Melvin Perry, Employee of Kenco Plastics 07/22/03
- • OK SBI Interview of Penny Michelle Hawks, Quality Control Inspector 07/22/03
- Z. Jemima Carol Hagan Meadows, Acquaintance, 11/21/03
- 1. Elaine Calhoun, Oklahoma Department of Corrections (OK SBI)
- 2. Kenneth Wayne Ritchie, Oklahoma Department of Corrections (OK SBI)
- 3. Gail Lynn Nichols, District Manager for Wortz (OK SBI)
- 4. David Love, Acquaintance through Computer Work (OK SBI)
- 5. Kath Fraggrell , Wortz Cracker Co. (FBI)
- 6. Jovonna Lee Fields, Supervisor Bremner Cracker Cp. (FBI
- 7. Michael Lloyd, Maintenance Manager, Oaks Nursing Home (FBI)
- 8. Karen Hall, cousin (FBI
- 9. Dean Anderson, Physician Assistant Hill Creast Clinic and Fishing Partner
- 10. Carol Lamb, Girlfriend, (USDA-FS)
- 11. Robert White, Neighbor of the Fields' Family, (USDA-FS)
- 12. Jason Janway, Worked with Fields at Jim Hamilton Correctional Facility '97-'98, (USDA-FS)
- 13. Daonal Allison, Live in Community Where Fields' Family Lived, (USDA-FS)
  Dave Meyer, Employee of Kenco, (USDA-FS)
- 14. Betty Vaughn, Janitor at Kenco, (USDA-FS)
- 15. Arlene Snyder, Employee of Kenco, (USDA-FS)
- 16. Judy Janway, Related to Fields by Marriage, Known Him Since Childhood, (USDA-FS)
- 17. Marla Dodd, Jack's Jewelers, (USDA-FS)
- 18. Brenda Stacy, Girlfriend, (USDA-FS)
- 19. Buddy Burleson, Employee of Kenco and Friend, (USDA-FS)
- 20. David Love, Acquaintance Through Computer Work (USDA-FS)
- 21. Andrea White, Met Fields in '95 and Knew Him From Her Video Store and Box Car Bar (USDA-FS)
- 22. Tony Lee Mayarant, Neighbor of Fields; Family (USDA-FS)
- 23. Sherr Sue McCullough, Friend, (USDA-FS)
- 24. Angela Brown, Bought Video Store from Carol Lamb, (USDA-FS)
- 25. Ruby Hall, Café Worker Where Fields Went Consistently, (USDA-FS)
- 26. Becky Steelman, Video Store Owner, (USDA-FS)
- 27. Elizabeth Annette Wilson, Third Cousin and Acquaintance, (USDA-FS)
- 28. Jerrie Lyn Mathews, Former Girlfriend
- 29. Janice Wright, Support Manager at Wal-Mart, (USDA-FS)
- 30. Charles Glascow, Wal-Mart Employee who Accessed Fields' Records, (USDA-FS)
- 31. Grand Jury Testimony
  - • Dawn Michelle Tipton 07/30/03
  - • Daniel Pressley 07/30/03
  - • Carole Lamb 07/30/03

Notebook 8
- 1. The Wackenhut Corporation Employment File on Mr. Fields
- 2. Bremner- Wortz Cracker- Poteau Employment Records
- 3. Kenco Plastics Employment Records
- 4. Navy Records

Neuropsychological Report: Edward L. Fields, Jr.

Notebook 9
- A. Prison Medication Records
- B. Calendar Pictures of Each Month of 2003
- C. Photos Related to Locations Where Edward Fields Spent Time Around the Time of the Murders.
- D. Divorce and Child Support Records

Notebook 10
- A. School Records
- B. LeFlore County Medical Center Records
- C. Muskogee Jail Medical Records
- D. Tulsa Jail Medical Records
- E. Psychiatric Report: Bradley D. Grinage, M.D.
- F. Psychiatric Report: Georged W. Woods, Jr., M.D.
- G. Holy Sacrament of Baptism: Edwards Leon Fields, Jr.

## REVIEW AND ANALYSIS OF RECORDS:

### Indictment

The Indictment included the following charges:

Count 1  First Degree Murder by shooting Shirley Elliott Chick on 07/10/03 (premeditated)
Count 2  Use of a Firearm in a Federal Crime of Violence Causing the Death of a Person
Count 3  First Degree Murder by shooting Charles Glenn Chick on 07/10/03 (premeditated)
Count 4  Use of a Firearm in a Federal Crime of Violence Causing the Death of a Person
Count 5  Assimilative Crime – Robbery with a Firearm of Charles and Shirley Chick, taking cash and personal property
Count 6  Assimilative Crime – Burglary of an Automobile, breaking and entering Charles and Shirley Chick's 1996 Ford van with the intent to steal property.

### Government's Motion and Incorporated Memorandum Regarding Mental Helath Evidence

Motion requesting that (1) "the defendant should be required to submit to an examination by experts of the government's choosing at a designated Bureau of Prisons facility, (2) the examination shall be conducted under published Guidelines for Forensic Evaluations, December 2004 . . . which apply to all forensic evaluations conducted by Federal Bureau of Prisons officials, (3) the examination will focus on the defense counsel's representations concerning defense expert's findings as stated in Attachment 1 including the following:
1. Did the defendant have a brain injury or frontal lobe deficit on July 10, 2003?
2. Did the defendant then have a bipolar disorder?
3. was the defendant then psychotic?
4. Did the defendant then experience a manic flip?
5. was the defendant then substantially affected by anti-depressants, such as Effexor or Tylenol PM?
6. Did the defendant then experience a "manic flip" or a "manic switch" as the result of the combined impact of any or all of the foregoing conditions, circumstances, or drugs?

Neuropsychological Report: Edward L. Fields, Jr.

7. At the time of the commission of the acts constituting the charged offenses, was the defendant, as a result of severe mental disease or defect, unable to appreciate the nature and quality or the wrongfulness of his acts?
8. Did any such conditions or circumstances or occurrences substantially impaire the defendant's judgment at the time of the commission of the accts constituting the charged offences?

and (4) all communication between trial counsel for the government and BOP experts shall end when such experts are designated by BOP officials, which experts' communication shall then be with "firewalled" AUSA(s).

## Court Order Responding to Government's Motion Regarding Mental Health Examination and Evidence 04/05/05

"It is the Order of the Court that the government's motion regarding mental health evidence (#122) is hereby GRANTED in part and DENIED in part. The defendant shall submit to examination(s) by experts of the government's choosing, but such examinations shall take place at the defendant's place of confinement. The examination shall focus primarily on the eight questions listed at pages 13-14 of the government's motion. The results and reports of any examination shall be sealed, Rule 12.2 (c) (2), and may only be disclosed to the "firewalled" AUSA. The government shall use the mental health evidence it obtains only for rebuttal purposes at the punishment stage, if any, of the trial."

## General Description of Crime and Investigation

According to the USDA Forest Service Supplemental Incident Report (0458) & Oklahoma State Bureo of Investigation Crime Scene Report, Max Hendrix, a motorcyclist from Weatherford, Texas who was visiting the Winding Stair Campground area found Mr. and Ms. Chick's bodies and reported to law enforcement on 07/11/03 at 2:40 p.m. Law enforcement arrived and investigated the crime scene.

Ms. Chick's body was found in a prone position next to the passenger side of the van, with her head near the front passenger door and her feet down hill. Blood was around her body and running down the hill. Her shirt was pulled up partially over her head. Autopsy Reports (0010) stated that Ms. Chick suffered a gunshot wound to her left foot and two gun shot wounds to her head.

Mr. Chick's body was found in a prone position next to the picnic table with blood around his head and a pool of blood and bloodstains on the picnic table. Mr. Chick's shirt also was pulled up (0023). Autopsy Reports stated that Mr. Chick had two gun shot wounds to the head. The campsite #15 included a tent, a clothesline, a tarp over the picnic table and a grill. A van with a broken passenger side window was also at the site. A search of the campsite was conducted. Trees and bushes separated campsite 15 from campsite 14.

Investigations included the crime scene where bullets, fiber and blood samples were recovered. Mr. and Ms. Chick's apartment in Hurst, Texas was searched. A man named Carl Wise who lived in Louisiana and had been registered at the Winding Stair campsite was interviewed regarding what he had observed while visiting the area.

7

Neuropsychological Report: Edward L. Fields, Jr.

## General Description of Arrest and Confession

The Oklahoma SBI interviewed (0054) Carole Lamb who was a friend of Edward Fields and who notified the police on July 18, 2003 that she had concerns regarding Mr. Edward Fields and the murders that had occurred at the campsite on June 10th. Ms. Lamb and Mr. Fields had dated on and off prior to Ms. Lamb's marriage to another man. Ms. Lamb and her husband divorced, and Mr. Fields and Ms. Lamb began dating again. He lived with her from early June 2003 to late June 2003 when the relationship began to deteriorate; however, they remained friends and talked often. Ms. Lamb had seen Mr. Fields .22 caliber rifle with its camouflage cover and his ghillie suit. Ms. Lamb was aware that Mr. Fields had been living out of his truck near the Winding Stair Campsite, because he had no place to live. He had called her on July 8th and told her he was planning to commit suicide. She visited with Mr. Fields that evening at his campsite and attempted to help him find a place to live. During their visit, Mr. Fields told Ms. Lamb that he had done something really bad the night before when he wore his ghillie suit and sneaked up on some parkers, and the parkers were unaware he was there. He giggled when he told her.

On July 10th, Ms. Lamb and Mr. Fields met for dinner at approximately 4:45, and Mr. Fields asked Ms. Lamb for money to get a motel room. She told him to be sure he could get the room and she would give him the money after her college class that she was attending at 6:00 pm. She did not hear form him again until the following day when he called to ask for money again; Ms. Lamb said she was leaving town and could not get any money to him. On July 14, she received another call from Mr. Fields when she was at the doctor, and she told him she could not talk. He left a voice message on her phone on July 15th, which had been the last time she had heard from him. However, she had seen his truck earlier that morning at Kenco where Mr. Fields worked.

Police went to Kenco and looked in the open bed of Mr. Fields' truck (0596) where they found the ghillie suit. In addition, Carl Wise, a camper who had been near the site close to the time of the murders had been contacted, and he described seeing a truck like that of Mr. Fields. Based on this evidence, a search and arrest warrant were obtained and Mr. Fields was taken in for questioning regarding the crimes.

Mr. Fields was cooperative, provided a history of his adult life, and when asked, stated he had nothing to do with the crime, he owned no guns, he was not at the campsite that week, and provided an alibi for the evening of 07/10/03. After further questioning, Mr. Fields confessed to the murders. He explained that he had gone to the campsite wearing his ghillie suit and taking his .22 caliber rifle to rob the campers at gunpoint and that he did not plan to kill them. He watched them as he hid in the trees as they were standing at a vista. He continued to creep closer to the campsite, and the campers came back. At that time the campers sat at the picnic table and Mr. Fields continued to sneek closer. At the time that the male camper said he was going to the tent, Mr. Fields opened fire on him shooting him in the head. He shot at the female camper as she ran to the van. He hit her in the foot and then moved to where she lay and shot her in the head. He then robbed the van of money, credit cards, and personal items. Mr. Fields confessions were provided verbally and in writing.

After the confession, Mr. Fields asked to call his girlfriend, Ms. Michelle Tipton. He was allowed to make the call and was heard telling Ms. Tipton where he was and what he had done. Ms. Tipton did not believe him until she called the police department back and gained verification that that Mr. Fields was telling the truth.

8

Neuropsychological Report: Edward L. Fields, Jr.

SA Gary W. Graff prepared a one-page summary opining 11 allegedly false or deceptive statements given by Mr. Fields during the interview on 07/18/03 including:

- Mr. Fields claimed he did not hunt in the traditional sense and possessed no firearms.
- Mr. Fields claimed he has not owned a .22 caliber rifle since he was a child.
- Mr. Fields claimed the cut on his left thumb occurred at work a few weeks ago; Special Agent Dalley estimated the cut to be no more than a week old and possible incurred when breaking the Chick's van window.
- Mr. Fields claimed that on July 10th, he had dinner with Carole Lamb and went directly to his campsite on Wister Lake.
- Mr. Fields claimed he last visited the Winding Stair campground during the first week of July and was not there the week of July 6yh.
- Mr. Fields denies shooting the Chicks at Winding Stair.
- Mr. Fields claimed Mr. Chick's body fell to the ground after the second shot to the head.
- Mr. Fields claimed he disposed of both of the victims backpacks, one in Wister Lake and the other near Kerr Lake.
- Mr. Fields claimed he only made one purchase with the Chick's credit cards.
- Mr. Fields claimed he had never been violent before. (The veracity of this statement would depend on how one defines violent.)

On the evening on July 18, 2003, FBI agents transported Mr. Fields from the Poteau Police Department where the confession took place to the Muskogee County Detention Center. Mr. Fields was placed on suicide watch due to his claim of being suicidal and a call from his mother stating that he was suicidal.

Records include numerous investigation reports that link Mr. Fields to the murder of Mr. and Ms. Chick including fiber samples, DNA samples, shoe prints, ballistics, witness seeing Mr. Fields truck near campsite.

Over 61 interviews with persons who knew Mr. Fields were provided to this examiner. Interviewees are listed above under Notebook 4 Table of Contents and include friends, girlfriends, family, co-workers, and neighbors. Information from many of the interviews is included in Time Table 1 and Table 2 appended to this report

## Mr. Fields' Suicide Attempt

On the morning of July 23, 2003, Mr. Fields asked if he could shave and shower to prepare for his court appearance that afternoon. He was given a razor and allowed to go to the shower where he cut his left wrist and the vein at the bend of his arm. He was found bleeding by an inmate and cared for by officer Glen Reed who tied his arm with cloth to stop the bleeding.

Juston Hutchinson, Under-sheriff-Muskogee County Sheriff's Department, stated that he rode to the hospital with Mr. Fields after his suicide attempt. After his wounds were cleaned and bandaged, the doctor left the room, and Mr. Fields began asking where he would go when he returned to jail (lock down, cage); he then said that his father had died and his mother had moved to Virginia and he had been hearing voices, and that he did not mean to kill those people, he went to rob them at gunpoint and once they were in his scope the gun went off. Mr. Fields was released from the hospital and moved to and from the wheel chair on his own.

9

Neuropsychological Report: Edward L. Fields, Jr.

## Medication Records While in the Muskogee Jail

While in the Muskogee Jail, Mr. Fields was given the following medications:
    July 19 to August 5 Effexor 150 mg every other day (which he took prior to his arrest)
    July 25 – August 2 Cefadroxil; 500 mg twice a day
    July 26 Risperidol 1 mg at bedtime
    July 27 Lexapro 20 mg. once a day
    August 8 Lithium 300 mg twice a day
All medication records stop on August 14. This was on or about the time Mr. Fields was moved from the Muskogee Jail to the Tulsa Jail.

## Prison Phone, Visitation, and Mail Records

Mr. Fields was housed in the Muskogee Jail until about 8/20/03 when he was moved to the Tulsa Jail. This examiner was given telephone transcripts on conversations held from 07/21/03 to 09/30/03. Included were 73 phone calls; seventy-one were made to Mr. Field's girlfriend, Ms. Michelle Tipton, and two were made to his friend, Mr. Danny Pressley.

Much of the talk between Mr. Fields and Ms. Tipton focused on their love for one another, their plan to marry, the possibility of Mr. Fields' mother living with Ms. Tipton, Mr. Fields wanting to receive more male from Ms. Tipton, their daily activities and feelings, and sex. Ms. Tipton says she is to blame for Mr. Fields' crime, because she did not let him move into her house. Mr. Fields says that if she had let him move in, he would not have committed the crimes, but that Ms. Tipton should not blame herself. A general theme of many conversations revolves around who is to blame for the crime.

The two calls to Danny Pressley occurred on 08/20/03 and 09/24/03. On 08/20/03, it appears the main purpose of the call to Mr. Pressley was to inform him that Ms. Tipton would be getting the truck that had been given to Mr. Pressley for safe-keeping (storage). The conversation seemed a bit uncomfortable as if perhaps Mr. Pressley thought the truck had been given to him. But, Mr. Pressley was very gracious and emphasized that what ever Mr. Fields wanted was fine. Mr. Fields and Mr. Pressley also talked about Mr. Fields' situation from the perspective of correctional officers. They teased each other a bit, but Mr. Pressley seemed concerned about Mr. Fields. Mr. Fields told Mr. Pressley that he was relieved to know that cutting veins was painless. He explained that knowing that it was pain-free was liberating.

The 09/24/03 call started out about Mr. Fields being an ex-correction officer and other prisoners remembering him as such. Teasing went on between the two men. Mr. Fields told Mr. Pressley to quit wondering if he did the crime because, they had him. Mr. Pressley asked Mr. Fields the meaning behind the song "Seven Spanish Angels" and Mr. Fields described it.

Visitors and telephone logs from the Tulsa jail spanning 09/03 to 12/21/04 showed that Pressley visited approximately once every-other month.

### Employment Files
Mr. Fields' employment records provided to this examiner include: (1) The U.S. Navy, (2) The Wackenhut Corporation, (3), Oklahoma Department of Corrections, (4) Bremer – Wortz Cracker

Neuropsychological Report: Edward L. Fields, Jr.

Co., and (5) Kenco Plastics. Information in other records suggests that Mr. Fields was self-employed as a computer repairperson. No files were provided for that job.

**U.S. Navy 1984 – 1999:** Mr. Fields enlisted in the U. S. Navy in 1984 after quitting high school after the 11th grade. Upon entering the Navy, he was given the Armed Services Qualifying Test (AFQT). The score table below shows the sections required and the scores Mr. Fields earned per section. To qualify for the armed forces, an overall score of 31 is required; Mr. Fields overall score was 59.

| Sections | Percentile Score |
|---|---|
| General Science | 67 |
| Arithmetic | 49 |
| Word Knowledge | 58 |
| Paragraph Comprehension | 54 |
| Numerical Operations | 57 |
| Coding Speed | 52 |
| Auto & Shop | 66 |
| Mathematics Knowledge | 48 |
| Mechanical Comprehension | 53 |
| Electronic Information | 49 |
| VE | 56 |

He served two years active duty, advancing to Boatswain mate. He voluntarily extended his active duty in 1986 for two additional years. Following those years, he served as a recruiter. His service record is without disciplinary action, and his evaluations average approximately 3.7 on a 4-point scale. He was honorably discharged in 1992.

**The Wakenhut Corporation:** The Wachenhut Corporation provided minimal records regarding Mr. Field's employment. Reviewed were payroll records and a fax stating that Mr. Fields employment was terminated in 1995. From the payroll records, it appears that he was employed on 09/29/92 and terminated on or about 02/95. Mr. Fields duties and reason for termination were not included in the records.

**The Oklahoma Department of Corrections:** The following dates indicate when Mr. Fields was employed, changed job descriptions, and received court notification regarding child support while employed with the Oklahoma Department of Corrections. Mr. Fields' file indicated no problems regarding his employment with the Department of Corrections.
07/14/95: Mr. Fields was employed at the Oklahoma State Penitentiary (OSP) (1197) as a Correctional Officer Cadet.
11/30/95: Mr. Fields requested a transfer to Ouachita Correctional Center (OCC) whenever a position became available.

11

Neuropsychological Report: Edward L. Fields, Jr.

09/15/95:    Mr. Fields signed a "Voluntary Income Assignment" to pay Jemima Carol Stubbs $136.08 per month fro child support.
12/06/95: Mr. Fields received a "Notice of Income Assignment for Payment of Child Support from Jemima Carol Stubbs. The amount to be withheld was $136.08 monthly.
01/01/96 Mr. Fields requested to reallocate his position from Correctional Officer I to Correctional Food Service Supervisor at OSP(1198)
03/27/96: Mr. Fields requested a transfer to OCC as a Food Service Supervisor (1202).
04/02/96: Mr. Fields was transferred to OCC as a Food Service Supervisor
12/01/96: Mr. fields was in Food Service Supervision (1191)
01/03/97: Mr. Fields requested to be voluntary demoted from a Food Service Supervisor to a Correctional Officer I (1189). The pay decrease appeared to be approximately $100. per month.
03/14/97: Mr. Fields received a "Notice of Income Assignment for Payment of Child Support from Jemima Carol Stubbs. The amount to withheld was $136.08 monthly and $129.92 per month arrearage payment, totaling $265.90 per month.
04/04/97: Mr. Fields received a "Notice of Income Assignment for Payment of Child Support from Jemima Carol Stubbs. The amount to be withheld was $136.08 monthly and $50.00 per month arrearage payment, totaling $186.08 per month.
10/04/99: Mr. Fields resigned his position. At the time of resignation it appears Mr. Fields was making $1,836.36 monthly as a Correctional Security Corporal (1185

Oklahoma State Bureau of Investigation Interview of Elaine Calhoun, Oklahoma Department of Corrections (0039)
Ms. Calhoun worked with Mr. Fields for 1.5 years on the same shift at the correctional facility. He was polite and had no problems with co-workers. Mr. Fields was awkward at first with inmates, but eventually the inmates came to like him. She knew nothing of his personal life other than he and his wife divorced shortly after he began working there.

Oklahoma State Bureau of Investigation Interview of Kenneth Dwayne Ritchie, Oklahoma Department of Corrections (0039)
Mr. Ritchie and Mr. Fields worked the same shift at the correctional facility. Mr. Fields got along well with others and had no problems. Mr. Fields and Mr. Ritchie were also friends out side of work. Mr. Fields had dinner with the Ritchie's and hunted squirrel on their property. Mr. Ritchie felt that Ms. Fields was demanding of Mr. Fields time. After their divorce, Mr. Fields became irresponsible with money and very interested in computers.

**Bremner – Wortz:** Mr. Fields was hired on 10/25/99. On a Basic Physical Form completed on 11/10/99, Mr. Fields listed "Serozine" (Serzone possibly) twice daily and Tylenol PM. Serzone is an antidepressant medication and Tylenol PM is for sleep. On 02/23/00, Mr. Fields applied for a seven-day leave of absence to go to Virginia to be with his wife due to breast cancer surgery. His request appears to have been approved. On 06/27/01 an incident report was filed regarding Mr. Fields leaving the work site at a break time. On 07/02/01, Mr. Fields was given a "Final Warning" for leaving work without permission. On 07/16/01, Mr. Fields brought a bomb to work and showed it to co-workers in the parking lot near his truck. He called it a fishing device and explained that he was going to drop it in the water and kill fish. An investigation ensued resulting in workers reporting the bomb incident as well as Mr. Fields having previously brought a

12

Neuropsychological Report: Edward L. Fields, Jr.

.22 caliber rifle with a new scope to work and showing it to co-workers. He was terminated on 07/17/01 for the incidents.

**Kenco Plastics::** Apparently, Mr. Fields was employed as a temporary worker at Kenco on 04/05/03 and was hired as a regular employee on or about 05/14/03. On the Health Questionnaire for Kenco completed on 05/14/03, Mr. Fields stated that he was taking no medication and stated that he had never been treated for a mental disorder. Kenco records included child support information directing support to be deducted from Mr. Fields' wages. On 07/18/03, law enforcement officers took Mr. Fields from Kenco for questioning about the murders of Mr. and Ms. Chick, which was his final day of employment.

Oklahoma State Bureau of Investigation Interview of Robert Ray Shankle, Employee of Kenco Plastics 07/22/03
Mr. Shankle was Mr. Fields' supervisor at Kenco. He reported that Mr. Fields was an "excellent hand", nice person, and got along well with others; he had received no complaints. Mr. Shankle did not know Mr. Fields personally.

Oklahoma State Bureau of Investigation Interview of Curtis Lee Elmore, Employee of Kenco Plastics 07/22/03
Mr. Elmore reported that Mr. Fields seemed "odd" and not talkative. He remembered only one conversation he had with Mr. Fields on 07/14/03 when Mr. Fields told him he and his girlfriend had gone to Fayetteville, Arkansas over the weekend and spent $3,000.

Oklahoma State Bureau of Investigation Interview of Marshall Henry Lamar, Employee of Kenco Plastics 07/22/03
Mr. Lamar reported that he had worked with Mr. Fields "a lot". Mr. Lamar had observed Mr. Fields starring at female workers. Mr. Fields spoke most often about having sex with his girlfriend. Mr. Lamar said that Mr. Fields was too "weird" for him, and they were not friends away from work. Mr. Fields never mentioned the murders.

Oklahoma State Bureau of Investigation Interview of Warren Melvin Perry, Employee of Kenco Plastics 07/22/03
Mr. Perry did not know Mr. Fields well; they worked together for one half day once. Mr. Perry reported that on July 14, 2003, Mr. Fields brought a live rattlesnake to work and said he got it at the Winding Stairs Recreational Area. Mr. Fields brought up the murders occurring in the same area. Mr. Perry was not aware of the murders. Mr. Fields told Mr. Perry the names of the victims and where they lived. Mr. Perry stated that the person who killed the victims should also be killed. Mr. Fields replied, "If it gets so bad I can't go fishing, I will move to the city". Mr. Perry thought that was a strange reply. Mr. Perry did not know Mr. Fields outside of work.

Oklahoma State Bureau of Investigation Interview of Penny Michelle Hawkes, Quality Control Inspector at Kenco Plastics 07/22/03 (0039)
When first meeting Mr. Fields, Ms. Hawkes found him polite and pleasant; but after a while, he was overly polite and "creepy". He often asked Ms. Hawkes to help him find a girlfriend. On July 16, 2003 Ms. Hawkes rejected some of Mr. Fields products, which was not usual as his work was typically good. When confronted, he became arrogant and

13

Neuropsychological Report: Edward L. Fields, Jr.

told Ms. Hawkes that he would not correct the problem, which also was uncharacteristic as he was typically receptive to Ms. Hawkes. She did not know Mr. Fields personally or anything about his personal life.

### USDA Forest Service Interview of Dave Meyer, Relief Press Operator at Kenco 07/22/03 (0958)

Mr. Meyer had contact with Mr. Fields for several minutes every couple of hours. He once tried to help Mr. Fields rent an apartment. Mr. Meyer said that the women at the plant did not like Mr. Fields due to his leering and derogatory comments regarding women. He always wanted to be fixed up with a women and asked some Kenco female employees out, but they did not go. Mr. Fields seemed to think he was better than others and looked down on them. He felt that Mr. Fields had knowledge from going to the courthouse library and offered to help Mr. Meyer with a divorce. Mr. Meyer heard that Mr. Fields was having financial problems. He also noticed Mr. Fields' appearance change on 07/14/03 having shaved his moustache and omitted his glasses.

### USDA Forest Service Interview of Betty Vaughn , Janitor at Kenco 07/23/03 (0959)

Ms. Vaughn first thought Mr. Fields was polite but after a short time she believed he was "a low life skank". He talked badly about women and bragged that his two girlfriends (one in Stigler and one in Wister) didn't know about each other. He said he picked up women on his way to Little Rock and met women on the Internet. He also talked about his sexual relations with women. One day he mentioned that he could kill someone and hide the person in a cave, mine, or deep hole where no one could find them. When talking with his co-workers about the murders at Winding Stair, he said it was scary, because he camped there.

### USDA Forest Service Interview of Arlene Snyder at Kenco 07/22/03 (0960)

Ms. Snyder was a press operator at Kenco and a neighbor of the Fields family in Reichert. Ms. Snyder stayed away from Mr. Fields at work, because he stared at her and made her feel violated. Mr. Fields told her "he wanted her", "he liked her body", and "You have a hot body". She thought Mr. Fields scared people.

### USDA Forest Service Interview of Buddy Burleson, Employee at Kenco 07/28/03 (0944)

Mr. Burleson considered Mr. Fields a friend at work; they talked most every day. Mr. Burleson knew nothing about Mr. Fields ghillie suit, guns, hearing voices, hunting, or using computers. Mr. Fields did tell Mr. Burleson that he shot a cat at his campsite because the cat was keeping him awake. Mr. Burleson thought Mr. Fields was living at the lake so he wound not have to drive to the home where he lived with his girlfriend in Stigler. Mr. Burleson said that co-workers did not like Mr. Fields due to his demeaning treatment of women.

## Child Support Documents

Mr. Fields was responsible for child support for three children. One child, Rhiannon Nycole Meadows, was born out of wedlock; her mother is Jemima C. Hagan Stubbs. The two other children, Amanda Fields and Andrew Fields, were from the marriage of Teresa and Edward Fields. Mr. Fields was seriously behind in child support payments to both mothers of these children. He was served court papers regarding his back child support on June 5th, 2003 from

14

Neuropsychological Report: Edward L. Fields, Jr.

Jamima C. Stubbs, mother of Rhiannon. On July 8th, 2003 an Order of Support Payments was issued for Andrew and Amanda Fields. On July 30th, 2003, Mr. Fields was served with court papers regarding the back support for his children Amanda and Andrew. Court records show that during the summer of 2003, Mr. Fields was being legally pressured by the courts to meet the responsibilities of the child support owed.

## Health Section of Pretrial Service Report

The records stated that Mr. Fields was currently taking Effexor for depression prescribed by Dr. Mike Kemp who had treated Mr. Fields since April 2003. Appointment dates and summaries with Dr. Kemp include:

04/10/03    Initial visit. Fields complained of depression and compulsive disorder. He reported: he had seen Dr. Winters in June of 2000 who had prescribed Celexa and Prozac; had seen Dr. Schumpert (no date given) who had prescribed Paxil and Serzone; all medications had negative side effects or were not otherwise helpful; current problems began a year prior when his father became ill; father died 6 months prior; mother was also ill and he had full responsibility of her care; he hears voices that result in compulsive behavior such as telling him to sharpen his knives or drive to his girlfriend's home (which he does); no voices told him to do dangerous or harmful things; denied suicidal thoughts; had decreased appetite; had problems sleeping. Dr. noted that Mr. Fields seemed intelligent with normal judgment and a flat affect. Clinical impression was: Clinical depression and Compulsive disorder. He prescribed Lexapro 10 mg. daily (provided samples). Return in three weeks.

05/01/03    Follow-up. Fields reported: feeling better regarding depression and compulsive behavior ("medicine has been wonderful"); still raises his voice occasionally; low energy, and decreased appetite; no sharpening of knives in two weeks; minor sexual dysfunction due to medication. Dr. noted that Fields seemed calm, alert, more animated, steady hands with normal judgment and orientation. Assessment and medication remained the same (samples provided). Return in four weeks.

05/27/03    Follow-up. Mr. Fields reported: previous day he thought about taking an overdose of Elavil but did not because he thought the medication would not take full effect before his girlfriend came home, and she would take him to the hospital, which he did not want; his reason for living is gone or going--his father died and his mother is moving to Virginia; must pay child support for three children and makes $7.00/hour; he reports IQ of 168 and high scores on SAT, could have gone to Harvard; denied hearing voices telling him to hurt himself; compulsions are better. Assessment remained clinical depression and compulsive disorder with thoughts of hurting himself by taking medicine. The doctor discussed inpatient and psychiatric assistance, which Mr. Fields rejected. Lexapro was increased to 20 mg. daily (samples provided). Return in three weeks.

06/16/03    Follow-up. Mr. Fields reported: he is not doing much but going to work; doesn't want to do anything; thoughts of suicide; poor appetite with weight loss; worries; does not hear voices; compulsion is not a problem; not as anxious as previously; medicine not working as well as he wanted but would not consider inpatient treatment; going to Kentucky in a few weeks, wanted to feel better by then. Assessment remained the same. Medication was changed from Lexapro to

15

Neuropsychological Report: Edward L. Fields, Jr.

Effexor XR 37.5 mg daily for one week and then 75 mg daily for two weeks (samples provided). Return in three weeks or if he feels suicidal.

07/07/03 Follow-up. Mr. Fields reported: doing a little better; catching snakes at night and selling them for 40 cents per running foot; broke-up with old girl friend but spent weekend with new girlfriend; continues to think about suicide, but not seriously; appetite increased. Dr. noted that Mr. Fields seemed happier and less negative. Assessment was that clinical depression and compulsive disorder had improved. Effexor was increased to 150 mg (prescription given). Return in one month.

## Time Tables

Time Table 1 is an addendum to this report and attempts to provide a time line of specific events, descriptions, and comments from a variety of individuals who knew Mr. Fields and were questioned about his behavior. The purpose of the Table is to provide examples of behaviors that help understand Mr. Fields over the course of his life as recorded in the records provided this examiner.

Table 2 includes comments and events taken from the records provided this examiner that are difficult to place in a time line but that shed light on the perceptions of others about Mr. Fields.

## INFORMED CONSENT:

Before the first session began, Ms. O'Connell, counsel for the defense, met with her client and me to insure a smooth beginning With his counsel present, I informed Mr. Fields about the nature of the evaluation, who had retained my services, the limits on confidential, his right to refuse to cooperate, his right to contact his attorney, and that the entire evaluation would be audio-taped. He gave consent both orally and in writing. Ms. O'Connell also met with her client and me at the beginning of the second session. The second session was also audio-taped.

## BEHAVIOR OBSERVATIONS AND MENTAL STATUS:

Ed Fields is a 38 year-old, Caucasian male in no apparent physical or emotional stress. He was attired in typical jail clothes. Personal hygiene was good with the exception of needing a shave. He wore correctional lenses. Hearing was within normal limits. His motor behavior was remarkable for a bilateral tremor secondary to medication. Gross attention and concentration was adequate for formal testing to proceed. Mr. Fields was alert, oriented, and cooperative throughout the evaluation session. Affect and mood were euthymic. Thought processes were goal-directed and logical. Thought content revealed no present or past delusions. He denied suicidal or homicidal thoughts. Sensorium was clear. Memory functions were grossly intact. Intelligence was judged to be average to above average. The results of this evaluation are judged to be a reliable and valid representation of his neuropsychological status.

## RESULTS OF CLINICAL INTERVIEW:

Mr. Fields has been incarcerated since 7/18/03 when he was charged with capital murder. He is now in a single cell designed for a disabled person so he has his own shower. Before coming to jail, he was staying with different girlfriends and in his truck in a campsite at Lake Wister. His main girlfriend continued to talk to him on the phone for approximately seven months after he was arrested but has since reconciled with her husband. Mr. Fields was working at a plastics

16

Neuropsychological Report: Edward L. Fields, Jr.

factory before his arrest. His interests were squirrel and snake hunting, fishing, cooking, and sex with his girlfriends.

His family of origin consists of his mother with whom he reported to have a "special bond" and a sister whose financial success is a bone of contention with Mr. Fields. Mr. Fields reported that his father died in either 2001 or 2002. He described his father as a good provider, hard worker, who was "gone most of the time."

Mr. Fields has been married twice to the same woman, Teresa Fields, with whom he has two children, ages 15 and 17. He stated that his divorce from Teresa was final in March of 2003. He is the father to another offspring, who is now 18-years-of-age. Mr. Fields has been in several marital-type relationships, most of which have been on-again, off-again. These relationships include Michelle Tipton, Carole Lamb, Brenda Stacey, Carlena Sparks, and, Roberta Casin, a woman he met online that lived in Ohio. His relationships with some of these individuals overlapped. He also dated other women during his relationships with these individuals. He reported to have had close to 50 sexual partners since the age of 13 or 14 years.

When asked about current physical symptoms, Mr. Fields reported the "shaking" in his hands that began when he was started on anti-psychotic medication. Once a day, he is currently taking Loxadane (50mg), Ardane (4 gr.), Prozac (40mg.) , and Lithium(900mg). He sleeps 12 to 13 hours per day now compared to 5 to 6 hours before he was incarcerated on 7/18/03. Before he came to jail, he took Tylenol PM for sleep. He has a long history of sleep disturbance. He lost 60 pounds just before coming to jail but has been gaining it back since them. He is 6'2" and weights approximately 237-240 pounds.

When asked about current psychological symptoms, especially mood, he reported that he is "pretty good for the circumstances." He does not want to die and will fight the death penalty because his family seem to "all want me around." He also thinks he can make a life for himself in prison. Mr. Fields also reported to have had a "bad case of stupidity" in all areas of his life, such as with girlfriends. He also reported to have had auditory hallucinations since he was approximately 16 years –of-age. He referred to the voice as a "little friend." He stated: "I have a voice that talks to me and tells me things. He ran my life." He indicated that the voiced is involved in all areas of his life. He does not have a name for the voice. He reported that the voice he hears is the same one, a male voice, no other voices, inside his head, about once or twice a week, that tells him to do things like call Michele, walk off jobs, and shoot Mr. and Mrs. Chick. He first reported that he did not remember the voice ever telling him to kill himself, but he later reported that he was sure the voice told him to kill himself when he attempted suicide after he was arrested. He described the process as being like an anxiety attack, that he argues with the voice when it tells him to do something, that pressure builds up in his chest, and that the way to make the pressure go away is to follow the command of the voice. One time, the voice told him to run a comb through his hair when he looked in the mirror. No delusional system was described. He said that his mother told him when he was little that there would always be a voice in his head telling him what to do. When he discussed the voice with his mother after the offense on 7/10/03, his mother told him that she was describing his conscience. He laughed when relating this story. He thinks that the medication has helped with the voice, and he only hears it once or twice a month now.

17

Neuropsychological Report: Edward L. Fields, Jr.

Medical history related by Mr. Fields includes having had Hyaline Membrane Disease (Respiratory Distress Syndrome) shortly after birth. According to Mr. Fields, he was transferred to another hospital because he was unable to breath and almost died. When he was 13 years-old, he was hospitalized for 3 to 4 days because he was dehydrated from having the flu. At 26 years-

of-age, he wrecked a pick-up truck and suffered a concussion and cervical strain. He reported that he was in the hospital for about one week in Richlands, Virginia. He does not think he lost consciousness. He had headaches for a period of time but does not think he had any residual effects from the concussion.

Mental health treatment history is limited to seeing a psychiatrist for "a few times" when he was 16 years of age. He reported that this was for depressions and that it was his mother's idea. He reported life-long depressive symptoms. He reported that he first took anti-depressant medication when he worked as a Correctional Officer for the Oklahoma State Prisons. The first medication he took was Wellbutrin, first for smoking cessation and then for symptoms of depression. He has taken several different anti-depressant medication including: Paxil, Prozac, Serzone, Lexapro, and Effexor. He reported that he liked Serzone the best. He reported that he also felt good on the 75mg dose of Effexor. Also, he reports that he does not feel depressed now. Mr. Fields has now been told that he is bipolar, but he denies ever experiencing a manic episode characterized by a distinct period of abnormal, persistent elevated, expansive, or irritable mood. He denied experiencing feelings of inflated self-esteem, decreased need for sleep, and pressured speech, flight of ideas, being easily distractible, or having an increase in goal-directed activity. He admits to a long history of sexual indiscretions and to not being able to manage his money. Rather, Mr. Fields stated that he has spent more time down rather than up. He has had periods of poor appetite with weight loss, chronic insomnia, low energy, low self-esteem, feelings of hopelessness, and bad decision-making. According to his report, these symptoms have caused him distress and impaired social functioning.

As previously stated, Mr. Fields admitted to a long history of sexual indiscretions. Beginning at age 13 or 14 years-of-age, he had approximately 50 sexual partners, several of who developed into marital-type relationships and some of which were brief and casual encounters. He stated that he greatly enjoyed sex and invested considerable energy into his pursuit of women. He often dated more than one woman at the same time and had to "juggle" his girlfriends. He admits to compulsive deceitfulness, stating that he lies about "pretty much everything" and that he is good at it. He also admits to life-long financial irresponsibility, stating that he never paid bills until they threatened to turn off the service. He would meet women online, call them and "chat them up", and then take them to dinner. His opinion about women appears ambivalent—at one point in the interview, he reported that he sought out "stupid" women but at another point, he said that he "thought highly of women" and never would insult them by using "pick-up lines". He denied any deviant sexual interests including exhibitionism, voyeurism, or any type of "swinging" or "swapping".

Mr. Fields reported his interest in certain areas that he characterizes as eccentric, such as keeping his knives so sharp that they are good for surgery—not just shaving. Regarding knives, he stated that "if you are going to have one, keep it sharp." He only kept a .22 rifle for squirrel hunting which he did with the ghillie suit that he made himself in about 2001. He had a 6X18X50 Bushnell scope on it so that he could hit a squirrel at 200 yards. He seemed to enjoy the ghillie suit. He described a squirrel coming right up to his feet while hunting one time and having

18

Neuropsychological Report: Edward L. Fields, Jr.

hidden from his friend, Danny Pressley, one time so well that he reached out and grabbed Danny's leg and scared him. He hunted squirrels every year with Danny and gave his bounty to some older folks who enjoyed cooking and eating them.

Educationally, Mr. Fields reported that he completed the 11th grade in 1984 at Richlands High School in Richlands, Virginia. He attended high school at Pineville High School in Pineville, West Virginia for one month in 1984. He described having been placed in "remedial" math and reading from the 3rd to the 7th grade. He stated that he performed satisfactorily in school, even very well in science and algebra but he quit school to go live with an older woman who "came and got me". He added that he had always been bored with school. He took mechanical drafting classes from Southern Virginia Community College while he was in the 9th and 10th grade but he did not consider the vocational possibilities of this pursuit. He said, "I never in my life connected two things like that together." Mr. Fields reported that he was only in trouble one time as a student having been suspended for passing a note.

Vocationally, Mr. Fields last worked at Kenco Plastics. He worked there from 4/5/03 until 7/18/03. He reported that he was told at the time he was hired that he would not be there long because he was overqualified for the job. Prior to that, he had worked at the Wortz Cracker Co. For approximately two years. He also worked at Wackenhut for two years. His longest job was approximately four years at the Oklahoma State Prison as a Correctional Officer. He reported that he often left jobs before securing another position. Given an unconditional wish for a career, Mr. Fields stated that he would attend the College of Geology and Paleontology in the United Kingdom and become a paleontologist, "whatever it is they do."

Mr. Fields was in the United States Navy from 1984 until 1992 when he was honorably discharged. He reported he joined under pressure from his family, but "looking back, I liked it." He feels he was a good sailor. He worked as a Boatswains mate, which is a deck hand supervisor. He also worked as a recruiter, which he hated.

Past involvement with the legal and criminal justice systems is limited to one dismissed charge for reckless driving when he was 16 years of age and to issues related to the failure to pay child support.

During the Spring of 2003, Mr. Fields reported that he was under considerable stress. He named the following sources of stress: (1) a new job; (2) his father having died relatively recently; (3) his mother moving to Virginia; (4) difficulties with Michelle Tipton with whom he was supposed to live but she would not let him until her daughter left for college; (5) making four child support payments per week that only left him $100 per week to live on; (6) living in his truck because he could not afford a place to reside. He was running out of coping skills for dealing with all these stressors.

When Mr. Fields secured health insurance at Kenco Plastics, he went to Dr. Kemp for medication to assist in his stress management and depression. He was given samples of anti-depressants including Lexapro. Mr. Fields reported that he began taking Effexor in June of 2003. He first took 37.5mg then went to 75mg over a three-week period at the direction of Dr. Kemp. During this three-week period, he reported that he felt happy and outgoing. He went out to a club with a friend, Danny Pressley, and met girls. He got several phone numbers. He stated that he could never talk to strangers before. He arranged a date with a girl that worked at a

19

Neuropsychological Report: Edward L. Fields, Jr.

tobacco shop. He continued to use Tylenol PM for sleep. Mr. Fields reported that he went back to Dr. Kemp on Friday, 7/4/03. However, the records indicate that he went on Monday, 7/7/03. Dr. Kemp doubled his dosage of Effexor, changing it to 75mg, quid. He stated that Carol Lamb had the prescription filled on 7/7/03 at Young's Pharmacy on Main Street in Poteau. Prior to this

time, Mr. Fields had been supplied samples of Effexor by Dr. Kemp. He reported that after taking the increased dose of Effexor, he began to feel very anxious and the voice in his head "buzzed.

On Tuesday, 7/8/03, he went to work and then reportedly stayed in his truck at a campsite. He went snake hunting that night, and he saw Mr. and Ms. Chick at their camping location that night when he visited the men's room in the area. He denies talking with them. He reportedly took the 150mg dose of Effexor. On Wednesday, 7/9/03, he went to work and then reportedly stayed with Michelle Tipton. He stated that she said that she would marry him. He reportedly took the 150mg dose of Effexor that night. On Thursday, 7/10/03, he went to work and then had dinner with Carol Lamb early in the evening. He went to the camping area to stay in his truck that night. He went snake hunting and saw Mr. and Ms. Chick again when he visited the bathroom. He related the following details concerning the events of the night of 7/10/03. He put on his ghillie suit to rob the Chicks. He parked his truck and walked down the road in his ghillie suit. It was close to dark. They were at a nearby vista. He hid close to their campsite and waited approximately 20 minutes for them to return. He observed them through his scope while they were sitting and talking. Mr. Chick said that he was going to the tent. Mr. Fields reported, "I don't remember pulling the trigger but I do remember hearing the gun go off." He had shot Mr. Chick in the head. Ms. Chick started to run, and he shot her in the foot. She ran to their van, and he followed her, then shot her twice in the head. He also shot Mr. Chick again in the head. He went through Mr. Chick's pockets and then went through their van and took all the valuables. He reported that he found $7000 in cash and a small container of marijuana. He stated that he knew that they would have cash because 'nobody in their right mind would camp out of state up there without having enough money to take care of things and get back." Mr. Fields reported that he had never thought about doing this before, but "I needed the money" as he only had $25 to his name. He was not scare but rather "preoccupied" with what he was doing. He was not distracted but rather "pretty much locked in". He was briefly distracted when a car came close to the area. He denied having a clear plan but rather he was "too wrapped up in what I was doing" and the "flood of crap in my mind". Mr. Fields said that the voice said, "You need the money, do it." He related that this was the first time the voice had told him to do something violent. After it was over, he felt "shock" and "terror". He reported that he went to his camp site and went to bed at approximately 1am and fell asleep at approximately 3am. He went to work the next morning and did not act any different. He stated, "I didn't think I was going to get caught." Later that day, he went to buy the $40 worth of marijuana that he bought every week for Michelle Tipton. While he was waiting, he bought her a $500 diamond engagement ring. He went to see her, and she accepted it. He told her that he had acquired some money from a drug run to Dallas. She reportedly said, "don't ever do that again—here, let me help you count that." He took her on a shopping spree in Arkansas on Saturday, 7/12/03 and returned on Sunday, 7/13/03. They bought pet supplies, clothes, gifts, etc. However, Mr. Fields said that it was not as much fun as it sounded. He continued to go to work at Kenco Plastics from 7/14/03 to 7/18/03 when he was arrested, charged, and confessed to robbery, burglary, and the murders of Mr. and Ms. Chick.

Neuropsychological Report: Edward L. Fields, Jr.

A second evaluation session was conducted on 6/28/05. The major purpose of this session was to administer memory testing which was not conducted during the first session. A follow-up interview was also conducted. Mr. Fields communicated that he had experienced happy periods in his life when certain events occurred, such as graduation from boot camp in the military, his marriage, the birth of his children, etc. He also reported that he had made As in algebra in high school and As and Bs in biology, although his transcript does not support that statement. He discussed his live-in relationship with Patsy Hatfield when he was 17 years-of-age and his relationship with a woman in Ohio he met over the internet. She gave hims $1500 to pay his child support before he went to Ohio and then supported him while he lived with her. He did paint the outside of her funeral home while he was there, and she paid him $2000 for the work. He expanded his description of the "buzz" in his head on the day of 7/10/03. He first described the "buss" as a lot of information going through his head, then he added that it was an argument between the voice and himself, "back and forth, back and forth" etc. He had difficulty coming up with examples of what the voice had said to him other than quitting a job or going to see his girlfriend or during the 7/10/03 incident. He attempted to describe his depressive symptoms in more detail. He tended to externalize the feelings. He did say that his sex drive was diminished. He said that he was not irritable or violent, but maybe "cranky". He described his behavior of picking up snakes by the tail and how it was no more risky than any other way of handling a snake.

## RESULTS OF TESTING:

### Validity Indicators:

Mr. Fields put forth adequate effort to insure valid test results. Two measures directly assessing effort, one with an auditory format and the other with a visual format, both reveal good effort on cognitive tests. The one personality measure utilized suggests exaggeration but no validity scales are included on that measure. No evidence of malingering on the neuropsychological tests was found. Mr. Fields was aware of testing for malingering during this evaluation.

### Intellectual Functioning:

Formal intellectual assessment was completed using the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III). On this test administration the following IQ values were revealed:

| Composite | IQ Score | Percentile | Classification |
|-----------|----------|------------|----------------|
| Verbal | 106 | 66th | Average |
| Performance | 111 | 77th | High Average |
| Full Scale | 109 | 73rd | Average |

• **Verbal and non-verbal intellectual abilities fall at similar levels.** The 5-point difference between the Verbal IQ and the Performance IQ is statistically and clinically insignificant.

21

Neuropsychological Report: Edward L. Fields, Jr.

• Some variability was noted among WAIS-III Subtests as indicated by the following data:

| Verbal Subtests | Age-corrected Scale Score | Percentile |
|---|---|---|
| Vocabulary | 16 | 98th |
| Similarities | 11 | 63rd |
| Arithmetic | 6 | 9th |
| Digit Span | 9 | 37th |
| Information | 12 | 75th |
| Comprehension | 13 | 84th |
| | | |
| Performance Subtests | Age-corrected Scale Score | Percentile |
| Picture Completion | 14 | 91st |
| Digit Symbol-Coding | 7 | 16th |
| Block Design | 9 | 37th |
| Matrix Reasoning | 14 | 91st |
| Picture Arrangement | 15 | 95th |

• **Verbal intellectual skills ranged from low average to very superior.** Very superior performance was noted on word knowledge. High average abilities were noted for fund of

information and comprehension. Average performance was found in verbal abstraction and auditory attention. Low average was revealed in mental calculations.

• **Nonverbal intellectual skills ranged from low average to superior.** Superior performance was found on visual attention, nonverbal abstraction and logical analysis. Average performance was revealed on visual problem-solving. Low average performance was found on psychomotor speed.

• **Intellectual functioning was not found to have declined from a previous level.** Based on the Wechsler Test of Adult Reading (WTAR) that requires the reading and pronunciation of words that have irregular grapheme-to-phoneme translation without text comprehension or knowledge of word meaning, Mr. Fields' current level of intellectual functioning is stable and does not represent a decline in performance from earlier in his life. This administration of the WTAR revealed a standard score of 105, which predicts a Verbal IQ of 104, a Performance IQ of 102 and a Full Scale IQ of 104. These values do not differ significantly from actual WAIS-III IQ values obtained.

Sensory Functioning:

• **Basic sensory perception appears fully intact.** Mr. Fields requires corrective lenses. Audition is intact for normal conversation. He reports difficulty with taste sensations but attributes it to the bland and boring food common in a correctional setting.

Neuropsychological Report: Edward L. Fields, Jr.

## Attention/Concentration and Information Processing:

• **Superficial attention was fully intact.** Mr. Fields remained appropriately alert, task-focused, and attentive throughout the lengthy testing process (approximately 8 hours). Obvious evidence of distractibility or inattention was not observed.

• **Simple focused visual auditory and visual attention were found to be normal.** On a measure of attention requiring the repetition of digits both forward and in reverse order, Mr. Fields scored in the average range (Digit Span, 37th %tile). On a simple test requiring Mr. Fields to sequence numbers from 1 to 25 on a page, he performed at the average level (Trail Making Test, Part A, 27th %tile).

• **Sustained visual attention was found to be mildly impaired for speed but low average for accuracy.** On another task designed to measure vigilance during rapid visual tracking and accurate selection of target stimuli, Mr. Fields performed at the mildly impaired level for speed (Digit Vigilance Time, 9th %tile) but at the average level for accuracy (Digit Vigilance Errors, 45th %tile). Mr. Fields is not impulsive on tasks requiring visual attention. He performs slowly but accurately.

• **Selective visual attention was found to be variable.** On a task requiring him to visually scan a dense matrix of random numerical digits *and* letters with the goal of identifying a recurring target digit stimulus, Mr. Fields performed at the mildly impaired level for speed and at the mild to moderate level of impairment for accuracy. However, on a more difficult task requiring him to visually scan a dense matrix of randomly occurring numerical digits (no letters) with the goal of identifying a recurring target digit stimulus, Mr. Fields performed at the mildly impaired level

for speed but at the high average level for accuracy. Therefore, when the task became more difficult, Mr. Fields performed slower but more accurately. On another task designed to measure vigilance during rapid visual tracking and accurate selection of target stimuli, Mr. Fields performed at the mildly impaired level for speed but at the average level for accuracy. However, on a test involving speeded symbol substitution, Mr. Fields performed at the average level (SDMT, 50th %tile).

• **Attention to visual detail was found to be superior.** On a task requiring Mr. Fields to identify what important part of a picture is missing, he performed at the 93rd %tile (WAIS-III Picture Completion Subtest).

## Memory Functioning:

• **All measured memory functions were found to fall at the average level.** Immediate memory functions, both auditory (70th %tile) and visual (27th %tile) fell within the average range. Delayed memory functions, both auditory (34th %tile) and visual (27th %tile) fell within the average range. His General Memory Quotient on the WMS-III was average (27th %tile).

Neuropsychological Report: Edward L. Fields, Jr.

<u>Visual-Spatial Functioning:</u>

• **Visuospatial constructional abilities were found to be intact.** On unstructured free-hand drawing tasks requiring planning and visual perception abilities, Mr. Fields performed within normal limits. (Clock, Cross, Key, and Bicycle Drawings).

• **Visual sequencing was demonstrated to fall at the superior level.** On a task requiring him to arrange a series of pictures so that they tell a logical story, Mr. Fields performed at the 95th %tile (WAIS-III Picture Arrangement Subtest).

• **Visual processing fell at the average level.** On a task requiring him to reproduce printed designs with colored cubes, Mr. Fields scored at the 37th %tile (WAIS-III Block Design).

• **Visual analysis and integration were found to fall at the average level.** Based on a task requiring him to identify cut-up line drawings of 30 common objects, Mr. Fields' performance was average.

<u>Language and Academic Functioning:</u>

• **Adequate use of functional speech at the conversational level was demonstrated.** Mr. Fields is fully capable of conversing at multiple levels. His auditory comprehension is intact and his verbal abilities are facile.

• **Aphasia screening results were within normal limits.** No pathognomonic signs that might identify a language processing abnormality were found. Samples of written language were unremarkable.

• **Sentence repetition was average.** On a task requiring the exact repetition of sentences of increasing length, Mr. Fields performed within the average level (MAE Sentence Repetition, 25th %tile).

• **Expressive word knowledge was found to fall within the very superior range.** On the WAIS-III Vocabulary Subtest, Mr. Fields performed equal to or above 98% of individuals of similar age in the standardization sample.

• **General fund of acquired knowledge was found to be high average.** Based on the WAIS-III Information Subtest, Mr. Fields performed equal to or above 75% of individuals of similar age in the standardization sample.

<u>Motor Functioning:</u>

• **Right-hand dominance was found.** Mr. Fields was found to be right-hand dominant for tasks normally tested. He did report that he "fishes, shoots, and deals cards left-handed."

• **Manual motor strength was low average to average bilaterally.** Mr. Fields' grip strength in his dominant hand was low average (23rd %tile) while his grip strength in his non-dominant hand was average (50th %tile).

24

Neuropsychological Report: Edward L. Fields, Jr.

• **Manual motor speed was average to high average bilaterally.** Mr. Fields' fine motor speed of the index finger of his dominant hand was high average (73rd %tile) while his fine motor speed of the index finger of his non-dominant hand was average (37th %tile).

• **Fine motor dexterity was low-average to average.** On a task requiring him to rotate small pegs to match the holes in a pegboard under timed conditions, Mr. Fields performed within the low average range with his dominant hand (23rd %tile) and within the average range with his non-dominant hand (37th %tile).

## Executive/Complex Cognitive Functioning:

• **Basic cognitive flexibility was variable.** A two-part visual motor speed of processing task was administered to assess cognitive flexibility. The second part requires the alternate sequencing of two sets of simple printed material (numbers and letters), while being timed. His performance was error-free but mildly impaired due to having performed the task slowly (Trail Making Test, Part B, 7th %tile). On another test used to measure cognitive flexibility, resistance to interference from outside stimuli, and the ability to suppress a prepotent response, Mr. Fields performed within the low average range (Stroop Color-Word Interference Test, 17th %tile).

• **Verbal fluency was found to be mildly impaired.** On a task requiring the ability to maximally produce words belonging to a particular class, Mr. Fields performed at the level of mild impairment (COWA, 7th %tile)

• **Figural fluency was found to be moderately impaired.** On a task requiring the ability to maximally produce unique figural responses under time pressure, Mr. Fields performed at the level of moderate impairment (RFFT, 1st %tile)

• **Abstract reasoning and deductive problem-solving skills fell from the average to the superior level.** Mr. Fields interpreted 100% of 11 proverbs of varying difficulty in an abstract rather than concrete fashion. On a non-verbal reasoning and problem-solving task, Mr. Fields performed at the above average level (Booklet Category Test, 70th %tile). On a test involving abstract verbal concepts involved in social awareness, Mr. Fields performed at the high average level (WAIS-III Comprehension Subtest, 84th %tile). Verbal conceptualization on a measure based on the use of abstract classificatory schemes, Mr. Fields performed at the average level (WAIS-III Similarities Subtest, 63rd %tile). Nonverbal abstract reasoning was found to fall within the superior level (WAIS-III Matrix Reasoning, 91st %tile).

## Personality and Emotional Functioning:

• **Self-perception of dysfunction in behaviors involved in frontal lobe syndromes is extremely elevated in all areas (apathy, disinhibition, and executive dysfunction) both during the time period of July, 2003 *and* currently.** Mr. Fields rates his own behavioral dysfunction on the Frontal Systems Behavior Scale Subscales of Apathy, Disinhibition, and Executive Dysfunction as falling in the range of the 83rd %tile to above the 99th %tile for the time period before he was incarcerated and for now. Scores on the Frontal Systems Behavior Scale are elevated for certain groups including ADHD, Antisocial Personality Disorder, and substance abusers.

Neuropsychological Report: Edward L. Fields, Jr.

**Diagnostic Formulation:**

The following diagnoses are based on the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition-Fourth Edition-Text Revision (DSM-IV-TR) published by the American Psychiatric Association (2000):

| | |
|---|---|
| **AXIS I: Clinical Disorders/Other Conditions of Clinical Attention** | |
| *Diagnostic Code* | *Disorder or Condition* |
| 300.4 | Dysthymic Disorder (Chronic Mild Depression) |
| | |
| **AXIS II: Personality Disorders/Mental Retardation** | |
| *Diagnostic Code* | *Disorder or Condition* |
| 301.9 | Personality Disorder, Not Otherwise Specified, with antisocial (and psychopathic), narcissistic, and dependent traits and features |
| | |
| **AXIS III: General Medical Conditions:** | Deferred |
| | |
| **AXIS IV: Psychosocial and Environmental Problems:** | Before incarceration: problems with primary support group, occupational problems, housing problems, and economic problems. Currently: problems related to the legal system. |
| | |
| **AXIS V: Global Assessment of Functioning Scale:** | Currently: 60-70, mild symptoms. |
| | |

Mr. Fields has received several different diagnoses in the past few years. He has been diagnosed with Clinical Depression and Compulsive Disorder by Dr. Kemp. He was diagnosed with Chronic Depression by Dr. Winters. In the Muskogee Jail, he was diagnosed with Dysthymia and Major Depression with Psychotic Features. In the Tulsa Jail, he was diagnosed with Schizoaffective Disorder. Defense-retained psychiatric expert, Dr. Ginage, diagnosed him with Bipolar I Disorder, Severe, with Psychotic Features. Defense-retained psychiatric expert, Dr. Woods, diagnosed him with Schizoaffective Disorder, Bipolar Subtype vs. Bipolar Disorder, Severe, with Psychosis, in pharmacological remission.

First of all, the results of this evaluation, including both the records review, clinical interview, and neuropsychological testing, did not reveal evidence of a brain injury or frontal lobe deficit. Second, no clear evidence was found of a bipolar disorder or a "manic flip". Third, no credible evidence was found for a psychotic disorder. No clear evidence was found for irritability or spontaneous anger. While Mr. Fields was out of resources and living out of his truck around the time of 7/10/03, he was not experiencing social deterioration or isolation. He has life-long insomnia. No evidence was found of excessive talkativeness, flight of ideas, distractibility, or increased goal-directed activity. There is evidence of a shopping spree with unrestrained buying, but it appears to be as much related to Michelle Tipton's behavior as to Ed Fields' actions. Mr. Fields describes his self-esteem as low but some

26

Neuropsychological Report: Edward L. Fields, Jr.

indications in the records suggest otherwise. Evidence was found for chronic, mild depression (Dysthymia) and for a Personality Disorder, Not Otherwise Specified. A Personality Disorder is marked by an long-standing pattern of inflexible and maladaptive personality traits that cause either distress or impairment. A personality disorder is not the same thing as a mental disorder.

## Conclusions and Opinions:

The conclusions and opinions expressed in this report are based on the results of this evaluation, my training and experience, and a reasonable degree of scientific and psychological probability.

1. From a neuropsychological point of view, Mr. Fields is of average verbal and non-verbal intelligence with some scatter in his abilities. He excels in word knowledge, fund of information, verbal comprehension, attention to visual detail, logical sequencing of non-verbal materials, as well as both verbal and non-verbal abstract reasoning. He is less adept at complex auditory attention processes and speed of processing non-meaningful non-verbal materials. The majority of neuropsychological findings identify uncompromised cognitive processes. Visual-spatial, memory, motor, and language abilities are all totally within normal limits. With regard to executive or frontal lobe functions, Mr. Fields evidences some mild deficits with regard to fluency or speed, but abstract reasoning and complex problem-solving abilities fall from the average to the superior levels. For the most part, he performed the majority of test measures within normal limits. His variable attention abilities are somewhat consistent with a longstanding attention deficit disorder. His performance on neuropsychological testing is inconsistent with either an acute or chronic neurological condition including a brain injury and/or a frontal lobe disorder.

2. From a psychological point of view, Mr. Fields' history is consistent with a long-standing mild depressive disorder, technically referred to as Dysthymia. The evidence from records and the results of my face-to-face evaluation of Mr. Fields do not indicate a bipolar disorder or a "manic flip" or "manic switch" secondary to anti-depressant medications on or about the date of 7/10/03. Several individuals who interacted with him during the days just before and just after that date did not see any change in his behavior. During my clinical interview with Mr. Fields, he did not describe a manic episode on or about 7/10/03. Rather, the data supports long-standing depressive symptoms, exacerbated by the financial and interpersonal stress Mr. Fields was experiencing at the time.

3. Mr. Fields' descriptions of the voice he hears are inconsistent with genuine auditory hallucinations experienced by psychotic individuals. Mr. Fields reported that he hears one identifiable male voice described as a "little friend" that comes from inside his head. The voice uses stilted language in issuing commands that Mr. Fields must obey to make the pressure in his chest subside. Mr. Fields lacks strategies to diminish the voice other than obedience. He does not describe associated delusional beliefs that are typical with a psychosis. The voice was not revealed by Mr. Fields for close to 20 years. The voice does not issue non-command hallucinations. All of these factors point to malingered auditory hallucinations presented for the purpose of the evasion of personal responsibility and punishment.

Neuropsychological Report: Edward L. Fields, Jr.

4.      Mr. Fields was not in manic state at the time of the offense for which he is charged. His description of the voice that told him to commit the offense is inconsistent with a genuine psychotic auditory hallucination. At the time of the commission of the acts constituting the

charges offenses, Mr. Fields was able to appreciate the nature and quality as well as the wrongfulness of his acts.

Sincerely,

J. Randall Price, Ph.D.

# J. RANDALL PRICE, Ph.D.

**Board Certified in Forensic Psychology, American Board of Professional Psychology**
**Board Certified in Neuropsychology, American Board of Professional Neuropsychology**

FORENSIC PSYCHOLOGY ASSOCIATES OF TEXAS
1221 ABRAMS RD., SUITE 109
RICHARDSON, TEXAS 75081-5579
TELEPHONE:  972-644-8686
FACSIMILE:   972-644-8688

## FAX

To:              Doug Horn

Date:           7/1/05

FAX:            (918) 560-7954

RE:             U.S. v. Edward L. Fields, Jr.

Mr. Horn,

My report of evaluation in this matter follows.  I am also emailing a copy to you as an attachment.  Finally, I am sending an original by Federal Express.

The faxed and emailed documents are sent in two parts: A and B.

Randy Price

*The information contained in this facsimile message is privileged, confidential, and protected from disclosure. If you have received this fax in error, if you do not receive all pages, or if you have any problem receiving this transmission, please call 972-644-8686. Thank you very much.*

*Part B follows.*

**Edward Leon Fields**
**Time Line Based on Records Review**
**Comments form Friends, Family, and Acquaintances Based on Records Review**

| Ages | Source | Reports |
|---|---|---|
| ED birth | Margaret Fields (Mom) Statement 08/31/03 1695 | Born in OK City; 3 weeks premature; Respiratory Distress Syndrome (could not get enough oxygen); doctors said he would not live. Moved to St. Anthony's Hospital where he stayed 9 days. Infancy was normal; potty trained for day and night between 1 and 2. |
| ED ages 3-6 | Margaret Fields (Mom) Statement 08/31/03 1695 | Price, Utah; ED socialized with children very well, was always "very busy', "into everything", and "hyper". These characteristics extended through childhood. |
| ED age 4 | Judy Janway Related to ED by marriage Knew him as a child 1670 | • ED hung a cat with a string and killed it. |
| ED age 5 | Margaret Fields (Mom) Statement 08/31/03 1695 - 1696 | • ED talked about having another father who was an Indian and cooked over a fire. He described details of a previous life. His mother thought it amazing that he could describe things he had never experienced; thought possibly he was reincarnated. These discussions faded as ED aged. |
| ED ages 5 - 18 | Margaret Fields (Mom) Statement 08/31/03 1696 | • ED made noises like music to a song, sometimes like a trumpet. Occurred especially when he was required to stay still |
| ED ages 7-13 | Margaret Fields (Mom) Statement 08/31/03 1696 | • In Beckley, WV attended Catholic School. Had a few minor discipline problems at school |
| ED ages 6 -7 | Denise Chitwood ED 2nd Cousin Speech Pathologist Statement 11/08/04 2184 | • Remembered ED as being very sweet when he was young. •Denise feels ED was not nurtured by his father due to his father's work schedule and the attention his father gave to his moter. |

| ED ages 13 - 17 | Margaret Fields (Mom) ED's Mother Statement 08/31/03 1696 | In Richlands, VA:<br><br>•Ed made friends with others of lesser character.<br>•At age 16, he set up all the family guns in his bedroom; his mother believed it was to intimidate her.<br>•At age 16 while in 11th grade, ED was suspended for 2 weeks from school for making out in the hall.<br>•At age 16, he was in a car accident and had a concussion; Mom did not see any changes in behavior following accident.<br>•At age 16 ED made napalm bomb in backyard with chemicals.<br>• During teen years, ED vented anger by beating on things, breaking several doors. He beat on bedroom wall with chains to intimidate his mother<br>• Ed's teen interests: Steven King books, hypnosis, women, Dungeons and Dragons, violent action movies, making large swords out of metal, and cooking.<br>• During teen years, ED had difficulty controlling his temper. Lost temper when he did not get his way or when he was made to do something he didn't want to do (e.g., broke the lawn mower to avoid mowing the lawn).<br>• ED was lazy and did not like work.<br>• At age 16, he met and ran away with 37-year-old woman for 3 weeks, and contacted Mom for $100 for food.<br><br>• Based on the run-away, Mom conspired with a priest to get ED in the Navy in an attempt to help straighten him out.<br>• Prior to going to the Navy, Mom and Dad got psychiatric help for ED. Mom remembers only result was that ED thought the psychiatrist was very pretty. Mom remembers no treatment other than counseling.<br>• Just prior to entering the Navy, ED had a fling with Jemima Carol Hagan resulting in pregnancy and the birth of a daughter, Rhiannon. |
| 1985 | Jemima Carol Hagan, Mother of Fields' 1st child. Interview 1905 | • When Ms. Hagan told ED of the pregnancy, he said it was not his. |

2

| 1984 – 1992? | Military File Throughout & FBI Interview w/ ED at arrest on 07/18/03 | • Apparently, ED joined Navy at age 17 on 09/27/84; Discharged 1986? Joined again in 1988?; Discharged 1990?. Reserves 1990-1992?. <br> • Navy <br> • Worked construction the year between his military services. <br> • Navy <br> • Fast Food Places & Navy Reserves? |
|---|---|---|
| ED age 18 and adult | Teresa Fields (TF) ED's Wife Statement 09/09/03 1989 <br><br> Angela Wade Statement 09/04/03 3161 – 3162 <br><br> Teresa Fields (TF) Statement 09/09/03 1989 | In Navy: <br><br> • ED married Teresa (TF) in 1987 who he met through his sister, Cherie; Ed had known TF only for a short time. They had two children Amanda and Andy. <br><br> • Angela believed ED and TF lived with ED's parents while in VA when he was in the Navy Reserves. <br><br> • ED was verbally abusive during this marriage. <br> • ED had affair with Carlena Michelle Sparks in 91 – 92, which resulted in the divorce of ED and TF. |
| 09/25/92 | Military File 1071 | • ED was honorably discharged from the Navy Reserves |
| 1992-1995 | FBI Interview w/ ED at arrest on 07/18/03 & Employment Records | • ED worked for Wackenhut at a coal power plant in Carbo, VA. Employment was terminated; reason was not in records. |

| Early 90's | Carlena Michele Sparks Girlfriend of ED Statement 09/09/03 1993 | • Carlena had two-year affair with ED in the early '90's. Met ED at Hardees; lived with him for short period. Approximately 93-94, she purchased a gun for fields. ED was emotionally stable and never reported hearing voices; observed no sudden mood swings of anger or depression. Sexual relations with ED were normal. His spending habits were "extraordinary and he also spent her money as well as his". Never saw violence from ED. No contact since 96 or 97. |
|---|---|---|

| 17/14/95 - 10/04/99 | Oklahoma Dept. of Corrections Records. | • Oklahoma Dept. of Corrections OK State Penitentiary Jimmy Hamilton Corrections (Living in house bought my Grandma) <br>•At the time of resignation it appears ED was making $1,836.36 monthly as a Correctional Security Corporal. |
|---|---|---|

| 1994-1999 | Teresa Fields Statement 09/09/03 1989 <br><br><br><br>1998-1999 <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>1999 | • ED and TF remarried in 1994 and moved to Poteau, OK. where they resided for four years. <br>• During the marriage, TF saw mood swings in ED (happy one day, sad, the next). <br>• ED abused TF and the children by slapping her, kicking her and the children and choking her. <br>• ED threw things and locked himself in the computer room for hours when he was angry. He mainly viewed adult pornography but also watched animal pornography. <br>• He talked about witchcraft and ghosts and said he could cause TF to have nightmares. He said he could kill TF and no one would ever know. Amanda, their daughter, also told TF that her father had threatened to kill her. <br>• ED was irresponsible with money and did not pay bills. <br>• ED is hypoglycemic, allergic to bee stings, and has hallucinations if he takes Claritin. <br>• ED & TF's sexual life was normal. <br>• ED's depression and anger became worse with the death of his grandfather in 1996. <br>• TF could not understand the killings unless the victims angered ED. <br>• TF left in June 1999 and divorced ED; she moved with her children to VA |
| Spring 1999 | Dean Anderson Physician Assistant at Hill Crest Clinic Interview 2181 | • First saw the Fields' children <br>• TF asked Anderson if he could give her husband something that would help ED's moods. He was often disagreeable. <br>• Anderson prescribed Paxil for mood disorder, anger management and irritability. <br>• ED stated at a follow-up visit that the Paxil had increased his libido. <br>• Anderson and ED went fishing a couple of times. Anderson observed no problems with moodiness or anger. |

4

| | | |
|---|---|---|
| | | • Anderson said he thought ED was proud of his kids.<br>• Anderson described Fields as an Internet addict.<br>• Anderson opined that web cam activity could be consistent with voyeuristic activities.<br>• Anderson was shocked about the murders not feeling ED was capable. |
| | Margaret Fields (Mom)<br>Statement<br>08/31/03<br>1699 | • The house in which ED & TF resided rent-free from 1994 to 1996 belonged to Mom and Dad and had been purchased in anticipation of Mom and Dad moving back to Poteau in 1996. (At this time ED was working for OK Dept. of Corrections.)<br>• ED was irresponsible regarding the house and did not pay bills other than phone and electric, which he needed for his computer activities.<br>• Initially, when Mom and Dad moved back to OK, they stayed with Mom's mother, but eventually wanted their house. ED was very angry and believed it unfair for his Mom and Dad to make ED and TF move out. It "got ugly", and to resolve the conflict, Mom's mom (ED's grandmother) bought ED and TF a home. (At this time ED was still working for OK Dept. of Corrections.)<br>• ED worked at a the Oklahoma Department of Corrections from 95-99.<br>• ED & TF's marriage was horrible. They fought and TF antagonized ED. TF told Mom that ED hit her. Mom believes that ED physically and verbally abused TF and the children. ED was not a good father.<br>• ED ruined almost every family/holiday gathering by arguing or getting angry.<br>• ED never bought his parents Christmas gifts but always made it known what he wanted for Christmas and birthdays.<br>• When ED's father was very ill, ED was asked to by his sister to stay with him so she and Mom could go to dinner; ED refused.<br>• Summer 2002, following ED's father's by-pass surgery and when ED's father had been diagnosed with leukemia, ED showed no compassion. Mom needed ED, but ED decided to go to Ohio for two months to see a woman he had met on the internet.<br>• After Dad died, ED moved in with Mom (October 2002).<br>• He kept a loaded gun at each door of the house.<br>• ED and his Mom did not get along; they yelled at each other, and ED refused to do any chores. |

| | | |
|---|---|---|
| | | • In April 2003, he forged his deceased father's name on his mother's checks and spent $1,500. <br> • ED does not seem to understand what love is. <br> • Mom believes that ED will follow through with suicide threats. He has suffered from depression his entire adult life. <br> • ED is smart enough to kill people and not get caught; he could have gotten away with the murders had he been careful; perhaps it was a cry for help. <br> • Mom did not think ED would kill her, but some of her friends did. <br> • ED never told his Mom about the voices until after the murders. He told her and reminded her that when he was young, she told him that voices in his head were his conscience that would tell him what was wrong and right. |
| 1999 | Denise Chitwood ED 2nd Cousin Speech Pathologist Statement 11/08/04 2184 - 2186 | • Denise remembers getting a call from TF in which TF indicated that ED had choked her during a family dispute. Denise recommended counseling, TF agreed but did not follow-up. This is only account of violence Denise knew. |
| 10/99 – 7/01 | Wortz Employment Files | • Worked at Wortz Cracker Co. -- fired for bringing gun and bomb to work. |
| 1999 - 2003 | From a variety of documents | • It appears ED lived with Mom from the time TF left him until Mom moved to VA in June 2003. |
| Sometime in 2000 | Brenda Stacy Girlfriend Statement 0466 | • Stacy is a schoolteacher turned home health care worker. <br> • Met ED in 2000. Had an on again – off again relationship -- they would break up – then he would come back and they would date again until 04/15/03 when she ran him off for good. <br> • ED was argumentative. <br> • When ED tried to show affection, he would mess it up with a belittling comment. |
| Year Prior to Mom Moving to VA. | Mom 1703 | • During the year before she moved to VA, ED spent a lot of time in his computer room and would play "Seven Spanish Angels" over and over and louder and louder. <br> • During the year before she moved, ED had seven live copperhead snakes in an aquarium at his mom's home. |

| 03/03 | David Love Computer Friend Interview | • Around March 2003, Ed told Love that he went to Ohio to see a woman he met on the Internet, and that she gave him money (Love estimated $1,500 to $1,800) |
|---|---|---|
| 03/31/03<br><br>Statement regarding 3/31/03 given 06/10/03 | Michelle Tipton (MT) Statement 06/10/03 001685 | •Ed Fields (ED) is harassing MT and wanting to live at her house. She is saying no and stopped by police dept. to report ED's harassment. He was called by police and told to stop. He left her alone for about three weeks and then it picked up again like before. |
| 04/03 | Kenco File | • ED began working at Kenco Plastics as a "temporary" and got on as a regular in May. From the time he was hired until the day he was arrested 07/18, he attended work regularly. |
| 04/10/03 | Pretrial Service Report Dr. Kemp p.4 | • ED's first visit to Dr. Kemp.<br>• ED complained of depression and compulsive disorder.<br>• ED had seen Dr. Winters in 2000 who treated him for depression. Given Prozac and Celexa.<br>• ED also saw Dr. Schumpert and dean Anderson (PA) who prescribed Paxil and Serzone<br>• ED reported dad had dies and mom was ill and he was caregiver.<br>• ED hears voices that tell him to compulsively do things like sharpen knives and drive to his girlfriend's house.<br>• Is sad much of the time.<br>• Dr.'s objective finding were within normal limits.<br>• Psychologically he has flat affect, intelligent.<br>• Lexapro 10 mg prescribed. |
| 05/01/03 | Pretrial Service Report Dr. Kemp p. 3 | • Follow up to first visit.<br>• ED reports medicine has been wonderful; depression and compulsion are improved.<br>• Has raised his voice a few times<br>• Has not sharpened knives in two weeks.<br>• Dr's. objective findings all within normal limits<br>• Dr. writes Clinical Depression and Compulsion Disorder Improved. Side effect sexual dysfunction.<br>• Continued 10 mg. Lexapro |
| On or about 05/02/03 | District Court of Leflore County Subpoena 1015 | • Mr. Fields received a subpoena to appear in court on 06/10/03 due to late child support payments to Jemima Stubbs, mother of Mr. Fields' 1st child. He was to pay $136.08 per month and was behind $637.43. |

| 06/10/03 | District Court of Leflore County Order 1017 | • ED appeared and plead guilty to Indirect Contempt of Court for failing to make child support payments, confessed a judgment of $773.51. Punishment was withheld until 09/09/03 and until such time, ED will stay current with child support payments and provide an additional $21.49 monthly. |
|---|---|---|
| 05/26/03 | Michelle Tipton (MT) 1686 | • ED went to MT's work and begged her to allow him to live with her for only two weeks. She called him a stalker and crazy and told him to see a doctor; he needed medication. He said he was on medication and would kill himself if she didn't let him move in. She said good that she would then be rid of him. |
| 05/27/03 | Pretrial Service Report Dr. Kemp p.2 | • ED considered taking an overdose of Elavil the day before but thought his girlfriend would come home before it took effect and hospitalize him which he did not want.<br><br>• ED says his reasons for living are gone since his dad died and his mother was leaving the state. He stated that he had taken care of both his parents.<br>• ED complained about child support and no money to pay it.<br>• ED reported that his IQ was 168, he scored high on SATs, and could have gone to Harvard.<br>• No voices telling him to hurt himself and compulsions are improved.<br>• Sexual dysfunction due to medication, but doesn't matter.<br>• ED rejects impatient treatment<br>• Dr's. objective findings are within normal limits. Dr. wrote: Clinical Depression. Compulsive Disorder. Recent thoughts of killing himself although he chose not to do that.<br>• Increased Lexapro to 20 mg daily |

| 05/28/03 | MT 1686 | • ED came to MT's house unannounced, acting strange. She was afraid of him so she was polite. He said he had been to the Dr. who had adjusted his medication and also had suggested "in-house psycho treatment" She encouraged him to get treatment. |
|---|---|---|
| May 2003 | Marilyn K. Pressley Speech Pathologist; Wife of Danny Pressley and | • Marilyn introduced ED to MT (Marilyn's cousin) one year prior to murders.<br>• It was on and off relationship. ED wanted to move in with MT and MT did not want him to. She had her own family and did not need his problems.<br>• Knew ED suffered from depression and took |

| | Friend to ED Interview 0515 | medicine two years prior and in May 2003.<br>• She did not know of him hearing voices.<br>• She read a description from a "Mayo Clinic" book of anti-social, excessive compulsive, and passive aggressive. After hearing the descriptions, ED said "that sounds like me". |
|---|---|---|
| June 2003 | Mom 1700 | • Mom moved to VA to live with her daughter. |
| Early June | Carole Lamb (CL) Girlfriend<br><br>0054 | • In early June, ED moved into her house.<br>• He bought burlap for gun cover and ammunition while living with her.<br>• She had seen ghilli suit previously. |
| 06/10/03 | Michelle Tipton<br><br>MT GJ Testimony 07/30/03 | • MT made statement to police telling them about ED's harassment during March – May. Applied for a restraining order.<br>• Stated she had known ED 11 months and met him via Marilyn Pressley, her cousin.<br>• ED and MT had an on-again –off-again intimate relationship. |
| 06/11/03 | Morgan Hope Tipton MT's daughter<br><br>1690 | • Described to police that ED had come to the house several times between 06/06 and 06/09 while her mother was in the hospital. She and her mother had agreed not to tell ED that MT was in the hospital.<br>• He came in the house and unloaded some furniture into MT's house. He continued to ask where MT was. Morgan said she didn't know. ED got a hammer and kept asking where MT was. Morgan was frightened and felt threatened by the hammer and ED's proximity and persistence.<br>• He went outside and remained on the porch for a while staring into space |
| 06/16/03 | Pretrial service Report Dr. Kemp p. 2 | • ED reports not doing much these days – go to work, go home, go to work.<br>• Decreased desire to do things.<br>• Thoughts of suicide.<br>• He worries.<br>• Anxiety is less<br>• No voices telling him to do compulsive things<br>• Dr. suggested inpatient treatment; ED rejected idea<br>•Dr. writes that ED looks better than he sounds. All objective signs are within normal limits.<br>• Clinical depression not doing a well as pt. would like; Compulsive Disorder is stable.<br>• Discontinued Lexapro. Started Effexor 37.5 daily for one week, then 75 daily for two weeks. Return |

| Late June | Carole Lamb (CL) 0055 | • Dating relationship did not work out and fields moved out at the end of June. They remained friends and spoke daily on the phone. |
|---|---|---|
| Early July | Carol Lamb (CL) 0055 | • ED called CL and told her he was living out of his truck at Lake Wister and on the Talimina Drive. |
| 07/05/03 | Brenda Stacy 0467 | • Saw ED at the IGA, which led to them spending the day and night together having fun. He was perfectly sane when she was with him. |
| 07/06/03 | Brenda Stacy 0467 | • About noon, ED appeared anxious and said he was going to his grandmothers.<br>• Stacy didn't believe him so went to his grandmother's and he was not there. |
| 07/07/03 | Brenda Stacy 0467 | • Brenda left ED an angry note. |
| 07/07/03 | Danny Pressley Best Friend GJ Testimony 07/30/03 1839 | • ED drove Danny's car to Ft. Smith while Danny drove his motorcycle.<br>• ED told Danny that he used his ghilli suit to sneak up on parkers and watch them. |
| 07/07/03 | Marilyn Pressley 0517 | • ED told Marilyn that he had a problem with calling MT too often and was not going to call her until Wednesday or Thursday. His demeanor was normal. |
| 07/07/03 | Pretrial Service Report Dr. Kemp Progress Notes | • ED saw Dr. Kemp<br>• ED reported doing better, doing more, more energy, catching snakes, split with one girlfriend but spent weekend with a new girlfriend. Still thinks about suicide but not seriously.<br>• Dr. Kemp wrote that he was a little happier, less negative, affective, concentration, memory, judgment and orientation normal. Steady hands. Depression and Compulsive Disorders improved.<br>• Increased Effexor from 75 mg to 150 mg. |
| 07/08/03 | District court of Leflore Notice of Registration of Foreign Support Order Under UIFSA 0962 | • Court document states that ED owed past support to Teresa Fields in the amount of $866.86 |
| 07/08/03 | Brenda Stacy 0467 | • ED went to Brenda's house, they argued about a girl that worked at a bar, and ED left.<br>• Brenda felt ED had a problem with computers – too much.<br>• ED wanted to take nude pictures of her and put them on the Internet. |

| | | |
|---|---|---|
| | | • ED wanted Brenda to pay for stuff like gas. He wanted to use her credit card.<br>• ED manipulated his parents to get money.<br>• ED and Stacy argued, but ED was not violent.<br>• ED didn't like to work; he liked to run around.<br>• ED had no stability in his life.<br>• ED's personality was up and down. When he was down, he was demeaning and hateful. When he was up, he was goofy, high, and over polite.<br>• ED's felt nothing was ever wrong with him, and everything was someone else's fault.<br>• Stacy knew that one of ED's girlfriends had given him anti-depressants, but ED did not talk about being depressed to her.<br>• ED was free spirited and lived on the edge.<br>• ED could talk to anyone; never met a stranger, but had problems approaching women. Met women on the Internet.<br>• ED loved sex and was experimental. He had been very sexually active with many girlfriends. He could be affectionate but also could be obsessed and aggressive.<br>• He had a bad relationship with grandmother because he would not pay her the rent he owed her. When Ed grocery shopped for his grandmother, he would buy things for himself with her money.<br>• He had no credit, yet ran up bills.<br>• He did not pay child support. |
| 0/08/03 | Carole Lamb (CL)<br>0055 | • ED called CL and told her he was going to kill himself in a couple of weeks when he got some business taken care of. CL convinced ED to meet her.<br>• They met at 7:30 at his Lake Wister campsite. CL told ED she would help him find a place to stay. She left but met him later that night at the campsite.<br>• She returned at 10:30 at which time he continued to talk about suicide and how he could make it look like an accident so his family would get insurance.<br>• ED told CL that he had done something "really bad". He snuck up on parkers in his ghilli suit and watched them. CL told him he shouldn't do that.<br>• Apparently, CL left the campsite. |
| 07/10/03 | CL<br>0055 | • CL met ED at LaHerta's Restaurant at 4:45 pm. ED asked CL for money to rent a room at Lester's Motel. CL said to check to see if he had a room and she would give him the money then. She did not hear from him again that day. |

| 07/10/03 | Danny Pressley 001841 | • ED went to Danny's house to see if Danny wanted to do something.<br><br>• He acted normal. |
| --- | --- | --- |
| 07/10/03 | Marilyn Pressley 0517 | • ED was at Pressley's house from 5:30 to 6:45.<br><br>• Was upbeat and thought that things were going to work out well with MT<br><br>• ED told Marilyn about sneaking up on a couple wearing his ghilli suit and watched them have sex. |
| 07/10/03 | Edward Fields' Confession | • He stalked the Chicks as they were at the vista and as they walked back to the campsite and sat and talked. When Mr. Chick said he was going to the tent, ED shot him and then shop Ms. Chick. |
| 07/10/03 | Andrea White Employee and Al's Video and Friend and Distant Relative of ED. 0948 | • Andrea White saw ED at Jr. Food Mart in Poteau at 11:00. She was pumping gas and called to ED as he went in to the store. He seemed in a hurry and didn't stop to talk, which was unusual since he typically "talked her ear off". |

| 07/11/03 | CL 0058 | • ED called CL on cell phone and asked for money. She said she was leaving town and could not meet him. |
| --- | --- | --- |
| 07/11/03 | Jack Jewelers Marla Dodd 0466 | • ED bought an engagement ring to MT. |
| 07/11/03 | Debora Kay Bailey Cousin 0367 | • On or about 07/11/03, she received several phone calls over several days from ED wanting to move to Florida and live with her and get a job.<br>• ED seemed desperate to leave OK. He owed child support; he seemed to want to run away.<br>• Debora got closer to Fields after she went into law enforcement, but she felt he got weirder and weirder over time. |
| 07/12/03 | MT Grand Jury Testimony 1865 | • ED and MT left of a weekend trip to Arkansas and spent lots of money; She asked why he had so much money, and ED told her he had done a drug run to Texas and made the money. MT asks ED if he killed the people |
| 07/12/03 | Margaret Fields Mom 1703 | • ED called Mom twice from the weekend trip with MT and was very happy both times. He told her of the engagement to MT, and he was at a bakery where he seemed ecstatic. |

12

| 07/14/03 | | • ED worked at Kenco and lived with MT. |
|---|---|---|
| 07/15/03 | | • ED worked at Kenco and lived with MT |
| 07/16/03 | | • ED worked at Kenco and lived with MT |
| 07/17/03 | | • ED worked at Kecco and lived with MT |
| 07/18/03 | Carole Lamb Interview | • CL went to police due to her concern regarding ED and the murders that had occurred at Winding Stair campsite. |
| 07/18/03 | • Arrest of ED | • ED worked at Kenco.<br>• Law enforcement officers went to Kenco and requested that he come to the police station for questioning.<br>• ED confessed to the robbery and murders of Mr. and Ms. Chick |
| 07/30/03 | Court of Leflore County Affidavit of Service | • It appears ED was served the court papers ordering child support payments in the Muskogee Detention Center. |
| 07/30/03 | MT Grand Jury Testimony 1853 -1880 | • MT believes ED has problems and she had tried to help with the problems, but ED is very intelligent. She believes he knew exactly what he was doing when he killed the people.<br>• ED told MT that he killed the people because she would not let him live with her.<br>• ED told MT that he could kill her ex-husband for her, and spoke of people he had killed in the military. |
| 07/30/03 | Danny Presley Grand Jury Testimony 1833 - 1852 | • Did not believe ED was violent.<br>• Talked to ED the on 07/10/03 prior to the murders and ED seemed fine.<br>• "ED felt like life was too hard to live, You know, it takes effort to live it. It definitely takes effort to live a life well, you know, to get the things you want. And I believe he felt like it was just too much trouble to put the effort out for it." |

| 07/30/03 | Carole Lamb Grand Jury Testimony 1809 - 1832 | |
|---|---|---|
| 08/11/03 | David Love Computer Friend Interview 2065 | • During week of 08/11/03, Danny Pressley asked Love to erase his hard drive so law enforcement could not retrieve it. Love refused. |

13

The following table includes comments from interviews with various individuals who knew Mr. Fields and described his behavior, characteristics of his personality and/or his relationships with them or other individuals.

Table 2

| Date | Source | Comments |
|---|---|---|
| No exact date<br><br>No exact date<br><br><br><br>For past 10 years<br><br>Early 2003<br><br>During 2003<br><br>Currently | Denise Chitwood 2184 - 2186 | • ED is somewhat obsessive regarding sex. She occasionally admonished ED re: his womanizing.<br>• She saw mood swings in which he would be very sweet and charismatic for a short period and then obnoxious and anti-social. Never saw him insane or irrational.<br>• Observed digression of attitude toward others, which affected social functioning. He had trouble meeting responsibilities.<br>• Denise asked ED to fix her computer. While he was fixing it, she tried to talk with him; he was distant and seemed depressed.<br>• Denise feels that ED may have felt abandon after the death of his grandfather, father, and his mother's move to VA.<br>• Denise feels ED has mental illness as well as his mother and grandmother. ED's mind has become sick over a long period of time. She remembers that ED was hurt and sad when his grandfather died.<br>• ED has a lifetime of not meeting other's expectations: failed marriage, couldn't hold a job, not a nurturing father.<br>• Denise visited ED in jail and he provided no explanation for murders. He was emotional during the visit, which was following his suicide attempt.<br>• Denise feels he did not mean to kill the people and was not in his right mind. |

| Date | Source | Comments |
|---|---|---|
|  | Kathy Fagrell Friend 1747 | • Field fed baby kittens to his snakes.<br>• Kathy felt ED was polite, slow to anger, honest, stable and normal.<br>• ED talked about sex a lot |
|  | Michael Lloyd Worked with ED 1998-1999 when working at the correctional facility 2044 | • ED had a very strange sex life; slept with other women than his wife. ED sought out young girls on the Internet so he could have sex with them. Described ED as a "sex freak".<br>• ED's personality could switch from nice and pleasant to rude and obnoxious depending on his mood.<br>• Once people go to know ED they did not like him as much. |

14

|  |  |  |
|---|---|---|
|  |  | • Ed was quick to anger with prisoners, but never got physical.<br>• ED seemed emotionally stable except for the sex issue.<br>• ED made fake documents and identification that looked very real. |
|  | Judy Janway<br>Cousin by<br>Marriage to<br>ED.<br>Knew him all<br>his life.<br>1670 | • Saw bruises on TF and thought ED was violent towards TF.<br>• Mean to his mother after she sold the farm.<br>• TF said there was pornography at their house.<br>• Judy overheard someone say they had seen a picture of ED having sex with a carp fish.<br>• As a child ED did not want attention, but as an adult would do anything to get attention and to shock.<br>• In Nov. 2002 when ED was working on Judy's computer he mentioned the voices in his head and made noises as if her were talking to someone. |
| 1993-2003 | David Love<br>Friend<br>Computer<br>Service Person<br>Statement<br>08/22/03<br>2065 | • Met ED in 1993 via Ed needing computer help.<br>• ED told Love he quit prison job because he had "problems with supervisors".<br>•ED borrowed digital web cam camera from Love. Told Love he masturbated in front of the camera so everyone on website could see him masturbate.<br>• Near end of 2000 ED went to Love for a job; ED said he had no money. |
| Known of<br>ED all his<br>life | Donald Allison<br>USDA Forest<br>Service<br>Supplemental<br>Incident Report<br>Interview<br>0462 | • ED got kicked out of the Boxcar Bar for bringing a inside.<br>• ED never had a stable job.<br>• ED was not much of a country boy – a little on the whacky side. |

15