**9**

# PARK DIETZ & ASSOCIATES, INC.
## Forensic Consultants in Medicine and the Behavioral Sciences

**Administrative Offices**

2906 Lafayette
Newport Beach, CA  92663
Tel:  949-723-2211
Fax:  949-723-2212
Email: expert@parkdietzassociates.com
Website: www.parkdietzassociates.com

**Forensic Psychiatry**
Park Dietz, MD, MPH, PhD
  President
Eugene Beresin, MD
Bennett Blum, MD
John Bradford, MB, ChB
Graham Glancy, MB, ChB
Bruce Harry, MD
Mark J. Hauser, MD
Joseph Kenan, MD
Stuart Kleinman, MD
Daryl Matthews, MD, PhD
Steven Pitt, DO
Gregory Saathoff, MD
Esperanza Salinas, MD
Rene Sorrentino, MD
Sheila Wendler, MD

**Forensic Pathology**
Tracey S. Corey, MD
Judy Melinek, MD
George R. Nichols II, MD

**Forensic Neurology**
David Griesemer, MD
Helen Mayberg, MD

**Forensic Psychology**
Joel Dvoskin, PhD
Stephen D. Hart, PhD
Kirk Heilbrun, PhD
Elizabeth Loftus, PhD
Daniel A. Martell, PhD
Ronald Roesch, PhD
Erin Spiers, PsyD

**Forensic Social Work**
Cheryl Regehr, PhD
Janet I. Warren, DSW

**Criminology**
Larry Ankrom, MS (FBI ret.)
Kenneth Lanning, MS (FBI ret.)
Gregg McCrary, MA (FBI ret.)
Ronald Walker, MA (FBI ret.)
James Wright, MPA (FBI ret.)

**Security**
Bernard Banahan
Robert Hayes, CPP, CFE
Steve Howell

**Medical Strategist**
Steven Ainbinder, MD

**Daniel A. Martell, Ph.D., ABPP**

2906 Lafayette
Newport Beach, CA  92663
Tel:  949-760-0422
Fax: 949-786-7478
Email: damartell@aol.com

April 1, 2010

Cristi Charpentier, Esq.
Michael Wiseman, Esq.
Chief, Capital Habeas Corpus Unit
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West -- The Curtis Center
Philadelphia, PA  19106

**RE:    Neuropsychological Examination:
        Edward Leon Fields, Jr.**

Dear Ms. Charpentier and Mr. Wiseman,

I am writing today to convey the findings and opinions arising from my initial examination of Mr. Fields pursuant to the above captioned matter.

## Referral Questions

You have asked that I examine Mr. Fields and administer a battery of neuropsychological tests in order to address the following referral questions:

> (1)    What is Mr. Fields' current neuropsychological status, and what issues (if any) does his current status raise with regard to the mitigation case presented at the time of his trial in 2005?

> (2)    Were the opinions offered by Dr. Price scientifically accurate, valid, and adequately supported by the available data?

Forensic Neuropsychological Examination          FIELDS, Jr., Edward
April 1, 2010                                                           Page 2 of 21

## Basis for Opinions

### Scope of Examination and Informed Consent

I personally examined and tested Mr. Fields at the Federal Correctional Institution in Terre Haute, IN on 03/16/2010 and 03/17/2010 for a total of approximately 10 hours.  The examinations were conducted in a quiet, private contact-interview room in the attorney visiting area.  Mr. Fields' hands were handcuffed to a belly chain during the first day of the examination, as the Warden had not yet approved a hand-free contact visit.  Therefore, the interview-only and no-hands-required portions of the examination were administered on 03/16/2010.   The Warden did approve hands-free testing on 03/17/2010, and the remainder of the neuropsychological examination was accomplished that day.

Mr. Fields was informed that I had been retained by the Federal Community Defender's office; of the nature and purpose of the examination; of the limits of confidentiality in this forensic context; and of the lack of any treating relationship between us.  He provided his informed consent to participate in the examination.

### Tests Administered

Structured Neuropsychological Interview
Mental Status Examination
Rey's 15 Item Memory Test
Test of Memory Malingering (TOMM)
Wide Range Achievement Test – 3 (WRAT-3)
California Verbal Learning Test - II
Halstead-Reitan Neuropsychological Test Battery
  -Booklet Category Test
  -Seashore Rhythm Test
  -Speech Sounds Perception Test
  -Portable Tactual Performance Test
  -Finger Oscillation Test
  -Reitan-Klove Sensory-Perceptual Examination
  -Tactile Form Recognition
  -Trail Making Test, Parts A & B
  -Lateral Dominance Examination
Grooved Pegboard Test

Forensic Neuropsychological Examination          FIELDS, Jr., Edward
April 1, 2010                                    Page 3 of 21


Tests of Motor Sequencing and Control
Wisconsin Card Sorting Test (WCST)
D2 Test of Attention
University of Pennsylvania Smell Identification Test (UPSIT)
Stroop Test
Controlled Oral Word Association Test (F-A-S)
Animal Naming
Boston Naming Test (BNT)
Hooper Visual Organization Test (HVOT)
Frontal Systems Assessment Battery (FrSBe)
Structured Interview of Reported Symptoms (SIRS)
Personality Assessment Inventory (PAI)

## Background Materials Reviewed

I have reviewed and considered the following background materials in forming my opinions in this case:

(1)  Neuropsychological Evaluation by Michael M. Gelbort, Ph.D., 08/11/2004.
(2)  Raw test data from Dr. Gelbort's examination.
(3)  Mental Health Evaluation by Bradley D. Grinage, M.D., 06/24/2005.
(4)  Neuropsychiatric Evaluation by George Woods, M.D., 06/25/2005.
(5)  Preliminary Neuropsychological Evaluation by J. Randall Price, Ph.D., 06/20/2005.
(6)  Materials Extracted from Preliminary Neuropsychological Evaluation by J. Randall Price, Ph.D., 06/20/2005.
(7)  Raw data from Dr. Price's examination.
(8)  Mental Health Evaluation by Jeff Mitchell, M.D., 06/30/2005.
(9)  Neuropsychological Evaluation by J. Randall Price, Ph.D., 07/01/2005.
(10) Testimony of Curtis Todd Grundy, Ph.D., 07/28/2003.
(11) Raw data from the SIRS and TOMM administered to Mr. Fields by Dr. Grundy on 07/25/2003.
(12) Testimony of Bradley D. Grinage, M.D., 07/19/2003.
(13) Testimony of George W. Woods, M.D., 07-20-2005.
(14) Testimony of J. Randall Price, Ph.D., 07/21/2005.
(15) Testimony of Jeff Mitchell, M.D., 07/21/2005.
(16) Birth Certificate

Forensic Neuropsychological Examination          FIELDS, Jr., Edward
April 1, 2010                                                    Page 4 of 21

(17) Baptism Certificate
(18) St. Francis de Sales School records.
(19) Psychological treatment records, Minaben D. Patel, M.D.
(20) Richlands High School records and yearbook photos.
(21) Humana Hospital Clinch Valley records.
(22) Southwest Virginia Community College records.
(23) General Educational Development Test records.
(24) Navy personnel records.
(25) Journal entries from service in the Navy.
(26) Oklahoma Department of Corrections employment records.
(27) Heavener Medical Clinic records.
(28) Child Support Enforcement records.
(29) Wortz Cracker employment records.
(30) Wakenhut employment records.
(31) The Employment Group records.
(32) Bremner employment records.
(33) Stigler Police Department Incident/Offense report – warrant
     request – arrest of Edward Leon Fields for stalking Dawn
     Michelle Tipton, 03/31/2003 to 06/11/2003.
(34) Leflore County Medical Center records.
(35) Kenco Plastics employment records.
(36) Muskogee County Jail records.
(37) Tulsa Jail medical records.
(38) Presentence report, 09/30/2005.
(39) Psychological treatment records of Minaben D. Patel, M.D.
(40) Neuropsychological evaluation by Dale Jeffus, Ph.D.,
     09/24/2001.
(41) Raw neuropsychological testing data from an examination of
     Mary Margaret Fields (at age 54) by Dale Jeffus, Ph.D.,
     undated.
(42) Mercy Behavioral Outpatient Services Counseling Center
     records.
(43) Cooper Clinic medical records.
(44) Treatment records of Chris Hardin, M.D.
(45) Center for Psychiatry records.
(46) Dewey Medical Center records for Mildred Giniman.

Forensic Neuropsychological Examination          FIELDS, Jr., Edward
April 1, 2010                                    Page 5 of 21

## BACKGROUND INFORMATION

Mr. Fields was convicted in the shooting deaths of Charles and Shirley Chick on 07/10/2003, and sentenced to death.  He is currently incarcerated at USP Terre Haute, and is pursuing his Habeas Corpus appeals.

His psychosocial and neurobehavioral history has been thoroughly reported elsewhere (see reports of Drs. Gelbort, Grinage, Woods, and Price) and will not be repeated at length here.

### Notable Family Medical History

It is important in understanding Mr. Fields' mental condition to consider relevant disorders in his first degree relatives (i.e. immediate family members) that may indicate a genetic predisposition to certain brain diseases and/or psychiatric disorders.  In this regard, I find the neuropsychiatric histories of his mother and his maternal grandmother to be particularly relevant.

His mother Mary Margaret Fields was examined in 2001 at age 54 by Dr. Dale Jeffus, due to stroke-like symptoms and positive findings on an MRI scan of her brain suggestive of ischemic disease or a demyelinating process.  Dr. Jeffus' testing found her to have moderately severe brain damage consistent with cerebrovascular disease (although he could not rule out Multiple Sclerosis) with a neuropsychological test profile that is strikingly similar to that later found for her son. [Neuropsychological evaluation by Dale Jeffus, Ph.D., 09/24/2001]  MS was subsequently ruled out by Dr. Knubley at St. Edward Mercy Medical Center, and she was found to have bilateral carotid artery stenosis. [St. Edward Mercy Medical Center records]  A CT scan of her head and brain on 08/13/2009 revealed atherosclerotic vascular disease. [Eastern Oklahoma Medical Center records] Outpatient treatment notes from Dr. Hardin report a history of Transient Ischemic Attacks (TIA) and episodic delirium.  She was also seen in treatment by Dr. Patel for symptoms of depression and anxiety, including panic attacks, and fears of committing acts of violence against others [Treatment notes of Dr. Patel] and has a history of diagnosis with Bipolar II Disorder.  [St. Edward Mercy Medical Center records; Center for Psychiatry records]

Forensic Neuropsychological Examination          FIELDS, Jr., Edward
April 1, 2010                                                          Page 6 of 21

Medical records from Mr. Fields' maternal grandmother Mildred Giniman reveal a history of transient ischemic attack (TIA), stroke, dementia/progressive memory loss, and treatment for depression and anxiety. [Dewey Medical Center records]

Considered together, it is highly likely that Mr. Fields inherited an elevated genetic risk both for cerebrovascular disease and stroke, as well as an affective psychiatric disorder based on records and test data available at the time of trial.

## Examination Findings

### Behavioral Observations and Mental Status Examination

Edward Fields is a 42 year-old Caucasian man who presented for testing on both days wearing tan prison-issues scrubs and tennis shoes.  He is overweight.  He wore a neatly trimmed graying mustache and a very short crew-cut.  He has male pattern baldness.

There was a prominent bump on his forehead over the left eye that he stated had been growing over the past five-and-a-half years.  He reported, "I stuck needles in it – nothing came out."  He also stated that the prison doctors have told him that it is, "purely cosmetic."  Although rare, there are reported cases of lipomas and other tumors growing through the frontal bone, and also involving the underlying brain structures.  Given the rapid deterioration of Mr. Fields' neuropsychological test findings (discussed below) over the period of time that he reports this growth to have been enlarging, this warrants further investigation via Magnetic Resonance Imaging to rule out any underlying neuropathologic process.

He was cooperative and effortful throughout both days of examination and testing. He brought his reading glasses.

His motor behavior was remarkable for severe extra pyramidal symptoms, including a Parkinsonian tremor bilaterally in the upper extremities (i.e., in both arms and both hands) and periodic positive myoclonic jerks (spasmodic twitching) that at their worst effected his entire body and caused him to sit bolt upright.  He reported these as side effects of his neuroleptic medication, despite treatment with the anti-Parkinsonian drug Artane to control such symptoms.  The shaking

Forensic Neuropsychological Examination          FIELDS, Jr., Edward
April 1, 2010                                                Page 7 of 21

in his arms and hands was severe enough to compromise his ability to write and draw neatly.

He stated that currently and for approximately the last 4-5 years, he has been treated with Loxitane for hallucinations; Lithium as a mood stabilizer; Artane for "the shakes;" Prozac for depression; and over the past year-and-a-half, a blood pressure medication whose name he could not recall.  He could not recall the dosages for any of his medications.

On sensory-perceptual examination numerous bilateral errors were observed in finger-tip number writing perception.  On tactile finger recognition, he was unable to correctly associate his fingers with the numbers one through five; hence although he was able to correctly perceive the tactile stimulation, he was unable to correctly identify the number for the finger that was being stimulated.

Persistent motor apraxia (a deficit in motor planning) was observed on formal testing.

He was generally well oriented to person, place, and situation, but was consistently confused with regard to time, reporting the year was 2001 both verbally during mental status examination, and hours later in written form while completing test forms.

His speech was produced at a normal rate and volume, but with occasional mumbling and poor articulation.  He did produce a normal quantity of output.  The content of his speech was remarkable for intermittent odd statements and inappropriate laughter.

Verbal perseveration was noted during the testing.  For example, during the Sensory Perceptual Examination he perseverated from a previous instruction to tell me which hand I was touching (i.e. "right" or "left") to saying "right" or "left" instead of "hand" or "face" as the task and instructions changed later.  Verbal perseverations were also noted on Tests of Verbal Fluency, Animal Naming, and the CVLT-II. Severe conceptual/problem-solving perseveration was observed on the WCST, as well as set-loss errors (perseveration of old behaviors on new task demands) on the Halstead Category Test and the SIRS.

Forensic Neuropsychological Examination          FIELDS, Jr., Edward
April 1, 2010                                                    Page 8 of 21

He also complained about a recent episode of aphasic dysgraphia.  He reported that he was attempting to write a request to use the telephone, but instead involuntarily wrote the words: "Cheese mix these thru and water."  This is a rare but very important neurobehavioral finding that has been associated in the literature with left-hemisphere stroke.[1]

His thought content was free from fixed, false beliefs (delusions).  However, he did report ongoing psychotic symptoms, including visual and auditory hallucinations.  Behaviorally, at several discreet moments during the examination he was observed to "zone out" and appeared to be responding to internal stimuli.

Emotionally, his observable affect was broad and stable, being generally appropriate and related to his mood and the content of his thoughts.  However, at times he exhibited inappropriate laughter, and returned on the second day and apologized, recognizing that he had been behaving strangely and concerned that I would be offended or not take him seriously.  Notably, his concern about this was out of proportion to my perceptions of his behavior.  His underlying mood was inferred to be mildly anxious, but otherwise euthymic.

He reported that his appetite is good, but that he has been losing weight secondary to dieting because, "I'm tired of being fat."  He reported that his sleep is good, and his social relationships are good. He denied anhedonia, but stated that he has been, "in a funky mood the last couple of weeks," which he attributed to increased activity

---

[1] Selnes,  O.A., Rubens, A.B., Risse, G.L., & Levy, R.S. (1982).  Transient Aphasia With Persistent Apraxia: Uncommon Sequela of Massive Left-Hemisphere Stroke. *Arch Neurol.,* 39(2), 122-126.

Spragg, D.D.  (2009). Resolution of Expressive Aphasia. *Circulation*; 120:645.

Gray, J.M.  (2002). 'Expressed' dysphasia.  Grand Rounds, Specialty: Neurology, Vol 2, 35–36.

Forensic Neuropsychological Examination        FIELDS, Jr., Edward
April 1, 2010                                  Page 9 of 21

regarding his legal case.  He exhibited some memory impairment for old autobiographical information, and complained about forgetfulness and loosing track of his thoughts during conversation.

## Neuropsychological Test Results

### Data Validity

Mr. Fields' has no history of malingering on neuropsychological or psychodiagnostic testing, including during the examinations performed by Drs. Grundy, Gelbort, and Price.  However, his level of effort during the present neuropsychological testing was evaluated nonetheless with multiple measures (Rey's 15 Items, Test of Memory Malingering), all of which indicated that he was compliant with the testing and put forth a good effort.  There was no indication of exaggeration or malingering.  This was also observed behaviorally, as he put forth tremendous effort in attempting all the tasks placed before him.  Hence the neuropsychological test data obtained during the present examination are believed to provide an accurate indication of his current level of neurobehavioral functioning.

### Test Findings

A table is appended at the end of this report that summarizes Mr. Fields' neuropsychological test performance over time (including data from the present examination, as well as those from Drs. Gelbort and Price).

Analysis of the test data collected by other doctors in this case proceeded in the following manner.  First, I inspected each available test protocol to establish that the test had been administered in a manner consistent with standard practice.  Then I double-checked the scoring of test items and the mathematical calculations required in order to arrive at raw test scores and indexes.  Finally, I checked to be sure that all the raw test scores had been converted to standardized scores on the basis of proper norms.[2]  In order to interpret Mr. Fields' test performances properly, all the raw test scores have been

---

[2] I did note discrepancies between the WAIS-III IQ scores reported in Dr. Gelbort's test data and report, and his actual scores.  The corrected scores are reflected in the Table.

Forensic Neuropsychological Examination          FIELDS, Jr., Edward
April 1, 2010                                              Page 10 of 21

converted to standardized scores on the basis of published norms. This means comparing Mr. Fields' test performance to that of his peers, i.e., comparing his scores wherever possible to norms for other persons of his age, race, sex, and education.  I was guided in this process by the American Psychological Association's <u>Standards for Educational and Psychological Testing</u> and the <u>Specialty Guidelines for Forensic Psychologists</u>.

A comprehensive neuropsychological test battery was administered during the present examination, including the Halstead-Reitan and allied procedures as listed above. Mr. Fields' test performance overall was in the range of moderate-to-severe brain damage, and this represents a catastrophic decline in functioning over the five years since he was seen by Dr. Price.

Impairment was seen in almost all areas of function, with few exceptions.  Mr. Fields' strengths included preserved or spared abilities in visual organization (HVOT) and pure motor speed with the non-dominant hand.  All other neurobehavioral functions tested fell in the range of moderate to severe impairment.

**Halstead-Reitan battery**.  Mr. Fields' performance on the Halstead Reitan battery was substantially worse than his prior testings.  This strongly suggests the presence of a progressive, degenerative neuropathological process.  His subtest scores fell in the range of moderate to severe brain impairment.  Some of his test performances were among the worst I have seen (i.e., TPT, Trails B).

**Halstead summary measures**.  Overall summary measures of brain damage on the Halstead-Reitan battery included an Impairment Index of 1.0 (on a scale from 0 to 1.0) which falls in the range of severe dysfunction.  His score on the Neuropsychological Deficit Scale, which incorporates more test scores than the Impairment Index, was in the range of moderately severe brain damage (NDS score = 42, cutoff for normal = 25 or less).

**Learning disability.**  Mr. Fields' academic achievement was tested using the WRAT-3.  His scores for Reading were at the post-high school level, and represent an area of relative strength for him. However, he was mildly impaired in Spelling (7th grade level) and

Forensic Neuropsychological Examination          FIELDS, Jr., Edward
April 1, 2010                                                    Page 11 of 21

moderately impaired for Arithmetic (4th grade level).  These data suggest the presence of a specific learning disability for mathematics.

**Frontal lobe/executive functioning.**  Mr. Fields' executive control functioning was the most profoundly impaired area tested.  His scores on diverse measures of discreet frontal lobe functions were all moderately to severely impaired, including: smell identification (UPSIT), abstract problem solving and set switching (Categories Test, Trails B, and WCST), impulse control (Stroop), verbal fluency (F-A-S, Animal Naming), and apathy, disinhibition, and executive dysfunction in real-world, natural settings (FrSBe).

**Attention, concentration, and speed of information processing**. Mr. Fields' scores on tests measuring sustained attention and concentration skills were moderately to severely impaired overall.  This was seen most clearly on the d2 Test of Attention, where he scored in the severe impairment range; a level of performance generally seen among inpatient schizophrenic patients.  His scores on Trials A and the Speech Perception Test were moderately impaired, and his scores on the Seashore Rhythm Test were mildly impaired.  Overall at the time of the present examination his speed of information processing was significantly impaired.

**Memory and verbal learning**.  Mr. Fields' scores on a test of new verbal learning (the CVLT-II) reflect mild to moderate impairment in new learning, as well as short-term and long-term verbal memory. Delayed recognition was severely impaired (i.e., his ability to correctly differentiate material he had learned previously from extraneous material after a long delay interval).  Notable here was a frank deficit in his ability to engage the frontal lobes in the process of organizing and clustering similar items to enhance his overall learning and memory performance.

### Psychodiagnostic Test Results

### Symptom Validity

The PAI is an objective test of psychopathology that includes built-in scales to assess response bias and malingering.  Mr. Fields' PAI profile was valid, indicating that the resulting Psychodiagnostic profiles

Forensic Neuropsychological Examination          FIELDS, Jr., Edward
April 1, 2010                                    Page 12 of 21

provide a reliable picture of Mr. Fields' current level of psychological functioning.

In addition, the SIRS was administered to address any concerns about symptom magnification or malingering.  Mr. Fields' SIRS profile was valid and provided no indication of "faking bad" or symptom exaggeration.  Notably, the profile he produced during the present examination was substantially identical to that which he produced during Dr. Grundy's pretrial examination in August of 2003, both of which indicate absolutely no effort to exaggerate or malinger psychotic symptoms that he does not actually have.

## Test Findings

Mr. Fields' PAI profile is primarily consistent with DSM-IV-TR diagnoses of Schizoaffective Disorder and Post-Traumatic Stress Disorder.  His test responses reflect social detachment and isolation, emotional lability, peculiar thinking and experiences, and somatic symptoms, together with significant cognitive and physiological symptoms of anxiety, as well as cognitive and affective symptoms of depression. There is also evidence of maladaptive personality features that do not rise to the level of a diagnosable condition, but involve isolated schizotypal, antisocial and borderline symptoms.

## Regarding the Opinions and Testimony of Dr. Price

In this section, I will review what I believe to be major weaknesses in the opinions and testimony offered by Dr. Price.

## Minimizing Deficits and Exaggerating Strengths

First, it is my opinion to a reasonable degree of neuropsychological certainty that any reasonable neuropsychologist looking at Dr. Price's neuropsychological data would have identified the presence of significant impairments Mr. Fields' brain functioning, primarily involving frontal lobe functioning.

In his reports and during his testimony Dr. Price: (a) minimized Mr. Fields' actual neurobehavioral impairments, and (b) over-reported his actual level of functioning.  The jury in this case was never provided with a countervailing opinion that there was a *pattern of impairments*

Forensic Neuropsychological Examination          FIELDS, Jr., Edward
April 1, 2010                                                    Page 13 of 21

in his test performances suggestive of brain damage.  The jury was never told about impairments found in Dr. Gelbort's data that got worse by the time of Dr. Price's testing (e.g., WAIS-III Arithmetic, Trails B).  This could have easily been accomplished by calling any competent neuropsychologist expert to testify in rebuttal.

Regarding the issue of Dr. Price over-estimating Mr. Fields' level of functioning, it has been my experience that competent practicing neuropsychologists as well as experienced attorneys involved in capital litigation in 2003 were generally aware of the issue of "practice effects" in neuropsychological testing, whereby individuals who are tested twice in a relatively short period of time will show artificially inflated scores the second time, due to the effects of prior experience and practice with the test stimuli.  This was the case here, as Dr. Gelbort had administered many of the same tests to Mr. Fields ten months before Dr. Price tested him.  There was an existing literature documenting such performance increases in the very tests administered to Mr. Fields that could have been used to confront Dr. Price,[3] either through cross examination or rebuttal testimony by another qualified neuropsychologist.

## Faulty Basis for Opinion About Malingered Hallucinations and Failure to Present Contradictory Evidence

Dr. Price repeatedly offered the opinion that Mr. Fields was malingering auditory hallucinations, which the objective record strongly contradicts.  His testimony could have been challenged with rebuttal using Dr. Price's own prior inconsistent statements that he found Mr. Fields to be cooperative and effortful, that his test results were valid and reliable (p. 3107) and that he impressed Dr. Price as, "trying hard" (p. 3141).

---

[3] Sureyya, S., Dikmen, SS, Heaton, R.K., Grant, I., & Temkin, N.R.  (1999).  Test–retest reliability and practice effects of Expanded Halstead–Reitan Neuropsychological Test Battery.  Journal of the International Neuropsychological Society, 5:346-356

Basso, M.R., Bornstein, R.A., & Lang, J.M.  (1999).  Practice Effects on Commonly Used Measures of Executive Function Across Twelve Months  The Clinical Neuropsychologist, 13(3), 283-292.

Forensic Neuropsychological Examination          FIELDS, Jr., Edward
April 1, 2010                                                    Page 14 of 21

Dr. Price offered various reasons that he felt the claim of auditory hallucinations was not genuine (primarily involving the lack of co-occurring delusions) that could have been easily challenged by one of the defense experts and/or with learned treatises available at the time that contradicted Dr. Price's assertions.[4]

Dr. Price administered several malingering test, all of which indicated honest effort and valid results, but there was no effort to square that fact with Dr. Price's opposing opinion that Mr. Fields was indeed malingering.  This could easily have been addressed through effective rebuttal testimony from a qualified neuropsychologist.

An even more compelling and egregious omission on Dr. Price's part, however, was the fact that Dr. Grundy had administered the SIRS to Mr. Fields prior to trial, and that the SIRS had shown that there was absolutely no evidence that he has malingering psychiatric symptoms. Dr. Grundy could easily have been called in rebuttal to make that point.

Dr. Price admitted that he did not administer any psychodiagnostic testing to Mr. Fields.  This glaring omission could have been exploited by a rebuttal expert to make the points that: (a) all the objective psychodiagnostic tests like the MMPI-2 and the PAI have built in "lie detector" scales that Dr. Price could have used to prove or disprove the hypothesis that Mr. Fields' auditory hallucinations were manufactured, and (b) that if Dr. Price was concerned about malingering, why did he chose not to administer a test like the SIRS himself to prove or disprove his clinical hunch?

## **Testifying Outside His Expertise**

Dr. Price is a psychologist, not a physician, yet he went beyond where Ph.D.'s generally are qualified to go in testifying about the specific effects and side effects of various psychotropic medications. [Testimony transcript, p. 3129; 3160].  This testimony was in conflict with the American Psychological Association's Ethical Principles of Psychologists and Code of Conduct, or the Specialty Guidelines for

---

[4] Resnick, P.  (1997). Malingered psychosis.  In R. Rogers (ed.), Clinical Assessment of Malingering and Deception (2 ed.).  New York:  Guilford, p. 47-67.

DSM-IV-TR, p. 411.

Forensic Neuropsychological Examination        FIELDS, Jr., Edward
April 1, 2010                                              Page 15 of 21

Forensic Psychologists that explicitly prohibit offering opinions outside of one's area of expertise.  One or more rebuttal experts could have testified about the impropriety of Dr. Price's behavior, and/or could have impeached any actual errors in the opinions he offered.  This was not done, however.

## Neglected Opportunities to Pursue Mr. Fields' Genetic Predispositions to Brain Disease and Mental Disorder

Finally, there is significant information in Mr. Fields' family history, specifically on the maternal side, to indicate that he was born at significantly elevated genetic risk for the development of brain disease and psychiatric disorder.  None of this was broached at trial, but could have made a significant impact on the jury.  The fact that Dr. Price failed to obtain or consider this information in formulating his opinions could have been used to impeach his testimony.

There were several facts and observations that Dr. Price testified about on direct that could have been used to confront him about the real possibility that Mr. Fields was suffering from a brain disease that was affecting his behavior.  This includes evidence of a disinhibiting frontal lobe syndrome reflected in Dr. Price's observations that, for example:

- Mr. Fields did not appear concerned about facing a life in prison (insouciance, p. 3111),

- That he exhibited inappropriate laughter during a conversation with mother after crime about hearing voices (p. 3115),

- That he was described as "locked-in" during crime; with no plan (p. 3136),

- That he got, "wrapped up in the process" and "wasn't thinking about the next step" (p. 3136).

These are all behaviors that are consistent with impairments reflected in the extant neuropsychological test data at that time that could have been used to challenge Dr. Price, either during cross examination or through rebuttal testimony by the available defense experts.

Forensic Neuropsychological Examination          FIELDS, Jr., Edward
April 1, 2010                                                      Page 16 of 21

## <u>Summary and Recommendations</u>

It is apparent from the current testing that Mr. Fields has experienced a catastrophic loss of brain function over the past five years.  Notably, the pattern of impairments detected at the time of trial (as well as the rare and pathognomonic findings indicative of brain dysfunction obtained during the present examination) are strikingly consistent with the pattern of brain impairments detected in Mr. Fields' mother, Mary Margaret Fields, in September of 2001.  This would raise another "red flag" as to the possibility of an inherited vulnerablility to brain dysfunction and the need for a more comprehensive neurodiagnostic workup, including MRI and neurological examination.

In light of his family history and the results of the present examination, the most likely disease process would appear to involve the cerebral vasculature, including the possibility of atherosclerosis and/or ischemic brain disease (transient ischemic attacks and/or stroke) leading to a multi-infarct dementia.  It is also possible, but less likely, that he may have neoplastic brain disease (i.e., a brain tumor).  Either way, an MRI study of his brain is strongly indicated to aid in proper differential neurodiagnosis and treatment.

This apparent degenerative brain disease process also raises important questions about his behavior at the time of the instant offense, as there is evidence in the test data from the time of trial that there was something abnormal and deteriorating about his neurocognitve functioning.  This is also relevant in light of research literature demonstrating linkages between transient ischemic attacks and strokes, and violent behavior.[5]

---

[5] Stephan A. Botez, S.A., Carrera, E., Maeder, P, & Bogousslavsky, J.  (2007).  Aggressive Behavior and Posterior Cerebral Artery Stroke.  *Arch Neurol.* 2007;64(7):1029-1033.

Aybek, S., Carota, A., Ghika-Schmid, F., Berney, A., Melle, G.V., Guex, P. & Bogousslavsky, J.  (2005).  Emotional Behavior in Acute Stroke: The Lausanne Emotion in Stroke Study. <u>Cognitive and Behavioral Neurology</u>, 18(1), 37-44.

J. S. Kim, J.S., Choi, S., Kwon, S.U., & Seo, Y.S.  (2002).  Inability to control anger or aggression after stroke. *Neurology*, 58, 1106-1108.

Forensic Neuropsychological Examination        FIELDS, Jr., Edward
April 1, 2010                                   Page 17 of 21

Although his overall level of cognitive functioning was significantly higher at that time, there is evidence in the neuropsychological test data from Drs. Gelbort and Price that indicates that whatever the underlying disease processes is, it affected his cognition and behavior at that time.  This is reflected most notably in attention, concentration, speed of information processing, and frontal lobe/ executive functioning (including measures of impulse control, cognitive flexibility, verbal fluency, design fluency; as well as apathy, disinhibition, and executive dysfunction in natural settings outside the laboratory as measured by the FrSBe).  In addition, there were distinct "lateralizing signs" suggesting left-hemisphere brain impairment (i.e., dominant hand inferiority in fine motor and grip strength).  The overall level of impairment in these areas was mild to moderate, and in the context of capital litigation during what the National Institutes of Health declared the "Decade of the Brain," would have been more than adequate to trigger a referral for brain imaging at that time.[6]

Finally, I did not anticipate finding the extreme degree of impairment and loss of function that Mr. Fields has experienced at the time I set out to evaluate him.  I did not budget time to re-administer formal intelligence testing or comprehensive memory testing during the present examination.  However, in light of the current test results I would strongly encourage you to consider having these additional assessments  administered in order to provide as complete a picture as possible of Mr. Fields' current neurobehavioral functioning.

---

Paradiso, S., Robinson, R.G., & Arndt, S.  (1996).  Self-Reported Aggressive Behavior in Patients with Stroke.  Journal of Nervous and Mental Disease,184(12), 746-753.

[6] Compare: Seiden, J.A.  (2004). The criminal brain: Frontal lobe dysfunction evidence in capital proceedings. *Capital Defense Journal*, *16*, 395; Silva, J.A.  (2007). The relevance of neuroscience to forensic psychiatry. *Journal of the American Academy of Psychiatry and the Law, 35*, 6-9;

Snead, O.C.  (2007, Feb.). Neuroimaging and the "complexity" of capital punishment.  Notre Dame Law School Legal Studies Research Paper No. 07-03. Available through the SSRN: http://ssrn.com/abstract=965837.

Forensic Neuropsychological Examination            FIELDS, Jr., Edward
April 1, 2010                                          Page 18 of 21


Thank you for the opportunity to consult on this complicated and
challenging case.  If you have any questions regarding my findings or
opinions, I will be happy to discuss them with you, and I can be
reached directly at (949) 732-2211.

Sincerely,


Daniel A. Martell, Ph.D. A.B.P.P. (Forensic)
Assistant Clinical Professor of Psychiatry and Biobehavioral Sciences
Semel Neuropsychiatric Institute
David Geffen School of Medicine at U.C.L.A.

Forensic Neuropsychological Examination          FIELDS, Jr., Edward
April 1, 2010                                    Page 19 of 21

```
          Normative Neuropsychological Profile: Edward Leon Fields, Jr.
                       1 = Dr. Gelbort, 08/11/2004
                        2 = Dr. Price, 06/13/2005
                       3 = Dr. Martell, 03/16–17/2010
          (Scores Normed for Sex=Male, Education=11, and Age=at Time of Testing)


                    1   2   3
Test               Score     -3      -2      -1   Average  +1      +2      +3
INTELLIGENCE                  .       .       |       |       |     .       .
WAIS-III                     .       .       |       |       |     .       .
Full Scale IQ   94 109       .       .       |   1   |   2   |     .       .
 Verbal IQ      92 106       .       .       |   1   |   2   |     .       .
  Information   10  12       .       .       |     1   2   |     .       .
  Digit Span     8   9       .       .       | 1   2 |       |     .       .
  Vocabulary    10  16S      .       .       |     1       |       2     .
  Arithmetic     7   6W      .       .     2 1       |       |     .       .
  Comprehension  8  13       .       .       | 1     |       2     .       .
  Similarities  10  11       .       .       |     1 2     |     .       .
 Performance IQ 95 111       .       .       |   1 |     2 |     .       .
  Pict. Complet  9  14       .       .       |   1 |       | 2     .       .
  Pict. Arrange  9  15       .       .       |   1 |       |     2 .       .
  Block Design   9   9W      .       .       |   12|       |     .       .
  Object Assemb --  --       .       .       |       |       |     .       .
  Digit Symbol   7   7W      .       .     12        |       |     .       .
  MatrixReasoning13 14       .       .       |       |     1 2     .       .
Verbal Comp.   100 116       .       .       |     1       2     .       .
Perceptual Org. 101 114      .       .       |     1     2|     .       .
WTAR                37       .       .       |       |       |     .       .
 Verbal IQ         104       .       .       |       | 2     |     .       .
 Performance IQ    102       .       .       |      |2       |     .       .
 Full Scale IQ     104       .       .       |       | 2     |     .       .
                             .       .       |       |       |     .       .
ACHEIVEMENT (WRAT3)          .       .       |       |       |     .       .
Reading         30       25 .       .       |3      |       |     .       .
Spelling        34       13 .       .     3 |       |       |     .       .
Arithmetic      18        2 .       3       |       |       |     .       .
                             .       .       |       |       |     .       .
MEMORY FUNCTIONING (WMS-3)   .       .       |       |       |     .       .
General Memory      91       .       .       | 2     |       |     .       .
 Auditory Imm.     108       .       .       |       | 2     |     .       .
 Visual Imm.        91       .       .       | 2     |       |     .       .
 Immediate Memory  100       .       .       |     2       |     .       .
 Auditory Delayed   94       .       .       |   2 |       |     .       .
 Visual Delayed     91       .       .       | 2     |       |     .       .
 Aud. Recog. Delay  95       .       .       |   2 |       |     .       .
 Working Memory     --       .       .       |       |       |     .       .
Logical Memory I 38 50       .       .       |   1   2 |     .       .
Family Pictures 29 38        .       .     1 2       |       |     .       .
                             .       .       |       |       |     .       .
```

Forensic Neuropsychological Examination        FIELDS, Jr., Edward
April 1, 2010                                  Page 20 of 21

```
                        1    2    3
Test                  Score  -3   -2    -1   Average  +1    +2    +3
California Verbal Learning Test-II .    |      |       |      .     .
 Trial 1                 3 .       3       |      |       |      .     .
 Trial 5                11 .       .       | 3    |       |      .     .
 Total 1-5              32 .       . 3     |      |       |      .     .
 Tues. List              2 .       3       |      |       |      .     .
 Short Delay Free        7 .       .    3  |      |       |      .     .
 Short Delay Cued        7 .       . 3     |      |       |      .     .
 Long Delay Free         7 .       . 3     |      |       |      .     .
 Long Delay Cued    --   9 .       .    3  |      |       |      .     .
 Recognition            11 3       .       |      |       |      .     .
 False Positives         5 .       .    3  |      |       |      .     .
                           .       .       |      |       |      .     .
ATTENTION/CONCENTRATION/SPEED OF INFORMATION PROCESSING |      .     .
Ruff 2 & 7                 .       .       |      |       |      .     .
 Auto Detect Speed    117  .       .    2| |      |       |      .     .
 Auto Detect Accuracy  89  .       2       |      |       |      .     .
 Control Search Speed 102  .       .   2 | |      |       |      .     .
 Total Speed           76  .       .    2| |      |       |      .     .
 Total Accuracy        88  .       .       | 2    |       |      .     .
d2 Test of Attention       .       .       |      |       |      .     .
  Total               132 3        .       |      |       |      .     .
  Total-Errors        128 3        .       |      |       |      .     .
Trails A         29  29 55.        3       | 12   |       |      .     .
Digit Vigilance            .       .       |      |       |      .     .
 Total Time           452  .       .   2 | |      |       |      .     .
 Total Errors           7  .       .       |  2|  |       |      .     .
Symbol Digit           53  .       .       |    2 |       |      .     .
                           .       .       |      |       |      .     .
FRONTAL LOBE/EXECUTIVE FUNCTIONING .       |      |       |      .     .
Wisconsin Card Sort        .       .       |      |       |      .     .
 Errors                98 3-       .       |      |       |      .     .
 Persev. Resp.         72 3-       .       |      |       |      .     .
 Persev. Errors        59 3-       .       |      |       |      .     .
 Non-Pers. Errs        39 .       3.       |      |       |      .     .
Categories       53  26 82 .       .    3  | 1    | 2     |      .     .
Stroop Test                .       .       |      |       |      .     .
 Word                  45 3-       .       |      |       |      .     .
 Color                 51 .        3       |      |       |      .     .
 Color-Word      95  27 .          .3      2      |       |      .     .
 Interference              .       .       |      |       |      .     .
Symbol-Digit Modalities Test.      .       |      |       |      .     .
 Written                   .       .       |      |       |      .     .
 Oral                      .       .       |      |       |      .     .
Trails B         94 130 421 3-     .    2  1      |       |      .     .
Verbal Fluency             .       .       |      |       |      .     .
 F-A-S           24  15 .          3 .     2      |       |      .     .
 Animals               10 . 3              |      |       |      .     .
 Sentence Repetition 11    .       .       |2     |       |      .     .
```

Forensic Neuropsychological Examination        FIELDS, Jr., Edward
April 1, 2010                                  Page 21 of 21

```
                          1    2    3
Test                    Score   -3      -2      -1   Average  +1      +2      +3
FRONTAL LOBE/EXECUTIVE FUNCTIONING .        |       |       |       .       .
Ruff Figural Fluency            .    .      |       |       |       .       .
 Unique Designs      42    .    2 .         |       |       |       .       .
 Error Ratio        .05    .      .         | 2     |       |       .       .
USPIT               17     .    3           |       |       |       .       .
                           .      .         |       |       |       .       .
HALSTEAD-REITAN BATTERY    .      .         |       |       |       .       .
 Neuro Deficit Scale  42 . 3                |       |       |       .       .
 Impairment Index   1.0 3  .                |       |       |       .       .
Categories    53   26  82 .       .      3  | 1     | 2     |       .       .
 Finger Tapping            .      .         |       |       |       .       .
  Dominant          57  41 .     .3         |       | 2     |       .       .
  Non-Dominant      46  44 .      .         | 3     2       |       .       .
 Grooved Pegboard          .      .         |       |       |       .       .
  Dominant          73 102.     3           |2      |       |       .       .
  Non-Dominant      72 106.     3           | 2     |       |       .       .
 Strength of Grip          .      .         |       |       |       .       .
  Dominant          47     .      .       2 |       |       |       .       .
  Non-Dominant      49     .      .         | 2     |       |       .       .
Trails A    29   29   55.       3           | 12    |       |       .       .
Trails B    94  130  421 3-     .     2   1 |       |       |       .       .
 Seashore Rhythm    22 .       .       3    |       |       |       .       .
 Speech Perception  15 .       . 3          |       |       |       .       .
 Tactual Performance Test  .      .         |       |       |       .       .
  Dominant Hand     5.0. 3        .         |       |       |       .       .
  Non-Dominant Hand 3.8. 3        .         |       |       |       .       .
  Both Hands        1.7.     3    .         |       |       |       .       .
  Total             2.8.     3    .         |       |       |       .       .
  Memory            3 .      3    .         |       |       |       .       .
  Localization      0 .       3             |       |       |       .       .
Boston Naming Test    --   .      .         |       |       |       .       .
Hooper Visual Org.  26  28.       .         |       2  3    |       .       .
```