**13**

Declaration of Dean Anderson
Pursuant to 28 U.S.C. § 1746

I, Dean Anderson, hereby verify and declare and follows:

1.      My name is Dean Anderson. I graduated from a masters degree program at the University of Oklahoma Health Sciences Center in December, 1998 as a Physician Assistant (PA). I assumed a position as a PA at Hillcrest Hospital's Clinic in Heavener, Oklahoma. I worked there for nine months when I obtained a position with the Rubin White Clinic in Poteau, Oklahoma. I have been employed there ever since.

2.      As part of my duties at the Heavener Clinic I treated Edward Fields in 1999. I saw him on a number of occasions. As a PA, all of my patient consultations were reviewed by a licensed medical doctor. At the time I saw Mr. Fields, my work was done in consultation with Dr. Don Schumpert.

3.      I have been asked by Mr. Fields' legal counsel to review my treatment records of Mr. Fields and to explain my impressions of him at the time of my medical encounters. The following is based upon my review of records and my independent recollection. Because I was new to this part of Oklahoma when I first met Mr. Fields, we engaged in brief social interactions over a period of one to two months. I had stopped this social interaction years before the offenses.

**Page 1 of 5**

4.      I first saw him on February 9, 1999 for cold symptoms.  I conducted a general review of his health which lead him to relate to me that he suffered from "anxiety."  His family, who attended the session with him, said that they were having trouble living with him (I recall he was married with two young children).  He was also somewhat anxious because he was trying to stop smoking.  Because I believed that his "anxiety" was a serious concern, and possibly evidence of a mood disorder, I provided him with 30 days of Wellbutrin (150 mg) samples and recommended that Mr. Fields return to the clinic in two weeks to monitor the impact of this medication on his mood and see if it was helpful with his smoking cessation attempt.

5.      He returned to the clinic as directed on February 26, 1999.  He reported that his mood and concentration improved with the Wellbutrin, per his family.  He reported increased sexual libido.  However, he also told me that he was more fatigued under this medication.  He told me about "periods of disorientation" and "tingling" in his hands and feet and around his lips, both of which have been experienced by his mother.  He said that his mother had been told that these conditions were due to "anxiety."  Based on my examination, I changed my assessment from "anxiety" to "depression/anxiety."   I continued him on Wellbutrin, recommended stress management techniques and ordered lab tests.

6.      My next progress note of March 5, 1999 indicates that I reviewed his lab

**Page 2 of 5**

work. Below the typed portion, I have a handwritten entry indicating that I discontinued Wellbrutin and started him on Paxil for his mood. I believe that I made this change after a phone call with Mr. Fields in which he indicated that his mood was not improving while on Wellbutrin.

7. Mr. Fields next attended the clinic on June 25, 1999 ostensibly for more cold symptoms. He also reported a new complaint of reduced libido and requested that his testosterone level be checked. He also reported decreased energy. My progress notes do not indicate any change in his medication related to mood.

8. He returned to see me four days later (June 29) because of an anaphylactic reaction to a bee sting. I tended to the bee sting and noted in my assessment "Depression by history."

9. I saw him medically for the last time on August 11, 1999. I noted that he was on Paxil, 20 mg per day. He reported that his wife was divorcing him and that he was upset at not being able to see his kids. He reported decreased sleep, increased psychomotor activity and weight loss. Although he told me he was "doing well" on Paxil, he also told me that he "does not want to get up and go to work." My assessment was that he was "depressed." I continued him on Paxil and told him to return to the clinic as needed.

10. Although I did not see Mr. Fields again professionally, I did see him

socially. We went fishing together and hung out a few times. However, I was not comfortable with Mr. Fields. I gathered that he wanted to be friends but as I told the FBI in 2003, he was "different." The FBI report of its interview with me indicates that I told them I never noticed "anything peculiar about Mr. Fields' mood." While it is true that he never acted moody in my presence, I would not want that interview to be interpreted as suggesting that Mr. Fields did not in fact suffer from depression – a mood disorder.

11.    Based upon my review of my notes and my recollection of Mr. Fields, I am confident that his reports of mood disturbances and related symptoms (e.g. depression, anxiety, sleep disturbances and weight loss) were genuine. I did not believe that he was in any way malingering these conditions or complaints. I perceived him at the time to be a disturbed individual (one whom I described as "different").

12.    I was aware when Mr. Fields was charged with the killing of the two campers and I was aware when his trial was on-going. As I told the FBI, I "never believed [] he would be capable of killing anyone and was shocked when" I learned of these circumstances. Until being contacted by Mr. Fields' current lawyers, I was never contacted by anyone on behalf of Mr. Fields to provide the information contained in this declaration. Had I been approached by Mr. Fields' lawyer at the

time of his arrest and trial, I would have provided the information contained in this statement and would have testified if asked.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Dean Anderson, PA

Dated:    Poteau, Oklahoma
          March 2〈, 2010