**20**

## DECLARATION AND AFFIDAVIT OF DANIEL PRESLEY
## PURSUANT TO 28 U.S.C. § 1746

I, Daniel Presley, do hereby declare and verify as follows:

1.     My name is Daniel Presley. Ed Fields and I were best friends prior to his incarceration. I have recently met with members of Ed's current defense team. They have shown me statements that I gave to the FBI in 2003 and to his investigator at the time of trial. They have also shown me my trial testimony and the prosecution's closing argument at Ed's trial. I am providing this declaration to clarify a number of serious misunderstandings and apparent attempts to twist my words. I was completely honest when I spoke with the FBI and the defense at the time of trial. These misunderstandings and twisting of my words seems to have occurred because I answered only what was asked of me. I did not know what was important to either side when they interviewed me or questioned me at trial, and I provided just the information that each side requested. I can now see because I was not asked about a number of areas, or because one side or the other decided not to ask about certain questions, that the information that I provided to them and that was given to the jury was not entirely accurate or fair.

2.     The lawyers prosecuting Ed's case called me to testify as a witness at his trial; Ed had come to my house early in the evening on the day of the homicides. I told the jury that Ed did not appear particularly stressed or depressed when I saw him that day, which was true. As I said in my testimony, I met Ed in 1998 when we were both working for the Oklahoma Department of Corrections at the Quachita Correctional Facility. We hit it off immediately and became best friends. There were

1

times Ed and I would go hunting or fishing together as many as five times a week. As a friend Ed was loyal. When my mother was sick, my wife and I spent a great deal of time tending to her needs. Ed would bring whole dinners to our house so my wife wouldn't have to cook. When Ed would come to the house he would tease and play with the kids. Neither my wife or I had any hesitation about Ed being with the kids. During the two years I worked with Ed at the prison, I never knew him to be physically violent with the inmates. Though he was stern with them, that was expected. I never knew him to be violent or use inappropriate force with inmates. Ed was never like that. Also, one of our favorite things to do was playing pool. Of course we played pool at the Electric Cowboy, a bar, where its not unusual to run into a bad apple who wants to start something. In all the hours we spent playing pool, I never once saw Ed become violent with anyone. At Ed's trial I testified that I was shocked when I heard that he had been arrested for the homicides and that I couldn't believe it. However, no one asked me why it was so shocking. Had they asked me, I could have told them how absolutely out of character it was for Ed to be a violent murderer. I mean prior to this incident I had never known him to have any criminal trouble with the law. Though I'm no doctor, I spent enough time both professionally and personally with Ed to know that something in him must have snapped when he killed those people.

3.      Another reason why I think something in Ed snapped has to do with when he came to my house in the early evening on the day of the homicides. As I told the FBI in July of 2003, Ed came to the house and wanted me to do something. At the

2

time, I was not asked by the FBI about Ed's offer to "do something." When I testified at trial, neither Ed's lawyers nor the prosecutor asked me any questions about why Ed came to my house on the day of the tragedy. If asked I would have told them that when Ed came to the house that day he wanted me to go snake hunting with him. I couldn't go because I had made other plans for that evening. When Ed and I would go snake hunting, it would always be at night. We'd use headlights to see the snakes. We wouldn't get back from snake hunting till ten or eleven p.m.- or even later. Snake hunting is one of the activities we would do all the time. Now that I have seen the prosecutor's closing argument, where he said that Ed had planned to kill those people, I wonder how he could have planned it, when he asked me to go snake hunting?

4.    At trial I testified that Ed made a ghillie suit about a year and a half to two years before the tragedy happened. I also testified that I was with Ed when he went to Fort Smith, Arkansas, to buy materials for the suit and that, after the suit was made, I had even worn it. Lastly I testified that Ed would hunt squirrels by sitting still in the ghillie suit and waiting for squirrels to come by. That's how you hunt with a camouflage suit. Though ghillie suits are most often used for turkey hunting, the fact that Ed made his own ghillie suit and used it for squirrel hunting did not at all strike me as unusual. You can go into any hunting supply store in Eastern Oklahoma and buy a ghillie suit. It is a common tool of hunters and lots of guys around here use them. Rather than spending a hundred dollars or so on a ghillie suit, Ed is the kind of person who is good with his hands and likes to make things for himself. It's really

3

amazing to me to read the part of the prosecution's closing argument where they said that Ed made the ghillie suit because his plan was that he intended to become a sniper, as well as the part where he implies that I said that you don't need a ghillie suit to hunt squirrels. This suggests that Ed did not make the suit for squirrel hunting, which is just a plain lie. If two years earlier Ed was making the suit to kill people, I never would have gone with him to buy the materials for it. Also, its not like Ed kept the ghillie suit hidden so no one would know about it. Most times he kept the darn thing in the back of his truck in plain sight. Like I told the FBI, Ed never once said to me that he made the ghillie suit, or that he ghillied his gun, so that he could stalk people.

5.      Like the Ghillie suit, the prosecutor also twisted my words around regarding Ed's .22 rifle and the scope he had on it. I testified that Ed hunted squirrels with a .22 rifle that had an amplified scope on it. Although I said that the scope was powerful and was something you'd usually see on a high powered hunting rifle, I did not say that there was no need for a scope like Ed's to be mounted on a .22 caliber rifle or that it was a scope for a snipers rifle. But, this is what the prosecutor told the jury I said. If someone would have asked, I could have explained to the jury that it is not at all unusual for hunters who eat the small game they catch to put a scope on a .22 rifle. You can either hunt small game with a shot gun or a .22. Using a shot gun, its easier to hit the target, though you have to be closer to it, but it often ruins the meat because it leaves too much shot in it. Using a .22 with a scope allows you to make a longer shot and it doesn't ruin the meat with a bunch of bee-bee's. I testified

4

that Ed could hit a squirrel off a branch from 50 to 70 yards away. Ed was a good shot and having a large scope on his gun allowed him to challenge himself by making very long shots with his gun. As I told the FBI in July of 2003, when Ed and I would go hunting, Ed would often see squirrels and shoot them before I even had a chance to see them. That was the advantage Ed had with his scope and its not like we weren't competitive when we hunted together. Although, Ed had mounted the scope on his gun more than a year before the tragedy happened, he ghillied the gun around three or four weeks before the tragedy. When I saw the gun at Carol Lambs house, like I testified, Ed didn't tell me why he ghillied the gun, but there really was no need for him to tell me why. Lots of hunters who use ghillie suits also ghillie their guns as well. Ghillieing the gun just completes the whole outfit. Had I thought there was something out of the ordinary about him ghillieing the gun I certainly would have asked him why he did that, but of course I didn't ask because it wasn't unusual. Nobody had me explain this to the jury at Ed's trial.

6.    Another thing I told the FBI in July of 2003, was that Ed's depression and his talking about suicide just got worse and worse. Ed's defense team never asked me about this. I told the FBI agent that Ed talked to me about suicide 15 to 20 times, and that he had done so especially during the year leading up to the homicides and especially during the last four months leading up to the homicides. Of course, when Ed would talk to me about his depression he would tell me about going to the doctor in the spring of 2003 and getting medication. I could never understand though why his talk about suicide got worse the more he was on the medication. As my wife told

the defense, it really seemed that the medication must have had something to do with this whole thing. At Ed's trial, the attorneys only asked me about the number of times Ed talked about suicide. No one asked me if it had become worse around the time of the tragedy. If they had asked, I could have told them what I told the FBI agent in July of 2003. Like I told that agent, a week or two before this tragedy happened, Ed and I were at some cliffs by Lake Eufaula. Ed jumped off the cliff and cut his back on some rocks in the water below. When I yelled at him for doing that Ed said, "The worst thing that could happen is I'd get killed."

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Daniel Presley

Dated:        March 30, 2010
              Heavener, Oklahoma