**36**

# CLIPSON & OSTERLOH

*A Professional Psychological Corporation*
Clinical and Forensic Psychology
Neuropsychological Assessment
3921 Goldfinch Street
San Diego, CA 92103
(619) 260-0335
www.clarkclipsonphd.com

## AFFIDAVIT PURSUANT TO 28 U.S.C. 1746

I, Clark R. Clipson, Ph.D., declare and state as follows:

1.      All of the facts contained in this affidavit are known to me personally and if called as a witness, I could and would testify thereto.

2.       Counsel representing Edward Leon Fields, Jr. (DOB: 05/15/67) asked me to review the neuropsychological evaluation of Mr. Fields conducted by J. Randall Price, Ph.D. on 6/13 and 6/28/05.  I was asked to review the interviews, test administration, and written report by Dr. Price.  I conducted my review of his work by listening to auditory recordings of the assessment sessions and reading written transcripts of those sessions and other records pertaining to Mr. Field's history, Dr. Price's report and the raw test data from the evaluation. After a thorough review of materials and applying my expert analysis, I have concluded to a reasonable degree of scientific and professional certainty that Dr. Price did not conduct a competent evaluation of Mr. Field's neuropsychological functioning because of the significant errors he made in test administration, scoring, and interpretation.

## QUALIFICATIONS

3.      I have been a licensed psychologist in California since 1983.  My practice has largely consisted of conducting a variety of psychological and neuropsychological evaluations, often in a forensic context.  My professional interests lie in the area of personal injury cases, sexual offenders, general criminal offenders, risk assessments (general, violent and sexual), sanity evaluations, penalty phase evaluations, child abuse and molest, juvenile offenders, domestic violence, and competency to stand trial.  I have expertise in the evaluation of traumatic brain injuries, learning disabilities, developmental disorders, criminal behavior, posttraumatic stress, personality disorders, sexual offenders, abuse victims, and substance abuse.

2

4.      In addition to my private practice, I served for over seven years as the director of psychological services at an inpatient psychiatric facility (Alvarado Parkway Institute) and over four years at an outpatient psychiatric clinic (Psychiatric and Counseling Services of North County), both in San Diego, California.

5.      I was an adjunctive faculty member at the California School of Professional Psychology from 1991 until 2006.  In addition to being a clinical supervisor, I also taught courses in professional ethics, cognitive and intelligence testing, clinical inference, and forensic psychological assessment.  Prior to that I taught psychology classes at National University for five years.

6.       I have consulted to numerous local and state agencies.  For 19 years I conducted psychological and neuropsychological evaluations for the Conditional Release Program throughout the state of California, assessing individuals found not guilty by reason of insanity and who had met the criteria as mentally disordered offenders.  I also consulted with a local high school conducting head injury evaluations for their athletes and participating in return-to-play decisions in conjunction with a physician and athletic trainer.  Through the California Department of Mental Health, I conducted sexually violent predator evaluations and mentally disordered offender evaluations for 14 and 8 years respectively.  I have also served as an expert reviewer for various state licensing boards, and was an oral commissioner for the Board of Psychology from 1988 until 2003.  I have also provided consultations to San Diego Juvenile Court, the Naval Alcohol Safety Action Program, and the California Department of Social Services.

7.       My publications include being coauthor of a textbook on abnormal psychology that was used for many years at universities throughout the United States and the world: *Casebook for Abnormal Psychology* with Joselyn Steer, Ph.D., published by Houghton-Mifflin in 1998.  I have also authored articles in peer-reviewed journals on the evaluation of sexual offenders, female domestic violence perpetrators, and ethical considerations in professional dual relationships.  I have provided trainings in sexual offender evaluations, familicide, assessment of PTSD in children, learning disabilities, domestic violence, ethics and violence risk assessment.

8.      I have conducted over 3500 psychological and neuropsychological evaluations.  Over 2200 of those evaluations were for the courts.  I have testified 171 times, and have qualified as an expert in state, federal, and military courts.

9.      A copy of my current *resume* is attached.

3

## DOCUMENTS REVIEWED

10.      In reaching the opinions expressed below, I have reviewed the following materials:

  (a) Interview Transcript of Edward Leon Fields, Jr. by Dr. Randall Price (d. 6/13/05)
  (b) Interview Transcript of Edward Leon Fields, Jr. by Dr. Randall Price (d. 6/28/05)
  (c) United States of America v. Edward Leon Fields, Jr. – United States District Court for the Eastern District of Oklahoma – Partial Transcript of Direct Examination of Dr. Randall Price (Part 1) (d. 7/20/05)
  (d) United States of America v. Edward Leon Fields, Jr. – United States District Court for the Eastern District of Oklahoma – Partial Transcript of Direct Examination of Dr. Randall Price (Part 2) (d. 7/20/05)
  (e) Preliminary Report of the Neuropsychological Evaluation of Edward Leon Fields, Jr. by Dr. Randall Price (d. 6/20/05)
  (f) Report of Neuropsychological Evaluation of Dr. Randall Price (d. 7/1/05)
  (g) Audio recording of June 13, 2005 Interview of Edward Leon Fields, Jr. by Dr. Randall Price
  (h) Audio recording of June 28, 2005 Interview of Edward Leon Fields, Jr. by Dr. Randall Price
  (i) Raw data from Neuropsychological Evaluation of Edward Leon Fields, Jr. by Dr. Randall Price.

My opinions are based on these materials, documents and other relevant scientific literature pertaining to neuropsychological assessment, and my expertise and experience in the fields of test administration, interpretation, and report writing in the fields of forensic and neuropsychological assessment. I express all opinions contained in this report to a reasonable degree of scientific and professional certainty.

## CRITIQUE OF DR. PRICE'S INTERVIEW WITH MR. FIELDS

11.      To his credit, Dr. Price appears to establish good rapport with Mr. Fields initially and to conduct a thorough interview.  He notes that both Mr. Fields and his sister have a chronic history of depression, and that Mr. Fields was first treated for this condition at the age of 16. Dr. Price clearly considers this historical information in his report when he opines that Mr. Fields meets the diagnostic criteria for dysthymic disorder.

12.      Dr. Price notes in his report that Mr. Fields' mother indicated he had a history of hyperactivity.  Mr. Fields also reports having possible symptoms of ADHD, including those of being forgetful, fidgety, disorganized and poor planning.  This is relevant because of Dr. Price's failure to consider this historical information when reaching his diagnostic conclusions.

4

13.       In addition, Dr. Price fails to inquire about or mention other possible neurodevelopmental, toxic, and/or traumatic contributors to Mr. Fields' current cognitive functioning.  In particular, the defense expert Michael Gelbort, Ph.D. notes the presence of several possible significant factors in Mr. Fields' background.  These include the possibility that he suffered a hypoxic episode at birth, that he was injured in a sledding accident and in a motor vehicle accident, and that he was exposed to toxins while working as a painter.  Dr. Price does not appear to know about these incidents in Mr. Fields' background.

14.       Throughout the interview, Dr. Price has an occasional tendency to ask leading questions rather than open-ended ones.  For example, instead of asking how school was, he says, "School was a struggle for you?"  A few times he says, "I don't want to put words in your mouth," as though he had some awareness he was doing this.  A tendency to ask leading questions can influence the person being evaluated, providing subtle clues as to what the examiner wants to hear.  This can invalidate the conclusions reached by the evaluator as the examinee may not provide all the information they would have if given the opportunity via more open-ended questions.  It also can indicate that the examiner had already reached a conclusion and that he was looking for evidence to support this conclusion.

15.       Although there was no prior reported history of psychosis or thought disorder, the objective history contained in Mr. Fields' records was inconsistent with this.  Dr. Price does not mention this inconsistency or address it in his report.

16.       Dr. Price observes in passing that Mr. Fields had undergone a prior assessment the year before.   He makes no further mention of this important fact in his report, nor does he take this into consideration in interpreting Mr. Fields' test results.  Mr. Fields specifically tells Dr. Price that he recalls taking the following tests at an earlier time: Booklet Category Test, Sentence Repetition Test, and Block Design.  He also recalls taking the Similarities subtest from the WAIS-III, adding that the other examiner told him that the correct answer to the question of how a *fly* and *tree* are alike is that they are both alive.  During the second day of testing with Mr. Fields (pg. 86), Dr. Price discusses an effort test (unspecified) that the previous examiner told Mr. Fields was an effort test.  Because of this, Dr. Price decides not to give it.

## CRITIQUE OF TEST ADMINISTRATION AND SCORING

17.       The Digit Vigilance Test was not administered properly, as Dr. Price did not allow Mr. Fields to complete the practice items.  The practice items should be given in order to ensure that the examinee understands the test directions.  In addition, taking the practice items allows Mr. Fields to orient to the test.  Failure to allow practice when this is mandated in the test manual is not standard practice, meaning that this test was improperly administered.

5

18.        The MMSE is not scored properly.  By my count, Mr. Fields made five errors on this test.  However, on his work sheet, Dr. Price indicates that Mr. Fields made only three errors. In particular, Dr. Price does not count the error Mr. Fields made on mental calculations, and he had Mr. Fields spell the word *world* backwards, even though the test manual indicates this should only be done if the person refused to perform the mental calculations (Serial 7's) task.  Mr. Fields also made an error on the repetition task that Dr. Price does not count.  Dr. Price does not mention these test results in his report.  The overall impact is that fewer errors would suggest better cognitive functioning.

19.        The Sentence Repetition Test is administered improperly as Dr. Price reads some of the sentences twice.  This is not allowed in most versions of the test (see for example pg. 369 in Spreen and Strauss, 1998).  This would likely result in improved performance on Mr. Fields' part, a higher score, and an impression of better cognitive functioning.

20.        WAIS-III Vocabulary Test – Dr. Price inquires appropriately when Mr. Fields provides answers that are given only partial credit.  However he commits four scoring errors which significantly raises Mr. Fields' score on this test.  For example, Dr. Price gives two points on item # 24 *plagiarize*.  He should only have scored this 1 point since in Mr. Field's response he does not say that one would claim the work as their own.  Secondly, Dr. Price awarded 2 points for Mr. Fields' response to the word *evolve* – "vary over time."  To obtain two points, the answer should involve the concept of growing or developing.  Third, Dr. Price awards Mr. Fields 2 points for his response "obnoxious," which is listed in the test manual as a 1 point response.  Finally, and most egregiously, Dr. Price gives Mr. Fields two points for an "I don't know" response.  (Wechsler, 1997)

21.        WAIS-III Arithmetic Test – This test must be timed in order to be properly scored. It is unclear if Dr. Price timed Mr. Fields on this test, as there are no times written on the test form as is standard practice.

22.        WAIS-III Picture Arrangement Test – As on the Arithmetic subtest, this test must be timed in order to be properly scored.  It is unclear if Dr. Price timed Mr. Fields on this test, as there are no times written on the test form as is standard practice.  Dr. Price also makes an inappropriate comment to Mr. Fields during the administration of this test.  When Mr. Fields turns a card over to look at the back, Dr. Price says, "You look at the back and I stab you in the back with the end of a pencil." (pg. 503)  Even if this remark is made playfully, it is aggressive and likely to undermine the alliance needed to obtain a valid test result.

23.        WAIS-III Comprehension Test – Test instructions require the examiner to ask for two answers on some of the test questions.  When Mr. Fields provides one answer to these particular questions, Dr. Price fails to ask him for a second one as mandated in the test manual (Wechsler, 1997).

24.        During the administration of the Ruff Figural Fluency test, Dr. Price makes another inappropriate comment to Mr. Fields.  When Mr. Fields complains, "You give me something to do, but you don't give me enough time to do it," Dr. Price replies, "Just like your mother." (pg. 524)  Another hostile comment.

6

25.          When Mr. Fields complains that he is getting tired at the end of the first day of testing, Dr. Price persists in having him complete three more tests (grip strength, finger tapping, and a motor dominance examination).  Fatigue could invalidate these test results.

26.          During the administration of portions of the Wechsler Memory Scale – III (Logical Memory I & II and Faces I & II), Mr. Fields informs Dr. Price towards the end of the test that he can tell which is the correct answer by how the examiner holds his pen.  Dr. Price states out loud that the test results are valid, although this is not at all clear.  It is very likely that the test results on these instruments could be skewed in a positive direction because of Dr. Price's behavior.

## CRITIQUE OF DR. PRICE'S CONCLUSIONS

27.          In addition to the test administration errors, scoring errors, and the failure to consider relevant historical information, there are two other major problems that contribute to my concerns with Dr. Price's conclusions.

28.          Dr. Price does not take into account the impact of the prior neuropsychological assessment by the defense expert, Michael Gelbort, Ph.D.  At the very least, he should have offered a fact-based opinion on how this may or may not have impacted the test results during his assessment with Mr. Fields.

29.          It is common practice for an examiner to use their clinical judgment in determining the impact of someone's prior exposure to a psychological test when that test is repeated (Schalock et al., 2010, p. 35).  This impact is commonly referred to as a "practice effect."  The impact on a person's test performance is particularly salient on novel, non-verbal tests, such as those commonly referred to as "performance tests" on the WAIS-III. Indeed, the average gain to be expected on the WAIS-III over a 1-month interval, is about 3 points on the individual's Verbal IQ score, 8-9 points on their Performance IQ, and 7 points on the Full Scale IQ (Kaufman and Lichtenberger, 1999).  These practice effects continue well past one month, as evidenced in a variety of research investigations.  Catron and Thompson (1979) showed that the gain in Performance IQ persisted after 4 months (8 points), although the gain on Verbal IQ had decreased to 1 point.  Further, in their review of the stability of intelligence and the resilience of practice effects, Calamia, Markon, and Tranel (2012) stated: "Retest scores are assumed to be highest at short intervals and then decrease with time (Theisen, Rapport, Axelrod, & Brines, 1998). However, several studies have found practice effects to persist years after testing, e.g., 3 years (Van der Elst et al., 2008), 5 years (Ronnlund et al., 2005), or even 7 or more years (Salthouse, Schroeder, & Ferrer, 2004)" (p. 547).

7

30.        In their assessments with Mr. Fields, Dr. Price and Dr. Gelbort used several of the same measures, so that these results can be compared directly:

| Test | Gelbort 2004 | Price 2005 |
|---|---|---|
| WAIS-III | | |
| FSIQ | 93 | 109 |
| VIQ | 92 | 106 |
| PIQ | 94 | 111 |
| Vocabulary | 10 | 16 |
| Similarities | 10 | 11 |
| Arithmetic | 7 | 6 |
| Digit Span | 8 | 9 |
| Information | 10 | 12 |
| Comprehension | 8 | 13 |
| Picture Completion | 9 | 14 |
| Coding | 7 | 7 |
| Block Design | 9 | 9 |
| Matrix Reasoning | 13 | 14 |
| Picture Arrangement | 9 | 15 |
| Trail Making Test | | |
| Part A | 29' | 29' |
| Part B | 94' | 130' |
| WMS-III | | |
| Logical Memory I | 10 | 12 |
| Family Pictures I | 6 | 7 |
| Category Test | | |
| Errors | 53 | 26 |

31.     In comparing Mr. Fields' results from 2004 and 2005, he shows surprising improvement, often significant, on tasks where practice effects would not be expected (i.e., Vocabulary, Comprehension), and no improvement on tasks where such practice effects would be anticipated (i.e., Coding, Block Design, Matrix Reasoning).  Tests in which greater than expected improvement are noted are shaded in light grey in the table above.

32.     Whereas the clinical literature suggests a three-point increase may be found in a person's Verbal IQ score between test administrations, in Mr. Fields' case, a 14-point increase is noted in this instance.  In addition, the clinical literature suggests an 8 to 9-point increase may be found in an individual's Performance IQ score between test administrations, between Mr. Fields' evaluations there is a 17 point improvement.  His improvement on the Category Test is also quite striking.

33.      These significant discrepancies cannot simply be attributed to practice effects, but instead seem to reflect the scoring errors and biases evident in Dr. Price's test administration. These are especially evident on the Vocabulary and Picture Arrangement subtests and in the Category Test. These differences also cannot be attributed to an improvement in Mr. Fields' mood, as the test scores most sensitive to mood (those related to working memory and speed of mental processing) are essentially the same between test administrations.

8

34.     Providing further support for the impression that Dr. Price's results are inflated, Dr. Gelbort's test results are more consistent with what would be expected given Mr. Fields' modest academic and occupational history.

35.     The second major problem with Dr. Price's conclusions involves his failure to recognize the presence of executive functioning deficits that are evident in the test results. Dr. Price concludes that Mr. Fields' test performance is inconsistent with a frontal lobe disorder.  However, there are consistent deficits in fluency (Coding – 16%, Digit Vigilance time – 9%, TMT-B – 7%, Stroop – 17%, COWAT – 7%, RFFT – 1%).  SDMT is the only exception (50%).  Fluency deficits are well-documented evidence of frontal lobe disorders and deficits in executive functioning.  Mr. Fields also rated himself as having deficits in frontal lobe functioning.  No assessment for ADHD was conducted by Dr. Price, despite the reported history of symptoms suggestive of this disorder.  In addition, no observer-report of frontal lobe behaviors was used.  Dr. Price simply seems to have ignored the historical, self-report, and testing evidence for a frontal lobe disorder, even though it is quite compelling.

## CONCLUSIONS

36.     After reviewing the test administration, scoring and interpretation of Dr. Price's neuropsychological examination with Mr. Fields, it is my opinion that Dr. Price inflated Mr. Fields' test scores, whether intentionally or not, making it appear that Mr. Fields' cognitive functioning was essentially normal.  In addition, he overlooked historical data and test results that would have indicated the possibility of a frontal lobe disorder that may have caused problems with judgment, impulse control and planning ability.  These deficits may have directly impacted Mr. Fields' behavior during the commission of his criminal offense, and thus may have had an impact on his sentencing.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 24th day of September, 2015, at San Diego, California.


Clark R. Clipson, Ph.D.
Licensed Psychologist
PSY 7669

9

## REFERENCES

Calamia, M., Markon, K., & Tranel, D. (2012). Scoring higher the second time around: Meta-analyses of practice effects in neuropsychological assessment, *The Clinical Neuropsychologist, 26* (4), 543-570.

Catron, D. A., & Thompson, C. C. (1979). Test-retest gains in WAIS scores after four retest intervals. *Journal of Clinical Psychology*, 35, 352-357.

Kaufman, A., & Lichtenberger, E. (1999).  *Essentials of WAIS-III assessment*.  New York: Wiley.

Ronnlund, M., Nyberg, L., Backman, L., & Nilsson, L. (2005). Stability, growth, and decline in adult life span development of declarative memory: Cross-sectional and longitudinal data from a population-based study. *Psychology and Aging, 20*, 3–18. doi: 10.1037/0882-7974.20.1.3.

Salthouse, T. A., Schroeder, D. H., & Ferrer, E. (2004). Estimating retest effects in longitudinal assessments of cognitive functioning in adults between 18 and 60 years of age. *Developmental Psychology, 40*, 813–822. doi:10.1037/0012-1649.40.5.813.

Schalock et al. (2010). *Intellectual disability:  Definition, classification, and system of supports* (11th ed.). Washington, D. C.: American Association on Intellectual and Developmental Disabilities (AAIDD).

Spreen, O. and Strauss, E. (1998) *A Compendium of Neuropsychological Tests.*  New York: Oxford University Press.

Van der Elst, W., Van Boxtel, M. P. J., Van Breukelen, G. J. P., Jolles, J., Aartsen, M., Martin, M., et al. (2008). Detecting the significance of changes in performance on the Stroop Color-Word Test, Rey's Verbal Learning Test, and the Letter Digit Substitution Test: The regression-based change approach. *Journal of the International Neuropsychological Society, 14*, 71–80. doi: 10.10170S1355617708080028.

Wechsler, D. (1997).  *Administration and scoring manual for the Wechsler Adult Intelligence Scale—Third Edition (WAIS-III)*.  San Antonio, TX:  The Psychological Corporation.

10

# CLARK R. CLIPSON, Ph.D.

CLINICAL AND FORENSIC PSYCHOLOGIST
PSYCHOLOGICAL AND NEUROPSYCHOLOGICAL ASSESSMENT
PAST PRESIDENT AND FELLOW, SAN DIEGO PSYCHOLOGICAL ASSOCIATION

---

**OFFICE:**      3921 Goldfinch Street
San Diego, California 92103
(619) 260-0335

**WEBSITE:**      www.clarkclipsonphd.com

**LICENSE:**      Psychology - PSY 7669 (1/83)

---

**EDUCATION:**      **California School of Professional Psychology - San Diego**
APA approved program in Clinical Psychology
M.A. 1978, Ph.D. 1980

**Duke University, Durham, North Carolina**
Majored in Comparative Religion and Psychology
Graduated *cum laude*
B.A. 1975

**Bangalore University, Bangalore, India**
Junior year abroad, 1973 - 1974

**Woodward Academy, College Park, Georgia**
Graduated with honors, 1971

---

**EXPERIENCE:**      Specializing in forensic evaluations, psychological and neuropsychological assessment. Expertise in traumatic brain injury, learning disabilities, attention deficit disorder, criminal behavior, posttraumatic stress, eating disorders, substance abuse, domestic violence, mood disorders, personality disorders, sexual offenders, mentally disordered offenders, risk assessment, child abuse, molest and sexual assault victims, and delinquency.

**Clinical and Forensic Psychologist**
**Clipson & Osterloh, APC, San Diego, California**
Established and developed a private practice providing a wide range of outpatient psychological services. Individual, group and family therapy, diagnostic, neuropsychological and forensic assessment, supervision of psychology interns, lectures and workshops, consultation to community agencies. Forensic experience in personal injury cases, sexual offenders (both adult and adolescent), general criminal offenders, sanity evaluations, penalty phase examinations, child abuse and molest, juvenile offenders, mentally disordered offenders, domestic violence, competency to stand trial. 1/82 - present

EXPERIENCE
Continued:

**Director of Psychological Services**
**Alvarado Parkway Institute, La Mesa, California**
Administration of Department of Psychology for a private psychiatric hospital. Supervision and training of pre-doctoral interns and post-doctoral fellows in providing psychotherapy and assessment services, coordination of psychological services with other departments, in-service training, and liaison with other psychologists in the community.  Responsible for program development, quality assurance, credentialing for psychologists seeking staff privileges and review of research proposals.
2/91 - 12/97

**Psychologist**
**Psychiatric and Counseling Services of North County, Vista, California**
Individual, group and family therapy with low-income adults in an outpatient setting. Responsible for program development, coordination and supervision of clinical services, psychological and forensic assessment, community liaison, in-service training, and supervision of psychology interns.
2/83 - 6/87

**Mental Health Consultant**
**San Diego County Mental Health Adolescent Inpatient Unit.**  Individual, group and family therapy, psychological assessment with severely disturbed adolescents. Responsible for case management, coordination of interdisciplinary treatment team, community liaison of hospital services and in-service training.
9/81 - 1/83

**Psychological Assistant**
Individual, marital, family therapy and psychological assessment in a private practice setting under the supervision of a licensed clinical psychologist.
2/79 - 12/81

**Psychology Intern Positions**
**San Diego County Mental Health Services, Family Service Association, and San Dieguito Union High School District**
Individual, group and family therapy, psychological assessment with adults and adolescents in school, outpatient and inpatient settings.
9/77 - 8/80

Pre-internship positions include crisis intervention through Episcopal Community Services, psychiatric attendant at Duke University Medical Center, volunteer counselor at a sexuality counseling center and a crisis hot-line, and medical assistant with a government hospital in Pokhara, Nepal.

**TEACHING:**      **Adjunct Faculty, California School of Professional Psychology, San Diego.**
Clinical Supervisor of fourth year graduate students.  9/91 - 6/97
Ethics and Legal Issues in Professional Psychology.  9/91 – 12/00
Cognitive and Intelligence Testing.  1/98 – 12/04
Clinical Inference. 9/01 – 06/06
Forensic Psychological Assessment. 9/02 – 06/06

**Instructor, National University.**  Undergraduate and Master's level classes in basic counseling skills, advanced psychotherapy, family therapy, abnormal psychology, self-development, and psychological testing and evaluation.
2/81 - 3/86

**Teaching assistant.**  Graduate level seminars in psychoanalytic, existential and Gestalt psychotherapy, and clinical supervision of first year graduate students.  9/77 - 7/80

**CONSULTATION:**      **Forensic Assessment Project.**  As part of Forensic Health Care in San Francisco,  conducting neuropsychological and personality assessment of mentally disordered offenders and insanity acquittees at Conditional Release Programs throughout California.  10/96 – 3/15

**Francis Parker High School.**  Neuropsychological consultant to athletic department.  Conduct neuropsychological evaluations using the ImPACT© assessment program to assist in making return-to-play decisions for athletes who suffered sports-related concussions. 3/07 – 06/10

**California Department of Mental Health.**  In accordance with WIC 6600, provided psychological evaluations and court testimony to determine if imprisoned sexual offenders meet statutory criteria as sexually violent predators requiring civil commitment for treatment.  1/98 – 6/12

**California Department of Mental Health.**  In accordance with Penal Code Section 2962, provided evaluations and court testimony to determine if state prisoners meet the statutory criteria as Mentally Disordered Offenders.
8/98 – 10/06

**National University.**  Chair of the External Review Committee for the proposed Doctor of Psychology program.  2/97

**State of California.**  Served as an Expert Reviewer for various state licensing boards, including those for psychology, medicine, pharmacy and chiropractic. Also an oral commissioner for the Board of Psychology, evaluating candidates for licensure.  1/88 – 1/03

**San Diego Juvenile Court**.  Served as a Peer Review Committee member to ensure quality of services by private psychologists providing therapy and evaluations for the Department of Social Services. 6/91 - 1/94

**CONSULTATION:**
(continued)

**New Attitudes.**  Consultation and training for staff and outcome studies with residents in a 12-step program for adult women with eating disorders.  5/87 - 3/88

**The Bridge Residential**.  Supervision and training of staff and interns, psychological assessment for adolescents in residential treatment.  2/83 - 1/86

**Naval Alcohol Safety Action Program**.  Supervision of group facilitators, training in group dynamics, stress reduction and communication skills. 4/83 - 1/84

**California State Department of Social Services, Disability Evaluation Division**.  Provided psychological assessment of people with severe neurological and psychiatric impairments as part of their medical evaluation to determine Social Security benefits.  1/83 - 8/84

**Project Oz**.  Consultation and in-service training to staff regarding case management and diagnostic evaluation of adolescents in residential treatment. 8/82 - 12/83

**San Diego Birth Control Institute**.  Staff development and stress reduction for professional and volunteer staff.  3/81 - 6/81

---

**PUBLICATIONS:**

Clipson, Clark (1989) "Confronting Bulimia Squarely and Winning" *Better Health*, Vol. 10, Number 5, September/October, pages 15-20.

Clipson, Clark and Steer, Jocelyn (1998) *Casebook for Abnormal Psychology*. Houghton-Mifflin.

Clipson, Clark (2004) "Illustrated Case Report: Psychological Evaluation" in Lichtenberger, E. O., Mather, N., Kaufman, N. L. and Kaufman, A. S. *Essentials of Assessment Report Writing.*  Hoboken, New Jersey: John Wiley & Sons, Inc.

Clipson, Clark (2004) "Practical Considerations in the Interview and Evaluation of Sexual Offenders" co-published in the *Journal of Child Sexual Abuse,* Vol. 12, Numbers 3/4 and in Geffner, R., Franey, K. C., Arnold, T. G. and Falconer, R., eds, *Identifying and Treating Sex Offenders: Current Approaches, Research and Techniques.*  Hayworth Press, Inc.

Franey, Kristina; Clipson, Clark; Viglione, Donald; Wayson, Peter; and Brager, Robert (2005) "An Investigation of Successfully Treated Adolescent Sex Offenders" co-published in the *Journal of Child Sexual Abuse*, Vol. 13, Numbers 3/4 and in Geffner, R., Franey, K. C., Arnold, T. G. and Falconer, R., eds, *Identifying and Treating Youth Who Sexually Offend: Current Approaches, Techniques, and Research.*  Hayworth Press, Inc.

**PUBLICATIONS:**
(continued)

Clipson, Clark (2005) "Misuse of Psychologist Influence: Multiple Relationships" in Bucky, S., Callan, J. and Stricker, G. eds., *Ethical and legal Issues for Mental Health Professionals: A Comprehensive Handbook of Principles and Standards.* New York: Hayworth Press.

Goldenson, Julie; Geffner, Robert; Foster, Sharon & Clipson, Clark (2007) "Female Domestic Violence Offenders: Their Attachment Security, Trauma Symptoms, and Personality Organization" in *Violence and Victims*, Vol. 22, No. 5.

**INVITED PRESENTATIONS**:

"Practice, Research and Policies in Sex Offender Risk Assessment: Are They in Tandem?" with L.C. Miccio-Fonseca and Maia Christopher. Presentation for the 19th International Conference on Violence, Abuse and Trauma, San Diego, 2014.

"Psychological Assessment for Attorneys 101" Presentation for the United States Marine Corps Defense Services Organization, Marine Corps Recruit Depot, San Diego, 2014.

"Evaluating Accused Sexual Offenders in the Context of a Custody Evaluation." Presentation for Child Custody Evaluators, San Diego, 2013.

"Sexual Offender Characteristics and Psychological Evaluations" as part of the Handling Sexual Assault Cases course with Judge (ret.) Richard Couzens, and Judge Mark Windham for the Administrative Office of the Courts, Center for Judiciary Education and Research, San Francisco, 2013 - 2015.

"Sex Offender Management, Supervision and Intervention" with The Honorable Harry Elias, Deputy District Attorney Gretchen Means, and Deputy Public Defender Marian Gaston. Presentation for the 17th International Conference on Violence, Abuse and Trauma, San Diego, 2011.

"Familicide: When the Unthinkable Happens. Understanding the dynamics and causes of family-related murders." Presentation for the 17th Annual Conference for Mental Illness and Law Enforcement Systems (MILES) put on by Pacific Clinics in Whittier, CA, 2008.

"How Do You Measure a Nightmare? The assessment of trauma in children and adults." Presentation for the Fall Conference of the San Diego Psychological Association, 2007.

"Assessing Defendants' Understanding and Appreciation of their *Miranda* Rights." Presentation for the Criminal Defense Lawyer's Club in San Diego, 2007.

"WISC-ful Thinking: Integrating the WISC-IV into a Comprehensive Assessment for Learning Disabilities" with Elizabeth Lichtenberger for the San Diego Psychological Association, 2005.

"Evaluating the Accused Sexual Offender in the Context of a *Stoll* Evaluation." Defending Child Molest Cases Conference for the San Diego County Public Defender's Office, 2004.

"Distinguishing between Feigned and Actual Claims of Domestic Violence during Custody Evaluations." SDPA Training for Custody Evaluators, 2003.

"Evaluation and Risk Assessment of Sexual Offenders." Legal Symposium presentation at the 22nd Annual UC Davis Western Regional Child Abuse and Neglect Conference, Sacramento, California, 2003.

"Law and Ethics: Risk Management in Clinical Practice" with Neil Ribner and James Rogers. Fall Conference for the San Diego Psychological Association, 2001.

"Clinical and Risk Management Implications of Psychological Assessment: Research with Adolescents, Adult and Priest Sexual Offenders" with Don Viglione, David Pogge, and Gerard McGlone. The 6th International Conference on Family Violence, San Diego, 2001.

"Violence Risk Assessment with Domestic Violence Perpetrators" Presentations for the Relationship Training Institute, San Diego, California, 1999, 2000.

"Dual Relationships and Psychologists" Presentation for the *Ethics and the Law for Psychologists* Fall Conference for the San Diego Psychological Association, 1999.

"Assessment and Treatment of Male Batterers" Presentation for the Family Court Counselors in San Diego County, 1999.

"Violence Risk Assessment and Psychopathy" Presentation for the Relationship Violence Training Institute, San Diego, 1999.

"Domestic Violence and Move-Away Requests" with Kate Yavenditti and Janet Bowermaster. The San Diego Domestic Violence Council and the YWCA of San Diego County, 1995.

"Preventing Therapist Sexual Abuse: A Training Program for Psychologists with Stephen Bucky, Ph.D., Ethics in the Professional of Psychology Conference. California School of Professional Psychology, 1993.

"Sexual Attraction in Therapy: A Professional Training Intervention" with Lisa Steres, M.A. and Steven Bucky, Ph.D., California Psychological Association Convention, 1992.

**DISSERTATION:**    Variability in Sex Role Identity Development During the Adult Years: A Sample of Heterosexual Men. Unpublished doctoral dissertation, 1980.

**ADVANCED TRAINING:**    Basic Training and Advanced Workshops in Clinical Neuropsychology. Training in administration and interpretation of the Halstead-Reitan Battery with Ralph M. Reitan, Deborah Wolfson, and Jim Hom.

Psychodrama Institute of San Diego.  Received training in psycho-dramatic role-playing and director skills.

Gestalt Training Center of San Diego.  Participated in a month-long intensive training in Gestalt therapy with Erving and Miriam Polster

**HOSPITAL AFFILIATIONS:**    **Alvarado Parkway Institute/Charter Behavioral Health System, La Mesa, California**
- Chairperson, Peer Review Committee, 9/87 - 4/90
- Psychology Credentials Committee, 2/91 - 6/95
- Active staff, 9/87 - 2/99

**PROFESSIONAL AFFILIATIONS:**
- **American Psychological Association (1681-8390)**

- **San Diego Psychological Association (SDPA)**
  - Chair, Student Committee, 1/08 – 1/10
  - Chair, Fellows Task Force, 1/03 – 2/05
  - Past-President's Committee, 1/98 - present
  - Elected to Fellow status, 1/98
  - President, 2/95 - 2/96
  - Board of Directors, 2/94 - 1/97
  - Long-range Planning Committee, 2/93 - 1/97
  - Psychopharmacology Committee, 6/94 - 2/96
  - Chair, Hospital Practice Committee, 1/93 - 1/94
  - Chair, Ethics and Standards Committee, 1/89 - 2/92

- **National Academy of Neuropsychology (NAN)**

- **Society for Personality Assessment (SPA)**

- **Association for the Treatment of Sexual Abusers (ATSA)**

- **San Diego Psych-Law Society**

**HONORS:**
- Fellow, San Diego Psychological Association, 1998
- Who's Who Among Health Service Providers, 1986
- International Youth in Achievement Award, 1981
- Who's Who Among Students in American Universities and Colleges, 1980
- San Diego County Mental Health Psychology Intern Representative - 1979
- Graduated *cum laude* from Duke University, 1975