**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**


| | | |
|---|---|---|
| **EDWARD LEON FIELDS, JR.,** | ) | |
| | ) | |
| *Petitioner*, | ) | |
| | ) | |
| **v.** | ) | **Case No. CV-10-00115-RAW** |
| | ) | **Criminal Case No. CR-03-73-RAW** |
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| *Respondent.* | ) | |


## <u>MOTION FOR JUDGMENT IN FAVOR OF THE GOVERNMENT</u>

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
520 Denison Ave
Muskogee, OK 74401
Telephone: (918) 684-5100
Fax: (918) 684-5150
chris.wilson@usdoj.gov

JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section
U.S. Dept. of Justice
1331 F Street, NW; Rm. 656
Washington, DC 20530
Telephone: (202) 305-8910
Fax: (202) 353-9779
jeffrey.kahan@usdoj.gov

# TABLE OF CONTENTS

**PROCEDURAL HISTORY** ........................................................................................... 1

**STATEMENT OF FACTS** ........................................................................................... 2

**FIELDS'S CONTENTIONS** ...................................................................................... 3

**THE GOVERNMENT'S ARGUMENT** ..................................................................... 3

    **I.    COUNSEL COMPETENTLY PRESENTED AND ARGUED MENTAL HEALTH EVIDENCE** ....................................................................................................... 3

        A.  Counsel's Mental Health Advocacy and the Jury's Verdict ............................... 6

            1.    Summation ...................................................................................................... 7

            2.    Verdict ........................................................................................................... 9

        B.  Trial Counsel Reasonably Omitted Brain Damage Evidence .......................... 11

            1.    Counsel Acted Appropriately ...................................................................... 12

            2.    Counsel's Strategy Prevented Damaging Rebuttal ..................................... 18

        C.  Trial Counsel Reasonably Opted to Forgo the Testimony of Fields's Treating Mental Health Professionals ...................................................................................... 21

        D.  Trial Counsel Reasonably Responded to Dr. Price's Testimony ................... 26

        E.  Counsel's Reliance on the Opinions of Retained Experts ............................... 29

        F.  Trial Counsel's Preparation of the Expert Witnesses ...................................... 31

    **II.     FIELDS HAS FAILED TO STATE A JUSTICIABLE CLAIM THAT HE IS INCOMPETENT TO BE EXECUTED** ................................................................... 33

    **III.    TRIAL COUNSEL REASONABLY RESPONDED TO THE GOVERNMENT'S VALID EVIDENCE AND ARGUMENTS** ................................................................ 33

    **IV.    TRIAL COUNSEL PRESENTED APPROPRIATE SOCIAL HISTORY EVIDENCEWITHOUT UNDERMINING THE DEFENSE STRATEGY** ....................... 34

    **V.  COUNSEL PROPERLY OMITTED FUTILE OBJECTIONS TO APPROPRIATE PROSECUTION ARGUMENTS** ............................................................................ 39

    **VI.    TRIAL COUNSEL PROPERLY REQUESTED A JURY CHARGE AND VERDICT FORM THAT PERMITTED A SINGLE WEIGHING OF AGGRAVATING AND MITIGATING FACTORS** ........................................................................... 40

    **VII.    THE PROSECUTION HONORED ITS OBLIGATIONS TO DISCLOSE EXCULPATORY MATERIAL** ................................................................................. 42

    **VIII.    THERE ARE NO ERRORS TO ACCUMULATE** ............................................. 42

**IX.    THIS COURT LACKS JURISDICTION TO DETERMINE WHETHER FIELDS'S EXECUTION WILL CONSTITUTE CRUEL AND UNUSUAL PUNISHMENT** ................................................................................................... 43

**CONCLUSION** ....................................................................................................... 44

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Mullin*, 368 F.3d 1220 (10th Cir. 2004)............................................................................ 4

*Babbit v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998)............................................................. 29

*Benson v. United States*, 332 F.2d 288 (5th Cir. 1964) ................................................................. 41

*Bergmann v. McCaughtry*, 65 F.3d 1372, 1380 (7th Cir.1995)...................................................... 22

*Boyd v. Ward*, 179 F.3d 904, 915 (10th Cir. 1999)....................................................................... 29

*Boyde v. California*, 494 U.S. 370, 377 (1990) ............................................................................. 10

*Boyle v. McKune*, 544 F.3d 1132 (10th Cir. 2008) ............................................... 12, 18, 21, 22, 29

*Buchanan v. Angelone*, 522 U.S. 269 (1998)................................................................................. 10

*Burger v. Kemp*, 483 U.S. 776, 794 (1987) .................................................................................. 17

*Card v. Dugger*, 911 F.2d 1494 (11th Cir. 1990) ......................................................................... 29

*Crum v. Hunter*, 151 F.2d 359, 361 (10th Cir. 1945) ..................................................................... 5

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) ................................................................................... 9

*Elledge v. Dugger,* 823 F.2d 1439 (11th Cir. 1987) ................................................................. 29, 30

*Estate of Lam v. Upjohn Co.*, No. Civ. A. 94-003-H,1995 WL 478844 (W.D. Va. April 21, 1995)
.................................................................................................................................................. 30

*Estate of Moffett v. SmithKline Beecham Corp.*, No. 1:03 CV 532 WJG JMR, 2005 WL 1595664
(S.D. Miss. June 9, 2005)......................................................................................................... 30

*Fields v. Brown*, 431 F.3d 1186 (9th Cir. 2005) ........................................................................... 12

*Fox v. Ward*, 200 F.3d 1286 (10th Cir. 2000)......................................................................... 22, 34

*Hallford v. Culliver*, 459 F.3d 1193 (11th Cir. 2006)................................................................ 12, 22

*Harris v. Dugger*, 874 F.2d 756 (11th Cir. 1989)........................................................................... 4

*Harris v. Vasquez*, 949 F.2d 1497 (9th Cir.1990)........................................................................ 12

*Hawkins v. Hannigan*, 185 F.3d 1146, 1152 (10th Cir. 1999)...................................................... 27

*Hendricks v. Calderon*, 70 F.3d 1032 (9th Cir. 1995) ............................................................... 12

*Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir.1995) ...................................................... 29

*Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005)............................................................. 27

*Knowles v. Mirzayance*, 129 S. Ct. 1411 (2009) ..................................................................... 4

*Lockett v. Ohio*, 433 U.S. 586, 604 (1978) ............................................................................. 9

*McCoy v. North Carolina*, 494 U.S. 433 (1990)....................................................................... 10

*Mills v. Maryland*, 486 U.S. 367 (1988) ................................................................................. 10

*Oregon v. Guzek*, 546 U.S. 517 (2006)................................................................................... 10

*Penry v. Lynaugh*, 492 U.S. 302 (1989) ................................................................................ 10

*Phyle v. Leapley*, 66 F.3d 154, 159 (8th Cir. 1995).................................................................. 40

*Pooler v. Secretary, Florida Dept. of Corrections*, 702 F.3d 1252 (11th Cir. 2012) ................... 12

*Randle v. Jackson*, 544 F. Supp. 2d 619 (E.D. Mich. 2008)...................................................... 8

*Riley v. Taylor*, 277 F.3d 261 (3d Cir. 2001) .......................................................................... 5

*Rompilla v. Beard*, 545 U.S. 374 (2005)........................................................................... 12, 17

*Smith v. Gibson*, 197 F.3d 454 (10th Cir. 1999) ...................................................................... 31

*Smith v. Workman*, 550 F.3d 1258 (10th Cir. 2008) ................................................................ 12

*Strickland v. Washington*, 466 U.S. 668 (1984) .................................................................. 4, 17

*United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002)........................................................... 11

*United States v. Fields*, 516 F.3d 923 (10th Cir. 2008) ............................................................. 1

*United States v. Haddock*, 12 F.3d 950 (10th Cir. 1993)........................................................... 4

*United States v. Kennedy*, 225 F.3d 1187 (10th Cir. 2000) ....................................................... 4

*United States v. Molina*, 934 F.2d 1440 (9th Cir. 1991)...................................................... 31

*United States v. Nguyen*, 413 F.3d 1170 (10th Cir. 2005) ............................................... 22

*United States v. Paul*, 217 F.3d 989 (8th Cir. 2000)........................................................ 11

*United States v. Rodriguez-Ramirez*, 777 F.2d 454, 458 (9th Cir. 1985) ....................................... 29

*United States v. Rogers*, 556 F.3d 1130, 1144 (10th Cir. 2009)........................................ 42

*United States v. Salazar*, 323 F.3d 852 (10th Cir. 2003) ................................................... 4

*Vanderwerf v. SmithKline Beecham Corp.*, 603 F.3d 842 (10th Cir. 2010) ................................. 30

*Wackerly v. Workman*, 580 F.3d 1171, 1177-79 (10th Cir. 2009)...................................... 35

*Walls v. Bowersox*, 151 F.3d 827 (8th Cir. 1998).......................................................... 4

*Williams v. Woodford,* 384 F.3d 567, 619-20 (9th Cir. 2004) .................................. 35, 36

*Wright v. Hopper*, 169 F.3d 695 (11th Cir. 1999) .......................................................... 8

*Yarborough v. Gentry*, 540 U.S. 1, 8 (2003).................................................................. 34

**Statutes**

18 U.S.C. § 3005.................................................................................................... 5

18 U.S.C. § 3592.................................................................................................... 7

18 U.S.C. § 3593.............................................................................................. 10, 25

18 U.S.C. § 3595.................................................................................................. 10

28 U.S.C. § 2255.................................................................................................... 1

EDWARD LEON FIELDS, JR., )
                                )
        *Petitioner*, )
                                )
**v.** )      **Case No. CV-10-00115-RAW**
                                )      **Criminal Case No. CR-03-73-RAW**
**UNITED STATES OF AMERICA** )
                                )
        *Respondent.* )

## MOTION FOR JUDGMENT IN FAVOR OF THE GOVERNMENT

**COMES NOW**, Respondent, United States of America, by and through undersigned counsel, and respectfully urges this Court to enter an order denying and dismissing the Petitioner's Motion for relief under 28 U.S.C. § 2255.

## PROCEDURAL HISTORY

A federal grand jury for this district returned an indictment that charged Edward Leon Fields with two death-eligible counts of first degree murder and four other crimes, all stemming from the homicides of Charles Glenn Chick, Jr. and Shirley Elliot Chick. Trl. Doc. 16 ("Ans.").[1] The government filed a notice of intent to seek the death penalty as to both first degree murder charges. Trl. Doc. 38.

Fields pleaded guilty to all counts. Trl. Docket June 30, 2005. Following a penalty trial, a petite jury recommended a sentence of death, which this Court imposed. Trl. Doc. 228; Trl. Docket Nov. 8, 2005. The Tenth Circuit Court of Appeals affirmed the judgment in a published opinion that the Supreme Court declined to review. *United States v. Fields*, 516 F.3d 923 (10th Cir. 2008), *cert. denied*, 556 U.S. 1167 (2009).

---

[1] "Trl. Doc. refers to the docket in case no. CR-03-73-RAW.

1

Fields moved for collateral relief under 28 U.S.C. § 2255. Docs. 1, 2, 14 & 106. After the government answered the Motion, the Court permitted limited discovery, including the government's neuropsychological evaluation of Fields and its receipt of a partial production of trial counsel's files. Docs. 50 & 82. The Court subsequently ordered the parties to submit dispositive briefing ahead of any evidentiary hearing. Doc. 91, 101. This motion follows, supplementing and incorporating by reference, but not repeating the arguments made by the government in its initial opposition to the § 2255 motion.

## STATEMENT OF FACTS[2]

On July 10, 2003, Fields murdered the Chicks at the Winding Stair Campground in the Ouachita National Forest, having seen couple at the campground some days earlier. On the evening of the killings, he drove to the campground with a homemade ghillie suit and a camouflaged rifle that was topped with a telescopic sight. Fields saw the Chicks on a vista. He retrieved his rifle and donned his ghillie suit before hiding by the couple's campsite. The Chicks eventually returned to the campsite and sat at a table. Fields watched them for about twenty minutes. When Charles told Shirley he was going to the tent, Fields shot him in the face. Charles slumped to the table, and Shirley ran toward the couple's van, but Fields shot her in the foot as she fled. Shirley reached the passenger door of the van, but Fields approached her and shot her twice more, once in the side of the head and once in the back of the head. Fields then shot Charles a second time in the head. Both victims died from their head wounds.

Physical evidence indicated that Fields departed the campsite and returned hours later, when he broke into the victims' van, rummaged through the driver's area and stole a few items. He left the remainder of the vehicle untouched.

---

[2] The facts are drawn from the Tenth Circuit's opinion in this case, *Fields*, 516 F.3d at 927.

A tip later led the police to Fields's truck, in which they found the rifle, the ghillie suit, and some items from the Chicks' van. Fields was detained for questioning. He initially denied any connection to the crime, but confessed when confronted with the evidence from his truck.

**FIELDS'S CONTENTIONS**

1. The jury improperly rejected an alleged mental health mitigator, and trial counsel ineffectively investigated, presented and argued mental health evidence.

2. Fields's mental health precludes his execution.

3. Trial counsel ineffectively investigated and presented evidence to rebut the substantial-planning and mental-anguish aggravators, which were based on false and misleading evidence and argument.

4. Trial counsel failed to present Fields's social history through the testimony of an appropriate expert and omitted an argument that such evidence was mitigating.

5. Trial counsel failed to interpose appropriate objections to the prosecution's arguments.

6. Trial counsel failed to object to the verdict form and jury charge, which allowed a unitary sentence.

7. The government withheld exculpatory evidence, which trial counsel ineffectively failed to investigate and present.

8. Cumulative prejudice requires relief.

9. The means of Fields's execution would violate the Constitution.

**THE GOVERNMENT'S ARGUMENT**

I.     **COUNSEL COMPETENTLY PRESENTED AND ARGUED MENTAL HEALTH EVIDENCE**

In his motion, Fields raised six claims about the supposed failings of his attorneys in their investigation, presentation and summation of mental health evidence. Additionally, Fields made

an abortive and procedurally-defaulted claim that the jury violated the Eighth Amendment when it rejected his mental health mitigator. 2255 Mtn. 1-54; Mem. 4-41.[3] The government addresses the sub-claims, in order, below, relying on its previously-filed answer and newly-discovered evidence premised on documents received during the course of discovery.

To demonstrate ineffective assistance, Fields must show that his attorneys' performance was deficient and that the deficiencies were prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Thus, he first must show that counsel's performance fell below prevailing professional norms. *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009); *United States v. Salazar*, 323 F.3d 852, 857 (10th Cir. 2003). In so doing, he must overcome a strong presumption that counsel provided adequate assistance. *United States v. Kennedy*, 225 F.3d 1187, 1197 (10th Cir. 2000) (citation omitted). Even counsel's admissions of ineffectiveness are not decisive, because the reasonableness of performance is a question for the court. *Walls v. Bowersox*, 151 F.3d 827, 836 (8th Cir. 1998); *see Allen v. Mullin*, 368 F.3d 1220, 1240 (10th Cir. 2004).

The prejudice prong imposes a heavier burden on the petitioner than the harmless error test applied on direct appeal. *United States v. Haddock*, 12 F.3d 950, 958 (10th Cir. 1993). Under it, Fields must show that, absent an alleged error, a reasonable probability exists that he would have received a more favorable verdict. *See id.*

At the outset of his complaints regarding the presentation of mental health evidence, Fields asserts that lead counsel, Julia O'Connell, received inadequate assistance from her co-counsel, Isiah Gant, a claim the defendant recently buttressed with newly-filed declarations. *See* 2255 Mtn. at 3-7; 2255 Mtn. Exs. 32 & 33. Significantly, the Constitution confers no right to multiple counsel in a capital case, though it specifies the quality of representation to which all

---

[3] 2255 Mtn. refers to docket no. 106, the amended motion for § 2255 relief; Mem. refers to docket no. 14, the memorandum of law in support of the motion.

defendants are entitled. *Strickland*, 466 U.S. at 687. "If a single attorney provides reasonably effective assistance, the Constitution is satisfied, and if a whole team of lawyers fails to provide such assistance, the Constitution is violated." *Riley v. Taylor*, 277 F.3d 261, 306 (3d Cir. 2001) (citing, inter alia, *Bell v. Watkins*, 692 F.2d 999, 1009 (5th Cir.1982)). Any constitutional right to co-counsel requires a showing that a second attorney is "essential" to an effective defense. *Crum v. Hunter*, 151 F.2d 359, 361 (10th Cir. 1945). While federal capital defendants have a conditional, statutory right to co-counsel under 18 U.S.C. § 3005, the right attaches only upon request. *Crum*, 151 F.2d at 361.

The docket contains no indication that Fields ever sought the appointment of a second attorney under § 3005. Rather, Fields's counsel, the Office of the Public Defender, moved for an order admitting Gant pro hac vice for purposes of representing the defendant. Trl. Doc. 19. Approximately one month after the filing of the motion, the Court granted it. Trl. Doc. 29. It appears that Fields had no reason to seek the separate appointment of Mr. Gant because his office had a budget that allowed him to involve himself in capital cases without creating an additional expense for local counsel. *See* Ex. 1. For want of any invocation of § 3005, Fields cannot claim any guarantee of counsel under that provision.

Moreover, Fields cannot show that Mr. Gant was "essential" to his representation for constitutional purposes given the relevant circumstances. Fields's lead counsel, Ms. O'Connell, made entered her appearance in the case nearly two years before the eventual trial. *See* Trl. Doc. 9. Fields eventually pleaded guilty and proceeded directly to a penalty phase hearing that involved only six days of testimony. *See* Trl. Docket June 30, 2005 and July 14 to July 21, 2005. While Ms. O'Connell may have found Mr. Gant's assistance unsatisfactory, she enjoyed ample support for this brief trial. She had assistance from a second assistant public defender, Mr.

5

Derryberry, who entered his appearance the same day as Ms. O'Connell. Trl. Doc. 10. She also had access to, and ongoing support from, the capital defense bar's brightest stars – Judy Clarke, David Bruck, Kevin McNally, Dick Burr, Michael Burt and investigator David Freedman. Ex. 1. Ms. O'Connell took advantage of that assistance, regularly communicating with Burt and Freedman, in addition to other expert attorneys like Lisa Greenman and Alex Bunin. *See e.g.*, Ex. 2. Such professionals presumably brought a wealth of knowledge and experience to bear. *See e.g.*, Exs. 3-6.

Given the brevity of the trial, the extended period of preparation for it, and the extensive outside resources available to Ms. O'Connell, there exists no basis upon which to presume that her relationship with Mr. Gant resulted in constitutionally ineffective assistance of counsel.

A. <u>Counsel's Mental Health Advocacy and the Jury's Verdict</u>

Fields concedes that counsel adduced mental health evidence and argued that it established specific mitigators. Nonetheless, Fields claims that counsel ineffectively presented the case to the jury. He specifically faults his lawyers for failing to argue or seek instructions for a theory that his asserted mental conditions, including depression and "bipolar flip," satisfied multiple mitigating factors. He also contends that counsel failed to argue that his mental health history was mitigating. Apart from his complaints about counsel's performance, Fields claims that the jury violated the Eighth Amendment when it found he had not refused to find his mental health issues were a mitigating factor. (2255 Mtn. 7-16; Mem. 6-15.)

As previously argued, Fields's position relies on claims that counsel omitted arguments that were, in fact, made on his behalf. Ans. at 12-16. To the extent that counsel did not argue that Fields's alleged mental issues would satisfy multiple mitigators, the defendant does not establish that counsel failed to provide constitutionally acceptable representation. Fields's

related complaint, about the jury's rejection of his defense theory, is defective and baseless.

1. Summation

Counsel presented strong mitigation evidence through two mental health experts, George Woods and Brad Grinage. Woods testified that Fields suffered from a mood disorder – schizoaffective disorder or bipolar disorder with psychotic features – to which he attributed the defendant's poor judgment and erratic thinking. Tr. 12: 2946, 2973, 2976-77. Woods asserted that Effexor, a drug Fields was taking at the time of the murders, could "flip" people with bipolar disorder from depression to mania, further impairing judgment. Tr. 12: 2989-90. The other expert, Grinage, diagnosed Fields with bipolar disorder with psychotic features, including auditory hallucinations. Tr. 11: 2768-2771, 2775-77. He explained that bipolar patients treated with antidepressants, especially Effexor, could enter a manic state, enhancing any existing psychosis. Tr. 11: 2780-81, 2811-13. Grinage concluded that Effexor caused Fields to enter an irritable manic state that amounted to a severe emotional disturbance. Tr. 11: 2815-16.

During summation, counsel urged empathy for Fields based on the mental health evidence. Tr. 14: 3435-36. Counsel specifically addressed the bipolar flip theory: "Effexor affects two of those neuroreceptors, and that over a period of time that medication built up like it's supposed to. It built up and it was like a wave and he got to the tipping point." Tr. 14: 3438. Counsel returned to evidence of auditory hallucinations: "[E]veryone of those physicians endorses the idea that voices are credible . . . . it's real, and it has to be painful." Tr. 14: 3439. Fields cannot show that counsel failed to argue his asserted mental health issues.

Fields complains that counsel argued that his alleged depression, hallucinations and bipolar flip supported an impaired capacity statutory mitigator (18 U.S.C. § 3592(a)(1)), rather than an emotional disturbance factor (§3592(a)(8)). In fact, counsel cogently urged the jury to

7

apply the factors in an intuitive fashion, arguing that mental illness diagnoses supported impaired capacity, while certain traumatic events in the defendant's past supported emotional disturbance. Counsel had no obligation to argue the same facts under multiple theories – a potentially confusing and counterproductive tactic. *Cf. Randle v. Jackson*, 544 F. Supp. 2d 619, 633-34 (E.D. Mich. 2008) (denying relief where s state court reasonably found that counsel had no obligation to make a confusing argument).

Counsel's decision to take an intuitive approach to the mental health evidence apparently stemmed from a concern that she should not overplay the significance of that testimony to a jury that would likely reject such an approach. As she explained in an e-mail:

> I have a jury pool of 225 people, less than 2 dozen with college educations, and only a handful who don't exceedingly approve of the death penalty. And, I recognize that experts can cancel each other out in juror's minds. And, many of them won't care about mental health.

Ex.7. Given counsel's sensitivity to her audience and her concomitant attempt to communicate effectively, Fields cannot establish ineffectiveness, as the decision to provide the jury with a clear path through a potentially confusing thicket of testimony was eminently reasonable. *See Wright v. Hopper*, 169 F.3d 695 (11th Cir. 1999).

Assuming, arguendo, counsel's streamlined and common sense theory of the case somehow fell below prevailing professional norms, Fields still could not demonstrate prejudice. Because the verdict form did not distinguish among mitigators on the basis of any underlying legal theory, the omission of argument on those grounds could not have prejudiced the defendant, as the jury was free to apply the evidence to the factors as it saw fit. *See* Trl. Doc. 228. The jury, however, rejected the mental health mitigating factors, outright. Their verdict indicates that they did not find the defense experts persuasive, not that some more complex approach to the same evidence would have carried the day. Given the verdict, no reasonable

probability exists that a different summation would have altered the outcome of the case.

In his reply, Fields contended that the government failed to accurately explain the strategies that informed the defense's actions. Doc. 20 at 8-10. Of course, the government answered the initial § 2255 motion without the benefit of discovery. Given access to counsel's correspondence, it now appears that the government correctly intuited that counsel was concerned about the jury's comprehension and acceptance of mental health evidence, and tailored her presentation according. Even if the government misconstrued the counsel's, the fact remains that the actions were reasonable. The government does not bear the burden of persuasion, and Fields has wholly failed to show that his attorneys' actions were unreasonable or prejudicial.

  2. <u>Verdict</u>

Fields also summarily argues that the Eighth Amendment required the jury to find the impaired capacity and emotional disturbance aggravators because the government did not dispute some evidence of mental illness. 2255 Mtn. 16; Mem. 15. As previously argued, Fields defaulted this claim by failing to raise it on appeal. Additionally, his argument is premised on an erroneous view of the law and a misinterpretation of the record. Ans. at 17-23.

The Supreme Court has never required jurors in a capital case to give mitigating effect to a proffered factor. The Constitution requires only that jurors not be precluded from considering and giving effect to relevant mitigating evidence. In *Lockett v. Ohio*, 433 U.S. 586, 604 (1978) (plurality op.), and *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982), the Court recognized, as a constitutional matter, that a capital sentencer – in federal practice, the jury – may not be prevented from considering, as a mitigating factor, any aspect of the defendant's background and character or the circumstances of his offense that the defendant proffers as a basis for imposing a

9

sentence less than death. Drawing on this principle, the Court in *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989), held that a capital sentencer must also be able to give effect to any mitigating evidence that is relevant to a defendant's background and character or the circumstances of his offense. *Accord, Oregon v. Guzek*, 546 U.S. 517, 526 (2006). And, in *Mills v. Maryland*, 486 U.S. 367 (1988), and *McCoy v. North Carolina*, 494 U.S. 433 (1990), the Court held that the Eighth Amendment requires that individual jurors be able to determine for themselves the existence and weight to be accorded any mitigating factor.

These constitutionally-based requirements do not, however, impede the ability of governments "to structure and shape consideration of mitigating evidence." *Guzek*, 546 U.S. at 526 (quoting *Boyde v. California*, 494 U.S. 370, 377 (1990)). As the Supreme Court noted in *Buchanan v. Angelone*, 522 U.S. 269, 276-77 (1998) (some internal citations omitted):

> Our consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence. . . . [¶] But we have never . . . held that the State must affirmatively structure in a particular way the manner in which juries consider mitigating evidence. And, indeed, our decisions suggest that complete jury discretion is constitutionally permissible. *See* . . . [*Zant v.*] *Stephens*, [462 U.S. 862, 875 (1983)] (rejecting the argument that a scheme permitting the jury to exercise "unbridled discretion" in determining whether to impose the death penalty after it has found the defendant eligible is unconstitutional, and noting that acceptance of that argument would require the Court to overrule *Gregg* [*v. Georgia*, 428 U.S. 153 (1976)]).

Consistent with these principles, the Federal Death Penalty Act requires special findings as to aggravators but not mitigators. *See* 18 U.S.C. § 3593(d). This same dichotomy is carried forward in the FDPA's appellate review provisions, which provide that a death sentence is subject to reversal if "the admissible evidence and information adduced does not support the special finding of the existence of the required aggravating factor." 18 U.S.C. § 3595(c)(2)(B).

No comparable provision exists requiring appellate review of mitigating factors or mandating reversal of a death sentence if jurors do not unanimously find a particular mitigator.

In light of the FDPA's language and structure, the courts of appeals that have considered the question have uniformly doubted their authority to review a jury's failure to unanimously find an asserted mitigator. *See United States v. Bernard*, 299 F.3d 467, 485-86 (5th Cir. 2002); *United States v. Paul*, 217 F.3d 989, 999-1000 & n.6 (8th Cir. 2000); *United States v. Hall*, 152 F.3d. 381, 413 (5th Cir. 1998). As these cases further make clear, "[n]either the FDPA nor *Lockett* and *Eddings* require a capital jury to give mitigating effect or weight to any particular evidence." *Paul*, 217 F.3d at 999. Hence, even though the factual predicate for a mitigator was uncontroverted, both the Fifth and the Eighth Circuits have held that jurors were constitutionally and statutorily free whether a particular set of facts has mitigating force in a particular case. *See Bernard*, 299 F.3d at 485-86 (as long as jurors were free to give mitigating effect to defendants' ages, jurors were not required to find that defendants' youthfulness was mitigating); *Paul*, 217 F.3d at 999-1000 (although defendant was 18 years old and his codefendant received a life sentence, jury not required to give mitigating effect to either factor); *Hall*, 152 F.3d at 413 ("jury was free to believe or disbelieve" testimony of family members that defendant experienced a difficult upbringing that mitigated against imposition of a death sentence). Accordingly, the jury's failure to find the existence proffered mitigating factors is not subject to review, and the jurors were entirely free to discount testimony supporting the various factors or to determine that the factors did not mitigate the offenses.

B.  Trial Counsel Reasonably Omitted Brain Damage Evidence

Fields claims his attorneys were ineffective for failing to investigate and present evidence of his supposed organic brain damage, as it was reported to them by a neuropsychologist, Dr.

Gelbort. Building on Gelbort's findings, Fields now presents the opinion of a new expert, Dr. Martell, indicating he is severely affected by brain damage. 2255 Mtn. 16-31; Mem. 16-24. The omission of organic brain damage testimony was objectively reasonable, given the information available to counsel. Moreover, Fields has not demonstrated that the alleged omission caused him any prejudice. Had he pursued neuropsychological evidence at the time of trial, he would have invited rebuttal that wholly undercut his defense.

1. Counsel Acted Appropriately

An attorney need not investigate all leads or present all available mitigating evidence, so long as the decision not to pursue a particular lead or present particular evidence is reasonable under the circumstances. *See Smith v. Workman*, 550 F.3d 1258, 1270 (10th Cir. 2008). "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005). Counsel have no obligation to advance weaker arguments that dilute their overall presentation. *See Boyle v. McKune*, 544 F.3d 1132 (10th Cir. 2008); *Hallford v. Culliver*, 459 F.3d 1193 (11th Cir. 2006). Further, counsel are generally entitled to rely on the opinions of mental health experts. *Fields v. Brown*, 431 F.3d 1186, 1205 (9th Cir. 2005) (citing *Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995)). Simply put, "It is certainly within the 'wide range of professionally competent assistance' for an attorney to rely on properly selected experts." *Harris v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir.1990)). When an expert's opinion dovetails with the defense strategy, counsel need not continue to seek other views. *See Pooler v. Secretary, Florida Dept. of Corrections*, 702 F.3d 1252, 1273 (11th Cir. 2012).

As previously argued, Gelbort found only "mild impairment" of higher cognitive abilities and processing speed for verbal tasks and "impulsivity of mild proportions." Ans. at 24-25.

Gelbort noted that Fields incongruously tended to perform better on more difficult tests, a phenomenon he explained as the likely result "deficits or impairments in functional attention and concentration abilities." *Id.* Gelbort's finding did not impress counsel as especially significant compared to that developed by her psychiatric expert: she explained to a consulting attorney, Michael Burt, "Most of my mitigation case is mental health evidence. Some evidence of frontal lobe impairment, but largely the compelling stuff is the manic-flip nature of Effexor treatment." Ex. 8 at 15028. Likewise, trial counsel explained to consulting attorney Lisa Greenman that she would rely on Woods, whose opinion formed the core of the defense strategy:

> One thing to keep in mind is that I have George Woods, who is my real mental health expert. His report will be far more comprehensive (and valuable). Quite frankly, I'd rather rely on George than this guy [Gelbort]. The potential brain damage has some value, but it's not a huge part of my mitigation. It just enters the equation, complicating the client's ability to make it through his hyper-manic state.

Ex. 9; *see also* Ex. 10 (referring to Gelbort's opinion as "icing on the cake").

Indeed, with co-counsel's endorsement, lead counsel had sought Woods, a neuropsychiatrist and board certified neurologist who, who had lectured on brain function and on the relationship between neuroimaging, neuropsychology and behavior. Ex. 11 (Woods's curriculum vitae), 12 (defense team correspondence). Woods had also published "Multiple Diagnostic Categories in Children Who Kill: Psychological and Neurological Testing and Forensic Evaluation." Ex. 11. Given Woods's credentials, counsel had every reason to anticipate he would identify any pertinent evidence of brain damage. In fact, lead counsel's correspondence made manifest her expectation that Woods could detect brain damage evidence and deflect any pertinent rebuttal. She specifically asked Woods when he could perform a neurological exam and if he thought that Dr. Gelbort should attend. *See* Ex. 13 at 15666. Fields's attorneys patently anticipated an investigation into brain damage. *See id.* at 15667; *see*

*also* Ex. 14 (indicating an expectation that Woods would evaluate Fields for brain damage).

For his part, Woods did nothing to disabuse counsel of the impression that he could effectively counter any neuropsychology evidence that the government might adduce through its expert, J. Randall Price. Though Woods warned counsel that Price was "dangerous" and should not have any opportunity to perform personality testing, he assured her, "I know Price. We might be able to work with him." Ex. 15. When counsel concluded that Price would not assist the defense, Woods reassured her by e-mail that the government expert presented little danger: "He's a psychologist. He doesn't know shit about medications, and Ed is being treated now, so he's probably not very symptomatic. We'll have to look to see if he did any tests of effort/malingering, to see how Ed performed." Ex. 16 at 14980. In subsequent correspondence, Woods provided further solace, encouraging counsel to "[c]all me. We'll eat this guy up." *Id*. at 14981. Counsel was, in fact, convinced of the strength of her case, commenting in an e-mail, "I smell blood. [Price] can be 'had' in cross-examination. He's just a PhD, not a REAL doctor." Ex. 17.

Beyond the relative insignificance of the brain damage evidence, and counsel's confidence in her ability to neutralize Price, the defense had a specific strategic reason to forgo testimony regarding brain damage – the avoidance of personality testing. The *defense's* neuropsychologist, Dr. Gelbort, believed personality testing was so important to the formation of his opinion, he left a copy of the Minnesota Multiphasic Personality Inventory for counsel to administer. Ex. 15 at 14940. Counsel, who was presumably concerned that the test would reveal damaging evidence, refused to administer the exam. With Dr. Woods's concurrence, counsel also resisted a request by the government's expert to perform personality testing. *Id*.

When the government's expert nonetheless diagnosed Fields with a personality disorder

14

with antisocial traits, counsel was outraged, but determined to rely on the defense's own lack of personality testing to narrow the scope of the evidence. In regard to the government expert's diagnosis, counsel wrote to a consulting attorney, Lisa Greenman, "This is killing me!!!! [¶] [Price] had to arrive at that shit by studying the prosecutor's 'can you help me kill this guy' pre-retainer packet. He didn't give any personality testing." Ex. 18. Having raised the concern with Greenman, counsel was advised to argue that the defense had not opened the door to personality disorder evidence – advice she manifestly took to heart. Ex. 19; *see* Tr. 3078 (arguing that the defense had not opened the door to personality disorder testimony). Counsel's concern for opened doors clearly stemmed from this Court's admonitions. *See* Trl. Doc. 157 at 4 (ruling with regard to evidence, "These exclusions are, of course, preliminary. For example, if a witness for the defendant 'opened the door' through some testimony, the government may argue for reconsideration outside the jury's earshot").

Counsel had a further tactical reason for forgoing brain damage evidence – concerns about showing such material to prosecutors:

> I don't know how far I want the report to go, for several reasons. One being that I may show it to the gov't for settlement purposes; the other being that my claim to fame isn't brain damage, it's the manic flip due to Effexor (the flip complicated by Tylenol PM for sleep problems, and then add on top maybe even some brain damage).

Ex. 20 at 4684. Counsel also disliked working with Gelbort, stating in one e-mail, "He sucks. Not because he's not smart, or doesn't know his field, but because he's too difficult to work with." *Id*. at 4688.

In fact, the attorney also had reason to question Gelbort's professional abilities, reporting that Woods "was dismayed when he first heard about [Gelbort's] test battery, because it isn't a standard protocol. But after he spoke with Gelbort about the case & the testing, Woods emailed

me that he was much more comfortable with Dr. Gelbort." Ex 20 at 4684. Furthermore, counsel openly mocked Gelbort's draft report as "THE crappiest one I have ever seen. Ex. 21 at 4652. The report gave pause to other members of the defense team, as evidenced by an e-mail in which an investigator observed that the facts known to the expert upended his own findings:

> [H]e says that Fields only did badly in classes he did not like which does not strike me as a very informed opinion for Gelbort to express; also, he never kept a job (Fields own self-report) is followed by he was in the military for 3 years and worked for DOC for 4 years - that strikes me as keeping a job - why is Gelbort uncritically reporting that sort of thing when it appears contradicted by collateral evidence?

*Id*. at 4648-49. More importantly, the investigator noted that Gelbort's findings provided little substantive mitigation: "The best potential evidence here is in the 'higher functions' paragraph in which he says he is mildly impaired on impulsivity and processing speed and higher level reasoning - but he takes that away by saying it results from concentration and attention deficits." *Id*. A consulting attorney agreed, "It doesn't sound, at least initially, like you will be needing/wanting Gelbort to have to carry much of the story line at trial." *Id*. at 4650.

Counsel was encouraged in her low opinion of Gelbort and her reliance on Woods. A defense investigator, noting that Gelbort was difficult to work with and "sloppy," recommended that counsel simply adduce any helpful neuropsychological evidence as part of the bipolarism diagnosis, which he advocated should be reduced to a chart. *See* Ex. 22 at 4653 & 4675. Woods agreed wholeheartedly: "I fucking hope so! Thanks so much. You're right about Gelbort." *Id*. at 4676. If Woods believed that Gelbort's findings merited more exposure or explanation than he could provide, he failed to say as much to counsel when the subject arose.

In short, the record of correspondence overwhelmingly demonstrates that counsel felt, at best, ambivalent about Gelbort's potential contribution to the case. If, as Fields has sometimes asserted, Gelbort was not available at the time of trial (*see* Doc. 20 at 13; *but see* 2255 Mtn. Ex.

16

34 at 5), it appears that trial counsel had prepared to forge on without him, having long since determined that he would not add significantly to the case. Recently, Fields has presented evidence that suggests Gelbort, and other mental health experts, could have offered assistance in rebutting the findings of a government expert, Dr. Price. *See* 2255 Mtn. Exs. 34-36. But Fields has not shown that the defense had any reason to believe that Gelbort could provide that information, much less any confidence in him, professionally. Furthermore, counsel already believed she had identified a strategy to neutralize Price based on his ignorance of psychotropic medications. *See* Ex. 17 (asserting Price "can be 'had' in cross-examination").

At bottom, Fields's complaints about the decision to defend the case with a single mental health theory rather than a grab bag of psychological, psychiatric and neurological testimony relies on an unstated legal assertion that counsel had an obligation to present all potentially mitigating evidence. The Sixth Amendment does not, however, require defense counsel to "consult" with any and every potentially helpful expert in preparation for trial. Instead, *Strickland* makes clear that only an "unreasonable" investigation is constitutionally deficient. 466 U.S. at 690-91 ("Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."). The Supreme Court has never suggested that anything less than a "scorched-earth" investigative strategy is constitutionally deficient. Instead, the Court has long recognized that counsel should have the ability to weigh the potential value of investigation with the cost of acquiring it. *See Rompilla v. Beard*, 545 U.S. 374, 382-83 (2005) (holding the "duty to investigate does not force defense lawyers to scour the globe on the off-chance something will turn up."); *Strickland*, 466 U.S. at 699 (counsel could "reasonably surmise ... that character and psychological evidence would be of little help). Counsel may properly reject evidence that they

17

believe will not assist the case. *See Burger v. Kemp*, 483 U.S. 776, 794 (1987) (holding that limited investigation was reasonable because all the witnesses brought to counsel's attention provided predominantly harmful information).

Here, counsel's correspondence demonstrates that decisions about brain damage evidence were entirely reasonable. Counsel was entitled to rely on Woods, who had the capacity to identify significant neurological concerns but concluded that the murders resulted from a manic flip. She placed greater stock in that theory than in the brain damage evidence, and neither Dr. Woods nor anyone else associated with the case did nothing to disabuse her of that position. By relying on the neuropsychiatric evidence to the exclusion of the brain damage theory, counsel also forestalled potentially damaging personality testing and reserved an argument that Dr. Price could not offer rebuttal evidence that the defendant was antisocial. Counsel had no obligation to advance weaker brain damage evidence that threatened to dilute the overall defense. *See Boyle*, 544 F.3d 1132. The actions were entirely reasonable and no reasonable probability exists that Fields would have received a more favorable verdict had his attorneys placed greater emphasis on de minimis brain damage evidence.

2. <u>Counsel's Strategy Prevented Damaging Rebuttal</u>

As discussed, the record from the trial and counsel's file demonstrates that the defense made an informed an appropriate choice to present psychiatric testimony to the exclusion of brain damage evidence. As the government has previously asserted, arguing a theory of brain damage resulting in progressively deteriorating impulse control would likely have suggested that Fields had premeditated the murders and would be apt to commit violent crimes, thereby giving far greater weight to the corresponding non-statutory future dangerousness aggravator allegation. *See* Doc. 228 at 36. And, as noted, the defense also sought to forestall the government from

presenting damaging evidence through Dr. Price, including evidence of personality testing. *See, supra*, Arg. I, B, 1. The defense, according to counsel, knew that Dr. Price had prepared a chronology of the defendant's behavior that she clearly believed would damage the case in mitigation. *See* Tr. 12: 3080-83. While Fields now takes issue with the quality of Dr. Price's neuropsychological testing (*see* 2255 Mtn. Exs. 34-36), he does not meaningfully dispute those aspects of the expert's conclusions about the defendant's personality, which clearly constituted an area of grave concern.

Additionally, a recent investigation undertaken by Dr. James Seward establishes that Fields's neuropsychological evidence remains open devastating rebuttal. Dr. Seward determined that Fields not only lacks any reliable symptoms of brain damage, but does not suffer from any major mental illness that would have mitigated his crimes. While Dr. Seward's findings were obviously unavailable at the time of trial, there exists no reason to believe that Fields would have performed any better on such evaluations had the defense invited such scrutiny.

Dr. Seward found Fields's intellectual functioning in the low average to average range, but stable over time. Ex. 23 at 61. Fields's attention and concentration test results were below normal, but did not demonstrate any marked impairment. *Id*. at 63. "Mr. Fields's scores on measures of executive functioning ranged from borderline abnormal to average, with no markedly impaired scores." *Id*. at 64. Testing revealed no language dysfunction or significant visuospatial impairment. Id. at 65. Fields received low average to average scores on memory tests, and claimed an inability to remember some things, but the expert found the assertion suspect because the defendant has taught himself American Sign Language. *Id*. at 66.

While Fields did not receive impressive scores on the aforementioned tests, he did not reveal any significant deficits. Even so, his demonstrated abilities probably do not reflect his

capacity, given the evidence that he malingered during the evaluation. *See* Ex. 23 at 74 ("Even given his lack of full effort . . . scores on measures of executive functioning ranged from borderline abnormal to average"). One test revealed significant evidence that Fields "feigned psychosis, neurologic impairment, memory disorders, low intelligence, and affective disturbance." *Id*. at 67. Other tests, revealed a similar effort to mislead. *Id*. at 68, 70.

In view of the foregoing evidence, Fields had an unsurprisingly normal brain scan and "no particular pattern emerged of pronounced difficulties with executive functioning or any other particular cognitive domain." Ex. 23 at 73, 78. The evidence does not reflect any "frontal lobe or other meaningful brain damage." *Id*. at 78. Fields's lack of obvious distress was consistent with observations of the mental health experts who have evaluated him for years on behalf of the Bureau of Prisons and consistently found him asymptomatic. *See* Ex. 24 at MH4, MH10, MH 13, MH26, MH33, MH36, MH38, MH42, MH47, MH48, MH52, MH54-55, MH57-58, MH71, MH78, MH81, MH84, MH92, MH97, MH100-01, MH107-08, MH111-18, MH120-30.

Putting aside the fact that Fields is not brain damaged, Dr. Seward's evaluation also cast substantial doubt on trial counsel's theory that Fields committed the murders in response to an auditory hallucination. While Dr. Seward reached no conclusion as to the validity of the supposed hallucinations, he was clear that they did not impact the murders:

> His description of the offense is one in which he was planning, scheming, and acting in an organized plan according to rational motive. . . . [¶] There are no indications that he was horrified by or remorseful of his actions, or that they were the product of an alien will or any type of delusional system. . . . [H]e clearly derived pleasure and emotional satisfaction from having looted the Chicks, and concocted a rational explanation to enable him to shower bounty on his love interest.

Ex. 23 at 84.

The expert also rejected claims of mania in Fields's past, which were central to his trial

defense. Ex. 23 at 88-89. Dr. Seward concluded generally, "When considered collectively, these data cast serious doubt on the veracity of Mr. Fields's self-report of psychological symptoms, and strong evidence for malingering." *Id.* at 94. Dr. Seward therefore found the jury "received embellished, and at times specious, analysis from qualified mental health professionals . . . . A more informed jury would have been better equipped to identify disingenuous defense testimony and think cautiously about mental health claims." *Id.* at 98. Seward's findings are consistent with those of BOP experts. *See* Ex. 24 at MH11, MH59 (observing that Fields has reported symptoms that "are often inconsistent with symptoms which are typically reported by individuals experiencing psychotic symptoms."); *see also id.* at MH85 (referring to Fields's reports of auditory hallucinations as "suspect"). In fact, one BOP psychologist hypothesized that Fields was malingering in to acquire additional psychotropic medications. Ex. 24 at MH 109.

Had Fields's attorneys invited this sort of analysis, through the presentation of neuropsychological evidence they had sound reasons to avoid, no reasonable probability exists that the defendant would have received a more favorable verdict.

C. <u>Trial Counsel Reasonably Opted to Forgo the Testimony of Fields's Treating Mental Health Professionals</u>

Fields claims that trial counsel ineffectively failed to call mental health professionals who had treated him, before and after the murders, to support the theory of bipolar flip and to rebut the testimony of a government expert that the defendant had not genuinely experienced auditory hallucinations. Specifically, Fields argues that his attorneys should have adduced the testimony of Joyce Bumgardner and Larry Trombka – psychiatrists who treated the defendant in custody – as well as Dean Anderson and R.L.Winters – a physician and physician's assistant who treated the defendant prior to the murders. 2255 Mtn. 31-39; Mem. 24-29. As previously argued, trial counsel reasonably elected to avoid the testimony of these potential witnesses. See Ans. at 28-

21

32.

"[T]he decision of which witnesses to call is quintessentially a matter of strategy." *Boyle v. McKune*, 544 F.3d at 1139; *see also United States v. Nguyen*, 413 F.3d 1170, 1181 (10th Cir. 2005) (holding that adequately informed strategic choices are "virtually unchallengeable"). To establish that counsel made an ineffective strategic decision, the defendant must show that it was completely unreasonable, such that it bore no relationship to any possible defense strategy. *See Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000). Counsel reasonably omits to call an expert when potentially damaging cross-examination or rebuttal could outweigh the value of the witness's testimony. *See Boyle*, 544 F.3d at 1139; *see also Hallford v. Culliver*, 459 F.3d at 1205 (holding that counsel may reasonably omit "certain lines of presentation" if they give rise to misgivings about a damaging response). As such, counsel have no obligation to call patently impeachable witnesses. *See Bergmann v. McCaughtry*, 65 F.3d 1372, 1380 (7th Cir.1995).

In large measure, Fields premises his claim on concerns about prosecutorial arguments about Woods's credibility based on his West Coast origins. As Fields observes, the prosecutor criticized the defense's witness selection, stating, "We didn't have to go out to the left coast to find somebody who testified for the defense every time. We got people in our own back yard who were credible." 2255 Mtn. 34 (quoting Tr. 14:3429). But Fields's concern rings hollow: if the selection of Woods opened the defense to the government's argument about the need to travel to California to find a favorable witness, the corroboration offered by Kansas resident Grinage provided adequate refutation of the point. Grinage obtained his training in three states bordering Oklahoma, Kansas, Texas and Missouri, and he worked in Topeka, a few hours' drive from the courthouse. *See* Tr.11:2768-69.

Grinage's testimony aside, Fields has not shown his attorneys should have called treating

22

professionals like Dr. Winters to support the bipolar flip theory.  Dr. Winters, who saw the defendant before the murders, has only a vague recollection of Fields and has not asserted that he would have testified for the defendant (*see* 2255 Mtn. Ex. 12).  Winters's inability to recall Fields is consistent with the records available to trial counsel, which indicate that the physician saw the defendant in June of 2000, more than three years before the crime.  Ex. 25.  The records reflect the fact that Winters changed Fields's anti-depressant prescription, not that he diagnosed, or even suspected, a thought disorder like bipolarism.  *Id.*  Fields's attorneys had no obligation to present evidence that would have diluted the opinion of their experts, especially through a witness as tenuously related to the case as Winters.  The historic fact that Winters prescribed an anti-depressant to Fields may have constituted the sine qua non of the bipolar flip defense, but was never subject to any dispute.

Like Winters, physician's assistant Anderson would not have advanced the defense case. He found that the defendant suffered from anxiety and depression, not bipolarity or schizoaffective disorder.  Even if Anderson's opinions might have arguably assisted the defense, counsel could not have reasonably decided to call him.  Anderson was not a doctor and he had a personal relationship with Fields, as the defendant's own exhibit acknowledges.  2255 Mtn. Ex. 13).  Furthermore, Anderson had last treated Fields in 1999 (*id*.), before even Winters became involved with the defendant.  Anderson's lack of expertise, minimal relevant contact, and arguable bias virtually disqualified him as a viable witness.

Counsel also had no reason to present professionals like Anderson and Winters, who diagnosed Fields with depression rather than bipolarism at a time when the defendant had no motive to malinger – a different set of circumstances than those confronting him when saw Woods and Grinage.  Of course, Woods and Grinage's status as paid witnesses rendered them

susceptible to impeachment, while Anderson and Winters had diagnosed Fields without any outside financial motivations. Counsel clearly would not have wanted to provide the government with fodder to make those juxtapositions during argument.

Fields also fails to make a convincing case that counsel had a professional obligation to present the testimony of Trombka and Bubgaradner the psychiatrists who treated him in jail. First, the treating professionals appear to have less impressive credentials than either of the defense's testifying experts. *Compare* 2255 Mtn. Exs. 10 & 11 (reporting specialties in psychiatry); *with* Tr. 11:2768-70 (relating Grinage's experience as a forensic psychiatrist and professor of forensic psychiatry); 12:2939-42 (relating Woods's experience as a forensic psychiatrist and professor of forensic psychiatry).

In fact, Trombka's personal history seriously undermine his selection as a credible defense witness. Trombka graduated from a foreign medical school in 1981. Exs. 26 & 27. In 1986, he received licenses to practice medicine in Iowa and Oklahoma. *Id*. Less than five years later, Trombka entered a guilty plea to felony Medicaid fraud in Oklahoma County. Ex. 28. The conviction led to a suspension of Trombka's medical license for six months followed by five years of probation. After the conviction, Trombka also suffered a five-year probation in Iowa, where his license has since lapsed. *Id*. Trombka's personal and professional record provided reason enough to avoid him as a witness.

The defense had no need to present the testimony of Dr. Bumgardner, the second psychiatrist who treated Fields in jail. Defense counsel adduced her treatment of Fields during the cross-examination of Dr. Price. Tr.13: 3209-10. The government acknowledged Bumgardner's diagnosis and treatment of Fields while presenting the direct testimony of Dr. Mitchell. As Mitchell related, however, Dr. Bumgardner had diagnosed Fields with major

24

depression, psychotic subtype. Tr. 13: 3272. That opinion is at odds with her more recent conclusion that Fields was bipolar. *See* 2255 Mtn. Ex. 10. At best, any corroborative testimony Bumgardner might have offered would have invited impeachment based on her prior opinion. To the extent the diagnoses were consistent, counsel had no professional obligation to present cumulative testimony from a less-qualified expert whose opinion invited attack and whose observations occurred in jail when the defendant had a motive to malinger.

In fact, counsel had no legal reason to risk the presentation of the aforementioned witnesses, who would have detracted from, rather than enhanced or corroborated testimony about the bipolar flip theory. As previously discussed, Woods had assured counsel of his capacity to testify effectively to his opinion. *See, supra*, Arg. I, B. Counsel was likewise impressed with Grinage, commenting, "I have hired a psychiatrist, Brad Grinage . . . . He impressed me quite well, . . . .He has a great deal of experience important to our case. At any rate, he has seen Ed, reviewed the records, and he concurs with Dr. Woods." Ex. 29. Counsel had no reason to believe that Woods and Grinage required assistance or corroboration from witnesses whose capacity to testify effectively and who were each subject to impeachment on at least one front.

To the extent that Woods and Grinage would have reasonably relied on prior diagnoses in rendering their opinions, they were able to testify about the corroborating findings. *See* Fed. R. Evid. 703; *see also* 18 U.S.C. § 3593(c) (exempting penalty phase testimony from the strictures of evidentiary rules). Given the experts' freedom to self-corroborate, Fields fails to explain how the defense would have benefitted from exposing treating physicians to cross-examination concerning their findings, training, experience, methods and potential biases, all of which could have tended to dilute or detract from the defense's message.

To the extent counsel believed that the diagnoses of treating professionals would assist

the defense in rebutting the government's experts, it appears that she intended to use their

diagnoses during cross-examination. Counsel wrote,

> At least 5 REAL doctors made a decision different from Price. He can be had, because he did a preliminary report just 11 days after taking the case; after that, he was provided reports from jail psychiatrists; pre-crime treating physician; 2 defense psychiatrists and STILL stuck to his unloaded guns.

Ex. 7. In fact, counsel questioned Price at length about the diagnoses of treating professionals,

and using their findings as leverage to observe that the government's witness was not a medical

doctor conversant in psychotropic drugs. Tr. 13: 3203-11. Counsel also cross-examined

Mitchell on the basis of the diagnoses made in the jail. Tr. 13: 3313-16.

Ultimately, the facts – rather than any lack of corroboration – undermined the defense

theory of bipolar flip. As Dr. Mitchell plainly observed, Fields's conduct during the murders did

not reflect uncontrolled mania:

> [H]e had two people who are on the vista and he waited for them to come down from the vista. He put on his Ghilley suit, took out his gun, looked at them through the high powered gun. He waited, moved forward in increments, so that's all -- that involves patience and I would say planning.

Tr.13: 3333. Dr. Mitchell went on to opine that nothing in that description "fits with a person

who's in a frenzy." *Id*.

Given that counsel adduced the findings that Fields faults her for omitting, he can

demonstrate neither error nor prejudice. The weak link in his bipolar flip theory was his own,

undisputed, behavior during the murders, rather than any absence of corroboration from

witnesses whose own flaws would have detracted from the overall credibility of the defense's

mental health evidence.

D. Trial Counsel Reasonably Responded to Dr. Price's Testimony

Fields alleges that trial counsel ineffectively failed to object when Dr. Price testified that

the defendant appeared to have average cognitive function and when he implied that he had not detected any organic brain damage.  Fields also contends that counsel ineffectively cross-examined Dr. Price concerning neuropsychological evidence, adducing testimony that Fields was not brain damaged.  2255 Mtn. 39-46; Mem. 29-34.  Fields fails to show that counsel's actions were unreasonable, much less that they prejudiced the outcome of this case.

Counsel expressly understood the likelihood that the Court would permit Price to testify about the health of Fields's brain.  She wrote, "I want to try to exclude his opinion, but know that will be nearly impossible. If nothing else, I want to show that he isn't following accepted practice by relying upon remote, unreliable information."  Ex. 2 at 3269.  Counsel had no obligation to raise a futile objection.  *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005); *Hawkins v. Hannigan*, 185 F.3d 1146, 1152 (10th Cir. 1999).

Given the admissibility of the testimony, counsel did not err when she briefly cross-examined Price about his findings.  The defense did not hinge on a showing of brain damage.  In fact, defense counsel did not believe that Gelbort's findings had much mitigating value.  *See, supra*, Arg. I, B.  Accordingly, counsel reasonably believed that Price's opinion about Fields's neurological health would not prejudice the defense.  Rather, counsel's decision to elicit Price's findings allowed her to then imply through further questioning that his testimony did not rebut the defense because he lacked any expertise concerning psychotropic medications.

Counsel's reasonable tactics reflected the advice of a consulting attorney, Lisa Greenman, who provided a road map to the cross-examination;

> I don't see how he can opine dysthymia - the guy is up to his eyeballs in medication to control the symptoms and Price says he disagrees with all the prior shrinks who saw him unmedicated and not properly medicated and that they are all wrong?  [I]s he even qualified as a psychopharmacologist? does he know what these meds do? [D]oes he typically diagnose? most neuropsychologists don't diagnose - I think this may be a case of Price wanting to be one of those TV

forensic psychologists.

Ex. 2 at 3268. Trial counsel, as noted, believed that she could neutralize the impact of Price's testimony by exposing the limits of his expertise: "I smell blood. [Price] can be 'had' in cross-examination. He's just a PhD, not a REAL doctor." Ex. 17.

Given the defense strategy, Fields cannot show that counsel unreasonably asked Price about cognitive function. She adduced Dr. Price's observation regarding a lack of "significant neuropsychological impairment" (Tr. 13: 3204), implying that the witness's expertise – neuropsychology – had no bearing on the case. Counsel transitioned from Price's findings to questions regarding psychotropic drugs, forcing the witness to concede that he had only a "nodding familiarity" with the medicines at the core of the defense. Tr. 13: 3205-06 ("I wouldn't say by any stretch of the imagination I'm an expert in those medications"). Counsel pressed the point, forcing Dr. Price to admit he did not know how the drugs actually worked. Tr. 13:3206-07. Counsel then forced Price to concede that all the professionals who had prescribed the drugs had medical degrees and that they had ordered the treatment to address far more serious disorders than Price had detected. Tr. 13:3209-12. Counsel reasonably leveraged Price's findings in an effort to undermine his credentials.

Price's brief cross-examination regarding brain function apparently served a second purpose. It emphasized an inconsistency with the witness's earlier testimony about Fields's performance on neuropsychological testing, which suggested substantial impairments. *See* Tr. 13: 3194-98. The arc of this examination permitted an inference that Price had premised his findings on bias or some pre-conceived notion of the outcome. The strategy mirrored one suggested by consulting attorney Greenman. Ex. 30 (observing "it is curious that this test shows frontal impairment and Price discounts it as malingering . . . that just rings of bias").

28

In view of counsel's sound tactical reasons to permit Price to provide his brief assessment of the defendant's neurological health, Fields cannot demonstrate infectiveness. Cross-examination is a matter of strategy, subject to a presumption of reasonableness. *See, e.g. Boyd v. Ward*, 179 F.3d 904, 915 (10th Cir. 1999); *United States v. Rodriguez-Ramirez*, 777 F.2d 454, 458 (9th Cir. 1985). Here, counsel pursued sound tactical goals when she elicited Price's findings. Sound tactics aside, Fields cannot demonstrate a reasonable likelihood that he would have received a more favorable verdict had his attorney forgone these lines of attack on the government's expert.

E.  Counsel's Reliance on the Opinions of Retained Experts

Fields claims his trial counsel ineffectively failed to present evidence that ingestion of Effexor has been shown to correlate with higher rates of compulsive aggressive behavior. 2255 Mtn. 46-53; Mem. 34-39. Fields is wrong. Counsel presented two experts who explained Fields's violence as a function of his Effexor use. Fields cannot show that counsel were ineffective for omitting allegedly corroborative testimony of questionable admissibility.

As previously stated, witness selection is a matter of strategy. *Boyle*, 544 F.3d at 1139. Counsel need not "'shop' for a psychiatrist who will testify in a particular way." *Elledge v. Dugger*, 823 F.2d 1439, 1447 n.17 (11th Cir.) (per curiam), *op. withdrawn in other part*, 833 F.2d 250 (1987), *and cert. denied*, 485 U.S. 1014 (1988). A retrospective assessment of an expert's methods and conclusions, even one that demonstrates the witness's inadequacy, will not by itself establish counsel's ineffectiveness. *Card v. Dugger*, 911 F.2d 1494, 1513-14 (11th Cir. 1990). Moreover, counsel has no obligation to present cumulative expert testimony. *Babbit v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998); *see also Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir.1995) (noting that "the duty to investigate and prepare a defense is not limitless: it

does not necessarily require that every conceivable witness be interviewed").

In this case, counsel presented two experts who attributed this crime to Fields's use of Effexor. The expert testimony could have permitted the jury to have found a nexus between the killings and the drug. Counsel's reliance on those experts, whose methods and conclusions Fields does not attack, was within the ambit of competent assistance. *Elledge*, 823 F.3d at 1447 n.17. To the extent that the testimony had a different shade of meaning than the information Fields now presents in an article by Peter Breggin (2255 Mtn. Ex. 14), counsel would have reasonably refused to alter course. Breggin's opinions, linking psychotropic medications to violent behavior have been repeatedly excluded from courts. *See, e.g., Vanderwerf v. SmithKline Beecham Corp.*, 603 F.3d 842, 844 (10th Cir. 2010); *Estate of Moffett v. SmithKline Beecham Corp.*, No. 1:03 CV 532 WJG JMR, 2005 WL 1595664 (S.D. Miss. June 9, 2005); *Estate of Lam v. Upjohn Co.*, No. Civ. A. 94-003-H, 1995 WL 478844 (W.D. Va. April 21, 1995).

In any event, Fields does not demonstrate that counsel knew of Breggin or had a reason to investigate his existence. None of counsel's correspondence mentions Breggin, and Fields cannot show that anyone in the defense camp doubted the efficacy of Woods's testimony. *See* Ex 31 (regarding Woods's reputation); *see also* Ex. 32 (predicting O'Connell would be very pleased with Dr. Woods); Ex. 22 at 4653 (noting that lead counsel "was, appropriately, raving" about Woods). Given the defense's unquestionable confidence in Woods, Fields cannot even show that his attorneys could have even justified the appointment of Breggin, who would have appeared superfluous at best and unlikely to offer an admissible opinion at worst. *Cf. Ake v. Oklahoma*, 470 U.S. 68, 83 (1985) (guaranteeing publicly-funded services when the defense can justify them as necessary tools).

Under these circumstances, Fields cannot show that defense counsel acted ineffectively

or prejudicially in omitting to present an additional expert with questionable credentials and conclusions.

F. Trial Counsel's Preparation of the Expert Witnesses

Fields claims his attorneys were ineffective for failing to adequately prepare Drs. Grinage and Woods for their testimony. Fields contends that the experts had a "general sense" that they were inadequately prepared. He further argues that counsel's failure to provide Grinage with a transcript of his guilty plea or to inform Woods of the elements of a pertinent statutory mitigator exposed both witnesses to damaging cross-examination. 2255 Mtn. 53-54; Mem. 39-41. In fact, both experts testified consistently with written opinions they rendered before Fields pleaded guilty and defended their conclusions in the face of questioning by the prosecution.

Counsel do not act ineffectively when allegedly forgone preparation would not have affected the outcome of the case. *United States v. Molina*, 934 F.2d 1440, 1448 (9th Cir. 1991); *see also Smith v. Gibson*, 197 F.3d 454, 462 (10th Cir. 1999) ("Petitioner fails to allege how further preparation would have enhanced his testimony").

Given Fields's obligation to show specifically that an asserted error in witness preparation handicapped he defense, he should fail in alleging a "general sense that . . . testimony was ill-prepared and presented." To the extent that Fields has submitted declarations asserting a lack of satisfaction with counsel's efforts, those sentiments are inconsistent with correspondence sent at the time of trial. Three days after the jury returned its verdict, Ms. O'Connell wrote to Woods, "I don't think we missed showing anything," and, "I was exhausted by the time you took the stand. Your hard work and preparation made it seem like I was better than I am. (Thank you.)." Ex. 33. For his part, Dr. Woods described the trial experience as "a good ride." *Id.* As to the defense's second expert, Grinage, counsel freely provided him with documents and other

31

information.  Ex. 34.

Fields's few specific allegations also fail to demonstrate any unreasonable omission on counsel's part.  Fields asserts that Grinage did not receive a transcript of the guilty plea and therefore did not appreciate the fact that the defendant had admitted to premeditating the crime. The argument collapses in light of evidence that counsel sent Grinage a copy of the indictment (Ex. 35), which specifically alleged premeditation.  Trl. Doc. 1.  Counsel could have reasonably anticipated that Grinage, the director of forensic psychiatry at the University of Kansas School of Medicine (*See* Ex. 36), would have surmised that Fields's guilty plea encompassed the premeditation allegation.

Likewise, the motion rings hollow when it asserts that counsel did not educate Woods about the relevant legal standard for impaired capacity under the Federal Death Penalty Statute. Good sense and her expert's credentials entitled counsel to assume that an international figure like Woods had read the relevant statute on his own if he were not already familiar with it. Woods sat on the board of directors for the International Academy of Law and Mental Health. Ex. 11.  He had also sat on the advisory board of the DePaul University Law School's Health Law Institute.  *Id*.  He had provided a continuing legal education class to the Federal Public Defenders Office in Oregon entitled, "Developing A Forensic Neuro-Psychiatric Team" and he had lectured the Maricopa County Public Defender's Office on investigation for mitigation and capital cases  *Id*.  Through the auspices of the National Institute of Trial Advocacy Training, Woods had also taught at some of the nation's preeminent law schools – New York University, the University of North Carolina, and the University of Texas, among them.  *Id*.  Consistent with his background, Woods demonstrated an admirable familiarity with the relevant statutory law during cross-examination.  Tr. 12:3048.

Not only did Woods's background foreclose any reasonable expectation of the need for education on elementary points of his own specialty, but his knowledge of legal principles precludes any likelihood that Fields suffered any prejudice for want of that preparation. As fully discussed in the Answer (Ans. at 41-44), Woods's opinion may have exceeded the statutory requirements for application of the application of an impaired-capacity mitigator (18 U.S.C. § 3592(a)(1)), but still encompassed the requisite showing for substantial impairment.

Regardless of Woods's testimony, the jury was instructed with the appropriate statutory language (*see* Trl. Doc. 227 at 25), and rejected the impaired capacity mitigator on a verdict sheet that restated the standard Woods supposedly misconstrued (Trl. Doc. 228 at 38). In view of the fact that the jury made its finding on the correct standard, no reasonable likelihood exists that Fields would have received a more favorable verdict had counsel better prepared Woods to address this semantic issue in his testimony before the jury. The complete rejection of the defense's mental health evidence (Trl. Doc. 228) does not suggest the jury's confusion over some nicety of the law that counsel might have forestalled through additional witness preparation, but rather represents a rejection of the experts' conclusions. No showing of prejudice should lie under these circumstances.

## II. FIELDS HAS FAILED TO STATE A JUSTICIABLE CLAIM THAT HE IS INCOMPETENT TO BE EXECUTED

Fields claims that his alleged mental illnesses render him incompetent to be executed. 2255 Mtn. 54-55; Mem. 42-46. The argument, as Fields concedes, is not ripe for adjudication. *See* Doc. 20 at 22.

## III. TRIAL COUNSEL REASONABLY RESPONDED TO THE GOVERNMENT'S VALID EVIDENCE AND ARGUMENTS

Fields claims that trial counsel ineffectively failed to investigate and identify evidence

that might have rebutted the government's evidence and arguments in favor of two aggravators – mental anguish and substantial planning and premeditation. In related arguments, Fields complains the government presented false and misleading evidence to support the factors. 2255 Mtn. 56-83; Mem. 46-62.

As the government has argued, Fields's attorneys reasonably responded to the government's presentation, which was, itself, entirely appropriate. In regard to the claim that the defense should have engaged a criminalist of its own to dispute the findings of Iris Dalley regarding the timing of the robbery, the government maintains that Fields's present expert has reached incorrect conclusions. Ans. at 46-58. Because the information obtained in discovery does not alter the government's response, it declines to further elaborate on its earlier answer to this claim. The government also stands by its response to Fields's related claims that the trial prosecutors committed misconduct in presenting crime scene evidence. Ans. at 46-62.

## IV. TRIAL COUNSEL PRESENTED APPROPRIATE SOCIAL HISTORY EVIDENCEWITHOUT UNDERMINING THE DEFENSE STRATEGY

Fields claims that trial counsel ineffectively failed to present and rely upon social history evidence as a basis for mitigation. While conceding that counsel did present some such evidence through his sister, Cherie Fields, the defendant argues that his attorneys should have adduced additional testimony to demonstrate the atmosphere of familial dysfunction in which he allegedly was raised. Fields further faults his lawyers for presenting social history evidence through his sibling instead of a paid witness – mental health experts Woods and Grinage or mitigation investigator Glori Shettles. Fields also contends that his attorneys should have argued that his personal history supported an independent mitigating factor. 2255 Mtn. 83-94; Mem. 62-71.

The law presumes that counsel acted for tactical reasons when they focus on particular issues to the exclusion of others. *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003). Even incorrect

decisions do not offend the guarantee of competent counsel, so long as they are not "completely unreasonable." *Fox v. Ward*, 200 F.3d at 1296. Counsel does not err in omitting evidence that would have undermined, rather than supplemented, a viable mitigation strategy. *See Wackerly v. Workman*, 580 F.3d 1171, 1177-79 (10th Cir. 2009). Significantly, evidence of a troubled upbringing and mental issues constitutes a double-edged sword, a fact that can support a reasonable strategic choice to omit it. *See Williams v. Woodford,* 384 F.3d 567, 619-20 (9th Cir. 2004); *see also Wackerly*, at 1177-78 (collecting authority regarding the permissibility of omitting double-edged evidence).

As previously argued, Fields's defense strategy centered on an explanation of his crimes as a behavioral aberration driven by a wrongly-prescribed psychotropic drug. Ans. 62-67. Any forgone evidence about his family history would have undermined the strategy by suggesting Fields was a dangerous person whose homicidal conduct was a product of his character. In fact, evidence intended to explain the crime in terms of Fields's upbringing would have been inconsistent with a recognized mitigator – that the defendant had no significant record of criminal conduct until he committed this crime at age 36. *See* Trl. Doc. 228 at 38.

The defense took pains to present Fields as non-threatening. Counsel expressly articulated to Dr. Woods a desire to portray Fields as non-violent: "I want to settle this case, and the only way to do it is to convince the committee in Washington that Ed was SICK and that medicine he now takes makes him better and not dangerous." Ex. 37. Likewise, a defense investigator collecting examples of the defendant's artwork culled only the non-violent images for exhibition to the jury. Ex. 38 at 4642. The defense team's statements and actions reflected a palpable concern that the jury might view Fields as a dangerous person. Articulating that apprehension, counsel fretted in an e-mail that the government's experts would rely on evidence

35

of the defendant's maladjustment and violence:

> The gov't has 2 docs, the examinations were taped. I have listened, and know the outcome, because the docs had been front-loaded with the creepy-crawly stuff. Lots of questions about his womanizing, probing inquiry into why someone would make up the cat-hanging incident. So I can anticipate all the "junk" will play a role in any determination made by gov't docs. Most of that crap isn't true (like hanging a cat), or has been largely exaggerated (the bomb thing has turned into threatening people at work with a bomb). But I'm worried that, through mental health evidence, all of it will somehow come in, because the govenrment's [*sic*] experts will say they reviewed it, it helped them reach their conclusions, whatever.

Ex. 2 at 3262.

To portray the murders as anomalous behavior, the defense presented the testimony of Cherie, who testified that she loved her brother. Tr. 11:2676, 2689. She recounted how Fields demonstrated his love for his father by planting a garden for him and fishing with him toward the end of his life. Tr. 11:2685-86. Cherie also testified to negative aspects of her brother's family life, but not to outright dysfunction. *See, e.g.,* Tr. 11:2674-76 (stating that she and her brother fought as teenagers), 2677-78 (stating that her father worked long hours and was frequently absent), 2679-80 (discussing her mother's illnesses), 2703-05 (recounting Fields's irresponsibility), 2711 (opining that Fields was an inadequate father). Consistent with counsel's strategy, Cherie testified that Fields was "sick," not "vicious." *See* Tr. 11: 2719-20. Cherie's observations were consistent with the defense's effort to portray the murders as crimes committed nearly 20 years after Fields left his parents' home, having never previously suffered an arrest.

Ignoring trial counsel's characterization of the murders as a behavioral anomaly, Fields observes that family dysfunction evidence of the type omitted at his trial has an historical pedigree as mitigation evidence. *See* Doc. 20 at 43. But he fails to come to recognize that admissibility does not equate with desirability. *See Williams*, 384 F.3d at 619-20. For instance,

36

evidence of Fields's upbringing might – as he has argued (Doc. 20 at 43) – underscored his "chronic depression," but the testimony would have contradicted his claim of undiagnosed bipolarism. *See generally* Tr. 11:2775-81. Fields also asserts that social history evidence would have demonstrated "mental illness and neurological impairments on both sides of his family." Doc. 20 at 43. Apart from the fact that such evidence would have suggested Fields's inherent instability and dangerousness, the defendant fails to show how the mental conditions of his distant relations led him to murder two campers after a life of law-abidingness.

Indeed, the psychic sufferings of Fields's relatives would have hardly formed the basis of meaningful sympathy for a middle aged man who began committing crimes 19 years after leaving home. Counsel clearly understood the need to generate sympathy: "I think it's going to be hard enough to get [the jury] to feel sympathy for client." Ex. 39. She further recognized that Fields was raised by a hard working father who "provided well for the family." Ex. 2 at 3260-62. Apropos of Fields's middle class upbringing, counsel noted that his parents "took him to mom's shrink" after he ran away from home. *Id*. Given this backdrop, counsel did not err in omitting evidence of an unpleasant mother or mentally ill relatives as meaningful mitigation.

Apart from inspiring little meaningful sympathy, Fields's upbringing was wholly attenuated from the crimes or criminal behavior generally. During the nearly two decades that Fields lived independently of his parents before the murders, he did nothing to suggest that some aspect of his childhood had driven him to homicidal violence. As counsel observed, Fields lived an uninspiring adult life characterized by inadequate effort and disappointing results – he had a child out of wedlock, he twice divorced the mother of his two other children, he had an affair, he was occasionally violent toward his family, he was addicted to on-line pornography, and he held a series of low paying jobs. Ex. 2 at 3260-62. Counsel had no illusions about Fields,

commenting, "Client's life was very under-productive.  His intellect is average.  He did not do well in school, or anything for that matter.  No special achievements."  *Id*.  But counsel also noted with some vehemence, "My client has absolutely no criminal record. But the government believes he is a psychopathic retrobate [*sic*]."  *Id*.

Thus, counsel wanted to disassociate the murders from every other aspect of Fields's life and believed she had the evidence to do so, writing to another attorney, "Throughout his life, he has received mental health treatment, always diagnosed with depression. He has been treated with serzone, paxil, lexapro, and others." Ex. 2 at 3260-62.  The most recent of those treatments, counsel believed, had caused Fields to kill the Chicks, as she explained that the last treating physician "changed him to Effexor in mid-June.  Double the dose on July 7.  Murders happened on July 10."  *Id*.  As counsel went on to observe, "[T][he compelling stuff is the manic-flip nature of Effexor treatment."  *Id*.

Counsel intended to show that a psychoactive agent caused Fields to behave in a manner at odds with his character.  Over the course of his life, he had revealed himself as someone generally respectful of the law and authority.  He had, after all, joined the Navy and worked as a prison guard.  If Fields's upbringing or family had caused the type of damage that might lead a person to commit multiple murder, counsel obviously believed that a jury would intuit that the damage would have manifested itself before the age of 36.  Any argument that the murders were mitigated by Fields's family life, would have detracted from the position that Effexor caused the defendant to abandon any and all concern for the most basic precepts of a civilized society in favor of a double homicide while potentially permitting the government to more thoroughly attack the defendant's character.

Additionally, Counsel sought to avoid any action that would permitted the government to

present damaging evidence that Fields tended toward violence and hyper-sexuality. In regard to evidence of Fields's less palatable behavior, counsel was conscious that the defense could open the door to damaging rebuttal:

> Judge says virtually all of this stays out, as long as I don't open the door. Only stuff the gov't can use to support non-statutory aggravator of future danger is the growing interest in camoflauge [*sic*] and in stalking people. None of the cat hanging, cow slapping, minor violence, snake loving, creepy stuff.

Ex. 2 at 3262.

Finally, had the defense presented evidence that Fields was emotionally estranged from his family, it would have contradicted its arguments that the death of the defendant's father and the illness of his mother represented a severe emotional disturbance. *Cf.* Tr. 14: 3440.

Thus, for the benefit of the defense as a whole, and to support its main theory, trial counsel reasonably omitted evidence that the defendant's home life was dysfunctional or that some flaw in his upbringing might have mitigated these crimes. Not only was the choice eminently reasonable, but Fields cannot show a reasonable likelihood that he would have received a more favorable verdict had counsel taken a different tack and largely undermined the case they did ultimately present.

## V. COUNSEL PROPERLY OMITTED FUTILE OBJECTIONS TO APPROPRIATE PROSECUTION ARGUMENTS

Fields claims his trial counsel provided ineffective assistance when they failed to object to several instances of alleged prosecutorial misconduct. Additionally, Fields complains that in instances in which trial counsel objected to supposed misconduct, appellate counsel ineffectively failed to raise the issue on appeal. 2255 Mtn. 95-112; Mem. 71-90.

As the government has argued, claims regarding misconduct at argument are procedurally barred. Further, Fields has failed to identify any instance of prejudicial misconduct that would

support a valid contention that any of his counsel provided ineffective assistance. Ans. 67-94. Because the information obtained in discovery does not alter the government's response, it declines to further elaborate on its earlier answer to these contentions. *See generally Phyle v. Leapley*, 66 F.3d 154, 159 (8th Cir. 1995) (noting the highly subjective factors that lawyers take into account as they make repeated, instantaneous decisions whether to object).

## VI.     TRIAL COUNSEL PROPERLY REQUESTED A JURY CHARGE AND VERDICT FORM THAT PERMITTED A SINGLE WEIGHING OF AGGRAVATING AND MITIGATING FACTORS

Fields claims his trial counsel acted ineffectively when they requested a single penalty verdict for the two murders to which he had pleaded guilty. Fields asserts that no reasonable strategy explains the decision and contends that it prejudiced him by permitting the jury to aggregate aggravating factors in its weighing analysis. 2255 Mtn. 112-119; Mem. 90-99. In fact, the request for a unitary verdict supported the defense's efforts to characterize the murders as a single behavioral irregularity cause by a psychoactive agent. Given the thrust of the defense, even if the request for a general verdict fell below professional norms, it did not prejudice Fields.

Counsel's correspondence underscores the intention to conceive of the murders as a single event, explainable by the impact of a psychotropic drug. As she summarized the theory of the defense, counsel stated, "my claim to fame isn't brain damage, it's the manic flip due to Effexor (the flip complicated by Tylenol PM for sleep problems, and then add on top maybe even some brain damage)." Ex 20 at 4684. Or, as counsel elsewhere wrote, "but largely the compelling stuff is the manic-flip nature of Effexor treatment." Ex 2 at 3262. Given counsel's intention to explain the murders as a single drug-induced spasm of violence, it made no sense to undermine that effort by asking for granular verdicts that emphasized the separate protracted nature of the two murders.

Even if the decision to ask for a single verdict amounted to professional error, Fields would have received no benefit from demanding that the jury consider the death penalty for the two death-eligible counts. The aggravating and mitigating factors applicable to the crimes were identical, as previously explained. Ans. at 99. Fields cannot show that the outcome of his case would have differed had the jury repeatedly engaged in the same analysis.

In his reply brief, Fields argued that unitary verdicts are impermissible, and that trial counsel therefore could not have properly requested one. Doc. 20 at 53 (citing *Benson v. United States*, 332 F.2d 288 (5th Cir. 1964)). Fields's principal authority holds that general sentences violate the Federal Rule of Criminal Procedure 35. *Benson*, at 291. The case concerns inapposite non-capital sentences and – as an out-of-circuit decision – does not bind this Court.

Fields also argued that the unitary verdict conflicted with the fact that the mental-anguish non-statutory aggravator applied only to Shirley's homicide, which he asserted the government had conceded on appeal. Doc. 20 at 57 (citing Ans. at 99). The government's appellee's brief did state that the factor applied to Shirley's murder alone, but upon subsequent review of the record, it appears the jury properly weighed the factor in regard to both homicides. The government's notice of intent to seek the death penalty did not limit the reach of the factor to a single homicide. *See* Trl. Doc. 38 at 3. In its summation, the government explained that Charles's shooting marked the outset of Shirley's anguish:

> What happens at the time of the shot? She gets splattered with her husband's blood all over her face. That's what happens to her. And picture the scene, ladies and gentlemen. They're out in the middle of nowhere and all of a sudden a sound of a gunshot and her husband collapses and she has his blood all over his face. What was the horror, the shock, the sheer, oh, my God, the terror that went through her mind at that instant? Because she doesn't know where it's coming from at this period of time.

Tr. 14:3416. Because the first potentially fatal wound inflicted on Charles created anguish in his wife, it makes no sense that the aggravator would apply to only one murder. Furthermore, the

Tenth Circuit – which declined to review the general verdict form – made no finding as to the application of the mental anguish factor and did not rely on the government's statement about it. *See* 516 F.3d at 938-39. The court found the anguish factor comported with applicable legal principles but did not consider its reach with respect to separate counts. *Id*. at 944-46.

Assuming, arguendo, the aggravators applied differently as to the two homicides, Fields still could show no more than that he would have received the death penalty for Shirley's murder alone. He suggested as much on appeal: "Had the jury been required to make separate findings . . ., it may well have returned a sentence of life without possibility of release for the murder of Charles Chick, and a death sentence for that of Shirley Chick." AOB 64. Surely, trial counsel would reached the same conclusion and seen the folly in pursuing such a strategy, precluding any finding of prejudicial ineffectiveness.

## VII.  THE PROSECUTION HONORED ITS OBLIGATIONS TO DISCLOSE EXCULPATORY MATERIAL

Fields makes a two-pronged attack on the government, claiming that it suppressed exculpatory evidence concerning a bottle of Effexor and that it failed to provide evidence concerning two seized computers. 2255 Mtn. 119-24; Mem. 100-06. As previously argued, Fields has failed to demonstrate that any aspect of the prosecution's actions amounted to prejudicial misconduct. Ans. 101-07. Because the information obtained in discovery does not alter the government's response, it declines to further elaborate on its earlier answer to these contentions.

## VIII.  THERE ARE NO ERRORS TO ACCUMULATE

Fields argues that even if no single alleged error requires relief, the cumulative effect of the supposed errors does require the Court to grant his Motion. 2255 Mtn. 124; Mem. 106-08. As the government has shown, Fields has failed to establish the existence of any prejudicial

errors to accumulate.  *See United States v. Rogers*, 556 F.3d 1130, 1144 (10th Cir. 2009).

## IX.     THIS COURT LACKS JURISDICTION TO DETERMINE WHETHER FIELDS'S EXECUTION WILL CONSTITUTE CRUEL AND UNUSUAL PUNISHMENT

Fields, without asserting any supporting facts, claims that his execution would constitute

cruel and unusual punishment under the Eighth Amendment.  2255 Mtn. 125; Mem. 109.  The

argument, as Fields concedes, is not ripe for adjudication.  *See* Doc. 20 at 63.

**CONCLUSION**

Except as expressly admitted, the government denies every allegation of the § 2255

Motion and specifically denies that Fields's sentence is improper, that the judgment and

commitment underlying that sentence is improper, or that his rights are being violated.  Based on

the foregoing reasoning and authority, the government respectfully urges this Court to deny and

dismiss the § 2255 Motion in its entirety.

Dated: October 15, 2015,

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

*/S/ Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
520 Denison Ave
Muskogee, OK 74401
Telephone: (918) 684-5100
Fax: (918) 684-5150
chris.wilson@usdoj.gov

*/S/ Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section
U.S. Dept. of Justice
1331 F Street, NW; Rm. 656
Washington, DC 20530
Telephone: (202) 305-8910
Fax: (202) 353-9779
jeffrey.kahan@usdoj.gov

# CERTIFICATE OF SERVICE

I, hereby certify that on October 15, 2015, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Hunter Labovitz, Attorney for Petitioner
Cristi Charpentier, Attorney for Petitioner
Katherine E. Ensler, Attorney for Petitioner

*/S/ Christopher J. Wilson*
Assistant United States Attorney

1