
AUSA Chris Wilson
United States Attorney's Office, Eastern District of Oklahoma
520 Denison Avenue
Muskogee, OK 74401

Re: Edward Leon Fields, Jr. v United States

November 16, 2013

Dear Mr. Wilson:

Pursuant to your request, I have conducted a peer-reviewed psychological and neuropsychological evaluation of the above defendant. Edward Leon Fields, Jr. is a 46-year-old native of Oklahoma convicted of the murders of husband and wife Charles and Shirley Chick. Mr. and Mrs. Chick were camping at the Winding Stair Campground in the Ouachita National Forest in Oklahoma when they were shot to death on July 10, 2003.

Edward Leon Fields, Jr. confessed to the murders on July 18, 2003 and was indicted on August 1, 2003. Mr. Fields pled guilty on June 30, 2005, and on July 13, 2005 a jury trial commenced to determine the penalty.

In the course of the sentencing trial testimony was presented by both expert and lay witnesses. Defense-retained psychiatrist Bradley D. Grinage, M.D. diagnosed Mr. Fields with bipolar disorder and testified that, as the result of antidepressant medications, he "developed an irritable manic mania" and consequently "was suffering from a severe emotional mental disturbance, mainly bipolar disorder with psychotic features" at the time of the offense. Dr. Grinage also described considering the potential effects of hypoxia as a result of respiratory distress syndrome in his formulation of Mr. Fields.

Psychiatrist George Woods, M.D. testified on behalf of the defense that Mr. Fields suffered either from schizoaffective disorder or bipolar disorder, and that "Mr. Fields has heard voices. He has described these voices to doctors, a doctor. He has described before the offense. He has described…these voices to doctors after the offense. The description has been consistent."

According to Dr. Woods, Mr. Fields was unable to conform his behavior to the law.

Randall Price, Ph.D. testified on behalf of prosecutors that he diagnosed Mr. Fields with dysthymic disorder and personality disorder NOS. Dr. Price indicated that he was uncertain as to whether Mr. Fields's reported auditory hallucinations were genuine.

Dr. Price further testified that he "did not see much neuropsychological impairment."

The jury voted to impose the death penalty on July 22, 2005, and Mr. Fields was sentenced to death on November 8, 2005.

Mr. Fields's defense team filed a Motion to Vacate, Set Aside or Correct Sentence on April 6, 2010. In it, they raise a number of issues pertaining to Mr. Fields's psychological and neuropsychological functioning, both current and at the time of the crime and trial. These include the following assertions: trial counsel failed to investigate organic brain damage; failed to adequately present evidence that his mental illness was not malingered; and that Mr. Fields is ineligible for the death penalty due to deteriorating mental health and neurological impairment.

In support of their motion, the defense presented the findings of psychologist Dan Martell, Ph.D. In his accompanying report dated April 1, 2010[1], Dr. Martell opined that

> "…any reasonable neuropsychologist looking at Dr. Price's neuropsychological data would have identified the presence of significant impairments [sic] Mr. Fields' brain functioning, primarily involving frontal lobe functioning."

Dr. Martell writes that testing data reflects a "catastrophic decline in functioning over the five years since he was seen by Dr. Price," and further, that Mr. Fields's scores on the Halstead Reitan battery declined significantly from previous testing, suggesting "the presence of a progressive, degenerative neuropathological process," and that some results "were among the worst I have seen."

Dr. Martell additionally writes that Dr. Price's testing data did not support his "opinion that Mr. Fields was indeed malingering," and that Dr. Price did not administer psychodiagnostic tests which would have provided more conclusive evidence informing on Mr. Fields having genuine or manufactured mental illness.

This matter was referred to The Forensic Panel to address the following questions:

> 1. *Does the collective testing data, in conjunction with pertinent collateral history, reflect upon Mr. Fields as suffering from frontal lobe or other brain damage-related disinhibition at the time of the crime? Does the data reflect upon any significance of hyaline membrane disease, earlier reported loss of consciousness, or early respiratory distress?*

---

[1] Dr. Martell submitted an additional report on May 30, 2013 identical to the earlier report with the exception of revisions of scores presented in the chart of Mr. Fields's Normative Neuropsychological Profile.

2. *Does the collective testing data, in conjunction with pertinent collateral history, reflect upon Mr. Fields as suffering from a neurological disease with progressive worsening to this day?*

3. *Does the collective testing data, in conjunction with pertinent collateral history, reflect upon Mr. Fields to have been suffering from auditory hallucinations before and after the crime?*

4. *What is Mr. Fields's diagnosis under DSM 5? What is the duration of whatever condition or conditions he has?*

5. *Does the collective testing data, in conjunction with pertinent collateral history, reflect upon Mr. Fields to be malingering? How does that relate to or differentiate from his capacity as an informant to mental health examiners about his actions at the time of the crime?*

6. *How does the available data relate to what the jury was presented at trial? Did the trial presentation leave a jury with an inadequate appreciation of the aforementioned mitigation related issues?*


## SOURCES OF INFORMATION

1. Motion to Vacate, Set Aside or Correct Sentence, April 6, 2010
2. Government's Answer to Motion to Vacate, September 28, 2010
3. Petitioner's Reply to Government's Answer, November 15, 2010
4. Declaration of Bradley Grinage M.D., March 29, 2010
5. Declaration of Dean Anderson P.A., March 24, 2010
6. Declaration of George Woods M.D., March 28, 2010
7. Declaration of Glori Shettles, March 22, 2010
8. Declaration of Joyce Bumgardner M.D., March 30, 2010
9. Declaration of Larry Trombka M.D., March 26, 2010
10. Declaration of RL Winters M.D., March 3, 2010
11. Neuropsychological report and raw data of Daniel Martell Ph.D., April 1, 2010
12. Neuropsychological report of Daniel Martell Ph.D., May 30, 2013
13. Neuropsychiatric report of George Woods M.D., June 25, 2005
14. Neuropsychological report and raw data of Michael M. Gelbort Ph.D., August 11, 2004 for competency proceedings
15. Preliminary neuropsychological report by Jack Randall Price, Ph.D., June 20, 2005
16. Neuropsychological report and raw data of Jack Randall Price Ph.D., July 1, 2005
17. Psychological report of Jeff Mitchell, M.D., June 30, 2005

18. Psychological report Bradley D. Grinage, M.D., June 24, 2005
19. Audio and transcript of interview with Edward Leon Fields by Jeffery Mitchell M.D., June 15, 2005
20. Audio and transcript of interview with Edward Leon Fields by Randall Price Ph.D., June 28, 2005
21. Competency hearing transcript of Curtis Todd Grundy, Ph.D., July 28, 2003
22. Grand Jury testimony transcripts of Carol Lamb, Daniel Pressley and Dawn Michelle Tipton, July 30, 2003
23. Trial testimony transcript of Bradley D. Grinage, M.D., July 19, 2005
24. Trial testimony transcript of George W. Woods, J.R. M.D., July 20, 2005
25. Trial testimony transcript of J. Randall Price, Ph.D., July 20-21, 2005
26. Trial testimony transcript of Jeff Mitchell, M.D., July 21, 2005
27. Trial testimony transcript of Teresa Fields, July 19, 2005
28. Trial testimony transcript of Terry Hanna, July 20, 2005
29. Trial testimony transcript of Marilyn Presley, July 18 and July 20, 2005
30. Trial testimony transcript of Pamela Albert, July 18, 2005
31. Trial testimony transcript of Daniel Presley, July 15, 2005
32. Trial testimony transcript of David Love, July 18, 2005
33. Trial testimony transcript of Dawn Michelle Bond (Tipton), July 18, 2005
34. Trial testimony transcript of Jerrie Lynn Mathews, July 15, 2005
35. Trial testimony transcript of Jovanna Fields, July 19, 2005
36. Trial testimony transcript of Amanda Fields, July 20, 2005
37. Trial testimony transcript of Berry Vaughn, July 18, 2005
38. Trial testimony transcript of Carol Lamb, July 15, 2005
39. Trial testimony transcript of Brenda Lee Stacy, July 15, 2005
40. Trial testimony transcript of Cherie Fields, July 19, 2005
41. Trial testimony transcript of Curtis Elmore, July 18, 2005
42. Presentence report, September 30, 2005
43. Edward Leon Fields's FBI interview and handwritten confession, July 18, 2003
44. Crime investigation documents from Oklahoma State Bureau of Investigation, Federal Bureau of Investigation, Forest Service, and Leflore County Sheriff's Office
45. Transcripts of recorded telephone calls between Edward Leon Fields and Dawn Michelle Tipton, July 21 – September 30, 2003
46. FBI Interview of Marilyn K. Pressley, by SA Gary W. Graff, July 25, 2003
47. OSBI Interview of Carl Wise, by Agent Donnie Long, July 20, 2003
48. OSBI Interview of Max Hendrix, by Agent Donnie Long, July 11, 2003
49. FBI Interview of Charles Thomas Miliara, by SA Gary W. Graff, July 23, 2003
50. FBI Interview of Ronald Edward, by SA Gary W. Graff, July 23, 2003
51. FBI Interview of Carolyn Curry, by SA Gary W. Graff, July 23, 2003
52. FBI Interview of Billy Joe Wallis, by SA Gary W. Graff, July 23, 2003
53. FBI Interview of Donald Curry, by SA Gary W. Graff, July 23, 2003

54. USFS Interview of Brenda Stacy, by SA James Alford, July 28, 2003
55. USFS Interview of Buddy Lynn Burleson, by SA James Alford, July 28, 2003
56. USFS Interview of David Love, by SA James Alford, July 28, 2003
57. USFS Interview of Andrea White, by SA James Alford, July 28, 2003
58. USFS Interview of Marla Dodd, by SA James Alford, July 23, 2003
59. USFS Interview of Janice Wright, by SA James Alford, July 24, 2003
60. USFS Interview of Charles Gossow, by SA James Alford, July 24, 2003
61. USFS Interview of Carole Sakura Lamb, by SA James Alford, July 18, 2003
62. USFS Interview of Jason Janway, by SA James Alford, July 23, 2003
63. USFS Interview of Alice Naylor, by SA James Alford, July 23, 2003
64. USFS Interview of Donald Allison, by SA James Alford, July 23, 2003
65. USFS Interview of Dave Meyer, by SA James Alford, July 23, 2003
66. USFS Interview of Robert O. White, by SA James Alford, July 24, 2003
67. USFS Interview of Betty Vaughn, by SA James Alford, July 23, 2003
68. USFS Interview of Arlene Snyder, by SA James Alford, July 23, 2003
69. FBI Interview of Debra Garcia, by SA Gary W. Graff, July 23, 2003
70. FBI Interview of Debbie Garcia, by SA Andrew D. Farrell, August 21, 2003
71. FBI Interview of Michael William Grey, by SA Andrew D. Farrell, August 22, 2003
72. FBI Interview of Paul Burnett, by SA Andrew D. Farrell, August 26, 2003
73. FBI Interview of Audrey Tom Linson, by SA Andrew D. Farrell, August 22, 2003
74. FBI Interview of Mattie Kirkham, by SA Andrew D. Farrell, August 26, 2003
75. FBI Interview of Charles Watkins, by SA Andrew D. Farrell, August 20, 2003
76. FBI Interview of Terri Vester, by SA Andrew D. Farrell, August 20, 2003
77. FBI Interview of Donald Dingler, by SA Andrew D. Farrell, August 15, 2003
78. FBI Interview of James Gregory Dean, by SA Andrew D. Farrell, August 15, 2003
79. USFS Interview of Sherry Sue McCullough, by SA James Alford, September 8, 2003
80. USFS Interview of Jerrie Lyn Matthews, by SA James Alford, September 4, 2003
81. USFS Interview of Elizabeth Annette Wilson, by SA James Alford, September 4, 2003
82. USFS Interview of Judy Janway, by SA James Alford, September 4, 2003
83. FBI Interview of Deborah Bailey, by SA Orlando Quant, September 9, 2003
84. FBI Interview of Helen Walker, by SA Orlando Quant, September 8, 2003
85. FBI Interview and computer search warrant of Mary Margaret Fields, by SA Gary W. Graff, September 31, 2003
86. FBI Interview of Jovonna Lea Fields, by SA Craig D. Cormier, September 9, 2003
87. FBI Interview of Ethel Gist, by SA Craig D. Cormier, September 9, 2003
88. FBI Interview of Paul D. Fields, by SA Craig D. Cormier, September 9, 2003

89. FBI Interview of James Richard White, by SA Craig D. Cormier, September 4, 2003
90. FBI Interview of Eleanor Elizabeth White, by SA Craig D. Cormier, September 4, 2003
91. FBI Interview of Kathy Fagrell, by SA Gary W. Graff, August 22, 2003
92. FBI Interview of Daniel Pressley, by SA Gary W. Graff, August 21, 2003
93. FBI Interview of Gayla Schlosser, by SA Gary W. Graff, August 22, 2003
94. FBI Interview of Rhiannon Nycole Meadows, by SA Daniel L. Reece, November 21, 2003
95. FBI Interview of Jemima Carol Hagan Meadows, by SA Daniel L. Reece, October 29, 2003
96. OSBI Transcript of Interview of Carole Sakura Lamb, October 16, 2003
97. OSBI Transcript of lnterview of Carl Gabriel Wise, October 20, 2003
98. FBI Interview of Teresa Fields, by Dale Fout, August 29, 2003
99. FBI Interview of Cadena Michele Sparks, by Dale Fout, August 29, 2003
100. FBI Interview of Rufus Allan Skeens, by Dale Fout, October 20, 2003
101. FBI Interview of John Rounds, by SA Gary W. Graff, October 2, 2003
102. FBI Interview of Jerry Alan Carter, by Jimmie D. Caudle, October 29, 2003
103. FBI Interview of Margaret Elliott, by SA Richard Whisenant, August 6, 2003
104. OSBI Interview of Gail Lynn Nichols, by Agent Donnie Long, September 5, 2003
105. OSBI Interview of Kenneth Dwayne Ritchie, by Agent Donnie Long, September 18, 2003
106. OSBI Interview of Elaine Calhoun, by Agent Donnie Long, September 18, 2003
107. OSBI Interview of Margaret Fields's CPU, by Agent Donnie Long
108. FBI Interview of Michael Lloyd, by SA Gary W. Graff, January 30, 2004
109. OSBI Interview of David Love, by Agent Donnie Long, September 30, 2003
110. USFS Interview of Becky Steelman, by SA James Alford, March 16, 2004
111. FBI Interview of Cherie Fields, by SA Gary W. Graff, September 4, 2004
112. FBI Interview of Karen Hall, by SA Gary W. Graff, October 4, 2004
113. FBI Interview of Dean N. Anderson, by SA Gary W. Graff, October 21, 2004
114. FBI Interview of Denise Chitwood, by SA Gary W. Graff, November 8, 2004
115. FBI Interview of Angela Wade, by SA Andrew D. Farrell, September 11, 2003
116. USFS Interview of Tony Lee Mayrant, by SA James Alford, December 22, 2003
117. USFS Interview of Alicia Herell, by SA James Alford, January 16, 2004
118. USFS Interview of store employees where Edward Leon Fields made purchases by Officer Paul Jolivette, August 27, 2003
119. Interview of Edward Fields by Glori J. Shettles, August 18, 19 and 25, 2003
120. Interview of Mildred "Pat" Ginniman by Glori J. Shettles, August 23, 2003
121. Interview of Dorothy Sapp by Glori J. Shettles, August 23 and 24, 2003
122. Interview of Ethel Gist by Glori J. Shettles, April 22, 2004
123. Interview of Karen Hall by Glori J. Shettles, April 22, 2004

124. Interview of Betty Davis by Glori J. Shettles, August 25, 2003
125. Interview of Retha Fenn by Glori J. Shettles, August 24, 2003
126. Interview of Jay Fields by Glori J. Shettles, August 24, 2003
127. Interview of Debra Bailey by Glori J. Shettles, September 3, 2003
128. Criminal and Mental Health Information of Rocky Hines by Glori J. Shettles, May 26, 2004
129. Interview of Welton Hines by Glori J. Shettles, May 4, 2004
130. Interview of Teresa and Amanda Fields by Glori J. Shettles, May 12, 2004
131. Interview of Jackie Sharon Koehne by Glori J. Shettles, December 19, 2003
132. Interview of Betty Owens by Glori J. Shettles, August 20, 2003
133. Interview of Cherie Fields by Glori J. Shettles, May 12, 2004
134. Interview of Elizabeth Wilson by Glori J. Shettles, August 31, 2004
135. Interview of Ethel Gist by Glori J. Shettles, August 20, 2003
136. Interview of Rhiannon Meadows by Glori J. Shettles, August 29, 2003
137. Interview of Cherie Fields by Glori J. Shettles, August 28, 2003
138. Interview Teresa Fields, Amanda Fields, and Andy Fields by Glori J. Shettles, August 27, 2003
139. Correspondence from Edward Fields to Glori J. Shettles, January 19, 2004
140. Mitigation Timeline by Glori J. Shettles, September 5, 2003
141. Interview of Paul and Jovanna Fields by Glori J. Shettles, August 24, 2003
142. Telephone Interview of Sharon Koehne by Glori J. Shettles, May 23, 2005
143. Telephone Interview of Mary Sizemore by Glori J. Shettles, May 10, 2004
144. Interview of Erline Butcher by Glori J. Shettles, May 13, 2004
145. Interview of Kathy Fagrell by Glori J. Shettles, April 22, 2004
146. Interview of David Love by Glori J. Shettles, April 22, 2004
147. Interview of Gayla Schlosser by Glori J. Shettles, April 22, 2004
148. Interview of Roberta Jasin by Glori J. Shettles, April 29, 2004
149. Telephone Interview of Frances Blankenship by Glori J. Shettles, April 7, 2004
150. Interview of Michelle Tipton by Glori J. Shettles, April 21, 2003
151. Interview of Carol "Tootie" Lamb by Glori J. Shettles, August 21, 2003
152. Interview of Tony and Pat Mayramt by Glori J. Shettles, April 21, 2004
153. Interview of Judy Janway by Glori J. Shettles, April 22, 2004
154. Interview of Michael Lloyd by Glori J. Shettles, April 22, 2004
155. Telephone Interview of Kenneth Ritchie by Glori J. Shettles, April 23, 2004
156. Telephone Interview of Gail Nichols by Glori J. Shettles, April 23, 2004
157. Interview of Sherry McCullough by Glori J. Shettles, April 21, 2004
158. Interview of Andrea White by Glori J. Shettles, April 20, 2004
159. Telephone Interview of Father Matt Rowgh by Glori J. Shettles, December 17, 2003
160. Telephone Interview of Mary Elston by Glori J. Shettles, December 17, 2003
161. Telephone Interview Dr. Mina Patel by Glori J. Shettles, February 11, 2004
162. Follow-Up Interview of Edward Elston by Glori J. Shettles, January 5, 2004

163. Response from Dr. Mina Patel to Glori J. Shettles, January 19, 2004
164. Correspondence from Edward Fields to Glori J. Shettles, January 19, 2004
165. Interview of Jerry Carter by Glori J. Shettles, April 24, 2004
166. Interview of Denise Chitwood by Glori J. Shettles, August 22, 2003
167. Interview of Michelle Tipton by Glori J Shettles, August 21, 2003
168. Telephone Conversations with Margaret Fields by Glori J. Shettles, September 12, 2003
169. Interview of Margaret Fields by Glori J. Shettles, August 26, 2003 and August 27, 2003
170. Interview of Carol Hagan by Glori J. Shettles, August 26, 2003
171. Interview of Danny Presley and Marilyn Presley by Glori J. Shettles, August 20, 2003
172. Telephone Interview of Helen Walker by Glori J. Shettles, September 2, 2003
173. Handwritten defense interview notes of Teresa Fields and Edward Leon Fields, July 2003 – August 2005
174. Minaben D. Patel, M.D. psychological treatment records of Mary Margaret Fields
175. Neuropsychological Evaluation of Mary Margaret Fields by Dale Jeffus, Ph.D., September 24, 2001
176. Mercy Behavioral Outpatient Services Counseling Center records of Mary Margaret Fields
177. Cooper Clinic medical records of Mary Margaret Fields
178. Chris Hardin, M.D. treatment records of Mary Margaret Fields
179. Center for Psychiatry records of Mary Margaret Fields
180. Medical Plaza medical records of Mildred Holt
181. Sparks Medical Foundation records of Edward Fields Sr.
182. Oklahoma State Reformatory records of Edward Fields Sr.
183. Blue Ridge Medical Specialists medical records of Teresa Fields
184. Family photographs of Edward Leon Fields
185. Edward Leon Fields's personal calendar with handwritten notes, April, 2003
186. Change of Plea hearing transcript, June 30, 2005
187. Drawings by Edward Leon Fields
188. Personal Correspondence of Edward Leon Fields (undated)
189. Newborn medical records
190. Birth Certificate
191. Baptism Certificate
192. St. Francis de Sales School records
193. Minaben D. Patel, M.D. psychological treatment records
194. Richlands High School records and yearbook photographs
195. Humana Hospital Clinch Valley records
196. Southwest Virginia Community College transcript
197. General Educational Development Tests Results
198. Navy personnel records

199. Journal entries from service in the Navy
200. Oklahoma Department of Corrections employment records
201. Wakenhunt employment records
202. The Employment Group records
203. Bremner-Wortz employment records
204. Kenco Plastics employment records
205. Child Support Enforcement records
206. Heavener Medical Clinic records
207. Leflore County Medical Center records
208. Humana Hospital records
209. Medical Plaza records of Mike Kemp, M.D.
210. Stigler Police Department incident report re: stalking Dawn Michelle Tipton, March 31 - June 11, 2003
211. Handwritten statement of Dawn Michelle Tipton, June 10, 2003
212. Handwritten statements of Morgan Hope, June 10 and 11, 2003
213. Muskogee County Jail records
214. Muskogee County Jail incident report re: suicide attempt
215. Tulsa Jail medical records
216. Terre Haute Bureau of Prison central file
217. Terre Haute Bureau of Prison medical records
218. Terre Haute Bureau of Prison mental health records
219. Terre Haute Bureau of Prison email correspondence records of Edward Leon Fields
220. Susan Koslow, M.D. neurological report and brain scan images, November 3, 2011
221. Interview and neuropsychological evaluation of Edward Leon Fields, July 31-August 2, 2013
222. Discussion with Jerry Carter on September 25, 2013
223. Discussion with Roberta Jasin on September 27, 2013
224. Discussion with Debra Bailey on September 27, 2013
225. Discussion with Gail Nichols on October 3, 2013
226. Discussion with Daniel Presley on October 10, 2013


**THE OFFENSE**

According to Mr. Fields's account, he noticed Charles and Shirley Chick at the Winding Stair Campground around July 8, 2003. He returned on the evening of July 10, 2003, with a ghillie suit and a rifle.

Mr. Fields reported that he located the Chicks and hid near their campsite as it grew dark. He stated that he heard Mr. Chick tell Mrs. Chick that he was going to the tent, at which

point Mr. Fields shot him in the face. When Mrs. Chick began running toward their vehicle, Mr. Fields shot her in the foot and the side of the head. Mr. Fields then approached the site and shot Mrs. Chick once more in the back of the head, and shot Mr. Chick once more in the head.

Mr. Fields then proceeded to rob the Chicks of their cash, credit cards, and other personal belongings.

Mr. and Mrs. Chick died as a result of their wounds.

Evidence indicated that Fields then left the campsite and only returned hours later, when he broke the driver's window of the van and stole some items.

After being apprehended, Mr. Fields's account changed over successive interviews with law enforcement. He initially denied involvement. However, later in that interview he provided a written statement with some self-incriminating admissions, which noted:

> Just before dark, I observed the Chicks at the vista, approximately 75 yards from their camp sight I dressed myself in a gilly (sic) suit, and with a 22 caliber rifle, crept up close to their campsight (sic) and waited for them to return. I had been short of money all week and intended to rob the Chicks. The main reason I was short of money was because of child support payments I have to pay. My intent was to rob the Chicks at gunpoint, tie them up, and leave…

> I shot Charles Chick with one shot to the head. I then shot at Shirley Chick a couple of times. I followed Shirley Chick to the van and shot her twice in the head. I then returned to Charles Chick and shot him once in the head. I removed $40.00 cash from Charles' pants pocket. I returned to my truck, a blue Chevrolet, parked about 75 yards away and brought my truck over to the Chicks campsight. I broke the drivers [sic] side window out of the Chick's van using a rock. I removed from the Chicks van two back packs, a camera with a long lense [sic], a mini television, Charles Chicks wallet, a battery charger, 2 mini flashlights, and a radar detector. One mini flashlight, the camera, the mini television, and the radar detector remain in my truck at the present time. I disposed of one of the back packs which included the battery charger at Kerr Lake. I disposed of the other back pack which contained Charles Chicks wallet, Shirley Chick's purse, and a rock in Lake Wister. I recovered 300.00 from Shirley Chicks purse before I disposed of it. Both Charles and Shirley Chick were dead when I left their campsight the evening of July 10th. After leaving the Chicks campsight, I returned to my campsight located near Lake

> Wister. Between the hours of 7 and 8 am on Friday, July 11th, I purchased gasoline at the Walmart in Poteau using Charles Chicks credit card. During the week prior July 10th, I have been very depressed, I have felt suicidal, I have had no money, and I felt desperate.

Blood evidence from government testing indicates that Charles Chick was not pulled to the ground for perhaps six hours after he was shot. In addition, Mr. Fields was observed in Poteau, Oklahoma at 11 PM the same night. Mr. Fields likely returned to the crime scene to rob the Chicks' belongings considerably later than the sequence of his statement.

## ESTABLISHED PERTINENT BACKGROUND

### *Developmental History*

Mr. Fields was born in Oklahoma City on May 15, 1967, to Margaret and Edward Leon Fields, Sr. His mother Margaret recalls the examinee to have been born three weeks premature, with hyaline membrane disease. This respiratory condition, which impedes the ability to adequately breathe, necessitated Edward's hospitalization for the first nine days after his birth. According to his mother, his infancy was otherwise normal. In interviews, both Margaret Fields and his sister Cherie Fields described Mr. Fields as being very "hyper" throughout childhood.

His father, Edward Sr., reportedly was a superintendent for coal mines. While Mr. Fields was growing up, he relates, the family moved around "between Oklahoma, Utah, West Virginia, and Virginia" to accommodate his father's job.

Due to his father's work schedule, Mr. Fields's mother was primarily responsible for raising him. The examinee has one sibling, his sister Cherie Fields, who is 18 months older. The home in which they grew up was socioeconomically middle class, and Mr. Fields relates that the parents met the family's material needs.

The examinee remembers his childhood as "decent," and he denies any abuse. On one occasion when he was older, his father hit him during a verbal exchange following the examinee coming home with a hangover.

Mr. Fields does not have a history of running away from home as a child; however, when he was in high school he would reportedly take supplies, his gun, and his dog and camp in the woods by himself for up to a week. He reports that his parents were initially distressed by this but later accepted it.

Mr. Fields acknowledged a childhood history of cruelty to animals, stating, "I'd kick them, slap them." However, he later had a pet dog from which he states that he was "inseparable." Mr. Fields reported involvement only in two physical fights in his life, one in high school and the other while incarcerated in Oklahoma.

In interviews with both the mitigation investigator and the Forest Service investigators, Mr. Fields's cousin Judy Janway recalled the examinee hanged a cat when he was four years old. Ms. Janway also told the mitigation specialist that her former father-in-law did not want her children to spend time with the young Mr. Fields.

According to his mother, the examinee would also intimidate her through various techniques. For example, when he became angry, Mr. Fields would beat his bedroom wall with chains. At age 16, he set up the family guns in his bedroom, all standing up against his bed. Mrs. Fields experienced this as an effort to intimidate her.

Cherie also described intimidation by her brother, enough that she would lock herself in the bathroom to escape him. She recounts that on one occasion he punched a hole in the locked bathroom door. Her mother disclosed her fears of Edward, acknowledged Cherie.

If Edward was asked to mow the yard, according to Margaret and Cherie Fields, he would tear up the lawnmower so that it would not work, thereby avoiding having to mow the yard. Mrs. Fields experienced her son as lazy; he did not like to work, was sloppy and dirty, and did not pick up after himself. The examinee's mother described these qualities to persist from his earliest years.

When Mr. Fields was approximately 16 years old, he moved in with Patsy Hatfield, a woman in her 30's. His mother, Margaret Fields, later recounted him to have been away for approximately three weeks. Mrs. Fields remembers this event to be a catalyst for guiding him to the Navy in the hopes that the military might "straighten Edward out."

Relations within the family would be strained even in his adult years. Cherie characterized Edward as given to negativity in conversations; Margaret Fields recalled the examinee to predictably become argumentative with someone or otherwise maintain himself quietly, away from the others, angry about one thing or another.

According to his sister, Mr. Fields could be charming on one hand and very uncaring, emotionless, self-centered and unsociable on the other. His mother depicted contrasts in his manner of both charming and hateful. Adding to this, former coworker Michael Lloyd remembered him to have a personality that was "nice and pleasant," or "rude and obnoxious," depending on his mood.

Cherie recounted an additional strain to be her brother's penchant for shirking financial responsibility. In a mitigation interview she described her exasperation with how he would attempt to coax money from her:

> Eddie would *"call three times"* before he actually asked her for money…. Cherie said he would call and chit chat for the first two times, then ask for the money on the third call.

On one occasion which led to an argument, Cherie recounted to defense investigators how Edward brought his children, Amanda and Andy, to her home. According to Cherie, she had already told the examinee she was not in a position to lend him the money he requested; he made remarks about her in front of the children, which she did not appreciate. She indicates that she experienced him as being manipulative by bringing the children with him.

## *Education*

Academic records document lackluster school performance. In grade school, Edward Fields earned the following grades:

| Grade | Final Average |
|---|---|
| 2 | S |
| 3 | C |
| 4 | C+ |
| 5 | C- |
| 6 | C |

In high school his grades were also lackluster, with his performance declining in 11th grade:

| Final Grades in Academic Subjects | Grade 7 | Grade 8 | Grade 9 | Grade 10 | Grade 11 |
|---|---|---|---|---|---|
| A | | | | 1 | |
| B | | | 1 | 1 | |
| C | 3 | 3 | 3 | 1 | |
| D | 1 | 1 | | | 3 |
| E | | | | 1 | 1 |

His scores on standardized testing clustered in the average range, with a pronounced strength noted in 1980 and 1984 on science:

| STS | 1976 Stanines[2] |
|---|---|
| Nonverbal | 2 |
| Verbal | 4 |
| Reading | 5 |
| English | 4 |
| Math | 4 |
| Battery Composite | 4 |
| Total Ability | 3 |
| Basic Skills | 5 |

| "Other Press Score Labels" | 1978 Percentiles |
|---|---|
| Reading Total | 54 |
| Language Total | 36 |
| Arith/Math Total | 37 |
| Total Battery | 40 |

| Comprehensive Tests of Basic Skills | 1979 Percentiles |
|---|---|
| Reading Total | 69 |
| Language Total | 31 |
| Arith/Math Total | 48 |
| Total Basis Skills | 48 |
| Reference Skills | 35 |
| Science | 55 |
| Social Studies | 68 |

| Cognitive Abilities Test | 1979 Percentiles |
|---|---|
| Verbal | 53 |
| Nonverbal | 35 |

| SRA Assessment Survey | 1980 Percentile | 1984 Percentile |
|---|---|---|
| Reading | 75 | 65 |
| Language Arts | 26 | 31 |
| Mathematics | 61 | 47 |
| Comprehension | | 45 |
| Social Studies | 44 | |
| Science | 91 | 96 |
| Sources | 36 | |

| PSAT | 1983 Percentile |
|---|---|
| Verbal | 57 |
| Math | 3 |

---

[2] Stanines (standard nines) are method of reporting test scores on a nine-point scale with a mean of 5 and a standard deviation of 2.

Margaret Fields, of her son's school performance, observed him to often appear "bored" with his classes and seemed a little advanced of his peers. She recalled him to do better in classes which were more challenging, and that he displayed impressive drawing abilities, especially with charcoal.

During his elementary school years, the examinee had "a few minor disciplinary problems at school," recalls Mrs. Fields. In the 11th grade, according to his mother, Edward was suspended for two weeks for "making out" in the hallway. He states that he would "sometimes" skip school to be intimate with a girl. He was also reportedly suspended "for writing a letter to his cousin during English class."

Mr. Fields was never diagnosed with a learning disability or attention deficit disorder. Special services were limited to "remedial math and remedial reading" in 3rd and 4th grade. Of his poor scholastics, Mr. Fields remarked, "I didn't care… the further I got in high school the more my grades dropped." The examinee ultimately left school during the 12th grade, explaining, "My parents decided that it would be better if I went to the Navy instead of finishing high school."

Mr. Fields passed the General Educational Development Tests (GED) on October 18, 1988, receiving the following scores:

| Test | Percentile Score |
| --- | --- |
| Writing Skills | 37 |
| Social Studies | 70 |
| Science | 82 |
| Literature & Arts | 63 |
| Mathematics | 44 |
| Battery Average | 63 |

Records from Southwest Virginia Community College indicate that Mr. Fields enrolled at that institution in 1985 and 1988, but did not receive any credits.

Mr. Fields has independently pursued his interests. While in the community, the examinee taught himself to fix computers (see below), to speak "quite a bit" of Japanese, and tackled scientific interests from general audience websites such as physics.com.

In custody, Mr. Fields is "trying to learn Klingon" with two other inmates. He is additionally learning sign language with another inmate so they can "communicate with each other across the hall."

## Employment

Mr. Fields enlisted in the U. S. Navy when he was 17 years old. His family, he notes, made this decision for him and made all of the arrangements. Explained Mr. Fields, "I was Shanghaied… it all happened so fast."

Mr. Fields was administered the Armed Forces Vocational Aptitude Battery (ASVAB), an aptitude test, resulting in the following scores:

| Subtest | Percentile Rank |
| --- | --- |
| General Science | 67 |
| Arithmetic Reasoning | 49 |
| Word Knowledge | 56 |
| Paragraph Comprehension | 54 |
| Numerical Operations | 57 |
| Coding Speed | 52 |
| Auto and Shop Information | 56 |
| Mathematics Knowledge | 48 |
| Mechanical Comprehension | 53 |
| Electronics Information | 49 |
| Verbal Expression | 56 |

The Armed Forces Qualification Test (AFQT) is a composite score derived from the ASVAB, which is used "as a gauge of general trainability in screening potential recruits."[3] Mr. Fields's score on this measure was at the 59%ile.

According to the available records, Mr. Fields enlisted in the U.S. Navy on September 26, 1984, and was first discharged on April 2, 1988. He re-enlisted from April 3, 1989, to September 30, 1990, and was honorably discharged from the U.S. Naval Reserve on September 27, 1992, and recommended for reenlistment. He served as Assault Boat Coxswain for 3 years 2 months, and he served as Navy Recruiter Canvasser for 1 year 3 months.

In enlistment documents from 1984, he denied ever being treated for a mental condition or ever having had "depression or excessive worry," "loss of memory or amnesia," "nervous trouble of any sort," or "periods of unconsciousness." He denied any substance abuse.

The examinee served on a ship for two years, which included a deployment to the Mediterranean. In the Navy, Mr. Fields was an "Assault Boat Coxswain." His duties

---

[3] Anastasi, A., & Urbina, S. (1997). *Psychological testing* (7th ed.). Upper Saddle River, NJ: Prentice-Hall.

involved supervising other sailors in "the watch section." He was involved in an action against Libya, cruising 20 miles off the coast during a dispute about the boundary of territorial waters. He was never involved in actual combat.

After leaving the Navy the first time, Mr. Fields did "construction work," working with a partner who bought burnt-out houses from insurance companies and remodeled them. He would also build "houses from scratch." Initially earning about twice the minimum wage, Mr. Fields states that he worked with his partner "off and on for about 12 years."

In the late 1980's Mr. Fields returned to active Navy duty as a recruiter. He and Teresa were living in Roanoke, Virginia.

While serving as a recruiter Mr. Fields was "the computer guy," downloading information gathered on potential recruits. He explained, "…nobody else knew how to use the computer." Mr. Fields did not like other recruiting duties, explaining, "I'm too bashful to just get on the phone and start talking to somebody I don't know." He added, "It sucked."

Mr. Fields was "offered orders" to go to Scotland. He declined this opportunity, as his wife, being pregnant, would have been unable to accompany him.

Mr. Fields left active duty in about 1990. His pay grade at discharge was E-5, which is "a non-commissioned officer," roughly equivalent to a sergeant. He departed the Navy with no disciplinary issues. Moreover, there were no medical leave periods or adjustments in his responsibilities due to psychiatric issues.

According to testimony at trial, Teresa and Edward Fields married in 1987. Mr. Fields related in our interview that although he was happy in the Navy, at Teresa's urging he left active service at the end of his enlistment and joined the Reserves for the remainder of his eight year commitment. He was honorably discharged and did not have any disciplinary issues in the Navy.

In her trial testimony, Teresa Fields offered a different account of Mr. Fields's decision to leave the Navy, observing that it was part of his pattern of capriciousness in employment:

> Q: You thought he was going the make a career of it?
> A: Yes.
> Q: How did you find out he wasn't going to make a career of it?
> A: He just came home and told me he wasn't going to reenlist. He just -- you know, told me he wanted out.
> Q: Did he like his Navy service?
> A: He seemed to.

Q: Did he tell you why he wanted to get out?
A: He really couldn't explain it to me.
Q: That caused some friction with you, didn't it?
A: Oh, yeah. I was upset because we had babies and I wanted stability.

As mentioned, Mr. Fields did not have any disciplinary issues in the Navy, and his personnel records contain no disparaging statements. To the contrary, he received good performance evaluations, both as a seaman and as a recruiter. A performance evaluation dated March 31, 1989 states:

– BM2 Fields is skilled in the seamanship duties for small boat operations.
– His positive attitude contributes to the morale of his co-workers
– BM2 Fields completes his assigned tasks with pride and minimal supervision.
– He wears his uniform in a proud and proper military manner.
– BM2 Fields has a good working knowledge of the Boatswainmate rating.
– BM2 Fields is highly recommended for retention in the Naval Reserve and advancement to BM1.

Regarding his performance as a recruiter, a March 31, 1990 document states:

Petty Officer Fields is an energetic, determined recruiter, who with additional training and experience can become an outstanding recruiter. For most of this reporting period he served as a Veteran recruiter, and recently transferred to First Enlistment recruiting where he has shown great improvement and natural ability. His specific accomplishments during this reporting period include:

- ACHIEVED 100% OF ASSIGNED GOAL IN HIS FIRST MONTH IN FIRST ENLISTMENT RECRUITING
- EARNED TWO COMNAVRESFOR [sic] HARD CHARGER AWARDS FOR OCTOBER AND DECEMBER 89
- SIGNIFICANTLY ASSISTED THE ADMINISTRATION OF THE ZONE THROUGH HIS ASSISTANCE AS THE PRIMARY COMPUTER OPERATOR IN THE AREA

Petty Officer Fields demonstrates an excellent oral and written command of the English language, and he fully supports the Navy's Equal Opportunity Programs. He presents an excellent appearance in uniform. Petty Officer Fields is highly

      recommended for advancement and continuation in the Naval Reserve Canvasser Recruiter Program. [upper case in original]

After leaving the Navy for the second time, Mr. Fields completed "truck driving school." He worked for about a year as a long-haul driver. He states his family did not like him working in this position due to his absences from home.

Mr. Fields then worked at "fast-food joints." He quit a job at Wendy's after his sister bought the restaurant franchise; he did not wish to work for her.

Mr. Fields was divorced at this time with child support obligations and only working part-time. He was supported by "a sugar mama."

Mr. Fields did not work for long in fast foods. He reportedly went to work "as a security guard" for about two years while still in Virginia and then moved back to Oklahoma, where he worked in a "chicken factory." Later, he reportedly supervised 15 employees on a sanitation crew.

On "July 14," as he correctly recalls, of 1995, Mr. Fields became an officer with the Oklahoma Department of Corrections.

He performed the duties of a Correctional Officer and Food Service Supervisor.

According to a probationary evaluation done on February 2, 1996, Mr. Fields was "eager to learn…asks if other tasks need to be done. Works very well with assigned CO Knows and follows (illegible) orders." An evaluation dated December 31, 1996, described him as meeting standards overall, but needing more training in communication and supervisory skills.

Mr. Fields was promoted to corporal in 1997.

A December 23, 1998, evaluation noted that Mr. Fields met standards, but needed to be more "dependable/committed to task," as well as having a "slite [sic] problem deal with inmates," and to "need maturity + experience."

The available records contain conflicting accounts of Mr. Fields's dealings with the inmates under his control. Jerry Carter, who worked with Mr. Fields at DOC and became friends with him, was a supervisor to whom officers submitted offense reports. Mr. Carter stated that he never witnessed the examinee to be abusing his power nor "target" an inmate for any particular reason. When I spoke with Mr. Carter, he described Mr. Fields as "a normal, average officer."

Others described Mr. Fields as having contentious relationship with inmates. According to a mitigation interview of his wife, Teresa Fields, Mr. Fields "spoke of his contempt for the offenders and the crimes they had committed after reading their files. She said he had a great deal of hostility toward them, and he reported to her that he teased and taunted the inmates".

Mr. Fields resigned from the Oklahoma DOC on September 30, 1999. As he explained,

> It was all just a pain in the neck. They got a new director – deputy warden and she was making things rough on everybody… And I got tired of it and I got a job interview at – at Wortz Crackers.

According to employment records, on October 25, 1999 Mr. Fields was hired as a "Shift Packer/Case Up" at Bremner-Wortz.

In our discussion, Mr. Carter told me that Mr. Fields actually left the DOC in order to work at better pay for a company that installed fiber optic cable. Mr. Fields was reportedly shortly thereafter terminated from that job, relates Mr. Carter, due to a mistake made by a co-worker.

In an October 19, 2000, Bremner-Wortz training evaluation, Mr. Fields's supervisor wrote, "Ed shows enthusiasm toward his job and rarely has a frown, but sometimes has mood swings as described by co-workers." His overall rating was 3.8 out of 5. A November 20, 2000, evaluation indicated that Mr. Fields needed to be "more of a team player. Need to accept constructive Criticism from supervisors and from all distribution – associate." His overall rating increased to 4.

I spoke with Gail Nichols, who managed the department in which Mr. Fields worked at Wortz. Ms. Nichols described Mr. Fields as

> "…just a different sort. He always seemed very, very intelligent… Seemed to be very well read. He knew a lot about computers, those type of things. He always liked to get into conversations with people about a multitude of different subjects."

Ms. Nichols described Mr. Fields as "quirky." Mr. Fields would reportedly embellish the comments section of shipping documents with mathematical equations and quotes from Chinese philosophers, such as Lau Tzu. However, Ms. Fields was not aware of him having any specific mental health issues. She has no recollection of his mood state and was not aware of him having any issues with drug or alcohol abuse. She was not aware of him ever becoming violent or getting angry, although she experienced him as argumentative.

Ms. Nichols, who has supervised numerous employees over 22 years with the company, described Mr. Fields as having strained relationships with coworkers, conveying an attitude of mental superiority and the feeling that other employees were somehow beneath him, and that "he was basically too good, or too smart, to do the job that he was doing." Ms. Nichols found him to be:

> "A little unsettling. I always felt a little uncomfortable with him… you just meet some people and you feel like something's not right… And then of course, as things added up – the gun incident, and – and I'm not even – there was other things that led up to me feeling unsettled."

On June 27, 2001, Mr. Fields violated Wortz company policy by leaving the premises during his break. He was given a "final warning" and suspended for three days. The examinee was terminated on July 17, 2001, for a violation of the company's weapons policy. According to a memo from Ms. Nichols one interviewed co-worker, Billy Martindale, detailed:

> Ed Fields, Jr. had a bomb thing but didn't have it fixed to go off…the pipe was about a 12 inch long metal pipe like a plumbing pipe… something was screwed on the ends, to close the end of the pipe off. The pipe had some wires and something like an egg timer hooked to it. Ed told Billy that it didn't have any type of explosives in it. When I asked Billy where and when he saw the device Billy said he had gone out to get the yard dog one day the first part of last week and Ed called him over to show it to him. The device was in Ed's truck and Ed took it out to show it to Billy. Ed told Billy he was going to take it out on his boat and toss it out to kill fish.
>
> When I asked Billy if he knew of any other instances involving Ed Fields, Jr he said yes. A couple of months ago Larry Hamby, Justin Crase and himself were out in the shipping parking lot and Ed pulled a .22 cal rifle out of a gun case in Ed's truck. Billy said Ed wanted to show them the new scope on his gun.

Ms. Nichols stated that Mr. Fields was also suspected of unauthorized access to company computers, although this was never proven.

After Wortz, according to Mr. Fields, he worked part-time jobs through a temporary service, in addition to helping take care of his ailing parents and their farm (see below).

Mr. Fields was then hired by Kenco Plastics, where he worked until the time of his arrest.

Government interviews with Kenco employees noted Mr. Fields as having a strained relationship with coworkers, at least in part due to his demeaning statements about women. He was variously labeled "creepy," "odd," "weird," and a "low life skank." However, his supervisor, Robert Shankle, described him as getting along well with his co-workers.

Coworker Arlene Snyder, interviewed by the U.S. Forest Service, stated that she "tried to stay away from him at work because he was creepy and the way he stared at her made her feel violated." The examinee would reportedly say "he wanted her," "he liked her body," and "you have a hot body" to her and other people.

In our interview, Mr. Fields told me that as a "sideline," he repaired and installed computers and designed web pages for about four years, at one point working for David Love. Mr. Fields explained that in addition to what he learned from Mr. Love, "I learned a lot of it online" and from a book. Mr. Love referred to the examinee's "natural talent" for computers, particularly software.

Mr. Fields "enjoyed the challenge" of this work, such as diagnosing problems. He reportedly wrote a computer program to enhance use of eBay transactions and another one to "buy [and] to sell computers online." He described a high level of proficiency. For example, using an early version of Windows:

> EF: I made my computer talk to me.
> JS: How so?
> EF: Just when I logged on it would say, hello, master. Good to see you back.
> JS: Okay.
> EF: And then as I did things it would – I programmed it to talk to me at that point.

It was "exhilarating" when one of his programs worked as expected. He reportedly taught himself C++, and successfully wrote programs in that language. On his 1999 application to Bremner-Wortz he listed his computer skills:

> Windows 3.1, 95, 98. Novell Netware H.1+5, Lynix [sic] Red hat 6.0, Word Perfect, Word Office. Perl Progaming [sic], HTML, JAVA   Able to Build and Service Local Area Network.

Various collateral sources confirmed Mr. Fields's computer acuity. In our conversation, Mr. Carter recalls,

> "He was able to take a large, thick book and start building web pages out of that just by reading the book. He bought a very cheap computer – a couple hundred

> dollar computer that my friend had built him. And he just started from there…Ed
> would have been a person that, in my opinion, he could have went to Google in
> California and he could have picked up and – and – and – and worked on it. He
> could have walked right in and worked in that place."

I spoke with Mr. Fields's coworker and friend Dan Presley. Mr. Presley described the
examinee's computer skills as "fantastic," and as him being "smart," able to figure things
out not just for computers but for other mechanical devices as well. He also described Mr.
Fields as a vocational underachiever:

> "He never came close to meeting his potential. In fact, I remember, I told him…
> 'if I had your gray matter upstairs, you know what I would be doing?' And he goes,
> 'What, driving a forklift like me?' I said, 'no. I'd be doing anything I wanted,
> anywhere I wanted to do it.' I said, 'Hell, you could go and take a test, like any
> entry exam for anything, and you can go ace it'."

Mr. Presley speculated that this may have been due to Mr. Fields being "afraid of failure."

His mother described Edward Fields as financially irresponsible. In approximately 1994,
Edward and Teresa were allowed to live in a home Margaret and her husband had
purchased for them without paying rent. Other than paying the electric and the telephone
bills, which he needed for his computer, Mr. Fields did not pay the other bills of the home,
but instead left them to Margaret Fields and her husband. Teresa related in a mitigation
interview that although the family was struggling financially, Mr. Fields bought expensive
fishing equipment and spent large sums of money for the computer.

Karen Hall characterized Mr. Fields, financially, as being chronically parasitic. She indicated
that Mr. Fields has depended on his parents and his grandmother over his entire life and
that, after the children were born, he would ask for money in terms of helping the children,
rather than himself, so his parents and grandmother would continue to give him money.

At the time of his arrest, the examinee was supplementing his income by about $800 to
$900 per month manufacturing and selling moonshine (see below) and by catching and
selling snakes.

Others continue to ask his advice about computers while in custody, including other
inmates and staff. He even received a call asking for computer advice while in the "suicide
cage" of county jail (see below). On July 31 he patiently responded to my request for some
computer advice, and he spontaneously followed-up on this issue the next day. He also
stated that he successfully helped one of his lawyers with "the same problem."

## Social/Relationship

Mr. Fields has three children. Daughter Rhiannon Meadows is his oldest, currently about 26. She was born out-of-wedlock to Jemima Carol Stubbs. The examinee has two children by his ex-wife: Amanda Fields, born in 1988, and Andy Fields, born in 1990. Mr. Fields maintains contact with Amanda and Andy.

After Jemima became pregnant, she notified Mr. Fields. He initially denied being the father of the child. She reportedly notified Mr. Fields of the birth of the baby while he was on a U. S. Navy ship. He wrote a letter back to her and said that he wanted to see the baby. Mr. Fields eventually came to visit her to see the baby – when she was five years old.

Teresa Fields related Edward to have been having adulterous relationships as early as when his daughter was age three and his son was one. Mr. Fields and Teresa divorced and eventually remarried.

Teresa relayed a history of verbal and physical abuse, including leaving bruises on her and their two children. She indicates this took place while the examinee was being treated for depression with Paxil in 1998-99, and that he would experience mood swings. Mr. Fields denies having been abusive.

In one mitigation interview, Teresa quietly acknowledged that Eddie had been physically abusive to her on more than one occasion, and held her head in water, while also strangling her. She did not speak about these events, specifically, but noted that the children had observed the abuse. Teresa was fearful that Eddie's abusive behavior would escalate.

According to the same interview, Mr. Fields maintained contact with Teresa after moving to Virginia, and on occasion made verbal threats to her.

In a mitigation interview Karen Hall, a cousin of Mr. Fields, observed that he became even more abusive towards Teresa after leaving his position with the Oklahoma Department of Corrections.

According to mitigation interviews with Teresa and the couple's children, the examinee was not affectionate toward the children and rarely talked with them.

Cherie Fields provided a similar account of Mr. Fields's parenting, telling a mitigation interviewer that she attempted to be active in the children's lives because she did not feel he was a good father or spent adequate time with his children. Cherie related that he did not exhibit a desire to be a part of his children's lives.

Mr. Fields was also irresponsible in his financial support for his children, and Teresa acknowledged she filed for delinquent support not long before the instant offense.

In her trial testimony, Teresa minimized the nature and extent of abuse. She testified that he choked her on one occasion, and that she had no recollection of telling the FBI that she or her children were bruised by Mr. Fields. She also testified that Mr. Fields would show tenderness towards his children.

Margaret Fields, in interviews with government investigators, recalled the marriage as "horrible." Mrs. Fields expressed that Teresa would instigate fights, but added that she believed Mr. Fields was physically and verbally abusive to his wife and their children.

Teresa Fields recalls her husband as "obsessed" with the computer after their remarriage. When Mr. Fields would get mad he would lock himself in his room and stay on the computer for long periods of time. Teresa stated that Edward would visit "sex sites" on the internet; would attempt to justify his long periods of internet activity as being work related. She stated that the pornography Edward viewed on the internet was mainly adult in nature, but she additionally indicated she had observed him viewing "animal pornography".

Mr. Fields would also reportedly leave the children unattended when he was supposed to be watching them.

Mr. Fields reportedly postponed his second divorce after Teresa was diagnosed with breast cancer so that she could remain on his insurance policy and get treatment. Teresa expressed gratitude for his encouragement and support during that period.

Co-worker Kathy Fagrell, however, indicated that during the period of time Fields worked at Bremner-Wortz, he showed a photograph of his wife, Teresa, to several people and made fun of the fact that Teresa had no hair due to her treatment. Ms. Fagrell found this behavior inappropriate.

Some collateral sources experienced Mr. Fields in warm and supportive terms. This is consistent with the loving capabilities noted by Teresa Fields to coexist with Mr. Fields's callousness.

I spoke with Debra Bailey, a paternal cousin of Mr. Fields's. She met Mr. Fields at a family reunion in the early 1980s and maintained contact with him "off and on over the years," primarily over the telephone. Ms. Bailey stated the family reunion was the only time she met Mr. Fields in person.

Although they only had one face-to-face contact, she described their relationship as being close, explaining that she trusted and confided in him regarding relationship and financial problems she was experiencing at the time.

Ms. Bailey described him as, "Very friendly… very silly… good-hearted guy… very warm and compassionate."

Jerry Carter described becoming good friends with Mr. Fields. According to Mr. Carter, they golfed, visited each other's homes, and he experienced nothing remarkable about the examinee.

Dan Presley also met Mr. Fields when they both worked for the Oklahoma Department of Corrections. They went on to become best friends, fishing, playing pool, "hanging out," snake hunting (which Mr. Presley introduced him to), and squirrel hunting.

Mr. Pressley's last contact with Mr. Fields was "several years" ago. Mr. Presley stated that he trusted Mr. Fields "100%" with both himself – being frequently in the woods with guns with Mr. Fields – and his family. He recounts that Mr. Fields would take Mr. Presley's ailing mother to the doctor, and then out to eat.

I asked Mr. Fields about other intimate relationships. He described two "people that were really close to me." Nita Dawn Hess "was an old girlfriend." Mr. Fields lamented, "I should have married her." Mr. Fields lived with Carlena Mitchell (Sparks) "for three years" in the early 1990s, and characterized her as his "sugar mama," paying for his first divorce from Teresa. Ms. Sparks later told government investigators, of their relationship, that Mr. Fields's spending habits were "extraordinary."

In addition to these relationships, Mr. Fields told me that he has had sex with many different women, "probably [in the] triple digits." He began engaging in sexual relations when he was 13 years old.

In the period leading up to the instant offence, Mr. Fields was dating four different women: Michelle Tipton, Carol Lamb, Brenda Stacy, and Penny Mitchell. His mother, Margaret, told investigators that she knew Mr. Fields to maintain as many as eight girlfriends at a time.

Mr. Presley described Mr. Fields's relationship with Michelle Tipton as "pulling at the heart strings and all that." The relationship with Ms. Tipton was contentious; at one point she obtained a restraining order against the examinee, accusing him of "stalking her."

She also testified that he was obsessed with their relationship, making "fifty phone calls a day, showing up at my home unannounced, sitting on my front porch waiting for me to get

home if I wasn't there. And since he lived an hour and a half away from me, I thought that was just a little odd."

Mr. Fields kept a calendar of Ms. Tipton's movements in his truck. She described a conversation in May 2003 when he threatened to kill himself if she did not let him move in with her.

Both Ms. Tipton and her daughter wrote a voluntary statement to the police dated June 10, 2003, describing a pattern of harassing and threatening behavior, including trying to unload his furniture at their house in an apparent attempt to move in. She wrote that Mr. Fields refused to stay away from her and her daughter, and that she initially complained to the Stigler Police Department around March 31, 2003. The police subsequently warned Mr. Fields to stay away from Ms. Tipton. This worked for about three weeks. But he continued.

In spite of this, Michelle reportedly continued their relationship and became engaged to Mr. Fields shortly prior to his arrest.

Mr. Fields met Carol Lamb "on the Internet" approximately four years prior to his arrest. At that time she offered to throw out her husband from the home so Mr. Fields could move in with her. He accepted that offer. He described her as ambivalent about this relationship, at one point telling him to leave and shortly thereafter asking him to return. Ms. Lamb later testified at trial that Mr. Fields initially stated that he was single, when he was in fact married to, and living with, Teresa.

Mr. Presley added, "When Ed was running around with Michelle, he was – he was – how can I say – he was using Tootie [e.g., Carol Lamb] for financial gain, I guess. He was playing one off the other, you could say." Mr. Presley recounts, for example, Mr. Fields obtaining money from Ms. Lamb to spend on Ms. Tipton.

In a mitigation interview, Ms. Lamb said that the examinee asked her for money during their first period of dating; he told her he needed money for any number of reasons, which she readily gave to him. She said Eddie "has a need for someone to take care of him."

Cherie Fields observed her brother to be charming with women, especially ones who seemed to be beneath him in some way. She reported it was not uncommon for her brother to obtain money from various women by relating to them a specific need he had for money.

Mr. Fields told me that at the time of his arrest his was involved in a consensual relationship with Brenda Stacy that involved bondage and exhibitionism over the internet. As he detailed, "Brenda would be in the bed and I would end up tying her up with my blue

rope on camera. So, if you ever wanted to watch you'd watch me tie Brenda up with my famous blue rope."

Mr. Fields described Penny Mitchell as "a simple kind of person" who was illiterate, received Social Security Disability, and competed in Special Olympics.

When interviewed by the Forest Service, David Love described Mr. Fields as being sexually preoccupied and as sending him nude photos of Ms. Stacy. Mr. Love reported that the examinee would masturbate on webcam, to broadcast over the Internet. According to Mr. Love, Mr. Fields borrowed his webcam; when he returned it, he told him how he had been masturbating over the webcam and how proud he was to have garnered as many hits of those logging in to watch him masturbate.

Mr. Love indicated that he nicknamed his friend "perv" because of his activities. Mr. Love added that Mr. Fields constantly sent him pictures and sexual material on the computer, which included photographs of women Eddie had sexual encounters with. Mr. Love felt that Eddie took the photographs without the women's knowledge or consent.

Another friend of the examinee, Michael Lloyd, spoke of how Mr. Fields bragged of luring women he met over the internet into sexual encounters. He experienced Mr. Fields as a "sex freak," as did Mr. Carter, who also remembered Mr. Fields to be sharing his sexual hijinks with internet contacts.

Ms. Hall, his cousin, recalled him to be preoccupied with sex in conversation, and observed that everyone who knew Mr. Fields well knew he seemed to have an obsession with sex. Ms. Hall took it as a part of his interesting personality.

Roberta Jasin told me in an interview that she met Mr. Fields in an online chat room around 1999 or 2000. In about April 2001, Mr. Fields moved to Toledo, Ohio, to live with Ms. Jasin, where he stayed until about July 2001. He then returned to Oklahoma to his parents' farm, saying that "they were both disabled." After he left, they "kept contact on the phone, on video chat." She described their relationship as not intimate, but rather as "more like roommates."

When speaking of this time, Ms. Jasin said "I had a lot of fun." They shared interests in fishing, music, playing pool, going to movies, walking in the park, cooking out, and internet chat rooms. Regarding the last, Ms. Jasin said, "It wasn't like a sexual channel or anything like that."

Ms. Jasin had no concerns regarding Mr. Fields living at her home with her and her family, even with two teenage sons living with her at the time. She never knew him to lose his

temper.  She was unaware of him having any mental issues, although she did say that he had frequent headaches.

Mr. Fields was not working while with Ms. Jasin, although she stated that he was "looking for employment."

According to Mr. Love, the examinee talked about meeting a girl from Ohio on the internet and going to

> …Ohio to live with her for a few months. The girl was supposed to pay him to have sex with her but he never did. Mr. Fields, according to Mr. Love, told him he had sex with her friend and used the girl's money.

In that vein, Kathy Fagrell reported that Mr. Fields told her that he did not like Ms. Jasin.

Ms. Jasin recalled that her most recent contact with Mr. Fields was in early 2002:

> "And the last I talked to him, he was very distraught that his mother said one day, something like, 'Oh, by the way I've sold the farm.  I'm going to live with your sister, and you're on your own'."

Mr. Fields reported having a good relationship with his mother.  She visited him "a couple times" while he was in custody, prior to her health declining.  He remains in telephone contact with her.  He also described having a good relationship with his father. However, one of his most painful memories involved his father's disapproval of him; Mr. Fields reported to me that shortly before his father's death, "He told me that he would feel like a failure because he raised a son that couldn't take care of himself."

In a mitigation interview, Cherie Fields provided a similar account of this incident.

Collateral sources provide conflicting accounts of Mr. Fields's relationship with his parents, and the amount of emotional and practical support that he provided.  In a mitigation interview Teresa Fields stated that Mr. Fields was "devastated over his Dad's death."  Ms. Bailey told me that the death of his father took "a major toll on him… that wiped him out pretty good, emotionally…"  Ms. Jasin recounted, "just talking to both Ed and his mother after the dad died, that they didn't celebrate, you know – like Christmas time, it was nothing.  It was like, dad died and that was the end of their world."

Margaret Fields, however, observed, "Edward does not seem to know what love is and does not know how to love people, including his children." His mother added her impression that her son never showed any compassion for her or for his father. As the elder Mr. Fields's medical situation deteriorated during the summer of 2002, Edward Jr.

would not provide any assistance for his father or help the family help his father. Visits he made to the family or his father would last five or ten minutes and then he would leave.

According to Cherie, when their father took ill, Edward began living with his parents for the purpose of helping them with various chores around the farm and home. Cherie visited her father throughout his illness and said her brother helped, to some extent, but not in the manner his parents expected. Cherie advised that she is the type of person who will clean something or perform a chore on her own without being asked, but her brother is not this type of person. She acknowledged that there were unspoken expectations, but Edward did not respond to these. Yet by her account he would go fishing every day while staying on that farm.

Following her father's initial triple bypass surgery, she and her mother had been at the hospital for several days. The examinee came to the hospital to visit and Cherie asked if he could stay with their father for a period of time to allow her and their mother to leave the hospital, take a break, and get something to eat. Her brother told Cherie he had plans and was unable to stay.

Angela Wade, a cousin of Mr. Fields's, likewise was unimpressed with the quality of his caring. She noted that the examinee's mother was indeed affected by Lupus and Multiple Sclerosis, and that his help would have been important to his parents; Ms. Wade did not experience him as helpful.

Tony Mayramt, a neighbor of the Fields', reported to defense investigators that prior to the elder Mr. Fields's death, Tony promised him he would cut firewood to ensure Margaret had adequate supplies, as the dying Mr. Fields did not feel his son would do chores such as this on a regular basis.

Tony did follow through on his promise and he took a large load of wood to the home. Even though the examinee was present, and had no part in cutting the wood, he would not help Tony unload the firewood.

Margaret Fields indicated that in the year before his arrest, they yelled at each other and the examinee often refused to do any chores around the house. Edward continued to spend his mother's money. She indicates that in approximately April 2003, Mr. Fields forged his deceased father's name on her checks and spent about $1,500.

Ms. Wade also alleges that Mr. Fields cashed a check that was meant for his mother. Richard White, Margaret Fields's cousin, would deposit her check into the bank so that Mr. Fields would not have access to it.

According to Sherry McCullough, a cousin of Mr. Fields, she went to Poteau with Mr. Fields in November or December 2002 to purchase groceries for Mr. Fields's mother and grandmother. During this trip, he had a check from his grandmother to buy her groceries; Mr. Fields purchased a DVD player and his own groceries with this check, and told Ms. McCullough that his grandmother would not know.

## Legal

Notwithstanding the aforementioned years of colorful history, Mr. Fields was never arrested prior to the instant offense. He readily admitted in our interview that he engaged in illegal activities. He described selling moonshine, distilling the liquor himself in a home-made still and selling it for $40 or $50 per gallon. According to the examinee, "I almost had to start up a new still because everybody was – I was selling all of it I could make."

Per Alicia Herell, a friend of Margaret Fields, Margaret told her that Mr. Fields was both making moonshine and growing marijuana inside of his parents' farmhouse. Ms. Wade also told government investigators that Mr. Fields was growing marijuana at his parents' house.

According to Michael Lloyd, Mr. Fields showed him fake identification which the examinee claimed to have made on his computer. Mr. Lloyd reports that Mr. Fields made a fake driver's license in which he changed his name and date of birth. The driver's license appeared real to Mr. Lloyd; he noted that Mr. Fields successfully gained entry to a nightclub in Nebraska with the ID.

Ms. Janway was also familiar with Mr. Fields's counterfeiting activities; her own son told her he wanted to borrow money from her to purchase a false identification from Mr. Fields. Ms. Janway also said Mr. Fields was making false identification documents for illegal immigrants in the area.

Ms. Lamb reported that Mr. Fields told her he had been in trouble for possession of marijuana in Sebastian County, Arkansas, and needed some money to take care of things. Ms. Lamb reportedly gave him seven hundred fifty dollars ($750.00) to pay his fines. There are no police records that confirm this incident; it may have been yet another ruse to obtain money from Ms. Lamb.

## Mental Health

Mr. Fields told me that when he was in his teens, his mother sent him to a psychologist due to "voices… telling me what to do." He "only went a couple times."

He stated that the voices started when he was 13 or 14 years old, and noted, "they're usually derogatory. But mostly they just tell me what I should do, stuff like that." The voices come from "inside my head," and he can distinguish them from actual voices. Although he initially described these as "voices" plural, when queried he stated that it was a male, adult-sounding voice.

Mr. Fields was not initially distressed by these voices:

> JS: Okay. So it happen– you say it first happened when you were like 13 or 14. What was your reaction at the time?
> EF: My mama always telling me that there would be a voice in my head telling me what I should do.
> JS: Uh-huh.
> EF: The conscience, but I didn't take it like that. I was hearing these voices, and I just took it as natural.
> JS: Okay.
> EF: I was a stupid kid.

When asked for examples of childhood voices, he described an incident when a voice told him to kill a pet cat (he was able to resist this command).

Mr. Fields told me that he has heard these voices intermittently since their onset:

> JS: Okay. Have you heard them continuously since you were 13 or 14?
> EF: Not every day, no.
> JS: Okay. About how often?
> EF: It could be every day –
> JS: Uh-huh.
> EF: –for a short period of time. It could be a week, could be a month.
> JS: Uh-huh.
> EF: There's no really set time that – that I hear them.

Over the years, he relates, the voices have "gotten a little more derogatory." The examinee reported that alcohol reduces the frequency of these voices.

Although he described the urge to follow the voice's commands, he could not specify the basis for its authority, or the consequences for disobeying the voice, other than to describe it as being "like a father figure or – or something."

The examinee reported distractibility, slowed thinking and difficulty concentrating, which he attributed to aging. Mr. Fields described word-finding difficulty. He described some difficulty following conversations and speaking (the latter he attributed to being told that he has an "awful accent.")

Mr. Fields described memory problems, stating, "I can't remember a lot of things." He attributed this to his current medication regimen, which "make[s] me sleepy and sometime confused."

According to psychiatric records from Minaben D. Patel M.D., Mr. Fields was initially seen on February 19, 1985. He was 17 years old when starting treatment. He presents his chief complaint as,

> My mother wanted me to come here and I cannot get along with my mother, thats [sic] why I am here.

Mr. Fields described being depressed with poor self-esteem, and reported conflict with his parents. He was close to his mother but not to his father, whom he did not see much due to his work schedule. Dr. Patel wrote,

> There is no evidence of any psychoses or organicity noted.

She diagnosed him with

> Adjustment reaction with depressed mood. R/O [rule out] dysthymic disorder
> Axis II: deferred   Axis III: None

Dr. Patel treated Mr. Fields with psychotherapy, meeting with him on February 26, March 26, and May 6, 1985; he missed some appointments. He was not treated with medications. There was no mention of any auditory hallucinations.

Margaret Fields, interviewed by investigators after Mr. Fields's arrest, stated that he never told her anything about hearing voices in his head until the killings occurred.

According to Ms. Janway, who also owns Al's Video store, the examinee came into the store for the purpose of repairing his computer. While there, Mr. Fields turned to her and asked her, "did you say something?" Ms. Janway told him she had not said anything; and he responded, "must be the voices again." Ms. Janway said she thought nothing of it at the time, but related that the discussion took place not too long prior to the crime.

Andrea White told Forest Service investigators a similar account on July 28, 2003. According to Ms. White, Mr. Fields was mumbling; she asked him what he was saying. He

told her it was just voices in his head. The examinee did this five or ten times in an hour. Ms. White said her mother has also heard Mr. Fields make such a comment.

In her grand jury testimony, his girlfriend Ms. Tipton provided the following testimony:

> Q: Did he ever talk about hearing voices?
> A: Yes, he did.
> Q: Over what period of time did he do so?
> A: Probably regularly for the past six months or so.
> Q: Did he tell you what he claimed the voices to say?
> A: The only time that we talked specifically about the voices was when it was -- when I was asking him why he couldn't stay away from me. And he said because the voices told him not to.
> Q: Did he tell you what the voices told him to do?
> A: Yeah, to live with me, to marry me, to never leave me, to work with me, to just too much me [sic].

In her trial testimony, Ms. Tipton provided a somewhat different account:

> Q: Did the Defendant ever talk to you about voices?
> A: Yeah.
> Q: Prior to the murders?
> A: Once.
> Q: What did he tell you about the voices – well, first, about when was that?
> A: You know, time having passed me because I wasn't working at the time, I would guess about six weeks prior to.
> Q: What is your best recollection that he told you with regard to the voices?
> A: Just that he had heard voices. And I'm not sure if that's the time that he told me that they didn't like me or if that was the time that we talked about – him and I talked about that we all hear voices. We hear our conscious [sic] and we try to listen to our conscious. I'm not sure which of the –
> Q: Did he ever explain to you anything that had occurred in his childhood consistent with what you just said?
> A: No.
> Q: Ever tell anything about what his mother had told him?
> A: Yes. His mother told him to always listen to the voices in his head.
> Q: Referring to what?

> A: Well, at the time we – I assumed in talking with Ed that we were all talking
>    about our conscious [sic]. And we all – we all have a conscious that we listen to.
> Q: Did the Defendant ever tell you what the voices told him or said?
> A: No. Just that they didn't like me.

When I spoke with Mr. Carter he described his experience dealing with mentally ill inmates in his position as a Corrections Officer; Mr. Fields did not show any such indications of mental illness. Ms. Bailey, who is also employed in corrections, had a similar opinion:

> JS: Did Eddie ever strike you as having any mental health issues?
> DB: No. Really, no. You know, I'm not going to say he didn't have any, but
>     when we spoke, he was – was very much aware of, you know, our
>     conversation, what was going on, you know, forethought as far as, you know,
>     planning things.
> JS: Okay.
> DB: You know, he –I don't recall any kind of craziness there.

The next mention of any mental health issues contained in the available records is 11 years after his treatment with Dr. Patel. Beginning in 1996, Mr. Fields was seen at the Heavener Medical Clinic, where he was treated for a variety of complaints by B. Don Schumpert, D.O. and Dean Anderson, P.A. There is no record of him ever reporting auditory hallucinations.

Mr. Fields told me that his next mental health treatment was in 1996 or 1997 (the time period in which he was working for the Oklahoma Department of Corrections).

Physician's assistant Dean Anderson (who Mr. Fields described as his "fishing buddy") initially provided Mr. Fields with "a month's supply of Wellbutrin" to help him quit smoking. Mr. Fields was also feeling depressed and wringing his hands together. Mr. Fields noted improvement from this treatment; he "quit wringing my hands and all that."

To follow up on this he was then prescribed Paxil, which was later switched to Serzone, and then to Effexor – "…that's when the incident happened." He was also prescribed "lithium… for the moods." He stated that he was continuously prescribed some type of antidepressant from 1996 or 1997 to 2003.

Dr. Kemp, his "family doctor" in Oklahoma, prescribed Effexor for anger problems.

Mr. Fields conveyed to me that prior to being taken into custody, he was experiencing episodes of elevated mood about once per month, during which "I'd get up. I'd go do things – shoot pool. I'd hang out with – with Danny and… girlfriends."

These episodes would last for "about a week or so." However, he later stated that when he is not depressed he feels "content," adding, "I don't think there's ever been a time where I could just jump up and down and yell."

Prior to taking medication Mr. Fields experienced "lots of thoughts of suicide." He also reported being suicidal "a couple months before the murders," explaining, "My family was gone, no one to talk to… living in my truck – yeah, I was suicidal." He formulated a plan: he was going to overdose on Xanax and, immediately prior to losing consciousness, "take a knife and… cut as long and deep as I could." Although he had a rifle, he rejected the idea of shooting himself, explaining, "That'd be damn messy."

On February 9, 1999, Mr. Fields presented for treatment of flu-like symptoms. Mr. Anderson wrote:

> He does ask about something for anxiety. He states that he quit smoking approximately one month ago and is using the patches but his family states that they are having trouble living with him at the present moment. He does admit to increased appetite and psychomotor activity with decreased sleep.

Mr. Anderson's diagnosis of Mr. Fields included "anxiety." He was prescribed Wellbutrin SR 150 mg once per day for one week, and then twice per day if needed.

On June 25, 1999 Mr. Fields complained of "reduced libido." Mr. Anderson wrote:

> In going through the criteria for depression, the only pertinent positives were decreased energy.

At the time of that visit Mr. Fields was not taking any medications.

His diagnosis on June 29, 1999, (when he was being treated for a bee sting) included "depression by history." He was taking no medications at that time.

On August 11, 1999, Mr. Anderson wrote:

> This is a 32-year-old white male coming in for consult in regard to his depression. He is currently on Paxil 20 mg q day. His wife told him approximately two weeks ago that she wants a divorce and she is currently in Virginia with his two children. He is very upset due to not being able to see his two children. He states he has decreased sleep and increased psychomotor activity. He denies any changes in his concentration or any suicidal ideation. He has lost 7 pounds in the past two weeks. He states he feels like he is doing pretty well on the Paxil, he just does not want to

get up and got to work. He has been on this medication for the last 1 ½ weeks. He states he spends a lot of time on the computer on the Internet and in chat rooms and feels like he is doing some commiseration with other people in the same circumstances or even worse. He has no known drug allergies. He is currently only taking Paxil.

Mr. Anderson continued him on Paxil at the same dose.

On April 11, 2000 Mr. Fields presented to R. L. Winters, M.D. Dr. Winters wrote:

Edward is a 32-year-old white male in today seeing me for the first time: His blood pressure is up. He has also been taking Serzone 150 mg from Dean Anderson, PA, that [sic] works for Dr. Schumpert. Dr. Schumpert has been gone and Dean Anderson has been seeing him, I guess. He tried the Paxil and that did not work. The Serzone helps him but not too much. He is separated from his wife, they are not divorced and she has got cancer of the breast. They have three kids that are with her and they might be going to get back together… Ed is chronically depressed. He works at night at Wortz and he is thinking about changing jobs…

Dr. Winters diagnosed Mr. Fields with:

Chronic depression.
Chronic obesity.
Elevated blood pressure secondary to chronic obesity.

He discontinued the Serzone and started Mr. Fields on Prozac 20 mg once per day.

Dr. Winters next saw Mr. Fields on May 25, 2000. He wrote:

He says he thinks the Prozac is helping the anxiety but it didn't help his depression much. He has been depressed since he was here last.

Dr. Winters increased his dose of Prozac to 40 mg once per day.

The last contact in the records is dated June 27, 2000. Dr. Winters wrote:

He said the Prozac worked well on him. It didn't make him depressed or anxious however he was so zonked he could hardly get out of bed in the morning and didn't feel like doing anything evidently it was too much for him [sic]. Ed seems to

> be doing pretty good although his Prozac is too much for him and he says the 20-mg didn't work. We could put him back on Serzone but I think we will try something new, I will try him on Celexa and see how he does on that.

Dr. Winters consequently prescribed Celexa 20 mg once per day.

Mr. Fields presented to Mike Kemp, M.D. of Medical Plaza on April 10, 2003, complaining of depression and hallucinations.  Per Dr. Kemp's note:

> The patient says that this all started some time back when his father got sick. His father had a heart attack about a year ago and has been quite ill since then. He developed cancer and leukemia. His father died about six months ago. His mother has lupus and possibly multiple sclerosis and is disabled. He is the primary caregiver for his mother.
>
> Mr. Fields says that he hears voices and they basically amount to a compulsion that he has to do whatever they tell him. They do not tell him to do anything dangerous, homicidal or suicidal and he denies any suicidal thoughts. He does however say that they may tell him to repetitively sharpen his knives and he knows that his knives are way to [sic] sharp. They may tell him to get in the car and drive over to Stigler to his girlfriend's house and he feels kind of compelled to do that.

Dr. Kemp diagnosed him with:

> Clinical depression
> Compulsive disorder

He prescribed Lexapro 10mg once per day.

Mr. Fields was seen for follow-up visits by Dr. Kemp on May 1, 2003.  He described benefit from his medication, with improved mood and decreased "compulsions."  He described some mild sexual dysfunction side effects.  Meds were continued at the same dose.

When seen on May 27, 2003, Mr. Fields described recent suicidal ideation, apparently secondary to psychosocial stressors:

> He says that overall the medicine has helped him somewhat. He is sleeping okay and eating better. He has actually gained 1 pound of weight. He feels tired much of the time and he notes that his reason for living has recently left or is fixing to leave.

> His dad, who he took care of died in October 2002. His mother apparently also is
> disabled and he has been taking care of her but she is fixing to move to Virginia
> with his sister and he is going to be left alone here.
>
> The patient says that he has three kids to support with child support and he is
> working a $7.00 an hour job down at a plant here in town.
>
> He states that he has an IQ of 168 and had a real high SAT score in high school.
> He could have gone to Harvard and he chose not to and now he is kind of alone in
> his life. He does admit however, that there are some good things in life and some
> good things worth living for. He told me he did not want to go into an inpatient
> psychiatric: unit and did not want to see a psychiatrist at the present time.
>
> He has not been hearing a lot of voices telling him to hurt himself or things like
> that and the convulsions [sic] are better.

Dr. Kemp doubled his dose of Lexapro; he next saw Mr. Fields on June 16, 2003.  He
wrote:

> This 36-year-old white male comes in today for followup of his clinical depression
> and compulsive disorder. Edward says he is not doing much these days. He just
> gets up, goes to work and comes home, eats, goes to bed and gets up and goes to
> work, etc. His desire to do things has decreased. He has thought [sic] of suicide. He
> says that he is not eating real good.  As a matter of fact, he has lost some four
> pounds of weight.  He does say he worries quite a bit. He does admit, however, his
> anxiety is not as bad as it has been previously. He is not hearing voices telling him
> to do things and his compulsion is not a problem now.
>
> He does feel like the medicine is not doing as much good as we would like.
>
> I asked him about going in to an inpatient facility but he does not wish to do that
> and stated that he was not willing to seek inpatient therapy at this time.
>
> He is planning on going on a trip, I think to Kentucky, in about three weeks and he
> would like to be feeling better by then, if possible.

Dr. Kemp discontinued Lexapro and started Mr. Fields on Effexor XR 37.5 mg once per
day for a week, then Effexor XR 75 mg once per day for two weeks.

Mr. Fields was last seen by Dr. Kemp on July 7, 2003.  This was his final meeting before the killings took place.  Dr. Kemp wrote:

> Edward does feel like he is doing a little better. He notes that his energy is a little better. He is doing a little more. He has been doing some nighttime snake catching as he has somebody who will give him 40 cents per running inch of snake. He notes that he has split up with his old girlfriend but over the weekend he spent with a new girlfriend. He still thinks about suicide but not seriously and he says it is less that it had been. His energy is better and he is doing a little more. His appetite has picked up and he is eating better and has gained some five pounds but he says he is not eating the right food particularly since he is eating out more since he is going with his girlfriend.

Mr. Fields increase the dose of Effexor XR to 150 mg once per day.

Both Mr. Fields's mother and sister described him as having a long history of depression. Teresa and the children reportedly spoke of Eddie's attitude and demeanor changing numerous times within a relatively short period of time.

When interviewed by the FBI in August 2003, Margaret Fields recalled that that over the past several years, Mr. Fields seemed to become more and more bitter towards life in general. Approximately one year before his mother moved back to Virginia, Ms. Fields recalls her son to have been taking some samples of various anti-depressants. Shortly before she moved in June 2003, a physician prescribed some anti-depressant medication for Mr. Fields, which he took.

I asked Mr. Presley about his impressions of Mr. Fields's moods:

DP: The majority of the time when we were together, he was upbeat –
JS: Uh-huh.
DP: You know.  Maybe that's because we were fishing or hunting snakes or—
JS: Yeah.
DP: Playing pool or – or you know, doing things he liked to do, I don't know.
JS: Okay.  And when you say upbeat, do you mean just normally happy, or do you mean like –
DP: Yeah.
JS: Just kind of like normally in a good mood?
DP: Yeah.

In spite of the above, Mr. Presley admitted that Mr. Fields thought about suicide "from time to time."

In her grand jury testimony, Ms. Tipton described Mr. Fields as making suicidal threats, alleging that he told her, "if I didn't let him live with me, he would have to kill himself."

Mr. Fields told me about one suicide attempt shortly after his arrest. While in a shower at the jail he states that he "popped the top off the razor and pulled the razor blade out. Cut four times here, here, here, here [referring to his arms]. This right there was the mother lode, right there."

According to an undated incident report written by Deputy Glen D. Reed,

> At approximately 10:18 A.M. on July 23, 2003 inmate Delbert Campbell, [redacted] heard the water stop running in the shower and went in to clean the shower. Upon entering the shower inmate Campbell saw inmate Fields sitting on the floor with his feet crossed and bleeding from his left arm. Inmate Fields was motioning for him to get away and asked him not to tell anyone.

Inmate Campbell notified jail staff, who provided first aid and called EMS. Deputy Reed described Mr. Fields as having "approximately three cuts in the wrist area and one cut around the bend of his arm that was bleeding freely." Deputy Reed also wrote,

> As I was wrapping his arm, inmate Fields asked my name. He then said, "Reed, let it bleed. I killed two people and I'm going to die or get life." He then asked me several times to leave him alone. He called out a phone number that I don't recall. He said, "Tell Michelle I love her".

Mr. Fields was treated at the Muskogee Regional Medical Center, but not admitted. Undersheriff Justin Hutchinson of the Muskogee County Sheriff's Department accompanied Mr. Fields, and wrote the following:

> At approximately 12:35 P.M., Mr. Fields became very serious and stated that his father had died in October of 2002 and that his Mother had moved to Virginia to live with his sister. Mr. Fields then stated that he had been hearing voices for some time, at this time Mr. Fields then looked directly at me and said, "I did not mean to kill those people, I just went out there to rob them at gunpoint, and the next thing you know I was looking at them through my rifle scope and the gun went off."

Mr. Fields was housed at the Muskogee County Detention Center from July 18 to August 14, 2003, and from May 2005 to December 8, 2005.

During his first stay, Mr. Fields was seen by a physician on July 24, July 29, and August 12, 2003. His psychiatric medications were venlafaxine, risperidone, escitalopram, and lithium carbonate.

He was diagnosed with Major Depressive Disorder with Psychotic Features and a history of Dysthymia (the signature of the physician is not legible).

During his second stay his psychiatric medications included lithium, fluoxetine, loxapine, and trihexyphenidyl. He was diagnosed with a history of Schizoaffective Disorder by Joyce L. Bumgardner, M.D. On July 1, 2003, he reported auditory hallucinations. On August 11, 2005, Mr. Fields complained of increased auditory hallucinations and being very suicidal.

Mr. Fields was housed at the David L. Moss Criminal Justice Center in Tulsa from August 14, 2003, to May 2005.

Partially legible records were provided for my review. He was diagnosed with schizoaffective disorder, based at least in part on his report of auditory hallucinations and anxiety.

Psychiatric medications included fluoxetine, lithium, loxitane, and Artane. He was prescribed Stelazine but this was discontinued due to lethargy. He had been prescribed Cogentin but this was changed to Artane due to blurry vision. His medications were changed several times at his request.

At various times while housed in Tulsa, he complained of anxiety, depression, auditory hallucinations, "repetitive thoughts," and problems distinguishing between fantasy and reality.

On August 14, 2003 he was placed on suicide watch; it is unclear how long this was continued. He did not have any psychiatric housing. He was prescribed various psychiatric medications, including Prozac, Lithium, Loxitane, Stelazine, Lexapro, and Risperdal.

Mr. Fields told me that his current medications include Loxitane, Artane, and lithium. He had a "bad reaction" to earlier prescribed Risperdal and Seroquel, describing severe lethargy.

While in the custody of the Federal Bureau of Prisons (FBOP) Mr. Fields has had regular mental health monitoring. His mental status was consistently described as unremarkable.

Mr. Fields has reported intermittent hallucinations, some unusual (see below).  He has never shown any signs of psychoses or other severe mental illnesses, suicidality, or cognitive dysfunction.  Corrections staff have not noted him to display any unusual or problem behaviors, or difficulties with his daily functioning.  He was never housed in a psychiatric unit.

Mr. Fields has been in the custody of the FBOP since December 8, 2005.  On December 30, 2005 Mr. Fields was seen for an "Intake Screening" by Steven J. Eckert, Ph.D. According to Dr. Eckert:

> Inmate claims that he first heard voices at the age of 14/15 but said he never told anyone of this until he was 36 y/o which was approximately 1 month before he committed the instant offense. He said that his family (his mother and his wife) never suspected that he had mental health problems/hearing voices. He said over his life that the voices were neither negative or positive instead saying they were "neutral." He was markedly vague as to what the voices would talk about and was also vague giving no "qualitative" characteristics of the voices."

Regarding his mental status, Dr. Eckert wrote:

> Inmate presented as relaxed, calm, polite, articulate and engaging throughout the conversation. His affect was bright and spontaneous during the interview and the inmate even appeared to be rather "pleased" with himself. He appeared to enjoy the interaction with this writer. He tracked the conversation well and picked up on all appropriate nuances responding appropriately even being the initiator throughout the interview. When asked about the instant offense he clearly admitted that he did it. He said, "It's the only time the voices ever told me to do anything bad." When this writer followed-up with the inmate to clarify his statement, he again said that this was the only time in his life (instant offense) that "voices" ever told him to do anything bad. He said that prior to the instant offense and since the instant offense the "voices" have never told him to do anything bad or negative.

FBOP psychology staff members have questioned the veracity of Mr. Fields's symptoms. On November 16, 2006 Dr. Eckert wrote:

> Inmate arrived to THP [Terre Haute Prison] in December 2005. He has a remote (history) of being diagnosed with Schizoaffective Disorder but has not exhibited any (symptoms) consistent with this dx since his arrival to this facility. And even when this writer explored his mental health (history) during his intake screening

there was no clear hx of him presenting with sxs of a psychotic disorder. The inmate is currently taking Loxapine Succinate, Lithium, Prozac, and Trihexyphenidyl.

He has been reviewed monthly by Psych (services) since his arrival and he has presented as (normal) and has not voiced any concerns of a psychological nature.

Dr. Eckert assigned the following diagnosis:

295.70 Schizoaffective Disorder, (remote with only minimal historical support). r/o V65.2 Malingering

On May 8, 2007 psychologist Ashley Noble, Psy.D. wrote:

Inmate was seen on this date for a mental status examination after he requested to speak with someone from Psychology Services. He informed this writer he has been experiencing intermittent auditory and visual hallucinations for the past month. He stated he recently saw "a mantle piece on this door with ducks on it" and thought he should inform someone in Psychology Services of this event. In addition, he reported that he continues to hear voices which make both "derogatory" and "beneficial" remarks to him. Inmate asked this writer if his medications would be changed as a result of the aforementioned symptoms and then requested that he be able to maintain certain medications in his regimen and not be prescribed others. He was subsequently informed that this writer did not make the decisions regarding which medications he would be prescribed. Inmate responded by indicating that he was managing his current symptoms effectively at the present time and denied having a need for a medication referral.

Inmate did not appear to be in any distress at the time of this contact. He presented to this writer as alert and oriented with no overt signs of psychosis. His affect and mood were unremarkable. His thoughts were connected and future oriented, while his speech was clear and intelligible. He did not appear to be responding to internal stimuli and reality testing was intact. No behavioral abnormalities were noted. It should also be noted that three of the inmate's phone-calls over the past two weeks were monitored prior to this contact. These calls did not indicate that this inmate was in any type of distress.

>     Inmate's current presentation does not suggest the presence of an Axis I disorder. He appears to be functioning adequately in SCU and showed no signs of psychosis during this contact. It appears as though his current presentation may have been prompted by his desire to acquire additional psychotropic medications without terminating use of the medication he is currently prescribed. Regardless, inmate was encouraged to notify Psychology Services should he notice an increase in symptoms or desire to speak with someone from Psychology Services again. He agreed to do so and appeared receptive to this writer's comments. He does not appear to warrant additional services at this time, but will continued to be monitored by Psychology Services during regular SCU rounds.

On August 4, 2008 psychologist Joseph Bleier, Ph.D. wrote:

>     Inmate was seen this date for a follow-up to a recent SCU review, in which he made some unusual complaints regarding possible side effects to his medications. Inmate was seen in the Law Library in SCU. Several weeks ago, and again this date, he described his beliefs he has been "sleep walking" at night. He also stated his beliefs he hides his property during these episodes, and described waking up at times and finding things "in the garbage." Inmate Fields believes his medications may be causing this behavior, although he admitted he had not experienced these episodes until relatively recently.
>
>     ….
>
>     After reviewing his mental health history, consulting with the Chief Psychologist, as well as reviewing his current medication regimen, two hypotheses have been proposed with regards to Inmate Fields' mental health and history. The first hypothesis is the inmate suffers from a psychotic disorder, however his current medication regimen is effectively managing his symptoms. This would also explain his recent and current stability. The second hypothesis is the inmate does not truly suffer from a psychotic disorder, thus the reason for his stability is not related to his medication regimen. Nonetheless, it is not recommended that his medication regimen be adjusted at this time due to a lack of evidence supporting a malingering diagnosis. However, it is recommended that the inmate be given the opportunity to attend Telepsychiatry, where he can be further evaluated by a Psychiatrist.

Psychiatrist Robert Sarrazin, MD therefore performed a "special tele-psychiatry consultation" on November 5, 2008. He assigned the following "diagnostic impression."

Axis I: Bipolar I disorder versus Schizoaffective disorder by history.
Axis II: Deferred
Axis III: Hypertension and elevated cholesterol

However, he qualified his findings:

After reviewing the available Psychology Data System notations, Bureau Electronic Medical Record notes, and interview, it is not clear that Mr. Fields suffers from a major mental illness; such as Bipolar disorder or Schizoaffective disorder. It should be noted that he has only been evaluated by this writer while on psychotropic medications of Lithium, Loxitane, and Prozac. His history does not appear consistent with a major mental disorder. His description of voices is rather vague and not consistent with what is usually described in psychotic illness; such as, hearing that the voices come within you. This is more that the voices are keeping up a commentary and telling him innocuous things to do. Also note his thought processes are entirely clear. There is no evidence of any type of confidentiality, circumstantiality, or disorganization. If indeed we were evaluating an individual with Schizoaffective disorder there should be some residual psychotic processes that affect the thinking patters, even with someone that is medicated.

Medications (that he is prescribed) can also be beneficial to individuals with personality disorders and some mood and affect of [sic] liability in spite of the fact of not having a diagnosable major mental illness.

On November 5, 2008, Dr. Eckert wrote:

During this interview inmate Fields recounted his history in a manner that was largely consistent with past interviews. His overall mental status was also consistent with past documentation made by psychologists at this facility. For example, he continued to present as WNL with no overt (symptoms) of mental illness. He did not voice any complaints or express any significant negative side-effects related to his medication regimen. He exhibited a bright affect, pleasant mood and was quick to smile throughout the interview. He said that his family keeps him well funded and he buys a lot of food n [sic] the commissary. He reported that the family members he communicates consistently with are his mother and sister. He was markedly future-oriented. Spoke about enjoying several tv shows and spoke about several hobbies he enjoys. Specifically said he will be starting crocheting soon.

When he did describe past psychotic sxs he focused almost exclusively on experiencing AH [auditory hallucinations]. His descriptions of hearing these voices appeared to be suspect, in that they seemed to be contrived, atypical, and lacked appropriate specificity. Further, the timing and content of these "voices" appear at times to be self-serving and occur during seemingly "convenient times." For example, the AH commanded him to engage in specfic [sic] negative/aggressive goal-directed behavior (instant offense). It is interesting to note that inmate Fields did not describe any other time in his life when the "voices" commanded him to engage in negative/aggressive behavior either before or since the instant offense.

Additionally, since his arrival to this facility he has not exhibited residual signs/symptoms of a thought disorder (such as negative symptoms, an even marginly [sic] compromised thought process, delusonal [sic] ideations, or any objective data such as observing him responding in some way to internal stimuli) some of these are usually (but not always) present to some degree in individuals even when a thought disorder is well-controlled by Rx.

It is also *possible* that he does have a mood component (Major Depression, Dysthymic Disorder, Bipolar Disorder) which is controlled by medication, even though clear signs of a mood disorder have not been noted in the last three years at this facility.

Even though questions exist as to the veracity or legitimacy of a current Axis I diagnosis, the continuation of the prescription is based on the following:

1) Although there was not a Forensic Evaluation conducted by a BOP psychologist/psychiatrist, according to his PSI he was evaluated while in pretrial status by three psychiatrists and one psychologist in 2004, and 2005, receiving the following Axis I diagnoses: "Bipolar Disorder I Disorder With Psychotic Features; Major Depression, Psychotic Subtype; Dysthymic Disorder; Schizoaffective Disorder, Bipolar Subtype, vs. Bipolar Disorder, severe with psychosis, in pharmacological remisssion" [sic].

2) He is requesting to stay on the medication, does not describe significant side-effects, and is currently presenting as stable.

3) It is *possible* that his sxs (psychotic and/or mood) are being managed by prescription and are currently in remission.

4) At this time there is not sufficient evidence which would confirm he is malingering beyond a reasonable doubt.  [emphasis in original]

On March 19, 2010, psychologist Jacqueline Cranmer, Psy.D. wrote:

Regarding other clinically significant mental health symptoms, Mr. Fields denied currently experiencing any symptoms suggestive of depression or mania and described his general mood as "great." However, he claimed he still experiences auditory hallucinations (which he described as "derogatory voices") and visual hallucinations (seeing a metal rack with stuffed ducks on his cell wall) on a daily basis. He denied that these experiences cause him significant distress. It should be noted that his description of hallucinations, particularly visual hallucinations, are atypical of individuals with active psychosis. During this contact, he did not appear to be responding to internal stimuli and did not report or display any other signs or symptoms consistent with psychosis or mood disturbance.

Mr. Fields also discussed his belief that he is still "sleepwalking" during the night. As examples, he reported he woke up one morning to find "letters in [his] mouth" and his blanket in the shower. He also stated he believed he ate all of his Swiss cake rolls one evening while asleep. Mr. Fields denied any other concerns and further denied any current suicidal ideation, plans or intent. His current presentation was not indicative of any Axis I diagnosis.

On October 25, 2012 Dr. Cranmer diagnosed Mr. Fields with "Schizoaffective Disorder – Depressive Type."  However, she qualified this diagnosis, writing:

Inmate Fields has been diagnosed with Schizoaffective Disorder in the past. Historically, he has reported experiencing mood instability, symptoms of depression, auditory hallucinations, and visual hallucinations. He arrived to THP prescribed a variety of psychotropic medication, which he continues to take. He is currently prescribed Prozac, Lithium, Loxapine, and Artane.

Periodically, inmate Fields has reported experiencing visual hallucinations while at THP (e.g., reported seeing "seeing a metal rack with stuffed ducks on his cell wall" in March 2010). The symptoms he has reported in the past are often inconsistent with symptoms which are typically reported by individuals experiencing psychotic symptoms. Inmate Fields has never been directly observed to be responding to internal stimuli or experiencing active psychotic symptoms by Psychology Services

staff at THP. However, he has remained relatively stable on psychotropic medication throughout his incarceration, and it is unknown to what extent he benefits from the medication.

On April 30, 2013 Dr. Cranmer wrote:

When asked how he has been doing lately, he responded, "Not too good." He reported a recent increase in auditory hallucinations. He stated at times, the "voices" tell him what to do, such as not to go out for recreation, or not to talk to staff about how he is feeling. He further stated the "voices" tell him he is "worthless" or "no good." He described his mood as "shifting" or somewhat labile. He denied any recent changes in his sleep or appetite, describing both as "OK." He noted that although he appears to sleep often, sometimes he is actually just laying in his bunk watching television, and not sleeping. He also indicated he attends indoor recreation with other inmates as an appropriate coping strategy and way to structure his time. Inmate Fields was advised that due to his report of an increase in auditory hallucinations, he would be referred to the telepsychiatry clinic for a medication review. He appeared receptive to this plan. Other than his self-report, he did not display any signs or symptoms suggestive of severe mental illness and he did not appear to be responding to internal stimuli during this contact. His general mental status was within normal limits and he did not appear to be in acute distress.

### Substance Abuse

Mr. Fields reportedly began to drink alcohol in the Navy while on shore; he would not drink on the ship. While a recruiter he also drank considerable alcohol, by his account "a fifth a day." This included drinking while on duty, as he noted, "The best place to wear a uniform is at a bar. They give you free drinks."

He continued to drink throughout his life. In the time immediately prior to his arrest, Mr. Fields was drinking, by his account, "a quart jar [of moonshine] every other day."

Mr. Fields did not consider his drinking to be pathological:

JS:  Okay. And do you think you were an alcoholic?
EF:  Uh-uh.
JS:  No? Why not?
EF:  I could quit anytime I wanted.
JS:  You just didn't want to?

          EF:   I just didn't want to – hell, I was making my own at the end.

According to the examinee, he was able to "scale back" his drinking when he was around people that did not drink. Mr. Fields smoked marijuana for about a month in 1984. He initially denied using any other drugs, including solvents or designer drugs. However, during follow-up questioning he stated that he also used "hashish, some speed."

Around the time of his arrest, the defendant was also reportedly growing marijuana.

## General Medical

In our interview, Mr. Fields reported that he was "blinded for about a month" in a Navy accident.

Mr. Fields is currently treated for hypertension, hypercholesterolemia, diabetes, and GERD, and has a history of elevated liver enzymes. He has had a vasectomy.

Mr. Fields puts in health care requests to receive health care, including routine or preventative treatment.

Mr. Fields denied ever having "been knocked completely out," but he was "addled" due to playing football in high school.

According to the available medical records, on December 5, 1983, he was admitted to a hospital for observation, after complaining of vertigo and dizziness following a motor vehicle accident "a few days" prior. A CT scan of the brain was done which was normal. He was discharged on December 8, 1983, with a diagnosis of "cerebral concussion" and "cervical sprain." His mother stated that she did not notice any change in his demeanor or personality from before to after the accident.

He also described being dazed as the result of a fight in 2005 while in custody and a motorcycle accident in 1984.

Mr. Fields was also involved in a motor vehicle accident on September 18, 1997. His head struck the windshield with no loss of consciousness. He was treated and released, with a diagnosis of "forehead contusion" and "acute upper thoracic and lower cervical strain." The examinee denies ever having suffered a seizure.

When I interviewed him, Mr. Fields described an improvement in his sense of smell and taste. He reported a worsening in his visual acuity, which he believes is age-related. He reported a sudden-onset loss of vision that took place about a year prior and lasted "about

a couple months." He was seen for medical care and told that this was due to diabetes. His vision "pretty much" recovered to baseline after this incident.

Mr. Fields described muscle weakness as a result of inactivity. He has "convulsions" when he is "drifting off to sleep," consistent with myoclonus. He has coordination and balance problems, a tremor (which he stated has been present since 2003), and parethesias; he attributed all of these symptoms to his medications. He also reported headaches, sometimes continuous.

Mr. Fields had an MRI of the brain on November 3, 2011, utilizing sagittal T1 weighted images followed by axial T1, T2, FLAIR, and diffusion weighted images. According to Susan Koslow, M.D., this study did not reveal any intracranial abnormality.

## Spiritual

Mr. Fields is a practicing Catholic. He maintains contact with "Father Mat" from "Shepherdstown, West Virginia" and "Sister Mary Griffin, she's from Saint Mary of the Woods, close to here." Sister Mary is his "minister of record." She corresponds with him and visits once a month.

Per Mr. Fields's email records from the BOP, he and Sister Griffin maintain a regular email and phone correspondence, and she visits him with some regularity. Sister Mary also appears from their correspondence to have assisted in facilitating an opportunity for Mr. Fields to meet with the archbishop.

Mr. Fields additionally corresponds with Father Mat regularly over email, discussing the Father's plans, familiar acquaintances to Mr. Fields, and Father Mat's congregation.

Father Mat also reports on the health of Edward Fields's mother; it can be inferred that the Father regularly reaches out to Mrs. Fields on that front.

## Leisure Interests

While in the community, Mr. Fields's interests included squirrel hunting, snake hunting, fishing, and computers. Kathy Fagrell reported that Mr. Fields spoke of how he would feed baby kittens to his snakes.

To assist in his squirrel hunting, Mr. Fields made a "ghillie suit," with which he was able to very effectively camouflage himself.

Mr. Presley confirmed that Mr. Fields made the ghillie suit to hunt squirrels in. He described Mr. Fields's rifle as "just a cheap .22, but it had a giant scope on it," which was "sited in to shoot squirrels from a long distance…"

Mr. Fields additionally conveyed wearing the ghillie suit for other purposes. Mr. Pressley indicates that he donned the ghillie suit to sneak up on a couple that was parked and "fooling around," in order to peer in on them as a voyeur. He also reportedly told Mr. Love that he had been "sneaking up on people on Talamina Drive." In addition, he told Ms. Lamb that he put on the ghillie suit and watched a couple having sex in their campground.

## Interest in Weapons and Violence

The collaterals I interviewed did not know Mr. Fields to have any special fascination with weapons or military matters. Other than shooting squirrels, Mr. Presley did not know Mr. Fields to "obsess over snipers" or "Marine training." He was not aware of Mr. Fields having any guns other than the .22 rifle, and was not aware of Mr. Fields playing any violent video games, let alone to a great degree. Mr. Presley reports that he heard that Mr. Fields made a suppressor (a "silencer"), but he did not have any direct knowledge of this.

Mr. Fields's mother further conveyed that he made a napalm bomb in the backyard of their residence by mixing chemicals.

A forensic examination of his computer following the crime revealed an article about the 2002 Washington DC area sniper shootings.

In her testimony, Michelle Tipton recalled that Mr. Fields bragged about having killing people, and offered to kill for her if she needed:

> "Well, he – mentioned killing my ex-husband for me if I needed him to or – you know, taking out this person or you know, all the people he killed when he was in the military, that kind of thing."

## Current Activities

Mr. Fields is single celled. Mr. Fields typically wakes up about 11:00 AM to eat lunch. He stays awake for most of the day.

Leisure interests include watching television. As mentioned, he is teaching himself Klingon and sign language, describing his proficiency in the latter as "probably intermediate." Mr. Fields also had plans to "knit an afghan" for his sister.

The examinee has access to "two leisure times a week" for a total of three hours. He also uses the computer to check his accounts and to download music onto his MP3 player. Mr. Fields maintains an inmate account and recently purchased a calculator to keep track of his finances.


## PREVIOUS TESTING DATA

On July 25 and 28, 2003 Mr. Fields was evaluated for his competency to stand trial by psychologist Curtis Todd Grundy, Ph.D. Dr. Grundy did not generate a report; he testified as to his findings that Mr. Fields was competent to proceed.

Dr. Grundy testified as to the existence of measures of malingering in his evaluation – the Test of Memory Malingering (TOMM) and the Structured Interview of Reported Symptoms (SIRS). Since he only gave five tests, these tests would be potentially easy to identify, potentially alerting the defendant to the existence and make-up of malingering.

On August 11, 2004 Mr. Fields was seen, at the request of defense counsel, for a "comprehensive neuropsychological evaluation" by Michael Gelbort, Ph.D. Dr. Gelbort concluded:

> Overall, Mr. Fields is an individual who demonstrated overall measures of intellectual functioning toward the lower portion of the average range with specific tests of freedom from distractibility and processing speed being lower. Tests of learning and memory found a similar pattern with new learning/memory adversely affected as a result. The patient has a history of emotional upset, turmoil, and treatment which has been less than optimally effective. He displays a pattern often found in individuals with frontal lobe or non-dominant hemisphere neurocognitive dysfunction and brain damage with further evaluation warranted. The nature and pattern of his deficits is long-standing and affects his every-day life, thought processes, and behavior.

Also at the request of the defense, Mr. Fields was seen for a "neuropsychiatric examination" by George W. Woods, M.D., on August 24, August 25, and October 9, 2004. Dr. Woods presented his findings in a report dated June 25, 2005, in which he concluded:

> Mr. Fields suffers from a severe mood disorder with significant mood swings from depressive episodes to manic episodes, manifested by irritability, explosive anger, and agitation. Mr. Fields also suffers from symptoms of psychosis, particularly auditory hallucinations, which, in the past, have become commanding in nature.

> Mr. Fields' combination of severe mood disorder and psychotic, command hallucinations fits the diagnosis of Schizoaffective Disorder, Bipolar type; as well as the diagnosis of Bipolar Disorder, severe, chronic, with psychotic features.
>
> …
>
> It is my professional opinion Mr. Fields was in a manic state and was also experiencing auditory hallucinations at the time of the offense for which he is charged.
>
> …
>
> Mr. Fields' psychotic manic episode before, during, and after the offense for which he is charged appears to have been triggered by increased doses Effexor, a serotonergic specific reuptake inhibiting antidepressant.

At the request of the prosecution, psychiatrist Jeffrey Mitchell, M.D. examined Mr. Fields on June 15 and June 23, 2005. In his report dated June 30, 2005, Dr. Mitchell opined that Mr. Fields "had childhood symptoms suggestive of an attention deficit hyperactivity disorder (ADHD)" which persisted into adulthood. He was depressed, with his symptoms possibly worsening as he aged.

Regarding the presence of auditory hallucinations, Dr. Mitchell wrote:

> His history of hearing voices is credible. It is impossible to determine objectively whether a person is truly hearing voices, and sometimes people who have a need to minimize responsibility for their behavior may "fake" hearing voices. However, before the crime, he revealed his auditory hallucinations to his physician and others close to him…

Dr. Mitchell also opined on Mr. Fields's mental state at the time of the offense, writing,

> There is scant evidence, however, of mania either in his history prior to the crime or at the time of the crime. The police have extensive interview data from family, friends, fellow employees, and employers. None of those descriptions are consistent with a person whose "mood swings" resemble the extreme irritability or euphoria seen in patients undergoing mania. On the day of the crime, Mr. Fields went to work and completed his shift. He had dinner with one of his girlfriends a

few hours before committing the crime. In her interview with police, she noted nothing unusual about his behavior. In the week after the crime, his behavior with his other girlfriend was purposeful. She did not report noting anything unusual about his mental state that would fit with a person experiencing a manic episode. Throughout his interview with the police he was calm. The FBI behavioral analysis noted above indicates that his approach to the campsite was purposeful and possibly planned. By Mr. Fields own description, he waited for significant intervals of time, remaining still, while the Chicks finished looking at the scenery, walked back to the campsite, conversed, and made the decision to retire. This behavior is not consistent with a person in a manic frenzy. Also, if the behavioral analysis is correct, a return to the scene of the crime hours later to possibly give the appearance of a robbery is not consistent with a person driven by mania.

…

It is uncertain whether Mr. Fields was hearing voices at the time of his crime. However, he had a lifetime of hearing voices which came to no one else's notice unless he told them. In other words he did not feel compelled to do anything strange or unusual because of the voices, apparently until the time of the crime. People with psychiatric disorders are not necessarily incapable of distinguishing right from wrong. In most cases they are capable of forming a correct judgment about right and wrong even when their symptoms are compelling them to do wrong. It is my opinion that Mr. Fields had the capacity to make such judgment at the time he committed the crime, regardless of the presence of the psychiatric disorder.

Dr. Mitchell opined that the most likely diagnosis for Mr. Fields is "Major Depression, Psychotic Subtype."

At the request of the defense, Bradley D. Grinage, M.D. saw Mr. Fields for a "forensic mental health evaluation." He detailed his findings in a report dated June 24, 2005:

Results of the evaluation indicate an individual with significant brain injury at birth and a long history of depressive symptoms and auditory perceptual disturbances that began as an adolescent. The defendant also has a history of irritable mood swings with probable mixed manic states. Although seen for mental health purposes sporadically throughout his life, the defendant predominantly went without appropriate mental health treatment until after his incarceration.

The defendant meets the criteria for Bipolar Disorder. Despite a past diagnosis of Schizoaffective Disorder there were no available data indicating active auditory hallucinations in the absence of mood symptoms that would warrant a diagnosis of Schizoaffective Disorder. For these reasons the defendant is given the diagnosis of Bipolar I Disorder, Severe With Psychotic Features.

Regarding Mr. Fields's mental state at the time of the offense, Dr. Grinage wrote:

In the opinion of the examiner, based on a reasonable degree of medical certainty, the defendant was suffering from severe mental and emotional disturbance, specifically an active bipolar disorder with an irritable manic state and psychotic features. Additionally, based on this psychotic state, in the opinion of the examiner, at the time of the shooting the defendant experienced significant impairment in his ability to control his behavior or conform his conduct to the requirements of the law. This opinion is based on documentation of the defendant's multiple stressors prior to the incident, mental health treatment surrounding the alleged criminal conduct, increase in antidepressant use only days before the conduct, description of his mental state at the time of the crime, current diagnosis of a bipolar type illness, and current knowledge of response to bipolar type medications.

Psychologist J. Randall Price, Ph.D. was retained by the prosecution to perform a neuropsychological evaluation of Mr. Fields, which he conducted on June 13 and June 28, 2005. He detailed his findings in a report dated July 1, 2005. He proffered the following DSM-IV-TR diagnostic formulation:

Axis I: Dysthymic Disorder (Chronic Mild Depression)
Axis II: Personality Disorder, Not Otherwise Specified, with antisocial (and psychopathic), narcissistic, and dependent traits and features

Dr. Price concluded:

l. From a neuropsychological point of view, Mr. Fields is of average verbal and non-verbal intelligence with some scatter in his abilities. He excels in word knowledge, fund of information, verbal comprehension, attention to visual detail, logical sequencing of non-verbal materials, as well as both verbal and non-verbal abstract reasoning. He is less adept at complex auditory attention processes and speed of processing non-meaningful non-verbal materials. The majority of neuropsychological findings identify uncompromised cognitive processes. Visualspatial, memory, motor, and language abilities are all totally within normal

limits. With regard to executive or frontal lobe functions, Mr. Fields evidences some mild deficits with regard to fluency or speed, but abstract reasoning and complex problem-solving abilities fall from the average to the superior levels. For the most part, he performed the majority of test measures within normal limits. His variable attention abilities are somewhat consistent with a longstanding attention deficit disorder. His performance on neuropsychological testing is inconsistent with either an acute or chronic neurological condition including a brain injury and/or a frontal lobe disorder.

2. From a psychological point of view, Mr. Fields' history is consistent with a long-standing mild depressive disorder, technically referred to as Dysthymia. The evidence from records and the results of my face-to-face evaluation of Mr. Fields do not indicate a bipolar disorder or a "manic flip" or "manic switch" secondary to anti-depressant medications on or about the date of 7/10/03. Several individuals who interacted with him during the days just before and just after that date did not see any change in his behavior. During my clinical interview with Mr. Fields, he did not describe a manic episode on or about 7/10/03. Rather, the data supports long-standing depressive symptoms, exacerbated by the financial and interpersonal stress Mr. Fields was experiencing at the time.

3. Mr. Fields' descriptions of the voice he hears are inconsistent with genuine auditory hallucinations experienced by psychotic individuals. Mr. Fields reported that he hears one identifiable male voice described as a "little friend" that comes from inside his head. The voice uses stilted language in issuing commands that Mr. Fields must obey to make the pressure in his chest subside. Mr. Fields lacks strategies to diminish the voice other than obedience. He does not describe associated delusional beliefs that are typical with a psychosis. The voice was not revealed by Mr. Fields for close to 20 years. The voice does not issue non-command hallucinations. All of these factors point to malingered auditory hallucinations presented for the purpose of the evasion of personal responsibility and punishment.

4. Mr. Fields was not in manic state at the time of the offense for which he is charged. His description of the voice that told him to commit the offense is inconsistent with a genuine psychotic auditory hallucination. At the time of the commission of the acts constituting the charges offenses [sic], Mr. Fields was able to appreciate the nature and quality as well as the wrongfulness of his acts.

At the request of Mr. Fields's defense counsel in the course of current proceedings, he was seen for a neuropsychological examination by Daniel Martell, Ph.D. on March 16 and March 17, 2010. Dr. Martell concluded:

> It is apparent from the current testing that Mr. Fields has experienced a catastrophic loss of brain function over the past five years. Notably, the pattern of impairments detected at the time of trial (as well as the rare and pathognomonic findings indicative of brain dysfunction obtained during the present examination) are strikingly consistent with the pattern of brain impairments detected in Mr. Fields' mother, Mary Margaret Fields, in September of 2001. This would raise another "red flag" as to the possibility of an inherited vulnerablility [sic] to brain dysfunction and the need for a more comprehensive neurodiagnostic workup, including MRI and neurological examination.

Further,

> This apparent degenerative brain disease process also raises important questions about his behavior at the time of the instant offense, as there is evidence in the test data from the time of trial that there was something abnormal and deteriorating about his neurocognitive [sic] functioning. This is also relevant in light of research literature demonstrating linkages between transient ischemic attacks and strokes, and violent behavior. [reference omitted]

Mr. Fields had an MRI of the brain on November 3, 2011, utilizing sagittal T1 weighted images followed by axial T1, T2, FLAIR, and diffusion weighted images. According to Susan Koslow, M.D. this study did not reveal any intracranial abnormality.

## PSYCHOLOGICAL TESTING

In our meetings on July 31, August 1, and August 2, 2013, I administered a variety of psychological and neuropsychological tests to Mr. Fields. These tests were chosen in order to provide a comprehensive assessment of his neuropsychological status, replicate the findings of previous evaluators, and assess his level of motivation and involvement in this evaluation. Cognitive test scores are presented in the attached table.

The following procedures were administered:

July 31, 2013
    Interview

Mini-Mental State Exam-2 (MMSE-2)
Medical Symptom Validity Test (MSVT)
Minnesota Multiphasic Personality Inventory-2

August 1, 2013
Additional interview
MMPI-2 completion (MMPI-2)
Victoria Symptom Validity Test (VSVT)
Wisconsin Card Sorting Test (WCST)
Wechsler Adult Intelligence Scale, Fourth Edition
Structured Inventory of Malingered Symptomatology (SIMS)
Wechsler Memory Scale, Third Edition Abbreviated
Wide Range Achievement Test-4  (WRAT4)
Word Reading
Sentence Comprehension
Dot Counting Test (DCT)
Boston Naming Test (BNT)

August 2, 2013
Additional interview
Word Memory Test (WMT)
Neuropsychological Symptom Checklist (NSC)
Booklet Category Test (BCT)
Verbal Fluency
Category Fluency
Rey Complex Figure Test with Recognition (RCFT)
California Verbal Learning Test-2 (CVLT-2)
Trail Making Test
Stroop Color and Word Test
Ruff Figural Fluency Test
Finger Tapping Test
WRAT4 Spelling
Memory Complaints Inventory (MCI)
Thurstone Word Fluency Test
Wechsler Test of Adult Reading (WTAR)
Personality Assessment Inventory (PAI)

Consistent with professional guidelines, multiple measures of symptom validity were administered in the course of this examination.[4] On some of these measures, Mr. Fields's performance was in the range of people with severe, objectively verified cognitive impairment (such as nursing home patients). He also endorsed improbable memory complaints. In addition, indications of feigned or exaggerated psychiatric and emotional symptoms were seen (see below). Therefore, there are indications of inappropriate task engagement, and consequently the following test findings are unlikely to provide an accurate description of his cognitive and psychological status. This caveat should be kept in mind when reviewing the following results.

Mr. Fields's performance on this evaluation is described below. Where appropriate, test scores were adjusted for age and education. For the sake of organization, the test results are grouped into various domains. However, this grouping is somewhat arbitrary; successful performance on neuropsychological tests is dependent upon multiple cognitive abilities acting in concert.

The following classifications were used:

| Classification | T-Score | Standard Score | Z-Score | Scaled Score | %ile Rank |
|---|---|---|---|---|---|
| Extremely Superior | ≥ 77 | ≥ 140 | >2.7 | >18 | >99 |
| Very Superior | 70-76 | 130-139 | 2.0-2.7 | 16-17 | 98-99 |
| Superior | 64-69 | 120-129 | 1.4-1.9 | 14-15 | 92-97 |
| High Average | 57-63 | 110-119 | 0.7-1.3 | 12-13 | 75-91 |
| Average | 44-56 | 90-109 | 0.6 to -0.6 | 8-11 | 24-74 |
| Low Average | 37-43 | 80-89 | -1.3 to -0.7 | 6-7 | 9-23 |
| Borderline Abnormal | 30-36 | 70-79 | -2.0 to -1.4 | 4-5 | 2-8 |
| Mildly Abnormal | 25-29 | 62-69 | -2.5 to -2.1 | 1-3 | 1-1.9 |
| Moderately Abnormal | 20-24 | 55-61 | -3.0 to -2.6 | <1 | 0.3-0.9 |
| Extremely Abnormal | ≤ 19 | ≤ 54 | <-3.0 | 0 | ≤0.2 |

## *Intellectual Functions*

Mr. Fields was administered the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV). The following scores resulted:[5]

---

[4] Heilbronner, R. L., Sweet, J. J., Morgan, J. E., Larrabee, G. J., & Millis, S. R. (2009). American Academy of Clinical Neuropsychology Consensus Conference Statement on the neuropsychological assessment of effort, response bias, and malingering. *Clin Neuropsychol, 23*(7), 1093-1129.

[5] On the Block Design subtest I inadvertently gave Item 8 prior to Item 7. In addition, he self-corrected on Item 10 after I had stopped the stopwatch (while I was recording his answer). As permitted in the test manual, I calculated alternates score by substituting the Figural Weights subtest for the Block Design subtest. This substitution resulted in a PRI of 96, and FSIQ of 92, and a GAI of 101.

**Composite Score Summary**

| Scale | Sum of Scaled Scores | Composite Score | | Percentile Rank | 95% Confidence Interval | Qualitative Description |
|---|---|---|---|---|---|---|
| Verbal Comprehension | 34 | VCI | 107 | 68 | 101-112 | Average |
| Perceptual Reasoning | 23 | PRI | 86 | 18 | 80-93 | Low Average |
| Working Memory | 13 | WMI | 80 | 9 | 74-88 | Low Average |
| Processing Speed | 13 | PSI | 81 | 10 | 75-91 | Low Average |
| Full Scale | 83 | FSIQ | 88 | 21 | 84-92 | Low Average |
| General Ability | 57 | GAI | 97 | 42 | 92-102 | Average |

Based on these scores, Mr. Fields's overall level of intellectual functioning is in the low average to average range. However, his score on an embedded measure of symptom validity raises the possibility of less than optimal effort. These scores are roughly similar to those obtained by Dr. Gelbort in 2004 and Dr. Price in 2005, using an earlier version of this test.

Within the WAIS-IV Mr. Fields received a relatively high score on a measure of his overall auditory verbal abilities (VCI). This was primarily due to a score in the high average range on a subtest measuring his fund of general knowledge (Information).

I re-administered the Wechsler Test of Adult Reading (WTAR), which had been given by Dr. Price. The WTAR is a method of estimating premorbid intellectual functioning. Scores from both administrations were in the average range, and roughly consistent with his obtained IQ scores across three assessments. (Using the WAIS-III, in 2004 Dr. Gelbort reported an FSIQ of 94, and in 2005 Dr. Price noted an FSIQ of 109.) These findings argue against any decline in his level of intellectual functioning.

*Academic Achievement Testing*

Mr. Fields was administered the Wide Range Achievement Test-4th Edition (WRAT-4).

The resulting composite scores are presented below:

| Subtest | Standard Score (95% CI) | Grade Equivalent |
|---|---|---|
| Word Reading | 92 (84-101) | 11.7 |
| Sentence Comprehension | 98 (90-106) | 12.9 |
| Spelling | 84 (76-94) | 7.3 |
| Math Computation | 84 (74-96) | 5.9 |
| Reading Composite | 94 (88-100) | N/A |

Mr. Fields's academic skills test in the low average to average range.

Mr. Fields was given an earlier version of this test by both Dr. Gelbort and Dr. Martell. His scores on the Word Reading part of this test were average for all three administrations. The second two administrations revealed a mild decline in his spelling abilities (from about the 34%ile in 2004 to about the 14%ile in 2010 and 2013). His arithmetic scores varied dramatically:

| Year | Percentile Rank |
| --- | --- |
| 2004 | 18 |
| 2010 | 2 |
| 2013 | 14 |

In 2010 Dr. Martell described Mr. Fields's arithmetic abilities as being at the 4th grade level, and wrote that this finding suggests "the presence of a specific learning disability for mathematics." However, Mr. Fields's increase of almost two grade levels in three years argues against any such disability.

## Attention and Concentration

As noted above, on the WAIS-IV, Mr. Fields received a Working Memory Index (WMI) of 80, which is in the Low Average range. According to the *WAIS-IV Technical and Interpretive Manual*, "working memory tasks require the ability to temporarily retain information in memory, perform some mental operation on, or manipulation of, it and produce a result." This index may be artificially lowered in that it contains the Digit Span subtest, a measure of attention that is used to calculate the Reliable Digit Span and Enhanced Reliable Digit Span.[6,7] Mr. Fields's scores on these two measures were at the recommended cutoff point for inadequate effort, and thus provide further support for the hypothesis that the obtained scores are an underestimate of his abilities.

Closely related to attention and concentration is Mr. Fields's speed of mental information processing. On this administration of the WAIS-IV, Mr. Fields received a Processing Speed Index (PSI) of 81, also in the Low Average range. According to the *WAIS-IV Technical and Interpretive Manual*, "The PSI provides a measure of the examinee's ability to quickly and correctly scan, sequence, or discriminate simple visual information."

---

[6] Reese, C. S., Suhr, J. A., & Riddle, T. L. (2012). Exploration of malingering indices in the Wechsler Adult Intelligence Scale-Fourth Edition Digit Span subtest. *Arch Clin Neuropsychol, 27*(2), 176-181.

[7] Suhr, J. A., & Barrash, J. (2007). Performance on standard attention, memory, and psychomotor speed tasks as indicators of malingering. In G. J. Larrabee (Ed.), *Assessment of malingered neuropscyhological deficits* (pp. 131-170). Oxford: Oxford University Press.

On another measure requiring single word reading and color naming speed, Mr. Fields produced mildly abnormal and low average scores, respectively.   On the third, most complex and diagnostic portion of this task, requiring response inhibition or impulse control, his score was low average (Stroop Color and Word Test).  Dr. Martell administered this same test in 2010.  Per the test manual, Mr. Fields's pattern of test results was "highly pathological," such that the test manual mandates that subjects who receive such a pattern "should be given a re-administration of the entire test" to assure the validity of the results.  There is no record that Dr. Martell followed this mandate.  This inconsistency between evaluations further supports the hypothesis of inadequate effort.

The Trail Making Test requires attention to visual arrays, one relatively simple (Part A) and the other more complex, with a demand for divided attention (Part B).  Mr. Fields's score on Part A was low average, and his score on Part B was borderline abnormal.  When seen by Dr. Martell, Mr. Fields's score on Part A was borderline abnormal, and he was reportedly unable to complete Part B, and it was discontinued due to frustration.

Thus, on this evaluation the majority of scores on tests focusing on attention and concentration clustered in the borderline abnormal to low average range, with no scores being markedly impaired.

### Executive Functions

Executive functions include the:

> Cognitive abilities necessary for complex goal-directed behavior and adaptation to a range of environment changes and demands.  Executive function includes the ability to plan and anticipate outcomes (cognitive flexibility) and direct the attentional resources to meet the demands of non-routine events.[8]

Mr. Fields's scores were low average to average on tasks that required him to solve problems by systematically generating and testing hypotheses based upon feedback (Booklet Category Test; Wisconsin Card Sorting Test).  When seen by Dr. Martell, Mr. Fields made more than twice as many errors on the Booklet Category Test (82 versus 40), and on the Wisconsin Card Sort his scores ranged from mildly to extremely abnormal.  This improvement in Booklet Category Test scores could potentially be at least partially explained by a practice effect (the presence of such an effect would demonstrate the ability to learn from experience, and retain the knowledge for about three years).

However, his dramatic improvement on the Wisconsin Card Sorting Test is unlikely to be due to a practice effect, in that when seen by Dr. Martell he failed to figure out any of the

---

[8] Loring, D. W. (Ed.). (1999). *INS Dictionary of Neuropsychology*. New York: Oxford University Press.

sorting principles (a very atypical result, even in patients with objectively verified brain damage). The most likely explanation for this improvement is a fluctuating level of engagement in the two evaluations. That is, over the course of both evaluations Mr. Fields at times was not exerting his best effort, but due to the number of tests administered he was unable to reproduce the same pattern of findings over two evaluations.

Word fluency has both executive functioning and language components. Mr. Fields's score was borderline abnormal on several fluency measures. When seen by Dr. Martell, his score was reported as being mildly abnormal on verbal fluency and moderately abnormal on category fluency.

The Ruff Figural Memory Test is a visual analog to verbal fluency. Per the manual, Mr. Fields's ability to generate unique designs was "impaired" (per the test manual) at about the 2%ile, although he was not significantly perseverative. His scores were about the same as when seen by Dr. Price in 2005.

As mentioned, Mr. Fields's score was borderline abnormal on this administration of a task that required him to keep track of two sequences simultaneously (e.g., numbers and letters) and switch back and forth (Trail Making Test, Part B). Successful completion of this task requires divided attention and cognitive flexibility, both aspects of executive functioning. He was reportedly unable to complete this test when seen by Dr. Martell.

As noted above, Mr. Fields's score was low average on the subtests that contributed to the Perceptual Reasoning Index of the WAIS-IV. These tasks require fluid reasoning (e.g., reasoning that is not dependent on prior learning or experiences), another component of executive functioning.

Another component of executive functioning is the ability to focus and sustain attention, resist distracting stimuli, and inhibit impulsive responses. As noted above, this evaluation did not reveal any difficulty with these abilities on the Color-Word portion of the Stroop.

Therefore, on this current evaluation Mr. Fields's scores on measures of executive functioning ranged from borderline abnormal to average, with no markedly impaired scores.

### Language Functions

As noted above, on the WAIS-IV Mr. Fields received a Verbal Comprehension Index (VCI) of 107, which is in the Average range. According to the *WAIS-IV Technical and Interpretive Manual*, "the VCI is a measure of verbal concept formation, verbal reasoning, and knowledge acquired from one's environment."

Results from tests of verbal fluency are described above.  His score on a confrontation naming task was superior (BNT).

Thus, this evaluation did not provide any indications of language dysfunction.

## Perceptual and Visuospatial Skills

As noted above, on this administration of the WAIS-IV, Mr. Fields's score was low average on the subtests that contributed to the Perceptual Reasoning Index of the WAIS-IV. According to the technical and interpretive manual for the WAIS-IV, "the PRI is a measure of perceptual and fluid reasoning, spatial processing, and visual-motor integration."

His copy of the Rey Complex Figure was in the borderline abnormal range.

As previously noted, Mr. Fields's score on a measure of rapid visual scanning that required him to connect numbers in ascending order was low average (Trail Making Test, Part A). Also as mentioned, his score was borderline abnormal on the more complex portion of this task, that required him to alternate between numbers and letters, the numbers in ascending order and the letters in alphabetical order.

Therefore, on this current evaluation Mr. Fields's scores on measures of perceptual and visuospatial functioning ranged from borderline abnormal to average, with no markedly impaired scores. Of note, Mr. Fields's reportedly ability to learn American Sign Language, which is highly dependent on spatial relationships,[9] argues against the presence of any significant visuospatial impairments.

## Motor Skills

Fine motor speed was mildly abnormal with his right, dominant hand and low average with his left hand (Finger Tapping Test).  His dominant hand scores have declined from the 2005 and 2010 evaluations, although his left-hand motor speed has been stable.

Mr. Fields's scores on timed measures requiring visuomotor abilities were low average (Trail Making Test, Part A; WAIS-IV Coding, Symbol Search).

Thus, he gave some indications of dominant hand motor slowing, perhaps due to his tremor.

---

[9] Sternberg, M. L. A. (1998). *Ameican Sign Language dictionary* (3rd ed.). New York: Harper.

## Learning and Memory

On the WMS-III Abbreviated Mr. Fields received a Total Memory Composite score of 96, which reflected an Immediate Memory Composite score of 96 and a Delayed Memory Composite score of 98. All of these scores are average.

Regarding his auditory-verbal memory, on a word list learning task his overall performance ranged the borderline abnormal to average (CVLT-II). His range of scores was about the same when seen by Dr. Martell, although the pattern of scores was different; in 2010 Mr. Fields made two errors on the forced-choice recognition portion of this task. Per the test manual, it is "extremely rare for individuals to make more than one error on this task."[10] Thus, the performance is a possible indication of either significantly impaired memory abilities or insufficient effort or exaggeration of memory deficits.

His immediate recall of spoken passages was average (versus average in 2004 and high average in 2005) (WMS-III Logical Memory). On the delayed recall portion he presented as being able to remember only 1 of 25 elements of one of the passages (he explained, "I know you're probably thinking that I'm faking this…"). However, he recalled 13 of 25 elements of the second passage, resulting in an overall score in the average range. His delayed recall of the passages was also average in 2005.

Visual memory was assessed with both a figure drawing test (Rey Complex Figure Test, or RCFT) and a motor-free test that required Mr. Fields to learn and remember the details from a series of pictures (WMS-III Family Pictures). His score on the immediate recall of the Rey figure was low average, and his score on the recognition phase was average. However, his score was moderately to extremely abnormal on the delayed recall portion. As he explained while he was drawing this figure, "I don't remember it, so I'm going to try to make it as pretty as possible." His immediate recall of the details from the Family Pictures test was average (in 2004 and 2005 his scores were low average). His delayed recall was also average (in 2005 his score was low average).

Thus, the majority of Mr. Fields's scores on measures of memory were in the low average to average range, with the exception of his delayed reproduction of a complex figure due to a reported inability to remember it. This marked inability to remember something he has seen is inconsistent with his learning sign language, and provides further support for a lack of engagement in this evaluation.

---

[10] Delis, D. C., Kramer, J. H., Kaplan, E., & Ober, B. A. (2000). *California Verbal Learning Test, Second Edition, Adult Version manual*. Psychological Corporation.

*Psychiatric/Psychological Status*

The Structure Inventory of Malingered Symptomatology (SIMS) screens for the feigning or exaggeration of cognitive, emotional, and psychiatric symptoms. Mr. Fields's Total Score on this test was 28, which is twice the recommended cut-off score of 14 for the identification of suspected malingering. This significantly elevated score indicates that Mr. Fields endorsed a high frequency of symptoms that are highly atypical in patients with genuine disorders. Specifically, his scores were above the cut-off for suspected malingering on all of the scales of this test, which included scales assessing feigned psychosis, neurologic impairment, memory disorders, low intelligence, and affective disturbance.

Mr. Fields was administered both the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) and the Personality Assessment Inventory (PAI). The results were interpreted with the assistance of scoring and interpretive software vended by the test publishers.

Per the test manual, the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) is a 567-item

> …broad-band test designed to assess a number of the major patterns of personality and psychological disorders.[11] (p. 1)

In addition to a variety of scales designed to inform on the presence of emotional or psychiatric distress or conditions, the MMPI-2 also includes validity scales, which are designed to evaluate the "acceptability of the record." Again, per the test manual:

> A test-taker may respond in a number of ways that can compromise a record's validity; he or she may leave large numbers of items unanswered; respond randomly, either intentionally or unintentionally (e.g., owing to limited reading ability); and/or distort his or her self-descriptions by either overreporting or underreporting difficulties. These threats to protocol validity are not mutually exclusive. Various combinations of such response patterns may be present in a given record. The validity indicators are designed to help detect these sources of protocol invalidity and to provide a basis for evaluating the impact of such distortions on the test record. (p. 14)

The first step in interpreting an MMPI-2 protocol is to evaluate the acceptability of the record. This is initially done by examining the number of unanswered items (0 in this

---

[11] Butcher, J. N., Graham, J. R., Ben-Porath, Y. S., Tellegen, A., Dahlstrom, W. , & Kaemmer, B. (2001). *MMPI-2 (Minnesota Multiphasic Personality Inventory-2) manual for administration, scoring, and interpretation* (rev ed.). Minneapolis, MN: University of Minnesota Press.

case), then looking for evidence of inconsistent responding. Mr. Fields gave some indications of inconsistent responding, receiving a T-Score of 65 (93%ile) on the VRIN scale, indicating a tendency to give contradictory responses to similar items.

The next step is to look at validity scales designed to detect under- or over-reporting of symptoms. One of the validity scales is the F-Scale. Individuals with high scores on this scale respond to the items in an exaggerated manner, endorsing a wide variety of symptoms and attitudes. Mr. Fields's was elevated with a T-Score of 98 (>99.98 %ile). In such instances, the clinical scales are invalid and cannot be interpreted.

Due to time constraints, Mr. Fields did not complete all of the items of the MMPI-2 in one session (he was able to complete the first 370 items, which contain the entire F-Scale). He completed this test the next morning.

Per the test manual, the Minnesota Multiphasic Personality Inventory-2 Restructured Format (MMPI-2-RF) "is a revised, 338-item version of the MMPI-2" (p. 1).[12] Similar to the MMPI-2, the MMPI-2-RF contains validity scales to assess the acceptability of the profile. Among these are the Variable Response Inconsistency scale (VRIN-r)which, as with the MMPI-2 VRIN scale, assesses for inconsistent responding.

Mr. Fields produced a T-Score of 73 (99th %ile) on VRIN-r. This high score does not in and of itself invalidate the protocol, although other scales must be interpreted cautiously.[13]

With that caveat in mind, examination of the MMPI-2-RF clinical profiles indicates that Mr. Fields reported a variety of somatic complaints, especially gastrointestinal complaints, and he is likely to develop physical symptoms in response to stress. He also reported cognitive difficulties, including trouble with memory and concentration.

He described a significant amount of emotional discomfort with his responses indicating significant and pervasive emotional distress, characterized at least in part due to a reaction to his current situation.

Mr. Fields received a high score on a scale assessing the presence of unusual thought and perceptual experiences. Examination of the individual items that make up this scale indicate that this elevation was triggered by reports of auditory and visual hallucinations, having had strange experiences, and amnesia for activities.

Behaviorally he reported a significant history of antisocial acting-out. Regarding his interpersonal functioning, he described not enjoying social events, and avoiding social

---

[12] Ben-Porath, Y. S., & Tellegen, A. (2008). *MMPI-2-RF (Minnesota Multiphasic Personality Inventory-2-Restructured Form*. Minneapolis: University of Minnesota Press.
[13] Ben-Porath, Y. S. (2012). *Interpreting the MMPI-2-RF*. Minneapolis: University of Minnesota Press.

situations, feeling easily embarrassed and uncomfortable around others.  He reported disliking people, a paucity of close relationships, and preferring to be alone.

Mr. Fields also completed the Personality Assessment Inventory (PAI), a 344-item self-report instrument which is described in the test manual as "a self-administered, objective test of personality..." (p. 1).[14]   Like the MMPI, the PAI contains validity scales designed to detect the truthfulness of the examinees responses.  Of note, Mr. Fields volunteered some awareness of these scales; the following exchange took place after he completed the PAI:

> JS:    …you said something about control questions.  How did you mean?
> EF:   I can't remember what it was, but it was just like stupid.
> JS:    Uh-huh.
> EF:   Like, nobody's going to answer that, and if they do they're faking it.

In spite of this awareness, relative to a correctional sample Mr. Fields received a T-Score of 64 (at about the 92%ile) on the Negative Impression Management Scale (NIM).  Per the test manual, the NIM

> …scale would be expected to elevate in the presence of malingering or feigning, or with cognitive styles characteristic of some forms of psychopathology that lead the client to exaggerate or focus solely on negative experiences.  (p. 155)[15]

In addition, again relative to a correctional sample, his T-Score was 61 (at about the 86%ile) on the Inconsistency scale (INC).  Per the test manual,

> The scale would be expected to elevate in the presence of careless or random responding, or in situations where the respondent did not accurately interpret items due to language problems, confusion, or idiosyncratic item interpretation.  (p. 145)

Given these caveats about symptom exaggeration and inconsistent responding, the resulting hypotheses produced by the interpretive program must be viewed cautiously.

On the PAI Mr. Fields reported symptoms of anxiety, depression, and psychosis.  Regarding psychotic symptoms, Mr. Fields received a T-Score of 71 (at about the 98th %ile) relative to a correctional sample on the Schizophrenia scale (SCZ), in part due to correctional T-Score of 71 on the Thought Disorder subscale (SCZ-T).  According to the test manual,

---

[14] Morey, L. C. (2007). *Personality Assessment Inventory (PAI) professional manual* (2nd ed.). Lutz, FL: Psychological Assessment Resources.

[15] Ibid

> Scores at or above 70$T$ reflect a loosening of associations and increased difficulties in self-expression and communication. (p. 39)[16]

Collectively, the results of personality testing must be viewed with extreme skepticism. Although Mr. Fields was aware of the presence of validity indicators on at least the PAI, he gave some indications of invalid responding on that test, and received a very elevated score on a validity indicator of the MMPI. His score was above the cut-off for suspected malingering on the SIMS. On the PAI and the MMPI-2-RF he reported psychotic symptoms, including thought disorganization; Mr. Fields's behavior during the interview portion of this evaluation and the collateral documents do not support the presence of any such difficulties.

## MENTAL STATUS EXAMINATION

At the beginning of my first meeting with Mr. Fields I informed him of my name and that I am a psychologist, and that I was retained by the prosecution to conduct a neuropsychological examination of him.

I informed him of the lack of confidentiality; that I would be communicating my findings to the prosecution and that from there any information or materials I gathered could be sent to others and possibly disclosed in court testimony, and thus could eventually become public record. I further informed him that I would not be providing any sort of counseling or feedback.

Mr. Fields was told that I would be video and audio recording the interview portion of my examination of him.

He was able to paraphrase the gist of this notification and agreed to proceed. He stated that his attorney had informed him of this examination.

I reiterated this notification at the beginning of our second and third meetings.

All meetings were conducted in a private room at the FBOP facility in Terre Haute, Indiana. The room was well lit, and the temperature was comfortable for Mr. Fields. The environment was noisy at times, especially on August 2 as the result of a raucous visit in a nearby room. Mr. Fields commented on this noise, but stated that he could ignore it and requested that I not intervene out of consideration for the visitors. The same day he also

---

[16] Ibid

complained of staff talking loudly. On August 1 a fire alarm went off immediately after the first item on the WCST. We waited for this alarm to stop and I restarted the test.

Mr. Fields was awake and alert in spite of describing an irregular sleep schedule. On July 31, he twice complained of losing his train of thought.

Mr. Fields displayed a tremor, which he attributed to his medication. On August 2 he complained that this tremor made it difficult for him to manipulate a computer mouse. He denied having any difficulty using a computer on other days.

Mr. Fields is a heavy set white male who appears his stated age. He was dressed in FBOP apparel with good grooming and hygiene. He wore glasses as necessary. His upper extremities were unrestrained. He spoke fluent English; although he had a slight regional accent his speech was easily understandable. His speech was of normal tone, rate, and volume. In contrast to his complaints, he did not demonstrate any significant word finding difficulties. His conversational abilities were consistent with an at least average verbal intelligence and fund of knowledge. He had no difficulties following conversation. He had red marks on his arm which he attributed to picking and scratching at his skin.

Mr. Fields related in a friendly and personable manner, with no obvious irritability or hostility. Social relatedness was unremarkable. He readily made appropriate small talk with both correctional officers and me, and was heard having jovial interactions with detention officers.
He described being in a generally "good" mood, although he reported experiencing anxiety and other emotional distress due to being "locked up on death row." He is pessimistic about his future, explaining that he is about "halfway down" his appeals. He reported some fluctuations in his mood, although this is "not as bad as it used to be." He stated that his mood swings were exacerbated (rather than mitigated) by lithium. He reported episodes of "regret" due to "all the stupid stuff I did in my life" and periods when he feels good, such as "when I go out to break and I've got stuff to make pizzas with, I'm really happy."

Out of 24 hours, he reportedly sleeps about 9 or 10. Where earlier he told me that his medications made him sleepy, he stated that he "would sleep more if I was off my meds." He denied thoughts of hurting himself or others. His appetite is "out of control."
His affect initially seemed somewhat guarded, but as the examination progressed it became more open. He related in a playful manner at times, and displayed a sense of irony and humor.

Mr. Fields stated that he continues to hear voices in spite of his psychiatric medications. However, he is "afraid to try something new" due to adverse reactions to medications in

the past. He later stated that the medication reduces the frequency of the voices, although they are still "just enough to aggravate the crap out of me."

Mr. Fields described his most recent auditory hallucination as occurring two nights prior to August 1:

> JS: Uh-huh. So, like Tuesday night or something? What did the voice say?
> EF: I was getting up to clean my cell.
> JS: Uh-huh.
> EF: And the voice was telling me not to.
> JS: Uh-huh.
> EF: I don't know why.
> JS: Yeah. Did you do it any – did you clean your cell anyway?
> EF: Not right then. It took me a little while, but I finally got it.

Mr. Fields reported that the voice does "not always [tell me] bad things to do… Some things, you know, that I – that I should do." He presented as being unable to provide any examples of the good things. Mr. Fields is able to "sometimes" ignore this voice.

Mr. Fields reported ongoing visual hallucinations. For example, he has seen an "apple" and "a couple of ducks." When questioned he allowed that these could be misperceptions, rather than hallucinations. These did not happen when he was drifting off to sleep or waking up.

He has seen other indistinct things:

> JS: Okay. What other types of things have you seen?
> EF: A lot of things I don't know what it is.
> JS: Uh-huh.
> EF: Then when I go to look it's gone.
> JS: Uh-huh.
> EF: But, you know, I'm – they're – they're hard to explain.

He denied tactile, olfactory and gustatory hallucinations. His thought processes were goal directed and coherent. He did not make any overtly delusional statements. He believes that there are inmates who would like to harm him due to his having been a correctional officer. His thought processes, as manifested in his speech, were logical, goal directed, and coherent.

On the Mini Mental State Exam-2 Mr. Fields earned a score of 27 out of 30, losing 2 points on a memory item and making a minor error when repeating a phrase.  He was fully oriented.

## FORENSIC PSYCHOLOGICAL ASSESSMENT

1. *Does the collective testing data, in conjunction with pertinent collateral history, reflect upon Mr. Fields as suffering from frontal lobe or other brain damage-related disinhibition at the time of the crime? Does the data reflect upon any significance of hyaline membrane disease, earlier reported loss of consciousness, or early respiratory distress?*

In his report, Dr. Martell stated,

> Any reasonable neuropsychologist looking at Dr. Price's neuropsychological data would have identified the presence of significant impairments [sic] Mr. Fields' brain functioning, primarily involving frontal lobe functioning.

Examination of the results from both Dr. Gelbort's 2004 evaluation and Dr. Price's 2005 evaluation reveals that the majority of the scores were within normal limits, with no pattern emerging that would be indicative of "significant impairments."

In testing with both Dr. Gelbort and Dr. Price, Mr. Fields displayed variable scores, as would be expected in an unremarkable test battery using multiple measures.[17,18] However, as mentioned, no particular pattern emerged of pronounced difficulties with executive functioning or any other particular cognitive domain.

Mr. Fields did display generally improved scores when seen by Dr. Price versus Dr. Gelbort. This may have been a manifestation of a practice effect,[19] a variable level of effort, changes in his affective status, or other situational or transitory factors.[20]

As discussed below, Mr. Fields gave indications of inadequate effort in the course of my evaluation of him. Thus my results must be interpreted to be an underestimate of his actual

---

[17]Binder, L. M., Iverson, G. L., & Brooks, B. L. (2009). To err is human: "Abnormal" neuropsychological scores and variability are common in healthy adults. *Archives of Clinical Neuropsychology, 24*, 31-46.

[18] Schretlen, D. J., Testa, S. M., Winicki, J. M., Pearlson, G. D., & Gordon, B. (2008). Frequency and bases of abnormal performance by healthy adults on neuropsychological testing. *Journal of the International Neuropsychological Society, 14*, 436-445.

[19] Lezak, M. D., Howieson, D. B., Bigler, E. D., & Tranel, D. (2012). *Neuropsychological Assessment* (5th ed). New York: Oxford.

[20] Ibid

level of abilities. Even given his lack of full effort, on this current evaluation Mr. Fields's scores on measures of executive functioning ranged from borderline abnormal to average, with no clearly impaired scores.

In addition, pertinent collateral history is not consistent with the presence of "significant impairments [in] Mr. Fields's brain functioning." As noted above, in school his scores on standardized testing, including the GED, clustered in the average range. His mother described him as seemingly advanced of his peers. Standardized testing conducted incident to his service in the Navy produced average scores.

Mr. Fields was able to independently master computer programming and repair, at a reportedly sophisticated level. He was characterized by friends and acquaintances as very intelligent. For example, at his trial Cherie Fields testified:

> Q: All right. As between you and your brother, who is smarter?
> A: My brother.
> Q: By how much would you say?
> A: I don't know how much. He's a very intelligent man.

Mr. Presley testified:

> Q: Could you tell me some of the things that you think Ed does really well?
> A: Just about anything he wants to do. But where he exceeds, he's fantastic with computers. He's an excellent cook. Mechanical, when he wants to, he's very mechanical. When he tries to do – sets his heart on something to work on something in order to fix it, he can do it.

Even his own defense counsel testified as to Mr. Fields's abilities: At a Change of Plea Hearing on June 30, 2005, his then-attorney Julia L. O'Connell testified:

> He has consulted with me numerous, numerous times. Our relationship has involved hours of consultation with one another. And I am convinced that Mr. Fields understands the nature and the consequences of this proceeding, that he understands the consequences especially of sacrificing his right to have a jury trial to determine whether he is guilty or not guilty of the offenses charged. He understands completely that what we are doing by doing that is litigating only the issue of what punishment is to be imposed.

Mr. Fields's description of the offense is not consistent with an impulsive, disinhibited act. He told me that at around the time of his offense he had been living out of his truck for a

"couple months," "camping down by the lake." He was "homeless," with his possessions in storage. He explained, "I only brought home about $100 a week" due to "paying out four child support payments for two different kids."

Approximately a month prior to the murders, Carol Lamb bought burlap for Mr. Fields to cover his rifle with camouflage material, testifying "we got home and he cut them up in strips and tied them all over his gun like a camouflage for his gun. I asked him what he did that for, and he said, 'Well, you don't want to know'."

Mr. Fields told me that he saw the Chicks camping. He first saw them "a couple days beforehand" at a shower facility adjacent to their campsite, saying, "the first time I saw them, I did not think of robbing them… The second time I saw them, they were like from Tex– out of state… And I figured, well, if they're out of state, they've got money." He described being "desperate" due to being "homeless" and was thinking that they might have "a couple hundred bucks."

After Mr. Fields decided to rob the Chicks, he put on his kit, grabbed his gun, and surreptitiously approached their campsite, being able to get "within like 15-20 feet" of them, close enough to hear their conversation. The Chicks initially were not there, and Mr. Fields waited for their return without alerting them to his presence nearby. When he heard Mr. Chick tell his wife that he was going to the tent, Mr. Fields, whose scope was aimed for a "head shot," shot him; he proceeded to shoot Mrs. Chick and then Mr. Chick again "just to make sure… they were dead."

From the time he saw the Chicks that evening, put on his kit, crept up on them, and killed them took "about an hour and a half."

Mr. Fields conveyed that immediately after the shootings he returned to his truck. He took off his ghillie suit (he was wearing his regular clothes underneath) and drove his truck to the crime scene, where he specifically went through the Chicks' possessions and selected items of perceived value. This, too, reflected organized behavior and decision-making. (As noted above, there is some dispute regarding exactly when Mr. Fields returned the crime scene to take the Chicks' possessions.)

After robbing the Chicks, Mr. Fields spent some of their money on gasoline, a cell phone, and an engagement ring for Michelle. These represent practical items and an extravagance in line with his customary obsession and dramatic gestures toward Michelle at baseline.

When Michelle asked him where he got the money from, Mr. Fields offered a self-serving but plausible lie that he had transported some drugs to Texas. He displayed the creativity to provide to her an elaborate story.

Mr. Fields denied being intoxicated at around the time of the offense, reporting that his last drink was "probably about four days before" the shootings.

Mr. Fields has repeatedly conveyed that financial strain and related stressors were a contributing factor in his actions. In a phone call with Ms. Tipton, he states "Michelle…I couldn't afford to keep going and finding somewhere else to stay. I couldn't afford it. It wasn't your fault… But I did need somewhere to stay."

However, Ms. Lamb indicated that she would have been willing to provide Mr. Fields with money for a room on July 10th, saying "he had asked me for some money to get a room; and I had told him to call and find out if you're going to get a room, and if you do, then let me know. I didn't hear from him again that night."

Other witnesses have noted Mr. Fields's behavior following the crime to be ordinary, and Mr. Fields's fluidity in explaining his improved finances.

As planned Thursday morning, Mr. Fields arrived at Ms. Tipton's home about 5:45 PM on Friday, July 11. He had two backpacks with him, "a wallet full of money, a bag of pot," and an engagement ring, according to her testimony.

He proposed to Ms. Tipton. They went out to dinner. One of the backpacks contained, "Video camera, digital camera, CDs, police scanner, electronic – it was all electronic stuff."

On Saturday, July 12 and Sunday July 13, Ms. Tipton and Mr. Fields went on shopping, where Mr. Fields purchased a variety of items for Ms. Tipton. They "had a great time" during these excursions. Nothing in his behavior during this period was reflective of cognitive impairment.

Mr. Fields also showed Ms. Tipton a large amount of cash. She asked him about the source of this money. According to Ms. Tipton;

> He told me that the Thursday night before he had done a drug run to Texas and the people had paid him thousands of dollars and a bag of pot to make this drug run. He had quite an elaborate story.

As for where he got the backpacks, Ms. Tipton recalled the examinee to say:

> It was coming back from Texas that he had stopped at a rest stop and found a young kid sleeping in the front of a pickup truck with these backpacks sitting behind a window and as he walked by he just reached over and picked them up and kept walking.

Daniel Presley had contact with Mr. Fields in telephone calls the following week. Per Mr. Presley's account, Mr. Fields "sounded fine during these telephone conversations and Pressley [sic] could determine nothing unusual about his demeanor or personality. Fields mentioned that he really needed to go fishing."

At his trial, coworker Betty Vaughn testified about his behavior in the week after the murders:

> Q: Did you notice any change in the Defendant's economic conditions in the week after the murders?
> A: Yes. He bought new truck tires and he had a cell phone and new tires.
> Q: Did you him or talk with him about those changes?
> A: Yeah. I asked him if he came into some money and he just smiled. He never really answered.
> Q: What have you known about the Defendant's economic condition before that time?
> A: He was basically broke. He was living out of his truck and living off his paycheck. I mean, he was always complaining about how broke he was. I remember that.
> Q: Did you make any comments to him about the way that he had spent this new money?
> A: Yeah. I asked him why he was buying truck tires and clothes and not getting a place to live. And he, once again, just grinned – you know, like the – I figured he found a new girlfriend or something.

Hyaline membrane disease (or respiratory distress syndrome) is a condition that can lead to hypoxia, reduced oxygen to the brain. Hypoxia can result in structural brain changes and impairments of cognitive functioning, including difficulties with memory and learning, and executive functioning[21] and developmental delays.[22] However, as noted above, the collateral information does not reveal any chronic aftereffects from this condition.

The collateral information documents two episodes of blows to the head requiring medical treatment. (Mr. Fields was also reportedly assaulted while at the David Moss Criminal Justice Center. I could not locate any documentation of medical treatment after this incident.)

---

[21] Lezak, M. D., Howieson, D. B., Bigler, E. D., & Tranel, D. (2012). *Neuropsychological Assessment* (5th ed.). New York: Oxford.

[22] Patrianakos-Hoobler, A. I., Msall, M. E., Huo, D., Marks, J. D., Plesha-Troyke, S., & Schreiber, M. D. (2010). Predicting school readiness from neurodevelopmental assessments at age 2 years after respiratory distress syndrome in infants born preterm. *Dev Med Child Neurol, 52*(4), 379-385.

In 1983 (when he was 16 years old) he was diagnosed with a concussion.  A CT scan was normal.  In 1997 (when he was 30 years old) he had a "forehead contusion."  He played football in high school.  There are no indications of any cognitive aftereffects from any of these experiences.

An opinion that would maximize the significance of these events, based upon the available history, would account for them as a history of uncomplicated concussion. A complete recovery is the norm in uncomplicated concussions.[23]

Not surprisingly, an MRI of the brain conducted in 2011 was normal.  Furthermore, the available testing exhibits no findings reflective of frontal lobe or other meaningful brain damage.

2. *Does the collective testing data, in conjunction with pertinent collateral history, reflect upon Mr. Fields as suffering from a neurological disease with progressive worsening to this day?*

As noted and as discussed below, on this current evaluation Mr. Fields gave indications of inadequate effort. Thus my results must be interpreted to be an underestimate of his actual level of abilities.  That being said, on this evaluation Mr. Fields's IQ score was low average.

Scores on academic achievement testing were in the low average to average range.  Scores on tests of his attentional abilities were mostly in the borderline abnormal to low average range, with a mildly abnormal score on the Word Reading portion of the Stroop, on which his score actually increased by at least a standard deviation from when he was seen by Dr. Martell.  As mentioned, scores on measures of executive functioning ranged from borderline abnormal to average, with dramatic improvements noted on the Wisconsin Card Sorting Test and Part B of the Trail Making Test from Dr. Martell's evaluation.  No indications of language dysfunction were noted.  His scores on measures of perceptual and visuospatial functioning ranged from borderline abnormal to average, with no markedly impaired scores.  He displayed some dominant hand motor slowing, perhaps due to his tremor.  The majority of Mr. Fields's scores on measures of memory were in the low average to average range, with the exception of his delayed reproduction of a complex figure (as mentioned, his purported inability to recall this figure is inconsistent with his reported ability to learn sign language).  **Thus, this current evaluation is most indicative of unimpaired cognition.**

In his report of April 1, 2010, Dr. Martell writes that Mr. Fields's testing data reflects a "catastrophic decline in functioning." He asserts that this warrants further evaluation in the

---

[23] McCrea, M. A. (2008). *Mild traumatic brain injury and postconcussion syndrome: The new evidence base for diagnosis and treatment.* New York: Oxford University Press.

form of a comprehensive neurological examination and MRI to account for "the possibility of an inherited vulnerability to brain dysfunction."

This study was done, and was normal. Mr. Fields had an MRI of the brain on November 3, 2011, utilizing sagittal T1 weighted images followed by axial T1, T2, FLAIR, and diffusion weighted images, which did not reveal any intracranial abnormality.

Dr. Martell's test battery had minimal overlap between those administered by Dr. Price and Dr. Gelbort, thus limiting the possibility of direct comparisons between scores. (In general the greatest practice effects are likely to occur between the first and second administrations;[24] therefore, he need not have adjusted his protocol to the end that other questions were unanswered by his not administering tests).

In addition, many of the measures administered by Dr. Martell on which Mr. Fields did poorly had a prominent motor component (i.e., Finger Tapping Test, Grooved Pegboard, and the Tactual Performance Test). Mr. Fields was evaluated by Dr. Martell in March 2010. During this time period he had a significant tremor, as documented by his signature on the April 2010 motion for relief:

Executed (signed) on _April 5 2010_____ (date).

_____
Signature of Movant

He was being treated with psychotropic medicines which are known to cause tremor.

When seen by Dr. Martell, Mr. Fields's performance on the Stroop Color and Word Test and the Forced Choice portion of the CVLT-2 was unusual, and he received extremely low scores on the Wisconsin Card Sorting Test, raising the possibility of either atypical neuropathology or inadequate effort. Dr. Martell did not investigate the latter possibility.

A basic principle of science is that the larger the effect, the easier it is to observe – you do not need a microscope to find a boulder. If Mr. Fields indeed has a major neurodegenerative condition causing a "catastrophic decline" in his mental functioning, this should be readily apparent in all aspects of his life that are in any way dependent upon intact brain functioning. A physical analogy is the onset of paralysis – this resultant disability would be obvious to both expert and lay observers, and would have massive

---

[24] Lezak, M. D., Howieson, D. B., Bigler, E. D., & Tranel, D. (2012). *Neuropsychological Assessment* (5th ed.). New York: Oxford.

consequences for the patient's life. No such monumental decline has been noted in Mr. Fields's functioning, either through formal evaluations or in his day-to-day life.

Comparison of my results with those obtained from previous evaluations is tempered by the indications of inadequate effort on this current evaluation. However, even with this lack of effort examination of the scores does not support the finding of a "catastrophic decline." His IQ scores remain within normal limits. His score on a measure of verbal fluency is roughly equivalent to when seen by Dr. Price, and improved from Dr. Martell's evaluation. On the Logical Memory and Family Pictures subtests of the Wechsler Memory Scale his current scores were average, with a trend towards improvement in the Family Pictures scores from when seen by Dr. Price and Dr. Gelbort. His overall performance on the California Verbal Learning Test-2 was roughly equivalent to that reported by Dr. Martell. As noted, on Part B of the Trail Making Test, the Wisconsin Card Sorting Test, and the Booklet Category Test his scores all improved from when seen by Dr. Martell. On achievement testing his arithmetic scores improved from Dr. Martell's evaluation.

Mr. Fields has been in the custody of the Federal Bureau of Prisons for the past eight years. In that time he has been repeatedly assessed by mental health staff, and has consistently been described as having essentially normal cognition. He has maintained correspondence and tended to his healthcare needs. In our meetings he was able to converse intelligently, provide an accurate history, and remember the content of our conversation from one day to the next. He has been learning American Sign Language, an assertion that is supported by documentation from mental health staff; on July 14, 2011 psychologist Jennifer A. Godlove wrote:

> We exchanged communication via sign language as he continues to practice and learn new words and phrases.

He converses intelligent about a variety of topics (for example, he was able to describe the Doppler Effect to me). He engages in email exchanges, during which he references previous topics.

> 3. *Does the collective testing data, in conjunction with pertinent collateral history, reflect upon Mr. Fields to have been suffering from auditory hallucinations before and after the crime?*

Mr. Fields told me in our interview that he shot Mr. Chick at the urging of the "voices," relating, "and I thought through my mind, I'm losing the situation. So, I just – voices told me to shoot him and I did."

> JS: …so the voice told you to kill Mr. Chick. Why did you shoot Mrs. Chick?
> EF: Because she would be able to point them at me.

Interpreted most sympathetically to Mr. Fields, he armed himself and positioned himself in sniper's proximity to Mr. and Mrs. Chick without influence of hallucinations. Moreover, he shot and killed Mrs. Chick to conceal a crime, under no influence of hallucination. His assertion of hallucination, should it be legitimate, did not elicit behavior that was any different from behavior he admitted that was not impacted by hallucination.

I asked Mr. Fields why he felt compelled to follow the commands of the "voice," and he related that "after all the years that I've been hearing the voice… I just guess I gave in." Per Mr. Fields, the voice stopped after he shot Mr. Chick and "after that I didn't hear the voice for a while."

Auditory hallucinations represent an acute psychotic symptom. Hallucinations occur in the context of worsening and acute psychiatric illness – schizophrenia, bipolar disorder, depression, and related diagnosis. As such, when a person is genuinely hallucinating, it is accompanied by other evidence for acute mental deterioration.

There is no history of an acute psychiatric condition to accompany the aforementioned explanation of a hallucination.

Just prior to committing the instant offense, Mr. Fields visited with friends Marilyn and Dan Presley. Mrs. Presley recounted nothing unusual about Mr. Fields's demeanor at that time, noting that he appeared "upbeat" and optimistic about his relationship with Michelle Tipton. Additionally, Mr. Fields again referenced having snuck up on people while wearing his ghillie suit, indicating that he observed a young couple having sex in their car "the other night." Mrs. Presley found him to behave as usual during this visit and that there was "nothing unusual about him."

Mr. Presley similarly conveyed that Mr. Fields seemed "just fine. It was business as usual… everything was fine at that point. And – in fact he invited me to go snake hunting."

Debra Bailey conveyed to me in our interview that Mr. Fields seemed future-oriented when she last spoke to him several weeks prior to the offense. Ms. Bailey explained that Mr. Fields was distressed about his job situation, but it "perked him up" when she suggested that he consider moving to Florida. Ms. Bailey described that "he explained that the job situation there was lousy… he needed a fresh start and was wanting to get a good job and pay his bills and the whole nine yards," and that Mr. Fields "was just anxious to – to start all over again." She found him to have "a positive outlook… he seemed to have his head together, and he was, you know, ready to go and ready to dig right in."

Ms. Bailey related to me that Mr. Fields was experiencing a great deal of stress about his job situation when she spoke with him several weeks prior to the murders, but that "it

didn't appear to me that, you know, there – there was any kind of, I guess, other issues besides, I guess, the job search."

Various sources note that Mr. Fields's behavior following the crime was not unusual or cause for concern. Mitigation specialist Glori Shettles reported in her interview with Michelle Tipton that Ms. Tipton is "still amazed that Eddie brought the victims' belongings into her home, and the fact that he appeared as if nothing had occurred."

Margaret Fields related that Mr. Fields called her from Michelle Tipton's house the day after the murders, and he "sounded to be in a very good mood and very happy." He informed her that he had proposed to Ms. Tipton. Mr. Fields called his mother the next day as well, outside a bakery in Fayetteville and again "sounded very ecstatic and very happy." Ms. Tipton overheard the telephone conversation that Mr. Fields made to his mother and sister, in which he informed them of the upcoming nuptials. She described his mood as "very happy" during this call.

Per an FBI interview, on July 12, 2003 Mr. Fields called former supervisor Jovonna Lea Fields (no relation) about a video camera that his mother had let him have. Ms. Fields testified at trial about this conversation:

> Q: All right. Do you remember what the nature of the conversation was?
> A: He had called telling me he had a digital camera that was his mother's and he was going to give it to me. He had had it after she moved and she was wanting to get it back. And so, he was going to try to get it to me knowing that I was still communicating with his mom and talking to her that I could get it sent.
> Q: So, his ideas flowed naturally and the phone conversation was normal?
> A: Yes.
> Q: No cause for your concern at all?
> A: No.

According to a Forest Service interview, Ms. Betty Vaughn, a coworker of Mr. Fields from Kenco Plastics, did not note nay change is his demeanor after the killings. However, she reported that

> …a couple of weeks ago in the break room Fields made a comment out of the blue. Fields said "You know how they say they found a body in a shallow grave and they never say they find them in a deep grave? I know lots of caves and mines and deep holes where they would never find a body if I put one there."

Others have described unusual demeanor but without evidence of hallucinations, such as Ms. Hall who "was concerned by what she described as his look being *'demonic.'* She said she has no frame of reference why he looked this way, but she definitely recalls he had a different look in his demeanor and this concerned her at the time."

Mr. Fields's first documented visit with a mental health professional to address auditory hallucinations occurred in April 2003, when he sought treatment for his depressed mood. His primary care physician, Dr. Kemp, noted that Fields related hearing voices which "basically amount to a compulsion that he do whatever they tell him," though not "anything dangerous, homicidal or suicidal" and that Fields denied suicidal ideation. Dr. Kemp further notes that Fields "feels kind of compelled" to drive to his girlfriend's house at the voices' urging.

In our interview, Mr. Fields did convey a time when the voices urged him to act violently, explaining that in one instance involving a newborn kitten "I picked up and was playing with it and the voice told me to kill the cat… Which I didn't, but it was like it was a fight to put the kitten down – and to walk away."

Mr. Fields dates these voices back to age 14; per his account to me, his mother sent him to a psychologist due to "voices… telling me what to do."

By his mother's account, she and Edward Sr. sent Mr. Fields to a psychiatrist. She does not relate in interviews or elsewhere that Mr. Fields's visits with the psychiatrist were prompted by hallucinations. She stated that he was not placed on medication at that time, and no records from his psychiatric treatment refer to hallucinations he was describing then.

Collateral information from family and friends of Mr. Fields regarding his experience with psychotic symptom varies.

Margaret Fields has stated that "Edward has never told Margaret anything about hearing voices in his head until the issue regarding the killings on Talimena Drive occurred." She recalled explaining to Edward about his conscience and describing it as a voice in his head which would tell him to do what is right."

Andrea White conveyed a time when she overheard Mr. Fields mumbling and, when probed, "he told her it was just voices in his head." Similarly, Judy Janway stated that while in her empty store sometime in November 2002, "Mr. Fields turned to her and asked, 'what did you say?'" When Ms. Janway informed him she hadn't said anything, he responded, "It must have been those voices in my head."

Carol Lamb additionally was unaware that Mr. Fields heard voices, though "she did not think he would have spoken to her about them."

Two relevant questions emerge. One, had Mr. Fields ever heard voices? The evidence for this is inconclusive in either direction. No definitive evidence can allow a professional to opine objectively that he has or has not. However, prior to the acts charged there are no objective indications that he was compelled to follow the commands of any hallucination.

The second question, of whether Mr. Fields was hearing voices at the time of the offense, is more dubious. His description of the offense is one in which he was planning, scheming, and acting in an organized plan according to rational motive. The gunshot that claimed Mr. Chick's life cannot be studied in a vacuum from the events that preceded or followed it. When probed further about whether the voice compelled his actions beyond shooting Mr. Chick, Mr. Fields denied that it was a factor, saying that "I just thought it would be necessary to – to – to kill her. I don't know why… But I just could have tied her up."

There are no indications that he was horrified by or remorseful of his actions, or that they were the product of an alien will or any type of delusional system. He devised a plan, he carried out that plan, and afterwards went about his life in an unremarkable manner. Furthermore, he clearly derived pleasure and emotional satisfaction from having looted the Chicks, and concocted a rational explanation to enable him to shower bounty on his love interest and her responsiveness to his gifting.

### 4. *What is Mr. Fields diagnosis under DSM 5? What is the duration of whatever condition or conditions he has?*

The most evidence-based DSM 5[25] diagnosis for Mr. Fields is **Other Specified Personality Disorder**.

A personality disorder is defined as a stable, inflexible, and pervasive way of relating to the self and others that leads to distress or impairment. A personality disorder is in contrast to acute mental illnesses such as depression, schizoaffective disorder, bipolar disorder, where although the conditions can be chronic they are characterized by sometimes florid symptomatology which stands in contrast to the person's typical functioning.

Per the DSM 5, the category of **Other Specified Personality Disorder**,

> …applies to presentations in which symptoms characteristic of a personality disorder… predominate but do not meet the full criteria for any of the disorders in the personality disorders diagnostic class. (p. 684)

---

[25] American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders* (5th ed.). Washington, DC: Author.

In Mr. Fields's case, he primarily displays features characteristic of Antisocial Personality Disorder and Borderline Personality Disorder, although he also has narcissistic and dependent characteristics. Personality disorders in general, and Antisocial and Borderline Personality Disorder in specific, have considerable overlap, with Antisocial and Borderline Personality Disorder being grouped together in the DSM 5 under the rubric of Cluster B personality disorders.

Features of Antisocial Personality Disorder are seen in his repeatedly performing acts that are grounds for arrest: brewing and selling moonshine, growing marijuana, bringing a bomb-type device to work. He was physically abusive to Teresa and the couple's two children. When younger he would physically intimidate both his mother and his sister. He was seen by other family members as contentious and argumentative.

He lived a parasitic lifestyle. His sister spoke of Mr. Fields as being "a scam artist where he uses people, especially women," and that the reason Mr. Fields "developed a relationship with this woman [Roberta Jasin] was to get something out of her and use her money." Ms. Lamb related that

> …Eddie asked her for money during their first period of dating; he told her he needed money for any number of reasons, which she readily gave to him. She said Eddie 'has a need for someone to take care of him'.

Other accounts note him to spend his family's money freely, including after his father's death:

> Edward continued to spend Margaret's money. In approximately April 2003, Edward forged his deceased father's name on Margaret's checks and spent about $1,500 of Margaret's money.

He mooched off his ailing parents, by many accounts living at their home without contributing. Although described as intelligent and gifted he failed to establish a consistent work history.

He has led an irresponsible lifestyle, depending on others for financial support and failing to consistently honor his financial obligations towards his children. His relationships with women are characterized by manipulation and deceitfulness. He displays an inflated self-appraisal, and evidenced by his strained relationships with coworkers at times. However, when it suits his purposes, he can also be charming.

Mr. Fields was manipulative and exploitive in his relationships with women, maintaining the ability to juggle multiple women at once, up to eight by his mother's account. This is perhaps best illustrated in the following drawing done by Mr. Fields:



Apart from the shooting itself, Mr. Fields's targeting of the Chicks as suitable prey because they were from out of state, is indicative of the callous and impersonal exploitation that is a feature of antisocial personality.

The hallmarks of Borderline Personality Disorder include emotional instability and a fear of abandonment.

Mr. Fields was reported to have temper problems and his wife and daughter noted his mood to change several times a day, and that he was like "two different people," according to defense interviews.

Borderline Personality Disorder features are seen in his instability of interpersonal relationships. In his relationship with Ms. Tipton he was alternatively both threatening and needy, and one point stalking her and threatening her daughter with a hammer.

By definition this personality disorder is enduring and pervasive, and thus has been with him for at least his adult life.

As an adolescent, Mr. Fields was diagnosed with "Adjustment reaction with depressed mood. R/O [rule out] dysthymic disorder." As an adult, prior to the acts charged he was diagnosed with anxiety, depression, and compulsive disorder. At various times after his arrest he has received the following diagnoses:

- Dysthymic Disorder and a Personality Disorder NOS.
- Bipolar Disorder with psychotic features
- Schizoaffective Disorder
- Major Depressive Disorder with Psychotic Features and a history of Dysthymia
- Major Depression, Psychotic Subtype

He has also been described by Dr. Mitchell as having "childhood symptoms suggestive of an attention deficit hyperactivity disorder (ADHD)" persisting into adulthood.

The disorders with a psychotic component (e.g., Schizoaffective Disorder, Major Depressive Disorder with psychotic features, Bipolar Disorder with psychotic features) were based on his report of auditory hallucinations. As noted above, evidence does not allow one to conclude with psychological certainty whether or not Mr. Fields ever heard voices. However, his description of these voices has been inconsistent and self-serving. Furthermore, FBOP mental health staff, who monitored Mr. Fields's psychiatric status for the past eight years, have expressed doubts over the veracity of his reported auditory hallucinations and other atypical symptoms (i.e., visual hallucinations and amnestic periods). Thus, when considered in the conjunction with the over-reporting of psychiatric symptoms in this current evaluation, any self-reported symptoms must be viewed with extreme skepticism. What is apparent is that any such voices did not rise to the level of a disorder; they were not manifested in his day-to-day functioning, and people who had close contact with him were unaware of any such condition.

As noted above, Mr. Fields's diagnoses have included Bipolar Disorder and Schizoaffective

Disorder. One of the hallmarks of both of these conditions is the presence of manic episodes, described in the DSM 5 as

> A distinct period of abnormally and persistently elevated, expansive, or irritable mood and abnormally and abnormally and persistently increased goal-directed activity or energy, lasting at least 1 week and present most of the day (or any duration if hospitalization is necessary). (p. 124)

The presentation of a person with a manic episode is striking and dramatic, with disturbances in mood, psychomotor acceleration, and cognitive distortions; "the mood in mania is classically one of elation, euphoria, and jubilation, typically associated with laughing, punning and gesturing[26] (p. 1704)."

Psychomotor acceleration is seen in "overabundant energy and activity and rapid, pressured speech" (p. 1704).[27] In addition to grandiosity, lack of insight and poor judgment, delusions and psychoses often occur.[28] These symptoms are more than an inconvenience in the patient's life, and instead present a major source of disability, at times requiring hospitalization.[29]

There are no such indications of manic episodes in Mr. Fields's history.

In the period preceding his shooting of the Chicks, Mr. Fields impressed a number of others, including his psychiatrist, as more depressed. On June 16, Mr. Fields started prescribed Effexor at a modest dose (37.5 mg a day). After one week, he increased to 75 mg daily, and was on this dose when he returned to his psychiatrist on July 7. At that visit, his symptoms reflected only depression. The examinee filled a prescription of 150 mg of Effexor on July 9, less than 24 hours before he stalked and killed the Chicks. Medical literature on Effexor-induced mania in non-geriatric adults describes the phenomenon at doses greater than 100 mg[30,31,32,33]. And, after at least a week of the increase or the dosage[34].

---

[26] Akiskal, H. S. (2009). Mood disorders: Clinical features. In B. J. Sadock & V. A. Sadock (Eds.), *Kaplan and Sadock's comprehensive textbook of psychiatry* (9th ed.). Philadelphia: Lippincott Williams & Wilkins.

[27] Ibid

[28] Ibid

[29] American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders* (5th ed.). Washington, DC: Author.

[30] Wilson, R, Jenkins, P (1997). Suspected complication of treatment with venlafaxine. *J Clin Psychopharmacol, 17*, 323.

[31] Stoner, S, Williams, R, Worrel, J, Ramlatchman, L (1999). Possible venlafaxine-induced mania. *J Clin Psychopharmacol, 19*, 184-185.

[32] Shulman, R, Scheftner, W, Nayudu, S (2001). Venlafaxine-associated mania. *J Clin Psychopharmacol, 21*, 239-241.

[33] Chand, P, Kalyani, G, Murthy, P (2004). Venlafaxine-associated hypomania in unipolar depression. *Can J Psychiatry 49*, 496.

The examinee was on a lower dose and for a more abbreviated period than has been demonstrated in the literature to conform with the established clinical picture of medication-induced mania.[35,36]

More importantly, on July 10, Mr. Fields's function and presentation was not appreciably different from earlier dates and weeks. There is no documented persistence of elevated or irritable mood accompanied by other symptoms of mania that coincided with the Chicks' shooting. Mr. Fields's history does not demonstrate manic symptoms reflecting a clear change in him aligned with the time course of his prescription. This history does not support medication-induced mania as an alternative to the explanation of robbery motive in a person who felt financial pressures and viewed the Chicks as an expedient opportunity.

Mr. Fields has reportedly displayed changes in his mood. However, rather than being mood swings these manifestations are better explained by emotional reactivity or normal interest in having a good time; as reported by Mr. Fields he described his periods of seemingly elevated mood as actually times when he felt "content" and would engage in his typical, pleasurable activities:

> I'd get up. I'd go do things – shoot pool. I'd hang out with – with Danny and… girlfriends.

He denied periods of excessive energy, explaining, "I don't think there's ever been a time where I could just jump up and down and yell."

As noted, Mr. Presley provided a similar account of Mr. Fields's good moods, describing him as happy and "upbeat" when engage in pleasurable activities.

The consensus of the available collateral information is that Mr. Fields is happy when doing things that he enjoys, but prone to anger and irritability when unwelcome demands are placed upon him.

Rushing or racing thoughts is another characteristic of manic episodes seen in Bipolar Disorders. In this case these claims are based upon Mr. Fields's self-report, and thus must be viewed with skepticism. Likewise, his "hypersexuality" was a manifestation of his sexual interests (which included a component of manipulativeness and exploitation), rather than a compulsion to engage in activities that he did not find fulfilling or pleasurable, or some pathological change in his sexual interests from his customary baseline. Informants consistently described him with terminology ranging from sexually preoccupied to a pervert.

---

[34] Ibid, footnotes 33-36
[35] Ibid, footnotes 33-36
[36] Psychopharmacological assessment and peer review by Michael Welner, M.D.

All of the diagnoses given to Mr. Fields over the course of his lifetime have a component of depression or anxiety. Collateral information confirms that at times Mr. Fields was aggrieved, disgruntled, or unsatisfied with his life. This discomfort is common among people with personality disorders. For example, per the DSM 5,

> Individuals with antisocial personality disorder may also experience dysphoria, including complaints of tension, inability to tolerate boredom, and depressed mood. (p. 661)

Similarly, among the criteria for Borderline Personality Disorder are "chronic feelings of emptiness" (p. 663). Thus, Mr. Fields's experience of depression, anxiety, and other emotional discomfort is fully explainable by his personality pathology, rather than indicating the presence of persistent depressive disorder (formerly called "dysthymia") or a major depressive disorder.

In addition, he it is plausible that he is experiencing emotional distress secondary to his legal situation (although no such manifestations are reported by FBOP mental health staff). However, this does not meet the DSM 5[37] criteria for an adjustment disorder, in that his distress in not "out of proportion to the severity or intensity of the stressor…," nor does it result in "significant impairment in social, occupational, or other important areas of functioning" (p. 286)

Shortly after his arrest Mr. Fields attempted suicide, and per the collateral information has made suicidal threats to friends and women that he was in relationships with. Some of the latter are at least in part manipulative. However, presence of suicidal threats and actions is not uncommon in people with personality disorders manifested by dramatic and erratic behavior. People with Antisocial Personality Disorder are at increased risk of death by suicide, and another criteria of Borderline Personality Disorder is "recurrent suicidal behavior, gestures, or threats…" (p. 663).[38] Furthermore, suicidality in the aftermath of arrest on double premeditated murder charges does not reflect upon one's mental state before confronted with the stress of life in prison or worse.

The presence of an undetected childhood ADHD cannot be entirely ruled out. However, this is an extremely difficult diagnosis to make retrospectively, given the non-specific nature of the symptoms in adults.[39]

---

[37] American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders* (5th ed.). Washington, DC: Author.
[38] Ibid
[39] Murphy, K. R., & Gordon, M. (2006). Assessment of adults with ADHD. In R. A. Barkley (Ed.), *Attention-deficit hyperactivity disorder: A handbook for diagnosis and treatment* (3rd ed.). New York: Guilford

5. *Does the collective testing data, in conjunction with pertinent collateral history, reflect upon Mr. Fields to be malingering? How does that relate to or differentiate from his capacity as an informant to mental health examiners about his actions at the time of the crime?*

Mr. Fields is an intelligent person who has been in a lengthy litigation. In the course of this process he has developed an awareness of the presence and design of psychological and neuropsychological measures to detect malingering.

Mr. Fields demonstrated an awareness of one of the methods to detect cognitive malingering in the following exchange with Dr. Price in 2005, which took place in the course of a test of recognition memory (similar to the TOMM):

EF:   This is a malingering test, isn't it?
RP:   No. No, this one isn't but it's – it's like one. It's like that. And you've – you've had one of those before?
EF:   Yeah, I passed too. Then he told me –
RP:   That doesn't surprise me.
EF:   Then he told me what it was and I was like, okay.
RP:   Yeah.
EF:   Well, even a severely mentally impaired person should be able to remember so many percentage of it.

In addition, the TOMM has the kind of recognition memory format that Mr. Fields commented upon in his meeting with Dr. Price. Dr. Price explained the purpose of the TOMM in his trial testimony.

In addition to being aware of malingering testing in cognitive testing, as mentioned Mr. Fields also verbalized an awareness of validity items in personality testing.

In spite of this awareness, the collective test data, when considered in the context of the collateral information, supports the conclusion that Mr. Fields is malingering both cognitive and psychological symptoms.

Support for cognitive malingering is seen the marked inconsistency in his performance both between and within evaluations, and in the lack of congruity between his profoundly impaired measures on some cognitive tests and the reports of his day-to-day function.

The Rey 15 Item test was one of the tests given by Dr. Price. At the trial he testified as to the purpose of this test. This test has been criticized in numerous studies as having limited sensitivity to malingering.[40]

Dr. Martell's choice of instruments with which to detect malingering was flawed, in that Mr. Fields had had previous exposure to these tests. As part of his assessment for malingering, Dr. Martell used the Test of Memory Malingering (TOMM), the Structured Interview of Reported Symptoms (SIRS), and the Rey 15 Item memory test. The TOMM and the SIRS had been utilized by Dr. Grundy as part of his battery, and he testified as to their purpose at a July 28, 2003, competency hearing:

> "…the SIRS or Structured Interview of Reported Symptoms, is administered to assess whether an individual is feigning or faking or fabricating psychiatric symptoms, symptoms of mental illness such as hearing voices or depression. And the Test of Memory Malingering, excuse me, is administered to look at an, to assess whether an individual is feigning or exaggerating cognitive impairment. So they're both specific to malingering but different areas of malingering."

In addition to atypical performance on cognitive testing in Dr. Martell's evaluation that raised the possibility of inadequate effort, there are also indications that Mr. Fields may have been exaggerating his psychiatric symptoms. In his report, Dr. Martell wrote:

> The PAI is an objective test of psychopathology that includes built-in scales to assess response bias and malingering. Mr. Fields' PAI profile was valid, indicating that the resulting psychodiagnostic profiles provide a reliable picture of Mr. Fields' current level of psychological functioning.

This statement; the following passage, which was excerpted from the PAI interpretive report contained in his raw data, raises questions about the reliability of the findings:

> With respect to negative impression management, there are subtle suggestions that the client attempted to portray himself in a negative or pathological manner in particular areas. Some concern about distortion of the clinical picture must be raised as a result; the respondent presents with certain patterns or combinations of features that are unusual or atypical in clinical populations but relatively common among individuals feigning mental disorder. It is suggested that the critical items, as

---

[40] Boone, K. B., Salazar, X., Lu, P., Warner-Chacon, K., & Razani, J. (2002). The Rey 15-item recognition trial: a technique to enhance sensitivity of the Rey 15-item memorization test. *J Clin Exp Neuropsychol, 24*(5), 561-573.

well as <u>certain aspects of the clinical history, be reviewed to evaluate the possibility of such distortion.</u>  [emphasis added]

Given his awareness of some of these measures, I administered tests of malingered memory impairment that were new to Mr. Fields.  His scores on some of these tests were extremely low, generating two hypotheses:

> The defendant has a level of cognitive impairment that is equivalent to that of demented nursing home patients; or

> He was attempting to feign or exaggerate difficulties.

These competing hypotheses were tested by both examining his performance on other memory tests I gave, and by looking at collateral information regarding his day-to-day functioning.

As noted above, the majority of Mr. Fields's scores on measures of memory were in the low average to average range.  This essentially normal performance is inconsistent with the low scores he received on extremely easy tests administered in this same evaluation, with the exception of his delayed reproduction of a complex figure.

As noted in a consensus conference statement issued by the American Academy of Clinical Neuropsychology (AACN),[41]

> When inconsistent or variable effort is shown to be present at any point during an evaluation, a reasonable and conservative conclusion is that all performances and obtained test scores may underestimate actual abilities, even those that occurred during apparent periods of adequate effort. (p. 1103)

Mr. Fields has been in the custody of the Federal Bureau of Prisons for the past eight years.  In that time he has been repeatedly assessed by mental health staff, and has consistently been described as having essentially normal cognition.  He has maintained correspondence and tended to his healthcare needs.  In our meetings he was able to converse intelligently, provide an accurate history, and remember the content of our conversation from one day to the next. FBOP mental health records convey skepticism on the part of mental health staff regarding whether Mr. Fields truly has a psychotic disorder.

---

[41] Heilbronner, R. L., Sweet, J. J., Morgan, J. E., Larrabee, G. J., & Millis, S. R. (2009). American Academy of Clinical Neuropsychology Consensus Conference Statement on the neuropsychological assessment of effort, response bias, and malingering. *Clin Neuropsychol, 23*(7), 1093-1129.

When considered collectively, these data cast serious doubt on the veracity of Mr. Fields's self-report of psychological symptoms, and strong evidence for malingering.

6. *How does the available data relate to what the jury was presented at trial? Did the trial presentation leave a jury with an inadequate appreciation of the aforementioned mitigation related issues?*

At trial the jury was provided qualified, enthusiastic, and unequivocal defense testimony that Mr. Fields was suffering from a psychiatric illness, despite significant evidence to the contrary.

Dr. Grinage diagnosed him with a Bipolar Disorder, testifying:

> "I concluded from all of the evidence I had weighed and records and evaluations and collateral history that Mr. Fields suffered from what we call a bipolar disorder… And his particular disorder some what we equal [sic] psychotic features. They're [sic] various types of psychotic features that go – that's specific to Mr. Fields was noted [sic] what we call auditory hallucinations, hearing things that other people do not hear."

Dr. Grinage also testified that Mr. Fields and "mood swings," compulsive behaviors, "rushing or racing thoughts," "episodic" symptoms (which Dr. Grinage described as being in "the nature of mental illness"), "distractibility," suicidal ideation, "irritability," and "hypersexuality."

Dr. Grinage testified as to the possible consequences of Mr. Fields's antidepressant medication regimen:

> "…all antidepressants with bipolar patients have been shown to create a mania or irritable agitation."

Further,

> "…the term that is described in the literature is called switching. And normally, you think of – when they call a manic switch that a person is really kicked into, that really high, flighty, euphoric state, but many times I have seen with patients very irritable and unable to concentrate…"

This "switch" could quickly worsen any psychotic symptoms according to Dr. Grinage, who added:

> "…I have seen patients – you can monitor them on antidepressants where they come out of their depression and at some point for a day or two look normal as they keep going on into a full blown mania. And so, you can just see that spectrum of mood change over a period of, you know, a week or less."

On direct examination Dr. Grinage summarized his findings:

Q: All right. Based on the all the information that you gathered and your knowledge in the area of psychiatry, and your own evaluation of Ed Fields, did you form any opinions about what may have happened to him as a result of his treatment with venlafaxine?

A: Yes.

Q: And what was that?

A: It's my opinion that Mr. Fields had gone for some time with a depression that alternated with bipolar-like symptoms and could probably have been diagnosed with bipolar had it been recognized. And when given multiple fail [sic] trials of antidepressants which you might expect with a bipolar patient given an antidepressant with some norepinephrine activity that he developed an irritable manic mania. He went from depression or mixed depression manic state into a more irritable state. He continued to have depressive symptoms, so, he was – in essence, he  may have been completely in a mix, both depression and mania, but, he tended to have more of a diagnosable irritable mania as he described classically an increase in his rushing thoughts, hearing the voices more frequently and having anxiety associated with the voice.

Q: Sir, were you able to form a professional opinion about whether or not at the time of the homicides in this case Mr. Fields was suffering from a severe mental or emotional disturbance?

A: That is my opinion, that he was suffering from a severe emotional mental disturbance, mainly bipolar disorder with psychotic features.

Q: The psychotic features were –?

A: The auditory hallucinations or hearing a voice in his head.

Q: Were you also able to form a professional opinion on whether or not the mental disease was so significant as to impair Mr. Fields' ability to conform his conduct to the requirements of the law?

A: Yeah. In my opinion he had such mental disorder that it caused significant impairment in his ability to behave in a particular way that he might otherwise [sic] or what he might be thinking about doing.

On cross-examination Dr. Grinage described considering the potential effects of hypoxia as a result of respiratory distress syndrome in his formulation of Mr. Fields.

Prosecutors, at trial, failed to adequately assert to the jury that the claims of hallucinations were self-serving and illegitimate. The only mental health professional presented to the jury who was less convinced in the veracity of the hallucinations was Dr. Price, who testified mildly that

> "…the only psychotic trait or feature that has emerged in the records and with examination of Mr. Fields is the auditory hallucinations and I don't know – I don't think anyone could say he does not have those. The way – what I said yesterday is the way he described them to me was inconsistent with what is known about auditory hallucinations as a psychotic feature. But that may not mean that he does not or has never had those."

Dr. Grinage testified as to Mr. Fields's "voices," explaining that they were "command" hallucinations because

> "…they told him to do things. They told him, you know, at times to – there was a – a lot of times hallucinations can be associated with a social stressors that are going on. He described going to one of his girlfriend's house that caused problems, but, he felt compelled to do that by this voice in his head… basically, there was not only did the nature of hallucinations were what we call derogatory in nature very consistent with depression. They put you down. When voices are depressed we call those mood congruent, they go along with your depressed mood. You're a bad person and actually the voices told him at some point you're a dumb ass. And so, those are derogatory in nature consistent with depression. But, he also described what we called command hallucinations which basically were a voice outside of what he felt was his own telling him to do something."

Dr. Woods also testified as to the defendant's mood disorder;

> "Mr. Fields has a history, a family history, of mood disorders. Mr. Fields has a history, a family history, of mood disorders. Mr. Fields was taken at the age of 16 to be evaluated for depression. Mr. Fields over the years, certainly from 1990, has attempted to get treatment for the way that he feels. If you look at the doctors' records from 1999, 2000, 2003, 2004, 2005, all the way through the relatively current treatment that he's getting in the jail, there is not one doctor that ever thought that Mr. Fields was malingering. Not one treating doctor that thought Mr.

Fields was malingering… In 2000 Mr. Fields again was going to his treating doctors trying to get some help with what was going on. Nobody thought that he was not telling the truth or at least not attempting to tell what he thought was going on. In 2003 obviously Dr. Kemp believed, number one, that Mr. Fields was hearing voices, number two, that Mr. Fields was depressed."

Dr. Woods testifid at trial that Mr. Fields had depression, mania, and was hallucinating,

"Mr. Fields has a history of depression. He's been treated for depression. He was first examined for depression he was 16 years old. He has been treated for depression, attempted to be treated for depression for many, many years and with many, many different medications. So that's one. He definitely has been depressed. It's also my opinion that Mr. Fields has a history of mania, the other end of the bipolar. He's been irritable, he's had impaired judgment, he's been hypersexual. There are occasions when he has been grandiose. He has had anger and rage that's come out of nowhere. His functioning has been impaired. He has had problems sleeping and he's had problems with his appetite. And I think the third piece is that Mr. Fields has heard voices. He has described these voices to doctors, a doctor. He has described before the offense. He has described these voices, this voice, these voices to doctors after the offense. The description has been consistent. So those are the three."

Dr. Woods's testimony also vouched for the defendant's credibility;

"If you look at the doctors' records from 1999, 2000, 2003, 2004, 2005, all the way through the relatively current treatment that he's getting in the jail, there is not one doctor that ever thought that Mr. Fields was malingering. Not one treating doctor that thought Mr. Fields was malingering… In 2000 Mr. Fields again was going to his treating doctors trying to get some help with what was going on. Nobody thought that he was not telling the truth or at least not attempting to tell what he thought was going on. In 2003 obviously Dr. Kemp believed, number one, that Mr. Fields was hearing voices, number two, that Mr. Fields was depressed."

In addition, Dr. Woods asserted that causing problems in Mr. Fields's behavior,

"…first off is just poor judgment. Mr. Fields described for me jobs that he would leave without really understanding why. Often snatching defeat from the jaws of victory. Working for or getting an honorable discharge from the Navy, going back

> to the Navy for a year, having plans with his wife, leaving the Navy. Leaving other jobs that he was successful at or at least competent at. So you see poor judgment. You see erratic mood and thinking. When you're going from depression to mania to normal to depression to mania, you're [sic] thinking is awry. You're think [sic] is erratic. Your problem solving skills are impaired. Not that they're gone, but they are impaired. Your ability to think through things, to do things effectively are impaired."

These elaborations in testimony are substantially contradicted by the historical record and diagnostic testing. Dr. Grinage and Dr. Woods's testimony furthermore contrast to the clinical impressions of mental health providers who have seen him regularly in custody.

The aforementioned testimony reflects how the Fields trial jury received embellished, and at times specious, analysis from qualified mental health professionals testifying on behalf of the defendant. Because certain assertions by defense witnesses were altogether unchallenged, the jury would not have been aware that the psychiatric evidence presented was overdramatized and not warranting the level of unequivocal forcefulness. A more informed jury would have been better equipped to identify disingenuous defense testimony and think cautiously about mental health claims.

In that vein, Dr. Martell's assertions, as raised in the Motion to Vacate, of "catastrophic" findings and other insinuations that everyone is overlooking Mr. Fields's rotting brain, are not at all borne out by evidence. Failure to expose these to a trial jury, based on all of the available evidence, reflects only that an entirely fictional argument has yet to be made to a jury or court charged with a serious responsibility.

The aforementioned conclusions and opinions are offered with a reasonable degree of psychological and neuropsychological certainty. Should additional information become available, I will address any additional questions you may have.


Respectfully,

James D. Seward, Ph.D., ABPP
Board Certified in Clinical Neuropsychology
Fellow, National Academy of Neuropsychology

The above report has been independently peer-reviewed for objectivity and diligence and reflects adherence to current standards of psychological assessment, measurement and diagnosis of mental illness and neuropsychological impairment.


Robert Denney, Psy.D., ABPP
Board Certified in Clinical Neuropsychology and Forensic Psychology


Elkhonon Goldberg, Ph.D., ABPP
Board Certified in Clinical Neuropsychology


Michael Welner, M.D., ABPN
Board Certified in Psychiatry and Forensic Psychiatry