# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | : |
|  | : |
| Respondent, | : |
|  | : |
| v. | : |
|  | : |
| EDWARD LEON FIELDS, JR., | : |
|  | : |
| Petitioner. | : |

CIV-10-115-RAW

CAPITAL 2255 PROCEEDINGS

HONORABLE RONALD A. WHITE

## PETITIONER'S ANSWER
## IN OPPOSITION TO MOTION FOR JUDGMENT

CRISTI CHARPENTIER
KATHERINE ENSLER
HUNTER LABOVITZ
Federal Community Defender Office
 for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone: (215) 928-0520

**TABLE OF CONTENTS**

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. iii

STANDARD OF REVIEW ................................................................................................ 1

I.  Trial Counsel Ineffectively Investigated, Presented, and Argued Mitigating Mental Health Evidence, Including Failing To Present Evidence of Petitioner's Organic Brain Damage. ... 4

    A.  Trial Counsel Failed To Argue the Full Mitigating Value of the Mental Health Evidence Presented ................................................................................................... 5

    B.  Trial Counsel Unreasonably Failed To Present Evidence of Mr. Fields's Frontal Lobe Brain Damage ...................................................................................................... 6

       1.  Deficient performance ....................................................................................... 6
       2.  Prejudice ......................................................................................................... 26

    C.  Trial Counsel Failed To Investigate and Present Treating Mental Health Professionals Who Would Have Supported the Defense's Case ........................................................ 29

    D.  Trial Counsel Unreasonably Failed To Refute Dr. Price's Damaging Rebuttal Testimony .......................................................................................................... 31

    E.  Trial Counsel Unreasonably Failed To Present Available Evidence of Compulsive Aggression in Effexor Patients .......................................................................... 37

    F.  Trial Counsel's Preparation of Experts ...................................................................... 38

II.  Mr. Fields Is Not Competent To Be Executed, and the Death Penalty Is Precluded by the State of His Mental Health. ........................................................................................ 38

III.  Trial Counsel Failed to Investigate, Present, or Argue Evidence That Would Have Rebutted the Substantial Planning and Mental Anguish Aggravating Factors; and the Government Presented False and Misleading Testimony and Argument in Support of the Substantial Planning Aggravating Factor. ...................................................................................... 39

IV.  Trial Counsel Ineffectively Failed to Present Mr. Fields's Social History Through the Testimony of a Mitigation Specialist or Mental Health Expert and to Argue That Social History as a Mitigating Factor. ................................................................................... 39

V.  Improper Arguments in the Government's Closing ........................................................... 42

VI.  Trial Counsel Were Ineffective for Failing To Object to Instructions and a Verdict Form That Allowed the Jury To Approve a General Verdict of Death Based on the Weighing of Aggravating Factors Applicable to Two Separate Murder Counts. .................................... 43

VII. The Government Withheld Exculpatory, Material Evidence from the Defense in Violation of Due Process, and Trial Counsel Were Ineffective for Failing To Investigate and Present Exculpatory Evidence.................................................................................................. 44

VIII.The Cumulative Impact of These Errors Denied Mr. Fields Due Process, Effective Assistance of Counsel and a Reliable Sentencing Hearing. .................................................. 45

IX.  Mr. Fields's Execution Would Violate the Eighth Amendment. ......................................... 45

CONCLUSION.............................................................................................................................. 45

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Sirmons*, 476 F.3d 1131 (10th Cir. 2007) .................................................. 13

*Beaulieu v. United States*, 930 F.2d 805 (10th Cir. 1991) .................................................. 2, 3, 16

*Bernaiche v. Woods*, No. 2:09-CV-11296, 2013 WL 3936438 (E.D. Mich. July 30, 2013) ....... 38

*Brancaccio v. State*, 698 So. 2d 597 (Fla. Dist. Ct. App. 1997) .................................................. 38

*Burch v. State*, 696 A.2d 443 (Md. 1997) ................................................. 44

*Castillo v. United States*, 34 F.3d 443 (7th Cir. 1994) ................................................. 28

*Coleman v. State*, No. W2007-02767-CCA-R3-PD, 2010 WL 118696 (Tenn. Crim. App. Jan. 13, 2010) ................................................. 17

*Daniels v. United States*, 54 F.3d 290 (7th Cir. 1995) ................................................. 28

*Eaton v. Wilson*, No. 09-CV-261-J, 2014 WL 6622512 (D. Wyo. Nov. 20, 2014) ..................... 41

*Grant v. Trammell*, 727 F.3d 1006 (10th Cir. 2013) ................................................. 13, 14

*Hardwick v. Sec'y, Fl. Dep't of Corr.*, No. 97-2319, 2015 WL 5474275 (11th Cir. Sept. 18, 2015) ................................................. 18

*Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012) ................................................. 13

*Hooper v. Mullin*, 314 F.3d 1162 (10th Cir. 2002) ................................................. 33, 34, 35, 36

*Jacobson v. State*, 171 So. 3d 188 (Fla. Dist. Ct. App. 2015) ................................................. 38

*Jefferson v. Upton*, 560 U.S. 284 (2010) ................................................. 11

*Jones v. State*, 134 P.3d 150 (Okla. Crim. App. 2006) ................................................. 43

*Littlejohn v. Trammell*, 704 F.3d 817 (10th Cir. 2013) ................................................. 13

*Machibroda v. United States*, 368 U.S. 487 (1962) ................................................. 4, 16, 28

*McCracken v. Gibson*, 268 F.3d 970 (10th Cir. 2001) ................................................. 14

*Mills v. Maryland*, 486 U.S. 367 (1988) ................................................. 12

*Moore v. United States*, 950 F.2d 656 (10th Cir. 1991) ................................................. *passim*

*Porter v. McCollum*, 558 U.S. 30 (2009) ................................................. 12, 28, 29, 36

*Rompilla v. Beard*, 545 U.S. 374 (2005) ................................................. 11

*Sears v. Upton*, 561 U.S. 945 (2010) ................................................. 32

*Schriro v. Landrigan*, 550 U.S. 465 (2007) ................................................. 1

*Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004) ................................................. 13, 25, 41

*State v. Deangelo*, No. CR 970108766S, 2000 WL 264303 (Conn. Super. Ct. Feb. 24, 2000) ... 38

*State v. Humphrey*, No. WM-05-012, 2006 WL 832916 (Ohio Ct. App. March 31, 2006) ........ 38

*State v. Turner*, No. E200302440CCAR3CD, 2004 WL 2804904 (Tenn. Crim. App. Dec. 7, 2004) ................................................. 38

*Tennard v. Dretke*, 542 U.S. 274 (2004) .................................................................. 41

*United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2015) .................................... *passim*

*United States v. Becker*, 109 F. App'x 264 (10th Cir. 2004)........................................... 1

*United States v. Duran-Salazar*, 307 F. App'x 209 (10th Cir. 2009) ............................. 1

*United States v. Georgiou*, No. CRIM.A. 09-88, 2011 WL 1081156 (E.D. Pa. Mar. 18, 2011)...38

*United States v. Gonzalez*, 98 F. App'x 825 (10th Cir. 2004) ............................ *passim*

*United States v. Pinson*, 584 F.3d 972 (10th Cir. 2009) ............................................... 7

*Walls v. State*, 926 So. 2d 1156 (Fla. 2006) .............................................................. 38

*Wiggins v. Smith*, 539 U.S. 510 (2003) ...................................................... 29, 30, 36

*Williams v. Taylor*, 529 U.S. 362 (2000) ................................................................. 12

*Wilson v. Trammell*, 706 F.3d 1286, 1306 (10th Cir. 2013) ....................................... 26

*Wong v. Belmontes*, 558 U.S. 15 (2009) ............................................................ *passim*

**Statutes**

18 U.S.C. § 3592 ....................................................................................... 6, 10, 11

28 U.S.C. § 2255 ............................................................................................ 1, 2, 4

**Other**

Fed. R. Crim. P. 12.2 ........................................................................................... 7

**STANDARD OF REVIEW**

When a federal prisoner files a petition for post-conviction relief under 28 U.S.C. § 2255, the district court "shall" hold an evidentiary hearing on the prisoner's claims "[u]nless the motion and the files and records of the case *conclusively* show that the prisoner is entitled to no relief."  § 2255(b) (emphasis added); *see also Unites States v. Barrett*, 797 F.3d 1207, 1224 (10th Cir. 2015) ("[A]n evidentiary hearing is warranted" in a § 2255 case if "such a hearing could enable [the movant] to prove the [motion's] factual allegations, which, if true, would entitle the [movant] to . . . relief." (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007))).

Applying this petitioner-friendly standard, the Court of Appeals for the Tenth Circuit has consistently reversed district court rulings denying § 2255 hearings.  Most recently, in *Barrett*, the court reversed a district court's denial of an evidentiary hearing, holding that where a defendant has "presented considerable evidence supporting his claims" – even if "other evidence may counter it" – "an evidentiary hearing is necessary to enable the district court to make the findings needed to determine whether Defendant has a valid claim."  797 F.3d at 1224; *see also United States v. Duran-Salazar*, 307 F. App'x 209, 212 (10th Cir. 2009) (unpublished) (reversing district court's refusal to hold § 2255 evidentiary hearing on petitioner's ineffective assistance of counsel claim because "our precedents state a preference for an evidentiary hearing in such circumstances"); *United States v. Becker*, 109 F. App'x 264, 270 (10th Cir. 2004) (unpublished) (remanding for § 2255 evidentiary hearing because, where petitioner presented expert report in support of ineffectiveness claim and "showed that his counsel did not present such evidence at sentencing," "case law requires the district court to grant an evidentiary hearing"); *United States v. Gonzalez*, 98 F. App'x 825, 831 (10th Cir. 2004) (unpublished) (remanding for § 2255 evidentiary hearing and observing that when "a habeas petitioner alleges detailed and specific

1

charges," supported by affidavits, "[f]ull consideration of [petitioner's] claims of ineffective assistance of counsel must be done with the benefit of a complete record" (quoting *Machibroda v. United States*, 368 U.S. 487, 495 (1962))); *Moore v. United States*, 950 F.2d 656, 660 (10th Cir. 1991) (finding where "factual disputes and inconsistencies beyond the record exist[,] . . . a hearing is needed"); *cf. Beaulieu v. United States*, 930 F.2d 805, 807 (10th Cir. 1991), *overruled in part on other grounds*, *United States v. Galloway*, 56 F.3d 1239, 1241 (10th Cir. 1995) (recognizing that § 2255 "encourages development of a record on the tactical reasons for trial counsel's decisions, the extent of trial counsel's alleged deficiencies, and the asserted prejudicial impact on the outcome of the trial").

Mr. Fields meets the standard for an evidentiary hearing. In support of his claims of constitutional error, Mr. Fields has alleged detailed and specific facts – supported by the trial record, documentary evidence and lay and expert affidavits, *see, e.g.*, Docs. 106-1-5, -10-14, -20-21, -23-24, -27, -33-37 – which, if proven, would entitle him to relief. *Barrett*, 797 F.3d at 1224; *Gonzalez*, 98 F. App'x at 831. Under these circumstances, even if the Government's proffer "counter[s]" some of Mr. Fields's evidence, *Barrett*, 797 F.3d at 1224; *Gonzalez*, 98 F. App'x at 831-32; *Moore*, 950 F.2d at 660, the record of the case cannot "conclusively" show that no relief is warranted, § 2255 (b).

The Government's Motion for Judgment further supports the need for evidentiary resolution of most of the grounds Petitioner asserted. In both the Government's Answer in Opposition to Motion Under 28 U.S.C. § 2255, Doc. 16, and the Motion for Judgment ("Resp't Mot."), Doc. 110,[1] the Government has posited that trial counsel made reasonable strategic decisions in failing to investigate, present, and argue certain evidence, and in failing to make

---

[1] The Government continues to rely on the contentions made in its Answer. *See* Resp't Mot. at 2.

certain objections. *See, e.g.*, Doc. 16 at 15, 24-26, 31, 35, 51, 63-65, 96-98; Resp't Mot. at 13-18, 26-29. The Government's hypothetical strategies, speculation, and unreasonable inferences are at odds with contemporaneous trial documents as well as with attorney Julia O'Connell's sworn statements regarding her actual reasons for taking, or failing to take, particular actions on Mr. Fields's behalf.[2] Thus there are significant factual issues for this Court to resolve regarding whether trial counsel's decisions to present or forego certain evidence, arguments, or objections had a reasonable basis, or were merely inadvertent and the product of a lack of preparation. *See Beaulieu*, 930 F.2d at 807.

Even when the Government's assertions appear to be supported by emails from Ms. O'Connell's file, those emails frequently conflict, as documented below, with other emails in her file. The Government has also countered Petitioner's expert declarations with reports from its own experts. At a minimum, there are genuine disputes of material fact between: (1) what the Government alleges and what trial counsel O'Connell averred in her declaration; (2) what trial counsel stated at different times in her emails; and (3) what the experts for the Government and Mr. Fields contend.

Thus, even in the light most favorable to the Government, its pleadings and supporting exhibits demonstrate that there are significant material and genuine factual determinations that this Court must resolve in order to determine Mr. Fields's entitlement to relief. These factual

---

[2] This Court should give short shrift to the Government's attempts to make up strategic reasons for trial counsel's failure to take specific actions, particularly when trial counsel has already confirmed under oath that the Government's hypothetical strategy was not her strategy. *See* Doc. 106-2 (O'Connell Decl.). The Government's reliance on hypothetical reasons is contrary to well-established Supreme Court precedent requiring an inquiry into the reasonableness of trial counsel's *actual* decision making. *E.g.*, *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003) (rather than accept a "post hoc rationalization of counsel's conduct," court must rely on "an accurate description of [counsel's] deliberations prior to sentencing").

determinations cannot be made based upon the record that is presently before the Court but can only be resolved via an evidentiary hearing. The Tenth Circuit in *Gonzalez* reversed a denial of a § 2255 evidentiary hearing specifically because the various pleadings and documents contained inconsistencies and controverted questions of fact:

> Because Gonzalez has presented specific and detailed allegations of ineffective assistance of counsel and because the evidence before us presents controverted questions of fact and inconsistencies not only as between Gonzalez and [trial counsel] Cunningham, but also as between Cunningham's Oklahoma Bar letter ["in response to a complaint filed by Gonzalez"] and her § 2255 affidavit, we cannot determine that the record conclusively demonstrates that Gonzalez is not entitled to relief. As a result, we hold that Gonzalez is entitled to an evidentiary hearing and **REVERSE** and **REMAND** for proceedings consistent with this order.

98 F. App'x at 832 (emphasis in original); *see also Machibroda*, 368 U.S. at 495 ("The Government's contention that [petitioner's] allegations are improbable and unbelievable cannot serve to deny him an opportunity to support them by evidence."); *Moore*, 950 F.2d at 660.

Because such inconsistencies do not conclusively demonstrate that no relief is warranted, Mr. Fields is entitled to an evidentiary hearing. In this Answer, Mr. Fields shows that the Government's pleadings raise factual disputes that can only be resolved by an evidentiary hearing.[3]

## I. TRIAL COUNSEL INEFFECTIVELY INVESTIGATED, PRESENTED, AND ARGUED MITIGATING MENTAL HEALTH EVIDENCE, INCLUDING FAILING TO PRESENT EVIDENCE OF PETITIONER'S ORGANIC BRAIN DAMAGE.

The Government asserts generally that "the Constitution confers no right to multiple counsel in a capital case." Resp't Mot. at 4. Petitioner does not contend that he was entitled to a specific number of attorneys, only that he was entitled to effective assistance of counsel. To the

---

[3] Petitioner does not reiterate arguments previously made. To the extent that Petitioner does not respond to every argument the Government makes in its Motion for Judgment, he does not waive any claims or arguments, but relies on his prior submissions to the Court.

4

extent that Ms. O'Connell relied on her co-counsel Isaiah "Skip" Gant and Mr. Gant dropped the ball, Ms. O'Connell was ineffective, as was Mr. Gant. In other words, Petitioner did not receive effective assistance from any of his trial counsel.

For similar reasons, the fact that Ms. O'Connell had access to an email list including some of the "capital defense bar's brightest stars," *id.* at 6, does not change that her representation of Petitioner was ineffective. Ms. O'Connell did consult with attorneys Lisa Greenman and Michael Burt and investigator David Freedman. In fact, she often consulted with them, because Mr. Gant – the purportedly expert "learned counsel" assigned to provide her direct assistance and appointed by the trial court as co-counsel – did not provide adequate assistance and she was "drowning." Exh. 1.

### A. Trial Counsel Failed To Argue the Full Mitigating Value of the Mental Health Evidence Presented

Trial counsel failed to explain to the jury how the majority of the mental health evidence presented at trial should be weighed. The Government, which at trial characterized Petitioner's manic flip theory as "unbelievable," Tr. 3424, "not credible," Tr. 3451, and only supported by "hired guns" from the "left coast," Tr. 3429, now describes trial counsel as presenting "strong mitigation evidence," via a "streamlined and common sense theory of the case." Resp't Mot. at 7-8. The Government characterizes counsel's failure to explain which mental health evidence supported which mitigators as relying on a purportedly "intuitive approach" in an attempt to provide a "clear path through a potentially confusing thicket of testimony." Resp't Mot. at 8. In fact, this purportedly "intuitive approach" gave the jury no guidance about how to analyze the mental health evidence.

The jury did not find a single mental health mitigating factor. *See* Special Findings Form at 38 (Dkt. No. 03-CR-73, Doc. 228). Had trial counsel argued that Petitioner's evidence of

manic flip, bipolar disorder, severe depression, and auditory hallucinations was mitigating in whole or in part under 18 U.S.C. § 3952(a)(6) or (a)(8), or that Petitioner's evidence of bipolar disorder, severe depression, and auditory hallucinations was mitigating in whole or in part under (a)(1), the jury could have given the evidence presented its full mitigating effect, and there is a reasonable probability that Petitioner's sentence would have been different. As it was, the jury received almost no guidance on how to weigh and analyze Petitioner's particular circumstances. What Respondent characterizes as a "streamlined and common sense" approach left the jury almost entirely to its own devices to find its way through the "potentially confusing thicket of testimony," at Petitioner's expense. *See also* Pet'r Mem. of Law (Doc. 14) at 6-15; Pet'r Reply (Doc. 20) at 4-11.

**B.     Trial Counsel Unreasonably Failed To Present Evidence of Mr. Fields's Frontal Lobe Brain Damage**

Once Ms. O'Connell received notice from trial neuropsychologist Dr. Michael Gelbort that Mr. Fields suffered from brain dysfunction, she regarded Mr. Fields's brain impairment as important mitigation that she wanted the sentencing jury to hear. Counsel simply failed to present that evidence, much to Mr. Fields's detriment. Ms. O'Connell's reasoned pre-trial decision to present to the jury evidence of Mr. Fields's brain dysfunction is reflected in contemporaneous court filings, letters, and emails and is corroborated by her sworn declaration. To the extent this central fact is disputed, Mr. Fields is entitled to an evidentiary hearing.

**1.     Deficient performance**

The Government asserts multiple reasons why it believes trial counsel omitted presentation of Mr. Fields's brain dysfunction, all of which are contradicted by evidence contemporaneous to trial as well as Ms. O'Connell's declaration.

**a.** The Government contends that pre-trial neuropsychological testing revealed that Mr. Fields had "only 'mild impairment,'" which "did not impress [trial] counsel as especially significant . . . ." Resp't Mot. at 12-13, 18, 27.

However, trial counsel recognized the importance of Dr. Gelbort's findings immediately upon receiving initial results from him on August 24, 2004. Just three days later, Ms. O'Connell used this finding as the basis to argue for an extension of time for filing Fed. R. Crim. P. 12.2 notice of mental health evidence:

> The *recently-discovered evidence of brain damage has significant mitigation value*. Counsel believes that, if allowed to properly diagnose and document the defendant's condition, the case may be resolved without the necessity of trial. If this end cannot be achieved, the evidence is *of such a compelling nature* that counsel feels it is her obligation to fully investigate it *for presentation to a jury*. In the case at bar, the *existence of physical brain impairment may be a mitigating factor that would cause a jury to render a life verdict rather than a death verdict*.

Defendant's *Ex Parte* Supplement to Motion for Extension of Time, at ¶ 4 (Dkt. No. 03-CR-73, Doc. 52) (Exh. 2) (emphasis added); *accord id.* at ¶ 2 ("presence of brain damage is a major medical factor").[4]

---

[4] This unsigned document was in trial counsel's file provided to Respondent during § 2255 discovery. Upon information and belief, the pleading in trial counsel's file is the unsigned final version of Defendant's *Ex Parte* Supplement to Motion for Extension of Time (Dkt. No. 03-CR-73, Doc. 52). Upon inquiry and response from the Court's Courtroom Deputy, the filed version is missing its second page. The filed pleading was placed under seal at trial because it contained confidential mental health information, including the results of expert evaluations. *See* Dkt. No. 03-CR-73, Doc. 50 at 1-2. Because the unsigned, unfiled motion in trial counsel's file was provided to the Government, and because it is relevant to Mr. Fields's current claims regarding trial counsel's ineffectiveness, it should no longer be considered privileged. *See United States v. Pinson*, 584 F.3d 972, 979 (10th Cir. 2009) (finding waiver of trial document relevant "to the specific ineffective assistance of counsel claims raised"). Counsel is concurrently filing a motion to unseal trial Doc. 52 as well as trial Doc. 65 (Defendant's Supplemental *Ex Parte* Motion for Extension of Time to File Rule 12.2 Notice) (Exh. 3), which corroborates Mr. Fields's position because counsel states that evidence of Mr. Fields's "frontal lobe impairment" has "overwhelming importance . . . for his mitigation case." Exh. 3 at 6 n.7.

Further, Ms. O'Connell was well aware pre-trial that Dr. Gelbort's finding of "mild impairment" was indeed significant. As then-United States Attorney Sperling memorialized in a letter to Ms. O'Connell after a December 2, 2004 settlement meeting:

> Your experts found the frontal lobe injury through psychological testing. While no PET scan or MRI had been conducted, you assured us that any type of brain damage testing would yield similar results . . . . Your neuropsychiatrist asserts that it is very hard for a defendant to malinger by presenting behavior and testing which would show only a frontal lobe injury and not an injury to other parts of the brain. *He told you that "there is no such thing as a minor case of brain damage" just like there is no "minor" case of cancer.* You informed us that the frontal lobe is "required for the brain's operating system" and that the brain "can't just patch itself." *Such an injury cannot be "cured" and cannot be overcome if the defendant were to just "suck it up and be a man."*

Dkt. No. 03-CR-73, Doc. 122-2 at 2 (emphasis added).

Ms. O'Connell's declaration corroborates that she considered Dr. Gelbort's neuropsychological findings important pre-trial. Doc. 106-2 at ¶ 17 ("Presentation of such brain impairments would have been an important part of our mitigation presentation."). This evidence refutes Respondent's assertion that trial counsel did not consider Mr. Fields's brain dysfunction to be significant and, at a minimum, necessitates an evidentiary hearing. *See, e.g.*, *Barrett*, 797 F.3d at 1224; *Gonzalez*, 98 F. App'x at 831-32; *Moore*, 950 F.2d at 660.

**b.** The Government argues that brain dysfunction was "weaker . . . evidence that threatened to dilute the overall defense." Resp't Mot. at 18; *accord id.* at 12-13, 17. However, emails written at the time of trial indicate that Ms. O'Connell wanted to present this evidence to Mr. Fields's sentencing jury but simply failed to do so. Indeed, pre-trial emails cited by the Government, *see* Resp't Mot. at 13 (citing Resp't Exhs. 8, 9, 10 (Docs. 110-8 to -10)), actually show that trial counsel did not consider brain dysfunction to be inconsistent with the manic flip defense presented but rather intended to present brain dysfunction as part of the mitigation case. *See* Doc. 110-8 at 15028 (O'Connell stating that "[s]ome evidence of frontal lobe impairment" is

8

part of defense "mitigation case"); Doc. 110-9 (O'Connell stating that "potential brain damage has some value"); Doc. 110-10 (O'Connell stating that  neuropsychological evidence of brain dysfunction is "icing on the cake").

At the December 2, 2004 meeting with the Government, Ms. O'Connell confirmed that far from being inconsistent with the trial defense of a medication-induced manic "flip" or "switch," *see, e.g.*, Tr. at 2989-90, 2995 (testimony of defense expert Dr. George Woods), 3438-39 (defense closing argument), Mr. Fields's "[i]njury to the frontal lobe, which regulates impulse control and judgement, would have *undoubtedly complicated any mania* suffered by the defendant."  Dkt. No. 03-CR-73, Doc. 122-2 at 2 (emphasis added).  Ms. O'Connell's declaration confirms that the defense did not view these two impairments as inconsistent.  *See* Doc. 106-2 at ¶ 15 ("Early on in the development of our mental health evidence we considered the presentation of both manic-flip and organic brain damage.  In other words, we *never* considered those to be mutually exclusive." (emphasis added)).

Further, Respondent ignores how trial experts Dr. Woods and Dr. Bradley Grinage would have testified had they been properly prepared by trial counsel.  Contrary to Respondent's assertion that Dr. Woods "did nothing to disabuse" trial counsel of the theory "that the murders resulted from a manic flip" rather than from "brain damage evidence," Resp't Mot. at 18, it was trial counsel – not Dr. Woods – who unreasonably chose to exclude presentation of brain dysfunction.  Dr. Woods explains:

> I was provided with Dr. Gelbort's and Dr. Price's report before my testimony and I recall that there had been favorable consideration given earlier in the case to the presentation of organic brain damage or dysfunction as a supplement to my opinion regarding manic switch, or as a free-standing mitigating factor.  However, the presentation of brain damage *dropped out of the picture in the lawyers' last minute and rushed preparations during trial*. I was not prepared by the attorneys to discuss it and was not asked any questions about it.

9

Doc. 106-3 at 2, ¶ 8 (emphasis added).

Dr. Woods's declaration refutes Respondent's claim that Ms. O'Connell "deci[ded] to take an intuitive approach to the mental health evidence . . . ." Resp't Mot. at 8. Counsel did not "intuitive[ly]" decide between mitigation strategies but rather unreasonably "dropped [presentation of brain dysfunction] out of the picture in [their] last minute and rushed preparations during trial." Doc. 106-3 at 2, ¶ 8.

Dr. Woods would have testified about brain dysfunction had Ms. O'Connell asked, but she herself chose to forego such presentation. Dr. Woods did not consider the manic switch theory to be mutually exclusive from Mr. Fields's brain dysfunction; instead he considered evidence of brain damage to be "highly significant" "[b]y itself" as well as supportive of his opinion on the manic switch. *See id.* at 2, ¶ 7.

To the extent that there is tension between Respondent's claim that Dr. Woods "did nothing to disabuse [Ms. O'Connell] of that position" and that she "placed greater stock in [the manic flip theory] than in the brain damage evidence," Resp't Mot. at 18, and Dr. Woods's averring that the presentation of brain damage "dropped out of the picture in the lawyers' last minute and rushed preparations," a hearing is needed to resolve the conflict.

Dr. Grinage's post-conviction declaration confirms that testimony about Mr. Fields's brain dysfunction would have strengthened his trial presentation. *See* Doc. 106-4 at ¶ 12 ("[T]he evidence of organic brain damage could have been offered as a factor that exacerbated the bipolar disease from which Mr. Fields suffers."). Pre-trial, trial counsel asked Dr. Grinage for his opinion regarding mitigating factors under 18 U.S.C. § 3592(a)(1) (impaired capacity), (a)(6) (disturbance), and (a)(8) (other factors). *See* Tr. at 2772. Evidence of Mr. Fields's brain dysfunction was relevant to the jury's evaluation of these three factors. *See, e.g.*, *Jefferson v.*

*Upton*, 560 U.S. 284, 285-86 (2010) (capital defendant's "permanent brain damage" "causes abnormal behavior" over which he "has no or substantially limited control"; causes " emotional dullness, " "restless or aggressive characteristics," "impulsiveness," "temper outbursts," "markedly diminished impulse control," "impaired social judgment," and "transient outbursts of rage which are totally inconsistent with his normal behavioral pattern"; and "profoundly alter[s] [defendant's] ability to plan and coordinate his actions, to be aware of the consequences of his behavior, and to engage in premeditated or intentional acts"); *Rompilla v. Beard*, 545 U.S. 374, 392-93 (2005) (mental health expert testing "found that [defendant] suffers from organic brain damage, an extreme mental disturbance significantly impairing several of his cognitive functions." (quotations omitted)).[5] Trial counsel unreasonably omitted expert testimony from Dr. Woods and Dr. Grinage about Mr. Fields's brain dysfunction.

Indeed, Dr. Gelbort informed trial counsel of the compelling nature of the damage to the frontal lobes of Petitioner's brain, Doc. 106-2 at ¶ 15, communicating the following to her:

> My testing of Mr. Fields revealed neuropsychological deficits in a number of areas. As a result of my evaluation and testing, I concluded to a reasonable degree of neuropsychological certainty that Mr. Fields suffers from brain dysfunction and cognitive impairments. Mr. Fields's neuropsychological profile indicates that his brain dysfunction is focused in the frontal lobes.
>
> \* \* \*
>
> Frontal lobe damage is well-known to adversely impact executive function, which acts in part as the "brakes" for a person's actions. Impairments in frontal lobe executive functions are correlated with impulsivity, disinhibition, poor reasoning, acting in an eccentric manner, affected judgment, and impaired ability to gauge the consequences of one's actions, all of which are present in Mr. Fields's case. Mr. Fields's neurocognitive impairments affect his ability to adequately judge and

---

[5] Mr. Fields's jury unanimously rejected (a)(1) and (a)(6), and trial counsel did not offer brain dysfunction in support of (a)(8). *See* Dkt. No. 03-CR-73, Doc. 228 at 38. Given the compelling, mitigating nature of evidence of brain dysfunction, there is a reasonable probability that at least one juror would have found (a)(1) and/or (a)(6) had trial counsel presented Dr. Gelbort to testify about his neuropsychological findings regarding Mr. Fields.

comprehend a given situation, to reflect and reason before making decisions, and to fully recognize the consequences of those decisions. Stressful situations exacerbate Mr. Fields's inability to control his actions and solve problems in a reasonable manner.

Neuropsychological testing demonstrated these problems with Mr. Fields's executive function. Measures of his higher cognitive functions showed impulsivity and disinhibition to be present, especially when he was encouraged to work quickly or under more taxing demands. Furthermore, slowed information processing speeds were seen on more complex or "speeded" tasks, whereas Mr. Fields performed better where work was untimed or when he could take his time to perform the task. In addition, measures of higher cognitive abilities showed that Mr. Fields's problem solving and reasoning skills are in the mildly impaired range. His areas of limitation or suppression occur in higher cognitive activities, effective and efficient learning and memory, and abstract reasoning or information processing. These deficits appear to be long-standing and impact his ability to think in a logical, adaptive and goal-directed manner.

\* \* \*

Particularly, the results from Mr. Fields's neuropsychological testing indicate cognitive anomalies and do not conform to patterns expected or seen in normal individuals. Instead, Mr. Fields's results display a pattern often found in individuals with frontal lobe or nondominant hemisphere neurocognitive dysfunction, as I wrote in my initial report that I provided to Ms. O'Connell.

Doc. 106-35 at ¶¶ 6-9 (Gelbort Decl.).

Supreme Court case law supports the importance of presenting brain dysfunction to a capital sentencing jury. *See, e.g.*, *Porter v. McCollum*, 558 U.S. 30, 36, 41 (2009) (per curiam) (defendant's "brain abnormality," which "could manifest in impulsive, violent behavior," is the "kind of troubled history [the Supreme Court] has declared relevant to assessing a defendant's moral culpability"); *Williams v. Taylor*, 529 U.S. 362, 370 (2000) (observing that evidence that defendant "might have mental impairments organic in origin" is mitigating); *Mills v. Maryland*, 486 U.S. 367, 370 n.1 (1988) (unconstitutional sentence where jury may have been inhibited from giving effect to evidence of "minimal brain damage").

12

In *Barrett*, the Tenth Circuit recently reinforced the compelling, mitigating nature of evidence that the defendant suffered from brain dysfunction:

> We have said that evidence of mental impairments "is exactly the sort of evidence that *garners the most sympathy from jurors*," *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004), and that this is *especially true of evidence of organic brain damage*, *see Littlejohn* [*v. Trammell*], 704 F.3d [817,] 864 [10th Cir. 2013] ("Evidence of organic mental deficits ranks among the most powerful types of mitigation evidence available."). Organic brain damage is so compelling, according to one of our decisions, because "the involuntary physical alteration of brain structures, with its attendant effects on behavior, tends to diminish moral culpability, altering the causal relationship between impulse and action." *Hooks* [*v. Workman*], 689 F.3d [1148,] 1205 [10th Cir. 2012]. This evidence goes beyond the generalized mental conditions we have determined to be unhelpful in mitigation. *See Grant v. Trammell*, 727 F.3d 1006, 1020-21 (10th Cir. 2013) (generalized personality disorders, borderline personality disorder, bipolar disorder, compulsive personality disorder, and severe emotional distress). It enables counsel to "explain to the jury why [the] defendant may have acted as he did[,] ... connect[ing] the dots between, on the one hand, [his] mental problems, life circumstances, and personal history and, on the other, his commission of the crime in question." *Hooks*, 689 F.3d at 1204.

*Barrett*, 797 F.3d at 1231 (emphasis added).

The Tenth Circuit has also held that the importance of presenting evidence of frontal lobe brain dysfunction, such as that suffered by Mr. Fields, "cannot [be] overstate[d]" because such evidence "serves to humanize a defendant and explain why an otherwise kind and loving family man can come to participate in a violent, murderous event." *Anderson v. Sirmons*, 476 F.3d 1131, 1147-48 (10th Cir. 2007). Trial counsel's failure to present mitigating evidence of Mr. Fields's frontal lobe brain dysfunction was unreasonable.

It was "patently unreasonable" for trial counsel to fail to present evidence of Mr. Fields's brain dysfunction – evidence that "is exactly the sort of evidence that garners the most sympathy from jurors," *Mullin*, 379 F.3d at 942, and that "ranks among the most powerful types of mitigation evidence available," *Littlejohn*, 704 F.3d at 864 – especially when trial counsel presented bipolar disorder evidence that the Tenth Circuit has ruled "unhelpful in mitigation."

13

*Barrett*, 797 F.3d at 1231; *accord McCracken v. Gibson,* 268 F.3d 970, 979-80 (10th Cir. 2001) (holding that evidence suggesting the defendant suffered from bipolar disorder was "not reasonably likely" to have helped him avoid death sentence); *Grant*, 727 F.3d at 1021 (same, citing *McCracken*).  Frontal lobe brain dysfunction is exactly what the Supreme Court and the Tenth Circuit have held to be "powerful," "compelling," and "sympath[etic]" mitigation that is "relevant to assessing a defendant's moral culpability"; professionally reasonable trial counsel would not think that the evidence of Mr. Fields's brain impairment was weak.

        **c.**      The Government contends that Ms. O'Connell did not present Dr. Gelbort to the sentencing jury because she had a contentious relationship with Dr. Gelbort and lacked confidence in him.  *See* Resp't Mot. at 15-16.  Respondent relies heavily on emails from outsiders with whom trial counsel consulted pre-trial.  However, its argument ignores two key facts: (1) despite any reservations that non-defense team members expressed to Ms. O'Connell, she decided to present Dr. Gelbort but then failed to do so; and (2) Dr. Gelbort was available and willing to testify on Mr. Fields's behalf but the defense unreasonably neglected to present him at Mr. Fields's capital sentencing.

        After discussions with consultants, Ms. O'Connell told co-counsel Gant that she was "actually happy with [Dr. Gelbort's March 2005 report] in many ways."  Exh. 4 at 2.  On June 19, 2005, again after outside consultation, Ms. O'Connell requested that Dr. Gelbort send her his final report.  Exh. 5.  On June 23, 2005, Ms. O'Connell asked Dr. Gelbort for his rate to testify at trial.  Exh. 6.  After Dr. Gelbort responded, Ms. O'Connell emailed him a contract to cover his testimony costs.  Exh. 7.  Additionally, on July 1, 2005, Ms. O'Connell emailed both Dr. Woods – who did testify at trial – and Dr. Gelbort as follows: "Jury selection begins July 5.  Testimony for the govt will probably begin the 13th.  My evidence may begin as early as the 18th, maybe

more like the 20th. *Anyway, I'll need you both*." Exh. 8 (emphasis added). On July 6, 2005, just days before trial, Ms. O'Connell faxed Dr. Gelbort a contract specifically for his testimony. Exh. 9. Thus, whatever hesitation is reflected in Respondent's exhibits overlooks Ms. O'Connell's ultimate decision to present Dr. Gelbort and the significant though incomplete steps she took to ensure that would happen. Any conflict in the pre-trial documents requires further evidentiary development. *See, e.g.*, *Barrett*, 797 F.3d at 1224; *Gonzalez*, 98 F. App'x at 831-32; *Moore*, 950 F.2d at 660.

Further, Dr. Gelbort was willing and available to testify at trial but no one from the defense trial team ever ensured his presence in court. After Ms. O'Connell asked Dr. Gelbort for his rate to testify, he responded on June 25, 2005, with his rates and asked that Ms. O'Connell confirm the date for his testimony "so we can get it on the books, please." Exh. 7. On July 3, 2005, Ms. O'Connell replied that she "[wi]ll probably need [him] around the 18th of July, but that won't get firmed up for a couple days." *Id.*

On July 11, 2005, Dr. Gelbort sent Ms. O'Connell a reminder email:

Hi Julia: Just a reminder, I had told you I would be leaving the country the evening of the 20th – departing from Chicago around 7:30 pm so I need to be there for check in by 4:30 that afternoon. You had thought I could go on on the 18th: that is preferable but the 19th could work, too, although I have rounds on the rehab unit here on that Tuesday the 19th which are important not to miss. Please let me know what you think.

Doc. 112-1 at 2. The defense case began on the morning of July 19, 2005. Tr. at 2639. Dr. Gelbort has subsequently reaffirmed that he was available to testify on July 19. *See* Doc. 106-35 at 4-5, ¶¶ 11-12.

Reasonable counsel would have presented Dr. Gelbort's compelling, non-conflicting mitigating testimony. Had the defense presented Dr. Gelbort's testimony at trial, he "would have told the jury that [his] neuropsychological evaluation showed that Mr. Fields has brain

dysfunction focused in the frontal lobe. [He] could have explained that concept and the resulting impairments to the sentencing jury. . . ." *Id.* at ¶ 12.

A hearing is necessary to resolve why counsel failed to present Dr. Gelbort's available testimony at trial despite having decided to do so. *See, e.g.*, *Gonzalez*, 98 F. App'x at 831 (holding that if there are "numerous questions regarding the underlying facts and events," those can only be resolved by an evidentiary hearing); *Beaulieu*, 930 F.2d at 807 (section 2255 "encourages development of a record on the tactical reasons for trial counsel's decisions, the extent of trial counsel's alleged deficiencies, and the asserted prejudicial impact on the outcome of the trial"). The apparent conflict between trial counsel's current recollection that, on "[t]he evening before trial testimony was to begin, Dr. Gelbort notified [her] that he was going to be traveling and would not be available on the dates of trial that had been set," Doc. 106-2 at ¶ 17, and Dr. Gelbort's trial emails and present declaration, Doc. 106-35 at ¶¶ 11-12, is all the more reason why an evidentiary hearing is necessary. *See, e.g.*, *Gonzalez*, 98 F. App'x at 832; *see also Machibroda*, 368 U.S. at 495 ("The Government's contention that [§ 2255 petitioner's] allegations are improbable and unbelievable cannot serve to deny him an opportunity to support them by evidence."); *Moore*, 950 F.2d at 660 (holding that when "factual disputes and inconsistencies beyond the record exist . . . a hearing is needed").

Additionally, Dr. Gelbort was prepared to testify to Mr. Fields's brain dysfunction based on the standardized testing he had already administered and required no further testing.

> In June 2005, trial counsel asked if l could do additional testing; I asked counsel to clarify exactly what kind of additional testing they wanted me to conduct, as I did not need any additional testing to reach my opinion of Mr. Fields's brain impairments to a reasonable degree of neuropsychological certainty. Counsel said they would have to think about this issue and would get back to me but never did.

Had trial counsel followed up and asked me to conduct additional neuropsychological testing, I would have told them it was unnecessary . . . ."[6]

Doc. 106-35 at ¶ 10.

Thus, Respondent's claim that trial counsel did not want to present Dr. Gelbort at trial is refuted by both contemporaneous trial emails and post-trial declarations. To the extent that Ms. O'Connell received advice counselling her against presenting Dr. Gelbort at trial, she considered and then rejected that advice. At a minimum, the conflict demonstrates that there are facts in dispute that can only be resolved at an evidentiary hearing.

    **d.** Respondent claims that Dr. Woods could have detected Mr. Fields's brain dysfunction, so trial counsel did not need other experts such as Dr. Gelbort. *See* Resp't Mot. at 13, 18. Dr. Woods, however, could not and cannot conduct neuropsychological testing. *See, e.g.*, *Coleman v. State*, No. W2007-02767-CCA-R3-PD, 2010 WL 118696, at *7 (Tenn. Crim. App. Jan. 13, 2010), *aff'd in part, vacated in part on other grounds*, 341 S.W.3d 221 (Tenn. 2011) ("Next to testify was Dr. George W. Woods . . . . He clarified that he does not administer psychological testing and is not trained to do so."). The diagnostic tools available to Dr. Woods are different from neuropsychological testing, as counsel apparently recognized pre-trial. *See* Exh. 3 at 6, ¶ 13. Moreover, even if Respondent were correct that the defense could have presented evidence of brain dysfunction through Dr. Woods, counsel's failure to do so was unreasonable.

---

[6] Respondent's claim that not calling Dr. Gelbort forestalled damaging personality testing, Resp't Mot. at 14, 18-19, is therefore unfounded because Dr. Gelbort made clear to trial counsel that he did not need to do any additional testing, *see* Doc. 106-25 at 4, ¶ 10. Any inconsistencies in Dr. Gelbort's declaration and Ms. O'Connell's email cited by Respondent can only be resolved at an evidentiary hearing. *See, e.g.*, *Gonzalez*, 98 F. App'x at 832. Additionally, contrary to Respondent's assertion, Resp't Mot. at 19, Dr. Price did not do personality testing; trial counsel specifically denied his request to do so and noted that Dr. Gelbort had not. Exh. 10.

**e.**     The Government asserts that Ms. O'Connell chose not to present evidence of Mr. Fields's brain dysfunction because she feared opening the door to damaging evidence that "wholly undercut [the] defense," particularly "rebuttal evidence that the defendant was antisocial" and a "future danger." *See* Resp't Mot. at 12, 18. This position ignores that: (i) pre-trial, the prosecution had already placed Petitioner's future dangerousness at issue; (ii) the defense's actual trial presentation did open the door to rebuttal evidence and argument on both future dangerousness and antisocial personality; (iii) the Government took advantage of the opened door, and as a result, the sentencing jury heard extensive evidence and argument regarding Mr. Fields's purported future dangerousness and antisocial traits; (iv) the sentencing jury unanimously found – on the evidence presented, which did not include brain dysfunction – the non-statutory aggravating factor that Mr. Fields would be a future danger if not sentenced to death; and (v) evidence of Mr. Fields's brain dysfunction would not only have "undercut" the prosecution's rebuttal but also supported at least three powerful mitigating factors that the jury unanimously rejected. Evidence of Petitioner's brain damage could also have undermined some of the Government's aggravating factors. *See Hardwick v. Sec'y, Fl. Dep't of Corr.*, No. 97-2319, 2015 WL 5474275, at *15 (11th Cir. Sept. 18, 2015) (evidence of petitioner's impaired mental state would have undermined Florida's "cold, calculated and premeditated" aggravating factor). There was no reason to not present evidence of Mr. Field's brain dysfunction and ample reason to do so.

Pre-trial, the Government submitted future dangerousness as an aggravating circumstance that it planned to present at the penalty phase. *See* Notice of Intent To Seek the Death Penalty at 1, 2-3 (Dkt. No 03-CR-73, Doc. 38). The Government later gave specific notice of the evidence it intended to introduce in support of the future dangerousness aggravator, including "history of

violent behavior toward people and animals going back to childhood," "threatening and abusive to parents, spouse and children," "reliance on violence when angry or frustrated," "[s]tealing from victims; carrying on with regular life's activities; spending stolen funds and using stolen credit cards after murders; lying about involvement instead of accepting responsibility for actions; lack of emotion in discussing murders; [and] lack of regret for actions." Notice of the Nature of Evidence and Listing of Potential Witnesses in Support of Aggravating Factors and Death Penalty Eligibility at 10, 16 (Dkt. No 03-CR-73, Doc. 147). Among the witnesses the prosecution relied upon in its pre-trial filing in support of future dangerousness were Mr. Fields's sister Cherie Fields, his ex-wife Teresa Fields, and his friend Marilyn Presley. *Id.* at 11-13.

The defense moved to limit the Government's evidence in support. At a pre-trial hearing on May 31, 2005, the Court indicated that there was not a legal basis to strike the future dangerousness aggravator entirely, Tr. at 8 (May 31, 2005), but that it would consider limiting the evidence the prosecution could submit in support thereof. *Id.* The Government subsequently filed a brief asserting that the evidence discussed in its notice supported a finding of future dangerousness. *See* Brief Addressing Admissibility of Evidence in Support of Future Dangerousness and Mental Anguish Non-Statutory Aggravating Factors at 3-11 (Dkt. No 03-CR-73, Doc. 153).

The Court then excluded most, though not all, of the proposed prior bad acts evidence, but noted that the prosecution could expand its presentation if the defense opened the door during its case-in-chief. *See* Order at 3-5 (Dkt. No. 03-CR-73, Doc. 157). Following the Court's ruling, Ms. O'Connell was very concerned that her presentation could open the door to the precluded evidence. *See* Exh. 11 at 1 ("[J]udge has sustained my objections to a boatload of

19

stupid, prejudicial, unreliable stuff the gov't wanted to use in aggravation. *However, he says I can open the door if I don't watch it.*" (emphasis in original)); Doc. 110-2 at 3262 (similar).

Despite those concerns, Ms. O'Connell presented two mental health experts to testify about Mr. Fields's mental health impairments, thereby placing Mr. Fields's mental health at issue. Dr. Woods testified that Mr. Fields had judgment problems. Tr. at 2948, 2953-54. Dr. Grinage testified that Mr. Fields "was suffering from a severe emotional mental disturbance" and had a mental disorder that "caused significant impairment in his ability to behave in a particular way that he might otherwise or what he might be thinking about doing." *Id.* at 2815. Ms. O'Connell also presented two family lay witnesses to testify about Mr. Fields's positive background (Cherie Fields, *id.* at 2673-2720, and Teresa Fields, *id.* at 2721-64), and a former cellmate to testify about Mr. Fields's good behavior while incarcerated pre-trial (Terry Hanna, *id.* at 2902-26). This presentation opened the door to rebuttal and impeachment by the prosecution regarding both Mr. Fields's purported antisocial personality and his future dangerousness; the prosecution took full advantage of the open door.[7]

Regarding antisocial personality, as Respondent admits, "defense expert Grinage was questioned at length about antisocial personality disorder, and agreed that Fields met many of the diagnostic criteria . . . ." Resp't Answer (Doc. 16) at 83.[8] Trial counsel did not raise a

---

[7] The defense also opened the door to evidence regarding Petitioner's hypersexuality – which the Court had excluded, *see* Dkt. No. 03-CR-73, Doc. 157 – through Drs. Grinage and Woods, who both testified that it was relevant to their diagnoses. Tr. 2791-92, 2970, 2973; c*f. id.* at 3082 (Court noting "I thought I was not going to let sexual stuff be evidence of anything, but somehow that's winnowed it's way in. Not improperly, just . . . .").

[8] The prosecution asked Dr. Grinage if he "consider[ed] when [he] was examining the Defendant the fact that [the Defendant] may just be a sociopath?" Tr. at 2840. The prosecution also asked questions that it stated were based on the Hare Psychopathy Checklist, *id.* at 2841, including whether Mr. Fields "may be glib and have superficial charm," *id.*, had "a grandiose sense of himself and his ability to think," *id.* at 2843, lied, *id.*, was "manipulative," *id.*, exhibited a "lack of remorse," *id.* at 2844, and "lived a parasitic lifestyle," *id.* at 2845. The Court

contemporaneous objection to any of this questioning. Indeed, after Dr. Grinage testified to Mr. Fields's mental health impairments, Ms. O'Connell agreed with the Court's position that it was permissible for the prosecution to try to rebut the defense presentation that Mr. Fields was mentally ill through questions and argument designed to show that instead "he was just evil." Tr. at 2850.[9]

Thus, contrary to Respondent's arguments, this is not a case like *Wong v. Belmontes*, 558 U.S. 15 (2009), in which counsel adopted a strategy of avoiding presentation of mitigating evidence – including expert testimony about the defendant's mental state – that would have opened the door to "extensive" and "potentially devastating" evidence regarding a prior murder defendant had allegedly committed. *Id.* at 17, 19. Rather, this is a case in which, despite concerns about "opening the door," counsel herself decided to open the door by presenting both mental state and good character evidence. Once counsel had done that, the concept floated by the Government that counsel could have feared opening the door wider by presenting evidence of brain dysfunction is fanciful; it bears no relation to what actually took place at trial or to counsel's actual decision making.

The prosecution also offered through Dr. Price, without defense objection, extensive evidence of Mr. Fields's purported psychopathy. Tr. at 3147 (Dr. Price describing characteristics

---

overruled trial counsel's untimely objection that such questions were improper because it "is a neuropsychologist's area, not a psychiatrist's area." *Id.* at 2846.

[9]A trial consultant had warned Ms. O'Connell about this very scenario in response to Ms. O'Connell's question about whether the defense case would open the door to evidence the Court had excluded:

> It seems to me likely that if those anecdotes are the proper basis of a diagnosis that the govt offers to counter your theory of diagnosis, then they probably come in. *If you say client is bipolar and the government says no, he's not bipolar he's actually antisocial and here's the evidence to support it, then the facts come in* unless you can keep them out as irrelevant, unreliable, more prejudicial than probative, etc, right?

Exh. 11 at 1 (emphasis added).

of a "sociopath"); *id.* at 3148-50 (describing characteristics of "anti-social and psychopathic"); *id.* at 3150-51 (testifying that there is no "effective treatment for [antisocial disorder]"); *id.* at 3245-46 (discussing conclusion that Mr. Fields has certain traits of antisocial personality disorder).[10]

Nevertheless, Respondent contends that "[b]y relying on the neuropsychiatric evidence to the exclusion of the brain damage theory, counsel . . . reserved an argument that Dr. Price could not offer rebuttal evidence that the defendant was antisocial." Resp't Mot. at 18. This contention ignores that "neuropsychiatric evidence" led to the jury hearing – through Dr. Price's testimony – precisely the "rebuttal that the defendant was antisocial." *Cf.* Doc. 16 at 83 (Respondent arguing that the trial evidence "amply demonstrated that Fields was sociopathic . . . "). Further, the prosecution called Mr. Fields's friend Marilyn Presley as a rebuttal witness to testify, without objection, that Mr. Fields told her "that he had some sociopathic tendencies." Tr. at 3086; *id.* at 3090 (same).[11]

During closing argument, both prosecutors stressed Mr. Fields's purported psychopathy. After Assistant United States Attorney Fries referred to Ms. Presley's rebuttal testimony about Petitioner's purported "sociopathic characteristics," Tr. at 3428-29, former United States Attorney Sperling then repeatedly stated that Mr. Fields is a "sociopath":

> The Defendant used and discarded people. He's a sociopath. He voluntarily
> chose to enter the darkened world of depraved criminality. He was even

---

[10] Prior to Dr. Price's testimony, Ms. O'Connell objected that the defense had not opened the door to testimony concerning a diagnosis of antisocial personality disorder. Tr. at 3078. The Court did not exclude the testimony in advance. *Id.* at 3079. While Dr. Price ultimately did not diagnose antisocial personality disorder, *id.* at 3246, Dr. Price testified to numerous antisocial traits that he believed Mr. Fields exhibited. *Id.* at 3245-46. That testimony about antisocial traits, on which the prosecutor relied at closing argument, *id.* at 3449-50, fully brought out the Government's rebuttal theory.

[11] This testimony was exactly what the prosecution had argued pre-trial supported future dangerousness. Dkt. No. 03-CR-73, Doc. 147 at 13.

emotionless as he confessed.  He denied sneaking up on other people in his exams
by Dr. Price and Dr. Mitchell.  He lied.  He was trying – manipulative, a con
artist.  Remorseless?  Sorry he got caught.  Emotionless?  Had a temper but no
empathy.  And was financially irresponsible parasitic and promiscuous.  Listen to
this: He was good at lying, and he told Dr. Price the older he got the better he got
at it. [12]

*   *   *

He has a ton of people who love him?  Well, a sociopath is not always demonic.
He may be charming and manipulative and have superficial charm.  Those are
also sociopathic qualities.

*Id.* at 3449-50, 3464.

Respondent does not show that the Government could have presented and argued

anything else regarding antisocial personality if trial counsel had presented evidence of brain

dysfunction.[13]  Counsel opened the door to the evidence and argument that the prosecution

offered at trial.  *See* Tr. at 3079 (Court stating that "I find it hard to draw some bright line now

[on the prosecution presenting evidence from Mr. Fields's background] the way things have

played out"); *id.* at 2845-46 (defense objection to cross-examination of Dr. Grinage on Hare

Psychopathy Checklist overruled); *id.* at 2849-50 (same); *id.* at 3243 (defense objection to

prosecution question about antisocial personality disorder overruled).  Counsel did not have a

"strategy" to keep the door closed by foregoing evidence of brain damage; if counsel did have

such a strategy, it was unreasonable.  Again, these are factual disputes to be resolved after a

hearing.

---

[12] This argument is consistent with the Court's ruling – and trial counsel's concession –
that it was permissible for the prosecution to argue that Mr. Fields did not have mental health
problems but rather was "just evil."  Tr. at 2850.

[13] If the Government is discussing the evidence of Petitioner's childhood cruelty to
animals, this was excluded by the Court as being confusing or prejudicial, and if the defense's
manic flip presentation did not open the door, neither would evidence of brain impairment.  *See,
e.g.,* Tr. at 3082 ("[W]e can't be trying him for hanging the cat, you know, when he was four.
We can't do that.  And so, and that can't be evidence of an aggravating factor.  I just can't let
that be. . . .  We've hashed that out.  The horse is laying on its side and not getting up.").

Trial counsel's presentation of evidence and argument about Mr. Fields's background and behavior while incarcerated similarly opened the door to an extensive array of future dangerousness evidence. When the prosecution questioned defense witnesses Cherie and Teresa Fields, trial counsel did not object to questions about Mr. Fields's purportedly scaring his mother, *id.* at 2700, 2706, 2717-18; physically hurting his sister, *id.* at 2705; verbally threatening his sister, *id.* at 2706; and physically and verbally abusing his ex-wife, including choking her, *id.* at 2751-54, 2761, 2763.[14]

The prosecution then argued future dangerousness in closing. *See* Tr. at 3465 ("Future dangerous? Which one of us would want to be in a cell next to someone who is capable of coldly attacking two innocent people who had done nothing to him?"). The prosecution also repeatedly argued that Mr. Fields was remorseless, Tr. at 3450, 3455, 3459-60, 3465, which the Court instructed the jury was one of two bases for the non-statutory future dangerousness aggravator. *See* Tr. at 3398 ("the Defendant poses a future danger to the lives and safety of other persons, as evidenced by one or more of the following: (A) The offenses were part of a continuing pattern of threatened or impending violence. (B) The Defendant's lack of remorse."); *id.* at 3479 (same). The jury unanimously found this aggravating factor, *see* Dkt. No. 03-CR-73, Doc. 228 at 36, and the jury unanimously rejected the defense's mitigating factors of remorse and that "[t]he defendant will not present a future danger to society by being imprisoned for life without possibility of release," *id.* at 41.[15]

---

[14] The prosecution argued that a future dangerousness instruction was warranted in part because of "the acts of domestic violence against his family which were revealed to the jury during cross-examination of defense witnesses." Br. in Opp'n to Def.'s Rule 29 Motion at 6 (Dkt. No. 03-CR-73, Doc. 223).

[15] The defense requested and received a jury instruction that "the Defendant will not present a future danger to society by being imprisoned for life without possibility of release." Tr. at 3401; *id.* at 3482-83 (same).

Again, Respondent does not show that any additional adverse evidence and argument of Mr. Fields's purported future dangerousness could have been presented by the prosecution if trial counsel had presented evidence of brain dysfunction; indeed, given the jury's unanimous finding of the future dangerousness aggravating circumstance, Respondent's claim that evidence of brain dysfunction would have "giv[en] far greater weight to the corresponding non-statutory future dangerousness aggravator allegation," Resp't Mot. at 18, is speculative and illogical.[16]

Because Ms. O'Connell's presentation "triggered admission" of future dangerousness and antisocial personality evidence and argument, any purported fears about rebuttal were not a reasonable basis for failing to present evidence of brain dysfunction. The jury heard this "devastating" evidence, *Barrett*, 797 F.3d at 1232, as well as Dr. Price's false and misleading testimony that Mr. Fields had no brain impairment, and because of trial counsel's deficient performance, the jury did not hear the powerful, mitigating aspects of Mr. Fields's brain dysfunction. As the Tenth Circuit has explained, counsel's actions are unreasonable in such a situation: "Here, whatever aggravating 'edge' there was to [defendant's] mental impairments was squarely before the jury in the guilt phase of the trial. It is the mitigating 'edge' [trial counsel] failed to present." *Mullin*, 379 F.3d at 943 n.11.

---

[16] Respondent contends that future dangerousness would have arisen at trial based on presentation of Mr. Fields's "progressively deteriorating impulse control." Resp't Mot. at 18. However, such an assertion is based on post-trial testing conducted by Dr. Daniel Martell, *see* Doc. 106-10 at 6, 16-17, not pre-trial testing conducted by Dr. Gelbort, who is the trial neuropsychological expert that Mr. Fields asserts trial counsel should have called. Dr. Gelbort found "pre-existing frontal lobe impairment." *See, e.g.*, Dkt No. 03-CR-73, Doc. 122-2 at 2. Additionally, as noted above, the defense placed Mr. Fields's judgment at issue at trial during the testimony of both Dr. Woods, Tr. at 2948, 2953-54, and Dr. Grinage, *id.* at 2815. The prosecution argued that the defense placed Mr. Fields's judgment at issue. *Id.* at 3080-81. Thus to the extent that Respondent argues that presentation of brain dysfunction-related impulse control problems would have resulted in future dangerousness rebuttal, that door was already open at trial based on the defense presentation, and the sentencing jury heard ample testimony and argument about this aggravating factor.

To the extent, if any, that trial counsel did not present evidence of Mr. Fields's brain dysfunction in the effort to limit the prosecution's presentation of antisocial traits and/or future dangerousness, counsel performed deficiently under *Strickland* because counsel's own actions opened the door wide and left the jury with only the prosecution's version of events.  Having already opened the door, professionally reasonable counsel would have presented the compelling mitigation evidence of brain damage.

### 2. Prejudice

Respondent relies on post-trial information from Dr. James Seward, Doc. 110-23, and the Bureau of Prisons, Resp't Mot. at 19-21, to claim that Mr. Fields cannot establish prejudice.  The Government errs for at least two reasons.

**a.** Supreme Court and Tenth Circuit case law are clear that while it is appropriate under *Strickland* to consider rebuttal that would have been presented in response to the new mitigation, it is not appropriate to consider rebuttal evidence that did not and could not have existed at the time of trial.  *See Wong*, 558 U.S. at 20 (*Strickland* prejudice analysis requires that the post-conviction court "consider all the relevant evidence that the jury *would have* had before it if [counsel] had pursued [a] different path." (emphasis added)); *see also Barrett*, 797 F.3d at 1231 ("[W]e must consider not just the mitigation evidence that Defendant claims was wrongfully omitted, but also what the prosecution's response to that evidence *would have been*." (emphasis added) (quoting *Wilson v. Trammell*, 706 F.3d 1286, 1306 (10th Cir. 2013))).

Here, however, Dr. Seward used and relied upon tests, such as the Wisconsin Adult Intelligence Scale-Fourth Edition (WAIS-IV), Doc. 110-23 at 59-65; diagnosis guidelines, such as the Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM-5), Doc. 110-23 at 84-90; and information, such as Bureau of Prisons (BOP) post-trial mental health

26

evaluations, Doc. 110-23 at 43-49, 98, that did not exist at the time of trial.[17] *See* Resp't Mot. at

19 ("Dr. Seward's findings were obviously unavailable at the time of trial . . . .").[18] The

prosecution's response could not have included information, evaluations, diagnostic tools and

forensic tests that only came into existence post-trial. Thus, Dr. Seward's findings and opinion

cannot be considered in the *Strickland* prejudice analysis. Similarly, the Court should not

consider the post-trial BOP records, Resp't Mot. at 20, in assessing prejudice and determining

whether to grant an evidentiary hearing.[19]

> **b.** To the extent that Dr. Seward's opinion is admissible, the Court cannot presume

that the sentencing jury would have found him more persuasive than Dr. Gelbort and/or Drs.

Woods and Grinage had trial counsel properly prepared them to testify about Mr. Fields's brain

dysfunction. *See supra* Claim I.B.1.b. Supreme Court precedent makes clear that the Court

cannot discount the impact that Dr. Gelbort's testimony would have had on the trial jury:

> [N]either the postconviction trial court nor the Florida Supreme Court gave any
> consideration for the purpose of nonstatutory mitigation to [defense expert] Dr.
> Dee's testimony regarding the existence of a brain abnormality and cognitive
> defects. While the State's experts identified perceived problems with the tests that
> Dr. Dee used and the conclusions that he drew from them, it was not reasonable to
> discount entirely the effect that his testimony might have had on the jury or the
> sentencing judge.

---

[17] The WAIS-IV was released in 2008, the DSM-5 is a 2013 update, and the BOP records relied upon by Dr. Seward and Respondent are from various dates post-trial.

[18] Respondent claims that even though Dr. Seward's findings were unavailable at the time of Mr. Fields's trial in 2005, there exists no reason to believe that [Mr.] Fields would have performed any better on such evaluations had the defense invited such scrutiny." Resp't Mot. at 19. This ignores that Dr. Price did conduct neuropsychological testing pre-trial, the results of which indicated brain dysfunction. Exh. 12.

[19] These records are of limited evidentiary value because they reflect only brief, routine mental health check-ins with Mr. Fields and do not contain the results of any standardized, comprehensive neurological or neuropsychological testing.

*Porter*, 558 U.S. at 42-43; *see also Machibroda,* 368 U.S. at 495 ("The Government's contention that [§ 2255 petitioner's] allegations are improbable and unbelievable cannot serve to deny him an opportunity to support them by evidence.").

The Tenth Circuit has also made clear that this Court cannot resolve differences among the parties' mental health experts without an evidentiary hearing:

> Full consideration of Gonzales' claims of ineffective assistance must be done with the benefit of a complete record. The district court made its determination that Gonzalez presented "no credible evidence" based primarily on the affidavits before it. However, in *Machibroda v. United States,* 368 U.S. 487, 495, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962), the Supreme Court instructs that when a habeas petitioner alleges detailed and specific charges, the district court must determine whether the petitioner has carried his burden of proof "[n]ot by the pleadings and the affidavits, but by the whole of the testimony . . . . The Government's contention that his allegations are improbable and unbelievable cannot serve to deny him an opportunity to support them by evidence." *See also Daniels v. United States,* 54 F.3d 290, 295 (7th Cir. 1995) (reversing a district court's attempt to judge the credibility of a habeas petitioner's claim based solely on the affidavits); *Castillo v. United States,* 34 F.3d 443, 445 (7th Cir. 1994) ("[A] determination of credibility cannot be made on the basis of an affidavit.").

*Gonzalez,* 98 F. App'x 825 at 832.

Further, assuming *arguendo* that Dr. Seward's testimony on brain dysfunction is admissible, Respondent does not show that he would have testified any differently than did Dr. Price, who opined that Mr. Fields does not suffer from "significant neuropsychological impairment." Tr. at 3204-05. Had trial counsel called Dr. Gelbort, the jury would have heard evidence to the contrary; additionally, had trial counsel properly cross-examined Dr. Price, *see infra* Claim I.D, she could have significantly impeached his opinion. Further, because the rebuttal that Dr. Seward would offer is no different on the issue of brain dysfunction than what the sentencing jury had already heard from Dr. Price, reasonable counsel would not have forgone presenting evidence of Mr. Fields's brain dysfunction out of fear of rebuttal, especially because

28

such evidence is compelling mitigation. *See, e.g.*, *Porter*, 558 U.S. at 36, 41; *Barrett*, 797 F.3d at 1231 (collecting cases).

**C.     Trial Counsel Failed To Investigate and Present Treating Mental Health Professionals Who Would Have Supported the Defense's Case**

Trial counsel's theory of the case was premised on Petitioner's having bipolar disorder and experiencing a manic flip caused by increased medication levels. The Government argued in rebuttal that Mr. Fields was malingering and that the defense had to bring in "hired guns" to support such a theory. Tr. at 3429; *id.* at 3452 ("High dollar shrinks were hired by the defense . . . ."). Had counsel reasonably investigated Petitioner's mental health background, counsel would have interviewed and presented Drs. Joyce Bumgardner, Larry Trombka, R.L. Winters, and physician assistant Dean Anderson, all of whom treated Mr. Fields and would have corroborated both that Petitioner was not malingering and that he had experienced symptoms consistent with bipolar disorder and a manic flip.

Respondent argues that "trial counsel reasonably elected to avoid the testimony of these potential witnesses," Resp't Mot. at 21, but trial counsel never *elected* to avoid their testimony. Counsel never spoke with them pre-trial, *see* Docs. 106-11 at 3 (Bumgardner), 106-12 at 3 (Trombka), 106-14 at 4-5 (Anderson); *cf.* Doc. 106-13 (Winters), and was therefore in no position to decide whether to call any of them. Accordingly, trial counsel's failure to present their testimony was not reasonable. *See Wiggins*, 539 U.S. at 533 ("'[S]trategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation.'"). All four of these mental health professionals could have rebutted the Government's attacks on Petitioner's experts.

Dr. Winters found Petitioner to be suffering from chronic depression. There is no indication that he was malingering and he was treated in a standard manner for depression. Doc.

106-13 at 1-2. Respondent argues that Dr. Winters was "tenuously related to the case," Resp't Mot. at 23, but that is precisely why he would have been a credible defense witness – he could have testified to Petitioner's depression years before the crime, a mood disorder that is consistent with and related to bipolar disorder. Dr. Winters could also have testified about his attempts to treat Mr. Fields's depression with a variety of anti-depressants. Doc. 106-13 at 1-2. Dr. Winters's testimony would have countered the Government's contention that the defense had to search far and wide to find paid experts to testify in support of the defense's theory.

Ms. Anderson, who worked as a physician assistant at Heavener Clinic and treated Mr. Fields in 1999, would also have advanced the defense's mental health case. Importantly, she could have provided pre-crime indicia of Petitioner's mania. *See, e.g.*, Tr. at 3452. Her notes from 1999 indicate Petitioner complained of "decreased sleep, increased psychomotor activity and weight loss." Doc. 106-14 at 3. She also noted that Petitioner might have a "mood disorder." *Id.* at 2.

Respondent argues that Ms. Anderson's status as a physician assistant and her personal relationship with Mr. Fields would have undermined her credibility. While Ms. Anderson socialized with Mr. Fields after treating him, her testimony would have been based on medical records from 1999, before that relationship existed. Counsel had every reason to call local medical professionals who treated Mr. Fields – years before the crime – for symptoms consistent with his mental health defense at trial. Moreover, testimony regarding Petitioner's pre-crime mental health treatment would not have "diluted" his trial evidence, Resp't Mot. at 23, but rather

corroborated it and protected the defense's case against allegations that he was malingering and that the paid defense experts were incredible.[20]

Likewise, Drs. Trombka and Bumgardner, local psychiatrists who treated Mr. Fields at the jail, should have been called to corroborate Petitioner's mental state. Dr. Trombka could have testified to Petitioner's depression and mania, his fluctuating moods, and his auditory delusions. Doc. 106-12 at 2. Respondent focuses on ways in which the Government could have attacked Dr. Trombka's credentials, but the defense did not need another highly credentialed expert. The defense did need a neutral witness, such as one who worked for the Department of Corrections and observed Petitioner's behavior to be consistent with the defense's mental health case. Similarly, Dr. Bumgardner's in-jail diagnosis of depression is consistent with bipolar disorder, given that depression is one component of bipolar disorder.

While these experts would have corroborated Drs. Woods and Grinage's findings, their testimony would not have been cumulative in that their perspectives – based on treating Petitioner more than five years *before* the crime and while he was incarcerated – would have bolstered the defense's mental health mitigation, and rebutted both any accusation of malingering and the Government's argument that the defense had to rely on hired guns.

### D. Trial Counsel Unreasonably Failed To Refute Dr. Price's Damaging Rebuttal Testimony

The Government contends that trial counsel had "sound tactical reasons to permit Price" to testify "regarding a lack of 'significant neuropsychological impairment.'" Resp't Mot. at 28-

---

[20] The Government's attempt to draw a distinction between depression and a "thought disorder like bipolarism," Resp't Mot. at 23, is misguided. Bipolar disorder (not "bipolarism"), is a *mood* disorder like depression, not a *thought* disorder. Also, the presence of depressive episodes is a diagnostic criterion for several types of bipolar disorder. *See* Diagnostic and Statistical Manual of Mental Disorders, (4th ed. text rev. 2000) (DSM-IV-TR), at 345, 382, 392, 398.

29. That contention is refuted by Petitioner's submissions; at best, the reasonableness of any tactical decisions by counsel should be determined after an evidentiary hearing.

Respondent's primary contention is that once counsel "decided" not to present brain damage evidence, it was reasonable for counsel to allow Dr. Price's testimony that Mr. Fields did not have any significant impairment to go unchallenged. But this begs the question. As shown in Claim I.B, trial counsel unreasonably omitted evidence of Mr. Fields's brain dysfunction. Thus, even if the theory propounded by Respondent "might be reasonable, in the abstract," that "does not obviate the need to analyze" whether counsel's underlying failure to present the brain damage evidence was unreasonable. *Sears v. Upton*, 561 U.S. 945, 953 (2010) (per curiam).

Additionally, Dr. Price's testing actually supported Dr. Gelbort's finding of brain dysfunction. After reviewing Dr. Price's report, Dr. Gelbort told Ms. O'Connell that:

> Price's data and conclusions are not inconsistent with my own, and, with reasonably focused questioning (and his having some integrity/honesty) - he should say that this is not a fully functioning or normally functioning brain. As he is there [sic] witness, I would fully expect that he will say that the deficits are not that significant or absolutely going to preclude normal behavior or be the cause of aberrant behavior . . . there is where the argument lies.

Exh. 12; *accord* Doc. 106-2 at ¶ 16.

Given that the existence of brain damage is powerful mitigation, reasonable trial counsel would not have elicited Dr. Price's conclusion that Petitioner does not suffer from brain dysfunction. Tr. at 3204. Alternatively, once Dr. Price had so testified, reasonable counsel would have used the facts laid out by Dr. Gelbort to impeach Dr. Price's testimony.

To support its argument that there was no reason to object to Dr. Price's testimony, Respondent notes that trial counsel anticipated that the Court would allow Dr. Price's testimony, but intended to impeach the reliability of his approach and findings. Resp't Mot. at 27 (quoting Resp't Exh. 2 at 3269 (Doc. 110-2 at 35)). It does not follow that counsel who believed Dr.

Price would present unreliable testimony somehow had a reasonable basis to not present competent evidence demonstrating that Mr. Fields suffers from frontal lobe impairment and that Dr. Price's conclusions were flawed.

Pre-trial, counsel knew Dr. Price had opined that Mr. Fields's "performance on neuropsychological testing is inconsistent with either an acute or chronic neurological condition including a brain injury and/or a frontal lobe disorder." Doc. 106-9 at 27 (Report of Neuropsychological Evaluation of Price, July 1, 2005). At trial, counsel asked Dr. Price about the results of some of his neuropsychological findings. Tr. at 3195-98. Respondent asserts that trial counsel's questions were designed to "permit[] an inference that Price" was biased. Resp't Mot. at 28.[21] However, trial counsel never – through Dr. Price or a defense expert – explained how Mr. Fields's poor performance on the neuropsychological tests demonstrated that he suffered from brain dysfunction. Instead, trial counsel allowed Dr. Price to testify on cross-examination that Mr. Fields did not have any neuropsychological impairment, which he described as "[t]he kind of impairment that comes from damage to the cells in the brain." Tr. at 3204-05. Given Dr. Price's pre-trial opinion, trial counsel should have been prepared to challenge such testimony. As detailed in Petitioner's Memorandum of Law, trial counsel unreasonably allowed this testimony to stand without explanation and confrontation. *See* Doc. 14 at 30-31 (citing *Hooper v. Mullin*, 314 F.3d 1162 (10th Cir. 2002)).

For example, at the request of current counsel, neuropsychologist Dr. Clark Clipson reviewed records related to Dr. Price's testing of Mr. Fields. Dr. Clipson concluded that:

> [A] major problem with Dr. Price's conclusions involves his failure to recognize the presence of executive functioning deficits that are evident in the test results. Dr. Price concludes that Mr. Fields' test performance is inconsistent with a frontal

---

[21] Such speculation into trial counsel's "apparent[]" purpose requires evidentiary resolution.

lobe disorder. However, there are consistent deficits in fluency (Coding – 16%, Digit Vigilance time – 9%, TMT-B – 7%, Stroop – 17%, COWAT – 7%, RFFT – 1%). SDMT is the only exception (50%). Fluency deficits are well-documented evidence of frontal lobe disorders and deficits in executive functioning.

Doc. 106-37 at ¶ 35. While trial counsel questioned Dr. Price about Mr. Fields's results on the TMT-B (Trail Making Test, Part B), Tr. at 3195, the Stroop Neuropsychological Screening Test, *id.*, and the RFFT (Ruff Figural Fluency Test), *id.* at 3197, the sentencing jury never heard that such "[f]luency deficits are well-documented evidence of frontal lobe disorders."

Additionally, trial counsel wanted to show that Dr. Price was not "following accepted practice." Resp't Mot. at 27 (quoting Resp't Exh. 2 at 3269 (Doc. 110-2 at 35); *accord* Resp't Exh. 2 at 3262 (Doc. 110-2 at 30) (Ms. O'Connell asking trial consultant "[i]s their [sic] any way to attack the govt's psychologist protocol based on his receipt and review of unreliable information?"). However, counsel's cross-examination did little to test Dr. Price's findings. Professionally reasonable counsel would have presented available expert testimony showing that Dr. Price in fact did not follow accepted practice.

At the request of current counsel, Dr. Alan Kaufman reviewed "auditory tapes of [Dr. Price's] testing sessions, written transcription of the testing sessions, records and documents pertaining to Mr. Fields's history, neuropsychological reports written by Dr. Price, and the 'raw data' (test record form) of the WAIS-III administration on June 13, 2005." Doc. 106-36 at ¶ 2.[22] Dr. Kaufman concluded:

---

[22] Dr. Kaufman is a Clinical Professor of Psychology at the Child Study Center of the Yale University School of Medicine who has authored more than a dozen psychological and educational tests widely used by professionals to assess the intelligence and academic achievement of children and adults. Doc.106-36 at ¶¶ 3-4. Among other things, he co-authored the leading texts on the WAIS-III, which Dr. Price administered to Mr. Fields pre-trial. *Id.* at ¶ 5.

Dr. Price did not conduct a competent evaluation of Mr. Fields's intelligence because of: (1) administration errors, (2) scoring errors, (3) interpretation errors, and (4) judgment errors . . . .

\* \* \*

All of these errors of administration, scoring, interpretation, and judgment challenge Dr. Price's competency as a scientist-practitioner. And as emphasized previously, these errors would have been just as noteworthy in 2005 when Dr. Price conducted his evaluation. The importance of following standardized administration and standardized scoring procedures, of interpreting IQs within the context of the research findings pertaining to the practice effect, of meticulously filling out record forms and computing a person's strengths and weaknesses, and of interpreting test scores within the context of background information (e.g., exposure to toxins, periods of unconsciousness) were well known in 2005. These principles of sound assessment had been carefully articulated for clinical tests in general – and for the WAIS-III in particular – by numerous researchers and writers (Kaufman & Lichtenberger, 1999, 2002).

Based upon all of these factors, it is my scientific, professional, and expert opinion, which I provide with a reasonable degree of scientific certainty, that Dr. Price's errors, taken together, argue against Dr. Price's competence to administer, score, and interpret the WAIS-III validly or to make sound judgments in reliance upon such testing. These conclusions are based on best practice guidelines of 2005, not only on best practice guidelines of 2015.

*Id.* at ¶¶ 2, 26-27; *see id.* at ¶¶ 12-25 (detailing errors); *see also* Doc. 106-37 at ¶ 36 (Dr. Clipson finding similar errors and omissions in Dr. Price's testing and conclusions).[23]

---

[23] Drs. Kaufman and Clipson listened to the recording of Dr. Price's evaluation of Mr. Fields and heard numerous comments and questions that raised significant concerns about the reliability of Dr. Price's methodology and the accuracy of his findings. By contrast, trial consultant David Freedman, who Respondent asserts is one of "the capital defense bar's brightest stars," Resp't Mot. at 6, told trial counsel that "I'm not sure I would be able to make anything of the tapes of neuropsych testing – maybe of the history [Dr. Price] took but I'm not knowledgeable enough to just listen and make sense of it." Exh. 13. Ms. O'Connell did listen to the tape recordings herself as evidenced by some of her questions to Dr. Price, *see, e.g.*, Tr. 3233-36, 3310, 3329, but was not qualified to recognize the flawed methodologies that experts like Drs. Kaufman and Clipson could recognize.

Mr. Freedman further demonstrated his lack of relevant expertise when he told Ms. O'Connell pre-trial that "you might consider not putting Gelbort on, sticking with the psychiatric evidence for penalty phase (and the story telling about his life of course) and denying them the opportunity to put Price on the stand." Resp't Exh. 2 at 3268 (Doc. 110-2 at 34). Once the defense placed Mr. Fields's mental health at issue by calling Drs. Woods and Grinage, the

Dr. Gelbort could have provided a similar attack at trial, "but neither [Ms. O'Connell] nor anyone from Mr. Fields's defense team ever provided [him] with the raw data, including audio recordings, from Dr. Price's testing and evaluation of Mr. Fields."  Doc. 106-35 at ¶ 15.  Now that current counsel has provided Dr. Gelbort with Dr. Price's raw data, *id.* at ¶ 16, Dr. Gelbort concludes that Dr. Price

> made significant errors in his testing.  For instance, he repeatedly made scoring errors on the WAIS-III that make Mr. Fields seem less impaired than he actually is. These errors call into question the validity of Dr. Price's testing results and the competency of his trial testimony, which I have reviewed.

*Id.*  Had trial counsel provided Dr. Gelbort with Dr. Price's raw data, Dr. Gelbort "would have been able to provide critical information about the unreliability of Dr. Price's testing and opinion" and "could have detailed these mistakes in rebuttal, had [he] been called upon to do so, and/or assisted counsel in preparing for cross-examination."  *Id.* at ¶¶ 15-16.

Because trial counsel wanted to show Dr. Price "[wa]sn't following accepted practice," she should have presented testimony from an expert such as Dr. Gelbort, Dr. Clipson, or Dr. Kaufman.  Trial counsel's failure to present available evidence that supported her chosen theory was deficient performance.  *See Wiggins*, 539 U.S. at 526; *Porter*, 558 U.S. at 32.[24]

---

Government was free to rebut with the expert of its choosing, whether psychiatrist, psychologist or otherwise.

[24] Respondent argues that even if trial counsel should have properly challenged Dr. Price's opinion testimony, "Fields has not shown that the defense had any reason to believe that [Dr.] Gelbort could provide that information ["in rebutting the findings of a government expert, Dr. Price"]."  Resp't Mot. at 17.  Respondent ignores that, on July 3, 2005, Ms. O'Connell told Dr. Gelbort that she "will want [him] to consult re:cross-exam of Randy Price."  Exh. 7.  This shows that trial counsel had "reason to believe" Dr. Gelbort could assist with rebuttal of Dr. Price; any doubt about that can only be resolved by an evidentiary hearing.

**E.    Trial Counsel Unreasonably Failed To Present Available Evidence of Compulsive Aggression in Effexor Patients**

Trial counsel were ineffective for failing to present available evidence of the link between Effexor and increased violence – the crux of Mr. Fields's defense. *See, e.g.*, FDA Public Health Advisory, Mar. 22, 2004 (recommending "close observation" of patients being treated with Effexor and other drugs for increased depression or suicidal thoughts and noting that "[a]nxiety, agitation, panic attacks, insomnia, irritability, hostility, impulsivity, akathisia, hypomania, and mania have been reported in adult and pediatric patients being treated with antidepressants for major depressive disorder as well as other indications, both psychiatric and nonpsychiatric") (Doc. 106-15); Peter Breggin, *Suicidality, Violence and Mania Caused by Selective Serotonin Reuptake Inhibitors (SSRIs): A Review and Analysis*, 16 Int'l J. of Risk & Safety in Medicine (2003/2004) (Doc. 106-15).

The Government only addresses the FDA Public Health Advisory in a footnote in its original Answer, stating it "goes no further than to warn of potential for 'hostility,' virtually the same side-effect noted by Dr. Woods," Doc. 16 at 39 n.7.  As discussed *supra* in Claim I.C, however, evidence from a neutral source of the link between Effexor and Petitioner's acts at the time of the murders is not cumulative.

The Government contends that counsel would have declined to introduce Dr. Breggin's opinions because they may not have been admissible.  Resp't Mot. at 30 (citing three civil cases where Dr. Breggin's testimony was excluded).  Undersigned counsel is not aware of a single criminal case in which Dr. Breggin's opinions linking psychotropic medications to violent behavior have been excluded from evidence.  To the contrary, his testimony has frequently been

admitted.[25]

Respondent argues that Petitioner has failed to demonstrate that counsel had any reason to know of Dr. Breggin, but at the time of trial, Dr. Breggin had recently written an article about violent tendencies in Effexor patients and had already testified several times for the defense in murder cases with defenses similar to Petitioner's. *See supra* n.25. Respondent's argument relies upon disputed facts that can only be resolved at an evidentiary hearing.

### F. Trial Counsel's Preparation of Experts

Petitioner relies on his prior pleadings. *See also supra* Claim I.B.1.b (counsel failed to prepare Drs. Woods and Grinage to testify about Mr. Fields's neurological impairments).

## II. MR. FIELDS IS NOT COMPETENT TO BE EXECUTED, AND THE DEATH PENALTY IS PRECLUDED BY THE STATE OF HIS MENTAL HEALTH.

Mr. Fields concurs that this claim is not ripe for review.

---

[25] *See, e.g.*, *Jacobson v. State*, 171 So. 3d 188, 190 (Fla. Dist. Ct. App. 2015) (granting motion for rehearing on ineffective assistance claim regarding counsel's failure to investigate the scientific evidence of psychiatrist Dr. Breggin, who has "written extensively on the effect of psychotropic drugs such as those [defendant] was taking at the time of the offenses"); *Bernaiche v. Woods*, No. 2:09-CV-11296, 2013 WL 3936438, at *2 (E.D. Mich. July 30, 2013) (noting Dr. Breggin testified at trial as expert witness to support defendant's defense that his violent behavior was caused by Prozac, which prevented him from conforming his behavior to legal requirements); *United States v. Georgiou*, No. CRIM.A. 09-88, 2011 WL 1081156, at *2 (E.D. Pa. Mar. 18, 2011) (noting judge amended order "to allow the defense's psychiatric expert, Dr. Peter Breggin . . . to review the sentencing materials concerning [a cooperating witness's] mental health and use of controlled substances"); *State v. Humphrey*, No. WM-05-012, 2006 WL 832916, at ¶ 29 (Ohio Ct. App. March 31, 2006) (considering a report by Dr. Breggin submitted to the court in July 2005); *Walls v. State*, 926 So. 2d 1156, 1170 (Fla. 2006) (noting Dr. Breggin's conclusions regarding Ritalin's effects on defendant at the time of the murders and acknowledging Dr. Breggin's qualification as an expert); *State v. Turner*, No. E200302440CCAR3CD, 2004 WL 2804904, at *5 (Tenn. Crim. App. Dec. 7, 2004) (noting Dr. Breggin's published findings were introduced and summarized in the record with the court's permission); *State v. Deangelo*, No. CR 970108766S, 2000 WL 264303, at *7 (Conn. Super. Ct. Feb. 24, 2000) (noting the court's review of Dr. Breggin's psychiatric report); *Brancaccio v. State*, 698 So. 2d 597, 599 (Fl. Dist. Ct. App. 1997) (noting defense expert Dr. Breggin's diagnosis of a "substance induced mood disorder brought on by Zoloft.").

**III. TRIAL COUNSEL FAILED TO INVESTIGATE, PRESENT, OR ARGUE EVIDENCE THAT WOULD HAVE REBUTTED THE SUBSTANTIAL PLANNING AND MENTAL ANGUISH AGGRAVATING FACTORS; AND THE GOVERNMENT PRESENTED FALSE AND MISLEADING TESTIMONY AND ARGUMENT IN SUPPORT OF THE SUBSTANTIAL PLANNING AGGRAVATING FACTOR.**

Trial counsel failed to present available evidence to rebut the substantial planning and mental anguish aggravating factors. Government witness Daniel Presley could have explained to the jury that it was common for hunters to wear ghillie suits and that Petitioner had mounted the scope on his rifle more than a year before the crime, Doc. 106-21 at ¶¶ 4-5, rebutting the substantial planning aggravating circumstance offered by the Government. Likewise, a criminalist could have testified to evidence that rebutted the Government's theory that Mrs. Chick suffered mental anguish when she saw her husband shot and that Mr. Fields returned to the crime scene hours after killing the Chicks to stage a robbery, theories that supported the substantial planning and mental anguish aggravating factors, which were both found by the jury.

The Government's primary response is that Mr. Fields's expert has reached incorrect conclusions, which further supports the need for an evidentiary hearing to assess the validity of Mr. Fields's claim and to resolve the factual disputes.

**IV. TRIAL COUNSEL INEFFECTIVELY FAILED TO PRESENT MR. FIELDS'S SOCIAL HISTORY THROUGH THE TESTIMONY OF A MITIGATION SPECIALIST OR MENTAL HEALTH EXPERT AND TO ARGUE THAT SOCIAL HISTORY AS A MITIGATING FACTOR.**

Mr. Fields had a dysfunctional childhood; he had almost no relationship with his father except being on the receiving end of whippings, often at the insistence of his mother, who also "took pleasure in making sure Eddie and [his sister] stayed at each other's throats." Doc. 106-27 at ¶ 5 (Cherie Fields Decl.). Mr. Fields was raised without parental care; his mother's severe and chronic depression and his father's chronic absence left him without adequate parenting. His

family's nomadic existence made it very difficult to even form friendships as a substitute support system. *See* Doc. 106-5 at 3 (Glori Shettles Decl.).

Moreover, Mr. Fields's mental health problems and impairments likely have a genetic component. Mr. Fields's mother and daughter have been diagnosed with bipolar disorder, his grandmother received electroshock treatments, and two maternal great-aunts were known to have been mentally ill. Doc. 106-27 at ¶ 8. Mr. Fields also had a paternal cousin who had bipolar disorder, heard voices, and was institutionalized for significant periods of time. His paternal grandmother died from a brain tumor. *Id.* While trial counsel knew about Mr. Fields's social history and intergenerational incidence of mental illness, counsel unreasonably failed to present this mitigating information at trial.

The Government argues that the evidence of family dysfunction would have undermined the defense's theory of the aberrational nature of the crime, implying that evidence of a dysfunctional upbringing "suggests that Fields was a dangerous person whose homicidal conduct was a product of his character." Resp't Mot. at 35. The Government further argues that such evidence would be inconsistent with Mr. Fields's lack of a prior criminal record. *Id.* The Government also relies on an absence of a causal connection between family dysfunction and the crime, e.g., "the defendant fails to show how the mental conditions of his distant relations *led him* to murder two campers after a life of law-abidingness"; "Fields' upbringing was *wholly attenuated* from the crimes or criminal behavior generally." *Id.* at 37-38 (emphasis added).

These contentions rest on a false premise: that evidence is mitigating only if it explains the crime or has some nexus with the crime. More than a decade ago, the Supreme Court explained that mitigation evidence was anything that "might serve as a basis for a sentence less than death," and that such evidence *need not have a nexus to the crime*. *Tennard v. Dretke*, 542

U.S. 274, 285, 287 (2004) (quotations omitted) (emphasis added). As the Tenth Circuit's recent decision in *Barrett* demonstrates, a defendant's family's "long history of mental-health problems, alcoholism, and abuse" is itself mitigating evidence. *Barrett*, 797 F.3d at 1229 (discussing the defendant's family history at length, and requiring an evidentiary hearing where defendant's proffered mitigation included, *inter alia*, a familial history of mental health problems). *Id*. A family's mental health histories can better illustrate a defendant's childhood, particularly where some of the impaired individuals were also the caretakers of a defendant. Likewise, "[a] multi-generational investigation frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment." *Eaton v. Wilson*, No. 09-CV-261-J, 2014 WL 6622512, at *24 (D. Wyo. Nov. 20, 2014).

Petitioner's upbringing would not have been presented solely as a factor to explain the crime, but also as an independent basis for a sentence less than death, as well as a possible explanation for the violence he exhibited toward his loved ones earlier in his life. While the Government asserts that trial counsel "sought to avoid any action that would permitted [sic] the government to present damaging evidence that Fields tended toward violence and hyper-sexuality," Resp't Mot. at 38-39, the Government ignores the fact that testimony about Mr. Fields's violent nature was elicited on cross-examination and that testimony about his hypersexuality was elicited on direct examination. *See supra* Claim I.B. Any concern about opening the door was illusory given that the door had already been opened. *See Mullin*, 379 F.3d at 943 & n.11 (when aggravating aspects of defendant's mental illness had already been presented to jury, little risk to presenting the mitigating aspects as explanation for defendant's behavior).

Similarly, while the Government claims a focus on Petitioner's family life would have "potentially permit[ed] the government to more thoroughly attack defendant's character," Resp't Mot. at 38, trial counsel had already opened the door. Therefore, trial counsel did not have a reasonable basis for failing to present a more complete version of Petitioner's social history.

The Government argues that counsel reasonably decided to pursue a defense of prescription-induced mania in order to avoid evidence that Mr. Fields had violent tendencies: "Any forgone evidence about his family would have undermined the strategy by suggesting Fields was a dangerous person whose homicidal conduct was a product of his character." Resp't Mot. at 35. This begs several questions. In the absence of a hearing, there is no evidence to support the idea that counsel deliberately chose not to present the evidence of Mr. Fields's troubled upbringing and family history of mental illness for that reason. Moreover, the jury heard testimony and argument that Mr. Fields was a dangerous person whose conduct was a product of his character, *see supra* Claim I.B. Because that evidence was already going to come in, counsel had no reasonable basis for failing to provide a complete picture of Petitioner's background and family history of mental illness.

Had counsel presented a social history of Mr. Fields's early life and dysfunctional upbringing, it likely would have neutralized the evidence of his violent tendencies that the Government brought out on cross-examination, and served as a stand-alone reason to give him a sentence less than death.

## V.     IMPROPER ARGUMENTS IN THE GOVERNMENT'S CLOSING

Petitioner relies on his prior pleadings on this claim.

**VI. TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO INSTRUCTIONS AND A VERDICT FORM THAT ALLOWED THE JURY TO APPROVE A GENERAL VERDICT OF DEATH BASED ON THE WEIGHING OF AGGRAVATING FACTORS APPLICABLE TO TWO SEPARATE MURDER COUNTS.**

The unitary verdict form suggested by trial counsel was improper because there were two crimes to which different aggravating factors were applicable. The Government asserts that the defense's theory of the case was that Petitioner's acts were the product of a psychotropic drug reaction, and therefore that "it made no sense to undermine that effort by asking for granular verdicts." Resp't Mot. at 40. Again, there is no evidence that counsel actually made the choice posited by the Government, or that such a choice was reasonable. There is no inconsistency between the theory that a "manic flip" was the primary cause of Mr. Fields's acts and the recognition that the sequence of events made the later crime more aggravated, requiring a distinct weighing process for each crime.

The merged weighing process allowed for the double counting of aggravators to Petitioner's detriment. Had the jury received two verdict slips rather than one, it would have only weighed the mental anguish aggravator in the killing of Mrs. Chick, and there is a reasonable probability that it would have concluded that the aggravating factors in Mr. Chick's killing did not substantially outweigh the mitigating factors. *See Jones v. State*, 134 P.3d 150, 156 (Okla. Crim. App. 2006) (reversing and remanding for resentencing with separate aggravating circumstance verdict forms where a single verdict form containing aggravating circumstances, which did not apply to both murder counts, was used); *cf. Burch v. State*, 696 A.2d 443, 462 (Md. 1997) (noting in response to a single verdict slip used for two murder counts, "had there been any prospect of either an aggravating or a mitigating factor peculiar to one victim but not the other or anything that could reasonably have caused the jury to reach a

different balance in the weighing process, from one victim to another, it would have required that we vacate both death sentences and remand for resentencing"). As explained further in Petitioner's Reply, in light of Petitioner's Claim III relating to trial counsel's ineffectiveness in rebutting the mental anguish factor, there is a reasonable probability that the jury would have also returned a life sentence for the killing of Mrs. Chick. *See* Doc. 202 at 57-58.

While the Government previously conceded that the mental anguish factor only applied to Mrs. Chick's murder, it now states: "[U]pon subsequent review of the records, it appears the jury properly weighed the factor in regard to both homicides." Resp't Mot. at 41. Indeed, due to trial counsel's ineffectiveness, the jury did weigh the factor in regard to both homicides; however the mental anguish aggravator was not applicable to the killing of Mr. Chick, who was fatally shot from a distance. The Government argues that "[b]ecause the first potentially fatal wound inflicted on Charles *created anguish in his wife*, it makes no sense that the aggravator would apply only to one murder." *Id.* But that is exactly the point. Mr. Chick suffered no mental anguish, his being shot "created anguish *in his wife*," which is exactly why the aggravator could apply only to her killing.

**VII.  THE GOVERNMENT WITHHELD EXCULPATORY, MATERIAL EVIDENCE FROM THE DEFENSE IN VIOLATION OF DUE PROCESS, AND TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT EXCULPATORY EVIDENCE.**

At Mr. Fields's penalty trial, one of the key issues was whether he had ingested any of the 150 milligram Effexor pills prior to committing the crimes. The bottle containing the remaining prescription pills was provided to the Muskogee County Detention Center by the FBI after it was found in Petitioner's truck; however, this fact was never disclosed to the defense. Instead, the defense's experts, Drs. Grinage and Woods, on cross examination, were asked if they knew how many pills Mr. Fields had taken from the prescription and to confirm that

44

"there's no evidence in this record apart from representations that the Defendant may have made to treating or to examining doctors that he even took any of the increased dosage."  Tr. 3029-30. The Government raises several factual disputes – that it lacked any knowledge of the contents of the Effexor bottle and that Mr. Fields could have lost, sold, or otherwise disposed of the pills he did not receive in the jail – which can only be resolved by an evidentiary hearing.

## VIII. THE CUMULATIVE IMPACT OF THESE ERRORS DENIED MR. FIELDS DUE PROCESS, EFFECTIVE ASSISTANCE OF COUNSEL AND A RELIABLE SENTENCING HEARING.

Given the number of factual disputes in multiple claims, Petitioner requests an evidentiary hearing to resolve such disputes, both with respect to each error individually, and also to provide further proof that Mr. Fields did not receive a reliable sentencing or effective assistance of counsel given the cumulative effect of the errors.

## IX. MR. FIELDS'S EXECUTION WOULD VIOLATE THE EIGHTH AMENDMENT.

Mr. Fields concurs that this claim is not ripe for review.

### CONCLUSION

For all of the above reasons, and those set forth in Petitioner's § 2255 Motion, Memorandum of Law, and Reply, Mr. Fields respectfully requests that the Court grant an evidentiary hearing on the claims that are ripe for review.

Respectfully submitted,

/s/ Hunter Labovitz
HUNTER LABOVITZ
CRISTI CHARPENTIER
KATHERINE ENSLER
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone: (215) 928-0520

# CERTIFICATE OF SERVICE

I, Hunter Labovitz, hereby certify that on this 6th day of January, 2016, I electronically transmitted the foregoing document to the Clerk of Court using the Court's electronic case filing system. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Christopher J. Wilson, Attorney for Respondent
Jeffrey B. Kahan, Attorney for Respondent

/s/ Hunter Labovitz
Hunter Labovitz