Case 6:10-cv-00115-RAW   Document 122-3   Filed in ED/OK on 02/02/16   Page 89 of 125

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 6:04-CR-00115-JHP-SPS** |
| | ) | |
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| *Defendant.* | ) | |

**EXHIBIT 117**

Exhs. § 2255 Motion                              *U.S. v. Barrett*, 6:04-CR-00115-JHP-SP

**DECLARATION OF GEORGE W. WOODS, JR., M.D.**

I, George W. Woods, M.D., declare as follows:

1. I am a licensed physician specializing in psychiatry and neuropsychiatry. I currently maintain a private practice focusing on neuropsychiatry, psychopharmacology, workplace safety, and forensic consultations.

2. I am a Fellow of the American Psychiatric Association, and a member of the California Psychiatric Association and the Northern California Psychiatric Association. I am also a member of the American Neuropsychiatric Association, the American Psychological Association, the American Society of Addiction Medicine and the Black Psychiatrists of America.

3. I am Secretary General-Elect of the International Academy of Law and Mental Health, where I am a member of the Scientific and Executive Committees. I also serve on the Advisory Board of the Center for African Peace and Conflict Resolution, California State University, Sacramento, California; and the Global Advisory Board for Humiliation and Dignity Studies, Trondheim University, Norway, and Columbia University, New York, New York.

4. I received my bachelor's degree from Westminster College in Salt Lake City, Utah, in 1969; and was awarded my medical degree from the University of Utah in 1977. I then completed a rotating medical internship at Alameda County Medical Center (Highland Hospital), in Oakland, California, which included internal medicine, surgery, orthopedic surgery, Emergency Medicine, and Obstetrics/Gynecology. In 1981, I completed my psychiatric residency at the Pacific Medical Center in San Francisco, California, where I served as Chief Resident my senior year. During my psychiatric residency, I pursued specialized neurological

1

Case 6:10-cv-00115-JHP-SPS   Document 404-4   Filed in USDC ED/OK on 09/16/2009   Page 91 of 125

electives at Kaiser Permanente Hospital, Oakland, California.  These electives consisted of extended, three month clerkships, in which I was assigned to the Neurology department, conducting neurological examinations and diagnosing neurological disorders, including movement disorders, headache disorders and central nervous dysfunctions, among others.

5.     In 1982, I then participated in a National Institute of Mental Health/American Psychiatric Association Fellowship, during which I developed the first medical/psychiatric unit at Pacific Presbyterian Hospital. This unit administered to patients with either medical illnesses that had psychiatric manifestations or psychiatric patients with severe medical illness that could not be treated effectively on regular medical units.  The focus of my Fellowship was Geriatric Psychopharmacology, the study of medication use with elderly populations. Geriatric Psychopharmacology, however, is an extremely valuable approach to the study of psychopharmacology in general.  The medical/psychiatric/neurological/pharmacological training and experience I gained during this period proved relevant to other patient populations, particularly forensic populations, who experience a higher incidence and greater interaction of drug, mental and neurocognitive problems than the general population.  Following the completion of my Fellowship, I become the Director of Outpatient Geriatric Services for the San Francisco Family Services Agency.  In that capacity, I conducted home visits with elderly patients who manifested psychiatric symptoms.  Medical examinations and neurological intervention were frequently required.

6.     From 1983 through 1990, I provided neuropsychiatric care at Crestwood Manor, Vallejo, California, a long-term psychiatric facility, dedicated to treating severely ill patients. Many of these patients came from state hospitals with atypical presentations and the diagnosis of

mental retardation. Atypical presentation of psychiatric symptoms is common among forensic populations as well, particularly in areas that may lack community mental health services and or widespread availability of intensive treatment.  Many of these patients Many of Crestwood's clients also had multiple, co-occurring disorders that required an understanding of pharmacology, neurology, and psychiatry, as noted by the American Neuropsychiatric Association.

7.      From 1989 to 1994, I served as Clinical Director of the New Beginnings Chemical Dependency Program, an inpatient substance abuse detoxification and rehabilitation center housed at Doctors Hospital in Pinole, California.  In 1994, I was appointed as Senior Consulting Addictionologist by Doctors Hospital, and oversaw complex withdrawals and detoxifications, and developed research protocols for the use of new medications for opiate withdrawals and sedation in the intensive care units.  During my tenure, New Beginnings evolved into program that treated patients with what are called co-occurring disorders, meaning persons who have multiple psychiatric disorders – which is the norm, rather than unusual. Many persons with neuropsychiatric disorders attempt to self-medicate their symptoms.

8.      The clinical facilities at Doctors Hospital afforded access to a Single Photon Emission Computerized Tomography (SPECT), which was utilized to determine brain function. My neuroimaging experience also includes the study of Magnetic Resonance Imagining (MRI) and Cathode Scans (CT), focusing on the different uses of structural imaging and functional imaging, like the SPECT and the Positive Emission Tomography (PET).  From 1990 through 1995, I also served as the Coordinator and Psychiatric Consultant to the Insomnia Division of the Doctors Hospital Sleep Disorders Center.  The assessment of sleep disorders, the evaluation of disorders in the architecture of sleep, is a seminal component of diagnosing medical illness and

psychiatric disorders, and formulating appropriate pharmacological interventions. Sleep disruption is frequently the first overt symptom of an underlying medical, neurological, or psychiatric disorder.  Disruption of sleep can be found in almost all psychiatric disorders. Impairment of normal sleep patterns is also often a contributing cause of and exacerbated by substance abuse.

9.      In 1991, I was retained by Neurocare Corporation, a treatment facility in Concord, California, specializing in head-injury and neurological disorders, to work with neurologically impaired individuals who had psychiatric manifestations of their cognitive impairments.  The facility was a multidisciplinary environment in which the treatment team consisted of neurologists, neuropsychiatrists, neuropsychologists, and social workers.  Treating physicians required an intimate knowledge of brain/behavior relationships in order to avoid misdiagnosis of atypical symptom presentations.

10.     In 1992, I received my board certification in psychiatry by the American Board of Psychiatry and Neurology.  I joined the faculty of the University of California, Davis, Medical School, Department of Psychiatry, in 1996. For the next four years, I taught Forensic Psychiatry and Criminal Responsibility to psychiatrists in the Postgraduate Forensic Fellowship.

11.     In 1998, at the request of Kenyan and Tanzanian Medical Societies, I assisted their nations in developing mental health delivery services after the Kenyan/Tanzanian Embassy bombings. The initial focus of the project centered on the acute trauma suffered by survivors and families of those killed and injured in the bombing. Appropriate diagnosis and treatment for trauma survivors required assessment of and treatment for pre-existing psychiatric and neurologic disorders and an appreciation of the consequences of chronic exposure to trauma that

4

predated the bombings.

12. I am currently an Adjunct Professor on the faculty of Morehouse School of Medicine, Department of Psychiatry, in Atlanta, Georgia, where I teach courses in Clinical Aspects of Forensic Psychiatry to third and fourth year residents. I am also on the Faculty of the Department of Educational Leadership and Public Policy, California State University, Sacramento, California.

13. My clinical private practice is based in Oakland, California. I have been qualified and testified as an expert in numerous civil and criminal cases in state and federal courts.

14. At the request of counsel currently representing Kenneth Barrett, I have performed a neuropsychiatric evaluation to determine whether Mr. Barrett suffers from any mental disease or defect and, if so, what functional impact his condition may have had before, during and after the commission of his current commitment offense. In order to complete this assessment, I evaluated Mr. Barrett, including conducting a structured clinical interview, at the federal prison in Terre Haute, Indiana, over the course of two full days on February 17 and 18, 2009. I also reviewed and considered the declaration of neuropsychologist, Myla Young, PhD; Mr. Barrett's institutional records, to include available academic, medical and custodial records; declarations and/or medical and social records of various family members, including his father, Ernie Barrett; his mother, Gelene Dotson; and his former wife, Abby Stites. These are the types of data customarily relied upon by qualified mental health professionals to perform an accurate and reliable neuropsychiatric assessment.

**Clinical Presentation**

15. Clinical observation of Mr. Barrett over the course of lengthy interviews revealed

Case 6:10-cv-00115-SPS Document 404 Filed in USDC ED/OK on 09/16/2009 Page 95 of 125

signs of significant neurologically impaired cognitive and psychosocial functioning, including severe depression, mania, psychotic ambivalence, adhedonia, sleep disturbance, suicidality, hypervigilance, avoidant behavior, withdrawal, constricted emotional range, and inability to sustain lasting relationships secondary to his severe mental illness.

16. Kenneth Barrett presented as an appropriately groomed White male who appeared to be his stated age of 47 years. His movements were fluid, although his gait was somewhat halting. Mr. Barrett noted he had difficulty with his legs since he had been shot multiple times during the police action that resulted in his arrest and conviction.

17. Speech was spontaneous and coherent, although he repeated questions often, even after the questions had been answered. He evidenced pressured speech. His ability to utilize complex words or grammatical structures was limited.

18. Mr. Barrett's thought form was extremely concrete, and his ability to abstract limited. There was no evidence of prosody or alexithymia, poverty of thought. On the contrary, Mr. Barrett had significant flight of ideas. He was paranoid and guarded, particularly in discussing the painful memories of separation from his father and the inattention of his mother, due to her own mental illness, during his formative years. His thinking was also grandiose, manifesting cognitive disinhibition, reflecting neurodevelopmental and/or acquired brain dysfunction. There was no evidence of perceptual disorders, hallucinations, or delusions.

19. He was most animated and fluent in describing his attempts to redress perceived injustices (e.g., disrespect and unfair enforcement of rules by prison staff; the misappropriation of his property after his arrest). His description of his responses in such situations indicated a significant lack of inhibition and age-appropriate defenses and coping skills.

20.     Mr. Barrett's mood was elevated. His affect was often inappropriate to the content of our examination. The affective content of his presentation was incongruent with self-description of his life and current situation.  Mr. Barrett is invested in appearing to be a high-functioning individual, without significant past or present impairment, and who is in control of his life.

21.     Insight and judgment were impaired by his severe mood disorder and executive functioning deficits. His conceptual dysfunction also limited his ability to develop a larger picture, further impinging his insight and judgment.

**Background and Developmental Impact**

22.     Kenneth Barrett was born on June 29, 1961, in Joliet, Illinois.  He is the oldest of three sons born to Ernie Barrett and Gelene Barrett (nee Dotson).  Both father's and mother's sides of Mr. Barrett's family were burdened by multi-generational neurological impairments and affective mood disorders, as well as patterns of substance abuse and parental neglect consistent with an affective-laden family.  Mr. Barrett's young parents were apparently ill-equipped cognitively, emotionally or financially to rear children.  Mr. Barrett's developmental years were characterized by parental neglect, lack of appropriate boundaries, domestic discord, inter-parental violence and physical abuse.  These factors likely potentiated Mr. Barrett's genetic predisposition for the development of mental disorders and chemical dependency, as well as exposing him to risk of increased compromise of his neurocognitive development and functioning.

23.     Significant risk factors for, and the symptomatic presentation of multiple types of mental disorders and neurologic impairments existed in both the maternal and paternal lines of Mr. Barrett's antecedents.  In particular, Mr. Barrett has high genetic loading (risk) for bipolar

7

disorder and other affective disorders. He has multiple multigenerational and first-degree relatives with confirmed diagnoses of such mental illness. Mr. Barrett's extensive family history of bipolar and associated neuropsychiatric disorders is rare, and presents a clinical profile which, consistent with research protocols of the National Institute of Mental Health's collaborative Genetic Linkage Study of Schizophrenia and Bipolar Disorder, identifies his family as likely genetically predisposed to develop the disorders.

24.     Mr. Barrett's mother, Gelene Dotson, his maternal aunt, Carolyn Joseph, and maternal cousin, Gwendolyn Crawford, satisfy diagnostic criteria for various significant brain disorders including bipolar mood disorder, depression and anxiety disorders. Gwendolyn's daughter, Brandy Hill, suffers with major depression punctuated by episodes of "high euphoria," and is noncompliant with her prescribed medication regimen. Gwendolyn's 26-year-old son, Brandon, suffers from developmental disabilities that prevent him from speaking or being able to live independently. Another of Mr. Barrett's first cousins, Travis Crawford, is being treated for anxiety, has a history of depression, and experiences significant cognitive impairment. Mr. Crawford's oldest daughter has been diagnosed with bipolar disorder, and one of his sons exhibits significantly impaired neurocognitive functioning. At least two other of Mr. Barrett's cousins each has a son who suffers from diagnosed bipolar disorder.

25.     Medical indications of the incidence of major mood disorders, and related impairments in functioning, can be found in Mr. Barrett's maternal family back to at least the generation of his grandmother, Hattie Gertrude Dotson. Her maternal cousin, Ingram Goodwin, committed suicide around the turn of the twentieth century. Wallace Dotson, a first cousin of Mr. Barrett's maternal grandfather, was involuntarily committed to a state psychiatric hospital by

8

his father, Tom Dotson. The record of admission documents the senior Dotson's description of his son as being "completely out of his mind," suffering from "some kind of spells" and not having slept for "three days and nights," a neurovegetative sign of mood disorders.

26.     Mr. Barrett's paternal family presents a comparable degree of genetic loading for major mood disorders and associated neurocognitive substrates. At least one paternal aunt, Linda Riley, suffers from depression, and both of her adult daughters have been diagnosed with bipolar disorder. One of Ms. Riley's grandsons has been diagnosed with Asperger's Syndrome, a neurodevelopmental disorder. Another paternal aunt, Elnora Long, currently meets diagnostic criteria for bipolar disorders and requires treatment with high doses of medication.

27.     The paternal pedigree, neuropsychiatrically indicative of mental illness in Mr. Barrett's family extends back at least four generations. A Certificate of Lunacy for Mr. Barrett's great-great-grandfather, A.J. (Jack) Barrett, documents his 1918 commitment to a psychiatric hospital in Sequoyah County. Mr. Barrett's great grandfather, Isaac Clifford Barrett, despite achieving prominence in his social and professional community, manifested a loss of pleasure, called anhedonia, eventually committing suicide. His oldest son, Mr. Barrett's grandfather, Andrew Jackson Barrett, manifested severe mood imbalances and disordered thinking, which resulted in violent physical and sexual assaults against his wife and children, including the forcible rapes and consequent impregnations of one of his daughters and his 13-year-old sister-in-law; and rampages in public while under the influence of alcohol. His occupational functioning was severely impaired. Psychiatric symptoms documented in his Certificate of Lunacy, contemporaneously with his commitment to a state psychiatric hospital, include auditory hallucinations, persecutory delusions and paranoid ideation, which were, in turn, exacerbated by

9

neuropsychological deficits that impaired his intellectual functioning, judgment and reasoning. He suffered severe mood swings, and attempted to self-medicate his psychiatric distress with excessive amounts of alcohol. When he was sober, his family described him as "a decent guy." When he consumed alcohol, as he did on frequent occasions, he became unpredictable and violent.

28.     A.J. Barrett's disinhibition, affective dysregulation and violent behaviors, including assaults against his wife, traumatized his own son, Ernie Barrett (Kenneth Barrett's father), and impaired Ernie's neurodevelopment and cognitive functioning. As an adolescent, Ernie Barrett exhibited signs of traumatic stress, becoming emotionally constricted, exhibiting psychic numbing and replicating his father's aggressive behaviors against his own siblings and classmates. As an adult, Ernie Barrett exhibited a neuropsychiatrically diagnostic symptom cluster of bipolar-related behaviors, including hypersexuality, grandiosity and substance abuse.

29.     Howard Maxwell, the brother of one of Mr. Barrett's paternal great grandmothers, Mary Ellen Maxwell, was colloquially described as exhibiting psychiatric symptoms, and his son, Billy Dean, had a history of Schizophrenia, and also committed suicide.

30.     Kenneth Barrett's own genetically based potential for developing a mental illness was significantly increased by the circumstances of his upbringing, especially his parents' chemical dependency. Mood disorders have an incidence in the United States of approximately 8 percent of the population. When there is a genetic loading of mood disorders in a family, the incidence increases exponentially.

31.     Early onset BD appears to have strong polygenetic inheritances, with strong expression in the children of affected parents, and has a higher incidence than reported in the

10

6:10-cv-00115-JHP-SPS   Document 404   Filed in USDC ED/OK on 09/16/2009   Page 100 of 125

offspring of parents with other types of mood or affective disorders. Children with one parent with BD have a 25% incident of inheriting BD; for children whose parents both have BD, the incidence rises to 50% to 75%. (Faust et al, *Diagnosis and Management of Childhood Bipolar Disorder in the Primary Care Setting*, Primary Pediatrics, November 2006, page 802.)

32.     Based on the research regarding the genetics of schizophrenia and bipolar disorder, it is medically reasonable to conclude that the prevalence and severity of substance dependency in Mr. Barrett's family is largely genetically determined.  His parents' dependency and their different, unpredictable behaviors while intoxicated, further compromised Mr. Barrett's ability to perceive and incorporate a sense of appropriate boundaries, and develop an adequate perception of social cues and interpersonal interactions.  Ernie Barrett was frequently physically absent for days at a time as a result of extramarital affairs, and Gelene Barrett was rendered emotionally distant and neglectful by her intoxication.  These behaviors left Mr. Barrett's parents ill equipped to develop the primary attachments or provide the basic physical and emotional nurturing necessary for a young child's normal, healthy neurocognitive development.

33.     *From Neurons to Neighborhoods*, a study of early childhood development by the National Research Council and the Institute of Medicine, documented sensory stimulation, and social interactions as conditions that affect the developing brain. They also determined that chronic stress is detrimental to the normal development of the brain. (Shonkoff and Phillips, *From Neurons to Neighborhoods: The Science of Early Childhood Development*, National Academy of Science Press, 2001, page 199.)

34.     Parental neglect of the type suffered by Mr. Barrett has been found to constitute as significant a risk factor for childhood trauma as physical abuse, and one which has some of the

11

longest term and most pernicious effects of all such early traumatic experiences.

35.     The brain is only starting to grow, mature, and differentiate at the time of birth. Within the newborn brain there are certain structures that develop only if stimulated, and there are other structures that atrophy if not stimulated.  The newborn child's interpersonal and environmental experiences determine the rate and quality of development for domains that regulate definition of person and comprehension of one's place in his or her environment.  The absence of necessary caretaking or experiences that promote attachment between parent and child can alter both the structure and function of the child's developing brain. Mr. Barrett's reactivity rather than responsiveness is directly related to the lack of parental training of appropriate coping mechanism, in addition to his genetically-derived mood disorder.

36.     Emotional development can be seen as the literal acquisition of emotions. Children must develop the capacity to recognize and use emotions appropriately. Children must also become successful in a complex maturation process that entails learning to become emotionally responsive rather than emotionally reactive to internal experiences of emotion.  In addition, children must learn to use their emotional repertoire to handle the inherent anxiety and stresses that are universal to the human condition. Emotional maturity can be understood as the acquisition of coping defenses in infancy and childhood. (Sadock and Sadock, Comprehensive Textbook of Psychiatry, Eight Edition, Lippincott, Wilkins, and Williams, 2005, page 3029.)

37.     Mr. Barrett was also exposed to neurological insults to his fragile central nervous system *in utero* due to his mother's alcohol use, and during his formative years from his mother's unpredictable beatings and his parents frequent domestic disputes, that were known to end in violence.  E.g., Mr. Barrett's mother describes the "pretty bad fights" she and her husband had

12

whenever she confronted him about his infidelity, and reports that "he gave [her] two black eyes and split [her] lip."

38. As a child, Mr. Barrett exhibited signs of impaired neurological growth, failing to meet developmental milestones expected of healthy infants. During his first year, Mr. Barrett exhibited increasing delays in areas associated with creating interpersonal relations and emotional development. Among other delays, at age three months, he did not "observe anyone speaking, inspect hand, laugh aloud, manipulate object placed in hand"; at nine months, he did not "knock down block houses in play, oppose thumb and forefinger in picking up one-inch cube, wave 'bye-bye' or play 'peek-a-boo' instinctively, respond to animated facial expressions, express vocal sounds upon recognition of familiar person or object, associate outdoor clothing with being taken out, react to strangers, reach for objects persistently, say 'ma-ma' or 'da-da' or equivalent"; at one year, Mr. Barrett's mother noticed that he "had trouble learning to walk," and could not "drink from cup, put one block on another when shown, say two or three words indicating want, play 'pat-a-cake,'" or "show preference for one hand in reaching."

39. Mr. Barrett failed reading in the first grade, was required to repeat the eighth grade and was eventually referred to special education classes before he dropped out of school in the ninth grade. By pre-adolescence his hyperactivity, irritability, isolation, and impaired academic functioning introduced the prodromal symptoms associated with major mood disorder. He became more hyperactive, intrusive, and emotional labile, extremely sensitive, and a tendency to emotionally decompensate without apparent provocation.

40. Initial presentation of childhood or adolescent bipolar disorder typically involves moodiness, frequent or aggressive oppositional behavior, anger that does not resolve in 15

minutes, sadness and easy crying, inattention, and impulsiveness.  When the illness begins before or soon after puberty, it is often characterized by a pattern of continuous rapid-cycling, irritable or mixed symptoms that may co-occur with disruptive behavior disorders such as ADHD or CDs (conduct disorders), or may have symptoms of these disorders as presenting features. (Faust et al, Diagnosis and management of childhood bipolar disorder in the primary care setting, Primary Pediatrics, November 2006, page 801.)

41.     As he approached adolescence and continuing through young adulthood, Mr. Barrett experienced potential neurological insults outside his home that posed further risks of cognitive impairment and traumatogenic sequelae.  In a playground accident that occurred when Mr. Barrett was eight or nine, he was struck in the head by what he describes as a "steel ball," with indicated loss of consciousness.  He recalls only "waking up" as he was being lifted off the ground after being struck.   At age 17, Mr. Barrett reportedly suffered an assault by one or more police officers.  Mr. Barrett reportedly declined to pursue an investigation of the officers' actions, but his mother reports that while one officer restrained Mr. Barrett, another one beat him around the face, head and neck, inflicting injuries that included a broken jaw and collar bone, facial contusions and a bloodied nose.  When he was approximately 22, and again at age 23, Mr. Barrett was involved in motorcycle accidents, again with apparent loss of consciousness.  Mr. Barrett, witness accounts and medical records confirm that at the age of 24, he apparently attempted suicide by shooting himself in the chest with a shotgun; and Mr. Barrett reports that he has made several other unsuccessful attempts to take his life by driving his car or motorcycle off the road at high speeds.   In connection with Mr. Barrett's arrest for the commitment offense, he suffered several gunshot wounds to his legs, facial contusions and abrasions, and superficial

blunt trauma to his head.

42.     Mr. Barrett reports that his regular use of alcohol, tobacco and other drugs, including marijuana, started around the age of eleven or twelve, a period when the development of his frontal lobes, the seat of neurological executive functioning, is first beginning.

43.     Executive functioning is the ability to organize, think, reason, problem solve, initiate actions, monitor actions and change actions as needed based on information received. More specifically, executive functioning is the ability to organize and understand, deliberate, reason through a problem, apply that reasoning in making a decision, choose an action, recognize if the decision and actions are not effective, understand why the decision and choice of action is working or not working, and inhibit and/or change thinking and actions as needed by the situation.  Damage to the prefrontal cortex is known to be specifically associated with multiple neurological and psychiatric disorders.  The prefrontal cortex is particularly vulnerable to damage by multiple causes, and specific to Mr. Barrett's history, to possible prenatal developmental abnormality, drug use/abuse and traumatic brain injuries.( Young declaration, page 13)

44.     In an environment in which "mom drank, grandpa drank," Mr. Barrett had easy access to alcohol and soon began drinking "more regular."  In the seventh grade he regularly abused marijuana on a weekly or bi-weekly basis, and increased to more frequent use as he gained greater access to the drug once his use became more widely known among peers, and other users were willing "to turn [him] on."  From late adolescence through early adulthood he reports episodic use of Valium, Lithium, LSD, PCP, psilocybin mushrooms, methamphetamine, cocaine, Quaaludes and Placidyl; and frequent abuse of barbiturates.  By his 30's, Mr. Barrett primarily abused cocaine, methamphetamine and Tuenol.  Mr. Barrett's chemical dependency

history is consistent with the high incidence of substance use secondary to the increased neurovegetative symptoms of eating and sleep disorders, adhedonia and mania found in bipolar disorder. Mr. Barrett's combination of traumatic stress and bipolar disorder predisposed him to chemical dependency. PTSD and bipolar disorder each have a co-occurring incidence with chemical dependence greater than 40% in the clinical literature.

45. Mr. Barrett was unable to acquire the skills and means necessary to live independently, and manifested significantly impaired social, relational and occupational functioning throughout his adulthood. He married at the age of 19, and his son, the couple's only child, was born shortly afterward. The union was severely strained by the effects of Mr. Barrett's mental instability, which was apparent to lay observers. Mr. Barrett experienced periods of severe depression, in which he exhibited signs of catatonia, followed by mania and racing thoughts. Mr. Barrett was unable to maintain a consistent work schedule, and the couple frequently had to live with Mr. Barrett's mother, Gelene Dotson.

46. Mr. Barrett's former wife reports that during the periods they lived with Ms. Dotson, the effects of Mr. Barrett's attempts to ameliorate symptoms by self-medicating with illicit drugs were exacerbated by his mother's habit of making him "get up from bed and party with crack and pot."

47. Mr. Barrett and his wife experienced frequent separations followed by unsuccessful attempts at reconciliation. Mr. Barrett was unable to live independently and resided with his mother or father when living apart from his wife. Mr. Barrett's efforts at pursuing gainful employment were defeated by feelings of irritability, agitation and dysthymia, and impulsive, unconsidered abandonment of his job.

48.     Mr. Barrett reported to me that he would become so paranoid over time when interacting with others, he would be forced to leave successful attempts at working, often leaving at the point he was experiencing his direst moment. He left Fort Smith, Arkansas, working with his father, overwhelmed with racing thoughts and paranoid ideation

49.     Mr. Barrett's documented suicide attempt in 1986 was followed by psychiatric intervention and treatment with Elavil and Ascendin, antidepressants well known to exacerbate mania. Many antidepressants force a neurological "switch" to occur in bipolar disorder, inducing mania.

50.     Mr. Barrett's bipolar disorder's pattern can best be described as a "mixed phase" disorder, with depressive mood and affect combined with racing thoughts, irritability, paranoia, and disinhibition. Treated most often with antidepressants due to his depressive presentation, the medication regimen had the potential to increase Mr. Barrett's symptomatology, rather than ameliorate it.

51.     Mr. Barrett was medication noncompliant and his condition deteriorated, necessitating involuntary commitment to Eastern State Hospital in October 1986.  At admission, he presented as emotionally labile with impaired insight and judgment, and was provisionally diagnosed as suffering "depressive neurosis with suicidal potential extremely high."   Upon discharge, Mr. Barrett was again unable to live independently, and stayed with relatives.  The results of a Social Security Administration determination of eligibility found that Mr. Barrett was "moderately depressed" and periodically unable to "think clearly."  He required frequent admissions to hospital emergency rooms after reportedly falling down stairs, sustaining a contusion to his right periorbital region of his head; being involved in a motor vehicle accident,

17

in which he experienced rib and chest pain; and suffering a rash "all over." Mr. Barrett's disclosure, during clinical evaluation, of described suicide attempts using motor vehicles indicates that documented motorcycle and automobile accidents may have been unsuccessful suicide attempts, increasing the psychologically traumatic component of such incidents in addition to creating a risk of further neurological insults.

52.     Following a final separation from his wife after being unable to live independently in Fort Smith, Arkansas, Mr. Barrett psychiatrically decompensated and was hospitalized in January 1995. He reported to hospital staff that he was "losing [his] mind," and noted to be extremely agitated, sleep-deprived, unable to concentrate and experiencing racing thoughts. He was diagnosed with bipolar mood disorder and started on a regimen of 10mg. of Haldol, to be injected intramuscularly ("IM"). The requirement of intramuscular administration of psychotropic medication indicates that Mr. Barrett lacked the insight to recognize his medical predicament and that involuntary treatment with neuroleptics was medically necessary. However, Mr. Barrett's symptoms also called for mood stabilizing and cognitive enhancing medication, and Haldol, although an excellent antipsychotic, does neither. Again, Mr. Barrett's symptoms, although identified, were not appropriately or adequately treated, leaving him to become increasingly paranoid and cognitively impaired.

53.     When he was discharged from the psychiatric hospital, Mr. Barrett returned to his mother's property, where he constructed what family members describe as a small "shack," with approximately $150 worth of building supplies and scraps of materials. The structure lacked running water, a toilet or electricity. Mr. Barrett's mother allowed him to run an electrical cord from her house trailer to his shack, to use her bathroom and shower, and eventually to eat in her

18

kitchen. Mr. Barrett's family and former wife recognized that he could never "live on his own," and his mother allowed him to remain on her property, where he earned a marginal income repairing cars for friends and neighbors.

54. In the years and months preceding the commitment offense, Mr. Barrett expressed increasingly paranoid thoughts, experienced intolerable irritation at perceived surveillance and harassment by law enforcement authorities and felt threatened by illicit drug users and dealers, some of whom he suspected of being police informants. He disclosed to others his belief that he was being monitored by satellites and became increasingly withdrawn until he stopped leaving his mother's property. He relied on others to shop and run errands in the nearby town for him. At other times, he believed the unidentified aircraft "hovering" over his property were "dirigibles," similar to "the ones the U.N. uses," and reinforced with "steel plates on their bottoms." He described shooting at one and causing it to flee.

55. In the weeks or days before the commitment offense, Mr. Barrett reportedly displayed a sign on the roadway leading onto his mother's property that warned: "Keep out. I don't give a shit who you are, if you cross my gate or come on my property, I'll shoot." There was some dispute whether the message was directed at law enforcement, drug dealers or both.

56. Mr. Barrett's description of the events leading to his arrest indicates that he did not leave his shack before he was shot by the police. Responding to the sound of his son's voice calling his name, Mr. Barrett rushed to the front porch and observed an unidentified Ford Bronco driving toward his son. Mr. Barrett retrieved a handgun from inside the shack and placed it in the waistband of his trousers, and began to return to the porch to investigate. He was struck by a bullet he believes was fired through a window of the shack as the Bronco "hit the front of the

19

house." Mr. Barrett says "I didn't know what was going on except someone was there to kill me." At the sight of the Bronco striking his residence, Mr. Barrett "went to firing." The next recollection he has is of a law enforcement officer ordering him to stand up. Mr. Barrett has no memory of having fallen, but he does recall he could not stand up due to bullet injuries to his legs.

**Neuropsychological Assessment**

57.     The neuropsychological assessment performed by Dr. Myla Young measured impairments in cognitive performance associated with significant dysfunction in the dorsolateral and orbital portions of the prefrontal lobes of Mr. Barrett's brain.   The measured deficits compromise Mr. Barrett's ability to inhibit cognitive and emotional stimuli, and seriously disrupt executive function including planning (the ability to inhibit short-term goals for long-term objectives), and engaging in reasoned, purposeful, self-regulating goal-directed behavior.  The frontal lobes are also responsible for the integration of motoric and cognitive functioning, including mediation of impulses from the regions of the amygdala and hippocampus.  The amygdala is associated with primordial "fight/flight" responses, as wells as the positive/negative emotional responses of happiness and sadness.  When the amygdala sends an impulse, it is modulated by the orbital frontal lobe before activating striatal responses.  Frontal lobe integration of working memory with limbic impulses enables the brain to contextualize new information, including external stimuli, and make an appropriate response selection.

58.     The prefrontal cortex, the area of most severe damage for Mr. Barrett, is the site of executive functions.  As Dr. Young has indicated, the processes grouped under the label of executive functions can be thought of as multiple processing modules collected together to direct

cognitive activity, including mental functions associated with the ability to engage in purposeful, organized, strategic, self-regulated, goal-directed behavior. These modules perform functions related to overseeing the use of other cognitive processes. As noted by Dr. Young, this array of brain functions include those that are central to integrated reasoning and thoughtful judgment, such as the processes necessary to inhibiting reflexive responding, interrupting, and returning to ongoing activity; interacting with and selectively directing attentional processes, screening out interference and sustaining attention; shifting cognitive resources to focus on new demands or respond to new conditions or information; directing the efficient use of, and alternation between, pattern and detail processing; monitoring and regulating speed of information processing; monitoring task performance for accuracy and efficiency; overseeing the selection of verbal-nonverbal and abstract-concrete processing mechanisms; directing motor output, altering performance based on feedback; directing the efficient use of fluid reasoning resources; directing the use of working memory resources; directing the efficient and fluent production of language when highly specific production demands are made; directing the integration of multiple abilities to produce oral or written responses or products that reflect the level of capacity of the component abilities involved; directing the efficient placement of information in long-term storage; directing the retrieval of information from long-term storage; regulating social behavior; regulating emotional control; enabling self-observation and self-analysis; and making use of hindsight and foresight in the direction of current processing. Mr. Barrett suffers significantly impaired functioning in all these domains.

59.     In addition to having problems with focusing and sustained attention, manic patients have difficulties shifting attention. Manic patients resemble patients with frontal lobe

damage on attentional shifting task such as the Wisconsin Card Sorting Test.  Both groups of patients perseverate in that they continue to select stimuli in accordance with a previously enforced rule that has been changed by the examiner and thus become incorrect. (Goldberg et al, Cognitive Dysfunction in Bipolar Disorder, American Psychiatric Publishing, 2009, page 29)

60. Mr. Barrett's difficulty in integrating multiple inputs, for example, his inability to integrate multiple environmental occurrences into a coherent picture, is based upon the neurocognitive deficits objectively identified by Dr. Young. These types of frontal lobe impairments are known to be the foundation for disinhibition, impaired judgment, and grandiosity/paranoia found in bipolar disorder.

**Malingering**

61. The Diagnostic and Statistical Manual of the American Psychiatric Association, Fourth Edition, Text-Revised (DSM-IV-TR™) explains that "[t]he essential feature of Malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as . . . evading criminal prosecution, or obtaining drugs."  Mr. Barrett does not "produce" or exaggerate symptoms, rather he minimizes the severity of his symptoms and attempts to present as high functioning, despite acknowledgement of signs of his mental illness.  There is no marked discrepancy between Mr. Barrett's acknowledged symptoms and the objective findings (Malingering criterion #2). Reliable, congruent clinical evidence – including lay witness observations predating Mr. Barrett's arrest, prior psychiatric diagnoses and treatment, and objective neuropsychological testing results – shows that he meets diagnostic criteria for mental illness and suffers cognitive deficits.

6:10-cv-00115-JHP-SPS   Document 404-3   Filed in USDC ED/OK on 09/16/2009   Page 112 of 125

62.     In particular, neuropsychological testing offers a reliable method for the delineation of cognitive strengths and weaknesses. The clinical batteries administered by Dr. Young included methods for validating findings of deficits within individual test protocols and across the battery of tests. When administered across a broad variety of testing instruments, congruent results further confirm the accuracy and reliability of test results.  The successful manipulation of test data to exaggerate measures of neurological impairment in a manner that eluded detection by imbedded validity scales would have required Mr. Barrett to have specific knowledge and mastery of neuroanatomy and test construction.

**Etiology and Onset**

63.     Although the severity of damage to the frontal and temporal lobes of Mr. Barrett's brain is consistent with external head trauma as a possible etiology, the pervasive distribution of measured dysfunction, and congruent deficits in early development and cognitive functioning, are all indicative of insidious onset and progress, such as congenital, genetic, or other early neurological insult.  The consistent pattern of impaired cognitive functioning observed since Mr. Barrett's early childhood medically indicates that head traumas are likely to have been potentially contributing or exacerbating events relative to pre-natal or early acquired brain dysfunction.

64.     The clinical literature consistently points to bipolar disorder having significant cognitive deficits as a course of the disorder, even when effectively treated. Impairments in judgment, effectively weighing and deliberating, being able to see the big picture, inhibit socially inappropriate behaviors, and plan effectively are all neurological functions that are impaired in bipolar disorder and also mediated by different aspects of the frontal lobe.

65.     Mr. Barrett's family history, the consistency of emotional dysregulation beginning

early in his life, impairment in adult functioning and subsequent diagnosis by independent clinicians in a state facility all medically indicate a classic predisposition to bipolar disorder, prodromal symptomatology, followed by onset in late adolescence/early adulthood and course of the illness.

**Clinical Impressions**

66.     Mr. Barrett meets diagnostic criteria in the DSM-IV-TR™ for Bipolar Disorder, severe, 296.4x; and Post Traumatic Stress Disorder (PTSD), chronic, severe, 309.81.  He also has clinically measured diffuse brain damage, particularly in the prefrontal, temporal, and limbic system cortices, with the most cognitively significant impairment located in the orbitofrontal and dorsolateral regions of the prefrontal cortex.  Mr. Barrett's clinical profile medically indicates cognitive functioning and behavior that is severely compromised by overlapping symptoms of depression and mania – diagnostic of Bipolar and secondary to PTSD – and impairments in higher cortical regions necessary for inhibition, reasoning and judgment.

67.     Mr. Barrett also suffers from a Dysexcutive Syndrome, which would be categorized on Axis III. "Executive functioning" is a term addressed by many but coalesced by Lezak to discriminate cognitive functions from the "how" or "whether" of human behaviors (Lezak 1983).  Lezak emphasized the fluid nature of executive functioning and how dependent the cognitive and emotional aspects of functioning were on the "executive." Baddeley grouped these behaviors into cognitive domains that included problems in planning,organizing behaviors, disinhibition, perseveration, reduced fluency, and initiation (Baddeley 1986). Baddeley coined the term "dysexecutive syndrome." Each component of executive functioning has added to the array of cognitive processes, which include maintaining a problem-solving set for goal-directed

behavior, interference control, flexibility, strategic planning ability, and the ability to anticipate and engage in goal-directed activity (Denckla 1994). The definition of executive function is encompassed by actions fueled by conceptualizations, such as the ability to filter interference, engage in goal-directed behaviors, anticipate the consequences of one's actions, and the adaptive concept of mental flexibility (Luria 1969; Luria 1980; Stuss and Benson 1986; Denckla 1996; Goldberg 2001). The concept of morality, ethical behaviors, self-awareness, and the idea of the frontal lobes as manager and programmer of the human psyche are also included." (Ardila et al, Executive Function, Medlink Neurology, 2009)

68.     Ample anecdotal and congruent documentary evidence confirm that Mr. Barrett's mental disorders and defects pre-existed the date of the commitment offense and his trial.

**Medicolegal Findings**

69.      Mr. Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms, none of which was addressed, either legally or psychiatrically. First, Mr. Barrett was suffering profound neurocognitive deficits that impaired his ability to rationally assist his attorney in the preparation of his defense.

70.     Mr. Barrett's paranoia, impaired judgment, and inability to effectively weigh and deliberate played into each step of his legal proceedings, rendering him unable to rationally assist his attorneys. He was suffering from both acute and chronic symptoms of his Post Traumatic Stress Disorder and Bipolar Disorder. The symptoms of these disorders, both disorders of mood, were amplified by a disinhibited, disjunctured, debilitated brain that limited Mr. Barrett's understanding of both the legal proceedings and the fear, suspicion, racing thoughts, and poor adaptive function from which he was suffering.

71.	Mr. Barrett's chronic PTSD became acutely activated by the event leading to his arrest. As previously noted, Mr. Barrett had multiple individual stressors which qualified for a stressor that was life threatening. Over the course of his life, he had been beaten multiple times by his caregiver and the police. He had shot himself in the chest, at close range, almost losing his life.

72.	He was hypervigilant, having put up a sign warning people to stay away. He was extremely anxious and paranoid. Delusional thinking and perceptual disorders, beliefs that helicopters were hovering, watching him, eroded Mr. Bartlett's reality, raising his traumatic thinking to a psychotic level.

73.	Mr. Barrett's paranoid ideation, hyperreactivity, and affective dysregulation primed his inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action and to gauge his reaction to unfolding events.

74.	Studies of the acutely traumatized have found that those individuals who are at increased risk for chronic PTSD are relatively more likely to experience a more severe acute emotional reaction. This includes not only the intensity of emotions such as fear, anxiety, and/or despair, but also dissociative experiences and cognitive disruption.

75.	Mr. Barrett's chronic PTSD had now become acute, faced with a new stressor. Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

76.	Mr. Barrett's bipolar disorder was, at this point in his life, at its most extreme. He

26

was profoundly depressed, and had been in a particularly steep downward spiral since his divorce. Mr. Barrett had become increasingly withdrawn, by everyone's account. He reported to me that the years from his divorce and the raid on his home were the darkest of his life. He was self medicating more heavily than ever before.

77.     Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer.  It is my professional belief that Mr. Barrett, as a function of a mental disorder, believed his actions were right at the time of the police action on his property. This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation. His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.

78.     My belief that Mr. Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Mr. Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the environment.  The severe impairment of Mr. Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats, neurologically disabled Mr. Barrett from knowing or deliberating on the nature of his reactions

27

before they occurred.

79.     Mr. Barrett's reactivated Post Traumatic Stress Disorder had built-in reminders, namely the bullet fragments that continued to cause him significant pain and the reactive immunological reaction he has had to the bullet fragments in his body. Consequently, it is clinically consistent that his constellation of PTSD symptoms would continue through his trial and, to some extent, exist today.

80.     He described symptoms of racing thoughts during his trial, which prevented him from being able to effectively track the proceedings. Mr. Barrett's thoughts were also ruminative, and he was "unable to get unstuck."  He would get his mind on an issue during the trial, and not be able to move to other aspects of the trial.

81.     Mr. Barrett was unable rationally to assist his attorneys in the preparation of his trial. His triad of neuropsychiatric impairments, his PTSD, Bipolar Disorder, and Dysexecutive Syndrome; were not bound, as they are today, in a structured environment without the overwhelming stress Mr. Barrett was facing at the time of trial.

82.     I hold the foregoing opinions to a reasonable degree of medical certainty, and if called as a witness, I would and could testify truthfully to the information set forth above.

I declare under the penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct and was executed on March 14, 2009.

/s/ George W. Woods
George W. Woods, Jr., M.D.