**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

EDWARD LEON FIELDS,    )
            )
    Petitioner/Defendant, )
            )
vs.           )  Case No. 10-CIV-115-RAW
            )
UNITED STATES OF AMERICA, )
            )
    Respondent/Plaintiff. )

## OPINION AND ORDER

This is a proceeding initiated, on April 6, 2010, by the above-named petitioner's
filing of a Motion to Vacate, Set Aside, or Correct Sentence.[1]  The motion to vacate
conviction and sentence is brought pursuant to 28 U.S.C. § 2255.  The government has filed
a response by and through the United States Department of Justice and the United States
Attorney for the Eastern District of Oklahoma.  On November 15, 2010, Petitioner filed his
reply.

## PROCEDURAL HISTORY

On August 1, 2003, Petitioner was named in a six-count indictment.  The indictment
charged Petitioner with Counts 1 and 3: First Degree Murder, in violation of 18 U.S.C. §§
1111(a) and (b), 7(3) and 13; Counts 2 and 4, Use of a Firearm in a Federal Crime of

---

[1]The motion itself does not contain any of the grounds for relief.  Rather, Petitioner states:

> Mr. Fields raised ten grounds for relief.  They are set forth in the pages
> attached to the back of this form.  To aid the Court, Mr. Fields includes an Index to
> Grounds which is at the beginning of the attachment.
> With respect to each of the ten grounds raised, none were raised on direct
> appeal or in any other post-conviction proceeding."  Dkt. # 1, at p. 5.

Only nine grounds, however, are raised in the pages attached to the original motion to vacate.
Dkt. #s 1-2 and 1-3.

Violence Causing the Death of a Person, in violation of 18 U.S.C. §§ 924(c)(1)(A), (d), (j), 7(3) and 13; Count 5, Assimilative Crime – Robbery with a Firearm, in violation of 18 U.S.C. § 7(3) and 13; and Count 6, Assimilative Crime – Burglary of an Automobile, also in violation of 18 U.S.C. § 7(3) and 13. On March 15, 2004, the government gave notice of its intention to seek the death penalty in the event of a conviction on Counts 1 and/or 3.

On June 30, 2005, Petitioner appeared before this court and waived jury trial as to stage one only and entered pleas of guilty to all of the six counts contained in the indictment. Thereafter, on July 5, 2005, this court began death penalty qualification of potential jurors. On July 13, 2005, the second stage jury trial was commenced. On July 22, 2005, the jury unanimously returned a verdict of death. Cr. Dkt. # 228.

On November 8, 2005, the court sentenced Petitioner to death on Counts 1 and 3; 405 months on Counts 2 and 4, to be served consecutively to one another and consecutively to any other term of imprisonment imposed; 405 months on Count 5; and 84 months on Count 6. Additionally, in the event of subsequent release, Petitioner was ordered to serve 36 months of supervised release. Petitioner was further ordered to pay restitution in the sum of $15,323.84 and a $100 special assessment on each count, for a total special assessment of $600. The judgment and commitment was filed of record on November 15, 2005.

Following his conviction, Petitioner filed a direct appeal. The following issues were raised on appeal:

1. The federal government lacked subject-matter jurisdiction to prosecute Fields for crimes committed in the Quachita National Forest.

2. The district court erred in sustaining the government's challenge to a potential juror for cause.

3. Double-counting of the aggravator for substantial planning and premeditation unconstitutionally skewed the weighing process because the victims were killed in a single episode.

4. The single verdict of death on two counts of murder deprived Fields of a unanimous verdict on each count.

5. The evidence was insufficient to prove substantial planning and premeditation.

6. The non-statutory aggravating factor for future dangerousness is unconstitutionally vague and overbroad, should have been limited to future danger in the prison setting, and was not supported by the evidence.

7. Since the jury was not required to unanimously agree on the which factual predicates applied to the future dangerousness aggravator, petitioner's right to a unanimous verdict was violated.

8. The non-statutory aggravator relating to the infliction of anguish or other special suffering on the part of a victim is unconstitutionally vague and overbroad and statutorily preempted.

9. The trial court improperly admitted evidence regarding the impact of the murders on people unrelated to the victims.

10. The unanimous rejection of the severe disturbance mitigator was prejudicial error.

11. The jury should have been required to find that the aggravating factor(s) sufficiently outweigh the mitigating factors beyond a reasonable doubt.

12. The trial court's decision to allow the "guilley suit" in the jury room during deliberations was improper.

13. Cumulative error requires reversal.

After considering each of these issues, the Tenth Circuit Court of Appeals affirmed Petitioner's conviction. *United States v. Fields*, 516 F.3d 923 (10th Cir. 2008), *cert. denied*, 129 S.Ct. 1905, 173 L.Ed.2d 1060 (2009).[2]

On April 6, 2010, Petitioner filed his Motion to Vacate pursuant to 28 U.S.C. § 2255 (Dkt. # 1). As previously indicated, Petitioner raised nine (9) grounds for relief. Seven of those grounds contain Sixth Amendment claims that he received ineffective assistance of counsel. In addition, he claims the Eighth Amendment was violated because the jury did not

---

[2]Certiorari was denied on April 6, 2009.

find as mitigating factors any of the uncontested mental health-related mitigating factors presented; the Eighth Amendment and international law bar his execution because he is not competent to be executed and the death penalty is precluded due to his deteriorating mental health; prosecutorial misconduct deprived him of due process and a fair trial; his Due Process rights were violated because the government withheld exculpatory evidence; cumulative errors deprived him of Due Process and a reliable sentencing hearing; and the manner of Petitioner's death, if carried out, would violate the Eighth Amendment.

Following extensive discovery of the issues herein, the record was expanded on October 13, 2015, with the filing by Petitioner of a document styled: "Grounds in Support of Amended Motion pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence by a person in federal custody" (Dkt. # 106)[3] and an Amended Appendix in support thereof consisting of thirty-six (36) exhibits (Dkt. #s 106-1 & 106-2). Thereafter, the record was further expanded on October 15, 2015, when the government filed a motion for summary judgment (Dkt. # 110) containing thirty-nine (39) new exhibits. On January 6, 2016, Petitioner filed his response adding thirteen (13) additional exhibits. Finally, on February 2, 2016, the government filed a reply (Dkt. # 122) containing eight (8) more exhibits. This Court has reviewed the relevant trial court records associated with Case No. CR-03-73-RAW, including pleadings, pretrial and trial transcripts as well as all of the pleadings and exhibits filed herein.

---

[3]This amended pleading contains the same nine grounds contained in the attachment to the original motion.

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA" or the "Act")

delineates the circumstances under which a federal court may grant collateral relief.  Title 28,

section 2255 provides, in pertinent part, as follows:

> A prisoner in custody under sentence of a court established by Act of Congress
> claiming the right to be released upon the ground that the sentence was
> imposed in violation of the Constitution or laws of the United States, or that
> the court was without jurisdiction to impose such sentence, or that the sentence
> was in excess of the maximum authorized by law, or is otherwise subject to
> collateral attack, may move the court which imposed the sentence to vacate,
> set aside or correct the sentence.

28 U.S.C. § 2255(a).  A prisoner seeking post-conviction relief under this statute must allege

as a basis for relief:  (1) lack of jurisdiction by the court entering judgment; (2)  an error of

constitutional magnitude; (3) a sentence imposed outside the statutory limits; or (4) an error

of law or fact where the claimed error constitutes "a fundamental defect which inherently

results in a complete miscarriage of justice."  *United States v. Addonizio*, 442 U.S. 178, 185,

99 S.Ct. 2235, 2240, 60 L.Ed.2d 805 (1979).

Section 2255 is not a substitute for an appeal and is not available to test the legality

of matters which should have been challenged on appeal.  *United States v. Khan*, 835 F.2d

749, 753 (10th Cir. 1987), *cert. denied*, 487 U.S. 1222 (1988).  Failure to raise an issue on

direct appeal bars the movant/defendant from raising such an issue in a § 2255 Motion to

Vacate Sentence unless he can show "both good cause for failing to raise the issue earlier,

and that the court's failure to consider the claim would result in actual prejudice to his

defense, . . ."  *Id.*  "An error of law [or fact] does not provide a basis for collateral attack

unless the claimed error constituted 'a fundamental defect which inherently results in a

complete miscarriage of justice.'"  *United States v. Blackwell*, 127 F.3d 947, 954 (10th Cir.

1997) (citations omitted).

In *United States v. Galloway*, 56 F.3d 1239, 1242 (10th Cir. 1995), the Tenth Circuit held claims of constitutionally ineffective counsel should be brought on collateral review. Consequently, no procedural bar will apply to ineffective assistance of counsel claims which could have been brought on direct appeal but are raised in post-conviction proceedings. A petitioner may also raise substantive claims which were not presented on direct appeal if he can establish cause for his procedural default by showing he received ineffective assistance of counsel on appeal.

A court considering a claim of ineffective assistance of appellate counsel for failure to raise an issue is required to look to the merits of the omitted issue. Where the omitted issues are meritless, counsel's failure to raise it on appeal does not constitute constitutionally ineffective assistance of counsel. *Hooks v. Ward*, 184 F.2d 1206, 1221 (10th Cir. 1999). *See also*, *Smith v. Robbins*, 528 U.S. 259, 288, 120 S.Ct. 746, 765, 145 L.Ed.2d 756 (2000). Additionally, where claims have been raised and rejected on direct appeal, they can not be relitigated in a § 2255 motion. *United States v. Warner*, 23 F.3d 287, 291 (10th Cir. 1994).

## STATEMENT OF THE FACTS

On appeal the Tenth Circuit accurately set forth the facts as relayed to the jury in this case. *Fields*, 516 F.3d, at pp. 927-928. Therefore, this court will not recite them here. The court will, however, discuss various facts as they become relevant to a particular issue. The court would also note that during the sentencing stage of the proceedings, the government presented twenty (20) witnesses and the defendant called nine (9) witnesses. Thereafter, the government put on three (3) rebuttal witnesses. *See*, Tr. of Jury Trial, Vol. VIII-XIII.

**PETITIONER'S CLAIMS FOR RELIEF**

## I. Ineffective Assistance of Counsel

Petitioner raises claims of ineffective assistance of counsel in Grounds One, Three, Four, Five, Six and Seven. *See*, Dkt. #s 14 and 106. Claims of ineffective assistance of counsel are governed by the now familiar two-part test announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The performance prong requires a defendant to show "that counsel's representation fell below an objective standard of reasonableness." *Id*., 466 U.S., at 688. While the prejudice prong requires a defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*., at 694. Failure to establish either prong of the *Strickland* standard will result in a denial of Petitioner's Sixth Amendment claims. *Id*., at 696.

"There is a strong presumption that counsel provided effective assistance, and a section 2255 defendant has the burden of proof to overcome that presumption." *United States v. Kennedy*, 225 F.3d 1187, 1196 (10th Cir. 2000) (quoting *United States v. Williams*, 948 F.Supp. 956, 960 (D.Kan. 1996), *cert. denied*, 522 U.S. 1033, 118 S.Ct. 636, 139 L.Ed.2d 615 (1997)). *See also*, *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1420 (2009). "Effective assistance does not mean victorious or flawless counsel. To be ineffective, the representation must have been such as to make the trial a mockery, sham or farce, or resulted in the deprivation of constitutional rights." *Dever v. Kansas State Penitentiary*, 36 F.3d 1531, 1537 (10th Cir. 1994) (citations omitted). "The sixth amendment right to reasonably effective counsel does not mean 'errorless counsel' or counsel judged ineffective by hindsight." *Clark v. Blackburn*, 619 F.2d 431, 433 (5th Cir. 1980).

7

While ensuring that criminal defendants receive a fair trial, considerable judicial restraint must be exercised. As the Supreme Court cautioned in *Strickland*,

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all to easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.

*Id.*, at 689. In order to establish prejudice at the penalty stage of a capital trial, the defendant must show "there is a reasonable probability that, absent the errors, the sentencer--including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* In other words, deficient performance is prejudicial only where it is clear that "but for trial counsel's errors, there is a reasonable probability that the ultimate result would have been different," *Washington v. Johnson*, 90 F.3d 945, 953 (5th Cir. 1996), *cert. denied,* 520 U.S. 1122, 117 S.Ct. 1259, 137 L.Ed.2d 338 (1997); so that, the "confidence in the reliability of the verdict is undermined." *Id.* Establishing prejudice imposes a heavier burden on a petitioner than the harmless error test applied on direct appeal. *United States v. Haddock*, 12 F.3d 950, 958 (10th Cir. 1993). Moreover, "admissions of inadequate performance by trial lawyers are not decisive in ineffective claims." *Walls v. Bowersox*, 151 F.3d 827, 836 (8th Cir. 1998). Ineffectiveness is a question the court must decide. *Id.*

*A. Failure to investigate, present and effectively argue mitigating mental health evidence*

In his first ground for relief, Petitioner claims counsel were ineffective "with regard to nearly every aspect of [his] mental health mitigation defense," Dkt. 14, at p. 5, enumerating six specific claims dealing with counsel's alleged failures regarding investigation, presentation and summation of mental health evidence. In essence, Petitioner asserts his counsel ineffectively argued his mental health history and failed to request jury instructions to the effect that his asserted mental conditions satisfied multiple mitigating factors. Although conceding that counsel presented "significant mental health-related mitigating evidence, including his pre-offense history of chronic depression and auditory hallucinations and a post-offense diagnosis of bi-polar disorder" (Dkt. # 14, at p. 21); substantial evidence of mental illness[4] and argued his various conditions established specific mitigating factors, petitioner complains because his lawyers did not argue that his mental health issues satisfied multiple mitigating factors. Petitioner also argues counsel were ineffective for failing to assert that his uncontested mental health history was mitigating and the Eighth Amendment was violated because the jury did not find any of this uncontested evidence was a mitigating factor in his case.

Petitioner further contends, despite the fact that in 2011 an MRI of his brain showed it was "normal",[5] counsel were ineffective for failing to investigate and present evidence of his organic brain damage. Petitioner also complains because counsel failed to call local

---

[4]Declaration of trial counsel states, in pertinent part, "[w]e offered and argued to the jury the existence of twenty-two mitigating factors. In the realm of mental health statutory mitigating factors: that he suffered a severe mental or emotional disturbance and that his capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law, was significantly impaired. . . . .one of the Government's doctors (Mitchell) agreed that his history of depression and voices was true, and the Government conceded that in argument." Dkt. # 2-2 at pp. 11-12.

[5]*See*, Dkt. # 110-23, at p. 78.

medical professionals to support his manic flip defense and to testify that his mental illness was genuine. Additionally, petitioner states counsel were ineffective for eliciting damaging testimony during the cross-examination of Dr. Price and for failing to investigate and present evidence of compulsive aggression in effexor patients. Finally, petitioner complains trial counsel ineffectively failed to thoroughly and properly prepare two mental health experts who testified.

To support his claims, petitioner relies primarily upon an affidavit by Julia O'Connell, Federal Public Defender for the Northern and Eastern Districts of Oklahoma and lead defense counsel in the criminal proceedings from which this § 2255 action arose. Ms. O'Connell indicates she was an Assistant Federal Defender at the time of appointment but had never tried a federal death penalty case. Ms. O'Connell had, however, tried two state capital cases while employed by the state public defender's office. Dkt. # 2-2, at ¶ 2. While counsel bemoans the fact she was overworked and didn't have a clue what she was doing, the record reveals there were actually four (4) attorneys who made appearances in this matter, three of whom were from the local federal defender's office and each of those attorneys had substantial federal and/or state criminal trial experience.[6] *See also*, Dkt. # 110-1 (email in which Paul Brunton, Federal Public Defender advises Judy Clark, National Capital Resource Counsel that his office has "very able lawyers both with lots of trial, motions and appeal experience in state [death penalty] cases." Brunton forwarded his email and the response

---

[6]The docket sheet in this matter reflects Michael A. Able, Assistant Federal Public Defender appeared at Fields initial appearance on July 21, 2003. Mr. Abel was admitted to practice in the United States District Court for the Eastern District of Oklahoma on November 8, 1995 and he was not terminated as counsel in this case until November 15, 2005, following Fields' formal sentencing. Additionally, on July 25, 2003, both Julia O'Connell and Barry L. Derryberry entered their appearances on behalf of Fields. *See*, Dkt. #s 9 and 10, respectively. Finally, on August 12, 2003, Mr. Isaiah S. Gant filed a Motion to appear *pro hac vice* on behalf of Fields. Dkt. # 19. On September 9, 2003, the motion was granted. Dkt. # 29.

thereto to Michael Abel, Barry Derryberry and Rob Ridenour, three assistant federal public defenders in his office. This would imply more counsel were available to assist on this case than those who actually made a formal appearance in the case.) Additionally, Ms. O'Connell's emails establish that she consulted numerous times with attorneys from the National Capital Resource Counsel regarding the facts of this particular case and ideas on how best to defend it. *See*, Dkt. #s 110-1-110-10.

Ms. O'Connell claims, despite the fact her client "remained insistent, and ultimately pled guilty," if Isaiah "Skip" Gant, counsel deemed "Learned Counsel by the Federal National Resource Counsel Project" had joined her in counseling against the plea, together they might have convinced Fields not to plead guilty. *Id*., at ¶¶ 6 and 7. To the extent she admits Fields was insistent on pleading guilty, it is nothing more than wishful thinking to speculate that one more attorney would have been able to convince Fields to follow counsel's advice. Ms. O'Connell continues her affidavit by claiming she had no tactical or strategic reasons for everything which is challenged in the case. *Id*., at p.8 (¶¶s 11 and 12); p. 9 (¶¶s 13 and 14); p. 11 (¶ 17); p. 12 (¶ 18); p 13 (¶¶s 19 and 20); and p. 15 (¶¶s 22 and 23).

Statements by trial counsel in affidavits filed years after trial, where counsel in effect "fall on their swords," do not create credibility issues when trial counsel's documented contemporaneous statements show the contrary. *Jackson v. United States*, 638 F.Supp. 2d 514, 528 (W.D.N.C. 2009). *See also*, *Allen v. Mullin*, 368 F.3d 1220, 1240 (10th Cir. 2004) (court relied on contemporaneous court record to discount trial counsel's testimony in competency trial). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S., at 686, 104 S.Ct., at 2064.

In this court's opinion, the arguments made by petitioner are the kind of arguments which the Supreme Court in *Strickland* cautioned against, those made with the advantage of 20/20 hindsight. *Id*., 466 U.S., at 689, 104 S.Ct., at 2065. A review of the record reflects, despite the circumstances surrounding the murders of two individuals who were stalked like animals before being killed in cold blood, defense counsel presented a strong case in mitigation premised on several theories of mental illness, including the testimony of two mental health experts, Brad Grinage and George Woods. Grinage, a forensic psychiatrist testified Fields suffered from bipolar disorder and he described symptoms which led him to his diagnosis as depression, rushing thoughts which were episodic in nature and distractibility. *See*, Tr. of Jury Trial, Vol. XI at pp. 2778, 2790-2791, and 2794-2795. Additionally, Grinage indicated Fields had the classic symptoms of mania with regard to pleasure seeking behaviors and hypersexuality. *Id*., at pp. 2791-2792 and 2795. Moreover, Grinage explained the most compelling evidence in his diagnosis was the fact Field's primary care doctor had documented that Fields suffered from auditory hallucinations prior to the murders. Grinage also explained to the jury that treating bipolar patients with antidepressants, especially Effexor, carried an increased risk of causing mania or symptoms of hypomania and/or enhancing any existing psychosis. *Id*., at p. 2780. Finally, Grinage indicated, in his professional opinion, Fields was suffering from a "severe emotional mental disturbance, mainly bipolar disorder with psychotic features" with the psychotic features being auditory hallucinations. *Id*., at p. 2815.

The other defense expert, Dr. Woods, a neuropsychiatrist who specialized in examining the relationship between a person's brains and their behavior, testified that Fields had suffered from a mood disorder for many years beginning in childhood. *See*, Tr. of Jury Trial, Vol. XII at p. 2946. Woods also discussed Fields history of depression beginning at

age sixteen and the many different medications which had been tried.  Woods further indicated Fields had a history of mania which he described as being at "the other end of the bipolar."  *Id*., at p. 2973.  Woods continued by explaining the symptoms experienced by Fields such as irritability, impaired judgment, hypersexuality, "anger and rage that's come out of nowhere," impaired functioning, problems sleeping, problems with his appetite and hearing voices both before and after the offenses.  *Id*.  Based upon his examination, Woods diagnosed Fields with either a schizoaffective disorder or a bipolar disorder with psychotic features which led Fields to display poor judgment and have erratic thinking.  *Id*., at p. 2976-2977.  Woods explained to the jury that the Effexor, which Fields was taking at the time of the murders, could "flip" people with bipolar disorder from depression to mania, further impairing his judgment.

Moreover, during closing argument, counsel addressed all aspects of Fields mental health discussing his depression and how it affected everything in his life, his inability to control what was going through his mind continually because of "rushing thoughts," and counsel implored the jury to show empathy for Fields since he had already accepted responsibility for his actions.  Tr. of Jury Trial, Vol. XIV, at pp. 3434-3436.  Counsel indicated his mental disease impaired his abilities.  *Id*., at p. 3436.  Counsel also emphasized the bipolar flip theory, pointing out to the jury that the Effexor built up like it was supposed to and then it hit a tipping point so bad that a girl friend of Fields called the prescribing doctor worried about either suicidal or homicidal behavior.  Thus, counsel argued when Fields committed these offenses he was "under severe mental or emotional disturbances." *Id*., at p. 3440.  Counsel also reminded the jury that all of the physicians who had treated Fields endorsed the idea that the voices were credible.  *Id*., at 3439.

While the right to effective assistance of counsel extends to closing arguments, counsel still has wide latitude in deciding how best to represent their client, and deference to counsel's tactical decisions in their closing arguments is extremely important because of the broad range of legitimate defense strategy at this stage of the case. *Yarborough v. Gentry*, 540 U.S. 1, 4, 124 S.Ct. 1, 5, 157 L.Ed.2d 1 (2003). The purpose of closing arguments is to "sharpen and clarify the issues for resolution by the trier of fact . . . . " *Herring v. New York*, 422 U.S. 853, 862, 95 S.Ct. 2550, 2555, 45 L.Ed.2d 593 (1975).

> Closing arguments should "sharpen and clarify the issues for resolution by the trier of fact," but which issues to sharpen and how best to clarify them are questions with many reasonable answers. Indeed it might sometimes make sense to forgo closing argument altogether.

*Yarborough*, *supra*. Therefore, as in all challenges to effectiveness of defense counsel's actions, this court's review of a defense attorney's summation is highly deferential.

Furthermore, in spite of petitioner's claim counsel should have argued these alleged mental issues satisfied multiple mitigators, the jury outright rejected this evidence, finding petitioner did not commit the offenses under severe mental or emotional disturbance. Cr. Dkt. # 229, at p. 6. To the extent the jury did not believe the mental health testimony was mitigating, it is pure speculation to suggest the jury would have viewed the evidence differently if counsel had argued it fit under several different mitigating factors. Ms. O'Connell's correspondence reveals she was aware she faced a difficult task to convince the jury to rely on her mental health evidence. Dkt. # 110-7. Counsel's criminal trial experience clearly gave her the ability to make a strategic decision as to the best way to argue the mental health evidence to the jury.

Fields argues failure to find the uncontested mental health evidence[7] was mitigating violates the Eighth Amendment. The government makes a compelling argument that this claim has been procedurally defaulted. Whether or not the claim has been defaulted, this court finds no authority to suggest that a jury is automatically required to find uncontested mental health evidence automatically qualifies as a "mitigating factor." Rather, the Supreme Court has suggested complete jury discretion is constitutionally permissible so long as the jury is not precluded from considering any relevant mitigating evidence offered by the defendant to support a sentence less than death. *See, Graham v. Collins*, 506 U.S. 461, 508, 113 S.Ct. 892, 919, 122 L.Ed.2d 260 (1993) (citing *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)). The Eighth Amendment simply requires jurors be allowed to consider and determine for themselves the existence and weight to be accorded alleged mitigating factors. *See, Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) and *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990).

Additionally, regardless of the reasons counsel did not followup with an MRI,[8] in light of the results of a 2011 MRI, this court finds petitioner has failed to establish prejudice based upon counsel's failure to investigate and/or present evidence of his alleged organic brain damage. While Petitioner urges this court to disregard the post-trial information of Dr. James Seward regarding a peer-reviewed psychological and neuropsychological evaluation of

---

[7]Fields argues "counsel's single-minded focus on the manic flip prevented the jury from finding and giving effect to the uncontested evidence of depression and the largely uncontested evidence of hallucinations." Dkt. # 106, at ¶ 16. There is nothing within the record to indicate the jury was prevented from considering **any** of the evidence which they heard at trial.

[8]In February, 2005, counsel advised the United States Attorney's office that the cost of a PET scan was $35,000 and suggested the prosecution team should absorb this cost. Thus, the cost of a brain imaging scan clearly played a role in counsel's decision to rely on their expert testimony and forego conducting a brain scan. *See*, Dkt. # 106-8.

Fields, Dkt. # 110-23, because it did not exist at the time of trial,[9] it is petitioner's burden to establish prejudice. The government's burden is to rebut the arguments presented by petitioner.

To support his argument that counsel was ineffective for failing to investigate and present evidence of his organic brain damage, petitioner submitted a neuropsychological examination report dated April 1, 2010, by Daniel A. Martell, Ph.D, Dkt. # 106-10. Dr. Martell claims the report of Dr. Price unequivocally demonstrates organic impairment in the frontal lobes. In that report, Dr. Martell indicates "any reasonable neuropsychologist looking at Dr. Price's neuropsychological data would have identified the presence of significant impairments (sic) Mr. Fields' brain functioning, primarily involving frontal lobe functioning", *id*., at p. 13, and "Mr. Fields has experienced a catastrophic loss of brain function over the past five years." *Id*., at p. 17. Dr. Martell goes on to state that "[t]his apparent degenerative brain disease process also raises important questions about his behavior at the time of the instant offense, as there is evidence in the test data from the time of trial that there was something abnormal and deteriorating about his neurocognitve (sic) functioning." *Id*. In addition, petitioner submits an affidavit from Dr. Grinage, which state "[i]t is highly likely that [Fields] has frontal lobe impairment that would affect his bipolar behavior and treatment." Dkt. # 106-4. To rebut Field's argument that he has significant brain impairments which trial counsel failed to follow up on, the government had the right to rely on current psychological testing, including an MRI of his brain. To hold otherwise, would allow post-conviction counsel to make arguments which could never have been proven at trial even if trial counsel had taken the very steps which post-conviction counsel argue they should have taken. While petitioner cites to, *United States v. Gonzalez*, 98

_____

[9]*See*, Dkt. # 119, at pp. 31-32.

Fed.Appx. 825, 832 (10th Cir. 2004), an unpublished Tenth Circuit opinion, for the proposition that this court cannot resolve differences among the parties mental health experts without an evidentiary hearing, petitioner submits nothing to contradict or rebut the evidence submitted by the government which shows an MRI conducted in 2011 was normal.

Fields further argues the trial counsel failed to object when the Government "brought out harmful, but limited, testimony from Dr. Price regarding brain damage." Dkt. # 106, at p. 47. A review of the testimony, however, reveals interposing an objection to the limited testimony elicited by the government which briefly indicated Fields "cognitive processes . . . . . were intact"[10] and Price's statement he "thought there was probably going to be some brain dysfunction"[11] would have drawn the jury's attention to the testimony. Giving counsel's desire to limit the jury's exposure to such testimony, this court finds counsel's decision to not object was a reasonable trial strategy. Again, to the extent Fields does not have organic brain damage, counsel's limited cross-examination of Dr. Price was not ineffective. Nor did this brief testimony likely impact the outcome of the trial. Therefore, this court finds petitioner has failed to establish prejudice.

Petitioner also is dissatisfied with counsel's decision to not call his local medical professionals, *i.e.*, two psychiatrists who treated him while he was in custody - Joyce Bumgardner and Larry Trombka - and a physician and physician's assistant who treated petitioner prior to the murders - Dean Anderson and R.L. Winters, respectively. This testimony, however, was cumulative to the evidence, discussed above, which was presented

---

[10]Tr. of Jury Trial, Vol. XII, at p. 3106.

[11]Tr. of Jury Trial, Vol. XII, at p. 3154.

at trial through defense experts, Dr. Grinage[12] and Dr. Woods.[13]  Moreover, trial counsel used this evidence in closing arguments to remind the jury that Fields had reported auditory hallucinations prior to the murders.[14]  Counsel's failure to call witnesses whose testimony is cumulative of evidence already presented at trial is not considered constitutionally deficient performance.  *Snow v. Sirmons*, 474 F.3d 693, 729 (10th Cir. 2007).  Since evidence which is essentially cumulative would not have led the jury to reach a different result in the sentencing phase of a capital case, failure to present such evidence could not have prejudiced the defendant.  *Humphreys v. Gibson*, 261 F.3d 1016, 1021 (10th Cir. 2001).  Petitioner has failed to establish his attorneys actions regarding this omitted testimony rendered their assistance ineffective or that he was prejudiced thereby.

Petitioner further attacks counsel's failure to investigate and present evidence regarding how the use of Effexor correlates with compulsive aggression.  Petitioner then cites to an FDA public health advisory asking manufacturers of ten anti-depressant drugs, including Effexor, to alter their labeling to include a "warning statement recommending 'close observation' of patients being treated with these drugs for increased depression or suicidality and noting that '[a]nxiety, agitation, panic attacks, insomnia, irritability, **hostility**, impulsivity, akathisia, hypomania, and mania . . . .'" Dkt. # 106, at p. 57 (bold in original).  Yet, the two experts presented by counsel attributed Fields behavior to the effects of Effexor.  First, Dr. Grinage opined Fields

> . . . . . had gone for some time with a depression that alternated with bipolar-like symptoms and could probably have been diagnosed with bipolar had it been recognized.  And when given multiple fail trials of antidepressants which

---

[12]Tr. of Jury Trial, Vol. XI, at pp. 2795-2810, 2821, 2893-2894.

[13]Tr. of Jury Trial, Vol. XII, at pp. 2978 - 2995 and Vol. XIII, at pp. 3209-3210.

[14]Tr. of Jury Trial, Vol. XIV, at p. 3442.

you might expect with a bipolar patient given an antidepressant with some norepinephrine activity that he developed an irritable manic mania. He went from depression or mixed depression manic state into a more irritable state. He continued to have depressive symptoms, so, he was - - in essence, he may have been completely in a mix, both depression and mania, but, he tended to have more of a diagnosable irritable mania as he described classically an increase in his rushing thoughts, hearing the voices more frequently and having anxiety associated with the voice.

Tr. of Jury Trial, Vol. XI, at pp. 2814-2815. Thereafter, Dr. Woods discussed "mania" and indicated that newer studies showed "often mania does not show up as – just pure grandiosity but that it really shows up in irritability, in spontaneous anger, in kind of this inability to control your anger." *Id*., Vol. XII, at p. 2953. Dr. Woods further discussed the pharmacological literature surrounding Effexor, testifying:

[w]hen you look at the literature - - not the PDR, not the Physicians Desk Reference, because the Physicians Desk Reference is not a learned treatise by any stretch of the imagination. But when you look at the actual literature, pharmacological literature, you see that Effexor has a significant incidence of flipping people into mania, of making that switch. When a person switches into mania, they often become - - their judgment becomes increasingly impaired.

*Id*., at p. 2990. Fields' argument that counsel would have learned that patients treated with Effexor "experience increased rates of compulsive aggression" is just another way of saying what defense experts actually said, *i.e.* Effexor increases the incidence of causing spontaneous anger, irritability or inability to control your anger. Therefore, this court finds counsel were not ineffective for failing to hire more experts who would have said the same things about the potential side effects of Effexor.

Finally, Petitioner states trial counsel failed to thoroughly and properly prepare their mental health experts. While trial counsel failed to provide Dr. Grinage with the transcript of Fields' change of plea hearing or to inform Woods of a pertinent statutory mitigator, this court finds petitioner has not established any prejudice occurred as a result of these oversights. Rather, as noted by the government, both experts testified consistent with the

written opinions they rendered before Fields entered his guilty pleas and defended their conclusions on cross-examination.  Fields has failed to establish counsel was ineffective in investigating, presenting and/or arguing his mitigating mental health evidence.

*B. Failure to investigate, present and argue evidence rebutting aggravating factors*

In his third ground for relief, Petitioner claims trial counsel's failure to challenge the statutory aggravating factor of substantial planning and premeditation and the non-statutory mental anguish aggravator violated his right to effective assistance of counsel. Moreover, Petitioner contends the government presented false and misleading testimony and argument in support of the substantial planning and premeditation factor thereby violating his right to due process guaranteed by the Fifth Amendment.

1. Substantial planning and premeditation

In regard to this aggravating factor, the jury was instructed as follows:

> The government seeks to prove that the defendant committed the offense of murder after substantial planning and premeditation to cause the death of Charles Glenn Chick, Jr. and/or Shirley Elliot Chick. "Planning" means mentally formulating a method for doing something or achieving some end. "Premeditation" means thinking or deliberating about something and deciding whether to do it beforehand. "Substantial planning" means planning that is ample or considerable for the commission of the crime at issue.

Cr. Dkt. # 227, at p. 22.

Petitioner argues counsel was ineffective for failing to conduct a reasonable investigation by asking his friend and government witness, Daniel Presley, about his knowledge of ghillie suits and rifles with scopes. First, he claims Presley would have testified that "ghillie suits and ghillied weapons were common among hunters in the area."[15] He also claims Presley "would have explained, if asked, that it was not unusual for hunters who ate what they shot (such as Mr. Fields) to attach large scopes to their .22 rifles;"[16] and "Fields attached the scope to his rifle at least a year before the homicides."[17] Additionally, Fields

---

[15]Dkt. # 14, at p. 50; Dkt. # 106, at p. 61; and Dkt. # 106-21, at p. 4.

[16]Dkt. # 14, at p. 50; Dkt. # 106, at p. 68; and Dkt. # 106-21, at p. 5.

[17]Dkt. # 14, at p. 50; Dkt. # 106, at pp. 68-69; and Dkt. # 106-21, at p. 6.

asserts Presley could have rebutted the government's claim that he had tried to set up an alibi for the night of the homicides by testifying that Fields had asked him to go snake hunting on the night of the murders. Finally, Fields argues a reasonable investigation, including consulting with an independent crime scene investigator, would have found evidence to refute the government's allegations that Fields returned to the crime scene many hours after the shooting to "stage" a robbery. Dkt. # 14, at p. 66; Dkt. # 106, at pp. 71-79; and Dkt. # 106-24. According to Fields this additional testimony would have rebutted the substantial planning and premeditation aggravating factor.

If this testimony had been elicited, however, it would not have changed the defendant's own statements regarding the what he had done on the evening of July 10, 2003, which were introduced through Special FBI Agent Graff. In particular, Agent Graff begin by telling the jury that the defendant originally denied having any firearms and stated that he did not hunt. Tr. of Jury Trial, Vol. IX, at pp. 2249-2250. Additionally, Fields originally denied having been to the Winding Stair campground and told the FBI agent he had made a ghillie suit approximately four years before, but he had thrown it away about two or three years ago. *Id.*, at pp. 2255-2256. Finally, Fields initially denied shooting the Chicks. *Id.*, at pp. 2256-2257.

Once confronted with the facts known by Agent Graff,[18] Fields changed his story and admitted that he had killed the Chicks. *Id.* In his confession to the FBI, Fields stated he went to the Winding Stair Campground on the evening of the 10th to use the bathroom. When he arrived at the campground, "he observed the Chicks over at the vista, which was an overlook

---

[18]These facts included: 1) defendant's truck had been seen at Winding Stair on the evening of the 9th; 2) agents were in the process of searching his truck; 3) a .22 rifle had been found behind the seat in his truck and it appeared to be consistent with the firearm that was used in the killings of the Chicks; 4) a ghillie suit had been found in the back of his truck which contained fibers that appeared to be consistent with fibers found at the crime scene and 5) items secluded under a blanket in his truck appeared to be personal items which belonged to the Chicks, including a camera and a portable Casio T.V. *Id.*, at pp. 2257-2259.

which overlooks the valley to the north. And he described the vista as being approximately seventy-five yards from their campsite." *Id*, at p. 2261. Upon seeing the Chicks, Fields "put on his ghillie suit and took his [.22 caliber] rifle and went over in the woods and secreted himself in the woods near their campsite." *Id*. Fields could not say how long he watched and waited for them to come back from the vista; but he observed them for approximately fifteen minutes after they had returned to the picnic table at their campsite before he crept up, on his belly, closer to their campsite (taking another five minutes) and when he heard Mr. Chick say he was going to the tent, he fired a shot into Mr. Chick's head. *Id*., at pp. 2263-2267. After shooting Mr. Chick, Fields told Agent Graff he moved closer to the campsite; Shirley Chick had gotten up from the picnic table and was running towards the van, so he fired two to three shots at her as she ran. *Id*., at pp. 2267-2268. Fields approached the van and shot Ms. Chick in the head at least two times. *Id*. Thereafter, Fields told the FBI that he went back to the picnic table and because he thought Mr. Chick might still be alive, he shot him in the head a second time. *Id*., at p. 2268. Further, Fields stated he then removed forty dollars from Mr. Chick's pants pocket, which he kept. *Id*., at p. 2270. Fields continued his confession to the FBI, indicating he went back to his truck, took off his ghillie suit and drove back to the Chicks' campsite, picked up a rock, broke the window of the van and took personal items of the Chicks from the van. *Id*. Following his interview with the defendant, the FBI agent wrote a synopsis of what Fields had said. It was introduced as Government's Exhibit 131 and read to the jury. The written confession stated the following:

> I, Edward L. Fields, have been advised of my Miranda warnings pursuant to my arrest for shooting Charles and Shirley Chick resulting in their deaths. I waive my Miranda rights and voluntarily provide the following written statement.
> On approximately Tuesday, July 8th, 2003, I observed a man and woman, whom I later determined to be Charles and Shirley Chick, camping at the Winding Stair Campground. My purpose for being there was to use the bathroom. The Chicks appeared to be using a tent and a blue van.

During the evening hours of July 10th, a Thursday, I returned to Winding Stair Campground to use the bathroom. Just before dark, I observed the Chicks at the vista approximately seventy-five yards from their campsite. I dressed myself in a guillie (sic) suit, and with a .22 caliber rifle crept up close to their campsite and waited for them to return.

I had been short of money all week and intended to rob the Chicks. The main reason I was short of money was because of child support payments I have to pay. My intent was to rob the Chicks at gunpoint, tie them up, and leave.

The Chicks returned from the vista and were sitting at the picnic table at their campsite. I remained concealed in the woods for about fifteen minutes after their returning to the campsite.

At one point Charles Chick said he was going to the tent. I shot Charles Chick with one shot to the head. I then shot at Shirley Chick a couple of times. I followed Shirley Chick to the van and shot her twice in the head. I then returned to Charles Chick and shot him once in the head. I removed forty dollars cash from Charles' pants pocket.

I returned to my truck, a blue Chevrolet, parked about seventy-five yards away, and brought my truck over to the Chicks' campsite. I broke the driver's side window out of the Chicks' van using a rock. I removed the Chick's van -- I removed from the Chicks' van two backpacks, a camera with a long lens, a mini television, Charles Chicks' wallet, a battery charger, two mini flashlights and a radar detector. One mini flashlight, the camera, the mini television, and the radar detector remain in my truck at the present time. I disposed of one of the backpacks, which included the battery charger at Kerr Lake. I disposed of the other backpack which contained Charles Chick's wallet, Shirley chick's purse and a rock in Lake Wister. I recovered $300 from Shirley Chick's purse before I disposed of it.

Both Charles and Shirley Chick were dead when I left their campsite the evening of July 10th. After leaving the Chicks' campsite, I returned to my campsite located near Lake Wister. Between the hours of 7:00 and 8:00 a.m. on Friday, July 11th, I purchased gasoline at the Wal-Mart in Poteau using Charles Chick's credit card.

During the week prior to July 10th, I had been very depressed. I had felt suicidal. I had no money, and I felt desperate. Since shooting the Chicks, I have felt very sick and very remorseful. I would like to tell the Chicks' family and relatives that I am sorry for this incident.

I make the above voluntarily. The above statement, Pages 1 through 3, are true and accurate.

Signed by Edward Fields, 7-18-03, witnessed by myself, Agent Jones and Donnie Long.

*Id*., at pp. 2280-2283.

In addition to the defendant explicitly admitting he had seen the Chicks two nights

prior to the murders, that he stalked them for at least fifteen minutes before shooting them like

animals, evidence supporting the substantial planning and premeditation aggravator was

introduced thru several other witnesses. First, Ms. Hairrell testified she helped make a "sniper suit"[19] for the defendant a few years before the murders. She asked the defendant several times what the suit was for and the defendant never would answer. *Id.*, at pp. 2326-2331. On one occasion when Ms. Hairrell saw the defendant's rifle, the defendant said "[h]e could shoot anybody a hundred yards off." *Id.*, at pp. 2329.

Carol Lamb testified, on June 15, 2003, she accompanied the defendant to Atwoods where he purchased gunny sacks. Later that day, Ms. Lamb helped the defendant cut the gunny sacks into strips. When Ms. Lamb observed the defendant tying the strips to his rifle, she asked him what he was doing and "[h]e just kind of laughed it off and said, 'You don't want to know.'" *Id.*, at pp. 2238 and 2340. Additionally, the defendant admitted to Ms. Lamb that he had previously snuck up on a couple while wearing his ghillie suit. *Id.*, at p. 2348.

On July 7, 2003, the defendant told his friend, Daniel Presley, he had seen a couple parked in a car and he had snuck up on them in his ghillie suit. *Id.*, at p. 2377. Another witness, Brenda Stacy, also heard the defendant say "You don't really want to know" when asked what the ghillie suit in the bed of his truck was for. *Id.*, p. 2421. Further, Marilyn Presley testified on July 7, 2003, the defendant also told her, he had donned his ghillie suit and watched a couple in a car for a few minutes. *Id.*, Vol. X, at p. 2463.

Charles Love testified about the defendant telling him he had worn his sniper suit "on Talimena Drive and had slipped upon on a couple of people on Talimena Drive." *Id.*, at p. 2487. This incident occurred sometime in the spring of 2003. *Id.*, ap p. 2486. Mr. Love indicated the defendant had told him that he got within 20 yards of this couple and they did

---

[19]This was the term the defendant used to refer to the ghillie suit. *Id.*, at p. 2331. *See also*, Tr. of Jury Trial, Vol. X, at p. 2486.

not know he was there. *Id.* A couple of weeks after this incident, the defendant asked Mr. Love about making a silencer. *Id.*, at pp. 2487-2488.

Finally, Dawn Michelle Bond testified the defendant called her from the Poteau Police Department to tell her "that he was in jail for murdering the people that I had joked with him about murdering." *Id.*, at p. 2584. During the course of her testimony, Ms. Bond said the defendant had told her he had watched the victims have sex in their car on some day prior to the shootings. *Id.*, at p. 2583.

All of this evidence establishes the defendant planned these murders for at least two days, if not substantially longer, prior to actually committing them. Even if Presley had testified about lawful uses of ghillie suits and rifles with scopes, that Fields had attached the scope to his rifle at least a year before the murders or that "lots of guys who use ghillie suits also ghillie their guns,"[20] it would not have lessened the impact of the evidence the jury heard regarding Fields ghillying his rifle less a month before the murders; his statements to so many people that they didn't want to know what his ghillie suit was for; the fact that the defendant became proficient in sneaking up on people while wearing his "sniper suit;" or finally, his statements that he drove to a secluded area, laid in wait for over fifteen minutes (even crawling closer on his belly) before killing two unsuspecting campers in cold blood. Each of these actions established the substantial and methodical planning and premeditation that went into the murders of these two innocent campers which the defendant ultimately carried out on July 10, 2003. Moreover, whether or not the defendant knew he was definitely going in for the kill when he told Ms. Tipton he would not be over because he would be going "fishing" with Presley, does nothing to lessen the substantial amount of planning which defendant engaged in to finally fulfill this human hunting expedition.

---

[20]Dkt. # 106, at p. 68 and Dkt. # 106-21 at p. 6.

Fields continues his attack on counsel's investigation by arguing counsel was ineffective for failing to consult an independent crime scene investigator. According to Fields, if counsel had consulted with such an expert, counsel could have introduced evidence contradicting an Oklahoma State Bureau of Investigation (O.S.B.I.) agent's testimony that Fields staged the robbery many hours after the shootings and/or suggested cross-examination questions to challenge the accuracy of the testimony regarding glass fragments and/or blood flow evidence at the scene. During the trial, Agent Dalley testified as a crime scene investigator, having expertise in blood stain pattern analysis and crime scene reconstruction. Tr. of Jury Trial, Vol. VIII, at p. 2080. Agent Dally indicated she was called to the scene on July 11, 2003, at which time she took numerous photographs of both of the victims and different areas of the victim's van. Many of the photographs taken at the scene were introduced in the trial. Agent Dalley explained each of the photographs to the jury and discussed gravity blood flow patterns depicted within those photographs, including pooling on the pavement , around the victims and in the victims' clothing. The agent also described blood spatter on Ms. Chick's face and while the photograph depicting this blood was not admitted into evidence, Dalley testified, after reviewing the photograph, she believed the only source for the blood on Ms. Chick's left cheek was from one of Mr. Chick's wounds. According to Dalley, Ms. Chick would have been approximately two feet from Mr. Chick when he sustained a gunshot wound thereby spraying high velocity spatter onto Ms. Chick. *Id.*, at pp. 2082-2091. Dalley further testified she observed glass fragments at the scene of the murders which were consistent with the broken driver's window of the van. Dalley surmised, because there was no blood stains on these fragments, that the glass had to have been shattered, at least an hour, after the murder in order to allow the blood to dry enough that it was not transferred to the glass on contact. *Id*., at p. 2099.

Petitioner now claims

> Agent Dalley's testimony that the glass fragments found resting on a dried pool of Mrs. Chick's blood were not stained with blood was contradicted by both Agent Dalley's own investigative report and photographs taken at the crime scene. In her report, Agent Dalley recorded no observations about these glass fragments, nor did she note whether she examined the fragments at the scene or collected them for later examination.

Dkt. # 14, at p. 66. *See also*, Petitioner's Exh. # 22, Dkt. # 106-23. Defense counsel, however, got Dalley to admit on cross-examination that she did not collect any of these glass fragments. Tr. of Jury Trial, Vol. IX, at p. 2216-2217.

Petitioner further claims the government argued he left the campground after shooting the Chicks and returned several hours later to stage a robbery and that this argument "was critical to the Government's case that the shootings were the result of substantial planning because it purportedly showed that Mr. Fields' true objective had been to kill, not steal." Dkt. # 106, at p. 71. Based upon the evidence in this trial, the court does not believe the length of time after the murders the robbery occurred was relevant to the jury's finding beyond a reasonable doubt that the "substantial planning and premeditation" aggravator applied to these murders. The defendant admitted in his confession that he took $40 from Mr. Chick's pocket right after the murders, then he left the victim's campsite, returning with his truck to complete the robbery. Nowhere does his confession indicate the length of time he was in his truck before he returned to the victim's campsite and completed the robbery, Tr. of Jury Trial, Vol. IX, at pp. 2281-2282; but, again, this was not relevant. As a result, the court finds it was not unreasonable for defense counsel to not consider hiring experts to contest evidence related to the robbery.

Next, petitioner argues trial counsel should have "attacked the Government's claim that Mr. Chick's body must have been moved from the picnic table to the ground six hours or more after he was shot." Dkt. # 106, at p. 76. Nowhere does Fields state that he advised

counsel that this evidence was not accurate; yet, Fields would have been the one person who would have known how long after the murders he moved the bodies. If counsel did not know of facts which would alert her to the need to conduct a particular investigation, a failure to investigate does not amount to deficient performance. *Alcala v. Woodford*, 334 F.3d 862, 892 (9th Cir. 2003). Moreover, the opinions now proffered by Robert Tressel regarding blood flow and lividity do not convince this court that any reasonable probability exists that his conclusions would have altered the jury's decision in this particular case regarding the substantial planning and premeditation aggravator. Since Tressel concedes Mr. Chick was found in full rigor 24 hours after his killing, there is no basis for this court to find Tressel's estimations regarding rigor would have undermined the testimony that the body was moved about six hours after death. In fact, the testimony at trial noted various factors which could have altered the timeline before full rigor mortis occurred and defense counsel adequately cross-examined the witnesses. *See*, Tr. of Jury Trial, at Vol. VIII, at pp. 2047- 2054; Vol. IX, at pp. 2196-2224; and Vol. XI, at pp. 2639-2650. Based on the record before the court, this court finds failure to hire an expert, like Robert Tressel, did not so undermine the proper functioning of the adversarial process such "that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S., at 686, 104 S.Ct., at 2064. Once again, how long it took the victim to "bleed out" and whether or not the victim was moved from the picnic table within an hour or after six hours is irrelevant to whether or not the defendant engaged in "substantial planning and premeditation" in relation to the actual murders. Regardless of the government's closing argument, what occurred after the victims were killed was relevant only to establish the defendant's mental state and/or state of mind after the murders.

2. <u>Mental anguish</u>

Petitioner also argues his attorneys were ineffective for not contesting the source of the blood spatter on Ms. Chick's face since it could have come from her own head wounds as opposed to being from Mr. Chick's head wounds. Petitioner claims this testimony would have rebutted the mental anguish aggravating factor because it was the only evidence used by the government, in conjunction with what he claims was "sheer speculation designed to inflame the passions of the jury,"[21] to provide a basis for the jury to find the mental anguish aggravating factor. Fields fails, however, to consider many of the facts known both by defense counsel, as she considered how to best defend this case, and the totality of the evidence heard by the jury. The evidence indicated the campground where these murders occurred was fairly rural and isolated. Tr. of Jury Trial, Vol. IX, at p. 2210. Defendant admitted that the victims were sitting at a picnic table when he silently approached and shot Mr. Chick in the head. Corroborating this confession, investigators found two partially empty beverage containers at the picnic table. *Id*., at pp. 2118-2119. The jury could use their common sense in determining that Ms. Chick would likely have heard the shot and seen her husband fall seconds before she began to run for her life, only to be shot in the foot as she attempted to escape to her van. She probably caught a glimpse of the ghillied up creature shortly before her death. While the prosecutor mentioned the blood spatter evidence in regard to this aggravator, his focus was on Ms. Chick's perceptions in the final moments of her life trying in vain to escape death. *See*, *id*., at Vol. XIV, pp. 3415-3418. These facts clearly allowed the jury to find beyond a reasonable doubt that Ms. Chick suffered mental anguish in the last moments of her life. Putting on an expert to opine as to the source of blood spatter

---

[21]Dkt. # 20, at p. 41.

on Ms. Chick's face would not have altered the jury's finding regarding the mental anguish aggravating factor.

Just as mitigating evidence can be important in a capital sentencing trial, defense counsel can not overlook the real risk of offending the jury by contesting points that, based upon a totality of the facts, are insignificant. This is never more important than in a case like this where the defendant is trying to convince the jury that his actions were the result of a manic flip from taking legally prescribed drugs, he has accepted full responsibility, and he wants the jury to believe that his apology to the victims' family was sincere.

There is no question that defense counsel could have hired more experts to contest the government's case. In the last twenty years, defense of criminal cases, especially capital cases, has become much more complex. Experts have sprung up for virtually every aspect of every case. Still all the high dollar experts money could buy would not have overcome the insurmountable task of convincing the jury in this particular case that the defendant deserved anything less than death for these two murders. The emails from defense counsel recognize she knew she was fighting an uphill battle to convince jurors to believe her mental health experts as jurors tend to distrust/discount expert testimony. Dkt. # 110-7. To have contested either the length of time which elapsed between the killings and the robbery or the source of the blood spatter on Ms. Chick's face with expert witnesses, would have been counter-productive in convincing the jury that the defendant deserved a sentence less than death if the murders were solely the result of a manic flip from taking a prescription drug. Accordingly, this court finds counsel was not ineffective in failing to investigate or present evidence to rebut these aggravating factors. Moreover, despite counsel "falling on her sword" and swearing she had absolutely no trial strategy, counsel's decision regarding her closing remarks fall within the broad range of reasonable trial conduct under *Strickland.* Counsel emphasized

the evidence she wanted the jury to remember in the jury room. Accordingly, no prejudice has been shown.

## C. Failure to present defendant's social history through mitigation specialist or mental heath expert

Fields further argues counsel's presentation of his social history "was disjointed, incomplete and unpersuasive." Dkt. # 106, at p. 90. Fields admits trial counsel was aware that the defense mitigation specialist "had collected compelling evidence" that he "was raised in a highly dysfunctional family, and that dysfunction had a profound impact on his life, his mental health and his adult functioning." *Id*., at pp. 90-91. While it is relatively easy in hindsight to look at an unsuccessful trial strategy and recreate various scenarios of all the things which could have been done differently, this is the exact type of post-trial exercise the Supreme Court in *Strickland* cautioned courts from becoming entangled in. The defendant has a "heavy burden"[22] to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S., at 689, 104 S.Ct., at 2065 (citation omitted). This court recognizes that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*., 466 U.S., at 690, 104 S.Ct., at 2066. "For counsel's performance to be constitutionally ineffective, it must have been 'completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy.'" *Le v. Mullin*, 311 F.3d 1002, 1025 (10th Cir. 2002) (citations omitted).

Counsel's duty in regard to mitigation was to conduct a reasonable investigation since professional decisions and informed legal choices can only be made after an investigation of

---

[22]*Bullock v. Carver*, 297 F.3d 1036, 1046 (10th Cir. 2002).

the options.  In this case, there is no question that counsel had fully investigated petitioner's social history.  Thus, despite Ms. O'Connell's affidavit that she had no strategic reason for not submitting Fields history through one of his doctors or through her mitigation specialist,[23] it is clear counsel fulfilled her duty to conduct a reasonable investigation into petitioner's social history.  Decisions regarding which witnesses to call at trial are "quintessentially a matter of strategy for the trial attorney."  *Boyle v. McKune,* 544 F.3d 1132, 1139 (10th Cir. 2008).  Where it is shown that a particular decision was, in fact, an adequately informed strategic choice, the presumption that the attorney's decision was objectively reasonable becomes "virtually unchallengeable."  *Strickland*, 466 U.S., at 690, 104 S.Ct., at 2066.

Moreover, submission of the evidence which Fields now suggests should have been introduced into evidence would not have changed the jury's verdict.  Rather, it would have actually undermined the defense theory that the Effexor caused an anomaly, a one-time switch to flip in Petitioner's brain thereby leading an otherwise law abiding citizen to commit these horrific murders.  The decision not to submit evidence that these murders were, in some way, the product of a long-standing lack of socialization or empathy, caused by a less than idyllic family life approximately twenty years earlier, would have diluted the defense theory that the crime was Effexor driven as opposed to the product of the defendant's sociopathic tendencies.  Furthermore, evidence Fields was emotionally estranged from his family would have directly contradicted the defense arguments that the death of defendant's father and his mother's illness caused the defendant to experience severe emotional disturbances.  Similarly, evidence the defendant had difficulty forming relationships would have undermined the notions that the defendant was remorseful and that he was a loved relative and friend.  Simply put, presentation of additional evidence that petitioner had a dysfunctional upbringing, or was

---

[23]Dkt. # 106-2, at pp. 13-14.

cruel and violent toward his relatives, would have substantially weakened, as opposed to strengthening, the defense's mitigation case. Fields has not met his burden to establish counsel's decision to not call the mitigation specialist or put more social history evidence before the jury through a mental health expert was an unreasonable trial strategy.

### D. Failure to object to the government's closing argument deprived the petitioner of his right to individualized sentencing, due process and a fair trial

Petitioner claims the Government misstated the law regarding the weighing of mitigating and aggravating circumstances so as to improperly increase the defense's burden of persuasion and decrease its own burden; it denigrated the jury's discretion to show mercy; and it invited the jury to sentence Fields to death based upon irrelevant and inflammatory societal concerns. Dkt. # 14, at pp. 89-90; and Dkt. # 106, at p. 102. Additionally, petitioner claims the prosecutor improperly vouched for its own expert witnesses while denigrating defense witnesses; launched *ad hominem* attacks against petitioner that were irrelevant to any issues in the trial; misrepresented the record and the testimony of witnesses; made arguments not supported by the evidence; and recited Biblical scripture at length. Thus, petitioner claims because this was a "close case,"[24] these alleged errors, individually and cumulatively, resulted in a fundamentally unfair trial thus rendering his death sentence "arbitrary and capricious." Most of the alleged prosecutorial conduct which Petitioner now challenges was not objected to at trial. Of course, "many lawyers refrain from objecting during opening and closing argument, absent egregious misstatements." *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir 1993). One reason to refrain from objecting is counsel may simply be calling the jury's attention to something which counsel, observing live jury reaction to, is not overly

---

[24]Petitioner defines "close case" as one in which he "presented a significant case for life and the jury found mitigation to exist." Dkt. # 14, at p. 103.

concerning. *Phyle v. Leapley*, 66 F.3d 154 (8th Cir. 1995). As a result, the failure to object during closing argument is considered within the "wide range" of permissible professional legal conduct. *Necoechea*, 986 F.2d, at 1281. In an effort to overlook this arguably permissible conduct, petitioner asserts appellate counsel were ineffective for failing to raise these issues on direct appeal. Petitioner further argues, because of counsel's ineffective assistance, he was "deprived of his right under the Eighth Amendment to have a jury consider and give effect to all relevant mitigating evidence." *Id*. Petitioner also argues his Fifth Amendment rights were violated because the government presented false and misleading testimony to support the substantial planning aggravating factor. The government argues Fields' claims of prosecutorial misconduct are procedurally barred.

In an effort to bolster his ineffective assistance of counsel claims, Petitioner complains of prosecutorial misconduct. Inappropriate prosecutorial comments, standing alone, will not justify reversal since the statements must be reviewed in context. *United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 1048, 84 L.Ed.2d 1 (1985). In a § 2255 action, relief for prosecutorial misconduct is only appropriate "when the prosecutor's misconduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). "[F]or due process to have been offended, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial." *Greer v. Miller*, 483 U.S. 756, 765, 107 S.Ct. 3102, 3109, 97 L.Ed.2d 618 (1987).

> To establish that a prosecutor's remarks were so inflammatory that they prejudiced substantial rights, a petitioner must overcome a high threshold: he or she must demonstrate either persistent and pronounced misconduct or that the evidence was so insubstantial that absent the remarks, the jury would not have imposed the death penalty.

*Short v. Sirmons*, 472 F.3d 1177, 1195 (10th Cir. 2006).

As previously indicated, however, § 2255 "is not available to test the legality of matters which should have been raised on appeal." *United States v. Khan*, 835 F.3d 749, 753 (10th Cir. 1987), *cert. denied*, 487 U.S. 1222, 108 S.Ct. 2881, 101 L.Ed.2d 915 (1988). As can be seen, to overcome this procedural bar, petitioner argues he received ineffective assistance of appellate counsel. The Sixth Amendment does not require an attorney to raise every nonfrivolous argument on appeal. Rather, the relevant questions in this proceeding are whether appellate counsel was "objectively unreasonable" in failing to raise these issues on direct appeal and, if so, whether there is a reasonable probability that, but for his counsel's unreasonable failure to raise these claims, he would have prevailed in his direct appeal. *Neill v. Gibson*, 278 F.3d 1044, 1057 (10th Cir. 2001). When considering a claim of ineffective assistance of appellate counsel for failure to raise an issue on appeal, the court considers the merits of the omitted issue. *Id*. (citations omitted). Therefore to resolve this claim, this court will focus on the merits of the alleged prosecutorial-misconduct claims.

Initially, Fields argues the prosecutor misstated the law regarding the weighing of mitigating and aggravators, this court erred in overruling the objection of trial counsel and appellate counsel was ineffective for failing to raise this issue on appeal. The specific rebuttal portion of the closing arguments challenged by Fields contained the following statements:

MR. SPERLING: . . . . . . . . . . .Let's remember and honor the two people who are unable to be here. The aggravating factors have been proved beyond a reasonable doubt. The mitigating factors, even if accepted as proved, cannot outweigh the premeditated murder of Charlie. The mitigating factors - - (Interrupted)

MR. DERRYBERRY:      Objection to that based on the law.

THE COURT:      Overruled.

MR. SPERLING:      The mitigating factors - - and I submit all of this to you based on the evidence that has been admitted - - do not begin to outweigh just one of the steps that Shirley took in a terrorized flight from the Defendant. She sought to

escape the monstrous form the Defendant had chosen to assume in the final moments of her life.

Tr. of Jury Trial, Vol. XIV, at pp. 3462-3463.

While petitioner argues the prosecutor's comments seemed to imply the mitigating factors had to outweigh the aggravating factors, taken in context this does not appear to be what the prosecutor was saying. Rather, the prosecutor was attempting to emphasize how, despite the mitigating evidence, the crime was so calculatingly heinous that the jury should easily find the aggravating factors outweighed all mitigating factors. Moreover, the court properly instructed the jury on how to weigh the aggravating and mitigating evidence, stating:

> The second step involves a weighing process. You must decide whether the proved aggravating factors outweigh the proved mitigating factors sufficiently to justify the death sentence. (If you do not find any mitigating factors, you still must decide whether the aggravating factors are sufficient to justify imposition of a death sentence). If you determine as a result of this weighing process that the factors do not justify a death sentence, such a sentence may not be imposed, and your deliberations are over.

Cr. Dkt. # 227, at p. 6; Tr. of Jury Trial, Vol. XIV, at p. 3384. The court also instructed the jury: "You must determine whether the proven aggravating factor[s] sufficiently outweigh any proven mitigating factor[s] to justify a sentence of death." *Id*., at p. 28; and p. 3403. Therefore, this court finds counsel's failure to raise this issue on direct appeal was not objectively unreasonable.

Next, Fields argues his counsel was ineffective for failing to object to prosecutorial comments during closing arguments regarding defendant's plea for mercy. In particular, Fields focuses on the following comments of the prosecutor:

> Ladies and gentlemen, in closing, just remember the victims in this case, Charles and Shirley and their family and what they went through. The defense is going to talk to you and they're going to ask you to show mercy for this Defendant. What I want you to do is think back on July 10th of 2003. How much mercy was shown then? The Defendant wants you to look at this Defendant and what he's done for the last two and a half years and say, oh,

there's a life that can be had. This case is about what happened on July 10th of 2003, not what happened since then.

Tr. of Jury Trial, Vol. XIV, at p. 3430. Thereafter, during rebuttal, the prosecutor said:

> Well, can justice be served by life in prison? The Defendant wants to be sent to his room as punishment. If he's allowed to live, he will have their percs, (sic) like workouts and visitors and phone calls and mail and tv and recreation. Don't let this Defendant be a hero to his incarcerated criminal inmates. All with a civilized core must recoil with revulsion of what the Defendant did to act as the executioner of the innocent. Don't give this Defendant what he wants. In the name of justice, give him what he deserves.
>
> **The Defendant wants to choose a sentence.** He wants to live. Now, how unjust is that? Just what choice did he give Charles Chick? Just what choice did he give Shirley Chick? You know, the Defendant made Shirley do something she would never have done, never have done, unless she knew there was absolutely nothing she could do for her dying husband, her best friend. This Defendant made her do something she would never have done unless she knew her life was in absolute, absolute jeopardy. And if we have to go much farther down the aggravating factor road that (sic) Shirley's fightingly horrible murder, there is something really wrong with us. This disturbing criminal conduct is far beyond the capital line. The Defendant didn't need to commit this murder. Even if we concede that the robbery was the motive, he said he had $500 in Michelle's panty drawer. Danny said he had seen the Defendant more broke. Michelle told him that he could move in within a day or so. He wanted the thrill of the kill. And even if we concede that robbery was a motive, the most we could argue is that he thought with premeditation and deliberation if I'm going to rob them and kill them, I may as well kill them and rob them. That's no excuse.
>
> Sympathy. It's hard not to feel sympathy for the Defendant's family members. He abandoned them though. He abandoned them. Only resurrecting contact with them conveniently now that he's in jail. . . . . What did his former wife say about him? Do you remember that one word? Selfish. Selfish. Narcicisstic. (sic) It's all about him. That's an understatement. He would have left them all perhaps by the easy way out. Typical for him. The Defendant wouldn't help his on (sic) widowed mother move halfway across this country. Remember this, here in court the Defendant continues to victimize his own family by reducing them to props in an effort to escape justice. Remember also that Charlie didn't get an opportunity to plead for his life. We can only imagine what Shirley must have said in the waning moments of her life. She came face to face with a killer who wore this suit. The Defendant's best friend now is down to a monthly phone call. Whatever he does for other people is far outweighed by what he has done. He has paid for membership in the club of the most hardened, the worst group of criminals. Remorseless, wanton, senseless, without any empathy or feeling, no emotion for a wonderful man and woman whose lives he extinguished that with six semi-automatic gun shots.

*Id.*, at p. 3457-3459 (emphasis added by petitioner).

Petitioner argues these comments urged the jury to reject mercy based on the evidence and invited the jurors to sentence him to death simply for exercising his Eighth Amendment right to individualized sentencing. This court disagrees. These comments simply focused the jury's attention on the aggravating nature of these crimes and was based upon the evidence before the jury. Moreover, the jury was instructed they could consider mercy (and petitioner's own trial counsel advised the jury - "Mercy is not precluded."),[25] the defendant's lack of remorse, the mental anguish the defendant inflicted on Shirley Chick, his value as a friend, his value as a family member and the impact his death would have on his relatives and friends. *See*, Cr. Dkt. # 227, at pp. 6, 23, and 25-26. Attorneys are given wide latitude during closing arguments and challenged remarks must be evaluated in the context of the trial as a whole. *United States v. Lawrence*, 735 F.3d 385, 431 (6th Cir. 2013). Since each of these subjects were before the jury, the court finds they were proper topics for the prosecutor to touch upon during closing arguments and such comments did not result in a fundamentally unfair trial.

Fields continues his challenge to the prosecutor's closing arguments by alleging the prosecutors improperly "invoked societal concerns about lenient sentences and recidivism." Dkt. # 106, at p. 105. Fields focuses this argument on the following comments of the prosecutors:

> Ladies and gentlemen, when you look around this courtroom you see a lot of people. They haven't come here to see me or Mr. Sperling or defense counsel or not even the judge. They've come here to see justice. They've come here to see what you are going to do today. Because today you are justice. You decide what is right. You decide what is wrong. You can't ever walk out of here again and say, boy, I can't believe they gave such a light sentence or I can't believe they gave such a heavy sentence. I can't believe they gave probation to a child molester. You know (sic) longer have that luxury. We ask you to do what's right, ladies and gentlemen.

---

[25]Tr. of Jury Trial, Vol. XIV, at p. 3443.

Tr. of Jury Trial, Vol. XIV, at p. 3431. These comments were made right as the prosecutor's first closing arguments concluded. Although the court does not really understand the reference to giving "probation to a child molester," it is clear all the prosecutor was telling the jury was that the decision as to an appropriate sentence in the case was solely their decision. Fields continues, however, that "these sentiments were echoed in later comments, invoking popular opinion that prison was to easy on criminals." Dkt. # 106, at p. 105. The rebuttal comments to which Fields objects seem designed to convince the jury that petitioner's crimes warranted greater punishment than lifetime incarceration and have already been discussed by this court. Furthermore, this court finds the prosecutor's comments suggesting incarceration would be an inadequate sentence, was an appropriate response not only to the defense counsel's suggestion that life imprisonment would be spent in a space smaller than the jury box[26] but also to the testimony during trial of Daniel Presley[27] which described various things inmates could do in prison such as working, receiving visitors, receiving and sending mail, reading and watching television.

Claiming the mental health experts' credibility was a "critical aspect of the trial," Petitioner continues his attacks on the prosecutor's closing arguments by arguing the prosecutor improperly embellished and bolstered the testimony of its mental health experts and improperly vouched for their credibility, while denigrating the defense experts. Dkt. # 106, at p. 106. To support his argument, petitioner highlights terms contained in the prosecutors' arguments, such as "high dollar shrinks," "hired guns," "from the left coast," "an axe to grind" and "an honest opinion." Dkt. 14, at p. 80.

---

[26]Tr. of Jury Trial, Vol. XIV, at p. 3442.

[27]Tr. of Jury Trial, Vol. IX, at pp. 2405-2406 and 2408-2409.

To the extent that there is no bright red line separating acceptable advocacy from improper advocacy, prosecutors have sometimes breached their duty to refrain from overzealous conduct by commenting on a defendant's guilt or offering unsolicited personal views on the evidence. *United States v. Young*, 470 U.S. 1, 7-8, 105 S.Ct. 1038, 1042, 84 L.Ed.2d 1 (1985). As a result, the federal courts have been required to police prosecutorial misconduct. In order to assist the courts, the legal profession has developed Codes of Professional Responsibility. *Id.* The American Bar Association's Standing Committee on Standards for Criminal Justice has complemented these efforts by developing Criminal Justice Standards, one of which states:

> The prosecutor should not express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

ABA Standards for Criminal Justice 3-5.8 (b)(3rd ed. 1993). The Unites States Attorney acts as a representative of a sovereignty whose obligation is to govern impartially. *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 632, 79 L.Ed. 1314 (1935). In this role, a federal prosecutor becomes a

> servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not a liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Id.*

Use by a prosecutor of "we know" statements in closing arguments should generally be avoided because such statements can blur the line between improper vouching and legitimate summary. *United States v. Younger*, 398 F.3d 1179, 1191 (9th Cir. 2005). An argument will be considered improper vouching "only if the jury could reasonably believe that the prosecutor is indicating a personal belief in the witness' credibility, either through explicit

41

personal assurance of the witness' veracity or by implicitly indicating that information not presented to the jury supports the witnesses' testimony." *United States v. Magallanez*, 408 F.3d 672, 680 (10th Cir. 2005)(quoting *United States v. Bowie*, 892 F.2d 1494, 1498 (10th Cir. 1990)). "[I]t is not improper for a prosecutor to direct the jury's attention to evidence that tends to enhance or diminish a witness's credibility." *Thornburg v. Mullin*, 422 F.3d 1113, 1132 (10th Cir. 2005).

The prosecutor in this case said the following, during the first closing remarks, in regard to the expert witnesses:

> Our doctors came in, ladies and gentlemen, and told you a number of different things also and I'll just run through those quickly because obviously they had a different opinion. They thought most of the Defendant's problems were based upon his depression. Kind of look at - - who do I believe? Which is the one for me? Who am I going to believe out of this? What does Dr. Price tell you? He tells you he's done hundreds of these things. And over half the time, 60 percent of the time, he testifies for the defendant. He told you he fully expected to find some type of mental illness here but didn't. He has a lot of credibility. He's not somebody who every time comes in and testifies for the defendant. We didn't have to go out to the left (sic) coast to find somebody who testified for the defense every time. We got people in our own back yard who were credible, who would give an honest opinion who were not hired guns. Dr. Mitchell - - and he may be the best one of all, one because he's never been a witness before in a criminal case. He's in charge of a well-recognized psychiatric care center. He comes in and he says I've never testified before. I'm just doing the best I can. But I did this evaluation and, yeah, I did give some credence to the voices. I thought the voices may be part of his problem. Whether or not he actually heard them I can't tell you, but they may be part of it. He even tells you with that knowing with the voices, he had the ability to conform his conduct to the requirements of the law. These were volitional choices on this Defendant's part. Dr. Mitchell who has no axe to grind here, ladies and gentlemen.

Tr. of Jury Trial, Vol. XIV, at pp. 3429-3430. During rebuttal arguments, the prosecutor returned to topic of experts stating:

> . . . . The facts here clearly compel the conclusion the Defendant was entirely responsible and not impaired by his volitionally, his purposefully, acquired sadness. He was just emotionally variable. Even united bipolarities, Dr. Price, I'm mostly on the low side, he says. High dollar shrinks were hired by the defense and we paid ours as well. I respectfully submit, thought (sic), that

Randy Price and Jeff Mitchell were straight shooters. Not hired guns. The defense got to substantially determine the parameters, we were told, of Dr. Price's exam. They both came into this case with an open mind, open to the prospect that the defense might be right. They found them wrong. Sure, the Defendant was depressed, but no evidence exists of bipolarity or mania. He now wants us to bail him out after he wrecked his life. People who experience traumatic, even depressing circumstances in their life are obligated at a minimum not to lash out at innocent people. The defense experts, one from far away, with a 60 to zero record, he has never testified for the Government. Every single time he testifies, sixty to zip, is for the Defendant. There's no evidence of mania here. The spending spree was a rational criminal effort to impress Michelle.

*Id.*, at p. 3452.

While this court might have sustained an objection, if it had been made as soon as the prosecutor stated, in regards to Dr. Price: "He has a lot of credibility";[28] the comment was immediately followed by a statement derived from evidence in the record which established that Dr. Price did not always testify for the defense. In context, this statement was not error. The prosecutor went farther, however, by stating: "We got people in our own back yard who were credible, who would give an honest opinion who were not hired guns." *Id*. This statement shows how quickly an argument can enter into the "gray zone"[29] between acceptable and improper advocacy. When considered, however, in context with the evidence introduced in this particular case this court finds the prosecutor's comments did not render petitioner's trial fundamentally unfair. Rather, this court concludes the comments, as a whole, were designed to remind the jury of its duty to scrutinize and weigh all of the witnesses' testimony, including that of the experts. *See, United States v. Franklin-El*, 555 F.3d 1115, 1127 (10th Cir. 2009) (finding no prosecutorial misconduct where the prosecutor stated in rebuttal, "The defendants had to go all the way to Missouri to find some blow hard expert who talked a lot

---

[28]Tr. of Jury Trial, Vol. XIV, at p. 3429.

[29]*United States v. Young*, 470 U.S., at 7, 105 S.Ct., at 1042.

but said very little of significance in this case.") As can be seen, the government began by urging the jury to decide who was the most believable. To focus the jury's thoughts, the prosecutor discussed the experts' experience based upon testimony presented in the trial.[30] In particular, the evidence established that Dr. Price was licensed to practice in the field of psychology in Texas and Oklahoma. Tr. of Jury Trial, Vol. XII, at p. 3094. Dr. Price had extensive experience in murder cases, having consulted on close to 200 cases. *Id*, at p. 3097. Dr. Price indicated he was retained by the defense in about 60% of those cases. *Id*. Dr. Price testified he began his evaluation of Fields anticipating that there was

> probably going to be some brain dysfunction, something there to have people evaluating him for this. And I thought there was going to be a mental illness there, probably more than the depression. I thought there was going -- you know, I didn't know what effect it was going to - - it would have had on the crime, but I thought there was going to be evidence of those things.

*Id*., at 3154. And, he was open to considering that the defense experts might be right. *Id.* The evidence further established Dr. Mitchell was a clinical assistant professor at the University of Oklahoma College of Medicine, practicing at Laureate, a large psychiatric hospital in Tulsa, Oklahoma, and vice president of St. Francis Health Care System. *Id*., Vol. XIII, at pp. 3248-3250. Dr. Mitchell testified he had never previously testified in a criminal case for either side. *Id*., at p. 3352. Dr. Mitchell indicated he gave Fields the benefit of the doubt regarding whether or not he was hearing voices. *Id*., at p. 3284. It was proper for the prosecutor to contrast this evidence with the testimony of the defense expert, Dr. Woods, who testified his primary office was in Oakland, California. *Id*., at Vol. XII, at p. 3000. Additionally, Dr. Woods testified approximately 40% of his practice was devoted to forensics and he had been qualified as an expert approximately 60 times. *Id*., at p. 3001. Dr. Woods indicated he had never been retained by the United States or by a state government in a

---

[30]Tr. of Jury Trial, Vol. XII, at pp. 2938-3068; 3091-3162; Vol. XIII, at pp. 3171-3356.

criminal prosecution. *Id.*, at p. 3002. After commenting on the differences in the doctors'

qualifications, it was not inappropriate for the prosecutor to say that Dr. Mitchell had no "axe

to grind" and this court finds the comment was not "improper vouching." Rather, it was

simply one way for the prosecutor to direct the jury's attention to evidence from which the

jury could determine the expert witnesses' credibility. Similarly, while stating the defense

hired "high dollar shrinks," the government immediately admitted they too had paid their

shrinks. Thus, it could not have unfairly characterized only the defense experts. While it is

true, not all defense experts were from the west coast, this court finds, based upon the

evidence at trial, that it was not improper for the government to emphasize that the expert

from the west coast had always testified on behalf of the defense.

Fields also argues the government "grossly misrepresented the testimony of Dr.

Woods, Dr. Grinage and other witnesses on several factual issues critical to the assessment

of Mr. Fields' mental state." Dkt. # 14, at p. 81. After reviewing the closing arguments in

light of the evidence presented at trial, this court finds the comments of the government

attacked by Fields were supported by the record or appropriate inferences to be made

therefrom.

Finally, petitioner argues the government improperly invoked Biblical Authority in

support of a sentence of death. Dkt. # 14, at p. 84. The comments, which petitioner

complains of were contained in the following passage of the rebuttal argument of the

government:

> Thousands of years ago the kind of the world's greatest then existent
> civilization and most powerful empire held a great feast for thousands of his
> ruling friends. They ate, they drank from golden and silver goblets that they
> had stolen from the temple of a subdued and now enslaved nation. They drank
> wine and they worshiped pagan idols. All of a sudden the fingers of a hand
> began to write on the palace wall. The king saw the hand and was so
> frightened, he was so scared, that his clothing literally came loose. He became
> white. He shook. His knees banged together. He cried out: Bring the

astrologers, bring the wise men of the nation. Whoever interprets this saying on the wall will become the third most powerful member of my government. He will have great riches. The wise men came in. They studied, they deliberated, they conversed, they conferred and they thought. But they couldn't read much less interpret the writing on the wall. The king's face turned ashen. The queen, though, remembered a forgotten man. She called for him after talking to the king. And the king made the man the same offer. The man, though he turned down all of the riches, all the honor and all of the prestige. The man bravely interpreted the writing on the wall. And the writing on the wall said in three words, your kingdom has come to an end, your kingdom will be divided and given to your neighboring enemies, and then the prophet said the writing said you have been weighed in the balance and found wanting. Sure enough, that night the king was killed. His kingdom was separated among his neighboring enemies.

The Defendant weighed his options on July 10, 2003. Under the Court's instructions and the law given by the court, the Defendant should be, as it were, weighed in the balance and found wanting.

Tr. of Jury Trial, Vol. XIV, at pp. 3466-3467.

Fields argues these remarks were similar to an arguments held improper and highly prejudicial in *Sandoval v. Calderon*, 241 F.3d 765, 775 (9th Cir. 2000).[31]  In *Sandoval*, the prosecutor's language was "eloquent, powerful, and unmistakably Biblical in style." *id.*, at 778; "[t]he lay juror would readily understand the words as referring to Scripture", *id.*; and the message was clear: those who have opposed the ordinance of God should fear the sword-bearing state, whose task, as an avenging minister of God, is to bring wrath upon those who, like Sandoval, practice evil." *Id.*  The *Sandoval* court recognized that "[t]hose learned in the New Testament would recognize the argument as closely following the thirteenth chapter of the Book of Romans." *Id.*  Additional comments made by the prosecutor following this

[31]Petitioner also cites to *Cunningham v. Zant*, 928 F.2d 1006, 1020 (11th Cir. 1991) to support his argument that the prosecutor's analogy was improper. While the *Cunningham* court condemned the prosecutor's closing arguments, the case was reversed for other reasons. Further, the closing arguments in *Cunningham* were significantly worse than any comments in this case where statements found offensive included comments that the prosecutor was "'offended' that Cunningham had exercised his Sixth Amendment right to a trial by jury in the guilt-innocence phase of the trial;" "improperly implied that Cunningham had abused our legal system in some way by exercising his Sixth Amendment right to a jury trial;" "questioned whether Cunningham was even entitled to his Sixth amendment rights;" and "made numerous appeals to religious symbols and beliefs, at one point even drawing an analogy to Judas Iscariot." *Id.*  (footnote omitted).

portion of his summation told the jury they were "not playing God" but were "doing what God says." *Id.*, at 779.

Despite religious arguments being condemned by both state and federal courts, relief is not warranted unless the remarks prejudiced Fields chances of receiving life without the possibility of parole instead of the death penalty. *Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998)(recognized argument that Bible condones capital punishment was inappropriate, but did not constitute reversible error). The remarks in this case are clearly distinguishable from those discussed by the court in *Sandoval*. While the analogy given by the prosecutor may have been paraphrased from the "writing on the wall" sermon in the Book of Daniel, the argument was not delivered in biblical style. The prosecutor did not argue that God or any other religious authority justified the death penalty in this case. Rather, the prosecutor used a story devoid of any religious connotation, to emphasize the defendant knew what could happen to him when he decided his course of action on July 10, 2003 and it was now up to the jury to impose the appropriate sentence based upon the court's instructions, which included a balancing (*i.e.*, weighing) of the aggravating and mitigating factors. Moreover, unlike *Sandoval*, where the jury deliberated over three days before advising "it was hopelessly deadlocked," *id.*, only to later return to court with a unanimous verdict; this was a case where the defendant pled guilty to murdering two people by randomly stalking them while wearing a ghillie suit; shooting them while hidden in the woods; and then stealing from them. The jury rendered their sentencing verdict in less than four hours. *See*, Criminal Docket sheet minutes for July 22, 2005, indicating the bailiff was sworn at 11:40 a.m. and the jury returned its verdict in open court at 3:38 p.m.

Accordingly, this court finds none of the prosecutorial arguments, either individually or collectively, would have warranted reversal of the sentence on appeal. Therefore, appellate counsel was not ineffective for failing to raise these issues on appeal.

*E. Failure to object to instructions and verdict form*

Fields claims in his sixth ground for relief that trial counsel were ineffective for failing to object to the jury instructions and the use of a single verdict form which allowed the jury to approve a general verdict of death based on the combined weighing of aggravating factors applicable to two separate murder counts. According to Fields, the jury was allowed to consider all seven of the aggravating factors argued by the Government, including five factors which applied to only one of the two counts of murder thereby allow the jury to improperly aggregate factors in their weighing analysis.

As the Government points out in its motion for summary judgment, however, the thrust of the defense was to characterize the murders as a single behavioral irregularity caused by the manic-flip nature of the psychotropic drug - Effexor. *See*, Dkt. # 110-20, at p. 1; and Dkt. # 110-2, at p. 37. Separating the verdict form would have emphasized the separate protracted nature of the two murders. Moreover, separate verdict forms would have required the jury to focus more on the aggravating facts of the case since they would have been required to consider them twice. Thus, this court finds it was a sound strategic choice by defense counsel to request a unitary verdict form.

Furthermore, since Fields pled guilty to both murders, this is not a case where one count could have been reversed on appeal and the sentence on that count had to be vacated. The jury was given a single basis for imposing a death sentence and they unanimously found that the aggravators outweighed the mitigators. If the jury had been required to make separate findings, it is possible the jury could have returned a sentence of life without possibility of

release on one of the murders and a death sentence on the other.  But, as pointed out by the Tenth Circuit,

> [t]he jury was not presented with alternative routes to the death penalty; it was given a single basis for imposing a death sentence – the jury had to unanimously find that the aggravators (themselves unanimously found) collectively outweighed the mitigators.  Thus, we know what the basis for the jury's verdict was and that it was unanimous.

*United States v. Fields*, 516 F.3d at 939-40.  There can be no question that all twelve jurors, after weighing the aggravating factors that they found to exist, concluded Fields should be put to death for at least one, if not both, of the murders.  The suggestion by counsel that the jury might have returned two life sentences had it used separate verdict forms has no basis in fact and is nothing more than unsupported conjecture and speculation.  Even assuming counsel was ineffective for failing to request two separate verdict forms, this court finds petitioner has failed to establish prejudice.  Accordingly, this claim is denied.

## II.  Alleged Brady violations

The seventh ground for relief alleges the government withheld exculpatory, material evidence from the defense in violation of due process and trial counsel was ineffective for failing to investigate and present exculpatory evidence.  Specifically, petitioner argues certain evidence would have corroborated the defense's argument that Fields had taken an increased dose of Effexor before the offense and emails and other items on his computer would have tended to help establish he was mentally ill.  Finally, petitioner argues the government withheld certain witness statements or interviews which would have been helpful to his defense.  To the extent the government had no duty to disclose this evidence, petitioner claims his counsel were ineffective for failing to investigate, discover and present this evidence.

The Supreme Court has held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material

either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-1197, 10 L.Ed.2d 215 (1963). In *Strickler v. Green*, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), the Supreme Court identified three components or essential elements of a *Brady* prosecutorial misconduct claim as follows: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [government], either willfully or inadvertently; and prejudice must have ensued." *Id.*, 527 U.S., at 281-282, 119 S.Ct., at 1948. To show evidence was 'material,' there must be "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 91995). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S., at 434, 115 S.Ct., at 1566.

If a defendant knew or should have known the essential facts permitting him to take advantage of the exculpatory evidence, *Brady* does not compel disclosure because no suppression occurred. *United States v. Erickson*, 561 3d 1150, 1163 (10th Cir. 2009). *See also*, *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998)(*Brady* violation does not occur when defendant "knew or should have known the essential facts permitting him to take advantage of exculpatory information" or where the evidence was available to him from another source).

*A. Bottle of effexor pills*

In his reply (Dkt. # 20) and in his answer to government's motion for summary judgment, petitioner concedes "[t]he bottle containing the remaining prescription pills was provided to Muskogee County Detention Center by the FBI after it was found in Petitioner's truck." Dkt. # 119, at p. 49. Petitioner goes so far in his reply to state that the "fourteen Effexor pills he consumed while at the Muskogee County Detention Center came from the bottle in his truck." Dkt. # 20, at p. 70. Petitioner has not established that the government took an inventory of the number of pills contained within the pill bottle prior to delivering the same to the jail and then failed to release that information to them. The government had no obligation to provide information to the petitioner that was never collected. Moreover, Fields is the only one who can say exactly how many pills from that the bottle he actually took. As a result, the information regarding the Effexor pills was information the defendant knew or should have known. Accordingly, this court finds no *Brady* violation occurred in relation to this bottle of Effexor pills.

Furthermore, assuming counsel was ineffective for failing to inspect the bottle of pills pre-trial and/or submit the bottle as evidence in trial to establish that Fields had taken the prescribed amount of pills or possibly more, this court finds Petitioner has failed to establish prejudice.

*B. Seized computers*

Fields summarily claimed in his motion to vacate that the "hard drives . . . . contain exculpatory mental health and other evidence that should have been disclosed to the defense, including information in the almost 16,000 documents and 7,000 emails." Dkt. # 1-3, at p. 62. Additionally, he stated the "exculpatory evidence withheld by the Government was material." *Id*., at p. 63. During the course of these proceedings, Fields has made no effort to supplement these conclusory statements with any facts which would establish what information contained on these computers, if any, was relevant to his criminal case. Therefore, this court finds petitioner has failed to establish any *Brady* violation in regard to the two seized computers.


**III. Execution issues**

In ground two of his amended motion, Petitioner argues he is not competent to be executed and, therefore, his execution would violate the Eighth Amendment to the United States Constitution and international law. In his ninth ground for relief, Petitioner argues his execution would violate the Eighth Amendment to the United States Constitution. Petitioner submits no facts to support these claims. Moreover, Petitioner admits these issues are not ripe for review.

Article III of the United States Constitution only extends the judicial power of this court to real cases or controversies. U.S. Const. art. III, § 1. "Under Article III of the Constitution, [this court] may hear only cases involving a live case or controversy, and this requirement adheres at all stages of judicial proceedings." *United States v. Quezada-Enriquez*, 567 F.3d 1228, 1231 (10th Cir. 2009) (citations omitted). Courts have routinely held that claims of incompetency are not ripe for review until the execution is imminent. *See*,

*Stewart v. Martinez-Villareal*, 523 U.S. 637, 118 S.Ct. 1618, 140 L.Ed.2d 849 (1998). Further, even if the claims were justiciable, Petitioner has failed to identify any facts which might give rise to relief under the Eighth Amendment. Accordingly, these claims are denied.

## IV. Cumulative Errors

Cumulative-error analysis evaluates only the effect of matters determined to be error, not the cumulative effect of non-errors. *U.S. v. Rivera*, 900 F.2d 1462 (10th Cir. 1990). In considering cumulative error, the Tenth Circuit has indicated a reviewing court should conduct the same inquiry as for individual errors – were the defendant's substantial rights affected; with the focus being on "the underlying fairness of the trial." *United States v. Woods*, 207 F.3d 1222, 1237 (10th Cir. 2000). Since this court has found Petitioner has failed to prevail on any of the claims he raises, cumulative-error analysis is not appropriate. Accordingly, this claim is denied.

<u>**CONCLUSION**</u>

For the reasons stated herein, the Petitioner's Motion to Vacate, Set Aside, or Correct a Sentence, pursuant to 28 U.S.C. § 2255, is hereby denied. Furthermore, this Court finds the Petitioner has failed to establish that he has been deprived of any constitutional rights. 28 U.S. § 2253(c)(2). Therefore, pursuant to Rule 11 of the Rules Governing Section 2255 Proceedings, this Court hereby declines to issue a certificate of appealability.


<u>Dated this 15th day of December, 2016.</u>

Ronald A. White
United States District Judge
Eastern District of Oklahoma