Appellate Case: 17-7031     Document: 010110281146     Date Filed: 12/30/2019     Page: 1

**<u>PUBLISH</u>**

### UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

———————————————

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

EDWARD LEON FIELDS, JR.,

    Defendant - Appellant.

No. 17-7031

———————————————

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. Nos. 6:10-CV-00115-RAW and 6:03-CR-00073-RAW-1)**

———————————————

Hunter Labovitz, Assistant Federal Defender (Katherine Ensler, Assistant Federal Defender, with him on the briefs), Capital Habeas Unit, Federal Community Defender Office for the Eastern District of Pennsylvania, Philadelphia, Pennsylvania, appearing for Appellant.

Jeffrey B. Kahan, Deputy Chief, Capital Case Section, United States Department of Justice, Washington, DC (Brian A. Benczkowski, Assistant Attorney General, United States Department of Justice, Washington, DC; Brian J. Kuester, United States Attorney, Christopher J. Wilson, Assistant United States Attorney, and Linda Epperley, Assistant United States Attorney, Office of the United States Attorney for the Eastern District of Oklahoma, Muskogee, Oklahoma, with him on the brief), appearing for Appellee.

———————————————

Before **BRISCOE**, **McHUGH**, and **CARSON**, Circuit Judges.

———————————————

**BRISCOE**, Circuit Judge.

———————————————

This is a federal death penalty case arising from two murders committed in a national forest in Oklahoma.  Petitioner Edward Leon Fields pleaded guilty in federal court to two counts of first degree murder, two counts of using a firearm during a federal crime of violence causing the death of a person, and two counts of assimilative crime. Fields was sentenced, following a penalty phase proceeding before a jury, to death on each of the two murder convictions, and to significant terms of imprisonment on each of the remaining convictions.

After completing the direct appeal process, Fields initiated these proceedings by filing a motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255.  The district court denied Fields's petition, and also denied him a certificate of appealability (COA).  We subsequently granted Fields a COA with respect to four issues.  Now, exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm in part, reverse in part, and remand to the district court with directions to conduct an evidentiary hearing on Fields's claim that his trial counsel was ineffective for failing to adequately investigate and present at trial evidence of his organic brain damage.

I

*Fields's criminal conduct*

We previously, in addressing Fields's direct appeal, outlined the underlying facts of Fields's crimes:

> Edward Leon Fields killed Charles and Shirley Chick at the Winding Stair Campground in the Ouachita National Forest on July 10, 2003.  He had seen the couple there days earlier and drove there the evening of July 10 with a homemade ghillie suit (a covering for head and body made to resemble underbrush that Fields referred to as his sniper suit) and a

camouflaged and powerfully scoped rifle in his truck.  He found the Chicks
on a vista some distance from their campsite.  He retrieved the rifle, put on
the ghillie suit, and hid near their campsite as it grew dark.  In time, the
Chicks came back to the campsite and sat at a table.  Fields waited and
watched them for about twenty minutes.  When Charles told Shirley he was
going to the tent, Fields shot him in the face.  As Charles slumped to the
table, Shirley got up and began running toward the couple's van.  Fields
shot at her and a bullet tore through her foot.  She reached the passenger
door of the van, but was shot again, on the side of her head.  Fields caught
up and shot her once more, in the back of the head, in the doorway of the
van.  Shirley died as a result of both head wounds.  Fields returned to the
table and shot Charles a second time in the head.  Charles also died as a
result of both of his wounds.

Physical evidence indicated that Fields then left the campsite and
only returned hours later, when he broke the driver's window of the van
and stole some items.  He rummaged through only the driver's area of the
van; the rest of the van and the Chicks' tent were untouched.  A tip
eventually led police to Fields'[s] truck, where they found the rifle, the
ghillie suit, and some of the items stolen from the Chicks' van.  In the
meantime, Fields had been taken in for questioning.  He initially denied any
connection to the crime, but confessed when confronted with the evidence
taken from his truck.

*United States v. Fields*, 516 F.3d 923, 927 (10th Cir. 2008) (*Fields I*).

*The trial proceedings and sentencing*

On August 1, 2003, a federal grand jury in the Eastern District of Oklahoma

returned a six-count indictment charging Fields with: two counts of first degree murder

(Counts 1 and 3), in violation 18 U.S.C. §§ 1111(a) and (b), 7(3) and 13; two counts of

use of a firearm in a federal crime of violence causing the death of a person (Counts 2

and 4), in violation of 18 U.S.C. §§ 924(c)(1)(A), (d), (j), 7(3) and 13; one count of

assimilative crime – robbery with a firearm (Count 5), in violation of 18 U.S.C. §§ 7(3)

and 13; and one count of assimilative crime – burglary of an automobile (count 6), in

violation of 18 U.S.C. §§ 7(3) and 13.

On June 30, 2005, Fields entered pleas of guilty as to all six counts alleged in the indictment. Shortly thereafter, the district court began death penalty qualification of potential jurors. On July 13, 2005, the penalty phase proceeding, which was conducted pursuant to the Federal Death Penalty Act of 1994 (FDPA), began. "At the conclusion of the proceeding, the jury determined that Fields was eligible for a death sentence under §§ 3591(a)(2) and 3593(e)(2) by finding, unanimously and beyond a reasonable doubt, (1) that he possessed the requisite homicidal intent, and (2) the presence of one (here, two) statutorily defined aggravating factors ('statutory aggravators'): substantial planning and premeditation to cause death (§ 3592(c)(9)), and multiple intentional killings committed in a single episode (§ 3592(c)(16))." *Fields I*, 516 F.3d at 927.

"The jury then turned to the ad hoc non-statutory aggravators framed and formally noticed by the government under § 3593(a)." *Id.* "The jury found, again unanimously and beyond a reasonable doubt, that Fields (1) posed a future danger to the lives and safety of other persons; (2) caused permanent loss to Charles Chick's family, friends, and community; (3) caused permanent loss to Shirley Chick's family, friends, and community; and (4) inflicted mental anguish on Shirley Chick before her death." *Id.* at 927–28.

"Next, the jury considered a host of mitigating factors offered by the defense" and made a number of findings. *Id.* at 928.

> At least one juror found, by the required preponderance of the evidence, that (1) Fields did not have a significant prior criminal history; (2) Fields served in and was honorably discharged from the Navy; (3) Fields had worked as a state prison guard; (4) Fields has special talents in cooking, art, and computers; (5) Fields is a loved father; (6) Fields is a loved brother; (7)

Fields is a loved son; (8) Fields is a valued friend; (9) Fields'[s] father died months before the offenses; (10) Fields'[s] mother moved away weeks before the offenses; (11) Fields'[s] ex-wife and their children moved away months before the offenses; (12) Fields'[s] ex-wife recently had cancer that may or may not be in remission; (13) Fields'[s] death will impact his children, family, and friends; (14) Fields cooperated with authorities after his arrest; (15) Fields confessed to the crimes; (16) Fields pled guilty to the crimes; and (17) Fields sought treatment for mental illness.  All jurors, however, rejected several mitigators, including that (1) Fields'[s] capacity to appreciate the wrongfulness of his conduct and conform his conduct to the law was significantly impaired; (2) Fields committed the offenses under severe mental or emotional disturbance; (3) Fields expressed remorse for the crimes; and (4) Fields will not present a future danger to society by being imprisoned for life without possibility of release.

*Id.*

"Finally, pursuant to § 3593(e), the jury weighed all of the aggravating and mitigating factors to determine whether the aggravators sufficiently outweighed the mitigators to justify a sentence of death." Id.  "The jury concluded, unanimously, that they did." Id.  "Thereafter, the district court imposed death sentences on both murder counts." Id.

On November 8, 2005, the district court sentenced Fields to death on Counts 1 and 3, 405 months on Counts 2 and 4, to be served consecutively to one another and consecutively to any other term of imprisonment imposed, 405 months on Count 5, and 84 months on Count 6.

### *The direct appeal*

Fields filed a direct appeal asserting thirteen propositions of error.  These included a challenge to "the jurisdictional basis for his federal conviction, which [wa]s a matter not waived by his guilty plea," and "many other objections with respect to the sentencing

5

proceeding." Id. On February 28, 2005, we issued a published opinion "conclud[ing]

that federal jurisdiction was properly exercised and that no reversible error occurred in

the proceedings." Id.

Fields filed a petition for writ of certiorari with the United States Supreme Court.

That petition was denied on April 6, 2009. *Fields v. United States*, 556 U.S. 1167 (2009).

*The § 2255 proceedings*

On April 6, 2010, Fields, through appointed counsel, initiated these proceedings

by filing a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. §

2255. The motion asserted nine general grounds for relief, as well as numerous sub-

issues.

In October 2015, following years of extensive discovery, Fields filed an amended

brief in support of his § 2255 motion, and the government in turn filed a motion for

summary judgment.

On December 15, 2016, the district court issued an opinion and order denying

Fields's § 2255 motion in its entirety. The district court entered final judgment on that

same date.

Fields filed a motion to alter or amend the judgment. The district court denied that

motion.

Fields filed a timely notice of appeal. A judge of this court subsequently issued an

order granting Fields a COA on four issues that we shall proceed to address.

## II

### *Standards of review*

Section 2255(a) provides as follows:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a).

"[A]s a general rule, federal prisoners may not use a motion under 28 U.S.C. § 2255 to relitigate a claim that was previously rejected on direct appeal." *Foster v. Chatman*, 136 S. Ct. 1737, 1758 (2016). Instead, relief under § 2255 is generally confined to situations where (a) the "convictions and sentences [were] entered by a court without jurisdiction," (b) the sentence imposed was outside of the statutory limits, (c) a constitutional error occurred, or (d) a non-constitutional error of law or an error of fact occurred that constituted a fundamental defect which inherently resulted in a complete miscarriage of justice, i.e., that rendered the entire proceeding irregular and invalid. *United States v. Addonizio*, 442 U.S. 178, 185–186 (1979).

Section 2255(b) states, in pertinent part, that "[u]nless the [2255] motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the [district] court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." The Supreme Court has interpreted this statutory language to mean that a hearing is unnecessary in those

instances (a) "where the issues raised by the motion were conclusively determined either by the motion itself or by the 'files and records' in the trial court," or (b) where the motion alleges circumstances "of a kind that the District Judge could completely resolve by drawing upon his own personal knowledge or recollection." *Machibroda v. United States*, 368 U.S. 487, 494–95 (1962). In contrast, where "[t]he factual allegations contained in the petitioner's motion and affidavit" are "put in issue by the affidavit filed with the Government's response" and "relate[] primarily to purported occurrences outside the courtroom and upon which the record could . . . cast no real light," a hearing is required under the statute. *Id.*

"On appeal from the denial of a § 2255 motion, ordinarily we review the district court's findings of fact for clear error and its conclusions of law de novo." *United States v. Barrett*, 797 F.3d 1207, 1213 (10th Cir. 2015) (quotations omitted). "Where, as here, the district court does not hold an evidentiary hearing, . . . our review is strictly de novo." *Id.* (quotations and brackets omitted). That "review proceeds in two steps." *United States v. Herring*, 935 F.3d 1102, 1107 (10th Cir. 2019). "First, we ask whether the defendant's allegations, if proved, would entitle him to relief, an inquiry we conduct de novo." *Id.* (citations omitted). "If so, we then determine whether the denial of the evidentiary hearing constituted an abuse of discretion." *Id.*

*Issue One – ineffective assistance of trial counsel for failing to adequately investigate and present evidence of Fields's organic brain damage*

In his first issue on appeal, Fields argues that the district court abused its discretion by failing to conduct an evidentiary hearing on his claim that his trial counsel

8

was ineffective for failing to investigate and present evidence of Fields's organic brain damage. To resolve this claim, we begin by outlining the legal standards that are applicable to the claim. We then review Fields's allegations of ineffective assistance and determine whether, if proved, they would entitle him to relief under the applicable legal standards. Finally, we review the evidence presented by both parties that is relevant to the claim and determine whether the district court abused its discretion by rejecting the claim without benefit of an evidentiary hearing. Given the applicable legal standards, we separate this final portion of our analysis into two components: whether trial counsel's performance was deficient and whether Fields was prejudiced by the allegedly deficient performance. As we shall proceed to explain, we ultimately conclude that the district court abused its discretion by failing to conduct an evidentiary hearing on both of these components, and therefore remand the case to the district court to conduct an evidentiary hearing on Fields's claim.

*a) Law applicable to Fields's claim*

The seminal Supreme Court case addressing claims of ineffective assistance of counsel is *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Court held that "[a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components." *Id.* at 687. "First," the Court held, "the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* "Second," the Court held, "the defendant must show that the deficient performance prejudiced the

defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.*

> *b) Fields's allegations of ineffective assistance regarding evidence of organic brain damage*

Fields alleged in his amended § 2255 motion that, "[a]t the time of the offenses," he "suffered from organic brain damage." ROA, Vol. 11 at 36. He further alleged that his "[t]rial counsel failed to discover the full extent of his brain damage because they arranged for [him] to receive only limited neuropsychological testing and then, after that testing indicated frontal lobe dysfunction, they ignored their neuropsychologist's recommendation to conduct further testing." *Id.* Fields alleged that even the limited neuropsychological testing that was actually performed "showed that [his] frontal lobes were impaired" and "[t]hese impairments affected his executive functioning in areas such as judgment and impulse control." *Id.* Fields alleged that "[e]vidence of this damage would have been mitigating in its own right and also would have bolstered the defense that [he] experienced a manic flip at the time of the offenses." *Id.* Fields in turn alleged that "[b]ecause [his] trial counsel did not fully investigate and discover this brain damage, the jury never heard this crucial mitigating mental health evidence." *Id.* at 36-37. Lastly, Fields alleged that, "[h]ad the jury known that [he] suffered from organic brain damage, there is a reasonable likelihood that the jury's verdict would have been different." *Id.* at 50.

Considering these allegations in light of the applicable legal standards outlined in *Strickland*, we have little trouble concluding that the allegations, if ultimately proven by Fields, would entitle him to federal habeas relief from his sentence. Therefore, we proceed to review the evidence that was submitted by the parties in support of and in opposition to these allegations.

*c) The performance prong of the Strickland test*

We begin by outlining the evidence relevant to the issue of trial counsel's performance. This includes evidence contained in the record of the trial proceedings, as well as extra-record evidence obtained by Fields and presented in support of his § 2255 motion, including a post-conviction declaration from Fields's lead trial attorney.

"*Strickland* requires a reviewing court to 'determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.'" *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986) (quoting *Strickland*, 477 U.S. at 690). The Supreme Court emphasized in *Strickland* that "[t]here are countless ways to provide effective assistance in any given case." 466 U.S. at 689. Consequently, Fields "must overcome the strong presumption that [his] counsel's conduct falls within the wide range of reasonable professional assistance." *United States v. Sanders*, 372 F.3d 1183, 1185 (10th Cir. 2004). In determining whether Fields has overcome this strong presumption, we must consider "counsel's overall performance, before and at trial," and not focus exclusively on the "particular [alleged] act or omission" giving rise to the claim of ineffective assistance. *Kimmelman*, 477 U.S. at 386.

Fields's lead trial attorney was Julia O'Connell, who at that time was an assistant federal public defender in the Northern and Eastern Districts of Oklahoma. O'Connell was assisted by three other attorneys: Isaiah Gant, a federal public defender from Nashville, Tennessee, and Michael Able and Barry Derryberry, both of whom worked in O'Connell's office.

In July 2004, O'Connell retained neuropsychologist Dr. Michael Gelbort "to conduct a forensic neuropsychological evaluation of . . . Fields." ROA, Vol. 11 at 504. Gelbort "met with . . . Fields on August 11, 2004 at the Muskogee County Jail," "conducted a clinical interview[,] and administered a battery of neuropsychological tests." *Id.* at 505. Based on the interview and testing, Gelbort concluded that "Fields suffer[ed] from brain dysfunction and cognitive impairments . . . focused in the frontal lobes." *Id.* "Frontal lobe damage," according to Gelbort, "is well-known to adversely impact executive function, which acts in part as the 'brakes' for a person's actions." *Id.* at 506. The deficits caused by this frontal lobe damage, according to Gelbort, "impact[ed] [Fields's] ability to think in a logical, adaptive and goal-directed manner" and "also affect[ed] his social functioning."[1] *Id.* at 507.

---

[1] According to the evidence compiled by Fields's post-conviction counsel, Fields suffered from neonatal respiratory distress syndrome shortly after he was born. ROA, Vol. 11 at 37. This syndrome, according to the record, "creates a serious risk of brain damage." *Id.* The record also indicates that "Fields experienced a number of head injuries and losses of consciousness before the age of twenty," including "a sleigh-riding accident" that occurred when he was thirteen years old and resulted in him losing "consciousness for several minutes." *Id.* at 38.

Gelbort "relayed [his] preliminary finding of brain dysfunction focused on the frontal lobe to Ms. O'Connell on August 24, 2004." *Id.* Gelbort "provided a preliminary report to . . . O'Connell on November 10, 2004," and "provided an updated report to [her] on March 8, 2005." *Id.* Gelbort concluded, in pertinent part, that Fields "display[ed] a pattern often found in individuals with frontal lobe or non-dominant hemisphere neurocognitive dysfunction and brain damage with further evaluation warranted." ROA, Vol. 9 at 227.

In June 2005, O'Connell asked Gelbort if he "could do additional testing" of Fields, and Gelbort responded by asking "what kind of additional testing [she] wanted [him] to conduct." ROA, Vol. 11 at 507. According to Gelbort, "[h]ad [O'Connell] followed up and asked [him] to conduct additional neuropsychological testing, [he] would have told [her] it was unnecessary and would have instead suggested that a qualified expert conduct medical testing such as PET scan or EEG to analyze . . . Fields's brain from a physical standpoint." *Id.* Gelbort alleges that O'Connell never got back to him on this issue. *Id.* O'Connell alleges in her post-conviction declaration that she "can offer no tactical or strategic reason for not having the additional testing performed" by Gelbort. *Id.* at 164.

"On June 19, 2005, . . . O'Connell requested [Gelbort's] final report, which [he] provided to her." *Id.* "On July 1, 2005, . . . O'Connell informed [Gelbort] that she would need [him] to testify at trial and that the defense case could begin as early as July 18, 2005." *Id.* at 508. On July 3, 2005, O'Connell "sent . . . Gelbort a contract to cover his anticipated testimony" and "informed him [again] that he would be needed to testify

around July 18, 200[5], and also would be needed to consult about the cross-examination of" the government's expert witness, Dr. J. Randall Price. *Id.* at 43.

O'Connell, in her post-conviction declaration, alleged that "[t]he evening before trial testimony was to begin, . . . Gelbort notified [her] that he was going to be traveling and would not be available on the dates of trial that had been set." *Id.* at 164. O'Connell alleges that she "made no motion to continue the trial" and "had no strategy or tactic for abandoning the specific factor of organic brain damage." *Id.* Instead, O'Connell alleges that she "was overwhelmed with the trial in progress."[2] *Id.* Gelbort, in his own post-trial declaration, alleges that "[o]n July 11, 2005, [he] sent a reminder e-mail to . . . O'Connell, letting her know that [he] could testify on July 18 or July 19, but that [he] was leaving the country on the evening of July 20." *Id.* at 508. Gelbort further alleges that he "ha[s] no recollection or record of any contact with . . . O'Connell or any other trial counsel representing . . . Fields after July 11, 2005." *Id.*

The government, for its part, points to various emails sent by O'Connell that contradict her affidavit and suggest she may have intentionally decided to forego any reliance on frontal lobe impairment and instead focus on evidence that Fields suffered from a mood disorder and had a "manic flip" or "manic switch" just shortly prior to the murders. For example, on June 18, 2005, O'Connell sent an email to Dr. George Woods, a neuropsychiatrist who she presented as an expert witness at trial. In that email,

---

[2] O'Connell alleges in her declaration that her "errors were a result of [her] being overburdened by essentially functioning without co-counsel in this complex and difficult case." ROA, Vol. 11 at 169. O'Connell explains that Gant was appointed "as Learned Counsel in th[e] case," but failed to "carry[] his share of the work." *Id.* at 154–55.

O'Connell noted that she "didn't let Gelbort administer any personality testing" to Fields, "although [Gelbort] REALLY wanted to do the MMPI, so badly that he left a test and answer sheet with [her] to have someone administer it to [Fields] if [O'Connell] changed her mind." ROA, Vol. 12 at 160. O'Connell asked Woods in the email if she should allow Fields to undergo any personality testing by the government's expert, to which Woods responded: "The answer is no. Price [(the government's expert)] is dangerous. We need to see what he has put together so far." *Id.* One week later, on June 25, 2005, O'Connell sent an email to another attorney asking for advice about her presentation of Fields's mental health history. In that email, O'Connell stated, in pertinent part: "Most of my mitigation case is mental health evidence. Some evidence of frontal lobe impairment, but largely the compelling stuff is the manic-flip nature of Effexor treatment." *Id.* at 122. This email suggests that O'Connell may have made a strategic decision, or was at least considering making a strategic decision, to focus on the "manic-flip" theory favored by Woods and to abandon any reliance on Gelbort's theory of frontal lobe impairment.

Additional evidence pointed to by the government indicates that O'Connell had reservations about Gelbort and his preliminary report. For example, on March 9, 2005, O'Connell sent an email to other attorneys stating that Woods was her "real mental health expert," that Woods's "report w[as] far more comprehensive (and valuable)," and that she would "rather rely on" Woods than Gelbort. *Id.* at 170. O'Connell also noted in that email: "The potential brain damage [identified by Gelbort] has some value, but it's not a huge part of my mitigation. It just enters the equation, complicating the client's ability to make it through his hyper-manic state." *Id.* In another email dated March 24, 2005,

O'Connell said, referring to Gelbort: "anyone asks you about him, tell them not to hire him. He sucks. Not because he's not smart, or doesn't know his field, but because he's too difficult to work with. I think it's because he's smarter than all of us, if you know what I mean." *Id.* at 171. And, in an email dated January 27, 2005, O'Connell stated that she was "not a fan [of Gelbort] at th[at] point" and she described Gelbort's written report as follows: "[E]ven though it's a 'draft,' his report is one of the crappiest I have ever seen. No, I take that back. It is THE crappiest one I've ever seen." *Id.* at 178.

The record also indicates that, in February of 2005, approximately five months prior to trial, O'Connell advised the prosecution that the cost of a PET scan was $35,000 and suggested that the prosecution should absorb this cost. *Id.* at 580. The district court in these § 2255 proceedings construed this evidence as indicating that "the cost of a brain imaging scan clearly played a role in [O'Connell's] decision to rely on the[] expert testimony and forego conducting a brain scan." *Id.*

During the penalty phase proceeding, each side presented expert witnesses who had evaluated and diagnosed Fields. Dr. Brad Grinage, a psychiatrist retained and presented by the defense, opined that Fields suffered from bipolar disorder with psychotic features, and that this disorder caused significant impairment in his ability to behave in a particular way. Similarly, Woods opined that Fields suffered from one of two types of mood disorders—schizoaffective disorder or bipolar disorder with psychotic features— either of which resulted in him exhibiting poor judgment. Woods also opined that, at the time of the murders, Fields was unable to conform his conduct to the law because of his mood disorder. Both Grinage and Woods opined that Effexor, an antidepressant that had

been prescribed to Fields by his personal physician (a non-psychiatrist) shortly prior to the murders, could have caused him to "flip" or "switch" from a depressed state to a manic state, which in turn could have further impaired his judgment.

The government presented testimony from Price, who is a clinical and forensic neuropsychologist. Price testified that he conducted a neuropsychological evaluation on Fields, including the administration of an adult IQ test. Price testified that Fields scored average to high average on the IQ test, including scores of 98th percentile in expressive vocabulary, 84th percentile in comprehension, and 9th percentile in arithmetic. Price diagnosed Fields with a dysthymic disorder (i.e., depression that is chronic but relatively mild) and a personality disorder not otherwise specified with anti-social and psychopathic narcissistic and dependent traits and features. Price testified that he disagreed with the defense experts who diagnosed Fields as suffering from a mood disorder. Price further testified that, in his opinion, Fields had the ability, at the time of the murders, to conform his actions to the requirements of the law, and that he acted in a very controlled and selfish manner, and with a lack of empathy and remorse. On cross-examination by defense counsel, Price testified that Fields exhibited some minor impairment on some of the tests that Price administered. Price testified, however, that he did not see much neuropsychological impairment of the type that had been identified by Gelbort. During his direct examination, Price testified that there is no treatment for a personality disorder, and that a structured environment is probably the best way to prevent such a person from making poor choices and manipulating people.

At the conclusion of the evidence, the jury found, in pertinent part, that Fields intentionally killed both of the Chicks, that he committed both murders after substantial planning and premeditation, and that he posed a future danger to the lives and safety of other persons, as evidenced by his lack of remorse. The jury declined to find that Fields's capacity to appreciate the wrongfulness of his actions was impaired, or that Fields committed the offenses under severe mental or emotional disturbance.

Subsequently, during preparation of Fields's § 2255 motion, Fields's post-conviction counsel contacted Gelbort and provided him with additional records and information, including Price's preliminary report, Price's raw data, and a September 15, 2015 declaration from Dr. Alan Kaufman. *Id.*, Vol. 11 at 508–510. Kaufman, a clinical professor of psychology at the Child Study Center of the Yale University School of Medicine, "concluded to a reasonable degree of scientific and professional certainty that Dr. Price did not conduct a competent evaluation of . . . Fields's intelligence because of: (1) administration errors, (2) scoring errors, (3) interpretation errors, and (4) judgment errors."[3] *Id.* at 525. Gelbort, after reviewing this information, similarly concluded that Price "made significant errors in his testing" of Fields, including "scoring errors on the WAIS-III [(the Wechsler Adult Intelligence Scale)] that ma[de] . . . Fields seem less impaired than he actually is." *Id.* at 510. Gelbort "agree[d] with" Kaufman "that Dr. Price's neglect in administration of the WAIS-III raise[d] significant concerns about the reliability of his expert opinion." *Id.* at 510–511. For example, Gelbort concluded that

[3] Kaufman did not offer an opinion in his report regarding what he believed Fields's IQ actually was.

18

"Price's . . . conclusions . . . understate[d] the impact that the impairments had on . . . Fields's behavior." *Id.* at 510. Gelbort also, in his declaration, noted that "[f]rontal lobe damage" of the type exhibited by Fields "is well-known to adversely impact executive function, which acts in part as the 'brakes' for a person's actions," and thus "affect[s] his ability to adequately judge and comprehend a given situation, to reflect and reason before making decisions, and to fully recognize the consequences of those decisions." *Id.* at 506.

Fields's post-conviction team also obtained declarations from three additional experts: Grinage and Woods (the two experts who testified for the defense at trial) and Dr. Daniel Martell. Grinage alleged in his declaration that, had he been presented with the information from Gelbort and Martell regarding "Fields'[s] organic brain dysfunction and . . . been asked to consider [Fields's] 'cognition,'" he "would have testified that [Fields's] organic brain damage, focused in his frontal lobes, [wa]s a mitigating factor." ROA, Vol. 11 at 181. Woods alleged in his declaration that, "[r]egardless of whether one accepts [his] opinion about a manic switch, the presence of frontal lobe impairments is highly significant" because "[p]eople with frontal lobe impairments as severe as those present in . . . Fields experience disinhibition—that is, an impaired ability to control one's impulses." *Id.* at 172. "They also," Woods alleged, "experience impairments in social judgment." *Id.* "By itself," Woods alleged, "this type of impairment is a highly mitigating factor." *Id.* Lastly, Martell alleged in his declaration "that any reasonable neuropsychologist looking at Dr. Price's neuropsychological data would have identified the presence of significant impairments [in] . . . Fields'[s] brain functioning, primarily

19

involving frontal lobe functioning." *Id.* at 282.  Martell further alleged that Price, "[i]n his reports and during his testimony[,] . . . (a) minimized . . . Fields'[s] actual neurobehavioral impairments, and (b) over-reported his actual level of functioning." *Id.* Martell alleged that "[i]t [wa]s apparent from the current testing that . . . Fields ha[d] experienced a catastrophic loss of brain function over the past five years" and that "the most likely disease process would appear to involve the cerebral vasculature, including the possibility of atherosclerosis and/or ischemic brain disease (transient ischemic attacks and/or stroke) leading to a multi-infarct dementia." *Id.* at 286.  Martell concluded that "an MRI study of [Fields's] brain [wa]s strongly indicated to aid in proper differential neurodiagnosis and treatment." *Id.*

The government, in its response to Fields's § 2255 motion, submitted a post-conviction report prepared by neuropsychologist James Seward.  Seward stated in his report that "an MRI of [Fields's] brain [was] conducted in 2011" and that the results were "normal."  ROA, Vol. 12 at 259.  Seward further stated that "the available testing" of Fields "exhibit[ed] no findings reflective of frontal lobe or other meaningful brain damage." *Id.*

Seward concluded, after examining "both . . . Gelbort's 2004 evaluation and . . . Price's 2005 evaluation," "that the majority of the scores were within normal limits, with no pattern emerging that would be indicative of 'significant impairments.'" *Id.* at 254.  Seward noted that "Fields did display generally improved scores when seen by . . . Price versus . . . Gelbort," and he opined that "[t]his may have been a manifestation of a practice effect, a variable level of effort, changes in his affective status, or other

situational or transitory factors." *Id.* Seward stated that "Fields gave indications of inadequate effort in the course of [Seward's] evaluation of him." *Id.* "Even given [Fields's] lack of full effort," Seward opined, "Fields's scores on measures of executive functioning ranged from borderline abnormal to average, with no clearly impaired scores." *Id.* at 255. Seward also noted that the "pertinent collateral history," including standardized testing scores from school and the Navy, was "not consistent with the presence of 'significant impairments [in] . . . Fields's brain functioning.'" *Id.* For example, Seward noted, "in school [Fields's] scores on standardized testing, including the GED, clustered in the average range." *Id.* Seward also noted that the "MRI of the brain conducted in 2011 was normal," and that "the available testing exhibit[ed] no findings reflective of frontal lobe or other meaningful brain damage." *Id.* at 259. These MRI results, Seward opined, undercut Martell's suggestion that Fields had suffered a catastrophic decline in functioning. *Id.* at 260. Seward noted, relatedly, that "[i]f . . . Fields indeed ha[d] a major neurodegenerative condition causing a 'catastrophic decline' in his mental functioning, this should be readily apparent in all aspects of his life that are in any way dependent upon intact brain functioning," but that "[n]o such monumental decline ha[d] been noted in . . . Fields's functioning, either through formal evaluations or in his day-to-day life." *Id.* at 260–61. Seward concluded that "[t]he most evidence-based DSM 5 diagnosis for . . . Fields [wa]s Other Specified Personality Disorder." *Id.* at 265 (footnote and emphasis omitted). Seward also concluded, based upon his review of the records, that the "evidence d[id] not allow one to conclude with psychological certainty whether or not . . . Fields ever heard voices." *Id.* at 268. Indeed, Seward noted, "FBOP

21

mental health staff, who monitored . . . Fields's psychiatric status for the past eight years, have expressed doubts over the veracity of his reported auditory hallucinations and other atypical symptoms (i.e., visual hallucinations and amnestic periods)." *Id.* "What [wa]s apparent," Seward concluded, "[wa]s that any such voices did not rise to the level of a disorder; they were not manifested in his day-to-day functioning, and people who had close contact with him were unaware of any such condition." *Id.* Ultimately, Seward concluded that the assertions of the defense experts, including Martell, were "entirely fictional" in nature. *Id.* at 279.

> *d) Our conclusion regarding the performance prong*

The district court did not reach a conclusion regarding the performance prong of the *Strickland* test; instead, it rested its decision exclusively on the prejudice prong of the *Strickland* test. For our part, we conclude, given the conflicting evidence discussed above, that "the files and records of the case" do not "conclusively show that" O'Connell's performance fell "within the wide range of reasonable professional assistance." 28 U.S.C. § 2255(b); *Sanders*, 372 F.3d at 1185. In other words, we conclude that the evidence presented by Fields, including most notably O'Connell's declaration, relates "to purported occurrences outside the courtroom," and creates a genuine issue of material fact regarding whether O'Connell made a strategic decision to forego the use of Gelbort's testimony or otherwise rely on evidence of Fields's possible brain damage. *Machibroda*, 368 U.S. at 494.

*e) The prejudice prong of the Strickland test*

Before deciding whether a remand for an evidentiary hearing is necessary, however, we must first consider the prejudice prong of the *Strickland* test. More specifically, we must determine whether the district court erred by resolving the issue of prejudice on the merits, without benefit of an evidentiary hearing. That determination hinges on whether Fields's "motion and the files and records of the case conclusively show that" Fields was not prejudiced by his trial counsel's failure to fully investigate and present testimony from Gelbort. 28 U.S.C. § 2255(b).

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. "The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *Id.* at 691-92. "Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Id.* at 692.

"Conflict of interest claims aside, actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." *Id.* "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The district court, in its opinion and order denying Fields's § 2255 motion, noted that O'Connell "presented a strong case in mitigation premised on several theories of mental illness, including the testimony of" Grinage and Woods. *Id.* at 577. The district court further noted that, "during closing argument, [O'Connell] addressed all aspects of Fields['s] mental health discussing his depression and how it affected everything in his life, his inability to control what was going through his mind continually because of 'rushing thoughts,' and counsel implored the jury to show empathy for Fields since he had already accepted responsibility for his actions." *Id.* at 578. O'Connell also argued, the district court noted, that Fields's "mental disease impaired his abilities" and "emphasized the bipolar flip theory" that was posited by Grinage, "pointing out to the jury that the Effexor" that was prescribed by Fields's local physician shortly before the murders "built up like it was supposed to and then it hit a tipping point so bad that a girl friend [sic] of Fields called the prescribing doctor worried about either suicidal or homicidal behavior." *Id.*

The district court concluded that, "regardless of the reasons [defense] counsel did not followup [sic] with an MRI, in light of the results of the 2011 MRI, . . . [Fields] . . . failed to establish prejudice based upon [O'Connell's] failure to investigate and/or present evidence of his alleged organic brain damage." *Id.* at 580. The district court explained:

> To support his argument that counsel was ineffective for failing to investigate and present evidence of his organic brain damage, [Fields] submitted a neuropsychological examination report dated April 1, 2010, by Daniel A. Martell, Ph.D., Dkt. # 106–10. Dr. Martell claims the report of Dr. Price unequivocally demonstrates organic impairment in the frontal

24

lobes. In that report, Dr. Martell indicates "any reasonable neuropsychologist looking at Dr. Price's neuropsychological data would have identified the presence of significant impairments (sic) Mr. Fields'[s] brain functioning, primarily involving frontal lobe functioning", *id.*, at p. 13, and "Mr. Fields has experienced a catastrophic loss of brain function over the past five years." *Id.*, at p. 17. Dr. Martell goes on to state that "[t]his apparent degenerative brain disease process also raises important questions about his behavior at the time of the instant offense, as there is evidence in the test data from the time of trial that there was something abnormal and deteriorating about his neurocognitve (sic) functioning." *Id.* In addition, [Fields] submits an affidavit from Dr. Grinage, which state[s] "[it] is highly likely that [Fields] has frontal lobe impairment that would affect his bipolar behavior and treatment." Dkt. # 106–4. To rebut Field's [sic] argument that he has significant brain impairments which trial counsel failed to follow up on, the government had the right to rely on current psychological testing, including an MRI of his brain. To hold otherwise, would allow post-conviction counsel to make arguments which could never have been proven at trial even if trial counsel had taken the steps which post-conviction counsel argue they should have taken. While [Fields] cites to[] *United States v. Gonzales*, 98 Fed. Appx. 825, 832 (10th Cir. 2004), an unpublished Tenth Circuit opinion, for the proposition that this court cannot resolve differences among the parties [sic] mental health experts without an evidentiary hearing, [Fields] submits nothing to contradict or rebut the evidence submitted by the government which shows an MRI conducted in 2011 was normal.

*Id.* at 581–82.

In short, the district court concluded that Fields could not establish prejudice in light of the fact that the 2011 MRI of Fields's brain, which was submitted as evidence by the government, was deemed "normal." *Id*. at 574, 582. Although the district court did not expressly say so, it apparently found, or perhaps simply assumed, that a "normal" MRI of the brain precludes any finding of organic brain damage, and that, consequently, Gelbort was wrong in his findings.

Fields argues in his appeal that "[n]othing in the record or scientific literature supports the district court's assumption that a purportedly normal brain scan contradicts,

25

let alone conclusively negates, the neuropsychological testing showing [his] brain impairment." Aplt. Br. at 43. Indeed, Fields asserts that this assumption "is scientifically wrong." *Id.* at 45. Fields notes, for example, that Seward, the post-conviction expert relied on by the government, "did not contend that a 'normal' MRI precludes . . . Fields from having brain damage." *Id.* "Presumably," Fields argues, "if the MRI in 2011 was dispositive on the impairment issue, . . . Seward would not have needed to 'administer[] a variety of psychological and neuropsychological tests to . . . Fields'[s] over the course of three days in 2013." *Id.* Nor, Fields argues, would Seward "have spent six pages in his report discussing how that psychological testing as well as collateral records and anecdotes—all apart from the MRI—led him to his opinion." *Id.* "Instead," Fields notes, "Seward briefly mentioned the purportedly normal MRI result once, only to state it was 'not surprising[]' given his opinion." *Id.* at 45–46 (quoting ROA, Vol. 12 at 259). Fields also asserts, citing to two different authorities, that "[b]rain imaging such as an MRI is *not* determinative of brain damage, particularly where, as here, neuropsychological testing shows otherwise." *Id.* at 46 (emphasis in original). In sum, Fields asserts that, contrary to the conclusion reached by the district court, "[a]n individual can have a normal MRI and still have brain damage based on neuropsychological testing and evaluation." *Id.* Fields also argues, relatedly, that "for capital mitigation purposes, neuropsychological testing is distinct from, and more probative than, neuroimaging." *Id.* at 47. Lastly, Fields argues that "[n]oticeably absent from any of the Government's district court pleadings was any argument that [his] MRI report precludes a finding of brain damage." *Id.* at 49.

Based upon the record before us, we agree with Fields. At a minimum, we conclude there is a genuine issue of material fact regarding whether an individual, such as Fields, can have organic brain damage that is revealed by neuropsychological testing, but that does not otherwise appear on an MRI of the brain. Therefore, we in turn conclude that the district court erred in basing its conclusion of no prejudice solely on the 2011 MRI results.

That of course still leaves a key question that was not addressed by the district court: assuming that the results of the 2011 MRI do not effectively undermine Fields's organic brain damage theory, is there a reasonable probability that, had O'Connell presented that organic brain damage evidence at trial, the result of the proceeding would have been different? On that point, Fields asserts that O'Connell "omitted evidence that is among the most persuasive types of mitigation evidence, particularly in comparison to the case the jury heard." Aplt. Br. at 20. In support, Fields argues that "available experts could have testified about [his] brain damage and how it interfered with his judgment, reasoning, and behavior." *Id.* Such expert testimony, Fields argues, "would have humanized [him] and explained why he 'c[a]me to participate in a violent, murderous event.'" *Id.* at 21 (quoting *Anderson v. Sirmons*, 476 F.3d 1131, 1147 (10th Cir. 2007)). In addition, Fields argues that O'Connell could have used the evidence of his brain damage "to enhance [the defense's] bipolar-based mitigation presentation in support of the two state-of-mind mitigating circumstances, as well as the 'other factors' mitigator." *Id.* at 22. Fields also argues that presenting evidence of his organic brain damage "would have strengthened another mitigating factor that the jury unanimously rejected: [that he]

'w[ould] not present a future danger to society by being imprisoned for life without possibility of release.'" *Id.* at 23.

It is true, as a general matter, that we have noted "that evidence of mental impairments 'is exactly the sort of evidence that garners the most sympathy from jurors,'" *United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2015) (quoting *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004)), and that "[o]rganic brain damage is so compelling . . . because 'the involuntary physical alteration of brain structures, with its attendant effects on behavior, tends to diminish moral culpability, altering the causal relationship between impulse and action.'" *Id.* (quoting *Hooks v. Workman*, 689 F.3d 1148, 1205 (10th Cir. 2012)).  But we must examine the evidence in the record on appeal to determine whether, in this specific case, Fields was prejudiced by O'Connell's failure to present Gelbort's testimony.

We begin with the written report that Gelbort prepared and submitted to O'Connell prior to trial.  That report stated, in pertinent part:

> Measures of higher cognitive abilities found mildly slowed to mildly impaired processing speed for verbally mediated tasks.  Impulsivity of mild proportions was also found.  Higher level reasoning tasks demonstrated mild impairment (performance in the bottom three percent of the population) with better performance noted on some of the more difficult tasks and worse performance on some that were easier.  Again, deficits or impairments in functional attention and concentration abilities appear to be the most likely cause of these suppressions in performance.

> Overall, Mr. Fields is an individual who demonstrated overall measures of intellectual functioning toward the lower portion of the average range with specific tests of freedom from distractibility and processing speed being lower.  Tests of learning and memory found a similar pattern with new learning/memory adversely affected as a result.  The patient has a history of emotional upset, turmoil, and treatment which has been less than optimally

> effective. He displays a pattern often found in individuals with frontal lobe or non-dominant hemisphere neurocognitive dysfunction and brain damage with further evaluation warranted. The nature and pattern of his deficits is long-standing and affects his every-day life, thought processes, and behavior.

ROA, Vol. 9 at 227. Respondent asserted below, and we tend to agree, that Gelbort's "report of 'mild' symptoms did not suggest this was a potentially rich vein of untapped mitigation evidence." *Id*. at 683. And, indeed, the email evidence that was submitted by respondent suggests that both O'Connell and Woods viewed Gelbort's report in a similar manner.

Gelbort's post-trial declaration, however, is more compelling and, we assume, reflects how Gelbort would have testified had he actually been adequately prepared by O'Connell and presented as a witness at the penalty phase proceeding. To begin with, Gelbort notes in his declaration that Fields's organic brain damage "affect[s] [Fields's] ability to adequately judge and comprehend a situation, to reflect and reason before making decisions, and to fully recognize the consequences of those decisions." ROA, Vol. 11 at 506. Gelbort further notes that "[s]tressful situations exacerbate . . . Fields's inability to control his actions and solve problems in a reasonable manner." *Id.* Gelbort's declaration also contains a critique of Price's testing and conclusions. "For instance," Gelbort states in his declaration, Price "repeatedly made scoring errors on the WAIS-III that make . . . Fields seem less impaired then he actually is," and that "[t]hese errors call into question the validity of . . . Price's testing results and the competency of his trial testimony." *Id.* at 510. In our view, discrediting Price would have been critical to the defense, since Price, in contrast to the defense experts who testified at trial, opined

that Fields suffered from an untreatable personality disorder with anti-social and psychopathic narcissistic and dependent traits and features.

We turn next to the post-conviction psychological evaluation report prepared by Martell.  In that report, Martell stated that he performed a neuropsychological examination of Fields in early 2010 and, as part of that examination, administered "[a] comprehensive neuropsychological test battery." *Id.* at 286.  Martell stated that "Fields'[s] test performance overall was in the range of moderate-to-severe brain damage, and [that] this represent[ed] a catastrophic decline in functioning over the five years since he was seen by Dr. Price." *Id.*  Martell further stated that "[i]mpairment was seen in almost all areas of function," the only exceptions being "preserved or spared abilities in visual organization . . . and pure motor speed with the non-dominant hand." *Id.* According to Martell, "Fields'[s] executive control functioning was the most profoundly impaired area tested," and "[h]is scores on diverse measures of discreet frontal lobe functions were all moderately to severely impaired, including . . . impulse control" and "disinhibition." *Id.* at 287.

As part of his report, Martell also commented on Price's findings and testimony. To begin with, Martell concluded that "Price: (1) minimized Mr. Fields'[s] actual neurobehavioral impairments, and (b) over-reported his actual level of functioning." *Id.* at 288.  Martell in turn concluded that "[t]he jury in this case was never provided with a countervailing opinion that there was a *pattern of impairments* in his test performances suggestive of brain damage,"  nor was the jury "told about impairments found in . . . Gelbort's data that got worse by the time of . . . Price's testing (e.g., WAIS-III

Arithmetic, Trails B)." *Id.* at 288–89 (emphasis in original). "Regarding the issue of . . .

Price over-estimating . . . Fields'[s] level of functioning," Martell opined that this was the

result of "'practice effects' in neuropsychological testing, whereby individuals who are

tested twice in a relatively short period of time will show artificially inflated scores the

second time, due to the effects of prior experience and practice with the test stimuli." *Id.*

at 289. Martell also stated that "Price repeatedly offered the opinion that Mr. Fields was

malingering auditory hallucinations, which the objective record strongly contradicts," and

he opined that Price's "testimony could have been challenged with rebuttal using . . .

Price's own prior inconsistent statements that he found . . . Fields to be cooperative and

effortful, that his test results were valid and reliable and that he impressed . . . Price as,

[sic] 'trying hard.'" *Id.* (citations omitted). Martell opined that Price also testified

outside his expertise. Specifically, Martell opined that Price "went beyond where

[psychologists] generally are qualified to go in testifying about the specific effects and

side effects of various psychotropic medications." *Id.* at 290. In his summary, Martell

stated: "It is apparent from the current testing that . . . Fields has experienced a

catastrophic loss of brain function over the past five years," and that Fields's "pattern of

impairments" was "strikingly consistent with the pattern of brain impairments detected in

[his] mother, Mary Margaret Fields, in September of 2001." *Id.* at 292. This pattern,

Martell opined, raised "the possibility of an inherited vulnerability to brain dysfunction

and the need for a more comprehensive neurodiagnostic workup, including MRI and

neurological examination." *Id.* Martell further opined that, "[i]n light of his family

history and the results of the present examination, the most likely disease process would

31

appear to involve the cerebral vascalature [sic], including the possibility of atherosclerosis and/or ischemic brain disease (transient ischemic attacks and/or stroke) leading to a multi-infarct dementia." *Id.* Martell conceded, however, that Fields's "overall level of cognitive functioning was significantly higher at th[e] time" he was evaluated by "Gelbort and Price." *Id.* at 293.

The problem with Martell's report and his opinions, however, is that Martell was only a post-conviction witness, and, as we have noted, Fields does not claim that O'Connell should have investigated and presented testimony from Martell. Rather, Fields argues only that O'Connell should have presented at trial expert testimony from Gelbort, and in turn asked Woods and Grinage to testify "about the connection between . . . Fields's brain damage and his criminal behavior." Aplt. Br. at 14. Thus, Martell's declaration is, at best, of limited value in assessing the prejudice prong of *Strickland*.

Lastly, we turn to the post-conviction declarations prepared by Woods and Grinage, the two defense experts who testified at trial. Woods stated in his declaration that "[p]eople with frontal lobe impairments as severe as those present in Mr. Fields experience disinhibition – that is, an impaired ability to control one's impulses," as well as "impairments in social judgment." ROA, Vol. 11 at 183. Woods further stated that "[if] this impairment [wa]s added to [his] clinical opinion that Mr. Fields underwent a manic switch, then we see a situation where Mr. Fields'[s] already impaired ability to control himself made him even less able to negotiate the flight into mania that I believe occurred." Id. Grinage, in his declaration, noted that, "[a]t the time of trial, [he] was provided only with the raw data from . . . Gelbort's neuropsychological testing," and that,

32

because he is "not expert in the interpretation of psychological test data," he "rel[ied] on reports written by psychologists to provide such interpretation." *Id.* at 190–91.  Grinage in turn stated that it was his understanding, based on the report of Martell, that "Fields was moderately impaired at the time of trial and now is severely impaired with some kind of degenerative or progressive neurological disease." *Id.* at 191  Grinage stated that, "[i]f [he] had been presented with th[at] information . . . and . . . been asked to consider [Fields's] 'cognition,'" he "would have testified that [Fields's] organic brain damage, focused in his frontal lobes, [wa]s a mitigating factor." *Id.*

The problem with the statements from Woods and Grinage is that the opinions contained therein are based on a combination of both Gelbort's pretrial evaluation of Fields and Martell's post-conviction evaluation of Field.  In other words, the declarations fail to distinguish between Woods's and Grinage's reliance on information provided by Gelbort versus information provided by Martell.  As a result, for example, it is unclear if Woods believes that the alleged impairments found by Gelbort prior to trial were sufficient, standing alone, to contribute to Woods's "manic switch" theory.

Ultimately, considering all of the evidence submitted by Fields and discounting portions of it, we are still left with some evidence that is relevant to the issue of prejudice and supportive of Fields's allegations.  Importantly, that evidence "relate[s] primarily to purported occurrences outside the courtroom and upon which the record could . . . cast no real light." *Machibroda*, 368 U.S. at 494–95.  Further, that evidence has been "put in issue by the" evidence submitted by respondent. *Id.* at 494.  Consequently, we are unable to say that "the files and records of the case conclusively show that" Fields was not

prejudiced by his trial counsel's failure to present Gelbort as a witness at trial. 28 U.S.C. § 2255(b). This is, of course, not to say that we are of the view that Fields will be able to establish prejudice. Rather, we conclude simply that the circumstances outlined by Congress in § 2255(b) under which a motion may permissibly be decided without benefit of an evidentiary hearing are not present in this case with respect to the issue of prejudice.

*f) Conclusion*

For the reasons outlined above, we must remand the case to the district court to conduct an evidentiary hearing on Fields's claim that his trial counsel was ineffective for failing to adequately investigate and present at trial the testimony of Gelbort. As discussed, we conclude that, as to this claim, genuine issues of material fact exist regarding both the performance and prejudice prongs of the *Strickland* test. It will therefore be the district court's task on remand to "make findings of fact and conclusions of law with respect" to those two prongs. *Machibroda*, 368 U.S. at 494 (quotations omitted).

*Issue Two – Ineffective assistance of trial counsel for failing to present Fields's social history as a mitigating factor*

In his second issue on appeal, Fields challenges the district court's rejection of his claim that his trial counsel was ineffective for failing, during the penalty phase proceeding, to present his social history as a mitigating factor. According to Fields, the district court's "holdings under both prongs of *Strickland* were erroneous," and it also

abused its discretion by failing to conduct an evidentiary hearing on the claim.  Aplt. Br. at 50.

Because this claim is subject to the same general legal standards as the previous claim, we begin our analysis by reviewing Fields's allegations of ineffective assistance and determining whether, if proved, they would entitle him to relief under the applicable legal standards.  We then review the evidence submitted by the parties that is relevant to the claim.  Lastly, we determine whether the district court erred in rejecting the claim on the merits, without first conducting an evidentiary hearing.  As discussed below, we conclude that the district court properly rejected this claim on the merits and did not abuse its discretion by failing to conduct an evidentiary hearing.

### a) Fields's allegations of ineffective assistance

In his amended § 2255 motion, Fields alleged that "[t]he defense's presentation of [his] social history evidence was disjointed, incomplete and unpersuasive."  ROA, Vol. 11 at 103.  Fields alleged that "[a] handful of witnesses told bits and pieces of his life history, and none of this testimony even remotely suggested that he was raised in anything but a typical family."  *Id.*  "Yet," Fields alleged, "the defense's mitigation specialist had collected compelling evidence that, contrary to the impression created with the jury, [he] was raised in a highly dysfunctional family, and that dysfunction had a profound impact on his life, his mental health and his adult functioning."  *Id.* at 103–04.  Fields argued that "[t]rial counsel should have presented this evidence through a mitigation specialist or mental health expert, who would have testified about information gleaned from many sources, including relatives, friends and institutional records."  *Id.* at

104. "Such a witness," Fields argued, "could then have explained that information to the jury as part of a coherent, compelling mitigation theme" *Id.* Fields argued that "[t]rial counsel also should have argued to the jury that . . . Fields's social history mitigated the offenses." *Id.* Lastly, Fields alleged that he "was prejudiced by trial counsel's deficient performance" because, "[h]ad the jury heard evidence of [his] dysfunctional family background, there is a reasonable likelihood that the jury would have returned a verdict of life rather than death." *Id.* at 114.

We conclude, after considering these allegations in light of the standards for ineffective assistance of counsel outlined in *Strickland*, that Fields would be entitled to federal habeas relief from his sentence if he were able to prove the allegations. We therefore proceed to review Fields's detailed allegations of family dysfunction and the evidence in the record on appeal that is relevant to Fields's allegations.

b) *The social history evidence cited by Fields*

According to Fields, both of his parents "grew up under challenging conditions." Aplt. Br. at 52. Fields alleges that his paternal grandfather died prematurely "in a truck fire," and "his paternal grandmother developed a brain tumor that left her blind and [ultimately] kill[ed] her." *Id.* As a result of his paternal grandmother's tumor "and her then-husband's sexual abuse of her daughters," Fields's father, Leon, "and his siblings were separated from [each other] and put in foster care or put up for adoption during their formative years." *Id.* Fields alleges that his maternal grandparents "had an unhappy marriage, which often included arguments and verbal fights." *Id.* (quotations omitted). His maternal grandmother, Fields alleges, "received electroshock treatment for her

36

mental health problems, and one of her sisters was 'disturbed' while another had unspecified mental problems." *Id.* Fields alleges that his mother Margaret, an only child, "suffered from depression her entire life, was diagnosed with bipolar disorder, and, as an adult, placed her own emotional needs above those of her children." *Id.* at 52–53.

Fields allegedly had a "near-death experience at the time of his birth." ROA, Vol. 11 at 187. According to his mother, "he had a 'hollow membrane disorder'" that made it difficult for him to breathe at birth. *Id.* Fields "almost died and ultimately was sent to another specialized hospital where he spent about one week." *Id.* These facts, Fields alleges, "raise[] the possibility of organic brain damage at the time of birth, secondary to oxygen deprivation." *Id.*

During Fields's childhood, "[h]is family moved often because of his father's jobs." *Id.* at 186. This included four moves before Fields reached high school. Id. at 426–28. "His father was largely absent from . . . Fields's day-to-day life due to the long work hours his job required." *Id.* at 186. "His mother was emotionally turbulent and self-centered." *Id.* "She jealously guarded her relationship with her husband to the extent that she literally kept the father from the children so as to maximize her private time with him." *Id.* "As a result, the relationship between the parents and . . . Fields and his sister (Cherie), was distant, cold and unemotional." *Id.*

Both Fields and Cherie related "bizarre discipline inflicted by either parent, but always at the command or insistence of the mother." *Id.* at 186–87. This included their father, at their mother's direction, beating them on the bare bottoms with a belt "until [they would] cry and scream." *Id.* at 442. Further, according to Cherie, their parents

37

never "showed [them] any physical affection." *Id.* at 441.  More specifically, their

parents never hugged them "and they would never say that they loved [them]." *Id.*  When

Cherie was in the ninth grade, their mother "had a hysterectomy and" Cherie

"remember[s] [her father] saying that he was thinking about putting [Fields] and [Cherie]

on a train and getting rid of [them]." *Id.*  Cherie also alleges that their "mother took

pleasure in making sure [that Fields] and [Cherie] stayed at each other's throats" and was

also "very good at dividing [them] and separating [them] from emotional comfort or

security." *Id.*

"Fields suffered from life-long depression." *Id.* at 187.  "He was predominantly

described by those who knew him as 'unhappy,' 'moody' and 'strange.'" *Id.*  "He did not

maintain interest in any particular activities and changed jobs frequently without apparent

reasons." *Id.*  "He seemed to move from one activity or relationship to another, without

any obvious motivation for doing so." *Id.*  "Medical records document that he was

variously diagnosed as 'depressed,' 'anxious' and as having mood problems." *Id.*  "He

reported sleep disturbances, weight loss and lack of energy as a result of his mood

problems." *Id.* at 187–88.  "At times, he reported hearing voices . . . ." *Id.* at 188.

Fields has also "rarely been able to express emotions or been encouraged to

express emotions during his life." *Id.*  As a result, he "has been almost universally

perceived as an emotionally flat or cold individual." *Id.*

As a teenager, Fields allegedly "exhibited behavioral problems." *Id.*  The only

specific event that is mentioned in the record, however, is his suspension from high

school during the eleventh grade.[4]  *Id.* at 428.  Fields "reported the reason [for the suspension] was because he was disrespectful to the principal; his mother reported it was because he was 'making out with a girl.'"  *Id.*  Fields "did not return to high school" after the suspension and instead "received his GED."  *Id.*  Fields apparently left home at that point and "began living with a woman he described as a 'biker tramp,' who was considerably older than he" was.  *Id.*  Fields "reported that during the period of time he lived with this woman, he drank and smoked marijuana for the first time."  *Id.*

At some point, Fields's mother responded to his behavior by taking "him to the same psychiatrist who was seeing her for 'therapy.'"  *Id.* at 188.  "[T]his was short-lived," however, and Fields "was soon pushed by his family into joining the Navy as a way of addressing the 'problem.'"  *Id.*  Although Fields completed his commitment to the Navy and actually reenlisted one time, he thereafter was unable "to stay at one job for long."  *Id.* at 189.

*c) Trial counsel's efforts to gather and present social history evidence*

Prior to trial, Fields's defense team retained a Memphis-based private investigation firm, Inquisitor, Inc., "to provide capital mitigation services for the defense."  *Id.* at 184.  Gloria Shettles, an employee of Inquisitor, was assigned to the case.  *Id.*  Shettles has a masters degree in guidance and counseling, worked for a time for

---

[4] While attending high school in Virginia, Fields was allegedly "advised . . . he had a particularly high IQ."  ROA, Vol. 11 at 428.  Further, prior to his suspension from high school, "a guidance counselor [allegedly] took it upon herself to make application for [Fields] to Harvard, and other prominent universities, to which he was accepted, but could not afford to attend."  *Id.*

the "Tennessee Board of Paroles," and began working for Inquisitor in 1993 as an investigator and mitigation specialist. *Id.* According to Shettles, she "began working on the Fields case . . . in August, 2003." *Id.* at 185. She began by "identify[ing], locat[ing] and interview[ing] as many individuals as possible who knew about . . . Fields'[s] background." *Id.* She "also ordered and eventually obtained as many documents as possible about . . . Fields'[s] life, including medical, mental health and school records." *Id.* Shettles "took direction from" O'Connell and "interviewed only those people to whom [she] was directed by . . . O'Connell." *Id.* Shettles "brought to the attention of . . . O'Connell" what Shettles believed to be "a variety of potential mitigating factors and themes." *Id.* at 189. Shettles alleges that she "was present throughout the trial," but "was never called to testify and much of the mitigating factors that [she] found were either not presented at all to the jury or were presented in isolated fashion and without providing an overall mitigating context." *Id.* In a post-conviction declaration, O'Connell states that she "had no tactical or strategic reason for not presenting th[is] [social] history either through one of the doctors or through . . . Shettles." *Id.* at 166.

Despite not calling Shettles as a witness, O'Connell presented some evidence regarding Fields's social history through three other witnesses. The first of those witnesses was Fields's sister Cherie. She testified that their mother was a full-time homemaker and that their parents provided well for her and Fields. She further testified that she and Fields attended Catholic schools through the eighth grade. She testified that Fields was very intelligent, but rejected authority as a teenager, would often start something and then quit, didn't finish high school, and instead received a GED. In

addition, she testified that when they were growing up, she was fearful that Fields would physically hurt her. She testified that Fields joined the Navy at age seventeen. She testified that Fields, as an adult, did not take his role as a father seriously, was not pleasant to be around, was always "bumming" money from their parents, and did not provide much emotional support for anyone. Notwithstanding her negative portrayal of Fields, Cherie testified that she loved him and wanted him to remain alive.[5]

The second witness to offer descriptions of Fields's social history was Teresa Fields, Fields's ex-wife and the mother of his two children.[6] She testified that they married when he was in the Navy and that, at one point, she thought he was going to make a career out of the Navy because he reenlisted and worked as a recruiter during his reenlistment period. She testified, however, that Fields subsequently left the Navy and proceeded to take and leave a number of menial jobs. She testified that he worked for several years as a prison guard and that that was the longest period of time that he held the same job.

Teresa painted a bleak picture of their married life together. In particular, she testified that he sometimes shoved her when they argued and, on one occasion, tried to choke her. She also testified that he would sometimes throw things when he got mad, was moody and grouchy, and would often lock himself in his room for long periods of

---

[5] Cherie represented a stark contrast to Fields because she was a successful business person who owned three Wendy's franchises in Virginia.

[6] Fields's two children both briefly testified, but did not offer any details regarding Fields's social history.

time.  In addition, she testified that he did not take financial responsibility during their marriage and would often purchase things for himself before he would take care of family obligations.

Teresa had a few complimentary things to say about Fields.  For example, she testified that after they separated, he continued to maintain health insurance for her and their children and that the insurance was critical for her because she was diagnosed with Stage 3 breast cancer.  She also testified that, after Fields regularly started taking medication in jail, his behavior was different and that he expressed interest in their children.

The third and final witness to testify about Fields's social history was Woods, the neuropsychiatrist retained by Fields's defense team.  Woods testified that Fields has a family history of mood disorders.  In particular, Woods noted that Fields's mother was being treated with antidepressants and anti-anxiety agents, his maternal grandmother had electroshock therapy in the 1930s and 1940s, and that Fields's sister was also being treated with antidepressants.  Woods also testified that there were two times in Fields's life when Fields functioned well: when he was in the Navy and when he worked as a correctional officer.  Both of these jobs, Woods noted, were very structured.

As Fields notes in his opening brief, defense counsel did not allege or argue any mitigating factors related to "his family dysfunction."  Aplt. Br. at 56.  Instead, Fields's defense counsel focused on twenty-two other alleged mitigating factors, including: his lack of any other serious criminal offenses; events that occurred in Fields's life shortly prior to the murders (e.g., the death of his father; his ex-wife and children moving away

42

from Oklahoma; his mother moving from Oklahoma to Virginia); his mental illness (as testified to by Grinage and Woods) and the fact that he sought treatment for it; his skills and work history; the fact that he had friends and family members who loved or cared for him; and the fact that he confessed to the murders and cooperated with authorities. As previously noted, O'Connell alleges in her post-conviction declaration that she "had no tactical or strategic reason for not presenting" more evidence of Fields's social history and arguing Fields's social history as a mitigating factor. ROA, Vol. 11 at 166.

### d) The district court's analysis of this claim

The district court rejected on the merits Fields's argument that his trial counsel was ineffective for failing to present evidence of his social history through a mitigation specialist or a mental health expert. In doing so, the district court first addressed the performance prong of the *Strickland* test and noted that "there [wa]s no question that [defense] counsel . . . fully investigated [Fields's] social history." ROA, Vol. 12 at 598. The district court thus concluded that defense "counsel fulfilled her duty to conduct a reasonable investigation into [Fields's] social history." *Id.* The district court also noted that "[d]ecisions regarding which witnesses to call at trial are quintessentially a matter of strategy for the trial attorney," and that such strategic choices are "virtually unchallengeable." *Id.* (quotations omitted). Although the district court did not directly say so, it appears to have implicitly concluded that O'Connell's performance was not deficient, i.e., that she knowingly decided, for strategic reasons, to forego presenting all of the available social history evidence.

The district court also addressed the prejudice prong of the *Strickland* test and concluded that "submission of the evidence which Fields now suggests should have been introduced into evidence would not have changed the jury's verdict." *Id.* "Rather," the district court concluded, "it would have actually undermined the defense theory that the Effexor" that was prescribed to Fields shortly prior to the murders "caused an anomaly, a one-time switch to flip in [Fields's] brain thereby leading an otherwise law abiding citizen to commit these horrific murders." *Id.* The district court concluded that "[t]he decision not to submit evidence that these murders were, in some way, the product of a long-standing lack of socialization or empathy, caused by a less than idyllic family life approximately twenty years earlier, would have diluted the defense theory that the crime was Effexor driven as opposed to the product of the defendant's sociopathic tendencies." *Id.* "Furthermore," the district court concluded, "evidence Fields was emotionally estranged from his family would have directly contradicted the defense arguments that the death of [his] father and his mother's illness caused the defendant to experience severe emotional disturbances." *Id.* "Similarly," the district court stated, "evidence [Fields] had difficulty forming relationships would have undermined the notions that [he] was remorseful and that he was a loved relative and friend." *Id.* "Simply put," the district court stated, "presentation of additional evidence that [Fields] had a dysfunctional upbringing, or was cruel and violent towards his relatives, would have substantially weakened, as opposed to strengthening, the defense's mitigation case." *Id.* at 597–98. Ultimately, the district court concluded that Fields failed to "me[e]t his burden to establish counsel's decision to not call the mitigation specialist or put more social history

44

evidence before the jury through a mental health expert was an unreasonable trial

strategy." *Id.* at 598.

Fields moved to alter or amend the judgment and, in that motion, asked the district

court to "reconsider its ruling denying relief without a hearing on" his claim "that trial

counsel was ineffective in failing to present [his] social history." *Id.* at 620. In denying

Fields's motion, the district court stated:

> While the court fully understands defense counsel's desire to prevent her
> client from receiving the death penalty at all costs, when counsel's memory
> does not accurately depict what, based upon contemporaneous documents,
> occurred in the case, the court does not need to hold an evidentiary hearing.
> Contrary to petitioner's allegations, a review of Ms. O'Connell's
> declaration when considered with various emails which were written
> contemporaneously with trial preparation convinces this court that Ms.
> O'Connell's memory was not as clear on March 30, 2010 [when she signed
> her declaration], as it was during trial preparation and/or the actual trial in
> 2005. As pointed out in the Opinion and Order denying relief, Ms.
> O'Connell claimed she did not have adequate assistance of counsel which
> was contradicted by various records in the case. *See*, Dkt. # 125, at pp. 10-
> 11. Similarly, Ms. O'Connell claimed she had no "tactical or strategic
> reason for not presenting [Fields's social] history either through one of his
> doctors or through Ms. Shettles." Dkt. # 106-2. Her emails, however, belie
> this statement. In an email discussing trial strategy regarding a mental
> health expert, counsel explained:
>
>> . . . .I recognize that experts can cancel each other out in
>> juror's minds. And, many of them won't care about mental
>> health.
>>
>> . . . . . .I want to keep the 'crap' away from the jury if at all
>> possible. I think its going to be hard enough to get them to
>> feel sympathy for client. If they get to hear all the other junk,
>> it may tip the scales (if we have any hope at all).
>
> Dkt. # 110-7. A few days later, Ms. O'Connell sent an email to another
> attorney who she was consulting with regarding Petitioner's case. After
> providing this consultant with her case and client in a nutshell, including a

substantial description of the social history of her client, Ms. O'Connell
stated:

> My client has absolutely no criminal record.  But the
> government believes he is a psychopathic retrobate [sic].
> They gathered all the garbage they could on him, by going to
> the community and asking what they'd heard, about a month
> after the murders. The town is tiny, and there was nothing to
> talk about except the client.  So the FBI guys got all the dirt.
> The gov't wanted to use the dirt in aggravation.  The judge
> has ordered that most of it stays out.  I'll list most of it here;
> don't laugh:

> Client has always been considered a little strange.  He was
> always coming on to women, some of whom say he was
> 'creepy.'  He often bragged of his sexual prowess.  In fact, he
> dated 2 women at the same time, unbeknownst to either of the
> women, and spoke of marriage to both.  He had a webcam
> that he told people he jacked off in front of, with over 1000
> visitors to his site, or so he bragged, anyway.  (And, as
> mentioned above, there was the fascination with pornography
> during his marriage.)  He chatted with women on the internet,
> and then went to meet them!

> Client liked to fish more than anything in the world.  Once he
> took a device to work--it was locked in his truck, in the
> parking lot.  It was like a pipe bomb, with a kitchen timer.
> But it had no detonator or explosive material.  In the parking
> lot, he showed it off to a couple guys, and explained it was for
> fishing.  He also took a rifle to work one day, again-- locked
> in the car.  He'd just purchased it at Wal-Mart, and didn't
> have time to take it home before his shift started.  He showed
> it off to a buddy.  (The bomb thing got him fired.)  He had a
> burmese python for a pet, and hunted rattlesnakes for extra
> cash (40 cents a foot).

> A distant relative believes he hung a cat over a limb when he
> was four years old.  Jump ahead 34 years---Someone else saw
> him put a stray cat in a burlap bag and twirl the bag around
> until the cat got dizzy.  He told a co-worker he shot a cat that
> was keeping him awake at night. Another co-worker reported
> that he said he fed baby kittens to his snake. And, no kidding,
> a (sic) witnessed him hit a cow and curse at it.

As also related above, client had some domestic violence in his life. Some people reported that his mother was afraid of him. One said he kept loaded guns by every door in the house.

\* \* \*

Judge says virtually all of this stays out, as long as I don't open the door. Only stuff the gov't can use to support non-statutory aggravator of future danger is the growing interest in camoflauge (sic) and in stalking people. None of the cat hanging, cow slapping, minor violence, snake loving, creepy stuff. Most of my mitigation case is mental health evidence. Some evidence of frontal lobe impairment, but largely the compelling stuff is the manic-flip nature of Effexor treatment. The gov't has 2 docs, the examinations were taped. I have listened, and know the outcome, because the docs had been front-loaded with the creepy-crawly stuff. Lots of questions about his womanizing, probing inquiry into why someone would make up the cat hanging incident. So, I can anticipate all the "junk" will play a role in any determination made by the gov't docs. Most of that crap isn't true (like hanging a cat), or has been largely exaggerated (the bomb thing has turned into threatening people at work with a bomb). But I'm worried that, through my mental health evidence, all of it will somehow come in, because the govenrment's (sic) experts will say they reviewed it, it helped them reach their conclusions, whatever.

Whatever I don't put on the table with my mental health testimony, they will want to get it in the back door, as justification for their docs' opinions.

Dkt. 129-1, at pp. 3-4.

Given Ms. O'Connell's express desire to rely on psychopharmacology evidence while avoiding all of the "crap," this court finds Ms. O'Connell had clearly developed a reasonable trial strategy to keep this evidence from the jury. Moreover, since Ms. O'Connell had investigated and discussed the petitioner's social history with a mitigating specialist prior to trial, she knew how difficult a job she had. With all of these things in mind, Ms. O'Connell did everything she could to portray the

murders as an aberration caused by a "SICK" individual who, upon receiving the proper medication, was no longer dangerous.  Ms. O'Connell was able to elicit positive attributes of petitioner through his sister, Cherie Fields; his ex-wife, Teresa Fields; a co-worker, Jovanna Fields; his son, Andrew Thomas Fields; and his daughter, Amanda Fields, while preventing the  government from asking these same witnesses to explain why Petitioner's mother was scared of him.

*Id.* at 644–47 (footnotes omitted).

The district court in turn noted that "[e]ven though a troubled childhood is the kind of evidence which garners the most sympathy from jurors, no case dictates that counsel must always introduce the evidence especially where, as here, the evidence could potentially backfire."  *Id.* at 648 (citation and quotations omitted).  The district court further noted that, "[w]hile trial counsel's strategy ultimately failed to convince the jury that Petitioner's life was worth sparing, this court believes it was a well thought out and sound trial strategy."  *Id.*  The district court therefore concluded that Fields "ha[d] failed to establish he received ineffective assistance of counsel," or that he was prejudiced by counsel's failure to present the social history evidence.  *Id.*

### e) Fields's appellate arguments

In this appeal, Fields argues that "[t]he district court's failure to conduct a hearing and its holdings under both prongs of *Strickland* were erroneous."  Aplt. Br. at 50.  With respect to the performance prong of *Strickland*, Fields argues that, "[t]aking his proffer as true," he "has proven that [his] trial counsel ineffectively failed to present [his] history of family dysfunction and mental illness."  *Id.* at 51.  In support, he points to O'Connell's post-conviction statement "that she had no reasonable strategic basis for failing to present" this evidence at trial.  *Id.* at 56.  With respect to the prejudice prong of

*Strickland*, Fields argues that, "[g]iven the importance of social history evidence in capital sentencing trials, [his] counsel's deficient performance prejudiced [him]." *Id.* He asserts, in support, that "[w]hile a few isolated biographical facts were told to the jury, some of the most mitigating aspects of [his] life—his upbringing in a home filled with abuse, emotional deprivation and dysfunction—were never coherently presented to the jury through any of the defense witnesses." *Id.* at 56–57. He further asserts that his "social history could have been utilized by . . . Grinage to bolster his testimony related to the defense's theory because a 'collateral history is critical in assessing and presenting a complete picture of the patient/defendant . . . to explain his mental state at the time of the incident.'" *Id.* at 57 (quoting ROA, Vol. 11 at 180). He also asserts that "presentation of [his] complete social history could have provided the jury an explanation for his seeming lack of emotion or remorse, which the jury relied on in sentencing [him] to death." *Id.* Fields argues that, had his defense counsel presented evidence of his social history, "there is a reasonable probability that at least one juror would have voted for a life sentence." *Id.* Finally, Fields argues that the district court erred in refusing to hold an evidentiary hearing on the claim because his "detailed averments and proffer of evidence, if true, would require relief." *Id.* at 59. According to Fields, "[t]he district court should have resolved any disputed facts through adversarial testing rather than summary dismissal." *Id.*

Turning first to the issue of defense counsel's performance, we tend to agree with the district court that the evidence in the record appears to refute O'Connell's post-conviction declaration that she did not make a strategic decision to forego presenting

49

Fields's complete social history.  But we need not reach a final conclusion regarding the performance prong of the *Strickland* test because, as we shall proceed to discuss, we agree with the district court that Fields was not prejudiced by his counsel's failure to present evidence of his complete social history.

Although presenting the social history evidence that Fields has identified in these § 2255 proceedings might have supported the existence of additional mitigating factors, it also, as the district court aptly noted, quite clearly would have undercut the main theme of O'Connell's defense strategy: that Fields was a normal, law-abiding citizen who, due to medication-induced mania, committed a horrible crime and has since confessed and shown remorse for that crime.  The social history evidence would also have been contrary to the following specific arguments made by O'Connell during her closing: that (a) "he has a ton of people who love him"; (b) his mental illness "impaired his abilities"; (c) he "brought joy to some people"; (d) he "excelled in his job"; and (e) "[h]is support system had evaporated" due to the death of his father, his ex-wife and children moving away, and his mother moving to live with his sister.  ROA, Vol. 5 at 3435, 3436, 3441.  The social history evidence would instead have portrayed Fields as an individual who, from late high school through the time of the crimes, acted selfishly and irresponsibly, and not only failed to develop meaningful relationships with his family, but either took advantage of or neglected multiple family members and girlfriends on multiple occasions.  We therefore firmly agree with the district court that there is not "a reasonable probability" that, had the social history evidence been presented at trial, "the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.

We in turn conclude that the district court did not abuse its discretion by dismissing this claim of ineffective assistance without first conducting an evidentiary hearing.  There are, of course, disputes of fact regarding whether or not O'Connell made a strategic decision to forego presenting the social history evidence.  But, importantly, the evidence of Fields's social history is essentially undisputed.  Thus, an evidentiary hearing was unnecessary for the district court, or in turn for us, to conclusively resolve the issue of prejudice.

*Issue Three – the government's invocation of religious authority during closing argument and defense counsel's failure to object thereto*

In his third issue on appeal, Fields argues that his constitutional rights were violated when the prosecutor, during closing arguments, invoked what Fields calls "religious authority."  Fields also argues that his trial counsel was ineffective for failing to object to the prosecutor's improper argument.  The district court rejected these arguments.  Fields now appeals from that ruling and also argues that the district court erred in violation of § 2255(B) in failing to conduct an evidentiary hearing on this claim of ineffective assistance.

We begin our analysis of this claim by reviewing the prosecutor's closing argument that is now being challenged by Fields.  We in turn review the district court's rulings on Fields's claims.  Lastly, we address Fields's challenges to the district court's rulings.  As discussed below, we conclude that Fields was not prejudiced by the prosecutor's allegedly improper arguments, that he was not prejudiced by his trial

51

counsel's failure to object to those arguments, and that the district court did not abuse its

discretion in failing to conduct an evidentiary hearing.

*a) Facts relevant to the claim*

At the conclusion of the evidence at the sentencing proceeding, the prosecutor

gave two closing arguments: an initial closing that preceded defense counsel's closing

argument, and a final closing that followed defense counsel's closing argument.  Near the

end of the final closing, the prosecutor stated, in pertinent part:

> Thousands of years ago the king of the world's greatest then existent
> civilization and most powerful empire held a great feast for thousands of
> his ruling friends.  They ate, they drank from golden and silver goblets that
> they had stolen from the temple of a subdued and now enslaved nation.
> They drank wine and they worshiped pagan idols.  All of a sudden the
> fingers of a hand began to write on the palace wall.  The king saw the hand
> and was so frightened, he was so scared, that his clothing literally came
> loose.  He became white.  He shook.  His knees banged together.  He cried
> out: Bring the astrologers, bring the wise men of the nation.  Whoever
> interprets this saying on the wall will become the third most powerful
> member of my government.  He will have great riches.  The wise men came
> in.  They studied, they deliberated, they conversed, they conferred and they
> thought.  But they couldn't read much less interpret the writing on the wall.
> The king's face turned ashen.  The queen, though, remembered a forgotten
> man.  She called for him after talking to the king.  And the king made the
> man the same offer.  The man, though, he turned down all of the riches, all
> the honor and all of the prestige.  The man bravely interpreted the writing
> on the wall.  And the writing on the wall said in three words, your kingdom
> has come to an end, your kingdom will be divided and given to your
> neighboring enemies, and then the prophet said the writing said you have
> been weighed in the balance and found wanting.  Sure enough, that night
> the king was killed.  His kingdom was separated among his neighboring
> enemies.

ROA, Vol. 5 at 3466-67.  The prosecutor then went on to say: "The Defendant weighed

his options on July 10, 2003.  Under the Court's instructions and the law given by the

Court, the Defendant should be, as it were, weighed in the balance and found wanting." *Id.* at 3467. Fields's trial counsel did not object to any of these statements.

### b) Fields's presentation of the claim to the district court

Fields first challenged the prosecutor's statements in his § 2255 motion. Fields characterized the prosecutor's statements as "relat[ing] to the jury the well-known 'writing on the wall' sermon from the Book of Daniel, in which God finds King Belshazzar wanting and condemns him to death." ROA, Vol. 9 at 143. Fields argued that "[t]he Government's invocation of biblical support for its position invited the jurors to decide the question of [his] punishment on matters other than the evidence properly presented in court, and was designed to inflame the passions of the jurors and incite feelings of vengeance." *Id.* at 144. Fields in turn argued that his "[t]rial counsel's failure to object . . . was deficient performance, and trial counsel could have had no strategic reason for their failure to do so." *Id.* at 144–45. Fields argued that he "suffered prejudice from [his] trial counsel's failure to make meritorious objections to the Government's improper closing arguments." *Id.* at 145. "As a result," he argued, "the jury was encouraged to ignore the substantial mental health evidence presented by [him], which it did in refusing to find that [he] committed the offenses under severe mental or emotional disturbance." *Id.* "[T]he jury also found," Fields argued, "that [he] committed the offenses after substantial planning and premeditation, and that [he] inflicted mental anguish upon Mrs. Chick." *Id.* Ultimately, Fields argued that "[i]f [his] trial counsel had objected . . . , there [wa]s a reasonable likelihood that the verdict would have been different." *Id.*

*c) The district court's resolution of the issue*

The district court, in addressing this issue, acknowledged that "religious arguments [are generally] condemned by both state and federal courts," but noted that "relief [wa]s not warranted unless the remarks prejudiced Fields['s] chances of receiving life without the possibility of parole instead of the death penalty." ROA, Vol. 12 at 612. The district court found that "[w]hile the analogy given by the prosecutor may have been paraphrased from the 'writing on the wall' sermon in the Book of Daniel, the argument was not delivered in biblical style." *Id.* The district court noted, in particular, that "[t]he prosecutor did not argue that God or any other religious authority justified the death penalty in this case," and instead "used a story devoid of any religious connotation . . . to emphasize [Fields] knew what could happen to him when he decided his course of action on July 10, 2003," and that "it was now up to the jury to impose the appropriate sentence based upon the court's instructions, which included a balancing (*i.e.*, weighing) of the aggravating and mitigating factors." *Id.* The district court also noted that "this was a case where the defendant pled guilty to murdering two people by randomly stalking them while wearing a ghillie suit; shooting them while hidden in the woods; and then stealing from them." *Id.* Lastly, the district court noted that "[t]he jury rendered their sentencing verdict in less than four hours." *Id.* The district court concluded that "none of the prosecutorial arguments, either individually or collectively, would have warranted reversal of the sentence on appeal." *Id.* at 48. The district court also, therefore, rejected the claim of ineffective assistance of counsel.

54

*d) Fields's arguments on appeal*

Fields argues in this appeal that "the Government violated its duty to seek justice when it concluded its closing argument in support of the death penalty with a lengthy reference to the well-known 'writing on the wall' sermon from the Book of Daniel." Aplt. Br. at 67. More specifically, Fields argues that "the prosecutor's Bible references had a substantial prejudicial effect on [his] Eighth Amendment right to a fair and reliable sentencing." *Id.* at 70. Fields also argues that his "[t]rial counsel was ineffective for failing to object to the Government's improper argument." *Id.* at 67. And, lastly, Fields argues that the district court abused its discretion by failing to conduct an evidentiary hearing on this claim of ineffective assistance of counsel.

Addressing these arguments in order, we note that Fields, in asserting the impropriety of the prosecutor's arguments, relies heavily on the Ninth Circuit's decision in *Sandoval v. Calderon*, 241 F.3d 765 (9th Cir. 2000). But the facts at issue in *Sandoval* were substantially different than those at issue in Fields's case. The California state prosecutor in *Sandoval*, "[a]t the close of the penalty phase" of the trial, "argued to the jury that the death penalty was sanctioned by God." 241 F.3d at 775. "His argument paraphrased Romans 13:1–5, a passage from the Bible's New Testament commonly understood as providing justification for the imposition of the death penalty." *Id.* "The prosecutor told the jurors that God sanctioned the death penalty for people like Sandoval who were evil and have defied the authority of the State." *Id.* at 775–76. The prosecutor "explained that by sentencing Sandoval to death, the jury would be 'doing what God

55

says.'" *Id.* at 776. "The prosecutor added that imposing the death penalty and destroying Sandoval's mortal body might be the only way to save Sandoval's eternal soul." *Id.*

The Ninth Circuit in *Sandoval* "agree[d] with Sandoval that the argument was both improper and highly prejudicial." *Id.* To begin with, the Ninth Circuit concluded that "[t]he prosecutor's argument frustrated the purpose of closing argument, which is to explain to the jury what it has to decide and what evidence is relevant to its decision." *Id.* The Ninth Circuit noted that "[a]rgument urging the jury to decide the matter based upon factors other than those it is instructed to consider is improper," and "any suggestion that the jury may base its decision on a 'higher law' than that of the court in which it sits is forbidden." *Id.* The Ninth Circuit further noted that, "[i]n a capital case," "the prosecution's invocation of higher law of extra-judicial authority violates the Eighth Amendment principle that the death penalty may be constitutionally imposed only when the jury makes findings under a sentencing scheme that carefully focuses the jury on the specific factors it is to consider in reaching a verdict." *Id.* The Ninth Circuit concluded that "[t]he Biblical concepts of vengeance invoked by the prosecution" in Sandoval's case "d[id] not recognize such a refined approach." *Id.* The Ninth Circuit also concluded that "[a]rgument involving religious authority . . . undercuts the jury's own sense of responsibility for imposing the death penalty," and that in Sandoval's case, "delegation of the ultimate responsibility for imposing a sentence to divine authority undermine[d] the jury's role in the sentencing process." *Id.* at 777.

The Ninth Circuit in turn concluded "that the prosecutor's remarks actually prejudiced Sandoval" by reducing his "chances of receiving life without possibility of

parole instead of the death penalty." Id. at 778.  In reaching this conclusion, the Ninth

Circuit noted:

> This is not a case where the evidence overwhelmingly supported the jury's verdict.  The issue was life or death and the jury was sharply divided.  After over three days of deliberations, the jury informed the trial judge that it was hopelessly deadlocked.  It was divided 6–6 on two of the counts and 7–5 on the other two.  In response to the judge's question whether the jury could possibly reach a result if it deliberated further or perhaps had portions of the transcript read back to it, each juror individually answered "no."  Upon being returned to its deliberations, the jury took only an hour and forty minutes to go from a deadlock to four unanimous verdicts.
>
> We do not know what actually happened in the jury room, but we cannot assume that the prosecutor's religious argument did not persuade at least one of the jurors to change a vote for life to death on the Marlene Wells count.  The evidence in aggravation was countered with considerable mitigating evidence.  That the jury deadlocked evenly after deliberating over three days exemplifies the difficulty of the sentencing decision.
>
> The State argues that a finding of prejudice here would be out of step with cases from our sister circuits that have considered similar prosecutorial argument to be harmless error.  There is no discord, for the cases are very record-specific.
>
> In *Bennett v. Angelone*, for example, the Fourth Circuit held that a prosecutor's religious argument was error, but that, in light of the total context of the trial, the error did not render the defendant's trial unfair.  92 F.3d at 1346.  In that case, the prosecutor told the jury that "'Thou shall [sic] not kill' is a proscription against an individual; it is not against Government.  Because Government has a duty to protect its citizens." *Id.* (sic in original).  The court found that religious arguments were improper but held that the prosecutor's comments did not deny the defendant due process because there was strong evidence of the defendan's guilt and eligibility for the death penalty. *See id.*  In that case the defendant's guilt trial lasted one day and defense counsel put on no evidence. *See id.* at 1341.  After the penalty phase, the jury took less than an hour to return a death sentence. *See id.*  Sandoval's trial was considerably longer and more complex, with the jury deliberating for over three days before reaching a verdict.

57

In *Coe v. Bell*, the Sixth Circuit held that argument that the Bible condones capital punishment was inappropriate, but that it did not in and of itself constitute reversible error. 161 F.3d at 351. The court did not explain why, but we observe that the prosecutor in that case did not argue that the Bible commanded capital punishment for the defendant. *See id.*

The First Circuit in *United States v. Giry*, held that the prosecutor's comparison of the defendant's testimony to "Peter who for the third time denied Christ" was improper, but that its prejudicial impact was significantly reduced by the trial judge's instructions and the strength of the evidence against the defendant. 818 F.2d at 132–34. *Giry* was not a capital case and defense counsel did not contemporaneously object to the prosecutor's statements. *Id.* at 122–23, 133.

The prosecutor in this case, although reminding the jury on various occasions that its duty was to determine whether the evidence in aggravation substantially outweighed the mitigating evidence and to follow the trial court's instructions, clearly intended to appeal to religious authority and did so repeatedly. The prosecutor meant this argument to have an effect on the jury. We think it did. At a minimum, we have grave doubts about the harmlessness of the error and therefore grant relief. *See Jeffries v. Wood*, 114 F.3d 1484, 1489 (9th Cir. 1997) (en banc) ("Where the record is so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of an error, the error is not harmless and relief should be granted.").

*Id.* at 779–80.

The district court in this case concluded, and we agree, that there are at least three important differences between the prosecutor's arguments in Fields's case and the prosecutor's arguments in *Sandoval*. First, the prosecutor's arguments in Fields's case, unlike the prosecutor's arguments in *Sandoval*, did not effectively "urg[e] the jury to decide the matter based upon factors other than those it [wa]s instructed to consider." Id. at 776. Rather, the prosecutor in Fields's case concluded his argument by stating: "Under the Court's instructions and the law given by the Court, [Fields] should be, as it were, weighed in the balance and found wanting." ROA, Vol. 5 at 3467. By expressly

referring to the law and instructions given by the trial court, the prosecutor seems to have been suggesting to the jury only that it should weigh the aggravating factors against the mitigating circumstances, find that the aggravating factors outweighed the mitigating circumstances, and ultimately find that Fields should be sentenced to death. Importantly, nothing about that suggestion was contrary to the trial court's instructions. Second, and relatedly, there was no reference by the prosecutor in Fields's case to any "higher law," nor any other suggestion by the prosecutor that the jury should ignore the law and instructions given to them by the trial court. Third, the arguments by the prosecutor in Fields's case did not seek to "undercut[] the jury's own sense of responsibility for imposing the death penalty." *Sandoval*, 241 F.3d at 777. More specifically, the prosecutor's arguments in Fields's case did not seek to "delegat[e] . . . the ultimate responsibility for imposing a sentence to divine authority." *Id.* Rather, the prosecutor expressly asked the jury at the conclusion of his argument to follow the trial court's instructions, conduct the required weighing of aggravating and mitigating factors, and find the death sentence to be appropriate for the two murder convictions.

Fields's case is also distinguishable from *Sandoval* in terms of prejudice. That is, even assuming that the prosecutor's arguments in Fields's case were improper, it is clear to us that, unlike the situation in *Sandoval*, they did not prejudice Fields's "chances of receiving life without possibility of parole instead of the death penalty." *Id.* at 778. Unlike the prosecutor's arguments in *Sandoval*, the prosecutor in Fields's case did not, by way of his challenged arguments, "cloak[] the State with God's authority," nor did he "invo[ke] . . . divine authority to direct [the] jury's verdict." *Id.* at 779. Further, unlike

the situation in *Sandoval*, the evidence presented at Fields's sentencing proceeding "overwhelmingly supported the jury's verdict," and the jury quickly reached a unanimous verdict. *Id.*

For these reasons, we conclude that the prosecutor's arguments, though perhaps misguided, were ultimately harmless.

That still leaves Fields's arguments that his trial counsel was ineffective for failing to object to the prosecutor's arguments, and that the district court abused its discretion by failing to conduct an evidentiary hearing on this claim of ineffective assistance.  Having concluded that the prosecutor's arguments were harmless, we likewise conclude that Fields was not prejudiced by his trial counsel's failure to object to the arguments.  And we in turn conclude that the district court did not abuse its discretion by refusing to conduct an evidentiary hearing on this claim of ineffective assistance.

*Issue Four – cumulative error*

In his fourth and final issue on appeal, Fields argues that his trial "counsel's errors had the cumulative effect of preventing the jury from hearing a powerful mitigation case while simultaneously allowing the jury to consider misleading evidence and improper argument in support of aggravation."  Aplt. Br. at 75.  "In particular," Fields argues, "absent counsel's deficient performance, the jury could have heard a mitigation case built not just on a single-episode manic flip, but also on evidence of brain damage that affected [his] executive functioning as well as a history of family problems." *Id.*  "At the same time," Fields further argues, "counsel could have greatly diminished the Government's case by challenging the testimony of its mental health expert and the evidence it

60

presented in support of aggravating circumstances, as well as by objecting to the Government's grossly improper argument to the jury." *Id.* at 75–76.

It is unnecessary, and indeed impossible, for us to resolve this cumulative error claim at this point, since we are reversing the district court's denial of Fields's claim that his trial counsel was ineffective for failing to adequately investigate and present evidence of his organic brain damage, and remanding that claim to the district court for an evidentiary hearing. If, on remand, the district court ultimately denies that claim of ineffective assistance following an evidentiary hearing, it will in turn have to reconsider Fields's claim of cumulative error. In conducting that cumulative error analysis, the district court will have to include the two ineffective assistance of counsel claims that we resolved in this appeal on the prejudice prong of the *Strickland* test (i.e., counsel's failure to present the social history evidence and counsel's failure to object to the prosecutor's allegedly improper closing argument) and the claim directly challenging the allegedly improper remark made by the prosecutor during closing argument, since we resolved that claim on the basis of harmlessness. In addition, if the district court denies the remanded ineffective assistance claim (failure to investigate and present evidence of organic brain damage) on the prejudice prong of the *Strickland* test, it will have to include that claim in its cumulative error analysis as well.

III

The judgment of the district court is AFFIRMED in part, REVERSED in part, and the case is REMANDED to the district court for further proceedings consistent with this opinion.